# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

COALITION FOR HUMANE IMMIGRANT RIGHTS,
2533 W. 3rd Street, Suite 101, Los Angeles, CA 90057;

UNDOCUBLACK NETWORK,
1032 15th Street #415, Washington, DC 20005;

CASA, INC.,
8151 15th Ave., Hyattsville, MD 20528;

                 Plaintiffs,


               *– versus –*


KRISTI NOEM, in her official capacity as Secretary of Homeland Security, 245 Murray Lane, SW, Washington, DC 20528;

TODD M. LYONS, in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement, 500 12th St., SW, Washington, DC 20538;

PETE R. FLORES, in his official capacity as Acting Commissioner of U.S. Customs and Border Enforcement, 1300 Pennsylvania Avenue, NW, Washington, DC 20229;

KIKA SCOTT, in her official capacity as the Senior Official Performing the Duties of the Director of U.S. Citizenship and Immigration Services, 5900 Capital Gateway Drive, Camp Springs, MD 20746;

DONALD J. TRUMP, in his official capacity as President of the United States, 1600 Pennsylvania Ave., NW, Washington, DC 20500;

                 Defendants.

**No: _____**

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### INTRODUCTION

1.     This lawsuit challenges the Trump administration's various agency policies expanding expedited removal to expose hundreds of thousands of people who entered the country legally through humanitarian parole processes to summary deportation.

2.     Expedited removal is an extraordinary procedure that allows removal from the United States with little to no due process. While expedited removal has historically been used only for people in the process of seeking admission at a port of entry or for people encountered in the country a short time after entry and within 100 miles of a land border who had "not been admitted or paroled into the United States," on January 21, the administration decided to expand the scope of expedited removal to include individuals throughout the United States who have been continuously present here for less than two years.

3.     On January 23, the administration issued a memorandum implementing the above expansion of expedited removal by directing agency personnel to consider using the fast-track removal authority on any noncitizen eligible for processing through expedited removal, including individuals who had previously been granted parole.

4.     Shortly thereafter, on February 18, the administration issued a directive that purports to expose individuals paroled into the country at ports of entry to the threat of expedited removal with "no time limit on the ability to process such aliens for ER [expedited removal]."

5.     The administration also issued a series of commands, both public and private, terminating various humanitarian parole programs, under which hundreds of thousands of individuals fleeing turmoil in their own countries have been lawfully allowed to enter the country for periods typically of two years to attempt to rebuild their lives. The administration additionally ended the use of CBP One, a mobile application, which allowed certain individuals outside the

country to schedule appointments to appear at certain land ports of entry to be inspected and considered for parole. Many CBP One parolees were also placed in ordinary removal proceedings. All of these paroled individuals have been able to apply for work authorization and, when eligible, for immigration benefits, such as asylum, Temporary Protected Status ("TPS"), or other forms of relief, and in some circumstances could re-apply for another period of parole.

6.    On March 21, the administration posted for public inspection a Federal Register notice that would upon publication formally terminate four such parole processes for nationals of Cuba, Haiti. Nicaragua, and Venezuela (the "CHNV" parole processes). In this notice, the administration again discusses the application of expedited removal to these parolees, but observes that expedited removal only can be used with respect to individuals who have been continuously present in the country for less than two years. The March 21 notice is inconsistent with the February 18 directive not only with respect to whether individuals like CHNV parolees may be processed for expedited removal without any time limit, but more fundamentally with respect to the legal basis for exposing them to expedited removal at all.

7.    The simultaneous expansion of expedited removal in various and inconsistent ways and the termination of humanitarian parole programs places recipients of parole at risk of being uprooted from this country and removed without basic due process rights.

8.    Without relief from this Court, individuals who have lawfully been granted parole and are living and working throughout the United States—many with families—are at constant risk of being arrested, detained, and removed from the country through a process that not only lacks basic procedural safeguards (like judicial review), but that cannot even be applied to them legally.

9.     Plaintiffs Coalition for Humane Immigrant Rights ("CHIRLA"), UndocuBlack Network ("UndocuBlack"), and CASA, Inc. ("CASA") are nonprofit, membership-based, immigrant rights organizations whose work, services, and programming are guided by their members. Each group's members include noncitizens subject to expedited removal under the policies challenged in this litigation.

10.     CHIRLA's members include newly arrived migrant families who fled persecution, torture, and the threat of death, and who sought safety in the United States using the CBP One mobile application. Although granted parole and permitted to enter the country temporarily with the opportunity of applying for various forms of protection, these members are now faced with the possibility of being sent back to the dangers they fled without notice and a full opportunity to secure relief for which they are eligible. One CHIRLA member, for example, is an Afghan man who fled under fear of execution by the Taliban and attacks by ISIS due to his ethnicity, religion, and prior activism. If he is rapidly deported to Afghanistan, he would be in immediate danger of bodily injury and death, as well as severe limits to his freedoms of religion, expression, and movement.

11.     UndocuBlack's members include Black migrants who were granted parole through the CHNV parole processes or after securing an appointment at a land port of entry through the CBP One mobile application. Since their entry into the country, these members have been targeted constantly in the United States by anti-Black, anti-Haitian violence, and are plagued by the constant fear of losing their parole and being subjected to rapid deportation back to persecution and danger in Haiti. One of these members, a Haitian man who fled political persecution in his home country, describes feeling now under the administration's expedited removal directives like he is "one second away from losing everything, including [his] life."

12.    CASA's members include both individuals who were sponsored to come to the United States through the CHNV parole processes and individuals who came through using the CBP One mobile application, and they are experiencing widespread anxiety, fear, and confusion about the administration's new policies on parole and expedited removal. One Venezuelan CASA member was granted TPS after he came to the United States on CHNV parole, but because of the administration's termination of Venezuelan TPS and expansion of expedited removal to apply to paroled individuals, he is now at risk of soon being subjected to expedited removal and separated from his young child.

13.    Plaintiffs seek a declaration that the application of expedited removal under 8 U.S.C. § 1225(b)(1)(A) to individuals like their members who have previously been granted parole at a port of entry is unlawful; an injunction prohibiting the Department of Homeland Security ("DHS") from continuing to apply its unlawful construction of the statute to expose individuals who have previously been granted parole at a port of entry to the threat of expedited removal; and vacatur of agency actions taken pursuant the agency's erroneous understanding of the law.

14.    There are other pending cases challenging (1) the expansion of expedited removal to individuals in the interior of the country who have lived here for less than two years and (2) the termination of various humanitarian parole programs. This case is largely focused on the intersection of those issues to ensure that people who were previously granted parole at a port of entry and have been living here continuously since that time are not subject to summary expulsion once they have been stripped of parole status or their period of parole has expired.

