YAAKOV M. ROTH
*Acting Assistant Attorney General*
DREW C. ENSIGN
*Deputy Assistant Attorney General*
PAPU SANDHU
*Assistant Director*
U.S. Department of Justice
Office of Immigration Litigation
General Litigation and Appeals Section
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
(202) 616-9357
Papu.Sandhu@usdoj.gov
TIM RAMNITZ
*Senior Litigation Counsel*
ARIC A. ANDERSON
TARYN ARBEITER
*Trial Attorneys*

Counsel for Defendants

## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| COALITION FOR HUMANE IMMIGRANT RIGHTS, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> KRISTI NOEM, in her official capacity as Secretary of Homeland Security, *et al.*, <br><br> Defendants. | Civil Action No. 1:25-cv-00872 (JMC) <br><br> Hon. Jia M. Cobb |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' COMPLAINT

# TABLE OF CONTENTS

INTRODUCTION..................................................................................................1

LEGAL AND PROCEDURAL BACKGROUND.....................................................3

   I.    Statutory Scheme for Expedited Removal and Parole....................................3

        A.   Expedited Removal..........................................................8

        B.   Parole..........................................................................1

   II.   Recent Developments Serving as the Ground of the Complaint.....................9

STANDARD OF REVIEW...................................................................................12

ARGUMENT......................................................................................................13

   I.    The Court Lacks Jurisdiction Over Plaintiffs' Claims for Several Reasons................13

        A.   Plaintiffs Lack Standing......................................................13

        B.   Under 8 U.S.C. § 1252 This Court Lacks Jurisdiction Over the Plaintiffs' Claims, and Further, Lacks Authority to Issue Injunctive Relief........................................22

            1.   Plaintiffs' Challenges to Expedited Removal Are Time-Barred........................23

            2.   The Relief That Plaintiffs Seek Is Also Squarely Foreclosed by 8 U.S.C. § 1252(g)..........................................26

            3.   Plaintiffs' Request for Injunctive Relief is Prohibited by 8 U.S.C. § 1252(f)(1)..........................................28

        C.   Plaintiff Organizations Cannot Show They are Within the Zone of Interests Protected by the Expedited Removal Statute..........................30

   II.   On the Merits, Plaintiffs Fail to Establish that Application of Expedited Removal to Their Members Would Violate the INA, APA, or Due Process....................................33

A.      Aliens Paroled into the U.S. at a Port of Entry are Properly Subject to Expedited Removal ...................................................................................................... 33

        1.      Paroled aliens fall within the category of aliens "arriving in the United States" . 33

        2.      Paroled aliens may be subject to expedited removal under the designation provision ......................................................................................................... 38

B.      Plaintiffs' APA Claim Fails Because the Documents They Contest Did Not Make the Changes That Plaintiffs Allege and Are Not Inconsistent ...................................................................................................... 40

C.      Plaintiffs' Due Process Claim Lacks Merit and Should be Dismissed .................... 42

CONCLUSION ................................................................................................................ 44

# TABLE OF AUTHORITIES

## Cases

*Abigail All. for Better Access to Developmental Drugs v. Eschenbach*,
    469 F.3d 129 (D.C. Cir. 2006) .......................................................................... 14

*Am. Immigr. Lawyers Ass'n v. Reno ("AILA")*,
    18 F. Supp. 2d 38 (D.D.C. 1998*), aff'd* 199 F.3d 1352 (D.C. Cir. 2000). ...................... *passim*

*Animal Legal Def. Fund, Inc. v. Vilsack*,
    111 F.4th 1219 (D.C. Cir. 2024) ....................................................................... 17

*Arab v. Blinken*,
    600 F. Supp. 3d 59 (D.D.C. 2022) ..................................................................... 13

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ..................................................................................... 12

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ..................................................................................... 12

*Biden v. Texas*,
    597 U.S. 785 (2022) ................................................................................ 28, 29

*California v. Grace Brethren Church*,
    457 U.S. 393 (1982) ..................................................................................... 29

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) ..................................................................................... 17

*Clarke v. Security Indus. Ass'n*,
    479 U.S. 388 (1987) ..................................................................................... 31

*Connecticut v. U.S. Dep't of the Interior*,
    344 F. Supp. 3d 279 (D.D.C. 2018) .................................................................. 13

*Ctr. for Biological Diversity v. Haaland*,
    849 F. App'x 2 (D.C. Cir. 2021) ................................................................... *passim*

*D.A.M. v. Barr*,
    474 F. Supp. 3d 45 (D.D.C. 2020) ..................................................................... 22

*Dep't of Homeland Sec. v. Thuraissigiam,*
　591 U.S. 103 (2020)................................................................................................ *passim*

*Dickerson v. District of Columbia,*
　70 F. Supp. 3d 311 (D.D.C. 2014)................................................................................ 12

*E.F.L. v. Prim,*
　986 F.3d 959 (7th Cir. 2021)................................................................................ 27, 28

*FDA v. All. for Hippocratic Med.,*
　602 U.S. 367 (2024)................................................................................................ 14, 16

*Fed'n for Am. Immigration Reform, Inc. v. Reno,*
　93 F.3d 897 (D.C. Cir. 1996)................................................................................ 32

*Garland v. Aleman-Gonzalez,*
　596 U.S. 543 (2022)................................................................................................ 28, 29

*Gill v. Whitford,*
　585 U.S. 48 (2018)................................................................................................ 30

*Gonzalez v. ICE,*
　975 F.3d 788 (9th Cir. 2020)................................................................................ 29

*Hunt v. Wash. State Apple Advert. Comm'n,*
　432 U.S. 333 (1977)................................................................................................ 17

*Ibragimov v. Gonzales,*
　476 F.3d 125 (2007)................................................................................................ 34, 39

*Indep. Equip. Dealers Ass'n v. EPA,*
　372 F.3d 420 (D.C. Cir. 2004)................................................................................ 40

*INS v. Legalization Assistance Project of L.A. Cty. Fed'n of Labor,*
　510 U.S. 1301 (1993)................................................................................................ 32, 33

*Jennings v. Rodriguez,*
　583 U.S. 281 (2018)................................................................................................ 34, 39

*Kowalski v. Tesmer,*
　543 U.S. 125 (2004)................................................................................................ 16, 17

*Leng May Ma v. Barber,*
　357 U.S. 185 (1958)................................................................................................ 8, 34, 39

iv

*Linda R.S. v. Richard D.*,
  410 U.S. 614 (1973)..................................................................................15

*Lujan v. Def. of Wildlife*,
  504 U.S. 555 (1992).............................................................................*passim*

*Make the Road N.Y. v. McAleenan*,
  405 F. Supp. 3d 1 (D.D.C. 2019)..................................................32, 35, 36

*Make the Road v. Wolf*,
  962 F.3d 612 (D.C. Cir. 2020)............................................................23, 29

*Marshall Cnty. Health Care Auth. v. Shalala*,
  988 F.2d 1221 (D.C. Cir. 1993)................................................................13

*Monsanto Co. v. Geertson Seed Farms*,
  561 U.S. 139 (2010)..................................................................................30

*Nat'l Pork Producers Council v. Ross*,
  598 U.S. 356 (2023)..................................................................................36

*Newdow v. Roberts*,
  603 F.3d 1002 (D.C. Cir. 2010)................................................................29

*Noem v. Doe*,
  -- S. Ct. --, 2025 WL 1534782 (2025) ........................................11, 37, 38

*Norton v. S. Utah Wilderness All.*,
  542 U.S. 55 (2004)....................................................................................41

*O.A. v. Trump*,
  404 F. Supp. 3d 109 (D.D.C. 2019)....................................................29, 32, 33

*Patchak v. Zinke*,
  583 U.S. 244 (2018)..................................................................................23

*People for the Ethical Treatment of Animals v. USDA*,
  797 F.3d 1087 (D.C. Cir. 2015)................................................................15

*Philip Morris USA Inc. v. U.S. FDA*,
  202 F. Supp. 3d 31 (D.D.C. 2016)............................................................34

*Reno v. Am.-Arab Anti-Discrimination Comm.*,
  ("AADC"), 525 U.S. 471 (1999)..............................................1, 27, 40

*Rohrbaugh v. Pompeo,*
   394 F. Supp. 3d 128 (D.D.C. 2019)...................................................................12

*Sessions v. Morales-Santana,*
   582 U.S. 47 (2017)...........................................................................................16

*Shaughnessy v. United States ex rel. Mezei,*
   338 U.S. 537 (1950).....................................................................................8, 43

*Sure-Tan, Inc. v. NLRB,*
   467 U.S. 883 (1984).........................................................................................33

*Svitlana Doe v. Noem,*
   --- F. Supp. 3d ---, 2025 WL 1099602 (D. Mass. Apr. 14, 2025), *appeal pending,*
   No. 25-1384 (1st Cir. filed April 18, 2025)..................................................37, 38

*Tazu v. Att'y Gen. U.S.,*
   975 F.3d 292 (3d Cir. 2020).........................................................................26, 27

*Thompson v. N. Am. Stainless,*
   562 U.S. 170 (2011).........................................................................................31

*TransUnion LLC v. Ramirez,*
   594 U.S. 413 (2021).....................................................................................19, 20

*Turkiye Halk Bankasi A.S. v. United States,*
   598 U.S. 264 (2023).........................................................................................36

*Turner v. U.S. Att'y Gen.,*
   130 F.4th 1254 (11th Cir. 2025).......................................................................38

*United States ex rel. Knauff v. Shaughnessy,*
   338 U.S. 537 (1950).........................................................................................43

*United States v. Guzman,*
   998 F.3d 562 (4th Cir. 2021)..............................................................................3

*United States v. Sanchez-Aguilar,*
   719 F.3d 1108 (9th Cir. 2013).............................................................................3

**Statutes**

5 U.S.C. § 551 (13).................................................................................................40

5 U.S.C. § 702 ................................................................................................. 31

5 U.S.C. § 704 ................................................................................................. 40

5 U.S.C. § 705 ................................................................................................. 11

8 U.S.C. § 1101(a)(13)(B) ................................................................................ 8

8 U.S.C. § 1182(a)(6)(C) ............................................................................. 4, 7

8 U.S.C. § 1182(d)(5) ................................................................................ 5, 34

8 U.S.C. § 1182(d)(5)(A) .......................................................................... *passim*

8 U.S.C. § 1225 ............................................................................................... 39

8 U.S.C. § 1225(b)(1) ................................................................................ *passim*

8 U.S.C. § 1225(b)(1)(A) ........................................................................ 28, 31

8 U.S.C. § 1225(b)(1)(B) ................................................................................ 3

8 U.S.C. § 1229a ....................................................................................... *passim*

8 U.S.C. § 1252 ......................................................................................... 1, 22

8 U.S.C. § 1252(a)(2)(A) ......................................................................... 23, 37

8 U.S.C. § 1252(e) .................................................................................... 23, 31

8 U.S.C. § 1252(e)(2) .......................................................................... 3, 35, 38

8 U.S.C. § 1252(e)(3) ...................................................................................... 23

8 U.S.C. § 1252(e)(3)(A) .................................................................... 24, 31, 37

8 U.S.C. § 1252(e)(3)(B) ................................................................... 1, 25, 42

8 U.S.C. § 1252(f)(1) ............................................................................... 28, 30

8 U.S.C. § 1252(g) ................................................................................... *passim*

8 U.S.C. § 1254a(b)(3) ................................................................................... 22

8 U.S.C § 1182(a)(7) ........................................................................................... 4

28 U.S.C. § 1331 ............................................................................................... 23

**Rules**

Fed. R. Civ. P. 12(b)(6) ..................................................................................... 12

Fed. R. Civ. P. 23 .............................................................................................. 30

