**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| COALITION FOR HUMANE IMMIGRANT RIGHTS, *et al*., | |
| *Plaintiffs*, | |
| *v.* | Case No.: 1:25-cv-0872 |
| KRISTI NOEM, in her official capacity as Secretary of Homeland Security, *et al.*, | |
| *Defendants*. | |

## FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### INTRODUCTION

1. This lawsuit challenges the Trump administration's various agency policies expanding expedited removal to categorically expose hundreds of thousands of people who entered the country legally through humanitarian parole processes to summary deportation.

2. Expedited removal is an extraordinary procedure that allows removal from the United States with little to no due process. While expedited removal has historically been used only for people in the process of seeking admission at a port of entry, or for people encountered in the country *a short time* after entry and within 100 miles of a land border who had "not been admitted or paroled into the United States," on January 21, the administration decided to expand the scope of expedited removal to include individuals throughout the United States who have been continuously present here for less than two years.

3. On January 23, the administration issued a memorandum implementing the above expansion of expedited removal by directing agency personnel to "consider" using the fast-track

removal authority on any noncitizen eligible for processing through expedited removal, including individuals who had previously been granted parole, including by terminating active removal proceedings and any active parole status (the "January 23 Huffman Memorandum").

4.      Shortly thereafter, on February 18, the administration issued a directive that purports to expose individuals who have been paroled into the country at ports of entry and who do not have a pending asylum application to the threat of expedited removal, with "no time limit on the ability to process such aliens for ER [expedited removal]" (the "February 18 ICE Directive").

5.      The administration also issued a series of commands, both public and private, terminating various humanitarian parole programs under which hundreds of thousands of individuals fleeing turmoil in their own countries have been lawfully allowed to enter the United states for periods of up to two years, permitting them to live and work safely for the duration of their authorized period of parole or any subsequent lawful authorized stay, such as during the consideration or granting of another immigration filing. The administration additionally ended the use of CBP One, a mobile application, which allowed certain individuals outside the country, also fleeing turmoil in their home countries, to schedule appointments to appear at certain land ports of entry to be inspected and considered for parole. Many CBP One parolees were also placed in ordinary removal proceedings, on a case-by-case basis, at the same time that they were granted parole. All of these paroled individuals have been able to apply for work authorization and, when eligible, for immigration benefits, such as asylum, Temporary Protected Status ("TPS"), or other forms of relief, and in some circumstances could re-apply for another period of parole.

6.      On March 25, the administration published a Federal Register Notice that formally terminated four such humanitarian parole processes for nationals of Cuba, Haiti. Nicaragua, and

Venezuela (the "CHNV" parole processes) and purported to categorically terminate all grants of parole previously extended to CHNV nationals ("the March 25 CHNV Termination Notice"). In this Notice, the administration again discussed the application of expedited removal to these parolees and observed that expedited removal only can be used with respect to individuals who have been continuously present in the country for less than two years. The March 25 CHNV Termination Notice is inconsistent with the February 18 directive not only with respect to whether individuals like CHNV parolees may be processed for expedited removal without any time limit, but more fundamentally with respect to the legal basis for exposing them to expedited removal at all.

7.    Starting around May 21, 2025—the same day that White House Deputy Chief of Staff Stephen Miller was reported to have demanded that U.S. Immigration and Customs Enforcement ("ICE") leadership meet high quotas for detentions and removals, pressuring them to go to locations such as Home Depot and 7 Eleven to fulfill quotas without regard to individuals' criminal history—Plaintiffs, attorneys, and noncitizens nationwide began reporting and experiencing the widespread implementation of the administration's policies targeting for expedited removal individuals who had been previously paroled into the United States at ports of entry.

8.    In immigration courtrooms around the country, ICE Trial Attorneys representing the Department of Homeland Security ("DHS") started to file motions to dismiss removal proceedings against certain noncitizens who were appearing for routine hearings, including noncitizens who had been inspected and paroled into the United States at a land port of entry during an appointment secured through DHS's CBP One mobile application. Some motions were filed in writing; others, orally. Some motions disclosed that ICE intended to process the noncitizens for

expedited removal upon dismissal of proceedings and some made no mention of plans to continue pursuing removal.

9.      At the conclusion of proceedings, where the immigration judge had granted the government's motion to dismiss, ICE officers waiting outside the courtroom arrested these noncitizens without warning, and without a warrant of any kind.

10.     Many of those arrested were (and many remain) wholly unaware of why they are detained or that they are going to be processed for expedited removal. Many had also already appeared for multiple prior court hearings without being detained, and many had requests for immigration relief pending with the immigration court or with U.S. Citizenship and Immigration Services (USCIS).

11.     Those arrested are often being separated from family—sometimes physically pulled away from loved ones in sight of the courtroom—and detained in remote immigration detention facilities, facing rapid deportation with limited access to counsel and without a meaningful opportunity to present claims for relief for which they are eligible.

12.     The simultaneous expansion of expedited removal in various and inconsistent ways and the attempted *en masse* termination of hundreds of thousands of previously-issued grants of parole, combined with the recent rise in the use of expedited removal on the ground, including against noncitizens who have been paroled into the country at ports of entry, place these parole recipients at imminent risk of being uprooted from this country and removed without basic due process rights and in violation of precise statutory limits.

13.     In addition to courthouse arrests, there have been sweeping worksite raids taking place across the country, from Washington, D.C. to Los Angeles, California, including significant

enforcement actions taking place in Los Angeles in June 2025. These actions further reinforce that parole beneficiaries are at imminent risk of expedited removal and all its concomitant harms.

14.    Without relief from this Court, individuals who have lawfully been granted parole and are living and working throughout the United States—many with families—are at significant risk of being arrested, detained, and removed from the country through a process that not only lacks basic procedural safeguards (including judicial review), but that cannot even be applied to them legally.

15.    Plaintiffs Coalition for Humane Immigrant Rights ("CHIRLA"), UndocuBlack Network ("UndocuBlack"), and CASA, Inc. ("CASA") are nonprofit, membership-based, immigrant rights organizations whose work, services, and programming are guided by their members. Each group's members include noncitizens subject to expedited removal under the policies challenged in this litigation who are at risk of being arrested or detained at any point.

16.    CHIRLA's members include newly arrived migrant families who fled persecution, torture, and the threat of death, and who sought safety in the United States using the CBP One mobile application. Although granted parole and permitted to enter the country temporarily with the opportunity of applying for various forms of protection, these members are now faced with the possibility of being sent back to the dangers they fled without notice and a full opportunity to secure relief for which they are eligible. One CHIRLA member, for example, is an Afghan man who fled under fear of execution by the Taliban and attacks by ISIS due to his ethnicity, religion, and prior activism. If he is rapidly deported to Afghanistan, he would be in immediate danger of bodily injury and death, as well as severe limits to his freedoms of religion, expression, and movement.

17.    UndocuBlack's members include Black migrants who were granted parole through the CHNV parole processes or after securing an appointment at a land port of entry through the CBP One mobile application. Since their entry into the country, these members have been targeted constantly in the United States by anti-Black, anti-Haitian violence, and are plagued by the constant fear of losing their parole and being subjected to rapid deportation back to persecution and danger in Haiti. One of these members, a Haitian man who fled political persecution in his home country, describes feeling now under the administration's expedited removal directives like he is "one second away from losing everything, including [his] life."

18.    CASA's members include both individuals who were sponsored to come to the United States through the CHNV parole processes and individuals who came through using the CBP One mobile application, and they are experiencing widespread anxiety, fear, and confusion about the administration's new policies on parole and expedited removal. One Venezuelan CASA member was granted TPS after he came to the United States on CHNV parole, but because of the administration's termination of Venezuelan TPS and expansion of expedited removal to apply to paroled individuals, he is now at risk of soon being subjected to expedited removal and separated from his young child.

19.    Plaintiffs seek a declaration that the application of expedited removal under 8 U.S.C. § 1225(b)(1)(A) to individuals like their members who have previously been granted parole at a port of entry is unlawful; an injunction prohibiting the Department of Homeland Security ("DHS") from continuing to apply its unlawful construction of the statute to expose individuals who have previously been granted parole at a port of entry to the threat of expedited removal; and vacatur of agency actions taken pursuant the agency's erroneous understanding of the law.

20.    There are other pending cases challenging (1) the expansion of expedited removal to individuals in the interior of the country who have lived here for less than two years and (2) the termination of various humanitarian parole programs. This case is largely focused on the intersection of those issues to ensure that people who were previously granted parole at a port of entry and have been living here continuously since that time are not subject to summary expulsion once they have been stripped of parole status or their period of parole has expired.

## JURISDICTION AND VENUE

21.    This Court has subject matter jurisdiction under 8 U.S.C. § 1252(e)(3). Section 1252(e)(3) provides jurisdiction in the United States District Court for the District of Columbia for an action challenging as unlawful "a written policy directive, written policy guidance, or written procedure" implementing the expedited removal statute. This Court additionally has jurisdiction under 28 U.S.C. § 1331.

22.    Venue is proper in this District because 8 U.S.C. § 1252(e)(3)(A) requires that all Section 1252(e)(3) actions be brought in the United States District Court for the District of Columbia. In addition, venue is proper under 28 U.S.C. § 1391(e)(1) because a substantial part of the events or omissions giving rise to this action occurred in this District and Defendants are officers of the United States being sued in their official capacity and reside in the District.

## PARTIES

23.    Plaintiff **Coalition for Humane Immigrant Rights ("CHIRLA")** is a nonprofit membership organization headquartered in Los Angeles, California, with ten offices throughout California and a national policy office in Washington, D.C. CHIRLA was founded in 1986, and it is the largest statewide immigrant rights organization in California, with approximately 50,597 active members. CHIRLA's members include noncitizens who entered the United States on some

form of humanitarian parole and are subject to and are being harmed by Defendants' application of expedited removal to parolees.

24.     Plaintiff **UndocuBlack Network ("UndocuBlack")** is a nonprofit membership organization incorporated in the District of Columbia. Created in 2016, UndocuBlack is a multigenerational network of Black immigrants that advocates for and supports Black immigrants through facilitating access to resources, storytelling, organizing, and community wellness. Since its inception, UndocuBlack has provided direct services and support to Haitian migrants who have sought protection in the United States as conditions in their home country have deteriorated. UndocuBlack has numerous members who are CHNV and CBP One parole beneficiaries from Haiti and are subject to and are being harmed by Defendants' application of expedited removal to parolees.

