# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| COALITION FOR HUMANE IMMIGRANT RIGHTS, *et al*., <br><br>     *Plaintiffs*, <br><br>     *v.* <br><br> KRISTI NOEM, in her official capacity as Secretary of Homeland Security, *et al.*, <br><br>     *Defendants.* | Case No.: 1:25-cv-0872 |

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR A STAY OF AGENCY ACTION UNDER 5 U.S.C. § 705 TO PRESERVE STATUS AND RIGHTS

## TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 4

LEGAL STANDARD ......................................................................................................... 9

ARGUMENT ..................................................................................................................... 10

I.      PLAINTIFFS HAVE STANDING, THIS COURT HAS JURISDICTION, AND DEFENDANTS' ACTIONS ARE REVIEWABLE. ......................................................... 11

II.     PLAINTIFFS ARE LIKELY TO SUCCEED IN PROVING THAT THE AGENCY ACTIONS ARE CONTRARY TO LAW AND VIOLATE THE AGENCY'S OWN PROCEDURES. ................................................................. 14

III.    PLAINTIFFS ARE ALSO LIKELY TO SUCCEED IN PROVING THAT THE AGENCY ACTIONS ARE ARBITRARY AND CAPRICIOUS ..................................... 21

IV.    A STAY IS NECESSARY TO STOP ONGOING AND FUTURE IRREPARABLE INJURY ...................................................................................... 28

V.      THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST STRONGLY FAVOR PLAINTIFFS ................................................................................. 36

CONCLUSION .................................................................................................................. 38

# TABLE OF AUTHORITIES

**Page(s)**

<u>**Cases**</u>

*A.B.-B. v. Morgan*,
   548 F. Supp. 3d 209 (D.D.C. 2020) ........................................................................37

*Al Otro Lado v. McAleenan*,
   394 F. Supp. 3d 1168 (S.D. Cal. 2019) ..................................................................19

*Al-Marri v. Bush*,
   No. Civ.A.04-2035 (GK), 2005 WL 774843 (D.D.C. Apr. 4, 2005) .......................35

*Bennett v. Spear*,
   520 U.S. 154 (1997) ................................................................................................13

*Bollat Vasquez v. Wolf*,
   460 F. Supp. 3d 99 (D. Mass. 2020) .......................................................................20

*Burlington Truck Lines, Inc. v. United States*,
   371 U.S. 156 (1962) ................................................................................................26

*Cherokee Nation v. Dep't of Interior*,
   Case No. 1:19-cv-02154 (TNM) 2024 WL 4286048 (D.D.C. Sept. 25, 2024) .......19

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
   401 U.S. 402 (1971) ................................................................................................21

*D.C. v. U.S. Dep't of Agric.*,
   444 F. Supp. 3d 1 (D.D.C. 2000) .............................................................................9

*Dep't of Com. v. New York*,
   588 U.S. 752 (2019) ................................................................................................21

*DHS v. Regents of the Univ. of Cal.*,
   591 U.S. 1 (2020) ....................................................................................................26

*Doe v. Noem*,
   No. 1:25-cv-10495 IT, 2025 WL 1099602 (D. Mass. Apr. 14, 2025) ..........5, 15, 27

*Encino Motor Cars, LLC v. Navarro*,
   579 U.S. 211 (2016) ....................................................................................23, 25, 26

*F.C.C. v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009) ................................................................................................28

*Grace v. Barr*,
965 F.3d 883 (D.C. Cir. 2020) ............................................................13, 16, 26, 27

*Grace v. Whitaker*,
344 F. Supp. 3d 96 (D.D.C. 2018) ...............................................................13

*Pursuing Am.'s Greatness v. Fed. Election Comm'n*,
831 F.3d 500 (D.C. Cir. 2016) .....................................................................10

*Hispanic Affs. Project v. Perez*,
319 F.R.D. 3 (D.D.C. 2016) ........................................................................12

*Hurry v. Fed. Deposit Ins. Corp.*,
589 F.Supp.3d 100 (D.D.C. 2022) ................................................................20

*Judulang v. Holder*,
565 U.S. 42 (2011) ............................................................................21, 22, 26

*Kiakombua v. Wolf*,
498 F. Supp. 3d 1 (D.D.C. 2020) ...............................................................13

*Kucana v. Holder*,
558 U.S. 233 (2010) ...............................................................................16, 27

*Las Americas Immigrant Advoc. Ctr. v. Wolf*,
507 F. Supp. 3d 1 (D.D.C. 2020) ...............................................................13

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) ..................................................................................14

*Lujan v. Nat'l Wildlife Fed'n*,
497 U.S. 871 (1990) ..................................................................................13

*Mach Mining, LLC v. EEOC*,
575 U.S. 480 (2015) ..................................................................................16

*Make the Rd. N.Y. v. Wolf*,
962 F.3d 612 (D.C. Cir. 2020) ..............................................................11, 12

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
567 U.S. 209 (2012) ..................................................................................12

*Motor Vehicle Mfr. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ............................................................................21, 22, 26

*NAACP v. Trump*,
298 F. Supp 3d 209 (D.D.C. 2018) ..............................................................12

*Nat'l Ass'n of Broadcasters v. F.C.C.*,
  740 F.2d 1190 (D.C.z Cir. 1984) ................................................................25

*Nat'l Ass'n of Mfrs. v. Dep't of Def.*,
  583 U.S. 109 (2018) ..........................................................................15, 20

*Nken v. Holder*,
  556 U.S. 418 (2009) ..........................................................................36, 37

*Pol'y & Rsch., LLC v. U.S. Dep't of Health & Hum. Servs.*,
  313 F. Supp. 3d 62 (D.D.C. 2018) ......................................................21, 22

*Sanchez v. Mayorkas*,
  593 U.S. 409 (2021) ................................................................................18

*SEC v. Chenery Corp.*,
  318 U.S. 80 (1943) ..................................................................................14

*SEC v. Chenery Corp.*,
  332 U.S. 194 (1947) ................................................................................22

*Shawnee Tribe v. Mnuchin*,
  984 F.3d 94 (D.C. Cir. 2021) ..................................................................37

*Shvartser v. Lekser*,
  308 F. Supp. 3d 260 (D.D.C. 2018) ........................................................36

*United States ex. rel. Accardi v. Shaughnessy*,
  347 U.S. 260 (1954) ................................................................................18

*United States v. Wilson*,
  503 U.S. 329 (1992) ................................................................................19

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ..............................................................................10, 36

**Statutes**

5 U.S.C.
  § 704 ......................................................................................................13
  § 705 ........................................................................................1, 4, 9, 10
  § 706 ......................................................................................................14
  § 706(2)(A) ............................................................................................21

8 U.S.C.
  § 1182(a)(6)(C) ...................................................................................4, 14
  § 1182(a)(7) ........................................................................................4, 14
  § 1182(a)(9)(A)(i) ..................................................................................35

§ 1225(a)(1) .................................................................................................................20
§ 1225(b)(1) .................................................................................................................10
§ 1225(b)(1)(A) ......................................................................................................14, 19
§ 1225(b)(1)(A)(i) ...........................................................................4, 5, 14, 19, 20, 24, 25
§ 1225(b)(1)(A)(iii) ............................................................................................... *passim*
§ 1225(b)(1)(A)(iii)(II) ................................................................................17, 18, 23, 24
§ 1229a .......................................................................................................................29
§ 1229a(a)(3) .................................................................................................................4
§ 1252(e)(3) ....................................................................................................12, 13, 16
§ 1252(e)(3)(B) ...........................................................................................................13

## **Other Authorities**

8 C.F.R.
§ 212.2 .......................................................................................................................35
§ 235.3(b)(1) .......................................................................................................10, 17, 18
§ § 235.3(b)(6) ......................................................................................................17, 18

62 Fed. Reg.
444-01 ......................................................................................................................17
480 ............................................................................................................................17
10312 ........................................................................................................................17
10314 ........................................................................................................................17

90 Fed. Reg.
8139 .....................................................................................................................6, 14, 24
13,611 ...................................................................................................................5, 13
13,619 ....................................................................................................................7, 15
13,620 .......................................................................................................................7

ACLU, *Freezing Out Justice: How Immigration Arrests at Courthouses are Undermining the Justice System* (2018), https://www.aclu.org/wp-content/uploads/publications/rep18-icecourthouse-combined-rel01.pdf ...............................38

Anna Giaritelli, *Stephen Miller 'eviscerated' ICE officials in private meeting for low deportation numbers*, Wash. Exam'r, May 30, 2025, https://www.washingtonexaminer.com/news/white-house/3425297/stephen-miller-eviscerated-ice-officials-deportation-numbers/ ...........................................................2

Brittany Gibson & Stef W. Knight, *Scoop: Stephen Miller, Noem tell ICE to supercharge immigrant arrests*, Axios (May 28, 2025), https://www.axios.com/2025/05/28/immigration-ice-deportations-stephen-miller .....................................................................................................................2, 7, 8

David J. Bier, *126 Parole Orders over 7 Decades: A Historical Review of Immigration Parole Orders*, Cato Institute (July 17, 2023), https://www.cato.org/blog/126-parole-orders-over-7-decades-historical-review-immigration-parole-orders ....................................................................................5, 6

DHS, Memorandum from Acting Secretary Benjamine C. Huffman on Guidance
    Regarding How to Exercise Enforcement Discretion (Jan. 23, 2025),
    https://www.dhs.gov/sites/default/files/2025-01/25_0123_er-and-parole-
    guidance.pdf ....................................................................................................6

FWD.us, *Industries with Critical Labor Shortages Added 1.1 Million Workers
    Through Immigration Parole* (Jan. 4, 2024), www.fwd.us/news/immigration-
    labor-shortages ...............................................................................................38

Hillel R. Smith, Cong. Rsch. Serv., R45314, *Expedited Removal of Aliens: Legal
    Framework* (2019), https://www.congress.gov/crs-product/R45314 .....................19

Human Rights Watch, *"You Don't Have Rights Here"* (Oct. 16, 2014),
    https://bit.ly/1GocBhZ .....................................................................................33

*Immigration and Public Safety*
    (2017), https://www.sentencingproject.org/app/uploads/2022/10/Immigration-
    and-Public-Safety.pdf; ....................................................................................38

Joshua Goodman & Gisela Salomon, *ICE agents wait in hallways of immigration
    court as Trump seeks to deliver on mass arrest pledge*, AP News (May 21,
    2025), https://apnews.com/article/immigration-courts-arrests-trump-ice-
    deportations-fa96435d4ec021cc8ff636b23d80d848 ...........................................3

Michael Elsen-Rooney, *A Bronx high schooler showed up for a routine
    immigration court date. ICE was waiting*, Chalkbeat (May 26, 2025),
    https://www.chalkbeat.org/newyork/2025/05/27/bronx-high-school-student-
    detained-by-immigration-ice-agents/ ...............................................................3, 9

