# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

COALITION FOR HUMANE IMMIGRANT RIGHTS, *et al*.,

    *Plaintiffs*,

    *v.*

KRISTI NOEM, in her official capacity as Secretary of Homeland Security, *et al.*,

    *Defendants.*

Case No.: 1:25-cv-0872

## PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR A STAY OF AGENCY ACTION UNDER 5 U.S.C. § 705 TO PRESERVE STATUS AND RIGHTS

## TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................................................1

ARGUMENT .....................................................................................................................2

I.    This Court Has Jurisdiction Both to Consider Plaintiffs' Claims and to Issue the Requested Stay. ...............................................................................................2

    A.    This Court Has Jurisdiction to Review Plaintiffs' Claims. ...................................2

    B.    This Court May Issue a Stay to Remedy Agency Action that Violates the APA. ......................................................................................................6

    C.    Plaintiffs Have Jurisdictional and Prudential Standing. ........................................10

II.    Plaintiffs are Likely to Succeed in Proving that the Agency Actions Violate the Expedited Removal Statute and the Agency's own Regulations. ....................................14

    A.    Noncitizens Paroled into the U.S. at a Port of Entry are Statutorily Exempted from the "Expanded Expedited Removal" Designation. ......................14

    B.    Noncitizens Who Have Been Paroled into the U.S. at a Port of Entry are Not "Arriving in the United States" for Purposes of the Expedited Removal Statute. ...............................................................................................18

III.    Plaintiffs Are Likely to Succeed in Proving that the Agency Actions are Arbitrary and Capricious. .................................................................................................24

    A.    Defendants' directives are reviewable under the APA. .........................................24

    B.    Defendants' directives are arbitrary and capricious. .............................................26

IV.    Without a Stay, Plaintiffs' Members and Countless Other Paroled Individuals Will Continue to Suffer Irreparable Harm. ..........................................................................29

V.    The Balance of Equities and the Public Interest Strongly Tip in Plaintiffs' Favor. ...........32

VI.    A Stay in Full of the Agency's Actions is Appropriate. ......................................................32

CONCLUSION ...................................................................................................................33

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott v. Perez*,
  585 U.S. 579 (2018)..................................................................................................7

*Al Otro Lado, Inc. v. Mayorkas*,
  619 F. Supp. 3d 1029 (S.D. Cal. 2022), *aff'd in part, vacated in part sub nom.*,
  *Al Otro Lado v. Exec. Off. for Immigr. Rev.*, 120 F. 4th 606 (9th Cir. 2024)...........6

*Am. Immigr. Laws. Ass'n v. Reno*,
  199 F.3d 1352 (D.C. Cir. 2000) ............................................................................13

*Am. Immigration Laws. Ass'n v. Reno ("AILA")*,
  18 F. Supp. 2d 38 (D.D.C. 1998), *aff'd,* 199 F.3d 1352 (D.C. Cir. 2000)...............30

*Am. Textile Mfrs. Inst., Inc. v. Donovan*,
  452 U.S. 490 ...........................................................................................................27

*Barrett v. United States*,
  423 U.S. 212 (1976)................................................................................................15

*Bennett v. Spear*,
  520 U.S. 154 (1997)...........................................................................................25, 26

*Biden v. Texas*,
  597 U.S. 785 (2022)..................................................................................................7

*Brown v. Gilmore*,
  533 U.S. 1301 (2001)................................................................................................7

*Cal. Communities. Against Toxics v. EPA*,
  934 F.3d 627 (D.C. Cir. 2019) ...............................................................................26

*California v. Grace Brethren Church*,
  457 U.S. 393 (1982)..................................................................................................7

*California v. U.S. Bureau of Land Mgmt.*,
  277 F. Supp. 3d 1106 (N.D. Cal. 2017) ...................................................................9

*Career Colls. & Schs. of Tex. v. U.S. Dep't of Educ.*,
  98 F.4th 220 (5th Cir. 2024) ...................................................................................33

*Castillo v. Bondi*,
  No. 24-3631, 2025 WL 1699534 (6th Cir. June 18, 2025)......................................24

*Ctr. for Biological Diversity v. Regan*,
    597 F. Supp. 3d 173 (D.D.C. 2022) ...............................................................................9

*D.A.M. v. Barr*,
    486 F. Supp. 3d 404 (D.D.C. 2020) ...............................................................................5

*D.C. v. U.S. Dep't of Agric.*,
    444 F. Supp. 3d 1 (D.D.C. 2020) ..................................................................................33

*Defs. of Wildlife v. Gutierrez*,
    532 F.3d 913 (D.C. Cir. 2008) ....................................................................................12

*DHS v. Regents of the Univ. of California*,
    591 U.S. 1 (2020) ...........................................................................................5, 27, 29

*DHS v. Thuraissigiam*,
    591 U.S. 103 (2020) ..............................................................................................22, 30

*Diamond Alt. Energy, LLC v. EPA*,
    606 U.S. --, No. 24-7, 2025 WL 1716141 (June 20, 2025) .......................................13

*Doe v. Noem*,
    No. 1:25-cv-10495 IT, 2025 WL 1099602 (D. Mass. Apr. 14, 2025) .............15, 18, 31, 34

*Doe v. Noem*,
    No. 24A1079, 145 S. Ct. 1524 (May 30, 2025)..........................................................18

*E. Bay Sanctuary Covenant v. Biden*
    993 F.3d 640, 681 (9th Cir. 2021) ...............................................................................33

*Encino Motorcars, LLC v. Navarro*,
    579 U.S. 211 (2016)...............................................................................................18, 28

*Fed. Election Comm'n v. Cruz*,
    596 U.S. 289 (2022)......................................................................................................21

*Fischer v. United States*,
    603 U.S. 480 (2024).....................................................................................................16

*Florida v. Mayorkas*,
    No. 3:23cv9962-TKW-ZCB, 2023 WL 3567851 (N.D. Fla. May 16, 2023) ...........9

*Florida v. United States*,
    660 F. Supp. 3d 1239 (N.D. Fla. 2023) .......................................................................6

*Garland v. Aleman Gonzalez*,
    596 U.S. 543 (2022)..................................................................................................6, 7

*Gomez v. Trump,*
   485 F. Supp. 3d 145 (D.D.C. 2020) ...................................................................8

*Grace v. Barr,*
   965 F.3d 883 (D.C. Cir. 2020) ................................................................4, 10

*Grace v. Whitaker,*
   344 F. Supp. 3d 96 (D.D.C. 2018), *rev'd in part sub nom. Grace v. Barr*, 965
   F.3d 883 (D.C. Cir. 2020) .................................................................3, 25

*Huisha-Huisha v. Mayorkas,*
   27 F.4th 718 (D.C. Cir. 2022) ...............................................................8

*Immigrant Defs. L. Ctr. v. Mayorkas,*
   No. CV 20-9893 JGB, 2023 WL 3149243 (C.D. Cal. Mar. 15, 2023) ....................6

*Kiakombua v. Wolf,*
   498 F. Supp. 3d 1 (D.D.C. 2020) (K. Jackson, J.) ...............................3, 10, 25, 33

*Kidd v. Mayorkas,*
   734 F. Supp. 3d 967 (C.D. Cal. 2024) ......................................................6

*Kingdom v. Trump,*
   No. 1:25-cv-691-RCL, 2025 WL 1568238 (D.D.C. June 3, 2025) ......................8

*Kucana v. Holder,*
   558 U.S. 233 (2010) .....................................................................8, 32

*Larson v. Valente,*
   456 U.S. 228 (1982) ........................................................................12

*Las Americas Immigrant Advoc. Ctr. v. DHS,*
   No. CV 24-1702 (RC), 2025 WL 1403811 (D.D.C. May 9, 2025) .......................6

*Las Americas Immigrant Advoc. Ctr. v. Wolf,*
   507 F. Supp. 3d 1 (D.D.C. 2020) (Jackson, K.B., D.J.)..........................25

*League of Women Voters of the U.S. v. Newby,*
   838 F.3d 1 (D.C. Cir. 2016) ...............................................................32

*Lofton v. D.C.,*
   7 F. Supp. 3d 117 (D.D.C. 2013) ...........................................................32

*Loper Bright Enters. v. Raimondo,*
   603 U.S. 369 (2024)........................................................................5, 14

*Lujan v. Nat'l Wildlife Fed'n,*
   497 U.S. 871 (1990)........................................................................24

*Make the Rd. New York v. McAleenan,*
    405 F. Supp. 3d 1 (D.D.C. 2019) ........................................................26

*Make the Road New York v. Wolf,*
    962 F.3d 612 (D.C. Cir. 2020) ....................................................3, 4, 11

*Mata Velasquez v. Kurtzdorfer,*
    Case No. 1:25-cv-00493-LJV (W.D.N.Y. June 18, 2025), ECF No. 42
    (attached hereto as Exhibit A) ............................................................16

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak,*
    567 U.S. 209 (2012) ......................................................................13, 14

*Merrill v. Milligan,*
    142 S. Ct. 879 (2022) (Kavanaugh, J., concurring) ............................18

*Michigan Citizens for an Indep. Press v. Thornburgh,*
    No. CIV.A. 88-2322, 1988 WL 90388 (D.D.C. Aug. 17, 1988) .........33

*Monsanto Co. v. Geertson Seed Farms,*
    561 U.S. 139 (2010) .............................................................................7

*Motion Picture Ass'n of Am., Inc. v. FCC,*
    309 F.3d 796 (D.C. Cir. 2002) ...........................................................17

*Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs,*
    417 F.3d 1272 (D.C. Cir. 2005) .........................................................24

*Nat'l Ass'n of Mfrs. v. Dep't of Def.,*
    583 U.S. 109 (2018) ...........................................................................19

*Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs,*
    145 F.3d 1399 (D.C. Cir. 1998) .........................................................32

*Nat'l TPS All. v. Noem,*
    No. 25-cv-01766-EMC, 2025 WL 957677 (N.D. Cal. Mar. 31, 2025) ..............................6, 17

*Nat'l Urb. League v. Ross,*
    977 F.3d 770 (9th Cir. 2020) ..............................................................28

*Nielsen v. Preap,*
    586 U.S. 392 (2019) .............................................................................2

*Niz-Chavez v. Garland,*
    593 U.S. 155 (2021) ...........................................................................28

*Nken v. Holder,*
    556 U.S. 418 (2009) ......................................................................8, 32

*Noem v. Doe*,
  No. 24A1079, 2025 WL 1534782 (U.S. May 30, 2025) ........................................31

*Northeast Ohio Coalition for Homeless & Service Employees Int'l Union, Local*
  *1199 v. Blackwell*,
  467 F.3d 999 (6th Cir. 2006) .................................................................9

*OPM v. American Federation of Government Employees, AFL-CIO*,
  473 U.S. 1301 (1985).........................................................................9

*Pub. Serv. Elec. & Gas Co. v. FERC*,
  989 F.3d 10 (D.C. Cir. 2021) ...............................................................21

*R.I.L.-R. v. Johnson*,
  80 F. Supp. 3d 164 (D.D.C. 2015)...........................................................32

*Reno v. Am.-Arab Anti-Discrimination Comm.*,
  525 U.S. 471 (1999).....................................................................4, 5, 6

*Rodriguez v. Hayes*,
  591 F.3d 1105 (9th Cir. 2010) ...............................................................7

*Safety-Kleen Corp. v. EPA*,
  No. 92-1629, 1996 U.S. App. LEXIS 2324 (D.C. Cir. Jan. 19, 1996) ......................9

*Sampson v. Murray*,
  415 U.S. 61 (1974)...........................................................................7

*Sanchez v. Mayorkas*,
  593 U.S. 409 (2021)........................................................................16

*Scripps-Howard Radio v. FCC*,
  316 U.S. 4 (1942)............................................................................7

*SEC v. Chenery Corp.*,
  318 U.S. 80 (1943).........................................................................14

*Shvartser v. Lekser*,
  308 F. Supp. 3d 260 (D.D.C. 2018) ........................................................32

*Sierra Club v. Jackson*,
  833 F. Supp. 2d 11 (D.D.C. 2012) ...........................................................7

