IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

COALITION FOR HUMANE          )
IMMIGRANT RIGHTS ET AL.,      )
                              )
                              ) CIVIL NO. 25-872
         Plaintiffs,          )
                              )
v.                            ) Wednesday, July 9, 2025
                              )
KRISTI NOEM, et al.,          )
                              )
                              )
         Defendants.          )
_____)

TRANSCRIPT OF MOTION HEARING

BEFORE THE HONORABLE JUDGE JIA M. COBB
UNITED STATES DISTRICT JUDGE
---

APPEARANCES:    JUSTICE ACTION CENTER
                BY:  HILLARY LI
                     ESTHER H. SUNG
                     KAREN C. TUMLIN
                     TOM JAWETZ
                P.O. Box 27280
                Los Angeles, CA 90027
                323-450-7262
                Email: Hillary.li@justiceactioncenter.org

                COALITION FOR HUMANE IMMIGRANT RIGHTS
                BY:  CARL BERGQUIST
                2533 West 3rd St, Suite 101
                Los Angeles, CA 90057
                310-279-6025
                Email: Cbergquist@chirla.org

                For the Plaintiffs


COURT REPORTER:    CHANDRA R. KEAN, RMR
                   Official Court Reporter
                   333 Constitution Avenue, NW
                   Washington, DC 20001

```
APPEARANCES CONT'D:

                    U.S. DEPARTMENT OF JUSTICE
                    BY: PAPU SANDHU
                        TIM RAMNITZ
                        ARIC A. ANDERSON
                    Office of Immigration Litigation
                    General Litigation and Appeals Section
                    P.O. Box 868, Ben Franklin Station
                    Washington, DC 20044
                    (202) 616-9357
                    Email: Papu.Sandhu@usdoj.gov

                    For the Defendants
                            ---
```

**PROCEEDINGS**

(Court called to order at 2:12 p.m.)

DEPUTY COURTROOM CLERK:  Good afternoon, Your Honor.  We are on the record in civil case 25-872, Coalition for Humane Immigration Rights, et al. v. Noem, et al.

Starting with plaintiffs' counsel, please approach the podium and state your appearance for the record.

MS. LI:  Good afternoon, Your Honor.  Hillary Li for the plaintiffs.

THE COURT:  Okay.  Good afternoon.  Put everyone's appearance on the record, please.

MS. LI:  We have Esther Sung for the plaintiffs; Karen Tumlin for the plaintiffs; Carl Bergquist for the plaintiffs; and Tom Jawetz for the plaintiffs.

THE COURT:  Okay.  Good afternoon.

And for the defendants.

MR. SANDHU:  Good afternoon, Your Honor.  Papu Sandhu on behalf of the defendants, as well as Aric Anderson and Tim Ramnitz at counsel's table.

THE COURT:  Okay.  Good afternoon.

So we're here for a hearing on pending motions.

I'll hear from plaintiffs first.

MS. LI:  Good afternoon, Your Honor.  Again,

Hillary Li for the plaintiffs.  I am prepared to address the merits of our motion.  My colleague, Ms. Sung, will handle all non-merits.  And I'm prepared to just jump right in to merits and walk you through our arguments on our contrary to law and arbitrary and capricious claims around the expedited removal of paroled individuals, if that works.

THE COURT:  Okay.  I just have a threshold question about what's at issue and what's being challenged versus what's not.  I don't know if that falls into merit or another bucket.

MS. LI:  Sure.

THE COURT:  But you're not challenging the definition of "arriving alien" in the regulation, correct?

MS. LI:  That's correct.  We're not moving on that in this motion.

THE COURT:  Okay.  So I guess my question -- I want to start by having you respond to the government's argument that even absent the three, you know, documents, directives at issue that you're challenging, if you're not challenging the arriving alien definition or its use in the two regulations, then does that -- that doesn't prevent them from enforcing, implementing the regulations as written.

So what is your response to -- they raised it as a redressability issue.  What's your response to that?

MS. LI:  Yes, I think my colleague, Ms. Sung, can handle this.

THE COURT:  Okay.  I would just like to start -- if we can just answer that threshold question.

MS. SUNG:  Absolutely, Your Honor.  Esther Sung for the plaintiffs.

So with respect to the sole element of redressability --

THE COURT:  Can you speak -- come into the microphone a little bit?

MS. SUNG:  Sorry.  So sorry.

THE COURT:  No problem.

MR. SUNG:  -- that the defendants' dispute, I simply would like to point out that all the evidence before the Court paints a very clear picture that it's only after the defendants issued the three writings that are challenged in this lawsuit that the federal government began subjecting paroled individuals in a systematic fashion to expedited removal, including through immigration courthouse enforcement that involves attorneys moving to dismiss, regular removal proceedings so that ICE agents can immediately detain paroled individuals pursuant to the expedited removal process.

And there are 16 fact declarations from -- if I have it -- the number right -- from the plaintiffs and from practicing attorneys, some of whom who have practiced for decades, who all say that this -- these tactics have never been seen before.

And so even if the regulations remain on the books and are not challenged in this specific motion, if the Court stays the three challenged writings at issue in this case, in this motion, that will provide some relief to the plaintiffs.

THE COURT:  Even if the regulation that also contains language along the lines of what you're challenging remains on the books and thus can be enforced?

MS. SUNG:  Yes, because the evidence is very clear that the world in which the regulations were on the books and in effect is qualitatively different from a world in which the three challenged writings plus the regulations are in effect, and that the harms that the plaintiffs have articulated that their members are experiencing stem from these three challenged writings.

THE COURT:  Right.  But could the government still remove individuals who have been paroled under the regulations, even despite the writings at issue?

MS. SUNG:  Yes, under the regulations as

they're currently written, yes, correct.

THE COURT:  And so if you could just respond -- I know in -- what I understand you're saying is that in practice, those regulations have been on the books and were never enforced that way, and it's only this recent directive.  So I understand what you're challenging, but if you could just speak to -- if you're acknowledging that the government could take the same action under the regulations as they exist, and what's your best argument for redressability.

MS. SUNG:  Well, the relief that the Court grants need not completely relieve all of the plaintiffs' harms.  And I think, again, the evidence is very clear that there are very specific harms stemming from these challenged writings, and that if the Court stays those writings and returns the situation to the status quo, that is an improvement for the plaintiffs and their members, I would submit.

THE COURT:  Okay.  All right.  I just wanted to start with that threshold question --

MS. SUNG:  Of course.

THE COURT:  -- so we can -- if you want to start with the merits and then --

MS. SUNG:  Okay.  Thank you.

MS. LI:  I can start whenever, and let me make

sure this is working.

Okay. So before I jump into the merits, I just want to make one note on terminology for the record. In various places the statutes, regulations, and cases that we're discussing used the word "alien." This is not a word that our clients and their members feel identifies them, so I want to note for the Court that I will strive to use different terms, like "noncitizens," but at times I will use the term "alien," especially if I'm quoting directly from the law.

THE COURT: Okay.

MS. LI: On the merits, plaintiffs are likely to succeed in proving that the three agency actions challenged here, the January 23rd Huffman memorandum, the February 18th ICE directive, and the March 25th CHNV termination notice are contrary to law because they violate the expedited removal statute and they violate the agency's own procedures, and they are arbitrary and capricious.

The Court need only find for plaintiffs on either the contrary to law or arbitrary and capricious claim for plaintiffs to prevail on the merits.

Starting with contrary to law, the INA specifies only two very narrow categories of noncitizens who can be subject to expedited removal.

Defendants put forth a lot of distractions to try to steer the Court away from what the plain text of the statute makes clear.  Individuals who have been paroled into the United States at a port of entry are excluded from both categories and cannot be subject to expedited removal.

If we go straight to the statute, 8 U.S.C. 1225(b)(1), we can see from the title, structure of the statute, and text that it deals with two distinct groups of noncitizens.

First, aliens, quote, "arriving in the U.S."  Those are folks who are not yet here in the country.  And second, "certain other aliens who have not been admitted or paroled," but those are folks that are already present in the country.

And this second group, as Your Honor is aware, I'll also call the "expanded expedited removal" designation at certain points.

The fact that this second category of expanded expedited removal is subject to a discretionary designation by the attorney general is important as well.  It highlights the fact that these are two separate, nonoverlapping groups.  The folks that are in the "is arriving" group, who are not in the U.S., are always statutorily eligible for expedited removal.

Whereas, the additional group of noncitizens, who are no longer arriving, are eligible for expedited removal only if the attorney general has implemented a designation and subject to certain limitations.

So it's clear that we're dealing with two nonoverlapping groups, and regardless, the paroled individuals are not eligible for expedited removal under either. And so I'm going to walk through each category to clearly explain why that's the case.

I'm going to start with expanded expedited removal because the January 23rd Huffman memorandum and March 25th CHNV termination notice purport to expose paroled individuals to expedited removal under this category.

Per the statute -- which is a lot of text on the PowerPoint -- but per the statute, this category can only be applied to a noncitizen who is determined to be inadmissible under the inadmissibility grounds in 1182(a)(6)(C) or (a)(7) and meets two requirements: One, he has not been admitted or paroled. And two, he cannot prove that he has been physically present in the U.S. for two years.

Therefore, under the plain language of the statute, an individual who has been paroled is clearly and explicitly exempted from expedited removal under this

provision.

THE COURT:  You're reading that to mean has ever been paroled even if the parole is terminated?

MS. LI:  That is correct.

THE COURT:  So what is your response -- I believe the government cited a case, the Hewitt case, a recent Supreme Court decision where the Court determined that the phrase, "has not been imposed" refers only to something that does not continue to be true or valid so that there's a kind of current temporal understanding with that specific grammatical tense.

What's your argument in response to that?

MS. LI:  Yes.  Thank you, Your Honor.  Glad to have the opportunity to address the supplemental authority that defendants submitted.

So *Hewitt v. United States* actually supports plaintiffs' reading of the statute.  In *Hewitt*, the Supreme Court held that a criminal sentence, quote, "has been imposed" for the purposes of the First Step Act if and only if an offender's previous sentence has not been vacated.

The Court, I believe, was very clear in the language that they used here.  And the Court first affirmed that the use of the present perfect tense, like "has" or "has not," can either be used for an event that

is now completed or a past action that comes up to and touches the present.

Then in the context of the First Step Act's provision, the Court then held very clearly based on the nature and legal effect of vacatur, specifically in the case of vacatur, quote, "by operation of legal fiction the law acts as though the vacated order never occurred."  "A criminal defendant whose judgment of conviction has been vacated is to be treated going forward as though he were never convicted."

Therefore, in that situation, it makes sense that a vacated sentence would not count as a sentence that, quote, "has been imposed," that they act like it was never imposed in the first place.

In contrast here, a paroled individual whose parole ends or is terminated stops having active parole, but their prior grant of parole is not vacated or made as if it never occurred in the first place.  They don't stop being someone who has been paroled.

Defendants' arguments to the contrary simply fail to understand how parole operates within our immigration legal system.

For example -- there are several examples of this -- but after parole status has expired or been terminated, the paroled individual can still adjust

status.  Based on that grant of parole, the person isn't given unlawful presence for the period of time that they were here on parole, and if they did work on an employment authorization document attached to their parole, that period of work doesn't suddenly become unauthorized.

So essentially, the prior parole continues to have legal effect even if that person is no longer in active parole status.  So the termination of parole has neither the nature nor the legal effect of vacatur.

THE COURT:  Okay.  So it's -- just so I understand you, there's a distinction between something being terminated versus something being revoked or rescinded.

I think in the Supreme Court case the Court gave the example of some -- of an Olympic gold medal holder --

MS. LI:  That's right.  Olympic medal holder.

THE COURT:  -- whose medal is -- they're stripped of their medal because of some misconduct.

MS. LI:  That's right.

THE COURT:  And you're saying -- and that fits with what you're saying because you're saying in that situation something was rescinded or revoked as opposed to, you know --

MS. LI:  Or specifically vacated, yeah, and made so that it doesn't exist in the first place, which I assume is the case for Olympic medals, but I don't have firsthand experience with that.  And so what I do know is that when parole is terminated, it's clearly not vacated.

And to go back to the Supreme Court's very clear language, they concluded that a sentence has been imposed for the purposes of the Act's provision if and only if that sentence is extant, meaning it has not been vacated.  And so here we're dealing with --

THE COURT:  And you were telling me -- I just want to make sure, and if they're in your papers, you can just tell me they're in your papers.  But you were giving some examples of where parole might be terminated but still has legal effect.

Can you repeat what you had said?

MS. LI:  Yes, absolutely.  I don't know if those are in our briefs so I will certainly repeat them.

THE COURT:  Okay.

MS. LI:  So after parole has been terminated, the paroled individual can still adjust status, so they can still apply for a green card.  Based on that grant of parole, the person isn't given unlawful presence for

the period of time that they were here on parole, like if -- yeah, if parole was vacated, that would just kind of, poof, expire, I suppose.  And that's not the case.

And then for folks who got a work permit attached to their parole and worked on that work permit, that period of work doesn't suddenly become unauthorized.  I think those are very clear examples.

THE COURT:  I guess I'm trying to understand how the Supreme Court's discussion of the specific verb tense maps on to what you're saying.  Meaning, you know, if you look just at the words used, if that -- if they're saying that suggests something that continues to the present, I get in the context of a sentence being vacated then it's not something that continues to the present.  But if something is terminated, I'm -- I understand the distinction you're drawing.  I'm just trying to map it on to the specific language the court used in considering the grammatical tense.

MS. LI:  Sure.  I mean, I think I read --

THE COURT:  Because the status has ended at that point, right, when you're --

MS. LI:  Right.  You don't have active parole.

THE COURT:  You don't have active parole.

MS. LI:  Right, but that doesn't change the fact that you have been paroled or that you are a person

that has been paroled in the past.

And I think there's other arguments in our briefing that I can also go over about why the language should be used that way, but when it comes to the Supreme Court's decision in *Hewitt*, I read Justice Jackson's opinion very closely to say -- where she says we conclude that a sentence, quote, "has been imposed for purposes of the Act's provision if and only if that sentence is extant," or like surviving.

And so to me that -- to us, when we read that, it means that as long as the sentence is not vacated -- I guess you can look at the reverse -- if the sentence is not vacated, then it still has been imposed in the past.

THE COURT:  So I'm just looking at the -- pulling up the exact language.

"When used in this way, the present perfect tense conveys to a listener that the event in question continues to be true or valid."

That doesn't seem to turn on the manner in which the event is terminated, whether it expired, terminated, was rescinded, or revoked.  So I guess that's the difficulty.  I understand the argument you're making.  I'm just having difficulty understanding if the Supreme Court has said that tense conveys to a listener that the event in question continues to be true, how does that

map on to -- and the event in question here is the parole status, right?  And so if you're no longer paroled, how does the use of the past perfect tense convey to the listener that that event --

MS. LI:  Because I think the event that is still true is that they have been paroled.  They were paroled previously.

THE COURT:  Well, the "has been" is the tense we're looking at, and the event is paroled.  Like in the context of the gold medal, the event is winning the gold medal.

MS. LI:  Right.

THE COURT:  And the question is:  What does that tense convey to a listener about the person's current status?

MS. LI:  Yeah, and I think the full context of -- I think I'm only looking at the syllabus right now, but I can try to find it in the decision.  But here it says, "the present perfect tense can refer to an act, stay, or condition that is now completed or a past action that comes up to and touches the present," and then the rest of what you said, and thus conveys that the event in question continues to be true or valid.

And I think I would read this part about the grammar in conjunction with the legal effect of vacatur

section, and that is kind of how we get to the fact that as long as it's not vacated it still exists, and so that fact that this person has been paroled is still true, still valid up until now, even though they're not currently under parole, active parole status.

THE COURT:  Okay.  You can continue.

MS. LI:  So I think -- I guess on this point, defendants do concede that while someone is on active parole they are not amenable to expanded expedited removal.  But they argue that this phrase, "has not been paroled," should be read to allow for expedited removal after the person's parole has ended.

This, like I was saying, violates the plain text of the statute, but I think the most obvious way that it does is that it renders the protection from expedited -- excuse me -- expanded expedited removal that Congress gave paroled individuals completely meaningless.

Defendants say that the protection extends only while parole is active, but they also take the position that they can terminate parole at any point by simply serving an expedited removal charging document. Therefore, defendants would like the Court to believe that Congress protected paroled individuals from expedited removal unless and until DHS decides to subject them to expedited removal.

So this circular logic gives no effect at all to the limits that Congress placed on the agency's ability to use this unprecedented and extraordinary summary removal process.  An interpretation of the statute that renders provisions in the text meaningless like this must be rejected.

Additionally, the fact that Congress exempted both people who have been paroled and admitted from expanded expedited removal supports our reading that "has been paroled" should refer to a historical fact that cannot be undone even if the person loses lawful status, meaning if they have their parole terminated.

And to say more on that, the terms "admission" and "admitted" are defined in the immigration laws at 8 U.S.C. 1101(a)(13)(A), as, quote, "The lawful entry of the alien into the United States after inspection and authorization by an immigration officer."

This definition very clearly turns on the way that the person came into the U.S., which is distinct from the person's lawful status in the U.S.  Like someone can be admitted and have a visa and then that visa is no longer valid, but that doesn't change the fact that they have been admitted.

And parole can be a way -- both a way of coming into the United States and a status, but since it's

paired here with the term "admitted," we think that that is an indication that we should read "has been paroled" like "has been admitted" to refer to the way that someone comes into the United States, they've gone through inspection, they were granted permission into the country, and it should not refer to the maintenance of a particular legal status.

Finally, on expanded expedited removal, DHS's own regulations on expedited removal at 8 C.F.R., Section 235.3 similarly confirm that expanded ER only applies to people who have not previously been paroled into the country without regard to their current parole status.

This is all laid out in our briefing, but I just want to point the Court in particular to 8 C.F.R., 235.3(b)(6), which requires that before being subjected to expanded expedited removal, a noncitizen be given the opportunity to prove that he, quote, "was paroled into the U.S. following inspection at a port of entry, not that he is currently on active parole status."

Again, this focuses on the way that the person came into the U.S., not their current status, and it affirms that an individual who can prove that he was previously paroled into the U.S. can't be subject to expanded expedited removal.

So defendants' policies that we're challenging here violate these regulations per the Accardi Doctrine.

Defendants point to certain regulations that they say stand for an opposing view, but even if that's the case, when there are conflicting regulations like this, as you can see on the slides -- we've shown ours here, and the ones that defendants pull out here -- those regulations cannot go beyond what the statute allows. And as defendants agree in their opposition, the statute is what controls. And so if we focus on the statute, it supports plaintiffs' reading.

THE COURT:  Can I just ask you about the issue of conflicts between regulations?

Is it your position that the APA imposes a requirement that separate agency actions be consistent with one another?

MS. LI:  I think it's -- under the Accardi Doctrine, the government has the responsibility -- or is required to abide by their own regulations, and that I think is what we're trying to get at here with the regulations.  Maybe I mis- --

THE COURT:  Is that the relevance of the arguments about inconsistencies that --

MS. LI:  Oh --

THE COURT:  -- it makes it difficult for them

to comply with inconsistent regulations so that's the problem?  Or are you suggesting that there's some --

MS. LI:  So, yeah, so --

THE COURT:  -- problem with inconsistent reg- -- that the APA imposes a requirement of regulations or separate agency actions directives, et cetera, be consistent with one another?

MS. LI:  Thank you.  Thank you for clarifying. I think I misunderstood at first.

I think our argument is -- about the inconsistent regulations is that we are pointing to regulations that support our reading of the expedited removal statute. The government comes back with provisions that they say supports an opposing view that paroled individuals can be subject to expedited removal under the regulations.

I think our overarching point is that the regulation can't do anything beyond the statute.  And at the end of the day, the statute is what controls, and so we don't need to get into all of the conflicting regulations that do exist.

And also, just -- we can get into arbitrary and capricious, but they also need to be consistent with the law and with each other --

THE COURT:  I'm jumping around, sorry.

MS. LI:  I'm sorry?

THE COURT: I said I'm jumping around. So I'm taking you to the arbitrary and capricious argument when we were elsewhere, but it just popped in my head so I just wanted to ask.

MS. LI: Oh absolutely.

So yeah, and I think the last thing I want to point the Court to is just an exhibit that we attached to our reply where the DOJ has also adopted plaintiffs' view of the statute, the expanded expedited removal statute specifically, in a separate individual challenge, Mata Velazquez, which -- that we provided as attached as an exhibit. And this is where the government stated that the petitioner who is a paroled individual is not subject to expanded expedited removal under, yeah, the designation.

So the February 18th ICE directive, on the other hand, purports to use the provision of expedited removal in 8 U.S.C. 1225(b)(1)(A)(i) to subject paroled individuals to expedited removal with no time limit.

And here, again, the defendants are in violation of the statute because that provision can only be applied to a noncitizen who, quote, "is arriving in the United States. A noncitizen who came to a port of entry, was inspected and paroled into the country and has been here for years, or even decades, cannot be defined as someone

who is arriving in the United States under the expedited removal statute."

The evidence, again, is in the statutory text. First, I think it's common parlance and also grammatically correct to say that Congress's use of the present progressive tense "is arriving" means that this category of expedited removal can only be applied to people who are currently in the process of arriving at a port of entry.

When someone has arrived, like plaintiffs' members who have been granted permission into the country, they're no longer in the process of arriving.

I mean, and if we go back to the point I was making at the beginning that the title and structure of 1225(b)(1) divides the noncitizens that can be subject to expedited removal into two distinct and nonoverlapping categories, that supports this understanding.

Essentially, if the first category applies to people who are in the process of arriving who are not in the country yet and the second category applies to folks who are already in the country for some length of time subject to the limitations, then the fact that Congress carved paroled individuals out of that second category, we think, is -- support that paroled individuals belong

in that category of people who have already arrived, and without the carve-out they would have potentially been subject to expedited removal under that category.

Other provisions -- oh, I forgot to move the slides, but that's okay.

Other provisions of 8 U.S.C. 1225 reinforce plaintiffs' reading that the process of arrival, as used in the same statute that created expedited removal or has expedited removal, is one that occurs at the border or at the moment of arrival.  And so Congress saw those who were arriving as distinct from people already present in the U.S.

I'm not going to read all of them, but, for example, Section 1225(d)(2), which is the authority to order detention and delivery of, quote, "arriving aliens" authorizes the detention of noncitizens arriving on the vessel or aircraft bringing the noncitizen to the U.S. or at the airport of arrival.

So clearly, in all of these examples, "arrival" or "arriving" is contemplated at -- in 8 U.S.C. 1225 to take place at that point of arrival.  It is not a forever status that someone hangs on to after they've entered and been present in the U.S.

And I think, again, the clearest way to articulate why this is a statutory violation in addition to

violating the plain text is that defendants argue that a noncitizen who came and was inspected, paroled into the country, and has been residing here remains indefinitely in the process of arriving in the U.S. for the purposes of expedited removal.  But this interpretation, again, effectively reads out of the statute the protections included in expanded expedited removal for paroled individuals.

Essentially, defendants are saying that if there's a paroled individual here, they can subject them to expedited removal under the "is arriving" provision -- excuse me -- at any time, including when their parole is active.  And so if that's the case, it really truly means nothing for the statute to explicitly exempt those same individuals from expedited removal under the expanded expedited removal provision, even if we -- if we accept defendants' point that the purpose of that is to only protect folks under -- while their parole is active -- which we don't agree with, obviously --

THE COURT:  Can I ask you a question again?  I might be jumping around.

There is a lengthier footnote in your reply brief where there was an argument that the history of the, quote, "arriving aliens" definitions under different iterations of the regulations support your argument.

And I just wanted to know if you had -- could expound on that or explain.

I think it was Footnote 20 of the reply brief.

MS. LI:  Yes, I'm sorry, could you repeat which footnote you're referring to?

THE COURT:  There was a Footnote 20 in your reply brief where, at least I read it to argue, that the history of the arriving aliens definitions under different iterations of the regulations supports plaintiffs' argument in this case.  And I didn't know if you could expound on that or explain.

