## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

COALITION FOR HUMANE IMMIGRANT RIGHTS, *et al.*,

Plaintiffs,

v.

KRISTI NOEM, in her official capacity as Secretary of Homeland Security, *et al.*,

Defendants.

Case No. 25-cv-872 (JMC)

## <u>MEMORANDUM OPINION</u>

## Table of Contents

**I.    INTRODUCTION** ................................................................................................................ **2**

**II.    BACKGROUND** ................................................................................................................. **5**

   **A.    Statutory and Regulatory Framework** ........................................................................... **5**
     1.  Expedited Removal ............................................................................................................. 5
     2.  Parole ................................................................................................................................ 14
     3.  Relevant Avenues of Immigration Relief ......................................................................... 18

   **B.    Factual Background** ........................................................................................................ **19**
     1.  The Challenged Actions ................................................................................................... 19
     2.  Plaintiffs ............................................................................................................................ 22
     3.  This Suit ............................................................................................................................ 24

**III.    LEGAL STANDARD** ..................................................................................................... **25**

**IV.    ANALYSIS** ....................................................................................................................... **26**

   **A.    Plaintiffs Are Substantially Likely to Succeed on the Merits** .................................. **26**
     1.  Jurisdictional and Other Bars Do Not Block Plaintiffs' Requested Stay ........................ 26
     2.  The Challenged Actions Exceed DHS's Statutory Authority ........................................... 44
     3.  The Challenged Actions Are Arbitrary and Capricious ................................................... 65

   **B.    Plaintiffs' Members Face Irreparable Harm** .............................................................. **73**

   **C.    The Balance of the Equities and the Public Interest Favor a Stay** ........................... **77**

   **D.    A Stay as to All Noncitizens Paroled into the United States, Not Just Plaintiffs' Members, Is Standard and Appropriate, and No Bond Is Required.** ......................................................... **80**

**V.    CONCLUSION** ................................................................................................................ **84**

## I.    INTRODUCTION

M.A.R., a Cuban national, arrived at the San Ysidro port of entry in San Diego, California, on March 14, 2024. ECF 22-8 ¶ 17. [1] Although he entered with travel authorization, he hoped to stay in the United States because he faced threats, harassment, and retaliation from Cuban authorities for his vocal opposition to the Cuban Government. *Id.* ¶ 29. Upon inspection at the border, he was paroled into the United States (i.e., released into the country pending removal proceedings) and issued a Notice to Appear (NTA) in immigration court. *Id.* ¶¶ 17–18. Since arriving, he has obtained work authorization and a job, married a United States citizen, met all his legal obligations, and committed no crimes. *Id.* ¶ 19. He also filed an application for adjustment of status under the Cuban Adjustment Act (CAA), which has long permitted Cuban nationals who were admitted or paroled into the United States to become lawful permanent residents after being here for more than a year. *See* Cuban Adjustment Act of 1966 ("CAA"), 89 Pub. L. 732, 80 Stat. 1161; 8 U.S.C. § 1255 note; ECF 22-8 at 26.

On May 28, 2025, M.A.R. attended his first hearing at the immigration court in Santa Ana, California. ECF 22-8 ¶ 21. Immediately after exiting the courtroom at the end of his hearing, M.A.R. was detained by Immigration and Customs Enforcement (ICE) officers. *Id.* ¶ 25. His pending immigration proceeding had not been dismissed at the hearing, and he received no indication at that hearing (or upon his arrest) that anything about his parole or proceedings had changed. *Id.* ¶¶ 23, 25–27. No indication, that is, besides his unexplained detention. M.A.R.'s attorney determined that he was being subjected to expedited removal, an abbreviated alternative to standard removal proceedings applicable only to certain noncitizens. *Id.* ¶ 27. Even so, he has

---

[1] Unless otherwise indicated, the formatting of citations has been modified throughout this opinion, for example, by omitting internal quotation marks, emphases, citations, and alterations and by altering capitalization. All pincites to documents filed on the docket in this case are to the automatically generated ECF Page ID number that appears at the top of each page.

yet to receive what minimal process expedited removal provides, namely a "credible fear" screening to identify potential eligibility for asylum. *Id.* ¶¶ 26, 30; *see* 8 U.S.C. § 1225(b)(1)(B)(ii). Unless M.A.R. passes that screening, which comes with limited administrative appeal rights and no judicial review, he will be unable to pursue adjustment of status under the CAA or based on his marriage—and he will be sent back to Cuba.

R.J.L.B., a Venezuelan national, arrived at the San Ysidro port of entry on January 17, 2025, with a scheduled appointment using the "CBP One" application.[2] ECF 22-14 ¶¶ 3–4. An officer in the Venezuelan military, R.J.L.B. seeks to defect to the United States to assist the U.S. military or intelligence services. *Id.* ¶¶ 3, 9. His home and his family in Venezuela are under surveillance by the Venezuelan government, and he believes he will be killed for desertion and disobedience if he is forced to return. *Id.* ¶¶ 3, 12. After inspection at San Ysidro, he was paroled into the United States and received an NTA. *Id.* ¶ 4. A month later, he submitted his application for asylum. *Id.* ¶ 6. When he appeared for a hearing on May 21, 2025, the Department of Homeland Security (DHS) attorney moved orally to dismiss his case. *Id.* ¶ 7. His attorney, believing this dismissal meant DHS thought he had a good case for asylum and could handle it administratively (as is often done in the attorney's experience), did not oppose the motion. *Id.* Neither the DHS attorney nor the Immigration Judge (IJ) mentioned expedited removal. Yet, as soon as R.J.L.B. left his hearing, ICE officers arrested him, telling him he was being removed through expedited removal. *Id.* ¶ 8. When R.J.L.B. and his attorney informed the ICE officers that he was a military officer seeking to help the United States, they "openly scoffed." *Id.* at ¶ 9. His attorney does not

---

[2] CBP One was a mobile application launched by the Department of Homeland Security (DHS) in October 2020. ECF 22-2 ¶ 11. It enabled noncitizens to book an appointment to appear for inspection at a port of entry, submit information in advance, and potentially obtain parole or admission into the country. *See id.*; U.S. Customs and Border Protection, CBP Removes Scheduling Functionality in CBP One™ App (Jan. 21, 2025), https://perma.cc/4XCF-ZX2S. At noon on January 20, 2025, DHS removed the scheduling functionality from the CBP One app. *See id.* DHS has also since renamed the application CBP Home, which it now says facilitates "voluntary self-deport[ation]." *See* Dep't of Homeland Sec., CBP Home: Assistance to Voluntarily Self-Deport, https://perma.cc/C9ED-4YPQ.

know whether he has received a credible fear interview or will receive consideration for asylum or other relief before being removed. *Id.* ¶¶ 10–13.

M.A.R. and R.J.L.B. are two of hundreds of thousands of noncitizens who were paroled into the United States in recent years after inspection at a port of entry and who now face the threat of removal under highly truncated procedures that have rarely, if ever, been applied at any scale to parolees. Organizations whose memberships include tens of thousands of such parolees have come to this Court to challenge three recent DHS agency actions that expanded expedited removal to this new population. They seek a stay of those actions pending final resolution of this case.

Narrowly, this is a straightforward case of statutory interpretation and agency rationality. Neither the applicable statutes nor principles of reasoned decision-making authorizes the challenged agency actions. More broadly, this case presents a question of fair play. Plaintiffs' members, and hundreds of thousands of others like them, fled oppressive regimes and perilous conditions in their home countries. They arrived for inspection at the United States border pursuant to procedures created and advocated by the U.S. Government. They were paroled into this country under those procedures and given the chance to prove their claims for asylum or other relief authorized by our laws. In a world of bad options, they played by the rules. Now, the Government has not only closed off those pathways for new arrivals but changed the game for parolees already here, restricting their ability to seek immigration relief and subjecting them to summary removal despite statutory law prohibiting the Executive Branch from doing so. This case's underlying question, then, asks whether parolees who escaped oppression will have the chance to plead their case within a system of rules. Or, alternatively, will they be summarily removed from a country that—as they are swept up at checkpoints and outside courtrooms, often by plainclothes officers

without explanation or charges, *see, e.g.*, ECF 22-10 ¶ 7; ECF 22-13 ¶ 9—may look to them more and more like the countries from which they tried to escape?

This Court will **GRANT** the requested stay. The challenged agency actions exceed DHS's statutory authority and are arbitrary and capricious. And Plaintiffs' members and others in their position face imminent, irreparable injury from those actions that outweighs any harm to the Government or the public from pressing pause. Accordingly, the challenged agency actions will be stayed, until the conclusion of this litigation, as to all noncitizens who have been, at any point in time, paroled into the United States at a port of entry.

## II. BACKGROUND

### A. Statutory and Regulatory Framework

#### 1. *Expedited Removal*

##### i. What Is Expedited Removal?

In the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRAIRA"), Congress established two main processes for removing noncitizens deemed ineligible to enter or remain in the United States.[3] *See* IIRAIRA, Pub. L. 104-208, 110 Stat. 3009, 3009-546 (1996). The first, commonly referred to as "section 240" proceedings due to the statutory section in which they appear, are the standard mechanism for removing inadmissible noncitizens.[4] Section 240 removal proceedings take place before an IJ, an employee of the Department of Justice (DOJ) who must be a licensed attorney and has a duty to develop the record in cases before them. 8 U.S.C. § 1229a(a)(1), (b)(1) ("The immigration judge shall administer oaths, receive evidence,

---

[3] The statute and regulations at issue typically use the term "alien" rather than "noncitizen." However, Plaintiffs advocate using the term "noncitizen." ECF 35 at 8 (Hr'g Tr. 8:2–10). Accordingly, the Court will use "noncitizen" unless quoting from a statute or regulation that uses "alien."

[4] Defendants sometimes refer to these proceedings instead as "section 1229a" proceedings, because that is the section of Chapter 8 of the U.S. Code in which section 240 of IIRAIRA was later codified. For simplicity, the Court will stick with "section 240" unless otherwise necessary for clarity.

and interrogate, examine, and cross-examine the alien and any witnesses."); ECF 22-6 ¶¶ 4, 6.[5] They are adversarial proceedings in which the noncitizen has the right to hire counsel, examine and present evidence, and cross-examine witnesses. 8 U.S.C. § 1229a(b)(4). The hearings are recorded, and a transcript is made available if a party appeals the decision. *Id.* § 1229a(b)(4)(C); ECF 22-6 ¶ 13. A section 240 proceeding typically takes place over the course of multiple hearings due to the built-in procedures. ECF 22-6 ¶ 9. This allows time for noncitizens to both gather evidence in support of petitions for relief available in immigration court (like asylum and certain adjustments of status) and seek collateral relief from other components of DHS (like adjustment of status on the basis of marriage or family). *Id.* Upon a decision by the IJ, either party may appeal to the Board of Immigration Appeals (BIA). 8 C.F.R. §§ 1240.15, 1003.1. If the BIA upholds a removal order, the noncitizen may then appeal that decision to a U.S. court of appeals. 8 U.S.C. § 1252. The Congress that passed IIRAIRA referred to the new section 240 as a "streamlined" removal process relative to what came before it because, among other things, it removed a layer of appellate review. H.R. Rep. 104-469, at 12, 107–08 (1996). And, replacing the multiplicity of proceedings that preceded it, the new section 240 framework would be a "single form of removal proceeding" "[f]or illegal aliens already present in the U.S." *Id.* at 108.

Still, IIRAIRA included a second, even more streamlined form of proceeding applicable only to certain noncitizens: expedited removal. Relative to section 240 removal, "[e]xpedited removal lives up to its name." *Make the Rd. New York v. Wolf*, 962 F.3d 612, 619 (D.C. Cir. 2020). In expedited removal, an immigration officer, not an IJ, conducts the initial fact-finding. 8 C.F.R.

---

[5] Plaintiffs' motion includes a declaration from A. Ashley Tabaddor, who among other credentials previously served as an Immigration Judge, as President of the National Association of Immigration Judges, and as Chief Counsel at the U.S. Citizenship and Immigration Services (USCIS) at DHS. *See* ECF 22-6 ¶ 2. Her declaration includes helpful information about removal proceedings that this Court considers alongside—and only to the extent it is not inconsistent with—the applicable statutes and regulations. Defendants have not objected to anything in her declaration or its use as evidence here.

§ 235.3(b)(2)(i). If a noncitizen is eligible for expedited removal, an immigration officer asks them a short series of questions to determine (a) their "identity, alienage, and inadmissibility," and (b) whether they intend to apply for asylum, fear persecution or torture, or fear returning to their country of origin. *Id.* § 235.3(b)(2)(i), (b)(4). Noncitizens are not entitled to counsel during this questioning, and no recording or transcript is made. ECF 22-6 ¶¶ 11, 17; *compare* 8 C.F.R. § 235.3(b)(2)(i) *with* 8 U.S.C. § 1229a(b)(4)(C). If the noncitizen is inadmissible and does not indicate intent to apply for asylum or fear of persecution or torture, the inspecting officer issues a Notice and Order of Expedited Removal (NOER), and the noncitizen may respond in a sworn statement. 8 C.F.R. § 235.3(b)(2)(i). Once a supervising officer reviews and signs off on the inspecting officer's determination, the noncitizen is ordered removed. *See id.* The noncitizen has no right to appeal that decision to an IJ, the BIA, or (with one exception discussed below) any court. *Id.* § 235.3(b)(2)(ii); 8 U.S.C. § 1252(a)(2)(A)(i).

"The process is scarcely more involved" if the noncitizen "assert[s] an intention to apply for asylum or a fear of prosecution." *Make the Rd.*, 962 F.3d at 619. If the noncitizen so indicates, the inspecting officer must refer them to a "credible fear interview," to be conducted by an asylum officer. 8 C.F.R. § 235.3(b)(4). If that asylum officer finds the noncitizen to have a credible fear of persecution, the noncitizen will be moved either to full section 240 removal proceedings or to USCIS administrative asylum proceedings. *Id.* § 208.30(f). If, however, the officer makes a negative credible fear determination, a supervisory officer will review the determination. *Id.* § 208.30(e)(8). And if the supervisor agrees, the noncitizen can request review by an IJ. *Id.* § 208.30(g). The IJ's review "is meant to conclude within 24 hours" and is final. *Make the Rd.*, 962 F.3d at 619. With narrow exceptions discussed below, no further administrative or judicial review is available. *Id.*

Unlike section 240 proceedings, which often take place over the course of several months, the expedited removal process is "conducted on a very compressed schedule and can result in deportation in hours or days." ECF 22-6 ¶ 11. As a result, noncitizens subject to expedited removal have little time to secure counsel—and no right to a continuance to give them time to do so. *Id.* And although the noncitizen may bring counsel to their credible fear interview, they typically have only a short window (24 to 48 hours on average) to secure counsel and ensure they can attend the interview. *Id.* ¶ 12. Meanwhile, asylum officers have no explicit duty to advise noncitizens of their rights or the requirements for relief. *Id.* ¶ 13. That fast pace also gives noncitizens little time to prepare evidence related to their credible-fear claim. *Id.* ¶ 17. Further, noncitizens in expedited removal have no way to pursue any other immigration relief besides asylum, such as adjustment of status or family-based petitions (e.g., for marriage)—even if they are eligible and were pursuing them before entering expedited removal. *Id.* ¶ 16. Only if they establish credible fear and return to section 240 proceedings can they then continue to pursue those other forms of relief. *Id.* ¶¶ 16–17. Compounding all those challenges, noncitizens are typically detained pending the outcome of their expedited removal proceedings, often in remote locations that may be far from their counsel or families. 8 U.S.C. § 1225(b)(1)(B)(iii)(IV); 8 C.F.R. § 235.3(b)(2)(iii); ECF 22-6 ¶¶ 17–20.

Key to that expedition is the lack of almost any role for judicial review. IIRAIRA provides that "no court shall have jurisdiction to review" issues related to expedited removal unless they fall into a narrow set of exceptions outlined at 8 U.S.C. § 1252(e). 8 U.S.C. § 1252(a)(2)(A). Under subsection (e), two forms of judicial proceedings are available. First, a noncitizen may file a habeas petition to challenge their expedited removal. However, that habeas proceeding is limited to the narrow grounds of (a) whether the petitioner is an alien, (b) whether the petitioner was ordered removed under the expedited removal provision, and (c) whether the petitioner can prove that they

were lawfully admitted or granted asylum. 8 U.S.C. § 1252(e)(2). Second, noncitizens may challenge expedited removal determinations, as well as the implementation of the expedited removal section, in this Court. *Id.* § 1252(e)(3)(A). In such suits, referred to in the statute as "[c]hallenges on validity of the system," a plaintiff may challenge either (i) whether the statute's expedited removal section, or any regulation implementing it, is constitutional, or (ii) "whether such a regulation, or a written policy directive, written policy guideline, or written procedure issued by or under the authority of the Attorney General to implement such section, is not consistent with applicable provisions of this subchapter or is otherwise in violation of law." *Id.* § 1252(e)(3). This kind of suit must be filed within 60 days after the date the challenged statutory provision or agency action is first implemented, *id.* § 1252(e)(3)(B), and it may not be a class action, *id.* § 1252(e)(1)(B).

Finally, the statute limits the relief a court may grant in such cases. Specifically, it provides,

> Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter, as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 [which includes the expedited removal section], other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated.

*Id.* § 1252(f)(1).

All that said, the expedited removal regulations provide a few other escape hatches for individuals to prove that they are not in fact eligible for expedited removal under the statute. Specifically, during the initial interview by the immigration officer, an individual in expedited removal proceedings may "claim[] to have been lawfully admitted for permanent residence, admitted as a refugee under section 207 of the Act, granted asylum under section 208 of the Act, or claim[] to be a U.S. citizen." 8 C.F.R. § 235.3(b)(5)(i). If the immigration officer can verify any of those claims, the individual will not be removed. *Id.* § 235.3(b)(5)(ii-iv). If the immigration

9

officer cannot verify the claim, but the individual makes the claim under penalty of perjury, the case is referred for review by an IJ. *Id.* § 235.3(b)(5)(iv). In addition, the regulation provides that the individual must be given "a reasonable opportunity to establish to the satisfaction of the examining immigration officer that he or she was admitted or paroled into the United States following inspection at a port-of-entry." *Id.* § 235.3(b)(6). "If the alien establishes that he or she was lawfully admitted or paroled," the regulation continues, the agency reviews whether the noncitizen's parole "has been, or should be, terminated." *Id.* If the noncitizen cannot establish that they were "lawfully admitted or paroled," they "will be ordered removed pursuant to" the expedited removal provision. *Id.*

## ii.    Who Is Subject to Expedited Removal?

Noncitizens may be eligible for expedited, rather than section 240, removal only if they are inadmissible on the basis that they either lack proper entry documents or falsified or misrepresented their application for admission. 8 U.S.C. § 1225(b)(1)(A)(i); *see id.* § 1182(a)(6)(C), (a)(7) (grounds of inadmissibility). Among that set, only two categories of noncitizens are eligible for expedited removal: (1) noncitizens "arriving in the United States," and (2) noncitizens who "ha[ve] not been admitted or paroled into the United States" and cannot affirmatively show that they have been "physically present in the United States continuously for the 2-year period immediately prior to the date of the determination of inadmissibility." 8 U.S.C. § 1225(b)(1)(A)(i)–(iii).[6] The statute permits the Attorney General (who has since delegated this authority to the DHS Secretary) to designate the population of noncitizens within that second category who will be subject to expedited removal. And that designation lies within the Secretary's

---

[6] In addition, the statute exempts from expedited removal noncitizens who are "native[s] or citizen[s] of a country in the Western Hemisphere with whose government the United States does not have full diplomatic relations and who arrives by aircraft at a port of entry." 8 U.S.C. § 1225(b)(1)(F).

