BRETT A. SHUMATE
*Assistant Attorney General*
*Civil Division*
DREW C. ENSIGN
*Deputy Assistant Attorney General*
PAPU SANDHU
*Assistant Director*
U.S. Department of Justice
Office of Immigration Litigation
General Litigation and Appeals Section
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
(202) 616-9357
Papu.Sandhu@usdoj.gov
TIM RAMNITZ
*Senior Litigation Counsel*
ARIC A. ANDERSON
TARYN ARBEITER
*Trial Attorneys*

Counsel for Defendants

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| COALITION FOR HUMANE IMMIGRANT RIGHTS, *et al.*, | |
| Plaintiffs, | |
| v. | Case No. 1:25-cv-00872 (JMC) |
| KRISTI NOEM, in her official capacity as Secretary of Homeland Security, *et al.*, | Hon. Jia M. Cobb |
| Defendants. | |

## DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO STAY THE COURT'S AUGUST 1, 2025 ORDER GRANTING  STAY OF AGENCY ACTION UNDER 5 U.S.C. § 705

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................................ 1

BACKGROUND ................................................................................................................................. 2

LEGAL STANDARD.......................................................................................................................... 2

ARGUMENT ...................................................................................................................................... 3

   I.   Plaintiffs' Claims are Time-Barred. ........................................................................................ 3

   II.  Defendants are Likely to Prevail on the Merits........................................................................ 5

      A.  "Arriving in" Authority ...................................................................................................... 5

      B.  "Designation" Authority ..................................................................................................... 9

      C.  The Agency's Actions are not Arbitrary and Capricious...................................................... 13

   III. Plaintiffs' Request for a Stay is Prohibited by 8 U.S.C. 1252(f)(1).......................................... 15

   IV. Defendants Will Suffer Irreparable Harm and The Remaining Equitable Factors Favor a Stay. ........................................................................................................................................... 17

   V.  The Court's Remedy is Overbroad.......................................................................................... 18

CONCLUSION................................................................................................................................... 20

CERTIFICATE OF SERVICE

## <u>TABLE OF AUTHORITIES</u>

### <u>CASES</u>

*Califano v. Yamasaki*,
    442 U.S. 682 (1979) ........................................................................................ 19

*Dept. of Homeland Sec. v. Thuraissigiam*,
    591 U.S. 103 (2020) ........................................................................................ 17

*Garland v. Aleman Gonzalez*,
    596 U.S. 543 (2022) ........................................................................................ 15

*Hewitt v. U.S.*,
    605 U.S. ---, 145 S. Ct. 2165 (2025) .................................................... 9, 10, 11

*Immigrant Defs. L. Ctr. v. Noem*,
    No. 25-2581, 2025 WL 2017247 (9th Cir. July 18, 2025) .......................... 18, 19

*Kaplan v. Tod*,
    267 U.S. 228 (1925) .......................................................................................... 6

*Kiakombua v. Wolf*,
    498 F. Supp. 3d 1 (D.D.C. 2020) .................................................................. 3, 4

*Lawyers Ass'n v. Reno*,
    ("AILA II"), 199 F.3d 1352 (D.C. Cir. 2000) ............................................ 3, 4, 5

*Lawyers Ass'n v. Reno*,
    *(AILA I)*, 18 F. Supp. 2d 38 (D.D.C. 1998) ................................................ 3, 5

*Leng May Ma v. Barber*,
    357 U.S. 185 (1958) ....................................................................................... 6, 7

*Loper Bright Enters. v. Raimondo*,
    603 U.S. 369 (2024) .......................................................................................... 6

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ........................................................................................ 19

*M.M.V. v. Garland*,
    14 F.4th 1100 (D.C. Cir. 2021) ......................................................................... 4

*Nat'l Treasury Emps. Union v. Trump*,
    2025 WL 1441563 (D.C. Cir. May 16, 2025) ..................................................... 3

*Nken v. Holder*,
556 U.S. 418 (2009) .......................................................................... 3

*Succar v. Ashcroft*,
394 F.3d 8 (1st Cir. 2005) ............................................................... 11

*Trump v. CASA, Inc*,
145 S. Ct. 2540 (2025) ........................................................... 2, *passim*

*Zheng v. Gonzales*,
422 F.3d 98 (3d Cir. 2005) .............................................................. 12

