# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

COALITION FOR HUMANE IMMIGRANT RIGHTS, *et al*.,

    *Plaintiffs*,

    *v.*

KRISTI NOEM, in her official capacity as Secretary of Homeland Security, *et al.*,

    *Defendants.*

Case No.: 1:25-cv-0872

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

### TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

STATEMENT OF FACTS ............................................................................................. 2

STANDARD OF REVIEW ............................................................................................ 4

ARGUMENT ................................................................................................................. 5

I.     PLAINTIFFS HAVE STANDING, THIS COURT HAS JURISDICTION, AND
       DEFENDANTS' ACTIONS ARE REVIEWABLE. ........................................... 5

       A.   Plaintiffs Have Standing ......................................................................... 5

       B.   Plaintiffs Fall Within the Relevant Zone of Interests ............................. 8

       C.   Plaintiffs' Challenge Is Timely .............................................................. 9

            1.   8 U.S.C. § 1252(a)(2)(A) does not prevent this Court from reviewing
                 Plaintiffs' claim as to the "arriving alien" definition in 8 C.F.R. § 1.2. ............... 10

            2.   Even if 8 U.S.C. § 1252(a)(2)(A) and (e)(3)(B) apply to 8 C.F.R. § 1.2, the
                 60-day filing requirement is a non-jurisdictional time bar that should be
                 equitably tolled ......................................................................................... 12

II.    THE INCLUSION OF PAROLED INDIVIDUALS IN THE DEFINITION OF
       "ARRIVING ALIEN" IN 8 C.F.R. § 1.2 IS CONTRARY TO LAW .............................. 18

III.   THE CHALLENGED DIRECTIVES ARE CONTRARY TO LAW AND VIOLATE THE
       AGENCY'S OWN PROCEDURES ................................................................................. 37

IV.    THE CHALLENGED DIRECTIVES ARE ARBITRARY AND CAPRICIOUS ............ 41

V.     PLAINTIFFS ARE ENTITLED TO PERMANENT RELIEF .......................................... 44

CONCLUSION ........................................................................................................................ 45

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*United States ex rel. Accardi v. Shaughnessy*,
  347 U.S. 260 (1954) ...........................................................................................5, 38

*Alpine Sec. Corp. v. FINRA*,
  121 F.4th 1314 (D.C. Cir. 2024) ...................................................................13

*Al Otro Lado, Inc. v. Mayorkas*,
  619 F. Supp. 3d 1029 (S.D. Cal. 2022) ........................................................45

*All. for Nat. Health U.S. v. Sebelius*,
  775 F. Supp. 2d 114 (D.D.C. 2011) ................................................................4

*Am. Bioscience, Inc. v. Thompson*,
  269 F.3d 1077 (D.C. Cir. 2001) .......................................................................4

*Am. Chem. Council v. Dep't of Transp.*,
  468 F.3d 810 (D.C. Cir. 2006) .........................................................................6

*Am. Immigration Lawyers Ass'n v. Reno*,
  18 F. Supp. 2d 38 (D.D.C. 1998) ..................................................................13

*Am. Immigration Lawyers Ass'n v. Reno*,
  199 F.3d 1352 (D.C. Cir. 2000) .....................................................................13

*Bd. of Governors of Fed. Reserve Sys. v. MCorp. Fin., Inc.*,
  502 U.S. 32 (1991) ..........................................................................................14

*Bechtel v. FCC*,
  10 F.3d 875 (D.C. Cir. 1993) .........................................................................45

*Bhaktibhai-Patel v. Garland*,
  32 F.4th 180 (2d Cir. 2022) ...........................................................................17

*Boechler, P.C. v. Comm'r*,
  596 U.S. 199 (2022) ............................................................................13, 14, 16

*Bollat Vasquez v. Wolf*,
  460 F. Supp. 3d 99 (D. Mass. 2020) .............................................................22

*Bona v. Gonzales*,
  425 F.3d 663 (9th Cir. 2005) .........................................................................25

*Bowen v. Mich. Acad. of Fam. Physicians*,
    476 U.S. 667 (1986) ................................................................................14

*Burlington Truck Lines, Inc. v. United States*,
    371 U.S. 156 (1962) ................................................................................44

*Castejon-Paz v. Bondi*,
    143 F.4th 116 (2d Cir. 2025) ...................................................................18

*Castillo v. Bondi*,
    140 F.4th 777 (6th Cir. 2025) ..................................................................14

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ..................................................................................4

*Corner Post, Inc. v. Bd. of Governors of Fed. Reserve Sys.*,
    603 U.S. 799 (2024) ................................................................................10

*Ctr. for Biological Diversity v. EPA*,
    861 F.3d 174 (D.C. Cir. 2017) ..................................................................8

*Ctr. for Biological Diversity v. McAleenan*,
    404 F. Supp. 3d 218 (D.D.C. 2019) ..........................................................5

*Dep't of Com. v. New York*,
    588 U.S. 752 (2019) ................................................................................44

*DHS v. Regents of Univ. of Cal.*,
    591 U.S. 1 (2020) ....................................................................................43

*DHS v. Thuraissigiam*,
    591 U.S. 103 (2020) ................................................................................24

*E.V. v. Raycraft*,
    No. 4:25-cv-2069, 2025 WL 2938594 (N.D. Ohio Oct. 16, 2025) ...........22

*Encino Motorcars, LLC v. Navarro*,
    579 U.S. 211 (2016) ...........................................................................20, 41

*FCC v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009) ................................................................................42

*Fong Haw Tan v. Phelan*,
    333 U.S. 6 (1948) ....................................................................................14

*Fox v. Clinton*,
    684 F.3d 67 (D.C. Cir. 2012) ..................................................................43

*Green v. Brennan*,
    578 U.S. 547 (2016) ................................................................................................. 10

*Harrow v. Dep't of Defense*,
    601 U.S. 480 (2024) ................................................................................. 13, 14, 15, 17

*James Madison Ltd. ex rel. Hecht v. Ludwig*,
    82 F.3d 1085 (D.C. Cir. 1996) ................................................................................ 42

*Henderson v. Shinseki*,
    562 U.S. 428 (2011) ....................................................................................... 13, 14, 16

*Hunt v. Washington State Apple Advert. Comm'n*,
    432 U.S. 333 (1977) .................................................................................................... 6

*INS v. St. Cyr*,
    533 U.S. 289 (2001) .................................................................................................. 14

*John R. Sand & Gravel Co. v. United States*,
    552 U.S. 130 (2008) .................................................................................................. 14

*Khogiani v. Raycraft*,
    No. 25-cv13744, 2025 WL 3753532 (E.D. Mich. Dec. 29, 2025) .......................... 22

*Kiakombua v. Wolf*,
    498 F. Supp. 3d 1 (D.D.C. 2020) ............................................................................ 16

*Kinkead v. Humana, Inc.*,
    206 F. Supp. 3d 751 (D. Conn. 2016) ..................................................................... 45

*Kirboga v. LaRose*,
    No. 25-cv-3706, 2025 WL 3779426 (S.D. Cal. Dec. 31, 2025) ............................. 22

*Leng May Ma v. Barber*,
    357 U.S. 185 (1958) .................................................................................................. 22

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    572 U.S. 118 (2014) ................................................................................................ 8, 9

*Loper Bright Enters. v. Raimondo*,
    603 U.S. 369 (2024) .................................................................................................. 19

*Lopez Benitez v. Francis*,
    795 F. Supp. 3d 475 (S.D.N.Y. 2025) ..................................................................... 20

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1993) ................................................................................................ 6, 7

iv

*Matter of M-D-C-V-*,
  28 I. & N. Dec. 18 (BIA 2020) .......................................................................20, 22

*M.M.V. v. Garland*,
  1 F.4th 1100 (D.C. Cir. 2021) ........................................................................13, 16

*Make the Rd. N.Y. v. Wolf*,
  962 F.3d 612 (D.C. Cir. 2020) ......................................................................5, 6, 7

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
  567 U.S. 209 (2012).........................................................................................9, 12

*McNeill v. United States*,
  563 U.S. 816 (2011)..............................................................................................24

*Menominee Indian Tribe of Wis. v. United States*,
  764 F.3d 51 (D.C. Cir. 2014) ...............................................................................18

*Momin v. Gonzales*,
  447 F.3d 447 (5th Cir. 2006) ...............................................................................25

*Mouelle v. Gonzales*,
  416 F.3d 923 (8th Cir. 2005) ...............................................................................25

*Munoz Materano v. Arteta*,
  804 F. Supp. 3d 395 (S.D.N.Y. 2025) .................................................................22

*Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*,
  145 F.3d 1399 (D.C. Cir. 1998).............................................................................44

*Nat'l Parks Conservation Ass'n v. Manson*,
  414 F.3d 1 (D.C. Cir. 2005)....................................................................................8

*Nat'l Postal Pol'y Council v. Postal Regul. Comm'n*,
  17 F.4th 1184 (D.C. Cir. 2021)..............................................................................20

*Nat'l TPS All. v. Noem*,
  No. 25-cv-01766, 2025 WL 3539156 (N.D. Cal. Dec. 10, 2025)..........................45

*Nelson v. SEC*,
  138 F.4th 514 (D.C. Cir. 2025)..............................................................................18

*Matter of O-*,
  16 I. & N. Dec. 344 (BIA 1977) ...........................................................................23

*O.A. v. Trump*,
  404 F. Supp. 3d 109 (D.D.C. 2019) ......................................................................12

*Occidental Petroleum Corp. v. SEC*,
    873 F.2d 325 (D.C. Cir. 1989) ..........................................................................42

*Pace v. DiGuglielmo*,
    544 U.S. 408 (2005) ........................................................................................18

*Pension Benefit Guar. Corp. v. LTV Corp.*,
    496 U.S. 633 (1990) ........................................................................................43

*Matter of R-*,
    3 I. & N. Dec. 45 (BIA 1947) ..........................................................................23

*Rafeedie v. INS*,
    795 F. Supp. 13 (D.D.C. 1992) ..........................................................................4

*Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Noem*,
    793 F. Supp. 3d 19 (D.D.C. 2025) ..............................................................4, 37

*Riley v. Bondi*,
    606 U.S. 259 (2025) .............................................................13, 14, 15, 17, 18

*Scheerer v. U.S. Attorney General*,
    445 F. 3d 1311 (11th Cir. 2006) ......................................................................25

*Sebelius v. Auburn Reg'l Med. Ctr.*,
    568 U.S. 145 (2013) ........................................................................................13

*SEC v. Chenery Corp.*,
    318 U.S. 80 (1943) ..........................................................................................19

*Sierra Club v. Mainella*,
    459 F. Supp. 2d 76 (D.D.C. 2006) ....................................................................4

*Simon v. Eastern Ky. Welfare Rts. Org.*,
    426 U.S. 26 (1976) ............................................................................................8

*Still v. Dep't of Labor*,
    Civ. A. No. 17-1420 (DLF), 2021 WL 4502053 (D.D.C. Sept. 30, 2021) ............37

*Succar v. Ashcroft*,
    394 F.3d 8 (1st Cir. 2005) ................................................................................25

*United States v. Alford*,
    89 F.4th 943 (D.C. Cir. 2024) ..........................................................................19

*United States v. Kwai Fun Wong*,
    575 U.S. 402 (2015) .............................................................................13, 14, 15

*Vijender v. Wolf*,
  No. 19-cv-3337, 2020 WL 1935556 (D.D.C. Apr. 22, 2020)..........................................16, 17

*Wilton v. Seven Falls Co.*,
  515 U.S. 277 (1995)...........................................................................................................45

*Zheng v. Gonzales*,
  422 F.3d 98 (3d Cir. 2005)................................................................................................25

*Zipes v. TWA*,
  455 U.S. 385 (1982)...........................................................................................................15

**Statutes**

5 U.S.C.
  § 706........................................................................................................................44
  § 706(2)(A)..............................................................................................................18
  § 706(2)(C)..............................................................................................................18

8 U.S.C.
  § 1101......................................................................................................................19
  § 1158(a)..................................................................................................................20
  § 1158(a)(2)(B).........................................................................................................23
  § 1158(a)(2)(D).........................................................................................................23
  § 1182(d)(5)(A) (1995).............................................................................................39
  § 1221(a)..................................................................................................................21
  § 1225(a)(1)..............................................................................................................22
  § 1225(b)(1).............................................................................................................44
  § 1225(b)(1)(A).........................................................................................................44
  § 1225(b)(1)(A)(i)..................................................................................................1, 23
  § 1225(b)(1)(A)(iii)....................................................................................1, 38, 41, 42
  § 1225(b)(1)(F).........................................................................................................21
  § 1225(b)(2)(C).........................................................................................................21
  § 1225(d)(2)..............................................................................................................21
  § 1252(a)(2)(A)...........................................................................................9, 11, 12, 16
  § 1252(a)(2)(A)(i)........................................................................................................9
  § 1252(a)(2)(A)(ii).......................................................................................................9
  § 1252(a)(2)(A)(iii)......................................................................................................9
  § 1252(a)(2)(A)(iv)......................................................................................................9
  § 1252(e)..................................................................................................................12
  § 1252(e)(3)(A)......................................................................................................9, 13
  § 1252(e)(3)(A)(i)......................................................................................................15
  § 1252(e)(3)(A)(ii).....................................................................................................15
  § 1252(e)(3)(B)....................................................................................................9, 13, 15
  § 1255(a)..................................................................................................................24
  § 1281(a)..................................................................................................................21
  § 1252(b)(1)..............................................................................................................17

