## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

COALITION FOR HUMANE IMMIGRANT RIGHTS, *et al*.,

     *Plaintiffs,*

     *v.*

KRISTI NOEM, in her official capacity as Secretary of Homeland Security, *et al.*,

     *Defendants.*

Case No.: 1:25-cv-00872

## PLAINTIFFS' RULE 56 STATEMENT OF MATERIAL FACTS NOT IN DISPUTE IN SUPPORT OF THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Rule 7(h) of the Local Rules of Civil Procedure for the United States District Court for the District of Columbia, Plaintiffs, by and through their undersigned counsel, hereby submit this statement of undisputed material facts in support of their Motion for Partial Summary Judgment.

### The Associational Plaintiffs

1.    Plaintiff Coalition for Humane Immigrant Rights ("CHIRLA") is a nonprofit membership organization headquartered in Los Angeles, California. Declaration of Angelica Salas, Dkt. No. 22-3 ("Salas Decl.") ¶ 2.

2.    CHIRLA's members include noncitizens who were previously paroled into the United States at a port of entry. Salas Decl. ¶¶ 15-16.

3.    CHIRLA's members who were previously paroled into the United States at a port of entry are at risk of being, or already have been, arrested, detained, and subject to

expedited removal due to Defendants' policies described below in ¶¶ 41-58. Salas Decl. ¶¶ 15-16.

4.     CHIRLA's mission is to ensure that immigrant communities are fully integrated into society with full rights and access to resources. This work includes advocating for immigrant rights, and organizing, educating, serving, and defending immigrants and refugees in Los Angeles and throughout California. Salas Decl. ¶¶ 3-4.

5.     CHIRLA's membership includes E.I.R.M., a noncitizen who was granted humanitarian parole at a port of entry in 2023 following an appointment made with the CBP One application and was placed in regular removal proceedings pursuant to 8 U.S.C. § 1229a ("Section 240 removal proceedings"). Salas Decl. ¶ 17; Declaration of Bianca Torres, Dkt. No. 22-7 ("Torres Decl.") ¶ 3.

6.     E.I.R.M. appeared for all his scheduled immigration court hearings and timely filed an asylum application with the immigration court. He was subsequently arrested and detained in March 2025 and placed in expedited removal proceedings after DHS moved to dismiss his Section 240 removal proceedings. Salas Decl. ¶ 17; Torres Decl. ¶¶ 4-6.

7.     E.I.R.M. was released from detention on bond while his appeal at the Board of Immigration Appeals was pending. In October 2025, the BIA dismissed his appeal, so he is at imminent risk of re-detention and being processed for expedited removal. Supplemental Declaration of Angelica Salas ("Salas Suppl. Decl.") ¶ 21; Supplemental Declaration of Bianca Torres ("Torres Suppl. Decl.") ¶¶ 4-6, 7-8.

8.     E.I.R.M.'s U.S.-citizen wife filed a family-based visa petition for E.I.R.M. and they filed an adjustment of status application with USCIS. Torres Suppl. Decl. ¶ 6.

9.      E.I.R.M. cannot freely travel because he is required to check in with ICE and may only travel within a certain parameter within his state. Because they fear E.I.R.M. may be detained again or removed, E.I.R.M. and his wife have postponed decisions regarding long-term plans. Torres Suppl. Decl. ¶¶ 6-8.

10.     Another CHIRLA member, R.H.H., was paroled into the United States at a port of entry along with her minor children, C.M.H. and M.M.H., following a CBP One appointment in November 2024. They were granted parole through April 18, 2025, and they were issued Notices to Appear at an immigration court hearing on June 5, 2025. They resided with R.H.H.'s partner—C.M.H. and M.M.H.'s father—and the children were enrolled in elementary school. Declaration of Elizabeth Hercules-Paez, ("Hercules-Paez Decl.") ¶¶ 3-4; Salas Suppl. Decl. ¶ 19.

11.     At their initial master calendar hearing on June 5, 2025, DHS moved to dismiss R.H.H. and her children's removal proceedings, which the immigration judge granted over R.H.H.'s opposition. ICE agents arrested and detained R.H.H. and her children as they walked out of the courtroom and detained them for over a month. Hercules-Paez Decl. ¶¶ 5-6; Salas Suppl. Decl. ¶ 19.

12.     While R.H.H. and her children were detained, their attorney appealed the dismissal of their removal proceedings. R.H.H. also underwent a credible fear interview, without the presence of counsel, and received a negative credible fear determination. Their counsel requested immigration judge review of that negative fear determination and submitted a release request. Hercules-Paez Decl. ¶ 8; Salas Suppl. Decl. ¶ 19.

13.   On July 11, 2025, R.H.H. and her children were released from detention on parole, which expires in July 2026. Hercules-Paez Decl. ¶ 9.

14.   On July 14, 2025, the immigration judge affirmed R.H.H.'s negative credible fear determination, and on December 5, 2025, their appeal was dismissed. Hercules-Paez Decl. ¶¶ 8-10; Salas Suppl. Decl. ¶ 19. They are subject to a final order of expedited removal. Hercules-Paez Decl. ¶¶ 14.

15.   CHIRLA's membership also includes J.L., a noncitizen who attended a CBP One appointment and was paroled into the United States at a port of entry in June 2024 with her two children. Salas Suppl. Decl. ¶ 20.

16.   J.L. applied for asylum and obtained work authorization associated with her application. Given the government's targeting of parolees for expedited removal, she and her family live in constant fear of being detained and being forcibly returned to Venezuela, where she believes she would be persecuted by the government. Salas Suppl. Decl. ¶ 20.

17.   CHIRLA's members who were previously paroled into the country at a port of entry were first subjected to expedited removal in 2025. Salas Suppl. Dec. ¶¶ 19-22.

18.   Plaintiff UndocuBlack Network ("UndocuBlack") is a nonprofit membership organization incorporated in 2022. Supplemental Declaration of Patrice Lawrence, ("Lawrence Suppl. Decl.") ¶ 4.

19.   UndocuBlack's mission is to foster community, facilitate access to resources, and contribute to transforming the realities of its members, who are Black immigrants. This work includes providing legal assistance to sponsors and beneficiaries of

humanitarian parole programs. Declaration of Patrice Lawrence, Dkt. No. 22-4 ("Lawrence Decl.") ¶¶ 3-5.

20.    UndocuBlack's members include nationals from Haiti who were previously paroled into the United States at a port of entry, including through the parole processes for Cubans, Haitians, Nicaraguans, and Venezuelans ("CHNV" parole) or following appointments made through the CBP One application. Lawrence Decl. ¶ 11.

21.    UndocuBlack's members who were previously paroled into the United States at a port of entry are at risk of being, or already have been, arrested, detained, and subject to expedited removal due to Defendants' policies described below in paragraphs 41-58. Lawrence Decl. ¶ 13.

