UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| COALITION FOR HUMANE IMMIGRANT RIGHTS, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> Noem, *et al.* <br><br> *Defendants*. | Case No 25-cv-00872. |

**DECLARATION OF ANGELICA SALAS, EXECUTIVE DIRECTOR OF THE COALITION FOR HUMANE IMMIGRANT RIGHTS ("CHIRLA")**

I, Angelica Salas, upon my personal knowledge, hereby declare as follows:

1. I am the Executive Director of the Coalition for Humane Immigrant Rights ("CHIRLA"). I have held this position since 1999, and I have worked at CHIRLA since 1995.

2. CHIRLA is a nonprofit organization headquartered in Los Angeles, California. CHIRLA was founded in 1986, and its mission is to advance the human and civil rights of immigrants and refugees and ensure immigrant communities are fully integrated into our society with full rights and access to resources.

3. I make this statement based upon personal knowledge, files and documents of CHIRLA that I have reviewed (such as case files, reports, and collected case metrics), as well as information supplied to me by employees of CHIRLA whom I believe to be reliable. These files, documents, and information are of a type that is generated in the ordinary course of our business and that I would customarily rely upon in conducting CHIRLA business.

4. I incorporate by reference my previous declaration submitted to this Court on June 11, 2025 (ECF No. 22-3).

5. CHIRLA has been generally aware of expedited removal since at least 1996 when it was incorporated into the Immigration and Nationality Act ("INA") with the enactment of the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA").

6. In 1997, the Immigration and Naturalization Service ("INS")—the predecessor agency to the Department of Homeland Security ("DHS")—issued a Notice of Proposed Rulemaking ("NPRM") containing significant and varied proposed changes to INS regulations. Although some of the proposed regulatory changes were focused on implementing the new expedited removal authority created in IIRIRA, most pertained to other parts of immigration law. For instance, the NPRM proposed creating for the first time a definition of "arriving alien," a term that is used throughout immigration law, at 8 C.F.R. § 1.1(q).

7. CHIRLA submitted a comment on the NPRM, attached as Exhibit A, AA-REG-01279-01283, that addressed a number of different topics, including proposed regulatory changes to, among other things, asylum, voluntary departure, detention, and the treatment of noncitizen children. But CHIRLA at the time was most concerned about the proposed regulations pertaining to the use of expedited removal on noncitizens "arriving" in the United States.

8. From the comment it is clear that CHIRLA understood that the proposed regulations for applying expedited removal to "arriving aliens"—consistent with the statutory authority in IIRIRA to apply expedited removal to noncitizens "arriving in the United States"—would be directed at noncitizens who were in the process of actually coming into the country at a port of entry "without proper documents." Ex. A, AA-REG-01280. CHIRLA's comment referenced the need to ensure that "[p]otential refugees arriving without documents" receive information about the process as well as adequate time to "rest, eat, and contact friends or family in the U.S., or organizations which may assist them" before undergoing a "[p]re-screening

interview" in a suitable location that is "away from *other airport activities*." *Id.* (emphasis added). The comment further reflected CHIRLA's understanding that arriving noncitizens referred for a credible fear interview would have limited opportunity to build corroborating evidence or obtain witness testimony to support their fear claim because they will have "been in the United States for a short period of time" and will have been detained throughout that period. *Id.* The comment additionally concurred with the INS's proposal to not utilize the authority granted by statute to make expedited removal available to noncitizens "who have entered without inspection and who have been in the U.S. for less than two years." Ex. A, AA-REG-01281.

9. Nothing in CHIRLA's comment suggests that the organization contemplated that the INS (or any successor agency) would adopt the position that expedited removal could be used against a noncitizen who was not in the process of attempting to physically come into the country at a port of entry. Similarly, CHIRLA's comment at the time makes clear that the organization understood that expedited removal against a noncitizen present in the country could only be used against a noncitizen who entered without inspection and was here for less than two years.

10. From the time I began working at CHIRLA in 1995, I had not until 2025 encountered any individual—CHIRLA member or otherwise—subjected to expedited removal who had been paroled at a port of entry.

