# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

COALITION FOR HUMANE IMMIGRANT RIGHTS, *et al.*,

    *Plaintiffs,*

    *v.*

KRISTI NOEM, in her official capacity as Secretary of Homeland Security, *et al.*,

    *Defendants.*

Case No.: 1:25-cv-0872

# DECLARATION OF GEORGE ESCOBAR
## EXECUTIVE DIRECTOR, CASA, INC.

I, George Escobar, hereby submit this declaration pursuant to 28 U.S.C. § 1746 and declare as follows:

1. I am the Executive Director of CASA, Inc. ("CASA").[1] CASA is a national nonprofit membership organization headquartered in Langley Park, Maryland, with offices in Maryland, Virginia, Pennsylvania, and Georgia. CASA's over 189,000 members across the United States are predominately noncitizens who hold various immigration statuses. CASA offers a variety of social, health, job training, employment, and legal services to immigrant communities.

---

[1] Since February 2, 2026, CASA, Inc. has been operating under the registered trade name "We Are CASA." For clarity and consistency with prior filings, I refer to CASA, Inc. as "CASA" in this declaration.

2.  I have been CASA's Executive Director since January 1, 2026. Immediately before becoming Executive Director, I served as CASA's Chief of Programs and Services. I have worked at CASA since 2011.

3.  I make this statement based upon personal knowledge, files and documents of CASA that I have reviewed (such as case files, reports, and collected case metrics), as well as information supplied to me by employees of CASA whom I believe to be reliable. These files, documents, and information are of a type that is generated in the ordinary course of our business and that I would customarily rely upon in conducting CASA business.

4.  I incorporate my Declaration, ECF 22-2, as if fully set forth herein. I submit this supplemental declaration to provide an update to the Court regarding the impact on our members of the government's targeting of parole beneficiaries for expedited removal.

5.  Many CASA members have already been directly harmed by the administration's use of expedited removal against paroled individuals, and many more are likely to be similarly harmed in the future. More than 33,000 CASA members entered the United States after the CBP One app first launched in October 2020, and a significant number of them were granted parole through CBP One.

6.  Over 2,200 CASA members are nationals of Cuba, Haiti, Nicaragua, and Venezuela, including individuals who were sponsored for and granted parole through CHNV parole. Last year, CASA members who were CHNV parole beneficiaries received letters terminating their parole status and, in some cases, directing them to leave the country.

7. I am aware of Defendants' position in this litigation that despite the district court's August 1, 2025 order, the government can subject people previously paroled into the country at a port of entry to expedited removal pursuant to its regulatory authority under 8 C.F.R. § 235.3(b)(1)(i), which refers to the definition of "arriving alien" at 8 C.F.R. § 1.2. I am also aware that 8 C.F.R. § 1.2 says that an "arriving alien" who is paroled into the country remains an "arriving alien," regardless of whether their parole is active or has been terminated or revoked. Given this position, CASA members who are parole beneficiaries remain at constant risk of being placed in expedited removal at any time. This is particularly true given the rampant immigration enforcement CASA members continue to see, both across the country and in the states where CASA primarily operates. In recent weeks, for example, CASA has learned of several ICE enforcement actions resulting in detentions in the neighborhoods surrounding our Maryland headquarters, and increased ICE presence near several of our offices in Maryland. These close-to-home actions highlight and heighten the vulnerability of CASA members to the harm of the administration's policies terminating parole and exposing paroled individuals to expedited removal.

8. In 1997, the Immigration and Naturalization Service ("INS") issued a Notice of Proposed Rulemaking ("NPRM") that proposed many changes to agency regulations across a variety of different areas. For instance, the NPRM proposed creating for the first time a definition of the term "arriving alien," which is a term that is used throughout immigration law, at 8 C.F.R. § 1.1(q).

9. CASA's Executive Director at the time, Gustavo Torres, submitted a brief comment to the NPRM, a true and correct copy of which is attached hereto as Exhibit A.[2] That comment fully endorsed comments submitted by another organization, the Washington Lawyers' Committee for Civil Rights and Urban Affairs, Asylum and Refugee Rights Law Project, a true and correct copy of which is attached hereto as Exhibit B. Those comments, prepared by Karen Grisez of Fried, Frank, Harris, Shriver & Jacobson, addressed provisions related to asylum, voluntary departure, and protections for victims of torture. They also addressed the NPRM's proposed regulations pertaining to the credible fear process provided to noncitizens placed in expedited removal proceedings who express a fear of persecution or an intention to seek asylum.

10. From those comments, it is clear that CASA and the Washington Lawyers' Committee understood that the use of expedited removal under the statute and the regulations against certain noncitizens who are "arriving in the United States" would take place at ports of entry. The comments discuss the power of "first-line immigration officers" encountering noncitizens "arriving at the border" to decide which should be referred to a credible fear interview and which are "turned back at this stage." Exhibit B, at 11-15.

11. CASA's then-Immigration Coordinator for its Employment Rights Project, Maria Reff, also submitted a comment to the NPRM, a true and correct copy of which is attached hereto as Exhibit C. Ms. Reff based her comment on her experience

---

[2] The comment was submitted on behalf of "CASA de Maryland, Inc.," a predecessor organization to present-day CASA.

interviewing political asylum seekers. She explained that given how difficult it can be even under optimal conditions and over multiple interviews to obtain the facts pertaining to an asylum seeker's fear claim, "it is highly unlikely that aliens pre-screened by immigration officers *at airports* will be able to articulate any fear of persecution to an immigration inspector, with no training in interviewing persons with post-traumatic stress disorders." Exhibit C, at 1 (emphasis added).

12. This comment again reflects CASA's understanding at the time that the only noncitizens who would be treated as "arriving in the country" and subject to expedited removal were those who were processed for expedited removal when they came to a port of entry and were in the process of seeking admission to the country, not those who were instead granted parole at the port of entry and permitted to come into the country.