**JURISDICTION AND VENUE**

15.    This Court has subject matter jurisdiction under 8 U.S.C. § 1252(e)(3). Section 1252(e)(3) provides jurisdiction in the United States District Court for the District of Columbia for

an action challenging as unlawful "a written policy directive, written policy guidance, or written procedure" implementing the expedited removal statute. This Court additionally has jurisdiction under 28 U.S.C. § 1331.

16.    Venue is proper in this District because 8 U.S.C. § 1252(e)(3)(A) requires that all Section 1252(e)(3) actions be brought in the United States District Court for the District of Columbia. In addition, venue is proper under 28 U.S.C. § 1391(e)(1) because a substantial part of the events or omissions giving rise to this action occurred in this District and Defendants are officers of the United States being sued in their official capacity and reside in the District.

## PARTIES

17.    Plaintiff **Coalition for Humane Immigrant Rights ("CHIRLA")** is a nonprofit membership organization headquartered in Los Angeles, California, with eight offices throughout California and a national policy office in Washington, D.C. CHIRLA was founded in 1986, and it is the largest statewide immigrant rights organization in California, with approximately 50,597 active members. CHIRLA's members include noncitizens who entered the United States on some form of humanitarian parole and are subject to Defendants' application of expedited removal to parolees.

18.    Plaintiff **UndocuBlack Network ("UndocuBlack")** is a nonprofit membership organization incorporated in the District of Columbia. Created in 2016, UndocuBlack is a multigenerational network of Black immigrants that advocates for and supports Black immigrants through facilitating access to resources, storytelling, organizing, and community wellness. Since its inception, UndocuBlack has provided direct services and support to Haitian migrants who have sought protection in the United States as conditions in their home country have deteriorated.

UndocuBlack has numerous members who are CHNV and CBP One parole beneficiaries from Haiti and are subject to Defendants' application of expedited removal to parolees.

19.     Plaintiff **CASA, Inc. ("CASA")** is a national nonprofit membership organization headquartered in Langley Park, Maryland, with offices in Maryland, Virginia, Pennsylvania, and Georgia. Founded in 1985, CASA has more than 173,000 lifetime members from across the United States. CASA's members are predominantly noncitizens in a variety of immigration statuses, including members who entered the United States on some form of humanitarian parole and are subject to Defendants' application of expedited removal to parolees.

20.     Defendant Kristi Noem is sued in her official capacity as the Secretary of the U.S. Department of Homeland Security ("DHS"), a position to which she was confirmed by the Senate on January 25, 2025.

21.     Defendant Todd M. Lyons is sued in his official capacity as the Acting Director of Immigration and Customs Enforcement ("ICE"), a component agency of DHS.

22.     Defendant Pete R. Flores is sued in his official capacity as the Acting Commissioner of Customs and Border Protection ("CBP"), a component agency of DHS.

23.     Defendant Kika Scott is sued in her official capacity as the Senior Official Performing the Duties of the Director of U.S. Citizenship and Immigration Services ("USCIS"), a component agency of DHS.

24.     Defendant Donald J. Trump is sued in his official capacity as the President of the United States. He was inaugurated on January 20, 2025.

## BACKGROUND

### The Statutory Parole Authority

25.     For more than 70 years, the Nation's immigration laws have granted the Executive the authority to temporarily parole certain noncitizens into the country. Such grants of parole do not constitute an admission into the country, but for the duration of their parole status noncitizens may apply for employment authorization and, in some cases, request that their period of parole be extended. Like other noncitizens, parolees can also apply for other forms of immigration relief. Certain noncitizens who were inspected and paroled into the country also may apply to adjust their status to lawful permanent residence.

26.     From 1952 until 1996, the Attorney General was authorized by statute to grant parole "for emergent reasons" or "for reasons deemed strictly in the national interest." Neither phrase was defined by Congress.

27.     Since 1996, the Attorney General (now the Secretary of Homeland Security) has been authorized by statute to grant parole for "urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A). Again, neither phrase has ever been defined by Congress.

28.     Humanitarian parole has been a key component of immigration policy since the Eisenhower administration used it to allow 30,000 Hungarians fleeing Soviet invasion to come to the United States. Parole has been used over 125 times by administrations of both parties—including the first Trump administration—to promote the national interest by advancing various humanitarian, foreign policy, regional security, and migration management objectives.

### Exercises of the Statutory Parole Authority

29.     In the past two decades alone, various challenges associated with managing migration throughout the Western Hemisphere and at the U.S.-Mexico border, as well as fallout

and displacement resulting from armed conflicts elsewhere in the world, informed decisions by DHS to create a variety of processes to facilitate the consideration of individuals for entry into the United States for a temporary period of time through the statutory parole authority.

30.     **Operation Allies Welcome.** When Afghanistan's military and government quickly fell to the Taliban upon the withdrawal of the U.S. military in August 2021, the U.S. government evacuated approximately 124,000 people from the country through Operation Allies Welcome. After evacuees went through medical, security, and other screenings in third countries, approximately 75,000 were authorized to travel to the United States and were inspected and paroled into the country. Fewer than 50,000 Afghans remain in the United States on current grants of parole by virtue of OAW.

31.     **Uniting for Ukraine.** In the weeks following Russia's invasion of Ukraine in February 2022, which marked the start of a war that continues to this day, significant numbers of Ukrainian nationals began presenting at U.S. ports of entry at the U.S.-Mexico border to request humanitarian protection. Initially, CBP generally paroled these individuals into the country, but in the interest of creating a safe, orderly, and humane pathway for displaced Ukrainian nationals and their immediate family members in Europe to request entry to the United States, DHS established the Uniting for Ukraine ("U4U") Parole Process. *See* Implementation of the Uniting for Ukraine Parole Process, 87 Fed. Reg. 25040 (Apr. 17, 2022).

32.     Under U4U, qualifying individuals who passed background and security checks and had a financial supporter in the United States would be granted travel authorization to fly to the United States at no expense to the government and present themselves at an interior port of entry to be inspected and considered for parole. Approximately 200,000 Ukrainians are in the

United States today by way of parole. Most had preexisting ties to the United States, which is why they came here for refuge when they fled their home country.

33.     **Cuban, Haitian, Nicaraguan, and Venezuelan Parole Processes:** Faced with a marked increase in the number of Cuban, Haitian, Nicaraguan, and Venezuelan nationals arriving at the U.S.-Mexico border in fiscal year 2022—and given the difficulties of repatriating CHNV nationals to their home countries for a variety of humanitarian and diplomatic reasons—the Biden Administration created for each country a parole process modelled on U4U.