**Regulations**

8 C.F.R. § 1.2 ........................................................................................... *passim*

8 C.F.R. § 208.30(e) ........................................................................................... 3

8 C.F.R. § 212.5(e)(2) .................................................................................... 8, 38

8 C.F.R. § 212.5(e)(2)(i) ................................................................................... 39

8 C.F.R. § 235.3 .................................................................................................. 3

8 C.F.R. § 235.3(b) ...................................................................................... 33, 43

8 C.F.R. § 235.3(b)(1) ........................................................................................ 4

8 C.F.R. § 235.3(b)(1)(ii) ................................................................................... 6

8 C.F.R. § 235.3(b)(4) .............................................................................. 19, 21, 43

8 C.F.R. § 235.3(b)(4)(i) ................................................................................... 43

**Other Authorities**

Proclamation No. 14, 159,
  90 Fed. Reg. 8443 (Jan. 20, 2025) ............................................................. 7, 10

*Designating Aliens for Expedited Removal,*
  90 Fed. Reg. 8139 (Jan. 24, 2025) ................................................................... 2

*Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of
  Removal Proceedings; Asylum Procedures,*
  62 Fed. Reg. 10 (Mar. 6, 1997) ........................................................... 4, 5, 43

*Amendment of the Regulatory Definition of Arriving Alien,*
63 Fed. Reg. 19 (Apr. 20, 1998).................................................................5

*Notice Designating aliens Subject to Expedited Removal Under Section 235(b)(1)(A)(iii) of the Immigration and Nationality Act,*
67 Fed. Reg. 68 (Nov. 13, 2002)...............................................................6

*Desingating Aliens for Expedited Removal,*
69 Fed. Reg. 48 (Aug. 11, 2004)................................................................6

Eligibility of Arriving Aliens in Removal Proceedings to Apply for Adjustment of Status and Jurisdiction to Adjudicate Applications for Adjustment of Status,
71 Fed. Reg. 27 (May 12, 2006).................................................................6

*Termination of Parole Process for Cubans, Haitians, Nicaraguans, and Venezuelans,*
90 Fed. Reg. 13 (Mar. 25, 2025)..............................................................10

*Implementation of a Parole Process for Venezuelans,*
88 Fed. Reg. 1243 (Jan. 9, 2023)..............................................................10

## INTRODUCTION

Defendants respectfully file this memorandum in support of their motion to dismiss Plaintiffs' complaint (ECF No. 1, "Compl.") under Rules 12(b)(1) and 12(b)(6).  At bottom, Plaintiffs seek to "enjoin Defendants from applying expedited removal to noncitizens who have previously been granted parole at a port of entry."  Compl., Prayer for Relief, at ¶ 4.  But their complaint suffers from several threshold deficiencies that preclude their request for such vastly overbroad relief.

To start, Plaintiffs, immigrant rights organizations, fail to plead cognizable injury, either to themselves or their members.  Indeed, they cannot point to even one member who has been threatened with expedited removal, and their theory of injury is based on a series of conjectures about possible future harm that is insufficient.  The Court should therefore dismiss the case for lack of Article III standing.

This Court further lacks subject-matter jurisdiction to review Plaintiffs' challenges to expedited removal because the expedited removal statute requires these claims to be raised within sixty days of when the statute and its implementing regulations went into effect (*i.e.*, within sixty days of April 1, 1997). 8 U.S.C. § 1252(e)(3)(B).  That limitation is jurisdictional. Because Plaintiffs' suit is untimely multiple times over under this jurisdictional limitation, their complaint must be dismissed.

Moreover, two additional provisions in 8 U.S.C. § 1252 preclude the Court from granting Plaintiffs' request for injunctive relief.  First, 8 U.S.C. § 1252(g), by its very terms, deprives the Court of jurisdiction to enjoin Defendants from "commenc[ing]" expedited removal proceedings. *See Reno v. Am.-Arab Anti-Discrimination Comm.* ("*AADC*"), 525 U.S. 471, 487 (1999).  And 8

U.S.C. § 1252(f)(1) precludes the Court from "enjoin[ing] or restrain[ing] the operation" of the expedited removal statute, other than with respect to "*an individual alien* against whom proceedings [] have been initiated." (Emphasis added). Plaintiffs include no such "individual alien[s]." Thus, Plaintiffs' request that the Court issue broad injunctive relief to every "noncitizen[] who ha[s] previously been granted parole at a port of entry" runs headlong into section 1252(f)(1)'s prohibition.

Alternatively, the complaint should be dismissed because Plaintiffs fail to state a viable claim. Plaintiffs' claims are rooted in an erroneous interpretation of the Immigration and Nationality Act ("INA") under which the Department of Homeland Security ("DHS") cannot invoke expedited removal for an alien paroled at a port of entry. But the governing statute clearly authorizes expedited removal of aliens "arriving in the United States," *see* 8 U.S.C. § 1225(b)(1)(A)(i), which includes aliens who arrive and are processed at a port of entry. 8 C.F.R. § 1.2. The fact that such aliens are granted parole into the United States does not preclude application of expedited removal. *Id.* Instead, "[a]n arriving alien remains such even if paroled pursuant to section 212(d)(5) of the Act." *Id.* Indeed, Congress has clearly provided that when the purposes of parole have been served the alien "shall forthwith" be returned to custody "and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States." 8 U.S.C. § 1182(d)(5)(A).

In addition, and apart from the arriving alien provision, aliens paroled at a port of entry (whose parole is later terminated or revoked) can be subject to expedited removal if they have been continuously present in the United States for less than two years as designated by the Secretary of Homeland Security, as they now are. 8 U.S.C. § 1225(b)(1)(A)(iii); 90 Fed. Reg. 8139 (Jan. 24,

2025).  The central and indispensable premise of Plaintiffs' claims is thus untenable.  Dismissal is required.

## LEGAL AND PROCEDURAL BACKGROUND

I.    **Statutory Scheme for Expedited Removal and Parole**

A.    ***Expedited Removal.***  In 1996, Congress created expedited removal, a removal procedure that allows the Government to deport from the United States quickly certain inadmissible aliens who have no supporting documentation or who present fraudulent documents. 8 U.S.C. § 1225(b)(1).  An alien subject to expedited removal can claim a fear of persecution or torture or express an intention to apply for asylum, after which he will receive a credible fear screening; if found to have a credible fear, he may apply for asylum, withholding of removal, and protection under the Convention Against Torture.  8 U.S.C. § 1225(b)(1)(B); 8 C.F.R. §§ 208.30(e), (f), (g), 235.3(b)(4).  If not, they can be then removed.  8 U.S.C. § 1225(b)(1)(B)(iii).  The constitutionality and legality of the expedited removal statute has generally been upheld by courts.[1] *Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 140-41 (2020) (holding that 8 U.S.C. § 1252(e)(2), which limited judicial review of § 1225(b)(1) expedited removal proceedings to habeas corpus proceedings and limited the habeas review, did not violate the Suspension Clause); *Am. Immigr. Lawyers Ass'n v. Reno ("AILA")*, 18 F. Supp. 2d 38, 47 (D.D.C. 1998), *aff'd*, 199 F.3d 1352 (D.C. Cir. 2000).

---

[1]  *See also United States v. Guzman*, 998 F.3d 562, 571-72 (4th Cir. 2021) (rejecting challenge asserting right to counsel in expedited removal proceedings); *United States v. Sanchez-Aguilar*, 719 F.3d 1108, 1112 (9th Cir. 2013) ("The statute and regulation governing expedited removal proceedings, 8 U.S.C. § 1225(b)(1) and 8 C.F.R. § 235.3, set forth the procedural rights to which such aliens are entitled, but the right to be informed of potentially available avenues of relief from removal is not among them.").

Two groups of aliens are subject to expedited removal:  (1) aliens arriving in the United States, 8 U.S.C. § 1225(b)(1)(A)(i) ("an alien . . . who is arriving in the United States"), and (2) aliens designated by the Secretary of Homeland Security within certain outer statutory limits, *id.* ("an alien . . . described in clause (iii)").  *See* 8 U.S.C. § 1225(b)(1)(A)(i), (iii); 8 C.F.R. § 235.3(b)(1).  The statute limits designation to that second group of aliens as follows:  "An alien . . . who has not been admitted or paroled into the United States, and who has not affirmatively shown, to the satisfaction of an immigration officer, that the alien has been physically present in the United States continuously for the 2-year period immediately prior to the date of the determination of inadmissibility under this subparagraph."[2]  8 U.S.C. § 1225(b)(1)(A)(iii)(II). Aliens in either the first group (arriving alien) or second group (designated alien) can be removed through the expedited removal procedure if they are removable on either of two grounds of inadmissibility, namely, on the basis of fraud, 8 U.S.C. § 1182(a)(6)(C), or a lack of documents, 8 U.S.C § 1182(a)(7).  8 U.S.C. § 1225(b)(1)(A)(i).

In 1997, DOJ promulgated implementing regulations to apply expedited removal initially only to aliens arriving at a port of entry.  Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures, 62 Fed. Reg. 10,312, 10,312-13 (Mar. 6, 1997) (noting the agency's view "that the statute seemed to differentiate more clearly between aliens at ports-of-entry and those encountered elsewhere in the United States").  The Department adopted a regulation defining arriving alien to include "an alien who

---

[2]  The statute explicitly excludes an alien "described in subparagraph (F)," *i.e.*, one "who is a native or citizen of a country in the Western Hemisphere with whose government the United States does not have full diplomatic relations and who arrives by aircraft at a port of entry."  8 U.S.C. § 1225(b)(1)(A)(iii)(II), (F).

seeks admission to or transit through the United States, as provided in 8 CFR part 235, at a port-of-entry."  8 C.F.R. § 1.1(q) (1998) (currently at 8 C.F.R. §§ 1.2, 1001.1(q)).  Critically, for purposes of this suit, it also provided: "An arriving alien remains such even if paroled pursuant to section 212(d)(5) of the Act [8 U.S.C. § 1182(d)(5)]." *Id.* That rule was effective on April 1, 1997. 62 Fed. Reg. at 10,312.

Although the regulation has been revised since its adoption, the amendments only confirm that "arriving alien" includes aliens paroled at a port of entry like the members described by Plaintiffs.  In 1998 the legacy Immigration and Naturalization Service (INS) issued a rulemaking amending the "arriving alien" definition by exempting aliens paroled before April 1, 1997.  *See* Amendment of the Regulatory Definition of Arriving Alien, 63 Fed. Reg. 19,382 (Apr. 20, 1998). The INS reasoned that such aliens constituted a "group[ ] not best regarded as arriving aliens for purposes of the applicability of expedited removal" because they had been "initially paroled before (often well before) the effective date of the expedited removal provisions." 63 Fed. Reg. at 19,382. The regulation similarly exempted aliens who were paroled pursuant to a grant of "advance parole" that they applied for and were granted while physically present in the United States to allow for temporarily departure and return.  *Id.* at 19,382-83.  The rule thus ameliorated the reach of the arriving alien definition for certain discrete groups (including aliens who had been paroled "well before" the enactment of the expedited removal provisions) vis-à-vis expedited removal but otherwise provided that all other aliens encompassed within the definition would remain arriving aliens and therefore subject to expedited removal.

And in 2006, the regulatory definitions were amended to specifically provide, as they do now, that an arriving alien includes aliens who are paroled "even after any such parole is terminated

or revoked." 8 C.F.R. §§ 1.2, 1001.1(q); *see* Eligibility of Arriving Aliens in Removal Proceedings to Apply for Adjustment of Status and Jurisdiction to Adjudicate Applications for Adjustment of Status, 71 Fed. Reg. 27,585, 27,591 (May 12, 2006). The 2006 rule also clarified that the exempted classes remain arriving aliens for all purposes except for expedited removal. *See* 71 Fed. Reg. at 27,588.