25.     Plaintiff **CASA, Inc. ("CASA")** is a national nonprofit membership organization headquartered in Langley Park, Maryland, with offices in Maryland, Virginia, Pennsylvania, and Georgia. Founded in 1985, CASA has more than 173,000 lifetime members from across the United States. CASA's members are predominantly noncitizens in a variety of immigration statuses, including members who entered the United States on some form of humanitarian parole and are subject to and are being harmed by Defendants' application of expedited removal to parolees.

26.     Defendant Kristi Noem is sued in her official capacity as the Secretary of the U.S. Department of Homeland Security ("DHS"), a position to which she was confirmed by the Senate on January 25, 2025.

27.     Defendant Todd M. Lyons is sued in his official capacity as the Acting Director of Immigration and Customs Enforcement ("ICE"), a component agency of DHS.

28.    Defendant Pete R. Flores is sued in his official capacity as the Acting Commissioner of Customs and Border Protection ("CBP"), a component agency of DHS.

29.    Defendant Angelica Alfonso-Royals is sued in her official capacity as the Acting Director of U.S. Citizenship and Immigration Services ("USCIS"), a component agency of DHS.

30.    Defendant Donald J. Trump is sued in his official capacity as the President of the United States. He was inaugurated on January 20, 2025.

**BACKGROUND**

**<u>The Statutory Parole Authority</u>**

31.    For more than 70 years, the Nation's immigration laws have granted the Executive the authority to temporarily parole certain noncitizens into the country. Such grants of parole do not constitute an admission into the country, but for the duration of their parole status, noncitizens may apply for employment authorization and, in some cases, request that their period of parole be extended. Like other noncitizens, parolees can also apply for other forms of immigration relief. Certain noncitizens who were inspected and paroled into the country also may apply to adjust their status to lawful permanent residence.

32.    From 1952 until 1996, the Attorney General was authorized by statute to grant parole "for emergent reasons" or "for reasons deemed strictly in the national interest." Neither phrase was defined by Congress.

33.    Since 1996, the Attorney General (now the Secretary of Homeland Security) has been authorized by statute to grant parole for "urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A). Again, neither phrase has ever been defined by Congress.

34.    Humanitarian parole has been a key component of immigration policy since the Eisenhower administration used it to allow 30,000 Hungarians fleeing Soviet invasion to come to the United States. Parole has been used over 125 times by administrations of both parties—

including the first Trump administration—to promote the national interest by advancing various humanitarian, foreign policy, regional security, and migration management objectives.

### Exercises of the Statutory Parole Authority

35.     In the past two decades alone, various challenges associated with managing migration throughout the Western Hemisphere and at the U.S.-Mexico border, as well as fallout and displacement resulting from armed conflicts elsewhere in the world, informed decisions by DHS to create a variety of processes to facilitate the consideration of individuals for entry into the United States for a temporary period of time through the statutory parole authority.

36.     **Operation Allies Welcome.** When Afghanistan's military and government quickly fell to the Taliban upon the withdrawal of the U.S. military in August 2021, the U.S. government evacuated approximately 124,000 people, including Afghan foreign nationals, from the country through Operation Allies Welcome. After Afghan foreign national evacuees went through medical, security, and other screenings in third countries, approximately 75,000 of them were authorized to travel to the United States and were inspected and paroled into the country. Fewer than 15,000 Afghans remain in the United States on current grants of parole by virtue of OAW.

37.     **Uniting for Ukraine.** In the weeks following Russia's invasion of Ukraine in February 2022, which marked the start of a war that continues to this day, significant numbers of Ukrainian nationals began presenting at U.S. ports of entry at the U.S.-Mexico border to request humanitarian protection. Initially, CBP generally paroled these individuals into the country, but in the interest of creating a safe, orderly, and humane pathway for displaced Ukrainian nationals and their immediate family members in Europe to request entry to the United States, DHS established the Uniting for Ukraine ("U4U") Parole Process. *See* Implementation of the Uniting for Ukraine Parole Process, 87 Fed. Reg. 25040 (Apr. 17, 2022).

38.     Under U4U, qualifying individuals who passed background and security checks and had a financial supporter in the United States would be granted travel authorization to fly to the United States at no expense to the government and present themselves at an interior port of entry to be inspected and considered for parole. Approximately 200,000 Ukrainians are in the United States today by way of parole, the vast majority of whom were granted two years of parole on a case-by-case basis. Most had preexisting ties to the United States, which is why they came here for refuge when they fled their home country.

39.     **Cuban, Haitian, Nicaraguan, and Venezuelan Parole Processes:** Faced with a marked increase in the number of Cuban, Haitian, Nicaraguan, and Venezuelan nationals arriving at the U.S.-Mexico border in fiscal year 2022—and given the difficulties of repatriating CHNV nationals to their home countries for a variety of humanitarian and diplomatic reasons—the Biden Administration created for each country a parole process modelled on U4U.

40.     In October 2022, DHS established a parole process for certain Venezuelans. *See* Implementation of a Parole Process for Venezuelans, 87 Fed. Reg. 63507 (Oct. 19, 2022). Approximately two months later, and in light of the effectiveness of the Venezuelan parole process in reducing encounters of Venezuelan nationals between the ports of entry, DHS expanded the Venezuelan parole process, *see* Implementation of Changes to the Parole Process for Venezuelans, 88 Fed. Reg. 1279 (Jan. 9, 2023), and established similar parole processes for certain Cubans, Haitians, and Nicaraguans. *See* Implementation of a Parole Process for Cubans, 88 Fed. Reg. 1266 (Jan. 9, 2023); Implementation of a Parole Process for Haitians, 88 Fed. Reg. 1243 (Jan. 9, 2023); Implementation of a Parole Process for Nicaraguans, 88 Fed. Reg. 1255 (Jan. 9, 2023). The Federal Register Notices announcing the CHNV parole processes identified a series of significant public benefits and urgent humanitarian reasons that would be advanced through the use of parole for

individuals availing themselves of the processes and additionally connected the implementation of the processes to ongoing foreign relations initiatives aimed at increasing regional cooperation in and capacity to effectively and responsibly manage migration throughout the Western Hemisphere.

41.    CBP granted parole on a case-by-case basis, for most individuals for two years, to over a half million Cubans, Haitians, Nicaraguans, and Venezuelans parole through CHNV.

42.    **CBP One:** Around the same time the administration created the CHNV parole processes, it also made available to migrants in Central and Northern Mexico a mobile application called CBP One, which could be used to schedule an in-person appointment at one of several land ports of entry along the U.S.-Mexico border. Upon receiving an appointment, migrants could present themselves at the port of entry for inspection and be considered for parole on a case-by-case basis into the country. Typically, paroled individuals would also be issued a Notice to Appear in immigration court where they would be able to pursue any form of immigration relief for which they might be eligible. Together with the new CHNV parole processes, the CBP One appointment process was designed to facilitate safe and orderly processing of qualified migrants at certain land ports of entry to reduce the incidence of migrants entering the country without inspection between ports of entry.

43.    **Central American Minors Parole:** Central American Minors (CAM) parole was created in 2014 as part of a broader initiative that also involved the consideration of certain Central American minors and qualifying family members for refugee status and potential resettlement in the United States; individuals determined not to be eligible for refugee status were considered, on a case-by-case basis, for parole into the United States. The CAM Refugee and Parole Program was largely prompted by the significant number of unaccompanied children from the Northern Triangle countries of El Salvador, Guatemala, and Honduras coming to the U.S.-Mexico border. Under the

program, certain nationals of those countries who are lawfully present in the United States may request that their children still in their home countries be considered for refugee status and, in the alternative, humanitarian parole, so that their families could be safely reunited. In addition to family reunification, the CAM program was intended to create a lawful and orderly pathway to disincentivize children from making the overland journey to the U.S.-Mexico border. In addition to being dangerous and potentially enriching smugglers, unaccompanied children presenting at the border create unique operational challenges for DHS. CAM parolees in the United States have been able to apply for and receive re-parole when their initial grants of parole expired.

44.    **Family Reunification Parole Programs:** In 2007, DHS created the Cuban Family Reunification Parole Program to allow certain approved beneficiaries of immigrant visa petitions, upon invitation by the federal government, to apply to be considered for parole into the United States so that they would not have to wait abroad—sometimes for years—for a visa number to become available. *See* Cuban Family Reunification Parole Program, 72 Fed. Reg. 65588 (Nov. 21, 2007). Similar programs were created for Haitian family members in 2014, family members of Filipino World War II veterans and their spouses in 2016, and family members from additional countries in Central and South America in 2023. *See, e.g.* Implementation of Haitian Family Reunification Parole Program, 79 Fed. Reg. 75581 (Dec. 18, 2014); Filipino World War II Veterans Parole Policy, 81 Fed. Reg. 28097 (May 9, 2016); Implementation of a Family Reunification Parole Process for Guatemalans, 88 Fed. Reg. 43581 (July 10, 2023).

<u>**Summary Termination of Parole Processes**</u>

45.    On January 20, 2025, President Donald Trump issued Executive Order 14165, "Securing Our Borders," that, among other things, directed the Secretary of Homeland Security (the "Secretary") to terminate all so-called "categorical parole program . . . including the program known as the 'Processes for Cubans, Haitians, Nicaraguans, and Venezuelans.'"

46.    That same day, Acting Secretary Benjamine C. Huffman issued a memorandum entitled, "Exercising Appropriate Discretion Under Parole Authority," to the heads of ICE, CBP, and USCIS. In that memorandum, Acting Secretary Huffman set out a narrow and legally incorrect interpretation of the parole statute, directed that every action regarding parole henceforth use this interpretation, and authorized pausing and terminating parole programs.

47.    Also on January 20, Acting Commissioner of CBP Pete Flores issued a memorandum restricting the CBP personnel authorized to grant parole and requiring that each parole granted by any CBP official be reported to him and the Chief of Staff, along with a justification for the grant. Acting Commissioner Flores' memorandum expressly supersedes any prior conflicting guidance.

48.    Further on that day, CBP terminated the ability of noncitizens to use the CBP One mobile application to schedule appointments to appear at select land ports of entry for inspection and consideration for parole and cancelled existing appointments.

49.    Later that same week, Acting Director of USCIS Jennifer Higgins issued a directive prohibiting USCIS staff from making any further decisions on any request for, among other things, parole or re-parole made through the OAW, U4U, CHNV, or other named parole processes.