Suzanne Gamboa, *Immigration arrests in courthouses have become the new
    deportation tool, stripping migrants of a legal process*, NBC News (May 30,
    2025), https://www.nbcnews.com/news/latino/immigrations-arrests-ice-
    deportations-courthouse-legal-process-ice-rcna209671 .......................................8

Ted Hesson & Kristina Cooke, *Trump weighs revoking legal status of Ukrainians
    as US steps up deportations*, Reuters (March 6, 2025),
    https://www.reuters.com/world/us/trump-plans-revoke-legal-status-
    ukrainians-who-fled-us-sources-say-2025-03-06/ (citing "internal ICE email"
    available at
    https://fingfx.thomsonreuters.com/gfx/legaldocs/gkpljxxoqpb/ICE_email_Reu
    ters.pdf) ..........................................................................................................7

The Sentencing Project, *Immigration and Public Safety* (2017),
    https://www.sentencingproject.org/app/uploads/2022/10/Immigration-and-
    Public-Safety.pdf; Ceres Policy Research, *The Chilling Effect of ICE
    Courthouse Arrests* (Oct. 2019),
    https://www.immigrantdefenseproject.org/wp-
    content/uploads/ice.report.exec_summ.5nov2019.pdf .........................................38

U.S. Comm'n on Int'l Religious Freedom, *Report on Asylum Seekers in Expedited Removal: Volume I: Findings & Recommendations* 4, 10 (2005), https://bit.ly/1GkjQfK ......................................................................................................31, 33

U.S. Comm'n on Int'l Religious Freedom, *Barriers to Protection: The Treatment of Asylum Seekers in Expedited Removal* (2016), https://bit.ly/2uydMQ8 ............................31

U.S. Comm'n on Int'l Religious Freedom, *Barriers to Protection as of 2024: Updated Recommendations on Asylum Seekers in Expedited Removal* (2025), http://bit.ly/4kZ3EYv ............................................................................................................31

U.S. Dep't of Justice, EOIR, Memorandum from Acting Director Sirce E. Owen re reinstatement of Memorandum 19-13, PM 25-27 (Mar. 21, 2025), https://iptp-production.s3.amazonaws.com/media/documents/ 2025.03.21_EOIR_25-27_Cancellation_of_DM_23- 01_and_Reinstatement_of_PM_19-13.pdf ..................................................................30

U.S. Dep't of Justice, EOIR, Memorandum from Director James R. McHenry III re use of status dockets, PM 19-13, at 1 (Aug. 16, 2019), https://www.justice.gov/eoir/page/file/1196336/dl ..................................................30

## INTRODUCTION

Plaintiffs respectfully move for a stay under 5 U.S.C. § 705 of Defendants' unlawful actions to apply summary deportation proceedings to hundreds of thousands of people who entered the country legally through humanitarian parole. The Immigration and Nationality Act ("INA") specifies only two narrow classes of noncitizens who may be subject to expedited removal—and people who have been paroled into the United States are excluded from both classes. Defendants' actions in seeking to remove parole beneficiaries from this country in summary fashion are as inhumane as they are unlawful, threatening to inflict devastating harm on individuals who have followed all the rules, came to this country lawfully, and have done everything that the government has asked of them.

On January 23, 2025, three days into the new administration, the Department of Homeland Security ("DHS") issued a memorandum directing and authorizing DHS agencies to use expedited removal, a fast-track summary deportation authority, on any noncitizen "who is amenable," including by affirmatively taking "steps to terminate ongoing removal proceedings and/or any active parole status" of individuals who had been granted parole into the United States at a port of entry. Subsequent government directives and notices have reinforced this command to wield expedited removal against these parolees.

Plaintiffs brought this lawsuit to challenge DHS's new policies exposing such paroled noncitizens to expedited removal without legal authority, but until recently Plaintiffs were aware of only a select few instances in which DHS was implementing these new policies to subject parolees to expedited removal. A few weeks ago, this changed. Shortly after the White House's deputy chief of staff Stephen Miller demanded that Immigration and Customs Enforcement ("ICE") increase arrest and deportation numbers, setting an arrest quota of 3,000 people a day and

pressuring ICE to send officers to Home Depot and 7-Eleven to arrest individuals without regard to their criminal history,[1] the federal government began aggressively implementing its new expedited removal policies on a widespread basis. In immigration courts across the country, DHS began targeting individuals dutifully appearing for their court hearings by moving to dismiss their cases—a necessary predicate step to instigate expedited removal proceedings—and then immediately apprehending them and placing them in ICE detention. People who came to this country lawfully on parole—many of whom have already applied for other, longer-term or more permanent legal status—are now having their lives upended as they are abruptly torn from their families and the lives they have begun building here.

For example: E.F.S. is a husband and father who was paroled into the United States with his wife and young son in 2024 after they came to an official port of entry with an appointment made using DHS's CBP One mobile application. Declaration of Andrew Freire ("Freire Decl."), ¶ 4. Like other individuals granted parole after securing a CBP One appointment, they were issued a Notice to Appear ("NTA") at the same time scheduling them for immigration proceedings. *Id.* After being granted parole, E.F.S. and his family resided in California and began preparing their application for asylum based on fear of returning to Honduras. *Id.* at ¶¶ 5, 9. On May 23, 2025, nearly a year after they were granted parole and while their parole was still valid, they appeared at the Los Angeles Immigration Court for their first master calendar hearing. That morning, they were taken by surprise when the attorney for DHS moved to sever E.F.S.'s case from his wife and son's case and then moved to dismiss his case because they were planning to put E.F.S. in expedited

---

[1] Anna Giaritelli, *Stephen Miller 'eviscerated' ICE officials in private meeting for low deportation numbers*, Wash. Exam'r, May 30, 2025, https://www.washingtonexaminer.com/news/white-house/3425297/stephen-miller-eviscerated-ice-officials-deportation-numbers/; Brittany Gibson & Stef W. Knight, *Scoop: Stephen Miller, Noem tell ICE to supercharge immigrant arrests*, Axios (May 28, 2025), https://www.axios.com/2025/05/28/immigration-ice-deportations-stephen-miller.

removal. *Id.* at ¶ 6; Declaration of Lindsay Toczylowski ("Toczylowski Decl."), ¶¶ 3-4. Despite E.F.S.'s opposition, the immigration judge granted dismissal. Freire Decl., ¶ 6; Toczylowski Decl., ¶ 5. When E.F.S. and his family then left the courtroom, six ICE officers descended and arrested E.F.S. in front of his wife and young son. Toczylowski Decl., ¶ 6. As his son watched, in shock and with tears in his eyes, the officers handcuffed E.F.S. and took him away. *Id.* E.F.S.'s attorney, who met E.F.S.'s wife and son immediately after, stated that "they were terrified, confused, and could barely speak to me," as they "did not know when or how they would next communicate with E.F.S." Freire Decl., ¶ 11. Since then, E.F.S. has been detained at an immigration jail outside of California, far from counsel and family, and faces the imminent threat of deportation back to a country where he has been threatened with torture and death. *Id.* at ¶¶ 7-9.

E.F.S.'s story is only one of countless examples of Defendants' recent implementation of their expedited removal policies around the country, which has been called, by reporters, a "nationwide blitz" of ICE enforcement waiting outside courtrooms to detain noncitizens whose cases have been dismissed on motion by ICE trial attorneys (or, in some cases, whose cases have not even been dismissed yet).[2] Plaintiffs' members and other noncitizens who were granted parole

---

[2] Michael Elsen-Rooney, *A Bronx high schooler showed up for a routine immigration court date. ICE was waiting*, Chalkbeat (May 26, 2025), https://www.chalkbeat.org/newyork/2025/05/27/bronx-high-school-student-detained-by-immigration-ice-agents/; Joshua Goodman & Gisela Salomon, *ICE agents wait in hallways of immigration court as Trump seeks to deliver on mass arrest pledge*, AP News (May 21, 2025), https://apnews.com/article/immigration-courts-arrests-trump-ice-deportations-fa96435d4ec021cc8ff636b23d80d848; *see generally* Declaration of Angelica Salas ("Salas Decl."); Declaration of George Escobar ("Escobar Decl."); Declaration of Patrice Lawrence ("Lawrence Decl."); Declaration of Melissa Chua ("Chua Decl."); Declaration of Enrique Espinoza ("Espinoza Decl."); Freire Decl.; Declaration of Sarah Gillman ("Gillman Decl."); Declaration of Michael Hirman ("Hirman Decl."); Declaration of Meghan DuPuis Maurus ("Maurus Decl."); Declaration of Cesar Montoya ("Montoya Decl."); Declaration of Jessica Olive ("Olive Decl."); Declaration of Sabrina Perez-Arleo ("Perez-Arleo Decl."); Declaration of Ming Tanigawa-Lau ("Tanigawa-Lau Decl."); Toczylowski Decl.; Declaration of Bianca Torres ("Torres Decl.").

into the U.S. have already been, and will continue to be, irreparably injured by Defendants' actions. And what makes Defendants' conduct all the more outrageous is that it is blatantly illegal: expedited removal cannot, by statute, be applied to individuals who have been paroled into the country.

The expedited removal process often moves extremely quickly. Unless this Court acts, paroled noncitizens across the country like E.F.S. and members of the Plaintiff organizations will continue to be rapidly and unlawfully deported—including back to countries where they are likely to face persecution, violence, even death—without a meaningful opportunity to present claims for immigration relief for which they are eligible, or to contest their eligibility for expedited removal. Plaintiffs respectfully request that the court order a stay under 5 U.S.C. § 705 of Defendants' recent policies targeting for expedited removal noncitizens who were paroled into the United States.

## BACKGROUND

Generally under the immigration laws, removal proceedings conducted in immigration court—with various process rights including the right to retain counsel, the right to present evidence, and the right to appellate review before the Board of Immigration Appeals and then the federal courts—are the "sole and exclusive procedure" for determining whether a person should be removed from the country. 8 U.S.C. § 1229a(a)(3).

One exception to full removal proceedings is "expedited removal," whereby certain noncitizens determined by an immigration officer to be "inadmissible," either because they engaged in fraud in applying for admission, 8 U.S.C. § 1182(a)(6)(C), or lack the requisite documents for entry, 8 U.S.C. § 1182(a)(7), may be ordered removed by that officer "without further hearing or review." 8 U.S.C. § 1225(b)(1)(A)(i). By statute, the use of expedited removal is authorized only for those two grounds of inadmissibility and, further, can be applied to

noncitizens in only two circumstances: those "arriving in the United States" (e.g., at a port of entry) and those who entered the United States who "ha[ve] not been admitted or *paroled*" (e.g., entered without inspection) and have been present for less than two years. *See* 8 U.S.C. § 1225(b)(1)(A)(i), (iii) (emphasis added). In other words, "[t]he statute does not subject persons who were authorized to enter the United States"—either because they were admitted on a visa, or granted parole at a port of entry—"to expedited removal, regardless of how long they have been in the United States." *Doe v. Noem*, No. 1:25-cv-10495 IT, 2025 WL 1099602, at *16 (D. Mass. Apr. 14, 2025).