*Spokeo, Inc. v. Robins*,
  578 U.S. 330 (2016)........................................................................12

*Texas v. Biden*,
  646 F. Supp. 3d 753 (N.D. Tex. 2022) ............................................... *passim*

*Texas v. United States*,
    40 F.4th 205 (5th Cir. 2022) .................................................................6, 7

*Trump v. CASA*,
    No. 24A884, 2025 WL 1773631 (U.S. June 27, 2025) ...........................33

*Turkiye Halk Bankasi A.S. v. United States*,
    598 U.S. 264 (2023) ...............................................................................15

*Turner v. U.S. Att'y Gen.*,
    130 F. 4th 1254 (11th Cir. 2025) .....................................................14, 15

*United States ex rel. Accardi v. Shaughnessy*,
    347 U.S. 260 (1954) ...............................................................................18

*Wyoming v. Dep't of Interior*,
    No. 18–8027, 2018 WL 2727031 (10th Cir. June 4, 2018) .....................7

## Statutes

5 U.S.C.
    § 704.................................................................................................24, 25
    § 705.........................................................................................7, 8, 9, 33
    § 706(2)..................................................................................................33
    § 706(2)(A)............................................................................................24

6 U.S.C.
    § 251.......................................................................................................2
    § 271(b)...................................................................................................2

8 U.S.C.
    § 1101(a)(13)(A)...................................................................................16
    § 1182(d)(5)(A).....................................................................................21
    § 1225....................................................................................................19
    § 1225(a)(1)...........................................................................................21
    § 1225(b).....................................................................................1, 4, 10
    § 1225(b)(1)..........................................................................2, 9, 18, 19, 20
    § 1225(b)(1)(A).....................................................................................14
    § 1225(b)(1)(A)(i)......................................................................... *passim*
    § 1225(b)(1)(A)(i)(F)...........................................................................20
    § 1225(b)(1)(A)(iii)...............................................................14, 18, 26, 27
    § 1225(b)(1)(A)(iii)(II) ................................................................. *passim*
    § 1225(b)(1)(B)(ii)................................................................................31
    § 1225(b)(1)(F).....................................................................................19
    § 1225(b)(2)(C).....................................................................................19
    § 1225(d)(2)...........................................................................................19
    § 1252...........................................................................................1, 3, 4
    § 1252(a)(2)............................................................................................2

§ 1252(a)(2)(A)(iv) ................................................................................................2
§ 1252(e)(1)(A) ...................................................................................................10
§ 1252(e)(3) ................................................................................................... *passim*
§ 1252(e)(3)(A) ......................................................................................................2
§ 1252(e)(3)(B) ......................................................................................................4
§ 1252(f)(1) .....................................................................................................6, 7, 8
§ 1252(g) ...........................................................................................................4, 5
§ 1551 ......................................................................................................................2

28 U.S.C.
§ 1253 .....................................................................................................................7
§ 1292(a)(1) ...........................................................................................................7
§ 1651(a) ................................................................................................................7

42 U.S.C. § 7607(g) .............................................................................................7

INA
§ 212 .....................................................................................................................17
§ 212(a) ................................................................................................................17

**Other Authorities**

Fed. R. Civ. P
65 ..........................................................................................................................33
65(c) .....................................................................................................................33

8 C.F.R.
§ 1.2 ..............................................................................................10, 12, 21, 22, 25
§ 235.3 ...........................................................................................................10, 12
§ 235.3(b)(1)(ii) ...................................................................................................17
§ 235.3(b)(4)(ii) ...................................................................................................31
§ 235.3(b)(6) ........................................................................................................17
§ 253.3 ..................................................................................................................12
§ 1001.1(q) ...........................................................................................................21

62 Fed. Reg.
10312 ...................................................................................................................22
10313 ...................................................................................................................22
10330 ...................................................................................................................22

63 Fed. Reg.
19382 ...................................................................................................................22
19384 ...................................................................................................................22

71 Fed. Reg.
27,585 ..................................................................................................................22
27,588 ..................................................................................................................22

87 Fed. Reg.

    63507................................................................................................................29

    63508................................................................................................................29

88 Fed. Reg.

    1243..................................................................................................................29

    1244..................................................................................................................29

    1255..................................................................................................................29

    1256..................................................................................................................29

    1266..................................................................................................................29

    1268..................................................................................................................29

90 Fed. Reg. ("March 25 CHNV Termination Notice")

    13611..................................................................................................................1

    13618..................................................................................................................3

    13619.............................................................................................................3, 27

103rd Cong. (1994), https://www.congress.gov/bill/103rd-congress/house-
    bill/3363/text; ...............................................................................................23

140 Cong. Rec. H3629, H3632 (daily ed. March 2, 1994),
    https://www.congress.gov/103/crecb/1994/03/02/GPO-CRECB-1994-pt3-5-
    2.pdf. ..............................................................................................................23

Michael Elsen-Rooney, *A Bronx high schooler showed up for a routine
    immigration court date. ICE was waiting*, Chalkbeat (May 26, 2025),
    https://tinyurl.com/2xc3e36f; ........................................................................11

Joshua Goodman & Gisela Salomon, *ICE agents wait in hallways of immigration
    court as Trump seeks to deliver on mass arrest pledge*, AP News (May 21,
    2025), https://tinyurl.com/53mkncxt ..............................................................11

Ted Hesson & Kristina Cooke, *Trump weighs revoking legal status of Ukrainians
    as US steps up deportations*, Reuters (Mar. 6, 2025),
    https://tinyurl.com/3v3ry4fr (citing "internal ICE email" available at
    https://tinyurl.com/mue9jm4x ("February 18 ICE Directive")) ..................... *passim*

H.R. 2602, 103rd Cong. (1993), https://www.congress.gov/bill/103rd-
    congress/house-bill/2602/text .......................................................................23

H.R. Rep. No. 104-469(I), at 157-58 (1996) (emphasis added), *available at* 1996
    WL 168955 .....................................................................................................23

Huffman Memorandum, DHS, Memorandum from Acting Secretary Benjamine
    C. Huffman on Guidance Regarding How to Exercise Enforcement Discretion
    (Jan. 23, 2025), https://tinyurl.com/3ru2fz46 ("January 23 Huffman
    Memorandum")......................................................................................... *passim*

Dan Katz, *ICE Arrested a 6-year-old Boy with Leukemia at Immigration Court.*
       *His Family is Suing*, Texas Public Radio (June 25, 2025),
       https://www.tpr.org/border-immigration/2025-06-25/ice-arrested-a-6-year-
       old-boy-with-leukemia-at-immigration-court-his-family-is-suing ..........................................30

**INTRODUCTION**

The January 23 Huffman Memorandum,[1] February 18 ICE Directive,[2] and March 25 CHNV Termination Notice[3] have prompted a nationwide blitz of immigration enforcement whereby paroled individuals appearing in immigration court encounter government attorneys moving to dismiss their cases, only then to find ICE personnel waiting to apprehend and detain them and put them into expedited removal proceedings. As Defendants acknowledge, these policy directives are integral to Defendants' efforts "to expeditiously remove" "potentially hundreds of thousands of [parole beneficiaries] whose parole it has terminated or will terminate," Opp. 3. A temporary stay of these policy directives would inflict no concrete harms on Defendants while restoring the status quo until this Court can issue a final judgment on the merits of Plaintiffs' claims.

Defendants take a "kitchen sink" approach to try and persuade the Court that it lacks jurisdiction to consider Plaintiffs' claims and issue such relief. But as Defendants concede, "the language of the statute controls," Opp. 38, and a faithful reading of 8 U.S.C. §§ 1225(b) and 1252 shows that Plaintiffs' claims are timely brought, reviewable and redressable by this Court, and amenable to relief under both § 1252 and the Administrative Procedure Act ("APA").

A faithful reading of § 1225(b) also confirms that noncitizens here in the United States after being inspected and paroled are categorically ineligible for expedited removal, because they are not "arriving in the United States," as required by 8 U.S.C. § 1225(b)(1)(A)(i), and are exempted from 8 U.S.C. § 1225(b)(1)(A)(iii)(II), which only applies to people who have "not been . . . paroled." The statute cannot bear Defendants' interpretation, which defies the plain meaning

---

[1] DHS, Memorandum from Acting Secretary Benjamine C. Huffman on Guidance Regarding How to Exercise Enforcement Discretion (Jan. 23, 2025), https://tinyurl.com/3ru2fz46.

[2] Ted Hesson & Kristina Cooke, *Trump weighs revoking legal status of Ukrainians as US steps up deportations*, Reuters (Mar. 6, 2025), https://tinyurl.com/3v3ry4fr (citing "internal ICE email" available at https://tinyurl.com/mue9jm4x).

[3] Notice, U.S. Dep't of Homeland Sec., Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans, 90 Fed. Reg. 13611 (Mar. 25, 2025).

of the text and the overall structure of the statute, would in multiple ways effectively strike the limiting language in 8 U.S.C. § 1225(b)(1)(A)(iii)(II) specifying that expanded expedited removal can only be applied to individuals who have "not been admitted or paroled." Defendants, moreover, have neither explained the fundamental inconsistencies in their policy directives, nor accounted for the serious reliance interests at stake. The APA does not tolerate unreasoned agency action that is not in accordance with law.

## ARGUMENT

I. **This Court Has Jurisdiction Both to Consider Plaintiffs' Claims and to Issue the Requested Stay.**

A. **This Court Has Jurisdiction to Review Plaintiffs' Claims.**

1. *Plaintiffs' claims are timely and judicial review is available under 8 U.S.C. § 1252(e)(3).* This Court has jurisdiction to review the January 23 Huffman Memorandum, February 18 ICE Directive, and March 25 CHNV Parole Termination Notice under the plain text of 8 U.S.C. § 1252(e)(3). Although § 1252(a)(2) bars judicial review of various aspects of the expedited removal process, including policies to implement the expedited removal statute, § 1252(a)(2)(A)(iv), together with subsection (e), expressly preserves judicial review of "Challenges on validity of the system." In relevant part, § 1252(e)(3)(A) guarantees "judicial review" of "an action instituted in" this Court to determine whether a challenged regulation, "written policy directive, written policy guideline, or written procedure issued by or under the authority of the Attorney General to implement" the expedited removal statute is lawful.[4]

This case is just such an action: Plaintiffs seek this Court's review of the January 23 Huffman Memorandum, which "provides guidance" in "implementing" expedited removal "under 8 U.S.C. § 1225(b)(1);" the February 18 ICE Directive, which directs ICE officers when and how

---

[4] Various INA functions formerly vested in the Attorney General have been transferred to the Secretary of Homeland Security. Some residual statutory references to the Attorney General that pertain to those functions are now deemed to refer to the Secretary of Homeland Security. *See* 6 U.S.C. § 251, 271(b), 542 note, 557; 8 U.S.C. § 1551 note; *see also Nielsen v. Preap*, 586 U.S. 392, 397 n.2 (2019).

to "consider" or "process for [expedited removal]" certain individuals; and the March 25 CHNV Parole Termination Notice, which terminates individual grants of CHNV parole for the sole purpose of subjecting CHNV parole beneficiaries to expedited removal, and expresses DHS's intent "to remove promptly" such individuals, 90 Fed. Reg. 13618, 13619—three separate written policies issued by Defendants to implement 1225(b). *See Grace v. Whitaker*, 344 F. Supp. 3d 96, 115-17 (D.D.C. 2018) (holding reviewable written directives and guidance regarding the expedited removal process), *rev'd in part sub nom. Grace v. Barr*, 965 F.3d 883 (D.C. Cir. 2020); *Kiakombua v. Wolf*, 498 F. Supp. 3d 1, 35 (D.D.C. 2020) (K. Jackson, J.) (same).