MS. LI:  Right, okay.

THE COURT:  Put a finer point on that point.

MS. LI:  Yes.  Okay.  So that is the footnote where we talk about the amendments to the regulations?

THE COURT:  Yes.

MS. LI:  Okay.  Yes, I'm happy to.

So essentially what this footnote and this evidence stands for is that for more than three decades DHS itself actually agreed with plaintiffs that the statute does not require paroled individuals to be considered arriving.  Defendants' argument is that paroled individuals are always arriving, forever arriving.  That's required by the statute.

But that is not the case, as I've been explaining.

And also, the agency itself has recognized that when, in 1998, it amended the regulation that defines arriving alien to remove two large groups of paroled individuals from that definition.  And that's all of those paroled into the country at ports of entry before April 1st, 1997, and all of those paroled into the country on or after that day pursuant to advanced parole.

And so essentially the -- in doing this, the agency said that it was making a discretionary policy decision. It said, quote, "as a matter of policy," it was excluding these people.  It didn't say that it was because of the text of the statute.  It wasn't because the statute was somehow construed to incorporate, you know, this understanding that paroled people are always arriving.  It didn't say anything about that.  And the fact that it was a policy choice emphasizes that it wasn't required by the statute.

THE COURT:  Okay.

MS. LI:  Yes, and I think -- another thing I want to address when it comes to the "is arriving" argument, to make sure that I'm very clear on plaintiffs' position here, is that defendants point repeatedly to the parole statute to argue that a paroled individual should be considered to be arriving because after the purposes of parole have been served, in

defendants' words, the paroled individual, quote, "reverts to the status of an applicant for admission," quote, "standing at this threshold of entry."

And I quote from defendants' words because this misstates the parole statute, which actually doesn't say reverts or standing at the threshold of entry at all. All it says is that a paroled individual's case, quote, "shall continue to be dealt with in the same manner as that of any other applicant for admission into the United States."

THE COURT:  Can you give me the cite for that?

MS. LI:  Absolutely.  8 U.S.C. 1182(d)(5)(A).

And so -- to get to what it means.  But essentially what it means is that a paroled person, after their parole has terminated, they'll just continue to be treated as an applicant for admission.  But if we look at this slide, the same statute on expedited removal tells us why this actually does not support defendants' reading at all or their interpretation.

So in 1996, in IIRIRA, at the same time that Congress created expedited removal and amended the parole statute to alter the conditions for granting parole, it also defined applicant for admission.  And in 8 U.S.C. 1225(a)(1) the statute defines the term "applicant for admission" to include both a noncitizen

present in the United States who has not been admitted and one who arrives in the United States.

And so just to make it very clear, because parole is not an admission, a paroled individual is always an applicant for admission.  That is, they can always be subject to the inadmissibility grounds and removed on those grounds.  That is true both when they have parole, and, according to the parole statute, after that parole is terminated.

And so that's all the parole statute is saying, and defendants are using it to back up their argument, but it's an inaccurate characterization of the parole statute because clearly, as you can see from this slide, the definition for applicants of admission is much broader.  And in the same statute, Congress then defined much narrower subsets of people who could be subject to expedited removal.

They didn't say that all applicants for admission could be subject to expedited removal, they were also amending the parole statute at the time, and they didn't say anything in there about how -- once people have their parole terminated then they would be subject to expedited removal or can be considered arriving. Nothing like that.  And we have to give these choices that Congress made in this statute meaning.

And so these are all of the indications that a paroled individual being treated as an applicant for admission does not equate them being considered as arriving for the purposes of expedited removal.

And finally, the last thing I want to say on the "is arriving" piece is that, kind of similar to what I was already getting at here, defendants also argue that Congress legislated expedited removal against what we know as the entry fiction.  But even if the concept of the entry fiction may continue to apply for due process purposes, as Your Honor is aware, it does not mean that Congress like -- necessarily mean that Congress applied the entry fiction to the creation of this new expedited removal process, and defendants provide no evidence that they did.

But also, even if the Court -- if the Court were to try to apply the entry fiction and treat paroled individuals as forever arriving, it creates a statutory scheme and, like, statute construction that doesn't make any sense and reads out of the statute other protections that Congress intentionally included, which is going back to the point I was making earlier, that if someone is treated as forever arriving and always subject to expedited removal even when their parole is active, there's no purpose to the carve-out for people who have

not -- or have been paroled -- excuse me -- in expanded expedited removal.

So agency decisions premised on an incorrect understanding of the law cannot stand, and plaintiffs are likely to succeed on their contrary to law claim.

I'm happy to move on to arbitrary and capricious, unless you have any additional questions.

THE COURT:  I do have some additional questions about the March 25th CHNV termination notice, and that is to ask you to put a finer point on precisely what you're challenging.  And to the extent that you're seeking a stay or vacatur, your position on whether the Supreme Court's recent *Doe* decision precludes that in any way.

MS. LI:  The recent *Doe* -- oh, yes, the recent *Doe v. Noem* decision.

So first on the CHNV termination FRN, we are asking for this to be stayed only insofar as it purports to subject parole individuals to expedited removal.  We're not asking for a stay of the entire notice or anything related to the parole terminations in this case.

It's -- I'm trying to find the language, but the FRN makes very clear that DHS intends to put CHNV parolees whose parole has been terminated through expedited removal, and so that is the scope of our

request there.

And then when it comes to the Supreme Court's grant of the stay of the stay in --

THE COURT:  Yeah, I called it the decision, but ruling.

MS. LI:  Yes, their ruling.  What I'll say there is that the Supreme Court provided no reasoning whatsoever.  They provided just their decision with no explanation, and so we can't use that -- that doesn't have any effect on our arguments here.

THE COURT:  And are you speaking about irreparable injury?

MS. LI:  No, my colleague can handle that, if you'd like to go there.

THE COURT:  Yes.

MS. LI:  Absolutely.

Would you like me to talk through arbitrary and capricious or --

THE COURT:  No, my only question that I asked out of turn had to do with, you know, the -- how the APA looks at or what's required in terms of consistency among agency actions and whether you're taking the position that there's a requirement that separate agency actions have to be consistent with one another.

MS. LI:  Yeah, I think that the APA does

require that if there is this inconsistency like this, that it has to be explained, like -- the way we look at it is from the January memo to the February directive to the March notice, there's this flip-flopping of what legal authority they're using to subject paroled individuals to expedited removal with absolutely no recognition of the fact that there has been that change. Also no explanation of why they're subjecting expedited people -- excuse me, paroled people to expedited removal, no consideration of relevant factors, as we briefed in our papers.  So the APA certainly requires more than no explanation.

THE COURT:  Okay.  Thank you.

MS. LI:  And, yes, my colleague can respond on irreparable injury.

THE COURT:  I guess my first question for you is what is your position about the irreparable harm plaintiffs' members would face under expedited removal that they would not face under standard removal proceedings.

MS. SUNG:  Sure.  I would point the Court first to the Ashley Tabaddor declaration, which lays out key differences between regular --

THE COURT:  I'm sorry, can you -- which declaration?

MS. SUNG:  Ashley Tabaddor.

THE COURT:  Okay.

MS. SUNG:  I believe it's the fourth declaration attached to our motion, if I'm not mistaken, but it lays out the key differences between expedited removal proceedings and regular removal proceedings. And then in addition to that, the declarations themselves -- the fact declarations that we submit illustrate this.

For example, the case of E.M.P., who is -- whose story is outlined in Jessica Olive's declaration.  He was in regular removal proceedings before he was then subjected to expedited removal proceedings when he appeared at his immigration court hearing.

And so there is a big difference between him being in expedited removal proceedings with easy access to an attorney, him being in his community with his family, and him being detained with very limited access to his attorney, and, again, only being given the opportunity to have a credible fear interview.

And so --

THE COURT:  And I appreciated from many of the declarations the harm of potentially being returned somewhere that's dangerous where you could face persecution, violence on a protected basis.  But what's

your response to the defendants' argument that the credible fear procedure under the expedited removal process is sufficient in that some of the declarations seem to support that -- given some of the declarants had such a finding made during the course of their procedures?

MS. SUNG:  Sure.  It's not sufficient because all you can articulate is a fear of being returned.  And so, for example, I believe it's E.I.R.M who is -- whose story is detailed in the Andrew Freire and the Lindsay Toczylowski declarations.  He's engaged to a U.S. citizen.  And in fact, he was detained when they were driving to California to celebrate his birthday.

And so the fact that he is engaged to a U.S. citizen and had -- potentially has an avenue to lawful permanent resident status through his future marriage to his fiancee is not something that can be raised in a credible fear interview that will get you a positive credible fear determination.

And so the fact that he, among other -- other plaintiffs -- excuse me -- other declarations outline, for example, asylum applications, the ability to adjust status under the Cuban Adjustment Act.  None of those avenues toward other lawful status that would foreclose deportation get you anywhere in a credible fear

interview.  The only thing that is considered in the credible fear interview is whether you have a credible fear of being returned to a country where you face persecution or death.

And so a person can have an avenue toward, again, lawful status here in the United States that would foreclose removal, but it doesn't mean anything in the expedited removal process.

THE COURT:  And are you speaking to standing?

MS. SUNG:  Yes, I am.

THE COURT:  I would be interested in your response to what I understand the defendants' arguments to be that your declarations in this case are insufficient for -- to confer standing as compared to the *Make the Road* -- earlier *Make the Road* decision that the Circuit decided in 2019, I believe.

MS. SUNG:  Yes.  And so I would submit that the evidence that we've provided here is no different.

What Judge Jackson focused on in that case was that there was evidence of harm to the plaintiffs' members. We have submitted evidence through the declarations of Mr. Escobar, Ms. Salas, and Ms. Lawrence documenting evidence of harm to the plaintiffs' members.  And so if the Court is going to require a sworn declaration, these declarations are sworn.

The key point that Judge Jackson -- then-Judge Jackson relied on was that there was evidence of harm, and we would submit that this Court has ample evidence of harm before it.

I would also just like to put a finer point on the effect of the *Svitlana Doe* case since you asked my colleague about that.  So the *Svitlana Doe* case concerns the categorical and premature termination of parole for some half a million individuals.  And that's not what we're challenging here in this case.  We are challenging the fact that the federal government wants to subject those half million individuals to expedited parole -- excuse me, expedited removal.

So the relief that's being requested and the facts at issue in this case, including the facts as to harm, are different.  And so anything that you can infer from the Supreme Court's stay in *Svitlana Doe*, which again is one paragraph, there's no reasoning and no analysis, just factually it doesn't apply to this case.

THE COURT:  Okay.

MS. SUNG:  Are there other specific questions that I -- I don't want to waste the Court's time.

THE COURT:  No, I don't have any additional questions at this point.

MS. SUNG:  Okay.  I mean, the only other thing

I would like to bring up before I sit down is your question about redressability at the beginning.

THE COURT:  Yes.

MS. SUNG:  And I think that if you -- if you take that question again to sort of its logical conclusion here, if the Court is inclined to grant relief here as to the three challenged writings, and if the basis for the Court's ruling is that the writings have to be stayed because they are contrary to the statute -- then you asked if the federal government could continue subjecting paroled individuals to expedited removal simply under the regulations that pre-existed.

We mentioned this I think in Footnote 13 of our reply brief.  It would be irregular for the federal government to continue removing paroled individuals through expedited removal under regulations that don't comport with what the statute allows.

And this is similar to how declaratory judgment relief is sufficient to support redressability because we presume that the federal government will comply with the finding that their actions don't comport with the statute.

And if the defendants do end up taking steps to subject parole beneficiaries to expedited removal under

the regulations, we would be back here in front of this Court. We have challenged the regulations in the complaint, in the amended complaint, but they're not at issue here in this motion. We're focusing on the writings that clearly have caused the harm that we are asking the Court to address in this motion.

And so with regard to the regulations, I would just say that's a future issue because that's not -- these expedited removals happening pursuant to the regulations is not what's happening today and not what we're challenging.

THE COURT: Okay. Thank you.

MS. SUNG: Thank you.

THE COURT: Okay. Whoever is speaking for defendants.

MR. SANDHU: Good afternoon, again, Your Honor. Papu Sandhu on behalf of the defendants.

Your Honor, if it's okay, unless you have questions that you want to ask at the outset, I would begin with redressability.

THE COURT: Sure. I do have one kind of what I'll call a threshold question. And that has to do with your argument that essentially what plaintiffs are seeking here is a prohibited injunction through their motion under 705, and I just wanted to kind of

understand that better.

It was my understanding that -- well, at least there's precedent suggesting that vacatur under APA Section 706 is not considered an injunction for purposes of the statute.  And so then, to me, it would follow that if there's precedence suggesting that that's not a prohibited injunction, then a stay pursuant to 705 wouldn't be either.

So if you could just expound on the government's position that the relief plaintiff seeks is foreclosed by the statute and, you know, what authority do you have contrary to the authority that I've seen that suggests that this is a different situation than an injunction.

MR. SANDHU:  Right, and so I think Your Honor was referring to Section 1252(f)(1).

THE COURT:  Yes.

MR. SANDHU:  The bar on injunction relief.

THE COURT:  Right.  And specifically whether what -- plaintiffs are arguing that they're not seeking an injunction.  And it's my understanding that there's precedent that in the context of vacatur under the APA, that that's not considered an injunction for purposes of that very statute.

So it seems to me that if -- if there's authority suggesting that vacatur under 706 is not an injunction

for purposes of 1252(f)(1), it seems to follow that a stay wouldn't be a prohibited injunction either, so --

MR. SANDHU:   Right.

THE COURT:   -- yes.

MR. SANDHU:   And I understand your question.

As I understand it, Your Honor, there is no binding precedent.  And this is an open question in this Circuit, in fact, as was alluded to this morning.  The D.C. Circuit issued a decision recently in the *Dixon* case in which it clarified the scope of Section 1252(f)(1).  And it adjusted the law as it was previously under the *Grace* decision because of the intervening decision in *Almonte*.  And what the D.C. Circuit said was that (f)(1) could apply.  It didn't address the 705 question, but it did say that (f)(1) can apply to agency -- to enjoined agency actions -- or I'm sorry -- to cover agency actions and not just the operation of the statutory provisions.  That was the holding in *Almonte*.

So the government's position is that it does apply and that it's an open question for this Court, that there's no binding case law in this Circuit.  And we would say especially in this case that it's appropriate, because when you look at the complaint and the prayer for relief in this case, they do ask that the Court,

quote, "enjoin the defendants from applying expedited removal to noncitizens who have been granted parole at ports of entry."  That is their prayer for relief in the amended complaint, Paragraph 5.

And on Page 1 of their stay motion, they say very clearly that they move to stay the defendants' unlawful actions to apply expedited removal to hundreds of thousands of people who have been paroled at ports of entry.  That sounds like very broad injunctive relief. And so part of that argument is essentially that's what they're seeking by seeking to stay these agency documents.

THE COURT:  And I just want a better understanding of what the government's position is about what the Court's authority is with respect to relief it can grant.  Because the statute clearly contemplates review, in this court in particular, as it pertains to the expedited removal system.

So what is your -- given that, you know, I have the authority to review agency action as outlined by the statute -- I know it's cabined, but there is review in this court.  What is the type of relief that the government contends this Court can provide under the statute?

MR. SANDHU:  What's permissible under

Section 1252(f)(1)?

THE COURT:  Yes.

MR. SANDHU:  In the expedited removal context?

THE COURT:  Yes.

MR. SANDHU:  And I'm glad you raised that because I did want to clarify with my office.  I was here this morning.

THE COURT:  Okay.

MR. SANDHU:  So we would take the position that the only relief that is available is for individual plaintiffs, because Section 1252(f)(1) specifically carves out an exception for individual plaintiffs.

So individual plaintiffs who can show an injury, that they have been impacted by a rule or by a certain guidance, and can succeed on the merits can seek vacatur of their specific expedited removal order.

So under (e)(3), if they bring a systematic challenge to some aspect of expedited removal, an individual can proceed and the Court can issue the relief of vacatur of the expedited removal order in the specific individual case.

THE COURT:  Okay.  And then -- so how do you square, then, the D.C. Circuit, what I read to be the precedent about associational standing in this context, and standing in for -- a member organization standing in

for an individual plaintiff in the way that these plaintiffs are attempting to do?

I guess I read the precedent to endorse associational standing, notwithstanding the language that you cited, and understanding, you know, what the court in *Make the Road* discusses.

What's your position on that?

MR. SANDHU:  You mean granting (f) --

THE COURT:  Allowing an organization to bring this challenge, this type of challenge.  Because you're saying it's -- my authority is limited to individual -- review of individual plaintiff cases.

MR. SANDHU:  Right.  So that would exclude any specific relief in this context, and it would have to be brought by an individual plaintiff.  That's the government's position.

THE COURT:  And what is the authority for that in light of --

MR. SANDHU:  Well --

THE COURT:  There is -- you're saying there is no associational standing for this type of claim?

MR. SANDHU:  There's -- there is no remedy that the Court can provide, except the remedy of vacatur for an individual plaintiff.  That is -- I think what we're saying is -- because your question is going to Section

1252(f)(1).  We wouldn't say that, you know, in different -- in other contexts you can't raise a claim of associational standing but --

THE COURT:  Right.  Well, in an association -- in an organizational -- I don't want to mix organizational standing with associational standing, but in a case involving an organization, assuming that there's associational standing available, what relief can the Court grant in the context of a case involving a plaintiff association -- asserting associational standing?

MR. SANDHU:  So since that's not an individual plaintiff bringing the claim, there would be no injunctive relief, the Court can rule on the merit certainly.  Right?  As --

THE COURT:  So declaratory relief?  Essentially declaring --

MR. SANDHU:  I wouldn't say declaratory relief, but it could adjudicate the merits.  And if --

THE COURT:  And give no remedy?

MR. SANDHU:  And if the, you know -- if the D.C. Circuit agreed with that, then that would be Circuit law, I guess, but --

THE COURT:  But if I can't -- if I can't give a remedy, then is -- I mean, part of the process here is

that there's an injury that can be redressed through a ruling which presupposes that there's some relief that I could give.  And so if you're acknowledging that an association under Circuit precedent can bring these types of challenges -- or are you saying an association can't?

I know you have a problem with plaintiffs' standing, but just as a general principle of Circuit law, there's no per se bar.  And you agree that the Circuit has said, you know, associational standing has -- has blessed associational standing in these types of challenges.

MR. SANDHU:  Right, but under Section 1252(f)(1) there's no remedy for that.

THE COURT:  Well, I guess that's what I'm --

MR. SANDHU:  Yeah.

THE COURT:  Maybe I'm confused.  If the association or organization can bring a lawsuit -- but you're saying they can bring the suit but the Court can't issue any relief.

MR. SANDHU:  That's our position under 1252(f)(1), Your Honor.

THE COURT:  Okay.  I don't -- is there any other circumstance in which there's standing to bring a lawsuit but -- and jurisdiction for the Court to hear

the merits but no authority for the Court to provide any relief?

MR. SANDHU:  I would have to --

THE COURT:  I mean, I don't even -- I'm not even familiar of -- the idea that you can have a judgment without a remedy.  I mean, what would anyone appeal?  You're appealing a final judgment.

I mean, can a Court issue a judgment without a remedy?  I'm not familiar -- I mean, I'm not familiar with that.

MR. SANDHU:  We can submit further briefing on that question, Your Honor.  I'm not sure exactly.

THE COURT:  Okay.

MR. SANDHU:  But if I could begin with redressability, because I think what my friend answered this morning -- this afternoon, I'm sorry -- I understand their position to be that they're not challenging the arriving alien definition at 8 C.F.R., Section 1.2, and they also seem to concede that the government could continue to implement that provision along with Section 235.3 to apply expedited removal to aliens paroled at a port of entry.

And if that's the case, then based on those concessions, I think the Court should deny the motion based on lack of standing -- Article III standing for

redressability.

THE COURT:  Well, can I ask about that?

Is it typical -- sometimes there are many purported legal authorities that could justify executive agency action.  And -- is it the case that if -- that a plaintiff doesn't have standing to challenge an agency action just because there might be some other legal authority under which the government could achieve that objective?  I mean, is that usually how we look at standing?

You know -- and I guess my -- and I pressed plaintiffs on this, but I'll press you.  You know, they're challenging very specific directives, and they're asking for relief with respect to those directives.

MR. SANDHU:  Right.

THE COURT:  And even if it is the case that another statute, regulation, et cetera, the government could find a legal way to pursue the same objectives, or a different way to pursue the same objectives, does that mean that they -- that a plaintiff doesn't have standing to challenge whatever they're challenging in the lawsuit?

And do you have any authority where the Court has done that and said, well, you know, there's another

legal avenue where the government could achieve the same objective so I'm going to find you don't have standing to challenge the agency action at issue?

MR. SANDHU: Yeah, I think that is true. And I think -- the fact that they're not challenging Section 1.2 is, I think, because they're out of time to challenge that, so they're trying to get around that problem.

But if you were to look at Justice Gorsuch's concurring opinion in *United States v. Texas*, 599 at U.S. -- at 691 through 692, it's a similar scenario there where Justice Gorsuch is saying, although it is a concurring opinion, that even if the Court were to invalidate the agency guidance on prioritization of prosecutorial discretion in the immigration context, that the agency would still have discretion under the prior law, or the law without the agency documents to proceed the way that it wanted to. And it said in that case that, you know, federal officials could still implement the policies under the authority that it pre-existed the agency memoranda.

And the argument was raised in that case similar to what the plaintiffs argue here, which is that -- well, they argued in that case that if the Court issued a decision invalidating the agency procedures or

documents, that that -- that the decision itself would contain an analysis that would, you know -- that if it indicated that the government was not lawfully construing the statutory provisions, that that would somehow cause the government to follow the -- follow, you know, the Court's sort of path that it set out in the decision.

And Justice Gorsuch in that concurring opinion rejected that, saying that that was not relevant for purposes of redressability, and said, "It is a federal court's judgment, not its opinion, that remedies an injury; thus, it is the judgment, not the opinion, that demonstrates redressability."  So that would be sort of an analogous situation.  And we would ask the Court, given the concessions, that it deny the motion.

I would just add one other thing.  The plaintiffs point to a timeline and argue that the recent actions of applying expedited removal to paroled individuals have to be based on these documents because of the timeline that was set out.

However, the Huffman memo, which is the primary memo that they rely on, which is dated January 23rd, and the plaintiffs did not move for a stay until June 11th. So if it were these documents, that seems to be undermined or belied by the very timeline that they rely

on.

THE COURT:  Are you -- just me kind of understanding what's happening on the ground.  Are you aware of DHS or its predecessors ever applying or subjecting to expedited removal procedures individuals who had been previously paroled but whose parole terminated for whatever reason?

MR. SANDHU:  I'm not, Your Honor.

THE COURT:  Okay.

MR. SANDHU:  I --

THE COURT:  Is it your understanding that it had not previously been extended in that way or enforced or applied in that way?

MR. SANDHU:  My understanding that -- so I haven't found a specific example.  I can certainly go back to the agency and ask further.  But I was referred to a 2011 memo that -- guidance memo that sought to encourage the immigration officers to consider expedited removal for aliens who were paroled for prosecution purposes and for other reasons as well.

So there is -- at least we do believe that this has happened before, but I can track that down.

THE COURT:  And can I just ask you about the February 18th directive, and specifically, what was the statutory or regulatory basis for that directive.

Was it 8 C.F.R. 1.2, or something else?

MR. SANDHU:  So I think that -- this goes to another important point in this case.  I think that that directive or that document, as well as the Huffman document, the way that I read those is that they are simply reinforcing and reminding immigration officials of their exercise -- of their discretion, of their enforcement discretion to choose between various removal procedures, and they're encouraging them to use expedited removal in appropriate cases.

So I don't think the authority comes from 8 C.F.R. 1.2.  I think it's just the discretionary authority to direct the agency enforcement officials to consider expedited removal, particularly given two other rules, which plaintiffs don't challenge.