"sole and unreviewable discretion." *Id.* § 1225(b)(1)(A)(iii); *see* 8 C.F.R. § 235.3(b)(ii).[7] This opinion refers to the statutory provision outlining the first category as the "Arriving Aliens Provision," and the provision defining the second category as the "Designation Provision."

The statute itself does not define "arriving" for purposes of the Arriving Aliens Provision. But a DHS regulation first promulgated in 1997, the year after the statute's passage, does. *See* Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures, 62 Fed. Reg. 10312, 10312–13 (Mar. 6, 1997) [*hereinafter* 1997 Rulemaking]. That definition has been altered only slightly since 1997 and today reads as follows:

> Arriving alien means an applicant for admission coming or attempting to come into the United States at a port-of-entry, or an alien seeking transit through the United States at a port-of-entry, or an alien interdicted in international or United States waters and brought into the United States by any means, whether or not to a designated port-of-entry, and regardless of the means of transport. An arriving alien remains an arriving alien even if paroled pursuant to section 212(d)(5) of the Act, and even after any such parole is terminated or revoked. However, an arriving alien who was paroled into the United States before April 1, 1997, or who was paroled into the United States on or after April 1, 1997, pursuant to a grant of advance parole which the alien applied for and obtained in the United States prior to the alien's departure from and return to the United States, will not be treated, solely by reason of that grant of parole, as an arriving alien under section 235(b)(1)(A)(i) of the Act.

8 C.F.R. § 1.2; *see id.* § 235.3(b)(i) (applying that definition).

The regulation also expands upon the criteria for designation under the Designation Provision. Eligible for designation under that section are

> aliens who arrive in, attempt to enter, or have entered the United States without having been admitted or paroled following inspection by an immigration officer at a designated port-of-entry, and who have not established to the satisfaction of the immigration officer that they have been physically present in the United States

---

[7] This designation authority originally belonged to the Commissioner of the Immigration and Nationalization Service before that agency was abolished and DHS was created in 2002. *See Make the Rd. New York v. McAleenan*, 405 F. Supp. 3d 1, 16 n.7 (D.D.C. 2019) (K.B. Jackson, J.) (citing Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135 (Nov. 25, 2002); 6 U.S.C. § 557).

continuously for the 2–year period immediately prior to the date of determination of inadmissibility.

8 C.F.R. § 235.3(b)(ii).

Since IIRAIRA's passage, the Executive Branch has altered its designation under that provision a handful of times. Initially, DHS's predecessor agency[8] did not make any designation under the Designation Provision, thereby limiting expedited removal only to "arriving aliens." 1997 Rulemaking, 62 Fed. Reg. at 10313. In so doing, the agency "acknowledge[d] that application of the expedited removal provisions to aliens already in the United States w[ould] involve more complex determinations of fact and will be more difficult to manage." *Id.* In fact, no designation was made under the Designation Provision until 2002, when the DHS Secretary designated for expedited removal "aliens who arrive in the United States by sea, either by boat or other means, who are not admitted or paroled, and who have not been physically present in the United States continuously for the two-year period prior to a determination of inadmissibility." Notice Designating Aliens Subject to Expedited Removal Under Section 235(b)(1)(A)(iii) of the Immigration and Nationality Act, 67 Fed. Reg. 68924, 68925 (Nov. 13, 2002).

DHS has made four other designations, or recissions of designations, between that 2002 Notice and today:

- In 2004, DHS designated noncitizens "who are physically present in the U.S. without having been admitted or paroled following inspection by an immigration officer at a designated port-of-entry, who are encountered by an immigration officer within 100 air miles of any U.S. international land border, and who have not established to the satisfaction

---

[8] The Commissioner of the Immigration and Nationalization Service (INS) used to make this designation before that agency was abolished and DHS was created in 2002. *See Make the Rd. New York v. McAleenan*, 405 F. Supp. 3d 1, 16 n.7 (D.D.C. 2019) (K.B. Jackson, J.) (citing Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135 (Nov. 25, 2002); 6 U.S.C. § 557).

of an immigration officer that they have been physically present in the U.S. continuously for the 14-day period immediately prior to the date of encounter." Designating Aliens For Expedited Removal, 69 Fed. Reg. 48877, 48880 (Aug. 11, 2004).

- In 2019, DHS additionally designated "[a]liens . . . who are physically present in the United States without having been admitted or paroled following inspection by an immigration officer at a designated port of entry, and who either (a) did not arrive by sea, are encountered by an immigration officer anywhere in the United States more than 100 air miles from a U.S. international land border, and have not been physically present in the United States continuously for the two-year period immediately prior to the date of the determination of inadmissibility, or (b) did not arrive by sea, are encountered by an immigration officer within 100 air miles from a U.S. international land border, and have been physically present in the United States continuously at least 14 days but less than two years immediately prior to the date of the determination of inadmissibility." Designating Aliens for Expedited Removal, 84 Fed. Reg. 35409, 35414 (July 23, 2019) [*hereinafter* 2019 Designation Notice]. This designation, when combined with the previous designations, expanded expedited removal to the full scope of the statutory authorization under the Designation Provision. *See id.* at 35411. This Designation Notice clarified that it "d[id] not apply to aliens who arrive at U.S. ports of entry, because those aliens are already subject to expedited removal." *Id.* at 35414.

- In 2022, DHS rescinded the 2019 designation while leaving in place the 2002 and 2004 designations. Rescission of the Notice of July 23, 2019, Designating Aliens for Expedited Removal, 87 Fed. Reg. 16022, 16022 (Mar. 21, 2022) [*hereinafter* 2022 Rescission Notice].

- In January of 2025, DHS rescinded the 2022 Recission Notice, returning the designation to its 2019 scope. Designating Aliens for Expedited Removal, 90 Fed. Reg. 8139, 8139 (Jan. 24, 2025) [*hereinafter* 2025 Designation Notice].[9]

Thus, as of January 21, 2025, DHS asserts the authority to apply expedited removal to all noncitizens described in the Designation Provision, alongside those described in the Arriving Aliens Provision, for the first time since the 2019 Designation Notice.[10]

### 2. *Parole*

Immigration law has long allowed the Executive Branch to exercise its discretion to temporarily allow into the United States noncitizens who are applying for admission to the country instead of holding them in detention. *See* 8 U.S.C. § 1182(d)(5)(A). Currently, the DHS Secretary holds that parole authority by statute.[11] *See id.* Parole may be granted "under such conditions as [the DHS Secretary] may prescribe" and "only on a case-by-case basis for urgent humanitarian reasons or significant public benefit." *Id.* Parole "shall not be regarded as an admission of the alien." *Id.* And the DHS Secretary may, in their discretion, terminate any grant of parole and return the noncitizen "to the custody from which he was paroled." *Id.* At that point, the noncitizen's "case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States." *Id.*

---

[9] This Notice was effective on January 21, 2025, and was published in the Federal Register on January 24, 2025. *See* 2025 Designation Notice, 90 Fed. Reg. at 8139.

[10] That chronology overstates the amount of time in which DHS executed on that full designation; the 2019 Designation Notice was preliminarily enjoined in September 2019. *See Make the Rd.*, 405 F. Supp. 3d at 72. The D.C. Circuit reversed that preliminary injunction the following year, in June 2020. *See Make the Rd.*, 962 F.3d at 635. And in February 2021, President Biden directed DHS to consider rescinding the 2019 designation, suggesting the administration had begun de-prioritizing its enforcement. *See* Exec. Order 14010, 86 Fed. Reg. 8267, 8270–71 (Feb. 2, 2021).

[11] The Secretary has further delegated that authority by regulation to various officials below them. *See* 8 C.F.R. § 212.5(a).

Congress has amended the parole statute a few times since its original enactment. Notably, in 1996, Congress restricted the Executive Branch's discretion under the statute by adding the language that parole be granted only on "a case-by-case basis for urgent humanitarian reasons or significant public benefit." *See* IIRAIRA § 602(a), 110 Stat. at 3009-689. Congress also added a reporting requirement, in which the Executive must report to Congress each year "the number and categories of aliens paroled into the United States" and related data. *Id.* § 602(b), 110 Stat. at 3009-689–90.

A DHS regulation fleshes out the conditions under which the DHS Secretary and her delegees may grant and terminate parole. *See* 8 C.F.R. § 212.5(a). As relevant here, the regulation provides that DHS may terminate a noncitizen's parole either "automatically" or "[o]n notice." *Id.* § 212.5(e)(1), (e)(2). A grant of parole terminates automatically, without written notice, (a) when the noncitizen departs the United States, or (b) "if not departed, at the expiration of the time for which parole was authorized." *Id.* § 212.5(e)(1). In all other cases, parole "shall be terminated upon written notice to the alien." *Id.* § 212.5(e)(2). Those other cases include when the "purpose for which parole was authorized" is "accomplish[ed]" or "when in the opinion of" the DHS Secretary or their delegee "neither humanitarian reasons nor public benefit warrants the continued presence of the alien in the United States." *Id.* A "charging document" (i.e., "the written instrument which initiates a proceeding before an Immigration Judge") constitutes written notice "unless otherwise specified." *Id*; *id.* § 244.1.[12] At that point, the noncitizen either moves to "further

---

[12] The parole regulation does not define "charging document," but other sections in the same chapter of the Code of Federal Regulations define it as follows: "*Charging document* means the written instrument which initiates a proceeding before an Immigration Judge. For proceedings initiated prior to April 1, 1997, these documents include an Order to Show Cause, a Notice to Applicant for Admission Detained for Hearing before Immigration Judge, and a Notice of Intention to Rescind and Request for Hearing by Alien. For proceedings initiated after April 1, 1997, these documents include a Notice to Appear, a Notice of Referral to Immigration Judge, and a Notice of Intention to Rescind and Request for Hearing by Alien." 8 C.F.R. § 244.1; *id.* § 1003.13; *see also* 1997 Rulemaking, 62 Fed. Reg. 10312, 10332 (defining the term in the same exact way in the regulation adopting IIRAIRA's changes to parole and expedited removal).

inspection or hearing" under "section 235 or 240 of the Act," or any previous "order of exclusion, deportation, or removal" against the noncitizen "shall be executed." *Id.* § 212.5(e)(2).

In 2022 and 2023, DHS issued four notices establishing parole processes for nationals from Cuba, Haiti, Nicaragua, and Venezuela—referred to collectively in this opinion as the "CHNV Parole Programs." *See* Implementation of a Parole Process for Venezuelans, 87 Fed. Reg. 63507 (Oct. 19, 2022); Implementation of a Parole Process for Cubans, 88 Fed. Reg. 1266 (Jan. 9, 2023); Implementation of a Parole Process for Haitians, 88 Fed. Reg. 1243 (Jan. 9, 2023); Implementation of a Parole Process for Nicaraguans, 88 Fed. Reg. 1255 (Jan. 9, 2023). Each notice created a process under which noncitizens, along with a U.S.-based supporter, could apply in advance to travel to a U.S. port of entry. *See, e.g.*, 87 Fed. Reg. at 63515–16. Once the noncitizen arrived at a port of entry, they would be subjected to inspection and additional vetting and "considered for a grant of discretionary parole for a period of up to two years on a case-by-case-basis." *Id.* at 63516. If granted parole, that parole would generally last for "up to two years, subject to applicable health and vetting requirements." *Id.* During that period of parole, the noncitizen would be "eligible to apply for employment authorization under existing regulations." *Id.* Between October 2022 and January 2025, approximately 532,000 noncitizens were paroled into the United States under the CHNV Parole Programs. Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans, 90 Fed. Reg. 13611, 13612 (Mar. 25, 2025) [*hereinafter* March 25 CHNV Termination Notice].

On October 4, 2024, DHS announced that it would not "re-parole" anyone paroled under the CHNV Parole Programs. *Id.* Accordingly, once their initial period of parole—granted when they arrived for inspection at a port of entry—ended, CHNV parolees would have to "leave the United States" or would otherwise be "placed in removal proceedings." *Id.*

Then, on March 25, 2025, DHS announced that it was terminating the CHNV Parole

Programs entirely. *Id.* at 13611. Accordingly, DHS announced,

> The temporary parole period of aliens in the United States under the CHNV parole
> programs and whose parole has not already expired by April 24, 2025 will terminate
> on that date unless the Secretary makes an individual determination to the contrary.
> Parolees without a lawful basis to remain in the United States following this
> termination of the CHNV parole programs must depart the United States before
> their parole termination date.

*Id*.

A group of noncitizens challenged the March 25 CHNV Termination Notice. Judge

Talwani in the District of Massachusetts stayed the Notice "insofar as it revokes, without case-by-

case review, the previously granted parole and work authorization issued to noncitizens paroled

into the United States pursuant to parole programs for noncitizens from Cuba, Haiti, Nicaragua,

and Venezuela . . . prior to the noncitizen's originally stated parole end date." *Doe v. Noem*, No.

1:25-cv-10495, 2025 WL 1099602, at *20 (D. Mass. Apr. 14, 2025). On May 30, 2025, in an

unsigned and unexplained order, the Supreme Court granted a stay of the District Court's order

pending resolution of the Government's appeal to the First Circuit and petition for certiorari to the

Supreme Court. *Noem v. Doe*, 145 S. Ct. 1524, 1524 (2025). Thus, as of that date, the March 25

CHNV Termination Notice remains in full effect.

All the while, DHS retains the authority to grant parole upon inspection at a port of entry

on a case-by-case basis, as well as to later terminate it. During the Biden Administration, DHS

began directing noncitizens to use the CBP One mobile application as the primary, if not exclusive,

mechanism to seek parole and/or asylum at the southwestern border. *See* Circumvention of Lawful

Pathways, 88 Fed. Reg. 31314, 31317–18. (May 16, 2023). The Trump Administration disabled

that functionality in CBP One in January 2025 and terminated all grants of parole authorized

through that application in April 2025. Valerie Gonzalez, *Trump's DHS Revokes Legal Status for*

*Migrants Who Entered the US on Biden-Era CBP One App* (Apr. 8, 2025), https://perma.cc/FX74-BN5Z; *see also* Dep't of Homeland Sec., Six Months of Keeping America Safe Under President Trump and Secretary Noem (July 20, 2025), https://perma.cc/7Z6X-328H ("President Trump ended the CBP One app that allowed more than one million aliens to illegally enter the U.S.").

### 3. *Relevant Avenues of Immigration Relief*

Immigration law supplies a few relevant avenues under which noncitizens who arrive in the United States without entry documents can gain lawful admission (as distinct from parole, which is not admission). First, pursuant to statute and treaties, the United States offers asylum to a set number of noncitizens per year whom DHS deems to be "refugee[s]." 8 U.S.C. § 1158(b)(1)(A). To qualify as a refugee, a noncitizen must show that they are "unable or unwilling to return to, and . . . unable or unwilling to avail himself or herself of the protection of, [the last country in which they habitually resided] because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." *Id.* § 1101(a)(42). In section 240 proceedings, the IJ can make that assessment and grant or deny asylum to the noncitizen. 8 C.F.R. § 208.14(a). Alternatively, an asylum officer within USCIS can grant or deny asylum. *Id.* § 208.14(b). In expedited removal, noncitizens must first establish a "credible fear" of such persecution to the satisfaction of an asylum officer, who then refers them to proceedings in immigration court to prove that they meet the higher standard of "well-founded fear" necessary to claim asylum status. *See id.* § 235.3(b)(4); *id.* § 208.30.

Second, noncitizens who were admitted or paroled into the United States can seek "adjustment of status," granting them lawful permanent resident status, on a variety of bases. 8 U.S.C. § 1255. For instance, the noncitizen or their spouse may seek the noncitizen's adjustment

of status if the spouse is a U.S. citizen. *See id.* § 1154(a)(1)(A). Parents and children of U.S. citizens may do the same. *See id.* So may noncitizens who were victims of human trafficking, *id.* § 1255(l), victims of crimes against women, *id.* § 1255(m), or juveniles abused or abandoned by their parents, *id.* § 1101(a)(27)(J), § 1255(g). So, too, may Cuban natives or citizens who were inspected and admitted or paroled at a port of entry and have been physically present in the United States for at least one year. 8 U.S.C. § 1255 note.

Noncitizens may pursue some of those forms of relief in section 240 proceedings, but most can be obtained only through separate applications to USCIS or another entity. ECF 22-6 ¶ 9. In section 240 proceedings, noncitizens typically have time to pursue such collateral relief through USCIS. *Id.* ¶¶ 9–10. Not so in expedited removal proceedings. Indeed, none of those forms of relief is available to noncitizens in expedited removal unless they manage to establish credible fear and get transferred back to section 240 proceedings. *Id.* ¶ 17.

## B. Factual Background

### 1. *The Challenged Actions*

Against that statutory and regulatory backdrop, DHS took three actions during the first two months of the second Trump Administration to subject a significantly greater number of noncitizens to expedited removal. Plaintiffs here challenge each one.

#### i.     The January 23 Huffman Memorandum

On January 23, 2025, Acting Secretary of DHS Benjamine Huffman issued a memorandum to the leadership of USCIS and U.S. Customs and Border Protection (CBP) "provid[ing] guidance regarding how to exercise enforcement discretion in implementing" two "policies" that he had announced in the days prior. Dep't of Homeland Sec., Memorandum from Acting Secretary

Benjamine C. Huffman on Guidance Regarding How to Exercise Enforcement Discretion (Jan. 23, 2025), https://perma.cc/4HPX-45Z7 [*hereinafter* January 23 Huffman Memorandum]. The first of the two "policies" was a January 20 memorandum "clarif[ying] DHS's position regarding the scope of the parole statute" and authorizing DHS components to "pause, modify, or terminate, effective immediately, any parole program . . . inconsistent with" that memorandum. *Id.* at 1. The second was the 2025 Designation Notice rescinding the 2022 Recission Notice and returning DHS's assertion of expedited removal authority to the full scope of the Designation Provision. *Id.*

The January 23 Huffman Memorandum "direct[ed]" USCIS and CBP officials to "consider" placing in expedited removal "any alien DHS is aware of who is amenable to expedited removal but to whom expedited removal has not been applied." *Id.* at 2. The Memorandum indicated that applying expedited removal "may include steps to terminate any ongoing removal proceeding and/or active parole status." *Id.*

The January 23 Huffman Memorandum also included a few qualifiers to its directives. For one, it repeatedly emphasized that the instructions were to be understood as "consistent with the principles of enforcement discretion"—namely, that "'[t]he Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case,'" including in immigration enforcement. *Id.* at 1–2 (quoting *United States v. Nixon*, 418 U.S. 683, 693 (1974)). In addition, the Memorandum stated that "actions contemplated by" it "shall be taken in a manner consistent with applicable statutes, regulations, and court orders," as well as "in a manner that takes account of legitimate reliance interests." *Id.* at 2.

ii.    The February 18 ICE Directive

On February 18, 2025, ICE leadership issued an internal directive to its Enforcement and Removal Operations (ERO) personnel directing them to "consider for expedited removal" a

different set of categories of noncitizens (the "February 18 ICE Directive").[13] The one relevant to Plaintiffs' members here, "paroled arriving aliens," it described as "any arriving alien (i.e., encountered at a port of entry) who CBP determined to be inadmissible and released, as long as the alien is inadmissible under" the two inadmissibility criteria to which expedited removal applies (i.e., lack of valid immigration documents or fraud or willful misrepresentation). February 18 ICE Directive at 1. For that category, the Directive explained, "[t]here is no time limit on the ability to process such aliens for [expedited removal]." *Id.* That Directive included no similar discussion of enforcement discretion, or reference to legality or reliance interests, as the January 23 Huffman Memorandum did.

### iii.    The March 25 CHNV Termination Notice

As discussed above, on March 25, 2025, DHS terminated the CHNV Parole Programs instituted in 2022 and 2023. *See supra* Section II.A.2. And after a stay by another district court, the March 25 CHNV Termination Notice remains back in effect as of May 30, 2025, pursuant to the Supreme Court's emergency order.