## STATUTES

### Immigration and Nationality Act of 1952, as amended:

5 U.S.C. § 705 ................................................................................. 20

8 U.S.C. § 1182(d)(5)(A) ...................................................... 1, 6, 10

8 U.S.C. § 1225(b)(1)(A)(i) ................................................................ 5

8 U.S.C. § 1225(b)(1)(A)(iii) .................................................... 8, 9, 11

8 U.S.C. § 1252(b)(1)(A)(iii)(II) ............................................... 10, 11

8 U.S.C. § 1225(b)(1)(F) ................................................................... 8

8 U.S.C. § 1225(b)(2)(C) ................................................................... 8

8 U.S.C. § 1225(d)(2) ........................................................................ 8

8 U.S.C. § 1252(e)(3)(A)(ii) .............................................................. 4

8 U.S.C. § 1252(e)(3)(B) ...................................................... 1, 3, 16

8 U.S.C. 1252(f)(1) .................................................................. 15, 16

8 U.S.C. § 1255(a) .......................................................................... 11

## REGULATIONS

8 C.F.R. § 1.1(q) (1998) ..................................................................... 3

8 C.F.R. § 1.2 ................................................................................ 6, 7

8 C.F.R. § 208.14(c)(4)(ii) .............................................................. 12

8 C.F.R. § 208.14(c)(4)(ii)(A) ............................................................................ 12

8 C.F.R. § 212.5(e) ............................................................................................ 13

8 C.F.R. § 212.5(e)(2)(i) ............................................................................. 13, 15

8 C.F.R. § 235(b)(1) .......................................................................................... 13

8 C.F.R. § 235(b)(2) .......................................................................................... 13

8 C.F.R. § 235.3 ........................................................................................... 12, 13

8 C.F.R. § 235.3(b) ...................................................................................... 12, 13

8 C.F.R. § 235.3(b)(1)(i) ..................................................................................... 3

8 C.F.R. § 235.3(b)(6) ................................................................................... 8, 12

8 C.F.R. § 1001.1(q) ........................................................................................... 6

## FEDERAL RULES OF APPELLATE PROCEDURE

Fed. R. Civ. Pro. 15(c)(1)(A) .............................................................................. 5

62 Fed. Reg. at 10,312 ......................................................................... 3, 4, 6, 12

## INTRODUCTION

The Court's August 1, 2025 order stays three agency actions (the January 23 Huffman Memorandum, February 18 Immigration and Customs Enforcement (ICE) Directive, and the March 25 CHNV Federal Register Notice) pending the conclusion of proceedings "to the extent those challenged actions subject to expedited removal individuals who have been, at any time, paroled into the United States at a point of entry."  The Court's order effectively prevents the Government from applying expedited removal to potentially hundreds of thousands of paroled arriving aliens, thereby halting its ability to expeditiously remove aliens who have no basis to remain in the country.  This Court should stay its order pending appeal.[1]

As Defendants explain below, the Government is likely to succeed on appeal.  First, the Court misconstrued the statutory time bar for raising systematic challenges to expedited removal.  8 U.S.C. § 1252(e)(3)(B).  That 60-day clock ran from April 1, 1997—the date the expedited removal procedures were "first implemented," *see id.*, and the Court therefore lacks jurisdiction over Plaintiffs' claims.  Second, the Court erroneously concludes Congress did not intend to apply expedited removal to aliens paroled at ports of entry, and along the way jettisons a long-established regulation implementing the statute in 1997.  In doing so the Court fails to give full effect to Congress's directive in the parole statute that parole "shall not be regarded as an admission" and when the purposes of parole have been served "the alien shall forthwith return ... to the custody from which he was paroled" and thereafter be treated "in the same manner as that of any other applicant for admission to the United States."  8 U.S.C. § 1182(d)(5)(A).

---

[1] Defendants have conferred with Plaintiffs under Rule L.R. 7(m), and Plaintiffs have informed undersigned counsel that they oppose Defendants' motion.  Defendants request the Court resolve the motion expeditiously in light of the interests at stake.

Further, the Court should grant a stay because the Court's universal remedy irreparably harms Defendants by preventing them from applying expedited removal to aliens paroled at ports of entry—aliens who indisputably have no right to remain in the United States. Expedited removal is a critical enforcement tool that allows DHS to remove aliens expeditiously as Congress intended without the more cumbersome procedures under section 240 of the Immigration and Nationality Act (INA). Indeed, in *Trump v. CASA, Inc*, 145 S. Ct. 2540, 2561 (2025), the Supreme Court held that this sort of intrusion on the Executive Branch's enforcement policies establishes irreparable harm.

Finally, *CASA* also means that the Court's nationwide remedy is impermissibly broad and instead the remedy should be tailored to Plaintiffs' members. To be sure, *CASA* did not resolve whether the Administrative Procedure Act (APA) authorizes federal courts to vacate federal agency action. But *CASA* held that traditional equitable principles required that injunctive relief should be limited to the plaintiffs before the court. And Section 705 is governed by those same traditional equitable principles and is thus equally subject to *CASA's* reasoning, as the Ninth Circuit recently held.

## BACKGROUND

The relevant facts and law are recounted in the Legal and Procedural Background section in the Government's Opposition to Plaintiffs' Motion for a Stay of Agency Action. *See* ECF No. 26 at 14-20 (hereafter "Op. at __").

## LEGAL STANDARD

In considering whether to grant a stay pending appeal, courts ask whether the applicant (1) "is likely to succeed on the merits," (2) "will be irreparably injured absent a stay," (3) whether a stay will not "substantially injure" other interested parties, and (4) whether a stay is in

the "public interest." *Nat'l Treasury Emps. Union v. Trump*, 2025 WL 1441563, at *1 (D.C. Cir. May 16, 2025) (quoting *Nken v. Holder*, 556 U.S. 418, 434 (2009)).

## ARGUMENT

### I.  Plaintiffs' Claims are Time-Barred.

The Court lacks jurisdiction because Plaintiffs' claims are time-barred under 8 U.S.C. § 1252(e)(3)(B).  In holding otherwise, *see* op. at 39, the Court did not give proper effect to Congress's directive that a suit under section 1252(e)(3) shall be filed "no later than 60 days" after the rule or agency action "is *first* implemented."  *Id.* (emphasis added); s*ee Am. Immigr. Lawyers Ass'n v. Reno (AILA I)*, 18 F. Supp. 2d 38, 47 (D.D.C. 1998) ("[T]he 60 days ran from a fixed point, the initial implementation of the challenged provisions"), *aff'd*, *Am. Immigr. Lawyers Ass'n v. Reno ("AILA II")*, 199 F.3d 1352, 1358 (D.C. Cir. 2000).  Here, it is undisputed that the rule Plaintiffs challenge—the application of expedited removal to aliens paroled at ports of entry—was "first implemented" in 1997, when the agency included paroled arriving aliens in the definition of "arriving aliens," thus making them subject to expedited removal.  62 Fed. Reg. at 10,312; 8 C.F.R. § 1.1(q) (1998); 8 C.F.R. § 235.3(b)(1)(i).