26 U.S.C.
   § 6330(d)(1) ....................................................................................................16

28 U.S.C.
   § 2201(a) ........................................................................................................45
   § 2401(a) ........................................................................................................10
   § 2501 ............................................................................................................14

Page Act of 1875, Chapter 141, § 5, 18 Stat. 477, 477-78 (1875)................................21

Pub. L. No. 64-301, Chapter 29, §§ 15, 16, 39 Stat. 874, 884-86 (1917)......................21

Pub. L. No. 82-414, Chapter 477, § 235(a), 66 Stat. 163, 198-99 (1952) ....................22

Pub. L. No. 85-559, § 2, 66 Stat. 182 (1958)........................................................22

Pub. L. No. 95-145, § 102, 91 Stat. 1223 (1977)....................................................22

Pub. L. No. 103-322, § 130010(b)(3), 108 Stat. 1796 (1994) ......................................27

Pub. L. No. 104-132, § 414, 110 Stat. 1214 (1996) .................................................39

## Regulations

8 C.F.R.
   § 1.2.............................................................................1, 5, 8, 9, 18, 19, 34, 44
   § 208.4(a)(5)(iv)..............................................................................................23
   § 211.1 ...........................................................................................................12
   § 212.5(d)........................................................................................................37
   § 235.3(b)........................................................................................................10
   § 235.3(b)(1)(i) ....................................................................................7, 8, 23
   § 239.1 ...........................................................................................................12
   § 241.15 ..........................................................................................................12
   § 245.1(c)(8) (1998) ...........................................................................................24
   § 245.2(a)(1) ...................................................................................................25
   § 1245.1(c)(8) (2005)..........................................................................................24
   § 1245.2(a)(1) .................................................................................................25

62 Fed. Reg. 10312 (Mar. 6, 1997)..................................................................................37

71 Fed. Reg. 27585 (May 12, 2006) ................................................................................25

## Legislative Materials

104 Cong. Rec. S3427 (daily ed. Apr. 17, 1996)............................................................29

104 Cong. Rec. S4457 (daily ed. May 1, 1996)..............................................................32

139 Cong. Rec. 16450 (1993) ..........................................................................................27

H.R. 1710, 104th Cong. § 621 (1995).............................................................................28

H.R. Rep. No. 104-383 (1995)........................................................................................39

H.R. Rep. No. 104-469 (1996)........................................................................................31

H.R. Rep. No. 104-518 (1996)...................................................................................29, 39

S. Rep. No. 104-249 (1996).......................................................................................32, 40

**Court Rules**

Fed. R. Civ. P. 56(a) .......................................................................................................4

Fed. R. Civ. P. 56(c) .......................................................................................................2

Local Rule 7(h)(1)............................................................................................................2

**Other Authorities**

Brief for the Petitioners, *Noem v. Al Otro Lado*, No. 25-5 (U.S. Jan. 6, 2026)............................20

*Garner's Modern American Usage* (2003) ........................................................................20

*Merriam-Webster's Collegiate Dictionary* (1996) ............................................................19

*Oxford English Reference Dictionary* (2016) ...................................................................20

## INTRODUCTION

Since this Court stayed Defendants' policies directing the expedited removal of paroled noncitizens (the three "Challenged Directives") on August 1, 2025, Dkt. No. 41, Defendants have taken the position that the order does not prohibit them from doing exactly what the Court found unlawful. Defendants have ignored the Court's findings at the preliminary relief stage that neither provision of the expedited removal statute[1] can be applied to paroled noncitizens, Dkt. No. 41 at 65, and that the regulatory definition of "arriving alien" at 8 C.F.R. § 1.2 is "*ultra vires* to the extent it subjects parolees to expedited removal," *id.* at 53. Instead, they assert that this regulation allows them to continue to subject parolees, including Plaintiffs' members, to expedited removal and the consequences that come with it: prolonged and mandatory detention, family separation, and deprivation of the opportunity to apply for immigration relief for which they are eligible. The plain meaning and longstanding use of the term of "arriving" in immigration law, the unlawful consequences that result from treating parolees as "arriving," and relevant legislative and regulatory history make clear that this Court was correct to find Section 1.2's definition of "arriving alien" *ultra vires*. Section 1.2's inclusion of paroled individuals as "arriving aliens" is contrary to law and it, like the Challenged Directives, must be set aside.

Additionally, as the Court assessed previously, the Challenged Directives are not only contrary to law, Dkt. No. 41 at 65, and contradict the Defendants' own regulations, *id.* at 52-54, but they are also arbitrary and capricious, *id.* at 73. The administrative records Defendants produced are devoid of any explanation for the "unacknowledged and unexplained inconsistency"

---

[1] The INA authorizes expedited removal only for two distinct categories of noncitizens: (1) those who are "arriving in the United States," 8 U.S.C. § 1225(b)(1)(A)(i) ("Arriving In" Provision") and (2) subject to designation by the Secretary of Homeland Security, "certain other" noncitizens who have "not been admitted or paroled" and cannot establish two years of continuous physical presence, 8 U.S.C. § 1225(b)(1)(A)(iii) (the "Designation Provision").

in the policies, "including of the agency's legal conclusions" therein, *id.* at 71, cementing that Plaintiffs are entitled to judgment as a matter of law on this independent claim as well.

Absent permanent relief, Plaintiffs' members will continue to suffer severe harm given Defendants' brazen disregard of the law. The Court should vacate Defendants' actions and declare them illegal.

## STATEMENT OF FACTS[2]

Pursuant to Federal Rule of Civil Procedure 56(c) and Local Rule 7(h)(1), Plaintiffs are filing herewith a Statement of Undisputed Material Facts ("SOMF"). For purposes of this motion, certain points bear emphasis:

1. Between January and March 2025, Defendants issued three written policies directing the expedited removal of individuals who were previously paroled into the country at a port of entry: the January 23 Huffman Memorandum, Declaration of Hillary Li ("Li Decl.") ¶ 5 & Ex. A, the February 18 ICE Directive, Li Decl. ¶ 8 & Ex. D, and the March 25 CHNV Termination Notice, Li Decl. ¶ 10 & Ex. F (together "the Challenged Directives").

2. In May 2025, Defendants began aggressively implementing the Challenged Directives, including in a nationwide campaign of surprise courthouse arrests of noncitizens attending routine immigration court proceedings. SOMF ¶¶ 64-66. Plaintiffs' members who were paroled into the country were among those arrested, detained, and processed for expedited removal. SOMF ¶ 67.

3. After this Court stayed the Challenged Directives on August 1, 2025, Defendants recognized that the Court's order blocked their ability to subject paroled individuals to expedited removal. SOMF ¶¶ 71-72. However, in October 2025, Defendants began to assert for the first time that they

---

[2] Plaintiffs incorporate by reference their prior briefing and declarations regarding the pertinent background. *See* Dkt. Nos. 22-1, 22-2 – 22-17, 51.

could put certain paroled individuals in expedited removal pursuant to regulations, notwithstanding the August 1 stay and despite never previously applying the regulations in this way. SOMF ¶¶ 59-62, 73; Li Decl. ¶ 4. Since October 2025, the Government resumed subjecting certain parolees to expedited removal. SOMF ¶ 74; Reply Brief for Appellants at 4-5, 26, Doc. 2159516, CHIRLA v. Noem, No. 25-5289 (D.C. Cir. Feb. 17, 2026); Supplemental Declaration of Bianca Torres ("Torres Suppl. Decl.") ¶ 7; Declaration of Elizabeth Hercules-Paez ("Hercules-Paez Decl.") ¶ 14; *see also* Declaration of Dmitry Filimonov ("Filimonov Decl.") ¶¶ 5-6.

4. Defendants' use of expedited removal against paroled individuals is unprecedented. Prior to 2025, Defendants rarely subjected individuals who were paroled into the country to expedited removal, and never *en masse.* SOMF ¶¶ 17, 25, 40, 59-62; Dkt. No. 22-8 ¶ 28; Dkt. No. 22-14 ¶ 14; Filimonov Decl. ¶ 12; Hercules-Paez Decl. ¶ 13; Declaration of Laura Kelley ("Kelley Decl.") ¶ 17. Indeed, Defendants have identified only four pre-2025 instances of paroled individuals being subjected to expedited removal; all four were paroled into the country to face criminal prosecution. SOMF ¶¶ 61-62.

5. Defendants' use of expedited removal against paroled individuals has caused, and continues to cause, severe harm to noncitizens around the country, including Plaintiffs' members who are parole beneficiaries. SOMF ¶¶ 3, 5-16, 21-24, 28, 30-39; Supplemental Declaration of Angelica Salas ("Salas Decl.") ¶¶ 14-23; Supplemental Declaration of Patrice Lawrence ("Lawrence Decl.") ¶¶ 9-14; Supplemental Declaration of George Escobar ("Escobar Decl.") ¶¶ 13-15, 23. Individuals who came to the United States through an established, lawful pathway like the Cuban, Haitian, Nicaraguan, and Venezuelan parole processes ("CHNV"), or who made an appointment on the CBP One mobile application; presented themselves at a port of entry; underwent inspection and were granted parole; and began working and strengthening their communities are now being

detained for prolonged periods of time far from family and counsel, being deprived of the opportunity to pursue immigration relief for which they are eligible, and facing the imminent risk of deportation, including to countries where they are at risk of harm. *See id.*

## STANDARD OF REVIEW

Summary judgment is appropriate if the moving party shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Evidence should be viewed in the light most favorable to the non-moving party. *See, e.g.*, *All. for Nat. Health U.S. v. Sebelius*, 775 F. Supp. 2d 114, 118 (D.D.C. 2011). But to defeat summary judgment, the non-moving party must "'designate specific facts showing that there is a genuine issue for trial.'" *Rafeedie v. INS*, 795 F. Supp. 13, 18 (D.D.C. 1992) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).

In challenges to agency action, the district court "sits as an appellate tribunal." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001). The agency should have "resolve[d] factual issues to arrive at a decision that is supported by the administrative record," so rather than applying the general summary-judgment standard, the "function of the district court is to determine whether . . . the evidence in the administrative record permitted the agency to make the decision it did." *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006). That determination "entire[ly] . . . is a question of law." *Am. Bioscience*, 269 F.3d at 1083. Thus, summary judgment "serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Sierra Club*, 459 F. Supp. 2d at 90; *accord Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Noem*, 793 F. Supp. 3d 19, 59 (D.D.C. 2025). Similarly, "in the context of *ultra vires* . . . claims, there are no questions of fact, because whether or not a statute . . . grants the [executive

branch] the power to act in a certain way is a pure question of law." *Ctr. for Biological Diversity v. McAleenan*, 404 F. Supp. 3d 218, 233 (D.D.C. 2019) (citation omitted).

## ARGUMENT

This motion seeks summary judgment on four independent grounds: (1) the inclusion of paroled individuals in the "arriving alien" definition at 8 C.F.R. § 1.2[3] is contrary to law and should be vacated; and the Challenged Directives should be vacated because they (2) are contrary to law, (3) violated agency procedures, *see United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954), and (4) are arbitrary and capricious.

## I.  PLAINTIFFS HAVE STANDING, THIS COURT HAS JURISDICTION, AND DEFENDANTS' ACTIONS ARE REVIEWABLE

### A.  Plaintiffs Have Standing

Plaintiffs, as membership-based associations, have Article III standing to challenge the "arriving alien" definition at 8 C.F.R. § 1.2 and the Challenged Directives on behalf of their members who are injured by them. *Make the Rd. N.Y. v. Wolf*, 962 F.3d 612, 627-28 (D.C. Cir. 2020) ("*MRNY*"). An association has standing where "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the

---

[3] That regulation defines "arriving alien" as "an applicant for admission coming or attempting to come into the United States at a port-of-entry, or an alien seeking transit through the United States at a port-of-entry, or an alien interdicted in international or United States waters and brought into the United States by any means, whether or not to a designated port-of-entry, and regardless of the means of transport. An arriving alien remains an arriving alien even if paroled pursuant to section 212(d)(5) of the Act, and even after any such parole is terminated or revoked. However, an arriving alien who was paroled into the United States before April 1, 1997, or who was paroled into the United States on or after April 1, 1997, pursuant to a grant of advance parole which the alien applied for and obtained in the United States prior to the alien's departure from and return to the United States, will not be treated, solely by reason of that grant of parole, as an arriving alien under section 235(b)(1)(A)(i) of the Act.".

organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Am. Chem. Council v. Dep't of Transp.*, 468 F.3d 810, 815 (D.C. Cir. 2006) (citation and internal quotation marks omitted). Here, there is no dispute that each Plaintiff "is a membership organization that advocates on behalf of its members in immigrant communities and that includes among its members individuals directly covered by the new expedited removal" policies and the regulatory definition such that the interests they seek to protect are germane to their purpose. *MNRY*, 962 F.3d at 621; SOMF ¶¶ 4, 19, 29. Nor is there any dispute that participation of individual members in the lawsuit is unnecessary, as neither the claims nor requests for relief "require[] individualized proof and . . . are thus properly resolved in a group context." *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 344 (1977).