22.    UndocuBlack's membership includes J.P., a noncitizen who was paroled into the United States at a port of entry in December 2024 after attending a CBP One appointment. He was issued a Notice to Appear before an immigration judge on July 25, 2025. J.P. timely filed an asylum application with the immigration court. Lawrence Supp. Decl. ¶ 13; Declaration of Ida De Luca ("De Luca Decl.") ¶¶ 2, 3-4. J.P. is also a member of CHIRLA. De Luca Decl. ¶ 2; Salas Suppl. Decl. ¶ 22.

23.    At his master calendar hearing on July 25, 2025, DHS moved to dismiss J.P.'s removal proceedings, which the immigration judge granted. Immediately after the hearing, ICE agents arrested J.P. at the Immigration Court and detained him, and when his attorney made a request for him to be released and any expedited removal order against him to be vacated, ICE refused. He remains detained. De Luca Decl. ¶¶ 4-7.

24. Another UndocuBlack member, UBN Jane Doe 3, was paroled into the United States in April 2024 through the CHNV parole processes. She applied for asylum, but her application is currently suspended due to the USCIS suspension on processing immigration benefits for nationals from Haiti. Because of this and the government's termination of grants of CHNV parole, Jane Doe 3 is at risk of being targeted for expedited removal at any time. Lawrence Suppl. Decl. ¶¶ 11-12.

25. UndocuBlack's members who were previously paroled into the country at a port of entry were first subjected to expedited removal in 2025. Lawrence Suppl. Decl. ¶¶ 11-14.

26. Plaintiff CASA, Inc. ("CASA") is a national nonprofit membership organization headquartered in Langley Park, Maryland. Declaration of George Escobar, Dkt. No. 22-2 ("Escobar Decl.") ¶ 1.

27. CASA's members include noncitizens who were previously paroled into the United States at a port of entry. Escobar Decl. ¶¶ 10-12.

28. CASA's members who were previously paroled into the United States at a port of entry are at risk of being, or already have been, arrested, detained, and subject to expedited removal due to Defendants' policies described below in ¶¶ 41-58. Escobar Decl. ¶¶ 10-13.

29. CASA's mission is to build, power, and improve the quality of life in working-class Black, Latino/a/e, Afro-descendent, Indigenous, and immigrant communities. In furtherance of its mission, CASA offers a wide range of social, health, job, training, employment, and legal services to immigrant communities. Escobar Decl. ¶¶ 7-8.

30.     CASA's membership includes E.M.P., a noncitizen who was granted humanitarian parole at a port of entry in 2023 following an appointment made with the CBP One application and was placed in Section 240 removal proceedings. Escobar Decl. ¶ 17; Declaration of Jessica Olive, Dkt. No. 22-10 ("Olive Decl.") ¶ 3.

31.     E.M.P. appeared for all his scheduled immigration court hearings and filed an asylum application with the immigration court in 2024. He was subsequently arrested, detained, and placed in expedited removal proceedings on May 21, 2025 after DHS moved to dismiss his Section 240 removal proceedings. Escobar Decl. ¶ 17; Olive Decl. ¶¶ 5-6.

32.     CASA's membership also includes L.Z.P., who was granted humanitarian parole and entered the United States with her three minor children in July 2024 after attending a CBP One appointment. The expiration date of her parole status was June 2, 2026, and her work authorization was valid through July 1, 2026. Escobar Decl. ¶ 14.

33.     Around May and June 2025, L.Z.P. received notice that her parole status and work authorization had been terminated. She awaits a hearing in her asylum case, which is scheduled for April 2026, and she is afraid that she will be detained and processed for expedited removal when she appears in court. Escobar Decl. ¶ 14; Supplemental Declaration of George Escobar ("Escobar Suppl. Decl.") ¶ 13.

34.     D.S., a CASA member, was paroled into the country at a port of entry in March 2022. He applied for asylum in January 2023. Escobar Suppl. Decl. ¶ 14; Declaration of Dmitry Filimonov ("Filimonov Decl.") ¶¶ 2-4.

35.    In August 2025, USCIS dismissed D.S.'s asylum application on the basis that DHS records indicated D.S. had been placed in expedited removal, and D.S. lost his employment authorization as a result, which has caused his family financial hardship. D.S. and his family fear that D.S. could be arrested at any point and processed for expedited removal. Escobar Suppl. Decl. ¶ 14; Filimonov Decl. ¶¶ 5-11.

36.    CASA member O.L.C. attended a CBP One appointment in September 2024 and was subsequently paroled into the United States. In May 2025, at a master calendar hearing, an Immigration Judge granted the government's motion to dismiss O.L.C.'s removal proceedings. O.L.C. was arrested at the courthouse following the hearing and was issued a Notice and Order of Expedited Removal. He has appealed the dismissal, and he remains detained while his appeal is pending. Escobar Suppl. Decl. ¶ 14; Supplemental Declaration of Laura Kelley ("Kelley Decl.") ¶¶ 2-3.

37.    Another CASA member, D.R.C., and her husband were granted humanitarian parole around 2024. They applied for lawful permanent residence status under the Cuban Adjustment Act. In July 2025, D.R.C. and her husband were pulled over while driving to work and detained. Upon being detained, D.R.C. learned her and her husband's grants of parole had been terminated. D.R.C. and her husband were separated, and D.R.C. remains detained. D.R.C.'s husband was processed for expedited removal and removed. Escobar Suppl. Decl. ¶ 14.

38.    CASA's membership also includes D.L.C., a noncitizen who was granted humanitarian parole at a port of entry in 2024 following an appointment made with

the CBP One application, and who was placed in Section 240 removal proceedings. Declaration of Melissa Lim Chua, Dkt. No. 22-13 ("Chua Decl.") ¶¶ 2-4.

39.    D.L.C. appeared for all his scheduled immigration court hearings, filed an asylum application with the immigration court, and began the process of seeking Special Immigrant Juvenile Status ("SIJS"). In May 2025, he was subsequently arrested, detained, and placed in expedited removal proceedings after DHS moved to dismiss his Section 240 removal proceedings. Chua Decl. ¶¶ 6-8.

40.    CASA's members who were previously paroled into the country at a port of entry were first subjected to expedited removal in 2025. Escobar Suppl. Decl. ¶¶ 12-16.

**Defendants' Use of Expedited Removal Against Paroled Individuals**

*The January 23 Huffman Memorandum*

41.    On January 23, 2025, Acting Department of Homeland Security ("DHS") Secretary Benjamine Huffman issued a memorandum (the "January 23 Huffman Memorandum") to the leadership of U.S. Immigration and Customs Enforcement ("ICE"), U.S. Customs and Border Protection ("CBP"), and U.S. Citizenship and Immigration Services ("USCIS") with the subject line, "Guidance Regarding How to Exercise Enforcement Discretion."  Declaration of Hillary Li ("Li Decl."), ¶ 5 & Ex. A.