11. CHIRLA has worked consistently with paroled individuals since at least 2000. From the time I began working at CHIRLA in 1995 and until 2025, I had not encountered a paroled individual—CHIRLA member or otherwise—who was put into expedited removal.

12. Now, we are seeing for the first time, people who have followed a process, been vetted and allowed to come into the United States, and then suddenly *en masse* be subjected to

3

mass termination of their status with the threat of imminent deportation looming over them and their families.

13. This amounts to bad faith, and pulling the rug out from under people, undermining their pursuit of legally available relief. We have people who arrived and were granted parole status by the government, aiming to file for another form of relief, and now with no notice they have to scramble to seek such relief or risk deportation. CHIRLA members are among those who, at all stages until the recent parole termination and threat of expedited removal, were promised something very different by the U.S. Government.

### Harm to CHIRLA's Members

14. CHIRLA continues to have many members who have already been, or are likely to be, directly harmed by the administration's attempts to end humanitarian parole protections and expose paroled individuals to expedited removal. We have members specifically who were granted parole through either CBP One or the parole processes for Cuba, Haiti, Nicaragua, and Venezuela ("CHNV parole") and who have been or are at risk of being placed in expedited removal proceedings under the Trump administration's current policies.

15. I am aware of Defendants' position in this litigation that despite the district court's August 1, 2025 order, the government can subject individuals previously paroled into the country at a port of entry to expedited removal pursuant to its regulatory authority under 8 C.F.R. § 235.3(b)(1)(i), which references the definition of "arriving alien" at 8 C.F.R. § 1.2. I am also aware that 8 C.F.R. § 1.2 states that an "arriving alien" who is paroled into the country remains an "arriving alien," regardless of whether their parole is active or has been terminated or revoked. Given this position, CHIRLA members who are parole beneficiaries remain at constant risk of being placed in expedited removal at any time.

16. CHIRLA's Ukrainian clients who are here on parole are very fearful that they could be deported without due process, without getting a fair chance to defend their right to be here. They spend a lot of time thinking about what will happen to them: will they get to stay in the U.S., or be forced to return to Ukraine where it is dangerous for them, or forced to seek refuge somewhere else?

17. Furthermore, our Afghan clients, some of whom are also CHIRLA members, are very afraid of being subjected to expedited removal without any due process. Specifically, they are fearful of being detained under poor conditions to pressure them into accepting deportation rather than receiving true due process. Their perspectives are that they put their lives on the line to help U.S. military members during a war that dragged on for 20 years, and now they are struggling to wrap their heads around how the U.S. has utterly broken its promise to them.

18. CHIRLA also has members who were granted parole after making a port-of-entry appointment with the CBP One application and are currently in section 240 removal proceedings, who must appear in immigration court for regular hearings. Many of these members fear that they will be arrested in immigration court and summarily removed from the country because they have heard of the exact same thing happening to others. CHIRLA also has members whose parole was prematurely terminated and who have been in the country for less than two years, including some who do not yet have any pending applications for asylum or other immigration relief. CHIRLA members are well aware of the recent significant increase in immigration enforcement at courthouses across the country and in and around Los Angeles. The escalation in immigration enforcement underlines how exposed CHIRLA members are to the administration's drive to terminate individual grants of parole and subject paroled individuals to expedited removal.

19. CHIRLA's membership includes R.H.H., a national of El Salvador, who was paroled into the United States at a port of entry along with her two minor children, C.M.H. and M.M.H, after she secured a CBP One appointment for them in November 2024. On June 5, 2025, R.H.H. and her children attended their initial master calendar hearing in immigration court. At the hearing, DHS moved to dismiss R.H.H. and her children's removal proceedings, which the immigration judge granted over R.H.H.'s opposition. As R.H.H. and her children were walking out of the courtroom following the hearing, ICE officers apprehended and detained them and then issued them expedited removal orders. ICE subsequently detained R.H.H., eight-year-old C.M.H., and six-year-old M.M.H. for over a month until their counsel's release request was granted. R.H.H. and her children described their time in detention as traumatic and devastating. R.H.H.'s children had trouble sleeping, did not want to eat, cried constantly, and asked when they would be able to see their father, with whom they all lived prior to their detention. R.H.H., who is pregnant, fears that if returned to El Salvador, she and her children would be tortured or killed.