13. CASA members have been tangibly harmed by the administration's effort to subject paroled individuals to expedited removal.

   a. CASA member LZP, described in my previous declaration, whose parole status and associated work authorization were terminated last year, continues to await an immigration court hearing in her asylum case, scheduled for April 2026. She remains afraid that, just by appearing in court, she is risking expedited removal to a country where she was a victim of domestic violence and death threats. She often feels afraid just to leave her home, including when she goes to work to support her children.

   b. NDG and YPC, also described in my previous declaration, who entered via CBP One parole, are also currently awaiting an immigration court hearing in

their case, scheduled for March 2026, and continue to fear for their family's safety if they were to be subjected to expedited removal and deported to Venezuela. They feel less stable just going about their daily lives since they were put into removal proceedings.

    c.    CASA member EMP, also described in my previous declaration and who also entered via CBP One parole, has now been detained for almost nine months and is awaiting an opportunity to present his asylum claim. He lost around 40 pounds during the first months of his detention and his mental health has suffered immensely, including intrusive thoughts in which he blames himself for his own detention.

14. CASA has also learned of other members who have been tangibly harmed by the administration's effort to subject paroled individuals to expedited removal. These include, for example:

    a.    DRC, a CASA member who came to the United States with her husband about two years ago. She and her husband are from Cuba and were granted humanitarian parole. DRC obtained work authorization and began working as a housekeeper in Key West. Three of her mothers' siblings live in Florida and are U.S. citizens. DRC and her husband applied for lawful permanent resident status under the Cuban Adjustment Act. Their parole was set to expire in 2026 but, in July 2025, she and her husband were pulled over while driving to work and were detained. DRC did not know that her or her husband's parole had been terminated until she was detained. After being detained, DRC and her husband were separated, sent to different detention centers. DRC is currently

detained in Texas. Her husband was processed for expedited removal and removed.

b.  DS, a CASA member and Russian national who was paroled into the country at a port of entry in March 2022 pursuant to a grant of advance parole that he had received while in the United States before making a brief trip abroad. Following his parole into the country, he applied for asylum in January 2023. Before his case was adjudicated, USCIS in August 2025 dismissed his asylum application on the basis that DHS records indicated that DS had at some point been placed in expedited removal. As a result of the dismissal of his asylum application, DS lost his employment authorization, which has significantly impacted his family: DS has struggled to cover basic living expenses for his U.S. citizen infant son and has been forced to stop attending English language classes, and DS's spouse may need to withdraw from her Master's program if they are not able to pay her upcoming tuition obligations. DS and his family also live with the constant fear that DS could be arrested and detained at any moment pursuant to an expedited removal order and quickly removed from the country.

c.  OLC, a CASA member and a Cuban national who was paroled into the United States in September 2024 following a CBP One appointment. In May 2025, OLC attended a master calendar hearing, and an Immigration Judge granted the government's motion to dismiss his removal proceedings. OLC was arrested at the courthouse immediately after the hearing and issued a Form I-860, Notice and Order of Expedited Removal. O.L.C. was found to have a

credible fear of persecution in Cuba, but he has been unable to present his asylum claim and has not been released from detention due to the government's decision to process him for expedited removal. OLC currently has an appeal of the dismissal of his removal proceedings pending with the Board of Immigration Appeals as well as a motion to terminate that appeal to allow his asylum case to go forward.

15. Additional CASA members (or members of CASA members' households) are parole beneficiaries whose parole was terminated and are now at risk of expedited removal as a result of the administration's effort to subject paroled individuals to expedited removal. These include, for example,

   a. a CASA member who is a mother of three children who was granted parole through the CBP One app in 2024 and applied for asylum. She did not receive any notice that her parole had been terminated but, in February 2026, was detained while on her way to buy food during her lunch break at work. Her detention tore her family apart: she was transferred to another state, thousands of miles from her husband and kids.

   b. a CASA member whose close friend and roommate, a 32-year-old man, had been granted parole into the country in 2024. Since then, he had been attending college and working in construction. Although he received no notice that his parole had been terminated, he was detained suddenly on his way to work in December 2025. The CASA member and her 10-year-old daughter have experienced significant emotional pain at their sudden separation. The CASA member has also experienced financial hardship as a result of the loss

of her friend's financial contributions to the household and because she has

been scrounging to try to pay for legal representation for him.

16. CASA has worked consistently with individuals processed for expedited removal

since at least 2013, when our legal team began providing direct immigration legal

services. This work has involved assisting individuals who were apprehended

entering without inspection at the border, or who had previously been deported. Even

prior to that, our work with immigrant populations throughout CASA's existence

meant that we frequently encountered individuals who were processed for expedited

removal. In the 15 years that I have worked at CASA, it was not until 2025 that I

encountered any individual—CASA member or otherwise—processed for expedited

removal who was previously paroled at a port of entry. My colleagues at CASA who

have been at CASA longer than I have—going back to 1991, the longest tenure of any

current CASA employee—have confirmed that they have never until 2025

encountered a member or other individual processed for expedited removal who was

previously paroled at a port of entry. I have no reason to believe that anyone at CASA

had ever encountered such an individual prior to 2025.

17. CASA has also worked consistently with paroled individuals since at least 2013.

Even prior to that, our work with immigrant populations, including Central American

asylum seekers during the early years of CASA's existence, meant that we

encountered individuals who were parole beneficiaries. In the 15 years that I have

worked at CASA, it was not until 2025 that I encountered a paroled individual—

CASA member or otherwise—who was later put into expedited removal. My

colleagues at CASA who have been at CASA longer than I have—going back to

1991, the longest tenure of any current CASA employee—have confirmed that they have never until 2025 encountered a paroled member or other paroled individual in the country who was put into expedited removal. I have no reason to believe that anyone at CASA had ever encountered such an individual prior to 2025.

18. Prior to 2025, CASA did not believe that parole beneficiaries could be at risk of detention or removal during their period of parole. From our experience and observations, parole beneficiaries maintained their parole status until its expiration. Our members who were parole beneficiaries expressed to us, and we observed, that they lived free from fear of detention or removal during their parole period. They were primarily concerned with securing long-term status before their period of parole expired so that they could remain in the country.

19. When CASA learned in 2025 that the government had issued new policies targeting parole beneficiaries for expedited removal, we were shocked. We were similarly shocked when the government stated that despite the court order staying those policies, the government believed it could continue to target parole beneficiaries for expedited removal based on the regulation at 8 C.F.R. § 235.3(b)(1)(i) that CASA had never before seen used in that manner.