34.     In October 2022, DHS established a parole process for certain Venezuelans. *See* Implementation of a Parole Process for Venezuelans, 87 Fed. Reg. 63507 (Oct. 19, 2022). Approximately two months later, and in light of the effectiveness of the Venezuelan parole process in reducing encounters of Venezuelan nationals between the ports of entry, DHS expanded the Venezuelan parole process, *see* Implementation of Changes to the Parole Process for Venezuelans, 88 Fed. Reg. 1279 (Jan. 9, 2023), and established similar parole processes for certain Cubans, Haitians, and Nicaraguans. *See* Implementation of a Parole Process for Cubans, 88 Fed. Reg. 1266 (Jan. 9, 2023); Implementation of a Parole Process for Haitians, 88 Fed. Reg. 1243 (Jan. 9, 2023); Implementation of a Parole Process for Nicaraguans, 88 Fed. Reg. 1255 (Jan. 9, 2023). The Federal Register Notices announcing the CHNV parole processes identified a series of significant public benefits and urgent humanitarian reasons that would be advanced through the use of parole for individuals availing themselves of the processes and additionally connected the implementation of the processes to ongoing foreign relations initiatives aimed at increasing regional cooperation in and capacity to effectively and responsibly manage migration throughout the Western Hemisphere.

35.     Over a half million Cubans, Haitians, Nicaraguans, and Venezuelans received parole through CHNV.

36.    **CBP One:** Around the same time that the administration created the CHNV parole processes, it also made available to migrants in Central and Northern Mexico a mobile application called CBP One, which could be used to schedule an in-person appointment at one of several land ports of entry along the U.S.-Mexico border. Upon receiving an appointment, migrants could present themselves at the port of entry for inspection and be considered for parole into the country. Typically, paroled individuals would also be issued a Notice to Appear in immigration court where they would be able to pursue any form of immigration relief for which they might be eligible. Together with the new CHNV parole processes, the CBP One appointment process was designed to facilitate safe and orderly processing of migrants at certain land ports of entry to reduce the incidence of migrants entering the country without inspection between ports of entry.

37.    **Central American Minors Parole:** Central American Minors (CAM) parole was created in 2014 as part of a broader initiative that also involved the consideration of certain Central American minors and qualifying family members for refugee status and potential resettlement in the United States; individuals determined not to be eligible for refugee status were considered, on a case-by-case basis, for parole into the United States. The CAM Refugee and Parole Program was largely prompted by the significant number of unaccompanied children from the Northern Triangle countries of El Salvador, Guatemala, and Honduras coming to the U.S.-Mexico border. Under the program, certain nationals of those countries who are lawfully present in the United States may request that their children still in their home countries be considered for refugee status and, in the alternative, humanitarian parole, so that their families could be safely reunited. In addition to family reunification, the CAM program was intended to create a lawful and orderly pathway to disincentivize children from making the overland journey to the U.S.-Mexico border. In addition to being dangerous and potentially enriching smugglers, unaccompanied children presenting at the

border create unique operational challenges for DHS. CAM parolees in the United States have been able to apply for and receive re-parole when their initial grants of parole expired.

38.    **Family Reunification Parole Programs:** In 2007, DHS created the Cuban Family Reunification Parole Program to allow certain approved beneficiaries of immigrant visa petitions, upon invitation by the federal government, to apply to be considered for parole into the United States so that they would not have to wait abroad—sometimes for years—for a visa number to become available. *See* Cuban Family Reunification Parole Program, 72 Fed. Reg. 65588 (Nov. 21, 2007). Similar programs were created for Haitian family members in 2014, family members of Filipino World War II veterans and their spouses in 2016, and family members from additional countries in Central and South America in 2023. *See, e.g.* Implementation of Haitian Family Reunification Parole Program, 79 Fed. Reg. 75581 (Dec. 18, 2014); Filipino World War II Veterans Parole Policy, 81 Fed. Reg. 28097 (May 9, 2016); Implementation of a Family Reunification Parole Process for Guatemalans, 88 Fed. Reg. 43581 (July 10, 2023).

## Summary Termination of Parole Processes

39.    On January 20, 2025, President Donald Trump issued Executive Order 14165, "Securing Our Borders," that, among other things, directed the Secretary of Homeland Security (the "Secretary") to terminate all so-called "categorical parole program . . . including the program known as the 'Processes for Cubans, Haitians, Nicaraguans, and Venezuelans.'"

40.    That same day, Acting Secretary Benjamine C. Huffman issued a memorandum entitled, "Exercising Appropriate Discretion Under Parole Authority," to the heads of ICE, CBP, and USCIS. In that memorandum, Acting Secretary Huffman set out a narrow and legally incorrect interpretation of the parole statute, directed that every action regarding parole henceforth use this interpretation, and authorized pausing and terminating parole programs.

41.    Also on January 20, Acting Commissioner of CBP Pete Flores issued a memorandum restricting the CBP personnel authorized to grant parole and requiring that each parole granted by any CBP official be reported to him and the Chief of Staff, along with a justification for the grant. Acting Commissioner Flores' memorandum expressly supersedes any prior conflicting guidance.

42.    Further on that day, CBP terminated the ability of noncitizens to use the CBP One mobile application to schedule appointments to appear at select land ports of entry for inspection and consideration for parole and cancelled existing appointments.

43.    Later that same week, Acting Director of USCIS Jennifer Higgins issued a directive prohibiting USCIS staff from making any further decisions on any request for, among other things, parole or re-parole made through the OAW, U4U, CHNV, or other named parole processes.

44.    On March 21, DHS posted for public inspection a Federal Register Notice that purports to formally terminate the CHNV parole processes and to terminate *en masse* at the end of a 30-day period all grants of parole issued to individuals pursuant to the CHNV parole processes. *See* Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans, Mar. 21, 2025, https://public-inspection.federalregister.gov/2025-05128.pdf ("CHNV Termination Notice"). The termination of parole will have the effect of immediately rendering void employment authorization documents issued to individuals on the basis of the grant of parole and will result in the accrual of unlawful presence for individuals who are not shielded from accruing unlawful presence through some other means (e.g., if they have a pending application for asylum, and/or have been granted Temporary Protected Status). The Notice asserts that the federal government has a "strong interest in promptly removing parolees when the basis for the underlying program no longer exists," but notes that "[e]xpedited removal is available only when an alien has not been

continuously present in the United States for at least the two years preceding the date of the inadmissibility determination." *Id*. at 27 (citing 8 U.S.C. § 1225(b)(1)(iii)(II); 8 C.F.R. § 235.5)." The Notice further observes that "[i]f DHS were to allow the CHNV parolee population to remain for the full duration of their two-year parole, DHS would be compelled to place a greater proportion of this population in section 240 removal proceedings to effectuate their removal." *Id*. The Notice is scheduled to be published in the Federal Register on March 25.