With respect to the designation provision at 8 U.S.C. § 1225(b)(1)(A)(iii), the Secretary of Homeland Security (and Commissioner of the legacy INS in 2002) have on five occasions exercised this designation authority.[3] *See* 67 Fed. Reg. 68,924 (Nov. 13, 2002) (designating for expedited removal qualifying aliens who arrive in the United States by sea, who are not admitted or paroled, and have not been physically present in the U.S. continuously for two years prior to the determination of inadmissibility); 69 Fed. Reg. 48,877 (Aug. 11, 2004) (designating qualifying aliens encountered within 100 air miles of the border and within fourteen days of their date of illegal entry regardless of the alien's arrival method)[4]; 82 Fed. Reg. 4,902 (Jan. 17, 2017) (extending all prior designations to Cuban nationals); 84 Fed. Reg. 35,409 (July 23, 2019) (designating qualifying aliens who have not shown that they have been physically present in the

---

[3]  In 1997, the Attorney General established a mechanism for later designations of classes of aliens subject to expedited removal. 8 C.F.R. § 235.3(b)(1)(ii). The Attorney General observed that "a proposed expansion of the expedited removal procedures may occur at any time and may be driven either by specific situations such as a sudden influx of illegal aliens motivated by political or economic unrest or other events or by a general need to increase the effectiveness of enforcement operations at one or more locations." 62 Fed. Reg. at 10,314.

[4]  The 2004 Notice explained that, to focus limited resources "upon unlawful entries that have a close spatial and temporal nexus to the border," it did not implement "the full nationwide expedited removal authority available to DHS." *Id.* at 48,879. It did, however, expressly reserve DHS's option of "implementing the full nationwide enforcement authority of the statute through publication of a subsequent Federal Register notice." *Id.*

United States continuously for the two-year period immediately preceding the date of the determination of inadmissibility); 87 Fed. Reg. 16,022 (Mar. 21, 2022) (rescinding 2019 designation).

The most recent designation of aliens under 8 U.S.C. § 1225(b)(1)(A)(iii) occurred on January 24, 2025, following President Trump's Executive Order 14159, *Protecting the American People from Invasion*, 90 Fed. Reg. 8443 (Jan. 20, 2025). The Acting Secretary of Homeland Security published a Federal Register notice restoring the scope of expedited removal to "the fullest extent authorized by Congress." Designating Aliens for Expedited Removal, 90 Fed. Reg. 8,139 (Jan. 24, 2025). The notice enabled DHS "to place in expedited removal, with limited exceptions, aliens determined to be inadmissible under [8 U.S.C. § 1182(a)(6)(C) or (a)(7)] who have not been admitted or paroled into the United States and who have not affirmatively shown, to the satisfaction of an immigration officer, that they have been physically present in the United States continuously for the two-year period immediately preceding the date of the determination of inadmissibility," who were not covered by previous designations. *Id*. at 8,139-40. The notice explained that this action aimed to "enhance national security and public safety—while reducing government costs—by facilitating prompt immigration determinations" and would "enable DHS to address more effectively and efficiently the large volume of aliens who are present in the United States unlawfully ... and ensure the prompt removal from the United States of those not entitled to enter, remain, or be provided relief or protection from removal." *Id*. at 8139. Plaintiffs do not challenge that expansion in this case.[5] Compl., at ¶¶ 14, 52.

---

[5] The designation is being challenged in other litigation in this District. *Make the Road New York v. Noem*, No. 1:25-cv-00190 (D.D.C.), ECF No. 1.

**B. *Parole.*** Congress has long provided authority to immigration officials to use parole to release aliens into the interior of the United States, emphasizing that parole is not an "admission" within the meaning of the INA. 8 U.S.C. §§ 1101(a)(13)(B), 1182(d)(5)(A). As amended in 1996, the relevant statute provides that the Secretary of Homeland Security "may ... in [her] discretion parole" an "alien applying for admission," and specifies that such a parole is done "temporarily under such conditions as [the Secretary] may prescribe [and] only on a case-by-case basis for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A). The statute further states that parole may be terminated "when the purposes of such parole shall, in the opinion of the Secretary of Homeland Security, have been served." *Id.* Thus, the grant of parole and its termination is committed to the broad discretion of the Secretary.

Parole is not an admission to the United States. *Id.*; *see id.* § 1101(a)(13)(B). "[A]liens who arrive at ports of entry—even those paroled elsewhere in the country for years pending removal—are 'treated' for due process purposes 'as if stopped at the border.'" *Thuraissigiam*, 591 U.S. at 139 (quoting *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 215 (1953)); *see also Leng May Ma v. Barber*, 357 U.S. 185, 188-90 (1958). There are multiple ways in which parole can expire or be terminated; among other possibilities, service of a document charging the alien with being removable terminates parole. 8 C.F.R. § 212.5(e)(2). And when parole ends, the alien "shall be restored to the status that he or she had at the time of parole." *Id.* "[W]hen the purposes of such parole shall, in the opinion of the Secretary of Homeland Security, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall *continue to be dealt with in the same manner as that of any other applicant for admission* to the United States." 8 U.S.C. § 1182(d)(5)(A) (emphasis added).

## II.    Recent Developments Serving as the Ground of the Complaint

Plaintiffs argue that aliens who are "arriving" in the U.S. and paroled at ports of entry cannot be subject to expedited removal.  In asserting their first two claims—violations of the INA and APA—Plaintiffs rely on three documents that are discussed below.  Compl., ¶¶ 102-112.

The first document is a memorandum issued on January 23, 2025 by then-Acting Secretary of Homeland Security Benjamine C. Huffman to senior DHS officials setting forth guidance on how to exercise enforcement discretion in light of a recent "clarifi[cation]" of DHS's policy regarding the scope of the parole statute and its recent expansion of expedited removal consistent with its statutory authority.  Memorandum from Benjamine C. Huffman, Acting Secretary (Jan. 23, 2025) ("Huffman Memo"), *available at* https://www.dhs.gov/sites/default/files/2025-01/25_0123_er-and-parole-guidance.pdf (last accessed May 27, 2025).  The Huffman Memo instructs immigration enforcement to take "all steps necessary to review [an] alien's case and consider, in exercising [] enforcement discretion, whether to apply expedited removal," which "may include" terminating other removal proceedings or active parole status.  *Id.*  For aliens who are not subject to expedited removal and have "been granted parole under a policy that may be paused, modified, or terminated immediately under the January 20 memorandum," the Huffman Memo instructs DHS officials to "consider, in exercising [their] enforcement discretion, whether any such alien should be placed in removal proceedings" or whether "parole remains appropriate in light of any changed legal or factual circumstances."  *Id.*  Finally, the Memo directs that "[t]he actions contemplated by this memorandum shall be taken in a manner consistent with applicable, statutes, regulations, and court orders."  *Id.*

The second document Plaintiffs rely on is, according to Plaintiffs, a "directive" sent by ICE leadership to Enforcement and Removal Operations personnel "directing such officers to consider for expedited removal 'paroled arriving aliens' who have not applied affirmatively for asylum with USCIS." Compl., ¶ 56. Plaintiffs allege that the directive states: "[t]here is no time limit on the possibility to process such aliens for [expedited removal]," and contend that this "expos[es] individuals paroled into the United States after inspection at a port of entry to the indefinite threat of this fast-track removal process." *Id.*

Finally, the third document Plaintiffs rely on is a March 2025 Federal Register Notice from Secretary of Homeland Security Kristi Noem ending certain parole programs. Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans, 90 Fed. Reg. 13,611 (Mar. 25, 2025) ("March 2025 FRN"). Plaintiffs' reliance on this document requires some background.

In the prior Biden Administration, DHS established several parole programs, including those for individuals from Cuba, Haiti, Nicaragua, and Venezuela ("CHNV" programs). Under the CHNV programs, nationals of those countries who met certain eligibility requirements, including have a U.S.-based "supporter," could be considered for advance authorization to travel to interior United States ports of entry to request parole for up to a two-year term. Implementation of a Parole Process for Venezuelans, 87 Fed. Reg. 63,507 (Oct. 19, 2022), *as amended by* 88 Fed. Reg. 1279 (Jan. 9, 2023); 88 Fed. Reg. 1266 (Jan. 9, 2023) (same for Cubans); 88 Fed. Reg. 1243 (Jan. 9, 2023) (same for Haitians); 88 Fed. Reg. 1255 (Jan. 9, 2023) (same for Nicaraguans). The CHNV parole programs were paused in July 2024 due to fraud concerns.[6]

---

[6] Stephen Dinan, "'Parole' program put on hold amid massive fraud," Wash. Times (Aug. 2, 2024),

In a notice published on March 25, 2025, DHS terminated the CHNV parole programs.[7] Upon re-examination and based on DHS's experience, Secretary Noem determined that the CHNV programs "do not serve a significant public benefit, are not necessary to reduce levels of illegal immigration, did not sufficiently mitigate the domestic effects of illegal immigration, are not serving their intended purposes, and are inconsistent with the Administration's foreign policy goals." *Id.* at 13,612. To the extent that "urgent humanitarian reasons" supported any grants of parole under CHNV, "DHS believes that [such] reasons for granting parole [are] best addressed on a case-by-case basis consistent with the statute, and taking into consideration each alien's specific circumstances." *Id.* Thus, the Secretary determined that grants of parole under CHNV that had not already expired by April 24, 2025, were to terminate on that date unless the Secretary decides to the contrary in individual cases. 90 Fed. Reg. at 13,611.

In addressing the effect of such termination on existing parolees and reliance interests, the Secretary determined any reliance interests were outweighed by the fact that allowing parole to expire on its own terms would enable some aliens to accrue more than two years of presence in

---

[7] Plaintiffs do not challenge the termination of the CHNV programs parole in this case. *See* Compl., ¶¶ 1, 13–14, 45. That challenge is raised in *Svitlana Doe v. Noem*, No. 1:25-cv-10495 (D. Mass. Apr. 14, 2025). The District Court for the District of Massachusetts issued a preliminary stay in that case under 5 U.S.C. § 705 enjoining the DHS Secretary's March 25, 2025 termination of parole grants for those previously granted parole under the CHNV programs. *Id* at *20. The Government filed a notice of appeal in that case and an emergency stay of the district court's order, which was denied by the First Circuit on May 5, 2025. No. 25-1384. The Government filed an emergency motion for a stay with the Supreme Court which the Court granted on May 30, 2025, pending the disposition of the Government's appeal in the First Circuit. *Noem v. Doe*, -- S. Ct. --, 2025 WL 1534782 (2025).

the United States, which would mean that DHS could not remove them by expedited removal but would instead have to initiate the more lengthy process of a full removal hearing under 8 U.S.C. § 1229a. *Id.* at 13,619 ("If DHS were to allow the CHNV parolee population to remain for the full duration of their two-year parole, DHS would be compelled to place a greater proportion of this population in section 240 removal proceedings to effectuate their removal, further straining the already over-burdened immigration court system") (citations and footnote omitted)); *see also id.* at 13,620 (same effect).

## STANDARD OF REVIEW

***Rule 12(b)(1).*** A court must dismiss a case pursuant to Rule 12(b)(1) when it lacks statutory or constitutional jurisdiction. Under this Rule, Plaintiffs "bear[] the burden of establishing jurisdiction by a preponderance of the evidence." *Rohrbaugh v. Pompeo*, 394 F. Supp. 3d 128, 131 (D.D.C. 2019). Additionally, "the court need not accept unsupported inferences or legal conclusions cast as factual allegations" to make a finding of subject matter jurisdiction. *Dickerson v. District of Columbia*, 70 F. Supp. 3d 311, 318 (D.D.C. 2014).