50.    On March 21, DHS posted for public inspection a Federal Register Notice that purports to formally terminate the CHNV parole processes and to terminate *en masse* at the end of a 30-day period all grants of parole issued to individuals pursuant to the CHNV parole processes. *See* Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans, Mar. 21, 2025, https://public-inspection.federalregister.gov/2025-05128.pdf ("CHNV Termination Notice"). Through the Notice, DHS seeks to end all grants of parole and related employment authorization documents and to make as many of these individuals as possible begin to accrue

unlawful presence. The Notice asserts that the federal government has a "strong interest in promptly removing parolees when the basis for the underlying program no longer exists," and notes that "[e]xpedited removal is available only when an alien has not been continuously present in the United States for at least the two years preceding the date of the inadmissibility determination." *Id.* at 27 (citing 8 U.S.C. § 1225(b)(1)(iii)(II); 8 C.F.R. § 235.5)." The Notice further observes that "[i]f DHS were to allow the CHNV parolee population to remain for the full duration of their two-year parole, DHS would be compelled to place a greater proportion of this population in section 240 removal proceedings to effectuate their removal." *Id.* The Notice was published in the Federal Register on March 25.

51.    The termination of various humanitarian parole processes is being challenged in separate litigation. *See*, *e.g.*, *Svitlana Doe v. Noem*, No. 1:25-cv-10495 (D. Mass. filed Feb. 28, 2025) (challenging, among other things, the termination of OAW, U4U, CHNV, and certain other parole processes).

## **The Statutory Expedited Removal Authority**

52.    Under our immigration laws and unless otherwise specified, removal proceedings conducted in immigration court—with the right to appellate review before the Board of Immigration Appeals and federal court review—are the "sole and exclusive procedure" for determining whether a person should be admitted to or removed from the country. 8 U.S.C. § 1229a(a)(3).

53.    One specified exception to full removal proceedings is the expedited removal process created by Congress in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), which was first implemented through regulations adopted by the agency in 1997, *see* Inspection and Expedited Removal of Aliens; Conduct of Removal Proceedings; asylum Procedures, 62 Fed. Reg. 10,312 (Mar. 6, 1997).

54.     IIRIRA introduced a shift from the prior exclusion/deportation framework that "turned on whether [a noncitizen] had *physically entered* the United States" to "a new framework that turned on whether [a noncitizen] had been *lawfully admitted* into the country by immigration authorities." Hillel R. Smith, Cong. Rsch. Serv., R45314, *Expedited Removal of Aliens: Legal Framework* (2019), https://www.congress.gov/crs-product/R45314.

55.     Under expedited removal, certain noncitizens determined by an immigration officer to be "inadmissible" because they engaged in fraud or misrepresentation to procure admission or other immigration benefits, 8 U.S.C. § 1182(a)(6)(C), or because they lack the requisite documents for entry, Section 1187(a)(7), may be ordered removed by that officer "without further hearing or review." 8 U.S.C. § 1225(b)(1)(A)(i). There is no neutral arbiter in this proceeding—the officer who initiates the removal order also adjudicates it.

56.     By statute, the use of expedited removal is authorized for only two categories of noncitizens. First, under 8 U.S.C. § 1225(b)(1)(A)(i), a noncitizen who "is arriving in the United States" may be processed for expedited removal if they are found to be inadmissible on the grounds described above.

57.     Second, 8 U.S.C. § 1225(b)(1)(A)(iii) permits the Attorney General (now the Secretary of Homeland Security) to apply expedited removal to certain other noncitizens found inadmissible on the above grounds who have entered and remain in the United States but who "ha[ve] not been admitted or paroled into the United States." For expedited removal to be used in this way, the Secretary must designate certain noncitizens in the country to whom 8 U.S.C. § 1225(b)(1)(A)(iii) may be applied, although regardless of the Secretary's designation, it may not be applied to any noncitizen who can prove to the "satisfaction of an immigration officer" that they were "admitted or paroled into the United States following inspection at a port-of-entry" and

have been continuously physically present in the country for two years. *See* 8 U.S.C. § 1225(b)(1)(A)(iii)(II); 8 C.F.R. §§ 235.3(b)(1)(ii), (b)(6).

58.     Historically, expedited removal under 8 U.S.C. § 1225(b)(1)(A)(iii)(II) has been applied only to people in the process of seeking admission at a port of entry or for people encountered in the country a short time after entry and within 100 miles of a land border who had "not been admitted or paroled into the United States." On January 21, 2025, Acting Secretary Huffman issued for public inspection a designation, effective immediately, expanding the scope of expedited removal to apply nationwide and to certain noncitizens who are unable to prove they have been in the country continuously for two years. The designation was published in the Federal Register three days later on January 24, 2025. *See* U.S. Dep't of Homeland Sec., *Designating Aliens for Expedited Removal*, 90 Fed. Reg. 8139 (Jan. 24, 2025).

59.     This expansion of expedited removal is being challenged in separate litigation. *See Make the Road New York v. Huffman*, 25-cv-00190 (D.D.C. filed Jan. 22, 2025).

**Application of Expedited Removal to Noncitizens Who Have Been Paroled**

60.     On January 23, 2025, Acting Secretary Huffman issued a memorandum entitled, "Guidance Regarding How to Exercise Enforcement Discretion," to the leadership of ICE, CBP, and USCIS. The memorandum describes the Acting Secretary's January 20 memorandum authorizing the pausing or termination of various parole programs and the January 21 designation expanding the scope of expedited removal—both of which are described above—and "provides guidance regarding how to exercise enforcement discretion in implementing these policies."

61.     Specifically, the January 23 Huffman Memorandum explains that "[t]o effectively implement these two new policies," agency personnel are "direct[ed]" to consider applying expedited removal to "any alien DHS is aware of who is amenable to expedited removal but to whom expedited removal has not been applied." The memorandum notes that this may include

taking steps to "terminate any ongoing removal proceeding" in immigration court and/or "any active parole status."

62.     For individuals DHS is aware of who do not meet the conditions above but have "been granted parole under a policy that may be paused, modified, or terminated immediately under the January 20 memorandum," the January 23 Huffman Memorandum directs that they be considered for placement in removal proceedings and that the continued appropriateness of their parole be reviewed.

63.     On or about February 18, 2025, a directive was sent by ICE leadership to all Enforcement and Removal Operations personnel, citing a new Executive Order issued by President Trump on January 20, 2025 entitled "Securing Our Borders," and directing such officers to consider for expedited removal "paroled arriving aliens" who have not applied affirmatively for asylum with USCIS. The directive claims that "[t]here is no time limit on the ability to process such aliens for [expedited removal]," thereby exposing individuals paroled into the United States after inspection at a port of entry to the *indefinite* threat of this fast-track removal process. Although this directive has not been officially released, a copy of the directive was published by Reuters in connection with its reporting on the impact of the directive. *See* Ted Hesson and Kristina Cooke, "Trump weighs revoking legal status of Ukrainians as US steps up deportations," Reuters, Mar. 6, 2025, https://www.reuters.com/world/us/trump-plans-revoke-legal-status-ukrainians-who-fled-us-sources-say-2025-03-06/.

64.     The February 18 ICE Directive further states that the issuance to the individual of an expedited removal charging document has the effect of terminating that individual's active parole status.

65.     On March 25, DHS published in the Federal Register the CHNV Termination Notice, which discusses in multiple places when and under what authority the agency intends to process CHNV parolees for expedited removal. Like the February 18 ICE Directive, the March 25 CHNV Termination Notice cites the January 20, 2025 "Securing Our Borders" Executive Order and its direction to "terminate all categorical parole programs," including the CHNV program, and announces the termination of the CHNV parole program. The Notice further states that "[e]xpedited removal is available only when an alien has not been continuously present in the United States for at least the two years preceding the date of the inadmissibility determination." CHNV Termination Notice at 27. Because "thousands of CHNV parolees . . . will become ineligible for expedited removal upon the natural termination of their two-year parole," *id*. at 29 n.77, and to "initiate expedited removal proceedings to the maximum extent possible for the appropriate CHNV population," *id*. at 29, the March 25 CHNV Termination Notice seeks to terminate all existing grants of CHNV parole early, rather than allowing individuals the benefit of the two-year period they have been granted, effective 30 days after the publication date.

66.     The March 25 CHNV Termination Notice also states that "DHS intends to prioritize for removal" individuals who had not filed an immigration benefit request before the Notice's publication date and are not the beneficiary of an immigration benefit request filed by another on their behalf.

67.     As directed by the January 23 Huffman Memorandum and the February 18 ICE Directive, some noncitizens who have been paroled into the country at ports of entry have been subjected to expedited removal when attorneys for DHS filed motions to dismiss their pending removal proceedings in order to initiate expedited removal proceedings.

19

68. Starting around May 21, 2025, noncitizens and their attorneys nationwide began reporting this practice on a far broader scale. As noncitizens and their attorneys showed up to scheduled immigration court hearings, attorneys for DHS were filing motions, sometimes oral and sometimes written, to dismiss the noncitizens' removal proceedings. Some motions provided limited or no reasoning; others expressed DHS's intent to process the noncitizen for expedited removal. Noncitizens were not always given the opportunity to oppose the motion.

69. If, as was often the case, an immigration judge granted the motion and dismissed the case, noncitizens—and, in the case of noncitizens represented by counsel, their attorneys—often left these proceedings believing that the noncitizen was free of removal proceedings and would be able to proceed with affirmative applications for relief outside of immigration court.

70. As they were leaving the courtroom, ICE officers were waiting outside to arrest and detain them, without a warrant of any kind, so they could be processed for expedited removal. In some instances, ICE officers separated noncitizens from their family members, including young children, so they could apprehend and detain the noncitizens.

71. In some cases, noncitizens were detained after their immigration court hearings even though their removal proceedings had *not* been dismissed. They were told the proceedings would be dismissed, and that they were going to be processed for expedited removal.

72. News reporting has indicated that this practice is widespread at immigration courts around the country.

73. Noncitizens who have been paroled into the United States, including Plaintiffs' members and clients, are increasingly being subject to expedited removal.

**Harm to Plaintiff Organizations and Their Members**

74.     The flaws and deficiencies in the expedited removal process, including when compared to standard/normal removal proceedings under 8 USC § 1229a ("section 240 removal proceedings"), are widespread and well-documented.

75.     While section 240 removal proceedings are formal adversarial civil proceedings conducted before a neutral adjudicator (an Immigration Judge), in expedited removal proceedings DHS officers both initiate and adjudicate the removal order. None of the officers involved in expedited removal is required to serve as a neutral arbiter of fact.

76.     In section 240 proceedings, noncitizens are afforded the opportunity to retain counsel and request continuances to secure representation. In expedited removal, there is no statutory or regulatory right to counsel prior to removal, and the compressed timeframes and remote locations in which these proceedings take place significantly diminish the ability of noncitizens to locate and retain counsel. As the term "expedited" implies, such proceedings are conducted on a very compressed schedule and can result in deportation in hours or days.