This suit concerns the Defendants' unauthorized application of expedited removal to individuals who are in the United States (i.e., are no longer in the act of "arriving") after having been "paroled" into the country. For over 70 years, the immigration laws have authorized immigration officials to "parole" noncitizens into the country for a temporary period.[3] Humanitarian parole has been a key component of immigration policy since the Eisenhower administration used it to allow 30,000 Hungarians fleeing Soviet invasion to come to the United States; parole has been used over 125 times by administrations of both parties to promote various humanitarian, foreign policy, regional security, and migrant management objectives.[4]  In recent years, the program has been used to assist 75,000 Afghan nationals following the takeover of the Taliban, 200,000 Ukrainians following Russia's invasion, approximately 500,000 Cubans, Haitians, Nicaraguans, and Venezuelans following civil unrest in those countries, and in

---

[3] David J. Bier, *126 Parole Orders over 7 Decades: A Historical Review of Immigration Parole Orders*, Cato Institute (July 17, 2023), https://www.cato.org/blog/126-parole-orders-over-7-decades-historical-review-immigration-parole-orders.
[4] *Id.*

conjunction with DHS's CBP One mobile application as a tool to assist with migration management at the Southern border.[5]

Starting on January 21, 2025, Defendants took steps to dramatically expand the use of expedited removal by taking the following actions:

- On January 21, 2025, Acting DHS Secretary Benjamine Huffman issued a designation expanding the scope of expedited removal to apply nationwide and to certain noncitizens who cannot prove to the satisfaction of an immigration enforcement officer that they have been here continuously for two years.  Notice, U.S. Dep't of Homeland Sec., *Designating Aliens for Expedited Removal*, 90 Fed. Reg. 8139 (Jan. 24, 2025).

- On January 23, 2025, Acting Secretary Huffman issued a memorandum directing DHS personnel to consider expanding the use of expedited removal to apply to "any alien DHS is aware of who is amenable to expedited removal but to whom expedited removal has not been applied," including by terminating ongoing removal proceedings in immigration courts as well as active grants of parole (hereinafter the "January 23 Huffman Memorandum").[6]

- On February 18, 2025, ICE leadership issued a directive to its Enforcement and Removal Operations personnel directing officers to consider removal for any "paroled arriving aliens" who had not affirmatively applied for asylum (hereinafter the "February 18 ICE Directive"). The directive provided additional guidance that "[t]here is no time limit on the ability to process such [individuals] for ER" and the issuance of an expedited removal

---

[5] *Id;* Notice, U.S. Dep't of Homeland Sec., Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans**,** 90 Fed. Reg. 13,611 (Mar. 25, 2025).
[6] DHS, Memorandum from Acting Secretary Benjamine C. Huffman on Guidance Regarding How to Exercise Enforcement Discretion (Jan. 23, 2025), https://www.dhs.gov/sites/default/files/2025-01/25_0123_er-and-parole-guidance.pdf.

charging documents would terminate the parole of an individual who is "on an active parole."[7]

- On March 25, 2025, DHS published a Federal Register Notice terminating the Cuban, Haitian, Nicaraguan, and Venezuelan ("CHNV") parole program and purporting to terminate *en masse* all valid grants of parole previously extended to CHNV nationals (hereinafter the "March 25 CHNV Termination Notice"). The Department explained in the Notice that it was terminating grants of parole early in order to be able to "initiate expedited removal proceedings to the maximum extent possible," and that it "intends to prioritize for removal" individuals who had not filed an immigration benefit request by the publication date of the Notice, or who were not the beneficiary of an immigration benefit request filed by someone else on their behalf. 90 Fed. Reg. at 13,619, 13,620.

Plaintiffs are aware of isolated reports in the first couple months after these policies were issued of individuals who had been paroled into the country being targeted for expedited removal, *see, e.g.,* Gillman Decl., ¶¶ 6-7, Maurus Decl., ¶¶ 2, 6, Perez-Arleo Decl., ¶¶ 7-10, Torres Decl., ¶ 6, but it was not until recently that enforcement efforts ramped up significantly. Around May 20, 2025, after White House deputy chief of staff Stephen Miller increased pressure on ICE to arrest and deport more people—including setting a quota of 3,000 arrests a day, which was triple the number of daily arrests being made[8]—Defendants significantly expanded their efforts to use

---

[7] Ted Hesson & Kristina Cooke, *Trump weighs revoking legal status of Ukrainians as US steps up deportations*, Reuters (March 6, 2025), https://www.reuters.com/world/us/trump-plans-revoke-legal-status-ukrainians-who-fled-us-sources-say-2025-03-06/ (citing "internal ICE email" available at https://fingfx.thomsonreuters.com/gfx/legaldocs/gkpljxxoqpb/ICE_email_Reuters.pdf).

[8] Brittany Gibson & Stef W. Knight, *Scoop: Stephen Miller, Noem tell ICE to supercharge immigrant arrests*, Axios (May 28, 2025), https://www.axios.com/2025/05/28/immigration-ice-deportations-stephen-miller.

expedited removal, initiating a "nationwide blitz." Around that time, noncitizens and their attorneys nationwide began reporting that, upon their showing up to scheduled immigration court hearings—frequently for a routine appearance or check-in—DHS's attorneys were asking immigration judges to dismiss the cases against the noncitizens.[9] This was in many instances done by oral motion with little to no reasoning, and the noncitizens (and their attorneys, for those represented) often left the courtroom thinking they were free of removal proceedings and would be able to proceed with affirmative applications for relief outside of court; in some cases that is precisely what the immigration judges thought, too.[10] *See, e.g.*, Olive Decl., ¶¶ 6-8 (after ordering dismissal, Immigration Judge advised client, who is a CASA member, to apply for asylum affirmatively with USCIS to continue his case, which becomes unavailable in expedited removal). After the judges granted dismissal, however, and the noncitizen left the courtroom, immigration enforcement personnel were waiting outside to arrest detain them so they could be processed for expedited removal. *See, e.g.*, Toczylowski Decl., ¶¶ 6, 9. In some cases, ICE arrested individuals after their hearing even though during the hearing, DHS did *not* move to dismiss and the regular removal proceedings were still active. *See, e.g.,* Espinoza Decl., ¶¶ 6-9 (describing arrest for expedited removal of parolee immediately following hearing where the immigration judge "granted [the noncitizen] a continuance to obtain counsel" and "[n]o other issues were raised").

---

[9] *Id.*

[10] *Id.*; *see also* Suzanne Gamboa, *Immigration arrests in courthouses have become the new deportation tool, stripping migrants of a legal process*, NBC News (May 30, 2025), https://www.nbcnews.com/news/latino/immigrations-arrests-ice-deportations-courthouse-legal-process-ice-rcna209671.

Noncitizens who had been paroled into the United States, including Plaintiffs' members, have been harmed by the "nationwide blitz."[11] *See* Salas Decl., ¶¶ 14-24; Escobar Decl., ¶¶ 10-18 Lawrence Decl., ¶¶ 13-19; Chua Decl., ¶ 2 (CASA member); Olive Decl., ¶ 2 (CASA member); Torres Decl., ¶ 2 (CHIRLA member). For the reasons described above, noncitizens in this position often did not realize they were going to be subjected to expedited removal until they were scheduled for a Credible Fear Interview (CFI) or given an expedited removal order. *See, e.g.,* Chua Decl., ¶¶ 7-8 (CASA member), 10; Hirman Decl., ¶¶ 7-8; Olive Decl, ¶¶ 6-9. Regardless, they have been jailed in immigration detention (and often moved around the country to various detention centers over a short period of time), forced to participate in CFIs without the benefit of counsel, and deprived of a meaningful opportunity to apply for immigration relief for which they are eligible. *See, e.g.*, Chua Decl., ¶¶ 14-16; Torres Decl., ¶¶ 8-12.

## LEGAL STANDARD

Under 5 U.S.C. § 705, courts may "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." The same factors for issuance of a preliminary injunction apply to issuance of a stay pursuant to Section 705. *D.C. v. U.S. Dep't of Agric.,* 444 F. Supp. 3d 1, 48 (D.D.C. 2000). Specifically, courts review whether the plaintiff seeking a stay has shown that "four factors, taken together, warrant relief: likely success on the merits, likely irreparable harm in the absence of preliminary relief, a balance of the equities in its favor, and accord with the public interest."

---

[11] Michael Elsen-Rooney, *A Bronx high schooler showed up for a routine immigration court date. ICE was waiting*, Chalkbeat (May 26, 2025), https://www.chalkbeat.org/newyork/2025/05/27/bronx-high-school-student-detained-by-immigration-ice-agents/

*Pursuing Am.'s Greatness v. Fed. Election Comm'n,* 831 F.3d 500, 505 (D.C. Cir. 2016) (quoting

*Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 22 (2008)).

Plaintiffs have met the standard for a stay pursuant to 5 U.S.C. § 705.

## ARGUMENT

Plaintiffs respectfully request that this Court preliminarily stay the January 23 Huffman

Memorandum, the February 18 ICE Directive, and the March 25 CHNV Termination Notice

insofar as they direct or authorize the application of expedited removal to individuals who have

been paroled into the country at ports of entry. ***First***, the INA specifies only two narrow categories

of individuals who can be subjected to expedited removal, and neither category includes

individuals who have been paroled into the country. Any interpretation of the expedited removal

authority that would permit Defendants to subject parole beneficiaries to expedited removal would

violate the statute and nullify key terms of the expedited removal authority. Defendants' policies

are therefore not in accordance with law and are acting in excess of their statutory authority.

Defendants' policies are likewise not in accordance with their own regulations, which expressly

contemplate that an individual who can demonstrate to an immigration officer's satisfaction "that

he or she was admitted or paroled into the United States" at a point in the past may not "be ordered

removed pursuant to [8 U.S.C. § 1225(b)(1)]." 8 C.F.R. § 235.3(b)(1)(ii)(b)(6). ***Second***,

Defendants offer no reasoned explanation for why they may apply expedited removal to

individuals who have been paroled into the country. In fact, the purported legal bases for

Defendants' policies proffered in the January 23 Huffman Memorandum, the February 18 ICE

Directive, and the March 25 CHNV Termination Notice are inconsistent with one another, and

Defendants neither acknowledge this inconsistency nor provide a reasoned explanation for it, nor

explain the change in policy that these documents represent. Nor have Defendants given any

mention to, much less consideration of, the significant reliance interests at stake, nor available alternatives. The APA does not tolerate such arbitrary and capricious agency action. In addition, as sixteen supporting declarations illustrate, Defendants' actions are inflicting substantial and irreparable harm on Plaintiffs' members and noncitizens around the country, and any hardship the Defendants would suffer as a result of a stay is substantially outweighed by the countervailing hardships that Plaintiffs' members and others similarly situated are suffering through Defendants' actions, which inflict broad and traumatic harm on the public as well.