This case, moreover, should be considered "against the backdrop of a familiar principle of statutory construction: the presumption favoring judicial review of administrative action." *Make the Road New York v. Wolf*, 962 F.3d 612, 623 (D.C. Cir. 2020) ("*MRNY*") (citations and internal punctuation omitted); *see also id.* at 624 ("That well-settled and strong presumption in favor of judicial review is so embedded in the law that it applies even when determining the scope of statutory provisions specifically designed to limit judicial review," including § 1252) (citations and internal punctuation omitted). Defendants attempt to insulate their recent policy directives implementing the expedited removal statute by recasting Plaintiffs' claims as untimely challenges to preexisting regulations rather than to "a new policy regarding the application of expedited removal to paroled [individuals]." Opp. 22, 23. But this argument contravenes the express terms of § 1252(e)(3), and Defendants cite no law or logic immunizing from judicial review a writing that falls within the scope of § 1252(e)(3) merely because it may include language from, or otherwise draw upon, prior guidance. *See MRNY*, 962 F.3d at 625 ("[T]he statute's plain language says that there is jurisdiction . . . [over] challenges on validity of the system.") Nor do Defendants explain how a Court is to determine whether a particular writing is "new"—a word that does not appear in the statute. *Cf. Kiakombua*, 498 F. Supp. 3d at 35-36 ("[S]ection 1252(e)(3) plainly authorizes judicial review of written policies, guidelines, or procedures that implement the expedited removal statute, without regard to whether such policies deviate substantively from an agency's prior practices").

To the contrary, § 1252(e)(3) provides that any written policy directive or guideline is subject to judicial review if suit is brought within 60 days of it being "first implemented," 8 U.S.C. § 1252(e)(3)(B), and Defendants do not dispute that Plaintiffs filed this action within the first 60 days after the January 23 Huffman Memorandum was published. *Grace v. Barr*, 965 F.3d 883, 894 (D.C. Cir. 2020) ("[S]ection 1252(e) operates to preserve district-court jurisdiction so long as the challenged decision implements section 1225(b)"); *MRNY*, 962 F.3d 612, 618, 625-28 (D.C. Cir. 2020) (holding that § 1252(e)(3) provides jurisdiction over the plaintiffs' challenge to the Secretary's designation regarding the expanded use of expedited removal").

2. *Plaintiffs' claims are not barred under 8 U.S.C. § 1252(g)*. Because Plaintiffs' claims are timely brought under § 1252(e)(3), §1252(g), which generally makes unreviewable "any cause or claim . . . arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter"—"*except as provided in this section* [i.e., 8 U.S.C. § 1252]"—poses no bar to Plaintiffs' request for a stay, for two independent reasons. 8 U.S.C. § 1252(g) (emphasis added).

First, the plain language of § 1252(g) carves out actions like the instant lawsuit. Section 1252(g) expressly "[e]xcept[s]" actions "as provided" in § 1252—including "[c]hallenges on validity of the system" under § 1252(e)(3). Here, Plaintiffs are challenging the lawfulness of the January 23 Huffman Memorandum, the February 18 ICE Directive, and the March 25 CHNV Parole Termination Notice, which each seek to "implement" the expedited removal statute by directing when and how federal personnel should consider or process for expedited removal certain individuals who cannot lawfully be subjected to expedited removal. Plaintiffs' claims are authorized and timely brought under § 1252(e)(3), and thus are excepted from the limitations that § 1252(g) places on federal courts' jurisdiction.

Second, as the Supreme Court recognized, § 1252(g) should be construed narrowly and "applies only to three discrete actions that the Attorney General may take: her 'decision or action' to commence proceedings, adjudicate cases, or execute removal orders." *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 482 (1999) ("*AADC*") (emphasis and some internal

quotation marks omitted). The Supreme Court reasoned that Congress's "special attention" on insulating these three discrete actions from judicial review was warranted because these actions "represent the initiation or prosecution of various stages in the deportation process" and thus identify stages where the Executive exercises "discretion to abandon the endeavor," either "for humanitarian reasons or simply for its own convenience." *Id.* at 483-84.

Plaintiffs' challenge to the lawfulness of the January 23 Huffman Memorandum, the February 18 ICE Directive, and the March 25 CHNV Parole Termination Notice, and their direction to federal personnel to consider or process for expedited removal the beneficiaries of humanitarian parole programs, does not implicate any of these three actions, or any decision-making where discretion plays a part. *See id.* (acknowledging that 1252(g) does not apply to the "many other decisions or actions that may be part of the deportation process"); *see also DHS v. Regents of the Univ. of California*, 591 U.S. 1, 19 (2020) (holding that 1252(g)'s scope is "narrow" and rejecting as "'implausible' the Government's suggestion that § 1252(g) covers 'all claims arising from deportation proceedings' or imposes 'a general jurisdictional limitation.'" (citing *AADC*, 525 U.S. at 482)). The plain text and overall structure of the expedited removal statute make clear that paroled individuals may not be subjected to expedited removal, *see infra* at II, and as a result, a written policy directive or written policy guidance that instructs agency employees to process paroled beneficiaries for expedited removal, in contravention of the INA, is not an exercise of the agency's discretion insulated from judicial review. *See D.A.M. v. Barr*, 486 F. Supp. 3d 404, 417 n.5 (D.D.C. 2020) ("[I]f the government tries to remove a noncitizen under circumstances where removal is not within the Attorney General's prosecutorial discretion, § 1252(g) does not apply.") (emphasis omitted); *accord Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 392 (2024) ("Under the APA, it thus remains the responsibility of the court to decide whether the law means what the agency says.") (citations and internal punctuation omitted).

**B.     This Court May Issue a Stay to Remedy Agency Action that Violates the APA.**

1. *Section 1252(f)(1) poses no bar to this Court issuing a stay under the APA.* Section 1252(f)(1) "generally prohibits lower courts from entering injunctions that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out" certain immigration statutes. *Garland v. Aleman Gonzalez*, 596 U.S. 543, 550 (2022). By its own terms, § 1252(f)(1) is "nothing more or less than a limit on injunctive relief." *AADC*, 525 U.S. at 481.

This Court—as well as numerous others, including the Fifth Circuit and at least five other district courts—has rejected Defendants' view that APA relief is functionally an injunction barred by § 1252(f)(1). *Las Americas Immigrant Advoc. Ctr. v. DHS*, No. CV 24-1702 (RC), 2025 WL 1403811, at *22 (D.D.C. May 9, 2025) (rejecting Defendants' contention "that the INA's limitation on injunctions, 8 U.S.C. § 1252(f)(1), applies to vacatur orders."); *see also Texas v. United States*, 40 F.4th 205, 219-20 (5th Cir. 2022) (holding § 1252(f)(1) does not apply "to vacatur" and that DHS was "unlikely to demonstrate" a lack of "jurisdiction to vacate unlawful agency action"); *Nat'l TPS All. v. Noem*, No. 25-cv-01766-EMC, 2025 WL 957677, at *15 (N.D. Cal. Mar. 31, 2025) ("reject[ing] the government's contention that 1252(f)(1) is a bar to Plaintiffs' request for [APA postponement] relief"); *Kidd v. Mayorkas*, 734 F. Supp. 3d 967, 987 (C.D. Cal. 2024) (§1252(f)(1) inapplicable because vacating ICE policy neither "compel[s] nor restrain[s] further agency decision-making") (citation omitted); *Florida v. United States*, 660 F. Supp. 3d 1239, 1284-85 (N.D. Fla. 2023) ("§1252(f)(1) does not strip [the Court] of the authority to vacate either of the challenged policies under the APA"); *Al Otro Lado, Inc. v. Mayorkas*, 619 F. Supp. 3d 1029, 1045-46 (S.D. Cal. 2022) (Section 1252(f)(1) does not prevent "'set[ting] aside' or 'vacating' a policy based upon an APA violation"), *aff'd in part, vacated in part sub nom.*, *Al Otro Lado v. Exec. Off. for Immigr. Rev.*, 120 F. 4th 606 (9th Cir. 2024); *Immigrant Defs. L. Ctr. v. Mayorkas*, No. CV 20-9893 JGB (SHKx), 2023 WL 3149243, at *14 (C.D. Cal. Mar. 15, 2023) (Section 1252(f)(1) "did not bar" vacatur); *Texas v. Biden*, 646 F. Supp. 3d 753, 768 (N.D. Tex. 2022) (same).

Although Defendants cite *Biden v. Texas*, 597 U.S. 785 (2022) for support, Opp. 11, *Texas* explicitly reserved the question of whether 8 U.S.C. § 1252(f)(1) bars relief under the APA, *id.* at 801 n.4, and the district court on remand rejected Defendants' view.[5] *Texas*, 646 F. Supp. 3d at 768. And notwithstanding Defendants' attempts to conflate the types of relief offered by injunctions and the APA, Opp. 11-14,[6] relief under the APA is distinct from injunctive relief—a "drastic and extraordinary remedy." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010). Vacatur is "less drastic," *id.*, and in this motion, Plaintiffs seek only a stay under § 705, which is itself "an interim or lesser form of [relief than] vacatur," *Texas*, 646 F. Supp. 3d at 769. A postponement (or "stay") under § 705 does not "'order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions' at issue;" it merely postpones agency action, *id.* (quoting *Aleman Gonzalez*, 596 U.S. at 550), and like vacatur, "does nothing but" maintain or "re-establish the status quo absent the unlawful agency action."[7] *Texas*,

---

[5] All the other cases Defendants cite to support their argument that Plaintiffs' stay request is "no different than a request for an injunction," Opp. 12, have nothing to do with immigration or the interaction between § 1252(f)(1) and relief available under the APA. *Brown v. Gilmore*, 533 U.S. 1301, 1303 (2001) (concerning an injunction of a state statute under the All Writs Act, 28 U.S.C. § 1651(a)); *Abbott v. Perez*, 585 U.S. 579, 595 (2018) (examining whether "orders" issued by a three-judge panel were reviewable as injunctions under the Judiciary Act, 28 U.S.C. § 1253); *California v. Grace Brethren Church*, 457 U.S. 393, 408 (1982) (holding that the district court had no jurisdiction to issue an injunction under the Tax Injunction Act); *Wyoming v. Dep't of Interior*, No. 18–8027, 2018 WL 2727031, at *1 (10th Cir. June 4, 2018) (examining whether a district court's order was reviewable under the Judiciary Act, 28 U.S.C. § 1292(a)(1)); *Sierra Club v. Jackson*, 833 F. Supp. 2d 11, 25, 28 (D.D.C. 2012) (concerning the Clean Air Act, 42 U.S.C. § 7607(g), which expressly precludes "any stay, injunctive, or similar relief").

[6] Defendants' reliance on *Sampson v. Murray*, 415 U.S. 61 (1974) and *Scripps-Howard Radio v. FCC*, 316 U.S. 4 (1942) is misplaced, Opp. 12, as the Court found that laws governing the judicial review of administrative agency actions "do not disclose any general legislative policy regarding the power to stay administrative orders pending review." *Scripps-Howard Radio*, 316 U.S. at 16.

[7] Defendants claim that Plaintiffs' stay request would "restrain how DHS implements expedited removal," in contravention of § 1252(f)(1), but virtually all orders against the government have the effect of restraining federal officials in some sense. If § 1252(f)(1) prohibited any order that had such an effect, then it would also bar declaratory relief, which it does not. *Texas*, 597 U.S. at 800 (section 1252(f)(1) preserves "jurisdiction to entertain the plaintiffs' request for declaratory relief") (internal quotation marks omitted); *Rodriguez v. Hayes*, 591 F.3d 1105, 1119 (9th Cir. 2010) (same).

40 F.4th at 219-20. Even if vacatur under the APA were analogous to an injunction, the stay relief Plaintiffs seek here still would not violate Section 1252(f)(1), because stays are not injunctions. *Nken v. Holder*, 556 U.S. 418, 428-29 (2009) ("A stay . . . temporarily suspend[s] the source of authority to act," it does not "direct[] an actor's conduct."). And had Congress wanted to prohibit stays in this context, it "could easily have said so." *Kucana v. Holder*, 558 U.S. 233, 248 (2010).

Defendants point to no controlling or persuasive authority that compels this Court to upend settled law and expand the scope of § 1252(f)(1) beyond its plain text. Section 1252(f)(1) does not prohibit this Court from issuing vacating agency action or from temporarily staying the January 23 Huffman Memorandum, the February 18 ICE Directive, and the March 25 CHNV Parole Termination Notice while litigation in this case continues.