I think that's what the Huffman memo alludes to. That is, the expansion of the expedited removal, which we heard about this morning, and the revocation of parole, which is the *Svitlana Doe* case.

And so -- and again, neither of those rules are being challenged here, but in light of those rules revoking parole for certain individuals and expanding expedited removal, this guidance was issued.  And all that the guidance does, Your Honor, is, in both of those documents, it uses the word "consider."

All it's doing is advising the immigration officers to consider using whatever removal procedure is appropriate, including expedited removal.  And --

THE COURT:  So why is it out of time for plaintiffs to challenge that?  Meaning, if they're contending that the directive is in error, why are they out of time -- I mean, you know -- any regulation/directive is always going to relate to something that was previously promulgated or passed, or whatever the statute or regulation at issue is.  But if, as you say, there is a directive given to remind people to use their enforcement discretion, including in this context, why can't plaintiff challenge that?

MR. SANDHU:  I think there are two reasons, Your Honor.  First is that the authority for paroling or -- I'm sorry, for applying expedited removal to paroled aliens comes from 8 C.F.R. 1.2, which was first implemented in 1997.  And so that's the first reason.

THE COURT:  I know, but they're arguing -- they're saying that they -- they are challenging a recent directive essentially directing people to consider using expedited removal procedures in contexts that they contend are unlawful.

And so at what point does -- can someone challenge that written directive?  Or you're saying that that

written directive relates to something that's been on the books, which any written directive will, that you're out of time, that that doesn't restart the clock for purposes of implementation of this written directive?

MR. SANDHU:  Yeah, I think that's our baseline argument.  But I also -- I would add that I don't think this -- that this document, or these two documents, are in any way creating a rule applying expedited removal to paroled aliens.

There's no -- there's nothing in them that lays out, you know, the authority for that rule --

THE COURT:  So you dispute that it could be categorized as a written policy directive?

MR. SANDHU:  It's a written policy guidance document that is merely speaking in terms of enforcement discretion.  And so --

THE COURT:  Isn't that a policy directive? What is your understanding of when the statute refers to written policy directive?

MR. SANDHU:  I mean, I think it's fair to say it's a written policy guideline, yes --

THE COURT:  Okay.

MR. SANDHU:  -- regarding enforcement discretion.  But I don't think that it's addressing what the plaintiffs say it's addressing.  That's sort of a

subsidiary argument.  I mean, our baseline argument is that, you know, this question of the authority to apply expedited removal in these circumstances was first addressed in the regulation in 1997.  And so it's out of time in that respect.

But secondly, if you look at these memos, they don't -- they don't talk about the designation provision or the arriving provision in any detail.  They don't lay out the specific rule or rationale.  That's set forth in the arriving alien regulation.

And moreover, the third document, which is the FRN, really doesn't have anything to do with this case.  Plaintiffs say that they want the Court to stay that portion of it which subjects paroled aliens to expedited removal, but that's not what the rule does.

The rule, as they later sort of backtracked a little bit when talking about *Svitlana Doe*, that case involved the revocation of parole for hundreds of thousands of individuals.  That's what was at issue there.

So the discussion in the FRN about expedited removal was in the context of a justification for categorically precluding parole or withdrawing parole -- terminating parole for those individuals.  So these documents we would say in whole, they don't paint the

picture that the plaintiff -- that the plaintiffs, I think, are trying to convey here.

So that would be another reason that we don't think that staying these documents really has the effect that the plaintiffs are alleging that it would have.

THE COURT:  Okay.  I think it would be helpful to talk about plaintiffs' interpretation and reading of Section 1225(b)(1) and the two categories of noncitizens who are subject to expedited removal.

So, one, those arriving in the United States.  So according to plaintiffs, those were in the act of arriving.  And two, other designated individuals present in the United States who have not been admitted or paroled, so those are people who have already arrived, which seems to make sense structurally.

So what is your disagreement with plaintiffs' reading of the statutory language?

MR. SANDHU:  Yeah, so beginning with the first category, "arriving in," I think that it's important to understand here that when Congress used this term "arriving," it was talking about a term of art.  You really have to look at the background of -- the context of what Congress was legislating with that backdrop in mind.

So it's very clear that parole does not change an

arriving alien's legal status.  And their position --
their legal position is one standing at the border, at
the threshold of entry.

So, for example, we cite in our brief a Second
Circuit decision on Page 31 that says, "a parolee
normally fits the regulatory definition of an arriving
alien for legal purposes."  And it's very important to
understand sort of the regulatory, the statutory context
when the statute was enacted, as well as the Supreme
Court case law that talks about this.

So a provision that was discussed earlier, the
statute was 8 U.S.C. 1182(d)(5)(A), which is very
important because that provision emphasizes that a
parole is not an admission.  And it also emphasizes that
when parole ends, the alien shall forthwith be returned
to custody from which he was paroled.  So in that sense
the picture is that a paroled individual is standing at
the border as an arriving alien.

A case -- the Second Circuit case that we cited
says the following:  "Although paroled aliens physically
enter the U.S. for a temporary period, they nevertheless
remain constructively detained at the border."

And there's a line of Supreme Court decisions that
say that when paroled -- I'm sorry -- that these
individuals who are paroled stand at the boundary line

and have gained no foothold in the United States. That's the backdrop in which Congress was legislating.

Also, I would say -- point you to a regulation, 8 C.F.R., Section 212.5(e)(2)(i), which says that when parole ends, the alien shall be restored to the status he or she had at the time of the parole.

And so that term has -- has specific meaning in the immigration context. And so an arriving -- "arriving in" applies to an individual who has -- stands at the border, was stopped at a port of entry, as well as someone who is just sort of released for a finite temporary period of time. They're -- constructively, they're still detained but they're released for a certain period of time.

And that's how parole has always been -- even before it was considered parole. I mean, temporary release into the country was always considered such. And if you go look at the Supreme Court's decision in *Mezei* that's exactly how the Court viewed it when it was talking with someone who -- or even I think it was two or three years -- was allowed or released into the country, and they were on Ellis Island. But, again, when they were looking at their status, they were looking at someone who was standing at the threshold, at the border.

THE COURT:  I'm going to confess, I find this -- I find this confusing so help walk me through it.  Because if "arriving in" -- you're contending it applies to people even with active parole -- who are actively paroled?

MR. SANDHU:  Yes, that's right.  Under the "arriving alien," correct.

THE COURT:  So why then would the, quote, "certain other aliens" provision require, even under your reading, that parole be terminated?

MR. SANDHU:  So that's a more limited authority, so the government's position is that is a more limited authority for designation purposes.

If the Secretary chooses to proceed under this specific designation authority, which is separate and apart from sort of the general expedited removal authority.  And there is overlap, we acknowledge that.  But that is another avenue or another option.  There's overlapping sort of options here for the Secretary to proceed with expedited removal.

THE COURT:  Okay.  And that --

MR. SANDHU:  In that situation -- yes.

THE COURT:  I guess -- okay.

So Congress allows expedited removal of people, under your reading, previously paroled but whose parole

was terminated within two years of their arrival under the second provision, under category 2.

MR. SANDHU:  That's right.

THE COURT:  But would also allow the same people to be removed with no time limit because they're arriving aliens.

MR. SANDHU:  Correct.  That's right.  It's a broader authority.  There may be --

THE COURT:  And can you just explain why?

MR. SANDHU:  Yeah.

THE COURT:  I'm really having trouble understanding that argument.

MR. SANDHU:  I think that the designation procedure is a different procedure, and there may be advantages -- some advantages to the Secretary using its specific designation authority to apply or designate a group of individuals for expedited removal that falls within the statutory bounds, and so that option is available.  But the fact that there is a broader authority and there is a more limiting authority shouldn't mean that we, you know, preclude all authority.

Congress clearly intended to apply expedited removal, we believe, to this group of individuals under the primary authority, because they use that term

"arriving in."

And if you go back and look at the history of the regulation, this issue came up, and we set it forth in our brief. And that's the understanding of the agency when they promulgated that rule, was that because of the backdrop, historical backdrop, the statutory backdrop, the way that these paroled individuals have always been treated, that they've always been considered to be arriving in, arriving aliens. That's a term of art.

THE COURT: So how is it consistent with the statute to permit expedited removal proceedings for people who are actively paroled?

Is it -- I mean, that's your position, that the statute permits that -- I mean, the regulation permits that because that's how you read the statute, but how do you square that with the statutory language?

It's your -- the government's position that notwithstanding the language of the statute, people who are paroled, whose parole has not been terminated -- whose parole has not been terminated, they can be subject to expedited removal proceedings as arriving aliens?

MR. SANDHU: That's right. That's correct.

THE COURT: How is that consistent with the language of the statute?

MR. SANDHU:  Under --

THE COURT:  "Has not been admitted or paroled."

MR. SANDHU:  Right.  So -- so that is just for a very limited short period of time.  And when --

THE COURT:  What is that period of time?

MR. SANDHU:  The duration of when they have parole.

THE COURT:  Well, that's what I'm saying.  I'm understanding your position and reading to suggest that if the government -- under -- that the government could, if it wanted to, subject someone who is active -- whose parole has not been terminated to expedited removal.

Am I wrong about that?

Because you're reading that those individuals are still considered arriving aliens and therefore could be subject to expedited removal procedures.

MR. SANDHU:  That's correct.

THE COURT:  So I'm trying to understand, how does that square with the language of the statute.

MR. SANDHU:  Well, when they commence an expedited removal proceeding, the notice of the -- the charging document does automatically, under the regulation, terminate parole.

THE COURT:  Well, if that's the case, why would there be a need for the statute to carve out individuals

who have been admitted or paroled outside of this expedited removal procedure if starting the procedure terminates parole?  Why would they need to carve paroled individuals out?

Does that seem to make -- what's the logic there?

MR. SANDHU:  Under the designation provision --

THE COURT:  Right.  You're saying that commencement of expedited removal procedures terminates -- well, and to me, that's -- you said that a person with active parole could be -- who's currently on parole could be submitted to -- or subjected to expedited removal procedures.

And I understand you to be saying that the commencement of expedited removal procedures terminates parole, so you would not have a situation where someone who's paroled was subject to expedited removal procedures.  And I'm trying to understand what would be the purpose of this language in the statute if someone who's actively paroled can be subject to expedited removal procedures or if those procedures could terminate parole and thus make a category of people who I read as excluded from the statute covered under the statute?

And if you could just help me understand.  Again, I confess my confusion.  If you could just help me

understand why that makes any sense.

MR. SANDHU:  Let me just say one thing about -- under the regulation, the termination of parole is automatic through the charging document, unless specified otherwise.  So DHS -- it's not always the case that, you know, issuing a notice of the charging document for expedited removal will terminate parole, if that makes sense.

In terms of Your Honor's question regarding the designation provision language, the best that I can explain to you is that I think that that -- the designation is a unique and specific procedure that is available at the disposal of the Secretary.  So it provides an alternative in specific situations that may be advantageous rather than proceeding under the broader authority of the "arriving in" statute.

THE COURT:  What's your response -- so the plaintiffs made an argument that Section 1182(d)(5)(A) does not say that a parolee whose parole is terminated reverts to the status of, quote, "an applicant for admission standing at the threshold of entry."  That the statute says that the individual's case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States.

How do you respond to that argument?

MR. SANDHU:  Yeah.  So they certainly are an applicant for admission, right, and that's what the parole statute says.  We would cite the parole statute, and our point in our brief was just to -- there is authority that says that they're standing at the threshold, you know, of the border and so should be treated as an arriving alien.

But our point about the parole statute and why it's important is for two reasons:  One, it says that admission -- I'm sorry, parole is not an admission.

And two, it says that as soon as parole terminates or is revoked, that the parolee shall be immediately detained and be -- and restored to the same status under a different regulation.

That along with, again, the unique history -- the statutory and the case law history here create -- really does, I think, evidence a powerful argument that these individuals -- when Congress was referring to "arriving in," they were referring to these individuals who have been paroled into the country.

So I think we would use the parole statute for those reasons, and not focusing on the applicant for admission -- which is correct, they're still an applicant for admission.  But as my friend points out, there are, you know, categories of aliens or applicants

for admission as well.  And that's not the key point that we're making -- that we're using in citing the parole statute.

THE COURT:  And do you agree that the government's reading potentially subjects hundreds of thousands of people who weren't previously subject to expedited removal proceedings to expedited removal proceedings, specifically paroled individuals or people who have been paroled?

MR. SANDHU:  That's correct.  I would emphasize to the Court that the agency obviously has discretion so they don't have to apply expedited removal to all individuals.  They would have had the discretion.

In fact, the memos talk about if there is a pending asylum application that the -- that that's, you know, a lower priority or maybe even -- I think one of the memos says that they -- you should not consider expedited removal in that situation.

So there is discretion in terms of how --

THE COURT:  Just given the scope of this, I'm curious as to your position about whether or not this is a major question such that I should look to a more explicit grant of authority to the agency before expanding expedited removal in the way that you're suggesting it be expanded.

MR. SANDHU:  I don't think it's an expansion, because under the reg -- the reg has been there, but I would say to your concern, you know, regardless of how you fit the designation provision with the "arriving in" provision, I don't think that there is, you know, a strong argument to say that these parolees don't fall within the first authority -- the "arriving in" authority.

So there may be some question about overlap or whether, you know, there's -- how the designation provision adds value here, but I think (a)(1) -- or I'm sorry, (b)(1)(i) is pretty clear on this.  And so we would contend that the Court should find that that is legitimate authority.

And also looking at it from the government's side, there are hundreds of thousands of individuals whose, you know, parole potentially now is going to be revoked under the *Svitlana Doe*, but that means there's a very strong interest on the government's part in terms of enforcement of individuals who aren't -- have no right now to be in the country, no legal basis to be in the country.

And some of them -- or many of them will be able to assert , you know, credible fear claims in these proceedings.  And I would point out that in the

*Thuraissigiam* decision -- I hope I'm saying that correctly -- Justice Alito pointed out -- and this goes back to the five years before that decision so I don't know what the current statistics are -- but he did point out that 77 percent of the population that asserted or -- a fear of return was found to have a credible fear, and that was for the five years before the decision.

So these procedures are meaningful. And again, I think -- to the question about -- earlier about the difference between expedited removal and Section 240 removal, there is -- for purposes of the balance of harms analysis, I don't think the plaintiffs have demonstrated how -- how there's a -- there's harm in the sense that these individuals most likely will be able to be placed in 240 proceedings because they don't have legal status in this country.

The fact that one might have more process or might take longer I don't think is sufficient to demonstrate irreparable harm for the plaintiffs. And I would definitely point out the countervailing interest of the government as were -- recently set forth in the *CASA* decision where -- let's see -- where it said "when a federal court enters a universal injunction against the government, it improperly intrudes on a coordinate

branch of the government and prevents the government from enforcing its policies against nonparties, and that intrusion is sufficient to demonstrate irreparable harm warranting a stay."

THE COURT:  Does that apply -- you read that to apply to relief under the APA?

MR. SANDHU:  I --

THE COURT:  Because I --

MR. SANDHU:  We do, Your Honor.

THE COURT:  And what authority extends that case's holding to APA relief?

MR. SANDHU:  No authority yet, Your Honor, but I would say the analysis that the Court went through would apply.  There, it was in the context of a preliminary injunction.  The same factors for a PI are also relevant for a stay motion under 705.

THE COURT:  Am I -- there's been a lot of activity so I'm trying to keep my cases straight.

I thought a concurring opinion specifically made the point that the holding either didn't extend or was an open question as to the extent under the APA.

MR. SANDHU:  I think they said it was --

THE COURT:  It wasn't --

MR. SANDHU:  It was a separate question.

THE COURT:  A separate question.

MR. SANDHU:  Yeah.

THE COURT:  Right.

MR. SANDHU:  But I think the gist of its analysis is that courts should tailor relief to the parties in the case.  And when it talked about what was complete relief, it distinguished complete relief is not universal relief.  And so it talked about this -- applying, you know, the determination to the specific parties.

So we would say here that if the Court were to issue a stay, it should only apply to the parties -- to the plaintiffs that have been identified that have standing and that could show harm in this context.

THE COURT:  You agree that I would be bound by Circuit precedent to the extent the Supreme Court has not weighed in on this question?  Circuit precedent concerning the scope of relief available under the APA?

MR. SANDHU:  Yes, if there is Circuit precedent, yes.  But I think that in light of *CASA*, I think, you know -- I mean, even pre-*CASA* there was, you know, sort of a stream of case law that says that courts should tailor the remedy to the parties in the case.

And so I would cite the *Madsen* decision, 512 U.S. 753, and the *Gill* decision, which is in our briefs, and the -- for the proposition that relief be no more

burdensome to defendants than to what's necessary to provide complete relief to the specific plaintiffs in the case.

THE COURT:  Thank you.

MR. SANDHU:  Thank you very much.

THE COURT:  Any response?

And actually, before you get started, so I'm still kind of wrestling with the statutory interpretation question, the grammatical construction of the sentence, your distinction between revocation or being vacated and just the understanding that parole can be revocated if the person doesn't comply with certain procedures.

Are you drawing any distinction or is that still a termination?  Meaning it doesn't change the status of the fact that the person had been paroled regardless of the manner in which it's terminated, so there's no distinction between revocation, termination, et cetera.

MS. LI:  Not to my knowledge.

THE COURT:  Okay.

MS. LI:  And also, to our knowledge, defendants are not purporting to or -- and have not purported to, in the past, vacated parole.  It's always been termination or revocation.  And to me -- to us, I believe --

THE COURT:  Yeah, that's like revocation.

MS. LI:  Yeah.

THE COURT:  Like, parole can be revocated --

MS. LI:  Or revoked, yes.

THE COURT:  Revoked, I'm sorry.  Parole can be revoked.

MS. LI:  But with the legal effect as termination.  It's the same as --

THE COURT:  It's the same legal effect as termination.  It's distinct from vacating a sentence in the sense that the sentence should never have existed in the first place.  It doesn't remove the legal import of the status, is your position.

MS. LI:  Yes, Your Honor.  That's correct.

And on that point I also did want to, I guess, put a finer point on our discussion about *Hewitt* for this exact reason, because I don't know if I was totally clear.

We were talking, Your Honor, about the piece in the opinion that says that the present perfect tense -- first, that it can refer to either an act that is now completed or a past action that comes up to the present, but then it thus conveys that the event in question continues to be true or valid.

And so to respond directly to that in a clearer way, I hope, based on -- the event that we were talking

about that continues to be true or valid is the manner or the way that the person came into the United States.

When I was explaining how -- because parole is paired with admitted in the statute, that's how we can tell that it's discussing the way that the person came in. They were inspected. They were granted permission to come in. It doesn't deal with their active parole status. And so that is the event here. That does continue to be true and valid, the fact that they were inspected and granted parole into the country regardless of whether they currently have that status.

And so, yeah, I wanted to revisit that in *Hewitt*.

THE COURT: Okay.

MS. LI: And then on the merits, the main thing that I just wanted to address on rebuttal is that defendants argued repeatedly that Congress legislated expedited removal against this entry fiction that parolees stand at the border. And I just want to reiterate that they've provided no evidence of the fact -- the idea that Congress injected the entry fiction into expedited removal specifically.

And as Your Honor was getting to with your questions, it leads to this incoherent contradictory statute where the carve-out for paroled people and expanded expedited removal loses purpose completely.

And I also just want to point Your Honor to legislative history that we have provided in our briefing, legislative history of IIRIRA specifically that indicates that Congress was focused on people coming to the U.S. without valid documents.

There's -- I can pull up the quotes, if needed, but essentially, they stand for the idea that they weren't focused on people who are already in the U.S., like parolees. And also, just to add to that, the only two grounds of inadmissibility that can lead to expedited removal emphasize that point. They're both concerned with the absence of valid entry documents.

So this is all clear evidence that plaintiffs have put forth in our papers and, here, that Congress's goal in creating expedited removal was not to target paroled individuals and people who have completed the act of arriving.

The government's interpretation makes no sense of the statute. They want you to ignore the language, ignore the inconsistencies, and explode the agency's ability to subject paroled individuals to expedited removal. The plain language of the statute simply cannot bear that.

THE COURT: Okay. All right. Thanks everyone.

Oh, you have something you want to say?

MS. LI:  If you have time.

THE COURT:  Sure.

MS. SUNG:  Sorry.  I'll be quick.

THE COURT:  Okay.

MS. SUNG:  So -- thank you for your patience, Your Honor.

First of all, I just would like to address one point made by the defendants.  We're not conceding that the regulations that define "arriving alien" are lawful in any way.  The regs are not what's causing harm here, and so they are not before the Court today.

Second of all, with regards to 1252(f)(1), the *Dixon* case that the government puts a lot of emphasis on, I think it's not apposite here because it deals with injunctive relief, and that's not what we're asking for here.

And in addition to that, I would just like to point out in *Grace v. Barr* at 965 F.3d at 907, the government actually took the position that vacatur of an agency action implementing the expedited removal statute is permissible under 1252, specifically 1252(e)(3).

The D.C. Circuit noted in its opinion that the government in that case had taken the position that 1252 specifically authorizes relief, namely, that when Section 1252(e)(3) says that judicial review is

available but is limited to determinations, then relief in the form of such a determination would authorize both declaratory or set aside relief preventing implementation of the challenged policies, but it wouldn't implement -- excuse me -- it wouldn't authorize system-wide injunctions.

Third, really quickly, on the timeliness issue, (e)(3)(B) says that any action instituted must be within 60 days.  That is what happened here.  And so the fact that we moved for relief at a later date is of no importance.

And then with regards to the March 25th FRN -- excuse me, Federal Register Notice, I think the government stood up and tried to say it's not a written guidance that can be challenged here under 1252(e)(3).

Obviously, we disagree.  It announces for the first time that DHS will target this population, CHNV parolees that had not previously been targeted for expedited removal, and it also expresses DHS's intent to remove that -- people in that population promptly and to initiate expedited removal proceedings to the maximum extent possible.

And if we're going to go to the dictionary, as we often have, both this morning and this afternoon, guidance -- to guide -- it's the act of guiding.  And

the act of guiding is to direct in a way or course, to direct, supervise, or influence usually to a particular end. And that's what we have here in the March 25th CHNV termination.

With regards to irreparable harm, there is harm articulated here, and it is irreparable and not compensable by money damages. I think that the then-Judge Jackson's decision in *Make the Road New York* -- in the first *Make the Road New York* case is instructive.

She found injury-in-fact because the associational plaintiff had shown that at least one identified member could be placed in expedited removal. Because in that case, the defendants had defined a new population that they wanted to subject to expedited removal, and they were very clear that expedited removal as to that population would begin imminently. And that's what's happening here.

And the Lawrence declaration at Paragraph 13, the Salas declaration at Paragraphs 11 through 13, and the Escobar declaration at Paragraph 15 all highlight that the plaintiffs' members are at risk of expedited removal because they fall within the population that these writings have identified as being subjected to expedited removal. And that risk of being subjected to expedited

removal is changing their behavior.

They are not taking their kids to school. They are foregoing medical treatment. This is irreparable harm. It can't be compensated with money damages.

I don't think I need to -- well, actually, I will address the balance of equities very quickly. Just to give the Court some cites, because, as you can imagine, the Court has raised these same kind of arguments about injury to the executive's authority under the INA and its policy agenda to remove as many people as quickly as possible. And I just want to point out that multiple courts, both District Courts and the Court of Appeals, have rejected the government's claims that these types of abstract harms tip the balance of equities in favor of the government, especially when confronted with the overwhelming public interest in not having individuals erroneously removed to places where they could face substantial harm, as the Supreme Court in *Nken* articulated. And also the many harms that are articulated in the plaintiffs' declarations:

*J.G.G. v. Trump*, 2025 Westlaw 1577811 at *26.

*Philadelphia Yearly Meetings v. DHS*, 767 F. Supp 3d at 334.

*Pacito v. Trump*, 768 F. Supp 3d at 1235 through 36.

*National TPS Alliance v. Noem*, 773 F. Supp 3d at 839 through 44.