As relevant here, the March 25 CHNV Termination Notice terminated parole for hundreds of thousands of noncitizens for the express purpose of subjecting them to expedited removal when they otherwise would not be. In justifying the parole terminations, DHS relied in large part on "the U.S. government's strong interest in promptly removing parolees when the basis for the underlying program no longer exists." March 25 CHNV Termination Notice at 13619. Termination of the parole programs was necessary, the Notice continued, because "[e]xpedited removal is available

---

[13] DHS has not published this directive; instead, it was reported by Reuters in early March 2025. *See* Ted Hesson & Kristina Cooke, *Trump Weighs Revoking Legal Status of Ukrainians as US Steps Up Deportations*, Reuters (March 6, 2025), https://perma.cc/MT7S-MR4Y (citing "internal ICE email" available at https://perma.cc/S3LJ-AFJM). This opinion refers to this document, as published by Reuters, as the February 18 ICE Directive. Defendants do not dispute the authenticity of this document, and their argument proceeds on the basis that it is authentic. *See, e.g.*, ECF 26 at 51.

only when an alien has not been continuously present in the United States for at least the two years preceding the date of the inadmissibility determination." *Id.* (citing 8 U.S.C. § 1225(b)(1)(iii)(II); 8 CFR § 235.3). If DHS did not terminate the CHNV Parole Programs and instead had to wait for the grants of parole to expire at the end of their terms, "DHS would be compelled to place a greater proportion of this population in section 240 removal proceedings to effectuate their removal." *Id.* That is because, the Notice explained, "parolees may begin to accrue more than two years of continuous presence in the United States," disqualifying them from expedited removal under the Designation Provision and therefore requiring "section 240 removal proceedings" as the only way to remove them. *Id.* at 13620.

Like the February 18 ICE Directive, and unlike the January 23 Huffman Memorandum, this Notice also contained no qualification about compliance with applicable law. It did state that it was being issued in response to an Executive Order that directed DHS to "take all appropriate action," "consistent with applicable law," to terminate the CHNV Parole Programs. *Id.* at 13611. (quoting Exec. Order 14165, 90 Fed. Reg. 8467, 8468 (Jan. 20, 2025)). But the Notice did not qualify its own actions with that or any similar language.

### 2. *Plaintiffs*

Plaintiffs here are three membership organizations whose members include parolees subject to, and in many cases already undergoing, expedited removal under one or more of the three Challenged Actions.

Plaintiff Coalition for Humane Immigrant Rights ("CHIRLA") is a nonprofit organization headquartered in Los Angeles with offices throughout California and in Washington, D.C. ECF 22-3 ¶ 2. CHIRLA is "the largest statewide immigrant rights organization in California," with approximately 51,297 members across the state. *Id.* ¶¶ 4–5. Many of CHIRLA's members were

granted parole via either the CBP One app or the CHNV Parole Programs and are now subject to expedited removal under the Challenged Actions. *Id.* ¶ 15. One CHIRLA member, for instance, was arrested at a CBP checkpoint on March 7, 2025, despite having active parole, and is now being processed for expedited removal. *Id.* ¶ 17.

Plaintiff CASA, Inc. ("CASA") is a national nonprofit organization with more than 173,000 members across the United States, most of whom are noncitizens. ECF 22-2 ¶ 1. Of those, more than 33,000 "entered the United States after the CBP One app first launched in October 2020," and "a significant portion of those members were likely granted parole through CBP One," according to the organization. *Id.* ¶ 11. In addition, about 2,250 CASA members are nationals of Cuba, Haiti, Nicaragua, or Venezuela and entered the United States after full implementation of the CHNV Parole Programs in January 2023. *Id.* ¶ 12. Thus, "[a] significant number of them were likely sponsored for and granted parole through CHNV parole." *Id.* As of the Supreme Court's termination of the district court's stay of the March 25 CHNV Termination Notice, they are now in the Government's view eligible for expedited removal—and some members have received letters terminating their parole status and "directing them to leave the country." *Id.* They now may be detained and put into expedited removal at any point, including at their section 240 removal hearings, which have been a primary site of the ramp-up in immigration enforcement in recent weeks. *Id.* ¶ 13. And they face adverse consequences for themselves and their families if they are removed without a full chance to prove asylum eligibility or eligibility for other relief, including risks of persecution or worse in their country of origin. *See id.* ¶¶ 16–19.

Finally, Plaintiff UndocuBlack Network ("UndocuBlack") is a membership organization with more than 1,000 active members—all of whom are immigrants and identify as Black—across New York, Los Angeles, and Washington, D.C. ECF 22-4 ¶¶ 1, 7–8. Among those are at least 300

Haitian nationals who were paroled into the United States through either the CHNV Parole Programs or the CBP One app. *Id.* ¶ 11. UndocuBlack's members, too, run the risk of detention and expedited removal at immigration courthouses, where they must report for their section 240 hearings, and of losing the opportunity to gain collateral immigration relief if they are detained before they can do so. *Id.* ¶¶ 13–15. UndocuBlack's members face family separation, as well as "extreme danger," if forced to return to Haiti. *Id.* ¶ 22.

### 3. *This Suit*

Plaintiffs filed a complaint in this Court on March 24, 2025, alleging that the Challenged Actions exceeded DHS's statutory authority under IIRAIRA and the Administrative Procedure Act (APA), 5 U.S.C. § 706(2)(A), (C); was arbitrary and capricious in violation of the APA, *id.* § 706(2)(A); and violated the Due Process Clause of the Fifth Amendment. ECF 1 ¶¶ 102–115. Plaintiffs sued DHS Secretary Kristi Noem; ICE, CBP, and USCIS officials Todd Lyons, Pete Flores, and Kika Scott; and President Donald Trump, all in their official capacities (collectively, Defendants). *Id.* at 1. On June 11, 2025, Plaintiffs amended their complaint and added two more causes of action: a claim that the January 23 Huffman Memorandum and CHNV Termination Notice violated the rule of *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954), that agencies must comply with their own regulations, ECF 21 ¶¶ 163–170; and a claim that the 1997 DHS regulation codified at 8 C.F.R. § 1.2 defining "arriving alien" exceeded the agency's statutory authority under IIRAIRA and the APA, *id.* ¶¶ 171–183.

That same day, June 11, Plaintiffs filed a motion to stay agency action, under 5 U.S.C. § 705, as to the three Challenged Actions (but not 8 C.F.R. § 1.2) "insofar as they subject individuals who have been previously granted parole at ports of entry to expedited removal." ECF 22 at 1; *see* ECF 28 at 23 n.12 (explaining that "Plaintiffs challenge 8 C.F.R. § 1.2 as *ultra*

*vires* . . . but have not moved for preliminary relief as to it"). For purposes of their stay motion, Plaintiffs also do not advance their Due Process claim, instead limiting their argument to claims that the Challenged Actions are *ultra vires* and arbitrary and capricious. *See* ECF 22-1 at 22. In their motion, Plaintiffs submit evidence that expedited removals of their members and others in their communities had ramped up in the weeks prior—particularly since the March 25 CHNV Termination went back into effect in May 2025—and that they therefore faced widespread actual or imminent irreparable harm. ECF 22 at 1; ECF 22-1 at 15–16; ECF 22-3 ¶ 21; ECF 22-4 ¶ 13.[14]

Defendants filed an opposition to Plaintiffs' motion for a stay, ECF 26, and Plaintiffs replied, ECF 28. The Court heard oral argument on the motion on July 9, 2025. *See* July 9, 2025 Min. Entry.

## III.  LEGAL STANDARD

Section 705 of the APA authorizes courts to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. The court may do so "[o]n such conditions as may be required and to the extent necessary to prevent irreparable injury." *Id.*

The factors governing issuance of a section 705 stay are the same as those that govern the grant of a preliminary injunction. *Dist. of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 15 (D.D.C. 2020) (citing, *inter alia*, *Cuomo v. U.S. Nuclear Regul. Comm'n*, 772 F.2d 972, 974 (D.C. Cir. 1985)). To prevail on such a motion, the movant "must show (1) a substantial likelihood of

---

[14] This increase in expedited removals also coincided, according to Plaintiffs, with a May 20, 2025, directive from Secretary Noem and White House Deputy Chief of Staff Stephen Miller telling ICE officials to increase immigration arrests to 3,000 per day—triple the status quo. ECF 22-1 at 15. That is consistent with Plaintiffs' argument, addressed further below, that the Challenged Actions caused the increase in expedited removals. As Plaintiffs' declarations demonstrate, and as the March 25 CHNV Termination Notice states, DHS sees and is using expedited removal as a basis to arrest and detain immigrants previously paroled from detention in section 240 removal proceedings. *See, e.g.*, ECF 22-2 ¶ 13; ECF 22-3 ¶¶ 14, 17; ECF 22-8 ¶ 21; ECF 22-10 ¶ 7; ECF 22-14 ¶ 8; March 25 CHNV Termination Notice at 13614–15 (discussing the need to increase the incentives against illegal immigration through, *inter alia*, "detention capabilities" and the problem of "releases from [U.S. Border Patrol] custody").

success on the merits, (2) that it would suffer irreparable injury if the [stay] were not granted, (3) that a[] [stay] would not substantially injure other interested parties, and (4) that the public interest would be furthered by the [stay]." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). In a case like this one, where the Government is the non-movant, the third and fourth factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## IV.    ANALYSIS

In this section, the Court assesses each of those four factors in turn to decide whether a stay under section 705 is warranted. Because each favors granting a stay, the Court will do so. In addition, this section discusses the scope of the stay the Court will order.

### A.  Plaintiffs Are Substantially Likely to Succeed on the Merits

To decide whether Plaintiffs are substantially likely to succeed on the merits, the Court must first assess whether a "substantial likelihood of jurisdiction" exists to hear those claims. *Church v. Biden*, 573 F. Supp. 3d 118, 133 (D.D.C. 2021); *see also Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015). This section answers that first question in the affirmative. It then finds that Plaintiffs are also substantially likely to succeed on the merits of their claims that the Challenged Actions are both *ultra vires* and arbitrary and capricious.

### 1.  *Jurisdictional and Other Bars Do Not Block Plaintiffs' Requested Stay*

IIRAIRA leaves little room for noncitizens, or those suing on their behalf, to seek judicial relief from expedited removal. That is by design; expedited removal's expedition derives in no small part from its insulation from judicial review. But Congress left a clear opening for suits challenging the expedited removal system's compliance with the law. Despite Defendants' myriad arguments to the contrary, Plaintiffs' suit falls squarely within that opening, as does their motion for preliminary relief. Accordingly, this Court likely has jurisdiction to hear this case, and no

constitutional requirement or statutory provision bars this Court from granting the requested relief.[15]

    i.  8 U.S.C. § 1252(f)(1) Does Not Bar Relief

Defendants' first volley against Plaintiffs' suit invokes 8 U.S.C. § 1252(f)(1)'s limitation on injunctive relief in immigration suits. Defendants argue that, "[w]hile Plaintiffs have styled their request for relief as a stay rather than an injunction, the relief requested is the same in substance." ECF 26 at 22. Accordingly, Defendants reason, section 1252(f)(1)'s prohibition on any "court (other than the Supreme Court) . . . enjoin[ing] or restrain[ing] the operation of the provisions of" the section of the U.S. code at issue, including the expedited removal provisions, prohibits the requested relief here. *Id.* (quoting 8 U.S.C. § 1252(f)(1)). Plaintiffs respond that section 1252(f)(1) by its terms is "nothing more or less than a limit on injunctive relief" and that a stay under APA section 705 does not constitute an injunction subject to that provision. ECF 28 at 17 (quoting *Reno v. Am.-Arab Anti-Discrimination Comm.* (*"AADC"*), 525 U.S. 471, 481 (1999)).

Plaintiffs have the better of the argument. Although neither the Supreme Court nor the D.C. Circuit has addressed this question, both the Fifth Circuit and numerous district courts, including in this District, have held that section 1252(f)(1) does not bar a remedy of vacatur under APA section 706.[16] As the Fifth Circuit explained, "a vacatur does nothing but re-establish the status quo absent the unlawful agency action. Apart from the constitutional or statutory basis on which

---

[15] In their opposition, Defendants frame some of the issues discussed in this section as questions of "jurisdiction" and others as whether section 705 provides a basis for the requested relief. *See* ECF 26 at 2. The Court analyzes these threshold issues together, without categorizing them as "jurisdictional," "prudential," "claims-processing," or otherwise, because those distinctions do not, at this point, matter to the Court's resolution of the issues.

[16] *See, e.g.*, *Texas v. United States*, 40 F.4th 205, 220 (5th Cir. 2022); *Las Americas Immigrant Advoc. Ctr. v. DHS*, No. CV 24-1702, 2025 WL 1403811, at *22 (D.D.C. May 9, 2025); *Texas v. Biden*, 646 F. Supp. 3d 753, 768 (N.D. Tex. 2022); *Kidd v. Mayorkas*, 734 F. Supp. 3d 967, 987 (C.D. Cal. 2024); *Florida v. United States*, 660 F. Supp. 3d 1239, 1284-85 (N.D. Fla. 2023); *Immigrant Defs. L. Ctr. v. Mayorkas*, No. CV 20-9893, 2023 WL 3149243, at *14 (C.D. Cal. Mar. 15, 2023).

the court invalidated an agency action, vacatur neither compels nor restrains further agency decision-making." *Texas v. United States*, 40 F.4th 205, 220 (5th Cir. 2022). A court in the Northern District of Texas extended that logic to hold that § 1252(f)(1) also does not bar a stay under section 705. *See Texas v. Biden*, 646 F. Supp. 3d 753, 768 (N.D. Tex. 2022). "Unlike an injunction," that court reasoned, "a stay [under section 705] would not 'order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions' at issue," which is all section 1252(f)(1) prohibits according to the Supreme Court. *Id*. at 769 (quoting *Garland v. Aleman Gonzalez*, 596 U.S. 543, 550 (2022)). Those opinions persuade this Court.

Defendants offer a two-fold response. First, Defendants point to a series of cases describing various forms of stays as equivalent to injunctions. But none of those cases involved, or purported to interpret, section 1252(f)(1) or its relationship to APA remedies. *See* ECF 26 at 23 (citing, for example, *Brown v. Gilmore*, 533 U.S. 1301, 1303 (2001) (Rehnquist, C.J., in chambers), which distinguished between stay of a lower court judgment and injunction against enforcement of a presumptively valid state statute for purposes of the All Writs Act). And Defendants fail to explain any analogical relevance those opinions might have. Defendants also pointed at oral argument to the D.C. Circuit's recent decision in *N.S. v. Dixon*, which held that section 1252(f)(1) bars injunctions not just of statutory provisions of the INA or IIRAIRA but also injunctions of agency actions implementing the statutory provisions. 141 F.4th 279, 288–90 (D.C. Cir. 2025); *see* ECF 35 at 42 (Hr'g Tr. 42:5–19). Although that case clarified a prior D.C. Circuit case on the scope of section 1252(f)(1), however, it had nothing to do with vacatur or stay under the APA but rather with a class-wide permanent injunction. *See Dixon*, 141 F.4th at 281; *N.S. v. Dixon,* No. 1:20-cv-101, 2021 WL 4622490 (D.D.C. Oct. 7, 2021), *vacated and remanded*, 141 F.4th 279 (D.C. Cir.

2025). Further, it relied heavily on the Supreme Court's decision in *Aleman Gonzalez*, a decision that is consistent with the analysis above and with the analysis in cases like *Texas v. Biden*. 646 F. Supp. 3d at 769.

Second, Defendants invoke IIRAIRA's legislative history, in which a House Report described the purpose of section 1252(f)(1) as ensuring that, in challenges to procedures under the Act, "the procedures w[ould] remain in force while such lawsuits are pending." ECF 26 at 25 (quoting H.R. Rep. 104-469, at 161 (1996)). On its face, that statement supports Defendants' position. But it is difficult to square with the unanimous view of the caselaw on section 1252(f)(1), including the Supreme Court's statement that the section effects "nothing more or less than a limit on injunctive relief." *AADC*, 525 U.S. at 481. In addition, Defendants' interpretation presents a structural problem: it would leave associational plaintiffs like those in this case without any remedy when suing in this Court, despite the statute's clear grant of jurisdiction for suits in this Court under section 1252(e). The D.C. Circuit has held that section 1252(e)(3) authorizes suits by associations to "prosecute a case on behalf of individuals directly regulated and affected by" an agency action challengeable under that provision. *Make the Rd.*, 962 F.3d at 627–28. And suits under section 1252(e)(3) must be brought "in the United States District Court for the District of Columbia." 8 U.S.C. § 1252(e)(3)(A). If the statute authorizes suits by associations in this Court, but authorizes no relief for anyone besides "an individual alien" that looks anything like an injunction, stay, or vacatur, *id.* § 1252(f)(1), then what relief could this Court grant?

When pressed on this question at oral argument, Defendants came up empty. First, they insisted that only an individual noncitizen could seek relief under section 1252(e)(3)(A) without hitting up against the bar of section 1252(f)(1). ECF 35 at 44 (Hr'g Tr. 44:9–12). But when confronted with the binding precedent on associational standing in *Make the Road*, Defendants

claimed that in such a case "there is no remedy that the Court can provide." *Id.* at 45 (Hr'g Tr. 45:22–23). A bizarre result. When pressed further still, Defendants assured the Court that it could still "adjudicate the merits" of the dispute, just not "issue any relief," including declaratory relief. *Id.* at 46–47 (Hr'g Tr. 46:18–47:22). And a Party could then, the Court supposes under Defendants' theory, appeal the merits decision until it reached the Supreme Court, at which point that Court could issue an injunction under section 1252(f)(1). Even more bizarre. The Court declines to give the statute such an absurd meaning based on a single sentence in the legislative history. *See United States v. Cook*, 594 F.3d 883, 891 (D.C. Cir. 2010) ("A statutory outcome is absurd if it defies rationality by rendering a statute nonsensical or superfluous . . . ." (cleaned up)).

The final problem with Defendants' legislative history argument is that their quote from the House Report does not match up to the statute's text. The legislative history appears to envision that section 1252(f)(1) would prevent preliminary relief of any kind. *See* H.R. Rep. 104-469, at 161 (1996) (discussing what happens while challenges to expedited removal procedures "are pending"). The statute's text, though, prohibits all orders that "enjoin or restrain the operation of" the statute's provisions, not just preliminary ones. 8 U.S.C. § 1252(f)(1). In short, because the statute's text, alongside the D.C. Circuit's interpretation of it, does not permit Defendants' reading, the Court will not give it that reading based on the legislative history alone. *See Int'l Bhd. of Elec. Workers, Loc. Union No. 474, AFL-CIO v. N.L.R.B.*, 814 F.2d 697, 699–700 (D.C. Cir. 1987) ("Although legislative history may give meaning to ambiguous statutory provisions, courts have no authority to *enforce* alleged principles gleaned *solely* from legislative history that has no statutory reference point." (emphasis in original)).

ii.    APA Section 705 Permits Stays of Agency Actions Already in Effect

In their next attack on the relief Plaintiffs seek, Defendants assert that a court may not stay agency actions under APA section 705 that have already gone into effect. ECF 26 at 25–28. APA section 705 permits an agency to "postpone the effective date" of its own actions pending judicial review and, separately, permits a court to "postpone the effective date of an agency action or . . . preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. Defendants' argument here relies on cases interpreting the term "postpone the effective date" as it relates to agencies' own stays of their agency actions. *See* ECF 26 at 26 (citing *Safety-Kleen Corp. v. EPA*, Nos. 92-1629, 92-1639, 1996 U.S. App. LEXIS 2324, at *2-3 (D.C. Cir. Jan. 19, 1996); *Ctr. for Biological Diversity v. Regan*, No. 21-cv-119, 2022 WL 971067, at *21 (D.D.C. Mar. 30, 2022); *California v. U.S. Bureau of Land Mgmt.*, 277 F. Supp. 3d 1106, 1118 (N.D. Cal. 2017)). Defendants argue that the same phrase in the same statute should be given the same meaning; a court, therefore, should not be able to stay an agency action after it has gone into effect if an agency under the same provision cannot. *Id.* at 26.