In support of its conclusion, the Court cites another district court case, *Kiakombua v. Wolf*, 498 F. Supp. 3d 1 (D.D.C. 2020) (K.B. Jackson, J.), for the proposition that "section 1252(e)(3) plainly authorizes judicial review of written policies, guidelines, or procedures that implement the expedited removal statute, without regard to whether such policies deviate substantively from an agency's prior practices."  Op. at 39.  But in *Kiakombua* the aliens challenged USCIS's lesson plans which provided *new* credible fear adjudication standards that the court found contrary to the statute and its regulations.  498 F. Supp. 3d at 36.  The court did not need to reach the question of

when the sixty-day clock starts to run if an agency document simply reiterates a rule that had already been implemented and had been in place for decades.

More fundamentally, the *Kiakombua* Court provides virtually no reasoning to support its dicta other than to state that "the 'first' implementation language … need not, and should not, be read that broadly," citing a D.C. Circuit decision applying the presumption in favor of judicial review. *Id.* at 36. But the more relevant D.C. Circuit precedent explains the reasoning for strictly interpreting the "first implementation" rule: "Congress imposed the 60–day limit on actions in order to cabin judicial review and to have the validity of the new law decided promptly." *AILA II*, 199 F.3d at 1364. That reasoning is especially relevant in this case where the same statutory objection to the application of expedited removal that Plaintiffs assert here was raised during the notice and comment process for the promulgation of the "arriving alien" regulation and rejected by the agency. *Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures*, 62 Fed. Reg. 10,312, 10,313 (Mar. 6, 1997). Given Congress's finality interest in avoiding repeated litigation over the expedited removal procedures, the 60-day deadline should be enforced and Plaintiffs' claims dismissed.

The Court's appeal to policy, *see* op. at 39 ("If no such guidance could be challenged, most of section 1252(e)(3)(A)(ii) would be rendered nugatory."), does not and cannot override a clear statutory time limitation that the DC Circuit has found jurisdictional and thus not subject to equitable tolling. *See AILA II*, 199 F.3d at 1363 (responding to the objection that, under the district court's construction of the 60–day limit "there is no possibility of bringing a challenge at all," by stating "True enough. But this is precisely what Congress intended."); *M.M.V. v. Garland,* 1 F.4th 1100, 1109 (D.C. Cir. 2021) (rejecting the argument that *AILA's* holding that the 60-day deadline

is jurisdictional "has been overtaken by recent Supreme Court decisions").  For these reasons, Defendants are likely to prevail on appeal on this threshold jurisdictional question.[2]

## II.    Defendants are Likely to Prevail on the Merits.

A. "Arriving in" Authority:  The expedited removal statute applies to aliens paroled at ports of entry.  No one disputes that a decades-old regulation implementing expedited removal soon after its enactment in 1996 says so.  8 C.F.R. § 1.2.  And neither the Court nor Plaintiffs cite any case law holding that paroled arriving aliens are excluded from the "arriving in" provision of 8 U.S.C. § 1225(b)(1)(A)(i) even though immigration authorities have applied expedited removal to paroled arriving aliens since at least 2002.

The Court nevertheless holds otherwise, *see* op. at 41, and in doing so makes several errors. The Court begins by accepting Plaintiffs' invitation to read the word "arriving" in a vacuum, isolating that term and concluding that it "would not naturally be read to refer" to someone who had already arrived and was paroled into the country.  Op. at 59.  But the Court unduly gives short shrift to Defendants' argument that the term "arriving" must be interpreted in light of the unique

---

[2] Alternatively, even assuming the Court determined the 60-day clock ran from the date the challenged documents took effect—the latest of which was the CHNV Federal Register Notice which took effect on March 25, 2025—Plaintiffs' amended complaint would still be untimely with respect to Claims 4 and 5 which were added in their amended complaint filed on June 11, 2025— those claims were not raised in their original complaint.  Thus, Claim 5 (challenge to the "arriving alien" regulation at section 1.2) and the portion of Claim 4 asserting that Defendants' position is contrary to DHS regulations are out of time because 60 days from March 25, 2025, is May 24, 2025, and the amended complaint was not filed until June 11, 2025.  And because the 60-day time period is jurisdictional, as discussed above, the added claims do not "relate back" to the date of the original complaint.  *See* Fed. R. Civ. Pro. 15(c)(1)(A) (allowing relation back only if "the law that provides the appliable statute of limitations allows relation back"); *AILA*, 18 F. Supp. 2d at 47 ("Where a statutory deadline is jurisdictional, however, no "relation back" under Rule 15(c) can occur.").  The district court in *AILA* reached a similar conclusion in holding that "new plaintiffs added in the amended Wood complaint are time barred since their claims were filed after May 31, 1997 [date 60-day period ended]."  The DC Circuit affirmed this dismissal "substantially for the reasons stated in the [district] court's thorough opinion."  *AILA II*, 199 F.3d at 1357.