Plaintiffs' members would have standing to sue in their own right. At least one member of each Plaintiff organization has suffered a "concrete and particularized" injury which is "actual or imminent," "fairly traceable to the challenged action of the defendant," and is "likely, as opposed to merely speculative, [to] be redressed by a favorable decision." *Am. Chem. Council*, 468 F.3d at 815 (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1993)). Plaintiffs have presented evidence both that specific members and their members more generally have suffered the "recognized harm" of being "depriv[ed] . . . of the more robust procedural protections afforded in regular removal proceedings," *MRNY*, 962 F.3d at 622, and the harms stemming from the lack of protections, such as detention, family separation, and emotional distress. *See, e.g.*, SOMF ¶¶ 22-23 (UndocuBlack member J.P.'s detention upon placement in expedited removal proceedings); ¶ 37 (CASA member D.R.C.'s separation from her husband upon her detention); ¶ 15 (CHIRLA member J.L.'s fear of detention and of persecution in Venezuela if removed). For those members who have been put into expedited removal proceedings, that harm has been and continues to be

realized. For others, the harm is imminent, as they are at risk of being put into expedited removal proceedings at any moment. *See, e.g.*, SOMF ¶¶ 24, 33, 37 (discussing Plaintiffs' members who have been paroled into the country, some of whom have had their parole status terminated). There is nothing "speculative about a threatened injury if the one who makes the threat simultaneously and unequivocally states that he intends to inflict the threatened harm as soon as possible and without further warning on such individuals," *MNRY*, 962 F.3d at 622 (internal quotation marks omitted), as Defendants have done in issuing the Challenged Directives and subjecting paroled individuals to expedited removal pursuant to those directives and 8 C.F.R. § 235.3(b)(1)(i).

Defendants have not disputed Plaintiffs' asserted injuries or their traceability to the Challenged Directives. *See* Dkt. No. 41 at 33; Dkt. No. 26 at 31. Nor could they. Plaintiffs have developed a record showing that their members have experienced the type of harm recognized to establish standing, and there is no question that the Challenged Directives have been applied to Plaintiffs' members. *See* SOMF ¶ 6 (CHIRLA member E.I.R.M. placed in expedited removal proceedings in March 2025); ¶ 23 (UndocuBlack member J.P. placed in expedited removal proceedings in July 2025); ¶¶ 31, 36, 39 (CASA members E.M.P., O.L.C., and D.L.C. placed in expedited removal proceedings in May 2025). After this Court's stay of the Challenged Directives, Defendants have resumed the same practice on a new legal basis, continuing to expose and target Plaintiffs' members for expedited removal, *see, e.g.,* SOMF ¶¶ 5-9 (CHIRLA member at imminent risk of expedited removal given dismissal of immigration appeal in October 2025), ¶ 14 (same, due to dismissal of appeal in December 2025), ¶ 37 (CASA member whose husband was removed through expedited removal remains detained and subject to expedited removal), so the injury is traceable to the regulation as well. Because Plaintiffs' injuries are the result of Defendants' action, and "'not . . . of the independent action of some third party not before the court,'" *Lujan*, 504 U.S.

7

at 562 (brackets omitted) (quoting *Simon v. Eastern Ky. Welfare Rts. Org.*, 426 U.S. 26, 41-42 (1976)), Plaintiffs have established traceability.

Plaintiffs' injuries would be redressed by the relief they seek. *See Ctr. for Biological Diversity v. EPA*, 861 F.3d 174, 183 (D.C. Cir. 2017). This Court has held that vacating the Challenged Directives would redress at least part of Plaintiffs' injuries, Dkt. No. 41 at 36, as Defendants cannot rebut Plaintiffs' robust record showing DHS only began to apply expedited removal to parolees (except for a few noncitizens paroled in solely for criminal prosecution) since the Challenged Directives, *id.* at 34; SOMF ¶¶ 62-68. This Court can also redress injuries caused by 8 C.F.R. § 1.2. Plaintiffs seek an order declaring that the inclusion of paroled individuals in the definition of "arriving aliens" in 8 C.F.R. § 1.2 conflicts with the Immigration and Nationality Act ("INA") and is *ultra vires* and permanently vacating that inclusion. Such an order would prevent Defendants from treating Plaintiffs' paroled members as "arriving aliens," including in connection with expedited removal proceedings initiated under 8 C.F.R. § 235.3(b)(1)(i). This would directly redress Plaintiffs' members' ongoing injuries even during the current stay—at that point, there would be no basis whatsoever to subject parolees to expedited removal—and establishes Plaintiffs' standing. *See Nat'l Parks Conservation Ass'n v. Manson*, 414 F.3d 1, 7 (D.C. Cir. 2005) ("A significant increase in the likelihood that the plaintiff would obtain relief that directly redresses the injury suffered will suffice for standing.") (citation and internal quotation marks omitted).

**B.  Plaintiffs Fall Within the Relevant Zone of Interests**

As this Court has already determined, Dkt. No. 41 at 41-44, Plaintiffs assert interests of themselves and their members that fall well within the zone of interests protected by the INA. The zone-of-interests test "forecloses suit only when a plaintiff's interests" are "marginally related to or inconsistent with the purposes implicit in the statute." *Lexmark Int'l, Inc. v. Static Control*

*Components, Inc.*, 572 U.S. 118, 130 (2014) (internal quotation marks omitted). Plaintiffs' interests in serving their members who were paroled into the country under different humanitarian parole processes, and their members' interests in not being unlawfully subjected to expedited removal, easily clear that bar. *See id.; see also Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012) (noting that the zone-of-interests test is "not meant to be especially demanding" in light of "Congress's evident intent when enacting the APA to make agency action presumptively reviewable." (internal quotation marks omitted)).

## C. Plaintiffs' Challenge Is Timely

As the Court previously held, Plaintiffs' claims as to the Challenged Directives were filed within the time limit set by 8 U.S.C. § 1252(e)(3)(B). Dkt. No. 41 at 40. This Court also has jurisdiction to review Plaintiffs' claim as to 8 C.F.R. § 1.2, because their injuries only accrued last year and are subject to the general six-year statute of limitations for challenges brought against the federal government. The provisions of 8 U.S.C. § 1252(a)(2)(A), which limit judicial review of certain specified matters "relating to section 1225(b)(1)," do not apply to 8 C.F.R. § 1.2. Plaintiffs' challenge to the inclusion of parolees in the definition of the term "arriving alien" does not involve a challenge to an order of removal, a decision to invoke the expedited removal authority, the application of expedited removal to any individual noncitizen, or any agency procedures or policies implementing expedited removal. *See* 8 U.S.C. § 1252(a)(2)(A)(i)-(iv).

Defendants are likely to contend that 8 U.S.C. § 1252(a)(2)(A) bars review of Plaintiffs' APA challenge to the inclusion of parolees in the "arriving alien" definition at Section § 1.2. That contention is wrong for the reasons set forth above. But even accepting Defendants' argument, and in the alternative, this Court has jurisdiction under 8 U.S.C. § 1252(e)(3)(A), which provides for

judicial review of regulations implementing expedited removal, and the suit was timely filed under 8 U.S.C. § 1252(e)(3)(B) given longstanding principles of equitable tolling.

### 1. 8 U.S.C. § 1252(a)(2)(A) does not prevent this Court from reviewing Plaintiffs' claim as to the "arriving alien" definition in 8 C.F.R. § 1.2.

This Court has jurisdiction to consider Plaintiffs' APA claim that Section 1.2's definition of "arriving alien" is not in accordance with law. Plaintiffs' challenge is subject to the six-year statute of limitations that applies to all civil claims brought against the federal government. 28 U.S.C. § 2401(a); *see also Corner Post, Inc. v. Bd. of Governors of Fed. Reserve Sys.*, 603 U.S. 799, 808 (2024) (observing that 28 U.S.C. § 2401(a) "applies generally to suits against the United States unless the timing provision of a more specific statute displaces it"). As the Supreme Court held in *Corner Post*, an APA claim accrues only "when the plaintiff has a 'complete and present cause of action'—*i.e.*, when she has the right to 'file suit and obtain relief'"—and for an APA plaintiff, this only occurs when the plaintiff "suffers an injury from final agency action." 603 U.S. at 809 (quoting *Green v. Brennan*, 578 U.S. 547, 554 (2016)). Accordingly, "the statute of limitations does not begin to run until [the plaintiff] is injured." *Id.*

Plaintiffs' suit is timely. Plaintiffs' cause of action as to Section 1.2 did not accrue until they suffered injury, *see id.*, from the inclusion of parolees in the regulation, and it is indisputable that they only suffered that injury in the past year, when Defendants began using Section 1.2's definition of "arriving alien" to subject Plaintiffs' members to expedited removal under 8 C.F.R. § 235.3(b). *See* SOMF ¶¶ 10, 18, 31 (Plaintiffs' members who were previously paroled into the United States at a port of entry were first subjected to expedited removal in 2025); Escobar Suppl. Decl. ¶ 16 (prior to 2025, CASA had not encountered a paroled member or other paroled individual who was put into expedited removal proceedings); Salas Suppl. Decl. ¶ 12 (same as to CHIRLA);

Lawrence Suppl. Decl. ¶ 10 (same as to UndocuBlack, which was incorporated fewer than six years before filing suit, just like the *Corner Post* plaintiff).

None of the provisions of 8 U.S.C. § 1252(a)(2)(A) apply to limit judicial review of Plaintiffs' challenge to 8 C.F.R. § 1.2. Section 1252(a)(2) identifies "[m]atters not subject to judicial review," and 8 U.S.C. § 1252(a)(2)(A) generally places limits on judicial review of certain claims "relating to" expedited removal, setting out four categories of claims that, with certain exceptions, "no court shall have jurisdiction to review":

> (i)    except as provided in subsection (e), any individual determination or to entertain any other cause or claim arising from or relating to the implementation of operation of any order of removal pursuant to section 1225(b)(1) of this title,

> (ii)   except as provided in subsection (e), a decision by the Attorney General to invoke the provisions of such section,

> (iii)  the application of such section to individual aliens, including the determination made under section 1225(b)(1)(B) of this title, or

> (iv)   except as provided in subsection (e), procedures and policies adopted by the Attorney General to implement the provisions of section 1225(b)(1) of this title.

8 U.S.C. § 1252(a)(2)(A). None of these provisions applies to Plaintiffs' claim that 8 C.F.R. § 1.2's definition of "arriving alien" is contrary to law insofar as it includes noncitizens previously paroled into the country. Section 1.2 does not concern any individual expedited removal order, and it is not a regulation that "relat[es]" to, "implement[s]," or reflects a "decision . . . to invoke" the expedited removal provision of § 1225(b)(1). It is merely a glossary provision defining 32 terms for use across Chapter 1 of Section 8 of the Code of Federal Regulations, which itself broadly governs the immigration and nationality functions of the federal government, ranging from the admission of noncitizens to removal procedures to naturalization procedures. The term whose definition Plaintiffs challenge—"arriving alien"—is one of general applicability, used in multiple other

provisions of the Code of Federal Regulations for a broad variety of purposes entirely unrelated to expedited removal.[4]

Indeed, Plaintiffs' claim "presents neither a challenge to a removal order nor a challenge to the statutory or regulatory system for expedited removal." *O.A. v. Trump*, 404 F. Supp. 3d 109, 140-41 (D.D.C. 2019). Accordingly, "§1252—as a whole—does not apply." *Id.* at 141 (holding that Plaintiffs' challenge to the first Trump Administration's so-called Asylum Ban was a "facial challenge to a rule governing eligibility for asylum" not subject to 8 U.S.C. § 1252, even though the Ban indirectly implicated the expedited removal provision because it amended the regulation governing credible fear determinations in expedited removal proceedings); *cf. Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians*, 567 U.S. at 216 ("When a statute is not addressed to the type of grievance which the plaintiff seeks to assert, then the statute cannot prevent an APA suit." (citation and internal punctuation omitted)).

### 2. Even if 8 U.S.C. § 1252(a)(2)(A) and (e)(3)(B) apply to 8 C.F.R. § 1.2, the 60-day filing requirement is a non-jurisdictional time bar that should be equitably tolled.

Plaintiffs maintain that 8 C.F.R. § 1.2 is only a definitional regulation that does not "implement" the expedited removal statute or otherwise implicate § 1252(a)(2)(A)'s bars on judicial review. As a result, the savings clause in § 1252(a)(2)(A) pointing to subsection (e) is not needed to preserve judicial review and § 1252(e)(3)'s 60-day filing requirement is similarly irrelevant. But even assuming, *arguendo*, that Plaintiffs' claim as to 8 C.F.R. § 1.2 falls within the ambit of 8 U.S.C. § 1252(a)(2)(A), that section generally permits judicial review "as provided in" 8 U.S.C. § 1252(e), which applies a 60-day filing requirement to lawsuits claiming that a

---

[4] *See, e.g.*, 8 C.F.R. § 211.1 (documents required of an "arriving alien applying for admission"); § 239.1 (authority to issue a notice to appear to an "arriving alien at a port-of-entry"); § 241.15 (conditions for removing "an arriving alien" to a third country).

"regulation" issued "to implement" § 1225(b) is "not consistent with applicable provisions of this subchapter or is otherwise in violation of law." 8 U.S.C. § 1252(e)(3)(A), (B). That 60-day filing requirement is non-jurisdictional, subject to equitable tolling, and should be tolled here.