42.    The January 23 Huffman Memorandum references two other documents: first, a memorandum entitled "Exercising Appropriate Discretion Under Parole Authority," signed on January 20, 2025," that "clarifies DHS's position regarding the scope of the parole statute, 8 U.S.C. § 1182(d)(5)" (the "January 20 Parole Memorandum"); and second, a Federal Register Notice entitled "Designating

Aliens for Expedited Removal," signed on January 21, 2025 and published on January 24, 2025, that "expands the scope of expedited removal to the statutory maximum under 8 U.S.C. § 1225(b)(1) which . . . includes certain aliens who have not been continuously present in the United States for two years" (the "January 24 Expanded Expedited Removal Notice"). Li Decl., ¶¶ 6-7 & Exs. B-C.

43.    Through the January 24 Expanded Expedited Removal Notice referenced in the January 23 Huffman Memorandum, the Secretary of DHS "exercise[d] the full scope of [DHS's] statutory authority to place in expedited removal, with limited exceptions, aliens determined to be inadmissible under sections 212(a)(6)(C) or (a)(7) of the INA who have not been admitted or paroled into the United States and who have not affirmatively shown, to the satisfaction of an immigration officer, that they have been physically present in the United States continuously for the two-year period immediately preceding the date of the determination of inadmissibility." Li Decl., Ex. C.

44.    The legal basis of the January 24 Expanded Expedited Removal Notice's expanded application of the expedited removal authority is "INA 235(b)(1)(A)(iii), 8 U.S.C. 1225(b)(1)(A)(iii), and 8 C.F.R. 253.3(b)(1)(ii)," Li Decl., Ex. C at 90 Fed. Reg. at 8139-40, which are statutes and regulations that allow expedited removal to be applied to individuals who have not been admitted or paroled and who have not been continuously present in the United States for two years.

45.    The January 23 Huffman Memorandum "provides guidance regarding how to exercise enforcement discretion in implementing" the January 20 Parole

Memorandum and the January 24 Expanded Expedited Removal Notice. Li Decl., Ex. A.

46. The January 23 Huffman Memorandum directs the leadership of ICE, CBP, and USCIS to "consider, in exercising your enforcement discretion, whether to apply expedited removal" to "any alien DHS is aware of who is amenable to expedited removal but to whom expedited removal has not been applied," which "may include steps to terminate any ongoing removal proceeding and/or any active parole status." Li Decl., Ex. A.

47. Apart from the January 20 Parole Memorandum and the January 24 Expanded Expedited Removal Notice (which itself cites 8 U.S.C. § 1225(b)(1)(A)(iii) and 8 C.F.R. § 253.3(b)(1)(ii)), the January 23 Huffman Memorandum cites no authority for this directive to ICE, CBP, and USCIS leadership. Li Decl., Ex. A.

*The February 18 ICE Directive*

48. On February 18, 2025, the leadership of Immigration and Customs Enforcement ("ICE") issued a directive to its Enforcement and Removal Operations ("ERO") personnel (the "February 18 ICE Directive") that instructed "ERO officers [to] consider for expedited removal (ER) . . . paroled arriving aliens." Li Decl., ¶ 8 & Ex. D.

49. The February ICE Directive authorized "ERO officers [to] process for ER any arriving alien (i.e., encountered at a port of entry) who CBP determined to be inadmissible and released, as long as the alien is inadmissible under INA 212(a)(6)(C) (fraud or willful misrepresentation) or 212(a)(7) (lack of valid immigration documents)." Li Decl., Ex. D.

50.   The February 18 ICE Directive authorized ERO officers to process "paroled arriving aliens" for expedited removal without regard to how long those individuals have been in the United States. Li Decl., Ex. D. ("There is no time limit on the ability to process such aliens for ER.").

51.   The February 18 ICE Directive references Executive Order 14165, "Securing Our Borders," 90 Fed. Reg. 8467 (Jan. 20, 2025). Li Decl. ¶¶ 8-9 & Exs. D-E. Apart from the reference to Executive Order 14165, the February 18 ICE Directive cites no authority for its directives to ERO personnel.  Li Decl., Ex. D.

52.   The February 18 ICE Directive does not reference the January 23 Huffman Memorandum. Li Decl., Ex. D.

*The March 25 CHNV Termination Notice*

53.   On March 25, 2025, DHS announced that it was terminating the parole processes for Cubans, Haitians, Nicaraguans, and Venezuelans. Notice, U.S. Dep't of Homeland Security, *Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans*, 90 Fed. Reg. 13611 (Mar. 25, 2025) (the "March 25 CHNV Termination Notice"). Li Decl. ¶ 10 & Ex. F.

54.   The March 25 CHNV Termination Notice also terminates all individual grants of parole under the CHNV parole processes. Li Decl., Ex. F, 90 Fed. Reg. at 13611 ("[t]he temporary parole period of aliens in the United States under the CHNV parole programs and whose parole has not already expired by April 24, 2025 will terminate on that date unless the Secretary makes an individual determination to the contrary.").

55.    DHS justified the premature termination of all grants of CHNV parole by explaining that "[e]xpedited removal is available only when an alien has not been continuously present in the United States for at least the two years preceding the date of the inadmissibility determination." Li Decl., Ex. F, at 90 Fed. Reg. at 13619.

56.    To support its assertion that expedited removal is only available when an individual has been present in the United States for less than two years, the March 25 CHNV Termination Notice cites INA § 235(b)(1)(iii)(II), 8 U.S.C. § 1225(b)(1)(iii)(II) and 8 CFR § 235.3, and—in a footnote—the January 24 Expanded Expedited Removal Notice, which itself cites the same authorities. Li Decl., Ex. F, 90 Fed. Reg. at 13619.

57.    The March 25 CHNV Termination Notice further explained that "[i]f DHS were to allow the CHNV parolee population to remain for the full duration of their two-year parole, DHS would be compelled to place a greater proportion of this population in section 240 removal proceedings to effectuate their removal." Li Decl., Ex. F, 90 Fed. Reg. 13619.

58.    Apart from 8 U.S.C. § 1225(b)(1)(A)(iii), 8 C.F.R. § 253.3(b)(1)(ii), and the January 24 Expanded Expedited Removal Notice, the March 25 CHNV Termination Notice cites no authority for its claim that expedited removal may be applied to CHNV parolees only if they have been continuously present in the United States for less than two years. Li Decl., Ex. F. The March 24 CHNV Termination Notice does not reference the January 23 Huffman Memorandum or the February 18 ICE Directive. Li Decl., Ex. F.

*Defendants' use of expedited removal*

59.    In 2011, DHS adopted a policy whereby ICE officers could use expedited removal "for all arriving aliens paroled into the United States for prosecution, regardless of how long they have been present in the United States." Dkt. No. 36-1 (Memo entitled "Strategic Use of Expedited Removal Authority") at 2.