20. J.L. is also a CHIRLA member and Venezuelan national. She, her brother, and her two children waited for 9 months in Mexico for a CBP One appointment. When they secured the appointment and came to a port of entry in June 2024, they were paroled into the U.S. J.L. obtained a work permit after applying for asylum. However, given the news of arrests, detention, and targeting for expedited removal of parolees like her, J.L. and her family live in constant fear of being detained for months in immigration detention – which she believes are "horrible places" where they would have "no idea what would happen to us" – or deported. If sent back to Venezuela, they fear oppression from the government, which often views those seeking safety in the U.S. as traitors and persecutes them with punishments that include stripping them of their

citizenship. Though this fear haunts J.L. constantly and becomes even more acute when she goes out, she must nonetheless go out in public six days a week to work her warehouse job. She would rather stay home to minimize the possibility of encounters with immigration agents, but because she is poor, she cannot keep up with the cost of living unless she works almost every day. She frequently thinks to herself that if this government is willing to kill citizens and detain green card holders, it would mean very little to them to detain and deport an asylum seeker like her.

21. As described in my last declaration, ECF 22-7, E.I.R.M. is a CHIRLA member and national of Mexico who was paroled into the United States at a port of entry in November 2023 following a CBP One appointment. In May 2025, an Immigration Judge dismissed his removal proceedings. He was immediately detained and later released on bond while his appeal was pending. In October 2025, the Board of Immigration Appeals dismissed his appeal. Accordingly, he is at imminent risk of being detained again and subjected to expedited removal.

22. J.P. is another CHIRLA member and a Haitian national who was paroled at a port of entry in December 2024 following a CBP One appointment. He filed an asylum application, and at his master calendar hearing in July 2025, the Immigration Judge granted DHS's motion to dismiss J.P.'s removal proceedings. J.P. was immediately arrested and detained, and when J.P.'s attorney submitted a request with ICE to release him and vacate any expedited removal order against him, ICE refused. J.P.'s attorney appealed the dismissal of J.P.'s removal proceedings, which remains pending. J.P. is still in detention and fears that if his appeal is not successful, he could be subjected to expedited removal and removed from the country at any time.

23. The administration remains clear — including through its interpretation of the current regulations — in its intention to remove noncitizens, including parole beneficiaries, as

quickly as possible, in as large numbers as possible. CHIRLA members are at significant risk of being subjected to expedited removal proceedings rather than regular removal proceedings because of the administration's express intent to target parole beneficiaries, including by terminating ongoing removal proceedings and active parole status. This threat of expedited removal and all the harm it inflicts on individuals and their families continues to cause widespread fear among CHIRLA members.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed February 27, 2026, in Los Angeles, California.

_____
Angelica Salas

# EXHIBIT A

Coalition for Humane Immigrant Rights, et al. v. Noem et al., 1:25-cv-00872 (JMC)

# CHIRLA

Coalition for Humane Immigrant Rights of Los Angeles                              1521 Wilshire Blvd. Los Angeles CA 90017

(213) 353-1333 • FAX (213) 353-1344





received
2/5/97 PDT

January 31, 1997

Director, Policy Directives and Instructions Branch
Immigration and Naturalization Service
425 I Street NW, Room 5307
Washington, D.C. 20536

RE: INS NUMBER 1788-96
    COMMENTS TO PROPOSED RULE ON ILLEGAL IMMIGRATION REFORM AND
    IMMIGRANT RESPONSIBILITY ACT OF 1996

Dear Sir/Madam:

The Coalition of Humane Immigrant Rights of Los Angeles ("CHIRLA") is a broad-based, multi-ethnic umbrella organization composed of over one hundred voluntary, nonprofit, legal, religious, immigrant, community, government, labor, academic, and business sectors concerned with ensuring the fair and humane treatment of immigrants and refugees. Since its inception in 1986, CHIRLA has been the leading advocacy group on immigration-related issues affecting the greater Los Angeles area.