20. Prior to 2025, our experience was that parole beneficiaries could live, work, and go about their daily lives without fear, so long as they were complying with the terms of their parole including, for example, appearing at immigration court hearings. Where a parole beneficiary's parole may have been terminated or naturally expired, CASA members have been processed for removal through ordinary removal proceedings.

21. Since 2025, CASA has worked to assist its members (and the community more broadly) who are affected by the administration's efforts to terminate parole status and process such individuals who have been paroled into the country through expedited removal. CASA has engaged in community education efforts. For example, we have hosted multiple information sessions to inform members and other community members of legal changes and to inform them of their rights, including with respect to expedited removal for paroled individuals. We have also provided legal consultations to paroled individuals who have had their court dates canceled, received generic parole termination notices, or otherwise been placed at risk of expedited removal despite being paroled at a port of entry.

22. CASA also provides legal assistance to individuals in removal proceedings, and has done so for over a decade. CASA's representation includes full representation before DHS and in immigration court and at the Board of Immigration Appeals, as well as pro se assistance to individuals in these case postures.

23. Our members will continue to be harmed if the administration is permitted to place paroled individuals in expedited removal. CASA members who are parole beneficiaries continue to live in intense fear and confusion, and many are forced to choose between two impossible options. On the one hand, they could pursue immigration relief knowing that, in doing so, they subject themselves to the risk of being forced to return–without any due process–to the countries they fled and fear. On the other hand, they could retreat to the shadows, where they have no hope of obtaining immigration relief to which they may be entitled.

I declare under penalty of perjury that the foregoing is true and correct to the best of my

knowledge.

Executed March 1, 2026 in Washington, DC

_____

George Escobar

# EXHIBIT A

Coalition for Humane Immigrant Rights, et al. v. Noem et al., 1:25-cv-00872 (JMC)

**CASA** of Maryland

Central American Solidarity & Assistance



310 Tulip Avenue, Takoma Park, Maryland 20912    (301) 270-0442

February 3, 1997

Director
Policy Directives & Instructions Branch
Immigration & Naturalization
425 I Street, N. W.
Room 5307
Washington, D. C. 20036



Dear Director:

CASA of Maryland, Inc., is a not for profit organization that
primarily advocates for the rights of immigrants. CASA
wholeheartedly endorses the comments submitted to your office by
the Washington Lawyers Committee, Asylum and Refugee Rights Law
Project.

At a time of heightened anti-immigrant feeling in our communities,
it is important to ensure that the INS provides regulatory
safeguards in the implementation of the new laws. We hope that the
comments and suggestions we endorse will be incorporated into the
Final Regulations.

Sincerely,

Gustavo Torres
Executive Director

AA-REG-01015

# EXHIBIT B

Coalition for Humane Immigrant Rights, et al. v. Noem et al., 1:25-cv-00872 (JMC)

# FRIED, FRANK, HARRIS, SHRIVER & JACOBSON

A PARTNERSHIP INCLUDING PROFESSIONAL CORPORATIONS

*84*

ONE NEW YORK PLAZA
NEW YORK, NEW YORK 10004 · 1980
212 · 820 · 8000
FAX · 212 · 747 · 1526

*received*
*2-3-97*

February 3, 1997

WRITER'S DIRECT LINE

(202) 639-7043

**VIA HAND DELIVERY**

Director, Policy Directives
 and Instructions Branch
Immigration and Naturalization Service
425 I Street, N.W.
Room 5307
Washington, D.C. 20536

> RE: **Comments on Proposed Regulations
> INS No. 1788-96**

Dear Sir or Madam:

The following comments on the above-referenced proposed rule implementing the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA" or "the Act") are submitted for your consideration on behalf of the Washington Lawyers' Committee for Civil Rights and Urban Affairs (the "Committee").

As you know, the Committee's Asylum and Refugee Rights Law Project has represented people fleeing persecution for nearly twenty years, and has a longstanding history of working with the Immigration and Naturalization Service ("INS" or "the Agency") to develop policies and procedures that implement the law without losing sight of the circumstances and practical realities confronting the very refugees and asylum seekers the law is designed to protect. The Committee is concerned that many aspects of the proposed rule present a serious risk of returning persons eligible for asylum to persecution or even death, and urges the INS to consider these comments in the spirit of professionalism and cooperation that was demonstrated during the implementation of asylum "reform" and the AntiTerrorism and Effective Death Penalty Act.

AA-REG-01102

FRIED, FRANK, HARRIS, SHRIVER & JACOBSON

Director, Policy Directives
 and Instructions Branch
February 3, 1997
Page 2

## I.   ASYLUM

### A.   Issues Relating to the Filing Deadline

The Committee prefaces its comments on this issue by expressing its gratitude for the Agency's strong support of efforts by a number of NGOs to avoid the imposition of **any** filing deadline.   This reflected a recognition that any firm deadline risks returning people to persecution, which completely contravenes the goal of keeping asylum available to all deserving applicants.  Because Congress ultimately adopted a filing deadline, but provided for exceptions to address this concern, the Committee urges the INS to interpret the exceptions to the filing deadline as broadly as possible to avoid returning an applicant to persecution because of an arbitrary deadline.  A fair construction of the exceptions to the deadline will allow cases to be decided on their merits, rather than on a technicality.

### 1.   Notice of the Deadline and Exceptions

Section 208(a)(2)(B) of the Act imposes a filing deadline of one year after the date of entry, unless the applicant demonstrates "either the existence of changed circumstances which materially affect the applicant's eligibility for asylum or extraordinary circumstances relating to the delay in filing the application . . . ."

The Committee strongly urges the INS to consider applying this one year deadline only to applicants arriving in the United States on or after April 1, 1997.[1]  By providing notice of the filing deadline to all arriving aliens beginning on April 1, 1997, and applying the filing deadline only to them, the administrative burden of adjudicating the applicant's actual knowledge of the filing deadline, particularly in the context of requests for exceptions to the deadline (see below), could be avoided.