45.     The termination of various humanitarian parole processes is being challenged in separate litigation. *See*, *e.g.*, *Svitlana Doe v. Trump*, No. 1:25cv10495 (D. Mass. filed Feb. 28, 2025) (challenging, among other things, the termination of OAW, U4U, CHNV, and certain other parole processes).

### The Statutory Expedited Removal Authority

46.     Under our immigration laws and unless otherwise specified, removal proceedings conducted in immigration court—with the right to appellate review before the Board of Immigration Appeals and federal court review—are the "sole and exclusive procedure" for determining whether a person should be admitted to or removed from the country. 8 U.S.C. § 1229a(a)(3).

47.     One specified exception to full removal proceedings is the expedited removal process created by Congress in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996. Under expedited removal, certain noncitizens determined by an immigration officer to be "inadmissible" because they engaged in fraud or misrepresentation to procure admission or other immigration benefits, 8 U.S.C. § 1182(a)(6)(C), or because they lack the requisite documents for entry, Section 1187(a)(7), may be ordered removed by that officer "without further hearing or review." 8 U.S.C. § 1225(b)(1)(A)(i).

48.    Individuals processed through expedited removal who express a fear of persecution or an intent to apply for asylum are entitled to a credible fear screening interview, *see* 8 U.S.C. § 1225(b)(1), and are entitled to "further consideration of the application for asylum," typically through placement in full removal proceedings, only if they are found to possess the requisite credible fear. *See* 8 U.S.C. § 1225(b)(1)(B).

49.    By statute, the use of expedited removal is authorized for only two categories of noncitizens. First, a noncitizen who "is arriving in the United States" may be processed for expedited removal if they are found to be inadmissible on the grounds described above. *See* 8 U.S.C. § 1225(b)(1)(A)(i).

50.    Second, the statute permits the Attorney General (now the Secretary of Homeland Security) to apply expedited removal to certain other noncitizens found inadmissible on the above grounds who have entered and remain in the United States but who "ha[ve] not been admitted or paroled into the United States." *See* U.S.C. § 1225(b)(1)(A)(iii). For expedited removal to be used in this way, the Secretary must designate certain noncitizens in the country to whom this so-called "expanded expedited removal" may be applied. Expanded expedited removal may not be applied to any noncitizen who can prove to the "satisfaction of an immigration officer" that they have been continuously physically present in the country for two years. *See* 8 U.S.C. § 1225(b)(1)(A)(iii)(II); 8 C.F.R. §§ 235.3(b)(1)(ii), (b)(6).

51.    On January 21, 2025, Acting Secretary Huffman issued for public inspection and effective immediately a designation expanding the scope of expedited removal to apply nationwide and to certain noncitizens who are unable to prove they have been in the country continuously for two years. The designation was published in the Federal Register three days later on January 24,

2025. *See* U.S. Dep't of Homeland Sec., *Designating Aliens for Expedited Removal*, 90 Fed. Reg. 8139 (Jan. 24, 2025).

52.     This expansion of expedited removal is being challenged in separate litigation. *See Make the Road New York v. Huffman*, 25-cv-00190 (D.D.C. filed Jan. 22, 2025).

### **Application of Expedited Removal to Noncitizens Who Have Been Paroled**

53.     On January 23, 2025, Acting Secretary Huffman issued a memorandum entitled, "Guidance Regarding How to Exercise Enforcement Discretion," to the leadership of ICE, CBP, and USCIS. The memorandum describes the Acting Secretary's January 20 memorandum authorizing the pausing or termination of various parole programs and the January 21 designation expanding the scope of expedited removal—both of which are described above—and "provides guidance regarding how to exercise enforcement discretion in implementing these policies."

54.     Specifically, the January 23 Huffman memorandum explains that "[t]o effectively implement these two new policies," agency personnel are directed to consider applying expedited removal to "any alien DHS is aware of who is amenable to expedited removal but to whom expedited removal has not been applied." The memorandum notes that this may include taking steps to terminate ongoing removal proceedings in immigration courts and/or "active parole status."

55.     For individuals DHS is aware of who do not meet the conditions above but have "been granted parole under a policy that may be paused, modified, or terminated immediately under the January 20 memorandum," the January 23 Huffman memorandum directs that they be considered for placement in removal proceedings and that the continued appropriateness of their parole be reviewed.

56.    On or about February 18, 2025, a directive was sent by ICE leadership to all Enforcement and Removal Operations personnel directing such officers to consider for expedited removal "paroled arriving aliens" who have not applied affirmatively for asylum with USCIS. The directive claims that "[t]here is no time limit on the ability to process such aliens for [expedited removal]," thereby exposing individuals paroled into the United States after inspection at a port of entry to the *indefinite* threat of this fast-track removal process. Although this directive has not been officially released, a copy of the directive was published by Reuters in connection with its reporting on the impact of the directive. *See* Ted Hesson and Kristina Cooke, "Trump weighs revoking legal status of Ukrainians as US steps up deportations," Reuters, Mar. 6, 2025, https://www.reuters.com/world/us/trump-plans-revoke-legal-status-ukrainians-who-fled-us-sources-say-2025-03-06/.

57.    The February 18 directive further states that the issuance to the individual of an expedited removal charging document has the effect of terminating that individual's active parole status.

58.    On March 21, DHS posted for inspection the CHNV Termination Notice, which discusses in multiple places when and under what authority the agency intends to process CHNV parolees for expedited removal. The notice states that "[e]xpedited removal is available only when an alien has not been continuously present in the United States for at least the two years preceding the date of the inadmissibility determination." CHNV Termination Notice at 27.   Because "thousands of CHNV parolees . . . will become ineligible for expedited removal upon the natural termination of their two-year parole," *id.* at 29 n.77, and to "initiate expedited removal proceedings to the maximum extent possible for the appropriate CHNV population," *id.* at 29, the Department decided to terminate grants of parole early rather than allowing individuals the benefit of the two-

year period they have been granted and made terminations effective 30 days after the publication date rather than at some later date.

**Harm to Plaintiff Organizations and Their Members**

59.    Plaintiffs are nonprofit membership-based organizations whose members include individuals who have been paroled into the United States through some of the humanitarian parole processes relevant to this case. Defendants' directives to apply expedited removal to parolees cause Plaintiffs' members substantial injury.