***Rule 12(b)(6).*** Under Rule 12(b)(6), a party may move to dismiss a complaint on the grounds that it "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "[A] complaint [does not] suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). Rather, a complaint must contain sufficient factual allegations that, if accepted as true, "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556

U.S. at 678.  Finally, as "a court can fully resolve any purely legal question on a motion to dismiss, there is no inherent barrier to reaching the merits at the 12(b)(6) stage."  *Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993).  The Court can make this adjudication without a record when the complaint "actually presents no factual allegations, but rather only arguments about the legal conclusion to be drawn about the agency action."  *Id.*  "As a result, the sufficiency of the complaint is the question on the merits[.]"[8]  *Id.*

## ARGUMENT

### I.  The Court Lacks Jurisdiction Over Plaintiffs' Claims for Several Reasons

#### A.    Plaintiffs Lack Standing

Plaintiff organizations challenge the legality of the three DHS documents described above regarding DHS officials' exercise of enforcement discretion with respect to placing former recipients of parole in expedited removal.  *See* Compl. ¶¶ 1, 13–14, 102–15 and "Prayer for Relief." In doing so, Plaintiffs assert claims on behalf of various members of theirs who were granted parole status, despite not being directly subject to DHS's documents themselves.  Compl. ¶¶ 60–75 (CHIR), ¶¶ 76–89 (UndocuBlack), ¶¶ 90–100 (CASA).  Plaintiffs have failed to demonstrate how

---

[8] Local Civil Rule 7(n) requires Defendants to file a certified list of the administrative record contents when answering the Complaint with a dispositive motion.  This Local Rule applies to cases involving "judicial review of administrative agency action."  *Id.*  However, Defendants respectfully request that the Court relieve them of compliance with this rule.  Defendants' motion does not require reference to an administrative record—it is premised on Plaintiffs' Complaint, and not on any further factual development.  *See Arab v. Blinken*, 600 F. Supp. 3d 59, 66 n.2 (D.D.C. 2022) ("Following the general practice in this Court, defendants' motion to waive compliance with Local Civil Rule 7(n) is granted because 'the administrative record is not necessary for [the court's] decision.'") (alteration in original) (citing *Connecticut v. U.S. Dep't of the Interior*, 344 F. Supp. 3d 279, 294 (D.D.C. 2018) (granting the Government's motion to be relieved of complying with Local Civil Rule 7(n) when the administrative record was not required to decide defendants' motion to dismiss)).

the three challenged actions cause harm to their organizational interests. Consequently, Plaintiffs lack Article III standing to seek their requested prospective relief.

As the parties invoking federal jurisdiction, Plaintiffs bear the burden of establishing the three elements that constitute the "irreducible constitutional minimum of standing,"—namely that that they have (1) suffered an "injury in fact"—an invasion of a legally protected interest which is "concrete and particularized," "actual or imminent" and not "conjectural" or "hypothetical" that is (2) "fairly traceable" to the challenged conduct of Defendants, and will (3) "likely" be redressed by a favorable decision. *Lujan v. Def. of Wildlife*, 504 U.S. 555, 560-61 (1992); *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024). There are two ways for an organization to establish standing. *See Abigail All. for Better Access to Developmental Drugs v. Eschenbach*, 469 F.3d 129, 132 (D.C. Cir. 2006). First, an organizational plaintiff can bring action "on its own behalf," which is known as "organizational standing." *Id*. Second, a plaintiff organization can demonstrate standing by bringing a claim "on behalf of its members," also known as "associational standing." *Id*.

Plaintiffs' Complaint establishes neither organizational nor associational standing. Beginning with organizational standing, all three organizational Plaintiffs in this suit have waived any reliance on organizational standing by failing to plead it in their complaint. *See* Compl., ¶ 59 (generally alleging that "Defendants' directives to apply expedited removal to parolees cause *Plaintiffs' members* substantial injury" (emphasis added)), ¶¶ 60–75 (CHIR), ¶¶ 76–89 (UndocuBlack), ¶¶ 90–100 (CASA); *Ctr. for Biological Diversity v. Haaland*, 849 F. App'x 2, 4 (D.C. Cir. 2021) ("[T]he Center did not purport to raise an organizational injury below

. . . . To the extent the Center advances any other basis for organizational standing on appeal, those arguments are waived.").

In any event, none of the three Plaintiffs can establish organizational standing because they have failed to identify any legally cognizable injury to themselves. *Cf. People for the Ethical Treatment of Animals v. USDA*, 797 F.3d 1087, 1094 (D.C. Cir. 2015) ("*PETA*") (holding that PETA suffered injuries "concrete and specific to the work in which they are engaged" sufficient to establish organizational standing at the motion-to-dismiss stage). Each Plaintiff suggests that the challenged actions indirectly impact it via its effect on aliens who may be clients and subjected to expedited removal procedures. *See* Compl., ¶¶ 60–75 (CHIR), ¶¶ 76–89 (UndocuBlack), ¶¶ 90--100 (CASA). But a plaintiff—organization or otherwise—generally "lacks a judicially cognizable interest in the prosecution or non-prosecution of another." *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973).

The closest Plaintiffs come to pleading organizational standing is a bare, single-sentence allegation that it has "devoted significant resources to deportation defense and preparing its membership for potential immigration enforcement actions, including developing new 'Know Your Rights' resources and devoting additional resources to immigration counseling and rapid response to immigration enforcement" due to the three challenged actions. Compl., ¶ 100; *accord.* Compl. ¶ 82 (UndocuBlack alleging it has created a Frequently Asked Questions resource and conducted "Know Your Rights" trainings). But mere "self-serving observation[s]" that an organization will "have to increase the resources that it spends on educating the general public and its members" about the consequences of government regulation are "insufficient to support

standing." *CHIR v. DHS*, No. 1:250-cv-00943, --- F. Supp. 3d ---, 2025 WL 1078776, at *5 (D.D.C. Apr. 10, 2025).

Indeed, the Supreme Court rejected such attenuated theories of standing in *Alliance for Hippocratic Medicine*, 602 U.S. at 391–92. There, the Court held that a group of doctors could not assert standing to challenge agency actions affecting third parties—and in their view, removing protections and "public safety requirements" that might otherwise apply to those third parties— simply because the doctors might later be called upon to provide medical services to those individuals. *Id*. Such an "attenuated" theory of standing, the Court reasoned, would improperly allow doctors to challenge virtually any change in policy that might indirectly affect the health or safety of potential patients because it might affect the number of patients they serve, or the time involved in helping those patients. *Id*. There "would be no principled way to cabin such a sweeping doctrinal change" that would allow various groups to challenge policies affecting their potential clients, such as "[t]eachers in border states" "su[ing] to challenge" changes to "immigration policies" that would affect the number of students in their classrooms. *Id*. at 392. The "Court has consistently rejected" such an "approach to standing" "as flatly inconsistent with Article III." *Id*.

Turning next to associational standing, Plaintiffs have failed to make the necessary showing. "Ordinarily, a party must assert his own legal rights and cannot rest his claim to relief on the legal rights of third parties." *Sessions v. Morales-Santana*, 582 U.S. 47, 57 (2017) (cleaned up). Courts will not recognize standing to assert others' rights unless the third-party plaintiff has "a close relationship with the person who possesses the right [and] there is a hindrance to the possessor's ability to protect his own interests." *Id*. (alteration in original); *see also Kowalski v.*

16

*Tesmer*, 543 U.S. 125, 130 (2004); *AILA v. Reno*, 199 F.3d 1352, 1364 (D.C. Cir. 2000). An association may bring a lawsuit on behalf of its members if certain conditions are met: its members have standing to sue in their own right, the interests the association seeks to protect align with its organizational purpose, and neither the claim asserted nor the relief requested requires individual members to participate in the litigation. *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977); *Animal Legal Def. Fund, Inc. v. Vilsack*, 111 F.4th 1219, 1225 (D.C. Cir. 2024) (same).

Here, Plaintiffs have not cleared *any* of the necessary hurdles to establish associational standing. To begin with, no Plaintiff has shown that its members would have standing to sue in their own right, considering they fail to allege that the "policy" they identify has been enforced against—or even *threatened* to be enforced against—any of their members. *See* Compl., ¶¶ 60-75 (CHIR), ¶¶ 76–89 (UndocuBlack), ¶¶ 90–100 (CASA). Instead, Plaintiffs simply speculate about possible future harm to their members—that some of their members who were paroled into the United States *may* be subjected to expedited removal resulting in "abrupt family separation" and loss of income and *may* suffer from perceived "flaw[s]" in the expedited removal process, including not having time to submit their claims for relief or evidence supporting those claims. Compl., ¶¶ 68-70, 73 (CHIR), ¶¶ 81-83 (UndocuBlack); *see Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) ("[W]e have repeatedly reiterated that threatened injury must be certainly impending to constitute injury in fact, and that allegations of possible future injury are not sufficient") (cleaned up).

Plaintiffs' feared injuries rely on a chain of hypothetical events that fail to amount to injuries in fact that are "concrete and particularized" and "actual or imminent," but rather, injuries

that are "conjectural" or "hypothetical." *Lujan*, 504 U.S. at 560-61. In their hypothetical chain of events, Plaintiffs first speculate that DHS officials will place their members in expedited removal, even though the DHS documents at issue merely remind officers of their existing authority and discretion to do so. *See supra* at 8-10; *see also* Compl., ¶¶ 68-70, 73 (CHIR), ¶¶ 81-83 (UndocuBlack). In fact, the February 18, 2025 guidance document actually undermines their argument; while Plaintiffs assert that many of its members fear persecution or torture if returned to their home countries, the February 18 guidance, according to Plaintiffs themselves, suggests that aliens who have pending asylum applications should *not be considered* for expedited removal. *See* Compl., ¶ 56.

Next, Plaintiffs speculate that expedited removal, as opposed to 8 U.S.C. § 1229a proceedings (before an Immigration Judge), will result in their members' abrupt family separation, removal to "dangerous circumstances abroad," loss of income, and failure to apply for immigration benefits.[9] But Plaintiffs provide no support for their speculation that, lacking legal status in the United States, they are entitled to protracted proceedings simply for the sake of avoiding these harms through delay of the inevitable. *See generally* Compl. Likewise, their claim that their

---

[9] *See* Compl., ¶ 74 (CHIR alleging that possible application of expedited removal to its members would be harmful "because of the rapid, summary nature of the process," which it alleges would deprive "some" members "of the opportunity to submit applications for immigration protections they are entitled to"); Compl., ¶ 84 (UndocuBlack alleging that the credible fear screening process is flawed and can result in people with valid asylum claims being removed to "dangerous circumstances abroad"); Compl., ¶¶ 94-100 (CASA alleging that it "has heard from its members" that there is "widespread confusion and fear from the administration's decisions to end parole processes and expand expedited removal," that there has been a chilling effect on its members preventing them for applying for further immigration benefits, and that CASA members who "may be eligible for asylum or Convention Against Torture protections" fear they could be deported through expedited removal and "do not know" if their case will be "properly heard by an immigration judge").

placement in expedited removal proceedings will result in their members dropping the ball on filing applications for relief or having them denied is also rampant speculation. Expedited removal proceedings by statute and regulation provide that if an alien indicates an intention to apply for asylum or expresses a fear of persecution or torture or of return, the alien will be referred to an asylum officer for a credible fear interview. 8 U.S.C. § 1225(b)(1); 8 C.F.R. § 235.3(b)(4). And Plaintiffs plead that they have provided their members Frequently Asked Questions resources and conducted "Know Your Rights" trainings concerning expedited removal, Compl. ¶¶ 60–100, which would alleviate some of these speculative concerns.