77.     Section 240 proceedings also grant noncitizens reasonable time to gather and submit evidence, including documents and witness testimony, and present legal motions. Expedited removal does not. If a noncitizen in expedited removal expresses a fear of return to their home country, they should be referred for a "credible fear" screening interview with an asylum officer (who is also an employee of DHS), but will be severely limited in the time they have to gather and present evidence during that interview and, as mentioned above, they have no right to counsel during the interview.

78.     While section 240 proceedings generate a formal record including transcripts and written decisions that are subject to appellate and judicial review, expedited removal results in

summary paperwork with no routine oversight or external review unless a credible fear claim is accepted.

79.     Clients who are not fluent in English have been forced to sign expedited removal forms in English without translation or interpretation. And noncitizens have very limited rights to judicial review of an expedited removal order.

80.     During the recent courthouse arrests of noncitizens who have been paroled into the country, some noncitizens have been arrested without being told, and/or without understanding, that they are being processed for expedited removal. They have not been given the opportunity to contest the charges.

81.     The expedited removal process also does not provide noncitizens with the opportunity to apply for any forms of immigration relief for which they are eligible, including those that would lead to permanent lawful status in this country, such as asylum or a green card based on marriage to a U.S. citizen. If noncitizens subjected to expedited removal are permitted to and do persuade an immigration official (in a brief interview often done telephonically, without legal representation) that there is a sufficiently high likelihood that they will be tortured, killed, or persecuted if returned to their home country, those noncitizens are diverted from the expedited removal system to the regular removal system. It is only then, in regular removal proceedings (or in no removal proceedings of any kind), that noncitizens can seek affirmative immigration relief.

82.     The credible fear screenings, moreover, lack basic procedural safeguards. Enforcement officers must refer an individual to a USCIS asylum officer to conduct the credible fear interview, but studies show that enforcement officers fail to do so consistently. As a result, asylum seekers have been deported through expedited removal without any opportunity to be screened for fear, much less to apply for asylum.

83.     Even if noncitizens are referred for a credible fear interview, they are often detained in immigration detention facilities when they are interviewed, far from their attorneys, family members, and communities, with limited access to resources to help them prepare for the screening. They have limited access to counsel, and it is difficult for them to gather relevant documents, present evidence, or otherwise prepare. These inadequacies have led to the removal of people back to countries where they face persecution and violence.

84.     For noncitizens who are prima facie eligible for collateral relief (i.e., relief from removal that can be granted not by an immigration court but by another entity like USCIS) such as applications for adjustment of status through a U.S. citizen immediate relative or other green card category, Temporary Protected Status ("TPS"), or Special Immigrant Juvenile Status ("SIJS"), they have options in section 240 proceedings to request that the immigration judge manage the case in a way that will allow them to pursue those applications. For example, an immigration judge could grant a continuance, administratively close proceedings, or place the case on the status docket to provide time for USCIS to adjudicate the collateral relief, which would obviate the need for the removal proceedings.[1] The immigration judge could terminate the proceedings as well. These options are commonly used by immigration judges to manage their dockets and allow noncitizens to secure relief for which they are eligible under the law.

85.     In expedited removal proceedings, all of these options are foreclosed. The speed at which expedited removal proceedings move, and the lack of an independent arbiter separate from

_____

[1] U.S. Dep't of Justice, EOIR, Memorandum from Director James R. McHenry III re use of status dockets, PM 19-13, at 1 (Aug. 16, 2019), https://www.justice.gov/eoir/page/file/1196336/dl (explaining that the status docket can be used for cases where "an immigration judge is required to continue the case . . . in order to await the adjudication of an application or petition by [USCIS]"); see also U.S. Dep't of Justice, EOIR, Memorandum from Acting Director Sirce E. Owen re reinstatement of Memorandum 19-13, PM 25-27 (Mar. 21, 2025), https://www.justice.gov/eoir/media/1394086/dl?inline.

the agency actively pursuing removal who decides when principles of fairness counsel in favor of giving individuals more time to pursue relief, means that noncitizens with pathways to green cards or other collateral relief will lose the opportunity to pursue them.

86.    Noncitizens who were paroled into the United States but arrested and detained for expedited removal in the last few weeks have already reported that they will lose the opportunity to have applications for adjustment of status and SIJS adjudicated due to the government's decision to detain them and process them for expedited removal.

87.    Many of the noncitizens who were granted parole at ports of entry into the United States and recently arrested to be processed for expedited removal either had asylum applications already pending with the immigration court or were preparing to file them when they were detained. They now face all of these new barriers.

88.    Expedited removal orders have additional consequences for noncitizens beyond removal itself, including a five-year ban on admission to the United States unless they are granted a discretionary waiver, 8 U.S.C. §1182(a)(9)(A)(i); 8 C.F.R. § 212.2. Noncitizens issued expedited removal orders after having been found inadmissible based on misrepresentation are subject to a lifetime bar unless they are granted a discretionary exception or waiver.

89.    Plaintiffs are nonprofit membership-based organizations whose members include individuals who have been paroled into the United States through some of the humanitarian parole processes relevant to this case and are thus subject to the challenged policies implementing the expedited removal statute. Defendants' directives to apply expedited removal to parolees are causing Plaintiffs' members substantial injury.

90.     Plaintiff **CHIRLA**'s mission is to advance the human and civil rights of immigrants and refugees and ensure immigrant communities are fully integrated into society with full rights and access to resources.

91.     In furtherance of this mission, CHIRLA provides a range of services that reach tens of thousands of Californians each year. These services include education programs, legal services programs, and an assistance hotline that fields on average 15,000 calls a year. CHIRLA educates its membership as well as the broader community through know-your-rights trainings, workshops, and social media and educational literature about a variety of social services and benefits, including immigration law, financial literacy, workers' rights, and civic engagement.

92.     CHIRLA serves individuals who were paroled into the country under humanitarian parole processes through all of its different programs. In particular, CHIRLA provides trauma-informed wrap-around case management services to newly arrived migrant families who were paroled through CBP One and Afghan nationals who arrived through Operation Allies Welcome. These include benefits navigation, employment services, housing search, cultural orientation, pro se legal services, and other services needed for newcomers to successfully integrate into their new communities.

93.     CHIRLA members play an important role in deciding what CHIRLA's priorities are and how CHIRLA serves the community. CHIRLA receives feedback from its members during an annual member meeting and other member convenings where CHIRLA staff meet with members to discuss priorities for CHIRLA's work.

94.     CHIRLA membership is voluntary, and it is open to anyone who believes in the importance of social justice and supports an immigrant community, and who embodies diversity,

equality and inclusion. By becoming a CHIRLA member, an individual agrees to take a stand for immigrant rights.

95.    To become a CHIRLA member, an individual must submit an online application for membership, make an annual dues payment, and agree to the values and mission of CHIRLA. The current membership fee for individuals is $25, which can be paid manually every year or by setting up an annual recurring payment. There is also a family membership option, which is $60, and an enhanced individual membership (called a "community membership") option, which is $100 and provides select additional benefits. The fee can be (and occasionally has been) waived for individuals who experience financial hardship or are otherwise unable to pay. Once an individual becomes a CHIRLA member, they will receive a membership card and access to CHIRLA legal services and educational resources, year-round events and membership calls, and other benefits.

96.    CHIRLA's membership is diverse and includes U.S. citizens, non-U.S. citizens with lawful status, and non-U.S. citizens without lawful status. Members include individuals who were paroled into the country through the CBP One application, the Operation Allies Welcome parole process, and the CHNV parole process. CHIRLA has serviced hundreds of CBP One parolees, at least a dozen of whom have already become CHIRLA members.

97.    Members include both noncitizens who have been granted parole and have been continuously present in the United States for less than two years, as well as those who have been here for two years or more. Some of these parolee members are in active removal proceedings already, and some are not.

98.    Because of the services CHIRLA provides to its members, CHIRLA is acutely aware of the harms that Defendants' application of expedited removal to parolees is causing and

will continue to cause to its members. Parolee members of CHIRLA include individuals who are currently being processed for expedited removal and are actively and significantly harmed by Defendants' directives.

99.     Specifically, CHIRLA has members who were granted parole through the CBP One application and are currently in section 240 removal proceedings, who must appear in immigration court for regular hearings. Many of these members fear that they will be apprehended at immigration court and summarily removed from the country because they have heard of the exact same thing happening to others. CHIRLA also has members whose parole was prematurely terminated and who have been in the country for less than two years, including some who do not have any pending applications for asylum or other immigration relief. CHIRLA members are well aware of the recent significant increase in immigration enforcement at courthouses across the country and in and around Los Angeles. The stepped-up immigration enforcement underlines how exposed CHIRLA members are to the administration's drive to terminate individual grants of parole and subject paroled individuals to expedited removal.

100.     For example, E.I.R.M., a member of CHIRLA, arrived in the United States in 2023 after securing a CBP One appointment, presenting at a port of entry on the appointed date, and being inspected and paroled through late 2025. At the same time as he was granted parole, he was issued a Notice to Appear that required him to appear at an immigration court hearing. While living and working in Arizona afterwards, he got engaged to a U.S. citizen, appeared for all his scheduled immigration court hearings, and timely filed an asylum application with the immigration court. In March 2025, however, even though his parole was still valid, CBP arrested him when he drove through an interior CBP checkpoint and transferred him to ICE detention.

101.    E.I.R.M. has been in detention since then, during which time DHS moved to dismiss his removal proceedings so that they could process him for expedited removal. The immigration judge granted the motion without providing time for E.I.R.M. to respond.

102.    E.I.R.M. now faces severe barriers to having his asylum claim adjudicated. He was not provided access to counsel during his CFI, and he has received neither a transcript of his interview, nor the immigration judge review he requested of his negative CFI determination. As he will become eligible to apply for adjustment of status once he and his fiancée are married, the dismissal of his removal proceedings and placement of his case in expedited removal have effectively foreclosed his opportunity to pursue that form of relief from removal. E.I.R.M. has been in detention, and thus separated from his fiancée and family, for several months, which has caused him mental distress as well. He fears swift deportation back to Mexico, where he would face harm. Both he and his brother received death threats from a Mexican cartel that the US government has designated as a Foreign Terrorist Organization.

103.    The parolee members of CHIRLA also include many individuals who face an imminent risk of expedited removal given Defendants' application of their directives to increase the use of expedited removal against parolees, and who would be deeply and severely harmed if they were subject to expedited removal. For example, CHIRLA John Doe 1 is an Ecuadorian man who was paroled into the United States through CBP One and concurrently issued an NTA during the latter half of 2024, after he fled Ecuador out of fear for his life. After a cartel began extorting him for money, threatening to kill him if he didn't make regular payments and if he tried to leave town, he felt he had no other option but to flee the country. Unable to make payments, and unwilling to give into pressure to join the cartel, CHIRLA Doe 1 left his home, fearing for his life. Given Defendants' use of expedited removal against individuals like him—who made a CBP One

appointment and were subsequently inspected and paroled into the country at a port of entry, and were concurrently placed in section 240 removal proceedings—CHIRLA John Doe 1 is likely to be similarly targeted for expedited removal in the near future. Expedited removal back to Ecuador would put CHIRLA John Doe 1 back at risk of being murdered by the cartel.