## I.    PLAINTIFFS HAVE STANDING, THIS COURT HAS JURISDICTION, AND DEFENDANTS' ACTIONS ARE REVIEWABLE.

This Court can consider Plaintiffs' claims because Plaintiffs have standing to bring suit on behalf of their members; their members are in the zone of interests of the INA, as are the organizations themselves; and Congress has made Defendants' actions reviewable.

*Jurisdictional standing.* The D.C. Circuit has held explicitly that membership-based associations like Plaintiffs have Article III standing to test the legality of policies and procedures implementing the expedited removal statute on behalf of their members who are subject to those policies and procedures. *See Make the Rd. N.Y. v. Wolf*, 962 F.3d 612, 627-28 (D.C. Cir. 2020) ("*MRNY*"). Like in *MRNY*, each Plaintiff here "is a membership organization that advocates on behalf of its members in immigrant communities and that includes among its members individuals directly covered by the new expedited removal" policies. *Id.* at 621; *see* Salas Decl., ¶¶ 5-7, 14-24; Escobar Decl., ¶¶ 1, 7-8, 10-18; Lawrence Decl., ¶¶ 1, 3-4, 13-19. Plaintiffs here likewise present the same "recognized harm"—"depriving those individuals of the more robust procedural protections afforded in regular removal proceedings." 962 F.3d at 622. That harm is also imminent. *Compare id.* (explaining that there is nothing "speculative about a threatened injury if the one who makes the threat simultaneously and unequivocally states that he intends to inflict the threatened

harm as soon as possible and without further warning on such individuals." (citation omitted) *with, e.g.*, 90 Fed. Reg. at 13620 (justifying mass revocation of CHNV parole based on DHS's "strong interest" in using "expedited removal proceedings to the maximum extent possible for the [amenable] CHNV population"); January 23 Huffman Memorandum (directing DHS to "take *all* steps necessary" to decide "whether to apply expedited removal" to "*any* alien DHS is aware of who is [now] amenable to it") (emphases added); February 18 ICE Directive (similar directive regarding certain noncitizens previously paroled into the country at a port of entry by CBP). Indeed, Defendants have already subjected members of Plaintiffs CASA and CHIRLA to expedited removal. Salas Decl., ¶ 17; Escobar Decl., ¶ 7. Plaintiffs have constitutional standing.

*Prudential standing.* Plaintiffs also meet the "not . . . especially demanding" test for prudential standing. *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012). Plaintiffs' interests here in their members avoiding summary deportation are at the core of the zone of interests the INA protects; indeed, Congress explicitly authorized just this type of lawsuit. *See MRNY*, 962 F.3d at 628 ("To sum up, [8 U.S.C. §] 1252(e)(3) expressly provides for jurisdiction over the very type of claim that the Associations are bringing on behalf of their individual members."). Plaintiffs have prudential standing. *See, e.g.*, *NAACP v. Trump*, 298 F. Supp 3d 209, 235 (D.D.C. 2018) (concluding organization's members were within the zone of interests); *Hispanic Affs. Project v. Perez*, 319 F.R.D. 3, 7-8 (D.D.C. 2016) (same).

*Statutory jurisdiction.* Although Congress has limited federal court jurisdiction regarding various aspects of the removal (and expedited removal) system, it "expressly preserve[d] jurisdiction over challenges like the Associations' claims of legal or constitutional error in the Secretary's rules implementing expedited removal." *MRNY*, 962 F.3d at 625. Here, the challenged actions are all written policy directives setting out guidance and procedures to implement

expedited removal in light of the new Administration's priorities. *See* January 23 Huffman Memorandum; February 18 ICE Directive; March 25 CHNV Termination Notice, 90 Fed. Reg. 13,611.[12] Jurisdiction is thus preserved under 8 U.S.C. § 1252(e)(3). *Id.*; *accord Grace v. Barr*, 965 F.3d 883, 891-96 (D.C. Cir. 2020); *Kiakombua v. Wolf*, 498 F. Supp. 3d 1, 30-31 (D.D.C. 2020) (Jackson, K.B., D.J.).

*Reviewable agency action.* Finally, Defendants' three actions at issue here are reviewable under the APA, which makes two kinds of agency action "subject to judicial review": "[a]gency action made reviewable by statute" and "final agency action." 5 U.S.C. § 704. The former need not be "final." *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882 (1990) ("the 'agency action' in question must also be 'final agency action'" unless "review is sought . . . pursuant to specific authorization in the substantive statute"). Here, "section 1252(e)(3) of the INA" makes Defendants' written implementation of expedited removal "'reviewable by statute' within the meaning of section 704 of the APA." *Las Americas Immigrant Advoc. Ctr. v. Wolf*, 507 F. Supp. 3d 1, 35 (D.D.C. 2020) (Jackson, K.B., D.J.); *accord Grace v. Whitaker*, 344 F. Supp. 3d 96, 118 (D.D.C. 2018) (rejecting argument "that Congress limited the application of [§] 1252(e)(3) to only claims involving legislative rules or final agency action"). Regardless, Defendants' actions also meet the two-part test for final agency action: legal consequences plainly flow from Defendants' decision to put parolees through expedited removal, which likewise determines the parolees' rights, and none of Defendants' actions can characterized as "tentative." *See Bennett v. Spear*, 520 U.S. 154, 178 (1997).

---

[12] Plaintiffs also incontestably filed suit "no later than 60 days after the date" that the challenged actions were "first implemented." 8 U.S.C. § 1252(e)(3)(B).

II.    **PLAINTIFFS ARE LIKELY TO SUCCEED IN PROVING THAT THE AGENCY ACTIONS ARE CONTRARY TO LAW AND VIOLATE THE AGENCY'S OWN PROCEDURES.**

Agency decisions premised on an incorrect understanding of the law cannot stand. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 391 (2024) ("[The APA] specifies that courts, not agencies, will decide 'all relevant questions of law' arising on review of agency action—even those involving ambiguous laws—and set aside any such action inconsistent with the law as they interpret it." (quoting 5 U.S.C. § 706)); *accord SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943) (agency action "may not stand if the agency has misconceived the law"). Here, Plaintiffs are likely to succeed on their claim that DHS erroneously interpreted the INA in applying expedited removal to noncitizens who were "paroled." Because DHS premises its actions on an erroneous legal interpretation, the APA requires that its decisions be nullified. *Loper Bright*, 603 U.S. at 391.

The plain language of the expedited removal statute, 8 U.S.C. § 1225(b)(1)(A), makes clear that noncitizens now here in the United States after being inspected and paroled are categorically ineligible for expedited removal, regardless of whether that parole has expired or been terminated. There are only two distinct groups of noncitizens who can be statutorily subject to expedited removal if they are found inadmissible under 8 U.S.C. §§ 1182(a)(6)(C) or 1182(a)(7): noncitizens who are "arriving in the United States" and certain noncitizens designated by the Secretary to be amenable to expedited removal, who have "*not* been admitted *or paroled* into the United States." 8 U.S.C. § 1225(b)(1)(A)(i), (iii) (emphases added). The Secretary has extended by designation the second category to include certain noncitizens located anywhere in the country who cannot show that they have been physically present in the United States continuously for two years. *See* Notice, U.S. Dep't of Homeland Sec., *Designating Aliens for Expedited Removal,* 90 Fed. Reg. 8139 (Jan. 24, 2025). Nevertheless, that does not change the fact that noncitizens who have been

14

"paroled" into the country like Plaintiffs' members are statutorily excluded from such a so-called "expanded expedited removal" designation under 8 U.S.C. § 1225(b)(1)(A)(iii).

1.      The January 23 Huffman Memorandum and the March 25 CHNV Termination Notice directly violate the plain language of the statute when they target for expanded expedited removal "paroled" noncitizens who have been in the United States for less than two years. *See Doe v. Noem,* No. 1:25-cv-10495 IT, 2025 WL 1099602, at *16 (D. Mass. Apr. 14, 2025) ("The statute does not subject persons who were authorized to enter the United States to expedited removal, regardless of how long they have been in the United States."). The statute could not be clearer.

Defendants' purported basis for subjecting paroled individuals to expanded expedited removal is that once an individual's parole is ended, that person has no longer "been . . . paroled into the United States" and can be put through expedited removal under 8 U.S.C. § 1225(b)(1)(A)(iii) if they have been here less than two years and have been found inadmissible under the relevant provisions. January 23 Huffman Memorandum; March 25 CHNV Termination Notice, 90 Fed. Reg. at 13,619. That interpretation defies the plain text of the provision that protects from expanded expedited removal individuals who are in the country by virtue of having been admitted or paroled.

In addition to being contrary to the plain text, Defendants' interpretation would render meaningless the explicit limitation that Congress placed on the Executive's authority to subject certain people who are in the United States to expedited removal. The provision limiting expanded expedited removal to people who have *not* been "paroled" would be rendered superfluous surplusage if the Government could subject a previously "paroled" person to expanded expedited removal by terminating their parole. *Cf.Nat'l Ass'n of Mfrs. v. Dep't of Def.,* 583 U.S. 109, 128-29 (2018) ("the Court rejects an interpretation of the statute that would render an entire subparagraph

meaningless. As this Court has noted time and time again, the Court is 'obliged to give effect, if possible, to every word Congress used.'") (citation omitted). This is even clearer given Defendants' position in the February 18 ICE Directive that an expedited removal charging document itself is sufficient to terminate parole. *See* February 18 ICE Directive. Defendants' position appears to be that Congress protected "paroled" noncitizens from expanded expedited removal unless and until DHS decides to process such individuals for expanded expedited removal. This is not tenable under the plain language of the statute. And adherence to the norms of statutory construction is particularly important here given how dramatically Defendants' reading would explode Executive authority to subject hundreds of thousands of parole recipients to expedited removal.