2. *The Court may stay agency action that has already commenced*. Defendants rely on dictionary definitions and inapposite cases to contend that 5 U.S.C. § 705 "does not authorize a postponement of the documents" because they are "already in effect." Opp. 14-15. This contention is similarly untethered to the plain language of the statute and unsupported by the case law.

Although § 705 allows both an "agency" and a "reviewing court" to "postpone the effective date of an agency action," it *further* allows a reviewing court "*to preserve status or rights pending conclusion of the review proceedings*." 5 U.S.C. § 705 (emphases added). Consistent with this language, "[c]ourts—including the Supreme Court—routinely stay already-effective agency action under Section 705." *Texas*, 646 F. Supp. 3d at 770 (collecting cases); *see also Gomez v. Trump*, 485 F. Supp. 3d 145, 205 (D.D.C. 2020) (preliminarily staying an already effective policy under § 705); *accord Kingdom v. Trump*, No. 1:25-cv-691-RCL, 2025 WL 1568238, at *5 (D.D.C. June 3, 2025) (rejecting as "unpersuasive" the same argument Defendants press here, "as various courts have interpreted § 705 to permit a 'stay'—which may be more aptly described as a temporary rollback—even of already-consummated agency action"). Relief "under Section 705 (even after the effective date) restores the [] status quo *ex ante*," *Texas*, 646 F. Supp. 3d at 771, i.e., "the last *uncontested* status which preceded the pending controversy," *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 733 (D.C. Cir. 2022) (emphasis in original) (citation omitted).

Defendants cite no cases to the contrary. *Northeast Ohio Coalition for Homeless & Service Employees Int'l Union, Local 1199 v. Blackwell*, 467 F.3d 999, 1066 (6th Cir. 2006), and *OPM v. American Federation of Government Employees, AFL-CIO*, 473 U.S. 1301, 1303-05 (1985), do not address § 705 at all: the former concerns the immediate appealability of a "mandatory injunction" that went "far beyond preserving the status quo", *Ne. Ohio Coal.*, 467 F.3d at 1006, while the latter held that an *appellate court* lacked authority to stay a regulation following a *denial* of a TRO brought "eight months after Congress had finally fixed" the effective date, and where the denial's consequences were not "grave," because it lacked jurisdiction to consider an appeal of a denied TRO at all, *OPM*, 473 U.S. at 1303-05. *Florida v. Mayorkas*, No. 3:23cv9962-TKW-ZCB, 2023 WL 3567851 (N.D. Fla. May 16, 2023), involved a policy actually "in effect," *id.* at *4, but the district court did "not definitely decide" whether § 705 applied because it granted an injunction, *id.* at *4 n.7. And as Defendants acknowledge, *Safety-Kleen Corp. v. EPA*, No. 92-1629, 1996 U.S. App. LEXIS 2324, at *2-3 (D.C. Cir. Jan. 19, 1996), *Ctr. for Biological Diversity v. Regan*, 597 F. Supp. 3d 173 (D.D.C. 2022), and *California v. U.S. Bureau of Land Mgmt.*, 277 F. Supp. 3d 1106 (N.D. Cal. 2017), concerned *agencies'* authority to postpone rules after an effective date, not judicial authority to issue a stay. The distinction matters because an agency's postponement of an already effective rule is "tantamount to amending or revoking a rule," which must comply with the APA—unlike court orders under § 705. *Texas*, 646 F. Supp. 3d at 770-71 (citations and internal punctuation omitted).

As a "reviewing court," this Court "may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. Nothing about the timing of Plaintiffs' motion deprives the Court of that authority.

3. *Section 1252(e)(1)(A) provides no impediment to this Court's jurisdiction or ability to grant Plaintiffs' requested stay.* Section 1252(e)(1) states (emphasis added) that "no court may . . . enter declaratory, injunctive, or other equitable relief *in an action pertaining to an order to exclude an alien in accordance with section 1225(b)(1) of this title* except as specifically

9

authorized in a subsequent paragraph of this subsection." As the D.C. Circuit held in *Grace v. Barr*, the "plain language of this provision makes clear" that § 1252(e)(1)(A) does not apply to "the kind of challenge we face here, namely, a '[c]hallenge[] on [the] validity of the [expedited-removal] system.'" 965 F.3d at 907 (citation omitted; alterations in original); *see also Kiakombua*, 498 F. Supp. 3d at 50-51 (K. Jackson, J.) (rejecting on the same grounds defendants' argument that 1252(e)(1)(A) "strip[s] federal courts of all such equitable remedies in all circumstances") (emphases omitted). Defendants are mixing apples and oranges when they urge this Court to apply the limitations Congress placed on the relief available in actions "pertaining to an order to exclude an alien" under § 1225(b) to actions "[c]halleng[ing]" the "validity of the system."[8] *Compare* 8 U.S.C. § 1252(e)(1)(A) *with id.* § 1252(e)(3).

### C.    Plaintiffs Have Jurisdictional and Prudential Standing.

1. *Plaintiffs' claims are redressable.* Defendants do not dispute that Plaintiffs "have sufficiently pled injury to their members." Opp. 19. Defendants only contend that Plaintiffs have failed to establish redressability, because the definition of "arriving alien" in 8 C.F.R. § 1.2 allows DHS to subject individuals who have been paroled at ports of entry to expedited removal under 8 C.F.R. § 235.3 and 8 U.S.C. § 1225(b). Defendants misapprehend the nature of the harm here.

As the media has reported and as the declarations attached to Plaintiffs' motion substantiate, following Defendants' adoption of the January 23 Huffman Memorandum, February 18 ICE Directive, and March 25 CHNV Parole Termination Notice—and also following a quota issued by the White House that ICE increase arrest and deportation numbers—individuals appearing for their immigration court hearings have been subject to an unprecedented "nationwide

---

[8] Defendants stray yet further from § 1252(e)(3) when they suggest that any determination of the lawfulness of any "written policy directive, written policy guideline, or written procedure issued by or under the authority of the Attorney General to implement [the expedited removal section]" must be a determination "*on the merits*," Opp. 17 (emphasis added), such that preliminary relief is unavailable. Defendants' interpretation "ignores the fact that section 1252(e)(3) is not addressed to remedies," *Kiakombua*, 498 F. Supp. 3d at 51, as well as the fact that the plain text of § 1252(e)(3) does not contain the additional limiting language Defendants have inserted. Defendants cite no case law showing why this Court should read such language into § 1252(e)(3).

blitz" of ICE enforcement.[9] DHS has begun targeting individuals appearing in court by moving to dismiss their cases, then immediately apprehending them as soon as they leave the courtroom and placing them in ICE detention for processing through expedited removal[10]—an action the January 23 Huffman Memorandum expressly directs the DHS component agencies to take.[11] As the attorneys of some of these detained individuals relate, both the tactic of immediately arresting and detaining individuals after their cases have been dismissed, as well as the practice of subjecting paroled individuals to expedited removal, are "*new*," "*irregular*," "*unusual*," and "*never seen*" before. *See, e.g.*, ECF No. 22-14 (Hirman Decl.) at ¶ 14; ECF No. 22-13 (Chua Decl.) at ¶ 13; ECF No. 22-8 (Montoya Decl.) at ¶¶ 28, 34-35, ECF No. 22-7 (Torres Decl.) at ¶ 6 (emphasis added). Plaintiffs' members are at risk of these new practices being applied to them, *see* ECF No. 22-2 (Escobar Decl.) at ¶¶ 10-17; ECF No. 22-3 (Salas Decl.) at ¶¶ 15-18; ECF No. 22-4 (Lawrence Decl.) at ¶¶ 13-19; in some instances have had these new practices actually applied to them, *see* ECF No. 22-2 (Escobar Decl.) at ¶ 17; ECF No. 22-3 (Salas Decl.) at ¶ 17; and fear for themselves and their families because of these new practices, ECF No. 22-2 (Escobar Decl.) at ¶¶

---

[9] Michael Elsen-Rooney, *A Bronx high schooler showed up for a routine immigration court date. ICE was waiting,* Chalkbeat (May 26, 2025), https://tinyurl.com/2xc3e36f; Joshua Goodman & Gisela Salomon, ICE agents wait in hallways of immigration court as Trump seeks to deliver on mass arrest pledge, AP News (May 21, 2025), https://tinyurl.com/53mkncxt.

[10] *See, e.g.*, ECF No. 22-3, Declaration of Angelica Salas ("Salas Decl."); ECF No. 22-2, Declaration of George Escobar ("Escobar Decl."); ECF No. 22-4, Declaration of Patrice Lawrence ("Lawrence Decl."); ECF No. 22-13, Declaration of Melissa Chua ("Chua Decl."); ECF No. 22-9, Declaration of Enrique Espinoza ("Espinoza Decl."); ECF No. 22-5, Declaration of Andrew Freire ("Freire Decl."); ECF No. 22-17, Declaration of Sarah Gillman ("Gillman Decl."); ECF No. 22-14, Declaration of Michael Hirman ("Hirman Decl."); ECF No. 22-12, Declaration of Meghan DuPuis Maurus ("Maurus Decl."); ECF No. 22-8, Declaration of Cesar Montoya ("Montoya Decl."); ECF No. 22-10, Declaration of Jessica Olive ("Olive Decl."); ECF No. 22-16, Declaration of Sabrina Perez-Arleo ("Perez-Arleo Decl."); ECF No. 22-15, Declaration of Ming Tanigawa-Lau ("Tanigawa-Lau Decl."); ECF No. 22-11, Declaration of Lindsay Toczylowski ("Toczylowski Decl."); ECF No. 22-7, Declaration of Bianca Torres ("Torres Decl.").

[11] Jan. 23 Huffman Memorandum, 2 (directing agencies to take steps to apply expedited removal, which "may include steps to terminate any ongoing removal proceedings and/or any active parole status").

14-16, 18-19; ECF No. 22-3 (Salas Decl.) at ¶¶ 17-24, ECF No. 22-4 (Lawrence Decl.) at ¶¶ 14-19, 22. Defendants do not dispute these facts in their briefing.

All the evidence before the Court establishes that ICE agents did not engage in ambush-style courthouse enforcement, and did not attempt to subject paroled individuals to expedited removal, until after Defendants adopted the January 23 Huffman Memorandum, February 18 ICE Directive, and March 25 CHNV Parole Termination Notice—each a new written policy directive or written policy guideline issued to implement the expedited removal statute. All the evidence before the Court therefore supports redressability, i.e., that the harm to Plaintiffs' members "is *likely* to be redressed," at least in part, "by a favorable judicial decision" staying the challenged agency actions. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (emphasis added); *see also Defs. of Wildlife v. Gutierrez*, 532 F.3d 913, 925 (D.C. Cir. 2008) (standing exists where "an order from the district court could redress [plaintiff's] injury, at least in part").