It continues.  Courts have rejected this notion that the executive's policy agenda in removing people as quickly as possible or in enforcing the immigration laws is what trumps here.

Here -- this is my last point.  So you were asking about controlling precedent from the D.C. Circuit.  I think *Grace v. Barr* and other cases control.  And especially given that Justice Kavanaugh's concurrence expressly acknowledges that plaintiffs may still ask a Court to preliminarily set aside a new agency rule in the *Trump v. CASA* decision.  *CASA* leaves APA relief and the case law around APA relief untouched.

And so the controlling precedent here is *National Mining Association v. U.S. Army Corps of Engineers*, 145 F.3d at 1409.  And that states that when agency regulations are unlawful, the ordinary result is that the rule is vacated, not that their application to the individual plaintiffs is proscribed.

And there's actually just a recent decision from Judge Bates in this court on July 3rd, 2025, where Judge Bates noted that in a case involving APA vacatur and not a universal or national injunction, the Supreme Court's recent decision in *Trump v. CASA* does not apply.

And that's *Doctors for America v. Office of Personnel Management*, 2025 Westlaw, 1836009 at *22, Note 17.

And vacatur of agency action here is consistent with Section 1252(e)(3), which allows challenges on the validity of the system. And as I think Your Honor was trying to get to, it -- vacatur is consistent with allowing challenges on the validity of the system, rather than -- if the Court finds that the agency here is unlawful to leave parts of an invalid system applicable to large parts of the country.

And then I would also like to point out that the Congress did authorize challenges on the validity of the system through Section 1252(e)(3) just as it authorized APA vacatur and stay relief and set aside relief in 5 U.S.C. 705 and 706.

So what the Supreme Court was concerned about in *Trump v. CASA* about this unbridled equitable discretion of the District Courts to bind the -- excuse me, to issue a national injunction or a universal injunction to bind parties not before the court, that's not what you're dealing with here. You have not equitable relief but statutorily authorized relief.

And then finally to address the defendants' argument that relief should be limited to people who

have specifically been identified in the papers filed before the Court, we have no quibble with *Madsen v. Women's Health Center*.

The point is that the Court may provide complete relief.  And even the Supreme Court in *Trump v. CASA* acknowledge this.  And complete relief for an associational plaintiff is relief for that plaintiffs' members.

We have established associational standing on behalf of the plaintiffs' organizations, and it has never been the case that an associational plaintiff has to identify all injured members in order to have the Court provide relief.

And then secondly and relatedly, it's also never been the case that when the court finds agency action to be unlawful that the plaintiffs have had to identify every single individual who has been or will be harmed by the unlawful agency action in order for the court to provide relief.

I think that's it.  I think I would just say in closing with regards to jurisdiction, the clear text of the relevant statutes and the controlling precedent from this Circuit make clear that the Court has jurisdiction to review the plaintiffs' claims.

The government has raised all the same

jurisdictional challenges in the first *Make the Road New York* case, in *Grace v Barr*, in *Kiakombua*. And all of the courts in those cases, both district court and appellate, have rejected these types of jurisdictional challenges, and the government has not shown why the Court here needs to do anything different.

Second, on the merits, it's certainly complicated, but at the end of the day, we agree with the defendants that the statute is what controls. The regulations can't do any more than what the statute allows. The text and the overall structure of 1225(b) are clear that paroled individuals should not be subjected to expedited removal, and the challenged writings here are, as a result, contrary to law.

Also the writings, they fail to explain why paroled individuals can and should be subjected to expedited removal. There's the flip-flop flip between three different writings as to the statutory justification for why parole beneficiaries can be subjected to expedited removal, and they wholly fail to account for any relevant reliance interest and should be considered arbitrary and capricious.

And then finally as to the equitable factors, the harms to the plaintiffs' members, their families, their communities, as outlined in the declarations that we

provided, they are grave and not compensable by money damages.  And the abstract injuries articulated by the government simply do not outweigh, again, the public interest in not removing people erroneously, and they also certainly do not outweigh the amount of human suffering that the challenged writings here have wrought on plaintiffs' members.  They are afraid.  They are under the -- what's been set out in the writings, they are subject to expedited removal and at risk of being picked up, like E.I.R.M. was when he was driving to California with his fiancee to celebrate his birthday. They're foregoing medical treatment, not bringing their kids to school.  They cannot work and lead normal lives to earn money and to care for their families.

And they are individuals who did everything that the federal government asked them to.  And now the federal government is trying to renege on the promises made and subject these people to a strip-down removal process that doesn't even have regard for their eligibility for other lawful statuses that would in fact foreclose removal.

And so we would respectfully request that the Court grant the motion and stay the challenged writings.  And if the Court sees fit to limit relief, then that relief should extend to all of the organizational plaintiffs'

members -- excuse me -- associational plaintiffs' members, including those who have not been identified in papers before the Court.

THE COURT:  Okay.  Thank you.

MS. SUNG:  Thank you.

THE COURT:  All right.  Thank you, everyone.

I will take this under advisement.

(Court adjourned 4:08 p.m.)

- - -

CERTIFICATE

I, Chandra Kean, RMR, hereby certify that the foregoing transcript is a true and correct transcription of the proceedings held in the above-titled matter.

_____          July 11, 2025
     Chandra Kean, RMR                    DATE

## 1

**1** [1] - 43:5
**1.2** [5] - 48:19, 50:6, 53:1, 53:12, 54:17
**11** [2] - 78:20, 85:20
**1101(a)(13)(A** [1] - 19:15
**1182(a)(6)(C** [1] - 10:19
**1182(d)(5)(A** [2] - 58:12, 65:18
**1182(d)(5)(A)** [1] - 29:12
**11th** [1] - 51:23
**1225** [2] - 25:6, 25:20
**1225(a)(1** [1] - 29:24
**1225(b** [1] - 83:11
**1225(b)(1** [3] - 9:8, 24:15, 57:8
**1225(b)(1)(A)(i** [1] - 23:18
**1225(d)(2** [1] - 25:14
**1235** [1] - 79:24
**1252** [2] - 76:21, 76:23
**1252(e)(3** [3] - 76:25, 81:5, 81:14
**1252(e)(3)** [2] - 76:21, 77:15
**1252(f)(1** [6] - 42:1, 44:1, 44:11, 47:14, 47:22, 76:12
**1252(f)(1)** [3] - 41:15, 42:11, 46:1
**13** [3] - 39:14, 78:19, 78:20
**1409** [1] - 80:17
**145** [1] - 80:16
**15** [1] - 78:21
**1577811** [1] - 79:21
**16** [1] - 6:1
**17** [1] - 81:3
**1836009** [1] - 81:2
**18th** [3] - 8:15, 23:16, 52:24
**1996** [1] - 29:20
**1997** [3] - 28:6, 54:18, 56:4
**1998** [1] - 28:2
**1st** [1] - 28:5

## 2

**2** [1] - 61:2
**20** [2] - 27:3, 27:6
**2011** [1] - 52:17
**2019** [1] - 37:16
**2025** [4] - 79:21, 80:22, 81:2, 85:20
**212.5(e)(2)(i** [1] - 59:4

**22** [1] - 81:2
**235.3** [2] - 20:10, 48:21
**235.3(b)(6** [1] - 20:16
**23rd** [3] - 8:14, 10:11, 51:22
**240** [2] - 69:11, 69:16
**25-872** [1] - 3:4
**25th** [5] - 8:15, 10:12, 32:9, 77:12, 78:3
**26** [1] - 79:21
**2:12** [1] - 3:2

## 3

**31** [1] - 58:5
**334** [1] - 79:23
**36** [1] - 79:25
**3d** [3] - 79:22, 79:24, 80:1
**3rd** [1] - 80:22

## 4

**44** [1] - 80:2
**4:08** [1] - 85:8

## 5

**5** [2] - 43:4, 81:15
**512** [1] - 71:23
**599** [1] - 50:10

## 6

**60** [1] - 77:9
**691** [1] - 50:11
**692** [1] - 50:11

## 7

**705** [5] - 40:25, 41:7, 42:15, 70:16, 81:16
**706** [3] - 41:4, 41:25, 81:16
**753** [1] - 71:24
**767** [1] - 79:22
**768** [1] - 79:24
**77** [1] - 69:5
**773** [1] - 80:1

## 8

**8** [15] - 9:7, 19:14, 20:9, 20:15, 23:18, 25:6, 25:20, 29:12, 29:24, 48:18, 53:1, 53:11, 54:17, 58:12, 59:3
**839** [1] - 80:2

## 9

**907** [1] - 76:18
**965** [1] - 76:18

## A

**a)(1** [1] - 68:11
**a)(7** [1] - 10:19
**abide** [1] - 21:19
**ability** [3] - 19:2, 36:22, 75:21
**able** [2] - 68:23, 69:15
**above-titled** [1] - 85:17
**absence** [1] - 75:12
**absent** [1] - 4:20
**absolutely** [6] - 5:7, 14:18, 23:5, 29:12, 33:16, 34:6
**abstract** [2] - 79:14, 84:2
**Accardi** [2] - 21:2, 21:17
**accept** [1] - 26:17
**access** [2] - 35:16, 35:18
**according** [2] - 30:8, 57:11
**account** [1] - 83:20
**achieve** [2] - 49:8, 50:1
**acknowledge** [2] - 60:17, 82:6
**acknowledges** [1] - 80:11
**acknowledging** [2] - 7:7, 47:3
**Act** [2] - 11:19, 36:23
**act** [7] - 12:13, 17:19, 57:11, 73:20, 75:16, 77:25, 78:1
**Act's** [3] - 12:3, 14:9, 16:8
**action** [13] - 7:8, 12:1, 17:21, 43:20, 49:5, 49:7, 50:3, 73:21, 76:20, 77:8, 81:4, 82:15, 82:18
**actions** [10] - 8:13, 21:15, 22:6, 33:22, 33:24, 39:22, 42:16, 42:17, 43:7, 51:18
**active** [15] - 12:16, 13:8, 15:22, 15:23, 18:5, 18:8, 18:19, 20:20, 26:13, 26:19, 31:24, 60:4, 63:11, 64:10, 74:7
**actively** [3] - 60:5, 62:12, 64:19

**activity** [1] - 70:18
**acts** [1] - 12:7
**add** [3] - 51:16, 55:6, 75:9
**addition** [3] - 25:25, 35:7, 76:17
**additional** [4] - 10:1, 32:7, 32:8, 38:23
**additionally** [1] - 19:7
**address** [9] - 4:1, 11:14, 28:20, 40:6, 42:15, 74:15, 76:7, 79:6, 81:24
**addressed** [1] - 56:4
**addressing** [2] - 55:24, 55:25
**adds** [1] - 68:11
**adjourned** [1] - 85:8
**adjudicate** [1] - 46:19
**adjust** [3] - 12:25, 14:23, 36:22
**adjusted** [1] - 42:11
**Adjustment** [1] - 36:23
**admission** [20] - 19:13, 29:2, 29:9, 29:16, 29:23, 29:25, 30:4, 30:5, 30:14, 30:18, 31:3, 58:14, 65:21, 65:24, 66:2, 66:10, 66:23, 66:24, 67:1
**admitted** [13] - 9:13, 10:20, 19:8, 19:14, 19:21, 19:23, 20:1, 20:3, 30:1, 57:13, 63:2, 64:1, 74:4
**adopted** [1] - 23:8
**advanced** [1] - 28:7
**advantageous** [1] - 65:15
**advantages** [2] - 61:15
**advisement** [1] - 85:7
**advising** [1] - 54:1
**affirmed** [1] - 11:24
**affirms** [1] - 20:22
**afraid** [1] - 84:7
**afternoon** [10] - 3:3, 3:9, 3:11, 3:17, 3:19, 3:22, 3:25, 40:16, 48:16, 77:24
**agency** [33] - 8:13, 21:15, 22:6, 28:1, 28:8, 32:3, 33:22, 33:23, 42:16, 42:17, 43:11, 43:20, 49:4, 49:6, 50:3, 50:14, 50:16, 50:17, 50:21, 50:25, 52:16, 53:13,

62:4, 67:11, 67:23, 76:19, 80:12, 80:17, 81:4, 81:9, 82:15, 82:18
**agency's** [3] - 8:18, 19:2, 75:20
**agenda** [2] - 79:10, 80:4
**agents** [1] - 5:24
**agree** [6] - 21:9, 26:19, 47:9, 67:4, 71:14, 83:8
**agreed** [2] - 27:20, 46:22
**aircraft** [1] - 25:17
**airport** [1] - 25:18
**al** [2] - 3:5, 3:6
**alien** [15] - 4:14, 4:22, 8:5, 8:9, 19:16, 28:3, 48:18, 56:10, 58:7, 58:15, 58:18, 59:5, 60:7, 66:7, 76:9
**alien's** [1] - 58:1
**aliens** [17] - 9:11, 9:13, 25:16, 26:24, 27:8, 48:22, 52:19, 54:17, 55:9, 56:14, 58:20, 60:9, 61:6, 62:9, 62:22, 63:15, 66:25
**Alito** [1] - 69:2
**alleging** [1] - 57:5
**Alliance** [1] - 80:1
**allow** [2] - 18:11, 61:4
**allowed** [1] - 59:21
**allowing** [2] - 45:9, 81:8
**allows** [5] - 21:8, 39:18, 60:24, 81:5, 83:10
**alluded** [1] - 42:8
**alludes** [1] - 53:16
**Almonte** [2] - 42:13, 42:19
**alter** [1] - 29:22
**alternative** [1] - 65:14
**amenable** [1] - 18:9
**amended** [4] - 28:2, 29:21, 40:3, 43:4
**amending** [1] - 30:20
**amendments** [1] - 27:15
**America** [1] - 81:1
**amount** [1] - 84:5
**ample** [1] - 38:3
**analogous** [1] - 51:14
**analysis** [5] - 38:18, 51:2, 69:13, 70:13, 71:4
**Anderson** [1] - 3:21

**Andrew** [1] - 36:10
**announces** [1] - 77:16
**answer** [1] - 5:6
**answered** [1] - 48:15
**APA** [15] - 21:14, 22:5, 33:20, 33:25, 34:11, 41:3, 41:21, 70:6, 70:11, 70:21, 71:17, 80:13, 80:14, 80:23, 81:15
**apart** [1] - 60:16
**appeal** [1] - 48:7
**appealing** [1] - 48:7
**Appeals** [1] - 79:12
**appearance** [2] - 3:8, 3:12
**appeared** [1] - 35:14
**appellate** [1] - 83:4
**applicable** [1] - 81:11
**applicant** [12] - 29:2, 29:9, 29:16, 29:23, 29:25, 30:5, 31:2, 65:20, 65:24, 66:2, 66:22, 66:24
**applicants** [3] - 30:14, 30:18, 66:25
**application** [2] - 67:15, 80:19
**applications** [1] - 36:22
**applied** [5] - 10:17, 23:21, 24:7, 31:12, 52:13
**applies** [5] - 20:11, 24:19, 24:21, 59:9, 60:4
**apply** [18] - 14:24, 31:10, 31:17, 38:19, 42:14, 42:16, 42:20, 43:7, 48:21, 56:2, 61:16, 61:23, 67:12, 70:5, 70:6, 70:14, 71:11, 80:25
**applying** [6] - 43:1, 51:18, 52:4, 54:16, 55:8, 71:8
**apposite** [1] - 76:14
**appreciated** [1] - 35:22
**approach** [1] - 3:7
**appropriate** [3] - 42:23, 53:10, 54:3
**April** [1] - 28:5
**arbitrary** [8] - 4:5, 8:18, 8:21, 22:21, 23:2, 32:6, 33:17, 83:22
**argue** [7] - 18:10, 26:1, 27:7, 28:23, 31:7, 50:23, 51:17

**argued** [2] - 50:24, 74:16
**arguing** [2] - 41:19, 54:19
**argument** [25] - 4:20, 7:9, 11:12, 16:22, 22:10, 23:2, 26:23, 26:25, 27:10, 27:22, 28:21, 30:11, 36:1, 40:23, 43:10, 50:22, 55:6, 56:1, 61:12, 65:18, 65:25, 66:17, 68:6, 81:25
**arguments** [7] - 4:4, 12:20, 16:2, 21:23, 33:10, 37:12, 79:8
**Aric** [1] - 3:20
**Army** [1] - 80:16
**arrival** [6] - 25:7, 25:10, 25:18, 25:19, 25:21, 61:1
**arrived** [3] - 24:10, 25:1, 57:14
**arrives** [1] - 30:2
**arriving** [58] - 4:14, 4:22, 9:11, 9:24, 10:2, 23:22, 24:1, 24:6, 24:8, 24:12, 24:20, 25:11, 25:15, 25:16, 25:20, 26:4, 26:11, 26:24, 27:8, 27:22, 27:23, 28:2, 28:15, 28:20, 28:24, 30:23, 31:4, 31:6, 31:18, 31:23, 48:18, 56:8, 56:10, 57:10, 57:12, 57:19, 57:21, 58:1, 58:6, 58:18, 59:8, 60:3, 60:7, 61:6, 62:1, 62:9, 62:21, 63:15, 65:16, 66:7, 66:18, 68:4, 68:7, 75:17, 76:9
**art** [2] - 57:21, 62:9
**Article** [1] - 48:25
**articulate** [2] - 25:24, 36:8
**articulated** [5] - 6:20, 78:6, 79:19, 79:20, 84:2
**Ashley** [2] - 34:22, 35:1
**aside** [3] - 77:3, 80:12, 81:15
**aspect** [1] - 44:18
**assert** [1] - 68:24
**asserted** [1] - 69:5
**asserting** [1] - 46:10
**Association** [1] - 80:16

**association** [5] - 46:4, 46:10, 47:4, 47:5, 47:18
**associational** [14] - 44:24, 45:4, 45:21, 46:3, 46:6, 46:8, 46:10, 47:10, 47:11, 78:11, 82:7, 82:9, 82:11, 85:1
**assume** [1] - 14:3
**assuming** [1] - 46:7
**asylum** [2] - 36:22, 67:15
**attached** [5] - 13:4, 15:4, 23:7, 23:11, 35:4
**attempting** [1] - 45:2
**attorney** [4] - 9:21, 10:3, 35:17, 35:19
**attorneys** [2] - 5:23, 6:3
**authorities** [1] - 49:4
**authority** [38] - 11:15, 25:14, 34:5, 41:11, 41:12, 41:24, 43:15, 43:20, 45:11, 45:17, 48:1, 49:8, 49:24, 50:20, 53:11, 53:12, 54:15, 55:11, 56:2, 60:12, 60:13, 60:15, 60:17, 61:8, 61:16, 61:20, 61:22, 61:25, 65:16, 66:5, 67:23, 68:7, 68:8, 68:14, 70:10, 70:12, 79:9
**authorization** [2] - 13:4, 19:17
**authorize** [3] - 77:2, 77:5, 81:13
**authorized** [2] - 81:14, 81:23
**authorizes** [2] - 25:16, 76:24
**automatic** [1] - 65:4
**automatically** [1] - 63:22
**available** [6] - 44:10, 46:8, 61:19, 65:13, 71:17, 77:1
**avenue** [4] - 36:15, 37:5, 50:1, 60:18
**avenues** [1] - 36:24
**aware** [3] - 9:16, 31:11, 52:4

**B**

**b)(1)(i** [1] - 68:12
**backdrop** [5] - 57:23, 59:2, 62:6

**background** [1] - 57:22
**backtracked** [1] - 56:16
**balance** [3] - 69:12, 79:6, 79:14
**bar** [2] - 41:17, 47:9
**Barr** [3] - 76:18, 80:9, 83:2
**based** [7] - 12:4, 13:1, 14:24, 48:23, 48:25, 51:19, 73:25
**baseline** [2] - 55:5, 56:1
**basis** [4] - 35:25, 39:8, 52:25, 68:21
**Bates** [2] - 80:22, 80:23
**bear** [1] - 75:23
**become** [2] - 13:5, 15:6
**began** [1] - 5:20
**begin** [3] - 40:19, 48:14, 78:17
**beginning** [3] - 24:14, 39:2, 57:18
**behalf** [3] - 3:20, 40:17, 82:10
**behavior** [1] - 79:1
**belied** [1] - 51:25
**belong** [1] - 24:25
**beneficiaries** [2] - 39:25, 83:19
**Bergquist** [1] - 3:15
**best** [2] - 7:9, 65:10
**better** [2] - 41:1, 43:13
**between** [10] - 13:12, 21:13, 34:23, 35:5, 35:15, 53:8, 69:11, 72:10, 72:17, 83:17
**beyond** [2] - 21:8, 22:17
**big** [1] - 35:15
**bind** [2] - 81:19, 81:21
**binding** [2] - 42:6, 42:22
**birthday** [2] - 36:13, 84:11
**bit** [2] - 5:12, 56:17
**blessed** [1] - 47:11
**books** [5] - 6:6, 6:13, 6:17, 7:4, 55:2
**border** [8] - 25:9, 58:2, 58:18, 58:22, 59:10, 59:25, 66:6, 74:18
**bound** [1] - 71:14
**boundary** [1] - 58:25
**bounds** [1] - 61:18
**branch** [1] - 70:1
**brief** [7] - 26:22, 27:3,

27:7, 39:15, 58:4, 62:4, 66:4
**briefed** [1] - 34:11
**briefing** [4] - 16:2, 20:14, 48:11, 75:3
**briefs** [2] - 14:19, 71:24
**bring** [7] - 39:1, 44:17, 45:9, 47:4, 47:18, 47:19, 47:24
**bringing** [3] - 25:17, 46:13, 84:12
**broad** [1] - 43:9
**broader** [4] - 30:15, 61:8, 61:19, 65:15
**brought** [1] - 45:15
**bucket** [1] - 4:11
**burdensome** [1] - 72:1

**C**

**C.F.R** [7] - 20:9, 20:15, 48:18, 53:1, 53:11, 54:17, 59:4
**cabined** [1] - 43:21
**California** [2] - 36:13, 84:11
**cannot** [8] - 9:5, 10:21, 19:10, 21:8, 23:25, 32:4, 75:23, 84:13
**capricious** [8] - 4:5, 8:19, 8:21, 22:22, 23:2, 32:6, 33:18, 83:22
**card** [1] - 14:24
**care** [1] - 84:14
**Carl** [1] - 3:14
**carve** [5] - 25:2, 31:25, 63:25, 64:3, 74:24
**carve-out** [3] - 25:2, 31:25, 74:24
**carved** [1] - 24:24
**carves** [1] - 44:12
**CASA** [8] - 69:22, 71:19, 71:20, 80:13, 80:25, 81:18, 82:5
**case** [60] - 3:4, 6:9, 10:9, 11:6, 12:6, 13:15, 14:3, 15:3, 21:5, 26:13, 27:10, 27:25, 29:7, 32:21, 35:10, 37:13, 37:19, 38:6, 38:7, 38:10, 38:15, 38:19, 42:10, 42:22, 42:23, 42:25, 44:21, 46:7, 46:9, 48:23, 49:5, 49:17, 50:19, 50:22, 50:24,

53:3, 53:19, 56:12, 56:17, 58:10, 58:19, 63:24, 65:5, 65:22, 66:16, 71:5, 71:21, 71:22, 72:3, 76:13, 76:23, 78:9, 78:14, 80:14, 80:23, 82:11, 82:15, 83:2