However, as Plaintiffs point out, Defendants' argument omits the other authority that section 705 grants only courts, not agencies. While an agency may only "postpone the effective date of action taken by it," a court may either "postpone the effective date of an agency action" *or* "preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. And "[c]ourts—including the Supreme Court—routinely stay already-effective agency action." *Texas v. Biden*, 646 F. Supp. 3d at 770 (citing, *e.g.*, *W. Virginia v. E.P.A.*, 577 U.S. 1126 (2016)); *accord Kingdom v. Trump*, No. 1:25-cv-691, 2025 WL 1568238, at *5 (D.D.C. June 3, 2025) (noting that "various courts have interpreted § 705 to permit a 'stay'—which may be more aptly described as a temporary rollback—even of already-consummated agency action"). Moreover, "[w]hile some

courts have held that an agency may not issue a § 705 stay for an already-effective action because that would amount to an amendment requiring a period of notice and comment, that reasoning plainly does not apply to courts." *Cabrera v. U.S. Dep't of Lab.*, No. 25-cv-1909, 2025 WL 2092026, at *8 (D.D.C. July 25, 2025) (internal citation and emphasis omitted). Thus, the fact that all three Challenged Actions are already in effect does not bar this Court from staying them—and returning things to the *status quo ante* while this case proceeds—under section 705. *See Texas v. Biden*, 646 F. Supp. 3d at 771.

iii.    8 U.S.C. § 1252(e)(1) Does Not Prohibit the Requested Relief

Defendants next invoke the provision of section 1252 that prohibits courts from "enter[ing] declaratory, injunctive, or other equitable relief in any action pertaining to an order to exclude an alien in accordance with section 1225(b)(1) of this title [i.e., the expedited removal provision] except as specifically authorized in a subsequent paragraph of this subsection." 8 U.S.C. § 1252(e)(1)(A). Although Plaintiffs bring this suit under section 1252(e)(3), which is carved out of that prohibition, Defendants insist that Plaintiffs' stay motion must fail because the sole remedy section (e)(3) authorizes is a final "determination[]" on the merits—not interim relief. ECF 26 at 28 (quoting 8 U.S.C. § 1252(e)(3)(A)). Further, Defendants urge, section 1252(e)(3) authorizes suits "by, and only by, aliens against whom the new procedures had been applied"—not by associations suing on behalf of their noncitizen members. *Id.* (quoting *Am. Immigr. Lawyers Ass'n v. Reno* ("*AILA*"), 199 F.3d 1352, 1360 (D.C. Cir. 2000)).

Defendants miss on both swings. As to interim versus final relief, Plaintiffs correctly observe that "section 1252(e)(3) is not addressed to remedies." ECF 28 at 21 n.8 (quoting *Kiakombua v. Wolf*, 498 F. Supp. 3d 1, 51 (D.D.C. 2020) (K.B. Jackson, J.)). Instead, its use of the term "determinations" refers to determination of "*certain legal issues*, including whether the

32

[challenged] written policy directive, guideline, or procedure is consistent with the [statute]." *Kiakombua*, 498 F. Supp. 3d at 51 (citing 8 U.S.C § 1252(e)(3)(A)(ii)) (emphasis in original). That is clear from the text of section 1252(e)(3), which nowhere mentions remedies but clearly describes legal grounds for suit. And with regard to suits by associations, Defendants' argument blinks the D.C. Circuit's holding in *Make the Road*. There, the Circuit rejected the very argument that the Government makes here, holding instead that associations *can* bring suit under § 1252(e) on behalf of their members. *See Make the Rd.*, 962 F.3d at 627–28 (explaining that *AILA*, the Government's primary case there and here, "rejected third-party organizational standing" but "did not address associational standing," and that associational suits, unlike organizational suits, "seek[] to remedy the individual members' injuries"). The caselaw thus forecloses Defendants' position.

iv.    Plaintiffs' Asserted Injuries Are Redressable

Moving to standing, Defendants do not challenge Plaintiffs' claimed injuries to their members—but they do challenge those injuries' redressability by this suit. ECF 26 at 31.[17] According to Defendants, Plaintiffs' members' injuries are not redressable because a regulatory provision that has been in place since 1997 and that Plaintiffs do not seek to stay in this motion already "allows DHS to apply expedited removal to aliens paroled at ports of entry." *Id.* at 29. Specifically, Defendants cite 8 C.F.R. § 235.3(b)(1)(i), which authorizes application of expedited removal to "[a]rriving aliens," and 8 C.F.R. § 1.2, which defines "arriving alien[s]" to include those who are "paroled . . . and even after any such parole is terminated or revoked." Based on these longstanding regulations, Defendants reason, DHS could already do exactly what Plaintiffs allege they are doing here, and thus Plaintiffs' injuries are "in no way contingent on" the

---

[17] Defendants briefly argue that Plaintiffs have "failed to plead an injury" sufficient for organizational standing, but they then acknowledge that Plaintiffs instead invoke associational standing and "do not challenge" Plaintiffs' asserted injury on that latter basis. ECF 26 at 30–31.

Challenged Actions. ECF 26 at 30. In other words, because "none of these documents are necessary for DHS to apply expedited removal to aliens paroled at a port of entry," "staying their implementation will not prevent the harms Plaintiffs allege they cause." *Id.*

The first problem with Defendants' argument is that it contradicts the factual record now before the Court. While DHS has long asserted the authority to apply expedited removal to parolees, Plaintiffs present evidence that the agency has only begun doing so *en masse* since the Challenged Actions—particularly the March 25 CHNV Termination Notice. *See* ECF 22-1 at 15–16; ECF 22-3 ¶ 21; ECF 22-4 ¶ 13; *see also supra* at n.13. Plaintiffs' employees testified in declarations that expedited removal has ramped up significantly among their memberships. *See id.* And multiple immigration attorneys who submitted declarations in this case, each of whom has years of experience representing immigrants in removal proceedings, swore that they have rarely, if ever, seen expedited removal applied to parolees or others already in section 240 proceedings before the past few months. *See, e.g.*, ECF 22-8 ¶ 28; ECF 22-14 ¶ 14.

Defendants do little to rebut that evidence. They first point to a memorandum issued by an ICE official in April 2011 instructing agents to "screen incarcerated aliens to determine if [expedited removal] is appropriate," including whether they qualify as an "arriving alien" under the regulation. ECF 36-1 at 2–3 (Memorandum from Gary Mead, ICE Executive Associate Director, to Field Officer Directors and Deputy Field Office Directors (Apr. 5, 2011)). Second, they refer the Court to two cases initiated prior to January 2025 in which DHS applied expedited removal to parolees. *See* ECF 36 at 2 (citing *Cordon-Linarez v. Garland*, No. 3:24-CV-00488, 2024 WL 4652824, at *1 (M.D. Pa. Nov. 1, 2024), *appeal pending*, No. 24-3068 (3d Cir.); *United States v. Arredondo-Martinez*, No. CR 10-525, 2011 WL 13196331, at *6 (C.D. Cal. Oct. 3, 2011), *aff'd* 492 F. App'x 823 (9th Cir. 2012)).

That scant evidence does not overcome the record Plaintiffs have developed. For one thing, the 2011 memorandum proves only that ICE officials considered and encouraged using their asserted authority under the "arriving alien" regulatory definition. Defendants offer no evidence of how often or how pervasively ICE officials actually used that authority. Indeed, Defendants did not even offer this memorandum in their initial briefing; instead, they submitted it after this Court's questions at oral argument as to any examples of DHS applying expedited removal to parolees before this year. *See id.* at 1. That Defendants could then muster just two examples of the agency applying that regulatory definition to specific noncitizens prior to 2025 only highlights the dearth of evidence. Further, in both of Defendants' cited cases, the noncitizens were charged with crimes and paroled into the country for purposes of criminal prosecution. *See Cordon-Linarez*, 2024 WL 4652824, at *4; *Arrendondo-Martinez*, 2011 WL 13196331, at *1. Additionally, the 2011 memorandum contained separate directives for noncitizens paroled into the United States for prosecution versus those paroled for another reason. It said that ICE officers "should use [expedited removal] for all arriving aliens paroled into the United States for prosecution, regardless of how long they have been present in the United States," but should only consider expedited removal for other parolees "if the parole has expired or been terminated <u>and</u> the alien has been continuously present in the United States for less than one year." ECF 36-1 at 3. Thus, Defendants provide *no* evidence that, prior to the Challenged Actions, DHS ever applied expedited removal to the many parolees—including the hundreds of thousands of parolees under the CHNV Parole Programs and others like them—who were paroled into the United States for a purpose other than criminal prosecution. And they certainly have no evidence that DHS applied expedited removal to that population at the scale it is doing so now. Plaintiffs' evidence, then, stands unrebutted.

Meanwhile, Defendants' own statements elsewhere in their briefing flatly contradict what is left of their redressability argument. Although Defendants insist for redressability purposes that they could do the exact same things they are doing here, and inflict the exact same injuries, even if the Court stayed the Challenged Actions, they assert for balance-of-the-equities purposes that "[t]he relief Plaintiffs request would prevent DHS from applying expedited removal to potentially hundreds of thousands of paroled aliens whose parole DHS is seeking to revoke or has revoked, thereby frustrating DHS's ability to quickly remove these aliens." ECF 26 at 61. That could only be true if DHS was not, in fact, already equipped to apply expedited removal to parolees without reliance on the Challenged Actions. Needless to say, Defendants cannot have it both ways. And Defendants' latter argument, that the Challenged Actions have some independent effect, matches the factual record. Indeed, at least one of the three Challenged Actions appears to be based on, and purports to implement, the "arriving alien" definition in 8 C.F.R. § 1.2. *See* February 18 ICE Directive at 1 (suggesting that ICE agents may commence expedited removal proceedings for noncitizens whose parole was terminated regardless of how long they have been present in the United States, which matches the Arriving Aliens Provision but not the Designation Provision). That evidence, too, undermines any claim that the Challenged Actions are entirely redundant.[18]

That record decides this question because redressability is ultimately a question of fact. This Court must examine the whole record and determine whether Plaintiffs' asserted injuries are "likely to be redressed" by a favorable decision. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). Defendants' cited cases only reinforce that point. In each of the cases Defendants cite, the courts

---

[18] Ironically, the main evidence in the record in favor of Defendants' position is a filing Plaintiffs attach to their Reply, which shows that, in at least one case, DHS has explicitly relied upon the Arriving Aliens Provision rather than the Designation Provision to subject a parolee to expedited removal in recent months. *See* ECF 28-1 at 18. But such a position is fully consistent with the proposition that the February 18 ICE Directive implemented 8 C.F.R. §§ 1.2 and 235.3, thereby having some independent effect.

found no redressability based on factual findings that the alternative legal route for the agency to do the same thing would necessarily, or at least likely, cause the exact same injury to the plaintiffs. In *Texas v. EPA*, the statute was "self-executing," and therefore would have exactly the same effect with or without the challenged regulations. 726 F.3d 180, 198 (D.C. Cir. 2013). In *Kaspersky Lab, Inc. v. DHS*, the court found that another regulation would "independently produce the same alleged result." 311 F. Supp. 3d 187, 219 (D.D.C. 2018), *aff'd*, 909 F.3d 446 (D.C. Cir. 2018). So, too, in *Delta Const. Co., Inc. v. EPA*. *See* 783 F.3d 1291, 1297 (D.C. Cir. 2015) ("Because a separate action—NHTSA's standards—independently causes the same alleged harm as the challenged action, the California Petitioners are unable to establish the 'necessary causal connection' between the EPA standards and their purported injury."). Here, Defendants have not demonstrated, as a factual matter, that 8 C.F.R. § 1.2 would have the same result had none of the three Challenged Actions been issued. Moreover, relief need only be likely to relieve the asserted injury "in part," not even the entirety of the injury. *Defs. of Wildlife v. Gutierrez*, 532 F.3d 913, 925 (D.C. Cir. 2008); *see also Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982) ("[A] plaintiff satisfies the redressability requirement when he shows that a favorable decision will relieve a discrete injury to himself. He need not show that a favorable decision will relieve his *every* injury." (emphasis original)). The factual record allows Plaintiffs to clear at least that bar.

Finally, Defendants attempt to fall back on a non-binding, and ultimately inapposite, concurrence by Justice Gorsuch in *United States v. Texas*, 599 U.S. 670, 689–93 (Gorsuch, J., concurring). There, the Justice (joined by Justices Thomas and Barrett) argued that the States' alleged injury arising from DHS guidance instructing non-enforcement against certain noncitizens was not redressable by vacatur of that guidance because immigration officers would still have

prosecutorial discretion not to arrest and remove any given noncitizen even without the challenged guidance. *Id.* at 690–91.

Of course, a three-Justice concurrence is not the law. Moreover, binding Supreme Court precedent holds that "a litigant to whom Congress has accorded a procedural right to protect his concrete interests . . . can assert that right without meeting all the normal standards for redressability and immediacy." *Massachusetts v. EPA.*, 549 U.S. 497, 517–18 (2007) (internal citations and quotation marks omitted). Here, Congress has specifically permitted challenges to any "written policy directive, written policy guideline, or written procedure" that implements the expedited removal system. 8 U.S.C. § 1252(e)(3). By definition, such documents implement some other regulatory or statutory authority. *See Nat'l Min. Ass'n v. McCarthy*, 758 F.3d 243, 252 (D.C. Cir. 2014) ("An agency action that merely explains how the agency will enforce a statute or regulation—in other words, how it will exercise its broad enforcement discretion or permitting discretion under some extant statute or rule—is a general statement of policy," also known as "guidance"). The statute thus permits procedural challenges to, and provides constitutionally suitable redress from, sub-regulatory guidance that causes injury in fact. This suit meets those criteria. Justice Gorsuch's concurrence does not address that legal theory at all, much less foreclose it.

v.    <u>Plaintiffs' Suit Is Not Time Barred</u>

Next up, Defendants challenge the timeliness of Plaintiffs' suit. The statute permitting challenges, like this one, to the expedited removal system requires that such challenges be filed "no later than 60 days after the date the challenged section, regulation, directive, guideline, or procedure . . . is first implemented." 8 U.S.C. § 1252(e)(3)(B). Because DHS has asserted the

authority to subject parolees to expedited removal since a regulation promulgated on April 1, 1997, Defendants contend, Plaintiffs are about 28 years too late. ECF 26 at 32.

Defendants' argument fails for the same basic reason as some of its previous ones: The statute permits Plaintiffs to challenge not just statutes and agency regulations, but also "written policy directive[s], written policy guideline[s], [and] written procedure[s]" that "implement" the expedited removal statute. 8 U.S.C. § 1252(e)(3)(A)(ii). In only a slight variation on their previous arguments, Defendants contend that the Challenged Actions were not in fact "first implemented" when they were issued, *id.* § 1252(e)(3)(B), because they merely restated the "long-established principle that aliens paroled at a port of entry are subject to expedited removal." ECF 26 at 33–34. Yet, by its text, "section 1252(e)(3) plainly authorizes judicial review of written policies, guidelines, or procedures that implement the expedited removal statute, without regard to whether such policies deviate substantively from an agency's prior practices." *Kiakombua*, 498 F. Supp. 3d at 36. Indeed, as already explained, sub-regulatory guidance necessarily implements statutory or regulatory principles. If no such guidance could be challenged, most of section 1252(e)(3)A)(ii) would be rendered nugatory. But courts "presume that Congress did not 'include words [in statutes] that have no effect.'" *Mercy Hosp., Inc. v. Azar*, 891 F.3d 1062, 1068 (D.C. Cir. 2018) (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 176–77 (2012)); *accord United States v. Menasche*, 348 U.S. 528, 538–39 (1955) ("It is our duty to give effect, if possible, to every clause and word of a statute." (internal quotations omitted)). Moreover, as demonstrated above, the Challenged Actions have had effects independent of the preexisting 1997 regulation and cannot be understood merely to restate that regulation. *See supra* Section IV.A.1.iv.

Plaintiffs brought this suit within 60 days of the first Challenged Action, the January 23 Huffman Memorandum. Their suit is therefore timely under 8 U.S.C. § 1252(e)(3)(B).

vi.    <u>8 U.S.C. § 1252(g) Does Not Foreclose the Requested Stay</u>

Proceeding down the page of the U.S. Code, Defendants invoke section 1252(g)'s "[e]xclusive jurisdiction" provision, which states in relevant part,

> Except as provided in this section . . . no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter.

8 U.S.C. § 1252(g). Defendants argue that Plaintiffs' suit seeks just that prohibited kind of relief, pointing to a prayer for relief in Plaintiffs' amended complaint that asks the Court to "[e]njoin Defendants from applying expedited removal to noncitizens who have previously been granted parole at a port of entry." ECF 26 at 35 (quoting ECF 21 at 54).

Not so. Defendants' argument breezes right past the first five words of that provision— "[e]xcept as provided in this section." 8 U.S.C. § 1252(g). That "section" includes section 1252(e)(3)(A), which authorizes challenges to expedited removal policies and procedures of the exact kind that Plaintiffs bring here. The provision's text thereby fully resolves the issue.

Defendants attempt to get out from under that text by accusing Plaintiffs of merely "restyl[ing]" their challenge to their members' expedited removals in a way that is easily manipulable and would render section 1252(g) a "paper tiger." ECF 26 at 37 (quoting *Tazu v. Att'y Gen. United States*, 975 F.3d 292, 298 (3d Cir. 2020); *E.F.L. v. Prim*, 986 F.3d 959, 965 (7th Cir. 2021)). Yet none of the three cases Defendants cite for that proposition purported to analyze the line between section 1252(e)(3) actions and those barred by section 1252(g). Instead, they all involved actions that clearly did not fall under section 1252(e)(3). *See Tazu*, 975 F.3d at 295–98 (challenging the timing of DHS decision to execute plaintiff's removal); *E.F.L.*, 986 F.3d at 964–

40

65 (challenging DHS decision to execute plaintiff's removal order while plaintiff sought administrative relief); *AADC*, 525 U.S. at 487 (selective prosecution challenge, which the Parties there appeared to agree did not fall under section 1252(e)(3)(A)). Thus, Defendants' arguments on this provision fail.

vii.    Plaintiffs Have Prudential Standing to Sue Under 8 U.S.C. § 1252(e)(3)(A)

The final threshold barrier that Defendants seek to erect is a claim that Plaintiffs fall outside the zone of interests protected by section 1252(e)(3) and therefore lack a cause of action to sue under it. ECF 26 at 37; *see Thompson v. N. Am. Stainless*, 562 U.S. 170, 177 (2011) (holding that a plaintiff "may not sue unless he falls within the zone of interests sought to be protected by the statutory provision whose violation forms the legal basis for his complaint" (internal quotations omitted)). Defendants point to language in the D.C. Circuit's decision in *AILA* stating that the Circuit "cannot see anything in these provisions allowing litigants—whether individuals or organizations—to raise claims on behalf of those not party to the lawsuit." 199 F.3d at 1358. Only "individual aliens who . . . were aggrieved by the statute's implementation," the *AILA* court reasoned, may sue under section 1252(e)(3)(A). *Id.* at 1359.