statutory and historical context of parole.  *See* op. at 60-62.  Indeed, the Attorney General's 1997 promulgation of the "arriving alien" regulation, which the Court finds *ultra vires*, *id.* at 53, was explicitly predicated on the parole statute at 8 U.S.C. § 1182(d)(5)(A).  62 Fed. Reg. at 10,313; 8 C.F.R. §§ 1.2, 1001.1(q).   By the Court's own analysis, this regulation should be afforded substantial weight.  *See* op. at 52 (quoting *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 388 (2024), for the proposition that "when interpreting a statute in an APA challenge, 'the informed judgment of the Executive Branch—especially in the form of an interpretation issued contemporaneously with the enactment of the statute—[may] be entitled to great weight").   Yet the Court fails to do so by suggesting the Attorney General unreasonably relied on section 1182(d)(5)(A).  Not so.  That statute provides that parole is not "an admission of the alien and when the purposes of such parole shall ... have been served the alien shall forthwith return ... to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States."  Thus, Congress made clear that parole is simply a temporary release of an alien into the United States that confers no immigration status, and that once parole expires or is revoked, the alien shall be detained and treated as any other applicant for admission.  In a nutshell, an alien paroled at a port of entry stands in the same legal position as one stopped at the border and should be treated as such for purposes of expedited removal.

This statutory context strongly suggests Congress intended to include paroled arriving aliens under the "arriving in" authority.  Indeed, the parole statute is foundational to the "legal fiction" the Supreme Court has adopted in a long line of decisions holding that arriving aliens paroled into the United States are legally in the position of aliens standing at the border, regardless of the duration of their parole.  *E.g., Leng May Ma v. Barber*, 357 U.S. 185, 188-91 (1958); *Kaplan*

6

*v. Tod*, 267 U.S. 228, 20 (1925). "The parole of aliens seeking admission is simply a device through which needless confinement is avoided while administrative proceedings are conducted. It was never intended to affect an alien's status, and to hold that petitioner's parole placed her legally within the United States is inconsistent with the congressional mandate, the administrative concept of parole, and the decisions of this Court." *Leng May Ma*, 357 U.S. at 191 (cleaned up).

The Court's objections to the Government's interpretation of "arriving" are not persuasive. The Court's observation that none of the pre-expedited removal cases cited in Defendants' brief use the term "arriving" is beside the point. *See* op. at 60. The critical point is that these specific principles concerning parole and paroled arriving aliens were well-established at the time of the enactment of the expedited removal statute through the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA) and should weigh heavily when interpreting the term "arriving." Although a paroled arriving alien may have "arrived" at a port of entry in terms of a historical event, *see* op. at 61, that does not mean he is not an "arriving alien" for purposes of the "arriving in" authority; he is positionally an arriving alien and Congress legislated with the awareness of that principle.[3]

Beyond its detached interpretation of the term "arriving," the Court's conclusion regarding the "arriving in" provision rests on little else. It reasons that other provisions in the expedited removal statute "use 'arrive,' or some conjugation thereof, to refer to physical arrival at a port of entry" but fails to elaborate. Op. at 59. None of those statutory provisions provide any insight regarding Congress's intent to apply expedited removal to aliens paroled at ports of entry. One of

---

[3] The Court reiterates several times that the parole statute does not state that the alien "return[s]" to the status of an applicant for admission once parole is terminated because the paroled alien is already an applicant for admission. *E.g.*, op. at 51, 52. Defendants do not disagree; indeed, that is part of their argument that parole does not alter the status of an arriving alien. *See also* 8 C.F.R. § 1.2.

these provisions does not even use the word "arriving." Op. at 59 (citing 8 U.S.C. § 1225(b)(1)(F)). More fundamentally, the Court unduly sanctions Plaintiffs' mixing of apples and oranges in relying on these provisions because they involve an entirely different context.[4]

The Court further misses the mark by suggesting that the "arriving alien" definition conflicts with the parole statute, and "another portion of the regulatory scheme," because aliens are considered "arriving both when their parole is active and after it is terminated." Op. at 61-62. The Court describes the "arriving alien" regulation correctly but that regulation is entirely consistent with the parole statute's directive that parole "shall not be regarded as an admission of the alien" and that after the alien's parole is terminated "his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States." The Court does not engage with this language or explain the inconsistency. *See* op. 61-62. Likewise, the Court's finding that the regulation "conflicts" with another regulation at 8 C.F.R. § 235.3(b)(6)— which provides the alien with an opportunity to establish they were paroled into the country— overlooks the fact that this regulation is implementing the *designation authority* at 8 U.S.C. § 1225(b)(1)(A)(iii) (which we discuss below), not the "arriving in" provision. *See* op. at 62.

Additionally, the Court miscomprehends the nature of parole in reasoning that "Defendants' interpretation creates an oddity" in treatment between aliens who enter the country illegally and those who are paroled; and this "contradict[s] the statute's purpose." *See* op. at 63. This view appears to ascribe some enhanced status to an alien by virtue of their parole, which the

---

[4] For example, the authority to detain provided in 8 U.S.C. § 1225(d)(2) is directed at the master of a vessel or aircraft "bringing an alien … to the United States," and requires that individual "to detain the alien on the vessel or at the airport" and deliver the alien to an immigration officer. And section 1225(b)(2)(C) applies to a broader group of aliens than paroled arriving aliens who are not even necessarily subject to expedited removal. *Id.* ("who is arriving on land (whether or not at a designated port of arrival)").

case law has repeatedly rejected as discussed above.  The Court also overlooks the fact that in accepting parole, the alien receives a certain bargain, including not accruing unlawful presence, and not being at risk of illegal entry charges and, in some cases, work authorization—all benefits that do not apply to aliens who enter illegally.  Further still, the Court fails to consider that DHS always retains discretion to place a paroled arriving alien in 240 proceedings if it concludes the facts and circumstances warrant so.  *See Matter of M-S-*, 27 I&N Dec. 509, 510 (A.G. 2019); *Matter of E-R-M- & L-R-M-*, 25 I&N Dec. 520, 524 (BIA 2011).[5]  To conclude, the "arriving in" provision authorizes expedited removal of aliens paroled at ports of entry.