The Supreme Court has "made plain that most time bars are nonjurisdictional." *United States v. Kwai Fun Wong*, 575 U.S. 402, 410 (2015). Time bars generally "'seek to promote the orderly progress of litigation,' . . . not deprive a court of authority to hear a case." *Id.* (quoting *Henderson v. Shinseki*, 562 U.S. 428, 435 (2011)); *see also Sebelius v. Auburn Reg'l Med. Ctr.*, 568 U.S. 145, 154-55 (2013) (collecting cases where the Supreme Court has "repeatedly held that filing deadlines ordinarily are not jurisdictional" and "described them as 'quintessential claim-processing rules'" (citation omitted)). Indeed, in the past two decades, the Supreme Court has identified only "one exception"—under circumstances that do not apply here. *Riley v. Bondi*, 606 U.S. 259, 275 (2025). Plaintiffs recognize that the D.C. Circuit has previously held that Section 1252(e)(3)(B)'s deadline is jurisdictional. *See M.M.V. v. Garland*, 1 F.4th 1100, 1109 (D.C. Cir. 2021); *Am. Immigration Lawyers Ass'n v. Reno*, 18 F. Supp. 2d 38, 47 (D.D.C. 1998), *aff'd*, 199 F.3d 1352, 1357 (D.C. Cir. 2000) ("*AILA*"). But as discussed below, the Supreme Court has subsequently held that this type of tenuous connection between jurisdictional terms and a time limit is insufficient to make the latter jurisdictional. These subsequent cases "eviscerate" and "effectively overrule" the D.C. Circuit's prior rulings in *M.M.V.* and *AILA*. *Alpine Sec. Corp. v. FINRA*, 121 F.4th 1314, 1334 (D.C. Cir. 2024).

A time bar is "jurisdictional only if Congress 'clearly states' that it is." *Harrow v. Dep't of Defense*, 601 U.S. 480, 484 (2024) (quoting *Boechler, P.C. v. Comm'r*, 596 U.S. 199, 203 (2022)). The provision must, through traditional statutory interpretation, "*plainly* show that Congress imbued a procedural bar with jurisdictional consequences." *Boechler*, 596 U.S. at 203 (emphasis

added) (quoting *Kwai Fun Wong*, 575 U.S. at 410). It is insufficient for a jurisdictional interpretation to be *a* plausible interpretation, among other plausible non-jurisdictional interpretations. *See id.* at 204-06. The evidence that a provision acts as a jurisdictional bar must be "exceedingly strong." *Riley*, 606 U.S. at 274. For instance, in the "one exception" where the Supreme Court held a time limit was jurisdictional, not only had the time limit been considered jurisdictional for over a century, *see id*. at 275-76 (citing *John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 138 (2008)), but the statutory text itself was written in jurisdictional terms, providing that "[e]very claim of which the United States Court of Federal Claims *has jurisdiction* shall be barred unless the petition thereon is filed within six years after such claim first accrues." *John R. Sand*, 552 U.S. at 132, 135 (quoting 28 U.S.C. § 2501).

The Supreme Court sets this "high bar" because jurisdictional requirements are "absolute bars to judicial action." *Harrow*, 601 U.S. at 484, 488. Particularly in this case, the Court's statutory interpretation should factor in the "strong presumption that Congress intends judicial review of administrative action," *Bowen v. Mich. Acad. of Fam. Physicians*, 476 U.S. 667, 670 (1986); *see also INS v. St. Cyr*, 533 U.S. 289, 298 (2001), which is overcome "only upon a showing of clear and convincing evidence of a contrary legislative intent," *Bd. of Governors of Fed. Reserve Sys. v. MCorp. Fin., Inc.*, 502 U.S. 32, 44 (1991) (internal quotation marks omitted). Moreover, ambiguity in immigration statutes have long been resolved in favor of the noncitizen, considering that removal from the country is a "drastic measure." *Fong Haw Tan v. Phelan*, 333 U.S. 6, 10 (1948); *Castillo v. Bondi*, 140 F.4th 777, 781 (6th Cir. 2025) (Sutton, C.J.) (collecting cases); *see also Henderson*, 562 U.S. at 441 (applying a similar canon construing beneficiary provisions in favor of Members of the Armed Services to find no clear indication that a statutory deadline for such filing appeals regarding benefits "was intended to carry . . . harsh [jurisdictional] consequences").

14

The time limit in § 1252(e)(3)(B) lacks the kind of clear jurisdictional statement necessary to foreclose Plaintiffs' claims. The prior subparagraph at § 1252(e)(3)(A) is titled "In general," and describes the "availab[ility] and "limit[s]" of judicial review of challenges to expedited removal. None of those "limit[s]" concern time of filing. *See* 8 U.S.C. § 1252(e)(3)(A)(i)–(ii). While other provisions of Section 1252 (such as Sections 1252(a)(2)(A), (a)(2)(B), (a)(2)(C), (b)(9), and (g)) may explicitly "speak[] to a court's authority to hear a case," *Harrow*, 601 U.S. at 485, Section 1252(e)(3)(B) does not. Rather, Section 1252(e)(3)(B) sets forth a filing deadline, per its subsection title, "Deadlines for bringing actions," and its text, which states that "[a]ny action instituted under this paragraph must be filed no later than 60 days after the date" the challenged regulation is first implemented. It is an "entirely separate provision" from any of the provisions addressing jurisdiction. *Zipes v. TWA*, 455 U.S. 385, 393-94 (1982); *see also Kwai Fun Wong*, 575 U.S. at 411 (collecting cases "explain[ing] that Congress's separation of a filing deadline from a jurisdictional grant indicates that the time bar is not jurisdictional"). Section 1252(e)(3)(B)'s "Deadlines" provision "on its own, does not deprive [the court] of power to hear [the claim]." *Harrow*, 601 U.S. at 486. It states what litigants must do, "but it provides no directives to courts." *Riley*, 606 U.S. at 274 (holding that § 1252(b)(1), which uses the same language as § 1252(e)(3)(B), is non-jurisdictional); *see also Harrow*, 601 U.S. at 485 (holding that a provision stating that a petition for review "shall be filed within 60 days" is non-jurisdictional). The INA has many "other sections in which the deadline could have been housed" or whose explicit terms § 1252(e)(3)(B) could have used if indeed "it had been meant to have jurisdictional status," *Riley*, 606 U.S. at 274. In juxtaposition to those sections, there is no indication that the deadline does anything other than "promote the orderly progress of litigation by requiring that the parties take

certain procedural steps at certain specified times." *Henderson*, 562 U.S. at 435 (describing non-jurisdictional "claim-processing rules").

The Supreme Court's reasoning in *Boechler*, *Harrow*, and *Riley* eviscerates the D.C. Circuit's precedent holding that § 1252(b)(3)(B) is jurisdictional. That D.C. Circuit precedent rested on § 1252(a)(2)(A), which provides that "no court shall have jurisdiction to review"— "except as provided in [§ 1252(e)]"—certain agency actions related to expedited removal. Section 1252(a)(2) might seem to "condition[] jurisdiction on satisfaction of the requirements of [§ 1252(e)]," including the 60-day time limit. *M.M.V.*, 1 F.4th at 1109. According to the D.C. Circuit, this met the clear-statement rule. *See id.* (stating the rule is "satisfied if the statute expressly . . . 'conditions the jurisdictional grant on the limitations period'") (citation omitted).[5] But the Supreme Court subsequently has definitively rejected such an interpretation.

In *Boechler, P.C. v. Commissioner*, 596 U.S. 199 (2022), the Supreme Court considered a provision that states a taxpayer "may, within 30 days . . . petition the Tax Court for review of such determination (and the Tax Court shall have jurisdiction with respect to such matter)." *Id.* at 204 (quoting 26 U.S.C. § 6330(d)(1)). The government argued that "such matter" referred not only to the petition but also to the 30-day deadline, meaning the Tax Court would have jurisdiction only over timely-filed petitions. *Id.* The Supreme Court acknowledged this was a plausible reading but held it was not the only one—and therefore was not a jurisdictional bar. *Id.* "Where multiple plausible interpretations exist—only one of which is jurisdictional—it is difficult to make the case that the jurisdictional reading is clear." *Id.* at 205.

---

[5] The "reasoning in *AILA* is . . . sparse" to begin with, *Vijender v. Wolf*, No. 19-cv-3337, 2020 WL 1935556, at *3 (D.D.C. Apr. 22, 2020), and courts have called it into question over the years. *See, e.g.*, *Kiakombua v. Wolf*, 498 F. Supp. 3d 1, 35 (D.D.C. 2020) (K.B. Jackson, J.) (stating it "is not at all clear" that Section 1252(e)(3)(B) is jurisdictional "given that [it] does not speak in jurisdictional terms").

And in *Harrow v. Department of Defense*, 601 U.S. 480 (2024), the Supreme Court rejected the approach the D.C. Circuit took in *M.M.V.*: treating a time limit as jurisdictional because a separate jurisdictional provision cross-references the statute containing it. The jurisdictional provision at issue in *Harrow* granted the Federal Circuit subject-matter jurisdiction over "an appeal . . . pursuant to [5 U.S.C. § 7703(b)(1)]." That cross-referenced section, in turn, governs "[j]udicial review of decisions of the Merit Systems Protection Board" and includes a 60-day filing deadline. The government argued that "pursuant to" can only mean "in 'conformance to' or 'compliance with,'" such that the deadline was baked into the jurisdictional grant. *Harrow*, 601 U.S. at 486. The Court disagreed. Reading "pursuant to" that way throughout the statute would make a "jumble of procedural rules . . . turn on and off the Federal Circuit's power." *Id.* at 488.

In *Riley v. Bondi*, 606 U.S. 259 (2025), the Supreme Court held that a parallel time limit in the INA is a non-jurisdictional claims-processing rule. Section 1252(b)(1) provides that a "petition for review must be filed not later than 30 days after the date of the final order of removal." 8 U.S.C. § 1252(b)(1). Similar to the D.C. Circuit's reading of § 1252(a)(2) and § 1252(e)(3)(B) in *M.M.V.*, lower courts had previously held that § 1252(b)(1)'s 30-day time limit is jurisdictional by looking to a separate provision, § 1252(a)(1), which limits "[j]udicial review of a final order of removal . . . except as provided in [§ 1252(b)]." Courts had read it to mean that judicial review is "subject to the 'requirements' 'provided in [§ 1252(b)],'" including the 30-day time limit at § 1252(b)(1). *Bhaktibhai-Patel v. Garland*, 32 F.4th 180, 187-89 (2d Cir. 2022); *see also Vijender v. Wolf*, No. 19-cv-3337 (APM), 2020 WL 1935556, at *3 (D.D.C. Apr. 22, 2020) (pointing to cases holding that § 1252(b)(1) is jurisdictional as "evidence that § 1252(e)(3)(B) is jurisdictional, too"). The Supreme Court, though, expressly held that no clear statement conferred § 1252(b)(1) with jurisdictional status. *See Riley*, 606 U.S. at 274. The language "must be filed not later than 30 days"

does not speak to the authority of courts, and "[n]either the particular subsection nor the broader section in which the deadline is placed concerns jurisdiction." *Id*. The Supreme Court's holding directly abrogated courts' prior statutory interpretation of Section 1252. *See, e.g.*, *Castejon-Paz v. Bondi*, 143 F.4th 116, 118 (2d Cir. 2025) (recognizing that *Riley* abrogated the law of the circuit).

As the time limit in § 1252(e)(3)(B) is nonjurisdictional, it can be equitably tolled. Tolling, which "must be applied flexibly, case by case," *Menominee Indian Tribe of Wis. v. United States*, 764 F.3d 51, 58 (D.C. Cir. 2014), is warranted here because Plaintiffs "pursu[ed] [their] rights diligently" and an "extraordinary circumstance stood in [their] way," *Nelson v. SEC*, 138 F.4th 514, 523 (D.C. Cir. 2025) (citing *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005)). Plaintiffs diligently pursued their rights upon being harmed by the unauthorized inclusion of paroled noncitizens in the "arriving alien" definition in 8 C.F.R. § 1.2, bringing this challenge swiftly following the Challenged Directives and the new exposure of their members to expedited removal. *See* SOMF ¶¶ 13, 21, 34 (Plaintiffs' members who came into the country on parole were first subjected to expedited removal in 2025). And an "extraordinary circumstance" prevented them from suing earlier, as any suit filed prior to the Challenged Directives would have failed for lack of standing or ripeness. This is because outside of a handful of criminal cases, the government did not begin subjecting paroled individuals to expedited removal until the Challenged Directives, and did not begin to rely upon 8 C.F.R. § 235.3(b)(1)(i) and the inclusion of parolees in 8 C.F.R. § 1.2's "arriving alien" definition to do so until after the D.C. Circuit denied Defendants' motion for a stay pending appeal of this Court's order staying the Challenged Directives. SOMF ¶¶ 71-72.

## II. THE INCLUSION OF PAROLED INDIVIDUALS IN THE DEFINITION OF "ARRIVING ALIEN" IN 8 C.F.R. § 1.2 IS CONTRARY TO LAW

The APA directs the reviewing court to "hold unlawful and set aside" agency action that is "not in accordance with law," 5 U.S.C. § 706(2)(A), or "in excess of statutory . . . authority." 5

18

U.S.C. § 706(2)(C). A reviewing court "must exercise [its] independent judgment" in interpreting the statutory text. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412-13 (2024).