60.    This 2011 policy was not made public until 2025, *see* Dkt. No. 36, and it is not in the administrative records (discussed more *infra*) for any of the agency actions challenged here, *see* Li Decl. ¶¶ 11-13, 28 & Exs. G, H, I, X.

61.    In this litigation, DHS has identified four noncitizens whom it paroled into the country for purposes of criminal prosecution and whom it later subjected to expedited removal after they completed their criminal sentences. Brief for Appellants at 9-10 n.1, Doc. 2145851, *CHIRLA v. Noem,* No. 25-5289 (D.C. Cir. Nov. 17, 2025).

62.    Beyond these four individuals, Defendants have identified no other pre-2025 instance in which DHS subjected a noncitizen paroled into the country at a port of entry to expedited removal. Brief for Appellants at 9-10 n.1, Doc. 2145851, *CHIRLA v. Noem,* No. 25-5289 (D.C. Cir. Nov. 17, 2025).

63.    Beginning in 2025, DHS has subjected other noncitizens paroled into the country at a port of entry to expedited removal, including those whose parole remained valid. Dkt. No. 22-2 – 22-5, 22-7 – 22-17; Salas Suppl. Decl.; Lawrence Suppl. Decl.; Escobar Suppl. Decl.; Torres Suppl. Decl.; Hercules-Paez Decl.; De Luca Decl.; Olive Suppl. Decl.; Declaration of Laura Kelley ("Kelley Decl."); Declaration of Dmitry Filimonov ("Filimonov Decl.").

64. In May 2025, White House deputy chief of staff Stephen Miller "set a goal of a minimum of 3,000 arrests for ICE every day and President Trump is going to keep pushing to get that number up higher each and every day." Li Decl. ¶ 14 & Ex. J.

65. In May 2025, pursuant to the direction of leadership, DHS attorneys representing ICE at immigration court hearings around the country moved to dismiss Section 240 removal proceedings of noncitizens. Li Decl. ¶ 15 & Ex. K.

66. After the cases were dismissed, ICE enforcement officers arrested the noncitizens and detained them to process them for expedited removal. Li Decl., Ex. K; Dkt. No. 22-5, 22-7 – 22-17; Hercules-Paez Decl.; De Luca Decl.; Kelley Decl.

67. Noncitizens previously paroled at a port of entry were among those targeted for expedited removal. Li Decl., Ex. K; Dkt. No. 22-5, 22-7 – 22-17; Hercules-Paez Decl.; De Luca Decl.; Kelley Decl.

68. As of July 9, 2025, Defendants represented to this court that they were not aware of "DHS or its predecessors ever applying or subjecting to expedited removal procedures individuals who had been previously paroled but whose parole terminated for whatever reason." Dkt. No. 35 at 52:3-8.

69. Between this Court's August 1, 2025 order preliminarily staying the January 23 Huffman Memo, February 18 ICE Directive, and March 25 CHNV Termination Notice, and the September 12, 2025 D.C. Circuit order denying Defendants' motion for a stay pending appeal, DHS acknowledged that this Court's order prevents the expedited removal of people previously paroled into the country at a port of entry. Dkt. No. 53-1.

70.     In September 2025, ICE canceled at least one expedited removal order of an individual who was previously paroled into the country, after Plaintiffs raised the case to Defendants as a violation of this Court's order. Dkt. No. 53-1.

71.     As of October 2025, DHS took the position that, even though this Court's order remained in place, DHS would resume placing previously paroled individuals in expedited removal, but now pursuant to the government's regulations. Li Decl. ¶ 4.

72.     Since October 2025, DHS has been subjecting certain noncitizens paroled into the country at a port of entry to expedited removal pursuant to the government's regulations. Reply Brief for Appellants at 4-5, 26, Doc. 2159516, *CHIRLA v. Noem*, No. 25-5289 (D.C. Cir. Feb. 17, 2026); Torres Suppl. Decl. ¶ 7; Hercules-Paez Decl. ¶ 14; *see also* Filimonov Decl. ¶¶ 5-6.

*Impact of expedited removal on noncitizens*

73.     Unlike Section 240 removal proceedings, which are conducted by Immigration Judges with the Department of Justice ("DOJ") who are sworn to serve as neutral judges, expedited removal is a process initiated, conducted, and adjudicated by DHS enforcement officers. Declaration of Ashley Tabaddor ("Tabaddor Decl."), Dkt. No. 22-6 ¶¶ 4, 11, 17.

74.     Individuals subject to expedited removal do not receive a hearing before an IJ, and they are not entitled to seek or be represented by counsel even at their own expense. Tabaddor Decl. ¶ 11. They are not given reasonable time to gather and submit documents, witness testimony, or legal motions to defend against their deportation. Tabaddor Decl. ¶ 17.

75. In Section 240 removal proceedings, noncitizens are afforded the opportunity to retain counsel and request continuances to secure representation. Tabaddor Decl. ¶ 17. They are given reasonable time to gather and submit documents, witness testimony, or legal motions to defend against their deportation. Tabaddor Decl. ¶ 17.

76. Expedited removal proceedings can result in deportation as quickly as within hours and days of detention. Tabaddor Decl. ¶ 11.

77. Individuals in expedited removal are typically detained by DHS from the time of apprehension through the conclusion of their case. Tabaddor Decl. ¶ 19.

78. In Section 240 proceedings, noncitizens who are *prima facie* eligible for collateral relief (relief from removal that can be granted not by an immigration court but by another entity like USCIS), such as adjustment of status, Temporary Protected Status ("TPS"), or Special Immigrant Juvenile Status ("SIJS"), can request that the Immigration Judge allow them to pursue those applications. Tabaddor Decl. ¶ 9. The Immigration Judge can exercise various options to do so, including granting a continuance, administratively closing proceedings, placing the case on the status docket to provide USCIS with time to adjudicate the collateral relief, or terminating proceedings altogether. Tabaddor Decl. ¶ 9.

79. In expedited removal, there is no mechanism for individuals to pursue eligibility for any non-fear-based forms of relief, including family-based petitions, special immigration visas, TPS, or adjustment of status. Tabaddor Decl. ¶ 16. Individuals with valid claims of these kinds of relief lose their ability to pursue them when they are processed for expedited removal. Tabaddor Decl. ¶ 16.

80.    Noncitizens in expedited removal who express a fear of returning to their home country are supposed to be referred for a credible fear screening interview. Tabaddor Decl. ¶ 12. These interviews are conducted by asylum officers who are also employees of DHS. Tabaddor Decl. ¶ 12.

81.    There is no right to counsel during a credible fear interview. Tabaddor Decl. ¶ 12.

82.    As noncitizens are typically detained during expedited removal proceedings, and they are given on average 24 to 48 hours' notice before credible fear interviews, their ability to obtain counsel, or contact another trusted individual to accompany them during the interview is severely constrained. Tabaddor Decl. ¶ 12.