Attached please find comments to proposed rules on IIRAIRA. These comments were compiled by the American Immigration Law Foundation.

On behalf of its members, CHIRLA hereby declares its support of these comments and urges their incorporation into the final regulations.

Thank you for your consideration.

Sincerely,

Susan Alva, Attorney/Coordinator
Immigration and Citizenship Project

# KEY CONCERNS TO PROPOSED RULE TO IIRIRA, # 1788-96

## COMMENTS REGARDING SUMMARY REMOVAL

**Information Given to Aliens Arriving Without Proper Documents**: The new law raises the stakes for those fearing persecution. Potential refugees arriving without documents will have to establish their fear in a very limited process. It is crucial that the Service allow repeated opportunities within the inspection and pre-screening process for those who may fear persecution to make that fear known to the INS officers, and that it provide a meaningful opportunity to apply for asylum.

The regulations should specify that arriving aliens without proper documents will be given information about the asylum interview. Such information should stress the importance of indicating to the immigration officer any fear of persecution or desire to apply for asylum. The information should be clearly communicated to the alien in a manner that the alien will understand, in the alien's language. The information should also explain the confidential nature of interviews with INS officials. The INS should also give to the alien information about volunteer services available to help arriving refugees during the expedited removal process, such as the names and telephone numbers of non-governmental organizations that provide pro bono services to refugees, including the United Nations High Commissioner for Refugees.

**The Pre-screening Interview**: Pre-screening interviews should be conducted only after arriving aliens are given time to rest, eat, and contact friends or family in the U.S., or organizations which may assist them. Pre-screening interviews should take place in private, comfortable rooms away from other airport activities. The regulations should require that aliens have access to interpreters before and during the pre-screening process. In order to facilitate review by a supervisory officer, pre-screening officers should keep records of all determinations of individuals who did not indicate a fear of being returned.

**"Credible Fear" Interviews**: The regulations should specify that an asylum officer will, before beginning the "credible fear" interview, again explain the importance and consequences of the process, the right of the alien to be represented at no expense to the United States government, and the right of the alien to contact friends, family, or human rights or refugee organizations to seek such representation. "Credible fear" interviews should be conducted, to the extent possible, at INS asylum offices or at detention facilities in or near major metropolitan areas. Access to counsel and other support systems, such as family, should be key determinants in selecting sites for the "credible fear" screening. The regulations should stipulate that interpretation should be provided by a live interpreter, unless it is impractical to locate and obtain the services of such an interpreter. In such a case, the alien should be given a reasonable period of time in which to locate and provide an interpreter.

**Asylum Officer Preparation**: In order to assess whether an alien's fear of return is credible, the regulations should require that asylum officers who conduct "credible fear" interviews have up-to-date information about country conditions around the world and that interviewers review this information before determining that an alien's fear is not credible.

**Standard of Proof**: Credibility determinations should take into account the fact that the alien has only been in the United States for a short period of time, has been in detention, and has not been able to collect the corroborating documentation often presented in initial asylum applications. The regulation should state that in expedited removal interviews, an asylum officer or immigration judge should apply a low screening standard to determine simply whether there is any significant possibility that the alien, given an opportunity to collect corroborating evidence and to present testimony and other evidence, might demonstrate eligibility for asylum or withholding of removal. In addition, an alien whose claim presents a novel question of law should be referred for a full hearing before an immigration judge for a determination of the novel issue.

**Record of Determination**: In order to assist the supervisory officer in determining whether the asylum officer conducting "credible fear" interviews is being sufficiently careful and thorough, the regulations should specify the format for a record of the asylum officer's determination. Such a record should include a thorough account of the

Comments re: 1788-96
page 2 of 4

---

alien's statement, any additional facts relied on by the officer, a description of the current conditions in the applicant's home country, any inconsistencies on which the officer relied to determine that the alien had no significant possibility of winning asylum, and a careful statement of the officer's analysis of why, in light of the facts, the order of removal should be entered. A copy of the record should be given to the alien against whom the order was entered.