---

[1]      Such an interpretation is supported by the history of this provision.  The chief sponsor of the deadline provision in the House, Rep. Bill McCollum, consistently assured interested parties in meetings during the evolution of a filing deadline provision that it would only be applied to persons receiving notice of the deadline.  In fact, Rep. McCollum indicated Congressional intent on this issue in a cable television program during the progress of the bill through the House.  In response to a specific question about whether notice of the deadline would be provided to potential asylum applicants, in light of the fact that no notice requirement was included in the House bill, Rep. McCollum replied, "Yes they will.  We had quite a colloquy with my colleagues on the other side of the aisle who were concerned about this.  The Immigration Service would be required to tell people who came in that they could apply for asylum and this is how long it would take.  Well it may not be in the legislation but it is certainly going to be in the report language and I think the Immigration Service is going to do that." ("Pork," America Online, Nov. 15, 1995.)

FRIED, FRANK, HARRIS, SHRIVER & JACOBSON

Director, Policy Directives
 and Instructions Branch
February 3, 1997
Page 3

Even if this suggested approach is rejected, the Committee is concerned that persons with meritorious claims must not be discouraged from applying because of the deadline. It is clear that Congress intended to allow for exceptions to the one year deadline, and that these exceptions may relate to either the applicant's eligibility for asylum or to the timeliness of his application. As a threshold matter, the new Form I-589 and accompanying instructions referenced in §299.1 of the proposed regulation should clearly indicate that if the application is being filed more than one year after the date of entry, an explanation for the delay must be provided. **Neither the Form nor the instructions should suggest that the application may not be filed if more than one year has passed since the date of entry.** Moreover, the regulations should provide that the determination of whether an applicant qualifies for the changed circumstances or extraordinary circumstances exception should be made by a trained asylum officer, and not by a clerical or ministerial service center employee.

If the asylum officer determines that an exception is justified on the basis of the explanation provided on the face of the Form I-589, the application should be deemed timely and an interview on the merits should be scheduled. If the exception is not clearly warranted by the explanation provided on the application, the asylum officer should schedule the case for an asylum interview, at which the eligibility for an exception would be the first issue considered. The supervisor should review the asylum officer's recommendation concerning the requested exception, as well as the recommended decision on the merits. The need for an interview to determine eligibility for an exception, as well as a review of that determination by a supervisor is critical, because there will be no judicial review on the issue of whether the filing deadline was met. Many of the circumstances supporting an exception, particularly if they are related to torture or other trauma, may not be written on the face of the I-589 but may emerge during the actual asylum interview. Consequently, eligibility for the exceptions should be probed in person and should be construed in a just manner to permit claims to proceed on the merits whenever possible.

2.    The "Changed Circumstances" Exception

Section 208(a)(2) of the proposed regulation fails to allow an exception for changed circumstances, which could be either changed country conditions or changed personal circumstances, that arise before the one year deadline, but too close to it to permit eligible applicants to file before that deadline.

In rejecting previously proposed deadlines of up to 180 days, Congress recognized that the process of assessing eligibility for asylum, making the decision to apply, obtaining an application form, seeking counsel, and preparing and filing the application with appropriate supporting documentation cannot reasonably be done within even a six month period. Assuming

FRIED, FRANK, HARRIS, SHRIVER & JACOBSON

Director, Policy Directives
 and Instructions Branch
February 3, 1997
Page 4

that a person is eligible for asylum on the date of entry, Congress has afforded him or her one year to file. Therefore, an applicant should also be afforded one year from learning of the changed country conditions or personal circumstances rendering him eligible for asylum within which to file a completed application. In a case in which the change is the availability of documentation, the applicant should be allowed one year from the date of its availability to complete and file an application. Such a provision would accommodate an applicant's delay in learning about a changed condition in his home country or relevant facts about the impact of such a change on family members or other similarly situated persons. It would also provide the same time period within which to act on that information that is given to other asylum applicants.

The INS should bear in mind that eligibility for asylum is case-specific, and even a small change in country conditions may tip the balance in favor of a grant. Therefore, even incremental changes should qualify for this exception.

### 3.     The "Extraordinary Circumstances" Exception

Section 208(a)(3) defines extraordinary circumstances as "events or factors beyond the alien's control that caused the failure to meet the 1- year deadline." The restriction of this exception to events or factors "beyond the alien's control" is unsupported by the Act and unnecessarily interposes yet another point at which an applicant risks possible return to persecution.

The Committee believes that the legislative history relating to exceptions to the filing deadline, including Senator Hatch's discussion of a proposed "good cause" exception, provides useful guidance on the types of delay intended to be excused by this exception. Although no list can be exhaustive, some of the factors mentioned, including physical or mental disability, technical defects in filing the application, threats of retribution against relatives abroad, temporary inability to obtain counsel, and ineffective assistance of counsel provide guidance as to the breadth and variety of circumstances Congress contemplated when it enacted this exception. This partial list of examples illustrates that because the intended beneficiaries of the exception are asylum applicants, the term "extraordinary circumstances" may be somewhat misleading; in fact, some of these factors are often ordinary obstacles to asylum seekers trying to adjust to life in entirely unfamiliar surroundings.

The INS should be especially sensitive in considering the application of the deadline to claims by minors, women, and victims of torture. It is well-recognized that applicants in these categories are frequently unable to relate the details of their experiences to a complete stranger in an initial meeting. It is much more common that several meetings with counsel are necessary before these applicants are able to tell their stories. The reason for the delay in filing in these

FRIED, FRANK, HARRIS, SHRIVER & JACOBSON

Director, Policy Directives
 and Instructions Branch
February 3, 1997
Page 5

cases may not be an event occurring after their arrival, but an inability to recount the trauma they have sustained. The Agency should be mindful of this in adjudicating requests for exceptions from this group of applicants.

Section 208.4(a)(3) of the proposed regulations currently includes language restricting the availability of the "extraordinary circumstances" exception to cases in which "the alien filed the application as soon as practicable given those circumstances." This language improperly makes eligibility for asylum hinge on whether an application was filed "as soon as practicable," and would permit an application to be rejected if it arguably could have been filed a week sooner, or even a day sooner. The focus should not be on whether the filing was done "as soon as practicable," but rather, on whether the application was filed within a reasonable time under the circumstances. The Committee urges the INS to amend this regulation accordingly, and to indicate that the accrual of time toward the filing deadline will be tolled during any period in which extraordinary circumstances existed.