60.    Plaintiff **CHIRLA**'s mission is to advance the human and civil rights of immigrants and refugees and ensure immigrant communities are fully integrated into society with full rights and access to resources.

61.    In furtherance of this mission, CHIRLA provides a range of services that reach tens of thousands of Californians each year. These services include education programs, legal services programs, and an assistance hotline that fields on average 15,000 calls a year. CHIRLA educates its membership as well as the broader community through know-your-rights trainings, workshops, and social media and educational literature about a variety of social services and benefits, including immigration law, financial literacy, workers' rights, and civic engagement.

62.    CHIRLA serves individuals who were paroled into the country under humanitarian parole processes through all of its different programs. In particular, CHIRLA provides trauma-informed wrap-around case management services to newly arrived migrant families who were paroled through CBP One and Afghan nationals who arrived through Operation Allies Welcome. These include benefits navigation, employment services, housing search, cultural orientation, pro se legal services, and other services needed for newcomers to successfully integrate into their new communities.

63.    CHIRLA members play an important role in deciding what CHIRLA's priorities are and how CHIRLA serves the community. CHIRLA receives feedback from its members during an annual member meeting and other member convenings where CHIRLA staff meet with members to discuss priorities for CHIRLA's work.

64.    CHIRLA membership is voluntary, and it is open to anyone who believes in the importance of social justice and supports an immigrant community, and who embodies diversity, equality and inclusion. By becoming a CHIRLA member, an individual agrees to take a stand for immigrant rights.

65.    To become a CHIRLA member, an individual must submit an online application for membership, make an annual dues payment, and agree to the values and mission of CHIRLA. The current membership fee for individuals is $25, which can be paid manually every year or by setting up an annual recurring payment. There is also a family membership option, which is $60, and an enhanced individual membership (called a "community membership") option, which is $100 and provides select additional benefits. The fee can be (and occasionally has been) waived for individuals who experience financial hardship or are otherwise unable to pay. Once an individual becomes a CHIRLA member, they will receive a membership card and access to CHIRLA legal services and educational resources, year-round events and membership calls, and other benefits.

66.    CHIRLA's membership is diverse and includes U.S. citizens, non-U.S. citizens with lawful status, and non-U.S. citizens without lawful status. Members include individuals who were paroled into the country through the CBP One application and through the Operation Allies Welcome parole process. CHIRLA has serviced hundreds of CBP One parolees, at least a dozen of whom have already become CHIRLA members.

67.    Members include both noncitizens who have been granted parole and have been continuously present in the United States for less than two years, as well as those who have been here for two years or more. Some of these parolee members are in active removal proceedings already, and some are not.

68.    These parolee members of CHIRLA include many who would be deeply and severely harmed if they were subject to expedited removal. For example, CHIRLA John Doe 1 is an Ecuadorian man who was paroled into the United States through CBP One during the latter half of 2024 after he fled Ecuador out of fear for his life. After a cartel began extorting him for money, threatening to kill him if he didn't make regular payments and if he tried to leave town, he felt he had no other option but to flee the country. The cartel told him that if they heard that he was trying to sell his possessions and leave town, they would find him and kill him on the spot. CHIRLA John Doe 1 was aware of this happening to other people, as extortion was common in the area where he lived. Additionally, if he got further involved in the extortion scheme, it was equivalent to joining the cartel. Unable to make payments, and unwilling to resort to a life of crime, CHIRLA Doe 1 left his home, fearing for his life. Expedited removal back to Ecuador would put CHIRLA John Doe 1 back at risk of being murdered by the cartel.

69.    Another CHIRLA member is a Guatemalan woman whose husband was the target of death threats back in Guatemala. A man who was the head of a local criminal network and was rumored to have murdered at least one other person in the community made verbal threats to their family, including to their son, and stalked them, hanging around their house at all hours. Before the death threats and stalking, he and members of his network had also harassed the CHIRLA member and her family when they went outside, impeding their ability to move freely. The CHIRLA member and her family tried to file reports with the police to obtain help but, as the man

was a former police officer, the police did not get involved. For their safety, she and her family left their home for the United States and were paroled into the country through CBP One during the summer of 2023. If they were subject to expedited removal, they would be rapidly sent back to the same severe risk of harm, including of death, from which they fled.

70.    Another CHIRLA member is an Afghan man who was paroled into the United States through CBP One during the summer of 2024. He fled Afghanistan because he is a member of a minority community that the Taliban and ISIS systematically target for violence, killings, and bombings. He has survived attacks in the past, but the fall of Kabul in August 2021 escalated the threats against him and his community. He is also an activist, so he faces an even higher risk of persecution, torture, and even execution in Afghanistan. If he is put into expedited removal proceedings and deported to Afghanistan, he would be in immediate danger of kidnapping, torture, and death at the hands of the Taliban. He would face severe restrictions on his freedom to exercise his religion, freedom of expression, and freedom of movement.

71.    CHIRLA members live in areas where encounters with ICE officers and detention by ICE are common. ICE actively detains noncitizens all over California, including in and near Los Angeles.

72.    Because of the services that CHIRLA provides to its members, CHIRLA is acutely aware of the harms that Defendants' application of expedited removal to parolees will cause to its members.

73.    Parolee clients and members have expressed fears to CHIRLA around their parole status being revoked and then being subject to expedited removal. Beyond being fearful, CBP One parolees also express a sense of betrayal as they followed an established process laid out by the U.S. government, with many of them waiting months and in some cases over a year in Mexico—

often in dangerous and difficult settings—for their appointments to appear at a land port of entry for inspection and consideration for parole. OAW Afghan parolees have expressed an even more heightened sense of disappointment as many of them risked their lives to support the U.S. military, and the government is now turning its back on them.

74.    Expedited removal of parolees like CHIRLA's members would be particularly harmful because of the rapid, summary nature of the process. It makes it more difficult for members and their families to have a plan in place; it causes more devastating, sudden family separation, which has a severe impact on any children involved; and the community around the members suffer as well. Additionally, the rapid deportation process would deprive some CHIRLA members of the opportunity to submit applications for immigration protections that they are entitled to. For those who may be eligible for asylum or Convention Against Torture protections in the United States, the credible fear screenings that exists in the expedited removal process— which depend upon case referrals by enforcement personnel to asylum officers and typically involve little to no access to counsel—is often badly flawed and result in the removal of people to horrible circumstances abroad.

75.    In its educational materials and know-your-rights trainings, CHIRLA has been teaching members about the risk of detention and deportation, including through expedited removal, and what they can do to prepare themselves and their families for the possibility.