In sum, because Plaintiffs' claims rely on a hypothetical chain of events, starting with speculation about how DHS officials will use their already existing discretion and ending with speculative harm they imagine may occur from receiving expedited (versus 8 U.S.C. § 1229a) proceedings, they have failed to plead an actual or imminent injury sufficient for associational standing at the first step. *See Lujan*, 504 U.S. at 560-61; *CHIR*, 2025 WL 1078776, at *5 ("Article III requires more than maybes—it demands that harms be 'actual or imminent.'").

Plaintiffs have failed their burden to establish the first requirement for standing for another reason, too: they have not shown that the associational harm they allege (having their members placed in the expedited removal proceedings they were already subject to under the expedited removal regulations promulgated in 1997) "has a close relationship to a harm traditionally recognized as providing a basis for a lawsuit in American courts." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 440 (2021). As *TransUnion* made clear, Plaintiffs must "identif[y] a close historical or common-law analogue for their asserted injury" to demonstrate their asserted injury is concrete.

*Id*. at 424.  Certain harms readily fit this bill, such as "traditional tangible harms" like "physical harms and monetary harms."  *Id*. at 425.

Plaintiffs' claims here rely on speculation that Defendants' discretionary decision to act within their existing legal authority to apply expedited removal will cause their members greater *degrees* of harm than § 1229a removal proceedings, though § 1229a removal proceedings would surely cause the same alleged *types* of harms (family separation, removal to potentially dangerous circumstances abroad, etc.).  Plaintiffs fail to "identif[y] a close historical or common-law analogue for their asserted injury" to demonstrate their asserted injury is concrete.  *Id*. at 424.  Furthermore, the "policies" that Plaintiffs challenge do not vest Defendants with any additional authority; they simply direct subordinates to wield their existing power under the applicable statues and regulations, which have allowed DHS to place aliens once granted parole into expedited removal proceedings since 1997.  *See supra* at 8–10.  As such, Plaintiffs have failed to show how the DHS guidance documents have caused them a concrete injury.  *See CHIR*, 2025 WL 1078776, at *5 ("Plaintiffs have failed to show that the mere requirement to abide by the law . . . constitutes a concrete injury for standing purposes.").  Consequently, Plaintiffs have failed to allege a cognizable injury in fact to their members sufficient to establish associational standing.

Plaintiffs also fail to establish the other standing requirements:  that their members' speculated injuries would be "fairly traceable" to the Defendants' guidance and will "likely" be redressed by a favorable decision granting Plaintiffs a preliminary injunction.  *Lujan*, 504 U.S. at 560–61.  As to traceability, the DHS guidance documents Plaintiffs challenge do not vest Defendants with any additional authority.  As discussed above, they merely direct officials to "consider" using expedited removal; they do not require it.

20

As to redressability, the relief Plaintiffs request, even if granted, would not prevent their members' asserted harms. Plaintiffs do not dispute that DHS has broad discretion to revoke parole and place their members into section 1229a removal proceedings; and DHS can clearly do so because paroled aliens remain applicants for admission who are authorized to remain in the country pursuant to such discretionary authority. *See* 8 U.S.C. § 1182(d)(5)(A). As a result, Plaintiffs cannot establish redressability because all of their alleged harms—arrest, detention, and removal from the United States, "family separation," loss of income, "financial and psychological harm," *see* Compl., ¶¶ 8, 83, 85, 87, 95—are simply the expected consequences of removal, whether DHS initiates expedited removal or removal proceedings under section 1229a. And to the extent Plaintiffs imply that their members will not have an opportunity to raise their fears of persecution or torture in expedited removal proceedings, *see id.*, ¶¶ 10-11, 68-70, 96-97, as they can in section 1229a proceedings, that suggestion is wrong; they can raise such fear claims through the credible fear process that is available in expedited removal.[10]  8 U.S.C. § 1225(b)(1)(B)(i); 8 C.F.R. §§ 235.3(b)(4), 208.30. Similarly, whether or not certain members lose their Temporary Protected

---

[10] Perhaps recognizing this point, Plaintiffs attack the credible fear procedures as inadequate. Compl., ¶ 84 (alleging "flaws in the credible fear screening process"); *see also id.,* ¶ 74. But Plaintiffs fails to elaborate on these allegations and, in any event, they do not assert a specific challenge to these procedures in any of their three claims; nor could they, *see Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 139 (2020) (reaffirming that whatever procedures Congress provides for admission of arriving aliens is sufficient). Furthermore, statistics undermine Plaintiffs' allegations by showing that over the years a large number of expedited removal aliens who have asserted a fear have been found to have a credible fear and referred to proceedings before an immigration judge to apply for asylum. *Thuraissigiam*, 591 U.S. at 113 (noting that over a ten-year period, "about 50%" of applicants were found to have a credible fear).

Status (TPS) following the Secretary's termination of the relevant country's TPS designation under 8 U.S.C. § 1254a(b)(3) has nothing to do with what type of removal proceeding DHS commences. *See id.*, ¶¶ 12, 83, 85. And although Plaintiffs state that expedited removal would "deprive" some members of "the opportunity to submit" immigration applications, *id.*, ¶ 74, they fail to explain what immigration relief they are eligible to apply for in section 1229a removal proceedings that is *not available* in expedited removal. In a nutshell, Plaintiffs have failed to show redressability because the same harms they allege will result from expedited removal also will result from § 1229a removal proceedings, and it is insufficient to claim nothing more than that expedited removal will happen more quickly. *See id.* ("[e]xpedited removal . . . . would be particularly harmful because of the rapid, summary nature of the process").

For all these reasons, the Court should dismiss this case at the threshold for failure to establish Article III standing.

### B.     Under 8 U.S.C. § 1252 This Court Lacks Jurisdiction Over the Plaintiffs' Claims, and Further, Lacks Authority to Issue Injunctive Relief

As this Court has noted, 8 U.S.C. § 1252 "is one of the most comprehensive jurisdiction-stripping statutes in the United States Code." *D.A.M. v. Barr*, 474 F. Supp. 3d 45, 62 (D.D.C. 2020). Numerous provisions of that statute preclude this Court's jurisdiction and bar the Court from granting injunctive relief in this case.

### 1.    Plaintiffs' Challenges to Expedited Removal Are Time-Barred

Plaintiffs claim that the Court has jurisdiction under 8 U.S.C. § 1252(e)(3).[11]  But their claims are out of time under that statute.  Section 1252(a)(2)(A), entitled "Review relating to section 1225(b)(1))," provides:

> Notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of Title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, no court shall have jurisdiction to review—
>
> *        *        *
>
> (ii) except as provided in subsection (e), a decision by the Attorney General to invoke the provisions of such section [section 1225(b)(1)],
>
> (iii) the application of such section to individual aliens, including the determination made under section 1225(b)(1)(B) of this title, or
>
> (iv) except as provided in subsection (e), procedures and policies adopted by the Attorney General to implement the provisions of section 1225(b)(1) of this title.

8 U.S.C. § 1252(a)(2)(A) (emphasis added).  Therefore, the INA precludes challenges to DHS's decision to "invoke" the expedited removal procedure or to apply it to "individual aliens" "except as provided under subsection (e)" of section 1252.  In turn, subsection (e)(3)(A), entitled "Challenges on Validity of the System," provides:

> Judicial review of determinations under section 1225(b) of this title and its implementation is available in an action instituted in the United States District Court for the District of Columbia, but shall be limited to determinations of—

---

[11]  They also cite 28 U.S.C. § 1331.  Although 28 U.S.C. § 1331 generally supplies jurisdiction over federal questions, 8 U.S.C. § 1252(a)(2)(A) eliminates jurisdiction for claims related to the decision to invoke the provisions of the expedited removal statute unless expressly permitted by 8 U.S.C. § 1252(e).  *See Make the Road v. Wolf*, 962 F.3d 612, 626 (D.C. Cir. 2020).  Here, section 1252(a)(2)(A), titled "Matters not subject to judicial review," removes from federal courts any jurisdiction, "[n]otwithstanding any other provision of law," including section 1331, jurisdiction to review Plaintiffs claims "relating to section 1225(b)(1)," *i.e.*, expedited removal.  *See Patchak v. Zinke*, 583 U.S. 244, 248-49 (2018) (the jurisdictional provision encompasses 28 U.S.C. § 1331).

(i) whether such section, or any regulation issued to implement such section, is constitutional; or

(ii) whether such a regulation, or a written policy directive, written policy guideline, or written procedure issued by or under the authority of the Attorney General to implement such section, is not consistent with applicable provisions of this subchapter or is otherwise in violation of law.

8 U.S.C. § 1252(e)(3)(A).

Critically, there is a sixty-day deadline for filing such an action. Under section 1252(e)(3)(B) these types of systematic challenges shall be filed "no later than 60 days after the date the challenged section, regulation, directive, guideline, or procedure . . . is first implemented." That deadline is jurisdictional and it is not excused by a post sixty-day discovery that a particular individual will be subject to expedited removal. *AILA*, 18 F. Supp. at 47 ("The Court reaches this conclusion because Congress designed the statute so that the 60 days ran from a fixed point, the initial implementation of the challenged provisions, rather than from the date of application of IIRIRA to a particular alien.").

In this case, Plaintiffs challenge several DHS documents and argue that those documents provide incorrect guidance because aliens paroled at a port of entry are not subject to expedited removal. *See, e.g.*, Compl., ¶ 13. They also allege that application of expedited removal to their members will violate due process. Compl., ¶ 114. However, as explained below, DHS promulgated a regulation effective on April 1, 1997 defining an "arriving alien" as "an alien who seeks admission . . . at a port-of-entry" and clarified that such an alien remains an arriving alien "even if paroled." 62 Fed. Reg. at 10,312 (codified at 8 C.F.R. § 1.2). Plaintiffs cannot challenge the conclusion that they are subject to expedited removal or the adequacy of these procedures because their complaint was not filed within sixty days of April 1, 1997.

Congress created expedited removal through the Illegal Immigration Reform and Immigration Responsibility Act of 1996, Pub. L. No. 104-208, Div. C, 110 Stat. 3009 (Sept. 30, 1996). *See id.* § 309(a), 110 Stat. 3009–625 (April 1, 1997 effective date). That statute provided that aliens arriving in the United States ("an alien . . . arriving in the United States") and aliens designated by the responsible official ("an alien . . . described in clause (iii)") who met the other requirements were subject to expedited removal. 8 U.S.C. § 1225(b)(1)(A)(i). Congress did not define the term "arriving alien." But in an interim final rule effective April 1, 1997, the Department of Justice defined the term as including precisely the group that Plaintiffs say are not subject to expedited removal:

> The term arriving alien means *an alien who seeks admission to or transit through the United States, as provided in 8 CFR part 235, at a port-of-entry,* or an alien who is interdicted in international or United States waters and brought into the United States by any means, whether or not to a designated port-of-entry, and regardless of the means of transport. *An arriving alien remains such even if paroled pursuant to section 212(d)(5) of the Act.*

62 Fed. Reg. at 10,312; 8 C.F.R. § 1.1(q) (1998) (emphases added). If Plaintiffs wanted to contest the regulation's inclusion of aliens paroled at a port of entry as within the group of "arriving aliens" subject to expedited removal, they had to do so within sixty days after April 1, 1997. 8 U.S.C. § 1252(e)(3)(B); *see AILA*, 199 F.3d at 1355. The same holds true for Plaintiffs' due process challenge to expedited removal. The present complaint was filed decades out of time and therefore should be dismissed. That is so even if Plaintiffs' members did not themselves become "arriving aliens" and subject to expedited removal until long after the deadline passed. *AILA*, 18 F. Supp. 2d at 47. Thus, the Court may dismiss the suit as all three of Plaintiffs' claims (*i.e.*, the INA claim, APA claim, and due process claim) are jurisdictionally time-barred.