104.    Another CHIRLA member is a Guatemalan woman whose husband was the target of death threats back in Guatemala. A man who was the head of a local criminal network and who was rumored to have murdered at least one other person in the community made verbal threats to their family, including to their son, and stalked them, hanging around their house at all hours. Before the death threats and stalking, he and members of his network had also harassed the CHIRLA member and her family when they went outside, impeding their ability to move freely. The CHIRLA member and her family tried to file reports with the police to obtain help but, as the man was a former police officer, the police did not get involved. For their safety, she and her family left their home and arrived in the United States in the summer of 2023 after being paroled into the country following a CBP One appointment. She was issued an NTA at the same time she was granted parole. Given Defendants' use of expedited removal against individuals like her who entered and were granted parole through a CBP One appointment and are in section 240 removal proceedings, this CHIRLA member and her family are likely to be similarly targeted for expedited removal in the near future. The CHIRLA member has applied for asylum, but the expedited removal process will pose more significant barriers to having that claim heard. If she and her family were subject to expedited removal, they would be rapidly sent back to the same severe risk of harm, including of death, from which they fled.

105.    Another CHIRLA member is an Afghan man who was paroled into the United States through CBP One during the summer of 2024 and issued an NTA at the same time. He fled

Afghanistan because he is a member of a minority community that the Taliban and ISIS systematically target for violence, killings, and bombings. He has survived attacks in the past, but the fall of Kabul in August 2021 escalated the threats against him and his community. He is also an activist, so he faces an even higher risk of persecution, torture, and even execution in Afghanistan. Given Defendants' use of expedited removal against individuals like him who entered and were granted parole through a CBP One appointment and are in section 240 removal proceedings, this CHIRLA member is likely to be similarly targeted for expedited removal in the near future. If he is put into expedited removal proceedings and deported to Afghanistan, he would be in immediate danger of kidnapping, torture, and death at the hands of the Taliban. He would face severe restrictions on his freedom to exercise his religion, freedom of expression, and freedom of movement.

106.    CHIRLA members live in areas where encounters with ICE officers and detention by ICE are common. ICE actively detains noncitizens all over California, including in and near Los Angeles.

107.    Parolee clients and members have expressed fears to CHIRLA around their parole status being revoked and then being subject to expedited removal. Beyond being fearful, CBP One parolees also express a sense of betrayal as they followed an established process laid out by the U.S. government, with many of them waiting months and in some cases over a year in Mexico—often in dangerous and difficult settings—for their appointments to appear at a land port of entry for inspection and consideration for parole. OAW Afghan parolees have expressed an even more heightened sense of disappointment as many of them risked their lives to support the U.S. military, and the government is now turning its back on them.

108.    Expedited removal of parolees like CHIRLA's members would be particularly harmful because of the rapid, summary nature of the process. It makes it more difficult for members and their families to have a plan in place; it causes more devastating, sudden family separation, which has a severe impact on any children involved; and the community around the members suffer as well. Additionally, the rapid deportation process would deprive some CHIRLA members of the opportunity to submit applications for immigration protections to which they are entitled, as described above.

109.    In its educational materials and know-your-rights trainings, CHIRLA has been teaching members about the risk of detention and deportation, including through expedited removal, and what they can do to prepare themselves and their families for the possibility.

110.    Plaintiff **UndocuBlack's** mission is to foster community, facilitate access to resources, and contribute to transforming the realities of its members—who are Black immigrants—so they can thrive and live their fullest lives.

111.    UndocuBlack's community-centered approach aspires to empower members to identify their needs and help shape the trajectory of UndocuBlack's work. UndocuBlack engages and supports their members and advocates for policies that protect members and Black immigrants at large through different areas of work including community engagement and organizing, community wellness, narrative and storytelling, and policy and advocacy.

112.    UndocuBlack has members across the country with chapters in New York, Los Angeles, and Washington, D.C. UndocuBlack serves thousands of immigrants through its organizational chapters with a national network across approximately thirty states.

113.    UndocuBlack's membership is over 1,000 active members. To become an active UndocuBlack member, an individual must (1) identify as Black, (2) be an immigrant, and is asked

to (3) apply by submitting a form to indicate their interest in joining the membership. There are no membership dues required. UndocuBlack also considers individuals in the larger UndocuBlack community—a diverse, inclusive, and expansive network—who have been involved with UndocuBlack programming or who have reached out to the organization for services to be members of UndocuBlack.

114. UndocuBlack has long served and supported the Haitian community in particular. Prior to the Trump administration's termination of humanitarian parole programs, UndocuBlack helped many Haitian members in the United States determine if they were eligible to sponsor family members for CHNV parole based on their income. UndocuBlack also assisted Haitian members and their families with school enrollment, getting connected to English Language Learner programs, applying for work authorizations, and completing applications for other immigration benefits like TPS.

115. UndocuBlack's members include at least 300 Haitian parole beneficiaries who were granted parole through either CHNV parole or CBP One. The Trump administration's application of expedited removal to parolees directly harms these members. Under the administration's recent policies, UndocuBlack's members who are Haitian CHNV and CBP One parole beneficiaries face an imminent risk of being processed for expedited removal, which would cause them severe harm.

116. Members who were paroled into the country through the Haitian CHNV parole program have now had their parole terminated early, and they face the impending threat of expedited removal given that in the March 25 CHNV Termination Notice, the federal government expressed a strong interest in initiating expedited removal proceedings "to the maximum extent possible" for CHNV parole beneficiaries.

117.    Some UndocuBlack members who are Haitian CHNV parolees did not come to the United States in time to apply for TPS, and even those who now have TPS recognize that the Trump administration is working to terminate those protections early (i.e., by August 3, 2025). Many have pending applications for other kinds of immigration relief, including asylum and adjustment of status, but some do not or are still preparing to file such applications. Given the March 25 CHNV Termination Notice and the government's increased use of expedited removal against paroled individuals, these members are at imminent risk of being processed for expedited removal and facing significant barriers to presenting the claims for which they are eligible.

118.    Additionally, although the March 25 CHNV Termination Notice indicated that individuals without pending immigration benefits will be prioritized for expedited removal, UndocuBlack's members are well aware of news reports of the Trump administration canceling other immigrants' visas and green card petitions and fear that their own petitions could likewise by canceled or otherwise rendered invalid. They are also well aware of news reports of the Trump administration's directives instructing DHS agencies to consider revoking individuals' grants of parole in order to subject them to expedited removal. Many CBP One parole beneficiaries have already had their parole revoked, and all CHNV parole beneficiaries will likely have their parole swiftly terminated soon.

119.    UndocuBlack's Haitian CHNV parolees also often have family members with different immigration statuses. UndocuBlack expects that many affected members, if they are put in expedited removal, will experience abrupt family separation and/or will lose one or more household incomes. UndocuBlack members could also be deported to Haiti where they do not have family or resources, and where they may be at risk of violence.

120.    UndocuBlack members who were granted parole through a CBP One appointment are also likely to be processed for expedited removal, given the recent rise in arrests at courthouses of noncitizens after their removal proceedings for that purpose. This practice of courthouse arrests poses particular danger to UndocuBlack members who are CBP One parolees, because many of them were placed in removal proceedings at the time of their parole and must appear regularly in immigration court.

121.    UndocuBlack members who may be eligible for asylum or Convention Against Torture protections in the United States still fear that they could be deported through expedited removal, given the flaws in the credible fear screening process. The screenings depend on case referrals by enforcement personnel to asylum officers, and noncitizens are given little opportunity to gather relevant documents, present evidence, or consult counsel. Due to these and other inadequacies, the screenings can result, and have resulted in, the removal of people to dangerous circumstances abroad.

122.    One UndocuBlack member, UBN Jane Doe 1, is a Haitian woman who was sponsored to come to the United States through the Haitian CHNV parole process. She applied for and was granted TPS, but now, due to the administration's efforts to terminate Haitian TPS prematurely, that status will likely expire in August, and she could be subject to expedited removal. UBN Jane Doe 1's son, who is back in Haiti, is ill, and being able to work in the U.S. through CHNV has been the only way UBN Jane Doe 1 has been able to provide for him. The termination of her CHNV parole and the anticipated early termination of her TPS, together with the possibility of being removed expeditiously without a meaningful opportunity to request any possible form of relief, have caused significant harm to UBN Jane Doe 1, who has relied upon CHNV parole to provide for herself and her ailing child. Moreover, the government's betrayal and stripping of time

that was given to her—which would be exacerbated by efforts to quickly remove her without process—will cause deep financial and psychological harm to her. Given Defendants' stated intention to initiate expedited removal proceedings to the maximum extent possible for CHNV beneficiaries like her, UBN Jane Doe 1 is likely to be targeted for expedited removal in the near future.

123.    Another UndocuBlack member, UBN Jane Doe 2, is a 45-year-old mother who fled Haiti and was paroled into the U.S. with her young son through CBP One in March 2024. She is in removal proceedings, and as she struggles to navigate the complex asylum process without legal representation, she lives in constant fear for both her life and her child's. Her greatest terror is that stepping outside for any reason could mean never returning to her son. Through free legal resources, she has learned that she must always be prepared to show documentation of at least two years of presence in the U.S., but the harsh reality is that she simply does not have that. The weight of this requirement, coupled with the uncertainty of her status, leaves her paralyzed with fear— afraid to attend her own hearings, afraid to send her son to school, and even afraid to stay in her own home. Any knock at the door or passing shadow, even from the mail carrier, fills her with terror. She lives in a constant state of anxiety, fearing that at any minute she will be processed for expedited removal, forced to try and quickly defend her asylum claim alone and without the opportunity to see a judge, without the ability to pay for an attorney, and while battling language barriers. Given Defendants' use of expedited removal against individuals like her who entered and were granted parole through a CBP One appointment and are in section 240 removal proceedings, this UndocuBlack member is likely to be similarly targeted for expedited removal in the near future.

124.    UndocuBlack members live in areas where encounters with ICE officers and detention by ICE are common. ICE actively detains noncitizens all over New York, where the largest concentration of UndocuBlack members reside. In the last several months, this activity has increased significantly, including for noncitizens granted parole.