Indeed, in the context of interpreting jurisdictional statutes, the Supreme Court has similarly rejected interpretations that would leave agencies' compliance with the law to the agencies themselves. *See Mach Mining, LLC v. EEOC,* 575 U.S. 480, 487-89 (2015); *Kucana v. Holder,* 558 U.S. 233, 252-53 (2010) (collecting cases in the immigration context). *See also Grace*, 965 F.3d at 895 (rejecting argument that would give the executive the power to "immunize credible-fear policies from judicial review by simply announcing them in" in forms not explicitly listed in § 1252(e)(3)—"a result [that] would conflict with section 1252(e)(3)'s purpose."). There is every reason to adhere to that principle here. As the Supreme Court explained, "[Courts] need not doubt the [agency]'s trustworthiness, or its fidelity to law, to shy away from" a statutory interpretation that would leave the agency's "compliance with the law . . . in [its] hands alone." *Mach Mining, LLC*, 575 U.S. at 488-89. Instead, "[courts] need only know—and know that Congress knows—that legal lapses and violations occur, and especially so when they have no consequence." *Id.*

Defendants' interpretation is further contradicted by DHS' own regulations, which make clear that the "has not been admitted or paroled" language of 8 U.S.C. § 1225(b)(1)(A)(iii)(II) refers to a past event that either did or did not occur, rather than a continuing immigration status that is maintained. Defendants' regulations describing to whom expanded expedited removal may be applied speak of "aliens who . . . have entered the United States without *having been* admitted or paroled." 8 C.F.R. § 235.3(b)(1)(ii) (emphasis added). In that same provision, the regulations specify that a noncitizen who establishes that they have been present in the U.S. for longer than two years may not be subjected to expedited removal even if that noncitizen "*was* not inspected and admitted or paroled into the United States"). *Id* (emphasis added). Additionally, Defendants' regulations require that a noncitizen be permitted to prove he "*was* . . . paroled into the United States following inspection at a port-of-entry" before being subjected to expedited removal under 8 U.S.C. § 1225(b)(1)(A)(iii); a noncitizen can be subjected to expedited removal under that statutory provision only if they "cannot satisfy the examining officer that he or she *was* lawfully admitted or paroled." 8 C.F.R. § 235.3(b)(6) (emphases added).[13] In each of these instances, the Department's focus is on the manner of entry into the United States (i.e., whether the individual was or was not inspected and admitted or paroled) rather than on the individual's current status. That the inquiry into whether a noncitizen has or "has not been admitted or paroled" refers to a past event rather than a continuing status is also consistent with the Supreme Court's observation

---

[13] 8 C.F.R. § 235.3(b)(6) contains what appears to be an erroneous cross-reference that has been in place since the interim final rule was published in 1997. Namely, although the text of the regulation says it applies to "any or all aliens described in paragraph (b)(2)(ii) of this section," it appears to be meant to be referring to paragraph (b)(1)(ii) of this section. The reference to (b)(2)(ii) appeared in the original Notice of Proposed Rulemaking (Inspection and Expedited Removal of Aliens, 62 Fed. Reg. 444-01, 480 (proposed Jan. 3, 1997)), and remained in place when the Interim Final Rule was published, even though the Interim Final Rule switched the order of § 235.3(b)(1) and (b)(2). Inspection and Expedited Removal of Aliens, 62 Fed. Reg. 10312, 10314 (interim rule promulgated Mar. 6, 1997).

in *Sanchez v. Mayorkas* that "[l]awful status and admission . . . are distinct concepts in immigration law," 593 U.S. 409, 415 (2021). "Parole" can be both a manner of entry and a status, but in the context of the full statutory expedited removal scheme and when paired with the term "admitted," it is clear that the text focuses on manner of entry and not maintenance of a particular admission or parole status.

That DHS has long (and correctly) interpreted 8 U.S.C. § 1225(b)(1)(A)(iii)(II) to pertain to people who were not inspected and admitted or paroled but rather entered without inspection is further confirmed by language in 8 C.F.R. § 235.3(b)(1)(ii). This regulation states that "[w]hen [the expanded expedited removal] provisions are in effect for *aliens who enter without inspection*, the burden of proof rests with the alien to affirmatively show that he or she has the required continuous physical presence in the United States." 8 C.F.R. § 235.3(b)(1)(ii) (emphasis added). This regulation makes clear that once the expanded expedited removal provisions were made effective by a designation, noncitizens in the country who entered without inspection —and *not* noncitizens in the country who were admitted or paroled into the U.S. at a port of entry following inspection—would be subject to expanded expedited removal.

In sum, Defendants' policies seeking to apply expedited removal to individuals who have been paroled into the country at a port of entry are contrary to the express terms of the statute, 8 U.S.C. § 1225(b)(1)(A)(iii). They also impermissibly violate DHS's own regulations, including those found at 8 C.F.R. § 235.3(b)(1)(ii) and (b)(6), which affirm that an individual who can demonstrate that he was previously paroled into the United States cannot be subjected to expedited removal. *See United States ex. rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954).

2.      The February 18 ICE directive asserts that a noncitizen who was paroled into the country at an official port of entry and is now in the United States can be subject to expedited

removal "as an arriving alien" with "no time limit on the ability to process such aliens for ER." This, too, violates the statutory scheme Congress created for expedited removal in the INA.

Congress, in constructing the grounds for expedited removal, drew a clear distinction between noncitizens who are in the act or process of "arriving" and those who were already in the country without having been "admitted" or "paroled." 8 U.S.C. § 1225(b)(1)(A). This is consistent with the broader shift in framework for removals and deportations that Congress adopted in the same overhaul of the statute that created expedited removal—a shift from the question of whether a noncitizen "had *physically entered* the United States" to whether the noncitizen "had been *lawfully admitted* into the country by immigration authorities." Hillel R. Smith, Cong. Rsch. Serv., R45314, *Expedited Removal of Aliens: Legal Framework* (2019), https://www.congress.gov/crs-product/R45314.

It is clear that "Congress' use of a verb tense is significant in construing statutes." *United States v. Wilson*, 503 U.S. 329, 333 (1992) (collecting statutes). The statute's use of the present progressive tense, in specifying that expedited removal may be applied to an individual who "is arriving in the United States," signals an action that is temporary but currently occurring. *See Al Otro Lado v. McAleenan*, 394 F. Supp. 3d 1168, 1200 (S.D. Cal. 2019) (construing "is arriving" in 8 U.S.C. § 1225(b)(1)(A)(i) and observing that "[t]he use of the present progressive, like use of the present participle, denotes an ongoing process"); *see also Cherokee Nation v. Dep't of Interior*, Case No. 1:19-cv-02154 (TNM) 2024 WL 4286048, at *11 (D.D.C. Sept. 25, 2024) (noting that the statutory phrase "'are being deposited,' (present continuous voice, passive voice) . . . suggests that the action of depositing is ongoing"). The use of the present progressive tense to refer to the first category of "arriving" noncitizens who may be subjected to expedited removal (i.e., those who "[are] arriving in the United States,") thereby focuses on people who are currently in the

process of arriving in the United States at a port of entry and who will no longer be arriving once that action has ended. 8 U.S.C. § 1225(b)(1)(A)(i). The statute does *not* somehow refer to people who carry with them forever an amorphous "arriving" status, long after the act of arriving is complete.

Noncitizens who arrived in the past in any manner—whether by presenting at a port of entry and getting inspected and paroled or admitted into the country, or by entering without inspection—and who have since established lives here, are no longer in the process of "arriving," so they cannot be subject to expedited removal on that basis. *See Bollat Vasquez v. Wolf,* 460 F. Supp. 3d 99, 111 (D. Mass. 2020) ("Under the statutory language, if [noncitizen] applicants [for admission] are apprehended while crossing the border (whether or not at a check point), they are 'arriving' applicants under the statute, and if apprehended at some point thereafter, they are not 'arriving,' but rather 'alien[s] present in the United States who [have] not been admitted.'" (quoting 8 U.S.C. § 1225(a)(1)) (last two alterations in original)).

The interpretation of the statute in Defendants' agency actions as including individuals who have been paroled into the United States as indefinitely "arriving" also effectively reads out of the statute the protections included in 8 U.S.C. § 1225(b)(1)(A)(iii) for noncitizens who have been paroled. If such individuals were forever subject to expedited removal because they were perpetually "arriving," then it would make no sense for the statute to explicitly exempt those same individuals from being subject to expedited removal under an expanded expedited removal designation under 8 U.S.C. § 1225(b)(1)(A)(iii); the carveout would have no effect. An interpretation of the statute that would render provisions in the text meaningless must be rejected. *See Nat'l Ass'n of Mfrs. v. Dep't of Def.,* 583 U.S. 109, 128-29 (2018); *Hurry v. Fed. Deposit Ins. Corp.,* 589 F.Supp.3d 100, 122-125 (D.D.C. 2022) (rejecting FDIC's reading of a statute because

it was "at odds with the statutory scheme" and would have rendered a statutory deadline included by Congress meaningless.").

Therefore, in each of the challenged agency actions, Defendants have incorrectly interpreted the expedited removal statute in applying any of the provisions to parolees. Plaintiffs are likely to succeed on their claim that Defendants' actions violate the INA and the APA and, with respect to the application of expanded expedited removal to paroled individuals, Defendants' own regulations.

## III.    PLAINTIFFS ARE ALSO LIKELY TO SUCCEED IN PROVING THAT THE AGENCY ACTIONS ARE ARBITRARY AND CAPRICIOUS

Because the January 23 Huffman Memorandum, the February 18 ICE Directive, and the March 25 CHNV Termination Notice are based on patently incorrect interpretations of the expedited removal statute, the Court need not also consider whether these agency actions are also arbitrary and capricious under 5 U.S.C. § 706(2)(A). But Plaintiffs are likely to succeed in proving that they are.

Congress has mandated through the APA that when executive agencies exercise their authority, they do so on an informed basis, ground their justifications on neutral and rational principles, and "offer genuine justifications for important decisions." *Dep't of Com. v. New York*, 588 U.S. 752, 756 (2019); *see also Motor Vehicle Mfr. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 48-49 (1983). Because "courts retain a role, and an important one, in ensuring that agencies have engaged in reasoned decisionmaking," *Judulang v. Holder*, 565 U.S. 42, 53 (2011), review of whether an agency's action reflects reasoned decision-making "is to be searching and careful," *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971).

To facilitate judicial review, "the most elementary precept[] of administrative law [is] an agency has no choice but to provide a reasoned explanation for its actions." *Pol'y & Rsch., LLC v.*

*U.S. Dep't of Health & Hum. Servs.,* 313 F. Supp. 3d 62, 83 (D.D.C. 2018) (Jackson, K.B., D.J.). As the Supreme Court has explained, "[t]he reasoned explanation requirement of administrative law is meant to ensure" that agencies provide "reasons that can be scrutinized by courts and the interested public." *Dep't of Com.*, 588 U.S. 785. It is the reviewing court's task to examine the proffered reasons—"or, as the case may be, the absence of such reasons." *Judulang*, 565 U.S. at 53. A court may not "attempt itself to make up for [any] deficiencies" in an agency's reasons, *State Farm*, 463 U.S. at 43, but "must judge the propriety of [agency] action solely by the grounds invoked by the agency." *Pol'y & Rsch., LLC,* 313 F. Supp. 3d at 72; *see also SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947).