The fact that an older regulation seems to allow DHS to apply expedited removal to paroled individuals is of no import to the Court's redressability analysis when the evidence shows that the actions harming Plaintiffs' members did not occur *before* Defendants adopted the January 23 Huffman Memorandum, February 18 ICE Directive, and March 25 CHNV Parole Termination Notice—when, Plaintiffs do not dispute, 8 C.F.R. § 253.3 and the definition of "arriving alien" at 8 C.F.R. § 1.2 were in effect—but only after.[12] Indeed, the evidence makes clear that there is a stark qualitative difference in the enforcement actions taken by ICE personnel pursuant to a decades-old regulation and those taken pursuant to the January 23 Huffman Memorandum, February 18 ICE Directive, and March 25 CHNV Parole Termination. Plaintiffs have more than sufficiently shown that a stay of the challenged agency actions is "likely" to redress at least some of the harms substantiated by the declarations submitted in support of their motion. *See Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982) ("[A] plaintiff satisfies the redressability requirement when he shows that a favorable decision will relieve a discrete injury to himself. He need not show that

---

[12] Plaintiffs challenge 8 C.F.R. § 1.2 as *ultra vires*, Am. Compl. ¶¶ 171-83, but have not moved for preliminary relief as to it.

a favorable decision will relieve his *every* injury.") (citation omitted); *Diamond Alt. Energy, LLC v. EPA*, 606 U.S. --, No. 24-7, 2025 WL 1716141, at *8 (June 20, 2025) (finding redressability when "invalidating the [challenged] regulations would likely redress at least some of the [plaintiffs'] monetary injuries").[13]

2. *Plaintiffs and their members have prudential standing.* Plaintiffs assert interests of themselves and their members that fall within the zone of interests protected by the INA. The zone of interests' prudential analysis only forecloses a lawsuit "when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012) (citation and internal punctuation omitted). The interests of Plaintiffs in serving their members who were paroled into the country under different humanitarian parole processes, and of their members in not being unlawfully subjected to expedited removal, easily meet this test, which is "not meant to be especially demanding" in light of "Congress's evident intent when enacting the APA to make agency action presumptively reviewable." *Id.*

Defendants' claim that Plaintiffs cannot fall within the zone of interests because they are not "subject to expedited removal from the United States," Opp. 26, and "have no cognizable interest in the way the Executive enforces the immigration laws against others," Opp. 30, ignores that Plaintiffs bring this suit on behalf of their members, including members who actually have been subject to expedited removal.[14] Moreover, courts "do not require any indication of

---

[13] Plaintiffs do not dispute that if the Court were to stay the challenged policies on the grounds that the application of expedited removal to persons paroled into the country at ports of entry is contrary to the statute, it would be more than strange for the government to nonetheless proceed with subjecting such paroled individuals to expedited removal on the argument that notwithstanding the Court's preliminary legal conclusion regarding the meaning of the statute, their regulations permit it. As Defendants concede, it is the statute that controls. Opp. 38.

[14] Because the Plaintiffs here are asserting associational standing, *AILA II* does not control, as Defendants suggest, because that case concerned only organizational standing, and not associational standing. *Am. Immigr. Laws. Ass'n v. Reno*, 199 F.3d 1352, 1357 (D.C. Cir. 2000).

congressional purpose to benefit the would-be plaintiff." *Match-E-Be-Nash-She-Wish*, 567 U.S. at 225 (internal quotation marks omitted).

Plaintiffs have more than sufficiently established standing, and this Court has jurisdiction to consider their claims.

## II.    Plaintiffs are Likely to Succeed in Proving that the Agency Actions Violate the Expedited Removal Statute and the Agency's own Regulations.

The plain language of the expedited removal statute, 8 U.S.C. § 1225(b)(1)(A), is clear that noncitizens in the United States after being inspected and paroled are categorically ineligible for expedited removal. Such individuals are not in the process of "arriving in the United States," as required by 8 U.S.C. § 1225(b)(1)(A)(i), and they are exempt from 8 U.S.C. § 1225(b)(1)(A)(iii), which only applies to people who have "not been admitted or paroled." None of Defendants' arguments support a contrary reading. Plaintiffs are therefore likely to succeed on their claim that the January 23 Huffman Memorandum, February 18 ICE Directive, and March 25 CHNV Termination Notice are premised on an erroneous legal interpretation. *See Loper Bright Enters.*, 603 U.S. at 391; *SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943) (agency action "may not stand if the agency has misconceived the law").

## A.    Noncitizens Paroled into the U.S. at a Port of Entry are Statutorily Exempted from the "Expanded Expedited Removal" Designation.

Although Defendants acknowledge that Congress statutorily exempted admitted and paroled noncitizens from expedited removal under 8 U.S.C. § 1225(b)(1)(A)(iii), Opp. 33, they argue that the exemption should be read to allow DHS to subject paroled individuals to expedited removal once their parole has ended, Opp. 34. Defendants provide no case law endorsing their interpretation, which directly contradicts the statutory text that only allows DHS to subject an individual to expedited removal who "has *not* been . . . paroled." 8 U.S.C. § 1225(b)(1)(A)(iii) (emphasis added). Defendants cite just a single case in support, *Turner v. U.S. Att'y Gen.*, 130 F. 4th 1254, 1261-62 (11th Cir. 2025), which says only—and in the context of a different statutory scheme—that "the use of the present-perfect tense can, as a matter of pure semantics, refer to a

time in the indefinite past *or* to a past action or state that continues into the present." *Id.* at 1261.

As an initial matter, the statute here uses the negative form of the present perfect tense, which would indicate an event that is neither continuing to the present nor occurred in the past. For example, if you visit a used car lot and say you will only purchase a vehicle that "has not been damaged in an accident," you would be referring to a car that is both not currently damaged from an accident and was not previously damaged in an accident. By including in expedited removal under this provision only noncitizens "who ha[ve] not been admitted or paroled," the statute is excluding those who previously were paroled, even if their current period of parole has expired or been terminated. Thus, even the language Defendants cherry-pick from *Turner* does not help them.

Additionally, Defendants notably omit *Turner*'s explanation that if multiple meanings are permissible, "the question becomes which of those meanings applies in this statutory context . . . [u]pon full review of the statute as a whole." *Id.* at 1261; *accord Turkiye Halk Bankasi A.S. v. United States*, 598 U.S. 264, 275 (2023) ("[T]his Court has a 'duty to construe statutes, not isolated provisions.'") (citation omitted). In this case, the text, context, and purpose of § 1225(b)(1)(A)(iii)(II) are clear: to permit DHS to utilize expedited removal procedures not only for those noncitizens who lack valid entry documents and who are in the act of "arriving in the United States," but also for "certain other" noncitizens inside the country who completed the act of arrival for expedited removal purposes and entered without inspection (i.e., entered without having been admitted or paroled). *See Doe v. Noem*, No. 1:25-cv-10495 IT, 2025 WL 1099602, at *17 (D. Mass. Apr. 14, 2025) (so holding); *see also Barrett v. United States*, 423 U.S. 212, 216 (1976) (interpreting the present perfect tense in a statute to "denot[e] an act that has been completed").

Defendants' position effectively nullifies the limiting language in § 1225(b)(1)(A)(iii)(II) that focuses expanded expedited removal on noncitizens who have not been admitted or paroled. As Defendants have noted and Plaintiffs do not dispute, Defendants have broad authority to terminate parole. In fact, Defendants take the position in both their opposition brief, Opp. 6 n.1, and the February 18 ICE Directive that issuance of an expedited removal charging document alone

terminates parole. Defendants are thus arguing that Congress's prohibition on the use of expedited removal against a paroled individual ends when expedited removal is used against the paroled individual. Their position is implausible and absurd, and it renders the textual limitation in 8 U.S.C. § 1225(b)(1)(A)(iii)(II) completely meaningless as to parolees and admittees alike, handing DHS extraordinary, unprecedented, and unchecked power. *See* Mot. 15-16.[15]

Defendants fail to address Plaintiffs' argument that the decision by Congress to pair the terms "paroled" and "admitted" in the phrase "has not been admitted or paroled" further demonstrates that both terms refer to a completed act that cannot be undone—a historical fact about whether an individual is present in the country after having been admitted or paroled. Mot. 17-18. Under our immigration laws, the terms "admission" and "admitted" are defined as "the lawful entry of the alien into the United States after inspection and authorization by an immigration officer." 8 U.S.C. § 1101(a)(13)(A). Whether an individual has been admitted—which turns on that person's manner of entry—is distinct from whether that individual maintains lawful status; in other words, an individual who has been admitted into the country (and thus given status) can lose that status but does not thereby become someone who has not been admitted. *Sanchez v. Mayorkas*, 593 U.S. 409, 415 (2021). So, too, here: someone who has been paroled into the country can likewise have their parole terminated, but that does not change that they have been paroled. Here, the meaning of "paroled" is elucidated by its association with "admitted." *See Fischer v. United States*, 603 U.S. 480, 487 (2024) ("the canon of *noscitur a sociis* teaches that a word is given more

---

[15] In response to an individual challenge brought by an individual paroled into the country at a port of entry who is now being processed for expedited removal, the Department of Justice disavows the argument it is advancing here—and which it advanced in the January 23 Huffman Memorandum and the March 25 CHNV Termination Notice, namely, that a paroled individual (such as the petitioner in that case and the members of Plaintiff Organizations in this case) can be subjected to expanded expedited removal under the "certain other aliens" authority at 8 U.S.C. § 1225(b)(1)(A)(iii)(II). Resp'ts Mem. of Law in Opp'n to the Pet., Compl., and Mot. for Prelim. Inj., *Mata Velasquez v. Kurtzdorfer*, Case No. 1:25-cv-00493-LJV (W.D.N.Y. June 18, 2025), ECF No. 42 (attached hereto as Exhibit A) at 12 ("Petitioner thus argues that because Petitioner—an arriving alien—as paroled, subsection (iii)(II) cannot apply to him. But this misses the point entirely: Petitioner is not subject to subparagraph (iii)(II) he is subject to subparagraph (i) as an arriving alien.").

precise content by the neighboring words with which it is associated.") (citation and internal quotation marks omitted). Given that "admitted" necessarily refers to a past, completed event—the manner of entry into the United States—the word "paroled" in the same sentence must be read *in pari materia. See Motion Picture Ass'n of Am., Inc. v. FCC*, 309 F.3d 796, 802 (D.C. Cir. 2002).

This interpretation is evident in Defendants' own regulations, which make clear that an individual *cannot* be subjected to expedited removal if he can prove he "*was* . . . paroled into the United States." 8 C.F.R. § 235.3(b)(6) (emphasis added); *see also* 8 C.F.R. § 235.3(b)(1)(ii) (Defendants' regulation describing to whom expanded expedited removal may be applied speaks interchangeably of "aliens who . . . have entered the United States without *having been* admitted or paroled," who have "enter[ed] without inspection," and who were "not inspected and admitted or paroled into the United States") (emphasis added). Defendants have no response other than to badly misconstrue one of the above provisions and to point to other regulations. Opp 36-38. With respect to Section 235.3(b)(6), Defendants puzzlingly suggest that by referencing the possibility that upon termination of parole an individual may be charged with inadmissibility under § 212(a) of the INA, the regulation somehow "envisions the possibility that such an alien with parole terminated could be subject to expedited removal or, at the very least, does not exclude the possibility." Opp. 37. The regulation does no such thing. It establishes clearly that if a person meets their burden of establishing that they were admitted or paroled—a question about something that did or did not happen in the past—they *cannot* be subjected to expedited removal. They can obviously still be *removed*, but that is not the question here.[16]

Unable to rebut the contrary weight of their own regulations, Defendants concede, "the language of the statute controls in any event." Opp. 38. This is true—to a point. Broadly speaking, Plaintiffs agree that the statute is what ultimately constrains Defendants' actions; and of course,

---

[16] Defendants suggest the reference to INA § 212 reinforces the idea that terminated parolees may be subjected to expedited removal because the only two inadmissibility grounds relevant in expedited removal are within § 212, but parolees are *always* subject to *all* the § 212 inadmissibility grounds because they have not been admitted.

the statute governs Plaintiffs' claim that the challenged policies exceed and conflict with DHS's statutory authority. But Defendants are *also* required to adhere to their own regulations, even where (unlike here) Defendants' actions violate only the regulation and not the statute.[17] *See United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954).

Finally, Defendants claim that the Supreme Court's recent grant of the Government's application for a stay in *Doe v. Noem* supports their position, merely because one of the Solicitor General's arguments was about the interpretation of "has not been . . . paroled" in 8 U.S.C. § 1225(b)(1)(A)(iii). *Doe v. Noem*, No. 24A1079, 145 S. Ct. 1524 (May 30, 2025). But the Supreme Court's one-paragraph order in *Doe* provided no reasoning at all for the grant of the stay, including on the government's argument about the expedited removal statute. A "stay order is not a ruling on the merits." *See, e.g.*, *Merrill v. Milligan*, 142 S. Ct. 879, 879 (2022) (mem.) (Kavanaugh, J., concurring).