**case's** [1] - 70:11

**cases** [6] - 8:4, 45:12, 53:10, 70:18, 80:9, 83:3

**categorical** [1] - 38:8

**categorically** [1] - 56:23

**categories** [5] - 8:24, 9:5, 24:17, 57:8, 66:25

**categorized** [1] - 55:13

**category** [13] - 9:19, 10:8, 10:14, 10:16, 24:7, 24:19, 24:21, 24:24, 25:1, 25:3, 57:19, 61:2, 64:21

**caused** [1] - 40:5

**causing** [1] - 76:10

**celebrate** [2] - 36:13, 84:11

**Center** [1] - 82:3

**certain** [9] - 9:13, 9:18, 10:4, 21:3, 44:14, 53:22, 59:14, 60:9, 72:12

**certainly** [7] - 14:19, 34:11, 46:15, 52:15, 66:1, 83:7, 84:5

**CERTIFICATE** [1] - 85:13

**certify** [1] - 85:15

**cetera** [3] - 22:7, 49:18, 72:17

**challenge** [12] - 23:10, 44:18, 45:10, 49:6, 49:22, 50:3, 50:7, 53:15, 54:5, 54:13, 54:24

**challenged** [16] - 4:10, 5:19, 6:7, 6:8, 6:18, 6:21, 7:15, 8:14, 39:7, 40:2, 53:21, 77:4, 77:15, 83:13, 84:6, 84:23

**challenges** [7] - 47:5, 47:12, 81:5, 81:8, 81:13, 83:1, 83:5

**challenging** [15] - 4:13, 4:21, 4:22, 6:13, 7:6, 21:1, 32:11, 38:10, 40:11,

48:18, 49:13, 49:22, 50:5, 54:20

**Chandra** [2] - 85:15, 85:20

**change** [5] - 15:24, 19:22, 34:7, 57:25, 72:14

**changing** [1] - 79:1

**characterization** [1] - 30:12

**charging** [4] - 18:21, 63:22, 65:4, 65:6

**CHNV** [7] - 8:15, 10:12, 32:9, 32:17, 32:23, 77:17, 78:4

**choice** [1] - 28:16

**choices** [1] - 30:24

**choose** [1] - 53:8

**chooses** [1] - 60:14

**circuit** [1] - 71:16

**Circuit** [18] - 37:16, 42:8, 42:9, 42:14, 42:22, 44:23, 46:22, 46:23, 47:4, 47:8, 47:10, 58:5, 58:19, 71:15, 71:18, 76:22, 80:8, 82:23

**circular** [1] - 19:1

**circumstance** [1] - 47:24

**circumstances** [1] - 56:3

**cite** [4] - 29:11, 58:4, 66:3, 71:23

**cited** [3] - 11:6, 45:5, 58:19

**cites** [1] - 79:7

**citing** [1] - 67:2

**citizen** [2] - 36:12, 36:15

**civil** [1] - 3:4

**claim** [5] - 8:21, 32:5, 45:21, 46:2, 46:13

**claims** [4] - 4:5, 68:24, 79:13, 82:24

**clarified** [1] - 42:10

**clarify** [1] - 44:6

**clarifying** [1] - 22:8

**clear** [19] - 5:17, 6:16, 7:14, 9:3, 10:5, 11:22, 14:7, 15:7, 28:21, 30:3, 32:23, 57:25, 68:12, 73:17, 75:13, 78:16, 82:21, 82:23, 83:11

**clearer** [1] - 73:24

**clearest** [1] - 25:24

**clearly** [11] - 10:9, 10:24, 12:4, 14:5, 19:18, 25:19, 30:13,

40:5, 43:6, 43:16, 61:23

**CLERK** [1] - 3:3

**clients** [1] - 8:6

**clock** [1] - 55:3

**closely** [1] - 16:6

**closing** [1] - 82:21

**Coalition** [1] - 3:5

**colleague** [5] - 4:2, 5:3, 33:13, 34:14, 38:7

**coming** [2] - 19:24, 75:5

**commence** [1] - 63:20

**commencement** [2] - 64:8, 64:14

**common** [1] - 24:4

**communities** [1] - 83:25

**community** [1] - 35:17

**compared** [1] - 37:14

**compensable** [2] - 78:7, 84:1

**compensated** [1] - 79:4

**complaint** [4] - 40:3, 42:24, 43:4

**complete** [5] - 71:6, 72:2, 82:4, 82:6

**completed** [4] - 12:1, 17:20, 73:21, 75:16

**completely** [3] - 7:12, 18:17, 74:25

**complicated** [1] - 83:7

**comply** [3] - 22:1, 39:21, 72:12

**comport** [2] - 39:18, 39:22

**concede** [2] - 18:8, 48:19

**conceding** [1] - 76:8

**concept** [1] - 31:9

**concern** [1] - 68:3

**concerned** [2] - 75:11, 81:17

**concerning** [1] - 71:17

**concerns** [1] - 38:7

**concessions** [2] - 48:24, 51:15

**conclude** [1] - 16:6

**concluded** [1] - 14:8

**conclusion** [1] - 39:6

**concurrence** [1] - 80:10

**concurring** [4] - 50:10, 50:13, 51:8, 70:19

**condition** [1] - 17:20

**conditions** [1] - 29:22

**confer** [1] - 37:14

**confess** [2] - 60:1, 64:25

**confirm** [1] - 20:10

**conflicting** [2] - 21:5, 22:19

**conflicts** [1] - 21:13

**confronted** [1] - 79:15

**confused** [1] - 47:17

**confusing** [1] - 60:2

**confusion** [1] - 64:25

**Congress** [23] - 18:16, 18:23, 19:2, 19:7, 24:23, 25:10, 29:21, 30:15, 30:25, 31:8, 31:12, 31:21, 57:20, 57:23, 59:2, 60:24, 61:23, 66:18, 74:16, 74:20, 75:4, 81:13

**Congress's** [2] - 24:5, 75:14

**conjunction** [1] - 17:25

**consider** [6] - 52:18, 53:13, 53:25, 54:2, 54:22, 67:17

**consideration** [1] - 34:10

**considered** [12] - 27:21, 28:24, 30:23, 31:3, 37:1, 41:4, 41:22, 59:16, 59:17, 62:8, 63:15, 83:21

**considering** [1] - 15:18

**consistency** [1] - 33:21

**consistent** [8] - 21:15, 22:7, 22:22, 33:24, 62:10, 62:24, 81:4, 81:7

**construction** [2] - 31:19, 72:9

**constructively** [2] - 58:22, 59:12

**construed** [1] - 28:13

**construing** [1] - 51:4

**contain** [1] - 51:2

**contains** [1] - 6:12

**contemplated** [1] - 25:20

**contemplates** [1] - 43:16

**contend** [2] - 54:23, 68:13

**contending** [2] - 54:6, 60:3

**contends** [1] - 43:23

**context** [17] - 12:3, 15:13, 17:10, 17:16, 41:21, 44:3, 44:24,

45:14, 46:9, 50:15, 54:13, 56:22, 57:22, 58:8, 59:8, 70:14, 71:13

**contexts** [2] - 46:2, 54:22

**continue** [10] - 11:9, 18:6, 29:8, 29:15, 31:10, 39:11, 39:16, 48:20, 65:22, 74:9

**continues** [9] - 13:7, 15:12, 15:14, 16:18, 16:25, 17:23, 73:23, 74:1, 80:3

**contradictory** [1] - 74:23

**contrary** [9] - 4:5, 8:16, 8:21, 8:23, 12:20, 32:5, 39:9, 41:12, 83:14

**contrast** [1] - 12:15

**control** [1] - 80:9

**controlling** [3] - 80:8, 80:15, 82:22

**controls** [3] - 21:10, 22:18, 83:9

**convey** [3] - 17:4, 17:14, 57:2

**conveys** [4] - 16:17, 16:24, 17:22, 73:22

**convicted** [1] - 12:10

**conviction** [1] - 12:9

**coordinate** [1] - 69:25

**Corps** [1] - 80:16

**correct** [13] - 4:15, 4:16, 7:1, 11:4, 24:5, 60:7, 61:7, 62:23, 63:17, 66:23, 67:10, 73:13, 85:16

**correctly** [1] - 69:2

**counsel** [1] - 3:7

**counsel's** [1] - 3:21

**count** [1] - 12:12

**countervailing** [1] - 69:21

**country** [20] - 9:12, 9:15, 20:6, 20:12, 23:24, 24:11, 24:21, 24:22, 26:3, 28:5, 28:6, 37:3, 59:17, 59:22, 66:20, 68:21, 68:22, 69:17, 74:10, 81:11

**course** [3] - 7:21, 36:5, 78:1

**Court** [72] - 3:2, 5:17, 6:8, 7:11, 7:15, 8:7, 8:20, 9:2, 11:7, 11:18, 11:22, 11:23, 12:4, 13:15, 16:24,

18:22, 20:15, 23:7, 31:16, 33:7, 34:21, 37:24, 38:3, 39:6, 40:2, 40:6, 42:21, 42:25, 43:23, 44:19, 45:23, 46:9, 46:14, 47:19, 47:25, 48:1, 48:8, 48:24, 49:24, 50:13, 50:24, 51:14, 56:13, 58:10, 58:23, 59:19, 67:11, 68:13, 70:13, 71:10, 71:15, 76:11, 79:7, 79:8, 79:12, 79:18, 80:12, 81:9, 81:17, 82:2, 82:4, 82:5, 82:13, 82:23, 83:6, 84:22, 84:24, 85:3, 85:8

**court** [11] - 15:17, 35:14, 43:17, 43:22, 45:6, 69:24, 80:22, 81:21, 82:15, 82:18, 83:3

**COURT** [130] - 3:11, 3:17, 3:22, 4:8, 4:13, 4:18, 5:5, 5:11, 5:14, 6:11, 6:22, 7:2, 7:19, 7:22, 8:11, 11:2, 11:5, 13:11, 13:19, 13:22, 14:12, 14:21, 15:8, 15:20, 15:23, 16:14, 17:8, 17:13, 18:6, 21:12, 21:22, 21:25, 22:4, 22:24, 23:1, 26:20, 27:6, 27:13, 27:16, 28:18, 29:11, 32:8, 33:4, 33:11, 33:15, 33:19, 34:13, 34:16, 34:24, 35:2, 35:22, 37:9, 37:11, 38:20, 38:23, 39:3, 40:12, 40:14, 40:21, 41:16, 41:18, 42:4, 43:13, 44:2, 44:4, 44:8, 44:22, 45:9, 45:17, 45:20, 46:4, 46:16, 46:20, 46:24, 47:15, 47:17, 47:23, 48:4, 48:13, 49:2, 49:17, 52:2, 52:9, 52:11, 52:23, 54:4, 54:19, 55:12, 55:17, 55:22, 57:6, 60:1, 60:8, 60:21, 60:23, 61:4, 61:9, 61:11, 62:10, 62:24, 63:2, 63:5, 63:8, 63:18, 63:24, 64:7, 65:17, 67:4, 67:20, 70:5, 70:8, 70:10, 70:17, 70:23, 70:25,

71:2, 71:14, 72:4, 72:6, 72:19, 72:25, 73:2, 73:4, 73:8, 74:13, 75:24, 76:2, 76:4, 85:4, 85:6

**Court's** [12] - 14:7, 15:9, 16:4, 32:13, 33:2, 38:17, 38:22, 39:8, 43:15, 51:6, 59:18, 80:24

**court's** [1] - 51:11

**courthouse** [1] - 5:22

**COURTROOM** [1] - 3:3

**courts** [5] - 71:4, 71:21, 79:12, 80:3, 83:3

**Courts** [2] - 79:12, 81:19

**cover** [1] - 42:17

**covered** [1] - 64:22

**create** [1] - 66:16

**created** [2] - 25:8, 29:21

**creates** [1] - 31:18

**creating** [2] - 55:8, 75:15

**creation** [1] - 31:13

**credible** [9] - 35:20, 36:2, 36:18, 36:19, 36:25, 37:2, 68:24, 69:6

**criminal** [2] - 11:18, 12:8

**Cuban** [1] - 36:23

**curious** [1] - 67:21

**current** [5] - 11:10, 17:15, 20:12, 20:22, 69:4

**custody** [1] - 58:16

**D**

**D.C** [6] - 42:9, 42:13, 44:23, 46:22, 76:22, 80:8

**damages** [3] - 78:7, 79:4, 84:2

**dangerous** [1] - 35:24

**DATE** [1] - 85:20

**date** [1] - 77:10

**dated** [1] - 51:22

**days** [1] - 77:9

**deal** [1] - 74:7

**dealing** [3] - 10:5, 14:11, 81:22

**deals** [2] - 9:9, 76:14

**dealt** [2] - 29:8, 65:23

**death** [1] - 37:4

**decades** [3] - 6:4,

23:25, 27:19

**decided** [1] - 37:16

**decides** [1] - 18:24

**decision** [27] - 11:7, 16:5, 17:18, 28:9, 32:13, 32:16, 33:4, 33:8, 37:15, 42:9, 42:12, 42:13, 50:25, 51:1, 51:7, 58:5, 59:18, 69:1, 69:3, 69:8, 69:23, 71:23, 71:24, 78:8, 80:13, 80:21, 80:25

**decisions** [2] - 32:3, 58:23

**declarants** [1] - 36:4

**declaration** [8] - 34:22, 34:25, 35:4, 35:11, 37:24, 78:19, 78:20, 78:21

**declarations** [12] - 6:1, 35:7, 35:8, 35:23, 36:3, 36:11, 36:21, 37:13, 37:21, 37:25, 79:20, 83:25

**declaratory** [4] - 39:19, 46:16, 46:18, 77:3

**declaring** [1] - 46:17

**defendant** [1] - 12:8

**defendants** [28] - 3:18, 3:20, 5:18, 9:1, 11:15, 18:8, 18:18, 18:22, 21:3, 21:7, 21:9, 23:20, 26:1, 26:9, 28:22, 30:11, 31:7, 31:14, 39:24, 40:15, 40:17, 43:1, 72:1, 72:20, 74:16, 76:8, 78:14, 83:8

**defendants'** [12] - 5:15, 12:20, 21:1, 26:17, 27:22, 29:1, 29:4, 29:18, 36:1, 37:12, 43:6, 81:24

**define** [1] - 76:9

**defined** [5] - 19:14, 23:25, 29:23, 30:15, 78:14

**defines** [2] - 28:2, 29:24

**definitely** [1] - 69:21

**definition** [7] - 4:14, 4:22, 19:18, 28:4, 30:14, 48:18, 58:6

**definitions** [2] - 26:24, 27:8

**delivery** [1] - 25:15

**demonstrate** [2] - 69:19, 70:3

**demonstrated** [1] - 69:14

**demonstrates** [1] - 51:13

**deny** [2] - 48:24, 51:15

**deportation** [1] - 36:25

**DEPUTY** [1] - 3:3

**designate** [1] - 61:16

**designated** [1] - 57:12

**designation** [14] - 9:17, 9:21, 10:3, 23:15, 56:7, 60:13, 60:15, 61:13, 61:16, 64:6, 65:10, 65:12, 68:4, 68:10

**despite** [1] - 6:24

**detail** [1] - 56:8

**detailed** [1] - 36:10

**detain** [1] - 5:24

**detained** [5] - 35:18, 36:12, 58:22, 59:13, 66:13

**detention** [2] - 25:15, 25:16

**determination** [3] - 36:19, 71:8, 77:2

**determinations** [1] - 77:1

**determined** [2] - 10:17, 11:7

**DHS** [7] - 18:24, 27:19, 32:23, 52:4, 65:5, 77:17, 79:22

**DHS's** [2] - 20:8, 77:19

**dictionary** [1] - 77:23

**difference** [2] - 35:15, 69:11

**differences** [2] - 34:23, 35:5

**different** [13] - 6:17, 8:8, 26:24, 27:9, 37:18, 38:16, 41:13, 46:2, 49:20, 61:14, 66:14, 83:6, 83:18

**difficult** [1] - 21:25

**difficulty** [2] - 16:22, 16:23

**direct** [3] - 53:13, 78:1, 78:2

**directing** [1] - 54:21

**directive** [17] - 7:6, 8:15, 23:16, 34:3, 52:24, 52:25, 53:4, 54:6, 54:11, 54:21, 54:25, 55:1, 55:2, 55:4, 55:13, 55:17, 55:19

**directives** [4] - 4:21, 22:6, 49:13, 49:15

**directly** [2] - 8:10, 73:24

**disagree** [1] - 77:16

**disagreement** [1] - 57:16

**discretion** [11] - 50:15, 50:16, 53:7, 53:8, 54:12, 55:16, 55:24, 67:11, 67:13, 67:19, 81:18

**discretionary** [3] - 9:20, 28:9, 53:12

**discussed** [1] - 58:11

**discusses** [1] - 45:6

**discussing** [2] - 8:5, 74:5

**discussion** [3] - 15:9, 56:21, 73:15

**dismiss** [1] - 5:23

**disposal** [1] - 65:13

**dispute** [2] - 5:15, 55:12

**distinct** [5] - 9:9, 19:19, 24:16, 25:11, 73:9

**distinction** [5] - 13:12, 15:16, 72:10, 72:13, 72:17

**distinguished** [1] - 71:6

**distractions** [1] - 9:1

**district** [1] - 83:3

**District** [2] - 79:12, 81:19

**divides** [1] - 24:15

**Dixon** [2] - 42:9, 76:13

**Doctors** [1] - 81:1

**Doctrine** [2] - 21:2, 21:18

**document** [10] - 13:4, 18:21, 53:4, 53:5, 55:7, 55:15, 56:11, 63:22, 65:4, 65:7

**documenting** [1] - 37:22

**documents** [12] - 4:21, 43:12, 50:17, 51:1, 51:19, 51:24, 53:25, 55:8, 56:25, 57:4, 75:5, 75:12

**Doe** [9] - 32:13, 32:15, 32:16, 38:6, 38:7, 38:17, 53:19, 56:17, 68:18

**DOJ** [1] - 23:8

**done** [1] - 49:25

**down** [3] - 39:1, 52:22, 84:18

**drawing** [2] - 15:16, 72:13

**driving** [2] - 36:13, 84:10
**due** [1] - 31:10
**duration** [1] - 63:6
**during** [1] - 36:5

# E

**e)(3** [1] - 44:17
**e)(3)(B** [1] - 77:8
**E.I.R.M** [2] - 36:9, 84:10
**E.M.P** [1] - 35:10
**earn** [1] - 84:14
**easy** [1] - 35:16
**effect** [13] - 6:17, 6:19, 12:5, 13:8, 13:10, 14:16, 17:25, 19:1, 33:10, 38:6, 57:4, 73:6, 73:8
**effectively** [1] - 26:6
**either** [7] - 8:20, 10:8, 11:25, 41:8, 42:2, 70:20, 73:20
**element** [1] - 5:9
**eligibility** [1] - 84:20
**eligible** [3] - 9:25, 10:2, 10:7
**Ellis** [1] - 59:22
**elsewhere** [1] - 23:3
**emphasis** [1] - 76:13
**emphasize** [2] - 67:10, 75:11
**emphasizes** [3] - 28:16, 58:13, 58:14
**employment** [1] - 13:4
**enacted** [1] - 58:9
**encourage** [1] - 52:18
**encouraging** [1] - 53:9
**end** [4] - 22:18, 39:24, 78:3, 83:8
**ended** [2] - 15:20, 18:12
**endorse** [1] - 45:3
**ends** [3] - 12:16, 58:15, 59:5
**enforced** [3] - 6:14, 7:5, 52:12
**enforcement** [7] - 5:22, 53:8, 53:13, 54:12, 55:15, 55:23, 68:20
**enforcing** [3] - 4:24, 70:2, 80:5
**engaged** [2] - 36:11, 36:14
**Engineers** [1] - 80:16
**enjoin** [1] - 43:1
**enjoined** [1] - 42:16

**enter** [1] - 58:21
**entered** [1] - 25:23
**enters** [1] - 69:24
**entire** [1] - 32:20
**entry** [21] - 9:4, 19:15, 20:19, 23:23, 24:9, 28:5, 29:3, 29:6, 31:9, 31:10, 31:13, 31:17, 43:3, 43:9, 48:22, 58:3, 59:10, 65:21, 74:17, 74:20, 75:12
**equate** [1] - 31:3
**equitable** [3] - 81:18, 81:22, 83:23
**equities** [2] - 79:6, 79:14
**ER** [1] - 20:10
**erroneously** [2] - 79:17, 84:4
**error** [1] - 54:6
**Escobar** [2] - 37:22, 78:21
**especially** [4] - 8:9, 42:23, 79:15, 80:10
**essentially** [11] - 13:7, 24:19, 26:9, 27:18, 28:8, 29:13, 40:23, 43:10, 46:16, 54:21, 75:7
**established** [1] - 82:9
**Esther** [2] - 3:13, 5:7
**et** [5] - 3:5, 3:6, 22:6, 49:18, 72:17
**event** [13] - 11:25, 16:17, 16:20, 16:25, 17:1, 17:4, 17:5, 17:9, 17:10, 17:23, 73:22, 73:25, 74:8
**evidence** [15] - 5:16, 6:15, 7:13, 24:3, 27:18, 31:14, 37:18, 37:20, 37:21, 37:23, 38:2, 38:3, 66:17, 74:19, 75:13
**exact** [2] - 16:15, 73:16
**exactly** [2] - 48:12, 59:19
**example** [8] - 12:23, 13:16, 25:14, 35:10, 36:9, 36:22, 52:15, 58:4
**examples** [4] - 12:23, 14:15, 15:7, 25:19
**except** [1] - 45:23
**exception** [1] - 44:12
**exclude** [1] - 45:13
**excluded** [2] - 9:4, 64:22

**excluding** [1] - 28:11
**excuse** [10] - 18:16, 26:12, 32:1, 34:9, 36:21, 38:13, 77:5, 77:13, 81:19, 85:1
**executive** [1] - 49:4
**executive's** [2] - 79:9, 80:4
**exempt** [1] - 26:14
**exempted** [2] - 10:25, 19:7
**exercise** [1] - 53:7
**exhibit** [2] - 23:7, 23:12
**exist** [3] - 7:9, 14:2, 22:20
**existed** [3] - 39:13, 50:21, 73:10
**exists** [1] - 18:2
**expanded** [17] - 9:17, 9:19, 10:10, 18:9, 18:16, 19:8, 20:8, 20:10, 20:17, 20:24, 23:9, 23:14, 26:7, 26:16, 32:1, 67:25, 74:25
**expanding** [2] - 53:22, 67:24
**expansion** [2] - 53:17, 68:1
**expedited** [135] - 4:6, 5:21, 5:25, 8:17, 8:25, 9:5, 9:17, 9:20, 9:25, 10:2, 10:7, 10:10, 10:13, 10:25, 18:9, 18:11, 18:15, 18:16, 18:21, 18:24, 18:25, 19:9, 20:8, 20:9, 20:17, 20:25, 22:12, 22:15, 23:9, 23:14, 23:17, 23:19, 24:1, 24:7, 24:16, 25:3, 25:8, 25:9, 26:5, 26:7, 26:11, 26:15, 26:16, 29:17, 29:21, 30:17, 30:19, 30:23, 31:4, 31:8, 31:13, 31:24, 32:2, 32:19, 32:25, 34:6, 34:8, 34:9, 34:18, 35:5, 35:13, 35:16, 36:2, 37:8, 38:12, 38:13, 39:12, 39:17, 39:25, 40:9, 43:1, 43:7, 43:18, 44:3, 44:16, 44:18, 44:20, 48:21, 51:18, 52:5, 52:18, 53:10, 53:14, 53:17, 53:23, 54:3, 54:16, 54:22, 55:9,

56:3, 56:14, 56:21, 57:9, 60:16, 60:20, 60:24, 61:17, 61:23, 62:11, 62:21, 63:12, 63:16, 63:21, 64:2, 64:8, 64:12, 64:14, 64:16, 64:19, 65:7, 67:7, 67:12, 67:17, 67:24, 69:11, 74:17, 74:21, 74:25, 75:10, 75:15, 75:21, 76:20, 77:18, 77:21, 78:13, 78:15, 78:16, 78:22, 78:24, 78:25, 83:12, 83:16, 83:19, 84:9
**experience** [1] - 14:4
**experiencing** [1] - 6:21
**expire** [1] - 15:3
**expired** [2] - 12:24, 16:20
**explain** [6] - 10:9, 27:2, 27:11, 61:9, 65:11, 83:15
**explained** [1] - 34:2
**explaining** [2] - 27:25, 74:3
**explanation** [3] - 33:9, 34:8, 34:12
**explicit** [1] - 67:23
**explicitly** [2] - 10:25, 26:14
**explode** [1] - 75:20
**expose** [1] - 10:12
**expound** [3] - 27:1, 27:11, 41:9
**expresses** [1] - 77:19
**expressly** [1] - 80:11
**extant** [2] - 14:10, 16:8
**extend** [2] - 70:20, 84:25
**extended** [1] - 52:12
**extends** [2] - 18:18, 70:10
**extent** [4] - 32:11, 70:21, 71:15, 77:22
**extraordinary** [1] - 19:3