Once again, though, Defendants' argument runs headlong into the D.C. Circuit's later decision in *Make the Road*, 962 F.3d 612. There, the Circuit permitted a suit under section 1252(e)(3)(A) by membership associations because "[w]hether aggrieved individuals sue on their own or band together through a representative association does not change the nature of the lawsuit as seeking to remedy the individual members' injuries." *Make the Rd.*, 962 F.3d at 628. Here, Plaintiffs' members are aggrieved by the Challenged Actions. Plaintiffs sue to redress those members' injuries. *See* ECF 22-2; ECF 22-3; ECF 22-4. That takes this case out of the *AILA* category and places it firmly under *Make the Road*. Indeed, judges in this District have found that

41

membership associations fall within the zone of interest of this statute on precisely that basis. *See, e.g.*, *Nat'l Ass'n for the Advancement of Colored People v. Trump*, 298 F. Supp. 3d 209, 235 (D.D.C. 2018), *adhered to on denial of reconsideration*, 315 F. Supp. 3d 457 (D.D.C. 2018), and *aff'd and remanded sub nom. Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891 (2020); *Hisp. Affs. Project v. Perez*, 319 F.R.D. 3, 7–8 (D.D.C. 2016).[19]

Defendants try to distinguish *Make the Road* on factual grounds, arguing that Plaintiffs' declarations do not sufficiently prove that their members are aggrieved by the Challenged Actions in the way the *Make the Road* plaintiffs' declarations did. Plaintiffs' declarations are deficient, Defendants posit, because they (a) do not come from the members themselves, (b) contain hearsay, (c) do not identify members by their full names, and (d) sometimes do not identify whether the noncitizen being discussed is a member of any of the Plaintiff associations. ECF 26 at 39. It is true that the record in *Make the Road* included "three declarations from the Associations' members stating that they were subject to and adversely affected by" the challenged expedited removal policy. *Make the Rd.*, 962 F.3d at 622. But Plaintiffs' declarations here similarly attest to harms Plaintiffs' members face from being newly subjected to expedited removal, including those currently in expedited removal proceedings or eligible for them. *See, e.g.*, ECF 22-2 ¶¶ 10–17; ECF 22-3 ¶¶ 14–23; ECF 22-4 ¶¶ 13–22. *Make the Road* imposes no requirement that the declarations identify members by their actual names. Nor does it require declarations from members themselves; declarations from others speaking about the members' circumstances based on the declarant's personal knowledge and observations serve the equivalent function.[20] And

---

[19] Justice O'Connor's decision in chambers in *INS v. Legalization Assistance Project of L.A. Cty. Fed'n of Labor*, 510 U.S. 1301, 1302 (1993), does not hold to the contrary. Although her opinion did say that the immigration law at issue there was "clearly meant to protect the interests of undocumented aliens, not the interests of organizations," she specifically clarified that "membership organizations which have members whose claims are ripe" could sue "on behalf of those members." *Id.* at 1305–06.

[20] To be sure, some portions of some of Plaintiffs' declarations do include hearsay. The Court does not rely on any hearsay in the declarations.

though a few of the declarations fail to identify whether certain described noncitizens are members, the record as a whole contains enough (non-hearsay) testimony about members of each Plaintiff association to demonstrate their standing.[21] Thus, Plaintiffs stand in the same position as those in *Make the Road*.

Defendants make one last ditch effort to get out from under that binding precedent by pointing to the Supreme Court's opinion in *United States v. Texas*, 599 U.S. 670 (2023). According to Defendants, that case decided that "third parties have no cognizable interest in the way the Executive enforces the immigration laws against others." ECF 26 at 41. But such a statement reads the Court's decision way too broadly. *United States v. Texas* was a decision about Article III standing in which the Supreme Court found that a state lacked a judicially cognizable injury in fact arising from the federal government's decision not to arrest or prosecute certain noncitizens. As the Supreme Court explained, that "case raise[d] only the narrow Article III standing question of whether the Federal Judiciary may in effect order the Executive Branch to take enforcement actions against violators of federal law—here, by making more arrests." 599 U.S. at 684–85. The instant case presents no such question, nor anything particularly close to it. *Texas* therefore does nothing

---

[21] *See, e.g.*, ECF 22-2 ¶ 11 (discussing CASA declarant's knowledge about "CASA members who have had their grants of CBP One parole prematurely terminated, putting them at risk of being subjected to expedited removal); ECF 22-3 ¶ 17 (discussing CHIRLA declarant's knowledge about a CHIRLA member's experience being detained and processed for expedited removal); ECF 22-4 ¶ 17 (discussing UndocuBlack declarant's knowledge of its "members who are Haitian parole beneficiaries" and newly eligible for removal due to the Challenged Actions, and who therefore face the heightened risk of "abrupt family separation," and "deport[ation] to Haiti where they don't have family or resources and where they may be at risk of violence or even death"); ECF 22-10 (discussing CASA member's experience in the expedited removal process based on the member's attorney's personal knowledge and observations). Defendants also seem to suggest that the only declarations that can support Plaintiffs' prudential standing are those from members who are already in expedited removal proceedings. ECF 26 at 39 ("In fact, Plaintiffs only identify three alleged members who were granted parole and subsequently placed in expedited removal proceedings, in each case through pseudonymous hearsay. . . . This is insufficient to establish that Plaintiffs fall within the zone of interests protected by the expedited removal statute."). But *none* of the declarants in *Make the Road* was already being processed for expedited removal, and yet their declarations sufficed for those plaintiff associations' standing. *See Make the Rd.*, 405 F. Supp. 3d at 33.

43

to alter *Make the Road*'s application to this case. Plaintiffs fall within the statute's zone of interests and may sue for relief under section 1252(e)(3)(A) and the APA cause of action.

### 2. *The Challenged Actions Exceed DHS's Statutory Authority*

Satisfied that it likely has jurisdiction to resolve this case, and that no statutory provision or doctrine raised by Defendants bars this suit, the Court proceeds to the merits of Plaintiffs' claims. The Court first addresses Plaintiffs' arguments that each of the three Challenged Actions exceeds DHS's statutory authority. Plaintiffs are likely to succeed on that claim.

Defendants argue that two statutory authorities justify the Challenged Actions: the Designation Provision and the Arriving Aliens Provision of 8 U.S.C. § 1225(b)(1)(A). The Court addresses each in turn.

### i.    The Designation Provision Does Not Authorize Expedited Removal of Parolees

Defendants attempt to ground the Challenged Actions' lawfulness partially in the provision of 8 U.S.C. § 1225(b)(1)(A) that permits the DHS Secretary to designate certain noncitizens for expedited removal—i.e., the Designation Provision. As a reminder, that provision, in relevant part, authorizes the Attorney General (now delegated to the DHS Secretary) to designate as eligible for expedited removal any

> alien . . . who has not been admitted or paroled into the United States, and who has not affirmatively shown, to the satisfaction of an immigration officer, that the alien has been physically present in the United States continuously for the 2-year period immediately prior to the date of the determination of inadmissibility under this subparagraph.

8 U.S.C. § 1225(b)(1)(A)(iii)(II). As of January 21, 2025, DHS has expanded its designation to the full scope permitted under that statutory provision. *See* 2025 Designation Notice at 8139.

Two of the three Challenged Actions explicitly relied upon the Designation Provision, and the DHS Secretary's designation thereunder, as their authority. The January 23 Huffman Memorandum noted that the then-Acting Secretary of DHS had, in the 2025 Designation Notice,

"expand[ed] the scope of expedited removal to the statutory maximum under 8 U.S.C. § 1225(b)(1) which . . . includes certain aliens who have not been continuously present in the United States for two years." January 23 Huffman Memorandum at 1. The Memorandum purported to "provide[] guidance regarding how to exercise enforcement discretion in implementing these policies," with "these policies" referring in part to the scope of DHS's designation. *Id.*[22] Meanwhile, the March 25 CHNV Termination Notice discussed DHS's authority under the Designation Provision in some detail as a primary reason for its termination of the CHNV Parole Programs. Among other references, the Notice stated that, because of the Designation Provision's less-than-two-year continuous presence requirement, "[e]xpedited removal is available only when an alien has not been continuously present in the United States for at least the two years preceding the date of the inadmissibility determination." March 25 CHNV Termination Notice at 13619.

Whether the third Challenged Action, the February 18 ICE Directive, also relied upon the Designation Provision is a bit less clear. That confusion raises a separate defect, arbitrariness, which the Court discusses further below. But for present purposes, the Directive appears to invoke the Designation Provision in one of its sections, in which it directed officers to "consider for expedited removal" certain paroled noncitizens who "ha[ve] not been continuously physically present in the United States for two years prior to the finding of inadmissibility by the ERO." February 18 ICE Directive at 1–2.

But the Designation Provision under the statute does not authorize the Challenged Actions. That is because the Designation Provision forbids the expedited removal of noncitizens who have been, at any point in time, paroled into the United States.

---

[22] The other "polic[y]" to which that sentence referred was a January 20 memorandum "clarif[ying] DHS's position regarding the scope of the parole statute" and encouraging pauses, modifications, or termination of parole grants given under categorical programs. January 23 Huffman Memorandum at 1.

As with any question of statutory interpretation, the Court "begin[s] with the text." *City of Clarksville v. FERC*, 888 F.3d 477, 482 (D.C. Cir. 2018). The Designation Provision authorizes designation for expedited removal of any noncitizen who, among other requirements, "has not been admitted or paroled into the United States." 8 U.S.C. § 1225(b)(1)(A)(iii)(II). On the text, the Parties' dispute comes down to the meaning of Congress's use of the present-perfect tense: "has not been . . . paroled." Plaintiffs claim that "the negative form of the present perfect tense," as the statute employs, "indicate[s] an event that is neither continuing to the present nor occurred in the past." ECF 28 at 26. They reason that the present-perfect tense "can, as a matter of pure semantics, refer to a time in the indefinite past *or* to a past action or state that continues into the present." *Id.* at 25–26 (quoting *Turner v. U.S. Att'y Gen.*, 130 F.4th 1254, 1261 (11th Cir. 2025) (emphasis in original)). It follows, they argue, that the negative form of the present-perfect tense must indicate that the event *neither* happened in the indefinite past *nor* is continuing into the present. *Id.* at 26. Under that reading, whether a noncitizen's parole is active, or has expired or been terminated, does not matter. Either way, if the noncitizen was ever "paroled into the United States," 8 U.S.C. § 1225(b)(1)(A)(iii)(II), the Designation Provision may not be applied to them, ECF 28 at 26.

Yet, as Defendants correctly point out, Plaintiffs' logic does not necessarily hold. Indeed, the Supreme Court recently held that a particular statutory phrase framed in the present-perfect tense "conveys to a listener that the event in question continues to be true or valid," even when used in the negative. *Hewitt v. United States*, 145 S. Ct. 2165, 2172 (2025). That case concerned a section of the First Step Act that applied "to any offense that was committed before the date of enactment of this Act, if a sentence for the offense *has not been imposed* as of such date of enactment." *Id.* at 2170 (quoting First Step Act § 403(b), 132 Stat. 5194, 5222 (2018) (emphasis added)). The Court determined that, "[w]hen used in this way," a sentence that "has not been

imposed" means a sentence that has no "continued legal validity," even if the sentence *was* imposed and had legal validity at some point in the past. *Id.* at 2172–73. By analogy, Defendants suggest, the Designation Provision exempts only those whose parole has not been terminated and continues to be valid. ECF 31 at 1; ECF 26 at 46.

Ultimately, the pure semantics of the phrase at issue cannot resolve this question. The Supreme Court's analysis in *Hewitt* alone disproves Plaintiffs' mistaken syllogism that the negative form of the present-perfect tense necessarily means that neither of the potential meanings of the positive present-perfect tense applies. At the same time, Defendants err in suggesting that *Hewitt* decided that the present-perfect tense *always* refers to an event that continues into the present. To the contrary, the *Hewitt* Court indicated that its grammatical conclusion—that the present-perfect tense necessarily refers to something that continues into the present—depended on the "way" in which the phrase at issue was "used." *Hewitt*, 145 S.Ct. at 2172. Specifically, the present-perfect tense holds the meaning the Court ascribed to it when it "describe[s] situations involving a specific change of state that produces a continuing result." *Id.* (internal citation and quotation marks omitted). In addition, the *Hewitt* Court referenced adjacent provisions of the statute and background legal principles to determine whether its grammatical holding made sense in the context of the statute as a whole. *Id.* at 2172–74. That analysis is consistent with the Eleventh Circuit's statement in *Turner* that the present-perfect tense can refer to two different things (either "a time in the indefinite past or . . . a past action or state that continues into the present"), and that "the question becomes which of those meanings applies in this statutory context." *Turner*, 130 F.4th at 1261 (citing *Pulsifer v. United States*, 601 U.S. 124, 133 (2024)).

Examining the statutory context, Plaintiffs point to the words immediately surrounding the phrase at issue. Again, the statute permits designation for expedited removal of noncitizens who

"ha[ve] not been *admitted* or paroled." 8 U.S.C. § 1225(b)(1)(A)(iii)(II) (emphasis added). Applying the canon of *noscitur a sociis*, Plaintiffs argue that "the meaning of 'paroled' is elucidated by its association with 'admitted.'" ECF 28 at 27–28 (citing *Fischer v. United States*, 603 U.S. 480, 487 (2024), for the proposition that "a word is given more precise content by the neighboring words with which it is associated"). And in immigration law, "admission" is something that happens at a specific point in time; it is not a "continuing status." ECF 22-1 at 25–26 (quoting *Sanchez v. Mayorkas*, 593 U.S. 409, 415 (2021) as stating, "[l]awful status and admission . . . are distinct concepts in immigration law"); *see also* 8 U.S.C. § 1101(a)(13)(A) (defining "admission" and "admitted" as "the lawful entry of the alien into the United States after inspection and authorization by an immigration officer"). Plaintiffs acknowledge that "[p]arole," unlike "admission," can refer to "both a manner of entry and a status." ECF 22-1 at 26. But when accompanied by "admitted," which refers only to a manner of entry, "paroled" likely refers to a manner of entry, too. *Id.* And if that is true, then *Hewitt*'s rule does not apply here, because *Hewitt*'s grammatical conclusion applies when the present-perfect word at issue "describe[s] situations involving a specific change of state that produces a continuing result"—i.e., a change in "status." *Hewitt*, 145 S.Ct. at 2172–73. Defendants offer no response to this persuasive argument from Plaintiffs.

Like the *Hewitt* Court, Plaintiffs also look to "[b]ackground [legal] principles." *Id.* at 2173; *see* ECF 35 at 12–15 (Hr'g Tr. 12:3–15:7). As Plaintiffs rightly observe, *Hewitt* hung its holding in part on the "legal effect of vacatur" of a sentence. *Hewitt*, 145 S.Ct. at 2173 (citing *Bond v. United States*, 572 U.S. 844, 857 (2014) for the proposition that "Congress legislates against the backdrop of certain unexpressed presumptions" (cleaned up)). Because "the law acts as though [a] vacated [court] order never occurred," it makes sense for an offender whose sentence was vacated

48

to be treated under the First Step Act the same as someone who was never sentenced in the first place. *Id.* at 2174. Here, background principles suggest the opposite: that termination of parole, unlike vacatur of a sentence, does not render that parole "void *ab initio*." *Id.* at 2173. For example, Plaintiffs observe that a noncitizen is generally ineligible to apply for adjustment of status if the noncitizen "was not admitted or paroled following inspection by an immigration officer." 8 C.F.R. § 245.1(b)(3); *see* ECF 35 at 14–15 (Hr'g Tr. 14:22–15:3). If the noncitizen was paroled into the country but that parole later expired or was terminated (as all parole does, since parole under 8 U.S.C. § 1182(d)(5) must be temporary), the regulation does not indicate that the noncitizen is therefore ineligible for adjustment of status. To the contrary, because the noncitizen "was . . . paroled," they would remain eligible under that requirement. *See* 8 C.F.R. § 245.1(b)(3). Thus, for at least some purposes, parole has ongoing legal effect even after it expires or is terminated. And, under *Hewitt*'s logic, it would therefore make sense for the Designation Provision to treat noncitizens who were paroled into the United States differently, even once their parole ends, than noncitizens who entered the country without parole.

Defendants respond by pointing the Court to a different background principle that they say informed the Designation Provision: the so-called "entry fiction." ECF 28 at 33; ECF 26 at 46. Under that principle, Defendants explain, "when parole is revoked, an alien reverts to the status he possessed prior to the grant of parole." ECF 26 at 46. "In the case of all those paroled at a port of entry," Defendants continue, "that is the position of an applicant for admission standing at the threshold of entry." *Id.* Defendants point to a few sources for that principle. First, they reference the parole statute, which has long stated that parole "shall not be regarded as an admission of the alien," and "when the purposes of such parole shall, in the opinion of the Secretary of Homeland Security, have been served the alien shall forthwith return or be returned to the custody from which

he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States." 8 U.S.C. § 1182(d)(5)(A). They also cite a Supreme Court case that held, for purposes of a since-repealed provision of the Immigration and Nationality Act (INA), that a noncitizen paroled into the United States is treated the same as a noncitizen held in detention and therefore is not considered to be "within the United States." *Leng May Ma v. Barber*, 357 U.S. 185, 186–188 (1958) (citing INA § 243(h)); *see* ECF 26 at 46. Finally, Defendants cite a Supreme Court decision and two decisions from other circuits that post-date IIRAIRA's passage by at least a decade and interpret, or just recite, the above-quoted text in 8 U.S.C. § 1182(d)(5)(A). *See* ECF 26 at 46 (citing *Jennings v. Rodriguez*, 583 U.S. 281, 288 (2018); *Duarte v. Mayorkas*, 27 F.4th 1044, 1058 (5th Cir. 2022); *Ibragimov v. Gonzales*, 476 F.3d 125, 137 (2d Cir. 2007)).

Defendants' sources do not establish the background principle they need to show. First, section 1182(d)(5)(A) does not, as Defendants insist, say that parolees return, upon the termination or expiration of their parole, to "the position of an applicant for admission standing at the threshold of entry." ECF 26 at 46. Rather, the provision says that two things happen to such a parolee: (1) he "shall forthwith return or be returned to the custody from which he was paroled"; and (2) "thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States." In other words, the noncitizen is physically brought back into immigration detention ("custody") and then legally continues to be treated as an "applicant for admission," because his parole itself did not constitute an admission. *See* 8 U.S.C. § 1182(d)(5)(A) (stating that parole "shall not be regarded as an admission of the alien"). That does not prove that the law treats the parole as if it never happened. At minimum, it recognizes that the parole physically happened, because it contemplates that the noncitizen must be returned

to detention. Moreover, it does not imply a *return* to the status of an applicant for admission, because a noncitizen is already an "applicant[] for admission" while their parole is active. *See, e.g.*, *Biden v. Texas*, 597 U.S. 785, 806 ("[T]he INA expressly authorizes DHS to process applicants for admission under a third option: parole.") (citing 8 U.S.C. § 1182(d)(5)(A)). Accordingly, the statute says that the noncitizen whose parole is terminated "continue[s]" to be treated as an applicant for admission, not that she "returns" to the status of applicant for admission.

The cases Defendants cite do not get them there, either. Again, *Leng May Ma* interpreted different statutory language ("within the United States") in a different, since-replaced provision of the INA. 357 U.S. at 186. Defendants supply no evidence that Congress intended to incorporate that decision into the distinct text and context of IIRAIRA's expedited removal provisions. To the contrary, as explained below, the legislative history conflicts with Defendants' interpretation. As for the other cases, *Jennings* merely repeated the language of section 1182(d)(5)(A) to show that parole is distinct from detention. 583 U.S. at 288. *Duarte* just said that parole allows a noncitizen "physically . . . to enter the country" even though his "legal status" remains "the same as if he or she were still being held at the border waiting for his or her application for admission to be granted or denied." 27 F.4th at 1058. That is perfectly consistent with the above reading of section 1182(a)(5)(A): a parolee has the legal status of "applicant for admission" before being paroled, during their parole, and after their parole ends. *Accord id.* ("[W]hen an alien is granted parole, immigration authorities temporarily allow the alien access to the country while his or her application for admission is pending."). Similarly, all *Ibragimov* said is that, "[a]lthough paroled aliens physically enter the United States for a temporary period, they nevertheless remain constructively detained at the border, *i.e.* legally unadmitted, while their status is being resolved by immigration officials." 476 F.3d at 134. Again, it does not follow that a noncitizen whose parole

ends "returns" to a previous status as if their parole never happened. Instead, under section 1182(d)(5), they physically return to custody and legally remain an applicant for admission. Thus, that section offers no real support to Defendants' reading of the Designation Provision.