B. **"Designation" Authority:**  The Government is likely to prevail as to its position that aliens paroled at ports of entry can also be removed under the expedited removal's designation provision at 8 U.S.C. § 1225(b)(1)(A)(iii), if their parole has been terminated.  Under that provision, Congress authorized expedited removal for an alien who "has not been" admitted or paroled.  Congress's use of the present perfect tense supports the Government's position that this qualification does not apply to aliens whose parole has terminated because they are no longer "paroled."  As the Court recognized, *see* op. at 46, a recent Supreme Court decision bolsters this interpretation.  *Hewitt v. United States*, 605 U.S. ---, 145 S. Ct. 2165 (2025) (the use of the present perfect tense "conveys to a listener that the event in question continues to be true or valid").  This Court, however, determined that "the pure semantics of the phrase at issue cannot resolve this question," and that Plaintiffs' interpretation was supported by the "statutory context."  Op. at 47.  The Court's analysis is flawed.

---

[5] The Court further asserts that Defendants' position is contrary to Congress's abrogation of "certain aspects of the current 'entry doctrine.'"  Op. at 63.  But it is unclear why this is so.  Under IIRIRA's revised statutory framework, an illegally entering alien is not deemed to be "admitted" and is subject to expedited removal just like a paroled arriving alien.

For starters, the Court reasons that because *Hewitt* involved vacatur of a sentence, "it makes sense for an offender whose sentence was vacated" to be treated as someone who was never sentenced; it then concludes that parole is different because termination "does not render that parole" void *ab initio*. Op. at 48-49. This conclusion rests on shaky ground because the Supreme Court's holding turned principally on the specific verb tense used and asked whether "the event in question continues to be true or valid." *Hewitt*, 145 S. Ct. at 2172; *id.* at 2171 *("[m]ost notably,* the operative phrase is not written in the past-perfect tense … Rather, Congress employed the present-perfect tense ….") (emphasis added). Applying that reasoning here, it is clear that parole, "the event in question," does not "continue to be true or valid." *See id.*

Furthermore, the context here indicates a continuing status, not a past event. If, as this Court found, "has not been … paroled" means has not been granted parole on a past occasion, an alien whose parole is terminated would *not* be "dealt with in the *same* manner as that of *any other* applicant for admission," as the INA requires, 8 U.S.C. § 1182(d)(5)(A) (emphases added). Any "other" applicant—*i.e.*, one who was never paroled—who lacks two years of continuous presence would be subject to expedited removal. To treat aliens whose parole has been terminated in the same manner as other applicants, all such aliens must be subject to expedited removal.

Additionally, the Court misreads the statute when it concludes that Congress's decision to pair "admitted" and "paroled" in the same phrase ("has not been admitted or paroled") "demonstrates that both terms refer to a completed act," and that the focus of this language is on the manner of entry as Plaintiffs' contend. Op. at 47-48. But as discussed above, that reading ignores that Congress used those terms in the context of employing the present perfect tense ("has been admitted or paroled"), which as the Supreme Court found "by definition focuses on the *present*." *Hewitt,* 145 S. Ct. at 2172 (emphasis in original). Thus, section 1252(b)(1)(A)(iii)(II)'s

10

language focuses on whether someone *presently* has permission to be within the United States, rather than their *past* manner of entry.  Aliens who are present without inspection (unadmitted aliens) and arriving aliens whose parole has been revoked (former parolees) lack valid documentation and are unlawfully present within the country.  As a result, they would not fall within the "has not been admitted or paroled" carve-out in section 1225(b)(1)(A)(iii) and could be designated for expedited removal by the Secretary, so long as they have not accrued two years of continuous physical presence and are inadmissible on one of the qualifying statutory grounds.  Neither the Plaintiffs nor the Court provides a persuasive reason for why Congress meant to permanently exclude from expedited removal all aliens who were temporarily paroled for any time and are now unlawfully present.  And it makes sense that someone who is temporarily paroled— *e.g.*, to testify in a trial—but who does not leave upon expiration or revocation of their limited parole term could be subjected to expedited removal under this provision, provided they have not accrued two years of continuous physical presence.

Other principles of statutory construction support Defendants' position.  If Congress wanted to distinguish in section 1225(b)(1)(A)(iii)(II) between those who were once paroled and those who were not, it could have used the past tense "was paroled."  *See Hewitt*, 145 S. Ct. at 2173 (noting that, in other provisions of the same act, Congress used simple past tense to convey events that occurred in the past as contrasted to its use of present perfect in other contexts).  For example, in 8 U.S.C. § 1255(a), Congress provided that the Attorney General may adjust the status of an alien who "was inspected and ... paroled into the United States" and meets other eligibility requirements.  8 U.S.C. § 1255(a); *Succar v. Ashcroft*, 394 F.3d 8, 16 (1st Cir. 2005).  As contrasted to the present-perfect, the past tense is more likely to indicate an alien who was, in the past, paroled, regardless of whether he continues to have parole at the time of his adjustment application.  *See*

*Zheng v. Gonzales*, 422 F.3d 98, 121 (3d Cir. 2005) (noting that use of past tense "does suggest that DHS might be unable to terminate adjustment eligibility simply by revoking parole").