The inclusion of paroled individuals in the "arriving alien" regulatory definition is based on an incorrect legal interpretation of the INA. The regulation, 8 C.F.R. § 1.2, defines "arriving alien" to include several categories of noncitizens in the process of physically coming or attempting to come into the United States: applicants for admission "coming or attempting to come into the United States at a port-of-entry," noncitizens "seeking transit through the United States at a port-of-entry," and noncitizens "interdicted in international or United States waters [who are] brought into the United States." The definition then includes one (and only one) category of noncitizens no longer in the process of coming in: noncitizens who completed the act of physically coming into the country and who are now present in the country pursuant to a grant of parole.

But paroled individuals are not "arriving." The plain meaning of the term "arriving," its use throughout immigration law, the unlawful consequences that follow the unauthorized inclusion of parolees in the "arriving alien" definition, and relevant legislative and regulatory history make clear that Section 1.2's inclusion of paroled individuals as "arriving aliens" is not in accordance with law. This definition is unlawful and cannot stand under the APA. *See Loper Bright Enters.*, 603 U.S. at 391; *accord SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943).

***Statutory scheme and the use of "arriving."*** The INA does not define "arriving," or any form of the term, *see* 8 U.S.C. § 1101, but "arrive," "arriving," and "arrival" are used throughout the statutory scheme. Where the statute itself does not provide a definition, interpretation begins with a term's "plain, everyday meaning." *United States v. Alford*, 89 F.4th 943, 949 (D.C. Cir. 2024). As this Court previously assessed, "arrive" means "to reach a destination" or "to make an appearance." Dkt. No. 41 at 59 (citing *Merriam-Webster's Collegiate Dictionary* (1996) and

*Oxford English Reference Dictionary* (2016)). The use of the present progressive tense, "is arriving," signals that an action is temporary but currently occurring. *Garner's Modern American Usage* 852 (2003) ("In the progressive or continuous aspect of a verb, the form denotes that an action is ongoing."); *see also Lopez Benitez v. Francis*, 795 F. Supp. 3d 475, 488 (S.D.N.Y. 2025) (finding Government's interpretation "simply ignores the statute's present-tense active language" and citing *Matter of M-D-C-V-*, 28 I. & N. Dec. 18, 23 (BIA 2020) ("The 'use of the present progressive, like use of the present participle, denotes an ongoing process.'")). Per the ordinary meaning, an "arriving alien" is a noncitizen in the process of reaching their destination. Dkt. No. 41 at 59. Defendants themselves are currently arguing for this same definition before the Supreme Court, where they define the term "arrives in the United States" in 8 U.S.C. § 1158(a) (on the right to apply for asylum) as referring to when a person "comes within the limits or bounds of the United States." Brief for the Petitioners at 14-15, *Noem v. Al Otro Lado*, No. 25-5 (U.S. Jan. 6, 2026)[6] (defining the verb "arrive" per the *Oxford English Dictionary* to mean "[t]o come to the end of a journey, to a destination, or to some definite place" and "in" to mean "[w]ithin the limits or bounds of."). As the Government argues in *Al Otro Lado*: "[c]ommon usage confirms that English speakers use 'arrive in' to mean entering a specified location." *Id.* at 15.[7]

The uses of "arrive," or a form thereof, in other provisions throughout the INA confirm that the term refers to people in the process of physically coming into the country, not individuals already present in the United States. *Nat'l Postal Pol'y Council v. Postal Regul. Comm'n*, 17 F.4th 1184, 1191 (D.C. Cir. 2021) ("[a] standard principle of statutory construction provides that

---

[6]    Brief    available    at    https://www.supremecourt.gov/DocketPDF/25/25-5/390940/20260106152523401_25-5AlOtroLadoPetBr.pdf.

[7] Plaintiffs take no position regarding whether a noncitizen on the threshold of entering the country "arrives in" the country, but do agree with the government's position in *Al Otro Lado* that once the noncitizen has come within the limits or bounds of the United States, arrival is complete.

identical words and phrases within the same statute should normally be given the same meaning.") (citation omitted). For example, 8 U.S.C. § 1221(a) requires manifests be provided to border officers for commercial aircrafts transporting people from outside the United States to "any seaport or airport of the United States," "prior to arrival at that port." Similarly, 8 U.S.C. § 1281(a) requires lists of "alien crewmen" to be provided to an immigration officer at the port of arrival "[u]pon arrival of any vessel of aircraft in the United States from any place outside the United States." There are many other similar references in the INA. *See, e.g.*, 8 U.S.C. § 1225(d)(2) (authorizing the detention of noncitizens arriving on the "vessel or aircraft bringing" the noncitizen to the United States or at the "airport of arrival"); 8 U.S.C. § 1225(b)(2)(C) (authorizing returning a noncitizen "who is arriving on land (whether or not at a designated port of arrival)" to a contiguous territory pending section 240 proceedings); 8 U.S.C. § 1225(b)(1)(F) (exempting from expedited removal a noncitizen of a Western Hemisphere country with whose government the United States lacks full diplomatic relations "who arrives by aircraft at a port of entry.").

Congress has used "arriving" to refer to noncitizens coming to the United States at a port of entry in the immigration laws since as far back as 1875. *See,* Page Act of 1875, ch. 141, § 5, 18 Stat. 477, 477-78 (1875) (requiring the inspection of every vessel "arriving in the United States" at the "port at which it arrives," and prohibiting the disembarkation of any noncitizen pending such inspection). The Immigration Act of 1917 mandated the inspection of all noncitizens "upon the arrival at a port of the United States of any vessel bringing [such noncitizens]," as well as physical and mental examinations of "[a]ll aliens arriving at ports of the United States." Pub. L. No. 64-301, ch. 29, §§ 15, 16, 39 Stat. 874, 884-86 (1917). And the Immigration and Nationality Act of 1952 directed that "[a]ll aliens arriving at ports of the United States shall be examined by one or more immigration officers at the discretion of the Attorney General and under such regulations as

21

he may prescribe." Pub. L. No. 82-414, ch. 477, § 235(a), 66 Stat. 163, 198-99 (1952). *Accord M-D-C-V-*, 28 I. & N. Dec. at 24 (recognizing that the term "arriving alien" has never been defined by Congress, but "has traditionally referred to aliens who appear at a port of entry.").

Given this longstanding understanding of "arriving," it is clear that paroled individuals like Plaintiffs' members—who previously reached their destination (the United States) by coming to a port of entry and being paroled into the United States, where they have since resided—are *not* now arriving in the United States. *See* Dkt. No. 41 at 59.[8] Indeed, Congress has for decades referred to parolees in adjustment of status statutes as having "arrived in the United States" or as having a "date of arrival in the United States." *See, e.g.*, Pub. L. No. 95-145, § 102, 91 Stat. 1223 (1977) (establishing a record of permanent residence for Indochinese parolees based upon "the date of the alien's arrival in the United States"); Pub. L. No. 85-559, § 2, 66 Stat. 182 (1958) (authorizing Hungarian parolees to adjust status and referring to their date and time of "arrival" in the United States); Pub. L. No. 89-732, § 2, 79 Stat. 919 (1966) (authorizing Cuban parolees to adjust status and referring to their date of "arrival" and the "date the alien originally arrived in the United States as a nonimmigrant or as a parolee"). Federal courts and the Board of Immigration Appeals have also long understood parolees to have already arrived in the country. *See, e.g.*, *Leng May Ma v. Barber*, 357 U.S. 185, 186 (1958) (describing a noncitizen paroled at a port of entry as having

---

[8] *See Kirboga v. LaRose*, No. 25-cv-3706, 2025 WL 3779426, at *10 (S.D. Cal. Dec. 31, 2025) (finding Petitioner could not be subject to § 1225 because "Petitioner is no longer an 'arriving' noncitizen after having resided [in the U.S.] for over a year"); *Khogiani v. Raycraft*, No. 25-cv13744, 2025 WL 3753532, at *3 (E.D. Mich. Dec. 29, 2025); *E.V. v. Raycraft*, No. 4:25-cv-2069, 2025 WL 2938594, at *14 (N.D. Ohio Oct. 16, 2025); *Munoz Materano v. Arteta*, 804 F. Supp. 3d 395, 404, 406-08 (S.D.N.Y. 2025); *see also Bollat Vasquez v. Wolf*, 460 F. Supp. 3d 99, 111 (D. Mass. 2020) ("Under the statutory language, if [noncitizen] applicants [for admission] are apprehended while crossing the border (whether or not at a check point), they are 'arriving' applicants under the statute, and if apprehended at some point thereafter, they are not 'arriving,' but rather 'alien[s] present in the United States who [have] not been admitted.'" (quoting 8 U.S.C. § 1225(a)(1)) (last two alterations in original)).

"arrived in this country"); *Matter of O-*, 16 I. & N. Dec. 344, 351-52 (BIA 1977) (describing persons evacuated from Vietnam to Guam as having made an "arrival" and having been "paroled into the United States"); *Matter of R-*, 3 I. & N. Dec. 45, 45 (BIA 1947) (reaffirming the parole of an excludable mother and daughter who "arrived in the United States" on the date they came to the port of New York and applied for admission).[9]

The inclusion of paroled individuals in the regulatory definition of "arriving alien" therefore violates the INA, because it sweeps in a whole category of people who are clearly not "arriving." There is no statutory support for the inclusion, and it runs counter to decades of Congressional enactments, federal case law, and agency case law and practice.

***Further unlawful consequences.*** That 8 C.F.R. § 1.2's definition is contrary to law is confirmed by where it leads. Including parolees in the definition produces at least three consequences that the INA does not authorize. First, a separate regulation (8 C.F.R. § 235.3(b)(1)(i)) uses the "arriving alien" definition to demarcate who is amenable to expedited removal under 8 U.S.C. § 1225(b)(1)(A)(i). Because § 1.2 sweeps parolees into that definition, it exposes them to expedited removal even though—as this Court already held—they are not "arriving in the United States" under Section 1225(b)(1)(A)(i). Dkt. No. 41 at 57-65; *see infra* at Section III. A regulatory definition that produces results the statute forbids is an unlawful one.

---

[9] Defendants' own asylum regulation implementing a statutory filing deadline is inconsistent with treating parolees as perpetually "arriving." The one-year asylum filing deadline runs from "the date of the alien's arrival in the United States." 8 U.S.C. § 1158(a)(2)(B). An otherwise untimely application may be excused based on "extraordinary circumstances relating to the delay." *Id.* § 1158(a)(2)(D). The agency's implementing regulation treats the maintenance of parole status "until a reasonable period before the filing of the asylum application" as such a circumstance. 8 C.F.R. § 208.4(a)(5)(iv). That regulation only works by recognizing that the date on which the parolee physically came into the country constitutes a date of arrival from which the one-year deadline begins to run—the act of arriving is not a perpetual status that never triggers the start of the clock.

Second, including paroled individuals in the definition of "arriving alien" leads to the "oddity" that this Court previously recognized. Dkt. No. 41 at 63-64. By including parolees in the regulatory definition, Defendants make parolees vulnerable to expedited removal in perpetuity, even as noncitizens who entered without inspection gain immunity from expedited removal after two years of physical presence. There is no reason to think that Congress, in a bill focused on "improv[ing] deterrence of illegal immigration," Declaration of Yael Schacher ("Schacher Decl") ¶ 63 & Ex. L, intended expedited removal to be used against people who came to a port of entry—frequently with DHS-provided travel authorization or an invitation or appointment issued by the government—and were inspected and paroled into the country. There is less reason to think Congress intended to do so on terms *harsher* than those applied to people who entered unlawfully. *See DHS v. Thuraissigiam*, 591 U.S. 103, 140 (2020) (rejecting an interpretation that would "create a perverse incentive to enter at an unlawful rather than a lawful location"); *cf. McNeill v. United States*, 563 U.S. 816, 822 (2011) ("[A]bsurd results are to be avoided."). Once again, the absurd result traces to the same source: the overbroad definition.

Third, the definition produced an unlawful result in another context: adjustment of status. At the same time Defendants included paroled individuals in the "arriving alien" definition, they amended a separate regulation to make "[a]ny arriving alien" in expedited or ordinary removal proceedings ineligible to apply for adjustment of status. 8 C.F.R. § 245.1(c)(8) (1998). DOJ later adopted an identical rule at 8 C.F.R. § 1245.1(c)(8) (2005). Paroled individuals challenged this bar in multiple cases, arguing that it lacked statutory authority because 8 U.S.C. § 1255(a) permits any noncitizen who was "inspected and admitted *or paroled*" to apply for adjustment (emphasis

added). The majority of circuits to consider these challenges held the bar contrary to law.[10] In 2006, USCIS and EOIR amended their regulations accordingly. 8 C.F.R. §§ 245.2(a)(1) (USCIS) and 1245.2(a)(1) (EOIR); *see also* Eligibility of Arriving Aliens in Removal Proceedings to Apply for Adjustment of Status and Jurisdiction to Adjudicate Applications for Adjustment of Status, 71 Fed. Reg. 27585, 27587 (May 12, 2006). Although the litigation challenged the regulatory bar on adjustment, it reflected a more fundamental problem: the inclusion of paroled individuals in the "arriving alien" definition was itself unauthorized. Had the agency not taken that step, the adjustment bar would have raised no concern. An arriving alien who is inspected, found inadmissible, and detained pending removal has been neither admitted nor paroled, and has no right under § 1255(a) to seek adjustment. In each of these cases, the same root error—the unlawful expansion of "arriving alien" to encompass parolees—generated cascading unlawful consequences that the agency and the courts had to untangle.