83.    If after a credible fear interview the asylum officer finds no credible fear, the noncitizen can request a limited review by an Immigration Judge that focuses solely on whether the credible fear determination was proper. Tabaddor Decl. ¶ 14. If the Immigration Judge affirms the asylum officer's finding, there is no judicial review of the decision. Tabaddor Decl. ¶ 14.

84.    In Section 240 removal proceedings, Immigration Judge decisions are subject to appellate and judicial review in the circuit court of appeals. Tabaddor Decl. ¶ 17.

85.    The credible fear screening process has long been documented to lack basic and necessary safeguards to protect against the erroneous removal of noncitizens to dangerous situations abroad. Li Decl. ¶¶ 16-17 & Exs. L, M.

**The History of Expedited Removal from the Refugee Act of 1980 through the Illegal Immigration Reform and Immigrant Responsibility Act of 1996**

*1980s*

86.    In March 1980, Congress passed the Refugee Act, establishing the U.S. Refugee Admissions Program for resettling in the United States refugees identified and

processed abroad and requiring the Attorney General to establish a procedure to allow noncitizens "physically present in the United States or at a land border or port of entry" to apply for asylum. Pub. L. No. 96-212, § 201(b), 94 Stat. 102, 105 (*codified as amended at* 8 U.S.C. § 1158(a)); Declaration of Yael Schacher, ("Schacher Decl.") ¶ 12.

87.   After enactment but before the Attorney General established the required procedures to allow for the filing of asylum applications, tens of thousands of Cubans sailed from the port of Mariel and began arriving by boat in Florida. Thousands of Haitians also arrived in Florida during the spring and summer of 1980. Many were paroled into the country. Schacher Decl. ¶ 13.

88.   In 1981, U.S. officials were concerned that additional large groups of Cuban or Haitian migrants might attempt to come to the United States by boat. The Reagan Administration and members of Congress of both parties began to propose legislation to create an expedited exclusion process for migrants with fraudulent documents or no documents at all who were in the process of arriving at our borders or who had just come into the country at a place that was not a designated port of entry. Schacher Decl. ¶¶ 14-15.

89.   The Reagan administration's legislation containing the first expedited exclusion proposal was introduced in 1981 as S. 1765 and H.R. 4832, the "Omnibus Immigration Control Act," which authorized immigration officers during inspection to order noncitizens lacking necessary entry documents to be excluded and to "immediately deport[]" such noncitizens who are "arriving in the United States." Schacher Decl. ¶ 17 & Ex. B.

90.   After debate over the administration's bill, Rep. Romano Mazzoli and Sen. Alan Simpson introduced bills both in 1982 and during the following Congress that allowed inspectors to exclude noncitizens in the physical act of seeking entry to the United States who lacked documents authorizing entry. Schacher Decl. ¶¶ 18-19.

91.   Sen. Simpson's bills in both Congresses specified that the provision applied only "at the port of arrival" to people without entry documents who were described as "unlawfully seeking entry into the United States." Rep. Mazzoli's bills in both Congresses referred to people "seeking entry" who failed to provide required entry documents. Schacher Decl. ¶¶ 18-19.

92.   Each of these proposals was motivated, in part, by a desire to give the Immigration and Naturalization Service (INS) an expeditious exclusion tool to use against non-asylum seekers in the event of a future mass migration event. Schacher Decl. ¶¶ 14-19.

93.   None of these legislative proposals would have subjected people previously paroled into the country—including those Cuban and Haitian nationals who came in 1980 and were paroled into the country—to the expedited exclusion procedures. Schacher Decl. ¶¶ 16-20.

94.   The legislative proposals that passed the House and the Senate in 1983 and 1984 that containing expedited exclusion provisions also contained provisions allowing eligible Cuban and Haitian nationals who had been paroled into the country during this period to adjust status to lawful permanent residence. Schacher Decl. ¶¶ 18-20.

95.   Although none of the legislation with summary exclusion provisions proposed in the 1980s were enacted, Congress, in the Immigration Reform and Control Act of

1986, enacted a provision allowing Cuban and Haitian parolees who were otherwise eligible under the legislation to apply for adjustment of status to lawful permanent residence. Schacher Decl. ¶ 21.

**1990s**

96.    Congress's interest in an expedited exclusion process generally faded toward the second half of the 1980s, but returned in the 1990s due to increased reports of noncitizens arriving at airports with no documents or with fraudulent documents, increased smuggling of migrants by boat, and after the February 1993 bombing of the World Trade Center. Schacher Decl. ¶¶ 23-25.

97.    In response, Rep. Bill McCollum in March 1993 (H.R. 1355) and Sen. Simpson in May 1993 (S. 667) both introduced legislation that would have created an expedited exclusion process for people seeking entry with fraudulent documents and those who claimed asylum but could not pass a credible fear screening. Schacher Decl. ¶ 24.

98.    During the May 1993 Senate Judiciary Committee hearing on Sen. Simpson's bill, S. 667, Members of Congress raised concerns about the need to address increased smuggling of Chinese migrants to the United States by boat. Schacher Decl. ¶ 25.

99.    In July 1993, Reps. Mazzoli, McCollum, and Schumer introduced legislation, H.R. 2602, that combined the expedited exclusion of people seeking entry at ports of entry without proper documentation with provisions aimed at preventing smuggling. Schacher Decl. ¶ 25.

100.    Speaking on the House Floor in support of this legislation, Rep. Mazzoli described the bill as "keeping people out of the United States who are attempting to travel

with fraudulent papers" and providing "an expedited but fair hearing for those who plead asylum when they reach this shore." Schacher Decl. ¶ 25 & Ex. H.

101.    In July 1993, Sen. Edward Kennedy introduced legislation, S. 1333, that applied expedited exclusion to those seeking entry at ports with fraudulent documents and those who tried to enter by boat and were brought by U.S. authorities to a port of entry for inspection. Schacher Decl. ¶ 26.

102.    In May 1994, Rep. Lamar Smith introduced legislation, H.R. 3860, that included an expedited exclusion provision. Like Rep. Mazzoli's bill, the legislation was focused on noncitizens seeking entry at ports without necessary documents. Schacher Decl. ¶ 27.

103.    None of these expedited exclusion provisions proposed between 1992 and 1994 mentioned people paroled into the country. Schacher Decl. ¶ 29.

104.    On September 13, 1994, Congress enacted the Violent Crime Control and Law Enforcement Act of 1994. The legislation contained a "sense of the Senate" that the country's immigration and asylum laws should be amended to provide an expedited exclusion process for noncitizens "who arrive[] at a port-of-entry with fraudulent documents, or no documents" and who make a "noncredible claim of asylum." Schacher Decl. ¶ 28 & Ex. I.

105.    The Violent Crime Control and Law Enforcement Act of 1994 contains no mention of people previously paroled into the country in connection with its support for the creation of an expedited exclusion authority. Schacher Decl. ¶ 28 & Ex. I.