**Review**: INS should presume that an alien who expresses fear of returning home after receiving a negative determination by an asylum officer would want to take advantage of an opportunity to appeal and should automatically refer the alien to a hearing before an Immigration judge. In the alternative, the regulations should require that the asylum officer or supervisor ask an alien receiving a negative determination if he or she would like to appeal that determination to an immigration judge. Review by the immigration judge should be in-person whenever possible.

**Citizens, Legal Residents, and Persons with Refugee or Asylee Status Attempting to Re-enter Without Proper Documents**: To protect against wrongful removal, the regulations should provide that aliens claiming to be citizens, lawful permanent residents, asylees, or refugees who are subject to expedited removal should be referred to a District Director or proceedings before an immigration judge. All arriving aliens should be permitted access to counsel and the right to challenge charges. The regulations should explicitly allow discretion when aliens allege citizenship or eligibility for certain benefits and, in those instances, refer the case either to a District Director or to an immigration judge under removal proceedings. The regulations should provide for a waiver of the document requirement for refugees and asylees returning to the U.S., just as there is a waiver provided for returning LPRs in certain circumstances.

**Applicability of Expedited Removal Procedures**: Though permitted by statute, the Attorney General should not apply expedited exclusion procedures to aliens other than those arriving at ports of entry. To include in the definition of "arriving alien" those who have entered without inspection and who have been in the U.S. for less than two years would be untenable. Such application would require prolonged factual determinations for each alien apprehended by INS as to whether the alien had been physically present in the U.S. for two years.

**Treatment of Minors**: Minors should be exempted from expedited removal proceedings in light of their particular needs and vulnerabilities.

**Detention of Aliens Who Establish a "Credible Fear"**: Arriving aliens who establish a "credible fear" of persecution in an interview with an asylum officer should not be detained unless the government can demonstrate that the alien poses a danger to the community or a risk of flight. The final regulations should establish procedures to ensure prompt parole determinations for detainees who have passed the "credible fear" screening. Since the enactment of expedited exclusion obviates the need to detain asylum applicants in order to deter fraudulent claims, and since the detention of legitimate asylum seekers would be an inefficient and inappropriate use of scarce detention resources, the regulations should state that arriving aliens who establish "credible fear" are presumptively eligible for release.

## COMMENTS REGARDING ASYLUM

**Adjudication of the Exceptions to the One-year Deadline**: The regulations should require that in the case of an asylum application that appears to have been filed more than a year after the applicant entered the United States, a trained asylum officer will interview the applicant regarding the reasons for late filing, and will determine whether the applicant qualifies under one of the exceptions to the deadline.

- 2 -

AA-REG-01281

Comments re: 1788-96
page 3 of 4

---

**Definition of "Changed Circumstances"**: The definition of "changed circumstances," which would exempt a person from the requirement that he file for asylum within one year of entering the U.S., is too narrow. The regulation should broaden the definition to include those cases in which circumstances change materially just *before* the deadline expires; an applicant did not *become aware of* a change in human rights violations in the applicant's home country until more than one year after entry; and those in which the applicant genuinely belatedly discovers the existence of the one-year deadline.

**Definition of "Extraordinary Circumstances"**: The definition of "extraordinary circumstances," which would excuse a person from filing for asylum within one year of entering the U.S., should specify some types of circumstances that would clearly fall within this exception. A list of such circumstances would not resolve every case, but it would provide guidance to applicants, asylum officers, and immigration judges, avoid inconsistent decision-making, and avoid needless and costly litigation regarding circumstances that INS regards as covered.

**Denial of Asylum to Aliens Who Have Been Offered Resettlement Elsewhere**: The regulation would permit asylum officers and immigration judges to deny asylum applications if the applicant can be removed to a safe third country which has *offered resettlement*. This proposed regulation is inconsistent with the law, which provides for denials when an alien may be removed *pursuant to a bilateral or multilateral agreement* to a safe third country. This section of the regulation should be deleted.