In cases in which more than one extraordinary circumstance can be demonstrated, the regulation should confirm that multiple periods of tolling should be combined. For example, the Committee previously represented a client who had been the victim of a politically motivated rape by a high-ranking government official in her native country. It took eleven months of working with her before she could fully describe what had happened to her. Once the facts supporting her claim were known, the Committee located pro bono counsel who began preparing her asylum application. When it was almost complete, the client became seriously ill and was incapacitated for varying periods of time due to chemotherapy. The application was ultimately filed and asylum granted, but a narrow interpretation of the extraordinary circumstances exception would preclude the filing of a case like this one.

The Committee particularly urges the INS to consider the availability of pro bono counsel in developing the final version of this regulation. It is indisputable that applicants are much more likely to be granted asylum if they are represented by counsel, and the burden on asylum officers to attempt to develop a thorough record as well as the time required to do so are greatly reduced when counsel is involved. However, most asylum applicants are unable to afford paid counsel, and pro bono counsel understandably need more flexibility in meeting filing deadlines. Strict application of filing deadlines and narrow interpretation of the grounds for exceptions will preclude pro bono attorneys from accepting otherwise meritorious cases. This is particularly true with respect to the claims of persons who entered the country more than one year prior to April 1, 1997. The Committee is painfully aware that there have not been enough pro bono lawyers available to provide counsel in all meritorious cases when no deadline existed. It will clearly be unable to meet the demand for pro bono counsel in cases that will be subject to the April 1, 1997 filing deadline. Therefore, a regulation that expressly includes the temporary unavailability of

FRIED, FRANK, HARRIS, SHRIVER & JACOBSON

Director, Policy Directives
 and Instructions Branch
February 3, 1997
Page 6

counsel as an extraordinary circumstance giving rise to an exception to the deadline will serve the goal of maintaining the availability of asylum to all those with truly meritorious claims.

In addition, the INS should specifically incorporate agreements it reached with NGOs about filing deadlines for particular applicant pools, such as the agreement that certain Haitian applicants would be required to file by September 1997, as one of the extraordinary circumstances that would support the grant of an exception.

### 4.     Burden of Proof re Filing Deadline

Proposed §208.13(c) of the regulations should be amended to clarify that the applicant's burden of proof pursuant to § 208(a)(2)(B) of the Act is to show by clear and convincing evidence only that the application was filed within one year of entry. Alternatively, if seeking an exception to the 1-year filing deadline pursuant to § 208(a)(2)(D) of the Act, the Act requires an applicant to demonstrate "to the satisfaction of the Attorney General" that an exception is justified. The Service should not impose a clear and convincing standard on eligibility for exceptions when not required by Congress to do so. The regulation should also clarify that the applicable standard for establishing that an applicant is a refugee as defined in INA § 101(a)(42) remains the preponderance of the evidence standard.

### 5.     The Completeness Requirement

Proposed §208.3(c)(3) of the regulations provides that an application will be "incomplete" if it does not contain an answer to every question on the Form I-589, if it is unsigned, or if it is not accompanied by the documents specified in §208.3(a). It further provides that the consequence of filing an application that is deemed "incomplete" for any of these reasons is that the INS may return it within thirty days, and that the filing of the incomplete application will not commence the running of the 150 day period required before employment authorization may be requested.

The enumerated deficiencies that will render an application incomplete will undoubtedly be common, particularly when unrepresented persons attempt to complete their own applications. If an applicant does not understand a question, or is uncertain how to answer it, the natural inclination is to leave that question blank. In striving to meet the filing deadline, a question could easily be overlooked. In addition, the Committee has direct experience in a number of cases in which the INS has returned an application on the grounds that required attachments, such as copies or photographs were not included, when the very items claimed to be missing were returned along with the application! For these reasons, this regulation should be amended to clarify that an application returned by the INS because it is deemed incomplete **for**

FRIED, FRANK, HARRIS, SHRIVER & JACOBSON

Director, Policy Directives
 and Instructions Branch
February 3, 1997
Page 7

**any reason** may be refiled within a specified period of time, i.e. 30 or 60 days, and that the submission of an incomplete application will not cause an application to be rejected as untimely pursuant to §208(a)(2)(B).

Proposed §208.4(c) provides that an asylum officer or immigration judge may permit an alien to amend or supplement an asylum application "upon request" and that the right to do so will be a matter of discretion. Such a provision would be inadvisable at any time, because as complete a record as possible is clearly always in the best interests of the applicant and aids the adjudicator in properly evaluating the claim. A requirement that permission to supplement an application must be formally requested would be particularly untenable during the transitional period beginning April 1, 1997. Presumably, many applicants present in the country for at least one year as of that date, whether represented by counsel or proceeding pro sé, will be diligently trying to meet the filing deadline. It may be impossible for them to obtain and file some of the supporting documentation by that deadline, particularly if it must be obtained from another country or translated before submission. The huge administrative burden imposed on the Agency by this proposed regulation is counterproductive, unnecessary and ill-advised.

B.    Termination of Asylum

Any termination of asylum or withholding of removal or deportation should be accomplished with an abundance of caution and due process. At a minimum, it should be accomplished in accordance with Article 1C(5) of the 1951 Refugee Convention regarding nationals whose reasons for becoming a refugee have ceased to exist, as explained in *Handbook On Procedures And Criteria For Determining Refugee Status* by the United Nations High Commissioner for Refugees. As stated in Paragraph 135:

> A refugee's status should not in principle be subject to frequent review to the detriment of his sense of security, which international protection is intended to provide.

The Committee is deeply concerned that the proposed regulation abandons many of the current procedural protections. The Service should continue to permit a procedure with such serious implications to occur only with the current protections, including:

- •    Motion by the Assistant Commissioner

- •    Hearing before an asylum officer

AA-REG-01108

FRIED, FRANK, HARRIS, SHRIVER & JACOBSON

Director, Policy Directives
 and Instructions Branch
February 3, 1997
Page 8

- A clear delineation of the standards for revocation

- An opportunity to re-assert an asylum or withholding claim in any subsequent removal proceeding

- Review by the office of the Deputy Attorney General

Proposed § 208.22(a) provides that the INS may terminate asylum in one of three enumerated circumstances. One of the bases for termination of asylum is set forth in § 208.22(a)(3), pertaining to changed country conditions. The Committee is extremely concerned that persons granted asylum prior to April 1, 1997, who are either not yet eligible to adjust status or whose applications to adjust have not yet been adjudicated should not have their grant of asylum terminated so soon absent extremely strong evidence of a change in country conditions. Any change should be proven to be "fundamental and durable" in keeping with international law to justify termination. Any change that has occurred within a year prior to the notice of intent to terminate is unlikely to be sufficiently stable to permit the return of an individual at risk of persecution.