76.    Plaintiff **UndocuBlack's** mission is to foster community, facilitate access to resources, and contribute to transforming the realities of its members – who are Black immigrants – so they can thrive and live their fullest lives.

77.    UndocuBlack's community-centered approach aspires to empower members to identify their needs and help shape the trajectory of UndocuBlack's work. UndocuBlack engages

and supports their members and advocates for policies that protect members and Black immigrants at large through different areas of work including community engagement and organizing, community wellness, narrative and storytelling, and policy and advocacy.

78.     UndocuBlack serves thousands of immigrants around the country, including in New York, Florida, California, and the greater D.C./Maryland/Virginia area. The largest concentration of UndocuBlack's membership is in New York, where there is an active local chapter.

79.     UndocuBlack's membership is approximately 700 members. To become an UndocuBlack member, an individual need only (1) identify as Black, (2) be an immigrant, and (3) submit a form to indicate their interest in joining the membership. There are no membership dues required.

80.     UndocuBlack has long served and supported the Haitian community in particular. Prior to the Trump administration's termination of humanitarian parole programs, UndocuBlack helped many Haitian members in the United States determine if they were eligible to sponsor family members for CHNV parole based on their income. UndocuBlack also assisted Haitian members and their families with school enrollment, getting connected to English Language Learner programs, applying for work authorizations, and completing applications for other immigration benefits like TPS.

81.     UndocuBlack has numerous members who are Haitian CHNV and CBP One parole beneficiaries. The Trump administration's application of expedited removal to parolees directly harms these members.

82.     Since the administration's expansion of expedited removal to apply nationwide and to certain noncitizens who cannot prove they have been here for two years and the various directives that expose parolees to expedited removal, UndocuBlack has received countless

inquiries from its members and the UndocuBlack community at large, including from those with parole, regarding what these policies mean and how they will be used to arrest, detain, and expeditiously remove parolees. In response to members' questions and requests for additional information, UndocuBlack created a Frequently Asked Questions (FAQ) resource to share with members and the broader community. UndocuBlack has also conducted member calls that have included Know Your Rights (KYR) trainings; such trainings have covered the impact that the expansion of expedited removal will have on parolees and safeguards that parolees should take to protect themselves and their families.

83.    Expedited removal of Haitian CHNV and CBP One beneficiaries will severely harm UndocuBlack members in many ways. Some UndocuBlack members who are Haitian CHNV parolees did not come in time to apply for TPS and even those who now have TPS recognize that the Trump administration is working to terminate those protections early (i.e., by August 3, 2025). UndocuBlack's Haitian CHNV parolees also have family members with different immigration statuses. UndocuBlack expects that many affected members will experience abrupt family separation, will lose one or more household incomes, fear sending their children to school, and may be deported to Haiti where they don't have family or resources, and where they may be at risk of violence.

84.    UndocuBlack members who may be eligible for asylum or Convention Against Torture protections in the United States still fear that they could be deported through expedited removal, given the flaws in the credible fear screening process. The screenings depend on case referrals by enforcement personnel to asylum officers, and noncitizens are given little opportunity to gather relevant documents, present evidence, or consult counsel. Due to these and other

inadequacies, the screenings can result in, and have resulted in, the removal of people to dangerous circumstances abroad.

85.    One UndocuBlack member, UBN Jane Doe 1, is a Haitian woman who was sponsored to come to the United States through the Haitian CHNV parole process. She applied for and was granted TPS, but now, due to the administration's efforts to terminate Haitian TPS prematurely, that status will likely expire in August, and she could be subject to expedited removal. UBN Jane Doe 1's son, who is back in Haiti, is ill, and being able to work in the U.S. through CHNV has been the only way UBN Jane Doe 1 has been able to provide for him. The anticipated early terminations of both TPS and parole, together with the possibility of being removed expeditiously without a meaningful opportunity to request any possible form of relief, have caused significant harm to UBN Jane Doe 1, who has relied upon CHNV parole to provide for herself and her ailing child. Moreover, the government's betrayal and stripping of time that was given to her—which would be exacerbated by efforts to quickly remove her without process—will cause deep financial and psychological harm to her.

86.    Another UndocuBlack member, UBN Jane Doe 2, is a 45-year-old mother who fled Haiti and was paroled into the U.S. with her young son through CBP One in March 2024. As she struggles to navigate the complex asylum process without legal representation, she lives in constant fear for both her life and her child's. Her greatest terror is that stepping outside for any reason could mean never returning to her son. Through free legal resources, she has learned that she must always be prepared to show documentation of at least two years of presence in the U.S. But the harsh reality is that she simply does not have that. The weight of this requirement, coupled with the uncertainty of her status, leaves her paralyzed with fear—afraid to attend her own hearings, afraid to send her son to school, and even afraid to stay in her own home. Any knock at

the door or passing shadow, even from the mail carrier, fills her with terror. She lives in a constant state of anxiety, fearing that at any minute, she will be processed for expedited removal, forced to try and quickly defend her asylum claim alone and without the opportunity to see a judge, without the ability to pay for an attorney, and while battling language barriers.

87.    UndocuBlack members live in areas where encounters with ICE officers and detention by ICE are common. ICE actively detains noncitizens all over New York, where the largest concentration of UndocuBlack members reside.

88.    UndocuBlack and its members see the expedited removal policies at issue in this case as another anti-Black, anti-Haitian attack in a long line of such discrimination and violence by the Trump administration.

89.    As an organization with some undocumented members who are also Black, UndocuBlack's members will be disproportionately affected by the Trump administration's expedited removal expansion. Due to intersectional bias around race and criminality, Black people in the United States experience a higher rate of interaction with law enforcement than people of other races. This racial bias and profiling coupled with a person's immigration status and possible language barrier will mean that Haitian parolees will be some of the most adversely affected by this expansion.

90.    Plaintiff **CASA**'s mission is to create a more just society by building power and improving the quality of life in working-class Black, Latino/a/e, Afro-descendent, Indigenous, and immigrant communities. From its beginnings in a church basement, CASA has envisioned a future with diverse and thriving communities living free from discrimination and fear, working together with mutual respect to achieve human rights for all.

91.     In furtherance of this mission, CASA offers a wide variety of social, health, job training, employment, and legal services to immigrant communities, with a particular focus in Maryland, Washington, D.C., Virginia, Pennsylvania, and Georgia. CASA also offers a more limited suite of services remotely to members across the United States. Those individuals who do not live in an area with a local CASA organizing committee are offered the opportunity to join a national organizing committee, whose members are entitled to vote on CASA's organizational priorities and are integrated into its member-led system of internal democratic governance. CASA also conducts campaigns to inform members of immigrant communities of their rights and assists individuals in applying for a variety of government benefits. In addition, CASA provides its members with free remote legal assistance, including free legal consultations and referrals on immigration issues. Capacity permitting, CASA provides legal representation to members in removal defense cases and on affirmative immigration applications to USCIS.