25

Plaintiffs may contend their suit is timely because their complaint was filed within 60 days of the DHS guidance and Federal Register Notice they challenge but, as discussed in more detail in Section II (addressing the merits of the APA claim), these documents do not establish a new rule or policy regarding the application of expedited removal to their members but merely remind immigration officials of their well-established authority to exercise prosecutorial discretion in considering whether to apply expedited removal in certain situations. The authority to apply expedited removal to aliens paroled at a port of entry is grounded in the expedited removal statute and implementing regulation, which went into effect in 1997. Thus, the Court should dismiss the suit as all three of Plaintiffs' claims, the INA claim, APA claim, and due process claim, are out of time.

  **2. The Relief That Plaintiffs Seek Is Also Squarely Foreclosed by 8 U.S.C. § 1252(g)**

The thrust of Plaintiff's action seeks to "[e]njoin Defendants from applying expedited removal to noncitizens who have previously been granted parole at a port of entry." Compl. at 34, Prayer for Relief, section 4. That claim falls directly within section 1252(g)'s preclusion of review for actions seeking to challenge DHS's commencement of removal proceedings, and therefore the Court should dismiss the complaint on this ground as well.

Section 1252(g) provides that "notwithstanding any other provision of law (statutory or nonstatutory) . . . no court shall have jurisdiction to hear any cause or claim by *or on behalf of any alien* arising from the decision or action by the Attorney General to [1] commence proceedings, [2] adjudicate cases, or [3] execute removal orders against any alien," except through a petition for review from a final order of removal filed in a court of appeals. (Emphasis added). Though this section "does not sweep broadly," *Tazu v. Att'y Gen. U.S.*, 975 F.3d 292, 296 (3d Cir. 2020),

its "narrow sweep is firm," *E.F.L. v. Prim*, 986 F.3d 959, 964-65 (7th Cir. 2021). Courts "cannot entertain challenges to the enumerated executive branch decisions or actions" outside a petition for review. *E.F.L.*, 986 F.3d at 964. The Supreme Court has explained that 8 U.S.C. § 1252(g) is "directed against a particular evil: attempts to impose judicial constraints upon prosecutorial discretion." *AADC*, 525 U.S. at 485 & n.9 ("Section 1252(g) seems clearly designed to give some measure of protection to . . . discretionary determinations.").

Plaintiffs, "on behalf" of their members, request that this Court "impose judicial constraints" on DHS's "prosecutorial" decision to "commence" expedited removal proceedings against those members. But that is one of the actions that § 1252(g) bars. *AADC* is directly on point: There the Court held that § 1252(g) precluded the district court's review of the aliens' selective prosecution claims which sought to enjoin the Government from commencing deportation proceedings. As the Court explained, the aliens' challenge in that case to the decision to "'commence proceedings' against them falls squarely within § 1252(g)—indeed, as we have discussed, the language seems to have been crafted with such a challenge precisely in mind—and nothing elsewhere in § 1252 provides for jurisdiction." *Id.* at 487.

Plaintiffs cannot bypass section 1252(g) simply because they raise a statutory interpretation question as to DHS's authority to apply expedited removal to paroled aliens or a constitutional challenge to the expedited removal procedures, just as the *AADC* Plaintiffs could not bypass section 1252(g) by alleging selective enforcement constitutional claims. *Id.* Indeed, such an outcome "would gut § 1252(g)" because "[f]uture petitioners could restyle any challenge to the [covered] actions . . . as a challenge to the Executive's general lack of authority to violate due process, equal protection, the [Administrative Procedure Act], or some other federal law." *Tazu,*

975 F.3d at 298; *see also E.F.L.*, 986 F.3d at 964 (noting that the restyling of claims would make § 1252(g) a "paper tiger"). For these reasons, section 1252(g) bars the Court from enjoining DHS from applying expedited removal to Plaintiffs' members.

### 3. Plaintiffs' Request for Injunctive Relief is Prohibited by 8 U.S.C. § 1252(f)(1)

The Court is further precluded by 8 U.S.C. § 1252(f)(1) from issuing non-individual injunctive relief restraining the inspection, apprehension, examination, exclusion, and removal of aliens—the type of relief Plaintiffs request. Section 1252(f)(1) provides that

> Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of Part IV of this subchapter . . . other than with respect to the application of such provisions to an individual alien against whom proceedings . . . have been initiated.

*See also Biden v. Texas*, 597 U.S. 785, 797 (2022) (Section 1252(f)(1) "generally prohibits lower courts from entering injunctions that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions"). "Part IV of this subchapter" refers to 8 U.S.C. §§ 1221-1232, the sections of the United States Code which govern the inspection, apprehension, examination, exclusion, and removal of aliens. *Garland v. Aleman-Gonzalez*, 596 U.S. 543, 549, 558 (2022). "[T]he operation of [§§ 1221-1232] is best understood to refer to the Government's efforts to enhance or implement them"—"a reference not just to the statute itself but to the way that [it is] being carried out." *Id.* at 555 (internal citations omitted).

Plaintiffs seek to "enjoin Defendants from applying expedited removal to noncitizens who have previously been granted parole at a port of entry." Compl., Prayer for Relief, at ¶ 4. Expedited removal under 8 U.S.C. § 1225(b)(1)(A) falls within §§ 1221-1232 and, therefore, is covered by 8 U.S.C. § 1252(f)(1). Consequently, the Court lacks authority to grant Plaintiffs'

request to categorically enjoin "the Government's efforts to enforce or implement" section 1225(b)(1)(A) as to "noncitizens who have previously been granted parole at a port of entry."[12] *Compare Texas*, 597 U.S. at 794, 797 (holding that the district court's order enjoining the government to continue applying its "remain in Mexico" program under 8 U.S.C. § 1225(b)(2)(C) violated § 1252(f)(1)), *with O.A. v. Trump*, 404 F. Supp. 3d 109, 158 (D.D.C. 2019) (holding that § 1252(f)(1) did not apply because plaintiffs sought to enjoin ineligibility grounds for asylum under 8 U.S.C. § 1158, and not a provision within §§ 1221-1232); *Gonzalez v. ICE*, 975 F.3d 788, 814 (9th Cir. 2020) (holding 8 U.S.C. § 1252(f)(1) did not apply because plaintiffs sought to enjoin detainers under 8 U.S.C. § 1357(d), and not a provision within §§ 1221-1232). Enjoining the operation of 8 U.S.C. § 1225(b)(1) is barred even if the Court ultimately determines the agency's application of expedited removal to former parolees is an "unlawful" or "improper" function of the statute. *Aleman Gonzalez*, 596 U.S. at 552-54. That is, "the reach of § 1252(f)(1)" is not "dependent upon the merits" of Plaintiffs' claim that the government is "misapplying a covered statutory provision," here § 1225(b)(1)(A), to former parolees. *Id.* at 553-54. In short, a categorical injunction here is simply not an available remedy. *See Texas*, 597 U.S. at 798. And it is especially unwarranted here where Plaintiffs are multiple organizations and, moreover, have not pointed to any member of their organization against whom expedited removal has "been initiated" (underscoring their lack of associational standing, *see* Section I.A). *See Aleman Gonzalez*, 596

---

[12] It remains the government's view that section 1252(f)(1) can also bar declaratory relief. *See Aleman Gonzalez*, 596 U.S. at 551 n.2; *cf. California v. Grace Brethren Church*, 457 U.S. 393, 408 (1982) (Tax Injunction act barred declaratory relief as well as injunctive relief); *Newdow v. Roberts*, 603 F.3d 1002, 1012 (D.C. Cir. 2010). The government recognizes, however, that the D.C. Circuit has held otherwise in an opinion pre-dating *Aleman Gonzalez*. *Make The Road N.Y. v. Wolf*, 962 F.3d 612, 635 (D.C. Cir. 2020).

U.S. at 564 ("In drafting § 1252(f)(1), Congress had every reason to be doubly sure that only individuals in removal proceedings and not other entities," such as "organizations" and "States," "would receive injunctive relief restraining the operation of the specified provisions of the INA") (Sotomayor, J., concurring) (internal citations omitted).[13] Thus, Plaintiffs' request for injunctive relief should be denied on this additional threshold ground.

### C.    Plaintiff Organizations Cannot Show They are Within the Zone of Interests Protected by the Expedited Removal Statute

Even if the Plaintiffs passed the threshold of Article III standing, and even if they showed they were making a timely challenge under § 1252(e)(3) that is not barred by subsections (f) or (g), they cannot succeed in asserting violations of the INA.   None of the Plaintiffs are natural persons subject to or potentially subject to expedited removal from the United States.  The Plaintiff organizations describe their reason for being, *e.g.*, Compl., ¶¶ 61, 75, 76, 88-89, 90, 100, but do

---

[13]  Even apart from section 1252(f)(1)'s prohibition, Plaintiffs are not entitled to the vastly overbroad injunctive relief they seek. Plaintiffs ask the Court to enjoin Defendants from initiating expedited removal against a huge number of aliens—all "noncitizens who have been previously granted parole at a port of entry."  Prayer for Relief, at ¶ 4; 90 Fed. Reg. at 13618 (noting that "between October 19, 2022, and January 22, 2025, approximately 532,000 inadmissible aliens received parole into the United States pursuant to the CHNV parole programs").  But they have no basis to request such broad relief benefiting non-parties; any injunctive relief should be limited to members that Plaintiffs can identify to the Court.  *See Gill v. Whitford*, 585 U.S. 48, 73 (2018) ("A Plaintiff's remedy must be tailored to redress the plaintiff's particular injury.").  It is also important to note that Plaintiffs have not sought to certify a class under Fed. R. Civ. Pro. 23; nor could they in light of 8 U.S.C. §§ 1252(f)(1) and 1252(e)(1)(B), the latter which precludes the Court from certifying a class "in any action for which judicial review is authorized" under section 1252(e)(3). *Am. Immigr. Laws. Ass'n*, 199 F.3d at 1359; *see also Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 163 (2010) (noting that where Plaintiffs "do not represent a class, [] they could not seek to enjoin such an order on the ground that it might cause harm to other parties").  Here, the excessive relief Plaintiffs request would, if granted, enjoin DHS from applying expedited removal to potentially hundreds of thousands of paroled aliens whose parole DHS is seeking to revoke, thereby frustrating DHS's efforts to expeditiously remove aliens who are unlawfully in the country and imposing substantial administrative burdens by requiring DHS to initiate and litigate full-blown removal hearings.

not show that Congress created a cause of action allowing them to enforce the limits established by Congress in the INA or, in particular, the expedited removal statute. *See AILA*, 199 F.3d at 1358 ("We cannot see anything in these provisions allowing litigants—whether individuals or organizations—to raise claims on behalf of those not party to the lawsuit."); *id*. at 1359 ("When we examine other subsections of 8 U.S.C. § 1252(e) dealing with judicial review, we find signs that Congress meant to allow actions only by aliens who have been subjected to the summary procedures contained in § 1225(b) and its implementing regulations.").

A plaintiff must be "adversely affected or aggrieved by agency action within the meaning of a relevant statute" to sue under the APA. 5 U.S.C. § 702. A plaintiff "may not sue unless he falls within the zone of interests sought to be protected by the statutory provision whose violation forms the legal basis for his complaint." *Thompson v. N. Am. Stainless*, 562 U.S. 170, 177 (2011). This inquiry asks whether Congress intended for a particular plaintiff to invoke a particular statute to challenge agency action. *See Clarke v. Security Indus. Ass'n*, 479 U.S. 388, 399 (1987). Plaintiffs do not even articulate how they are in the zone of interests of the expedited removal statute. *See* Compl., ¶¶ 10-12, 17-19, 59-100.