125.    Since the administration's expansion of expedited removal to apply nationwide and to certain noncitizens who cannot prove they have been here for two years and the various directives that expose parolees to expedited removal, UndocuBlack has received countless inquiries from its members and the UndocuBlack community at large, including from those with parole, regarding what these policies mean and how they will be used to arrest, detain, and expeditiously remove parolees. In response to members' questions and requests for additional information, UndocuBlack created a Frequently Asked Questions (FAQ) resource to share with members and the broader community. UndocuBlack has also conducted member calls that have included Know Your Rights (KYR) trainings; such trainings have covered the impact that the expansion of expedited removal will have on parolees and safeguards that parolees should take to protect themselves and their families.

126.    UndocuBlack and its members see the expedited removal policies at issue in this case as another anti-Black, anti-Haitian attack in a long line of such discrimination and violence by the Trump administration.

127.    As an organization with some undocumented members who are also Black, UndocuBlack's members will be disproportionately affected by the Trump administration's expedited removal expansion. Due to intersectional bias around race and criminality, Black people in the United States experience a higher rate of interaction with law enforcement than people of other races. This racial bias and profiling coupled with a person's immigration status and possible

language barrier will mean that Haitian parolees will be some of the most adversely affected by this expansion.

128.    Plaintiff **CASA**'s mission is to create a more just society by building power and improving the quality of life in working-class Black, Latino/a/e, Afro-descendent, Indigenous, and immigrant communities. From its beginnings in a church basement, CASA has envisioned a future with diverse and thriving communities living free from discrimination and fear, working together with mutual respect to achieve human rights for all.

129.    In furtherance of this mission, CASA offers a wide variety of social, health, job training, employment, and legal services to immigrant communities, with a particular focus in Maryland, Washington, D.C., Virginia, Pennsylvania, and Georgia. CASA also offers a more limited suite of services remotely to members across the United States. Those individuals who do not live in an area with a local CASA organizing committee are offered the opportunity to join a national organizing committee, whose members are entitled to vote on CASA's organizational priorities and are integrated into its member-led system of internal democratic governance. CASA also conducts campaigns to inform members of immigrant communities of their rights and assists individuals in applying for a variety of government benefits. In addition, CASA provides its members with free remote legal assistance, including free legal consultations and referrals on immigration issues. Capacity permitting, CASA provides legal representation to members in removal defense cases and on affirmative immigration applications to USCIS.

130.    A CASA member is a person who shares CASA's values, envisions a future where we can achieve full human rights for all, and is convinced that, when united and organized, we can create a more just society by building power in our working-class and immigrant communities.

CASA members play an important role in deciding what campaigns CASA works on and how CASA serves the community.

131.    CASA membership is voluntary. To become a member, an individual must apply, pay dues, and subscribe to the principles of CASA. CASA members also must self-identify as members of an immigrant or working-class community. Currently, the annual fee for CASA membership is $35. Alternatively, individuals may pay a recurring membership fee of $5 per month. The membership fee can be waived when appropriate. Members are also offered the opportunity, for an additional $5, to obtain a CASA ID. This is a physical, picture identification card that contains basic information about the member. For many of CASA's immigrant members, this card may be the only type of picture identification they have, other than documents from their home country. In certain jurisdictions, CASA IDs are recognized for the purposes of engaging with certain government agencies, including the police.

132.    CASA has members who have been paroled into the United States, including members who have received parole after presenting at a land port of entry with a CBP One appointment and through the CHNV parole processes.

133.    More than 33,000 CASA members entered the United States after the CBP One app first launched in October 2020, and a significant portion of those members were likely granted parole through CBP One. We are aware of CASA members who have had their grants of CBP One parole prematurely terminated, putting them at risk of being subjected to expedited removal.

134.    Some CASA members have already been directly harmed by being processed for expedited removal under Defendants' directives and recent actions increasing the use of expedited removal against paroled individuals.

135.    For example, E.M.P. is a member of CASA and Venezuelan national who was paroled into the country through a CBP One appointment in December 2023 and issued an NTA. He filed an application for asylum with the court in late 2024. When E.M.P. appeared in immigration court on May 21, 2025 for his second master calendar hearing, the attorney representing DHS moved to dismiss his case and the Immigration Judge granted dismissal, advising E.M.P. to apply for asylum affirmatively with USCIS if he wanted to continue his asylum claim. It was not clear to E.M.P. that dismissal meant that he was going to be put in expedited removal. However, as he was leaving the courtroom, ICE officers followed him and arrested him. He has been detained since, which has been detrimental to his mental and physical health, and he is awaiting a credible fear interview. In expedited removal, he now faces significant barriers to presenting and fighting his asylum case, including that he is detained far from his attorney and loved ones, and the risk of swift deportation back to a country to which he fears returning.

136.    Similarly, D.L.C., a 20-year-old national of Venezuela and CASA member, was granted parole into the United States in May 2024 through a CBP One appointment and simultaneously issued an NTA. Once in the U.S., he lived with his mother, also a CASA member, and started attending public school to learn English. He also filed an application for asylum with the immigration court detailing his fear of removal to Venezuela. In October 2024, D.L.C. attended his first master calendar hearing, during which the Immigration Judge scheduled a second hearing for May 2025. Prior to that second hearing, D.L.C. began the process of seeking Special Immigrant Juvenile Status ("SIJS"), a pathway to a green card for children under 21 years of age who have been "abused, neglected, or abandoned" by one or more parents. D.L.C. is *prima facie* eligible for SIJS relief. On May 21, 2025, when D.L.C. and his mother attended his second master calendar hearing in New York, the attorney for DHS moved to dismiss D.L.C.'s proceedings. Neither

D.L.C. nor his mother realized that dismissal would lead to D.L.C.'s arrest, and both believed that it would allow him to pursue his asylum and SIJS applications more easily. However, after the immigration judge granted dismissal and D.L.C. and his mother left the courtroom, ICE officers followed them into the elevator, ordered them up against the wall, and arrested and detained D.L.C. It was only when D.L.C. was scheduled for a CFI that he and his counsel realized he was being processed for expedited removal. Being subject to expedited removal put D.L.C. at great risk of losing his ability to pursue SIJS and created significant barriers to his ability to pursue his asylum claim. He is also deprived of consistent access to counsel and separated from his family, school, and other support. D.L.C. also suffers from serious, chronic health issues for which he is unable to get treatment while in detention.

137.    CASA has multiple members who could be placed in expedited removal proceedings under the Trump administration's current policies at any point because they fit one or more of the various profiles the administration has prioritized for expedited removal. CASA has multiple members whose parole has been prematurely terminated and who have been in the United States for less than two years, including some do not have any pending applications for alternate immigration relief. CASA also has multiple members who were granted parole through the CBP One application and are currently in section 240 removal proceedings, who must appear in immigration court for regular hearings and who run the risk of having their proceedings dismissed and subsequently being placed in expedited removal. The significant ramp-up in immigration enforcement in recent weeks, including but not limited to courthouse arrests and raids in Los Angeles that have resulted in swift and summary deportations, only underlines the vulnerability of CASA members to the harms of the administration's policies terminating individual grants of parole and exposing paroled individuals to expedited removal.

138.    CASA member J.N.M., for example, is a Haitian national whose sister sponsored him to come to the United States with his two children on CHNV parole in July 2024. In Haiti, J.N.M. was assaulted at gun point, and gangs threatened to kidnap his children, which forced him to stop taking them to school. Since being paroled into the United States with his family, J.N.M. has for the first time in many years been able to live in peace, with his children attending school and no longer fearing for their physical safety. However, now that his CHNV parole is subject to imminent termination, he is at risk of being subjected to expedited removal because he fits the profile outlined in the March 25 CHNV Termination Notice. After consulting with a CASA attorney, J.N.M. was advised to apply for asylum, but he has not been able to find an attorney to assist him with the application and CASA has not been able to provide him with representation due to resource constraints. To his knowledge, he does not have a case in immigration court, but he has a pending sibling petition his sister filed for him approximately seven years ago. He is terrified of being subjected to expedited removal without the chance to pursue an asylum application and while the sibling petition remains unadjudicated. All of the gang members who threatened his children know who he is and know that he left, so if he returns to Haiti he fears it will be a death sentence for him and his family.

139.    L.Z.P. is a CASA member originally from Honduras who currently resides in Maryland. A single mother, she and her three children—ages 18, 13, and 6—entered the United States on humanitarian parole after attending a CBP One appointment at the southern border in July 2024. L.Z.P.'s youngest two children are in school in the U.S., which is an opportunity they did not have while living in Honduras, and she works at a fruit factory, helping to pack fruit for distribution, to ensure that her family have their daily necessities. Over the last month, LZP received notice that both her parole status and work authorization have been terminated, despite

the fact that her parole was not supposed to expire until June 2, 2026 and her work authorization was valid through July 1, 2026. These terminations have made her even more afraid that she could be returned to Honduras, because she faced domestic violence by her ex-partner there, including death threats against her and the children. She is very afraid of being separated from her children, because they could not support themselves without her. She has a pending asylum claim and intends to apply for work authorization based on her pending asylum application as soon as she is eligible, but recent reporting about individuals who, like her, were paroled into the country being detained after immigration court and placed into expedited removal makes her afraid to go to her next scheduled hearing. This places her in a terrible situation where she is afraid to pursue her legitimate asylum claim, since even going to court could mean that she would be summarily detained and removed from the country without the process she is relying upon. Yet she knows that in order to have any hope for the future she must fight her case and plans to continue complying with all of her legal obligations, including presenting for immigration court.

140.    N.D.G. and Y.P.C. are a married couple originally from Venezuela who currently live in Maryland. Both are CASA members. They, along with their four children—ages 16, 13, 8, and 5—were granted humanitarian parole through CBP One in July 2024. They were also issued NTAs, so they are in section 240 removal proceedings. N.D.G. works as a DoorDash driver to support their family, and Y.P.C. devotes her time to taking care of their children. Their 8-year-old son suffers from a disability called psychomotor delay that slows his learning process. He still requires diapers, has difficulty walking, and cannot write. He requires constant support. While he does attend school, Y.P.C. often has to go to the school to help the teachers with his care. N.D.G. was a politically active small business owner back in Venezuela, and he was targeted and attacked by the government for supporting its opposition. If he and Y.P.C. were subject to rapid, expedited

deportation back to Venezuela, they fear their family's safety would be at risk, and they would not be able to pursue their pending asylum claims. Given Defendants' use of expedited removal against individuals like them who entered and were granted parole through a CBP One appointment and are in section 240 removal proceedings, N.D.G. and Y. P.C. are likely to be similarly targeted for expedited removal in the near future.