The explanations Defendants have provided in the January 23 Huffman Memorandum, the February 18 ICE Directive, and the March 25 CHNV Termination Notice to justify applying the expedited removal statute to individuals inspected and paroled into the United States at ports of entry are, on their face, arbitrary and capricious and do not stand up to judicial scrutiny. The reasoning Defendants provide in these documents is scant, if not nonexistent. The proffered legal bases for why the agency may apply expedited removal to paroled individuals, moreover, shift from document to document and are fundamentally inconsistent across the January 23 Huffman Memorandum, the February 18 ICE Directive, and the March 25 CHNV Termination. And Defendants' reasoning is arbitrary for an independent reason: none of these policies reflect consideration of any reasonable alternatives, reliance interests, or the impact that the application of expedited removal to paroled individuals has on the individuals themselves, their families, their employers, their communities, and any supporters who participated in their parole applications.

*Defendants have provided no substantive reasoning for their actions*. The January 23 Huffman Memorandum, the February 18 ICE Directive, and the March 25 CHNV Termination

Notice all fail the APA's reasoned decisionmaking requirement: None of these policies provides any explanation, much less a reasonable one, for the decision to allow the DHS component agencies to apply expedited removal to individuals who have previously been paroled into the United States. The January 23 Huffman Memorandum and February 18 ICE Directive command DHS component agencies to apply, or to consider applying, expedited removal to certain populations of paroled individuals; the March 25 CHNV Termination Notice justifies the decision to precipitously strip hundreds of thousands of people of lawful parole status based on the unexplained assertion that doing so is necessary for DHS to process such paroled individuals for expedited removal under the statute. They contain no other content explaining why Defendants now seek to apply expedited removal to individuals who have previously been paroled into the United States. "One of the most basic procedural requirements of [the APA] is that an agency must give adequate reasons for its decisions." *Encino Motor Cars, LLC v. Navarro*, 579 U.S. 211, 221 (2016). When the agency has ignored the most elementary requirement of the APA, its actions are arbitrary and capricious. *Id.*

*Defendants' justifications for applying expedited removal to paroled individuals shifted over time and are fundamentally inconsistent.* When viewed side by side, it is readily apparent that the January 23 Huffman Memorandum, the February 18 ICE Directive, and the March 25 CHNV Termination Notice rely on different parts of the expedited removal statute and offer contradictory explanations, without any acknowledgment, much less any effort to reconcile or otherwise explain why the policies are fundamentally at odds with one another.

| Agency Action | Authority Relied Upon |
|---|---|
| January 23 Huffman Memorandum | 8 U.S.C. § 1225(b)(1)(A)(iii)(II): expedited removal applies to any individual "present in the United States, without having been admitted or paroled into the United States," "for up to two years after the [individual] arrived in the United States" |

| February 18 ICE Directive | 8 U.S.C. § 1225(b)(1)(A)(i): expedited removal applies to all "paroled arriving aliens" who have been "previously released by U.S. Customs and Border Protection (CBP). . .. [t]here is no time limit on the ability to process [such individuals] for [expedited removal]." |
|---|---|
| March 25 CHNV Termination Notice | 8 U.S.C. § 1225(b)(1)(A)(iii)(II): "[e]xpedited removal is available only when an alien has not been continuously present in the United States for at least the two years preceding the date of the inadmissibility determination." |

The March 25 CHNV Termination Notice, for example, cites 8 U.S.C. § 1225(b)(1)(A)(iii)(II) as support for its statement that "[e]xpedited removal is available only when an alien has not been continuously present in the United States for at least the two years preceding the date of the inadmissibility determination." 90 Fed. Reg. at 13619. Indeed, this is the justification that the Notice offers for why the Department decided to categorically terminate the grants of parole of hundreds of thousands of CHNV parole beneficiaries: "If DHS were to allow the CHNV parolee population to remain for the full duration of their two-year parole, DHS would be compelled to place a greater proportion of this population in section 240 removal proceedings," rather than expedited removal proceedings. *Id.*

The January 23 Huffman Memorandum does not itself cite a specific expedited removal provision, but its stated purpose is to "provide[] guidance" as to "two new policies"—a DHS parole memorandum and the Federal Register Notice "Designating Aliens for Expedited Removal," which was officially published on January 24, 2025. "Designating Aliens for Expedited Removal," 90 Fed. Reg. 8139 (Jan. 24, 2025). Like the March 25 CHNV Termination Notice, the January 24, 2025 Notice also relies solely on 8 U.S.C. § 1225(b)(1)(A)(iii) as the authority for expanding the application of expedited removal to any individual "present in the United States, without having been admitted or paroled into the United States," "for up to two years after the [individual] arrived in the United States." 90 Fed. Reg. at 8139.

The February 18 ICE Directive, however—issued *in between* the January 23 Huffman Memorandum and the March 25 CHNV Termination Notice—relies on the expedited removal authority articulated at 8 U.S.C. § 1225(b)(1)(A)(i) when it instructs officers to consider for expedited removal all "paroled arriving aliens" who have been "previously released by U.S. Customs and Border Protection (CBP)." The Directive further instructs that officers may process for expedited removal "any arriving alien (i.e., encountered at a port of entry who CBP determined to be inadmissible and released,") and that "[t]here is no time limit on the ability to process [such individuals] for [expedited removal]."

In other words, in the three official articulations of the agency's reason for why it can subject hundreds of thousands of humanitarian parole beneficiaries to expedited removal, Defendants have relied on different statutory provisions for the expedited removal authority and offered irreconcilable reasons for doing so. The inherent contradiction between rushing to apply expedited removal to paroled individuals before they have been in the United States for longer than two years, on the one hand, and declaring that paroled individuals may be processed for expedited removal at any time, on the other, only underlines the arbitrary and capricious nature of the agency action challenged here: "the agency has failed to provide even that minimal level of analysis" for its own actions and its contradictory conclusions about the statutory authority for the agency's desired policy to apply expedited removal to paroled individuals. *Encino Motorcars*, 579 U.S. at 221; *see also Nat'l Ass'n of Broadcasters v. F.C.C.*, 740 F.2d 1190, 1201 (D.C. Cir. 1984) ("[T]he [agency] has no authority to experiment with its statutory obligations."). To the extent that the January 23 Huffman Memorandum, the February 18 ICE Directive, and the March 25 CHNV Termination Notice represent changes in the agency's policy as to why expedited removal may be applied to parole beneficiaries, the agency has likewise failed to offer any reasoned explanation

for such a change. *Encino Motorcars*, 579 U.S. at 221 ("Agencies are free to change their existing policies as long as they provide a reasoned explanation for the change."); *Grace,* 965 F.3d at 903 (concluding that a credible fear policy was arbitrary and capricious "due to USCIS's failure to acknowledge and explain its departure from past practice.").

Where, as here, "no findings and no analysis . . . justify the choice made," the APA "will not permit" a court to uphold the agency's action. *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 167 (1962); *accord Judulang*, 565 U.S. at 64 ("[Courts] must reverse an agency policy when we cannot discern a reason for it," and doing so on that basis).

*Defendants failed to consider reasonable alternatives, reliance interests, or the impact that the agency policies would have on parole beneficiaries and their communities.* In each of the three written policy directives and guidelines implementing expedited removal, DHS failed to consider numerous factors relevant to this exercise of the expedited removal authority that would expose hundreds of thousands of parole beneficiaries to summary deportation from the country. At a minimum, the January 23 Huffman Memorandum, the February 18 ICE Directive, and the March 25 CHNV Termination Notice are each devoid of even any mention, much less any analysis, of the impact that applying expedited removal to parolees would have on parole beneficiaries who have begun building new lives here; the reliance interests of those parole beneficiaries, their families, their sponsors, their employers, and their communities; the humanitarian purpose of parole; the policy reasons why DHS created these parole processes in the first place, and available alternatives. *See DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 28-33 (2020); *State Farm*, 463 U.S. at 83.

Indeed, the only thing DHS appears to have considered—and only then in the March 25 CHNV Termination Notice—is its clear intent to remove as many CHNV parole beneficiaries as possible, as quickly as possible and by whatever means necessary. *See* 90 Fed. Reg. at 13620

26

(describing "strong interest" in using "expedited removal proceedings to the maximum extent possible for the [amenable] CHNV population"). The expedited removal statute does permit expedited removal proceedings, but it also expressly "limit[s] the Secretary's authority to utilize expedited removal only with regard to those arriving at the border or a port of entry, or those who entered the country unlawfully and have not been present in the country long enough to warrant consideration of any interests their residence may have created." *See Doe v. Noem*, No. 1:25-cv-10495 IT, 2025 WL 1099602, at *17 (D. Mass. Apr. 14, 2025). Defendants failed to consider the significance of these limits when seeking to maximize the number of people who may be subject to expedited removal. Indeed, in *Grace v. Barr*, the D.C. Circuit found that another policy implementing the expedited removal statute—a policy change that required asylum officers conducting CFIs to apply the law of the circuit where the noncitizen was located, instead of the law most favorable to the noncitizen—was insufficiently explained (and therefore arbitrary and capricious) because while the change furthered the goal of "ensur[ing] efficient removal of aliens with no lawful authorization to remain in the United States," it did not consider the "equally important goal" of "ensuring that individuals with valid asylum claims are not returned to countries where they could face persecution." *Grace*, 965 F.3d at 902. Defendants' policy to maximize the application of expedited removal to paroled individuals, in contravention of the limits Congress placed on the expedited removal authority, is not a faithful application of the statute or a reasonable consideration of relevant factors. C*f. Kucana*, 558 U.S. at 252 ("[N]o law pursues its purpose at all costs.").

Already, the actions Defendants have taken to enforce expedited removal against paroled individuals have upended lives and caused chaos in families and places of employment. *See infra,*

Section IV. At minimum, a "more detailed justification" for Defendants' actions was required. *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

## IV.    A STAY IS NECESSARY TO STOP ONGOING AND FUTURE IRREPARABLE INJURY

Plaintiffs' members and other noncitizens around the country who were paroled into the United States and are now being processed for expedited removal are facing ongoing harm and will continue to face imminent and irreparable injury if Defendants' actions are not stayed. The speed of expedited removal "blitz" proceedings cannot be overstated here: as the name makes clear, these proceedings move quickly, and paroled persons already in the process face the possibility of being deported in mere days, if not hours. Declaration of A. Ashley Tabaddor ("Tabaddor Decl."), ¶ 11. Being put in expedited removal in lieu of immigration court proceedings means they are not able to apply for forms of immigration relief for which they are eligible; they are deprived of the opportunity to fight their deportation with access to counsel, due process procedures, and judicial review; and they are at imminent risk of deportation back to countries where they fear for their lives and the consequences that come with an expedited removal order. On top of all this, they are detained in immigration prisons with inhumane conditions and separated from their families and communities, which is irreparable injury on its own. *See generally* Tabaddor Decl.