**B.      Noncitizens Who Have Been Paroled into the U.S. at a Port of Entry are Not "Arriving in the United States" for Purposes of the Expedited Removal Statute.**

The only other category of noncitizen statutorily eligible for expedited removal is one who "is arriving in the United States." 8 U.S.C. § 1225(b)(1)(A)(i). The statute's use of the present progressive tense indicates an action that is temporary but currently occurring. *See* Mot. 19-20. Defendants say Plaintiffs are incorrect but offer neither argument nor support, offering only *ipsa dixit*. Opp. 32-33. Because those paroled into the United States cannot be said to be in the act or process of arriving in the United States under the statute, they are not eligible for expedited removal on this basis.

The title of § 1225(b)(1) as well as the text and structure of the provision support this understanding of a noncitizen who "is arriving." Two distinct categories of noncitizens may be subjected to expedited removal. First, those who are "arriving in the United States." And second,

---

[17] As explained *infra* at III, the unexplained mismatch between DHS's actions and regulations is also a reason why the former are arbitrary and capricious. *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016).

"certain *other* aliens" present in the United States who have not been admitted or paroled. The former speaks to those in the act of arriving and the latter speaks to those who already have arrived—two clearly defined, non-overlapping categories delineated by whether the noncitizen without valid entry documents had come to or is now present in the United States. By explicitly carving paroled individuals out of the category of certain other noncitizens present in the country eligible for parole, Congress made clear that such individuals belonged in that category and would be subject to expedited removal under that provision—and not under the "is arriving" provision—in the absence of such a carveout. *Cf. Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 583 U.S. 109, 128-29 (2018) ("As this Court has noted time and time again, the Court is 'obliged to give effect, if possible, to every word Congress used.'").

Other provisions in 8 U.S.C. § 1225 only reinforce what the title, text, and structure of §§ 1225(b)(1) and (b)(1)(A)(iii)(II) already make plain: that the process of arrival, as used in the statute, is one that occurs at the border, and Congress saw those who were "arriving" as distinct from people already present in the United States. For example:

- Section 1225(d)(2) authorizes the detention of noncitizens arriving on the "vessel or aircraft bringing" the noncitizen to the United States or at the "airport of arrival."
- Section 1225(b)(2)(C) authorizes returning a noncitizen "who is arriving on land (whether or not at a designated port of arrival)" to a contiguous territory pending section 240 proceedings.
- Section 1225(b)(1)(F) exempts from expedited removal a noncitizen of certain countries "who arrives by aircraft at a port of entry."

In all these instances, arrival is clearly contemplated to take place at the point of arriving, either at a land or sea border or at an airport, and not an interminable implicit statutory status, as Defendants would have this Court believe. Indeed, Defendants can point to no statutory text or purpose supporting their argument that a noncitizen who came to a port of entry, was inspected and paroled into the country, and has been here for years or even decades remains indefinitely in the process of "arriving in the United States" for purposes of expedited removal and thus forever

19

eligible for summary expulsion. Opp. 30-32.

Defendants argue that Plaintiffs overlook other "key textual clues" in the expedited removal statute, Opp. 33, yet none can carry the weight of Defendants' argument. In fact, Defendants' arguments are not even aimed at the contested legal issue here. Defendants argue that if Congress wanted to exclude paroled noncitizens from the "is arriving" category, it would have done so expressly, as it did with regard to those noncitizens present in the country subject to expedited removal by designation. Opp. 31. Defendants also point to the title of § 1225(b)(1) for essentially the same proposition. *Id.* But Defendants' argument is classic question begging, as it assumes that Congress *needed* to exempt parolees from the "is arriving" category, even though that is what Defendants need to prove. On *that* point, Defendants, it appears, have nothing to say.[18] As explained above, there was no need for Congress to explicitly carve paroled individuals out of the category of noncitizens who are "arriving" in the United States both because the process of arrival is inherently temporary and completed for purposes of expedited removal at the point when the noncitizen arrives and becomes present in the country, and because the inclusion of a carveout for paroled individuals in the "certain other aliens" category necessarily meant that such individuals were not included in the entirely distinct category of "arriving" noncitizens.

In their efforts to read meaning into the statute that does not exist, Defendants urge the court to look at statutes and regulations not at issue here and to give words meaning the text cannot bear. None of Defendants' three arguments support their grammatically, legally, and logically nonsensical position.

1.    To support their characterization of paroled individuals as forever "arriving," Defendants misleadingly cite the statutory parole authority for the proposition that upon termination of parole, a noncitizen "reverts to the status . . . of an applicant for admission standing

---

[18] Defendants also bafflingly claim that 8 U.S.C. § 1225(b)(1)(A)(i)(F)—which exempts from both expedited removal bases those noncitizens from Western hemisphere countries with which the United States does not have full diplomatic relations—somehow supports them but do not explain how, and Plaintiffs' counsel have yet to imagine any conceivable basis that it does.

at the threshold of entry." Opp. 30 *(citing* 8 U.S.C. § 1182(d)(5)(A)). But that section actually provides that "when the purposes of such parole shall . . . have been served . . . [the noncitizen's] case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States." 8 U.S.C. § 1182(d)(5)(A). The statute itself defines the term "applicant for admission" to include both a noncitizen "present in the United States who has not been admitted" as well as one "who arrives in the United States." 8 U.S.C. § 1225(a)(1). An "applicant for admission" is, therefore, a much broader term that includes not only noncitizens who are arriving, but also people who entered the country without admission (including those who were paroled into the country, whether or not they continue to maintain active parole). It is definitively not synonymous with the category of noncitizens who are "arriving" under the expedited removal statute. The mere fact that a paroled individual whose parole has ended is to "continue to be dealt with" as an "applicant for admission", 8 U.S.C. § 1182(d)(5)(A), does not mean that they would be treated as if they are "arriving"; indeed, if that is what Congress intended, the most natural way to express that intent is to say so, since it defined "applicant for admission" in the very same section in which it created expedited removal. Moreover, and contrary to Defendants' characterization, nowhere in the parole statute does it say a terminated parolee will "revert" to an applicant for admission "at the threshold of entry." Opp. 35. This, too, Congress easily could have done, since it also amended the parole statute when creating expedited removal in 1996. But that is not the statute Congress enacted.

2.     Defendants' reliance on DHS's regulations that define an "arriving alien" to include previously paroled individuals, 8 C.F.R. §§ 1.2, 1001.1(q), is patently misplaced. Opp. 30-31. Agency regulations cannot and do not provide more or different authority than does the underlying statute. "An agency after all, 'literally has no power to act'—including under its regulations—unless and until Congress authorizes it to do so by statute . . .  [a]n agency's regulation cannot 'operate independently of' the statute that authorized it." *Fed. Election Comm'n v. Cruz*, 596 U.S. 289, 301 (2022) (citations omitted); *accord Pub. Serv. Elec. & Gas Co. v. FERC*, 989 F.3d 10, 19

(D.C. Cir. 2021) ("[A] regulation can never 'trump the plain meaning of a statute'" (citation omitted)).[19]

3.    Defendants next argue that Congress intended to and did incorporate into the text of the expedited removal statute the "entry fiction," whereby paroled individuals are considered "standing at the border," which Defendants claim is the same thing as "arriving," even long after their actual entry. Opp. 31-32. But whatever relevance the entry fiction continues to have for due process purposes, *see DHS v. Thuraissigiam*, 591 U.S. 103, 139 (2020), Defendants provide no evidence that Congress intended to incorporate it into the completely novel expedited removal process it created in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"). Here again, had Congress wanted to do what Defendants suggest, it easily could have done so; indeed, Defendants have no explanation for why Congress would have chosen to communicate so significant a decision in cryptic language seemingly inconsistent with the text and the structure of the statute itself.[20]

---

[19] As Plaintiffs have not at this time moved for relief on their challenge to 8 C.F.R. § 1.2, Am. Compl. ¶¶ 171-83, they do not at this point address Defendants' contention that those claims are time-barred.

[20] Defendants' position that Congress incorporated the "entry fiction" into the expedited removal statute to treat paroled individuals as arriving is inconsistent with the agency's own position for nearly 30 years. Although the agency's 1997 regulation treated all individuals paroled into the country at ports of entry as arriving aliens for purposes of expedited removal, Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures, 62 Fed. Reg. 10312, 10313, 10330 (Mar. 6, 1997), the following year the agency amended the definition of "arriving alien" to say that two large classes of paroled individuals—all of those paroled into the country at ports of entry prior to April 1, 1997, and all of those paroled into the country on or after that date pursuant to a grant of advanced parole— would not be treated as arriving aliens for expedited removal purposes. Amendment of the Regulatory Definition of Arriving Alien, 63 Fed. Reg. 19382, 19384 (Apr. 20, 1998). The agency made this change "as a matter of policy," 63 Fed. Reg. at 19382, thereby recognizing that neither the text of the statute, nor the statute as construed to somehow incorporate the entry fiction, command that paroled individuals be treated as arriving for purposes of expedited removal. A later amendment to the regulation in 2006 clarified further that the classes of paroled individuals exempted from being treated as "arriving" for purposes of expedited removal remain "arriving aliens" for all other purposes. Eligibility of Arriving Aliens in Removal Proceedings to Apply for Adjustment of Status and Jurisdiction to Adjudicate Applications for Adjustment of Status, 71 Fed. Reg. 27,585, 27,588 (May 12, 2006).

Defendants' atextual appeals to history fare no better. When expedited removal was proposed in 1993, the bill's sponsor explained on the House Floor that the measure was focused on "keeping the people without documents out of the country in the first place."[21] In 1996, when the House Judiciary Committee advanced its version of the bill that would eventually become IRRIRA, it authorized expedited removal for "an alien arriving in the United States" and explained in its Committee Report that "[t]his provision is necessary because thousands of aliens arrive in the U.S. at airports each year *without valid documents* and attempt to illegally enter the United States." H.R. Rep. No. 104-469(I), at 157-58 (1996) (emphasis added), *available at* 1996 WL 168955. The only two grounds of inadmissibility cognizable in expedited removal further emphasize this historical purpose, as both concern the absence of valid entry documents.

Defendants' positions on expedited removal explode their authority far beyond what Congress authorized. One final example: they claim that under 8 U.S.C. § 1225(b)(1)(A)(i), they can subject paroled individuals to expedited removal at any time, no matter how long they have been in the United States and including when their parole is active. But they concede that 8 U.S.C. § 1225(b)(1)(A)(iii)(II) protects paroled individuals from being subjected to expedited removal under a designation "for the duration of the alien's parole." Opp. 34. Defendants offer no explanation for why Congress would have exposed to expedited removal in the "is arriving" section the very people it extended protection to in the designation section.[22]

The answer to all of the textual and structural inconsistencies in Defendants' position is clear: the extraordinary, historically unprecedented expedited removal authority does not extend to individuals like Plaintiffs' members who were inspected and paroled into the country at ports of

---

[21]  H.R. 2602, 103rd Cong. (1993), https://www.congress.gov/bill/103rd-congress/house-bill/2602/text; H.R. 3363, 103rd Cong. (1994), https://www.congress.gov/bill/103rd-congress/house-bill/3363/text; 140 Cong. Rec. H3629, H3632 (daily ed. March 2, 1994), https://www.congress.gov/103/crecb/1994/03/02/GPO-CRECB-1994-pt3-5-2.pdf.

[22] The same point is true with respect to individuals continuously present in the country for two years or more after being paroled into the country; such individuals would be statutorily protected from expanded expedited removal under § 1225(b)(1)(A)(iii)(II) but inexplicably face continued and indefinite jeopardy under § 1225(b)(1)(A)(i).

entry. It was focused on individuals without valid entry documents who showed up at the border or who entered without inspection (and even then, only if apprehended within two years of entry and subject to designation). Finally, were there any doubt, Plaintiffs are entitled to all benefit thereof, further underscoring why they are likely to prevail. *Castillo v. Bondi*, No. 24-3631, 2025 WL 1699534, at *3 (6th Cir. June 18, 2025) (Sutton, C.J.) ("When such uncertainty clouds a deportation statute, the longstanding principle of construing it in favor of the alien kicks into gear." (citations and internal quotation marks omitted)).