# F

**f)(1** [2] - 42:14, 42:15
**F.3d** [2] - 76:18, 80:17
**face** [5] - 34:18, 34:19, 35:24, 37:3, 79:17
**fact** [28] - 6:1, 9:19, 9:22, 15:25, 18:1, 18:3, 19:7, 19:10, 19:22, 24:23, 28:16,

34:7, 35:8, 36:12, 36:14, 36:20, 38:11, 42:8, 50:5, 61:19, 67:14, 69:18, 72:15, 74:9, 74:20, 77:9, 78:11, 84:20
**factors** [3] - 34:10, 70:15, 83:23
**facts** [2] - 38:14, 38:15
**factually** [1] - 38:19
**fail** [3] - 12:20, 83:15, 83:20
**fair** [1] - 55:20
**fall** [2] - 68:6, 78:23
**falls** [2] - 4:11, 61:17
**familiar** [3] - 48:5, 48:9
**families** [2] - 83:24, 84:14
**family** [1] - 35:17
**fashion** [1] - 5:21
**favor** [1] - 79:14
**fear** [11] - 35:20, 36:2, 36:8, 36:18, 36:19, 36:25, 37:2, 37:3, 68:24, 69:6, 69:7
**February** [4] - 8:15, 23:16, 34:3, 52:24
**federal** [10] - 5:19, 38:11, 39:10, 39:15, 39:21, 50:19, 51:10, 69:24, 84:16, 84:17
**Federal** [1] - 77:13
**fiancee** [2] - 36:17, 84:11
**fiction** [7] - 12:6, 31:9, 31:10, 31:13, 31:17, 74:17, 74:21
**filed** [1] - 82:1
**final** [1] - 48:7
**finally** [4] - 20:8, 31:5, 81:24, 83:23
**finer** [4] - 27:13, 32:10, 38:5, 73:15
**finite** [1] - 59:11
**first** [24] - 3:24, 9:11, 11:23, 12:14, 12:18, 14:2, 22:9, 24:4, 24:19, 32:17, 34:16, 34:21, 54:15, 54:17, 54:18, 56:3, 57:18, 68:7, 73:11, 73:20, 76:7, 77:16, 78:9, 83:1
**First** [2] - 11:19, 12:3
**firsthand** [1] - 14:4
**fit** [2] - 68:4, 84:24
**fits** [2] - 13:22, 58:6
**five** [2] - 69:3, 69:7
**flip** [3] - 34:4, 83:17

**flip-flop** [1] - 83:17
**flip-flopping** [1] - 34:4
**flop** [1] - 83:17
**flopping** [1] - 34:4
**focus** [1] - 21:10
**focused** [3] - 37:19, 75:4, 75:8
**focuses** [1] - 20:21
**focusing** [2] - 40:4, 66:22
**folks** [6] - 9:12, 9:14, 9:23, 15:4, 24:21, 26:18
**follow** [4] - 41:5, 42:1, 51:5
**following** [2] - 20:19, 58:20
**foothold** [1] - 59:1
**footnote** [4] - 26:22, 27:5, 27:14, 27:18
**Footnote** [3] - 27:3, 27:6, 39:14
**foreclose** [3] - 36:24, 37:7, 84:21
**foreclosed** [1] - 41:10
**foregoing** [3] - 79:3, 84:12, 85:16
**forever** [4] - 25:22, 27:23, 31:18, 31:23
**forgot** [1] - 25:4
**form** [1] - 77:2
**forth** [5] - 9:1, 56:9, 62:3, 69:22, 75:14
**forthwith** [1] - 58:15
**forward** [1] - 12:10
**fourth** [1] - 35:3
**Freire** [1] - 36:10
**friend** [2] - 48:15, 66:24
**FRN** [5] - 32:17, 32:23, 56:11, 56:21, 77:12
**front** [1] - 40:1
**full** [1] - 17:16
**future** [2] - 36:16, 40:8

## G

**gained** [1] - 59:1
**general** [4] - 9:21, 10:3, 47:8, 60:16
**Gill** [1] - 71:24
**gist** [1] - 71:3
**given** [11] - 13:2, 14:25, 20:17, 35:19, 36:4, 43:19, 51:15, 53:14, 54:11, 67:20, 80:10
**glad** [2] - 11:13, 44:5
**goal** [1] - 75:14
**gold** [3] - 13:16, 17:10

**Gorsuch** [2] - 50:12, 51:8
**Gorsuch's** [1] - 50:9
**government** [34] - 5:20, 6:22, 7:8, 11:6, 21:18, 22:13, 23:12, 38:11, 39:10, 39:16, 39:21, 43:23, 48:20, 49:8, 49:18, 50:1, 51:3, 51:5, 63:10, 69:22, 69:25, 70:1, 76:13, 76:18, 76:23, 77:14, 79:15, 82:25, 83:5, 84:3, 84:16, 84:17
**government's** [12] - 4:19, 41:9, 42:20, 43:14, 45:16, 60:12, 62:17, 67:5, 68:15, 68:19, 75:18, 79:13
**Grace** [4] - 42:12, 76:18, 80:9, 83:2
**grammar** [1] - 17:25
**grammatical** [3] - 11:11, 15:18, 72:9
**grammatically** [1] - 24:5
**grant** [9] - 12:17, 13:1, 14:24, 33:2, 39:6, 43:16, 46:9, 67:23, 84:23
**granted** [5] - 20:5, 24:11, 43:2, 74:6, 74:10
**granting** [2] - 29:22, 45:8
**grants** [1] - 7:12
**grave** [1] - 84:1
**green** [1] - 14:24
**ground** [1] - 52:3
**grounds** [4] - 10:18, 30:6, 30:7, 75:10
**group** [5] - 9:16, 9:24, 10:1, 61:17, 61:24
**groups** [4] - 9:9, 9:23, 10:6, 28:3
**guess** [12] - 4:18, 15:8, 16:12, 16:21, 18:7, 34:16, 45:3, 46:23, 47:15, 49:11, 60:23, 73:14
**guidance** [8] - 44:15, 50:14, 52:17, 53:23, 53:24, 55:14, 77:15, 77:25
**guide** [1] - 77:25
**guideline** [1] - 55:21
**guiding** [2] - 77:25, 78:1

## H

**half** [2] - 38:9, 38:12
**hand** [1] - 23:17
**handle** [3] - 4:3, 5:4, 33:13
**hangs** [1] - 25:22
**happy** [2] - 27:17, 32:6
**harm** [17] - 34:17, 35:23, 37:20, 37:23, 38:2, 38:4, 38:15, 40:5, 69:14, 69:20, 70:3, 71:13, 76:10, 78:5, 79:3, 79:18
**harmed** [1] - 82:17
**harms** [7] - 6:19, 7:13, 7:14, 69:13, 79:14, 79:19, 83:24
**head** [1] - 23:3
**Health** [1] - 82:3
**hear** [2] - 3:24, 47:25
**heard** [1] - 53:18
**hearing** [2] - 3:23, 35:14
**held** [3] - 11:18, 12:4, 85:17
**help** [3] - 60:2, 64:24, 64:25
**helpful** [1] - 57:6
**hereby** [1] - 85:15
**Hewitt** [6] - 11:6, 11:16, 11:17, 16:5, 73:15, 74:12
**highlight** [1] - 78:21
**highlights** [1] - 9:22
**Hillary** [2] - 3:9, 4:1
**historical** [2] - 19:10, 62:6
**history** [7] - 26:23, 27:8, 62:2, 66:15, 66:16, 75:2, 75:3
**holder** [2] - 13:17, 13:18
**holding** [3] - 42:19, 70:11, 70:20
**Honor** [25] - 3:4, 3:9, 3:19, 3:25, 5:7, 9:16, 11:13, 31:11, 40:16, 40:18, 41:14, 42:6, 47:22, 48:12, 52:8, 53:24, 54:15, 70:9, 70:12, 73:13, 73:18, 74:22, 75:1, 76:6, 81:6
**Honor's** [1] - 65:9
**hope** [2] - 69:1, 73:25
**Huffman** [5] - 8:14, 10:11, 51:21, 53:4, 53:16
**human** [1] - 84:5

**Humane** [1] - 3:5
**hundreds** [4] - 43:7, 56:18, 67:5, 68:16

## I

**ICE** [3] - 5:24, 8:15, 23:16
**idea** [3] - 48:5, 74:20, 75:7
**identified** [5] - 71:12, 78:12, 78:24, 82:1, 85:2
**identifies** [1] - 8:6
**identify** [2] - 82:12, 82:16
**ignore** [2] - 75:19, 75:20
**III** [1] - 48:25
**IIRIRA** [2] - 29:20, 75:3
**illustrate** [1] - 35:9
**imagine** [1] - 79:7
**immediately** [2] - 5:24, 66:12
**Immigration** [1] - 3:5
**immigration** [11] - 5:22, 12:21, 19:14, 19:17, 35:14, 50:15, 52:18, 53:6, 54:1, 59:8, 80:5
**imminently** [1] - 78:17
**impacted** [1] - 44:14
**implement** [3] - 48:20, 50:20, 77:5
**implementation** [2] - 55:4, 77:4
**implemented** [2] - 10:3, 54:18
**implementing** [2] - 4:24, 76:20
**import** [1] - 73:11
**importance** [1] - 77:11
**important** [6] - 9:21, 53:3, 57:19, 58:7, 58:13, 66:9
**imposed** [7] - 11:8, 11:19, 12:13, 12:14, 14:9, 16:7, 16:13
**imposes** [2] - 21:14, 22:5
**improperly** [1] - 69:25
**improvement** [1] - 7:17
**INA** [2] - 8:23, 79:9
**inaccurate** [1] - 30:12
**inadmissibility** [3] - 10:18, 30:6, 75:10
**inadmissible** [1] - 10:18

**inclined** [1] - 39:6
**include** [1] - 29:25
**included** [2] - 26:7, 31:21
**including** [6] - 5:21, 26:12, 38:15, 54:3, 54:12, 85:2
**incoherent** [1] - 74:23
**inconsistencies** [2] - 21:23, 75:20
**inconsistency** [1] - 34:1
**inconsistent** [3] - 22:1, 22:4, 22:10
**incorporate** [1] - 28:13
**incorrect** [1] - 32:3
**indefinitely** [1] - 26:3
**indicated** [1] - 51:3
**indicates** [1] - 75:4
**indication** [1] - 20:2
**indications** [1] - 31:1
**individual** [27] - 10:24, 12:15, 12:25, 14:23, 20:23, 23:10, 23:13, 26:10, 28:24, 29:1, 30:4, 31:2, 44:10, 44:12, 44:13, 44:19, 44:21, 45:1, 45:11, 45:12, 45:15, 45:24, 46:12, 58:17, 59:9, 80:20, 82:17
**individual's** [2] - 29:7, 65:22
**individuals** [51] - 4:6, 5:20, 5:25, 6:23, 9:3, 10:7, 10:13, 18:17, 18:23, 22:14, 23:19, 24:24, 24:25, 26:8, 26:15, 27:21, 27:23, 28:3, 31:18, 32:19, 34:6, 38:9, 38:12, 39:11, 39:16, 51:19, 52:5, 53:22, 56:19, 56:24, 57:12, 58:25, 61:17, 61:24, 62:7, 63:14, 63:25, 64:4, 66:18, 66:19, 67:8, 67:13, 68:16, 68:20, 69:15, 75:16, 75:21, 79:16, 83:12, 83:16, 84:15
**infer** [1] - 38:16
**influence** [1] - 78:2
**initiate** [1] - 77:21
**injected** [1] - 74:20
**injunction** [14] - 40:24, 41:4, 41:7, 41:13, 41:17, 41:20, 41:22, 41:25, 42:2,

69:24, 70:15, 80:24, 81:20

**injunctions** [1] - 77:6

**injunctive** [3] - 43:9, 46:14, 76:15

**injured** [1] - 82:12

**injuries** [1] - 84:2

**injury** [7] - 33:12, 34:15, 44:13, 47:1, 51:12, 78:11, 79:9

**injury-in-fact** [1] - 78:11

**insofar** [1] - 32:18

**inspected** [4] - 23:24, 26:2, 74:6, 74:10

**inspection** [3] - 19:16, 20:5, 20:19

**instituted** [1] - 77:8

**instructive** [1] - 78:10

**insufficient** [1] - 37:14

**intended** [1] - 61:23

**intends** [1] - 32:23

**intent** [1] - 77:19

**intentionally** [1] - 31:21

**interest** [5] - 68:19, 69:21, 79:16, 83:21, 84:4

**interested** [1] - 37:11

**interpretation** [6] - 19:4, 26:5, 29:19, 57:7, 72:8, 75:18

**intervening** [1] - 42:13

**interview** [4] - 35:20, 36:18, 37:1, 37:2

**intrudes** [1] - 69:25

**intrusion** [1] - 70:3

**invalid** [1] - 81:10

**invalidate** [1] - 50:14

**invalidating** [1] - 50:25

**involved** [1] - 56:18

**involves** [1] - 5:22

**involving** [3] - 46:7, 46:9, 80:23

**irregular** [1] - 39:15

**irreparable** [8] - 33:12, 34:15, 34:17, 69:20, 70:3, 78:5, 78:6, 79:3

**Island** [1] - 59:22

**issue** [19] - 4:9, 4:21, 5:2, 6:8, 6:24, 21:12, 38:15, 40:4, 40:8, 44:19, 47:20, 48:8, 50:3, 54:10, 56:19, 62:3, 71:11, 77:7, 81:20

**issued** [4] - 5:18, 42:9, 50:24, 53:23

**issuing** [1] - 65:6

**iterations** [2] - 26:25, 27:9

**itself** [3] - 27:20, 28:1, 51:1

## J

**J.G.G** [1] - 79:21

**Jackson** [3] - 37:19, 38:1, 38:2

**Jackson's** [2] - 16:5, 78:8

**January** [4] - 8:14, 10:11, 34:3, 51:22

**Jawetz** [1] - 3:15

**Jessica** [1] - 35:11

**Judge** [6] - 37:19, 38:1, 78:8, 80:22

**judgment** [7] - 12:8, 39:19, 48:6, 48:7, 48:8, 51:11, 51:12

**judicial** [1] - 76:25

**July** [2] - 80:22, 85:20

**jump** [2] - 4:3, 8:2

**jumping** [3] - 22:24, 23:1, 26:21

**June** [1] - 51:23

**jurisdiction** [3] - 47:25, 82:21, 82:23

**jurisdictional** [2] - 83:1, 83:4

**Justice** [6] - 16:5, 50:9, 50:12, 51:8, 69:2, 80:10

**justification** [2] - 56:22, 83:18

**justify** [1] - 49:4

## K

**Karen** [1] - 3:14

**Kavanaugh's** [1] - 80:10

**Kean** [2] - 85:15, 85:20

**keep** [1] - 70:18

**key** [4] - 34:22, 35:5, 38:1, 67:1

**Kiakombua** [1] - 83:2

**kids** [2] - 79:2, 84:13

**kind** [9] - 11:10, 15:2, 18:1, 31:6, 40:21, 40:25, 52:2, 72:8, 79:8

**knowledge** [2] - 72:18, 72:20

## L

**lack** [1] - 48:25

**laid** [1] - 20:14

**language** [18] - 6:12, 10:23, 11:23, 14:8, 15:17, 16:3, 16:15, 32:22, 45:4, 57:17, 62:16, 62:18, 62:25, 63:19, 64:18, 65:10, 75:19, 75:22

**large** [2] - 28:3, 81:11

**last** [3] - 23:6, 31:5, 80:7

**law** [20] - 4:5, 8:10, 8:16, 8:21, 8:23, 12:7, 22:23, 32:4, 32:5, 42:11, 42:22, 46:23, 47:9, 50:17, 58:10, 66:16, 71:21, 80:14, 83:14

**lawful** [8] - 19:11, 19:15, 19:20, 36:15, 36:24, 37:6, 76:9, 84:20

**lawfully** [1] - 51:3

**Lawrence** [2] - 37:22, 78:19

**laws** [2] - 19:14, 80:5

**lawsuit** [4] - 5:19, 47:18, 47:25, 49:23

**lay** [1] - 56:8

**lays** [3] - 34:22, 35:5, 55:10

**lead** [2] - 75:10, 84:13

**leads** [1] - 74:23

**least** [4] - 27:7, 41:2, 52:21, 78:12

**leave** [1] - 81:10

**leaves** [1] - 80:13

**legal** [21] - 12:5, 12:6, 12:22, 13:8, 13:10, 14:16, 17:25, 20:7, 34:5, 49:4, 49:7, 49:19, 50:1, 58:1, 58:2, 58:7, 68:21, 69:17, 73:6, 73:8, 73:11

**legislated** [2] - 31:8, 74:16

**legislating** [2] - 57:23, 59:2

**legislative** [2] - 75:2, 75:3

**legitimate** [1] - 68:14

**length** [1] - 24:22

**lengthier** [1] - 26:22

**LI** [48] - 3:9, 3:13, 3:25, 4:12, 4:16, 5:3, 7:25, 8:12, 11:4, 11:13, 13:18, 13:21, 14:1, 14:18, 14:22, 15:19, 15:22, 15:24,

17:5, 17:12, 17:16, 18:7, 21:17, 21:24, 22:3, 22:8, 22:25, 23:5, 27:4, 27:12, 27:14, 27:17, 28:19, 29:12, 32:15, 33:6, 33:13, 33:16, 33:25, 34:14, 72:18, 72:20, 73:1, 73:3, 73:6, 73:13, 74:14, 76:1

**Li** [2] - 3:10, 4:1

**light** [3] - 45:18, 53:21, 71:19

**likely** [3] - 8:12, 32:5, 69:15

**limit** [3] - 23:19, 61:5, 84:24

**limitations** [2] - 10:4, 24:23

**limited** [7] - 35:18, 45:11, 60:11, 60:13, 63:4, 77:1, 81:25

**limiting** [1] - 61:20

**limits** [1] - 19:2

**Lindsay** [1] - 36:10

**line** [2] - 58:23, 58:25

**lines** [1] - 6:12

**listener** [4] - 16:17, 16:24, 17:4, 17:14

**lives** [1] - 84:13

**logic** [2] - 19:1, 64:5

**logical** [1] - 39:5

**look** [12] - 15:11, 16:12, 29:16, 34:2, 42:24, 49:9, 50:9, 56:6, 57:22, 59:18, 62:2, 67:22

**looking** [6] - 16:14, 17:9, 17:17, 59:23, 59:24, 68:15

**looks** [1] - 33:21

**loses** [2] - 19:11, 74:25

**lower** [1] - 67:16

## M

**Madsen** [2] - 71:23, 82:2

**main** [1] - 74:14

**maintenance** [1] - 20:6

**major** [1] - 67:22

**Management** [1] - 81:2

**manner** [5] - 16:19, 29:8, 65:23, 72:16, 74:1

**map** [2] - 15:17, 17:1

**maps** [1] - 15:10

**March** [6] - 8:15, 10:12, 32:9, 34:4, 77:12, 78:3

**marriage** [1] - 36:16

**Mata** [1] - 23:10

**matter** [2] - 28:10, 85:17

**maximum** [1] - 77:21

**mean** [23] - 11:2, 15:19, 24:13, 31:11, 31:12, 37:7, 38:25, 45:8, 46:25, 48:4, 48:6, 48:8, 48:9, 49:9, 49:21, 54:7, 55:20, 56:1, 59:16, 61:21, 62:13, 62:14, 71:20

**meaning** [7] - 14:10, 15:10, 19:12, 30:25, 54:5, 59:7, 72:14

**meaningful** [1] - 69:9

**meaningless** [2] - 18:17, 19:5

**means** [6] - 16:11, 24:6, 26:14, 29:13, 29:14, 68:18

**medal** [6] - 13:16, 13:18, 13:19, 13:20, 17:10, 17:11

**medals** [1] - 14:3

**medical** [2] - 79:3, 84:12

**Meetings** [1] - 79:22

**meets** [1] - 10:19

**member** [2] - 44:25, 78:12

**members** [14] - 6:20, 7:18, 8:6, 24:10, 34:18, 37:20, 37:23, 78:22, 82:8, 82:12, 83:24, 84:7, 85:1, 85:2

**memo** [6] - 34:3, 51:21, 51:22, 52:17, 53:16

**memoranda** [1] - 50:21

**memorandum** [2] - 8:14, 10:11

**memos** [3] - 56:6, 67:14, 67:16

**mentioned** [1] - 39:14

**merely** [1] - 55:15

**merit** [2] - 4:11, 46:14

**merits** [12] - 4:2, 4:3, 4:4, 7:23, 8:2, 8:12, 8:22, 44:15, 46:19, 48:1, 74:14, 83:7

**Mezei** [1] - 59:19

**microphone** [1] - 5:12

**might** [5] - 14:15, 26:21, 49:7, 69:18
**million** [2] - 38:9, 38:12
**mind** [1] - 57:24
**Mining** [1] - 80:16
**mis** [1] - 21:21
**misconduct** [1] - 13:20
**misstates** [1] - 29:5
**mistaken** [1] - 35:4
**misunderstood** [1] - 22:9
**mix** [1] - 46:5
**moment** [1] - 25:10
**money** [4] - 78:7, 79:4, 84:1, 84:14
**moreover** [1] - 56:11
**morning** [5] - 42:8, 44:7, 48:16, 53:18, 77:24
**most** [2] - 18:14, 69:15
**motion** [13] - 4:2, 4:17, 6:7, 6:9, 35:4, 40:4, 40:6, 40:25, 43:5, 48:24, 51:15, 70:16, 84:23
**motions** [1] - 3:23
**move** [4] - 25:4, 32:6, 43:6, 51:23
**moved** [1] - 77:10
**moving** [2] - 4:16, 5:23
**MR** [63] - 3:19, 5:15, 40:16, 41:14, 41:17, 42:3, 42:5, 43:25, 44:3, 44:5, 44:9, 45:8, 45:13, 45:19, 45:22, 46:12, 46:18, 46:21, 47:13, 47:16, 47:21, 48:3, 48:11, 48:14, 49:16, 50:4, 52:8, 52:10, 52:14, 53:2, 54:14, 55:5, 55:14, 55:20, 55:23, 57:18, 60:6, 60:11, 60:22, 61:3, 61:7, 61:10, 61:13, 62:23, 63:1, 63:3, 63:6, 63:17, 63:20, 64:6, 65:2, 66:1, 67:10, 68:1, 70:7, 70:9, 70:12, 70:22, 70:24, 71:1, 71:3, 71:18, 72:5
**MS** [68] - 3:9, 3:13, 3:25, 4:12, 4:16, 5:3, 5:7, 5:13, 6:15, 6:25, 7:11, 7:21, 7:24,

7:25, 8:12, 11:4, 11:13, 13:18, 13:21, 14:1, 14:18, 14:22, 15:19, 15:22, 15:24, 17:5, 17:12, 17:16, 18:7, 21:17, 21:24, 22:3, 22:8, 22:25, 23:5, 27:4, 27:12, 27:14, 27:17, 28:19, 29:12, 32:15, 33:6, 33:13, 33:16, 33:25, 34:14, 34:21, 35:1, 35:3, 36:7, 37:10, 37:17, 38:21, 38:25, 39:4, 40:13, 72:18, 72:20, 73:1, 73:3, 73:6, 73:13, 74:14, 76:1, 76:3, 76:5, 85:5
**multiple** [1] - 79:11
**must** [2] - 19:6, 77:8