To buttress their interpretation of the Designation Provision's text, Plaintiffs next turn to DHS's own regulations, including those promulgated closely following IIRAIRA's enactment. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 388 (2024) (explaining that, when interpreting a statute in an APA challenge, "the informed judgment of the Executive Branch—especially in the form of an interpretation issued contemporaneously with the enactment of the statute—[may] be entitled to great weight" (internal quotations omitted)). Plaintiffs note, for example, that multiple provisions in 8 C.F.R. § 235.3—the expedited removal regulation, adopted shortly after IIRAIRA passed—refer to parole in the past tense, rather than the present-perfect tense of the statute. *See, e.g.*, 8 C.F.R. § 235.3(b)(6) ("If the Commissioner determines that the expedited removal provisions . . . shall apply to any or all aliens described in [the Designation Provision], such alien will be given a reasonable opportunity to establish to the satisfaction of the examining immigration officer that he or she *was admitted or paroled into the United States follow inspection at a port-of-entry*.") (emphasis added); *id.* § 235.3(b)(1)(ii) ("An alien who *was not inspected and admitted or paroled into the United States* but who establishes that he or she has been continuously physically present in the United States for the 2-year period . . . .") (emphasis added). In addition, the regulation's Designation Provision describes noncitizens eligible for designation as "aliens who arrive in, attempt to enter, or have entered the United States *without having been admitted or paroled* following inspection by an immigration officer at a designated port-of-entry." *Id.* (emphasis added). Both such uses—with the word parole in some version of a past tense alongside other verbs that are all present tense—makes clear that parole under those provisions refers to a

moment in time when the noncitizen entered the country at a port of entry and was granted parole. The regulation thus reinforces Plaintiffs' position that parole operates under the Designation Provision as a method of entry, not a status.

So, too, does DHS's apparent understanding of its authority under the Designation Provision in the years since that regulation. For example, in DHS's 2019 Designation Notice, in which the agency designated for expedited removal all those it believed to be eligible under the Designation Provision, the agency stated that a key question for eligibility was whether a noncitizen was "physically present in the United States without having been admitted or paroled following inspection by an immigration officer at a designated port of entry." 2019 Designation Notice at 35414. A further clue lies in the Designation Notice's statement that its designation "does not apply to aliens who arrive at U.S. ports of entry, because those aliens are already subject to expedited removal." *Id.* That statement unmistakably refers to the fact that DHS has defined the term "arriving alien" for purposes of the statute's Arriving Aliens Provision to include noncitizens "paroled pursuant to [8 U.S.C. § 1182(d)(5)], and even after any such parole is terminated or revoked." 8 C.F.R. § 1.2. In the following section, this Court finds that regulatory definition to be *ultra vires* to the extent it subjects parolees to expedited removal. But DHS has, of course, believed its regulation to be valid. Thus, its statement in the 2019 Designation Notice that its new designation "d[id] not apply to" arriving aliens suggests it believed that its new designation did not apply to those with either active or terminated parole. 2019 Designation Notice at 35414.[23]

---

[23] Indeed, the Government has even in recent months (since issuing the Challenged Actions) reiterated that prior understanding, stating in a filing in an individual noncitizen's removal case the following: "Petitioner . . . argues that because Petitioner—an arriving alien—was paroled, [the Designation Provision] cannot apply to him. But this misses the point entirely: Petitioner is not subject to [the Designation Provision], he is subject to [the Arriving Aliens Provision] as an arriving alien." Resp'ts Mem. of Law in Opp'n to the Pet., Compl., and Mot. for Prelim. Inj., *Mata Velasquez v. Kurtzdorfer*, Case No. 1:25-cv-493 (W.D.N.Y. June 18, 2025), ECF No. 42.

Defendants respond not by contesting Plaintiffs' interpretations of those DHS regulations but instead by pointing to another regulation that suggests parolees are subject to expedited removal. ECF 26 at 47–49. One of the agency's asylum regulations states that an asylum officer may, upon denying a noncitizen's asylum claim, proceed with expedited removal of a paroled asylum applicant if the applicant "is an arriving alien or is otherwise subject to removal under § 235.3(b) of this chapter, and was paroled into the United States on or after April 1, 1997," and if that parole "has expired or been terminated." 8 C.F.R. § 208.14(c)(4)(ii). According to Defendants, this demonstrates that the regulation envisions parolees to be subject to expedited removal under either the "arriving alien" definition *or* the Designation Provision (i.e., the other basis for expedited removal eligibility under 8 C.F.R. § 235.3(b)).

On its face, that language does seem to negate Plaintiffs' suggestion that DHS regulations uniformly treated the Designation Provision as inapplicable to noncitizens who were paroled into the United States at any point. At best for Defendants, that shows that the agency's regulations are internally contradictory and therefore provide little insight into the statute's meaning. Still, any implication from section 208.14(c)(4)(ii) is weak. First, unlike the regulatory provisions Plaintiffs cite, this provision does not appear in the original 1997 rulemaking that first implemented IIRAIRA's expedited removal system. *See* 1997 Rulemaking.[24] Second, the regulation draws a sharp distinction between noncitizens paroled before and after April 1, 1997. *Compare* 8 C.F.R. § 208.14(c)(4)(i) (providing that those paroled before that date may be subject only to section 240 removal) *with id.* § 208.14(c)(4)(ii) (providing that those paroled after that date may be subject to expedited removal). Such a distinction appears nowhere in the regulation construing the statute's Designation Provision. It does, however, appear in the regulatory definition of "arriving alien."

---

[24] Instead, DHS's predecessor agency added this paragraph in 2000. *See* Asylum Procedures, 65 Fed. Reg. 76121, 76134 (Dec. 6, 2000).

*See* 8 C.F.R. § 1.2; Amendment of the Regulatory Definition of Arriving Alien, 63 Fed. Reg. 19382, 19382 (Apr. 20, 1998). That fact adds to the implication that the asylum regulation envisioned expedited removal of parolees only pursuant to the agency's asserted authority under the Arriving Aliens Provision, not the Designation Provision.

The other regulations Defendants invoke help them even less. Defendants point to 8 C.F.R. § 235.3(b)(6), arguing that, because it establishes a process for termination of parole, it "envisions the possibility that such an alien with parole terminated could be subject to expedited removal or, at the very least, does not exclude that possibility." ECF 26 at 48. In context of the rest of the regulatory provision, that is a possible reading. But the language is hardly clear. While the provision discusses termination of parole, the only people it specifically says should be subject to expedited removal are those who "cannot satisfy the examining officer that [they] w[ere] lawfully admitted or paroled." 8 C.F.R. § 235.3(b)(6). It says nothing about what should happen to those who were "paroled" but whose parole the officer decides to terminate. *Id.*

Finally, Defendants note a provision of the parole regulation which states that, after a noncitizen's parole is terminated, "[a]ny further inspection or hearing shall be conducted under section 235 or 240 of the Act." 8 C.F.R. § 212.5(e)(2)(i); *see* ECF 26 at 48. Section 235 of the INA, as amended by IIRAIRA, does indeed contain the expedited removal provisions, whereas section 240 contains the standard removal proceedings in front of an IJ. *See* 8 U.S.C. §§ 1225, 1229a. But section 235 does not *only* contain the expedited removal provisions. Rather, as its title suggests, section 235 governs "[i]nspection by immigration officers" generally. *See also id.* § 1225(a)(3) (stating that "[a]ll aliens" applying for admission "shall be inspected by immigration officers"). More specifically, it provides that certain noncitizens (those that fall under the Arriving Aliens Provision or, if/when designated, the Designation Provision) are subject to expedited

removal proceedings, which it then outlines. *See id.* § 1225(b)(1). It then provides that all "other aliens" who are "applicant[s] for admission" and who do not "clearly and beyond a doubt" meet the criteria for admission "shall be detained for a proceeding under section 1229a of this title" (i.e., a section 240 proceeding). *Id.* § 1225(b)(2). Thus, the parole regulation Defendants cite is easily read as providing not, as Defendants insist, for either expedited removal or section 240 removal for noncitizens whose parole is terminated. Instead, it appears to provide for either inspection under section 235 (which can then lead to either expedited or regular removal proceedings) or, if the parolee does not require any "further inspection," to section 240 proceedings. 8 C.F.R. § 212.5(e)(2)(i). All told, then, regulatory provisions implementing or involving the Designation Provision favor Plaintiffs' interpretation.

As a last gasp, Defendants try to divine meaning from the Supreme Court's stay of Judge Talwani's decision preliminarily enjoining termination of the CHNV Parole Programs. *See* ECF 26 at 46 n.3 (citing *Doe*, 145 S. Ct. 1524). In reviewing the March 25 CHNV Termination Notice, Judge Talwani decided that the Designation Provision does not permit expedited removal of a noncitizen if the noncitizen was paroled when they entered the United States upon inspection at the border. *Doe*, 2025 WL 1099602, at *16. The Supreme Court granted the Government's request to stay that injunction without explanation. *Doe*, 145 S. Ct. 1524. Defendants say that stay "calls into question the soundness of the district court's reasoning." ECF 26 at 46 n.3. This Court cannot make that leap. After all, "[t]he [Supreme] Court's stay order is not a decision on the merits." *Merrill v. Milligan*, 142 S. Ct. 879, 879 (2022) (Kavanaugh, J., concurring in grant of application for stays). And this Court does not know why the lower court order was stayed (i.e., because of likelihood of success on the merits, irreparable harm, or something else).

Because the Designation Provision does not authorize designation for expedited removal of any noncitizen who has, at any point in time, been paroled into the United States, that statutory provision does not authorize the Challenged Actions.

ii.    The Arriving Aliens Provision Does Not Authorize Expedited Removal of Parolees

To survive on the merits, the Challenged Actions must instead conform to the authority granted to DHS under the Arriving Aliens Provision. They do not.

Recall that, under IIRAIRA, the only other set of noncitizens eligible for expedited removal besides those covered under the Designation Provision are those who "[are] arriving" in the United States. 8 U.S.C. § 1225(b)(1)(A)(i). The statute does not define the term "arriving." Plaintiffs argue that its use of the present-progressive tense "signals an action that is temporary but currently occurring." ECF 22-1 at 27. Thus, the statute's category of "arriving" noncitizens refers to "people who are currently in the process of arriving in the United States at a port of entry and who will no longer be arriving once that action has ended." *Id.* at 27–28. Once inspected at the border and paroled into the country, Plaintiffs reason, a noncitizen is no longer in the process of "arriving." *Id.* at 28 (citing *Bollat Vasquez v. Wolf*, 460 F. Supp. 3d 99, 111 (D. Mass. 2020), which interpreted the Arriving Aliens Provision to mean, "if [noncitizen] applicants [for admission] are apprehended while crossing the border (whether or not at a check point), they are 'arriving' applicants under the statute, and if apprehended at some point thereafter, they are not 'arriving,' but rather 'aliens present in the United States who have not been admitted.'" (cleaned up)). To support that reading, Plaintiffs note that other uses of the words "arriving," "arrival," or "arrive" in 8 U.S.C. § 1225 plainly refer to a process that occurs upon physical entry at the border, "not an interminable implicit statutory status." ECF 28 at 30. *See, e.g.*, 8 U.S.C. § 1225(d)(2) (authorizing detention of noncitizens "on the vessel or at the airport of arrival"); *id.* § 1225(b)(2)(C) (authorizing returning

a noncitizen "who is arriving on land (whether or not at a designated port of arrival)" to a contiguous territory after section 240 proceedings); *id.* § 1225(b)(1)(F) (exempting from expedited removal a noncitizen from certain countries "who arrives by aircraft at a port of entry").

Meanwhile, Defendants lean once again on the purported background principle, discussed above, that "aliens paroled into the United States are legally in the position of aliens standing at the border, regardless of the duration of their parole." ECF 26 at 42 (citing *Leng May Ma*, 357 U.S. at 188–91; *Ibragimov*, 476 F.3d at 134). And they point, yet again, to language in the parole statute and regulation providing that a noncitizen whose parole ends "shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States." 8 U.S.C. § 1182(d)(5)(A); 8 C.F.R. § 212.5(e)(2)(i) (providing that when parole ends the alien "shall be restored to the status that he or she had at the time of parole"); *see* ECF 26 at 43. Finally, Defendants refer back to the regulatory definition of "arriving alien," which since the first rulemaking under IIRAIRA has provided that "[a]n arriving alien remains an arriving alien even if paroled pursuant to section 212(d)(5) of the Act, and even after any such parole is terminated or revoked." ECF 26 at 41–42 (quoting 8 C.F.R. § 1.2). They also note the agency's statement, upon adopting that definition, that its "inclusion of paroled aliens was based on the statutory language in section 212(d)(5) of the Act," i.e., the statutory parole provision. *Id.* at 43 (quoting 62 Fed. Reg. at 10313).

All told, Plaintiffs' interpretation is the best reading of the statute, despite DHS's longstanding regulation to the contrary. *See Loper Bright*, 603 U.S. at 394 (holding that "courts must exercise independent judgment in determining the meaning of statutory provisions" and need not defer to agencies' interpretations). When interpreting a statutory term Congress did not define,

courts first look to the term's ordinary meaning. *United States v. Alford*, 89 F.4th 943, 949 (D.C. Cir.), *cert. denied*, 145 S. Ct. 180 (2024)). "Arrive" means "to reach a destination" or "to make an appearance." *Arrive*, Merriam-Webster's Collegiate Dictionary (1996); *see also Arrive*, Oxford English Reference Dictionary (1996) (defining "arrive," when followed by "in," as "reach a destination; come to the end of a journey or a specified part of a journey"). Read according to its plain meaning, a noncitizen "arriving" in the United States would be one who is in the process of reaching his or her destination (the United States) and making an appearance here. It would not naturally be read to refer to someone who previously reached the United States via a port of entry, underwent inspection at that port of entry, and then was paroled into the United States (beyond their original destination) for an indefinite period of time. Thus, if the plain language governs, Plaintiffs have the upper hand.

The term's context within the rest of the statute accords with that ordinary meaning. Plaintiffs are correct that multiple other provisions in IIRAIRA section 235 use "arrive," or some conjugation thereof, to refer to physical arrival at a port of entry. *See* 8 U.S.C. § 1225(d)(2); *id.* § 1225(b)(2)(C); *id.* § 1225(b)(1)(F). Defendants offer no response to those provisions. They do, however, point to other provisions of the statute they call "textual clues" demonstrating that parolees are always considered "arriving." ECF 26 at 44. First, they note that Congress explicitly excluded paroled noncitizens from the Designation Provision but wrote no similar exclusion into the Arriving Aliens provision, and the Court should give meaning to that choice. *Id.* (citing *Bates v. United States*, 522 U.S. 23, 29–30 (1997), for the proposition, "where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposefully in the disparate inclusion or exclusion"). That argument just begs the question, though: Congress would only think it needed

to carve out parolees from the category of "aliens" who are "arriving" in the United States if it thought the term would otherwise include parolees. The Designation Provision, by contrast, carves out parolees from the larger category of "aliens," which of course otherwise includes parolees. *See* 8 U.S.C. § 1225(b)(1)(A)(iii). Second, Defendants point to the title of section 1225(b)(1), "[i]nspection of aliens arriving in the United States and *certain other aliens who have not been admitted or paroled*." ECF 26 at 44 (emphasis added). They say this highlights Congress's exclusion of parolees only from the "other aliens" defined in the Designation Provision. *Id.* But that does not really follow; the title is just as easily read as modifying both "aliens arriving" and "other aliens' with "have not been admitted or paroled." And regardless, all it does is track the language of the Arriving Aliens and Designation Provisions. A statutory title, while informative, does not displace the meaning of the statutory text itself. *See City & Cnty. of San Francisco v. EPA*, 145 S. Ct. 704, 714 (2025). Finally, Defendants note that Congress exempted from expedited removal certain noncitizens from certain Western Hemisphere nations, but did not carve out parolees. *See* 8 U.S.C. § 1225(b)(1)(F). Again, that just begs the question. Those noncitizens could otherwise have been eligible for expedited removal under the Arriving Aliens or Designation Provisions. Not so, necessarily, for parolees.

So the statutory text and context weighs in Plaintiffs' favor. Nonetheless, Defendants insist that the term "arriving" represents a "term of art" and should be given that meaning. ECF 35 at 57 (Hr'g Tr. 57:18–24). Yet, just as it did for the Designation Provision, Defendants' argument from background principles comes apart on further inspection. First, none of the sources Defendants cite interpret the word "arriving," which makes it hard to consider it a "term of art." Recall that *Leng May Ma* interpreted the distinct term "within the United States" for purposes of a different provision of the INA. 357 U.S. at 188. Even worse for Defendants, *Ibragimov* described parole as

"a means by which the government allows aliens *who have arrived at a port-of-entry* to temporarily remain in the United States pending the review and adjudication of their immigration status." 476 F.3d at 134 (emphasis added). Under that construction, while a parolee remains "legally unadmitted," they "have arrived"—i.e., their arrival is complete, whereas their admission is not. *Id.* That reading is consistent with the statute's distinction between aliens who have been "admitted" and those who have been "paroled." 8 U.S.C. § 1225(b)(1)(A)(iii)(II). It does little to prove Defendants' preferred definition of "arrived." And *Duarte*, the other circuit case Defendants cite, merely noted the regulatory definition reflected in 8 C.F.R. § 1.2 (that "a parolee normally fits the regulatory definition of an 'arriving alien'") but did not actually scrutinize that regulation. Instead, it was concerned with whether parolees are considered "applicant[s] for admission while on parole" (a question it answered in the affirmative). 27 F.4th at 1059–60. Thus, none of those cases establishes the term of art that Defendants claim Congress inserted into the statute. And "absent" any "evidence" that Congress intended to employ a term of art, "those whose lives are governed by law are entitled to rely on its ordinary meaning, not left to speculate about hidden messages." *Feliciano v. Dep't of Transp.*, 145 S. Ct. 1284, 1291 (2025).

Worse yet, even Defendants' reading of the parole statute suggests a background principle altogether different from the one Defendants need to prove. Recall that Defendants believe the parole statute enshrined the principle that "when parole is revoked, an alien reverts to the status he possessed prior to the grant of parole," namely "the position of an applicant for admission standing at the threshold of entry." ECF 26 at 46. As discussed in the previous section, the statute actually says something more limited. But neither account supports DHS's position in its regulatory definition of "arriving alien," which is that noncitizens are considered arriving both when their parole is active and after it is terminated. *See* 8 C.F.R. § 1.2. To what "status" does a noncitizen

whose parole was revoked "revert[]?" ECF 26 at 46. It cannot be the "status" of "arriving alien"; under 8 C.F.R. § 1.2, a parolee never leaves that status, even when their parole is active. It is therefore no saving grace of Defendants' position that DHS's predecessor agency said it relied upon the parole statute when coming up with the definition of "arriving alien" in its 1997 regulation. *See* 62 Fed. Reg. at 10313. Rather, that claim only highlights the regulatory definition's conflict with the statutory scheme.