The Court's reliance on language in 8 C.F.R. § 235.3 that refers to parole in the past tense is misplaced. *See* op. at 52 (citing 8 C.F.R. § 235.3(b)(6) (describing the burden on the alien to show he "was admitted or paroled"). First, it is a stretch to conclude based *solely* on this past tense usage that the agency promulgated a regulation intending to limit application of the designation provision in this way *when the statute does not contain such limitation*. At a minimum, one would expect the history of the regulation's promulgation to contain a discussion of such a deviation from the statute's language if the agency intended this limitation. But neither Plaintiffs nor the Court offer any supporting evidence. *See also* 62 Fed. Reg. 10313-314.

Second, while the Court acknowledged that language in another regulation relied on by Defendants "seem to negate" Plaintiffs' argument and supports the Government's position, it ultimately discounted that regulation without a persuasive explanation. Op. at 54-56. Specifically, an asylum regulation—added just three years after IIRIRA went into effect—authorizes the use of expedited removal to a paroled alien under both the designation and "arriving in" authorities. 8 C.F.R. § 208.14(c)(4)(ii). Nevertheless, the Court states that any "implication from [this regulation] is weak" because it authorizes expedited removal only for those paroled after April 1, 1997." Op. at 54. The Court then speculates that the regulation "envisioned expedited removal for parolees only" under the "arriving in" authority because the "arriving alien" regulation contains a similar dichotomy between aliens paroled before April 1, 1997 and after. *Id.* But that theory is refuted by the language of the asylum regulation itself, which authorizes expedited removal under *both* authorities. 8 C.F.R. § 208.14(c)(4)(ii)(A) ("In the case of an applicant who is an arriving alien *or is otherwise subject to removal under § 235.3(b)* of this chapter...." the asylum officer

"shall proceed in accordance with 235.3(b) (Emphasis added)).[6] Thus, the regulations Defendants cite are more probative of the agency's intent than the strained inferences Plaintiffs and the Court draw from section 235.3.

In sum, the designation provision and regulations authorize expedited removal of aliens paroled at ports of entry whose parole has been terminated.

**C. The Agency's Actions are not Arbitrary and Capricious:** Even assuming the challenged DHS documents are subject to the APA's arbitrary and capricious standard, the agency did not act arbitrarily or capriciously in issuing these documents. The Huffman Memorandum reasonably provided guidance on the exercise of immigration officers' enforcement discretion in light of two recent DHS policies regarding the scope of the parole statute and the expansion of expedited removal; in light of those policies, the Memo instructs officers to "consider" applying expedited removal to anyone who may be "amenable" to that process. Op. at 19-20. The Court faults DHS for failing to answer a host of questions detailing when aliens paroled at ports of entry are subject to expedited removal and when they are not. *Id.* at 68-69. But for APA purposes, it was sufficient for the Memo to instruct that "[t]he actions contemplated by this memorandum shall be taken in a manner consistent with applicable statutes, regulations, and court orders." *See* op. at

---

[6] The Court similarly fails to give due weight to the regulation at 8 C.F.R. § 212.5(e), entitled, "Termination of Parole." Section 212.5(e)(2)(i) provides that after parole is terminated, "further inspection or hearing shall be conducted under *section 235* or 240 of the Act." (emphasis added). Even though section 235 authorizes expedited removal at section 235(b)(1), the Court objects that section 235 also includes section 235(b)(2), and that applicants for admission processed under that provision are placed in section 240 proceedings. Op. at 56. While the Court's description of section 235(b)(2) is correct, its legal conclusion is not. The only removal procedure under section 235 is the expedited removal procedure at section 235(b)(1); recall that aliens processed under section 235(b)(2) are referred to section 240 proceedings. Thus, when the regulation states that "further inspection or hearing shall be conducted under section 235 or 240 of the Act," the most natural reading is that the alien will be subject to expedited removal or placed in 240 proceedings.

20 (quoting Huffman memo). Immigration officers are presumed to be aware of the existing statutory and regulatory provisions governing expedited removal and are tasked with exercising their enforcement discretion based on the individual facts and circumstances of each case. The Court is troubled by the fact that the Huffman Memo does not explain when a paroled alien would *not* be "amenable" to expedited removal. Op. at 68-69. But as the Court itself notes, there could be any number of reasons why in an individual case, an alien paroled at a port of entry may not be "amenable" to expedited removal—DHS may not be able to establish a statutorily-required inadmissibility ground under section 1182; the alien may have been granted asylum or temporary protected status, etc. The fact that the Memo did not memorialize all of these scenarios does not render it arbitrary and capricious.[7]

The Court ultimately concludes, incorrectly, that the challenged DHS documents set forth inconsistent "legal justifications" for expedited removal. Op. at 71-72. That conclusion is predominantly based on language in the March 25 CHNV Termination Notice regarding the Secretary's designation authority. *Id.* at 70-71. But as a preliminary matter, the Court and Plaintiffs fail to adequately explain how the Notice can serve as a basis for an APA violation when it did not purport to create any rule applying expedited removal to aliens paroled at ports of entry. 90 Fed. Reg. at 13,611 (summary and background). The discussion of the designation provision in the Notice was in the context of providing one of several agency justifications for the termination of the CHNV parole programs, which is not at issue in this case. *Id*. at 13,612-17.