*Legislative history.* The fact that Congress in 1996 never intended for noncitizens paroled into the country at ports of entry to be treated perpetually as "arriving aliens" is likewise clear from the 15 years of legislative history preceding the enactment of expedited removal in IIRIRA. That history reveals that throughout the period when Congress contemplated creating an expedited removal authority for people "seeking entry" to or "arriving in" the United States, it focused on people attempting to physically come into the country without valid entry documents—not people who had been inspected and authorized to come into the country. *See generally* Schacher Decl.[11]

---

[10] *See Scheerer v. U.S. Attorney General*, 445 F. 3d 1311, 1318-22 (11th Cir. 2006); *Bona v. Gonzales*, 425 F.3d 663, 667-70 (9th Cir. 2005); *Zheng v. Gonzales*, 422 F.3d 98, 111-20 (3d Cir. 2005); *Succar v. Ashcroft*, 394 F.3d 8, 20-36 (1st Cir. 2005). *But see Momin v. Gonzales*, 447 F.3d 447 (5th Cir. 2006); *Mouelle v. Gonzales*, 416 F.3d 923 (8th Cir. 2005).

[11] A timeline of the key events that took place in the 104th Congress from 1995-96 leading up to the enactment of an expedited removal provision—first in AEDPA and then in IIRIRA—is attached as Exhibit J to the Declaration of Yael Schacher. Schacher Decl. ¶ 31 & Ex. J.

1. <u>Post-1980 Refugee Act</u>: Congress first considered legislation to create an expedited exclusion authority in the early 1980s, shortly after the enactment of The Refugee Act of 1980 that established the right of noncitizens to apply for asylum, including by coming to a port of entry. In the months that followed, Fidel Castro permitted tens of thousands of Cuban nationals to leave the port of Mariel by boat and come to the United States. Separately, thousands of Haitian nationals came by boat as well. Schacher Decl. ¶¶ 12-13. Concerned about the possibility of similar mass migration events in the future, beginning in 1981 the Reagan administration and Members of Congress advanced various bills to create an expedited exclusion authority for noncitizens lacking proper immigration documents who were in the process of arriving in the United States, or who had just come into the country at a place other than a designated port of entry. *Id*. ¶¶ 14-15. The Reagan administration supported legislation to authorize immigration officers during inspection to order noncitizens lacking necessary entry documents to be excluded and to deport "immediately" those who are "arriving in the United States." *Id*. ¶ 17 & Ex. B. Legislation in the Senate spearheaded by Sen. Alan Simpson proposed to create such an authority for noncitizens "at the port of arrival" who lacked necessary documents to enter. *Id*. ¶¶ 18-19 & Ex. D. Legislation in the House led by Rep. Romano Mazzoli proposed an expedited exclusion process for such noncitizens "seeking entry." *Id*. ¶¶ 18-19. Notably, although many of the Cuban and Haitian nationals who came by boat to the country in 1980 had been paroled into the country, the bills did not seek to expose them to the expedited exclusion processes being proposed. Instead, they included provisions granting such parolees temporary resident status and permitting them to eventually apply to adjust to lawful permanent resident status. *Id*. & Ex. D. Although Sen. Simpson's bill passed the Senate two times and Rep. Mazzoli's bill passed the House once, neither was enacted

into law and congressional interest in creating an expedited exclusion authority generally diminished during the second half of the 1980s. *Id*. ¶¶ 18-21.[12]

2. <u>Renewed Interest in 1992-94</u>: In the early 1990s, strong congressional interest returned to create an expedited exclusion authority for people arriving at ports of entry or arriving by sea with fraudulent or no documents. *Id*. ¶¶ 23-25.[13] In 1993, Rep. Mazzoli led the introduction of a bill to create a port-of-entry expedited exclusion authority "without further hearing or review." *Id*. ¶ 25. Speaking that year on the House Floor in support of this proposal, which was favorably marked up in the Immigration Subcommittee but received no further action, Rep. Mazzoli described the legislation as "*keeping people out* of the United States who are attempting to travel with fraudulent papers" and providing "an expedited but fair hearing for those who plead asylum *when they reach this shore*." 139 Cong. Rec. 16450 (1993) (emphases added); Schacher Decl. ¶ 25 & Ex. H. The following year, Congress enacted the Violent Crime Control and Law Enforcement Act of 1994, which included a "sense of the Senate" that the country's immigration and asylum laws should be amended to provide an expedited exclusion process for noncitizens "who *arrives at a port-of-entry* with fraudulent documents, or no documents" and who make a "noncredible claim of asylum." Pub. L. No. 103-322, § 130010(b)(3), 108 Stat. 1796 (1994); Schacher Decl. ¶ 28 & Ex. I (emphasis added).

3. <u>104th Congress (AEDPA)</u>: In 1995, both the House and the Senate Immigration Subcommittees began work on immigration enforcement legislation that was ultimately enacted

---

[12] When Congress in 1986 enacted the Immigration Reform and Control Act, the legislation contained a provision specifically allowing Cubans and Haitians paroled into the country in 1980 to adjust to lawful permanent resident status. Schacher Decl. ¶ 21.

[13] Such legislation was introduced in 1992 by Reps. Bill McCollum and Lamar Smith and Sen. Simpson, key players in the subsequent enactment of IIRIRA in 1996. Schacher Decl. ¶ 23.

as IIRIRA on September 30, 1996.[14] Schacher Decl. ¶ 31. But shortly after the process began, the bombing of the Alfred P. Murrah Federal Building in Oklahoma City in April 1995 shifted the focus of many in Congress to a new legislative priority. *Id.* ¶¶ 30-31. Just eight days after the bombing, Senator Robert J. Dole introduced S. 735, the Comprehensive Terrorism Prevention Act of 1995, and one month later House Judiciary Committee Chairman Henry Hyde introduced H.R. 1710, the Comprehensive Antiterrorism Act of 1995. *Id.* ¶ 33. Although the Senate bill, which quickly passed on June 7, 1995, contained no broad expedited exclusion provisions for noncitizens, the House bill incorporated an idea from Rep. Mazzoli's port-of-entry inspection bill in the previous Congress: an "expedited exclusion" authority permitting immigration officers to "exclude[] from the United States without further hearing or review" any noncitizen "seeking entry" who lacked valid entry documents. *Id.* ¶¶ 25, 33, 36; H.R. 1710, 104th Cong. § 621 (1995).

The expedited exclusion provision in Chairman Hyde's bill received limited attention during two hearings on the bill in the House Judiciary Committee, but it received greater attention when the bill was marked up over four days. Schacher Decl. ¶¶ 34-35. At the Judiciary Committee markup, the discussion about using expedited exclusion for people "seeking entry" without proper documents was focused on "people who show up at the airport" without proper documents and the need to "get control" of the situation where people "get off [the plane] without documentation." *Id.* ¶ 35 & Ex. K. There was no discussion of applying expedited exclusion to noncitizens who had been paroled into the country at a port of entry. *Id.*

---

[14] In March 1995, the Senate Judiciary Committee held a lengthy hearing on a Senate bill, S. 269, as well as a proposal from the Clinton Administration, both of which contained expedited exclusion provisions. S. Hrg. 104-731; Schacher Decl. ¶ 29. The discussion regarding these provisions focused exclusively on people actually arriving at ports of entry or brought to the United States after interdiction.

The House Judiciary Committee's report on H.R. 1710 confirms that by creating an expedited exclusion authority for certain noncitizens "seeking entry," the legislation was focused on being able to return noncitizens "arriving at a port of entry" without documents "as promptly as possible, to where they boarded the plane to come here." Schacher Decl. ¶ 36 & Ex. M. This point was reaffirmed when the AEDPA Conference Committee accepted the expedited exclusion provisions contained in the House-passed bill and repeated the language in the House Judiciary Committee's report that described the "seeking entry" provision as applying to "the inspection and exclusion of aliens *arriving at a port of entry*." H.R. Rep. No. 104-518, at 117 (1996) (Conf. Rep.), 1996 WL 183509; Schacher Decl. ¶ 38 & Ex. N (emphasis added).

On April 16 and 17, 1996, the Senate quickly debated and passed AEDPA. Schacher Decl. ¶ 40. During Senate Floor consideration of the legislation, Sen. Patrick Leahy filed an unsuccessful motion to recommit the conference report to the conference committee with instructions to strip three of the immigration provisions out of the bill, including the expedited exclusion provision. *Id*. ¶ 39. Sen. Leahy believed that the provisions were unrelated to the antiterrorism legislation and deserved to be considered in connection with the immigration bill, and he was frustrated at the lack of review they received throughout the AEDPA process; in support of his motion, he said it was unlikely that any senator had time to read the conference report and understand the import of the provisions. *See* 104 Cong. Rec. S3427 (daily ed. Apr. 17, 1996) (statement of Sen. Leahy); Schacher Decl. ¶ 39 & Ex. O. The legislation cleared the House the following day—one day before the anniversary of the bombing—and was signed into law shortly thereafter. Schacher Decl. ¶ 40. When IIRIRA was enacted five months later, it repealed and replaced the expedited exclusion provision in AEDPA before it ever took effect.

4. <u>104th Congress (IIRIRA)</u>: Whereas expedited exclusion in AEDPA originated only in the House and flew through to enactment with little scrutiny, the expedited removal provisions enacted in IIRIRA—including the "arriving in the United States" provision directed at people in the process of physically coming into the country without valid documents—drew upon proposals advanced by both the House and the Senate and were heavily negotiated in conference. Just two days after the House Judiciary Committee concluded its work on Chairman Hyde's antiterrorism bill, Rep. Lamar Smith introduced H.R. 1915, the Immigration in the National Interest Act of 1995. Schacher Decl. ¶ 49. The bill received an Immigration Subcommittee hearing and markup within a matter of weeks. *Id*. H.R. 1915 proposed the creation of an expedited removal authority for noncitizens "arriving in the United States (whether or not at a port of entry)" who lacked valid entry documents and who did not have a fear of persecution or intent to apply for asylum. *Id*. Following Subcommittee markup, the legislation was introduced as a new bill, H.R. 2202, the Immigration Control and Financial Responsibility Act of 1995. *Id*. H.R. 2202 was then marked up by the full Judiciary Committee in September and October 1995. *Id.* ¶ 50.

Throughout the markup, bill sponsor Rep. Smith made clear that the provision authorizing expedited removal for noncitizens "arriving in the United States" was focused on people in the process of physically coming into the country; no one suggested it could or would apply to a noncitizen who has been paroled into the country. *Id*. Rep. Smith explained that the authority would return people without entry documents "as promptly as possible to where they boarded the plane to come here," and he opposed one amendment calling for immigration judges to review negative credible fear findings because it would be impossible to "make immigration judges available in . . . a short time *at each airport*." *Id*. ¶¶ 49-50 & Exs. U, V (emphasis added). The focus of the provision is confirmed by the Committee Report, which explained that authorizing expedited

removal for noncitizens "arriving in the United States" without proper documents "was necessary . . . because thousands of aliens arrive in the U.S. at airports each year without valid documents and attempt to illegally enter the U.S." H.R. Rep. 104-469, 157-58 (1996); Schacher Decl. ¶ 51 & Ex. CC. In March 1996, the House brought H.R. 2202 to the Floor and passed it after three days. Schacher Decl. ¶ 52. During Floor debate, there was no discussion of applying the proposed expedited removal authority to parolees. *Id*. Instead, Members referenced parole only to support permitting a group of Hungarian and Polish nationals who had previously been paroled into the country to adjust to lawful permanent resident status and when discussing various other provisions in the bill pertaining to parole entirely unrelated to expedited removal. *Id*.

The Senate turned to immigration immediately after Floor passage of its version of the antiterrorism legislation in June 1995. The following day, the Senate Immigration Subcommittee began marking up a bill, S. 269, that had been introduced at the beginning of the Congress and that contained an expedited exclusion provision applying to people seeking entry with fraudulent documents or brought to the United States after being apprehended at sea. *Id*. ¶¶ 29, 42. The bill sponsor, Sen. Simpson, explained that "[t]he purpose of expedited exclusion is just that, to accelerate the exclusion of those who would abuse our hospitality and generosity through surreptitious entry, document fraud, and by making fraudulent and wholly frivolous asylum claims." *Id*. ¶ 43 & Ex. Q. In February and March 1996, the Senate Judiciary Committee took up the bill and began a lengthy markup that spanned three weeks. Sen. Simpson defended the expedited exclusion provision as necessary to address people coming by airplane with fraudulent documents, and Sen. John Kyl focused on the need for the authority to handle large numbers of people being smuggled across the border. Schacher Decl. ¶ 44 & Ex. R.

On March 21, 1996, the same day that the House passed its immigration bill, the Senate Judiciary Committee completed its work on S. 269 and voted to report the bill to the Floor as S. 1664. *Id*. ¶ 45. The bill reported out of the Senate Judiciary Committee would have authorized expedited exclusion in four circumstances: (1) noncitizens who entered without inspection and were present for less than two years; (2) noncitizens at ports of entry with false or no documents; (3) noncitizens interdicted at sea; and (4) where the Attorney General designated the existence of an "extraordinary migration situation." Immigration Control and Financial Responsibility Act of 1996, S. Rep. No. 104-249, at 14 (1996); Schacher Decl. ¶ 45 & Ex. BB. On the Senate Floor—just days after failing to strip the expedited exclusion provision from AEDPA, which had by this point been signed into law—Sen. Leahy successfully amended the immigration legislation to eliminate expedited exclusion in the first three categories above and to permit it only during an "extraordinary migration situation" as designated by the Attorney General based on "the numbers or circumstances of aliens en route to or arriving in the United States, by land, sea, or air." 104 Cong. Rec. S4457 (daily ed. May 1, 1996); Schacher Decl. ¶ 47 & Ex. T. The use of "arriving" here, particularly as juxtaposed with the reference to those "en route," further evidences that Congress understood that "arriving in the United States" referred to the actual process of physically coming into the country. *Id.* The debate over the amendment between Senators Leahy and Simpson further makes clear that both understood the expedited exclusion provision to be directed at noncitizens attempting to come into the country with fraudulent documents. *Id*.