### 104th Congress and the Enactment of AEDPA and IIRIRA

106.    On March 14, 1995, the Senate Judiciary Committee held a hearing on S. 269, the "Immigrant Control and Financial Responsibility Act of 1995," as well as a

proposal advanced by the Clinton Administration, both of which contained expedited exclusion provisions. At the hearing, the discussion regarding these provisions focused exclusively on people arriving at ports of entry or brought to the United States after interdiction at sea. Schacher Decl. ¶ 29.

107. Although both expedited exclusion and reforms to the parole authority were discussed at the hearing, the two topics were treated as entirely separate subjects and no senator or witness argued that an expedited exclusion authority should be available for use against noncitizens paroled into the country at ports of entry. Schacher Decl. ¶ 29.

108. On April 19, 1995, a domestic terrorist attack took place in Oklahoma City, where the Alfred P. Murrah Federal Building was bombed. Schacher Decl. ¶ 30.

109. Over the course of the next year and a half, Congress considered both immigration legislation that eventually became the Illegal Immigration and Immigrant Responsibility Act (IIRIRA) and antiterrorism legislation that eventually became the Antiterrorism and Effective Death Penalty Act (AEDPA). Both pieces of enacted legislation included expedited removal provisions. Schacher Decl. ¶ 31.

110. Exhibit J to the Declaration of Yael Schacher accurately reflects and summarizes key legislative moments in the 104th Congress leading to the enactment of both IIRIRA and AEDPA. Schacher Decl. ¶ 31 & Ex. J.

111. AEDPA was enacted into law first, on April 24, 1996. Schacher Decl. ¶ 40; AEDPA, Pub. L. No. 104-132.

112.    AEDPA made noncitizens lacking entry documents who were "seeking entry" subject to expedited exclusion. Schacher Decl. ¶ 38 & Ex. N; AEDPA, Pub. L. No. 104-132, § 422.

113.    Congress designed this "seeking entry" authority for noncitizens lacking entry documents who were arriving in the country at a port of entry. Schacher Decl. ¶¶ 35-36, 38.

114.    During markup of H.R. 1710, the House bill that first contained the expedited removal provisions ultimately enacted in AEDPA, Judiciary Committee Chairman Henry Hyde emphasized that the goal of the "seeking entry" provision was deal with "people who show up at the airport" without proper documents and to "get control" of the situation where people "get off [the plane] without documentation." Schacher Decl. ¶ 35 & Ex. K.

115.    The House Judiciary Committee report for H.R. 1710 described the "seeking entry" provision as applying to noncitizens "arriving at the port of entry" and providing authority to return noncitizens at airports with fraudulent or no documents "as promptly as possible, to where they boarded the plane to come here." Schacher Decl. ¶ 36 & Ex. M.

116.    AEDPA also deemed noncitizens "found in" the country without having been admitted following inspection to be "seeking entry and admission" and exposed them not only to exclusion hearings, but also to expedited exclusion. Schacher Decl. ¶ 33; AEDPA, Pub. L. No. 104-132, § 414.

117.    Congress designed this "found in" authority for noncitizens present in the country who entered without inspection, wholly unlawfully. Schacher Decl. ¶¶ 35-36, 38.

118. During markup, Chairman Hyde described the "found in" provision as focused on those who "evade our border controls," "succeed in crossing our borders illegally," and make a "stealthy entrance." The provision was meant as "an expression of our resolve" to end incentives "for terrorists to enter the country illegally." Schacher Decl. ¶ 35 & Ex. K.

119. The House Judiciary Committee report for H.R. 1710 described the "found in" provision as applying to noncitizens who "entered the United States unlawfully" and "regardless of the length of time the illegal entrant has been unlawfully present within the United States." Schacher Decl. ¶ 36 & Ex. M. The INS described the "found in" provision in AEDPA as applying to noncitizens "who have entered the U.S. without inspection, wherever encountered and irrespective of their length of stay in the U.S." Schacher Decl. ¶ 46 & Ex. S.

120. At no point in the legislative history leading to the enactment of AEDPA, including the House Judiciary Committee hearings and markups on H.R. 1710 or consideration of the legislation on the House or Senate Floor, was there any mention of noncitizens who had been paroled into the country at a port of entry being treated as "seeking entry." Schacher Decl. ¶¶ 34-35, 37, 39.

121. At no point in the legislative history leading to the enactment of AEDPA, including the House Judiciary Committee hearings and markups on the bill or consideration of the legislation on the House or Senate Floor, was there any mention of noncitizens who had been paroled into the country at a port of entry being treated as "found in" the country without inspection. Schacher Decl. ¶¶ 34-35, 37, 39.

122.   IIRIRA was enacted into law on September 30, 1996. Schacher Decl. ¶ 62; IIRIRA, Pub. L. No. 104-208, 110 Stat. 3009, Division C. The first purpose of IIRIRA was to "improve deterrence of illegal immigration to the United States." Schacher Decl. ¶ 63 & Ex. L.

123.   IIRIRA rescinded both the "seeking entry" and "found in" provisions enacted in AEDPA. Schacher Decl. ¶ 41.

124.   To replace the "seeking entry" expedited exclusion provision contained in AEDPA, Congress authorized in IIRIRA the use of expedited removal against noncitizens lacking entry documents who are "arriving in" the country. IIRIRA, Pub. L. No. 104-208, 110 Stat. 3009, Division C, Sec. 302; *see* Schacher Decl. ¶¶ 40, 42-66.

125.   To replace the "found in" expedited exclusion provision contained in AEDPA, Congress authorized in IIRIRA, subject to designation by the Attorney General, the use of expedited removal against noncitizens lacking entry documents who have not been admitted or paroled into the country and cannot establish two years of physical presence. IIRIRA, Pub. L. No. 104-208, 110 Stat. 3009, Division C, Sec. 302; *see* Schacher Decl. ¶¶ 40, 42-66.

126.   When the Senate Immigration Subcommittee marked up the Senate bill that would become IIRIRA, the bill sponsor, Sen. Simpson, emphasized that "[t]he purpose of expedited exclusion is just that, to accelerate the exclusion of those who would abuse our hospitality and generosity through surreptitious entry, document fraud, and by making fraudulent and wholly frivolous asylum claims." Schacher Decl. ¶ 43 & Ex. Q.

127. Similarly, the House Judiciary Committee markup debates for its versions of the bill confirm that the bill's proponents understood the expedited removal provision as applying to people in the process of physically coming into the country without valid documents. During the markup, Rep. Smith made it clear that expedited removal was designed to return "as promptly as possible to where they boarded the plane to come here" those without valid entry documents who had no fear of persecution. Schacher Decl. ¶ 50 & Ex. U.