## COMMENTS REGARDING VOLUNTARY DEPARTURE

**Attachment of Conditions**: Language in the regulation that the INS may attach to the granting of voluntary departure "any condition it deems necessary" should be deleted. Such language goes beyond the scope of the legislation.

**Duration of Voluntary Departure**: The regulation should not restrict the *total* number of days of voluntary departure to 120 days. The statute only requires that 120 days of voluntary departure be granted at any one time, but does not prevent giving multiple grants of voluntary departure that exceed 120 days.

**Revocation**: Revocation of voluntary departure should require notice and the opportunity to be heard.

**Restriction to Grant at Master Calendar Hearing**: The restriction that voluntary departure may only be requested at a master calendar hearing should be removed. At this stage, an alien (especially one without representation) may not be aware of this form of relief. Cases are often "settled" and voluntary departure is agreed to *after* the master calendar hearing.

**Pursuit of Other Forms of Relief**: The regulation's language restricting an alien from pursuing other forms of relief that may become available to him after receiving voluntary departure goes beyond the language of the statute and should be removed.

**Appeals**: The regulation denies aliens the opportunity to appeal a denial of voluntary departure while permitting the INS to appeal approvals. Both sides should be given the right to appeal, or both sides should be denied.

**Employment Authorization**: The language denying employment authorization should be removed as it goes beyond the scope of the legislation.

**Failure to Depart**: The regulation should provide an exemption for an alien who would otherwise have a deportation order issued against him for failing to depart when the alien, through no fault of his own, has not obtained travel documents. In cases where an alien who was previously granted voluntary departure and failed to

AA-REG-01282

Comments re: 1788-96
page 4 of 4

depart, the regulation correctly reflects the statutory language that such an alien is not eligible for voluntary departure. It fails, however, to include the statutory exception that the alien must have received notice of the penalty for failing to depart.

## COMMENTS REGARDING DETENTION

**Standards for Detention Facilities**: The regulations should require non-INS detention facilities to meet the American Correctional Association's standards for local detention facilities.

**Aliens Being Held Pending Removal Hearings**: Aliens without a criminal conviction being held in custody pending removal hearings should be presumptively eligible for release absent proof that they pose a threat to the community or are likely to flee. The burden to demonstrate a danger to the community or a risk of flight should be on the government.

**Detention revocation and review**: Revocation of release from detention should only occur if the INS demonstrates that the material conditions or circumstances which justified release have changed.

## OTHER COMMENTS

**Treatment of Juveniles**: We commend the INS for including the appointment of a *guardian ad litem* for all children. This is recognized as an effort to safeguard the best interests of children and assist in the prompt release of children to appropriate guardians.

**Cancellation of Removal**: The proposed regulation says that an application for cancellation of removal may only be filed with the Immigration Court after jurisdiction is vested by the INS filing a charging document with the Immigration Court. In practice, the INS does not file charging documents with the Immigration Court promptly. By not filing a Notice to Appear, the INS will effectively block a respondent's access to court and to obtain relief. The regulation should state that jurisdiction vests and proceedings commence when a charging document is filed with the Immigration court by the INS or by the respondent.

**Adjustment**: The regulations should refrain from limiting the availability of adjustment of status under section 245(i) to different classes of aliens, as such limitations are beyond the scope of the statute.

**Reinstatement of Removal Orders for Those Illegally Reentering**: The regulation should clarify that aliens believed to have entered the United States illegally after being subject to previous deportation, exclusion, or removal orders should receive a hearing before an immigration judge in order to avoid the costly error of a wrongful removal. The hearing is essential to minimize the risk of such an error by providing for the proper determination of issues such as: the identity of the individual; whether or not the individual complied with the previous order and remained outside of the U.S. for the requisite period of time; whether or not the person left under a grant of voluntary departure within the prescribed time limit; whether or not the person is a U.S. citizen; or whether the previous order was properly entered, among other issues.

**Notice to Appear (Form I-862)**: While the statute did not retain the requirement that the Notice to Appear be provided in Spanish, the INS is not required to remove the requirement. We recommend the regulations retain the requirement thereby maximizing the likelihood of respondents understanding and participating in INS proceedings.

AA-REG-01283