The procedure governing termination, including the issuance of a notice of intent to terminate and the scheduling of an interview are set forth in § 208.22(c). However, it is unclear what circumstances could give rise to the notice of intent to terminate, and when such action can be taken by the INS. The Committee assumes that this regulation is only intended to apply to asylees who have not yet applied for/been granted adjustment of status, but this should be clarified.

In addition, § 208.22(d) provides for automatic termination of asylum for anyone who was a derivative beneficiary of a principal applicant whose asylum is terminated. It further provides that the derivative beneficiary shall not be precluded from separately asserting their own claim for asylum, or withholding of deportation or removal. This extremely limited relief from termination is sorely inadequate. Innocent derivative beneficiaries should not be be subject to termination if they were not involved in, or aware of, the facts giving rise to the termination of the principal.

FRIED, FRANK, HARRIS, SHRIVER & JACOBSON

Director, Policy Directives
 and Instructions Branch
February 3, 1997
Page 9

C.     Other Asylum Issues

The Committee expresses its gratitude to the INS for its decision not to impose a filing fee for asylum applications at this time, despite the fact that the Act would enable it to do so. The Committee thanks the Agency for continuing to recognize that the right to be protected from persecution or torture should not depend on the ability to pay a fee, and urges the INS to continue to maintain this position in the future.

The Committee urges the INS to consider the following additional concerns:

§ 208.2(b) provides that after a Form I-863 (Notice of Referral) has been filed with the Immigration Court, the Immigration Judge shall have exclusive jurisdiction over an asylum claim filed by a person not entitled to a proceeding under Section 240 of the Act. This regulation should be revised to permit the Immigration Judge in such cases to have jurisdiction over any other claim to relief the alien may have.

§ 208.3(c)(4) subjects "the person" who knowingly places false information on an asylum application to criminal and civil penalties, but does not define "knowingly," "person," or "places." This provision has very serious consequences. The INS should take care to identify how these terms will be defined, and who will determine when they apply and in what circumstances.

Similarly, § 208.3(c)(5) renders an asylum applicant who "knowingly" files a frivolous application permanently ineligible for any benefits under the Immigration and Nationality Act pursuant to § 208.18. That regulation in turn defines a frivolous application as one that "is fabricated or is brought for an improper purpose." This definition is too vague, particularly when considered in light of the penalty attached. A frivolous application should be defined as one that is determined by an Immigration Judge or the Board of Immigration Appeals to be patently untrue or deliberately fraudulent.

§ 208.5 contains special provisions for providing alien crewmen or stowaways who indicate a fear of returning to their home country with a credible fear interview and a referral to an Immigration Judge for adjudication of the asylum claim. The same procedural safeguards afforded to all other asylum applicants, both before and during the credible fear interview and during the preparation of and hearing on the asylum application, should be afforded to these persons.

§ 208.6 contains provisions regarding the confidentiality of asylum applications and protecting information "contained in or pertaining to" an application from disclosure. The

AA-REG-01110

FRIED, FRANK, HARRIS, SHRIVER & JACOBSON

Director, Policy Directives
 and Instructions Branch
February 3, 1997
Page 10

Committee urges the INS to revisit the method by which it delivers "referrals" when a case is not granted. The practice of calling names and delivering decisions in a large public room where any bystander can hear the discussion violates the letter and the spirit of the non-disclosure requirement.

Proposed § 208.7(a) should be clarified to confirm that the "denial by an asylum officer" that stops the running of the 150 day period refers only to denial to in-status applicants, and that a "referral" by an asylum officer to an Immigration Judge does not stop the employment authorization clock from running.

Proposed § 208.9(d) currently provides for the applicant to pick up the asylum officer's decision in person, with any delay in doing so to be treated as a delay attributable to the applicant for purposes of the 150-day work authorization period. The Committee urges the INS to incorporate a procedure whereby the applicant could authorize a representative who has entered an appearance in the matter to pick up the decision or accept service by mail without any interruption of the 150-day period.

Proposed § 208.9 provides that the asylum officer may require the applicant's representative to submit any statement or comment on the evidence **in writing**. This should be changed to an **opportunity** to submit in writing. Pro bono counsel in particular may be able to respond orally to any question raised or evidence presented in the interview, but may not be able to prepare a written submission within the time period available for the asylum officer to make a recommended decision. This is particularly true because asylum officers are evaluated on the rapidity with which they issue recommended decisions; a delay of even one day to wait for a written submission would cause the asylum officer to receive a lower rating on that case.

Proposed § 208.9(g) requires an applicant unable to proceed in English to provide an interpreter fluent in both English and the applicant's native language. In some cases, where the applicant's native language is relatively uncommon, this may be more restrictive than necessary. The applicant should be permitted to provide an interpreter who is fluent in English and in any other language in which the applicant is also fluent.

Proposed § 208.12(b) provides that an asylum applicant may not conduct "discovery" directed toward the records, officers, agents or employees of an enumerated list of government agencies. The INS should clarify that the term "discovery" does not include FOIA requests.

Discretionary denials pursuant to § 208.13(d) should be rare. There should be a presumption in favor of a grant if the applicant satisfies the definition of a "refugee."

FRIED, FRANK, HARRIS, SHRIVER & JACOBSON

Director, Policy Directives
  and Instructions Branch
February 3, 1997
Page 11

Referrals to an Immigration Judge by an asylum officer should be subject to the same requirement of written reasons for the decision and assessment of the applicant's credibility required for denials under proposed § 208.17.

Proposed § 208.13(b) twice uses the word "actual" or "actually." This language is not included in the statute, and may suggest a higher burden of proof than that imposed by the statute and interpreted by the Supreme Court in *United States v. Cardoza-Fonseca*. The proposed regulation requires an applicant to show a fear of persecution, a reasonable possibility of "actually suffering" such persecution if returned, and an unwillingness to return because of that fear. The Supreme Court has held that a 10% likelihood of persecution may be enough; the regulation should not even **suggest** any other standard.