92.     A CASA member is a person who shares CASA's values, envisions a future where we can achieve full human rights for all, and is convinced that, when united and organized, we can create a more just society by building power in our working-class and immigrant communities. CASA members play an important role in deciding what campaigns CASA works on and how CASA serves the community.

93.     CASA membership is voluntary. To become a member, an individual must apply, pay dues, and subscribe to the principles of CASA. CASA members also must self-identify as members of an immigrant or working-class community. Currently, the annual fee for CASA membership is $35. Alternatively, individuals may pay a recurring membership fee of $5 per month. The membership fee can be waived when appropriate. Members are also offered the opportunity, for an additional $5, to obtain a CASA ID. This is a physical, picture identification

card that contains basic information about the member. For many of CASA's immigrant members, this card may be the only type of picture identification they have, other than documents from their home country. In certain jurisdictions, CASA IDs are recognized for the purposes of engaging with certain government agencies, including the police.

94.    CASA has members who have been paroled into the United States, including members who have received parole after presenting at a land port of entry with a CBP One appointment and through the CHNV parole processes.

95.    CASA John Doe 1, for example, is a CASA member originally from Venezuela who now resides in Maryland. His sister, who has TPS, sponsored him to come to the United States on the Venezuelan CHNV parole program in May 2023. After arriving, CASA John Doe 1 applied for and was granted TPS as well, but with the administration's early termination of Venezuelan TPS, that status is set to expire in April. CASA John Doe 1 works in construction and lives with his wife and 9-year-old daughter, who depend on him for financial support. He fears returning to Venezuela, because he was targeted by the government there. If he were subjected to expedited removal, he would be separated from his family, which would be especially harmful for his young daughter. He is also the sole breadwinner for his family, and they would struggle to support themselves without him. CASA John Doe 1 has worked hard to build a life in the United States, to establish a safe place for himself and his family to thrive. He is active in his community and regularly attends church. He is proud to pay his taxes and abide by the law in this country.

96.    CASA Jane Doe 1 is a CASA member originally from Honduras who currently resides in Maryland. A single mother, she and her three children – ages 18, 13, and 6 – entered the United States on humanitarian parole after attending a CBP One appointment at the southern border in July 2024. CASA Jane Doe 1's youngest two children are in school in the U.S., which is

an opportunity they did not have while living in Honduras, and she works at a fruit factory, helping to pack fruit for distribution, to ensure that her family have their daily necessities. CASA Jane Doe 1 fears being deported to Honduras, because she faced domestic violence by her ex-partner there, including death threats against her and the children. She is very afraid of being separated from her children, because they could not support themselves without her. She has a pending asylum claim that she would not be able to pursue from Honduras as well. Rapid deportation would deprive her of the opportunity to find safety in the U.S. for herself and her children.

97.    CASA John Doe 2 and CASA Jane Doe 2 are a married couple originally from Venezuela who currently live in Maryland. They, along with their four children – ages 16, 13, 8, and 5 – were granted humanitarian parole through CBP One in July 2024. CASA John Doe 2 works as a DoorDash driver to support their family, and CASA Jane Doe 2 devotes her time to taking care of their children. Their 8-year-old son suffers from a disability called psychomotor delay that slows his learning process. He still requires diapers, has difficulty walking, and cannot write. He requires constant support. While he does attend school, CASA Jane Doe 2 often has to go to the school to help the teachers with his care. CASA John Doe 2 was a politically active small business owner back in Venezuela, and he was targeted and attacked by the government for supporting its opposition. If he and CASA Jane Doe 2 were subject to rapid, expedited deportation back to Venezuela, they fear their family's safety would be at risk, and they would not be able to pursue their pending asylum claims.

98.    CASA is acutely aware of the harms that Defendants' application of expedited removal to parolees will cause. CASA has heard from its members that there is widespread confusion and fear from the administration's decisions to end parole processes and expand expedited removal. There has also been a chilling effect among members, with members unsure

about whether it is safe to share their information with government agencies, including by applying for further immigration benefits for which they qualify. Given all of the recent policy reversals, they have significant and legitimate fear that their information will now be weaponized against them.

99.     CASA members who may be eligible for asylum or Convention Against Torture protections in the United States still fear that they could be deported through expedited removal, given the ever-shifting nature of policy changes within this administration. They do not know if they will be able to have their case properly heard by an immigration judge, or if anyone will care about their legitimate fear of return.

100.     In response, CASA has devoted significant resources to deportation defense and preparing its membership for potential immigration enforcement actions, including developing new Know Your Rights resources and devoting additional resources to immigration counseling and rapid response to immigration enforcement. Stripping legal protections from hundreds of thousands of people, and subjecting them to rapid deportation via expedited removal, has a deep negative impact on CASA's membership.

101.     All of the foregoing allegations are incorporated into each of the following claims for relief as set forth therein.

## FIRST CLAIM FOR RELIEF

### (Violation of the Immigration and Nationality Act, 8 U.S.C. § 1225(b)(1)(A); Administrative Procedure Act, 5 U.S.C. § 706(2); 8 U.S.C. § 1252(e)(3))

102.     An immigration officer may process a noncitizen for expedited removal upon determining that such noncitizen "is arriving in the United States or is described in clause (iii)" and is inadmissible under 8 U.S.C. §§ 1182(a)(6)(C) or 1182(a)(7). *See* 8 U.S.C. § 1225(b)(1)(A)(i).

103.    Subclause (I) of clause (iii) referenced above provides that the Secretary may apply expedited removal to "any or all aliens described in subclause (II) as designated by the [Secretary]." 8 U.S.C. § 1225(b)(1)(A)(iii)(I).

104.    Subclause (II) referenced above includes a description of noncitizens who may be designated by the Secretary to be amenable to expedited removal and specifies that such noncitizens must not "ha[ve] been admitted or paroled into the United States." 8 U.S.C. § 1225(b)(1)(A)(iii)(II). A noncitizen who "ha[s] been admitted or paroled following inspection by an immigration officer at a designated port-of-entry" is excluded from expedited removal under 8 U.S.C. § 1225(b)(1)(A)(i). 8 C.F.R. § 235.3(b)(1)(ii). *See also* 8 C.F.R. § 235.3(b)(6) (requiring that noncitizen be given a "reasonable opportunity" to establish to an immigration officer "that he or she was admitted or paroled into the United States following inspection at a port-of-entry," and cannot thereby be processed for expedited removal).