Furthermore, nothing in the text, structure, or purpose of the INA generally, or § 1225(b)(1)(A) specifically, shows an intent to allow organizational Plaintiffs to challenge agency action. With respect to expedited removal, neither section 1225 nor section 1252 evinces any concern with organizations or their interest in representing individuals subject to expedited removal. *See* 8 U.S.C. § 1225(b)(1)(A); *see also id*. § 1252(e)(1)(B) (limiting class certification for matters subject to judicial review in subsection (e) of the section). These provisions do not regulate the organizational Plaintiffs' conduct or create any benefits for which the organizations

may be eligible.  For example, section 1252(e)(3) is a jurisdiction-conferring statute and does not "provid[e] plaintiffs with a cause of action to challenge the government's implementation of the expedited removal system." *Make the Road N.Y. v. McAleenan*, 405 F. Supp. 3d 1, 36 (D.D.C. 2019); *see also O.A*, 404 F. Supp. 3d at 140 (finding no "feature of § 1252(e)(3) suggesting that it provides a cause of action, much less an exclusive cause of action for claims brought challenging implementation of the expedited removal statute").  And the D.C. Circuit has concluded that immigration statutes are directed at aliens, not organizations advocating for them. *AILA*, 199 F.3d at 1364 ("[P]laintiff organizations do not have standing to raise claims, whether statutory or constitutional, on behalf of aliens subjected to IIRIRA's expedited removal system."); *see Fed'n for Am. Immigration Reform, Inc. v. Reno*, 93 F.3d 897, 900-04 (D.C. Cir. 1996) (affirming the district court's dismissal of the complaint, reasoning Congress did not "seek to protect the interests of the Federation's members by intending them as beneficiaries or as suitable challengers of violations").

Allowing third parties who cannot be subject to expedited removal to challenge the Executive Branch's decisions through the APA would circumvent Congress's statutory design.  As Justice O'Connor explained in granting the government's stay application in an immigration case involving similar organizational plaintiffs, organizations that "provide legal help to immigrants" do not satisfy the zone-of-interests test. *INS v. Legalization Assistance Project of L.A. Cty. Fed'n of Labor*, 510 U.S. 1301, 1302 (1993) (O'Connor, J., in chambers).  Federal immigration law was "clearly meant to protect the interests of undocumented aliens, not the interests of organizations." *Id*. at 1305.  The fact that an immigration regulation "may affect the way an organization allocates

its resources" for representing aliens accordingly does not bring the organization "within the zone of interests" that the asylum and withholding statutes protect. *Id.*

Defendants acknowledge that some courts in this District have sometimes held that the zone-of-interests test should be applied permissively and have found organizations satisfy it, even in the context of the INA. *See, e.g.*, *O.A.*, 404 F. Supp. 3d at 144. However, this relaxed standard does not (and cannot) survive the Supreme Court's *United States v. Texas* decision. 599 U.S. 670. There, the Court clarified—relying on principles that inform the scope of Article III and the APA's cause of action—that third parties have no cognizable interest in the way the Executive enforces the immigration laws against others. 599 U.S. at 674, 677; *see also Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 897 (1984) ("[P]rivate persons such as petitioners have no judicially cognizable interest in procuring enforcement of the immigration laws[.]"). Thus, for this reason as well, the Court should dismiss Plaintiffs' statutory claims.

## II. On the Merits, Plaintiffs Fail to Establish that Application of Expedited Removal to Their Members Would Violate the INA, APA, or Due Process

### A. Aliens Paroled into the U.S. at a Port of Entry are Properly Subject to Expedited Removal

#### 1. Paroled aliens fall within the category of aliens "arriving in the United States"

An alien paroled at the border is subject to expedited removal because he retains his status as an "arriving alien" under the INA. The statute provides that aliens arriving in the United States who meet the other requirements (*i.e.*, inadmissibility on fraud and lack-of-documents grounds) are subject to expedited removal. 8 U.S.C. § 1225(b)(1)(A)(i); 8 C.F.R. § 235.3(b). Indeed, an alien reverts to the status he possessed prior to the grant of parole which, in the case of all those paroled at a port of entry, is that of an applicant for admission standing at the threshold of entry.

33

*See* 8 U.S.C. § 1182(d)(5)(A). As Congress explained, parole "shall not be regarded as an admission of the alien and when the purposes of such parole shall ... have been served the alien shall forthwith return ... to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States." *Id.*; *see Jennings v. Rodriguez*, 583 U.S. 281, 288 (2018) (same) (citing statute); *Leng May Ma*, 357 U.S. at 188-90; *Ibragimov*, 476 F.3d at 137.

The long-extant parole regulations confirm what Congress made clear—that an individual paroled continues to be considered an arriving alien. The governing regulations define arriving alien to include "an applicant for admission coming or attempting to come into the United States at a port-of-entry." 8 C.F.R. §§ 1.2, 1001.1(q). "An arriving alien remains an arriving alien even if paroled pursuant to section 212(d)(5) of the Act [8 U.S.C. § 1182(d)(5)], and even after any such parole is terminated or revoked." 8 C.F.R. § 1.2. Moreover, the qualifications made to the regulatory definition—that it does *not* cover aliens paroled before a particular date or aliens paroled after that date if particular circumstances exist—highlights that it *does* include the group of aliens paroled at a port of entry. *Id.* Moreover, the definition of arriving alien does not include any temporal limit to those who could be subject to expedited removal. *See id.*

Plaintiffs cite various subregulatory language in an attempt to contradict these clear statutory and regulatory rules, but that effort must fail, in light of this plain statutory and regulatory language. *Cf. Philip Morris USA Inc. v. U.S. FDA*, 202 F. Supp. 3d 31, 50 (D.D.C. 2016) (holding that agency guidance was inconsistent with plain text of statute). The March 2025 FRN, which discusses the designation of those subject to expedited removal in such a way as to also encompass certain parolees, does not change that conclusion. *See* 90 Fed. Reg. at 13,611; *see also* 8 U.S.C.

34

§ 1225(b)(1)(A)(iii).  Instead, reference to the designation provision only adds to the potential sources of authority for subjecting parolees to the expedited removal statute.  It does not diminish or alter the unambiguous regulatory provision treating a parolee as an arriving alien (8 C.F.R. § 1.2) or Congress's unambiguous command that when parole ends "thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission."  8 U.S.C. § 1182(d)(5)(A). [14]

Plaintiffs also erroneously rely on language in the FRN which states:  "Expedited removal is available only when an alien has not been continuously present in the United States for at least the two years preceding the date of the inadmissibility determination."  90 Fed. Reg. at 13,619 (citing the designation provision); *see also id.* at 13,620 (if parole were allowed to expire on its own terms, "CHNV parolees may begin to accrue more than two years of continuous presence in the United States, such that DHS would have to initiate section 240 removal proceedings to effectuate their removal.") (same citation).  Plaintiffs seize on these statements to argue that DHS's reliance on the designation provision in the FRN is inconsistent with its guidance documents.  Compl., ¶ 109.  But Plaintiffs' argument fails because the regulation is relying on an additional source of authority for applying expedited removal— the designation authority—not changing the statutory or regulatory basis for treating parolees as arriving aliens.  In turn, nothing requires an

---

[14] Plaintiffs assert that their members "have begun establishing their lives here" and therefore are "no longer in the act of 'arriving.'"  Compl., ¶ 105.  But they cite no authority for that theory, which directly contradicts Congress's direction that a parolee reverts to the status as an applicant for admission once parole ends.  And the expedited removal statute indicates the opposite: Section 1252(e)(2) anticipates that even aliens "admitted for permanent residence" or as refugees/asylees may be placed in expedited removal if their status is terminated.  8 U.S.C. § 1252(e)(2).

agency to use one source of legal authority over another (*i.e.*, § 1225(b)(1)(A)(i) vs. § 1225(b)(1)(A)(iii)), and this type of policy choice is within the unreviewable discretion of the agency. Here, while DHS cited its designation authority under § 1225(b)(1)(A)(iii), nothing in the FRN precludes it from exercising the full scope of its statutory authority for expedited removal, including 8 U.S.C. § 1225(b)(1)(A)(i), pursuant to implementing regulations that have been in effect for over 25 years.

Moreover, Plaintiffs ignore the context of the statements in the FRN. The FRN did not set out to decide which individuals would be eligible for expedited removal. *See id.* at 13,611 (summary and background). Instead, in issuing this FRN, the Secretary decided to end certain parole programs (an action that Plaintiffs do not challenge) and explained her reasons for doing so. *Id.* at 13,612-17. One risk—as evidenced by this litigation—was that allowing parole to continue without prompt termination would raise practical and legal barriers to expedited removal that included a risk that full removal proceedings would be needed. *Id.* at 13,619-20. One need only read the statements in this complaint to understand the legitimacy of the Secretary's concern that removal would become more difficult if parole were let to run its course. *See* Comp. ¶ 105. Beyond that, the Secretary did not purport to alter the clear statutory and regulatory rules that treat parolees as arriving aliens. Even Supreme Court opinions are not to be parsed like a statute, *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 373-74 (2023), or to be read as controlling beyond the facts presented, *Turkiye Halk Bankasi A.S. v. United States*, 598 U.S. 264, 278 (2023), and the Secretary's decision to assess the risks of continued parole programs on the burden of removal obviously did not purport to reduce the removal options once parole was rescinded. In short, the regulation that defines arriving alien remains in place and individuals who meet that definition and

are inadmissible on the specified grounds are subject to expedited removal without regard to whether they previously were granted parole or the length of their presence in the United States.

The district court's decision in *Svitlana Doe v. Noem*, --- F. Supp. 3d ---, 2025 WL 1099602 (D. Mass. Apr. 14, 2025), *appeal pending*, No. 25-1384 (1st Cir. filed April 18, 2025), does not advance Plaintiffs' position. There, the district court stayed the FRN's revocation of parole for aliens of certain countries to the extent parole was revoked "without case-by-case review." *Id.* at *20. The court found plaintiffs were likely to prevail on their claim of legal error in DHS's rationale for immediately terminating parole for individuals already present in the U.S. based on the FRN's invocation of the designation provision. *Id.* at *16-18.