141.    CASA is acutely aware of the harms that Defendants' application of expedited removal to parolees is actively causing and will continue to cause. CASA has heard from its members that there is widespread confusion and fear from the administration's decisions to end parole processes and expand expedited removal. There has also been a chilling effect among members, with members unsure about whether it is safe to share their information with government agencies, including by applying for further immigration benefits for which they qualify. Given all of the recent policy reversals, they have significant and legitimate fear that their information will now be weaponized against them.

142.    CASA members who may be eligible for asylum or Convention Against Torture protections in the United States still fear that they could be deported through expedited removal, given the ever-shifting nature of policy changes within this administration. They do not know if they will be able to have their case properly heard by an immigration judge, or if anyone will care about their legitimate fear of return.

143.    In response, CASA has devoted significant resources to deportation defense and preparing its membership for potential immigration enforcement actions, including developing new Know Your Rights resources and devoting additional resources to immigration counseling and rapid response to immigration enforcement. Stripping legal protections from hundreds of

thousands of people, and subjecting them to rapid deportation via expedited removal, has a deep negative impact on CASA's membership.

## FIRST CLAIM FOR RELIEF

### (Violation of the Immigration and Nationality Act, 8 U.S.C. § 1225(b)(1)(A); Administrative Procedure Act, 5 U.S.C. § 706(2); 8 U.S.C. § 1252(e)(3))
**(as to the January 23 Huffman Memorandum, the February 18 ICE Directive, and the March 25 CHNV Termination Notice)**

144.    All the foregoing allegations are repeated and incorporated as though fully set forth herein.

145.    An immigration officer may process a noncitizen for expedited removal upon determining that such noncitizen "is arriving in the United States or is described in clause (iii)" and is inadmissible under 8 U.S.C. §§ 1182(a)(6)(C) or 1182(a)(7). *See* 8 U.S.C. § 1225(b)(1)(A)(i).

146.    Subclause (I) of clause (iii) referenced above provides that the Secretary may apply expedited removal to "any or all aliens described in subclause (II) as designated by the [Secretary]." 8 U.S.C. § 1225(b)(1)(A)(iii)(I).

147.    Subclause (II) referenced above includes a description of noncitizens who may be designated by the Secretary to be amenable to expedited removal and specifies that such noncitizens must not "ha[ve] been admitted or paroled into the United States." 8 U.S.C. § 1225(b)(1)(A)(iii)(II). A noncitizen who "ha[s] been admitted or paroled following inspection by an immigration officer at a designated port-of-entry" is excluded from expedited removal under 8 U.S.C. § 1225(b)(1)(A)(i). 8 C.F.R. § 235.3(b)(1)(ii); *see also* 8 C.F.R. § 235.3(b)(6) (requiring that noncitizen be given a "reasonable opportunity" to establish to an immigration officer "that he or she was admitted or paroled into the United States following inspection at a port-of-entry" before being subjected to expedited removal).

148.    The February 18 ICE Directive violates the INA and is "not in accordance with law" and "in excess of statutory . . . authority" under the APA, 5 U.S.C. § 706(2)(A), (C), to the extent that it authorizes the use of expedited removal for noncitizens who were inspected and granted parole at a port of entry and are currently present in the United States subsequent to that parole. Such individuals have already arrived in the United States and have lawfully applied for and secured employment, enrolled their children in school, and taken steps to settle their lives here for the duration of their parole or prospective immigration pathways, and are therefore no longer in the act of "arriving." Because such noncitizens are not "arriving in the United States," they cannot be subjected to expedited removal under 8 U.S.C. § 1225(b)(1)(A)(i).

149.    The January 23 Huffman Memorandum and the March 25 CHNV Termination Notice violate the INA and are "not in accordance with law" and "in excess of statutory . . . authority" under the APA, 5 U.S.C. § 706(2)(A), (C), to the extent that they authorize the use of so-called expanded expedited removal for CHNV and other parole beneficiaries who have not "been physically present in the United States continuously for the 2-year period immediately prior to the date of the determination of inadmissibility." 8 U.S.C. § 1225(b)(1)(A)(iii)(II). *See* CHNV Termination Notice (noting that "CHNV parolees . . . will become ineligible for expedited removal upon the natural expiration of their two-year parole."). Such individuals "ha[ve] been . . . paroled into the United States," which makes them ineligible for expedited removal under 8 U.S.C. § 1225(b)(1)(A)(iii)(II), regardless of whether they have been physically present in the United States for less than two years.

150.    Each of these policies must therefore be held unlawful, set aside, and/or otherwise vacated.

151.    Each of these policies constitutes a new and unique "written policy directive, written policy guideline, or written procedure issued by or under the authority of the [Secretary of Homeland Security] to implement [8 U.S.C. § 1225(b), the expedited removal statute]." 8 U.S.C. § 1252(e)(3)(A)(ii).

152.    Because this claim was brought within 60 days of the issuance of the January 23 Huffman Memorandum, the earliest issued of these policies, this action is timely instituted under 8 U.S.C. § 1252(e)(3)(B).

**SECOND CLAIM FOR RELIEF**

**(Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A) –
arbitrary and capricious)**
**(as to the January 23 Huffman Memorandum, the February 18 ICE Directive,
and the March 25 CHNV Termination Notice)**

153.    All the foregoing allegations are repeated and incorporated as though fully set forth herein.

154.    The APA provides that courts "shall . . . hold unlawful and set aside agency action" that is arbitrary and capricious. 5 U.S.C. § 706(2)(A).

155.    The agency's various articulations of its authority to expose individuals inspected and granted parole at ports of entry to expedited removal are unexplained and entirely inconsistent with each other. In the January 23 Huffman Memorandum and the March 25 CHNV Termination Notice, the Department contemplates using expedited removal against parolees pursuant to 8 U.S.C. § 1225(b)(1)(A)(iii). The March 25 CHNV Termination Notice in particular clearly articulates the Department's view that under the expedited removal statute, CHNV parolees may be removed only under this provision, which is why the Department decided to terminate CHNV beneficiaries' paroles precipitously in order to maximize the number of people who may be expeditiously removed by minimizing the number who have been continuously present in the

country for two years. The February 18 ICE Directive, however, appears to make all individuals who were granted parole at ports of entry and are now present in the United States eligible for expedited removal under 8 U.S.C. § 1225(b)(1)(A)(i) as individuals who are "arriving." The directive additionally is explicit that "[t]here is no time limit on the ability to process [such parole beneficiaries] for expedited removal."

156.    Neither the January 23 Huffman Memorandum, nor the February 18 ICE Directive, nor the March 25 CHNV Termination Notice contains any reasoned explanation for why parole beneficiaries may be processed for expedited removal, and any explanation that exists in the January 23 Huffman Memorandum and March 25 CHNV Termination Notice is inconsistent with any explanation that exists in the February 18 ICE Directive. The arbitrariness and capriciousness of each agency policy is further evidenced by the failure of each such policy to consider the agency's own contrary conclusions regarding the legal authority for the agency to adopt the policy as contemplated. None of these documents acknowledges, much less provides an explanation for, the inconsistency and the change in policy from the January 23 Huffman Memorandum to the February 18 ICE Directive to the March 25 CHNV Termination Notice. Indeed, the inconsistent agency interpretations are both incorrect as a matter of law.

157.    Moreover, none of the agency policies consider the impact of their decision to apply expedited removal to some population of parolees on paroled individuals themselves, their families, their employers, their communities, and any financial supporters, as well as any reasonable alternatives.

158.    Each of these policies must therefore be held unlawful, set aside, and/or otherwise vacated.

## THIRD CLAIM FOR RELIEF

### (Violation of the Due Process Clause of the Fifth Amendment to
### the United States Constitution)
### (as to the January 23 Huffman Memorandum, the February 18 ICE Directive,
### and the March 25 CHNV Termination Notice)

159.    All the foregoing allegations are repeated and incorporated as though fully set forth herein.

160.    The Due Process Clause of the Fifth Amendment provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law."

161.    Plaintiffs who are at risk of being subjected to expedited removal under the January 23 Huffman Memorandum, the February 18 ICE Directive, and/or the March 25 CHNV Termination Notice are entitled under the Due Process Clause to notice, an opportunity to be heard, and to have the law correctly applied to their cases, including to a meaningful process before they can be removed from the country.

162.    The January 23 Huffman Memorandum, the February 18 ICE Directive, and the March 25 CHNV Termination Notice must therefore be enjoined as violative of the Fifth Amendment's guarantee of due process.

## FOURTH CLAIM FOR RELIEF

### (Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2) –
### *Accardi* Doctrine)
### (as to the January 23 Huffman Memorandum and the March 25 CHNV Termination
### Notice)

163.    All the foregoing allegations are repeated and incorporated as though fully set forth herein.

164.    Title 8 U.S.C. § 1225(b)(1)(A)(iii)(II) states that the Secretary of Homeland Security may apply expedited removal to an individual "who has not been admitted or paroled into

the United States" and cannot show that he or she "has been physically present in the United States continuously" for two years.

165.    Under DHS regulations, when the federal government determines that the expedited removal provisions of 8 U.S.C. § 1225(b)(1) apply to an individual described in an expedited removal designation made by the Secretary of Homeland Security under 8 U.S.C. § 1225(b)(1)(A)(iii),[2] that individual "will be given a reasonable opportunity to establish to the satisfaction of the examining immigration officer that he or she *was admitted or paroled* into the United States following inspection at a port-of-entry." 8 C.F.R. § 235.3(b)(6) (emphasis added). An individual who cannot show "that he or she *was lawfully admitted or paroled* will be ordered removed pursuant to [section 235(b)(1) of the INA, the expedited removal authority]." *Id*. (emphasis added); *see also* 8 C.F.R. § 235.3(b)(1)(ii) (stating that expedited removal under 8 U.S.C. § 1225(b)(1)(A)(iii)(II) applies only to certain noncitizens in the United States "without *having been* admitted or paroled," while section 240 removal proceedings apply to a noncitizen has been present in the country for at least  two years notwithstanding the fact that the noncitizen "*was not* inspected and admitted or paroled." (emphasis added)).

166.    The January 23 Huffman Memorandum instructs the component DHS agencies to consider whether to apply expedited removal to paroled individuals, including taking "steps to terminate any ongoing removal proceeding and/or any active parole status." The March 25 CHNV

---

[2] 8 C.F.R. § 235.3(b)(6) contains what appears to be an erroneous cross-reference that has been in place since the interim final rule was published in 1997. Namely, although the text of the regulation says it applies to "any or all aliens described in paragraph (b)(2)(ii) of this section," it appears to be meant to be referring to paragraph (b)(1)(ii) of this section. The reference to (b)(2)(ii) appeared in the original Notice of Proposed Rulemaking (Inspection and Expedited Removal of Aliens, 62 Fed. Reg. 444-01, 480 (proposed Jan. 3, 1997)), and remained in place when the Interim Final Rule was published, even though the Interim Final Rule switched the order of § 235.3(b)(1) and (b)(2). Inspection and Expedited Removal of Aliens, 62 Fed. Reg. 10312, 10314 (interim rule promulgated Mar. 6, 1997).