*Loss of opportunity to apply for relief.* The rapid deportation process of expedited removal will deprive Plaintiffs' members and other noncitizens who were paroled into the country of the opportunity to submit and have adjudicated claims for immigration protections that they are entitled to, including protections that can lead to more permanent status in the United States.

In expedited removal proceedings, noncitizens are screened through a Credible Fear Interview for a fear that they will be tortured, killed, or persecuted if returned to their home country.

If (and only if) the noncitizen receives a positive CFI, he or she is diverted from expedited removal proceedings and placed in regular removal proceedings under 8 U.S.C. § 1229a. It is only then, in regular removal proceedings, that a noncitizen may pursue affirmative immigration relief, such as asylum or a family-based visa petition. The credible fear process therefore provides no meaningful alternative to the opportunity to file applications for relief and present those claims in immigration court proceedings, even for individuals who already had applications for immigration relief outstanding with USCIS. The credible fear screening process, moreover, lacks meaningful procedures and has been long-documented to be badly flawed, resulting in the removal of people to dangerous circumstances abroad. *See* Freire Decl., ¶ 9 (Because ICE moved to sever the immigration proceedings of client E.F.S. from those of his wife and 8-year-old son and dismiss his case and process him for expedited removal, E.F.S., who was finalizing an asylum application when he appeared for court, "will now not be able to present his asylum claim unless immigration officials decide during his CFI that he has established a credible fear of persecution."). *See also* Lawrence Decl., ¶ 16; Olive Decl., ¶¶ 5-8 (client who was paroled into the country and filed an asylum application before their immigration court hearing is now subject to expedited removal); Espinoza Decl., ¶¶ 4, 6-9 (same); Hirman Decl., ¶¶ 6-8 (same); Chua Decl., ¶¶ 3-4 (same).

Other avenues for immigration benefits and relief are foreclosed in expedited removal, including forms of relief that could lead to more permanent protections and status in the United States. In section 240 proceedings, noncitizens who are *prima facie* eligible for collateral relief (that is, relief from removal that can be granted not by an immigration court but by another entity like USCIS) such as adjustment of status through a U.S. citizen immediate relative, diversity visa, or certain employment-based visas; Temporary Protected Status ("TPS"); or Special Immigrant Juvenile Status ("SIJS") can request that the immigration judge allow them to pursue those

applications. Tabaddor Decl., ¶ 9 The immigration judge has various options to do so, including granting a continuance, administratively closing proceedings, or placing the case on the status docket[14] to provide USCIS with time to adjudicate the collateral relief, or terminating proceedings altogether. *Id. See also* Montoya Decl., ¶¶ 31-33 (describing importance of these options for client who is *prima facie* eligible for adjustment both under the Cuban Adjustment Act and through his marriage to a U.S. citizen). Immigration judges frequently use these options to permit noncitizens to obtain supporting documents necessary for their collateral relief and avoid premature adjudication in court before those processes could be completed outside of court, or to otherwise manage their dockets to allow noncitizens to secure relief for which they are eligible under the law. *Id.* at ¶¶ 9-10. In expedited removal proceedings, all these options are foreclosed. *Id.* at ¶ 16. Instead, noncitizens who are eligible for green cards or other collateral relief are forced through a swift, summary deportation process without due process protections or an independent arbiter separate from the agency actively pursuing their removal. *Id.* at ¶ 17; Gillman Decl., ¶ 12 ¶ 12 (client's removal through expedited removal "would have vitiated his right to continue pursuing his application for adjustment of status under the [Cuban Adjustment Act].").

Noncitizens who were paroled into the United States but arrested and detained for expedited removal in the last few weeks have already reported that their ability to pursue applications for adjustment of status and SIJS classification have been seriously jeopardized as a

---

[14] U.S. Dep't of Justice, EOIR, Memorandum from Director James R. McHenry III re use of status dockets, PM 19-13, at 1 (Aug. 16, 2019), https://www.justice.gov/eoir/page/file/1196336/dl (explaining that the status docket can be used for cases where "an immigration judge is required to continue the case . . . in order to await the adjudication of an application or petition by [USCIS]")*; see also* U.S. Dep't of Justice, EOIR, Memorandum from Acting Director Sirce E. Owen re reinstatement of Memorandum 19-13, PM 25-27 (Mar. 21, 2025), https://iptp-production.s3.amazonaws.com/media/documents/2025.03.21_EOIR_25-27_Cancellation_of_DM_23-01_and_Reinstatement_of_PM_19-13.pdf.

result. For example, M.A.R., a national of Cuba, was granted parole into the United States in March 2024 and is married to a U.S. citizen. Montoya Decl., ¶¶ 17, 19. He is also *prima facie* eligible for adjustment of status under the Cuban Adjustment Act as a result of his parole into the country more than one year ago, and he has already filed an application for adjustment. Id. at ¶¶ 19-20. However, on May 28, 2025, M.A.R. was unexpectedly arrested by ICE after attending his first scheduled master calendar hearing in Santa Ana and is being processed for expedited removal. Id. at ¶¶ 21-27. In expedited removal proceedings, M.A.R. will lose his opportunity to pursue adjustment of status, despite the fact that he has already completed and submitted his application. Id. at ¶¶ 31-33. He could be at risk of being quickly removed from the country, separated from his wife, and sent back to Cuba, where he fears punishment from the Cuban government for his political views. Id. at ¶ 29. *See also* Gillman Decl., ¶¶ 4, 11 ("Immigration Judge stated that if J.M.A. had a pending application to adjust status under the [Cuban Adjustment Act], he should not have been put into expedited removal proceedings . . . and the DHS attorney concurred"). Similarly, individuals who have been granted parole but are now subject to expedited removal stand to lose the opportunity to apply for a green card through U.S. citizen immediate relatives, Torres Decl., ¶ 4, or to secure Special Immigrant Juvenile Status classification and eventually lawful permanent resident status, Chua Decl., ¶¶ 6, 19 (describing CASA member who is *prima facie* eligible for SIJS relief), to name a few.

*Lack of meaningful process.* The expedited removal process notoriously deprives noncitizens of their due process rights.[15] As an initial matter, DHS does not give noncitizens put

---

[15] *See, e.g.,* U.S. Comm'n on Int'l Religious Freedom, *Report on Asylum Seekers in Expedited Removal: Volume I: Findings & Recommendations* 4, 10 (2005), https://bit.ly/1GkjQfK; U.S. Comm'n on Int'l Religious Freedom, *Barriers to Protection: The Treatment of Asylum Seekers in Expedited Removal* (2016), https://bit.ly/2uydMQ8; U.S. Comm'n on Int'l Religious Freedom,

through expedited removal a meaningful opportunity to contest the statutory and regulatory requirements for expedited removal, including inadmissibility and whether they have been admitted or paroled into the country. Unlike in regular removal proceedings, they are not provided with time and means to prepare evidence or the opportunity to review DHS's evidence so they can fight their removal, and they are often not given time to obtain or consult with counsel. Clients who are not fluent in English have been forced to sign expedited removal forms in English without clearly understanding them. Espinoza Decl., ¶ 8. What is more, noncitizens have no right to judicial review of an expedited removal order, and there are certain jurisdictional bars that limit their ability to bring other litigation to challenge the use of expedited removal against them.

Attorneys around the country have documented recently that often their clients, who have been paroled into the country, are not even told that they are being processed for expedited removal, let alone given an opportunity to contest it. For example, one Immigration Judge who granted DHS's request to dismiss the proceedings of a noncitizen who had been paroled into the U.S. advised the noncitizen and CASA member, E.M.P., during the hearing to apply for asylum affirmatively with USCIS if he wanted to continue his asylum claim. Olive Decl., ¶ 6. It was not clear to E.M.P. that dismissal would lead to his being placed in expedited removal, and it seemed to E.M.P.'s attorney that even the IJ was not aware of the purpose of dismissal. *Id.* at ¶¶ 6-8. E.M.P. has been in detention since that hearing on May 21, and he has yet to be notified that he is being processed for expedited removal, despite his attorney getting a message from a Deportation Officer that E.M.P. would be receiving a CFI. *Id.* at ¶ 9. *See also* Hirman Decl., ¶ 10; Montoya Decl., ¶¶ 8-10, 23-26; Chua Decl., ¶¶ 7-8, 10.

---

*Barriers to Protection as of 2024: Updated Recommendations on Asylum Seekers in Expedited Removal* (2025), http://bit.ly/4kZ3EYv.

For those with fear-based asylum and Convention Against Torture claims, the credible fear screenings that exist in the expedited removal process also lack critical procedural safeguards. They depend on case referrals by enforcement personnel to asylum officers, but studies have documented a failure of enforcement officers to do so.[16] This means that asylum seekers have been removed without any opportunity to speak with an asylum officer or apply for asylum. *See, e.g.*, Tanigawa-Lau Decl., ¶ 8 (client fears that "the system would not protect him even if he did have a legitimate asylum claim.") Additionally, even when they are referred for a credible fear interview, there is no right to counsel during the process and, if the noncitizen has counsel, the attorney is generally not permitted to speak on the noncitizen's behalf during the interview. Noncitizens are also detained during the course of expedited removal proceedings, often in immigration jails far from their attorneys, family members, and communities, so there are significant barriers to consulting with counsel, gathering relevant documents, and presenting evidence. Tabaddor Decl., ¶¶ 19-21. *See also* Chua Decl., ¶ 14 (describing the immense difficulty of discerning where client was being detained and securing an attorney call with him); Tanigawa-Lau Decl., ¶¶ 4-5, 10 (same); Torres Decl., ¶ 12 ("The dismissal has deprived E.I.R.M. [a CHIRLA member] of his right to have his meritorious asylum claim adjudicated in the immigration court. The limited rights and lack of meaningful process provided in the credible fear process, including barriers to accessing counsel and evidence since he is detained, are inadequate to protect E.I.R.M.'s legitimate interests."); Olive Decl., ¶ 10 ("After his last hearing, E.M.P. should have been able to return home and gather evidence in support of his claim with the help of his community. Instead, he is now detained in a location far away, unable to regularly communicate with his attorney and loved ones.

---

[16]  U.S. Comm'n on Int'l Religious Freedom, *Report on Asylum Seekers in Expedited Removal: Volume I: Findings & Recommendations* 4, 10 (2005), https://bit.ly/1GkjQfK; Human Rights Watch, *"You Don't Have Rights Here"* (Oct. 16, 2014), https://bit.ly/1GocBhZ.