## III. Plaintiffs Are Likely to Succeed in Proving that the Agency Actions are Arbitrary and Capricious.

Because the January 23 Huffman Memorandum, the February 18 ICE Directive, and the March 25 CHNV Termination Notice are based on erroneous interpretations of the expedited removal statute, the Court need not also consider whether these agency actions are also arbitrary and capricious under 5 U.S.C. § 706(2)(A). But Plaintiffs are likely to succeed in proving that they are, as they rely on fundamentally inconsistent legal bases; provide little to no reasoning for the application of expedited removal to paroled individuals; and fail to consider reasonable alternatives, reliance interests, or the impact of expedited removal on paroled individuals, their families, and their communities. Mot. 21-28. Defendants' arguments to the contrary fail.

### A. Defendants' directives are reviewable under the APA.

Defendants' argument that the January 23 Huffman Memorandum, the February 18 ICE Directive, and the March 25 CHNV Termination Notice are not "final agency action" under the APA is a red herring. Opp. 39 (citing 5 U.S.C. § 704). Not only is this argument fundamentally at odds with their admission that these policy directives "have already gone into effect," Opp. 1, but Defendants also misstate the law and ignore that § 704 makes two kinds of agency action "subject to judicial review": "final agency action" and "[a]gency action made reviewable by statute," 5 U.S.C. § 704. The latter need not be "final." *See Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 882 (1990) (explaining that "the 'agency action' in question must be 'final agency action'" unless "review is sought . . . pursuant to specific authorization in the substantive statute"); *Nat'l Ass'n of*

*Home Builders v. U.S. Army Corps of Eng'rs,* 417 F.3d 1272, 1278 (D.C. Cir. 2005) ("final agency action" review available under § 704 if "no more specific statute provides for judicial review"). "[S]ection 1252(e)(3) of the INA" makes Defendants' written implementation of expedited removal "'reviewable by statute' within the meaning of section 704 of the APA." *Las Americas Immigrant Advoc. Ctr. v. Wolf,* 507 F. Supp. 3d 1, 35 (D.D.C. 2020) (Jackson, K.B., D.J.); *accord Grace v. Whitaker,* 344 F. Supp. 3d 96, 118 (D.D.C. 2018), *aff'd in part, rev'd in part,* 965 F.3d 883 (D.C. Cir. 2020) (rejecting argument "that Congress limited the application of [§] 1252(e)(3) to only claims involving legislative rules or final agency action").

Each policy directive at issue here is a "written policy directive, written policy guideline, or written procedure" implementing expedited removal. As Defendants themselves characterize them, they "guide immigration officers with regard to the exercise of their existing prosecutorial discretion and statutory and regulatory authority" around the use of expedited removal. Opp. 39; *see also Kiakombua,* 498 F.Supp.3d at 33-34 (finding that document "intended to guide and direct asylum officers in making [credible fear] determinations" is a written directive within the meaning of § 1252(e)(3) and "an agency's written recitation of its understanding of the substantive and procedural standards of asylum law that pertain to credible fear determinations" "designed to help the asylum officers" who make those determinations is an implementation of expedited removal procedures). As such, they are reviewable.

Defendants do not contest that the policies "mark the 'consummation' of the agency's decisionmaking process," satisfying the first prong of the inquiry. *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (citation omitted). They contend instead that the directives do not purport to change the rules around which noncitizens are eligible for expedited removal—which Defendants argue was established in the promulgation of 8 C.F.R. § 1.2—so they do not determine "rights or obligations" or cause "legal consequences to flow." *Id.,* 520 U.S. at 178. Defendants are incorrect, as the directives do not merely regurgitate the expedited removal statute, which is a question for the merits besides. Instead, they provide clear guidance and direction to agency officials to

implement expedited removal in a new and different way.[23] Based on the agency guidance provided in the three directives, paroled individuals will be subjected to expedited removal when they previously were not. The clearest evidence of these "legal consequences" is that, after the issuance of the directives, Plaintiffs' members and paroled noncitizens around the country are in fact being targeted for expedited removal.[24] *Make the Rd. New York v. McAleenan,* 405 F. Supp. 3d 1, 48 (D.D.C. 2019) (finding that where "before the agency issued that statement, immigration officers could not have subjected an undocumented non-citizen . . . to the expedited removal process, whereas . . . pursuant to the issuance of the [statement], such officers were authorized to do so," it is "fairly obvious that 'legal consequences will flow.'"). This is more than enough to meet *Bennett*'s second prong. *Cal. Communities. Against Toxics v. EPA,* 934 F.3d 627, 637 (D.C. Cir. 2019) ("[L]ower courts [are] to make *Bennett* prong-two determinations based on the concrete consequences an agency action has or does not have as a result of the specific statutes and regulations that govern it.").

The written policies are reviewable under the APA.

**B.      Defendants' directives are arbitrary and capricious.**

Confronted with the fundamental inconsistencies between the January 23 Huffman Memorandum and the March 25 CHNV Termination Notice, which rely on § 1225(b)(1)(A)(iii) and focus on terminating individual grants of parole within two years to be able to subject the parole beneficiary to expedited removal, and the February 18 ICE Directive, which relies on §

---

[23] *See* January 23 Huffman Memorandum (stating that "[t]his memorandum provides guidance regarding how to exercise enforcement discretion in implementing these [expanded expedited removal] policies," and "directing [ICE, CBP, and USCIS agency leadership] to take the following actions"); February 18 ICE Directive (providing detailed instructions to ICE Enforcement and Removal Operations ("ERO") officers as to processing individuals, including those who have been granted parole, for expedited removal); March 25 CHNV Termination Notice (terminating individuals grants of CHNV parole in order to effectuate the removal of parolees through expedited removal).

[24] ECF No. 22-2 (Escobar Decl.) at ¶¶ 11-17; ECF No. 22-3 (Salas Decl.) at ¶¶ 15-17, 22-23; ECF No. 22-4 (Lawrence Decl.) at ¶¶ 13-19, 22; ECF No. 22-7 (Torres Decl.) at ¶¶ 2, 6; ECF No. 22-13 (Chua Decl.) at ¶¶ 2, 10, 19.

1225(b)(1)(A)(i) and claims that no time limit exists to subject "paroled arriving aliens" to expedited removal, the most Defendants can do is suggest that Plaintiffs are misreading the documents.[25] But Defendants cannot hide from the plain language of either the expedited removal statute or their own policies, and they certainly have not explained why they have flip flopped from one position to another and back in a matter of months.

Defendants only claim that the March 25 CHNV Termination Notice's express statements—that "[e]xpedited removal is available *only* when an alien has not been continuously present in the United States for at least the two years preceding the date of the inadmissibility determination," 90 Fed. Reg. at 13619, and that if Defendants allowed CHNV beneficiaries' parole to expire naturally, "CHNV parolees may begin to accrue more than two years of continuous presence in the United States, such that DHS would *have to* initiate section 240 removal proceedings to effectuate their removal," *id.* at 13620 (emphasis added)—do not mean to limit the expedited removal authority or indicate that paroled individuals can *only* be subjected to expedited removal under 8 U.S.C. § 1225(b)(1)(A)(iii). Instead, Defendants argue, the Notice relies on an "additional" source of authority, and the agency can make a "policy choice" as to which provision of expedited removal to use to process a noncitizen. Opp. 41-42. But these are post-hoc justifications found nowhere in the text of the Notice that the Court cannot and should not consider. *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 22 (2020) (holding that "impermissible post hoc rationalizations" for the Secretary's decisionmaking "are not properly before us"); *Am. Textile Mfrs. Inst., Inc. v. Donovan*, 452 U.S. 490, 539 ("[T]he *post hoc* rationalizations of the agency . . . cannot serve as a sufficient predicate for agency action."). Additionally, the *post hoc* justifications

---

[25] Defendants do reiterate the argument that the documents do nothing more than "assume" the existing expedited removal authority, but as discussed above, this is inaccurate. *See supra* at I.C.; III.A. The directives provide concrete guidance and direction to DHS personnel as to DHS and ICE's implementation of the expedited removal authority, and Defendants do not dispute that it is only *after* they adopted the January 23 Huffman Memorandum, February 18 ICE Directive, and March 25 CHNV Parole Termination Notice that ICE agents began courthouse enforcement and subjecting paroled individuals to expedited removal. *See, e.g.*, ECF No. 22-14 (Hirman Decl.) at ¶¶ 7-8, 14; ECF No. 22-13 (Chua Decl.) at ¶¶ 7-9, 13; ECF. No. 22-8 (Montoya Decl.) at ¶¶ 7-9, 21, 34.

are patently inconsistent with what the Termination Notice actually says.[26] Finally, the statute does not give any "policy choice" about which source of authority for expedited removal should be used as to any particular noncitizen. Opp. 41-42. As explained above, the two categories of individuals statutorily eligible for expedited removal are entirely distinct ("aliens arriving in the United States and *certain other aliens* who have not been admitted or paroled"), and regardless of which category an individual falls in, the expedited removal process is the same.

Defendants do not otherwise provide a meaningful explanation for how the March 25 CHNV Termination Notice's sole and express reason for terminating grants of parole before the full two-year period of parole expired—i.e., to ensure that parolees could be subjected to expedited removal—can be reconciled with the February 18 ICE Directive's claim that "[t]here is no time limit on the ability to process ['paroled arriving aliens'] for [expedited removal]." They likewise provide no explanation for the flip-flop in position between the January 23 Huffman Memo and the February 18 ICE Directive, and then from the ICE Directive to the March 25 CHNV Termination Notice. Where, as here, "the agency has failed to provide even that minimal level of analysis, [the] action is arbitrary and capricious." *Encino Motorcars,* 579 U.S. at 221; *see also id.* at 222 ("[A]n unexplained inconsistency in agency policy is a reason for holding an interpretation to be an arbitrary and capricious change from agency practice.") (internal punctuation and citation omitted).

In addition to failing to meet the "basic procedural requirement of administrative rulemaking" of providing "adequate reasons for [their decisions]," *Encino Motorcars,* 579 U.S. at 212, the challenged policy directives show "basic gaps in the government's attention to the pertinent factors," particularly reliance interests. *Nat'l Urb. League v. Ross*, 977 F.3d 770, 778 (9th

---

[26] Defendants' insistence that the March 2025 CHNV Termination Notice should not be "parsed like a statute," Opp. 42, is likewise untenable. The Notice prematurely and categorically truncates the parole of 500,000 individuals and exposes them to the risk of being subjected to expedited removal. Neither Plaintiffs nor the Court should be forced to look behind the express terms of the Notice for hidden meaning: "If men must turn square corners when they deal with the government, it cannot be too much to expect the government to turn square corners when it deals with them." *Niz-Chavez v. Garland*, 593 U.S. 155, 172 (2021).

Cir. 2020). For example, none of the challenged policy directives considers that an express purpose of the CHNV parole processes was to "enable individuals to seek humanitarian relief or other immigration benefits . . . for which they may be eligible,"[27] and that placing such individuals in expedited removal proceedings would upset considerable reliance interests around the adjudication of those applications, including the fact that a positive adjudication would provide the parole beneficiary with an alternate legal status and protection from expedited removal. *See, e.g.*, ECF No. 22-8 (Montoya Decl.) at ¶ 4 (parolee eligible for lawful permanent residence via Cuban Adjustment Act); ECF No. 22-17 (Gillman Decl.) at ¶ 4 (same); ECF No. 22-10 (Olive Decl.) at ¶ 5 (parolee had applied for asylum); ECF No. 22-13 (Chua Decl.) at ¶ 4 (same); ECF No. 22-6 (Declaration of A. Ashley Tabaddor) at ¶¶ 9, 16-17. Nor did Defendants give any meaningful consideration to the significant reliance interests of landlords and employers, or family members and communities, of individuals targeted for expedited removal. *See, e.g.*, ECF No. 22-2 (Escobar Decl.) at ¶¶ 11-19; ECF No. 22-3 (Salas Decl.) at ¶¶ 15-17, 22-23; ECF No. 22-4 (Lawrence Decl.) at ¶¶ 18-19, 22. Defendants' failure to "assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns," *Regents,* 591 U.S. at 33, was an arbitrary and capricious failure to consider "important aspect[s] of the problem,'" *State Farm*, 463 U.S. at 43.[28]

## IV.    Without a Stay, Plaintiffs' Members and Countless Other Paroled Individuals Will Continue to Suffer Irreparable Harm.