## N

**namely** [1] - 76:24
**narrow** [1] - 8:24
**narrower** [1] - 30:16
**National** [2] - 80:1, 80:15
**national** [2] - 80:24, 81:20
**nature** [2] - 12:5, 13:10
**necessarily** [1] - 31:12
**necessary** [1] - 72:1
**need** [7] - 7:12, 8:20, 22:19, 22:22, 63:25, 64:3, 79:5
**needed** [1] - 75:6
**needs** [1] - 83:6
**never** [9] - 6:5, 7:5, 12:7, 12:10, 12:14, 12:18, 73:10, 82:11, 82:14
**nevertheless** [1] - 58:21
**New** [3] - 78:8, 78:9, 83:1
**new** [3] - 31:13, 78:14, 80:12
**Nken** [1] - 79:18
**Noem** [3] - 3:5, 32:16, 80:1
**non** [1] - 4:3
**non-merits** [1] - 4:3
**noncitizen** [7] - 10:17, 20:17, 23:22, 23:23, 25:17, 26:2, 29:25
**noncitizens** [8] - 8:8, 8:24, 9:10, 10:1,

24:15, 25:16, 43:2, 57:8
**none** [1] - 36:23
**nonoverlapping** [3] - 9:23, 10:6, 24:17
**nonparties** [1] - 70:2
**normal** [1] - 84:13
**normally** [1] - 58:6
**Note** [1] - 81:2
**note** [2] - 8:3, 8:7
**noted** [2] - 76:22, 80:23
**nothing** [3] - 26:14, 30:24, 55:10
**notice** [7] - 8:16, 10:12, 32:9, 32:20, 34:4, 63:21, 65:6
**Notice** [1] - 77:13
**notion** [1] - 80:3
**notwithstanding** [2] - 45:4, 62:18
**number** [1] - 6:2

## O

**objective** [2] - 49:9, 50:2
**objectives** [2] - 49:19, 49:20
**obvious** [1] - 18:14
**obviously** [3] - 26:19, 67:11, 77:16
**occurred** [2] - 12:8, 12:18
**occurs** [1] - 25:9
**offender's** [1] - 11:20
**Office** [1] - 81:1
**office** [1] - 44:6
**officer** [1] - 19:17
**officers** [2] - 52:18, 54:1
**officials** [3] - 50:19, 53:6, 53:13
**often** [1] - 77:24
**Olive's** [1] - 35:11
**Olympic** [3] - 13:16, 13:18, 14:3
**once** [1] - 30:21
**One** [1] - 66:9
**one** [17] - 8:3, 10:20, 21:16, 22:7, 25:9, 30:2, 33:24, 38:18, 40:21, 51:16, 57:10, 58:2, 65:2, 67:16, 69:18, 76:7, 78:12
**ones** [1] - 21:7
**open** [3] - 42:7, 42:21, 70:21
**operates** [1] - 12:21
**operation** [2] - 12:6,

42:18
**opinion** [9] - 16:5, 50:10, 50:13, 51:8, 51:11, 51:12, 70:19, 73:19, 76:22
**opportunity** [3] - 11:14, 20:18, 35:19
**opposed** [1] - 13:24
**opposing** [2] - 21:4, 22:14
**opposition** [1] - 21:9
**option** [2] - 60:18, 61:18
**options** [1] - 60:19
**order** [7] - 3:2, 12:7, 25:15, 44:16, 44:20, 82:12, 82:18
**ordinary** [1] - 80:18
**organization** [4] - 44:25, 45:9, 46:7, 47:18
**organizational** [3] - 46:5, 46:6, 84:25
**organizations** [1] - 82:10
**otherwise** [1] - 65:5
**outline** [1] - 36:21
**outlined** [3] - 35:11, 43:20, 83:25
**outset** [1] - 40:19
**outside** [1] - 64:1
**outweigh** [2] - 84:3, 84:5
**overall** [1] - 83:11
**overarching** [1] - 22:16
**overlap** [2] - 60:17, 68:9
**overlapping** [1] - 60:19
**overwhelming** [1] - 79:16
**own** [3] - 8:18, 20:8, 21:19

## P

**p.m** [2] - 3:2, 85:8
**Pacito** [1] - 79:24
**Page** [2] - 43:5, 58:5
**paint** [1] - 56:25
**paints** [1] - 5:17
**paired** [2] - 20:1, 74:4
**papers** [6] - 14:13, 14:14, 34:11, 75:14, 82:1, 85:3
**Papu** [2] - 3:19, 40:17
**paragraph** [1] - 38:18
**Paragraph** [3] - 43:4, 78:19, 78:21

**Paragraphs** [1] - 78:20
**parlance** [1] - 24:4
**parole** [103] - 11:3, 12:15, 12:16, 12:17, 12:21, 12:24, 13:1, 13:3, 13:5, 13:7, 13:9, 14:5, 14:15, 14:22, 14:25, 15:1, 15:2, 15:5, 15:22, 15:23, 17:2, 18:5, 18:9, 18:12, 18:19, 18:20, 19:12, 19:24, 20:12, 20:20, 26:12, 26:18, 28:7, 28:23, 28:25, 29:5, 29:15, 29:22, 29:23, 30:3, 30:7, 30:8, 30:10, 30:12, 30:20, 30:22, 31:24, 32:19, 32:21, 32:24, 38:8, 38:12, 39:25, 43:2, 52:6, 53:19, 53:22, 56:18, 56:23, 56:24, 57:25, 58:14, 58:15, 59:5, 59:6, 59:15, 59:16, 60:4, 60:10, 60:25, 62:19, 62:20, 63:7, 63:12, 63:23, 64:3, 64:10, 64:11, 64:15, 64:21, 65:3, 65:7, 65:19, 66:3, 66:8, 66:10, 66:11, 66:21, 67:3, 68:17, 72:11, 72:22, 73:2, 73:4, 74:3, 74:7, 74:10, 83:19
**paroled** [91] - 4:6, 5:20, 5:24, 6:23, 9:3, 9:14, 10:6, 10:13, 10:20, 10:24, 11:3, 12:15, 12:19, 12:25, 14:23, 15:25, 16:1, 17:3, 17:6, 17:7, 17:9, 18:3, 18:11, 18:17, 18:23, 19:8, 19:10, 20:2, 20:11, 20:18, 20:24, 22:14, 23:13, 23:18, 23:24, 24:24, 24:25, 26:2, 26:7, 26:10, 27:21, 27:22, 28:3, 28:4, 28:6, 28:14, 28:23, 29:1, 29:7, 29:14, 30:4, 31:2, 31:17, 32:1, 34:5, 34:9, 39:11, 39:16, 43:8, 48:22, 51:18, 52:6, 52:19, 54:17, 55:9, 56:14, 57:14, 58:16, 58:17, 58:20, 58:24,

58:25, 60:5, 60:25, 62:7, 62:12, 62:19, 63:2, 64:1, 64:3, 64:16, 64:19, 66:20, 67:8, 67:9, 72:15, 74:24, 75:15, 75:21, 83:12, 83:15
**parolee** [3] - 58:5, 65:19, 66:12
**parolees** [5] - 32:24, 68:6, 74:18, 75:9, 77:17
**paroling** [1] - 54:15
**part** [4] - 17:24, 43:10, 46:25, 68:19
**particular** [4] - 20:7, 20:15, 43:17, 78:2
**particularly** [1] - 53:14
**parties** [5] - 71:5, 71:9, 71:11, 71:22, 81:21
**parts** [2] - 81:10, 81:11
**passed** [1] - 54:9
**past** [7] - 12:1, 16:1, 16:13, 17:3, 17:20, 72:22, 73:21
**path** [1] - 51:6
**patience** [1] - 76:5
**pending** [2] - 3:23, 67:14
**people** [35] - 19:8, 20:11, 24:8, 24:20, 25:1, 25:11, 28:11, 28:14, 30:16, 30:21, 31:25, 34:9, 43:8, 54:11, 54:21, 57:14, 60:4, 60:24, 61:5, 62:12, 62:18, 64:21, 67:6, 67:8, 74:24, 75:4, 75:8, 75:16, 77:20, 79:10, 80:4, 81:25, 84:4, 84:18
**per** [4] - 10:15, 10:16, 21:2, 47:9
**percent** [1] - 69:5
**perfect** [5] - 11:24, 16:16, 17:3, 17:19, 73:19
**period** [9] - 13:2, 13:5, 15:1, 15:6, 58:21, 59:12, 59:14, 63:4, 63:5
**permanent** [1] - 36:16
**permissible** [2] - 43:25, 76:21
**permission** [3] - 20:5, 24:11, 74:6
**permit** [3] - 15:4, 15:5, 62:11

**permits** [2] - 62:14
**persecution** [2] - 35:25, 37:4
**person** [15] - 13:1, 13:8, 14:25, 15:25, 18:3, 19:11, 19:19, 20:21, 29:14, 37:5, 64:10, 72:12, 72:15, 74:2, 74:5
**person's** [3] - 17:14, 18:12, 19:20
**Personnel** [1] - 81:2
**pertains** [1] - 43:17
**petitioner** [1] - 23:13
**Philadelphia** [1] - 79:22
**phrase** [2] - 11:8, 18:10
**physically** [2] - 10:21, 58:20
**PI** [1] - 70:15
**picked** [1] - 84:10
**picture** [3] - 5:17, 57:1, 58:17
**piece** [2] - 31:6, 73:18
**place** [5] - 12:14, 12:18, 14:2, 25:21, 73:11
**placed** [3] - 19:2, 69:16, 78:13
**places** [2] - 8:4, 79:17
**plain** [5] - 9:2, 10:23, 18:13, 26:1, 75:22
**plaintiff** [14] - 41:10, 45:1, 45:12, 45:15, 45:24, 46:10, 46:13, 49:6, 49:21, 54:13, 57:1, 78:12, 82:7, 82:11
**plaintiffs** [44] - 3:10, 3:14, 3:15, 3:16, 3:24, 4:1, 5:8, 6:2, 6:10, 6:20, 7:17, 8:12, 8:20, 8:22, 27:20, 32:4, 36:21, 40:23, 41:19, 44:11, 44:12, 44:13, 45:2, 49:12, 50:23, 51:17, 51:23, 53:15, 54:5, 55:25, 56:13, 57:1, 57:5, 57:11, 65:18, 69:13, 69:20, 71:12, 72:2, 75:13, 80:11, 80:20, 82:16
**plaintiffs'** [24] - 3:7, 7:13, 11:17, 21:11, 23:8, 24:10, 25:7, 27:10, 28:22, 34:18, 37:20, 37:23, 47:7, 57:7, 57:16, 78:22,

79:20, 82:7, 82:10, 82:24, 83:24, 84:7, 84:25, 85:1
**plus** [1] - 6:18
**podium** [1] - 3:8
**point** [41] - 5:16, 15:21, 18:7, 18:20, 20:15, 21:3, 22:16, 23:6, 24:13, 25:21, 26:17, 27:13, 28:22, 31:22, 32:10, 34:21, 38:1, 38:5, 38:24, 51:17, 53:3, 54:24, 59:3, 66:4, 66:8, 67:1, 68:25, 69:4, 69:21, 70:20, 73:14, 73:15, 75:1, 75:11, 76:8, 76:17, 79:11, 80:7, 81:12, 82:4
**pointed** [1] - 69:2
**pointing** [1] - 22:11
**points** [2] - 9:18, 66:24
**policies** [4] - 21:1, 50:20, 70:2, 77:4
**policy** [10] - 28:9, 28:10, 28:16, 55:13, 55:14, 55:17, 55:19, 55:21, 79:10, 80:4
**poof** [1] - 15:3
**popped** [1] - 23:3
**population** [6] - 69:5, 77:17, 77:20, 78:14, 78:17, 78:23
**port** [6] - 9:4, 20:19, 23:23, 24:9, 48:22, 59:10
**portion** [1] - 56:14
**ports** [3] - 28:5, 43:3, 43:8
**position** [24] - 18:19, 21:14, 28:22, 32:12, 33:23, 34:17, 41:10, 42:20, 43:14, 44:9, 45:7, 45:16, 47:21, 48:17, 58:1, 58:2, 60:12, 62:13, 62:17, 63:9, 67:21, 73:12, 76:19, 76:23
**positive** [1] - 36:18
**possible** [3] - 77:22, 79:11, 80:5
**potentially** [5] - 25:2, 35:23, 36:15, 67:5, 68:17
**powerful** [1] - 66:17
**PowerPoint** [1] - 10:16
**practice** [1] - 7:4
**practiced** [1] - 6:3

**practicing** [1] - 6:3
**prayer** [2] - 42:24, 43:3
**pre** [3] - 39:13, 50:21, 71:20
**pre-CASA** [1] - 71:20
**pre-existed** [2] - 39:13, 50:21
**precedence** [1] - 41:6
**precedent** [12] - 41:3, 41:21, 42:7, 44:24, 45:3, 47:4, 71:15, 71:16, 71:19, 80:8, 80:15, 82:22
**precisely** [1] - 32:10
**preclude** [1] - 61:21
**precludes** [1] - 32:13
**precluding** [1] - 56:23
**predecessors** [1] - 52:4
**preliminarily** [1] - 80:12
**preliminary** [1] - 70:15
**premature** [1] - 38:8
**premised** [1] - 32:3
**prepared** [2] - 4:1, 4:3
**presence** [2] - 13:2, 14:25
**present** [16] - 9:15, 10:21, 11:24, 12:2, 15:13, 15:15, 16:16, 17:19, 17:21, 24:6, 25:12, 25:23, 30:1, 57:12, 73:19, 73:21
**press** [1] - 49:12
**pressed** [1] - 49:11
**presume** [1] - 39:21
**presupposes** [1] - 47:2
**pretty** [1] - 68:12
**prevail** [1] - 8:22
**prevent** [1] - 4:24
**preventing** [1] - 77:3
**prevents** [1] - 70:1
**previous** [1] - 11:20
**previously** [10] - 17:7, 20:11, 20:23, 42:12, 52:6, 52:12, 54:9, 60:25, 67:6, 77:18
**primary** [2] - 51:21, 61:25
**principle** [1] - 47:8
**prioritization** [1] - 50:14
**priority** [1] - 67:16
**problem** [5] - 5:14, 22:2, 22:4, 47:7, 50:8
**procedure** [7] - 36:2, 54:2, 61:14, 64:2,

65:12
**procedures** [15] - 8:18, 36:6, 50:25, 52:5, 53:9, 54:22, 63:16, 64:8, 64:12, 64:14, 64:17, 64:20, 69:9, 72:12
**proceed** [4] - 44:19, 50:18, 60:14, 60:20
**proceeding** [2] - 63:21, 65:15
**proceedings** [15] - 5:23, 34:20, 35:6, 35:12, 35:13, 35:16, 62:11, 62:21, 67:7, 67:8, 68:25, 69:16, 77:21, 85:17
**PROCEEDINGS** [1] - 3:1
**process** [14] - 5:25, 19:4, 24:8, 24:12, 24:20, 25:7, 26:4, 31:10, 31:14, 36:3, 37:8, 46:25, 69:18, 84:19
**progressive** [1] - 24:6
**prohibited** [3] - 40:24, 41:7, 42:2
**promises** [1] - 84:17
**promptly** [1] - 77:20
**promulgated** [2] - 54:9, 62:5
**proposition** [1] - 71:25
**proscribed** [1] - 80:20
**prosecution** [1] - 52:19
**prosecutorial** [1] - 50:15
**protect** [1] - 26:18
**protected** [2] - 18:23, 35:25
**protection** [2] - 18:15, 18:18
**protections** [2] - 26:6, 31:20
**prove** [3] - 10:21, 20:18, 20:23
**provide** [9] - 6:9, 31:14, 43:23, 45:23, 48:1, 72:2, 82:4, 82:13, 82:19
**provided** [7] - 23:11, 33:7, 33:8, 37:18, 74:19, 75:2, 84:1
**provides** [1] - 65:14
**proving** [1] - 8:13
**provision** [20] - 11:1, 12:4, 14:9, 16:8, 23:17, 23:21, 26:11,

26:16, 48:20, 56:7, 56:8, 58:11, 58:13, 60:9, 61:2, 64:6, 65:10, 68:4, 68:5, 68:11

**provisions** [6] - 19:5, 22:13, 25:4, 25:6, 42:18, 51:4

**public** [2] - 79:16, 84:3

**pull** [2] - 21:7, 75:6

**pulling** [1] - 16:15

**purport** [1] - 10:12

**purported** [2] - 49:3, 72:21

**purporting** [1] - 72:21

**purports** [2] - 23:17, 32:18

**purpose** [4] - 26:17, 31:25, 64:18, 74:25

**purposes** [16] - 11:19, 14:9, 16:7, 26:4, 28:25, 31:4, 31:11, 41:4, 41:22, 42:1, 51:10, 52:20, 55:4, 58:7, 60:13, 69:12

**pursuant** [4] - 5:25, 28:7, 40:9, 41:7

**pursue** [2] - 49:19, 49:20

**put** [8] - 3:11, 9:1, 27:13, 32:10, 32:23, 38:5, 73:14, 75:14

**puts** [1] - 76:13

## Q

**qualitatively** [1] - 6:17

**questions** [6] - 32:7, 32:8, 38:21, 38:24, 40:18, 74:23

**quibble** [1] - 82:2

**quick** [1] - 76:3

**quickly** [4] - 77:7, 79:6, 79:10, 80:5

**quo** [1] - 7:17

**quote** [18] - 9:11, 11:18, 12:6, 12:13, 16:7, 19:15, 20:18, 23:22, 25:15, 26:24, 28:10, 29:1, 29:3, 29:4, 29:7, 43:1, 60:8, 65:20

**quotes** [1] - 75:6

**quoting** [1] - 8:9

## R

**raise** [1] - 46:2

**raised** [6] - 5:1, 36:17, 44:5, 50:22, 79:8,

82:25

**Ramnitz** [1] - 3:21

**rather** [2] - 65:15, 81:9

**rationale** [1] - 56:9

**read** [14] - 15:19, 16:5, 16:10, 17:24, 18:11, 20:2, 25:13, 27:7, 44:23, 45:3, 53:5, 62:15, 64:22, 70:5

**reading** [14] - 11:2, 11:17, 19:9, 21:11, 22:12, 25:7, 29:19, 57:7, 57:17, 60:10, 60:25, 63:9, 63:14, 67:5

**reads** [2] - 26:6, 31:20

**really** [7] - 26:13, 56:12, 57:4, 57:22, 61:11, 66:16, 77:7

**reason** [4] - 52:7, 54:18, 57:3, 73:16

**reasoning** [2] - 33:7, 38:18

**reasons** [4] - 52:20, 54:14, 66:9, 66:22

**rebuttal** [1] - 74:15

**recent** [9] - 7:5, 11:7, 32:13, 32:15, 51:17, 54:21, 80:21, 80:25

**recently** [2] - 42:9, 69:22

**recognition** [1] - 34:7

**recognized** [1] - 28:1

**record** [4] - 3:4, 3:8, 3:12, 8:3

**redressability** [10] - 5:2, 5:10, 7:10, 39:2, 39:20, 40:20, 48:15, 49:1, 51:10, 51:13

**redressed** [1] - 47:1

**refer** [5] - 17:19, 19:10, 20:3, 20:6, 73:20

**referred** [1] - 52:16

**referring** [4] - 27:5, 41:15, 66:18, 66:19

**refers** [2] - 11:8, 55:18

**reg** [3] - 22:5, 68:2

**regard** [3] - 20:12, 40:7, 84:19

**regarding** [2] - 55:23, 65:9

**regardless** [4] - 10:6, 68:3, 72:15, 74:10

**regards** [4] - 76:12, 77:12, 78:5, 82:21

**Register** [1] - 77:13

**regs** [1] - 76:10

**regular** [4] - 5:23, 34:23, 35:6, 35:12

**regulation** [14] - 4:14, 6:11, 22:17, 28:2, 49:18, 54:10, 56:4, 56:10, 59:3, 62:3, 62:14, 63:23, 65:3, 66:14

**regulation/directive** [1] - 54:8

**regulations** [36] - 4:23, 4:25, 6:6, 6:16, 6:19, 6:24, 6:25, 7:4, 7:9, 8:4, 20:9, 21:2, 21:3, 21:5, 21:8, 21:13, 21:19, 21:21, 22:1, 22:6, 22:11, 22:15, 22:20, 26:25, 27:9, 27:15, 39:12, 39:17, 40:1, 40:2, 40:7, 40:9, 76:9, 80:18, 83:9

**regulatory** [3] - 52:25, 58:6, 58:8

**reinforce** [1] - 25:6

**reinforcing** [1] - 53:6

**reiterate** [1] - 74:19

**rejected** [5] - 19:6, 51:9, 79:13, 80:3, 83:4

**relate** [1] - 54:8

**related** [1] - 32:21

**relatedly** [1] - 82:14

**relates** [1] - 55:1

**release** [1] - 59:17

**released** [3] - 59:11, 59:13, 59:21

**relevance** [1] - 21:22

**relevant** [5] - 34:10, 51:9, 70:16, 82:22, 83:21

**reliance** [1] - 83:21

**relied** [1] - 38:2

**relief** [51] - 6:9, 7:11, 38:14, 39:7, 39:20, 41:10, 41:17, 42:25, 43:3, 43:9, 43:15, 43:22, 44:10, 44:20, 45:14, 46:8, 46:14, 46:16, 46:18, 47:2, 47:20, 48:2, 49:14, 70:6, 70:11, 71:4, 71:6, 71:7, 71:17, 71:25, 72:2, 76:15, 76:24, 77:1, 77:3, 77:10, 80:13, 80:14, 81:15, 81:22, 81:23, 81:25, 82:5, 82:6, 82:7, 82:13, 82:19, 84:24

**relieve** [1] - 7:12

**rely** [2] - 51:22, 51:25

**remain** [2] - 6:6, 58:22

**remains** [2] - 6:13, 26:3

**remedies** [1] - 51:11

**remedy** [8] - 45:22, 45:23, 46:20, 46:25, 47:14, 48:6, 48:9, 71:22

**remind** [1] - 54:11

**reminding** [1] - 53:6

**removal** [142] - 4:6, 5:21, 5:23, 5:25, 8:17, 8:25, 9:6, 9:17, 9:20, 9:25, 10:2, 10:7, 10:10, 10:13, 10:25, 18:10, 18:11, 18:16, 18:21, 18:24, 18:25, 19:4, 19:9, 20:8, 20:9, 20:17, 20:25, 22:12, 22:15, 23:9, 23:14, 23:17, 23:19, 24:2, 24:7, 24:16, 25:3, 25:8, 25:9, 26:5, 26:7, 26:11, 26:15, 26:16, 29:17, 29:21, 30:17, 30:19, 30:23, 31:4, 31:8, 31:14, 31:24, 32:2, 32:19, 32:25, 34:6, 34:10, 34:18, 34:19, 35:6, 35:12, 35:13, 35:16, 36:2, 37:7, 37:8, 38:13, 39:12, 39:17, 39:25, 43:2, 43:7, 43:18, 44:3, 44:16, 44:18, 44:20, 48:21, 51:18, 52:5, 52:19, 53:8, 53:10, 53:14, 53:17, 53:23, 54:2, 54:3, 54:16, 54:22, 55:9, 56:3, 56:15, 56:22, 57:9, 60:16, 60:20, 60:24, 61:17, 61:24, 62:11, 62:21, 63:12, 63:16, 63:21, 64:2, 64:8, 64:12, 64:14, 64:16, 64:20, 65:7, 67:7, 67:12, 67:18, 67:24, 69:11, 69:12, 74:17, 74:21, 74:25, 75:11, 75:15, 75:22, 76:20, 77:19, 77:21, 78:13, 78:15, 78:16, 78:22, 78:25, 79:1, 83:13, 83:17, 83:20, 84:9, 84:18, 84:21