Indeed, the regulatory definition conflicts even with another portion of the *regulatory* scheme. The language in 8 C.F.R. § 235.3(b)(6) at least heavily implies that noncitizens with active parole may not be subjected to expedited removal. *See* 8 C.F.R. § 235.3(b)(6) (giving noncitizens in expedited removal proceedings "a reasonable opportunity to establish to the satisfaction of the examining immigration officer that he or she was admitted or paroled into the United States following inspection at a port-of-entry" and providing that "[a]n alien who cannot satisfy the examining officer that he or she was lawfully admitted or paroled will be ordered removed pursuant to section 235(b)(1) of the Act.") Whether it allows the agency to terminate that parole and then send the noncitizen to expedited removal is another matter, discussed above. But if the Arriving Aliens Provision permitted the agency to subject a noncitizen to expedited removal even while that parole is active, this entire regulatory provision would be irrelevant. At best, then, the regulatory definition provides little insight into the statutory definition—the latter of which is our concern here. *See Loper Bright*, 603 U.S. at 388 (explaining that courts interpreting a regulatory statute give more or less weight to an agency interpretation depending on "'the thoroughness evident in [the agency's] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control'" (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).

Legislative history and purpose put a final nail in the coffin of Defendants' interpretation. Although the relevant legislative history is thin, it contains some indications that Congress focused its concern on noncitizens physically arriving at the border for entry, not those already physically present within the country. For instance, one House Report noted that the law's new expedited removal procedures were "necessary because thousands of aliens arrive in the U.S. at airports each year without valid documents and attempt to illegally enter the U.S." H.R. Rep. 104-469, 157–58 (1996). "Unless such aliens claim to be U.S. nationals, or state a fear of persecution," the Report went on, "there is no requirement under the Constitution or international treaty to do anything other than return them, as promptly as possible, to where they boarded the plane to come here." *Id.* Although that provision did not discuss parole, it did use the term "arrive" in a way that clearly describes physical arrival at a port of entry (specifically, an airport). And it described "return[ing] them" to their country from which they flew. *Id.* It did not explicitly contemplate a regime wherein noncitizens arriving at airports are paroled into the country and returned to their airport of origin months or years later.

Defendants' interpretation also creates an oddity that appears to contradict the statute's purpose. Under Defendants' definition of "arriving alien," a noncitizen who snuck into the country outside of an inspection point gets a full section 240 removal hearing as long as they have been physically present in the United States for two years. By contrast, a noncitizen who entered at an inspection point and was paroled after inspection can face expedited removal forever, regardless of how long they have been physically present in the United States. Defendants offer no explanation for such a counterintuitive result, nor does the legislative history show that Congress intended that result. Quite the opposite: such a result flies in the face of the House Report's statement that IIRAIRA was intended to "replace certain aspects of the current 'entry doctrine,'

under which illegal aliens who have entered the United States without inspection gain equities and privileges in immigration proceedings that are not available to aliens who present themselves for inspection at a port of entry." H.R. 104-469 at 225.

Yet another aspect of the legislative history supports Plaintiffs' reading and undermines Defendants'. The 1996 House Report shows that IIRAIRA was intended in part to restrict parole, but not by subjecting parolees to expedited removal. It noted that, in 1994, the Clinton Administration made a migration agreement with Cuba that included using the parole authority to admit up to 20,000 Cuban nationals annually, who would then be entitled to adjust to permanent resident status under the Cuban Adjustment Act. The House Report called that "a misuse" of the parole system that "ha[d] not been authorized by Congress." H.R. 104-469 at 140–41. And accordingly, the proposed bill, which eventually became IIRAIRA, tightened the criteria for granting parole. *Id.* at 140. Nowhere in that Report, or elsewhere in the legislative history, did it say that Congress sought to address what it saw as excessive parole by subjecting parolees to expedited removal once they were already paroled in.[25] If the Congress that was so concerned about abuse of the parole system had created a solution by which the Executive could summarily deport parolees using expedited removal, you would think it would have noted as much.

In the end, the only way to make sense of the statutory scheme Congress created is to see that parolees fall under neither the Arriving Aliens Provision nor the Designation Provision. Any other result conflicts with other aspects of the statute and regulations, Congress's evident purpose, and the ordinary meaning of the statute's words. At bottom, Defendants rest their argument under

---

[25] Instead, the Report said the following: "The text of section 212(d)(5) is clear that the parole authority was intended to be used on a case-by-case basis to meet specific needs, and not as a supplement to Congressionally-established immigration policy. In recent years, however, parole has been used increasingly to admit entire categories of aliens who do not qualify for admission under any other category in immigration law, with the intent that they will remain permanently in the United States. This contravenes the intent of section 212(d)(5), but also illustrates why further, specific limitations on the Attorney General's discretion are necessary." H.R. Rep. 104-469 at 140.

both provisions on a purported background legal principle that they cannot even pin down. In the face of all the evidence to the contrary, Defendants' thin argument cannot stand. Accordingly, neither the Designation Provision nor the Arriving Aliens Provision authorizes the Challenged Actions, and the Challenged Actions are therefore likely invalid as *ultra vires*.

### 3. The Challenged Actions Are Arbitrary and Capricious

Independent of being *ultra vires*, the Challenged Actions are also likely invalid as arbitrary and capricious. Under blackletter administrative law, agencies must provide "reasoned explanation[s]" for their actions. *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 35 (2020). An agency action is arbitrary and capricious if it "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). In short, "an agency must give adequate reasons for its decisions," *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016), such that a reviewing court can "evaluate the agency's rationale at the time of decision," *Pension Ben. Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 654 (1990). This includes at least some explanation of the agency's legal "conclusion," especially if the legal conclusion upon which the action relies conflicts with the agency's prior view. *Bauer v. DeVos*, 325 F. Supp. 3d 74, 109 (D.D.C. 2018). It also includes consideration of "alternatives that are within the ambit of the [previous] policy" and any "legitimate reliance" on the previous policy. *Regents*, 591 U.S. at 30 (cleaned up).

In Plaintiffs' view, the Challenged Actions fail that standard in multiple ways. For one thing, they contend, the Challenged Actions contain little in the way of explanation at all. ECF 22-

1 at 30–31. To the extent they do, Plaintiffs argue, those explanations are inconsistent with one another and provide conflicting interpretations of the agency's own statutory authority. *Id.* at 31–34. And beyond that, the Challenged Actions' explanations lack "even any mention, much less any analysis, of the impact that applying expedited removal to parolees would have on parole beneficiaries . . . their families, their sponsors, their employers, and their communities," nor do they contain analysis of "the humanitarian purpose of parole" or "available alternatives." *Id.* at 34–36.

Defendants first fight the premise that arbitrary-and-capricious review is available at all. Such review, they argue, applies only to "final agency action," defined as an action (1) that "mark[s] the consummation of the agency's decisionmaking process," and (2) "from which legal consequences will flow." ECF 26 at 50 (quoting 5 U.S.C. § 704; *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (cleaned up)). The Challenged Actions, Defendants reason, do not "purport to make any changes in rules governing which aliens are" subject to expedited removal, but rather merely restate the agency's longstanding interpretation of expedited removal eligibility under the "arriving aliens" definition of 8 C.F.R. § 1.2. *Id.* Next, Defendants argue that, even if arbitrary-and-capricious review did apply, the Challenged Actions would pass it. The Challenged Actions, they say, merely "assume[]" the authority to subject parolees to expedited removal; they do not purport to create that authority, so they do not need to explain their reasons for that assertion of authority. *Id.* at 51. Moreover, the Challenged Actions' legal justifications are not "inconsistent," as Plaintiffs allege; they just rely on alternative but equally available legal authorities (the Arriving Aliens Provision and/or the Designation Provision). *Id.* at 51–53. Defendants also invoke DHS's "unfettered discretion over whether to initiate [removal] proceedings" and which type of removal proceeding to initiate—decisions that Defendants call unreviewable. *Id.* at 54–55. Finally,

Defendants claim that the Challenged Actions are so clearly authorized under the expedited removal statute that the agency need not justify Congress's "policy decision" any further. *Id.* at 55–56.

Defendants' threshold objection—that arbitrary-and-capricious review does not apply—lacks merit. APA section 704 authorizes judicial review both of "[a]gency action" that is "made reviewable by statute" *and* "final agency action." 5 U.S.C. § 704. Defendants completely omit that first criterion from their discussion. Yet, as Plaintiffs note, that first criterion covers the Challenged Actions. *See* 8 U.S.C. § 1252(e)(3)(A) (authorizing "[j]udicial review" in this District of "whether . . . a written policy directive, written policy guideline, or written procedure issued by or under the authority of the Attorney General to implement [section 1225(b)], is not consistent with applicable provisions of this subchapter or is otherwise in violation of law"). As this Court already decided above, the Challenged Actions qualify under that provision. Thus, the statute authorizes judicial review of them for purposes of the APA. *Accord Las Americas Immigrant Advoc. Ctr. v. Wolf*, 507 F. Supp. 3d 1, 34 (D.D.C. 2020) (K.B. Jackson, J.), *voluntarily dismissed sub nom. Las Americas Immigrant Advoc. Ctr. v. Mayorkas*, No. 20-5386, 2024 WL 3632500 (D.C. Cir. Aug. 1, 2024); *Grace v. Whitaker*, 344 F. Supp. 3d 96, 118 (D.D.C. 2018), *aff'd in part*, *rev'd in part on other grounds and remanded sub nom. Grace v. Barr*, 965 F.3d 883 (D.C. Cir. 2020). That result resolves the issue, because judicial review under the APA includes consideration of whether the challenged agency action (whether "final" or otherwise) is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

On the substance, the Challenged Actions do indeed fail even the "fundamentally deferential" standard of arbitrary-and-capricious review. *Fox v. Clinton*, 684 F.3d 67, 75 (D.C. Cir. 2012) (explaining that the standard is "fundamentally deferential" but that "no deference is

owed to an agency action that is based on an agency's purported expertise where the agency's explanation for its action lacks any coherence" (internal citation and quotation marks omitted)). First, the January 23 Huffman Memorandum claimed to "provide[] guidance regarding how to exercise enforcement discretion in implementing" two previously announced "policies"—a memorandum authorizing DHS components to terminate certain grants of parole "immediately," and the 2025 Designation Notice expanding expedited removal to the full scope of the Designation Provision. January 23 Huffman Memorandum at 1. Specifically, it "direct[ed]" DHS components to "consider" subjecting to expedited removal "any alien DHS is aware of" who "is amenable to expedited removal but to whom expedited removal has not been applied," including by terminating any such noncitizen's "active parole status." *Id.* at 2. It also "direct[ed]" those components to "consider" placing in "removal proceedings" (note: not "expedited removal") noncitizens who "d[id] not meet the conditions described in (1)" (i.e., were not "amenable to expedited removal") and were subject to a categorical parole policy that Huffman's earlier memorandum directed be "paused, modified, or "terminated." *Id.*

Because the January 23 Huffman Memorandum referenced the 2025 Designation Notice and its two-year-continuous-presence limit, *see id.* at 1, it seems possible that the reason for the differential treatment of parolees—directing some to be considered for expedited removal and some for (presumably section 240) removal—was that the latter group included parolees continuously present in the United States for more than two years and thus ineligible for expedited removal under even the Defendants' view of the Designation Provision. But the Memorandum did not state that reason, much less justify it. And it would seem to require some explanation, given Defendants' view of its authority under the Arriving Aliens Provision. Under DHS's longstanding regulation applying that Provision, 8 C.F.R. § 1.2, all noncitizens who were paroled at a port of

entry (whether that parole is active or terminated) are "amenable to expedited removal," as the Memorandum put it. *Id.* at 2. Indeed, Defendants claim in this litigation that the "arriving aliens" regulatory definition, not the Designation Provision, was the basis for the Memorandum, despite the lack of any citation to that regulation anywhere in the document. *See* ECF 26 at 51. So whom would the second category—noncitizens with parole granted through a categorical program that Huffman had directed be paused or terminated—include? Under Defendants' interpretation of its authority since 1997, potentially no one. Alternatively, it may include those who do not meet the inadmissibility criteria (fraud/misrepresentation or lack of documents) for expedited removal. *See* 8 U.S.C. § 1225(b)(1)(A). But the Court is left guessing, because the Memorandum did not cite its legal authorities for expedited removal eligibility or explain how it was directing DHS components to interpret and apply them. Instead, the Memorandum merely directed that "actions contemplated by this memorandum shall be taken in a manner consistent with the applicable statutes, regulations, and court orders." January 23 Huffman Memorandum at 2. The question, though, is which statutes and regulations did the agency believe to be applicable? Nor is the Memorandum's reference to "enforcement discretion" sufficient. Even guidance documents that give room for enforcement discretion must explain their legal basis and reasoning. *See, e.g.*, *Regents*, 591 U.S. at 26–28. Without any such explanation of the legal lines the Memorandum was drawing, the Court cannot "evaluate the agency's rationale at the time of decision." *Pension Ben. Guar. Corp.*, 496 U.S. at 654.

Take next the February 18 ICE Directive, which was similarly legally opaque. That document's section on expedited removal of parolees cited no legal authorities whatsoever besides the inadmissibility criteria of sections 1182(a)(6)(C) and 1182(a)(7). *See* February 18 ICE Directive at 1. Those authorities say nothing about eligibility of parolees to expedited removal.

The Directive suggested, by its use of the term "paroled arriving aliens," that it was invoking the agency's definition of "arriving aliens" under 8 C.F.R. § 1.2, but it did not say so explicitly. So, too, did its statement that "[t]here is no time limit on the ability to process such aliens for [expedited removal]." *Id.* That is true of expedited removal under the Arriving Aliens Provision but not the Designation Provision. On its own, perhaps the February 18 ICE Directive's use of the regulatorily defined term sufficed to indicate that Directive's legal authority.

Things get considerably murkier, though, when looking to the third Challenged Action, the March 25 CHNV Termination Notice. There, DHS stated that "[e]xpedited removal is available only when an alien has not been continuously present in the United States for at least the two years preceding the date of the inadmissibility determination." March 25 CHNV Termination Notice at 13619 (citing 8 U.S.C. § 1225(b)(1)(A)(iii)(II)[26]; 8 C.F.R. § 235.3). That is true under the Designation Provision but not the Arriving Aliens Provision. Indeed, under the agency's own interpretation of its statutory authority, that statement is flat wrong. And yet, that statement played an important role in DHS's explanation for why it chose to terminate the CHNV Parole Programs and begin subjecting those parolees to expedited removal: it was on the clock. *See id.* ("If DHS were to allow the CHNV parolee population to remain for the full duration of their two-year parole, DHS would be compelled to place a greater proportion of this population in section 240 removal proceedings to effectuate their removal . . . ."); *id.* at 13620 ("Any lengthening of the wind-down period will increase the likelihood that additional CHNV parolees are no longer subject to expedited removal."). DHS gave no explanation for departing from its longstanding interpretation of its statutory authority—no less from the stated policy in the February 18 ICE Directive issued just five weeks prior.

---

[26] The Termination Notice actually cites "8 U.S.C. § 1225(b)(1)(iii)(II)," but that appears to be a typo because a provision with that numbering does not exist.

Taking the three Challenged Actions together, DHS's policy appears to be both that it must first terminate a noncitizen's parole before subjecting them to expedited removal, *see* January 23 Huffman Memorandum at 2, and that it can subject even active parolees to expedited removal, *see* February 18 ICE Directive at 1. The agency believes both that it must (and should) subject former parolees to expedited removal within two years of the beginning of their continuous presence, *see* March 25 CHNV Termination Notice at 13619, and that it is under "no time limit," February 18 ICE Directive at 1. Call it Schrödinger's legal justification. But unlike a quantum particle, an agency's legal justification cannot be two opposing things at once. Rather "unacknowledged and unexplained inconsistency," including of the agency's legal conclusions, "is the hallmark of arbitrary and capricious decision-making." *Bauer*, 325 F. Supp. 3d at 109; *see also FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) ("[T]he requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it *is* changing position. An agency may not, for example, depart from a prior policy *sub silentio* or simply disregard rules that are still on the books." (emphasis in original)); *Johnson v. Copyright Royalty Bd.*, 969 F.3d 363, 389–91 (D.C. Cir. 2020) (remanding an agency decision that "failed to explain the legal authority" for a change in position).

In view of these inconsistencies, Defendants' remaining arguments here fall apart. Defendants' claim that the Challenged Actions do not "purport to justify applying expedited removal to parolees" because "this authority has already existed since at least 1997," ECF 26 at 51, might make sense if the Challenged Actions clearly and consistently relied upon the 1997 regulatory definition of "arriving alien." But they did not. Instead, at various points, the Challenged Actions implicitly abjured reliance on that definition, if not outright contradicted it. *See, e.g.*, March 25 CHNV Termination Notice at 13619. Similarly, the flatly incorrect (under DHS's

71

regulation) legal justification in the March 25 CHNV Termination Notice belies Defendants' claim that the document merely "rel[ied] on an *additional* source of authority for applying expedited removal—the designation authority." *Id.* at 52 (emphasis in original). At best, Defendants' explanation is an "impermissible *post hoc* rationalization[]"; more accurately, it is nonsensical. *Regents*, 591 U.S. at 22; *see Am. Textile Mfrs. Inst., Inc. v. Donovan*, 452 U.S. 490, 539 ("[T]he *post hoc* rationalizations of the agency or the parties to this litigation cannot serve as a sufficient predicate for agency action.").

Finally, Defendants' claim that none of this rational-decision-making stuff matters because DHS has unreviewable discretion to choose between expedited removal and section 240 removal proceedings ignores the statutory scheme. Section 1252(e)(3)(A) permits challenges to written policy directives, guidelines, and procedures implementing section 1225(b)'s expedited removal system. As already established, the Challenged Actions fall into that category. Thus, they are by Congress's clear command "[j]udicial[ly] review[able]." 8 U.S.C. § 1252(e)(3)(A). Defendants' argument to the contrary amounts to little more than a mad-libs of Executive-speak untethered to the laws Congress enacted. *See* ECF 26 at 54–55 ("The agency has unfettered discretion over whether to initiate proceedings, . . . and if so, to choose between removal proceedings, and there is no judicially manageable standard in the INA for this Court to review such decisions."); *id.* at 55 ("DHS need not provide extensive justification for utilizing its long-established enforcement authority, particularly where that decision concerns prosecutorial charging choices traditionally within the unreviewable discretion of the Executive Branch.").

Plaintiffs raise other important questions, such as whether the Challenged Actions sufficiently assessed reasonable alternatives and reliance interests. But the Challenged Actions' scattershot legal explanations suffice to render them likely arbitrary and capricious in this

preliminary posture. Accordingly, Plaintiffs are likely to succeed on the merits of their arbitrary and capricious claim.

### B. Plaintiffs' Members Face Irreparable Harm

In addition to showing a likelihood of success on the merits, Plaintiffs must also establish that they face irreparable injury absent the requested preliminary relief. *Nat'l Min. Ass'n v. Jackson*, 768 F. Supp. 2d 34, 50 (D.D.C. 2011); *Chaplaincy*, 454 F.3d at 297. To constitute irreparable injury, the injury "must be 'both certain and great,' 'actual and not theoretical,' 'beyond remediation,' and 'of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm.'" *Mexichem Specialty Resins, Inc. v. EPA.*, 787 F.3d 544, 555 (D.C. Cir. 2015) (quoting *Chaplaincy*, 454 F.3d at 297) (emphasis in original).

Plaintiffs offer evidence of four categories of ongoing or imminent irreparable harm to their members and others like them: (1) lack of opportunity to apply for immigration relief in expedited removal, as compared to section 240 removal proceedings; (2) lack of meaningful process in expedited removal, including lack of judicial review and limited access to counsel; (3) risks of persecution and death if/when noncitizens subject to expedited removal are removed; and (4) detention and family separation during expedited removal proceedings. ECF 22-1 at 36–44.