Meanwhile, the Huffman Memo and the ICE directive—the two documents that actually provide guidance on expedited removal—are consistent with each other. The Court's suggestion

---

[7] For similar reasons, ICE's February 18, 2025 directive passes APA muster. In fact, as the Court acknowledges, *see* op. at 70, that directive refers to "paroled arriving aliens" suggesting it was invoking the "arriving in" authority.

that they conflict because the Huffman Memo contemplates termination of parole prior to initiating expedited removal, while the ICE Directive does not, is incorrect. *See* Op. at 71. The directive's statement that "[i]f the alien is on an active parole, the NTA or ER charging document will terminate the parole," accurately reflects the termination regulation's procedure that notice of the charging document terminates parole. 8 C.F.R. § 212.5(e)(2)(i). But that regulation also contemplates that, prior to the termination of parole through service of the charging document, there must be a determination by an authorized official that "neither humanitarian reasons nor public benefit warrants the continued presence of the alien in the United States." *Id.* As such, service of the I-860 charging document initiating expedited removal reflects the determination to terminate parole that has already been made by an authorized agency official. Thus, the statements in both the Huffington Memo and ICE directive are correct, consistent with each other, and with the termination regulation.

## III.    Plaintiffs' Request for a Stay is Prohibited by 8 U.S.C. 1252(f)(1).[8]

The Court's analysis of 8 U.S.C. § 1252(f)(1) is lacking in at least two respects. *See* op. at 27-30. First, it did not engage with the text. *See id.* Section 1252(f)(1) eliminates any court's (other than the Supreme Court's) authority to issue orders "enjoin[ing]" or "restrain[ing]" implementation of the expedited removal statute, where "restrain" means to "check, hold back, or prevent (a person or thing) from some course of action," to "inhibit particular actions," or to "stop (or perhaps compel)" action. *Garland v. Aleman Gonzalez*, 596 U.S. 543, 549 (2022). The reference to both enjoin and restrain indicate that a court may not impose coercive relief that

---

[8] Defendants acknowledge numerous courts have found otherwise, albeit some of these cases arose in the context of vacatur under section 706, and not a stay of agency action under section 705. *See* op. at 27. & n.16. However, as the Court noted, the issue remains an open one in the D.C. Circuit. *Id.* at 27.

"interfere[s] with the Government's efforts to operate" the covered provisions in a particular way. *Id.* at 551. That meaning comfortably encompasses the stay of agency action in this case. A contrary interpretation would read the word "restrain" out of the statute. The Court relies on a district court decision for the proposition that a section 705 stay would not order federal officials to take or refrain from taking actions to enforce, implement or otherwise carry out the specified provisions at issue. Op. at 28. But that's exactly the effect of the Court's order in this case; not only does the Court stay the challenged agency actions—which by the Court's own language and analysis are directing federal officials to apply expedited removal to aliens at ports of entry, *see* op. at 34 (linking DHS' documents to the "en masse" application of expedited removal to aliens paroled at ports of entry)—but the Court's opinion invalidates the "arriving alien" regulation which implements the "arriving in" authority for expedited removal. Thus, the order impermissibly contravenes section 1252(f)(1).

Second, the Court acknowledges the on-point legislative history reflecting Congress's intent that pursuant to section 1252(f)(1) the challenged procedures would "remain in force while such lawsuits are pending." Op. at 29 (quoting H.R. Rep. No. 104-469, at 161 (1996)). The Court even says that "[o]n its face, that statement supports Defendants' position," but it then refuses to give weight to the legislative history because of policy concerns—specifically, that the Court would be unable to provide a remedy in section 1252(e)(3) cases like this one, brought by organizations asserting associational standing. *See* Op. at 29-30. But that result is hardly "bizarre;" *see id.* at 30; it is instead precisely what Congress intended as the legislative history tells us. The Court's policy-based rationale for rejecting § 1252(f)(1)'s bar does not withstand scrutiny.

16

**IV.    Defendants Will Suffer Irreparable Harm and The Remaining Equitable Factors Favor a Stay.**

The Court's order thwarts the Executive Branch's constitutional and statutory responsibility for immigration affairs on an issue potentially affecting hundreds of thousands of aliens.  The Court's nationwide remedy irreparably harms the Executive Branch and the public interest by invalidating a long-established regulation contemporaneously interpreting the INA to allow expedited removal to aliens paroled at ports of entry and effectively enjoining the removal of those aliens notwithstanding that they have no right to remain in the United States.

The Court recounts the Government's various arguments asserting the significant harms it will face in granting Plaintiffs' relief and does not appear to quibble with those assertions.  *See id.*  In fact, it recognizes these arguments are "consistent with the record" but then asserts it is not in the public interest to "perpetuat[e] … unlawful conduct."  *Id.* at 78.  But as Defendants have explained above, they are likely to prevail on the merits of their argument that DHS may lawfully apply expedited removal to aliens paroled at ports of entry.  The Court is also incorrect in stating that the public interest in the removal of illegal aliens is "fully vindicated by section 240 proceedings."  *Id.* at 78.  The Court overlooks the fact that expedited removal is an invaluable enforcement resource that allows DHS to remove aliens *expeditiously* as Congress intended without the more "cumbersome and duplicative" proceedings under section 240.  *See Dept. of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 118 (2020).