The Senate bill passed the following day, May 2, 1996, and months of conference committee negotiation followed. On May 31, the Department of Justice gave the official views of the Administration on the legislation, explaining that "[e]xpedited exclusion authority is critically important to our ability to deal with organized alien smuggling and fraud *at our ports of entry*."

Schacher Decl. ¶ 55 & Ex. W (emphasis added). The Clinton Administration on that basis supported the Senate's version of the provision applying to extraordinary migration situations, with certain modifications not relevant here. *Id.*

In the weeks leading up to and throughout the conference committee, lawmakers vigorously debated the scope of expedited removal—who would be subject to it, how credible fear screenings would work, and what judicial review would be available. Schacher Decl. ¶ 54. With respect to what eventually became the "Arriving In" provision, these debates confirm that lawmakers consistently and uniformly focused on creating an expedited removal power specifically to address individuals in the process of physically coming into the United States without legal documents. Multiple memos from House and Senate staffers in June and July 1996, for example, explain the contours of this negotiation between Sen. Orrin Hatch and Rep. Smith, as well as efforts by Sen. Simpson to reach an agreement; none of the memos include mention of subjecting parolees to the expedited removal authority under discussion. *Id.* ¶¶ 56-62. One memo from Sen. Simpson's staff in advance of the first meeting of Republican conferees described the scope of the various "expedited exclusion" proposals on the table. *Id.* ¶ 57 & Ex. X. Although the Senate-passed bill authorized expedited exclusion only for "extraordinary migration situations," the House-passed bill and the version of the Senate bill (and a separate bill reported out of the Senate Judiciary Committee covered "aliens *arriving at a port of entry* with no or fraudulent documents." *Id.* (emphasis added). A second staff memo for Sen. Simpson similarly reflects that both the Senate Judiciary Committee bill and House bill covered noncitizens "arriving at a port of entry with fraudulent or no documents." Schacher Decl. ¶ 59 & Ex. Z. When Sen. Simpson became engaged in attempting to break a stalemate over the terms of the expedited exclusion provision, talking points prepared for him by his staff focused on how helpful the authority would have been

in the past when large numbers of people began showing up at airports without documents and claiming asylum, as well as when large numbers of people without documents began arriving onshore in smuggling boats—again, confirming that the focus was on people in the process of physically coming into the country. Schacher Decl. ¶ 61 & Ex. AA.

The bill that emerged from the conference committee reflected the same understanding that Congress had maintained for 15 years and throughout consideration and enactment of AEDPA. By making expedited removal available for a noncitizen who "is arriving in the United States" without valid entry documents, the provision gave immigration authorities a streamlined mechanism to remove individuals in the process of physically entering the country at a port of entry, with limited administrative and judicial review. Nothing in the conference record mentions subjecting parolees to expedited removal. Schacher Decl. ¶ 62.[15]

***Contemporaneous Evidence of IIRIRA's Meaning in the 8 C.F.R. § 1.2 Administrative Record.*** The evidence in the administrative record confirms that IIRIRA provides no support for including paroled individuals in the regulatory definition of "arriving alien" at 8 C.F.R. § 1.2. Instead, the public comments received in response to both the notice of proposed rulemaking and the interim rule (including comments from legislators heavily involved in IIRIRA's enactment) indicate that with the exception of a small number of commenters who objected to the inclusion of parolees in the definition of "arriving alien," nearly everyone who commented was unaware of

---

[15] Beginning in the Refugee Act of 1980 and continuing through enactment of IIRIRA in 1996, Congress made various changes to the statutory parole authority and to other provisions in immigration law referencing parole. Schacher Decl. ¶¶ 67-71. Still other reforms to the parole authority were considered but rejected. *Id*. ¶¶ 68, 71. In the 104th Congress, when both expedited exclusion and parole reforms were discussed during the Senate Judiciary Committee's hearing on S. 269 and on the House Floor during passage of H.R. 2202, the two were treated as entirely separate subjects. *Id*. ¶¶ 52, 69. Throughout this 15-year period, no parole-related reforms involved subjecting parolees to an expedited exclusion or removal provision, and no reforms proposed to define parolees as "arriving" or any variant thereof. *Id*. ¶ 73.

the potential application of expedited removal to parolees and instead understood the arriving alien definition and its application in the expedited removal context to be limited to people literally in the process of arriving in the United States. Schacher Decl. ¶ 77.

For example, Senators Edward Kennedy and Paul Wellstone submitted a comment on the proposed rule evidencing their understanding that IIRIRA's authorization to use expedited removal on noncitizens "arriving in the United States" was limited to noncitizens at ports of entry during secondary inspection. Their comments focused on the fact that, "[r]efugees often arrive in the U.S. having just fled their persecutors. They are usually exhausted, jet-lagged and terrified." Li Decl. ¶ 22 & Ex. R, AA-REG-00895-96. Senator Spencer Abraham's comment similarly reflects his view that the use of expedited removal under the statute for noncitizens arriving with false or no documents applied to people in secondary inspection at ports of entry, frequently "following an exhausting and stressful escape from persecution." Li Decl. ¶ 23 & Ex. S, AA-REG-01146. He requested that additional time be provided before credible fear screenings be performed, preferably "away from airports and other ports of entry" in locations that would not "unduly delay[] the process." Li Decl., Ex. S, AA-REG-01146-47.[16]

---

[16] Multiple comments by immigration and refugee advocates similarly focused on the need for adequate notice, confidentiality, and monitoring during the secondary inspection process at ports of entry for "arriving alien[s]" processed for expedited removal. *See, e.g.*, Li Decl. ¶ 26 & Ex. V, AA-REG-00949-50 (detailing procedural protections and officer training needed at secondary inspection to ensure that "arriving" asylum seekers, who are often "exhausted, weak, hungry, scared and disoriented from their ordeals and flight from danger," are not improperly ordered to "return immediately upon arrival."); Li Decl. ¶ 27 & Ex. W, AA-REG-00624-29 (requesting that information, interpreters, access to counsel, and other procedural protections be provided "as soon as a decision is made to refer [a person at risk of expedited removal] to secondary inspection."). A comment submitted by a career INS official in his personal capacity similarly observed that under the proposed rule, expedited removal "would only apply to aliens who appear at a designated port of entry and attempt to enter the United States under the procedural system of safeguards in place there" and would not apply to "any class of aliens already in the U.S." Li Decl. ¶ 29 & Ex. Y, AA-REG-00029-30.

Representative Lamar Smith submitted lengthy comments on both the proposed rule and the interim rule that discussed the "arriving alien" definition. Li Decl. ¶¶ 24-25 & Exs. T, U. In his comment on the proposed rule, Rep. Smith explained that:

> The term 'arriving alien' was selected specifically by Congress in order to provide a flexible concept that would include *all aliens who are in the process of physical entry past our borders* . . . .'Arrival' in this context should not be considered ephemeral or instantaneous but, consistent with common usage, as a process. An alien apprehended at any stage of this process, whether attempting to enter, at the point of entry, or just having made an entry, should be considered an 'arriving alien' *for the various purposes in which that term is used* in the newly revised provisions of the INA.

Li Decl., Ex. T, AA-REG-00685-86 (emphases added). Rep. Smith's comments highlight not only that Congress carefully chose the phrase "arriving in the United States" to focus on the process of physically coming into the country "past our borders," but also that the regulatory definition was understood to do work well beyond the expedited removal context. *Accord* Li Decl., Ex. U, AA-REG-00632-33.

Of the approximately 240 non-duplicative records produced in the administrative record pertaining to the 1997 rulemaking, only three commenters identified and objected to the inclusion of people paroled into the country at ports of entry in the "arriving alien" definition. Two made the structural argument presented in this case that including paroled individuals as arriving aliens who would therefore be exposed to expedited removal as noncitizens "arriving in the United States" conflicts with the express statutory provision that protects individuals who have been paroled into the country from expedited removal. *See* Li Decl. ¶ 19 & Ex. O, AA-REG-00840; Li Decl. ¶ 20 & Ex. P, AA-REG-00863-64 ("Parolees are exempt from the second part of the summary removal provision, that allows the Attorney General great latitude in expanding the category of noncitizens subject to summary removal. The INS cannot circumvent clear Congressional intent to except parolees (and those admitted) to summary removal by categorizing them as "arriving aliens.").

One group of immigration and asylum law experts argued that the inclusion of people previously paroled into the country appeared to rest on the "legal fiction" that parolees, though physically present, had not yet effected an entry into the country, but changes made in IIRIRA were largely designed to "do away with that fiction." Li Decl. ¶ 21 & Ex. Q, AA-REG-01162.

In the interim rule, the agency provided no more response to these structural, statutory arguments than Defendants have throughout this litigation. Instead, the agency stated simply that "[o]ne commenter objected to the inclusion of parolee in the definition of arriving alien," and responded that the inclusion of parolees in the definition was "based on the statutory language in section 212(d)(5) of the Act." Inspection and Expedited Removal of Aliens, 62 Fed. Reg. 10312, 10313 (Mar. 6, 1997). The agency also referenced the parole termination regulation at 8 C.F.R. § 212.5(d). Neither INA § 212(d)(5) nor 8 C.F.R. § 212.5(d) use the term "arriving alien" or describe a parolee as "arriving." The Department then concludes with the *ipse dixit* assertion that it "feels there is solid statutory basis for inclusion of certain paroled aliens in the definition of arriving alien, and so will retain this provision." 62 Fed. Reg. at 10313. This response in the interim rule makes it clear: the agency, both then and now, has had no statutory basis for including parolees as "arriving aliens."

## III. THE CHALLENGED DIRECTIVES ARE CONTRARY TO LAW AND VIOLATE THE AGENCY'S OWN PROCEDURES

The Challenged Directives are contrary to law and the agency's own regulations for all the reasons set out in the Court's opinion, Dkt. No. 41, and Plaintiffs incorporate by reference their prior briefing on this claim, *see* Dkt. No. 22-001, 28, as well as the relevant briefing above on the meaning and legislative history of "arriving," *see supra* at Section II. *See also Refugee & Immigrant Ctr.*, 793 F. Supp. 3d at 59 (requiring agency actions be set aside if "they are not 'authorized by the statutory text,'" or "some other source of lawful authority."); *Still v. Dep't of*

*Labor*, Civ. A. No. 17-1420 (DLF), 2021 WL 4502053, at *4 (D.D.C. Sept. 30, 2021) (requiring a federal agency to follow its own rules, including rules that "limit[] the agency's discretion and impose[] 'rights or obligations on the respective parties.'"); *see also Accardi*, 347 U.S. at 268.

The text and legislative history of AEDPA—and its interaction with IIRIRA—further confirm that the January 23 Huffman Memorandum and March 25 CHNV Termination Notice are contrary to law in seeking to apply expedited removal to parole beneficiaries under 8 U.S.C. § 1225(b)(1)(A)(iii) (the "Designation Provision"). In addition to creating an expedited exclusion authority for noncitizens "seeking entry" without valid documents, AEDPA also authorized expedited exclusion for noncitizens lacking valid documents who were "found in" the country without having been inspected and formally "admitted." Although AEDPA's legislative history is unambiguous that this provision was targeted at individuals who had entered the United States unlawfully, the language around formal "admission" likely would have exposed parolees to expedited exclusion, given that a grant of parole is not an admission.  When IIRIRA rescinded this provision five months later, the legislation once more created an expedited removal authority directed at noncitizens who entered the country illegally and without inspection, but the language used in the legislation was materially different—and more precise—than that used in AEDPA. IIRIRA shields not only noncitizens who have been admitted into the country from expedited removal, but also noncitizens who have been paroled. 8 U.S.C. § 1225(b)(1)(A)(iii). The text and legislative histories of these two bills demonstrates that Congress designed the Designation Provision specifically to target noncitizens who entered illegally and evaded inspection—not those who were admitted or paroled following such an inspection.