128. The Department of Justice's official views on the expedited exclusion provisions in the House- and Senate-passed versions of IIRIRA supported the Senate-passed version, with certain modifications, because it provided sufficient flexibility to use the authority when needed for people attempting to come into the country at ports of entry without proper documents. The Department wrote that, "[e]xpedited exclusion authority is critically important to our ability to deal with organized alien smuggling and fraud at our ports of entry." Schacher Decl. ¶ 55 & Ex. W.

129. Unlike the expedited removal provisions that were enacted in AEDPA after receiving little scrutiny throughout the process, the expedited removal provisions that were being considered in the House and Senate immigration bills underwent significant debate and discussion. But at no point during the process was there any discussion of creating a statutory authorization of expedited removal to be used against noncitizens who had already been paroled into the country at a port of entry. Schacher Decl. ¶ 41.

130. At no point in the legislative history leading to the enactment of IIRIRA, which included extensive House Judiciary Committee and Senate Judiciary Committee

hearings and markups on the bill, House and Senate Floor debates, and materials prepared and exchanged when the House and Senate bills were being conference was there any mention of noncitizens who had been paroled into the country at a port of entry being treated as "arriving in" the country. Schacher Decl. ¶¶ 41-66.

131.    At no point in the legislative history leading to the enactment of IIRIRA, which included extensive House Judiciary Committee and Senate Judiciary Committee hearings and markups on the bill, House and Senate Floor debates, and materials prepared and exchanged when the House and Senate bills were being conferenced was there any mention of noncitizens who had been paroled into the country at a port of entry being subjected to expedited removal pursuant to a designation by the Attorney General. Schacher Decl. ¶¶ 41-66.

132.    The first time in the legislative history of IIRIRA that there is a reference to noncitizens paroled into the country in connection to exposure to expedited removal is in the version of the legislation reported by the Conference Committee, where the provision targeting noncitizens who entered the country without inspection now included language to specifically protect from expedited removal noncitizens who have been paroled into the country (just as the language already protected noncitizens who have been admitted to the country). Schacher Decl. ¶ 66.

**Parole Reform Efforts As Distinct From Expedited Removal**

133.    Congressional efforts to modify the parole authority prior to IIRIRA have always been distinct from efforts to create an expedited removal authority. Schacher Decl. ¶¶ 67-74.

28

134. In 1980, Congress replaced the conditional entry of refugees with a process for the admission of refugees and also amended the parole statute to limit the statutory authority to parole refugees into the country rather than admitting absent "compelling reasons in the public interest." Schacher Decl. ¶ 68.

135. In 1994 and 1995, legislation was proposed but not enacted to limit how many people and who could be paroled and the eligibility of parolees for work authorization or adjustment of status. Schacher Decl. ¶ 68.

136. In 1996, Congress in IIRIRA enacted several provisions pertaining to the parole authority and amended the parole statute itself. Schacher Decl. ¶¶ 69-71. These include: (1) requiring nearly all long-term parolees who have yet to become lawful permanent residents be counted against annual numerical caps on family-sponsored immigration; (2) requiring the Executive to report to Congress annually on the use of parole; and (3)  and replacing the "emergent reasons or for reasons deemed strictly in the public interest" language that had been in the parole criteria since 1952 with "urgent humanitarian reasons or significant public benefit." Schacher Decl. ¶¶ 69-71.

137. Congress did not in IIRIRA amend—or discuss amending—the parole statute to render noncitizens paroled into the country at a port of entry as "arriving" in the United States," regardless of whether their parole had expired or otherwise been terminated. Schacher Decl. ¶ 73.

138. Congress did not in IIRIRA amend—or discuss amending—the parole statute to state that a noncitizen paroled into the country at a port of entry could be subject to

removal under the contemporaneously enacted expedited removal authority at 8 U.S.C. § 1225(b)(1). Schacher Decl. ¶ 73.

139.    When legislative proposals regarding parole were being considered in the wake of the enactment of the Refugee Act and continuing through enactment of IIRIRA, there was no consideration given to subjecting noncitizens who previously had been paroled into the country to summary removal provisions also being considered. Schacher Decl. ¶ 73.

140.    Rather, throughout this period—and even in IIRIRA itself—Congress regularly continued to enact legislation allowing such individuals physically present in the country pursuant to parole to adjust status to lawful permanent residence. Schacher Decl. ¶ 74.

**The Administrative Record**

*January 23 Huffman Memorandum*

141.    The Administrative Record ("AR") that Defendants produced for the January 23 Huffman Memorandum consists of 18 documents in PDF format totaling 141 pages. Li Decl., Ex. G.

142.    All 18 documents in the AR were already publicly available either because they were published on a government website, printed in the Federal Register, or filed on the public docket of a federal court case. Li Decl., Ex. G.

143.    The AR has no information about DHS subjecting of individuals who were paroled into the country at a port of entry to expedited removal before 2025. Li Decl., Ex. G.

144.   Nothing in the AR provides an explanation as to why the government began subjecting paroled individuals to expedited removal in 2025. Li Decl., Ex. G.

145.   The AR includes the Federal Register Notice cited in the January 23 Huffman Memo, "Designating Aliens for Expedited Removal," 90 Fed. Reg. 8139 (Jan. 24, 2025), which expanded the use of expedited removal under 8 U.S.C. § 1225(b)(1)(A)(iii)(II). Li Decl., Ex. C.

146.   The AR includes two notices of termination of parole, which instruct to the individual receiving the notice, "Do not attempt to unlawfully remain in the United State – the federal government will find you." Li Decl. ¶ 18 & Ex. N.

147.   There is no information in the AR about the government's ability to subject paroled individuals to expedited removal while their parole is active. Li Decl., Ex. G.

148.   There is no information in the AR about the government's ability to subject paroled individuals to expedited removal after they have been continuously present in the United States for at least two years. Li Decl., Ex. G.

149.   There is no information in the AR about the impact that applying expedited removal to parole beneficiaries have on those individuals, nor on any reasonable alternatives to applying expedited removal to paroled individuals that DHS considered. Li Decl., Ex. G.

150.   There is no information in the AR about the reliance interests of parole beneficiaries or their families, sponsors, employers, and communities that would be implicated of the parole beneficiaries were to be subjected to expedited removal. Li Decl., Ex. G.

*February 18 ICE Directive*

151.   The AR that Defendants produced for the February 18 ICE Directive consists of three documents in PDF format totaling seven pages. Li Decl., Ex. H.

152.   The three documents that make up the AR are the February 18 ICE Directive itself, the January 23 Huffman Memorandum, and the Executive Order specifically referenced in the February 18 ICE Directive (Executive Order 14165, "Securing Our Borders," (January 20, 2025). Li Decl., Ex. H.

153.   All three documents in the AR were already publicly available either because they were published on a government website or made publicly available online (on news sites, for example). Li Decl. ¶ 12 & Ex. H.

154.   The AR has no information about DHS's subjecting of individuals who were paroled into the country at a port of entry to expedited removal before 2025. Li Decl., Ex. H.