## II.   CREDIBLE FEAR INQUIRY

The Committee wishes to express its gratitude to the INS for declining to apply the summary removal procedures to persons discovered within the borders who have been present for less than two years, and urges it to maintain this position.

### A.   Eligibility for Credible Fear Interview

In many ways, the decision of the first-lime immigration officer as to whether or not a credible fear interview will be provided is the most significant step in the entire summary removal process. It is at this juncture that persons fleeing persecution will first encounter the INS. If they are turned back at this stage, they may be returned to persecution or death, with no recourse or remedy. Consequently, it is critical that this stage of the summary removal process be implemented in a way to maximize the opportunity of persons arriving at the border to seek asylum, and to minimize the risk that anyone with a potentially meritorious claim will be turned away.

The Committee urges the INS to provide, at a minimum, the following procedural safeguards to all persons at risk of summary removal:

- inform arriving aliens about the right to apply for asylum in the U.S. and the requirements for eligibility

- provide this information in a standardized, written and video format in the 30 most commonly used languages

FRIED, FRANK, HARRIS, SHRIVER & JACOBSON

Director, Policy Directives
 and Instructions Branch
February 3, 1997
Page 12

- provide interpreters for anyone for whom written and video materials are not available

- provide opportunity for food and rest if necessary before conducting the initial screening

- design the questions to be used for the preliminary screening as broadly as possible to elicit information about fear of returning in every case in which it might possibly exist

- provide access to free telephones and a list of telephone numbers for information and assistance

- provide access for volunteers to conduct "know your rights" sessions, including suitable space and interpreters when necessary

- provide private interview rooms for counsel

- ensure that immigration officers are trained to recognize symptoms of torture and trauma

- ensure that immigration officers are trained to be sensitive to gender-related and other sexual abuse issues, and to ask female aliens if they would prefer to talk with a female officer and vice-versa

- provide opportunity for counsel both before and during the screening interview

- provide officers with specific standards for determining eligibility, to prevent "gut" reactions and inconsistent results

- adopt procedures that will create a written record for every screening interview

AA-REG-01113

Director, Policy Directives
 and Instructions Branch
February 3, 1997
Page 13

- guarantee that the review by a supervisor will occur <u>before</u> the alien is removed, regardless of any "ideal" processing times, and is face-to-face, either in person or by video.

B.    Conduct of Credible Fear Interview

Section 302 of the Act provides that individuals eligible for a credible fear interview "may consult with a person or persons of the alien's choosing prior to the interview or any review thereof . . . . Such consultation shall be at no expense to the Government and shall not unreasonably delay the process."

The Committee urges the INS to construe this provision as broadly as necessary to afford every alien the opportunity to consult with an attorney or another source of asylum information, if he wishes to do so, and to take the position that no delay for this purpose is unreasonable.

Specific steps the INS should take to ensure the availability of counsel, particularly pro bono counsel, include the following:

- The INS should work with NGOs to identify desirable locations for the conduct of credible fear interviews. The locations should be chosen to maximize the availability of counsel, and should be accessible by public transportation whenever possible.

- In the event that no detention space is available in an agreed-upon facility, the overflow should be directed to the closest alternative facility where representation is available.

- If credible fear is established, the alien should not be transferred without agreement of the parties.

- If credible fear is not established at the interview, review by the Immigration Judge should be at the same location.

- Locations for detention, transfers, and scheduling hearings should be handled with flexibility to accommodate access to counsel, and to permit continuing representation by the same attorney, once counsel is obtained.

FRIED, FRANK, HARRIS, SHRIVER & JACOBSON

Director, Policy Directives
 and Instructions Branch
February 3, 1997
Page 14

- No formal entry of appearance should be required for "know your rights" presentations or for initial screening interviews.

- "Limited appearances" should be permitted for credible fear interviews.

- Asylum officers conducting credible fear interviews cannot possibly be expected to be familiar with current conditions for every country worldwide. Therefore, immediate on-site access to the Resource Information Center, by computer and by telephone, must be available. If it is unavailable, or if additional factual development is necessary, the officer should continue the hearing until information can be obtained. The applicant should have the right to submit evidence at his disposal, or to request a continuance to permit him to obtain and submit evidence.

- The INS should strive not to separate families whenever possible, particularly when children, elderly persons, incompetent persons, or persons with other infirmities are involved.

- Halfway houses or other appropriate "foster care" should be provided for these groups, for whom traditional detention is inappropriate.

- Any minor dependent of an adult who successfully establishes credible fear should be deemed to have established credible fear derivatively.

- Any minor accompanying an adult who does not successfully establish credible fear should be entitled to an independent credible fear interview. (Minors age 20 or below should be represented by a guardian ad litem.)

- Unaccompanied minors should be presumed to have a credible fear of persecution. A guardian ad litem should be

AA-REG-01115

FRIED, FRANK, HARRIS, SHRIVER & JACOBSON

Director, Policy Directives
 and Instructions Branch
February 3, 1997
Page 15

        appointed to protect their rights during the pendency of
asylum proceedings.

- INS should provide significant funding for informational
materials, and for the expenses of NGOs or individual
attorneys providing pro bono representation.

- Information or materials consulted by the asylum officer
should be provided to the applicant for review and
comment.

- An interpreter should be provided at government expense
for "know your rights" sessions.

- INS should continue to consult with NGOs on development
of training materials for all first-line immigration officers,
asylum officers, and others involved in the summary
removal process.

- INS should designate a high-level ombudsman to resolve
problems as they occur. An emergency contact person
should be available on a 24-hour basis.

## III.    SPECIAL OBLIGATION TO VICTIMS OF TORTURE

The Committee reminds the INS that the United States has a binding obligation pursuant
to Article 3 of the Convention Against Torture not to return a person to another nation "where
there are substantial grounds for believing that he would be in danger of being subjected to
torture." 5 Treaty Doc. No. 20, 100th Cong., 2nd Sess. 20 (1988). Even if an individual does **not**
qualify for asylum under U.S. law, he may still be entitled to protection under the Convention
Against Torture. The Committee endorses the comments submitted on this issue by Pierson
Semmes and Bemis, and urges the INS to amend the proposed regulations to address the
concerns raised therein.