105.    The February 18 directive violates the INA and is "not in accordance with law" and "in excess of statutory . . . authority" under the APA, 5 U.S.C. § 706(2)(A), (C), to the extent that it authorizes the use of expedited removal for noncitizens who were inspected and granted parole at a port of entry and are currently present in the United States subsequent to that parole. Such individuals have already arrived in the United States and have begun establishing their lives here and are therefore no longer in the act of "arriving." Because such noncitizens are not "arriving in the United States," they cannot be subjected to expedited removal under 8 U.S.C. § 1225(b)(1)(A)(i).

106.    The January 23 Huffman memorandum and the March 21 CHNV Termination Notice violate the INA and are "not in accordance with law" and "in excess of statutory . . . authority" under the APA, 5 U.S.C. § 706(2)(A), (C), to the extent that they authorize the use of

so-called expanded expedited removal for CHNV and other parole beneficiaries who have not "been physically present in the United States continuously for the 2-year period immediately prior to the date of the determination of inadmissibility." 8 U.S.C. § 1225(b)(1)(A)(iii)(II). *See* CHNV Termination Notice (noting that "CHNV parolees . . . will become ineligible for expedited removal upon the natural expiration of their two-year parole."). Such individuals "ha[ve] been . . . paroled into the United States," which makes them ineligible for expedited removal under 8 U.S.C. § 1225(b)(1)(A)(iii)(II), regardless of whether they have been physically present in the United States for less than two years.

107.    Each of these policies must therefore be held unlawful, set aside, and/or otherwise vacated.

## SECOND CLAIM FOR RELIEF

### (Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A))

108.    The APA provides that courts "shall . . . hold unlawful and set aside agency action" that is arbitrary and capricious. 5 U.S.C. § 706(2)(A).

109.    The agency's various articulations of its authority to expose individuals inspected and granted parole at ports of entry to expedited removal are unexplained and entirely inconsistent with each other. In the January 23 Huffman memorandum and the March 21 CHNV Termination Notice, the Department contemplates using expedited removal against parolees pursuant to 8 U.S.C. § 1225(b)(1)(A)(iii). The March 21 CHNV Termination Notice in particular is clear that under the expedited removal statute, CHNV parolees may be removed only under this provision, which is why the Department decided to terminate their paroles precipitously in order to maximize the number of people who may be expeditiously removed by minimizing the number who have been continuously present in the country for two years. The February 18 directive, however,

appears to make all individuals who were granted parole at ports of entry and are now present in the United States eligible for expedited removal under 8 U.S.C. § 1225(b)(1)(A)(i). The directive additionally is explicit that "[t]here is no time limit on the ability to process [such parole beneficiaries] for expedited removal."

110.    None of the agency policies described above contains any reasoned explanation for why parole beneficiaries may be processed for expedited removal, and any explanation that exists in the January 23 and March 21 agency policies is inconsistent with any explanation that exists in the February 18 directive. The arbitrariness and capriciousness of each agency policy is further evidenced by the failure of such policy to consider the agency's own contrary conclusions regarding the legal authority for the agency to adopt the policy as contemplated. Indeed, the inconsistent agency interpretations are both incorrect as a matter of law.

111.    Moreover, none of the agency policies consider the impact of their decision to apply expedited removal to some population of parolees on paroled individuals themselves, their families, their communities, and any financial supporters, as well as any reasonable alternatives.

112.    Each of these policies must therefore be held unlawful, set aside, and/or otherwise vacated.

**THIRD CLAIM FOR RELIEF**

**(Violation of the Due Process Clause of the Fifth Amendment to
the United States Constitution)**

113.    The Due Process Clause of the Fifth Amendment provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law."

114.    Plaintiffs who are at risk of being subjected to expedited removal under the January 23 Huffman memorandum, the February 18 directive, and/or the March 21 CHNV Termination Notice are entitled under the Due Process Clause to notice, an opportunity to be heard, and to have

the law correctly applied to their cases, including to a meaningful process before they can be removed from the country.

115.    The January 23 Huffman memorandum, the February 18 directive, and the March 21 Federal Register Notice must therefore be enjoined as violative of the Fifth Amendment's guarantee of due process.

<strong>PRAYER FOR RELIEF</strong>

**WHEREFORE**, Plaintiffs respectfully request that this Court:

1.    Declare that noncitizens who have previously been granted parole at ports of entry are not amenable to expedited removal under 8 U.S.C. § 1225(b)(1)(A) and that the January 23 Huffman memorandum, February 18 directive, and March 21 CHNV Termination Notice are unconstitutional and contrary to law and arbitrary and capricious in violation of the APA;

2.    Preliminarily enjoin and stay the January 23 Huffman memorandum, February 18 directive, and March 21 CHNV Termination Notice pursuant to Federal Rule of Civil Procedure 65(a) and 5 U.S.C. § 705 during the pendency of this suit;

3.    Permanently enjoin and vacate the January 23 Huffman memorandum, February 18 directive, and March 21 CHNV Termination Notice at final judgment;

4.    Enjoin Defendants from applying expedited removal to noncitizens who have previously been granted parole at a port of entry;

5.    Award Plaintiffs' counsel reasonable attorneys' fees under the Equal Access to Justice Act, and any other applicable statute or regulation; and

6.    Grant such relief as the Court deems just, equitable, and appropriate.

Dated: March 24, 2025                    Respectfully submitted,

                                         */s/ Esther H. Sung*

Esther H. Sung (CA00132)
Karen C. Tumlin (CA00129)
Hillary Li (application for admission forthcoming)
Laura Flores-Perilla (*pro hac vice* forthcoming)
Brandon Galli-Graves (*pro hac vice* forthcoming)
**JUSTICE ACTION CENTER**
P.O. Box 27280
Los Angeles, CA 90027
Telephone: (323) 450-7272
esther.sung@justiceactioncenter.org
karen.tumlin@justiceactioncenter.org
hillary.li@justiceactioncenter.org
laura.flores-perilla@justiceactioncenter.org
brandon.galli-graves@justiceactioncenter.org

Nicholas Katz, Esq. (*pro hac vice* forthcoming)
**CASA, INC.**
8151 15th Avenue
Hyattsville, MD 20783
Telephone: (240) 491-5743
nkatz@wearecasa.org

Carl Bergquist (D.C. Bar # 1720816)
**COALITION FOR HUMANE IMMIGRANT RIGHTS**
2533 West 3rd St, Suite 101
Los Angeles, CA 90057
Telephone: (310) 279-6025
cbergquist@chirla.org

*Attorneys for Plaintiffs*