That case offers no support for Plaintiffs' position. First, the Supreme Court, by a 7-2 margin, recently granted the Government's application to stay the district court's order in *Svitlana Doe* pending its appeal to the First Circuit. *Noem v. Doe*, -- S. Ct. --, 2025 WL 1534782 (May 30, 2025). And notably, not even the dissenting Justices defended the district court's stay based on the likelihood-of-success factor but focused on irreparable harm and the balance of equities. *Id.* at *1-4; *id.* at *1 ("Even if the Government is likely to win on the merits, in our legal system, success takes time and the stay standards require more than anticipated victory.") (Jackson, J., dissenting). In any event, the question of DHS's authority to apply expedited removal to paroled aliens was not squarely before the district court and could not have been given the expedited removal statute's jurisdictional limitations. *See* 8 U.S.C. § 1252(a)(2)(A), (e)(3) (venue over systematic challenges is proper only in the D.C.); *see supra*, Section I.B.1.[15]

---

[15] To the extent there are statements in the *Svitlana Doe* decision suggesting there is no authority

2.    **Paroled aliens may be subject to expedited removal under the designation provision**

Even apart from the arriving alien definition, aliens paroled at a port of entry are subject to expedited removal under the designation provision at 8 U.S.C. § 1225(b)(1)(A)(iii), which allows designation of an alien "who has not been admitted or paroled" and who cannot show they have been present in the U.S. continuously for the 2-year period immediately prior to the date of their determination of inadmissibility.   Plaintiffs rely on the "who has not been admitted or paroled" language to argue that aliens paroled at a port of entry cannot be designated for expedited removal.   Compl., ¶ 106.   Not so.   Aliens who were (as a historical matter) paroled into the U.S. at a port of entry can be designated for expedited removal in the future because parole can expire or be terminated. 8 U.S.C. § 1225(b)(1)(A)(iii)(II); *see* 8 C.F.R. § 212.5(e)(2) (termination by service of charging document).   The use of the present perfect tense ("has not been ... paroled") here reflects a "state that continues into the present."   *See Turner v. U.S. Att'y Gen.*, 130 F.4th 1254,

---

under *any* statutory provision allowing DHS to apply expedited removal to aliens paroled at ports of entry*, see Svitlana Doe*, 2025 WL 1099602, at *16, those statements are simply wrong, and the Supreme Court's grant of a stay implicitly supports that view. *See id.* at *16. There is no provision in any statute or regulation providing that someone "authorized to enter the United States" is not eligible for expedited removal. *See id.* On the contrary, with respect to the definition of arriving alien, an alien paroled at a port of entry is authorized to physically enter the United States. That is, after all, what parole does. 8 U.S.C. § 1182(d)(5)(A) ("parole into the United States"). But such an alien remains in the position of an applicant for admission, *id.* ("thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission"), and in the position of an "arriving alien" subject to expedited removal, 8 C.F.R. §§ 1.2, 1001.1(q) ("An arriving alien remains an arriving alien even if paroled pursuant to section 212(d)(5) of the Act, and even after any such parole is terminated or revoked."). Indeed, the district court's statement that expedited removal does not apply to those "authorized to enter the United States" is squarely at odds with Congress's enactment of statutory provisions that anticipate that even an alien who was initially "admitted for permanent residence" or "as a refugee" may be placed in expedited removal if "such status" has "been terminated." 8 U.S.C. § 1252(e)(2). The *Svitlana Doe* Court did not address these statutory or regulatory provisions.

1261–62 (11th Cir. 2025) (construing former 8 U.S.C. § 1432 and explaining that the present perfect tense can "refer to a . . . state that continues into the present"). The simpler explanation for this language is Congress's recognition that a person would not be subjected to expedited removal pursuant to 8 U.S.C. § 1225(b)(1)(A)(iii)(II) during the period for which they were designated for parole.

This textual interpretation comports with the statutory and historical context: when parole is revoked, an alien reverts to the status he possessed prior to the grant of parole which, in the case of all those paroled at a port of entry, is that of an applicant for admission standing at the threshold of entry. *See* 8 U.S.C. § 1182(d)(5)(A); *Jennings*, 583 U.S. at 288 ("[W]hen the purpose of the parole has been served, the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States.") (cleaned up); *Leng May Ma*, 357 U.S. at 188-90; *Ibragimov*, 476 F.3d at 137.[16]

In sum, the import of the statutory language—"who has not been admitted or paroled"—is best understood as encompassing aliens who are no longer paroled. So long as an alien retains parole status, he cannot be numbered among those designated for expedited removal under 8

---

[16] For these reasons, the district court in *Svitlana Doe* misread the designation provision by interpreting the "who had not been admitted or paroled" language to mean that any alien who has ever been paroled, for any length of time, is categorically immune from expedited removal. That reading is not only contrary to the text and structure of the parole statute and inconsistent with the broader statutory and historical context of parole, it is also inconsistent with longstanding regulations which provide that after parole is terminated, "further inspection or hearing shall be conducted under section 235 or 240 of the Act." 8 C.F.R. § 212.5(e)(2)(i). Section 235 of the Act is 8 U.S.C. § 1225, which includes the expedited removal provision.

U.S.C. § 1225(b)(1)(A)(iii). But once parole is terminated or expired then—so long as he has not been present for two years—there is no obstacle to his being designated for expedited removal.

**B.    Plaintiffs' APA Claim Fails Because the Documents They Contest Did Not Make the Changes That Plaintiffs Allege and Are Not Inconsistent**

In their Second Claim for Relief, Plaintiffs raise an APA claim alleging that three DHS documents—the Huffman Memo, the February "directive," and the March 2025 FRN—are inconsistent and that through these documents DHS made substantive policy changes without considering the impact on the affected population. Compl., ¶¶ 109-11. Plaintiffs misread these documents. The documents provide guidance to immigration officers with regard to the exercise of their prosecutorial discretion in selecting which INA procedures to use to process removable aliens—a decision that itself is not subject to judicial review, *see supra* at Section I.B.2 (discussing 8 U.S.C. § 1252(g); *AADC*, 525 U.S. at 487).

As noted above, a long-standing DHS regulation provides that "[a]n arriving alien remains such even if paroled pursuant to section 212(d)(5) of the Act," and therefore is subject to expedited removal. 8 C.F.R. § 1.2. None of the three documents change this rule or purport to make any changes in rules governing (1) which aliens are designated within the statutory limit, (2) whether the groups of arriving aliens and the group of designated aliens are subject to expedited removal, or (3) whether aliens paroled at a port of entry fall into either of those groups.[17]

---

[17] For this reason, Plaintiffs' claims also fail on the ground that there is no "final agency action." 5 U.S.C. § 704. The APA's definition of "action" is "not so all-encompassing as to authorize [courts] to exercise judicial review [over] everything done by an administrative agency," *Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 427 (D.C. Cir. 2004) (Roberts, J.), but is limited to the set of "circumscribed, discrete agency actions" delineated in 5 U.S.C. § 551(13), which defines "action" as "an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or

The Huffman Memo "provides guidance regarding how to exercise enforcement discretion in implementing" two separate policies that Plaintiffs do not contest. Huffman Memo at 1-2. For "any alien . . . amenable to expedited removal but to whom expedited removal has not been applied," the Memo simply directs relevant officials "to review the alien's case and consider, in exercising your enforcement discretion, whether to apply expedited removal." *Id.* This guidance is entirely consistent with the February 18, 2025 ICE "directive" which similarly directs enforcement officers to "*consider* for expedited removal (ER) all aliens previously released by U.S. Customs and Border Protection (CBP) who have not affirmatively filed an application for asylum with U.S. Citizenship and Immigration Services." *Id.* (emphasis added). The directive then summarizes without change legal principles governing the application of expedited removal to various groups of aliens.

The March 2025 FRN has a different purpose from the two documents discussed above. It did not intend to provide general guidance on how immigration officials should exercise their enforcement discretion, including the use of expedited removal. Rather, it announced the termination of specific parole programs and that individuals paroled under those programs and in the United States would have their parole terminated prior to the natural expiration of the grant. 90 Fed. Reg. at 13,612-17, 13,619-20. DHS's determination that the relatively higher burden and cost to remove someone using removal proceedings under 8 U.S.C. § 1229a than employing

---

failure to act." *See Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62 (2004). Here, none of the contested documents definitively address the issue Plaintiffs raise, which, as discussed, is governed by an implementing regulation in 1997. The 2025 FRN makes a policy change by terminating certain parole programs not contested in this case, and the other two DHS documents simply remind immigration officers—in the context of aliens whose parole has been revoked—of their enforcement discretion in choosing whether or not to initiate removal proceedings, and, if so, in determining what type of proceeding to apply.

expedited removal is not inconsistent with either the Huffman Memo or the February 18 document Plaintiffs rely on. And DHS's statements in the March 2025 FRN about being limited to a two-year time period simply do not constitute a renunciation of the availability of using expedited removal against arriving aliens who qualify, which would be contrary to a governing regulation. Accordingly, there is no basis for any claim of inconsistency.

Finally, Plaintiffs charge that the agency's actions violate the APA because they fail to consider the impact of their "changes" on an affected population. Compl., ¶ 111. However, as discussed above, the challenged documents made no policy change with regard to the application of expedited removal when they instructed immigration officers of their well-established authority to consider which removal procedure should be utilized in the individual case. The Court cannot review the agency's decision to adopt policies directing that discretion, and because there has been no change in policy, Plaintiffs cannot establish that any reliance interests have been upset.

### C.    Plaintiffs' Due Process Claim Lacks Merit and Should be Dismissed

Plaintiffs also allege that aliens who are at risk of being subjected to expedited removal are entitled to "notice, an opportunity to be heard, and to have the law correctly applied in their cases, including a meaningful process before they can be removed from the country." Compl., ¶ 114. Although unclear, it appears Plaintiffs implicitly challenge the adequacy of the expedited removal procedures as applied to aliens paroled at a port of entry. *Id.; see also id.*, ¶ 84 (claiming "flaws in the credible fear screening process"). But, as discussed above, that challenge is untimely because under 8 U.S.C. § 1252(e)(3)(B), it had to have been raised in this Court within sixty days of the date that the expedited removal statute was "first implemented."

In any event, Plaintiffs' challenge is without merit. The sufficiency of the expedited removal procedures was upheld long ago in *AILA*, 18 F. Supp. 2d at 54-56. Plaintiffs fail to explain how the ICE memos and the FRN affect the adequacy of these procedures. *See* Compl., ¶¶ 114-15. Plaintiffs are entitled to all the process set forth in the expedited removal statute and regulations, *see* 8 U.S.C. § 1225(b)(1); 8 C.F.R. § 235.3(b),[18] and that is sufficient to satisfy due process. *AILA*, 18 F. Supp. 2d at 54-56; *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 544 (1950) ("Whatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned"); *accord Thuraissigiam*, 591 U.S. at 138-39; *see also Mezei*, 345 U.S. at 215 ("aliens who arrive at ports of entry—even those paroled elsewhere in the country for years pending removal—are treated for due process purposes as if stopped at the border") (cleaned up).

---

[18] This includes the opportunity to express a fear of persecution or torture and to apply for asylum, withholding of removal, and protection under CAT if the alien can establish a "credible fear" of persecution or torture before a USCIS officer or an Immigration Judge. 8 U.S.C. § 1225(b)(1)(B)(i); 8 C.F.R. § 235.3(b)(4). Under these procedures, the inspecting officer provides the alien with Form M-444, "Information About Credible Fear Interview." *See* 8 C.F.R. § 235.3(b)(4)(i). Form M-444 discusses among other things the alien's statutory rights to consultation and to Immigration Judge review and the consequences of failure to establish a credible fear of persecution or torture. 8 C.F.R. § 235.3(b)(4)(i). An alien referred for a credible fear interview is also given a list of *pro bono* representatives whom he or she might contact, along with access to a telephone. "Inspection and Expedited Removal of Aliens," 62 Fed. Reg. 10,312, 10320 (Mar. 6, 1997).

# CONCLUSION

For these reasons, the Court should dismiss the Complaint.

Dated: May 30, 2025

Respectfully submitted,

YAAKOV M. ROTH
*Acting Assistant Attorney General*

DREW C. ENSIGN
*Deputy Assistant Attorney General*

*/s/ Papu Sandhu*
PAPU SANDHU
(Mass. Bar No. 630090)
*Assistant Director*
U.S. Department of Justice
Civil Division
Office of Immigration Litigation
General Litigation & Appeals Section
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
Papu.Sandhu@usdoj.gov

TIM RAMNITZ
*Senior Litigation Counsel*

ARIC A. ANDERSON
TARYN ARBEITER
*Trial Attorneys*

*Counsel for Defendants*

44

**CERTIFICATE OF SERVICE**

I hereby certify that on May 30, 2025, I electronically filed this Memorandum of Points and Authorities with the Clerk of the Court for the United States Court of for the District of Columbia by using the CM/ECF system.  Counsel in the case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

*/s/ Papu Sandhu*
PAPU SANDHU
Assistant Director
U.S. Department of Justice