Notice further states that CHNV parolees "will become ineligible for expedited removal upon the natural expiration of their two-year parole," and as a result states that all grants of CHNV parole will terminate on April 24, 2025, to serve DHS's "strong interest in preserving the ability to initiate expedited removal proceedings to the maximum extent possible for the appropriate CHNV population." These policies are based on Defendants' interpretation of 8 U.S.C. § 1225(b)(1)(A)(iii)(II) that a noncitizen who has been paroled into the country becomes a person who has not been paroled into the country once their parole status terminates or expires. *See Doe v. Noem,* No. 1:25-cv-10495 IT, 2025 WL 1099602, at *17 (D. Mass. Apr. 14, 2025) (summarizing Defendants' position); *see also* Defs.'s Mot. Dismiss, Dkt. No. 20, at 39-40 (arguing that only an individual who "retains parole status" is exempt from expedited removal, while an individual whose "parole is terminated or expired" may be subject to expedited removal).

167. Defendants' actions are contrary to the express terms of the statute and the implementing regulation at 8 C.F.R. § 235.3(b)(1)(ii) and (b)(6), which expressly contemplate that an individual who can demonstrate to an immigration officer's satisfaction "that he or she was admitted or paroled into the United States" at a point in the past may not "be ordered removed pursuant to [8 U.S.C. § 1225(b)(1)]."

168. Defendants' interpretation of the statute and relevant regulations, as set forth above, violate agency procedures, including those found at 8 C.F.R. § 235.3(b)(1)(ii) and (b)(6).

169. Defendants' actions, as set forth above, should therefore be set aside under the principle articulated in *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954).

170. Defendants' actions, as set forth above, fail to comply with the issuing agencies' regulations and are therefore arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A).

## FIFTH CLAIM FOR RELIEF

### (Violation of the Immigration and Nationality Act, 8 U.S.C. § 1225(b)(1)(A); Administrative Procedure Act, 5 U.S.C. § 706(2); 8 U.S.C. § 1252(e)(3))
(as to 8 C.F.R. § 1.2 definition of "arriving alien" only)

171.    All the foregoing allegations are repeated and incorporated as though fully set forth herein.

172.    The INA specifies in precise terms only two circumstances under which a noncitizen may be subjected to expedited removal: if the noncitizen "is arriving in the United States" and is inadmissible either because they engaged in fraud to procure admission or other immigration benefits, or because they lack the requisite documents for entry, *see* 8 U.S.C. § 1225(b)(1)(A)(i); or if the noncitizen "has not been admitted or paroled into the United States" and has not been in the United States continuously for at least two years before the date the noncitizen is determined to be inadmissible, *see* 8 U.S.C. § 1225(b)(1)(A)(iii)(II).

173.    The expedited removal statute "thus allows for expedited removal for a non-citizen 'arriving in the United States' (i.e., arriving at the border or a port of entry)." *Doe v. Noem,* No. 1:25-cv-10495 IT, 2025 WL 1099602, at *16 (D. Mass. Apr. 14, 2025). It also allows for expedited removal "for a non-citizen who entered the United States without authorization, except that a non-citizen who entered the United States without authorization, that is an individual who 'has not been paroled or admitted into the United States,' may not be subject to the expedited removal period if that individual has been present in the United States for two years." *Id.* But "[t]he statute does not subject persons who were authorized to enter the United States to expedited removal, regardless of how long they have been in the United States." *Id.*

174.    Title 8 C.F.R. § 1.2 defines an "arriving alien" as:

> an applicant for admission coming or attempting to come into the
> United States at a port-of-entry, or an alien seeking transit through
> the United States at a port-of-entry, or an alien interdicted in

> international or United States waters and brought into the United States by any means, whether or not to a designated port-of-entry, and regardless of the means of transport. An arriving alien remains an arriving alien even if paroled pursuant to section 212(d)(5) of the Act, and even after any such parole is terminated or revoked.

175.    Title 8 C.F.R. § 235.3(b), the regulation that implements the expedited removal statute, refers to and incorporates 8 C.F.R. § 1.2's definition of "arriving alien" when outlining the two classes of noncitizens to whom "[t]he expedited removal provisions shall apply."

176.    The breadth of 8 C.F.R. § 1.2's definition of "arriving alien" means that, via 8 C.F.R. § 235.3, more classes of individuals are subjected to expedited removal than permitted by the expedited removal statute, 8 U.S.C. § 1225(b)(1)(A). Title 8 C.F.R. § 1.2's definition of "arriving alien" is therefore "not in accordance with law" and "in excess of statutory . . . authority." 5 U.S.C. § 706(2)(A), (C).

177.    The statutory limits on the Secretary's expedited removal authority are clear: the Secretary may "utilize expedited removal only with regard to those arriving at the border or a port of entry, or those who entered the country unlawfully and have not been present in the country long enough to warrant consideration of any interests their residence may have created." *Doe*, 2025 WL 1099602, at *17.

178.    The overbroad definition of "arriving alien" in 8 C.F.R. § 1.2, when Defendants apply it through 8 C.F.R. § 235.3, means that any paroled individual may be subjected to expedited removal at *any* time, regardless of the fact that the individual was lawfully paroled into the United States, and regardless of how long the individual has been continuously in the country, impermissibly expanding the narrow classes of noncitizens that Congress determined should be subjected to expedited removal and deprived of the normal due process protections available in ordinary removal proceedings under 8 U.S.C. § 1229a.

179.    To the extent the unlawfully overbroad definition of "arriving alien" in 8 C.F.R. §
1.2 permits the application of expedited removal to individuals who have been paroled into the
United States at a port of entry, regardless of the fact that the individual was lawfully paroled into
the United States, and regardless of how long such an individual has been continuously present in
the United States, the definition of "arriving alien" in 8 C.F.R. § 1.2 must be held unlawful, set
aside, and/or otherwise vacated.

180.    To the extent the overbroad definition of "arriving alien" in 8 C.F.R. § 1.2 reflects
the agency's considered interpretation of the INA, that interpretation is not entitled to deference
from courts reviewing agency action under the APA. *Loper Bright Enters. v. Raimondo,* 603 U.S.
369, 392 (2024) ("Section 706 [of the APA] makes clear that agency interpretations of statutes—
like agency interpretations of the Constitution—are *not* entitled to deference. Under the APA, it
thus 'remains the responsibility of the court to decide whether the law means what the agency
says.'" (quoting *Perez v. Mortgage Bankers Ass'n,* 575 U.S. 92, 109 (2015)).).

181.    The regulatory definition of "arriving alien" in 8 C.F.R. § 1.2 is not subject to 8
U.S.C. § 1252(a)(2), which makes certain matters pertaining to 8 U.S.C. § 1225 not subject to
judicial review. As a result, it does not need to fit within the jurisdiction preservation provisions
of 8 U.S.C. § 1252(e), including the filing deadline provision in (e)(3) for suits challenging the
implementation of the expedited removal statute.

182.    This claim is timely because it is brought within six years of when Plaintiffs' right
of action accrued. *See* 28 U.S.C. § 2401(a); *Corner Post, Inc. v. Bd. of Governors of Fed. Reserve
Sys.*, 603 U.S. 799, 808, 825 (2024) ("An APA claim does not accrue for purposes of § 2401(a)'s
6-year statute of limitations until the plaintiff is injured by final agency action.").

183.    In the alternative and to the extent this claim is subject to the judicial review provisions of 8 U.S.C. § 1252(a)(2) and (e)(3), this claim is timely even if it is subject to the 60-day deadline in 8 U.S.C. § 1252(e)(3)(B), based on equitable tolling. *Boechler, P.C. v. Commissioner*, 596 U.S. 199, 209 (2022) ("[N]onjurisdictional limitations periods are presumptively subject to equitable tolling.").

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that this Court:

1.    Declare that noncitizens who have previously been granted parole at ports of entry are not amenable to expedited removal under 8 U.S.C. § 1225(b)(1)(A) and that the January 23 Huffman Memorandum, February 18 ICE Directive, and March 25 CHNV Termination Notice are unconstitutional and contrary to law and arbitrary and capricious in violation of the APA;

2.    Declare that the definition of "arriving aliens" in 8 C.F.R. § 1.2 conflicts with the INA and is *ultra vires.*

3.    Preliminarily enjoin and stay the January 23 Huffman Memorandum, February 18 ICE Directive, and March 25 CHNV Termination Notice pursuant to Federal Rule of Civil Procedure 65(a) and 5 U.S.C. § 705 during the pendency of this suit;

4.    Permanently enjoin and vacate the January 23 Huffman Memorandum, February 18 ICE Directive, the March 25 CHNV Termination Notice, and 8 C.F.R. § 1.2's definition of "arriving alien" at final judgment;

5.    Enjoin Defendants from applying expedited removal to noncitizens who have previously been granted parole at a port of entry;

6.    Enter an order vacating the order of expedited removal of any member of a Plaintiff organization wrongfully subjected to expedited removal as a consequence of Defendants' action(s) challenged here;

7.    Enter an order requiring Defendants to facilitate the return to the United States of any member of a Plaintiff organization wrongfully removed pursuant to an order of expedited removal issued in accordance with Defendants' action(s) challenged here;

8.    Award Plaintiffs' counsel reasonable attorneys' fees under the Equal Access to Justice Act, and any other applicable statute or regulation; and

9.    Grant such relief as the Court deems just, equitable, and appropriate.

Dated: June 11, 2025                    Respectfully submitted,

*/s/ Esther H. Sung*
Esther H. Sung (CA00132)
Karen C. Tumlin (CA00129)
Hillary Li (GA0052)
**JUSTICE ACTION CENTER**
P.O. Box 27280
Los Angeles, CA 90027
Telephone: (323) 450-7272
esther.sung@justiceactioncenter.org
karen.tumlin@justiceactioncenter.org
hillary.li@justiceactioncenter.org

Nicholas Katz, Esq. (*pro hac vice*)
**CASA, INC.**
8151 15th Avenue
Hyattsville, MD 20783
Telephone: (240) 491-5743
nkatz@wearecasa.org

Carl Bergquist (*pro hac vice*)
**COALITION FOR HUMANE IMMIGRANT RIGHTS**
2533 West 3rd St, Suite 101
Los Angeles, CA 90057
Telephone: (310) 279-6025
cbergquist@chirla.org

*Attorneys for Plaintiffs*