E.M.P. was actively pursuing his asylum claim when that process was abruptly taken from him. Forcing him into the credible fear interview (CFI) process is not an adequate substitute, as it offers substantially fewer legal protections."); Espinoza Decl., ¶ 18 ("Relocating [A.A.A.] to Oklahoma—hundreds of miles from his pro bono counsel, community ties, and evidence—has effectively deprived him of meaningful access to representation."); Hirman Decl., ¶ 13 ("R.J.L.B. will not be able to meaningfully fight for his asylum claim or any other claims for relief if he is forced to do so through the expedited removal process and while detained. He will lack consistent access to counsel and other resources that will allow him to strengthen his case, which means that the merits of his legitimate claims of fear will not be assessed fully."); Perez-Arleo Decl., ¶ 12 ("In removal proceedings, G.C.M. could present expert testimony, and he would have time to obtain evidence. He also would have been able to prepare his claim with his family and counsel, instead of being detained, which creates significant challenges for communication, access to counsel and other resources.").

*Consequences of removal.* For many individuals paroled into the country, including Plaintiffs' members, removal to their home countries will almost certainly result in a return to persecution or even death. *See, e.g.,* Escobar Decl., ¶¶ 14-18; Lawrence Decl., ¶¶ 17, 22; Freire Decl., ¶ 9 (client E.F.S., if deported back to Honduras, "risks being tortured or killed by gang members who extorted, attacked, and threatened to kill him and his family."); Hirman Decl., ¶ 3 (client R.J.L.B. is a Venezuelan military officer in possession of highly classified information who is in the process of defecting, so if he is deported back to Venezuela, "he will be killed at the very least for deserting."); Torres Decl., ¶ 12 (client E.I.R.M. "received various credible death threats from a Mexican cartel that has been designated a Foreign Terrorist Organization group and a Specially Designated Global Terrorist group by the current administration" and would face harm

if deported back to Mexico). *See Al-Marri v. Bush,* No. Civ.A.04-2035 (GK), 2005 WL 774843, at *4 (D.D.C. Apr. 4, 2005) ("the possibility of transfer to a country where [Petitioner] might be tortured or indefinitely confined . . . undeniably would constitute irreparable harm.").

Additionally, noncitizens issued expedited removal orders face serious consequences beyond removal itself, including a five-year bar on admission to the United States unless they are granted a discretionary waiver. 8 U.S.C. § 1182(a)(9)(A)(i); 8 C.F.R. § 212.2. Noncitizens issued expedited removal orders after having been found inadmissible based on misrepresentation are subject to a lifetime bar on admission to the United States unless they are granted a discretionary exception or waiver.

*Detention and family separation.* Finally, Plaintiffs' members and other noncitizens who were paroled into the country and are now facing expedited removal are being separated from their families—including in physically violent arrests—and jailed in overcrowded, traumatizing immigration detention centers. *See* Freire Decl., ¶ 11 (after client E.F.S. was "arrested and pulled away from them into ICE's basement office for processing," his wife and son were "terrified, confused and could barely speak," "in a state of shock"); Torres Decl., ¶ 10. For example, attorneys report that their clients are being detained in overcrowded rooms that "forc[e] some detainees to sleep on the floor" and "inflict[] severe psychological distress." Espinoza Decl., ¶¶ 14, 20; *see also* Torres Decl., ¶ 10 ("[my client's] mental state has significantly declined knowing that he is being detained for an unspecified amount of time, and he struggles to understand why"); Maurus Decl., ¶ 16 (describing the significant emotional distress caused by the government's attempt to process client for expedited removal). Others have clients whose clients have serious medical conditions and have not been able to access medication or treatment while in detention. Chua Decl., ¶¶ 11, 20-21 (Client D.L.C., a CASA member, has been suffering from serious, chronic health issues and

was in the process of seeking specialized medical care to diagnose and treat him when he was detained, so he is likely to miss the critical appointments he has scheduled, and his health will deteriorate); Olive Decl., ¶ 10 (client who is HIV+ went days without his life-saving medication because of his detention and his mental health is deteriorating rapidly as he "is debilitated by intrusive thoughts and fears about being returned to Venezuela at a moment's notice.").

Each of these harms on its own represents a shocking betrayal of noncitizens who followed lawful pathways to come to the United States, build a chapter of their life here, contribute to their families and communities, and apply for relief for which they are legally eligible. *See* Salas Decl., ¶ 24; Escobar Decl., ¶¶ 18-19; Lawrence Decl., ¶ 21; Espinoza Decl., ¶ 17 ("ICE's sudden detention and out-of-state transfer, undertaken without notice to counsel or a pending motion before the Court, have . . . undermined his faith in the integrity of these proceedings."); Olive Decl., ¶ 11 ("[My client] now faces the asylum process with greater fear and uncertainty, knowing that the system meant to protect him can change course without warning. This disruption has not only undermined his legal rights but has also deepened his trauma, as he lives with the constant threat that the rules may once again shift beneath him."). Together, they paint a clear picture of the layers of "certain and great" actual injury inflicted by expedited removal. *Shvartser v. Lekser,* 308 F. Supp. 3d 260, 267 (D.D.C. 2018). Independently and collectively, they clearly amount to imminent "irreparable harm for which there is no adequate remedy at law." *Id.*

## V.   THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST STRONGLY FAVOR PLAINTIFFS

The balance of equities and the public interest, which merge here, likewise support Plaintiffs' request for a stay. *See Winter*, 555 U.S. at 20; *Nken v. Holder*, 556 U.S. 418, 435 (2009). Defendants' hardship, if any, is substantially outweighed by the countervailing hardships Plaintiffs

and others similarly situated will suffer through Defendants' actions, which inflict broad and deep harm to the public as well.

As set out above, Plaintiffs' members and others like them are irreparably injured by Defendants' unlawful actions, but Defendants can point to no remotely comparable injury to the public by a stay of the January 23 Huffman Memorandum, the February 18 ICE Directive, and the March 25 CHNV Termination Notice insofar as these policies seek to subject paroled individuals to expedited removal. Ordinary removal proceedings remain available for the government to pursue, consistent with Congressional intent and design. And many paroled individuals have pending applications or are otherwise eligible for affirmative relief, including asylum, SIJS, TPS, and adjustment of status, also consistent with Congressional intent and design, and if they are successful in their applications, need not be subject to removal at all. *See, e.g.,* Tabaddor Decl., ¶¶ 9-10 (immigration court cases are often continued to avoid premature adjudication before individuals could seek other legal status outside of court). Defendants' interest in subjecting paroled individuals to expedited removal, thereby preventing them from seeking alternate and longer-term lawful statuses for which they are eligible, is contrary to Congressional intent and does not serve the public interest. *See Shawnee Tribe v. Mnuchin*, 984 F.3d 94, 102 (D.C. Cir. 2021) ("[T]here is generally no public interest in the perpetuation of unlawful agency action." (internal quotation marks and citation omitted)).

In contrast, the public has a strong interest in parole beneficiaries not being unlawfully subjected to expedited removal proceedings and probable summary deportation, because "the public has an interest in 'preventing [noncitizens] from being wrongfully removed, particularly to countries where they are likely to face substantial harm.'" *A.B.-B. v. Morgan*, 548 F. Supp. 3d 209, 222 (D.D.C. 2020) (quoting *Nken v. Holder*, 556 U.S. 418, 436 (2009)); *see also* Tabaddor Decl.,

¶ 17 (describing how expedited removal does not provide the same protections as section 240 proceedings and has a negative impact on a noncitizen's ability to make their case). Additionally, the public has a strong interest in ensuring public safety, which is harmed if noncitizens are hesitant to go to courthouses or approach law enforcement out of fear of immigration enforcement.[17] *See* Montoya Decl., ¶ 34 (describing how the new practice of arresting parolees in or near immigration courts "has eroded [clients'] trust in the legal system"). Parole beneficiaries have, moreover, strengthened family unity and promoted economic growth by filling crucial labor shortages and dampening inflation.[18] The public interest is not served if parole beneficiaries who have lawfully come to the United States are abruptly torn from their families and employment and prevented from contributing their time, energy, and effort to their local communities.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court issue a stay of the January 23 Huffman Memorandum, February 18 ICE Directive, and March 25 CHNV Termination Notice insofar as they subject individuals who have previously been granted parole at ports of entry to expedited removal.

---

[17] The Sentencing Project, *Immigration and Public Safety* (2017), https://www.sentencingproject.org/app/uploads/2022/10/Immigration-and-Public-Safety.pdf; Ceres Policy Research, *The Chilling Effect of ICE Courthouse Arrests* (Oct. 2019), https://www.immigrantdefenseproject.org/wp-content/uploads/ice.report.exec_summ.5nov2019.pdf; ACLU, *Freezing Out Justice: How Immigration Arrests at Courthouses are Undermining the Justice System* (2018), https://www.aclu.org/wp-content/uploads/publications/rep18-icecourthouse-combined-rel01.pdf.
[18] S*ee* FWD.us, *Industries with Critical Labor Shortages Added 1.1 Million Workers Through Immigration Parole* (Jan. 4, 2024), www.fwd.us/news/immigration-labor-shortages.

Dated: June 11, 2025                    Respectfully submitted,

                                        */s/ Esther H. Sung*
                                        Esther H. Sung (CA00132)
                                        Karen C. Tumlin (CA00129)
                                        Hillary Li (GA0052)
                                        **JUSTICE ACTION CENTER**
                                        P.O. Box 27280
                                        Los Angeles, CA 90027
                                        Telephone: (323) 450-7272
                                        esther.sung@justiceactioncenter.org
                                        karen.tumlin@justiceactioncenter.org
                                        hillary.li@justiceactioncenter.org

                                        Nicholas Katz, Esq. (*pro hac vice*)
                                        **CASA, INC.**
                                        8151 15th Avenue
                                        Hyattsville, MD 20783
                                        Telephone: (240) 491-5743
                                        nkatz@wearecasa.org

                                        Carl Bergquist (*pro hac vice*)
                                        **COALITION FOR HUMANE IMMIGRANT RIGHTS**
                                        2533 West 3rd St, Suite 101
                                        Los Angeles, CA 90057
                                        Telephone: (310) 279-6025
                                        cbergquist@chirla.org

                                        *Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify on June 11, 2025, I electronically filed the foregoing with the Clerk of the

Court for the United States District court for the District of Columbia by using the CM/ECF

system. I certify that all participants in the case are registered CM/ECF users and that service

will be accomplished by the CM/ECF filing system.

*/s/ Esther H. Sung*
Esther H. Sung (CA00132)
**JUSTICE ACTION CENTER**
P.O. Box 27280
Los Angeles, CA 90027
Telephone: (323) 450-7272
esther.sung@justiceactioncenter.org