Plaintiffs' members and paroled noncitizens around the country have been faithfully showing up to routine immigration court hearings only to be ambushed, arrested, detained, and put

---

[27] Implementation of a Parole Process for Venezuelans, 87 Fed. Reg. 63507, 63508 (Oct. 19, 2022); Implementation of a Parole Process for Cubans, 88 Fed. Reg. 1266, 1268 (Jan. 9, 2023); Implementation of a Parole Process for Haitians, 88 Fed. Reg. 1243, 1244 (Jan. 9, 2023); Implementation of a Parole Process for Nicaraguans, 88 Fed. Reg. 1255, 1256 (Jan. 9, 2023).

[28] Defendants make arguments against Plaintiffs' arbitrary and capricious claim "to the extent that [the claim] is based on a *different* argument, that the documents fail to justify applying expedited removal instead of 240 proceedings or fail to justify commencing removal proceedings at all." Opp. 43-44. Plaintiffs' claim is not based on these arguments.

through a rapid removal process that could result in their deportation within hours, including to countries where they could face persecution or death.[29] Families have been physically torn apart as parents and children are taken away in front of their loved ones.[30] Yet Defendants claim that this is not irreparable harm.

Defendants specifically assert that Plaintiffs' members and other paroled noncitizens who are subject to expedited removal will not suffer irreparable harm because (1) the credible fear procedures will protect against deportation to countries where they will face persecution or death; and (2) some harms caused by expedited removal also result from section 240 removal proceedings. Both arguments ignore the reality of the expedited removal process—and also are beside the point.

*First,* Defendants do not seriously dispute that the credible fear process provides *far* less protection against deportation to countries where noncitizens will face violence and the risk of death. Defendants argue that the credible fear process *exists*, Opp. 45-46, but Plaintiffs have pointed to evidence and statistics showing that for decades, the procedures have not provided meaningful process to noncitizens and have resulted in wrongful deportations, Mot. 31 n.15, 33.[31] Compared to section 240 removal proceedings, noncitizens are not afforded meaningful access to counsel during the credible fear procedures, and they are often detained, which creates significant challenges to consulting with any counsel they do secure and gathering and presenting evidence.

---

[29] ECF No. 22-5 (Freire Decl.) at ¶¶ 6-7; ECF No. 22-8 (Montoya Decl.) at ¶¶ 6-9, 21-25; ECF No. 22-10 (Olive Decl.) at ¶¶ 6-7; ECF No. 22-13 (Chua Decl.) at ¶¶ 7-8; ECF No. 22-14 (Hirman Decl.) at ¶¶ 7-8. *See also* ECF Nos. 22-9 (Espinoza Decl.), 22-11 (Toczylowski Decl.), 22-15 (Tanigawa-Lau Decl.).

[30] ECF No. 22-5 (Freire Decl.) at ¶ 7; ECF No. 22-11 (Toczylowski Decl.) at ¶¶ 6, 9; ECF No. 22-13 (Chua Decl.) at ¶ 8. *See also* Dan Katz, *ICE Arrested a 6-year-old Boy with Leukemia at Immigration Court. His Family is Suing*, Texas Public Radio (June 25, 2025), https://www.tpr.org/border-immigration/2025-06-25/ice-arrested-a-6-year-old-boy-with-leukemia-at-immigration-court-his-family-is-suing.

[31] Defendants' reliance on *AILA* and *DHS v. Thuraissigiam* in this context is misplaced, as the portions they cite do not address irreparable harm. *Am. Immigration Laws. Ass'n v. Reno ("AILA"),* 18 F. Supp. 2d 38 (D.D.C. 1998), *aff'd,* 199 F.3d 1352 (D.C. Cir. 2000); *DHS v. Thuraissigiam,* 591 U.S. 103 (2020).

ECF No. 22-6 (Tabaddor Decl.) at ¶¶ 19-21. And there is very limited right to judicial review in expedited removal.[32]

*Second,* the other harms of expedited removal are unique and/or significantly amplified when compared to section 240 removal proceedings. For example, noncitizens in expedited removal lose the opportunity to apply for collateral immigration relief for which they are eligible, including adjustment of status, Temporary Protected Status ("TPS"), and Special Immigrant Juvenile Status ("SIJS"). *See* Mot. 29-31. Similarly, while detention and family separation are a possibility in section 240 removal proceedings, they are typical or even mandatory during expedited removal proceedings. *See* ECF No. 22-6 (Tabaddor Decl.) at ¶¶ 18-19; 8 U.S.C. § 1225(b)(1)(B)(ii); C.F.R. § 235.3(b)(4)(ii). This harm is illustrated most clearly by the recent arrests of paroled individuals at courthouses pursuant to Defendants' directives: these individuals were with their families and in community while they were in section 240 proceedings, then abruptly detained and separated from their families when they were processed for expedited removal.[33]

Defendants also attempt again to invoke the Supreme Court decision in *Doe*, specifically Justice Jackson's dissent, as indication that a stay isn't appropriate. However, Justice Jackson's dissent holds no precedential value, and the Supreme Court order is silent as to irreparable harm. *See Noem v. Doe*, No. 24A1079, 2025 WL 1534782 (U.S. May 30, 2025).

In parsing through each of the individually identified harms and trying to cherry-pick differences, Defendants miss the bigger point. While each harm on its own represents a significant consequence and a betrayal of noncitizens who followed lawful pathways to come to the United States, together they paint the full picture of the "certain and great" actual injury inflicted by

---

[32] Review of a negative credible fear finding by an Immigration Judge ("IJ") is limited in scope and based solely on the record of the credible fear interview, often conducted remotely via telephone or videoconference, and has no further judicial review. ECF No. 22-6 (Tabaddor Decl.) at ¶ 14.

[33] *See, e.g.*, ECF Nos. 22-5, 22-8 to 22-10, 22-13 to 22-15.

expedited removal. *Shvartser v. Lekser*, 308 F. Supp. 3d 260, 267 (D.D.C. 2018). They clearly amount to imminent "irreparable harm for which there is no adequate remedy at law." *Id.*

## V.     The Balance of Equities and the Public Interest Strongly Tip in Plaintiffs' Favor.

Defendants claim that the concrete and irreparable harms inflicted on the Plaintiffs' members are outweighed by abstract injuries to the government. In particular, Defendants claim great harm based on the mere fact that the district court's order contravenes the will of President Trump. Opp. 51. This ignores, however, that the public's primary interest is in government officials obeying the law that the people's representatives have enacted. *See League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) ("[T]here is a substantial interest in having governmental agencies abide by the federal laws that govern their existence and operations.") (internal punctuation and citation omitted); *see also R.I.L.-R. v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015). Although the President claims the "prompt removal" of noncitizens "not entitled to remain here" as a top priority, Opp. 51, "no law pursues its purposes at all costs," *Kucana v. Holder*, 558 U.S. 233, 252 (2010), and "there is a public interest in preventing [noncitizens] from being wrongfully removed, particularly to countries where they are likely to face substantial harm," *Nken*, 556 U.S. at 43. To the extent the government incurs any extra expense to subject removable noncitizens to regular removal proceedings rather than expedited removal proceedings, the public interest in the proper enforcement of the INA and affording noncitizens the process and rights it provides "out weighs any asserted financial harm" to Defendants. *Lofton v. D.C.*, 7 F. Supp. 3d 117, 125 (D.D.C. 2013) (internal punctuation and citation omitted).

## VI.     A Stay in Full of the Agency's Actions is Appropriate.

The relief Plaintiffs seek—a stay, which is "an interim or lesser form of [relief than] vacatur," *Texas*, 646 F. Supp. 3d at 769—is not overbroad. As the D.C. Circuit has explained, "when a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—*not that their application to the individual plaintiffs is proscribed*." *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (internal punctuation and citation omitted) (emphasis added). Other circuits have held the same. *See, e.g.*,

*E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 681 (9th Cir. 2021); *Career Colls. & Schs. of Tex. v. U.S. Dep't of Educ.*, 98 F.4th 220, 255 (5th Cir. 2024) ("Nothing in the text of Section 705, nor of Section 706, suggests that either preliminary or ultimate relief under the APA needs to be limited to [the associational plaintiff] or its members"); *D.C. v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 48 (D.D.C. 2020) ("Similarly [as with § 706], the APA's § 705 must be read to authorize relief from agency action for any person otherwise subject to the action, not just as to plaintiffs.").

A stay that temporarily "takes the unlawful agency action 'off the books'" is "an entirely appropriate response when a plaintiff successfully establishes" a likelihood "that the agency's conduct violates the law." *Kiakombua*, 498 F. Supp. 3d at 50. The Supreme Court's recent decision in the birthright citizenship cases does not hold otherwise and expressly reserves questions around scope of remedy in APA vacatur cases for another day. *See Trump v. CASA*, No. 24A884, 2025 WL 1773631, at *8 n.10 (U.S. June 27, 2025) ("Nothing we say today resolves the distinct question whether the Administrative Procedure Act authorizes federal courts to vacate federal agency action. *See* 5 U. S. C. § 706(2) (authorizing courts to 'hold unlawful and set aside agency action')."); *see also id.* at *19 (Kavanaugh, J., concurring) ("And in cases under the Administrative Procedure Act, plaintiffs may ask a court to preliminarily 'set aside' a new agency rule.") (citations omitted).

## CONCLUSION

Plaintiffs respectfully request that the Court issue a stay of the January 23 Huffman Memorandum, February 18 ICE Directive, and March 25 CHNV Termination Notice insofar as they subject individuals who have previously been granted parole at ports of entry to expedited removal.[34]

---

[34] Defendants assert in passing that "the Court should not grant relief without issuing the bond required by Rule 65(c)," Opp. 54, but ignore that Plaintiffs' motion is not under Rule 65, but rather 5 U.S.C. § 705, which has no bond requirement, *Michigan Citizens for an Indep. Press v. Thornburgh*, No. CIV.A. 88-2322, 1988 WL 90388, at *8 n.12 (D.D.C. Aug. 17, 1988) ("[T]he APA stay provision does not impose a security requirement."). Even if it did, no bond would be

Dated: July 1, 2025                    Respectfully submitted,

                                       */s/ Hillary Li*
                                       Esther H. Sung (CA00132)
                                       Karen C. Tumlin (CA00129)
                                       Hillary Li (GA0052)
                                       **JUSTICE ACTION CENTER**
                                       P.O. Box 27280
                                       Los Angeles, CA 90027
                                       Telephone: (323) 450-7272
                                       esther.sung@justiceactioncenter.org
                                       karen.tumlin@justiceactioncenter.org
                                       hillary.li@justiceactioncenter.org

                                       Carl Bergquist (*pro hac vice*)
                                       **COALITION FOR HUMANE IMMIGRANT RIGHTS**
                                       2533 West 3rd St, Suite 101
                                       Los Angeles, CA 90057
                                       Telephone: (310) 279-6025
                                       cbergquist@chirla.org

                                       *Attorneys for Plaintiffs*

---

appropriate here. *See, e.g.*, *Doe v. Noem*, 2025 WL 1099602, at *20 n.33 (D. Mass. Apr. 14, 2025) (declining to set a bond because, among other things, "requiring a bond would impose a substantial hardship on the Plaintiffs," and finding "a grave risk that imposing a bond would undesirably deter individuals from enforcing their procedural rights to challenge agency action affecting immigration decisions").

**CERTIFICATE OF SERVICE**

I hereby certify on July 1, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the District of Columbia by using the CM/ECF system. I certify by all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF filing system.

*/s/ Hillary Li*
Hillary Li (GA0052)
**JUSTICE ACTION CENTER**
P.O. Box 27280
Los Angeles, CA 90027
Telephone: (323) 450-7272
hillary.li@justiceactioncenter.org