**removals** [1] - 40:9

**remove** [5] - 6:23, 28:3, 73:11, 77:19,

79:10

**removed** [3] - 30:6, 61:5, 79:17

**removing** [3] - 39:16, 80:4, 84:4

**renders** [2] - 18:15, 19:5

**renege** [1] - 84:17

**repeat** [3] - 14:17, 14:19, 27:4

**repeatedly** [2] - 28:23, 74:16

**reply** [5] - 23:8, 26:22, 27:3, 27:7, 39:15

**request** [2] - 33:1, 84:22

**requested** [1] - 38:14

**require** [4] - 27:21, 34:1, 37:24, 60:9

**required** [4] - 21:19, 27:24, 28:17, 33:21

**requirement** [3] - 21:15, 22:5, 33:23

**requirements** [1] - 10:19

**requires** [2] - 20:16, 34:11

**rescinded** [3] - 13:14, 13:24, 16:21

**resident** [1] - 36:16

**residing** [1] - 26:3

**respect** [4] - 5:9, 43:15, 49:14, 56:5

**respectfully** [1] - 84:22

**respond** [5] - 4:19, 7:2, 34:14, 65:25, 73:24

**response** [8] - 5:1, 5:2, 11:5, 11:12, 36:1, 37:12, 65:17, 72:6

**responsibility** [1] - 21:18

**rest** [1] - 17:22

**restart** [1] - 55:3

**restored** [2] - 59:5, 66:13

**result** [2] - 80:18, 83:14

**return** [1] - 69:6

**returned** [4] - 35:23, 36:8, 37:3, 58:15

**returns** [1] - 7:16

**reverse** [1] - 16:12

**reverts** [3] - 29:2, 29:6, 65:20

**review** [6] - 43:17, 43:20, 43:21, 45:12, 76:25, 82:24

**revisit** [1] - 74:12
**revocated** [2] - 72:11, 73:2
**revocation** [6] - 53:18, 56:18, 72:10, 72:17, 72:23, 72:25
**revoked** [8] - 13:13, 13:24, 16:21, 66:12, 68:17, 73:3, 73:4, 73:5
**revoking** [1] - 53:22
**Rights** [1] - 3:5
**risk** [3] - 78:22, 78:25, 84:9
**RMR** [2] - 85:15, 85:20
**Road** [6] - 37:15, 45:6, 78:8, 78:9, 83:1
**rule** [10] - 44:14, 46:14, 55:8, 55:11, 56:9, 56:15, 56:16, 62:5, 80:12, 80:19
**rules** [3] - 53:14, 53:20, 53:21
**ruling** [4] - 33:5, 33:6, 39:8, 47:2

**S**

**Salas** [2] - 37:22, 78:20
**SANDHU** [62] - 3:19, 40:16, 41:14, 41:17, 42:3, 42:5, 43:25, 44:3, 44:5, 44:9, 45:8, 45:13, 45:19, 45:22, 46:12, 46:18, 46:21, 47:13, 47:16, 47:21, 48:3, 48:11, 48:14, 49:16, 50:4, 52:8, 52:10, 52:14, 53:2, 54:14, 55:5, 55:14, 55:20, 55:23, 57:18, 60:6, 60:11, 60:22, 61:3, 61:7, 61:10, 61:13, 62:23, 63:1, 63:3, 63:6, 63:17, 63:20, 64:6, 65:2, 66:1, 67:10, 68:1, 70:7, 70:9, 70:12, 70:22, 70:24, 71:1, 71:3, 71:18, 72:5
**Sandhu** [2] - 3:20, 40:17
**saw** [1] - 25:10
**scenario** [1] - 50:11
**scheme** [1] - 31:19
**school** [2] - 79:2, 84:13
**scope** [4] - 32:25, 42:10, 67:20, 71:17

**se** [1] - 47:9
**Second** [2] - 58:4, 58:19
**second** [8] - 9:13, 9:16, 9:19, 24:21, 24:24, 61:2, 76:12, 83:7
**secondly** [2] - 56:6, 82:14
**Secretary** [4] - 60:14, 60:19, 61:15, 65:13
**Section** [19] - 20:10, 25:14, 41:4, 41:15, 42:11, 44:1, 44:11, 45:25, 47:14, 48:19, 48:21, 50:6, 57:8, 59:4, 65:18, 69:11, 76:25, 81:5, 81:14
**section** [1] - 18:1
**see** [4] - 9:8, 21:6, 30:13, 69:23
**seek** [1] - 44:15
**seeking** [5] - 32:12, 40:24, 41:19, 43:11
**seeks** [1] - 41:10
**seem** [4] - 16:19, 36:4, 48:19, 64:5
**sees** [1] - 84:24
**sense** [9] - 12:11, 31:20, 57:15, 58:16, 65:1, 65:8, 69:15, 73:10, 75:18
**sentence** [14] - 11:18, 11:20, 12:12, 14:8, 14:10, 15:13, 16:7, 16:8, 16:11, 16:12, 72:9, 73:9, 73:10
**separate** [8] - 9:23, 21:15, 22:6, 23:10, 33:23, 60:15, 70:24, 70:25
**served** [1] - 28:25
**serving** [1] - 18:21
**set** [9] - 51:6, 51:20, 56:9, 62:3, 69:22, 77:3, 80:12, 81:15, 84:8
**several** [1] - 12:23
**shall** [5] - 29:8, 58:15, 59:5, 65:22, 66:12
**short** [1] - 63:4
**show** [2] - 44:13, 71:13
**shown** [3] - 21:6, 78:12, 83:5
**side** [1] - 68:15
**similar** [4] - 31:6, 39:19, 50:11, 50:22
**similarly** [1] - 20:10
**simply** [7] - 5:16,

12:20, 18:20, 39:12, 53:6, 75:22, 84:3
**single** [1] - 82:17
**sit** [1] - 39:1
**situation** [8] - 7:16, 12:11, 13:24, 41:13, 51:14, 60:22, 64:15, 67:18
**situations** [1] - 65:14
**slide** [2] - 29:17, 30:13
**slides** [2] - 21:6, 25:5
**sole** [1] - 5:9
**someone** [15] - 12:19, 18:8, 19:20, 20:4, 23:25, 24:10, 25:22, 31:22, 54:24, 59:11, 59:20, 59:24, 63:11, 64:15, 64:18
**sometimes** [1] - 49:3
**somewhere** [1] - 35:24
**soon** [1] - 66:11
**sorry** [14] - 5:13, 22:24, 22:25, 27:4, 34:24, 42:17, 48:16, 54:16, 58:24, 66:10, 68:12, 73:4, 76:3
**sort** [10] - 39:5, 51:6, 51:13, 55:25, 56:16, 58:8, 59:11, 60:16, 60:19, 71:21
**sought** [1] - 52:17
**sounds** [1] - 43:9
**speaking** [4] - 33:11, 37:9, 40:14, 55:15
**specific** [19] - 6:7, 7:14, 11:11, 15:9, 15:17, 38:21, 44:16, 44:21, 45:14, 49:13, 52:15, 56:9, 59:7, 60:15, 61:16, 65:12, 65:14, 71:8, 72:2
**specifically** [13] - 12:5, 14:1, 23:10, 41:18, 44:11, 52:24, 67:8, 70:19, 74:21, 75:3, 76:21, 76:24, 82:1
**specified** [1] - 65:5
**specifies** [1] - 8:23
**square** [3] - 44:23, 62:16, 63:19
**stand** [5] - 21:4, 32:4, 58:25, 74:18, 75:7
**standard** [1] - 34:19
**standing** [31] - 29:3, 29:6, 37:9, 37:14, 44:24, 44:25, 45:4, 45:21, 46:3, 46:6, 46:8, 46:11, 47:8,

47:10, 47:11, 47:24, 48:25, 49:6, 49:10, 49:21, 50:2, 58:2, 58:17, 59:24, 65:21, 66:5, 71:13, 82:9
**stands** [2] - 27:19, 59:9
**start** [6] - 4:19, 5:6, 7:20, 7:23, 7:25, 10:10
**started** [1] - 72:7
**starting** [3] - 3:7, 8:23, 64:2
**state** [1] - 3:8
**States** [17] - 9:4, 11:16, 19:16, 19:25, 20:4, 23:23, 24:1, 29:10, 30:1, 30:2, 37:6, 50:10, 57:10, 57:13, 59:1, 65:24, 74:2
**states** [1] - 80:17
**statistics** [1] - 69:4
**status** [32] - 7:17, 12:24, 13:1, 13:9, 14:23, 15:20, 17:2, 17:15, 18:5, 19:11, 19:20, 19:25, 20:7, 20:13, 20:20, 20:22, 25:22, 29:2, 36:16, 36:23, 36:24, 37:6, 58:1, 59:5, 59:23, 65:20, 66:13, 69:17, 72:14, 73:12, 74:8, 74:11
**statuses** [1] - 84:20
**statute** [79] - 8:17, 9:3, 9:7, 9:9, 10:15, 10:16, 10:23, 11:17, 18:14, 19:4, 21:8, 21:9, 21:10, 22:12, 22:17, 22:18, 23:9, 23:21, 24:2, 25:8, 26:6, 26:14, 27:20, 27:24, 28:12, 28:13, 28:17, 28:23, 29:5, 29:17, 29:22, 29:24, 30:8, 30:10, 30:13, 30:15, 30:20, 30:25, 31:19, 31:20, 39:10, 39:18, 39:23, 41:5, 41:11, 41:23, 43:16, 43:21, 43:24, 49:18, 54:10, 55:18, 58:9, 58:12, 62:11, 62:14, 62:15, 62:18, 62:25, 63:19, 63:25, 64:18, 64:22, 64:23, 65:16, 65:22, 66:3, 66:8, 66:21, 67:3, 74:4,

74:24, 75:19, 75:22, 76:20, 83:9, 83:10
**statutes** [2] - 8:4, 82:22
**statutorily** [2] - 9:25, 81:23
**statutory** [14] - 24:3, 25:25, 31:18, 42:18, 51:4, 52:25, 57:17, 58:8, 61:18, 62:6, 62:16, 66:16, 72:8, 83:18
**stay** [18] - 17:20, 32:12, 32:20, 33:3, 38:17, 41:7, 42:2, 43:5, 43:6, 43:11, 51:23, 56:13, 70:4, 70:16, 71:11, 81:15, 84:23
**stayed** [2] - 32:18, 39:9
**staying** [1] - 57:4
**stays** [2] - 6:8, 7:16
**steer** [1] - 9:2
**stem** [1] - 6:21
**stemming** [1] - 7:14
**Step** [2] - 11:19, 12:3
**steps** [1] - 39:24
**still** [18] - 6:23, 12:25, 14:16, 14:23, 14:24, 16:13, 17:6, 18:2, 18:3, 18:4, 50:16, 50:19, 59:13, 63:15, 66:23, 72:7, 72:13, 80:11
**stood** [1] - 77:14
**stop** [1] - 12:18
**stopped** [1] - 59:10
**stops** [1] - 12:16
**story** [2] - 35:11, 36:10
**straight** [2] - 9:7, 70:18
**stream** [1] - 71:21
**strip** [1] - 84:18
**strip-down** [1] - 84:18
**stripped** [1] - 13:20
**strive** [1] - 8:7
**strong** [2] - 68:6, 68:19
**structurally** [1] - 57:15
**structure** [3] - 9:8, 24:14, 83:11
**subject** [33] - 8:25, 9:5, 9:20, 10:4, 18:25, 20:24, 22:15, 23:14, 23:18, 24:15, 24:23, 25:3, 26:10, 30:6, 30:16, 30:19, 30:22, 31:23, 32:19,

34:5, 38:11, 39:25, 57:9, 62:21, 63:11, 63:16, 64:16, 64:19, 67:6, 75:21, 78:15, 84:9, 84:18
**subjected** [8] - 20:16, 35:13, 64:11, 78:24, 78:25, 83:12, 83:16, 83:19
**subjecting** [4] - 5:20, 34:8, 39:11, 52:5
**subjects** [2] - 56:14, 67:5
**submit** [5] - 7:18, 35:8, 37:17, 38:3, 48:11
**submitted** [3] - 11:15, 37:21, 64:11
**subsets** [1] - 30:16
**subsidiary** [1] - 56:1
**substantial** [1] - 79:18
**succeed** [3] - 8:13, 32:5, 44:15
**suddenly** [2] - 13:5, 15:6
**suffering** [1] - 84:6
**sufficient** [5] - 36:3, 36:7, 39:20, 69:19, 70:3
**suggest** [1] - 63:9
**suggesting** [5] - 22:2, 41:3, 41:6, 41:25, 67:25
**suggests** [2] - 15:12, 41:12
**suit** [1] - 47:19
**summary** [1] - 19:3
**SUNG** [21] - 5:7, 5:13, 5:15, 6:15, 6:25, 7:11, 7:21, 7:24, 34:21, 35:1, 35:3, 36:7, 37:10, 37:17, 38:21, 38:25, 39:4, 40:13, 76:3, 76:5, 85:5
**Sung** [4] - 3:13, 4:2, 5:3, 5:7
**supervise** [1] - 78:2
**Supp** [3] - 79:22, 79:24, 80:1
**supplemental** [1] - 11:14
**support** [6] - 22:12, 24:25, 26:25, 29:18, 36:4, 39:20
**supports** [6] - 11:16, 19:9, 21:11, 22:14, 24:17, 27:9
**suppose** [1] - 15:3
**Supreme** [19] - 11:7,

11:18, 13:15, 14:7, 15:9, 16:4, 16:23, 32:13, 33:2, 33:7, 38:17, 58:9, 58:23, 59:18, 71:15, 79:18, 80:24, 81:17, 82:5
**surviving** [1] - 16:9
**Svitlana** [6] - 38:6, 38:7, 38:17, 53:19, 56:17, 68:18
**sworn** [2] - 37:24, 37:25
**syllabus** [1] - 17:17
**system** [7] - 12:22, 43:18, 77:6, 81:6, 81:8, 81:10, 81:14
**system-wide** [1] - 77:6
**systematic** [2] - 5:21, 44:17

## T

**Tabaddor** [2] - 34:22, 35:1
**table** [1] - 3:21
**tactics** [1] - 6:4
**tailor** [2] - 71:4, 71:22
**talks** [1] - 58:10
**target** [2] - 75:15, 77:17
**targeted** [1] - 77:18
**temporal** [1] - 11:10
**temporary** [3] - 58:21, 59:12, 59:16
**tense** [12] - 11:11, 11:24, 15:10, 15:18, 16:16, 16:24, 17:3, 17:8, 17:14, 17:19, 24:6, 73:19
**term** [8] - 8:9, 20:1, 29:24, 57:20, 57:21, 59:7, 61:25, 62:9
**terminate** [4] - 18:20, 63:23, 64:21, 65:7
**terminated** [23] - 11:3, 12:16, 12:25, 13:13, 14:5, 14:15, 14:22, 15:15, 16:20, 19:12, 29:15, 30:9, 30:22, 32:24, 52:7, 60:10, 61:1, 62:19, 62:20, 63:12, 65:19, 72:16
**terminates** [4] - 64:3, 64:9, 64:14, 66:11
**terminating** [1] - 56:24
**termination** [13] - 8:16, 10:12, 13:9, 32:9, 32:17, 38:8, 65:3, 72:14, 72:17,

72:23, 73:7, 73:9, 78:4
**terminations** [1] - 32:21
**terminology** [1] - 8:3
**terms** [7] - 8:8, 19:13, 33:21, 55:15, 65:9, 67:19, 68:19
**Texas** [1] - 50:10
**text** [10] - 9:2, 9:9, 10:15, 18:13, 19:5, 24:3, 26:1, 28:12, 82:21, 83:11
**THE** [130] - 3:11, 3:17, 3:22, 4:8, 4:13, 4:18, 5:5, 5:11, 5:14, 6:11, 6:22, 7:2, 7:19, 7:22, 8:11, 11:2, 11:5, 13:11, 13:19, 13:22, 14:12, 14:21, 15:8, 15:20, 15:23, 16:14, 17:8, 17:13, 18:6, 21:12, 21:22, 21:25, 22:4, 22:24, 23:1, 26:20, 27:6, 27:13, 27:16, 28:18, 29:11, 32:8, 33:4, 33:11, 33:15, 33:19, 34:13, 34:16, 34:24, 35:2, 35:22, 37:9, 37:11, 38:20, 38:23, 39:3, 40:12, 40:14, 40:21, 41:16, 41:18, 42:4, 43:13, 44:2, 44:4, 44:8, 44:22, 45:9, 45:17, 45:20, 46:4, 46:16, 46:20, 46:24, 47:15, 47:17, 47:23, 48:4, 48:13, 49:2, 49:17, 52:2, 52:9, 52:11, 52:23, 54:4, 54:19, 55:12, 55:17, 55:22, 57:6, 60:1, 60:8, 60:21, 60:23, 61:4, 61:9, 61:11, 62:10, 62:24, 63:2, 63:5, 63:8, 63:18, 63:24, 64:7, 65:17, 67:4, 67:20, 70:5, 70:8, 70:10, 70:17, 70:23, 70:25, 71:2, 71:14, 72:4, 72:6, 72:19, 72:25, 73:2, 73:4, 73:8, 74:13, 75:24, 76:2, 76:4, 85:4, 85:6
**themselves** [1] - 35:8
**then-Judge** [2] - 38:1, 78:8
**therefore** [4] - 10:23,

12:11, 18:22, 63:15
**they've** [4] - 20:4, 25:22, 62:8, 74:19
**third** [2] - 56:11, 77:7
**thousands** [4] - 43:8, 56:19, 67:6, 68:16
**three** [10] - 4:20, 5:18, 6:8, 6:18, 6:21, 8:13, 27:19, 39:7, 59:21, 83:17
**threshold** [10] - 4:8, 5:6, 7:20, 29:3, 29:6, 40:22, 58:3, 59:24, 65:21, 66:6
**Thuraissigiam** [1] - 69:1
**Tim** [1] - 3:21
**timeline** [3] - 51:17, 51:20, 51:25
**timeliness** [1] - 77:7
**tip** [1] - 79:14
**title** [2] - 9:8, 24:14
**titled** [1] - 85:17
**Toczylowski** [1] - 36:11
**today** [2] - 40:10, 76:11
**Tom** [1] - 3:15
**took** [1] - 76:19
**totally** [1] - 73:16
**touches** [2] - 12:2, 17:21
**toward** [2] - 36:24, 37:5
**TPS** [1] - 80:1
**track** [1] - 52:22
**transcript** [1] - 85:16
**transcription** [1] - 85:16
**treat** [1] - 31:17
**treated** [6] - 12:9, 29:16, 31:2, 31:23, 62:8, 66:7
**treatment** [2] - 79:3, 84:12
**tried** [1] - 77:14
**trouble** [1] - 61:11
**true** [12] - 11:9, 16:18, 16:25, 17:6, 17:23, 18:3, 30:7, 50:4, 73:23, 74:1, 74:9, 85:16
**truly** [1] - 26:13
**Trump** [6] - 79:21, 79:24, 80:13, 80:25, 81:18, 82:5
**trumps** [1] - 80:6
**try** [3] - 9:1, 17:18, 31:17
**trying** [11] - 15:8,

15:17, 21:20, 32:22, 50:7, 57:2, 63:18, 64:17, 70:18, 81:7, 84:17
**Tumlin** [1] - 3:14
**turn** [2] - 16:19, 33:20
**turns** [1] - 19:18
**two** [20] - 4:23, 8:24, 9:9, 9:22, 10:5, 10:19, 10:20, 10:22, 24:16, 28:3, 53:14, 54:14, 55:7, 57:8, 57:12, 59:20, 61:1, 66:9, 66:11, 75:9
**type** [3] - 43:22, 45:10, 45:21
**types** [4] - 47:5, 47:11, 79:13, 83:4
**typical** [1] - 49:3

## U

**U.S** [20] - 9:11, 9:24, 10:22, 19:19, 19:20, 20:19, 20:22, 20:24, 25:12, 25:18, 25:23, 26:4, 36:11, 36:14, 50:11, 58:21, 71:23, 75:5, 75:8, 80:16
**U.S.C** [9] - 9:7, 19:15, 23:18, 25:6, 25:20, 29:12, 29:24, 58:12, 81:16
**unauthorized** [2] - 13:6, 15:6
**unbridled** [1] - 81:18
**under** [66] - 6:23, 6:25, 7:8, 10:7, 10:13, 10:18, 10:23, 10:25, 18:5, 21:17, 22:15, 23:14, 24:1, 25:3, 26:11, 26:15, 26:18, 26:24, 27:8, 34:18, 34:19, 36:2, 36:23, 39:12, 39:17, 39:25, 40:25, 41:3, 41:21, 41:25, 42:12, 43:23, 43:25, 44:17, 47:4, 47:13, 47:21, 49:8, 50:16, 50:20, 60:6, 60:9, 60:14, 60:25, 61:1, 61:2, 61:24, 63:1, 63:10, 63:22, 64:6, 64:22, 65:3, 65:15, 66:13, 68:2, 68:18, 70:6, 70:16, 70:21, 71:17, 76:21, 77:15, 79:9, 84:8, 85:7
**undermined** [1] - 51:25

undone [1] - 19:11
unique [2] - 65:12, 66:15
United [17] - 9:4, 11:16, 19:16, 19:25, 20:4, 23:22, 24:1, 29:10, 30:1, 30:2, 37:6, 50:10, 57:10, 57:13, 59:1, 65:24, 74:2
universal [4] - 69:24, 71:7, 80:24, 81:20
unlawful [8] - 13:2, 14:25, 43:6, 54:23, 80:18, 81:10, 82:16, 82:18
unless [4] - 18:24, 32:7, 40:18, 65:4
unprecedented [1] - 19:3
untouched [1] - 80:14
up [12] - 12:1, 16:15, 17:21, 18:4, 30:11, 39:1, 39:24, 62:3, 73:21, 75:6, 77:14, 84:10
uses [1] - 53:25

**V**

vacated [16] - 11:21, 12:7, 12:9, 12:12, 12:17, 14:1, 14:6, 14:11, 15:2, 15:14, 16:11, 16:13, 18:2, 72:10, 72:22, 80:19
vacating [1] - 73:9
vacatur [16] - 12:5, 12:6, 13:10, 17:25, 32:12, 41:3, 41:21, 41:25, 44:15, 44:20, 45:23, 76:19, 80:23, 81:4, 81:7, 81:15
valid [10] - 11:9, 16:18, 17:23, 18:4, 19:22, 73:23, 74:1, 74:9, 75:5, 75:12
validity [3] - 81:6, 81:8, 81:13
value [1] - 68:11
various [2] - 8:4, 53:8
Velazquez [1] - 23:11
verb [1] - 15:9
versus [2] - 4:10, 13:13
vessel [1] - 25:17
view [3] - 21:4, 22:14, 23:8
viewed [1] - 59:19
violate [3] - 8:17, 21:2

violates [1] - 18:13
violating [1] - 26:1
violation [2] - 23:20, 25:25
violence [1] - 35:25
visa [2] - 19:21

**W**

walk [3] - 4:4, 10:8, 60:2
wants [1] - 38:11
warranting [1] - 70:4
waste [1] - 38:22
weighed [1] - 71:16
Westlaw [2] - 79:21, 81:2
whatsoever [1] - 33:8
whereas [1] - 10:1
whole [1] - 56:25
wholly [1] - 83:20
wide [1] - 77:6
winning [1] - 17:10
withdrawing [1] - 56:23
women's [1] - 82:3
word [3] - 8:5, 8:6, 53:25
words [3] - 15:11, 29:1, 29:4
works [1] - 4:7
world [2] - 6:16, 6:18
wrestling [1] - 72:8
writings [17] - 5:18, 6:8, 6:18, 6:21, 6:24, 7:15, 7:16, 39:7, 39:8, 40:5, 78:24, 83:13, 83:15, 83:18, 84:6, 84:8, 84:23
written [11] - 4:25, 7:1, 54:25, 55:1, 55:2, 55:4, 55:13, 55:14, 55:19, 55:21, 77:14
wrought [1] - 84:6

**Y**

Yearly [1] - 79:22
years [6] - 10:22, 23:25, 59:21, 61:1, 69:3, 69:7
York [3] - 78:9, 83:2