Defendants contest each category. They claim that Plaintiffs' members' lack of ability to pursue immigration relief (besides asylum) in expedited removal does not impose irreparable harm because noncitizens can pursue an alternative, consular processing, outside of the United States at a U.S. embassy or consulate. ECF 26 at 59. And anyway, Defendants assert, none of Plaintiffs' members described in Plaintiffs' declarations both (a) are currently in expedited removal proceedings and (b) have a pending application for adjustment of status. *Id.* at 59–60. As to the

extent of the process under expedited removal, Defendants insist that the credible fear screening process suffices to permit asylum-seekers to make such a claim, that the Supreme Court has "upheld the constitutionality" of this process, and that multiple instances recounted in Plaintiffs' own declarations show the effectiveness of those screenings. *Id.* at 56–58 (citing *Thuraissigiam*, 591 U.S. at 109–10). Defendants also point to the D.C. Circuit's decision upholding expedited removal and "rejecting arguments based on many of these alleged [procedural] flaws" that Plaintiffs raise. *Id.* at 60 (citing *AILA*, 18 F. Supp. 2d at 52–60, *aff'd*, 199 F.3d at 1357). Further, Defendants insist that any irreparable harm from expedited removal besides fear of persecution or death (e.g., detention, family separation, a bar on returning to the United States) applies equally under section 240 removal and therefore cannot be attributed to the Challenged Actions. *Id.* at 58–59. Finally, Defendants hark back to the Supreme Court's stay order in *Noem v. Doe*, which they say implicitly rejected similar arguments of irreparable injury in that case. *Id.* at 61 (citing *Doe*, 145 S. Ct. 1524).

Defendants vastly understate Plaintiffs' evidence of irreparable injury. Summarized, Plaintiffs' asserted irreparable injuries fall into two buckets: (1) the risk of erroneous removal arising from lack of meaningful process, whether as to asylum-based claims or other claims for immigration relief; and (2) injuries resulting from the fact of being in expedited removal, such as detention in far-flung facilities and family separation during such detention. As to the first bucket, Plaintiffs present unrebutted evidence that expedited removal proceedings lack as thorough procedures as section 240 procedures and likely result in more wrongful removals. *See, e.g.*, ECF 22-1 at 39 n.15 (citing U.S. Comm'n on Int'l Religious Freedom, Report on Asylum Seekers in Expedited Removal: Volume I: Findings & Recommendations 4, 10 (2005), https://perma.cc/56WL-6VQC; U.S. Comm'n on Int'l Religious Freedom, Barriers to Protection:

The Treatment of Asylum Seekers in Expedited Removal 2–3 (2016), https://perma.cc/67CM-YFY7; U.S. Comm'n on Int'l Religious Freedom, Barriers to Protection as of 2024: Updated Recommendations on Asylum Seekers in Expedited Removal 2–3, 10–11 (2025), https://perma.cc/YEE4-XQM3); ECF 22-7 ¶ 12 (discussing CHIRLA member's "limited rights and lack of meaningful process provided in the credible fear process, including barriers to accessing counsel and evidence since he is detained," relative to his section 240 proceedings); ECF 22-10 ¶¶ 9–10 (discussing CASA member's lack of notice about the expedited removal process and inability to gather evidence to support his asylum claim from his detention facility far from his home and "to regularly communicate with his attorney"); ECF 22-16 ¶ 12 (discussing parolee's inability to prepare with his attorney and family, or to present expert testimony, for his credible fear interview in expedited removal, unlike section 240 removal, which his attorney suggests resulted in him receiving a negative credible fear determination). And although Defendants note that some of the parolees discussed in the declarations are not identified as members of one of the Plaintiff organizations, several others who have faced or are currently facing these and similar procedural deficiencies are so identified. *See, e.g.*, ECF 22-7 ¶ 2; ECF 22-10 ¶ 2; ECF 22-13 ¶ 2.

Defendants' legal arguments are similarly unavailing. It is well established that a noncitizen's removal to a country where they face persecution, torture, or death constitutes irreparable harm. *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 733–34 (D.C. Cir. 2022). So, too, does the "delta between what the law requires with respect to the traditional [section 240] process and" the truncated procedures in the expedited removal context. *Make the Rd. New York v. McAleenan*, 405 F. Supp. 3d 1, 62 (D.D.C. 2019) (K.B. Jackson, J.), *rev'd on other grounds and remanded sub nom. Make the Rd.*, 962 F.3d 612; *accord Kiakombua*, 498 F. Supp. 3d at 57. All Defendants offer in response are cases in which both the Supreme Court and the D.C. Circuit held

that the expedited removal procedures Congress created could not be challenged on due-process grounds because the plaintiffs in those cases had no cognizable due process right to a certain removal procedure. *See Thuraissigiam*, 591 U.S. at 138–39; *AILA*, 18 F. Supp. 2d at 58–60. But Plaintiffs do not raise a constitutional due process claim here. Nor do Plaintiffs argue that the expedited removal procedures themselves violate IIRAIRA, as in *AILA*, *see* 18 F. Supp. 2d at 52–57; instead, they argue that parolees should not be subject to those procedures, compliant with IIRAIRA or not, at all. In the irreparable injury analysis, the Court "assumes, without deciding, that the movant has demonstrated a likelihood that the non-movant's conduct violates the law." *Chaplaincy*, 454 F.3d at 303. On the assumption (as the Court found above) that parolees likely are not subject to expedited removal under IIRAIRA, the question is just whether expedited removal procedures avert the irreparable injuries of wrongful removal to the same degree as section 240 procedures. Neither *Thuraissigiam* nor *AILA* stands for that proposition. And Plaintiffs' evidence shows the opposite.

Plaintiffs' asserted irreparable injuries from detention and family separation during the expedited removal process also withstand Defendants' attacks. Plaintiffs' declarations are replete with uncontested evidence that their members and other parolees have (a) been detained pursuant to explicit or apparent expedited removal proceedings, when they were previously undergoing section 240 proceedings without being detained, (b) often been detained in far-flung locations away from their families and attorneys, (c) faced poor conditions in detention more commonly associated with expedited removal facilities than others, and (d) suffered mental and physical health challenges as a result of their detention. ECF 22-1 at 43–44; *see, e.g.*, ECF 22-13 ¶¶ 8, 10, 20 (CASA member separated from his mother and suffering from a chronic health condition for which he is not receiving the treatment in detention that he was able to receive while in section

240 proceedings); ECF 22-5 ¶¶ 7–10 (discussing separation of parolee from his wife and son, who remained non-detained and in section 240 removal when he was sent to expedited removal, detained, and held for weeks pending a credible fear interview that as of the declaration had still not occurred); ECF 22-9 ¶ 14 (overcrowded conditions where detainees are "forc[ed] . . . to sleep on the floor," in out-of-state detention far from counsel); ECF 22-6 ¶¶ 17–20 (discussing detention in remote locations and that those in expedited removal face fewer options to avoid detention than in section 240 proceedings). Defendants' response that section 240 proceedings can also involve detention and family separation do not address—much less refute—Plaintiffs' evidence that, in many of the cases Plaintiffs identify, parolees were not detained or separated from their families until after (or just before) their section 240 proceedings were terminated and expedited removal proceedings begun. *See* ECF 26 at 58.

Finally, Defendants' reliance once again on the Supreme Court's order in *Noem v. Doe*, 145 S. Ct. 1524, falls flat for the same reason as before: without any explanation from the Supreme Court for its decision, this Court simply cannot apply it to any case besides the single case it (preliminarily) decided.

## C. The Balance of the Equities and the Public Interest Favor a Stay

On the final two stay factors, which merge here, Defendants' arguments hold little weight. First, Defendants claim that a stay of the Challenged Actions would "prevent DHS from applying expedited removal to potentially hundreds of thousands of paroled aliens whose parole DHS is seeking to revoke or has revoked, thereby frustrating DHS's ability to quickly remove these aliens." ECF 26 at 61. In addition, a stay would "impose substantial administrative burdens and tax agency resources by requiring DHS to initiate and litigate [section 240 proceedings] if it chose to pursue removal." *Id.* And because of the "significance of expedited removal to the

Government's enforcement efforts," the harm to the Government "would be particularly acute." *Id.* Those claims are all consistent with the record before the Court (and they undermine other aspects of Defendants' arguments, particularly their redressability objection). But subjecting parolees to expedited removal likely violates the law, and "there is generally no public interest in the perpetuation of unlawful agency action." *Shawnee Tribe v. Mnuchin*, 984 F.3d 94, 102 (D.C. Cir. 2021) (internal citations and quotation marks omitted).

Moreover, while the Supreme Court has said that "[t]here is always a public interest in prompt execution of removal orders" because "[t]he continued presence of an alien lawfully deemed removable undermines the streamlined removal proceedings [IIRAIRA] established," *Nken*, 556 U.S. at 436, section 240 proceedings *are* the main "streamlined" removal proceedings that IIRAIRA established, H.R. Rep. 104-469, 12, 107–08. Similarly, the Government's other case on this point, *Lucacela v. Reno*, also discusses the "clear public interest (as expressed by Congress) in deporting illegal aliens without delay" in the context, it appears, of *section 240* removal proceedings rather than expedited removal proceedings. 161 F.3d 1055, 1059 (7th Cir. 1998). Under those cases, then, the public's interest in removal of unauthorized immigrants is fully vindicated by section 240 proceedings and does not require expedited removal—much less expedited removal in violation of the substantive statute and the APA. What's more, "the public has an interest in 'preventing [noncitizens] from being wrongfully removed, particularly to countries where they are likely to face substantial harm.'" *A.B.-B. v. Morgan*, 548 F. Supp. 3d 209, 222 (D.D.C. 2020) (quoting *Nken*, 556 U.S. at 436).

Defendants next point to "the Executive Branch's constitutional and statutory authority over immigration and the admission and removal of aliens," into which they say the requested stay would "severe[ly] intru[de]." ECF 26 at 62. Yet, the immigration system is a responsibility shared

by the Executive and Legislative branches. On some questions, in fact, Congress's power over immigration is "plenary." *Plyler v. Doe*, 457 U.S. 202, 225 (1982) ("The Constitution grants Congress the power to 'establish an uniform Rule of Naturalization.' Drawing upon this power, upon its plenary authority with respect to foreign relations and international commerce, and upon the inherent power of a sovereign to close its borders, Congress has developed a complex scheme governing admission to our Nation and status within our borders." (quoting U.S. Const. Art. I., § 8, cl. 4)). As relevant here, it is Congress, not the President, that "specifie[s] which aliens may be removed from the United States and the procedures for doing so." *Arizona v. United States*, 567 U.S. 387, 396 (2012). When the Executive Branch circumvents Congress's decision, it undermines that separation of powers. A court order staying such a circumvention, by contrast, vindicates it.[27]

Defendants try one final argument: "[t]he government has a substantial interest in carrying out the President's policies," and "vigorous enforcement of the immigration laws and the prompt removal of aliens not entitled to remain here is one of the President's top priorities." ECF 26 at 62. For support, Defendants cite Chief Justice Roberts's opinion in chambers in *Maryland v. King*, 567 U.S. 1301 (2012) (Roberts, J., in chambers), for the proposition that "[t]he United States suffers a form of irreparable harm to its democratic system when it is prohibited from effectuating [the President's] policies against anyone anywhere in the Nation." ECF 26 at 62. But the actual quote from the case says something else: "Any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *King*, 567

---

[27] Defendants attempt, once again, to fall back on Justice O'Connor's opinion in *Legalization Assistance Project*, which found that the balance of the equities tipped in favor of staying a lower-court decision that constituted an "improper intrusion by a federal court into the workings of a coordinate branch of Government." 510 U.S. at 1306 (O'Connor, J., in chambers). But there, the lower-court's decision was an "improper intrusion" because it permitted a suit by plaintiffs without prudential standing. *See id.* ("Moreover, *if the above analysis is correct* the order is not merely an erroneous adjudication of a lawsuit between private litigants, but an improper intrusion . . . ." (emphasis added)) Here, by contrast, this Court follows the D.C. Circuit in holding that Plaintiffs here *do* fall within the zone of interests, and thus this order is no "improper intrusion" under Justice O'Connor's reasoning.

U.S. at 1303 (quoting *New Motor Vehicle Bd. of California v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers)). That case does not stand for the proposition that the public has an interest in carrying out presidential policies that violate statutes. Rather, it affirms the public interest in enforcement of duly enacted statutes—statutes like IIRAIRA and its limitations on which noncitizens may be subject to expedited removal.

This Court will not "endorse[] the radical proposition that the President is harmed, irreparably, whenever he cannot do something he wants to do, even if what he wants to do is break the law." *Trump v. CASA, Inc.*, 145 S. Ct. 2540, 2581 (2025) (Sotomayor, J., dissenting). Defendants point to no case endorsing such a proposition. Indeed, in *CASA*, the Court's majority rejected that proposition, too.[28] The Executive Branch must follow duly enacted laws or ask Congress to change them, and the public has a strong interest in seeing that principle upheld.

All told, the balance of the equities and the public interest, like the other stay factors, weigh in favor of Plaintiffs' requested relief.

### D. A Stay as to All Noncitizens Paroled into the United States, Not Just Plaintiffs' Members, Is Standard and Appropriate, and No Bond Is Required.

Because all four factors weigh in favor of a stay, the Court will grant a stay of the Challenged Actions. Still, Defendants ask that if this Court does so, it limit the stay to Plaintiffs' "members who [Plaintiffs] can identify as being affected by the challenged agency actions." ECF 26 at 64. Yet, as the D.C. Circuit has repeatedly held, vacatur of the agency action—not merely exempting plaintiffs from the agency action— is the normal remedy under APA section 706. *Nat'l*

---

[28] The *CASA* majority disclaimed any reliance on the "radical proposition" alleged in Justice Sotomayor's dissent. Instead, the Court said the irreparable harm came not from the President being unable to enforce the Birthright Citizenship Order but from "the District Courts' entry of injunctions that likely exceed the authority conferred by the Judiciary Act." *CASA*, 145 S. Ct. at 2562; *see also id.* ("The dissent is wrong to say, however, that a stay applicant cannot demonstrate irreparable harm from a threshold error without also showing that, at the end of the day, it will prevail on the underlying merits."). The majority did not dispute that the proposition Justice Sotomayor described is indeed a "radical" one. *Id.* at 2581 (Sotomayor, J., dissenting).

*Min. Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998). Courts in this and other circuits have applied that same rule to section 705 stays. *See, e.g.*, *Career Colls. & Schs. of Tex. v. U. S. Dep't of Educ.*, 98 F.4th 220, 255 (5th Cir. 2024), *cert. granted in part sub nom. Dep't of Educ. v. Career Colls. & Schs. of Tex.*, 145 S. Ct. 1039 (2025); *Dist. of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d at 48; *Cabrera*, 2025 WL 2092026, at *8. Those decisions track the text of section 705, which authorizes the reviewing court to "postpone the effective date of an agency action or preserve status or rights" full stop, not only as to plaintiffs before the court. 5 U.S.C. § 705. Against that authority, Defendants provide no case in which a court has granted a section 705 stay only as to the plaintiffs, rather than as against the Government and its enforcement of the challenged agency action in general.

Defendants do attempt to argue, also without any supporting caselaw, that section 705 stays must be limited to the plaintiffs because they may only be granted "to the extent necessary to prevent irreparable injury." 5 U.S.C. § 705. But the statue does not say "to the extent necessary to prevent irreparable injury *to the plaintiffs*" or "*to the challengers of the agency action*." And here, Plaintiffs have established irreparable injury to their members and to "others similarly situated." ECF 22-1 at 19; *see also id.* at 36 (discussing irreparable injury to "Plaintiffs' members and other noncitizens around the country who were paroled into the United States and are now being processed for expedited removal"). Without more, Defendants' perfunctory textual analysis cannot overcome the weight of the statutory text and the caselaw.

Defendants also err in relying on *CASA*, which expressly reserved the question of relief under section 706. *See* 145 S. Ct. at 2554 n.10 ("Nothing we say today resolves the distinct question whether the Administrative Procedure Act authorizes federal courts to vacate federal agency action."). Accordingly, Justice Kavanaugh's concurrence highlighted that, even after

*CASA*, "plaintiffs may ask a court to preliminarily 'set aside' a new agency rule" "in cases under the Administrative Procedure Act." *Id.* at 2567 (Kavanaugh, J., concurring). That is precisely what Plaintiffs ask this Court to do here, and the Court has the power to do so under current precedent.

Finally, it is worth pausing on the significant practical challenges and limited benefits that would result from a stay limited to Plaintiffs' members. By design, the expedited removal process offers few opportunities to raise objections to eligibility for removal, or to get a neutral adjudicator's eyes on such objections. Moreover, Plaintiffs' cited studies and declarations show that the agencies struggle even to follow the limited procedures that exist—and that individuals in expedited removal are often unaware of their rights. *See supra* Section IV.B. Now imagine the Executive Branch having to implement, across every immigration facility and officer nationwide, additional procedures to determine whether individuals in expedited removal are members of one of the Plaintiff organizations. Recall that individuals in expedited removal lack ready access to their belongings, families, or counsel. *See id*. Would they be expected to carry around a membership card everywhere they went, in case they were picked up for expedited removal? How would the agency verify their membership? These problems may be surmountable, but Defendants do not explain how. On the flip side, one of the key practical benefits of plaintiff-confined relief, percolation of suits across different districts and circuits, would not materialize here. *See CASA*, 145 S. Ct. at 2584 (Sotomayor, J., dissenting) (describing the percolation argument). Instead, under section 1252(e)(3)(A), all suits like this one challenging the expedited removal system must be brought in this District. In the end, then, the Court sees numerous reasons to stay the Challenged Actions as to all noncitizens paroled into the United States at any point in time and few reasons not to.

Defendants also ask the Court to, if it grants relief, require Plaintiffs to put forward a bond pursuant to Federal Rule of Civil Procedure 65(c). That rule requires the Court when issuing a preliminary injunction or temporary restraining order to order the movant to "give[] security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). Yet, Plaintiffs here seek a stay under APA section 705, which is neither a preliminary injunction nor a temporary restraining order. *Mich. Citizens for an Indep. Press v. Thornburgh*, No. 88-CV-2322, 1988 WL 90388, at *8 n.12 (D.D.C. Aug. 17, 1988) ("[T]he APA stay provision does not impose a security requirement."). Further, even if a section 705 stay did require bond in a "proper" amount, that proper amount would be zero dollars here because bond would "impose a substantial hardship on the Plaintiffs" and "undesirably deter individuals from enforcing their procedural rights to challenge agency action affecting immigration decisions." *See* Fed. R. Civ. P. 65(c); *Doe*, 2025 WL 1099602, at *20 n.33.

One last note on remedy: The March 25 CHNV Termination Notice plainly does more than implement the expedited removal statute. It also terminates the CHNV Parole Programs. Appropriately, Plaintiffs do not ask the Court to stay that Notice in its entirety, but instead ask that the Court stay the Notice, like the other Challenged Actions, only "insofar as [it] subject[s] individuals who have previously been granted parole at ports of entry to expedited removal." ECF 22-1 at 38; ECF 22-18 at 1 (Proposed Order). The Court does so today. To be clear, in other words, the Court is not staying termination of the CHNV Parole Programs. Instead, the Court's order "re-establish[es] the status quo absent the unlawful agency action," which was that CHNV Parole Program parolees were generally not subject to expedited removal (unless they were already subject to one of the other two Challenged Actions, which are also stayed). *Texas*, 40 F.4th at 220.

## V.     CONCLUSION

For the foregoing reasons, Plaintiffs' motion for a stay of agency action, ECF 22, is **GRANTED**. The Challenged Actions (the January 23 Huffman Memorandum, February 18 ICE Directive, and March 25 CHNV Termination Notice) are hereby **STAYED**, pending conclusion of these review proceedings, to the extent the Challenged Actions subject to expedited removal individuals who have been, at any time, paroled into the United States at a point of entry.

A separate order accompanies this memorandum opinion.


**SO ORDERED.**

_____
JIA M. COBB
United States District Judge

Date: August 1, 2025