The Court's irreparable harm analysis is also undermined by the Supreme Court's recent decision in *CASA* which found the Government had established irreparable harm sufficient to grant "interim relief."  *Trump v. CASA*, *Inc.*, 145 S. Ct. 2540, 2561 (2025).  There, the Supreme Court reasoned that "when a federal court enters a universal injunction against the Government, it improperly intrudes on a coordinate branch of the Government and prevents the Government from

17

enforcing its policies against nonparties." *Id.* (cleaned up). In this case, the Court's issuance of a stay has similar nationwide impact because it stays the challenged agency actions for *all* aliens paroled at a port of entry, most of whom are not parties to this case. This alone constitutes irreparable harm. *See id.*; *cf. Immigrant Defs. L. Ctr. v. Noem*, No. 25-2581, 2025 WL 2017247, at *2 (9th Cir. July 18, 2025) (granting in part the Government's emergency motion for a stay pending appeal by limiting the district court's section 705 stay order to Plaintiffs' "current and future clients").

The harm to Defendants and the public interest outweigh Plaintiffs' harms. Even assuming the members of Plaintiff organizations who are subject to expedited removal are more likely to be detained and experience family separation, *see* op. at 76-77, those harms are outweighed by the harm to the Government described above. Plaintiffs do not contend that these members have any right to remain in the United States or that they have been improperly charged with one of the qualifying inadmissibility grounds for expedited removal. As such the balance of harms tips in the Defendants' favor.

## V.     The Court's Remedy is Overbroad.

Defendants are likely to prevail on their argument that the Court's remedy is improperly broad. Plaintiffs' lawsuit is brought on behalf of their members, and complete relief is provided by an appropriate remedy that applies to those members who they can identify as being affected by the challenged agency actions. Although the Supreme Court's recent decision in *CASA*, 145 S. Ct. 2540, did not "resolve[] the distinct question whether the [APA] authorizes federal courts to vacate federal agency action," *see id.*, at 2554 n.10, its complete-relief principle for crafting injunctive relief provides some useful guidance, *see id.* at 2557. In *CASA*, the Court held the Government was likely to succeed on the merits of its argument that federal courts lack statutory

authority to issue "universal injunctions." *Id.* at 2550. The Court explained that under the complete-relief principle, "the question is not whether an injunction offers compete relief to *everyone* potentially affected by an allegedly unlawful act; it is whether an injunction will offer complete relief *to the plaintiffs before the court*." *Id.* at 2557 (emphasis in original) (citing *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) ("[I]njunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs.")).

The Court's analysis in *CASA* counsels against a universal stay in this case. Section 705 of the APA grants courts the power to issue all "necessary and appropriate process" tailored to the circumstances of a particular case to "preserve status or rights." Section 705 thus is guided by the very same traditional equitable principles that governed the injunctions at issue in *CASA*. *See* 145 S. Ct. 2561-62. The Court can provide Plaintiffs "complete relief" by granting an appropriately tailored remedy to *Plaintiffs' members* who Plaintiff organizations identify and show have been harmed by the alleged unlawful conduct; complete relief does not extend to other paroled nonparty aliens. *See id.* at 2557; *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (requiring a showing of injury). The Court, however, concluded otherwise, quickly dispensing with *CASA* because the Supreme Court did not reach the issue in the APA context. But *CASA's* reasoning is still instructive in the APA context, and the Court erred in failing to apply its principles.

A recent Ninth Circuit decision illustrates the point. That Court granted in part the Government's motion to stay the district court's grant of a stay of agency action under section 705 of the APA because the district court's remedy was too broad. *Immigrant Defs. L. Ctr.*, 2025 WL 2017247, at *2. The court explained that *CASA's* "complete-relief principle for crafting injunctive relief provides some useful guidance for crafting interim equitable relief" in section 705 cases. *Id.* at *14. *CASA* is especially "informative [] because the factors used to determine whether to issue

a § 705 stay under the APA are the same equitable factors used to consider whether to issue a preliminary injunction." *Id.* The Ninth Circuit proceeded to "limit the district court's § 705 Stay order" to Plaintiff's clients (current and future), and the Court should have done the same here. In sum, this Court's remedy is overbroad under principles set forth in *CASA*.

## CONCLUSION

This Court should grant Defendants' motion for a stay pending appeal.

Dated: August 4, 2025                    Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*
*Civil Division*

DREW C. ENSIGN
*Deputy Assistant Attorney General*

/s/ Papu Sandhu
(Mass. Bar No. 630090)
*Assistant Director*
U.S. Department of Justice
Civil Division
Office of Immigration Litigation
General Litigation & Appeals Section
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
Papu.Sandhu@usdoj.gov

TIM RAMNITZ
*Senior Litigation Counsel*

ARIC A. ANDERSON
TARYN ARBEITER
*Trial Attorneys*

*Counsel for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 4, 2025, I electronically filed this MEMORANDUM

OF POINTS AND AUTHORITIES with the Clerk of the Court for the United States Court of

for the District of Columbia by using the CM/ECF system.  Counsel in the case are registered

CM/ECF users and service will be accomplished by the CM/ECF system.

<div style="margin-left: 50%;">

*/s/ Papu Sandhu*
PAPU SANDHU
Assistant Director
U.S. Department of Justice

</div>