*AEDPA's "Found-In" Language.* At the same time that Congress in AEDPA created an "expedited exclusion" authority for noncitizens without valid entry documents who were "seeking

entry," it also deemed a noncitizen "found in the United States who has not been admitted to the United States after inspection" to be "seeking entry and admission" and "subject to examination and exclusion." AEDPA, Pub. L. No. 104-132, § 414, 110 Stat. 1214, 1270 (1996). The text of the provision—which applied to noncitizens "found in" the United States without having been inspected and admitted—would likely have reached noncitizens paroled into the country, because then, as now, parole was not an admission. *See* 8 U.S.C. § 1182(d)(5)(A) (1995) (parole "shall not be regarded as an admission"). At every stage of the legislative process, however, Congress uniformly and unambiguously evinced the intent for such language to apply only to individuals who had entered the country unlawfully. During the House Judiciary Committee markup, bill sponsor and Committee Chairman Henry Hyde explained that the provision applied to those who "evade our border controls," "succeed in crossing our borders illegally," and make a "stealthy entrance." Schacher Decl. ¶ 35 & Ex. K. It was "an expression of our resolve to end incentives to *illegal immigration* that can be taken advantage of by terrorists." *Id.* (emphasis added.) The Committee's report stressed that the provision applied to noncitizens who "entered the United States unlawfully," "successfully evaded requirements for lawful entry," and "whose initial entry was wholly illegal." H.R. Rep. No. 104-383, at 40, 100-01 (1995); Schacher Decl. ¶¶ 35-36 & Ex. M. The Committee Report also made clear that such a noncitizen would be subject to the expedited exclusion provision created in the bill "regardless of the length of time the *illegal entrant* has been unlawfully present within the United States." *Id.* (emphasis added). The Conference Report explaining the Senate's decision to recede to the House's "found in" language similarly states that the provision pertains to "any alien who has entered the United States unlawfully." H.R. Rep. No. 104-518, at 117 (1996) (Conf. Rep.); Schacher Decl., ¶ 38 & Ex. N. Finally, the INS itself

understood the provision to be targeting "aliens who have entered the U.S. without inspection." Schacher Decl. ¶ 46 & Ex. S.

Despite the breadth of the "found in" language included in AEDPA, at no point during the AEDPA debate did any Member indicate that a parolee "found in" the country should be subjected to expedited exclusion. Schacher Decl. ¶ 35. And for good reason: noncitizens who were inspected and paroled into the country at a port of entry clearly could not be described as "illegal entrants" or people who entered "wholly illegal[ly]" or "evaded our border controls," regardless of whether their parole had since expired or been terminated.

*IIRIRA's Repeal of AEDPA's Expedited Exclusion "Found In" Provision.* As discussed above, the legislation that became IIRIRA was moving through Congress on a parallel track with the legislation that became AEDPA. Unlike the House-passed immigration bill, the Senate Judiciary Committee's bill included an expedited exclusion authority directed at "aliens *who entered without inspection* within the past 2 years." S. Rep. No. 104-249, at 14 (1996) (emphasis added); Schacher Decl. ¶ 45, Ex. BB. That provision was not in the legislation first introduced by Sen. Simpson in January 1995, but he agreed to amend the bill to authorize expedited exclusion for "all aliens who entered the U.S. without INS inspection and who have been in the U.S. for less than 2 years." Schacher Decl. ¶ 42 & Ex. P (describing the "EWI" provision as applying to people who "sneak across the border"). Like the language enacted in AEDPA, however, the text of the Senate Judiciary Committee bill might have posed jeopardy to parolees because it applied to noncitizens who "entered the United States without having been inspected *and admitted* by an immigration officer." Schacher Decl. ¶ 45, Ex. BB (S. Rept. 104-249 at 110) (emphasis added).

But the language that emerged from the IIRIRA conference committee and that was ultimately enacted into law was meaningfully different from both the language enacted in AEDPA

and the language in the Senate Judiciary Committee's bill. IIRIRA repealed AEDPA's expedited

exclusion provision for a noncitizen "found in" the country "who has not been admitted," and

replaced it with a version better tailored to Congress's intent: one focused on authorizing expedited

removal for a noncitizen physically present in the country for less than two years "who has not

been admitted *or paroled.*" 8 U.S.C. § 1225(b)(1)(A)(iii) (emphasis added). This language more

accurately reflected Congress's consistent intent to apply the newly created expedited removal

authority to noncitizens who had entered the country "illegally" and without inspection.

Across both AEDPA and IIRIRA, Congress's intent was consistent: to make expedited

removal available for certain noncitizens who entered without inspection. The change in language

from AEDPA to IIRIRA, made within a matter of months, sharpened that focus while adding an

express protection for parolees against expedited removal that remains the law today.

## IV. THE CHALLENGED DIRECTIVES ARE ARBITRARY AND CAPRICIOUS

The Challenged Directives are arbitrary and capricious for all the reasons set out in the

Court's opinion, Dkt. No. 41, and Plaintiffs incorporate by reference their prior briefing on this

claim, *see* Dkt. No. 22-1, 28. The administrative records only confirm that Defendants "failed to

provide even [a] minimal level of analysis" or reasoning for the "[u]nexplained inconsistency in

agency policy" between the January 23 Huffman Memorandum and the March 25 CHNV

Termination Notice, which focus on terminating individual grants of parole within two years to be

able to subject the parole beneficiary to expedited removal, and the February 18 ICE Directive,

which claims that no time limit exists to subject "paroled arriving aliens" to expedited removal.

*Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) (internal quotation marks omitted).

Given the serious reliance interests created by decades of agency practice *not* to subject

humanitarian parolees to expedited removal, "a more detailed justification" for Defendants' abrupt

change in policy—and for the rapid changes in position between the Challenged Directives themselves—was necessary. *FCC v. Fox Television Stations, Inc.,* 556 U.S. 502, 515 (2009).

The administrative records for the Challenged Directives are more noteworthy for what they do not include than what they do. The administrative record for an agency decision must include "all materials compiled by the agency that were before the agency at the time the decision was made," *James Madison Ltd. ex rel. Hecht v. Ludwig,* 82 F.3d 1085, 1095 (D.C. Cir. 1996) (citations and punctuation omitted), and "delineate[] the path by which [the agency] reached its decision," *Occidental Petroleum Corp. v. SEC*, 873 F.2d 325, 338 (D.C. Cir. 1989). But apart from the Challenged Directives themselves and the documents they cite, the administrative records contain *no* documentation of any analysis or consideration of the agency's statutory authority:

- All mentions of expedited removal in the record for the **January 23 Huffman Memorandum** appear in publicly available documents addressing other policies only tangentially related (at most) to the scope of the expedited removal authority, such as the Federal Register Notices establishing the parole processes for Cubans, Haitians, Nicaraguans, and Venezuelans, and a Federal Register Notice proposing changes to streamline the credible fear process. SOMF ¶¶ 143-150; Li Decl. ¶ 11 & Ex. G.

- The record for the **February 18 ICE Directive** includes only the executive order it cites (Executive Order No. 14165, entitled "Securing Our Borders") and the January 23 Huffman Memorandum. SOMF ¶¶ 153-154; Li Decl. ¶ 12 & Ex. H. The record contains nothing offering an explanation for why the February 18 ICE Directive contemplates that "paroled arriving aliens" may be subject to expedited removal at any time, nor any acknowledgement of the January 23 Huffman Memorandum, the Huffman Memorandum's indirect reliance on the time-limited authority of 8 U.S.C. § 1225(b)(1)(A)(iii), or its

instruction that officers to consider terminating an individual's parole to subject them to expedited removal. SOMF ¶¶ 154-157.

- The record for the **March 25 CHNV Termination Notice** includes no document mentioning the application of expedited removal to parolees except for the January 23 Huffman Memorandum. SOMF ¶ 163; Li Decl. ¶ 13 & Ex. I. Notably, the record does not even include the February 18 ICE Directive, let alone an explanation for the change in position after that directive was issued. SOMF ¶¶ 161-166.

This Court correctly found at the preliminary relief stage that the Challenged Directives "fail even the 'fundamentally deferential' standard of arbitrary-and-capricious review," Dkt. 41 at 67 (quoting *Fox v. Clinton*, 684 F.3d 67, 75 (D.C. Cir. 2012)), because they provided no explanation that would enable the court to "'evaluate the agency's rationale at the time of decision,'" *id.* at 69 (quoting *Pension Benefit Guar. Corp.*, 496 U.S. 633, 654 (1990)). The administrative records for the Challenged Directives reinforce this conclusion: the records are devoid of any further reasoning even acknowledging the "Schrödinger's legal justification" the court identified, namely, that "[t]he agency believes both that it must (and should) subject former parolees to expedited removal within two years of the beginning of their continuous presence, *see* March 25 CHNV Termination Notice at 13619, and that it is under 'no time limit,' February 18 ICE Directive at 1." Dkt. 41 at 71. The records, moreover, confirm that Defendants failed to consider any reasonable alternatives, reliance interests, or the impact that expedited removal has on the individuals themselves, their families, their employers, their communities, and any supporters who participated in their parole applications. SOMF ¶¶ 149-150, 156-157, 165-166. *See DHS v. Regents of Univ. of Cal.*, 591 U.S. 1, 28-33 (2020).

The administrative record confirms that there are "no findings and no analysis" to "justify the choice made" in adopting the Challenged Directives. *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 167 (1962). The Challenged Directives thus fail "[t]he reasoned explanation requirement of administrative law" and are arbitrary and capricious. *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019).

## V.    PLAINTIFFS ARE ENTITLED TO PERMANENT RELIEF

Plaintiffs seek an order:

(1) Declaring that noncitizens who have previously been granted parole at ports of entry are not amenable to expedited removal under 8 U.S.C. § 1225(b)(1)(A);

(2) Permanently vacating the January 23 Huffman Memorandum, February 18 ICE Directive, and March 25 CHNV Termination Notice insofar as they subject noncitizens previously granted parole at ports of entry to expedited removal, as contrary to law and arbitrary and capricious in violation of the APA;

(3) Declaring that the inclusion of paroled individuals in the definition of "arriving aliens" in 8 CFR § 1.2 conflicts with the INA and is *ultra vires*;

(4) Permanently vacating 8 CFR § 1.2's definition of "arriving alien" insofar as it is applied to paroled individuals; and

(5) Declaring that expedited removal orders issued to individuals previously paroled into the country at a port of entry are not in accordance with law and that such orders are not considered orders of removal under 8 U.S.C. § 1225(b)(1).

Vacatur of the unlawful actions is the appropriate remedy under the APA. 5 U.S.C. § 706; *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs,* 145 F.3d 1399, 1409 (D.C. Cir. 1998) ("We have made clear that '[w]hen a reviewing court determines that the agency regulations are unlawful, the ordinary result is that the rules are vacated . . . .'").

The Court also has authority to grant declaratory relief for Plaintiffs where it finds the agency actions at issue unlawful. 28 U.S.C. § 2201(a) (federal courts "may declare the rights and other legal relations of any interested party seeking such declaration . . . . Any such declaration shall have the force and effect of a final judgment or decree."); *see also Wilton v. Seven Falls Co.,* 515 U.S. 277, 288 (1995) ("By the Declaratory Judgment Act, Congress sought to place a remedial arrow in the district court's quiver ... to grant a new form of relief to qualifying litigants."). Here, declaratory relief will allow paroled individuals unlawfully subjected to expedited removal to seek concrete protection, including in immigration court, based upon the specific facts of their cases. *See, e.g.*, *Nat'l TPS All. v. Noem,* No. 25-cv-01766, 2025 WL 3539156, at *2 (N.D. Cal. Dec. 10, 2025) (granting declaratory relief declaring that the terminations of TPS for Venezuela were unlawful, in part because "Plaintiffs have indicated an intent to preserve the status quo of individual members, possibly in individual actions where an individual member might receive some benefit from the declaratory judgment."); *Al Otro Lado, Inc. v. Mayorkas,* 619 F. Supp. 3d 1029, 1049 (S.D. Cal. 2022) (issuing declaratory relief in part because Defendants argued that it could be used by individuals "'as a predicate to further relief, including an injunction.'")*; cf. Bechtel v. FCC*, 10 F.3d 875, 887 (D.C. Cir. 1993) (individual denied license from the FCC based on a policy violating the APA was "entitled to a proceeding in which the Commission considers her application (and any other application properly before it) under standards free of that policy."); *Kinkead v. Humana, Inc.,* 206 F. Supp. 3d 751, 754 (D. Conn. 2016) (identifying "the well-established rule that judicial decisions are presumptively retroactive in their effect and operation").

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their motion, enter judgment on Claims 1, 2, 4, and 5, and issue the relief requested.

Dated: March 3, 2026                          Respectfully submitted,

                                              */s/Hillary Li*
                                              Hillary Li (GA0052)
                                              Esther H. Sung (CA00132)
                                              Karen C. Tumlin (CA00129)
                                              Laura Flores-Perilla (admitted *pro hac vice*)
                                              Brandon Galli-Graves (admitted *pro hac vice*)
                                              **JUSTICE ACTION CENTER**
                                              P.O. Box 27280
                                              Los Angeles, CA 90027
                                              Telephone: (323) 450-7272
                                              esther.sung@justiceactioncenter.org
                                              karen.tumlin@justiceactioncenter.org
                                              hillary.li@justiceactioncenter.org
                                              laura.flores-perilla@justiceactioncenter.org
                                              brandon.galli-graves@justiceactioncenter.org

                                              Tom-Tsvi M. Jawetz (*pro hac vice*)
                                              *JAC Cooperating Attorney*
                                              1358 Jefferson St. NW
                                              Washington, DC 20011
                                              Telephone: (202) 413-5208
                                              Tom.Jawetz@gmail.com

                                              Carl Bergquist (*pro hac vice*)
                                              **COALITION FOR HUMANE IMMIGRANT RIGHTS**
                                              2533 West 3rd St, Suite 101
                                              Los Angeles, CA 90057
                                              Telephone: (310) 279-6025
                                              cbergquist@chirla.org

                                              Shana Khader (D.D.C. Bar No. 90011926)
                                              **CASA, INC.**
                                              P.O. Box 7277
                                              Hyattsville, MD 20787
                                              (240) 406-4348
                                              skhader@wearecasa.org

                                              *Attorneys for Plaintiffs*