155.   Nothing in the AR provides an explanation as to why the government, shortly after issuing the January 23 Huffman Memorandum, took the new position that there is no time limit on the ability to process paroled individuals for expedited removal. Li Decl., Ex. H.

156.   There is no information in the AR about the impact that applying expedited removal to parole beneficiaries has on those individuals, nor on any reasonable alternatives to applying expedited removal to paroled individuals that DHS considered. Li Decl., Ex. H.

157.   There is no information in the AR about the reliance interests of parole beneficiaries or their families, sponsors, employers, and communities that would be implicated

if the parole beneficiaries were to be subjected to expedited removal. Li Decl., Ex. H.

*March 25 CHNV Termination Notice*

158.   The AR that Defendants produced for the March 25 CHNV Termination Notice has 68 entries consisting of two native format Excel spreadsheets and 66 documents in PDF format totaling 840 pages. Li Decl., Ex. I.

159.   Of the 66 PDF documents in the AR, all were already publicly available either because they were published on a government website, printed in the Federal Register, filed on the public docket of a federal court case, or otherwise made publicly available online (on news sites, for example). Li Decl., Ex. I.

160.   The AR does not include the February 18 ICE Directive. Li Decl., Ex. I.

161.   Aside from the January 23 Huffman Memorandum and the March 25 CHNV Termination Notice itself, there is no information in the AR about DHS's subjecting of individuals who were paroled into the country at a port of entry to expedited removal. Li Decl., Ex. I.

162.   Nothing in the AR provides an explanation as to why the government, after issuing the February 18 ICE Directive, took the changed position that expedited removal is available only when a noncitizen has not been continuously present in the United States for at least two years. Li Decl., Ex. I.

163.   There is no information in the AR about the government's ability to subject paroled individuals to expedited removal while their parole is active. Li Decl., Ex. I.

164. There is no information in the AR about the government's ability to subject paroled individuals to expedited removal after they have continuously resided in the United States for more than two years. Li Decl., Ex. I.

165. There is no information in the AR about the impact that applying expedited removal to parole beneficiaries have on those individuals, nor on any reasonable alternatives to applying expedited removal to paroled individuals that DHS considered. Li Decl., Ex. I.

166. There is no information in the AR about the reliance interests of parole beneficiaries or their families, sponsors, employers, and communities that would be implicated of the parole beneficiaries were to be subjected to expedited removal. Li Decl., Ex. I.

*The "Arriving Alien" Definition*

167. The AR that Defendants produced for the 1997 rulemaking that included the definition of "arriving alien" has 291 entries consisting of 9 documents in PDF format totaling 1,949 pages. Li Decl. ¶ 28 & Ex. X.

168. The AR that Defendants produced for the 1997 rulemaking is entirely composed of public comments submitted on the notice of proposed rulemaking and the interim rule. Li Decl., Ex. X; Schacher Decl. ¶ 75.

169. Of the public comments in the AR, only three commenters identified and objected to the inclusion of people paroled into the country at ports of entry in the "arriving alien" definition. Li Decl. ¶¶ 19-21 & Exs. O, P, Q.

170. Two of these commenters made the structural argument presented in this case that including paroled individuals as arriving aliens who would therefore be exposed to

expedited removal as noncitizens "arriving in the United States" conflicts with the express statutory provision that protects individuals who have been paroled into the country from expedited removal. Li Decl., Exs. O, P.

171. The third commenter, a group of immigration and asylum law experts, argued that the inclusion of people previously paroled into the country appeared to rest on the "legal fiction" that parolees, though physically present, had not yet effected an entry into the country, but changes made in IIRIRA were largely designed to "do away with that fiction." Li Decl., Ex. Q.

172. With the exception of these commenters who objected to the inclusion of parolees in the definition of "arriving alien," the public comments received in response to both the notice of proposed rulemaking and the interim rule indicate that nearly everyone who commented was unaware of the potential application of expedited removal to parolees and instead understood the arriving alien definition and its application in the expedited removal context to be limited to people literally in the process of arriving in the United States. Schacher Decl. ¶ 77.

173. Senators Edward Kennedy and Paul Wellstone's comment on the proposed rule evidenced their understanding that IIRIRA's authorization to use expedited removal on noncitizens "arriving in the United States" was limited to noncitizens at ports of entry during secondary inspection, as they focused on the fact that, "[r]efugees often arrive in the U.S. having just fled their persecutors. They are usually exhausted, jet-lagged and terrified." Li Decl. ¶ 22 & Ex. R.

174. Senator Spencer Abraham's comment similarly evidenced his understanding that the use of expedited removal under the statute for noncitizens "arriving" with false

or no documents applied to people in secondary inspection at ports of entry, frequently "following an exhausting and stressful escape from persecution." Li Decl. ¶ 23 & Ex. S.

175.   The comments from Representative Lamar Smith, who played a key role in House passage of IIRIRA, highlight both that "arriving in the United States" was tied to the process of physically entering into the country, and that the regulatory definition of "arriving alien" was used for various purposes beyond expedited removal. Li Decl. ¶¶ 24-25 & Exs. T, U.

Dated: March 3, 2026                                Respectfully submitted,

                                                    */s/Hillary Li*
                                                    Hillary Li (GA0052)
                                                    Esther H. Sung (CA00132)
                                                    Karen C. Tumlin (CA00129)
                                                    Laura Flores-Perilla (admitted *pro hac vice*)
                                                    Brandon Galli-Graves (admitted *pro hac vice*)
                                                    **JUSTICE ACTION CENTER**
                                                    P.O. Box 27280
                                                    Los Angeles, CA 90027
                                                    Telephone: (323) 450-7272
                                                    esther.sung@justiceactioncenter.org
                                                    karen.tumlin@justiceactioncenter.org
                                                    hillary.li@justiceactioncenter.org
                                                    laura.flores-perilla@justiceactioncenter.org
                                                    brandon.galli-graves@justiceactioncenter.org

                                                    Tom-Tsvi M. Jawetz (*pro hac vice*)
                                                    *JAC Cooperating Attorney*
                                                    1358 Jefferson St. NW
                                                    Washington, DC 20011
                                                    Telephone: (202) 413-5208
                                                    Tom.Jawetz@gmail.com

                                                    Carl Bergquist (*pro hac vice*)
                                                    **COALITION FOR HUMANE IMMIGRANT RIGHTS**
                                                    2533 West 3rd St, Suite 101

Los Angeles, CA 90057
Telephone: (310) 279-6025
cbergquist@chirla.org

Shana Khader (D.D.C. Bar No. 90011926)
**CASA, INC.**
P.O. Box 7277
Hyattsville, MD 20787
(240) 406-4348
skhader@wearecasa.org

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on March 3, 2026, I electronically filed the foregoing motion with the Clerk of the Court for the United States Court of for the District of Columbia by using the CM/ECF system. Counsel in the case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

*/s/Hillary Li*
Hillary Li