## IV.    VOLUNTARY DEPARTURE

The Committee is most concerned about the elimination of employment authorization for
persons granted voluntary departure. The statute does not require this, and will increase the

FRIED, FRANK, HARRIS, SHRIVER & JACOBSON

Director, Policy Directives
 and Instructions Branch
February 3, 1997
Page 16

hardship of the impending departure on U.S. citizen or Lawful Permanent Resident family
members by depriving them of the financial support of a breadwinner during the period of time
preceding departure. This provision will also increase the likelihood that departing individuals
may be unable to pay their debts, and that remaining family members may be forced to seek
public benefits. This measure seems completely unwarranted when eligibility for voluntary
departure requires a determination of good moral character, a showing of the means to depart and
the posting of a bond to guarantee timely departure.

Other concerns about voluntary departure include:

- Provision in §240.25 that the INS may attach to the grant of
  voluntary departure "any conditions it deems necessary."
  This far exceeds the scope of the statute and presents the
  danger of overreaching. Congress has already identified
  the conditions necessary to establish eligibility; no more is
  necessary.

- Duration of time allowed for voluntary departure –
  proposed §240.25(c) provides that the total period of time
  allowed including extensions, shall not exceed 120 days.
  This is inconsistent with the statute, which provides for a
  maximum of 120 days at any one time; nothing prevents
  the INS from authorizing additional 120 day increments for
  humanitarian reasons.

- Restrictions on Availability of Voluntary Departure –
  §240.26(b)(1) provides that voluntary departure can only be
  requested at a Master Calendar Hearing, and allows a
  person to be granted voluntary departure only if they make
  no other requests for relief, concede removability and
  waive appeal of all issues. These provisions make the
  availability of voluntary departure into a carrot-and-stick,
  where it is only available if the alien abandons all his other
  legal rights. Nothing in the statute supports this "either/or"
  approach.  Voluntary departure has historically been
  available as an alternative form of relief, and it should
  remain so. It is to the benefit of the INS to have persons
  depart voluntarily at their own expense if no other relief is
  available. That choice should not have to be made **before**

AA-REG-01117

FRIED, FRANK, HARRIS, SHRIVER & JACOBSON

Director, Policy Directives
 and Instructions Branch
February 3, 1997
Page 17

> other relief can be pursued. Requiring voluntary departure
> to be requested at the Master Calendar prevents the
> possibility of an agreement for voluntary departure during
> the pendency of removal proceedings.

> • Proposed §240.26(g) precludes an alien from appealing the
>   denial by voluntary departure, but the INS is not precluded
>   from appealing a grant. Any appeal rights available should
>   be reciprocal.

> • Section 240.26(b)(3)(B)(ii) should be amended to provide
>   an exemption in cases where the failure to obtain a travel
>   document within the time period allowed is not the fault of
>   or was not within the control of the applicant.

> • Voluntary departure should not be revoked without notice
>   and an opportunity to be heard.

The Committee thanks the INS for its consideration of these comments, and requests the
opportunity for a meeting with any appropriate INS personnel to discuss these issues.

Sincerely,

Karen T. Grisez

67437.01

AA-REG-01118

# EXHIBIT C

LAW OFFICE

# EMPLOYMENT RIGHTS PROJECT

CASA of MARYLAND, Inc.
310 Tulip Avenue
Takoma Park, MD 20912
(301) 431-4185
Fax: (301) 431-4179

W. Steven Smitson
Maria Maldonado Reff*

February 3, 1997

Director, Policy Directives and Instructions
Branch, INS, 425 I Street, N. W., Room 5307
Washington, D. C. 20036

RE: INS Number 1788-96

Dear Director:

First of all, I endorse the comments and suggestions proposed by
the Washington Lawyers Committee, Asylum and Refugee Rights Law
Project.

I am also writing to comment on certain areas of concern,
particularly, INS' proposed rules to implement the asylum filing
deadline and the expedited removal provisions of the Illegal
Immigration Reform and Immigrant Responsibility Act of 1996
(IIRIRA), as well as, in the area of voluntary departure.

I have first hand experience in interviewing political asylum
seekers fleeing persecution, primarily, from El Salvador and
Guatemala.  These interviews, under the best conditions, are not
easily conducted because of the applicants' cultural differences,
language barriers, lack of formal education, fear and apprehension,
and distrust of anyone who exerts authority.  In many instances,
only after a second and more in depth interview, and after gaining
confidence and trust in the person conducting the interview,  have
asylum applicants provided facts of a well-founded fear of
persecution in their home countries, on account of their political
opinion, or membership in a particular social group.

In view of the above it is highly unlikely that aliens pre-screened
by immigrations officers at airports will be able to articulate any
fear of persecution to an immigration inspector, with no training
in interviewing persons with post-traumatic stress disorders.  The
devastating result will be that genuine refugees will be summarily
removed by immigration inspectors, without having an opportunity of
being represented and, later having a fair chance to explain and
demonstrate to an asylum officer that they are fleeing from
persecution.

---

* Practice limited to immigration (PA only)

Competent interpretation is crucial at an interview. Failure to provide competent interpreters at the pre-screening interview is of great concern. An alien with a claim to political asylum could very well be removed because of incompetent interpretation, and without representation no one could challenge such interpretation.

The one-year deadline for filing a political asylum application is also of great concern. Political asylum seekers often find it difficult to obtain pro bono representation. After several attempts to obtain a private attorney, those asylum seekers that do not give up, finally, may turn to a community organization and/or get referred to an attorney who may provide pro bono representation, only to find that the one-year deadline has passed.

Finally, INS' wanting to eliminate the granting of work authorization to aliens eligible for voluntary departure under the new requirements would have devastating effects. Departing aliens would leave behind debts, because unscrupulous employers would get the wrong message from INS that such employers do not have to worry about paying the departing aliens their earned wages. INS' denial of work authorization to aliens under voluntary departure, would prevent these aliens from being lawfully employed during the specified voluntary departure time. This situation would make it impossible for these aliens to earn wages to obtain representation to recover their owed wages, from such employers.

I hope this comments and suggestions are given consideration and incorporated into the Final Regulations. Particularly in light of Senator Orrin G. Hatch's statement, "I am committed to ensuring that those with legitimate claims for asylum are not returned to persecution, particularly for technical deficiencies." 142 Cong. Rec. S11840 (daily edition, Sept. 30, 1996).

Sincerely,

María Reff
Immigration Coordinator