# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

COALITION FOR HUMANE IMMIGRANT RIGHTS, *et al*.,

    *Plaintiffs,*

    *v.*

KRISTI NOEM, in her official capacity as Secretary of Homeland Security, *et al.*,

    *Defendants.*

Case No.: 1:25-cv-00872

## EXPERT DECLARATION OF YAEL SCHACHER

I, YAEL SCHACHER, hereby declare pursuant to 28 U.S.C. § 1746:

## BACKGROUND

1. I am an historian of immigration to the United States and I currently serve as the Director for the Americas and Europe at Refugees International, a non-partisan, non-profit organization founded in 1979.

2. I have published peer reviewed academic articles on the history of immigration law and policy, a list of which is attached to this declaration as **Exhibit A**, and have taught courses on migration at Georgetown University and other academic institutions.

3. My specialty is the history of humanitarian immigration statuses, including refugee, asylum, and parole status. My academic focus is on the relationship between foreign policy and immigration policy, particularly as it relates to humanitarian protection. As part of my doctoral (Harvard University Ph.D., 2016) and postdoctoral (University of Texas at Austin, 2017-2018) work, I conducted extensive archival research on the Executive branch's use of the statutory parole authority and the evolution of asylum policy.

4. In 2023, I wrote an expert declaration on the history of parole for the intervenors in *Texas v. Biden*, 23-cv-00007 (S.D. Tex. Jun. 20, 2023). In 2024, I served as a subject matter expert and researcher for a report about expedited removal for the U.S. Commission for International Religious Freedom, an independent, bipartisan U.S. government commission created by the 1998 International Religious Freedom Act. United States Commission on International Religious Freedom, *Barriers to Protection as of 2024: Updated Recommendations on Asylum Seekers in Expedited Removal* (Feb. 2025). In

1

2025, I wrote a declaration about the history of the implementation of expedited removal for the plaintiffs in *Make the Road New York v. Noem*, 25-cv-00190 (D.D.C. Jun. 10, 2025).

5.   I have also conducted extensive research into legislative proposals, beginning in 1981 and ending with the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), to create the expedited removal authority at 8 U.S.C. § 1225(b)(1). I have been retained by counsel for the Plaintiffs to explain and summarize this legislative history.

6.   In preparing this declaration, I have reviewed the following documents:

    A.   All proposed bills and Congressional debates between 1981 and 1996 pertaining to legislative proposals to create summary removal procedures, whether referred to as "expedited exclusion," "summary exclusion," or "expedited removal." Except when quoting from original materials, I will refer to these various proposals herein as pertaining to "expedited exclusion" or "expedited removal" provisions.

    B.   Bill files, committee markups, conference negotiations, correspondence, and memos in the legislative archives of the National Archives and Records Administration regarding legislation that included expedited removal provisions, including IIRIRA and the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").

    C.   Papers at the Loyola University Congressional Archives of Rep. Henry Hyde, Chair of the House Judiciary Committee, and notes and memos in the University of Wyoming American Heritage Center archival papers of Sen. Alan Simpson, Chair of the Subcommittee on Immigration of the Senate Judiciary Committee, related to IIRIRA and AEDPA.

    D.   Papers at the University of Virginia Arthur J. Morris Law Library Special Collections of David Martin, general counsel of the Immigration and Naturalization Service ("INS") during the relevant period, related to parole, expedited removal, administrative asylum reforms, and proposed legislation.

    E.   The briefs and administrative record in this case, including comments by members of Congress regarding the INS rulemaking that followed the enactment of IIRIRA.

### SUMMARY OF OPINIONS

7.   Overall, my research shows that in the 15 years from when Congress first began to consider creating an expedited removal authority in 1981 to when Congress in 1996 first enacted such a provision in AEDPA and then repealed and replaced that provision five months later in IIRIRA, Congress never considered that this removal authority would be available for people who had come to a port of entry and been inspected and paroled into the country. Indeed, bills that included expedited removal provisions also included

provisions preserving or providing the ability of people previously paroled into the country to adjust status to permanent residence.

8. Throughout this period, Members of Congress consistently wanted an expedited removal authority to be available to apply to specific arriving populations, especially noncitizens without proper documents at airports. Many proposals also applied expedited removal to noncitizens crossing the land border or arriving by boat at places other than designated ports of entry. Some Members of Congress proposed the authority should be used for those interdicted in U.S. or international waters and brought to the country or only during designated "extraordinary migration situations" when large numbers of migrants were en route or seeking entry. Some Members of Congress additionally wanted expedited removal to be applicable to noncitizens present in the country who had previously entered "illegally" and without inspection. I have not found evidence that members of Congress wanted the expedited removal authority to apply to individuals present in the United States pursuant to a grant of parole.

9. Although no legislation creating an expedited removal authority was enacted into law until 1996, in that year Congress enacted two such pieces of legislation. The relevant provisions contained in AEDPA originated in the House, received little scrutiny throughout the legislative process, and were enacted with the legislation in April 1996. The relevant provisions contained in IIRIRA—which repealed and replaced the provisions enacted five months earlier in AEDPA—were the focus of significant debate in both the House and the Senate and among the most extensively negotiated provisions during the conference between the two chambers.

10. The legislative history of both AEDPA and IIRIRA makes clear that in the enacted versions of both laws, Members of Congress were focused on making expedited removal available for two groups of noncitizens: (1) those who are in the process of physically entering the country at a port of entry; and (2) those present in the country who entered without inspection. There was no discussion at any time of creating an expedited removal authority to be used on parolees. Instead, when the IIRIRA conference committee released its report, the provision authorizing the use of expedited removal against noncitizens present in the country who entered without inspection now explicitly carved out not only noncitizens physically present who have been admitted, but also those who have been paroled.

11. Additionally, although IIRIRA enacted several provisions intended to limit or discourage the use of parole, Members of Congress never proposed that people who came into the country as a result of being granted parole at a port of entry should be subject to expedited removal.

**Expedited Removal Proposals Following Enactment of the Refugee Act of 1980**

12. The history of legislative proposals to establish an expedited removal authority began just a few months after the passage of the Refugee Act of 1980 in March 1980. In addition to establishing the U.S. Refugee Admissions Program for resettling in the United States refugees identified and processed abroad, the legislation also required the Attorney

3

General to establish a procedure to allow noncitizens "physically present in the United States or at a land border or port of entry" to apply for asylum.

13. Before any asylum procedures were established, beginning in mid-April 1980, tens of thousands of Cubans were permitted by Fidel Castro to leave from the port of Mariel and sail for Florida, frequently on boats that came from Florida to pick them up. This was referred to as the Mariel Boatlift. Thousands of Haitians also arrived by boat in Florida in the spring and the summer of 1980. The Carter administration examined and processed the Cubans and Haitians and used its longstanding parole authority to release many of them to relatives and sponsors secured with the help of supportive organizations and refugee resettlement agencies. In the Refugee Education Assistance Act (Public Law 96-422), Congress authorized refugee benefits for Cubans and Haitians who arrived before October 10, 1980.

14. In January 1981, U.S. officials worried about an impending arrival of Haitians newly expelled from the Bahamas or additional Cubans setting sail to Florida, as threatened by Fidel Castro. There was concern about the time and resources that would be required to do case-by-case review of asylum claims (as required under procedures called for in the Refugee Act) made by new arrivals placed in exclusion proceedings.

15. This prompted the first of numerous legislative proposals by administrations and members of Congress of both parties to create an expedited exclusion process for migrants with fraudulent documents or with no documents at all who were in the process of arriving or who had just come into the country at a place that was not a designated port of entry.

16. All of these proposed bills also included provisions authorizing the adjustment of status of the Cubans and Haitians who entered in 1980, which indicates that Congress did not intend expedited exclusion to be applied to people previously paroled.

17. In October 1981, identical bills advanced by the Reagan administration containing the first expedited exclusion proposal were introduced as S. 1765 and H.R. 4832, the "Omnibus Immigration Control Act." The legislation authorized immigration officers during inspection to order noncitizens lacking necessary entry documents to be excluded and to "immediately deport[]" such noncitizens who are "arriving in the United States." The legislation authorized various additional powers during an "immigration emergency" declared by the president. However, the legislation did not apply the expedited exclusion provisions to the Cuban and Haitian nationals who had been paroled into the country in 1980. Instead, it granted them temporary resident status and authorized the Attorney General to adjust their status to lawful permanent residence if they met certain requirements. A true and correct copy of the relevant portions of H.R. 4832 is attached as **Exhibit B**.

18. After debate over the administration's bill, Rep. Romano Mazzoli and Sen. Alan Simpson introduced bills in 1982 that allowed inspectors to exclude noncitizens in the physical act of seeking entry to the United States who lacked necessary documents. Rep. Mazzoli's bill, H.R. 7357, amended INA 235(b) to authorize examining officers to exclude without

4

a hearing people "seeking entry" who do not present documentation required to enter the United States and do not indicate an intention to apply for asylum. A true and correct copy of the relevant portions of H.R. 7357 is attached as **Exhibit C**. Sen. Simpson's bill, S. 2222, which passed the Senate in 1982, created an expedited exclusion provision only "at the port of arrival" for people lacking documents to enter and referred to them as "unlawfully seeking entry into the United States." A true and correct copy of the relevant portions of the Senate-passed version of S. 2222 is attached as **Exhibit D**. Like the administration's bill, both of these bills created a process whereby those previously paroled could adjust status "to avoid wasteful use of the Immigration and Naturalization Service's limited enforcement resources." A true and correct copy of the relevant portion of Senate Report 97-485 is attached as **Exhibit E**.

19. In the following Congress, Sen. Simpson and Rep. Mazzoli again introduced legislation creating expedited exclusion processes. Sen. Simpson's bill, S. 529, again focused on those "at the port of arrival" without documents who were referred to as "unlawfully seeking entry." Rep. Mazzoli's bill, H.R. 1510, focused again on having the examining officer exclude upon inspection and without a hearing those "seeking entry" without proper documents. Sen. Simpson described his bill as giving the INS "the ability to react to immigration emergencies," and Rep. Bill McCollum similarly described the need for expedited exclusion in Rep. Mazzoli's bill as "to insure that we have the capacity to handle and deal with future Mariel boatlifts." A true and correct copy of the relevant portion of Sen. Simpson's Floor remarks is attached as **Exhibit F** and a true and correct copy of the relevant portion of Rep. Bill McCollum's Floor remarks is attached as **Exhibit G**. McCollum, a representative from Florida particularly familiar with the Mariel boatlift, also proposed his own legislation at this time to address immigration emergencies (H.R. 2304) and speed exclusion proceedings (H.R. 2356); together with Sen. Simpson, Rep. McCollum would remain a proponent of the use of expedited exclusion for people seeking entry without documents for the next fifteen years. Other provisions in S. 529 and H.R. 1510 were designed to prevent a future boatlift by including penalties for transporting migrants to the United States who lacked prior authorization to enter. They also authorized the appropriation of funds for an "immigration emergency fund" should another mass migration event occur. As with the administration's proposal, both bills included provisions granting eligibility for adjustment of status to (among others) previously paroled Cubans and Haitians.

20. The Senate passed Sen. Simpson's legislation in 1983 and the House passed Rep. Mazzoli's legislation in 1984. The two bills were conferenced but no agreement was reached before Congress adjourned.

21. Congressional efforts to pass expedited exclusion legislation waned in the mid-1980s as no new "mass influx" occurred and the Reagan administration invoked executive authority to interdict Haitians at sea to prevent their arrival in the United States. The Simpson-Mazzoli Immigrant Reform and Control Act of 1986 focused on preventing illegal migration through increased funding for inspection and enforcement activities of the INS. It also included a "Cuban-Haitian Adjustment" provision allowing the Cubans and Haitians paroled into the country in 1980, among others, to apply to adjust to permanent resident status. Under the legislation, such parolees would be granted

permanent resident status as of January 1, 1982, essentially expediting their path to U.S. citizenship. *See* Pub. L. No. 99-603 § 202 (Nov. 6, 1986).

22. Congress's interest in expedited exclusion and quickened asylum adjudication revived briefly in 1988 and 1989 due to an increase in the number of mostly Nicaraguans who crossed the border without inspection in south Texas in the hopes of traveling to Florida and elsewhere to seek asylum. The INS adopted a speeded-up process for handling these claims in early 1989 and Rep. Bill McCollum proposed legislation, H.R. 3186, that included expedited exclusion provisions similar to those contained in Rep. Mazzoli's legislation that passed the House in 1984. It amended INA 235(b) to provide for the exclusion without a hearing of noncitizens seeking entry to the United State who do not present the documentation required to obtain entry, lack a basis for legal entry, and do not indicate an intention to apply for asylum.

**Renewed Interest in Expedited Removal Provisions, 1992-1994**

23. In the early 1990s, an increase in people arriving at airports without documents, sometimes after destroying or discarding them on airplanes, or with fraudulent documents, led Sen. Simpson (S. 3214) and Reps. McCollum and Lamar Smith (H.R. 5780) to introduce legislation creating an expedited exclusion authority for such individuals at ports of entry (and eliminate appeals and judicial review of their exclusion) if they did not have credible claims for asylum. These bills also included provisions enhancing penalties for smuggling.

24. Interest in legislation of this kind dramatically increased in the wake of the February 1993 bombing of the World Trade Center, including by one person who had been allowed to enter when he claimed he wanted to seek asylum on arrival at John F. Kennedy airport in New York. In April 1993, there was a hearing on "Asylum and Inspections Reform" in the House Judiciary Committee that discussed expedited exclusion as one of several needed legislative responses to the terrorist attack. Several members of Congress referred to a March 14 episode of CBS's 60 Minutes, a transcript of which was made part of the Congressional Record. The episode included an interview with a New York INS official who estimated that fifty people a day "come through" JFK airport without documents or with fraudulent documents—having disposed en route of the documents used to get on the plane or having procured fake passports from smugglers. The official said that many of these people asked for political asylum upon arrival and were released because of lack of detention space. The answer for Rep. McCollum and several other Members of Congress was H.R. 1355, the "Exclusion and Asylum Reform Amendments of 1993," introduced on March 16, 1993, which created an expedited exclusion process for people seeking entry with fraudulent documents and those who claimed asylum but could not pass a credible fear screening. There was a similar hearing in the Senate Judiciary Committee in May 1993 regarding a bill Sen. Simpson also introduced in March, S. 667, the "Port of Entry Inspections Improvement Act of 1993," which would have created an expedited exclusion process for the same people seeking entry at ports.

6

25. An additional concern raised by Senators at the May 1993 hearing was the need to address increased smuggling of Chinese migrants to the United States by boat. Concern about this increased further after a ship, the Golden Venture, ran aground off Queens, New York in June 1993. On July 1, 1993, Reps. Mazzoli, McCollum, and Chuck Schumer introduced H.R. 2602, the "Immigration Enforcement and Asylum Reform Act of 1993," that combined the expedited exclusion of people seeking entry at ports of entry without proper documentation and who could not pass a credible fear screening with provisions designed to enhance investigations and penalties against smugglers. Rep. Mazzoli described this legislation on the House Floor as "keeping people out of the United States who are attempting to travel with fraudulent papers" and providing "an expedited but fair hearing for those who plead asylum when they reach this shore." A true and correct copy of the relevant portion of Rep. Mazzoli's Floor remarks is attached as **Exhibit H**.

26. On July 30, 1993, Sen. Edward Kennedy introduced S. 1333, the "Expedited Exclusion and Alien Smuggling Enhanced Penalties Act of 1993," that applied expedited exclusion to those seeking entry at ports with fraudulent documents and those who tried to enter by boat and were brought by U.S. authorities to a port of entry for inspection. This bill was supported by the Clinton administration, which wanted a faster way to process migrants like those on the Golden Venture and to avoid having the Coast Guard interdict migrants without documents and hold them at sea while arrangements were made for their repatriation or for a third county to accept them.

27. In May 1994, Rep. Lamar Smith and several House Republicans included a provision about expedited exclusion in a broader bill, H.R. 3860, designed to enhance border security, limit access of immigrants to federal benefits, and ensure the deportation of noncitizens who committed crimes. But the provision continued to apply only to people seeking entry at ports without documents and who could not pass a credible-fear screening as in H.R. 2602.

28. In 1994, both the House and the Senate marked up crime bills that included provisions facilitating the detention and deportation of immigrants who served sentences in prisons. Section 130010 of the Violent Crime Control and Law Enforcement Act of 1994, which became law on September 13, 1994, said that it was the "sense of the Senate" that immigration laws be reformed to provide "a procedure for the expeditious exclusion of any asylum applicant who arrives at a port of entry with fraudulent documents, or no documents, and makes a noncredible claim of asylum." A true and correct copy of Sec. 130010 of the Violent Crime Control and Law Enforcement Act of 1994 is attached as **Exhibit I**. People paroled into the country were never mentioned in this or any other proposed expedited exclusion provision.

**The 1996 Enactment of Expedited Removal in AEDPA and IIRIRA**

29. In March 1995, the Senate Judiciary Committee held a hearing on S. 269, the "Immigrant Control and Financial Responsibility Act of 1995," a comprehensive immigration reform bill introduced by Sen. Simpson in January, as well as a different legislative proposal supported by the Clinton administration. As introduced, S. 269 included an expedited

exclusion provision for people seeking entry with fraudulent documents or brought to the United States after being apprehended at sea. The administration's proposal supported the creation of an expedited exclusion authority at the discretion of the Attorney General during extraordinary migration situations. No senator or witness argued that an expedited exclusion authority should be available for use against noncitizens paroled into the country at ports of entry.

30. On April 19, 1995, a domestic terrorist attack took place in Oklahoma City, where the Alfred P. Murrah Federal Building was bombed.

31. Over the course of the next year, Congress considered several immigration bills (including S. 269) that eventually became IIRIRA, as well as antiterrorism legislation that eventually became AEDPA. Both pieces of enacted legislation included expedited removal provisions. **Exhibit J** attached to this declaration accurately reflects and summarizes key legislative moments in the 104th Congress leading to the enactment of both IIRIRA and AEDPA.

32. For purposes of clarity, I will discuss the two pieces of legislation separately but will highlight points of overlap. It is important to note that, whereas the expedited removal provisions were the focus of great attention in the legislation leading to IIRIRA, they were not extensively debated at all in the AEDPA process. AEDPA included a provision designed to apply expedited removal to people present in the country after having entered without inspection and without regard for how long they had already been in the United States—a provision that had not previously been considered by any prior Congress and was not being considered by those working on the immigration legislation.

33. In response to the Oklahoma City bombing, the Senate and the House introduced two different bills that—once passed by each chamber and conferenced—formed the basis for AEDPA. The Senate introduced its antiterrorism legislation in April 1995, S. 735. The legislation contained no expedited removal provision. House Judiciary Committee Chairman Henry Hyde, however, introduced legislation, H.R. 1710, that contained one provision making expedited removal available for noncitizens "seeking entry" into the country without documents and another that made people "found in" the country without inspection and admission subject to that expedited removal authority.

34. The House Judiciary Committee held two days of hearings on Chairman Hyde's legislation in June 1995, during which the issue of parole was never once discussed. The expedited removal provisions in the bill were discussed briefly by witnesses and were not discussed by members of the committee.

35. The House legislation was then marked up over four days later that month.  During the mark-up, Chairman Hyde explained that the expedited removal provision about noncitizens "found in" the country without inspection and admission applied to those who "evade our border controls," "succeed in crossing our borders illegally," and make a "stealthy entrance."  The provision was meant as "an expression of our resolve to end incentives to illegal immigration that can be taken advantage of by terrorists." Chairman Hyde and other members were equally clear that the "seeking entry" provision was meant

to apply to "people who show up at the airport" without proper documents. Chairman Hyde made clear that the goal of the provision was designed to "get control" of the situation, especially in New York, where people "get off [the plane] without documentation." A true and correct copy of relevant portions of the H.R. 1710 markup transcript is attached as **Exhibit K**. There was never any discussion during the markup of the expedited removal provisions applying to noncitizens physically present in the country after having been granted parole at a port of entry.

36. The House Judiciary Committee report on the antiterrorism bill reiterated that these two populations—people without documents "arriving at a port of entry" and people who "entered the United States unlawfully"— were the targets of the expedited removal provisions in the bill. Regarding the first group, it said people arrive "at airports" with fraudulent or no documents and an authority was needed to "return them, as promptly as possible, to where they boarded the plane to come here." The report noted that this provision "is based upon legislation approved by the Subcommittee on International Law, Immigration, and Refugees during the 103rd Congress." Regarding the second group, it noted that the expedited removal procedure would apply to those who entered unlawfully "regardless of the length of time the illegal entrant has been unlawfully present within the United States." A true and correct copy of relevant portions of the House Judiciary Committee report on H.R. 1710 is attached as **Exhibit M**.

37. When the antiterrorism bill came to the House Floor, there was no debate on the expedited removal provisions in the legislation and no discussion of parole.

38. After the legislation passed the House in March 1996, it was sent for conference with the bill passed by the Senate the previous year, S. 735. When the AEDPA conference committee issued its report, the House language on expedited removal for those "seeking entry" and those "found in" the country without inspection and admission remained intact. With respect to the "seeking entry" provision, the conference report included the same language found in the House Judiciary Committee report that described the provision as applying to "the inspection and exclusion of aliens arriving at a port of entry." With respect to the "found in" provision, the conference report similarly included the same language found in the House Judiciary Committee report that described the provision as applying to "any alien who has entered the United States unlawfully." A true and correct copy of relevant portions of the AEDPA Conference Committee Report is attached as **Exhibit N**.

39. On the Senate Floor, Sen. Patrick Leahy attempted to have several immigration-related provisions, including the two expedited removal provisions, stripped from the bill by sending it back to the conference committee, but his effort failed. At no time during Senate Floor consideration did any senator describe the expedited removal provisions in AEDPA as applying to or being designed to apply to noncitizens who had been paroled into the country. A true and correct copy of relevant portions of the Senate Floor debate is attached as **Exhibit O**.

40. AEDPA quickly passed both the Senate and the House and was signed into law on April 24, 1996. But as explained below, before either of the expedited removal provisions in

AEDPA could take effect, they were repealed in IIRIRA and replaced with similar but materially different expedited removal provisions that made it even clearer what populations the provisions were designed to reach (and what populations, including people previously paroled, were meant to be out of the provisions' reach).

41. Unlike the expedited removal provisions that were enacted in AEDPA after receiving little scrutiny throughout the process, the expedited removal provisions that were being considered in the House and Senate immigration bills underwent significant debate and discussion. The bill passed by the House, the bill reported out of the Senate Judiciary Committee, and the bill passed by the Senate all contained different expedited removal provisions from each other and from the language ultimately enacted in AEDPA. But at no point during the process—and consistent with the 15 years of legislative history that preceded it—was there any discussion of creating a statutory authorization of expedited removal to be used against noncitizens who had already been paroled into the country at a port of entry.

42. As mentioned above in paragraph 29, the Senate immigration bill, S. 269, initially only made expedited removal available for noncitizens lacking entry documents at ports of entry and those brought to the country following interdiction. Before the legislation went to the Senate Immigration Subcommittee for markup, bill sponsor Sen. Simpson received a memorandum from his staff proposing that the bill be amended to make the authority available for "all aliens who entered the U.S. without INS inspection and who have been in the U.S. for less than 2 years." The memorandum explained that this would "place an alien who has tried to sneak across the border in a position no more favorable than the alien with no documents or fraudulent documents who has presented himself for inspection." Sen. Simpson noted his agreement with the proposal on the memorandum. A true and correct copy of the May 16, 1995 memorandum is attached as **Exhibit P**.

43. When the Subcommittee marked up the legislation the following month, Sen. Simpson explained on June 14, 1995: "The purpose of expedited exclusion is just that, to accelerate the exclusion of those who would abuse our hospitality and generosity through surreptitious entry, document fraud, and by making fraudulent and wholly frivolous asylum claims." A true and correct copy of the relevant portion of the Subcommittee markup transcript is attached as **Exhibit Q**.

44. When the legislation was marked up in the full Judiciary Committee on March 14, 1996, Sen. Simpson explained that expedited exclusion was designed to get at an issue that he had been troubled by since 1993, namely noncitizens coming to the country by airplane using fraudulent documents provided by smugglers and destroyed en route. "You board a plane . . . flush [the document] down the john [i.e., toilet] on the plane, step off the plane, and claim asylum at the port of entry. The problem is a very serious one many of us saw dramatically depicted on 60 Minutes." Later in the markup, Senator John Kyl of Arizona suggested expedited exclusion and screening for credible fear should apply to large groups of people who were being smuggled across the border who then seek asylum. A true and correct copy of the relevant portion of the full Committee markup transcript is attached as **Exhibit R**.

45. On March 21, 1996, at the end of the Senate Judiciary Committee's markup, the bill as amended was ordered to be reported as S. 1664, a new piece of legislation introduced by Committee Chairman Orrin Hatch. S. 1664 subjected to expedited removal four categories of people: (1) those entering without documents or with false documents at ports of entry; (2) those who entered without inspection and have not been present for two years; (3) those brought to the United States following interdiction; and (4) those arriving during an Attorney General-declared extraordinary migration situation. A true and correct copy of relevant portions of the Senate Judiciary Committee report on S. 1664 is attached as **Exhibit BB**. (The "extraordinary migration situation" provision was previously introduced by Sen. Kennedy in a bill, S. 754, supported by the Clinton administration, which authorized expedited removal when the imminent arrival of noncitizens exceeded the capacity for their inspection and examination.) At no point during the markup did any senator indicate that noncitizens paroled into the country at a port of entry would be subject to expedited exclusion under any of these four categories.

46. On April 16, 1996, the day after the Senate brought S. 1664 to the Floor and the day the AEDPA conference report was to be considered on the Senate Floor, the INS wrote to Dick Day, a senior staffer for Sen. Simpson, regarding "INS issues" with the AEDPA legislation. One of the INS's concerns involved the provision in the legislation making noncitizens "found in" the country without inspection and admission subject to expedited removal without any time limit. The INS explained that "Obtaining expedited exclusion authority is critically important to our ability to deal with organized alien smuggling and fraud at our ports of entry . . . While we agree that aliens who have never been admitted should be subject to exclusion, we believe the ordinary exclusion procedures are more appropriate to address issues typically involved in the case of an alien who has been in the United States for some time." A true and correct copy of the April 16, 1996, facsimile from the INS to Dick Day is attached as **Exhibit S**.

47. After Sen. Leahy was unsuccessful on the Senate Floor at removing from AEDPA the expedited removal provisions, *see* ¶ 39, he and Sen. Mike DeWine successfully amended S. 1664's expedited removal provision to make it only available in extraordinary migration situations as designated by the Attorney General based on "the numbers or circumstances of aliens en route to or arriving in the United States, by land, sea, or air." The May 1, 1996, debate between Senators Leahy and Simpson over the Leahy-DeWine amendment reveals that there was consensus among those who supported broader use of expedited removal (Simpson) and those who opposed its use in almost all circumstances (Leahy) that the population the provision was directed at was noncitizens attempting to come into the country with fraudulent documents. Sen. Simpson referred to such targets of expedited removal as people who "have presented themselves for inspection with fraudulent documents" and Sen. Leahy as "people coming in with false passports fleeing persecution." A true and correct copy of the relevant portions of the Senate Floor debate on S. 1664 is attached as **Exhibit T**.

48. Meanwhile, the House Judiciary Committee's work on its immigration bill began shortly after the Committee completed its work on the antiterrorism bill. In fact, during markup of the antiterrorism bill, some members expressed concerns that the immigration provisions in the bill—including the expedited removal provisions—did not belong in the

legislation. Chairman Hyde acknowledged that work was underway in the immigration subcommittee on immigration legislation and that a bill would soon be introduced by Rep. Lamar Smith, who was not present. *See* Exh. K.

49. Two days after markup, Rep. Smith introduced H.R. 1915, the "Immigration in the National Interest Act of 1995," which included an expedited removal provision for noncitizens "arriving in the United States (whether or not at a port of entry)" who lacked entry documents. The Immigration Subcommittee held a hearing about H.R. 1915 in late June and received testimony from a Clinton administration witness who said that the migration of large numbers of Cubans to Florida by boat the previous year demonstrated the need for a prompt exclusion procedure. Similar to the position the administration took in March 1995 during the Senate Judiciary Committee hearing on S. 269, the administration expressed its preference that such an authority be made available only at the discretion of the Attorney General during extraordinary migration situations so as to make best use of agency resources; legislation reflecting the administration's preference had been included in another bill, H.R. 1929. Following the conclusion of the Subcommittee markup of H.R. 1710, a new bill was introduced on August 4, 1995 as H.R. 2202 that incorporated the language of the earlier bill's expedited removal provision.

50. The House Judiciary Committee markup debates for H.R. 2202, which occurred in September and October 1995, confirm that the bill's proponents understood the expedited removal provision as applying to people in the process of physically coming into the country without valid documents; none of the members suggested during markup that expedited removal was applicable to people who had been inspected and paroled. During the markup, Rep. Smith made it clear that the provision authorizing expedited removal of noncitizens "arriving in" the country without necessary documents was focused on those arriving at airports without documents and who could not pass a credible fear screening. On September 20, Rep. Smith explained that expedited removal was designed to return "as promptly as possible to where they boarded the plane to come here" those without valid entry documents who had no fear of persecution. A true and correct copy of the relevant portion of the full Committee markup transcript of H.R. 2202 for September 20, 1995, is attached as **Exhibit U**. On October 24, speaking in opposition to an amendment to allow immigration judges to review credible fear denials, Rep. Smith said that a streamlined processed was needed to expeditiously remove those who "arrive in the United States with no valid entry documents" and that it was impossible to "make immigration judges available in . . . a short time at each airport." A true and correct copy of the relevant portions of the full Committee markup transcript of H.R. 2202 for October 24, 1995, is attached as **Exhibit V**.

51. The House Judiciary Committee completed its consideration of the bill in late October 1995 and issued its Committee Report in March 1996. According to the report, the legislation was addressing the contribution of smugglers to the problem of illegal immigration—including smuggling not only by boat but via circuitous routes through other countries and onward travel either by air or unauthorized crossing of the land border—and the "abuse" of asylum procedures by those "smuggled aliens" who "arrive in the United States . . . with no valid entry documents." The report said that the

expedited exclusion provision was meant to address "arriving aliens" who lack or present fraudulent documents upon inspection by an immigration officer and was based on the legislation of the previous Congress. The provision "was necessary," the report said, "because thousands of aliens arrive in the U.S. at airports each year without valid documents and attempt to illegally enter the U.S." If they don't claim to be U.S. nationals or to have a fear of persecution, they should be returned "as promptly as possible, to where they boarded the plane to come here." A true and correct copy of the relevant portions of the House Judiciary Committee report on H.R. 2202 is attached as **Exhibit CC**.

52. The version of the legislation passed by the House later that month contained the same "is arriving in the United States" language pertaining to expedited removal that was in the version considered by the House Judiciary Committee. During the three days of debate on the House Floor regarding the legislation, there was no discussion of applying the expedited removal provisions to people previously paroled into the country at a port of entry. The discussion of parole was instead focused on support for permitting a group of Hungarian and Polish nationals who were paroled into the country over a two-year period to adjust status and on various provisions in the bill limiting parole that were entirely unrelated to the expedited removal provisions in the bill.

53. As the House passed its immigration bill in March 1996 and the Senate passed its immigration bill in early May 1996, the legislation was ready to be referred to a conference committee to reconcile differences between the two bills.

54. Many of the differences between the House and Senate bills were resolved by staff and with little involvement of Members of Congress themselves. But the details of the expedited removal provisions (not only for whom expedited removal would be available but also questions of the fear screening standard, judicial review, etc.) were among the most closely scrutinized by key members of the House and Senate.

55. On May 31, the Department of Justice provided its official views on the legislation and expressed support for the Senate-passed version, with certain modifications, of the expedited exclusion provision because it provided sufficient flexibility to use the authority when needed for people attempting to come into the country at ports of entry without proper documents. The Department wrote that "Expedited exclusion authority is critically important to our ability to deal with organized alien smuggling and fraud at our ports of entry." A true and correct copy of the letter from Deputy Attorney General Jamie S. Gorelick to Sen. Simpson, May 31, 1996, is attached as **Exhibit W**.

56. Memos from Senate and House staffers in June and July of 1996 explained proposals by Chairman Hatch and Rep. Smith to come to an agreement on the expedited removal provision during the conference. People who had been paroled into the country after inspection were never mentioned in these memos as a population potentially subject to expedited removal.

57. One memo dated June 25, 1996, was provided to Sen. Simpson in advance of the first meeting of Republican conferees on the immigration bill and it described the scope of the

13

various expedited exclusion proposals on the table. The memo noted that although the Senate-passed bill authorized expedited exclusion only for "extraordinary migration situations," the bills reported out of the Senate Judiciary Committee and the House-passed bill both covered "aliens arriving at a port of entry with no or fraudulent documents." A true and correct copy of the memorandum from Dick Day to Sen. Simpson, June 25, 1996, is attached as **Exhibit X**.

58. Sen. Hatch originally proposed having expedited removal apply in extraordinary migration situations and for those interdicted at sea and brought to the United States. But a July 9, 1996, memo from his staffer, Mark Disler, to Rep. Smith's staffer, Cordia Strom, said "Senator Hatch is willing to have broad coverage under an expedited exclusion procedure, so long as there is adequate protection against erroneous decisions to exclude persons genuinely deserving of asylum . . . . That is why the [credible fear] standard, the nature of administrative review including a meaningful appeal, and some judicial check on INS's implementation are important." A true and correct copy of the memorandum from Mark Disler to Cordia Strom, July 9, 1996, is attached as **Exhibit Y**.

59. In another memo dated June 26, 1996, and revised July 24, 1996, Sen. Simpson's staffer reviewed the different populations covered in the enacted version of AEDPA and various immigration proposals on the table. The Senate Judiciary Committee's reported bill covered "aliens arriving at a port of entry with fraudulent or no documents (the situation publicized by "60 Minutes"); noncitizens interdicted at sea; "extraordinary migration situations" as determined by the Attorney General; and "'EWIs' (aliens who have entered without inspection)" who cannot establish two years of continuous presence. Because of Sen. Leahy's successful amendment on the Senate Floor, the Senate-passed bill covered only extraordinary migration situation cases. The House-passed bill covered the "fraudulent or no document cases" involving noncitizens arriving at a port of entry and interdiction cases. And Sen. Hatch and Rep. Smith were negotiating within those parameters. As enacted, AEDPA would make "all EWIs, not just those in the U.S. less than two years" subject to expedited exclusion." A true and correct copy of the memorandum from Chip to Sen. Simpson, June 26, 1996, revised July 25, 1996, is attached as **Exhibit Z**.

60. In early July, the negotiation positions of Sen. Hatch and Rep. Smith were clear. The most important concerns for Sen. Hatch were lowering the credible fear standard, having immigration judge review for negative credible fear determinations, and discretionary (rather than mandatory) use of all expedited removal. Sen. Hatch also wanted additional review for people seeking entry who claimed to have lawful immigration status. Rep. Smith wanted a higher credible fear standard, review of negative credible fear determinations by a supervisory asylum officer, discretionary use of expedited removal only for those found in the country in the two years after entering without inspection, and expedited exclusion applied to anyone seeking entry without proper documents.

61. In mid-July, Sen. Simpson was called in to broker a deal between Rep. Smith and Sen. Hatch, but his position on expedited exclusion aligned with Rep. Smith. In advance of an anticipated meeting regarding the issues holding up agreement on the bill, Sen. Simpson's staff prepared talking points on expedited exclusion noting that Congress had

almost passed an expedited exclusion bill in the 1980s. "If we had expedited exclusion on the books, the spectacle at JFK airport so vividly portrayed on 60 Minutes would have been quickly stemmed. The Chinese on the Golden Venture in New York Harbor could have been quickly processed with those having a credible fear of persecution receiving a full asylum hearing and the others swiftly returned to their homeland." A true and correct copy of these talking points is attached as **Exhibit AA**.

62. By the end of August a compromise had been reached on several provisions – i.e., limited immigration judge reviews of negative credible fear determinations, a low fear standard that also evaluated credibility, and giving the Attorney General discretionary authority to use expedited removal for those who entered without inspection who have been in the U.S. for less than two years. Nowhere in the archives about the conference negotiation about what became IIRIRA is there any mention of people paroled into the United States being subject to expedited removal.

63. The IIRIRA conference committee filed its report on September 24, 1996. The first purpose of the legislation described in the report's Joint Explanatory Statement is to "improve deterrence of illegal immigration to the United States." The conference report describes expedited removal as applying to "arriving alien[s]" determined upon examination to be inadmissible for having fraudulent or no entry document, except that the provision shall not apply to "an alien arriving by air who is a national of a Western Hemisphere nation with which the United States does not have diplomatic relations." The conference report additionally describes the Attorney General's authority to apply the expedited removal provision to certain noncitizens who "ha[ve] not been paroled or admitted into the United States." The conference report explains that the purpose of these provisions is "to expedite the removal from the United States of aliens who indisputably have no authorization to be admitted to the United States." A true and correct copy of relevant portions of the IIRIRA Conference Committee Report is attached as **Exhibit L**. IIRIRA was passed by Congress as part of an omnibus spending bill and was signed into law on September 30, 1996.

64. To recap, whereas the language of the expedited removal authority enacted in AEDPA received little scrutiny, the language of the provision in IIRIRA was the subject of significant attention in both the House and the Senate and throughout the conference committee. Different versions of the provision were contained in the versions passed by the House of Representatives, the version reported to the Senate by the Senate Judiciary Committee, and the version passed by the Senate. For each of these versions and just as was the case since 1981, Members of Congress were clear about what specific groups would be exposed to expedited removal, and at no point—not in the years preceding the 104th Congress, not in the legislative effort that matured into AEDPA, and not in the markups, floor consideration, and conference negotiations on IIRIRA—was there ever a single mention by anyone that expedited removal would be available for use against people who had come to a port of entry, presented themselves for inspection, and been paroled into the country.

65. Other groups were clearly considered and included in the version of IIRIRA enacted into law (i.e., those without proper documents (1) in the process of arriving at ports of entry or

15

(2) within the country who entered without inspection). Others were included in different ways than originally proposed (e.g., noncitizens encountered while attempting to come into the country between ports of entry who would have been included in the House-passed bill's language applying to those arriving "whether or not at a port of entry" could in the enacted legislation be designated for expedited removal as noncitizens physically present without having been admitted or paroled). Others were considered and discarded (e.g., making expedited removal available during designated extraordinary migration situations and using expedited removal against noncitizens who have lived in the country for more than two years after entering without inspection, the latter of which would have been subjected to expedited exclusion under AEDPA had that provision taken effect).

66. Noncitizens physically present in the country after having been granted parole at a port of entry were never considered targets for expedited removal, and the first time in all of this 15-year history that they came up is in the version of IIRIRA reported out of the conference committee in the provision that explicitly carves them out of exposure to expedited removal as people present in the country—the provision that had consistently been described and understood as having been designed for people who entered "illegally."

### Efforts to Limit or Discourage the Use of Parole Have Always Been Distinct From Efforts to Create an Expedited Removal Authority

67. As enacted, IIRIRA was a huge piece of legislation that touched many different parts of immigration law. Separate from the efforts to remake immigration enforcement and, among other things, create an expedited removal authority, Congress enacted several provisions addressing specific concerns related to the use of the parole authority.

68. Congressional efforts to guide the Executive's exercise of the parole authority were not new. In 1980, Congress replaced the conditional entry of refugees with a process for the admission of refugees and also amended the statute to limit the authority to parole refugees into the country rather than admitting them absent "compelling reasons in the public interest." 8 U.S.C. 1182(d)(5)(B). Legislation was proposed but not enacted in 1994 (H.R. 4934) and 1995 (H.R. 1697) to limit how many people and who could be paroled and the eligibility of parolees for work authorization or adjustment of status.

69. In the 104th Congress (1995-1996), some Members were concerned that parole was being used to allow large groups of noncitizens who may not have had a path to permanent legal status to remain in the United States for long periods. During the Senate Judiciary Committee hearing on S. 269 at the beginning of the Congress, for instance, in addition to discussing the expedited exclusion provisions in the legislation and in the Clinton administration's proposal, senators and witnesses also discussed reforms to the parole authority. These topics were treated as entirely separate subjects, and no one proposed that expedited exclusion should be available for use against noncitizens in the country pursuant to a grant of parole.

70. Congress attempted to address certain concerns about parole in IIRIRA by enacting a provision that limits future immigration because of the presence of long-term parolees.

16

As enacted, Section 603 of the legislation required that nearly all long-term parolees who have yet to become lawful permanent residents be counted against annual numerical caps on family-sponsored immigration, thereby reducing the available number of family-based visas from a particular country by the same number of its nationals who are long-term parolees in the United States.

71. In the final legislation, Congress in IIRIRA also mandated annual reporting to Congress on the Executive's use of parole and replaced the "emergent reasons or for reasons deemed strictly in the public interest" language that had been in the parole criteria since 1952 with "urgent humanitarian reasons or significant public benefit." Whereas the version of the legislation reported out of the House Judiciary Committee would have significantly constrained the parole authority by narrowly defining key terms, the enacted version of the legislation left the new terms undefined and therefore up to interpretation by the Executive.

72. Notably, as the House- and Senate-passed immigration bills were conferenced, these reforms to the parole authority were not discussed by conferees until mid-September 1996, after a compromise on expedited removal had been reached.

73. Importantly, at no point during the legislative proposals regarding parole beginning in the wake of the enactment of the Refugee Act or coming up to and including enactment of IIRIRA was there any proposal to subject—or even discussion about subjecting—noncitizens paroled into the country to expedited removal provisions. There was no conversation about using the expedited removal authority to facilitate the expeditious removal of people who previously had been paroled into the country. And there was no discussion about amending the parole statute to describe parolees as "arriving" or any variant thereof.

74. Rather, throughout this period—and even in IIRIRA itself—Congress regularly continued to enact legislation allowing such individuals physically present in the country pursuant to parole to adjust status to lawful permanent residence. The version of the immigration reform bill reported out of the House Judiciary Committee, for instance, which contained more significant constraints on the Executive's use of its parole authority than were passed by the House or enacted in IIRIRA, contained a section permitting Hungarian and Polish nationals paroled into the country over a two-year period to adjust to lawful permanent resident status. The enacted legislation similarly permitted Hungarian and Polish parolees to adjust status and recognized the continuing ability of Cuban parolees to adjust status pursuant to the Cuban Adjustment Act.

## 1997 Rulemaking

75. The Administrative record produced by Defendants for Legacy INS 1788-96, Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings (the 1997 rulemaking that included the regulatory definition of "arriving alien") consists entirely of public comments submitted on the 1997 notice of proposed rulemaking and the interim rule to implement IIRIRA.

76. Comments submitted by members of Congress in response to the agency's proposed IIRIRA rulemaking underscore that their intention in authorizing expedited removal for noncitizens "arriving in the United States" was to have expedited removal be used for people literally arriving in the United States. For example, in his comments submitted in response to the proposed regulation and the interim rule, Rep. Lamar Smith indicated that expedited removal was intended for "arriving" people "in the process of physical entry," including "attempting to enter, at the point of entry, or just having made an entry," and including those apprehended "very recently" after arrival and in "close proximity" to the border. *See* AA-REG-00686 (attached as Ex. T to Declaration of Hillary Li ("Li Decl.")); AA-REG-00635 (Li Decl., Ex. U). Senator Kennedy's two comments (one joined by Sen. Wellstone) discuss the expedited removal system only with respect to noncitizens in secondary inspection at ports of entry. *See* AA-REG-00327-329 (Li Decl., Ex. Z); AA-REG-00895-897 (Li Decl., Ex. R). In his comment, Senator Spencer Abraham requested that the agency, in implementing expedited removal, give noncitizens arriving at ports of entry who request asylum sufficient time to prepare for their credible fear interviews. *See* AA-REG-01147 (Li Decl., Ex. S).

77. Overall, the public comments received in response to both the notice of proposed rulemaking and the interim rule indicate that nearly everyone who commented thought the definition of arriving alien and the expedited removal provision was applicable to people in the process of arriving and not to those present in the United States pursuant to a grant of parole.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed March 2, 2026, in Washington, D.C.

Yael Schacher

18

**EXHIBIT LIST**

| Exhibit | Description |
|---|---|
| A | List of academic articles published by Yael Schacher |
| B | Excerpt from Omnibus Immigration Control Act, H.R. 4832, 97th Cong. (1981) |
| C | Excerpt from Immigration Reform and Control Act of 1982, H.R. 7357, 97th Cong. (1982) |
| D | Excerpt from Immigration Reform and Control Act of 1982, S. 2222, 97th Cong. (as passed by Senate, Sept. 8, 1982) |
| E | Excerpt from S. Rep. No. 97-485 (1982) |
| F | 129 Cong. Rec. 12,795, 12,842 (1983) (statement of Sen. Simpson) |
| G | 130 Cong. Rec. 17,225, 17,272 (1984) (statement of Rep. McCollum) |
| H | 139 Cong. Rec. 16,448, 16,450 (1993) (statement of Rep. Mazzoli) |
| I | Violent Crime Control and Law Enforcement Act, Pub. L. No. 103-322, 108 Stat. 1796 (1994) |
| J | Demonstrative and list of key moments in IIRIRA/AEDPA |
| K | Excerpt from Markup of H.R. 1710 Before the H. Comm. on the Judiciary, 104th Cong. (June 14, 1995) (transcript) |
| L | Excerpt from H.R. Rep. No. 104-828 (1996) |
| M | Excerpt from H.R. Rep. No. 104-383 (1995) |
| N | Excerpt from H.R. Conf. Rep. 104-518 (1996) |
| O | 142 Cong. Rec. S3427-31 (daily ed. Apr. 17, 1996) |
| P | Memorandum from [Chip] to Sen. Alan K. Simpson, Re: Amendments to S. 269 (May 16, 1995) |
| Q | Excerpt from Markup of S. 269 Before the S. Subcomm. on Immigration, S. Comm. on the Judiciary, 104th Cong. (June 14, 1995) (transcript) |
| R | Excerpt from Markup of S. 269 Before the S. Comm. on the Judiciary, 104th Cong. (Mar. 14, 1996) (transcript) |

| S | Facsimile from INS to Dick Day, Re: Terrorism Bill – INS Issues (Apr. 16, 1996) |
|---|---|
| T | 142 Cong. Rec. S4457-63 (daily ed. May 1, 1996) |
| U | Excerpt from Markup of H.R. 2202 Before the H. Comm. on the Judiciary, 104th Cong. (Sept. 20, 1995) (transcript) |
| V | Excerpt from Markup of H.R. 2202 Before the H. Comm. on the Judiciary, 104th Cong. (Oct. 24, 1995) (transcript) |
| W | Letter from Jamie S. Gorelick, Deputy Att'y Gen., to Sen. Alan K. Simpson, Re: Administration Views on H.R. 2202 (May 31, 1996) |
| X | Memorandum from Dick Day to Sen. Alan K. Simpson, Re: First Meeting of Republican Immigration Conferees (June 25, 1996) |
| Y | Memorandum from Mark R. Disler to Cordia Strom, Re: Immigration Discussions (July 9, 1996) |
| Z | Memorandum from [Chip] to Sen. Alan K. Simpson, Re: Expedited Exclusion (June 26, 1996; revised July 24, 1996) |
| AA | Memorandum from Dick Day to Sen. Alan K. Simpson, Re: Stalemate on Immigration Conference (July 24, 1996) |
| BB | Excerpt from S. Rep. No. 104-249 (1996) |
| CC | Excerpt from H.R. Rep. No. 104-469, pt. 1 (1996) |

# EXHIBIT A

## Publications of Yael Schacher

A list of Yael Schacher's publications for Refugees International can be found here: https://www.refugeesinternational.org/authors/yael-schacher/.

"Misreading History: The United States Supreme Court and the Thwarting of the U.S. Asylum System since the 1980s," *Whose America?: U.S. Immigration Policy since 1980*, ed. Maddalena Marinari and Maria Cristina Garcia, Univ. of Illinois Press, 2023, 209-236.

Review of *The Deportation Machine* by Adam Goodman, *Federal History,* Issue 15 (2023), 132-135, https://shfg.wildapricot.org/page-18388.

"The Wedge of the Refugee As Worker: Litigation over Asylum Seeker Work Authorization in the United States, 1974-2021," *Global Labor Migration: New Directions,* ed. Julie Greene, Eileen Boris, Heidi Gottfried, and Joo-Cheong Tham, Univ. of Illinois Press, 2022, 171-189.

"Return of the Repressed," *Journal of American History*, Vol. 109, Issue 2, Sept. 2022, 375–387.

"Exclusions and Exceptions: The History of Asylum in the United States," *The State of Human Rights: Historical Genealogies, Political Controversies, and Cultural Imaginaries,* ed. Kerstin Schmidt, Universitatsverlag Winter, 2020, 71-84.

"Family Separation and Lives in Limbo," *Annals of the American Academy of Political and Social Science*, Vol. 690, July 2020, 192-199.

"'I Hate to See Human Beings Kicked Around by Fate & by Law:' Edith Lowenstein's Asylum Advocacy in the 1950s and 1960s," *Journal of American Ethnic History*, Vol. 30, No. 3, Spring 2020, 49-74.

"Diversity in American Letters," *American Literature in Transition: The 1930s,* ed. Ichiro Takayoshi (Cambridge UP, 2018), 177-197.

Review of *Making Refuge: Somali Bantu Refugees and Lewiston, Maine* by Catherine Besteman, *Border Criminologies*, July 13, 2018, https://www.law.ox.ac.uk/research-subject-groups/centre-criminology/centreborder-criminologies/blog/2018/07/book-review.

Review of "A View from the Bridge*,*" Nov. 20, 2017, *Not Even Past* (UT Austin), https://notevenpast.org/a-view-from-the-bridge-directed-by-sidney-lumet-1962.

Review of *Captivity Beyond Prisons: Criminalization Experiences of Latina (Im)migrants*, by Martha D. Escobar, *Journal of American Ethnic History,* Vol. 37, No.1, Fall 2017, 92-95.

# EXHIBIT B

Coalition for Humane Immigrant Rights, et al. v. Noem et al., 1:25-cv-00872 (JMC)

97TH CONGRESS
1ST SESSION

# H. R. 4832

To revise and reform the Immigration and Nationality Act, and for other
purposes.

---

## IN THE HOUSE OF REPRESENTATIVES

OCTOBER 22, 1981

Mr. RODINO (by request) introduced the following bill; which was referred to the
Committee on the Judiciary

---

# A BILL

To revise and reform the Immigration and Nationality Act, and
for other purposes.

1    *Be it enacted by the Senate and House of Representa-*

2    *tives of the United States of America in Congress assembled,*

3    That this Act may be cited as the "Omnibus Immigration

4    Control Act".

5    TITLE I—TEMPORARY RESIDENT STATUS FOR

6                   ILLEGAL ALIENS

7        SEC. 101. (a) Notwithstanding any other provision of

8    law, the Attorney General in his discretion and under such

16

1     SEC. 203. The provisions of this title shall become effec-

2 tive upon the date of enactment.

3     SEC. 204. This title shall be known as the Unlawful

4 Employment of Aliens Act of 1981.

5     TITLE III—CUBAN/HAITIAN TEMPORARY

6          RESIDENT STATUS ACT OF 1981

7     SEC. 301. (a) Except as provided in subsection (c) of

8 this section, the following aliens shall be granted Cuban/Hai-

9 tian temporary resident status beginning sixty days after en-

10 actment of this Act and may remain in the United States

11 under such conditions as the Attorney General may deem

12 appropriate:

13          (1) Nationals of Cuba who arrived in the United

14     States and presented themselves for inspection after

15     April 20, 1980, and before January 1, 1981; and who

16     are still physically present in the United States;

17          (2) Nationals of Haiti who on December 31,

18     1980, were the subjects of exclusion proceedings under

19     section 236 of the Immigration and Nationality Act,

20     including those who on that date were under orders of

21     exclusion and deportation which had not yet been ex-

22     ecuted;

23          (3) Nationals of Haiti who on December 31,

24     1980, were the subjects of deportation proceedings

25     under section 242 of the Immigration and Nationality

17

1   Act, including those who on that date were under

2   orders of deportation which had not yet been executed;

3       (4) Nationals of Haiti who were paroled into the

4   United States under section 212(d)(5) of the Immigra-

5   tion and Nationality Act or were granted voluntary de-

6   parture before December 31, 1980, and were physical-

7   ly present in the United States on that date; and

8       (5) Nationals of Cuba or Haiti who on December

9   31, 1980, had applications for asylum pending with the

10  Immigration and Naturalization Service.

11      (b) The Attorney General may in his discretion grant an

12  alien described in subsection (a) of this section authorization

13  to engage in employment in the United States and provide to

14  that alien an "employment authorized" endorsement or other

15  appropriate work permit.

16      (c) Cuban/Haitian temporary resident status for any

17  alien may be denied or terminated by the Attorney General,

18  in his discretion, pursuant to such regulations as the Attor-

19  ney General may prescribe, if the Attorney General deter-

20  mines, with or without a hearing, that the alien is inadmissi-

21  ble under section 212(a) of the Immigration and Nationality

22  Act (8 U.S.C. 1182(d)) (except paragraphs (14), (15), (20),

23  (21), (23), if the alien's inclusion in paragraph (23) is the

24  result of only one conviction for possession without intent to

18

1 distribute narcotic drugs or marihuana, (25), or (32) of sub-
2 section (a)), or if the Attorney General determines that—

    (1) the alien ordered, incited, assisted, or other-
    wise participated in the persecution of any person on
    account of race, religion, nationality, membership in a
    particular social group, or political opinion;

    (2) there are serious reasons for considering that
    the alien has committed a serious nonpolitical crime
    outside the United States prior to the arrival of the
    alien in the United States;

    (3) the alien is in detention at the time this title is
    enacted.

13 (d) An alien granted Cuban/Haitian temporary resident
14 status under this section shall register with the Immigration
15 and Naturalization Service every three years, under such
16 regulations as the Attorney General may prescribe, for so
17 long as the alien remains in temporary resident status.

18 (e)(1) An alien under Cuban/Haitian temporary resident
19 status shall not be eligible for benefits under section 501 of
20 the Refugee Education Assistance Act of 1980 (Public Law
21 96–122).

22 (2) The spouse and children of an alien granted tempo-
23 rary resident status under this section shall not receive any
24 status or preferred treatment under the Immigration and Na-
25 tionality Act by reason of the family relationship with the

19

1 temporary resident alien. However, this subsection shall not

2 prevent a spouse or child who independently meets the quali-

3 fications of subsections (a) and (b) of this section from obtain-

4 ing temporary resident status.

5     (3) An alien granted Cuban/Haitian temporary resident

6 status shall not be eligible for any benefits under any of the

7 following provisions of law:

8         (A) aid to families with dependent children under

9         title IV, part A, of the Social Security Act (42 U.S.C.

10         601 et seq.);

11         (B) supplemental security income for the aged,

12         blind, and disabled under title XVI of the Social Secu-

13         rity Act (42 U.S.C. 1381 et seq.) unless such disability

14         was incurred directly from employment after registra-

15         tion under the provisions of the Act;

16         (C) Food Stamp Act of 1964, as amended (7

17         U.S.C. 2011 et seq.);

18         (D) financial assistance made available pursuant

19         to the United States Housing Act of 1937, section 235

20         or 236 of the National Housing Act, or section 101 of

21         the Housing and Urban Development Act of 1965;

22         (E) aid or assistance under a State plan approved

23         under title I, X, XIV, or XVI of the Social Security

24         Act (other than on the basis of a disability described in

25         paragraph (G) of this subsection); and

20

1       (F) redesignating paragraph (5) as paragraph (6)

2 and amending it to read: "(6) medical assistance under

3 title XIX of the Social Security Act (other than in the

4 case of an individual receiving aid under a State plan

5 approved under title XIV or XVI of the Social Secu-

6 rity Act, or supplemental security income benefits

7 under title XVI of that Act, on the basis of a disability

8 described in paragraph (G) of this subsection.)'';

9       (G)(1) Section 402(a)(33) of the Social Security

10 Act is amended by striking out the period at the end

11 thereof and inserting instead ''other than an alien

12 granted Cuban/Haitian temporary resident status.

13       (2) Section 1614(a)(1)(B) of such Act is amended

14 by striking out the period at the end thereof and insert-

15 ing instead ''other than an alien granted Cuban/Hai-

16 tian temporary resident status.''.

17       (3) Section (2)(a) of such Act is amended—

18       (A) by striking out ''and'' at the end of para-

19 graph (12),

20       (B) by striking out the period at the end of

21 paragraph (13) and inserting instead ''; and'', and

22       (C) by adding at the end of such subsection

23 the following new paragraph:

24       ''(14) provide that, in order for any individual to

25 be a recipient of old-age assistance, or an individual

1   whose needs are taken into account in making the de-
2   termination under paragraph (10)(A), such individual
3   must be either (A) a citizen, or (B) an alien lawfully
4   admitted for permanent residence or otherwise perma-
5   nently residing in the United States under color of law
6   (including any alien who is lawfully present in the
7   United States as a result of the application of the pro-
8   visions of section 207(c) of the Immigration and Na-
9   tionality Act (or of section 203(a)(7) of such Act prior
10  to April 1, 1980), or as a result of the application of
11  the provisions of section 208 or 212(d)(5) of such Act),
12  other than an alien granted Cuban/Haitian temporary
13  resident status.".

14      (4) Section 1002(a) of such Act is amended—

15          (A) by striking out "and" at the end of para-
16      graph (13),

17          (B) by striking out the period at the end of
18      paragraph (14) and inserting instead "; and", and

19          (C) by adding at the end of such subsection
20      the following new paragraph:

21  "(15) provide that, in order for any individual to
22  be a recipient of aid to the blind, or an individual
23  whose needs are taken into account in making the de-
24  termination under paragraph (8), such individual must
25  be either (A) a citizen, or (B) an alien lawfully ad-

22

1    mitted for permanent residence or otherwise perma-
2    nently residing in the United States under color of law
3    (including any alien who is lawfully present in the
4    United States as a result of the application of the pro-
5    visions of section 207(c) of the Immigration and Na-
6    tionality Act (or of section 203(a)(7) of such Act prior
7    to April 1, 1980), or as a result of the application of
8    the provisions of section 208 or 212(d)(5) of such Act),
9    other than an alien granted Cuban/Haitian temporary
10   resident status.''.
11       (5) Section 1402(a) of such Act is amended—
12           (A) by striking out ''and'' at the end of para-
13       graph (11),
14           (B) by striking out the period at the end of
15       paragraph (12) and inserting instead ''; and'', and
16           (C) by adding at the end of that subsection
17       the following new paragraph:
18       ''(13) provide that, in order for any individual to
19   be a recipient of aid to the permanently and totally dis-
20   abled, or an individual whose needs are taken into ac-
21   count in making the determination under paragraph (8),
22   such individual must be either (A) a citizen, or (B) an
23   alien lawfully admitted for permanent residence or oth-
24   erwise permanently residing in the United States under
25   color of law (including any alien who is lawfully pres-

23

1    ent in the United States as a result of the application

2    of the provisions of section 207(c) of the Immigration

3    and Nationality Act (or of section 203(a)(7) of such Act

4    prior to April 1, 1980), or as a result of the application

5    of the provisions of section 208 or 212(d)(5) of such

6    Act), other than an alien granted Cuban/Haitian tem-

7    porary resident status.".

8        (6) Section 1602(a) of such Act (as in effect in

9    Puerto Rico, Guam, and the Virgin Islands) is amend-

10   ed—

11           (A) by striking out "and" at the end of para-

12       graph (16),

13           (B) by striking out the period at the end of

14       paragraph (17) and inserting instead "; and", and

15           (C) by adding at the end of such subsection

16       the following new paragraph:

17       "(18) provide that, in order for any individual to

18   be a recipient of aid to the aged, blind, or disabled, or

19   an individual whose needs are taken into account in

20   making the determination under paragraph (14), such

21   individual must be either (A) a citizen, or (B) an alien

22   lawfully admitted for permanent residence or otherwise

23   permanently residing in the United States under color

24   of law (including any alien who is lawfully present in

25   the United States as a result of the application of the

24

1    provisions of section 207(c) of the Immigration and

2    Nationality Act (or of section 203(a)(7) of such Act

3    prior to April 1, 1980), or as a result of the application

4    of the provisions of section 208 or 212(d)(5) of such

5    Act), other than an alien granted Cuban/Haitian tem-

6    porary resident status.''.

7        (7) Section 1902(a) of such Act is amended—

8            (A) by striking out the period at the end of

9            paragraph (43) and inserting instead ''; and'', and

10           (B) by adding at the end thereof the follow-

11           ing new paragraph:

12   ''(44) provide that, in order for any individual to

13   be eligible for medical assistance, such individual must

14   be either (A) a citizen, or (B) an alien lawfully ad-

15   mitted for permanent residence or otherwise perma-

16   nently residing in the United States under color of law

17   (including any alien who is lawfully present in the

18   United States as a result of the application of the pro-

19   visions of section 207(c) of the Immigration and Na-

20   tionality Act (or of section 203(a)(7) of such Act prior

21   to April 1, 1980), or as a result of the application of

22   the provisions of section 208 or 212(d)(5) of such Act),

23   other than an alien granted Cuban/Haitian temporary

24   resident status.''.

25

1      Sec. 302. (a) Any alien (except an alien specified in

2  section 301(a)(3), or an alien specified in section 301(a)(5)

3  who has entered the United States) who is denied Cuban/

4  Haitian temporary resident status for any of the reasons set

5  forth in section 301(c), or whose status is terminated pursu-

6  ant to the provisions of section 301 shall be detained pending

7  a final determination of admissibility, or pending release on

8  parole, or pending deportation if the alien is found exclud-

9  able, unless an examining officer finds that the alien is clearly

10  and beyond a doubt entitled to be admitted to the United

11  States. Such detention shall be in any prison or other deten-

12  tion facility or elsewhere, whether maintained by the Federal

13  Government or otherwise, as the Attorney General may

14  direct. The Attorney General may at any time transfer an

15  alien from one place of detention to another. No alien shall be

16  released from detention pending a final determination of ad-

17  missibility, or pending exclusion or deportation if the alien is

18  found excludable, except in the discretion of the Attorney

19  General, and under such conditions as the Attorney General

20  may prescribe, including release on bond. No court shall

21  review any decision of the Attorney General made pursuant

22  to this paragraph to detain, to transfer, or to release an alien,

23  except that any person so detained may obtain review, in

24  habeas corpus proceedings, on the question of whether that

25  person falls within the category of aliens subject to detention.

26

1  A determination of admissibility is exempt from the provi-
2  sions of the Administrative Procedures Act (15 U.S.C.
3  701(a)).

4      (b) An alien specified in section 301(a)(3), or an alien
5  specified in section 301(a)(5) who has entered the United
6  States, who is denied Cuban/Haitian temporary resident
7  status for any of the reasons set forth in section 301(c), or
8  whose status is terminated pursuant to the provisions of sec-
9  tion 301 shall be dealt with in accordance with section 242 of
10  the Immigration and Nationality Act.

11      SEC. 303. (a) Notwithstanding any numerical limitations
12  in the Immigration and Nationality Act, the Attorney Gen-
13  eral, in his discretion and under such regulations as he may
14  prescribe, may adjust the status of a Cuban/Haitian tempo-
15  rary resident to that of an alien lawfully admitted for perma-
16  nent residence if the alien—

17          (1) applies for such adjustment,

18          (2) is not firmly resettled in any foreign country,

19          (3) has been physically present in the United
20      States for at least five years after the earliest date
21      upon which he came within any category specified in
22      section 2(a) (1) through (5),

23          (4) can demonstrate an understanding of the Eng-
24      lish language: *Provided*, That this requirement shall
25      not apply to any person physically unable to comply

27

1 therewith, if otherwise eligible for adjustment: *Pro-*

2 *vided further,* That the requirements of this section re-

3 lating to ability to read and write shall be met if the

4 applicant can read or write simple words and phrases

5 and that no extraordinary or unreasonable conditions

6 shall be imposed upon the\applicant; and

7   (5) is admissible (except as otherwise provided in

8 subsection (b)) as an immigrant under the Immigration

9 and Nationality Act at the time of examination for ad-

10 justment of such alien.

11 (b) The provisions of paragraphs (14), (20), (21), and

12 (32) of section 212(a) of the Immigration and Nationality Act

13 shall not be applicable to an alien seeking adjustment of

14 status under this section, and the Attorney General may

15 waive any other provision of such section (other than para-

16 graph (27), (29), or (33) and other than so much of paragraph

17 (23), except if the alien's inclusion in paragraph (23) is the

18 result of only one conviction for possession without intent to

19 distribute narcotic drugs or marihuana) with respect to such

20 an alien for humanitarian purposes, to assure family unity, or

21 when it is otherwise in the public interest.

22 SEC. 304. (a) An alien granted Cuban/Haitian tempo-

23 rary resident status may not apply for asylum under section

24 208 of the Immigration and Nationality Act (8 U.S.C. 1158),

25 and any application for asylum under section 208 or under

28

1  any other provision of law filed by the alien but not approved

2  before the alien was granted Cuban/Haitian temporary resi-

3  dent status shall be denied.

4      (b) Subsection (c) of section 208 of the Immigration and

5  Nationality Act (8 U.S.C. 1158) and subsection (b) of section

6  209 (8 U.S.C. 1159) of that Act shall not be applicable to an

7  alien granted Cuban/Haitian temporary resident status or to

8  the spouse or child of such alien.

9      SEC. 305. Public Law 89–732 is repealed.

10      SEC. 306. There are hereby authorized to be appropri-

11  ated such sums as may be necessary for the purpose of carry-

12  ing out the provisions of this Act.

13      SEC. 307. This Act may be cited as the "Cuban/Hai-

14  tian Temporary Resident Status Act of 1981".

15  TITLE  IV—THE  FAIR  AND  EXPEDITIOUS

16  APPEAL, ASYLUM AND EXCLUSION ACT OF 1981

17      SEC. 401. Section 106(a)(1) of the Immigration and Na-

18  tionality Act (8 U.S.C. 1105a) is amended to read as follows:

19  "A petition for review may be filed not later than thirty days

20  from the date of the final deportation order or from the effec-

21  tive date of this section, whichever is the later.".

22      SEC. 402. (a) Section 279 of the Immigration and Na-

23  tionality Act (8 U.S.C. 1329) is designated as section 279(a).

33

1  manded for further proceedings, only upon a showing that

2  such denial was arbitrary and capricious, or was otherwise

3  not in accordance with law.''.

4      SEC. 404. Section 235(b) of the Immigration and Na-

5  tionality Act (8 U.S.C. 1225(b)) is amended to read as fol-

6  lows:

7      ''SEC. 235. (b) Provided that an 'Immigration Emergen-

8  cy' has not been declared an immigration officer shall inspect

9  each alien who is required to have documentation seeking

10 entry to the United States and shall make a determination on

11 each alien's admissibility:

12          ''(1) The decision of the immigration officer on ad-

13      missibility of an alien shall be final, and not subject to

14      further agency review or to judicial review, if the im-

15      migration officer determines an alien to be an alien

16      crewman, a stowaway under section 273(d) of this Act,

17      or an alien who does not present documentary evi-

18      dence of United States citizenship, or lawful admission

19      for permanent residence, or a visa or other entry docu-

20      ment, or a certificate of identity issued under section

21      360(b) to support a claim of admissibility.

22          ''(2) Any alien not excluded under paragraph one

23      of this subsection who does not appear to the examin-

24      ing immigration officer to be clearly and beyond a

34

1    doubt entitled to admission shall be detained for further

2    inquiry by a special inquiry officer under section 236.''.

3        SEC. 405. Section 237 of the Immigration and Nation-

4    ality Act (8 U.S.C. 1227(a)) is amended to read as follows:

5        ''SEC. 237. (a)(1) Any alien (other than an alien crew-

6    man) arriving in the United States who is excluded under this

7    Act, shall be immediately deported, in accommodations of the

8    same class in which he arrived, unless the Attorney General,

9    in an individual case in his discretion, concludes that immedi-

10   ate deportation is not practicable or proper. Deportation shall

11   be to the country in which the alien boarded the vessel or

12   aircraft in foreign territory. If such boarding occurred in ter-

13   ritory contiguous to the United States or in any island adja-

14   cent thereto or adjacent 'o the United States and the alien is

15   not a native, citizen, or subject or national of, or does not

16   have residence in, such foreign contiguous territory or adja-

17   cent island, the deportation shall instead be to the country in

18   which is located the port at which the alien embarked for

19   such foreign contiguous territory or adjacent island. The cost

20   of the maintenance, including detention expenses incident to

21   detention of any such alien while he is being detained, shall

22   be borne by the owner or owners of the vessel or aircraft on

23   which he arrived, except that the cost of maintenance (in-

24   cluding detention expenses and expenses incident to deten-

25   tion while the alien is being detained prior to the time he is

1 offered for deportation to the transportation line which

2 brought him to the United States) shall not be assessed

3 against the owner or owners of such vessel or aircraft if (A)

4 the alien was in possession of a valid, unexpired immigration

5 visa, or (B) the alien (other than an alien crewman) was in

6 possession of a valid, unexpired nonimmigrant visa or other

7 document authorizing such alien to apply for temporary ad-

8 mission to the United States, or an unexpired reentry permit

9 issued to him, and (i) such application was made within one

10 hundred and twenty days of the date of issuance of the visa

11 or other document, or in the case of an alien in possession of

12 a reentry permit, examined and admitted by the Service, or

13 (ii) in the event the application was made later than one hun-

14 dred and twenty days of the date of issuance of the visa or

15 other document or such examination and admission, if the

16 owner or owners of such vessels or aircraft establishes to the

17 satisfaction of the Attorney General that the ground of exclu-

18 sion could not have been ascertained by the exercise of due

19 diligence prior to the alien's embarkation, or (C) the person

20 claimed United States nationality or citizenship and was in

21 possession of an unexpired United States passport issued to

22 him by competent authority.

23    "(2) If the government of the country designated in sub-

24 section (a)(1) will not accept the alien into its territory, the

25 alien's deportation shall be directed by the Attorney General,

36

1 in his discretion and without necessarily giving any priority

2 or preference because of their order as herein set forth, to—

3          "(A) the country of which the alien is a subject,

4       citizen, or national;

5          "(B) the country in which he was born;

6          "(C) the country in which he has a residence; or

7          "(D) any country which is willing to accept the

8       alien into its territory, if deportation to any of the fore-

9       going countries is impracticable, inadvisable or impossi-

10      ble.

11      "(b) It shall be unlawful for any master, commanding

12 officer, purser, person in charge, agent, owner, or consignee

13 of any vessel or aircraft (1) to refuse to receive any alien

14 (other than an alien crewman) ordered deported under this

15 section back onboard such vessel or aircraft or another vessel

16 or aircraft owned or operated by the same interests; (2) to fail

17 to detain any alien (other than an alien crewman) on board

18 any such vessel or at the airport of arrival of the aircraft

19 when required by this Act or if so ordered by an immigration

20 officer, or to fail or refuse to deliver him for medical or other

21 inspection, or for further medical or other inspection, as and

22 when so ordered by such officer; (3) to refuse or fail to

23 remove him from the United States to the country to which

24 his exclusion and deportation has been directed; (4) to fail to

25 pay the cost of his maintenance while being detained as re-

37

1 quired by this section or section 233 of this title; (5) to take

2 any fee, deposit, or consideration on a contingent basis to be

3 kept or returned in case the alien is landed or excluded; or (6)

4 knowingly to bring to the United States any alien (other than

5 an alien crewman) excluded or arrested and deported under

6 any provision of law until such alien may be lawfully entitled

7 to reapply for admission to the United States. If it shall

8 appear to the satisfaction of the Attorney General that any

9 such master, commanding officer, purser, person in charge,

10 agent, owner, or consignee of any vessel or aircraft has vio-

11 lated any of the provisions of this section or of section 233 of

12 this title, such master, commanding officer, purser, person in

13 charge, agent, owner, or consignee shall pay to the district

14 director of customs of the district in which the port of arrival

15 is situated or in which any vessel or aircraft of the line may

16 be found, the sum of $500 for each violation. No such vessel

17 or aircraft shall have clearance from any port of the United

18 States while any such fine is unpaid or while the question of

19 liability to pay any such fine is being determined, nor shall

20 any such fine be remitted or refunded; except that clearance

21 may be granted prior to the determination of such question

22 upon the deposit with the district director of customs of a

23 bond or undertaking approved by the Attorney General or a

24 sum sufficient to cover such fine.

38

1  ''(c) An alien shall be deported on a vessel or an aircraft

2  owned by the same person who owns the vessel or aircraft on

3  which such alien arrived in the United States, unless it is

4  impracticable to so deport the alien within a reasonable time.

5  The transportation expenses of the alien's deportation shall

6  be borne by the owner or owners of the vessel or aircraft on

7  which the alien arrived. If the deportation is effected on a

8  vessel or aircraft not owned by such owner or owners, the

9  transportation expenses of the alien's deportation may be

10  paid from the appropriation for the enforcement of this Act

11  and recovered by civil suit from any owner, agent, or con-

12  signee of the vessel or aircraft on which the alien arrived.

13  ''(d) The Attorney General, under such conditions as are

14  by regulations prescribed, may stay the deportation of any

15  alien deportable under this section, if in his judgment the

16  testimony of such alien is necessary on behalf of the United

17  States in the prosecution of offenders against any provision of

18  this Act or other laws of the United States. The cost of main-

19  tenance of any person so detained resulting from a stay of

20  deportation under this subsection and a witness fee in the

21  sum of $1 per day for each day such person is so detained

22  may be paid from the appropriation for the enforcement of

23  this title. Such alien may be released under bond in the pen-

24  alty of not less than $500 with security approved by the

25  Attorney General on condition that such alien shall be pro-

39

1  duced when required as a witness and for deportation, and on

2  such other conditions as the Attorney General may prescribe.

3      "(e) Upon the certificate of an examining medical officer

4  to the effect that an alien ordered to be excluded and deport-

5  ed under this section is helpless from sickness or mental and

6  physical disability, or infancy, if such alien is accompanied by

7  another alien whose protection or guardianship is required by

8  the alien ordered excluded and deported, such accompanying

9  alien may also be excluded and deported, and the master,

10  commanding officer, agent owner, or consignee of the vessel

11  or aircraft in which such alien and accompanying alien ar-

12  rived in the United States shall be required to return the

13  accompanying alien in the same manner as other aliens

14  denied admission and ordered deported under this section."

15      SEC. 406. Section 243(h) of the Immigration and Na-

16  tionality Act (8 U.S.C. 1253(h)) is hereby repealed.

17  TITLE V—THE IMMIGRANT VISAS FOR CANADA

18              AND MEXICO

19      SEC. 501. (a) Section 201(a) of the Immigration and

20  Nationality Act (8 U.S.C. 1151(a)) is amended to read as

21  follows:

22      "(a)(1) Exclusive of special immigrants defined in sec-

23  tion 101(a)(27), immediate relatives specified in subsection (b)

24  of this section, aliens who are admitted or granted asylum

25  under section 207 or 208, and aliens described in paragraph

# EXHIBIT C

I

97TH CONGRESS
2D SESSION

# H. R. 7357

To revise and reform the Immigration and Nationality Act, and for other purposes.

## IN THE HOUSE OF REPRESENTATIVES

DECEMBER 3, 1982

Mr. MAZZOLI (for himself and Mr. FISH) introduced the following bill; which was referred to the Committee on the Judiciary

# A BILL

To revise and reform the Immigration and Nationality Act, and for other purposes.

1     *Be it enacted by the Senate and House of Representa-*

2 *tives of the United States of America in Congress assembled,*

3

4         SHORT TITLE; REFERENCES IN ACT

5     SECTION 1. (a) This Act may be cited as the "Immigra-

6 tion Reform and Control Act of 1982".

7     (b) Except as otherwise specifically provided, whenever

8 in this Act an amendment or repeal is expressed in terms of

9 an amendment to, or repeal of, a section or other provision,

21

1  PART C—ADJUDICATION PROCEDURES AND ASYLUM

2             INSPECTION AND EXCLUSION

3      SEC. 121. Subsection (b) of section 235 (8 U.S.C. 1225)

4  is amended to read as follows:

5      "(b)(1)(A) An immigration officer shall inspect each

6  alien who is seeking entry to the United States.

7      "(B)(i) If the examining immigration officer determines

8  that the alien seeking entry—

9          "(I) does not present the documentation required

10         (if any) to obtain entry to the United States,

11         "(II) does not have any reasonable basis for legal

12         entry into the United States, and

13         "(III) does not indicate an intention to apply for

14         asylum under section 208,

15  subject to clause (ii), the alien shall be excluded from entry

16  into the United States without a hearing.

17      "(ii) Before excluding an alien without a hearing under

18  clause (i), the examining immigration officer shall inform the

19  alien of his right to have an administrative law judge redeter-

20  mine the conditions described in clause (i). If the alien re-

21  quests such a redetermination by an administrative law

22  judge, the alien shall not be so excluded without a hearing

23  until and unless the administrative law judge (after a nonad-

24  versarial, summary proceeding in which the alien may appear

22

1  personally) redetermines that the alien meets the conditions

2  of subclauses (I) through (III) of clause (i).

3      ''(C) If the examining immigration officer determines

4  that an alien seeking entry, other than an alien crewman and

5  except as otherwise provided in subparagraph (B), subsection

6  (c), or section 273(d), is otherwise not clearly and beyond a

7  doubt entitled to land, the alien shall be detained for a hear-

8  ing before an administrative law judge on exclusion of the

9  alien.

10      ''(2) The decision of the examining immigration officer,

11  if favorable to the admission of any alien, shall be subject to

12  challenge by any other immigration officer and such chal-

13  lenge shall operate to take the alien, whose privilege to land

14  is so challenged, before an administrative law judge for a

15  hearing on exclusion of the alien.

16      ''(3) The Attorney General shall establish, after consul-

17  tation with the Judiciary Committees of the Congress, proce-

18  dures which assure that aliens are not excluded under para-

19  graph (1)(B) without an inquiry into their reasons for seeking

20  entry into the United States.

21      ''(4) In the case of an alien who would be excluded from

22  entry under paragraph (1)(B) but indicating an intention to

23  apply for asylum, the exclusion hearing with respect to such

24  entry shall be limited to the issues raised in connection with

25  the alien's application for asylum.''.

80

1    tinuously in the United States in an unlawful status

2    since January 1, 1977; and

3          "(C) in the case of an alien who at any time was

4        a nonimmigrant exchange alien (as defined in section

5        101(a)(15)(J)), the alien was not subject to the two-

6        year foreign residence requirement of section 212(e) or

7        has fulfilled that requirement or received a waiver

8        thereof; and

9          "(3) the alien—

10            "(A) is admissible to the United States as an

11           immigrant, except as otherwise provided under

12           subsection (c)(3),

13            "(B) has not been convicted of any felony or

14           of three or more misdemeanors committed in the

15           United States, and

16            "(C) has not assisted in the persecution of

17           any person or persons on account of race, reli-

18           gion, nationality, membership in a particular

19           social group, or political opinion.

20    "(b)(1) The Attorney General, in his discretion and

21    under such regulations as he shall prescribe, may adjust the

22    status of an alien to that of an alien lawfully admitted for

23    temporary residence if—

24          "(A) the alien applies for such adjustment during

25        1983;

81

1          "(B)(i)(I) the alien (other than an alien who en-

2      tered as a nonimmigrant) establishes that he entered

3      the United States prior to January 1, 1980, and has

4      resided continuously in the United States in an unlaw-

5      ful status since January 1, 1980, or

6          "(II) the alien entered the United States as a

7      nonimmigrant before January 1, 1980, the alien's

8      period of authorized stay as a nonimmigrant expired

9      before January 1, 1980, through the passage of time

10     or the alien's unlawful status was known to the Gov-

11     ernment as of January 1, 1980, and the alien has re-

12     sided continuously in the United States in an unlawful

13     status since January 1, 1980; and

14         "(III) in the case of an alien who at any time was

15     a nonimmigrant exchange alien (as defined in section

16     101(a)(15)(J)), the alien was not subject to the two-

17     year foreign residence requirement of section 212(e) or

18     has fulfilled that requirement or received a waiver

19     thereof; or

20         "(ii) the alien is—

21             "(I) a national of Cuba who arrived in the

22         United States and presented himself for inspection

23         after April 20, 1980, and before January 1, 1981,

24         and who is still physically present in the United

25         States;

82

1        "(II) a national of Haiti who on December

2     31, 1980, was the subject of exclusion or deporta-

3     tion proceedings under section 236 or section 242

4     of the Immigration and Nationality Act, including

5     a national of Haiti who on that date was under an

6     order of exclusion and deportation or under an

7     order of deportation which had not yet been ex-

8     ecuted;

9        "(III) a national of Haiti who was paroled

10    into the United States under section 212(d)(5) of

11    such Act or was granted voluntary departure

12    before December 31, 1980, and was physically

13    present in the United States on that date; or

14       "(IV) a national of Cuba or Haiti who on

15    December 31, 1980, had an application for

16    asylum pending with the Immigration and Natu-

17    ralization Service; and

18    "(C) the alien—

19       "(i) is admissible to the United States as an

20    immigrant, except as otherwise provided under

21    subsection (c)(3),

22       "(ii) has not been convicted of any felony or

23    three or more misdemeanors committed in the

24    United States, and

83

1                 ''(iii) has not assisted in the persecution of

2                 any person or persons on account of race, reli-

3                 gion, nationality, membership in a particular

4                 social group, or political opinion.

5 ''(2) In the case of an alien during the period he is

6 granted lawful temporary resident status under paragraph

7 (1)—

8                 ''(A) the Attorney General shall, in accordance

9                 with regulations, permit the alien to return to the

10                 United States after such brief and casual trips abroad

11                 as reflect an intention on the part of the alien to adjust

12                 to lawful permanent resident status under paragraph

13                 (3), and

14                 ''(B) the Attorney General shall grant the alien

15                 authorization to engage in employment in the United

16                 States and provide to that alien an 'employment au-

17                 thorized' endorsement or other appropriate work

18                 permit.

19 ''(3) The Attorney General, in his discretion and under

20 such regulations as he may prescribe, may adjust the status

21 of any alien provided lawful temporary resident status under

22 paragraph (1) to that of an alien lawfully admitted for perma-

23 nent residence if the alien—

24                 ''(A) applies for such adjustment during the six-

25                 month period beginning with the thirty-seventh month

84

1    that begins after the date the alien was granted such

2    temporary resident status;

3        "(B) establishes that he has continuously resided

4    in the United States since the date the alien was

5    granted such temporary resident status;

6        "(C)(i) is admissible to the United States as an

7    immigrant, except as otherwise provided under subsec-

8    tion (c)(3), and

9        "(ii) has not been convicted of any felony or three

10    or more misdemeanors committed in the United States;

11    and

12        "(D) can demonstrate that he either (i) meets the

13    requirement of paragraph (1) of section 312 (relating to

14    minimal understanding of ordinary English), or (ii) is

15    satisfactorily pursuing a course of study (recognized by

16    the Attorney General) to achieve such an understand-

17    ing of English.

18    "(4) The Attorney General shall provide for the rescis-

19    sion of temporary resident status granted an alien under this

20    subsection—

21        "(A) if it appears to the Attorney General that

22    the alien was in fact not eligible for such status,

23        "(B) if the alien commits an act that (i) makes the

24    alien inadmissible to the United States as an immi-

25    grant, except as otherwise provided under subsection

85

1    (c)(3), or (ii) is convicted of any felony or three or more

2    misdemeanors committed in the United States, or

3        "(C) at the end of the forty-third month beginning

4    after the date the alien is granted such status, unless

5    the alien has filed an application for adjustment of such

6    status pursuant to paragraph (3) and such application

7    has not been denied.

8    "(c)(1) The Attorney General shall provide that applica-

9    tions for adjustment of status under subsection (a) and sub-

10    section (b)(1) may be made to and received, on behalf of the

11    Attorney General, by qualified voluntary agencies, which

12    have been designated for such purpose by the Attorney Gen-

13    eral.

14    "(2) The numerical limitations of sections 201 and 202

15    shall not apply to the adjustment of aliens to lawful perma-

16    nent resident status under this section.

17    "(3) The provisions of paragraph (14), (20), (21), (25),

18    and (32) of section 212(a) shall not be applicable in the deter-

19    mination of an alien's admissibility under subsections

20    (a)(3)(A), (b)(1)(C)(i), (b)(3)(C)(i), and (b)(4)(A)(i), and the At-

21    torney General, in making such determination, may waive

22    any other provision of such section other than paragraph (9),

23    (10), (23) (except for so much of such paragraph as relates to

24    a single offense of simple possession of 30 grams or less of

25    marihuana), (27), (28), (29), or (33) with respect to the alien

86

1 involved for humanitarian purposes, to assure family unity, or

2 when it is otherwise in the public interest.

3     "(4) During the six-month period beginning on the date

4 of the enactment of this section, the Attorney General, in

5 cooperation with qualified voluntary agencies designated

6 under paragraph (1), shall broadly disseminate information

7 respecting the benefits which aliens may receive under this

8 section and the requirements to obtain such benefits.

9     "(5) Notwithstanding any other provision of law, the

10 Attorney General shall first issue, on an interim or other

11 basis and before January 1, 1983, such regulations as are

12 necessary to implement this section on a timely basis.

13     "(6) The Attorney General shall provide that in the case

14 of an alien who is apprehended before January 1, 1983, and

15 who can establish a prima facie case of eligibility to have his

16 status adjusted under subsection (a) or (b)(1) (but for the fact

17 that he may not apply for such adjustment until January 1,

18 1983) may not be deported or excluded until he has had a

19 reasonable opportunity to file an application for such adjust-

20 ment.

21     "(d)(1) During the period an alien is in lawful temporary

22 resident status granted under subsection (b)(1) and during the

23 three-year period beginning on the date an alien is granted

24 lawful permanent resident status under subsection (a) or

25 (b)(3), and notwithstanding any other provision of law—

87

1     "(A) except as provided in paragraph (2), the

2  alien is not eligible for—

3       "(i) any program of financial assistance fur-

4      nished under Federal law (whether through grant,

5      loan, guarantee, or otherwise) on the basis of fi-

6      nancial need, as such programs are identified by

7      the Attorney General in consultation with other

8      appropriate heads of the various departments and

9      agencies of Government,

10      "(ii) medical assistance under a State plan

11      approved under title XIX of the Social Security

12      Act, and

13      "(iii) assistance under the Food Stamp Act of

14      1977, and

15     "(B) a State or political subdivision therein may,

16  to the extent consistent with subparagraph (A), provide

17  that the alien is not eligible for the programs of finan-

18  cial or medical assistance furnished under the law of

19  that State or political subdivision.

20  "(2) Paragraph (1) shall not apply—

21     "(A) to an alien described in subsection

22     (b)(1)(B)(ii) (relating to certain Cuban and Haitian en-

23     trants),

24     "(B) in the case of assistance provided to aliens

25     who are determined (in accordance with regulations

88

1    prescribed by the Attorney General in consultation

2    with the Secretary of Health and Human Services) to

3    require such assistance because of age (in the case of

4    aliens 65 years of age or older), blindness, or disability,

5    and

6        "(C) in the case of medical assistance provided to

7    aliens who are determined (in accordance with regula-

8    tions prescribed by the Attorney General in consulta-

9    tion with the Secretary of Health and Human Serv-

10    ices) to require such assistance in the interest of public

11    health or because of serious illness or injury.

12    "(3) For the purpose of section 501 of the Refugee Edu-

13    cation Assistance Act of 1980 (Public Law 96–422), assist-

14    ance shall be continued under such section with respect to an

15    alien without regard to the alien's adjustment of status under

16    this section.

17    "(e) The Attorney General, after consultation with the

18    Committees on the Judiciary of the House of Representatives

19    and the Senate and with qualified voluntary agencies desig-

20    nated pursuant to subsection (c)(1), shall prescribe regulations

21    establishing a definition of the term 'resided continuously', as

22    used in this section, and for establishing the requirements

23    necessary to prove eligibility for immigration benefits under

24    this section. Such regulations may be prescribed to take

25    effect on an interim basis if the Attorney General determines

89

1 that this is necessary in order to implement this section in a

2 timely manner.

3     "(f) In order to carry out this section (including the

4 making of arrangements with qualified voluntary agencies

5 under subsection (c)(1) and the dissemination of information

6 under subsection (c)(3)) there are authorized to be appropri-

7 ated $10,000,000 for fiscal year 1983.".

8     (b) The table of contents for chapter 5 of title II is

9 amended by inserting after the item relating to section 245

10 the following new item:

> "Sec. 245A. Adjustment of status of certain entrants before January 1, 1980, to that of person admitted for temporary or permanent residence.".

11     (c) The President shall transmit to Congress, not later

12 than 18 months after the date of the enactment of this Act, a

13 report on the impact of the enactment of the legalization pro-

14 gram described in section 245A of the Immigration and Na-

15 tionality Act, including such impact on State and local gov-

16 ernments in the different regions of the United States.

17     (d)(1) Public Law 89–732 (approved November 2, 1966)

18 is repealed.

19     (2) The repeal made by paragraph (1) shall not apply to

20 a native or citizen of Cuba who has been inspected and ad-

21 mitted or paroled into the United States before April 21,

22 1980.

23     UPDATING REGISTRY DATE TO JANUARY 1, 1973

24     SEC. 302. (a) Section 249 (8 U.S.C. 1259) is amend-

25 ed—

HR 7357 IH

# EXHIBIT D

I

97TH CONGRESS
2D SESSION

# S. 2222

---

## IN THE HOUSE OF REPRESENTATIVES

SEPTEMBER 8, 1982

Referred to the Committee on the Judiciary

---

# AN ACT

To revise and reform the Immigration and Nationality Act, and
for other purposes.

1    *Be it enacted by the Senate and House of Representa-*

2    *tives of the United States of America in Congress assembled,*

3        SHORT TITLE; REFERENCES IN ACT

4        SECTION 1. (a) This Act may be cited as the "Immigra-

5    tion Reform and Control Act of 1982".

6        (b) Except as otherwise specifically provided in this Act,

7    whenever in this Act an amendment or repeal is expressed as

8    an amendment to, or repeal of, a provision, the reference

9    shall be deemed to be made to the Immigration and National-

10    ity Act.

### TABLE OF CONTENTS

Sec. 1. Short title; references in Act.

19

1     "(b) The Attorney General, after consultation with the

2 Secretary of State, shall impose fees for an alien's use of

3 border facilities or services of the Service in an amount nec-

4 essary to make the total of such fees substantially equal to

5 the cost of maintaining and operating such facilities and serv-

6 ices.".

7     (b) The item in the table of contents relating to section

8 281 is amended to read as follows:

"Sec. 281. Nonimmigrant visa fees and border facility fees.".

9     PART C—ADJUDICATION PROCEDURES AND ASYLUM

10          INSPECTION AND EXCLUSION

11     SEC. 121. Section 235(b) (8 U.S.C. 1225(b)) is amend-

12 ed—

13          (1) by striking out the first sentence and inserting

14          in lieu thereof the following:

15     "(b)(1) If an examining immigration officer at the port of

16 arrival determines that an alien does not have the documen-

17 tation required to obtain entry into the United States, does

18 not have any reasonable basis for legal entry into the United

19 States, and has not applied for asylum under section 208,

20 such alien shall not be admissible and shall be excluded from

21 entry into the United States without further inquiry or hear-

22 ing.

23     "(2) If an examining immigration officer at the port of

24 arrival determines that an alien (other than an alien crewman

25 and except as otherwise provided in subsection (c) of this

20

1 section and in section 273(d)) is otherwise not clearly and

2 beyond a doubt entitled to land, such alien shall be detained

3 for a hearing on exclusion of alien to be held before an immi-

4 gration judge.'',

5       (2) by designating the sentence beginning ''The

6       decision'' as paragraph (3), and

7       (3) by adding at the end the following new para-

8       graphs:

9   ''(4) The Attorney General shall establish procedures,

10 after consultation with the Judiciary Committees of the Con-

11 gress, which assure that aliens are not excluded under para-

12 graph (1) without an inquiry into their reasons for unlawfully

13 seeking entry into the United States.

14   ''(5) In the case of an alien who would be excluded from

15 entry under paragraph (1) but for an application for asylum

16 under section 208, the exclusion hearing with respect to such

17 entry shall be limited to the issues raised by the asylum ap-

18 plication.''.

19 UNITED STATES IMMIGRATION BOARD AND ESTABLISH-

20      MENT OF IMMIGRATION JUDGE SYSTEM

21   SEC. 122. (a) Title I is amended by adding at the end

22 the following new section:

82

1    January 1, 1977, through the passage of time or the

2    alien's unlawful status was known to the Government

3    as of January 1, 1977, and the  lien has resided con-

4    tinuously in the United States in an unlawful status

5    since January 1, 1977, and

6        "(C) if the alien was at any time a nonimmigrant

7    exchange alien (as defined in section 101(a)(15)(J)), the

8    alien was not subject to the two-year foreign residence

9    requirement of section 212(e) or has fulfilled that re-

10   quirement or received a waiver thereof; and

11       "(3) the alien—

12           "(A) is admissible to the United States as an

13           immigrant, except as otherwise provided under

14           subsection (c)(2),

15           "(B) has not been convicted of any felony or

16           of three or more misdemeanors committed in the

17           United States, and

18           "(C) has not assisted in the persecution of

19           any person or persons on account of race, reli-

20           gion, nationality, membership in a particular

21           social group, or political opinion.

22   "(b)(1) The Attorney General may, in his discretion and

23   under such regulations as he shall prescribe, adjust the status

24   of an alien to that of an alien lawfully admitted for temporary

25   residence if—

83

1    "(A) the alien applies for such adjustment during

2    the eighteen-month period beginning on the date of the

3    enactment of this section;

4    "(B)(i)(I) the alien (other than an alien who en-

5    tered as a nonimmigrant) establishes that he entered

6    the United States prior to January 1, 1980, and has

7    resided continuously in the United States in an unlaw-

8    ful status since January 1, 1980; or

9    "(II) the alien entered the United States as a

10    nonimm'_rant before January 1, 1980, the alien's

11    period of authorized stay as a nonimmigrant expired

12    before January 1, 1980, through the passage of time

13    or the alien's unlawful status was known to the Gov-

14    ernment as of January 1, 1980, and the alien has re-

15    sided continuously in the United States in an unlawful

16    status since January 1, 1980; and

17    "(III) if the alien was at any time a nonimmigrant

18    exchange alien (as defined in section 101(a)(15)(J)), the

19    alien was not subject to the two-year foreign residence

20    requirement of section 212(e) or has fulfilled that re-

21    quirement or received a waiver thereof; or

22    "(ii) the alien is—

23    "(I) a national of Cuba who arrived in the

24    United States and presented himself for inspection

25    after April 20, 1980, and before January 1, 1981,

84

1 and who is still physically present in the United

2 States;

3  "(II) a national of Haiti who on December

4 31, 1980, was the subject of exclusion or deporta-

5 tion proceedings under section 236 or section 242

6 of the Immigration and Nationality Act, including

7 a national of Haiti who on that date was under an

8 order of exclusion and deportation or under an

9 order of deportation which had not yet been ex-

10 ecuted;

11  "(III) a national of Haiti who was paroled

12 into the United States under section 212(d)(5) of

13 such Act or was granted voluntary departure

14 before December 31, 1980, and was physically

15 present in the United States on that date; or

16  "(IV) a national of Cuba or Haiti who on

17 December 31, 1980, had an application for

18 asylum pending with the Immigration and Natu-

19 ralization Service; and

20 "(C) the alien—

21  "(i) is admissible to the United States as an

22 immigrant, except as otherwise provided under

23 subsection (c)(2),

85

1              "(ii) has not been convicted of any felony or

2        three or more misdemeanors committed in the

3        United States, and

4              "(iii) has not assisted in the persecution of

5        any person or persons on account of race, reli-

6        gion, nationality, membership in a particular

7        social group, or political opinion.

8    "(2) During the period an alien is in the lawful tempo-

9 rary resident status granted under paragraph (1)—

10        "(A) the Attorney General shall, in accordance

11       with regulations, permit the alien to return to the

12       United States after such brief and casual trips abroad

13       as reflect an intention on the part of the alien to adjust

14       to lawful permanent resident status under paragraph

15       (3), and

16        "(B) the Attorney General shall grant the alien

17       authorization to engage in employment in the United

18       States and provide to that alien an 'employment au-

19       thorized' endorsement or other appropriate work

20       permit.

21    "(3) The Attorney General, in his discretion and under

22 such regulations as he may prescribe, may adjust the status

23 of any alien provided lawful temporary resident status under

24 paragraph (1) to that of an alien lawfully admitted for perma-

25 nent residence if the alien—

86

1            "(A) applies for such adjustment during the six-
2       month period beginning with the first day of the thirty-
3       seventh month that begins after the date the alien was
4       granted such temporary resident status;

5            "(B) establishes that he has continuously resided
6       in the United States since the date the alien was
7       granted such temporary resident status;

8            "(C)(i) is admissible to the United States as an
9       immigrant, except as otherwise provided under subsec-
10      tion (c)(2), and

11           "(ii) has not been convicted of any felony or three
12      or more misdemeanors committed in the United States;
13      and

14           "(D) can demonstrate that he either (i) meets the
15      requirement of paragraph (1) of section 312 (relating to
16      minimal understanding of ordinary English), or (ii) is
17      satisfactorily pursuing a course of study (recognized by
18      the Attorney General) to achieve such an understand-
19      ing of English.

20      "(4) The Attorney General shall provide for termination
21  of temporary resident status granted an alien under this sub-
22  section—

23           "(A) if the alien commits an act that (i) makes the
24      alien inadmissible to the United States as an immi-
25      grant, except as otherwise provided under subsection

87

1    (c)(2), or (ii) is convicted of any felony or three or more

2    misdemeanors committed in the United States, or

3        "(B) at the end of the forty-second month begin-

4    ning after the date the alien is granted such status,

5    unless the alien has filed an application for adjustment

6    of such status pursuant to paragraph (3) and such ap-

7    plication has not been denied.

8    "(c)(1) The Attorney General shall provide that applica-

9    tions for adjustment of status under subsection (a) and sub-

10   section (b)(1) may be made to and received, on behalf of the

11   Attorney General, by qualified voluntary agencies which

12   have been designated for such purpose by the Attorney Gen-

13   eral, as well as to the Attorney General.

14   "(2) The provisions of paragraph (14), (20), (21), (25),

15   and (32) of section 212(a) shall not be applicable in the deter-

16   mination of an alien's admissibility under subsections

17   (a)(3)(A), (b)(1)(C)(i), (b)(3)(C)(i), and (b)(4)(A)(i), and the At-

18   torney General, in making such determination with respect to

19   a particular alien, may waive any other provision of such

20   section other than paragraph (9), (10), (23) (except for so

21   much of such paragraph as relates to a single offense of

22   simple possession of thirty grams or less of marihuana), (27),

23   (28), (29), or (33), for humanitarian purposes, to assure

24   family unity, or when it is otherwise in the public interest.

88

1  "(3) During the six-month period beginning on the date

2 of the enactment of this section, the Attorney General, in

3 cooperation with qualified voluntary agencies designated

4 under paragraph (1) and the Secretary of Labor, shall broadly

5 disseminate information respecting the benefits which aliens

6 may receive under this section and the requirements to obtain

7 such benefits.

8  "(d)(1) During the period an alien is in lawful temporary

9 resident status granted under subsection (b)(1) and during the

10 three-year period beginning on the date an alien is granted

11 lawful permanent resident status under subsection (a) or

12 (b)(3), and notwithstanding any other provision of law—

13   "(A) except as provided in paragraph (2), the

14   alien is not eligible for—

15    "(i) any program of financial assistance fur-

16    nished under Federal law (whether through grant,

17    loan, guarantee, or otherwise) on the basis of fi-

18    nancial need, as such programs are identified by

19    the Attorney General in consultation with other

20    appropriate heads of the various departments and

21    agencies of Government,

22    "(ii) medical assistance under a State plan

23    approved under title XIX of the Social Security

24    Act, and

89

1              "(iii) assistance under the Food Stamp Act of

2           1977, and

3            "(B) a State or political subdivision therein may

4       provide that the alien is not eligible for the programs

5       of financial or medical assistance furnished under the

6       law of that State or political subdivision.

7       "(2)(A) Paragraph (1) shall not apply to an alien de-

8  scribed in subsection (b)(1)(B)(ii) (relating to certain Cuban

9  and Haitian entrants).

10      "(B) For the purpose of section 501 of the Refugee

11  Education Assistance Act of 1980 (Public Law 96–122), as-

12  sistance shall be continued under such section with respect to

13  an alien without regard to the alien's adjustment of status

14  under this section.

15      "(e) The Attorney General, after consultation with the

16  Committees on the Judiciary of the House of Representatives

17  and the Senate and with qualified voluntary agencies desig-

18  nated pursuant to subsection (c)(1), shall prescribe regulations

19  establishing a definition of the term 'resided continuously', as

20  used in this section, and for establishing the requirements

21  necessary to prove eligibility for immigration benefits under

22  this section. Such regulations may be prescribed to take

23  effect on an interim basis if the Attorney General determines

24  that this is necessary in order to implement this section in a

25  timely manner.

90

1    "(f) In order to carry out this section (including the

2  making of arrangements with qualified voluntary agencies

3  under subsection (c)(1) and the dissemination of information

4  under subsection (c)(3)) there are authorized to be appropri-

5  ated $10,000,000 for fiscal year 1983.".

6    (b) The table of contents for chapter 5 of title II is

7  amended by inserting after the item relating to section 245

8  the following new item:

"Sec. 245A. Adjustment of status of certain entrants before January 1, 1980, to
that of person admitted for temporary or permanent residence.".

9    (c)(1) Public Law 89–732 (approved November 2, 1966)

10  is repealed.

11    (2) the repeal made by paragraph (1) shall not apply to a

12  native or citizen of Cuba who has been inspected and ad-

13  mitted or paroled into the United States before April 21,

14  1980.

15    STATE LEGALIZATION IMPACT-ASSISTANCE BLOCK

16    GRANTS

17    SEC. 302. (a) There are authorized to be appropriated

18  for grants (and related Federal administrative costs) to carry

19  out this section such sums as may be necessary for fiscal year

20  1983 and for each of the five succeeding fiscal years.

21    (b)(1) From the sums appropriated under subsection (a)

22  for a fiscal year (less the amount reserved for Federal admin-

23  istrative costs), the Secretary of Health and Human Services

24  (hereinafter in this section referred to as the "Secretary")

# EXHIBIT E

# Calendar No. 665

| 97TH CONGRESS<br>2d Session | SENATE | REPORT<br>No. 97-485 |
|---|---|---|

## IMMIGRATION REFORM AND CONTROL

JUNE 30 (legislative day, JUNE 8), 1982.—Ordered to be printed

Mr. SIMPSON, from the Committee on the Judiciary
submitted the following

## REPORT

together with

## ADDITIONAL AND MINORITY VIEWS

[To accompany S. 2222]

The Committee on the Judiciary, to which was referred the bill (S. 2222) to amend the Immigration and Nationality Act, and for other purposes, having considered the same, reports favorably thereon, with amendments, and recommends that the bill as amended do pass.

## I. PURPOSE AND SUMMARY

The Committee bill is intended to increase control over both illegal and legal immigration.

In order to reduce the primary incentive for illegal immigration, the availability of U.S. employment, the bill makes unlawful the knowing employment, or the recruitment or referral for a fee, of illegal aliens; provides for a system to verify work eligibility; and establishes appropriate civil and criminal penalties for violations. In addition, the bill establishes new crimes for certain activities involving fraudulent documents and for bringing illegal aliens to the U.S.; states the sense of Congress that resources for conventional enforcement should be increased; requires the imposition of fees for use of Immigration and Naturalization Service border and other facilities; provides for more efficient adjudication of exclusion, deportation, and asylum cases; and prohibits adjustments of status by visa abusers.

S. 2222 also reforms legal immigration so that it will better serve the national interest. The current system of numerical limitations is revised in order to reduce the growth in the number of immigrants to the U.S., to reserve limited family reunification visas for the closest family members, to increase the immigration opportunity of aliens who

family even if it is illegal, or if they have no family, that they will start a family in the U.S.). Furthermore, to the extent that temporary workers believe that they will be returning to their home country, they will tend not to learn English and otherwise integrate into American life. They will tend to form foreign enclaves, with associated social problems, and may even delay the integration of lawful permanent residents from the same country of origin.

In addition the bill prohibits foreign students from adjusting their status to permanent resident and provides that foreign students will not generally be allowed to obtain immigrant status, or temporary worker status under INA section 101(a) (H) or (L), until they have resided and been physically present in their home country for two years after their departure from the United States.

Foreign students are admitted to the U.S. so that they may be educated and then return to their home country, giving that country the benefit of their U.S. education. In a sense it is a form of foreign aid. Allowing the students to stay is a "brain drain" of their best young talent. The Committee believes that the best long-term way to control immigration pressure on the U.S. is to encourage political and economic improvement abroad. If foreign students who have received the benefit of U.S. education and exposure to U.S. political values return to their home country, such improvements are more likely to occur. Furthermore, the Committee has been informed that a significant number of foreign students use their stay in the U.S. as "a scouting expedition" to search for a U.S. employer willing to submit a preference petition on their behalf. Finally, the Committee notes and expresses its concern at what appears to be a growing dependence on foreign high technology labor. Part of this results from a pattern of college and industry recruitment of aliens facilitated by the ability of students to adjust to permanent resident status.

The bill allows the Attorney General and the Secretary of State acting jointly to establish a 3-year pilot visa waiver program after the development of an automated nonimmigrant entry and exit control system. Under the program the requirement of a visitor's visa for the nationals of 5 countries selected from those which extend or agree to extend reciprocal privileges to U.S. citizens would be waived if such persons have a round trip, nonrefundable, nontransferable ticket and if the rate of exclusion and of visa denial for the nationals of such country is very low. This change would allow the Secretary of State to transfer resources to consular offices where the need to screen visitors is greater. Furthermore, the beneficial entry of desirable business and tourist visitors would be facilitated.

Finally, the bill provides special immigration benefits to certain holders of the G–iv visa if they have resided in the U.S. for many years, specifically certain retired employees of international organizations, such as the U.N. and the World Bank, surviving spouses of deceased employees of such organizations, and children of such employees.

### (3) TITLE III—LEGALIZATION

The U.S. has become home for millions of illegal aliens, a large number of whom have been here for many years.

S. 2222 provides for the legalization of illegal aliens into two categories of legal status.

First, illegal aliens who have continuously resided in the United States since January 1, 1978 will immediately qualify for permanent resident status.

Second, those who have continuously resided in the U.S. since January 1, 1982, or who are in the Cuban/Haitian "entrant" status, will qualify for a temporary status, which may be adjusted to permanent status after two years if the alien has or is acquiring minimum English competence. Aliens in the temporary status will not be eligible for most forms of public assistance.

Persons convicted of certain crimes, Nazis and other persons who have persecuted others, Communists, anarchists, saboteurs, and those seeking to overthrow the government will be excluded from each category of legalization. Most other classes of excludable alien will also not qualify, including aliens who are likely to become a public charge, unless a waiver is obtained. See Section-by-Section Analysis relating to Sec. 301.

We seek three major goals through legalization:

The first is to avoid wasteful use of the Immigration and Naturalization Service's limited enforcement resources. The United States is unlikely to obtain as much enforcement for its dollar if the Immigration and Naturalization Service attempts to locate and deport those who have become well settled in this country, rather than to prevent new illegal entry or visa abuse.

The second goal is to allow dependent employers to continue lawfully hiring from this pool of labor.

The third is to eliminate the illegal subclass now present in our society. Not only does their illegal status and resulting weak bargaining position cause these people to depress U.S. wages and working conditions, but it also hinders their full assimilation, and they then remain a fearful and clearly exploitable group within the U.S. society.

(4) TITLE IV—REPORTS TO CONGRESS

The President is required to report to the Senate and House Judiciary Committee on:

    (1) The employer sanctions provisions, including an analysis of the progress toward a secure verification system; and the impact of such provisions on illegal immigration, on U.S. employment, on discrimination against ethnic minorities, and on the recordkeeping burden of employers;

    (2) Legal immigration;

    (3) Legalization;

    (4) H-2 program;

    (5) Visa waiver program.

## III. RECENT IMMIGRATION STUDIES AND REFORM EFFORTS

The Immigration Reform and Control Act of 1982 represents the first comprehensive immigration reform effort in the United States in 30 years. The last major legislation enacted in this area was the Immigration and Nationality Act of June 27, 1952, popularly known as the McCarran-Walter Act. The 1952 statute has been modified through the years by a series of amendments, most notably those of 1965 and

# EXHIBIT F

Coalition for Humane Immigrant Rights, et al. v. Noem et al., 1:25-cv-00872 (JMC)

Chile a waiver on some of its economic targets on the expectation Chile will be able to comply with the program later this year.

[From the Washington Post, May 11, 1983]
BETHESDA BROKER CHARGED WITH ILLEGAL SALE OF ARMS
(By Michael Isikoff)

A Bethesda firm that serves as a broker in the international arms market has been indicted by a federal grand jury on charges of selling military equipment to the Chilean government in violation of U.S. export laws.

The 21-count indictment against United Aviations Industries Inc. and its two principal officers were said by federal officials to be part of a broader investigation into efforts by the regime of Gen. Augusto Pinochet to circumvent an American arms embargo imposed in 1976 after reports of widespread human rights abuses there and Chilean complicity in the murder of Orlando Letelier, the country's former ambassador to the United States.

The indictment charges that United Aviations' President Robert Poisson of Chevy Chase and Vice President Anthony Villa of Oxon Hill conspired with two members of the Chilean naval mission in Washington to disguise the shipment of parts for torpedoes, launchers, depth charges, guns and sonar equipment. The shipments were "destined for the Chilean navy," according to the indictment handed up Monday by a grand jury in Norfolk.

Alfred Swersky, lawyer for United Aviations and Poisson, said yesterday that the Chilean government "is and was a customer" of the company, but said that his clients have violated no laws. Bryan P. Gettings, a lawyer for Villa, said his client also denied wrongdoing.

He estimated that the total value of the arms shipments was not more than $50,000. "This is not about a high technology drain to the Russians," Gettings said, "This is peanuts."

Jerry Friedlander, a Washington lawyer for the Chilean government, said his client would have no comment until it has an opportunity to review the charges. The two Chilean navy officers, Capt. Jorege Acuna and Cmdr. Douglas Ashcroft, both of whom had headed the naval mission's purchasing department, were named as unindicted co-conspirators. Both are in Chile, Friedlander said.

United Aviations was described by Swersky and others yesterday as a small international arms broker that arranges sales between foreign government purchasers and U.S. weapons suppliers. Swersky said the firm consisted of only five employes, "three of whom are relatives." In addition to Poisson and Villa, he said, the employes include Villa's wife, Villa's daughter and a secretary.

The investigation into United Aviations grew out of Operations Exodus, a Reagan administration program to crack down on the illegal export of critical technology, principally to the Soviet Union and its allies. Recently, officials said, the Customs Service and other agencies involved in Exodus have turned up evidence of Chilean arms purchases.

Late last year, the U.S. attorney's office in Alexandria seized documents relating to Chilean weapons shipments after searching the offices of the Chilean air force mission, which was renting space from an exporting firm in Arlington, officials said yesterday.

The indictment outlines a complicated series of alleged transactions by United Aviations and the Chileans intended to disguise prohibited weapons shipments that were executed through a variety of suppliers, exporters and middlemen. The alleged purchases were begun by the two Chilean navy officers in February 1977, shortly after the embargo went into effect, and continued until July 1982, according to the indictment.

Because the military items were banned by State Department for export to Chile, the indictment charges that United Aviations furnished false or misleading information about the shipments on export declarations.

The indictment specified how one such shipment allegedly occurred. United Aviations ordered a $25,000 purchase of sonar equipment from the Ford Aerospace and Communications Corp. in Norfolk on May 5, 1981. The cargo was shipped from Norfolk to a Northern Virginia exporting firm. It was seized by customs officials at John F. Kennedy International Airport in New York while being loaded onto a Lan-Chile Air cargo plane on May 27, 1982. The sonar parts had been listed on shipping documents as aircraft parts.

(Also contributing to this article was Washington Post staff writer Al Kamen.)

---

U.S. SENATE,
*Washington, D.C., May 4, 1983.*
Hon. DONALD T. REGAN,
*Secretary of the Treasury,*
*Washington, D.C.*

DEAR SECRETARY REGAN: We are deeply concerned over reports that the Administration is considering granting Chile a $400 million bridge loan from the Exchange Stabilization Fund, or helping to organize an emergency loan to the Chilean regime through international institutions. This credit would be applied against interest owed by Chile on foreign loans which are currently the subject of rescheduling negotiations with creditor banks.

As you know, U.S. military and economic assistance to Chile was originally curtailed in the International Security Assistance and Arms Export Control Act of 1976. The International Security and Development Cooperation Act of 1981 continues to prohibit security assistance to Chile until the President has certified to Congress that (1) the Government of Chile has made significant progress in complying with internationally recognized principles of human rights; (2) the Government of Chile is not aiding or abetting international terrorism; and (3) the Government of Chile has taken appropriate steps to bring to justice by all legal means available those indicted by a United States grand jury in connection with the murders of Orlando Letelier and Ronni Moffitt in Washington, D.C. in 1976.

It is the clear intention of Congress that any major change in our assistance relationship with Chile should be approached with full Congressional cooperation.

There has been no significant change in the situation in Chile since those laws were enacted. Rather than making the progress which Congress had sought to encourage, the human rights situation in Chile has continued to deteriorate. The Chilean Commission on Human Rights reports that 1982 was the worst recent year in Chile, with nearly twice as many political arrests as occurred during 1981. Nearly 40,000 Chileans remain in exile abroad, and arbitrary detention, torture. internal exile and banishment remain common practices.

The regime in power in Santiago was found by a U.S. Federal District Court in 1979 to be responsible for the Letelier-Moffitt terrorist murders on the streets of Washington. The court ordered the Pinochet Government to pay the Letelier and Moffitt families $5 million in damages, a judgment which the Chilean regime continues to ignore. Administration spokesmen have acknowledged in public testimony that the Government of Chile has failed to investigate fully or prosecute those implicated in these assassinations.

In our view, it would be a travesty of justice for the United States to offer a $400 million bailout to the Pinochet regime—or to the private bankers who stepped in to support that repressive regime when U.S. aid was denied.

Such a bailout would also violate both the spirit and the letter of U.S. law, including the specific legislation on Chile enacted by Congress, and explicit provisions of the Foreign Assistance Act (Sections 116 and 502B), which make clear that U.S. assistance shall not be extended to countries which have a consistent pattern of human rights violations.

In addition, we believe that any such bailout would violate the clear criteria in the law before utilizing the Exchange Stabilization Fund.

For these reasons, we oppose any such bridge loan to Chile, and we urge the administration to reject it.

We would appreciate receiving full information on the status of this reported U.S. loan, together with your assurances that no credit of this magnitude will be authorized without full consultations, in advance, with the Congress.

Sincerely,
EDWARD M. KENNEDY.
WILLIAM PROXMIRE.

---

## CONCLUSION OF MORNING BUSINESS

The PRESIDING OFFICER. Is there further morning business? If not, morning business is closed

---

## IMMIGRATION REFORM AND CONTROL ACT OF 1983

The PRESIDING OFFICER. The clerk will now report the unfinished business.

The assistant legislative clerk read as follows:

A bill (S. 529) to revise and reform the Immigration and Nationality Act, and for other purposes.

The Senate resumed consideration of S. 529.

### AMENDMENT NO. 1210

The PRESIDING OFFICER. The pending question is the Kennedy amendment No. 1210.

Mr. SIMPSON. Mr. President, I ask unanimous consent that the pending Kennedy amendment be laid aside subject to bringing it forward at the time my colleague returns to the floor; that we now under the time agreement proceed to the consideration of the amendment of Senator HUMPHREY.

The PRESIDING OFFICER. Without objection, it is so ordered.

On page 148, line 15, strike out "or the Attorney General".

Mr. KENNEDY. Mr. President, we are getting close to the time of passage, but I welcome the opportunity on this final item to have worked very closely with the Senator from Wyoming and also the Senator from Michigan, the Senator from Colorado, and others who have been very much concerned about the whole issue of judicial review.

May we have order, Mr. President?

The PRESIDING OFFICER. The Senate will be in order.

Mr. KENNEDY. Mr. President, I will briefly spell out what is currently in the Senate bill and where the House of Representatives is on the same issue, and what compromise has been made in the working group that drafted the amendment before us. I understand that it is now acceptable to the manager of the bill.

The original bill S. 2222 last year, had a structure for administrative law judges as asylum judges and a Presidentially appointed U.S. Immigration Board. No provision was made for a review of the Board's decision.

The House bill kept that structure and superimposed on top of it the appeals to the Federal Circuit Court of Appeals.

The pending Senate bill changed the structure to immigration judges with the Attorney General appointing Immigration Board. Judicial review continues to be limited. Only if the Attorney General certifies a case is his modification then reviewable by a court of appeals. The Senate has a 9-member board and the House a 6-member board.

The compromise amendment I am offering goes with the Senate bill. However, the Attorney General's certification is eliminated and there is provision for judicial review to the circuit court of appeals.

The Senate bill deletes the statutory habeas corpus review in the district court, but the House bill specifically retains it and says habeas corpus petitions may be brought individually or on a multiple-party basis in Federal circuit courts of appeals. The compromise amendment deletes statutory habeas corpus review.

However, we do provide for a limited judicial review in asylum cases. The court is limited in its review only to, first, whether the jurisdiction of the administrative law judge or Board was properly exercised; second, whether the asylum determination was in accordance with applicable laws and regulations; third, the constitutionality of the determination; and, fourth, whether the decision was arbitrary or capricious.

That is the compromise.

So we have retained both the constitutional habeas corpus and a limited

statutory habeas corpus provision. What we have done is follow the administrative provisions that are in the Senate bill, but established the House provisions on judicial review. It seems to me, Mr. President, that this is a very important adjustment to what is in the legislation now, and it seems to me to achieve the basic kinds of protections which we are interested in protecting.

On the issue of the habeas corpus, in many instances we are talking about decisions of life or death, where an individual may be deported back to parts of the world where his life may very well be threatened. So this whole issue is of enormous importance and consequence. It deserves the consideration of this body.

I welcomed during the work of the subcommittee and the full committee, and particularly in the past several days, both the continued cooperation of the chairman of the committee and the Justice Department and the various Senators who share these concerns—and there are many on both sides of the aisle—and who have helped to reach this compromise.

I will be glad to go into greater detail. I have tried to make the legislative history concise and precise on this particular issue, but I will welcome further explanation within the time limit.

As I have described it, I am hopeful this amendment can be adopted.

Mr. SIMPSON. Mr. President, this has been a very knotty problem with regard to the entire reform issue. It is the area of judicial review.

Senator KENNEDY had a viewpoint which included the use of administrative law judges and some other procedures which were originally unacceptable. In the long course of negotiations we now have come to this situation which is where we have a full, upfront type of hearing, cross-examination, open or closed, right to counsel, administrative hearings, administrative appeals. We stay with the Senate language on summary exclusion matters. We stay with the language on habeas corpus. We have adjusted the review process. The amendment still gives control of the adjudication procedure within the Department of Justice. That is what we were seeking. That Department will have the ability to react to immigration emergencies through this procedure.

There will be a limited judicial review of asylum cases, and there will be judicial review of deportation and exclusion cases.

I think it is an appropriate amendment. The system will certainly be more workable than it is now.

I ask unanimous consent to enter into the RECORD a most extraordinary docket review of an actual case which proceeded from a person admitted as a visitor to the United States on August

24, 1974, who brought over his fiance and two children, U.S. citizens, were born. That case now, 8 years later, is at the status of petition for review filed with the U.S. Court of Appeals for the First Circuit.

That is what happens in asylum cases. That is what happens when we learn how to use the systems. I want that in the RECORD. I think all Senators would be interested in that.

There being no objection, the material was ordered to be printed in the RECORD, as follows:

[No. 82–1829]

United States Court of Appeals for the First Circuit

(Thomas Le Blanc and Marie Margaret Le Blanc, Petitioners v. Immigration and Naturalization Service, Respondent. Petition for Review of an Order of the Board of Immigration Appeals—Brief for Respondent).

Date and events.

Aug. 24, 1974: Thomas Le Blanc admitted as a visitor to the United States until 9-10-74. (A.R. 228).

June 15, 1975: Margaret Le Blanc, nee Commodore admitted as a visitor to the United States until 6-20-75. (A.R. 230).

Oct. 25, 1975: Petitioners marry. (A.R. 53).

Dec. 12, 1975: Thompson Sonel Le Blanc is born. (A.R. 223).

Jan. 19, 1978: Petitioners Reported to INS.

Feb. 19, 1978: Petitioners granted until such date to depart voluntarily.

Mar. 19, 1978: Petitioners granted until such date to depart voluntarily. (A.R. 228).

Mar. 28, 1978: Petitioners failed to depart. Order to Show Cause (OSC) issued.

Apr. 12, 1978: Deportation hearing opened. Hearing continued upon Petitioners' request. (A.R. 239).

Apr. 25, 1978: Deportation hearing reconvened. Petitioners conceded allegations in OSC, requested and were granted 75 days to depart voluntarily. (A.R. 234).

July 8, 1978: Petitioners requested and were granted until such a date to depart voluntarily from the United States.

Oct. 8, 1978: Petitioners requested and were granted until such a date to depart voluntarily from the United States.

Jan. 20, 1979: Petitioners requested and were granted until such a date to depart voluntarily from the United States.

Apr. 1, 1979: Petitioners requested and were granted until such a date to depart voluntarily from the United States.

May 24, 1979: Petitioners requested and were granted until such a date to depart voluntarily from the United States.

June 1, 1979: Petitioners requested and were granted until such a date to depart voluntarily from the United States.

July 23, 1979: Christopher Thomas Le Blanc is born. (A.R. 51).

Sept. 1, 1979: Petitioners requested and were granted until such a date to depart voluntarily from the United States.

Oct. 5, 1979: I-166 issued (Notice to report to INS for deportation).

Oct. 15, 1979: Deportation notice cancelled due to hurricane in Dominica. Thirty (30) day extension granted until 11-15-79.

Jan. 25, 1980: Motion to Reconsider and Reopen and to Stay Deportation Proceedings filed with Immigration Court. (A.R. 223).

Feb. 22, 1980: INS' opposition to motion is filed (A.R. 225).

# EXHIBIT G

Coalition for Humane Immigrant Rights, et al. v. Noem et al., 1:25-cv-00872 (JMC)

age facilities, and of clarifying the circumstance under which collective-bargaining agreements may be rejected in cases under chapter 11, and for other purposes, and agree to the conference requested by the Senate.

The SPEAKER. The question is on the motion offered by the gentleman from Kentucky [Mr. MAZZOLI].

The motion was agreed to.

The SPEAKER. The Chair appoints the following conferees: Messrs. RODINO, KASTENMEIER, EDWARDS of California, SEIBERLING, HUGHES, SYNAR, GLICKMAN, MORRISON of Connecticut, FISH, MOORHEAD, KINDNESS, and SAWYER.

---

## CONTINUATION OF TRANSITION PROVISIONS OF BANKRUPTCY ACT

Mr. MAZZOLI. Mr. Speaker, I ask unanimous consent to take from the Speaker's table the Senate bill (S. 2776) to continue the transition provisions of the Bankruptcy Act until June 27, 1984, for other purposes, and ask for its immediate consideration in the House.

The Clerk read the title of the Senate bill.

The SPEAKER. Is there objection to the request of the gentleman from Kentucky?

Mr. FISH. Mr. Speaker, reserving the right to object, this is the fourth extension of the transitional period, but it is the very first to be enacted in an atmosphere of positive hope for resolution of our bankruptcy problems in the immediate future. That is why the extension is for a mere 7 days. Many of our colleagues in the past have said, "No more extensions," when we passed the lengthy ones on May 24, April 26, and March 30. I hope that they will consider giving the Congress the benefit of the doubt this one more time. The stakes are very high as we go into conference on H.R. 5174, the omnibus bankruptcy bill on which the other body has now acted. If we fail to achieve agreement by June 27, I anticipate that the transition period will be extended well into next year, and all of those who have advanced their bankruptcy interests thus far will have to commence all over again in the 99th Congress, a prospect I am sure few of us relish.

I wonder if the chairman of the subcommittee could, on behalf of Chairman RODINO, give us some assurances that we will be acting with diligence and dispatch to achieve this 7-day deadline in the conference.

Mr. MAZZOLI. If the gentleman will yield under his reservation of objection, on behalf of the distinguished chairman of our full committee, I can assure the gentleman that this 7 days which our bill provides will give the conferees an opportunity to, in a positive atmosphere, as the gentleman has

correctly characterized it, seek a final agreement and some final solution to this nettlesome problem which has dragged on for the better part of, I guess, 2 years. So I can certainly assure the gentleman, who will be a conferee and involved in it actively, that the gentleman from New Jersey, our chairman [Mr. RODINO], wants this to be the very last extension and that these conferees will be able to work out a compromise, and then we will have a chance to vote on it.

Mr. FISH. The chairman is giving me assurance, on behalf of the chairman of the full committee, that he expects this conference and he will do his best to see that this conference within this limited time does resolve this issue and it is not extended into next year?

Mr. MAZZOLI. Simply stated, the gentleman from Kentucky will respond yes.

Mr. FISH. I thank the gentleman, and I withdraw my reservation of objection, Mr. Speaker.

The SPEAKER. Is there objection to the request of the gentleman from Kentucky?

There was no objection.

The Clerk read the Senate bill, as follows:

S. 2776

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That (a) section 402 of the Act entitled "An Act to establish a uniform law on the subject of Bankruptcies" (Public Law 95-598) is amended in subsections (b) and (e) by striking out "June 21, 1984" each place it appears and inserting in lieu thereof "June 28, 1984".

(b) Section 404 of such Act is amended in subsections (a) and (b) by striking out "June 20, 1984" each place it appears and inserting in lieu thereof "June 27, 1984".

(c) Section 406 of such Act is amended by striking out "June 20, 1984" each place it appears and inserting in lieu thereof "June 27, 1984".

(d) Section 409 of such Act is amended by—

(1) striking out "June 21, 1984" each place it appears and inserting in lieu thereof "June 28, 1984"; and

(2) striking out "June 20, 1984" each place it appears and inserting in lieu thereof "June 27, 1984".

SEC. 2. The term of office of any bankruptcy judge who was serving on June 20, 1984, and of any bankruptcy judge who is serving on the date of the enactment of this Act is extended to and shall expire on June 27, 1984.

SEC. 3. (a) Section 8339 (n) of title 5, United States Code, is amended by striking out "June 21, 1984" and inserting in lieu thereof "June 28, 1984".

(b) Section 8331 (22) of title 5, United States Code, is amended by striking out "June 20, 1984" and inserting in lieu thereof "June 27, 1984".

The Senate bill was ordered to be read a third time, was read the third time, and passed, and a motion to reconsider was laid on the table.

---

## IMMIGRATION REFORM AND CONTROL ACT OF 1963

The SPEAKER. Pursuant to House Resolution 519 and rule XXIII, the Chair declares the House in the Committee of the Whole House on the State of the Union for the further consideration of the bill, H.R. 1510.

□ 1030

IN THE COMMITTEE OF THE WHOLE

Accordingly the House resolved itself into the Committee of the Whole House on the State of the Union for the further consideration of the bill (H.R. 1510) to revise and reform the Immigration and Nationality Act, and for other purposes, with Mr. NATCHER in the chair.

The Clerk read the title of the bill.

The CHAIRMAN. When the Committee of the Whole rose on Tuesday, June 19, the amendment in the nature of a substitute recommended by the Committee on the Judiciary was considered as an original bill for the purpose of amendment which is only subject to amendment by the amendments made in order pursuant to House Resolution 519.

AMENDMENT NO. 58 OFFERED BY MR. MINETA

The CHAIRMAN. Amendment No. 58 is in order at this time.

Does the gentleman from California [Mr. MINETA] desire to offer Amendment No. 58?

Mr. MINETA. Yes, I do, Mr. Chairman.

The CHAIRMAN. The Clerk will designate the amendment.

The text of the amendment is as follows:

Amendment No. 58 offered by Mr. MINETA: Page 97, strike out line 21 and all that follows through page 98, line 18, and insert in lieu thereof the following:

"(d)(1) There shall be no administrative or judicial review of a determination respecting an application for adjustment of status under this section except in accordance with this subsection.

"(2) An alien whose application for adjustment of status under this section is denied is entitled to a de novo hearing with respect to such application if a notice of request for such hearing is made within a reasonable time (of not less than thirty days, as established by the Attorney General) of the date of the notice of the denial. Only one such de novo hearing may be requested with respect to any alien. The hearing shall be conducted before an administrative law judge in accordance with the requirements of section 554 of title 5, United States Code, and rules of the United States Immigration Board established under section 107.

"(3)(A) If such a hearing is timely requested, any further administrative or judicial review (whether in a deportation proceeding or otherwise) of the determination on the application for adjustment shall be based solely upon the administrative record upon which the order is based and the administrative law judge's findings of fact, if supported by substantial evidence on the record considered as a whole, shall be conclusive.

egory which fits the rationale the gentleman has stated that this is a Federal responsibility. It just does not apply to refugees and nonimmigrants because those people come here lawfully and it is all agreed to under our ceilings and under our laws.

The CHAIRMAN. The time of the gentleman from New York [Mr. SCHUMER] has again expired.

(On request of Mr. FISH and by unanimous consent, Mr. SCHUMER was allowed to proceed for 2 additional minutes.)

Mr. SCHUMER. I thank the gentleman from New York. We had talked about the various changes that he had mentioned, the gentleman from New York and the gentleman from Kentucky, and we have come up with language that we think meets all of our agreements, and I would just like to read if for the record. Because of the rule, we cannot amend this amendment on the floor, but given that the complete language is in the Senate bill, given that the gentleman from New York and the gentleman from Kentucky have given their assurance that they will fight for this in conference and that the Senator from Wyoming has also seen the language of this amendment and reports it to be favorable, I would withdraw the amendment after getting the concurrence of the gentlemen from New York and Kentucky that this is the language that we will work for in the Senate conference.

I would just like to read the Senate language, the language here. It would be the same section, section (d):

Subject to the amounts provided in advance in appropriation acts, the Attorney General shall reimburse a State and a local jurisdiction in a State for 100 per centum of the costs incurred by such State or jurisdiction for the detention or imprisonment of any illegal alien convicted of a felony.

Does that language meet with the gentleman's approval?

Mr. FISH. That narrowed language does meet my objection and I will do my best to see that survives the conference.

Mr. MAZZOLI. Mr. Chairman, will the gentleman yield?

Mr. SCHUMER. I yield to the gentleman from Kentucky.

Mr. MAZZOLI. I thank the gentleman for yielding.

Mr. Chairman, while I have not been privy to the entire conversation, the gentleman from Kentucky and the gentleman from New York have talked repeatedly over the last several days and I am satisfied with the explanation on this side. That sounds like a good handling.

The CHAIRMAN. Does the gentleman from New York [Mr. SCHUMER] ask unanimous consent to withdraw his amendment?

Mr. SCHUMER. The gentleman

from New York asks such unanimous consent, Mr. Chairman.

The CHAIRMAN. Is there objection to the request of the gentleman from New York?

There was no objection.

Mr. OTTINGER. Mr. Chairman, I ask unanimous consent to speak out of order for 5 minutes.

The CHAIRMAN. Is there objection to the request of the gentleman from New York?

There was no objection.

Mr. OTTINGER. Mr. Chairman, I take this time to advise the Committee, since there will not be time for debate once we go back in the House, that when the Committee rises and we go back in the House, I am going to ask for a separate vote on the amendment offered by the gentleman from Florida [Mr. McCOLLUM], that was passed earlier.

I think that amendment is particularly disadvantageous to the country, and unfortunate. It removed all class actions on behalf of those people whom the Immigration Service seeks to deport, and that is the only effective means by which refugees from repression overseas have to address their grievances effectively.

Refugees who seek asylum are represented by volunteer groups with very limited resources, and if they have to bring each one of these cases individually, it would be an impossible task. Furthermore, to have each asylum case brought individually would be a tremendous burden on our courts and a wasteful expenditure of public funds.

Second, the McCollum amendment gave arbitrary powers to the Immigration and Naturalization Service border guards to make determinations with respect to the legitimacy of refugees' requests for consideration under our laws with respect to being granted asylum. Those border guards are in no way equipped to be able to do that. The existing law provides that determination be made by an administrative judge.

Third, the McCollum amendment vastly restricted judicial review of asylum cases that are brought before the courts.

The chairman of the subcommittee, the chairman of the full committee, the ranking minority member, all opposed the McCollum amendment when it was offered. I think there was a good deal of confusion in the committee because the committee had just voted to support an amendment that I had offered that would have prevented the constriction of class actions to merely constitutional cases. So the committee had expressed itself as being in favor of class actions and then this broader amendment by the gentleman from Florida [Mr. McCOLLUM] was offered and was passed, I think without full examination by the committee.

I strongly urge that the committee defeat the McCollum amendment. It only prevailed by 16 votes, and upon reconsideration and full explanation of this amendment, I hope that it will be defeated when it is brought up in the full House of Representatives.

☐ 1530

(By unanimous consent, Mr. McCOLLUM was allowed to speak out of order.)

Mr. McCOLLUM. Mr. Chairman, I have requested unanimous consent to speak out of order to respond to the gentleman.

Mr. Chairman, a few days ago, we debated what the gentleman has just brought up on the floor of this House and we had a vigorous debate and we had a vote on it in which the majority of this body voted to support the McCollum amendment, which would toughen and make workable the summary exclusion provisions that are in this bill.

I would like to briefly take the time of the body, since it appears it is going to be brought up for a revote, that is what the gentleman said, when the House rises and goes into the full House, or the committee rises, I should say, I would like to bring the Members up to date and remind them of what that vote was about and perhaps remind some of them why they voted for the McCollum amendment.

We have two different possible avenues that are taken when the Government questions the right of an alien to remain in this country and attempts to have him removed. One of them is called exclusion and the other is called deportation.

With respect to summary exclusion, the McCollum amendment does not touch on deportation. Deportation as such or the deportation process deals with somebody who has managed to get his foot on the shore, walk up the beach and then later be apprehended. It may be 1 day later, it may 1 week later, or it may be several years later. There is a long standing process under the laws that now exist on the books for deportation. We also have a procedure called exclusion which is designed to handle those cases where people are apprehended, as they cross our border or attempt to cross our border by the immigration officers and the border patrol.

Those folks are people who have never been in this country, but they have attempted to come here. They are very much apparent in my State of Florida and were those in many cases who came in during the Cuban Mariel boatlift a few years ago that many of you may remember. They crossed the borders. They were apprehended as they began crossing. They had not really gotten on our shores.

Under those conditions, the Government uses a process called exclusion. There are certain things that are han-

dled a little differently for exclusion than they are for deportation, and they should be; but under the current laws that exist, only those who are stowaways on boats and those who are stowaways on planes and alien crewmen who jump ships can be handled in what is known as a summary fashion.

The McCollum amendment, as passed, advocates and allows for the processes to work that were intended in this bill and were crafted originally in the original Simpson-Mazzoli bill on summary exclusion to allow the Immigration Service when somebody comes in, like getting off a boat at the shoreline setting foot on our shores, to allow the Immigration Service to apprehend them while they are still on the beach and have an Immigration officer query them about: First, do they have any documents that would give them color to be here rightfully; second, do they have a claim for political asylum, and if they do have the documents or they do have a claim for political asylum; or third, if they have any other basis for being here that they claim, then they are brought into the process. If they have any documents or any claim for asylum, they are brought into the process and they are given a right to hearings before an administrative law judge. But under the bill, before the McCollum amendment was adopted, there were rights given to an alien to have an administrative law judge hearing even if the alien had no documents and no claim for asylum. There was an extra step, a procedure given where these people would have to be warned or given their rights to counsel and be told that there could be a redetermination by an administrative law judge if they did not agree with this decision, even though they had been checked already by the Immigration Service, even though they have not set foot on our shores, but are just beginning the process of trying to cross our border, and even though they had no documents, no claim to asylum, and no other basis for coming into the United States.

What my amendment did and what I urge the Members to protect, what my amendment did was to say that that second step does not have to be taken, that somebody who has not crossed our borders yet, is just in the process of being apprehended, should be treated as he would be treated if he came to a consul's office across the seas somewhere or if he were a stowaway or if he were an alien jumping ship and summarily excluded.

In other words, to insure that we have the capacity to handle and deal with future Mariel boatlifts, we need to have effective and workable summary exclusion. It does not deny anybody any rights. It simply makes for uniformity out of a condition that has existed for many years and many of us

thought existed all along, but apparently has not.

Mr. LUNGREN. Mr. Chairman, will the gentleman yield?

Mr. McCOLLUM. I will be glad to yield to the gentleman from California.

Mr. LUNGREN. Mr. Chairman, I just want to make it very clear that what we will be revoting on, will be a vote that we already had several days ago that was passed. The gentleman's amendment was passed by a recorded vote and that will be the subject of the vote, as the gentleman has explained it, not the McCollum amendment that had to do with legalization. This has nothing to do with that section of the bill.

Mr. McCOLLUM. That is right.

Mr. LUNGREN. It is something that we fully debated several days ago and decided by a recorded vote and has nothing to do with anything that we have really discussed today, except for the discussion in the last 10 minutes.

I hope that is clear to everybody when we go back into the full House.

Mr. McCOLLUM. Mr. Chairman, I thank the gentleman and reclaiming my time for 1 minute, the amendment had two other features in it. One of those features dealt with class actions. It struck the right for folks to bring class actions in exclusion, deportation, and asylum matters under our immigration laws. The gentleman is raising this again and I debated it at some length at the time.

The CHAIRMAN. The time of the gentleman from Florida has expired.

(At the request of Mr. OTTINGER, and by unanimous consent, Mr. McCOLLUM was allowed to proceed for 2 additional minutes.)

Mr. OTTINGER. Mr. Chairman, will the gentleman yield?

Mr. McCOLLUM. In a moment, if I might finish this.

There is a procedure for habeas corpus and multiple party actions for habeas corpus in the bill, and class action suits under these conditions and circumstances are simply not necessary. They are redundant and they add a delay in the process of asylum claims that have clogged up our courts and immigration hearings process in Florida and across the country. Now we have over 170,000 of them pending. We only had 3,800 of that type of claim back in 1978, just a few years ago; so we really need a streamline of the process that the adjudication section does and to further streamline was the purpose of that portion of my amendment.

The last thing that the amendment did was remove the automatic stay of kicking somebody out of the country that attaches when appealing an exclusion order, again protecting that automatic stay for deportation.

What this does is avoid some of many frivolous procedures that can be brought up to delay the process by

those who want to simply stop the processes and clog up our system and use this for the purpose of delay.

It still allows them to seek and get a stay if the judge, in his discretion, wants to give it.

So all I have done is try to streamline in this amendment the whole process to insure that we do not have another Mariel boatlift type of situation and be able to handle it if it ever were to arise again in the future, and to have a summary exclusion that is really workable and an asylum exclusion and deportation system that is workable.

The CHAIRMAN. The time of the gentleman from Florida has expired.

Mr. OTTINGER. Mr. Chairman, I ask unanimous consent that the gentleman may proceed for 1 additional minute.

The CHAIRMAN. Is there objection to the request of the gentleman from New York?

Mr. MAZZOLI. Reserving the right to object, Mr. Chairman, this is the last time the gentleman from Kentucky will permit any extensions. The gentleman from Kentucky, hereafter, will object to unanimous-consent requests for time.

We must move the bill along. I will not, however, object to this.

Mr. Chairman, I withdraw my reservation of objection.

The CHAIRMAN. Is there objection to the request of the gentleman from New York [Mr. OTTINGER] that the gentleman from Florida may proceed for 1 additional minute?

There was no objection.

Mr. OTTINGER. Mr. Chairman, will the gentleman yield?

Mr. McCOLLUM. I yield to the gentleman from New York.

Mr. OTTINGER. Mr. Chairman, there is one thing that I think is very important to clarify and that is the impression the gentleman left was that all three of these provisions only applied with respect to exclusions.

The border guards are given what I consider to be an arbitrary right of exclusion, but the amendment's prohibition of class-action suits does apply to deportation actions. The elimination of the authorization for class actions that the gentleman has provided does apply both to exclusions and to deportation actions, and in the latter instance, particularly, it will do incalculable harm to the refugees whose lives may be at stake in deportation proceedings.

Mr. McCOLLUM. It applies, if I may reclaim my time, to the asylum procedures which could conceivably be under either exclusion or deportation because they are claiming to be refugees or maybe just aliens who have been apprehended either inside our borders or trying to cross the borders. It also applies to any and all other exclusion and deportation matters. Class

actions would be totally barred in all these immigration matters.

However, the amendment primarily deals with summary exclusion and that is critical. It also deals with the area that the gentleman is talking about, which is the asylum exclusion and deportation speedup.

If we are going to streamline this bill and allow summary exclusion to work, if we are going to allow asylum procedures to work and not have the delays and the frivolous procedures that we have had in the past, I urge my colleagues to revote for the McCollum amendment, as they did a few days ago when it comes up again, when the committee rises.

I hope they have listened to this summary debate and will check the RECORD to see how they voted before, because they will see that a sizable majority voted with me to sustain this improvement in the adjudication and summary exclusion area to make it streamlined and workable.

Mr. SMITH of Iowa. Mr. Chairman, I move to strike the requisite number of words.

The CHAIRMAN. Without objection, the gentleman from Iowa [Mr. SMITH] is recognized for 5 minutes.

There was no objection.

Mr. SMITH of Iowa. Mr. Chairman, before we move on to amendment No. 66, I want to give a little word of caution about amendment No. 65 which was withdrawn.

Now, the language they agreed to consider in conference is vastly better than the wording originally presented; however, it still includes felonies committed under State law. We are talking about a State determining what is a felony and then if they are convicted under the State law, the Federal Government is going to pay for their incarceration and the State determines how long they will remain incarcerated at 100 percent Federal cost.

Right now there are 5,000 such felons in prison. That would cost $65 million per year.

Now, I could not help but notice that some of those who supported the proposal so strongly are the same ones who voted a few days ago for a 4-percent cut for law enforcement for the country over, including programs where the Federal Government helps or reimburses State and local governments.

Now, it is inconsistent to add $65 million to this authorization bill and then cut them $65 million in the funding bill.

□ 1540

A lot of those programs that were cut by 4 percent were programs that provide money to State and local communities. So I want to add a word of caution that supporting such a provision does not mean someone has found a new store where candy is free.

Mr. O'BRIEN. Mr. Chairman, will the gentleman yield?

Mr. SMITH of Iowa. I yield to the gentleman from Illinois.

Mr. O'BRIEN. I thank the gentleman for yielding.

Mr. Chairman, as the House knows, the gentleman from Iowa [Mr. SMITH] is chairman of our Subcommittee on Appropriations that deals with the immigration and naturalization appropriation and I, as ranking member, believe every word he said is correct. And I speak in support of his remarks.

Mr. SMITH of Iowa. I thank the gentleman.

Mr. Chairman, so what such a provision would do is to add, if it is funded, $65 million to the Federal law enforcement appropriations. Now, those who support this authorization should be prepared to support it when the appropriations bill comes up and do not vote for another one of those amendments to cut the grants to States for law enforcement under programs already in being.

Mr. MAZZOLI. Mr. Chairman, will the gentleman yield?

Mr. SMITH of Iowa. I yield to the gentleman from Kentucky.

Mr. MAZZOLI. I thank the gentleman for yielding.

Mr. Chairman, I could not agree more with what the gentleman has said. The gentleman from Iowa [Mr. SMITH], has just been an outstanding leader for the proposition that the Immigration and Naturalization Service needs adequate money. He has labored, and my friend from Illinois [Mr. O'BRIEN] the ranking minority member, the same way, labored mightily to bring forth a bill which had $20 million for the recommendations of this subcommittee by way of authorization only to see the ignominy of a 4-percent across-the-board cut which not only does not have the $20 million now but now we are even below the original recommendation.

So I agree 100 percent, if we are going to do something we have to pay the bill.

Mr. SMITH of Iowa. I thank the gentleman from Kentucky.

The CHAIRMAN. Amendment No. 66 is in order at this time.

Does the gentleman from California [Mr. LUNGREN] desire to offer amendment No. 66?

Mr. LUNGREN. No. Mr. Chairman, I do not.

Mr. EDWARDS of California. Mr. Chairman, the gentleman from California [Mr. LUNGREN] has withdrawn amendment No. 66. If he had offered it, I would have opposed it. It would have substituted block grants for Federal reimbursement for the costs of legalization.

Immigration decisions are made at the Federal level. The financial ramifications of those decisions cannot in good conscience be passed to State and local governments who are suffering their own budgetary difficulties in this troubled economy. Because cost projections for legalization are based on conflicting data and varying assumptions, none of which have been validated, there simply is no way of predicting what costs will incur from the legalization program. I am the author of the current reimbursement provision in the bill which was designed to hold the State and local governments harmless for a limited period of time—fiscal year 1984 and the following 3 years—if costs should incur.

By maintaining the current language, we can demonstrate the good-faith concern of the Congress for the fiscal integrity of the States, counties, and municipalities. If there are no significant costs for programs of public assistance as a result of legalization, there will be no substantial financial burden under the current language for the Federal Government.

If significant costs do result, the current language in the bill guards against a unilateral imposition on our partners in federalism of financial burdens which they have no way to predict and over which they have no control.

It must be emphasized that no one knows what the costs of legalization will be, either for the Federal Government or for State and local governments. I have attempted to have some good-faith estimates developed by various groups, and I can personally vouch that it is like asking for the proverbial number of angels capable of dancing on the head of a pin.

The Department of Health and Human Services and the Office of Management and Budget both did cost estimates. The high estimate was 800 percent higher than the low estimate—quite an extraordinary range!

The point that needs to be made here is not how high a cost figure can be developed in order to scare the daylights out of everyone. The point is just this: There is great disagreement on the basic assumptions that were used to develop the various figures. No one knows how low or how high the cost will be. Under the Lungren amendment, the risk is removed from the Federal Government, where it belongs, and is placed on State and local governments, where it does not belong.

The legalization program as reported by the Judiciary Committee would make newly legalized aliens ineligible for most Federal programs. But, they will remain eligible for cash assistance, medical assistance, and other services offered by States and localities to residents living in their domain. Many States have equal protection clauses in their States constitutions that prevent the State from treating different residents differently. And, we all remember that, when the State of Texas re-

# EXHIBIT H

Case 1:25-cv-00872-JMC   Document 55-12   Filed 03/03/26   Page 85 of 280

# HOUSE OF REPRESENTATIVES—Wednesday, July 21, 1993

The House met at 10 a.m.

The Reverend Dr. Lawrence H. Phipps, pastor, First Baptist Church, Enterprise, AL, offered the following prayer:

Father, I praise and honor You as the creator and sustainer of our world. I acknowledge that You have provided this Nation in Your world to be an example of freedom, unity, morality, and spirituality.

We, as a nation, have always understood that there are "certain unalienable rights." The commitment to these rights has brought on needed revolutions, here and abroad. Now, help us to be committed to our responsibility so You can bring to us needed revival, here and abroad.

I pray that those who lead through this House of Representatives will always remain aware of this responsibility. May they seek Your wisdom, first. May they seek Your will foremost.

You are the King of this world's kings. You are the Lord of this world's lords. Help us to follow Your Kingship and Lordship.

In Jesus name I pray. Amen.

## THE JOURNAL

The SPEAKER. The Chair has examined the Journal of the last day's proceedings and announces to the House his approval thereof.

Pursuant to clause 1, rule I, the Journal stands approved.

## PLEDGE OF ALLEGIANCE

The SPEAKER. Will the gentleman from New York [Mr. LAZIO] please come forward and lead the House in the Pledge of Allegiance.

Mr. LAZIO led the Pledge of Allegiance as follows:

I pledge allegiance to the Flag of the United States of America, and to the Republic for which it stands, one nation under God, indivisible, with liberty and justice for all.

## THE REVEREND DR. LAWRENCE H. PHIPPS

(Mr. EVERETT asked and was given permission to address the House for 1 minute and to revise and extend his remarks.)

Mr. EVERETT. Mr. Speaker, on behalf of the Members of the 103d Congress, today it is with great pride and respect that I welcome Dr. Lawrence Phipps to this historic Chamber. For 3 years, Dr. Phipps has served as my pastor at First Baptist Church of Enterprise, AL.

I, along with many others, have come to recognize and appreciate this man who routinely demonstrates his natural generosity and genuine desire to selflessly meet the needs of those who gather under his wisdom and experience. Dr. Phipps' theological experience has been enhanced by his educational and professional diversity. He received a master of divinity degree and a doctorate degree of ministry while attending Southern Baptist Theological Seminary. Currently, Dr. Phipps continues his association with his former seminary by serving as field supervisor for doctor of ministry students of Southern.

During the last few years, while continuing to perform his pastoral duties, Dr. Phipps has continued to advance within his field. Presently, he sits as a trustee of Samford University in Birmingham, on the tellers committee of the Alabama Baptist Convention, and serves as president of the Alabama Alumni Association of Southern Baptist Theological Seminary. He also is past chairman of the personnel committee for Coffee County Baptist Association.

It is with great pleasure and admiration that I welcome my pastor and personal friend, Dr. Phipps, to deliver today's opening prayer.

## THE CLINTON-DEMOCRATIC PLAN: PRO-JOBS AND PRO-SMALL BUSINESS

(Ms. DELAURO asked and was given permission to address the House for 1 minute and to revise and extend her remarks.)

Ms. DELAURO. Mr. Speaker, shortly this body will consider one of the boldest deficit reduction and job creating legislative packages it has ever seen. Central to the plan is the assistance and incentives it provides to small businesses—where the bulk of our new jobs are being created. The Clinton-Democratic plan is a pro-jobs and pro-small business plan containing the balance of cuts and incentives that will finally revive our economy.

Contrary to the disinformation being spread by political opponents of the President's plan, this proposal helps small business. The vast majority—96 percent—of all small businesses will not be affected by any tax increases in the plan. And more importantly, almost 90 percent of small businesses will see some form of tax break in the form of target capital gains, increased expensing, or health care deductions.

Many of those who today criticize the President's plan can hardly afford to. Critical independent groups have in the past endorsed many of the proposals included in the President's plan. Others, as yesterday's Wall Street Journal noted, have mischaracterized the effect of the plan. And those in Congress who are critical have little in their past that shows us how to proceed. Under the previous administration small business failures increased by 77 percent.

The President, and this House, have proposed and endorsed a plan with solid small business incentives. With real potential for job creation. We must finish our job. Pass the President's plan and get our Nation moving forward again.

## HOUSE POST OFFICE SCANDAL

(Mr. PAXON asked and was given permission to address the House for 1 minute and to revise and extend his remarks.)

Mr. PAXON. Mr. Speaker, the House post office scandal represents in microcosm all that is wrong with this House, 40 years of one-party control, doors closed to public scrutiny, and putting personal interest above the public interest.

When the post office scandal first broke, the Democratic leadership assured us that there was nothing wrong, but recent events have proven them wrong. The point is, if Americans cannot trust the Democrats to run a tiny post office, how can folks back home trust the Democrats to balance the budget and to tell the truth about their budget plan?

The Democrats want the American people to believe that their budget, written behind closed doors, will help the economy. But taxpayers now understand that the Democrats' budget, with the largest tax increase in American history, will not reduce the deficit but will place a heavy tax burden on working families, small businesses, and the retired.

Mr. Speaker, it is time for Congress to be honest with the American people, whether it is the House post office scandal or the budget; folks back home deserve to know the truth, they expect no less.

## FOREIGN AID: THE SACRED COW

(Mr. TRAFICANT asked and was given permission to address the House for 1 minute and to revise and extend his remarks.)

---

□ This symbol represents the time of day during the House proceedings, e.g., □1407 is 2:07 p.m.

Matter set in this typeface indicates words inserted or appended, rather than spoken, by a Member of the House on the floor.

AUTHENTICATED
U.S. GOVERNMENT
INFORMATION
GPO

Mr. TRAFICANT. Mr. Speaker, what tax will it be: Btu tax, fuel tax, corporate taxes?

Once again Americans are being asked to bite the bullet, but who is kidding whom? This year we passed another $15 billion foreign aid bill. $15 billion in foreign aid is equal to a 15-cents-per-gallon fuel tax or the entire Btu tax of this President.

But the truth is foreign aid is a sacred cow and Congress would rather pass taxes on you, the American people, than cut that sacred cow in foreign aid.

I am saying that Congress is right now robbing from Peter to pay Paul, and it does not stop there. Now they are paying Boris and everybody else all over the world.

I am saying it is time to stop this madness. Congress should be ashamed of themselves for continuing to tax the American people and give it away overseas.

━━━━━━━━

DEMOCRATIC        LEADERSHIP STONEWALLED ON THE HOUSE POST OFFICE SCANDAL

(Mr. SANTORUM asked and was given permission to address the House for 1 minute and to revise and extend his remarks.)

Mr. SANTORUM. Mr. Speaker, on Monday the postmaster, the former postmaster of the House, pled guilty to actions that took place in the House post office, not just in the last couple of years, having to do with embezzlement, but things having to do with 15 years ago. Fifteen years, there has been illegal activity being conducted in the House post office, and all that time the Democratic leadership stonewalled. Reports came out, stonewalled; they slammed the door, barricaded the door, and they said, "No, there is nothing wrong."

We would knock, and they would say, "Nobody is home." And we would walk away. We would knock again, and they would say, "Oh, nobody is home," and we would walk away.

Mr. Speaker, it is time to break down the doors, let the people see what was going on, not just in the post office, ladies and gentlemen, but what was going on in the Speaker's office to continue to cover this scandal up for 15 years. It is time to break down the doors and disclose the information.

━━━━━━━━

□ 1010

SMALL BUSINESS WILL BENEFIT FROM CLINTON PLAN

(Mr. SKAGGS asked and was given permission to address the House for 1 minute and to revise and extend his remarks.)

Mr. SKAGGS. Mr. Speaker, they are at it again. The princes of privilege and the dukes of distortion are trying to scare the American people—this time telling them that the Clinton economic plan hurts small businesses. Nice rhetoric—but far from the truth.

They say that the Clinton plan is bad for the economy. The fact is that the markets have given Clinton a strong vote of confidence—interest rates have fallen to their lowest level in 20 years. And 1 million new jobs have been created since January.

They claim the Clinton plan will stunt the growth of small businesses. The truth is that the President's plan includes incentives targeted specifically to help small businesses invest, grow and prosper. There is a capital gains tax cut for smaller firms; a doubling of the amount of new equipment that can be expensed in the first year; and a host of other expensed provisions that will help small businesses invest in both plant and people.

Clinton's critics do not want you to know about that. Instead, they rant and rave—saying that mom and pop operations are going to be taxed out of business. Again, let us look at the truth. Only 4.3 percent—that's right 4.3 percent—of small business people will see their taxes go up under the Clinton plan.

They don't tell you that. Why? They don't want you to know that those very few small business owners whose taxes will go up are those making, on average, over half a million dollars a year—the same folks still benefiting from the tremendous tax breaks they got during the Reagan-Bush years. Yes indeed, the Clinton plan demands that they start paying their fair share.

With all their misleading talk about what the Clinton plan does, you have to wonder, who are the Republicans really trying to protect?

━━━━━━━━

THE TAX KILLER

(Mr. KINGSTON asked and was given permission to address the House for 1 minute and to revise and extend his remarks.)

Mr. KINGSTON. Mr. Speaker, Jerry Clower has a story about Eugene and Clem going coon hunting. Clem chases what he thinks is a raccoon up a tree, only to find it is a bobcat. Immediately they start wrestling, tussling, scratching, and fighting.

Finally Clem hollers down to Eugene, "Gene, shoot this thing. It's killing me."

Gene hollers back, "I can't get a fix on him, Clem."

Gene says, "Well, just shoot up here amongst us. One of us needs some relief."

Mr. Speaker, that bobcat is taxes and Gene and Clem are our constituents. They need some relief. They have been wrestling, fighting, scratching, with this thing called taxes for too long.

The President was elected on the promise of a middle-class tax cut, not a tax increase.

Every weekend that I go home, they holler to me, "Give me some relief. I can't stand these taxes, but they go up and up."

Mr. Speaker, let us give them that relief, because they are going to pull the trigger in November 1994. Let us not fool ourselves with rhetoric now. Folks know a tax increase when they see one, small businesses, working people included.

Mr. Speaker, let us vote "no" on higher taxes. Give them some relief.

━━━━━━━━

SMALL BUSINESS

(Ms. SHEPHERD asked and was given permission to address the House for 1 minute and to revise and extend her remarks.)

Ms. SHEPHERD. Mr. Speaker, Americans need to know that reducing the deficit means business—and especially small business.

Let us talk about the details of the President's deficit reduction package. The plan doubles the equipment writeoff for small business investment. The bill cuts the capital gains tax in half for investment in new, high-technology businesses. The bill extends the deduction for health insurance premiums for the self-employed retroactively.

As the former owner of a small business, I know these policies will help. I know it matters that 96 percent of all small businesses will be free of any tax increases. The Wall Street Journal says opponents of this plan have deliberately misled the American people. This is a time to lead, not mislead. Studies show these provisions will create 200,000 new small business jobs—just the shot in the arm our economy needs.

I urge my colleagues to break the gridlock on Capitol Hill and support the President's deficit reduction plan. It is a vote for small business, not business as usual.

━━━━━━━━

CUT RADIO FREE EUROPE

(Mr. KLUG asked and was given permission to address the House for 1 minute and to revise and extend his remarks.)

Mr. KLUG. Mr. Speaker, I and a number of my colleagues were frustrated yesterday because we were never allowed to offer an amendment on this floor to cut 15 percent out of the operating budget of Radio Free Europe and Radio Free Liberty, because we were told that $32 million in cuts would devastate an agency that obviously did good work throughout the cold war, but I and a number of other people think is now in many ways an outdated relic.

Consider these facts this morning in the Washington Post. It turns out that the president of the Munich-based operation receives $316,000 in salary, including a $52,000 post allowance for living

expenses and payment of German taxes.

The director of Radio Free Europe receives a package worth $318,000 and the personnel director gets a package worth $232,000.

At a time of $400 billion deficits, we are spending $250 million a year telling the people of Russia what they already know, that Soviet rule was miserable.

It is time to get serious about the deficit and cut Radio Free Europe and cut these exorbitant salaries.

---

## MISREPRESENTATIONS ABOUT THE ECONOMY

(Mr. HOAGLAND asked and was given permission to address the House for 1 minute and to revise and extend his remarks.)

Mr. HOAGLAND. Mr. Speaker, we have been hearing an enormous amount of rhetoric and misrepresentations from groups like the Citizens for a Sound Economy and others about the reconciliation bill before the conference committee and how it is bad for small business.

Well, I commend to your attention an article written yesterday in the Wall Street Journal with the headline, "Foes of Clinton's Tax Boost Proposals Mislead the Public and Firms on Small Business Aspect."

Now, my colleagues have already talked this morning about increasing the expensing for small businesses, more than doubling it, about the targeted capital gains tax relief that was in the House bill; but you know, when it comes right down to it, the most important thing of all that the Clinton proposal does for small business is to keep interest rates low. The prime rate is lower now than it has been in 25 years.

I talked to a constituent from Omaha yesterday who just got a 15-year mortgage for 6¾ percent. That is what is important about this package.

---

## TRIBUTE TO THE LATE MIKE WALDMAN OF NEWSDAY

(Mr. LAZIO asked and was given permission to address the House for 1 minute and to revise and extend his remarks.)

Mr. LAZIO. Mr. Speaker, being a newcomer to this institution can be a daunting experience. Yet, from the start, Mike Waldman of Newsday reached out to me with a genuine desire to be helpful. And helpful he was. I am deeply saddened by his death on Monday.

Mike was always there when I had questions about how things really worked in this crazy town and in this unique institution. His sage advise reflected not only his many years of journalistic experience, it also reflected his innate political sachel [common sense]. I will miss his counsel very much, but I will miss his friendship even more.

In a world with so many out for No. 1 and willing to step on others in order to boost themselves, it was refreshing to know Mike Waldman who gave so much and yet asked for nothing in return. In an environment where adversarial relations between the press and politicians are the norm, and the two groups generally view each other with suspicion, if not contempt, Mike Waldman stood above it all.

Mr. Speaker, here were two people from very different worlds—Mike having covered Presidential campaigns and other important political happenings for decades, and me, a brandnew Member of Congress. It was an odd couple that emerged at the end of one career and, perhaps, the beginning of another.

I wish I could find more eloquent words to describe the person behind the name and face. To be able to pick up the phone and just talk and be absolutely honest with each other—that is what I will miss the most about Mike Waldman.

---

## REBUILDING THE ASYLUM SYSTEM

(Mr. MAZZOLI asked and was given permission to address the House for 1 minute and to revise and extend his remarks.)

Mr. MAZZOLI. Mr. Speaker, we cannot expect a pickup to carry the weight a dump truck can carry. Pretty soon the pickup breaks down and has to be rebuilt. That is exactly the analogy for our current asylum system. It has been asked to bear too heavy a load. It has broken down and needs to be rebuilt.

A bill, H.R. 2602, was introduced by the gentleman from Kentucky, along with his colleagues and his friends, the gentleman from New York [Mr. SCHUMER] and the gentleman from Florida [Mr. McCOLLUM] that would in fact rebuild and revitalize the asylum system so it is there to grant asylum protection from persecutions to those who deserve it, but to deny that same protection to the people who do not deserve it.

The section of the bill authorized by the gentleman from New York [Mr. SCHUMER] deals primarily with keeping people out of the United States who are attempting to travel with fraudulent papers. The section of the gentleman from Florida [Mr. McCOLLUM] would provide an expedited but fair hearing for those who plead asylum when they reach this shore. And, my part of the bill would make general changes in the asylum law to reduce the lengthy, almost interminable, hearings and appeals of today's law.

Once again, Mr. Speaker, the asylum system is broken and we have to fix it.

---

## THE BYRD RULE

(Mr. EWING asked and was given permission to address the House for 1 minute and to revise and extend his remarks.)

Mr. EWING. Mr. Speaker, leading House negotiators on the tax bill conference committee are looking for ways to dump the other body's Byrd rule. The Byrd rule prohibits the bill from containing items which do not directly reduce the deficit.

The President and House Democrats have been working hard to convince the American people that this massive tax increase bill is a deficit reduction package. If this is the case, why are we afraid of the Byrd rule? If our No. 1 goal is to reduce the deficit, we should have no problems with the Byrd rule.

The forceful reaction of House Democrat leaders against the Byrd rule makes me wonder just what they intend to tuck away in the tax bill during their secret meetings. And it really makes me wonder whether they are as committed to deficit reduction, as they profess.

Mr. Speaker, the Byrd rule could actually force Congress to keep its promise of passing a deficit reduction bill. Maybe that is why Democrats are trying to kill the Byrd rule.

---

□ 1020

## A SURGEON GENERAL WHO TALKS SENSE IS THE RIGHT WOMAN FOR THE JOB

(Mrs. KENNELLY asked and was given permission to address the House for 1 minute and to revise and extend her remarks.)

Mrs. KENNELLY. Mr. Speaker, yesterday I met an exceptional woman. When this individual was first nominated for a high position in our new administration, I was impressed by her résumé. But what I was truly excited about was the philosophy which this woman presented. This was an individual that talked sense when she talked about choice and the right of women to have that choice. She also talked about the fact that every child born should be a wanted child. She talked with eloquence about the important issue that children should not be having children.

Mr. Speaker, this woman's name is Dr. Joycelyn Elders. She is a woman with experience; she is a woman that can talk about the fact that we have children in this country that need health care, and we have to do something about it.

Dr. Joycelyn Elders is the right woman for a very important job, Surgeon General, and I certainly hope those in the other body see fit to let us have, this country have, the help of this marvelous, exceptional woman, Dr. Joycelyn Elders.

---

## THERE THEY GO AGAIN

(Mr. DeLAY asked and was given permission to address the House for 1 minute.)

# EXHIBIT I

Coalition for Humane Immigrant Rights, et al. v. Noem et al., 1:25-cv-00872 (JMC)

108 STAT. 1796    PUBLIC LAW 103–322—SEPT. 13, 1994

### Public Law 103–322
### 103d Congress

## An Act

To control and prevent crime.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

Sept. 13, 1994

[H.R. 3355]

Violent Crime Control and Law Enforcement Act of 1994. Inter-governmental relations. 42 USC 13701 note.

### SECTION 1. SHORT TITLE.

This Act may be cited as the "Violent Crime Control and Law Enforcement Act of 1994".

### SEC. 2. TABLE OF CONTENTS.

The following is the table of contents for this Act:

Sec. 1. Short title.
Sec. 2. Table of contents.

#### TITLE I—PUBLIC SAFETY AND POLICING

Sec. 10001. Short title.
Sec. 10002. Purposes.
Sec. 10003. Community policing; "Cops on the Beat".

#### TITLE II—PRISONS

##### Subtitle A—Violent Offender Incarceration and Truth in Sentencing Incentive Grants

Sec. 20101. Grants for correctional facilities.
Sec. 20102. Truth in sentencing incentive grants.
Sec. 20103. Violent offender incarceration grants.
Sec. 20104. Matching requirement.
Sec. 20105. Rules and regulations.
Sec. 20106. Technical assistance and training.
Sec. 20107. Evaluation.
Sec. 20108. Definitions.
Sec. 20109. Authorization of appropriations.

##### Subtitle B—Punishment for Young Offenders

Sec. 20201. Certain punishment for young offenders.

##### Subtitle C—Alien Incarceration

Sec. 20301. Incarceration of undocumented criminal aliens.

##### Subtitle D—Miscellaneous Provisions

Sec. 20401. Prisoner's place of imprisonment.
Sec. 20402. Prison impact assessments.
Sec. 20403. Sentences to account for costs to the Government of imprisonment, release, and probation.
Sec. 20404. Application to prisoners to which prior law applies.
Sec. 20405. Crediting of "good time".
Sec. 20406. Task force on prison construction standardization and techniques.
Sec. 20407. Efficiency in law enforcement and corrections.
Sec. 20408. Amendments to the Department of Education Organization Act and the National Literacy Act of 1991.
Sec. 20409. Appropriate remedies for prison overcrowding.
Sec. 20410. Congressional approval of any expansion at Lorton and congressional hearings on future needs.


AUTHENTICATED U.S. GOVERNMENT INFORMATION GPO

### SEC. 130009. PASSPORT AND VISA OFFENSES PENALTIES IMPROVEMENT.

(a) IN GENERAL.—Chapter 75 of title 18, United States Code, is amended—

(1) in section 1541 by striking "not more than $500 or imprisoned not more than one year" and inserting "under this title, imprisoned not more than 10 years";

(2) in each of sections 1542, 1543, and 1544 by striking "not more than $2,000 or imprisoned not more than five years" and inserting "under this title, imprisoned not more than 10 years";

(3) in section 1545 by striking "not more than $2,000 or imprisoned not more than three years" and inserting "under this title, imprisoned not more than 10 years";

(4) in section 1546(a) by striking "five years" and inserting "10 years";

(5) in section 1546(b) by striking "in accordance with this title, or imprisoned not more than two years" and inserting "under this title, imprisoned not more than 5 years"; and

(6) by adding at the end the following new section:

### "§ 1547. Alternative imprisonment maximum for certain offenses

"Notwithstanding any other provision of this title, the maximum term of imprisonment that may be imposed for an offense under this chapter (other than an offense under section 1545)—

"(1) if committed to facilitate a drug trafficking crime (as defined in 929(a)) is 15 years; and

"(2) if committed to facilitate an act of international terrorism (as defined in section 2331) is 20 years.".

(b) TECHNICAL AMENDMENT.—The chapter analysis for chapter 75 of title 18, United States Code, is amended by adding at the end the following new item:

"1547. Alternative imprisonment maximum for certain offenses.".

### SEC. 130010. ASYLUM.

(a) FINDINGS.—The Senate finds that—

(1) in the last decade applications for asylum have greatly exceeded the original 5,000 annual limit provided in the Refugee Act of 1980, with more than 150,000 asylum applications filed in fiscal year 1993, and the backlog of cases growing to 340,000;

(2) this flood of asylum claims has swamped the system, creating delays in the processing of applications of up to several years;

(3) the delay in processing asylum claims due to the overwhelming numbers has contributed to numerous problems, including—

(A) an abuse of the asylum laws by fraudulent applicants whose primary interest is obtaining work authority in the United States while their claim languishes in the backlogged asylum processing system;

(B) the growth of alien smuggling operations, often involving organized crime;

(C) a drain on limited resources resulting from the high cost of processing frivolous asylum claims through our multilayered system; and

(D) an erosion of public support for asylum, which is a treaty obligation.

(4) asylum, a safe haven protection for aliens abroad who cannot return home, has been perverted by some aliens who use asylum claims to circumvent our immigration and refugee laws and procedures; and

(5) a comprehensive revision of our asylum law and procedures is required to address these problems.

(b) POLICY.—It is the sense of the Senate that—

(1) asylum is a process intended to protect aliens in the United States who cannot safely return home;

(2) persons outside their country of nationality who have a well-founded fear of persecution if they return should apply for refugee status at one of our refugee processing offices abroad; and

(3) the immigration, refugee and asylum laws of the United States should be reformed to provide—

(A) a procedure for the expeditious exclusion of any asylum applicant who arrives at a port-of-entry with fraudulent documents, or no documents, and makes a noncredible claim of asylum; and

(B) the immigration, refugee and asylum laws of the United States should be reformed to provide for a streamlined affirmative asylum processing system for asylum applicants who make their application after they have entered the United States.

# TITLE XIV—YOUTH VIOLENCE

### SEC. 140001. PROSECUTION AS ADULTS OF CERTAIN JUVENILES FOR CRIMES OF VIOLENCE.

The 4th undesignated paragraph of section 5032 of title 18, United States Code, is amended by striking "; however" and inserting ". In the application of the preceding sentence, if the crime of violence is an offense under section 113(a), 113(b), 113(c), 1111, 1113, or, if the juvenile possessed a firearm during the offense, section 2111, 2113, 2241(a), or 2241(c), 'thirteen' shall be substituted for 'fifteen' and 'thirteenth' shall be substituted for 'fifteenth'. Notwithstanding sections 1152 and 1153, no person subject to the criminal jurisdiction of an Indian tribal government shall be subject to the preceding sentence for any offense the Federal jurisdiction for which is predicated solely on Indian country (as defined in section 1151), and which has occurred within the boundaries of such Indian country, unless the governing body of the tribe has elected that the preceding sentence have effect over land and persons subject to its criminal jurisdiction. However".

### SEC. 140002. COMMENCEMENT OF JUVENILE PROCEEDING.

Section 5032 of title 18, United States Code, is amended by striking "Any proceedings against a juvenile under this chapter or as an adult shall not be commenced until" and inserting "A juvenile shall not be transferred to adult prosecution nor shall a hearing be held under section 5037 (disposition after a finding of juvenile delinquency) until".

# EXHIBIT J

## AEDPA / IIRIRA Timeline

| Date | AEDPA-Related Events | | IIRIRA-Related Events | |
|------|------------------------------|------------------|------------------------------|------------------|
| | **House of Representatives** | **Senate** | **House of Representatives** | **Senate** |
| **1/24/95** | | | | Introduction of S. 269, the "Immigrant Control and Financial Responsibility Act of 1995" |
| **3/14/95** | | | | Senate Judiciary Committee hearing on S. 269 |
| **4/6/95** | House Judiciary Committee hearing on "International Terrorism: Threats and Responses" | | | |
| **4/19/95** | Oklahoma City Bombing | | | |
| **4/27/95** | | Introduction of S. 735, the "Comprehensive Terrorism Prevention Act of 1995" | | |
| **5/25/95** | Introduction of H.R. 1710, the "Comprehensive Antiterrorism Act of 1995" | | | |
| **5/27 – 6/7/95** | | Senate Floor consideration and passage of S. 735 | | |
| **6/8/95** | | | | Senate Immigration Subcommittee markup of S. 269 |
| **6/12 – 6/13/95** | House Judiciary Committee hearings on H.R. 1710 | | | |
| **6/14/95** | | | | Senate Immigration Subcommittee markup of S. 269 |

| Date | AEDPA-Related Events | | IIRIRA-Related Events | |
|---|---|---|---|---|
| | House of Representatives | Senate | House of Representatives | Senate |
| **6/14 – 6/16/95** | House Judiciary Committee markup of H.R. 1710 | | | |
| **6/20/95** | House Judiciary Committee markup of H.R. 1710 | | | |
| **6/22/95** | | | Introduction of H.R. 1915, the "Immigration in the National Interest Act of 1995" | |
| **6/29/95** | | | House Immigration Subcommittee hearing on H.R. 1915 | |
| **7/13/95** | | | House Immigration Subcommittee markup of H.R. 1915 | |
| **7/17 – 7/20/95** | | | House Immigration Subcommittee markup of H.R. 1915 | |
| **8/4/95** | | | Introduction of H.R. 2202. the "Immigration Control and Financial Responsibility Act of 1996" with relevant text of H.R. 1915 | |
| **9/19 – 10/24/95** | | | House Judiciary Committee markup of H.R. 2202 | |
| **12/5/95** | House Judiciary Committee files its committee report on H.R. 1710, H. Rept. 104-383 (1995) and H.R. 2703 is introduced with the reported version of H.R. 1710 | | | |

| Date | AEDPA-Related Events | | IIRIRA-Related Events | |
|---|---|---|---|---|
| | House of Representatives | Senate | House of Representatives | Senate |
| **2/29/96** | | | | Senate Judiciary Committee markup of S. 269 |
| **3/4/96** | | | House Judiciary Committee files its committee report on H.R. 2202, H. Rept. 104-469 (1996) | |
| **3/7/96** | | | | Senate Judiciary Committee markup of S. 269 |
| **3/13 – 3/14/96** | House Floor consideration of H.R. 2703 and passage as S. 735 | | | Senate Judiciary Committee markup of S. 269 |
| **3/19 – 3/21/96** | | | House Floor consideration and passage of H.R. 2202 | |
| **3/20 – 3/21/96** | | | | Senate Judiciary Committee markup of S. 269 and vote to report bill as S. 1664 |
| **4/10/96** | | | | Senate Judiciary Committee files its committee report on S. 1664, S. Rept. 104-249 (1996) |
| **4/15/96** | Conference Committee files H.R. Conf. Rept. 104-518 (1996) for S. 735, the "Antiterrorism and Effective Death Penalty Act of 1996" | | | |
| **4/15 – 4/16/96** | | | | Senate Floor consideration of S. 1664 |

3

| Date | AEDPA-Related Events | | IIRIRA-Related Events | |
|---|---|---|---|---|
| | House of Representatives | Senate | House of Representatives | Senate |
| 4/16 – 4/17/96 | | Senate Floor consideration and adoption of the conference report for S. 735 | | |
| 4/18/96 | House Floor consideration and adoption of the conference report for S. 735 | | | |
| 4/24/96 | **AEDPA signed into law** | | | |
| 4/24 – 5/2/96 | | | | Senate Floor consideration of S. 1664 and passage as H.R. 2202 |
| 9/24/96 | | | Conference Committee files H.R. Conf. Rep. No. 104-828 (1996) for H.R. 2202, the "Illegal Immigration Reform and Immigrant Responsibility Act of 1996" | |
| 9/25/96 | | | House Floor consideration and adoption of the conference report for H.R. 2202 | |
| 9/28/96 | | | House passes H.R. 3610, the "Omnibus Consolidated Appropriations Act, 1997," containing the conference report version of H.R. 2202 | |
| 9/30/96 | | | | Senate passes H.R. 3610; **IIRIRA signed into law** |

# AEDPA / IIRIRA 1995 Timeline



AEDPA-related events     IIRIRA-related events

Apr. 19:
Oklahoma City Bombing

Apr. 27:
Intro of
S. 735

May 27 – June 7:
Senate Floor
consideration and
passage of S. 735

Apr. 6:
HJC hearing on
"Int'l Terrorism:
Threats and
Responses"

May 25:
Intro of
H.R. 1710

June 12 – 13:
HJC
hearings on
H.R. 1710

June 14 – 16:
HJC markup
of H.R. 1710

June 20:
HJC markup
of H.R. 1710

Dec. 5:
HJC files H.R. 1710
committee report and H.R.
2703 introduced with HJC-
reported text of H.R. 1710

Jan.     Feb.     Mar.     Apr.     May     June     July     Aug.     Sep.     Oct.     Nov.     Dec.

June 22:
Intro of
H.R. 1915

July 13:
HIS hearing
on H.R.1915

July 13:
HIS markup
of H.R.1915

July 17 – 20:
HIS markup
of H.R.1915

Aug 4:
Intro of H.R.
2202 with
relevant text
of H.R.1915

Sep. 19 – Oct. 24:
HJC markup
of H.R. 2202

Jan. 24:
Intro of
S. 269

Mar. 14:
SJC hearing
on S. 269

June 8:
SIS markup
of S. 269

June 14:
SIS markup
of S. 269

House Immigration Subcommittee ("**HIS**")
House Judiciary Committee ("**HJC**")
Senate Immigration Subcommittee ("**SIS**")
Senate Judiciary  Committee ("**SJC**")

# AEDPA / IIRIRA 1996 Timeline



**AEDPA-related events**    **IIRIRA-related events**

Apr. 15: S. 735 Conference Report filed

Apr. 16 – 17: Senate Floor consideration and passage of S. 735

Apr. 24: AEDPA signed into law

Mar. 13 – 14: House Floor consideration and passage of H.R. 2703 as S. 735

Apr. 18: House Floor consideration and passage of S. 735

Jan.  Feb.  Mar.  Apr.  May  June  July  Aug.  Sep.  Oct.  Nov.  Dec.

Mar. 4: HJC files H.R. 2202 committee report

Mar. 19 – 21: House Floor consideration and passage of H.R. 2202

Sep. 24: H.R. 2202 Conference Report filed

Sep. 25: House Floor consideration and passage of H.R. 2202

Sep. 28: House consideration and passage of H.R. 3610 containing H.R. 2202 text

Feb. 29: SJC markup of S. 269

Mar. 7: SJC markup of S. 269

Mar. 13 – 14: SJC markup of S. 269

Mar. 20 – 21: SJC markup of S. 269 and vote to report bill as S. 1664

Apr. 10: SJC files S. 1664 committee report

Apr. 15 – 16: Senate Floor consideration S. 1664

Apr. 24 – May 2: Senate Floor consideration and passage of S. 1664 as H.R. 2202

Sep. 30: Senate consideration and final of H.R. 3610: IIRIRA signed into law

House Immigration Subcommittee ("**HIS**")
House Judiciary Committee ("**HJC**")
Senate Immigration Subcommittee ("**SIS**")
Senate Judiciary  Committee ("**SJC**")

# EXHIBIT K

Coalition for Humane Immigrant Rights, et al. v. Noem et al., 1:25-cv-00872 (JMC)

STENOGRAPHIC MINUTES
Unrevised and Unedited
Not for Quotation or
Duplication

Original

DCMN MAYER

MARKUP OF H.R. 1710, THE COMPREHENSIVE
ANTITERRORISM ACT OF 1995

Wednesday, June 14, 1995

House of Representatives,
Committee on the Judiciary,
Washington, D.C.

## Committee Hearings

### of the

## U.S. HOUSE OF REPRESENTATIVES



OFFICE OF THE CLERK
Office of Official Reporters

1    RPTS BLAZEJEWSKI

2    DCMN MAYER

3

4

5    MARKUP OF H.R. 1710, THE COMPREHENSIVE

6    ANTITERRORISM ACT OF 1995

7

8    Wednesday, June 14, 1995

9

10    House of Representatives,

11    Committee on the Judiciary,

12    Washington, D.C.

13

14    The committee met, pursuant to call, at 10:27 a.m., in

15    Room 2141, Rayburn House Office Building, Hon. Henry J. Hyde

16    [chairman of the committee] presiding.

17    Present: Representatives Hyde, Moorhead, Sensenbrenner,

18    McCollum, Gekas, Coble, Gallegly, Canady, Inglis, Goodlatte,

19    Buyer, Hoke, Bono, Heineman, Bryant of Tennessee, Chabot,

20    Flanagan, Barr, Conyers, Schroeder, Frank, Schumer, Berman,

21    Boucher, Bryant of Texas, Reed, Nadler, Scott, Watt, Becerra,

22    Serrano, Lofgren, and Jackson Lee.

23    Staff Present: Alan Coffey, General Counsel; Tom

24    Smeeton, Administrator; Patrick Murray, Counsel; Joseph

25    Gibson, Counsel; Peter Levinson, Counsel; Dan Freeman,

1    Parliamentarian; Sam Stratman, Press Secretary; Paul McNulty,

2    Counsel, Glenn Schmitt, Counsel; Dan Bryant, Assistant

3    Counsel; Cordia Strom, Counsel; and Edward Grant, Counsel.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  known they would not be deported.  A whole variety of

2  reasons.

3  The exclusionary hearing does not provide for counsel.

4  There is no appeal.  There are no witnesses.  It is not public

5  and there is a place for that and I am not suggesting that

6  there not be, but this could be millions of people.  It is

7  over broad.  It has nothing to do with terrorism and I think

8  it is of dubious constitutionality since the Supreme Court has

9  indicated many times that people who have lived here in some

10 cases for 20 or 30 years have some due process that

11 exclusionary hearings do not meet and so I would recommend

12 that this section be deleted and I reserve the balance of my

13 time.

14 Chairman Hyde.  I thank the gentlelady and the Chair

15 would express his opposition to the gentlelady's amendment.

16 The revision of the entry doctrine is certainly long overdue.

17 Section 623 in our bill eliminates one incentive to illegal

18 immigration and that is the ability of those who evade our

19 border controls to gain certain rights in the immigration

20 system that make it more difficult to remove them from the

21 country.

22 We agree that this issue conserves a fuller treatment and

23 we expect that this will occur in the context of the

24 immigration legislation soon to be introduced, I think, on

25 Thursday by the Chairman of our Subcommittee on Immigration

1   and claims Mr. Lamar Smith, but in the interim Section 623 in
2   the bill proper should be retained in this legislation as an
3   expression of our resolve to end incentives to illegal
4   immigration that can be taken advantage of by terrorists.

5       Now, section 623 of the bill, which the gentlelady seeks
6   to strike, addresses the anomalous situation under current law
7   of extending special protection to aliens found within the
8   United States who succeeded in crossing our borders
9   illegally.  Inexplicably, we extend special procedural
10  safeguards and offer possible discretionary relief to such
11  aliens, safeguards and relief that are not available to the
12  individuals seeking entry.

13      Such preferential treatment for law violators is
14  inconsistent with our national values and section 623 in the
15  bill, again, which the gentlelady seeks to strike
16  appropriately provides that an individual found for the U.S.
17  who has not been admitted legally shall be treated as seeking
18  entry and shall be subject to the exclusion processes
19  applicable to those seeking entry and so with regret, I must
20  oppose the gentlelady's amendment.

21      The gentleman from Virginia is recognized for five
22  minutes.

23      Mr. Goodlatte.  Thank you, Mr. Chairman.  I concur with
24  the Chairman's assessment and I, too, must join in opposition
25  to this amendment.  Quite frankly, I have never understood how

1   someone who enters the country illegally without inspection

2   could accord themselves additional benefits that somebody who

3   was attempting to comply with the law and enter the United

4   States by presenting themselves for inspection could not

5   obtain.  This is not the circumstance of somebody who has

6   cleared the process of entering the country legally and are in

7   the midst of changing their status from one legal status to

8   another or whose status has even expired.

9       They are all entitled to some greater inspection in the

10  process.  However, I do not think that somebody who has simply

11  entered the country without documentation without going

12  through the admissions process should be entitled to any more

13  standards than an individual who is already --

14      Ms. Lofgren.  Would the gentleman yield?

15      Mr. Goodlatte.  I yield to the gentlewoman from

16  California.

17      Ms. Lofgren.  I thank you and I will disagree.  I am

18  hopeful that will garner bipartisan support.  There is a whole

19  body of law out of the Supreme Court that indicates that

20  people who have entered unlawfully who have been here for a

21  substantial period of time do have due process rights, and we

22  can have that discussion and I understand we will have the

23  discussion promptly with the revision of the Immigration Act

24  before us.

25      I think it would be a mistake and will also lose

1  bipartisan support if we stick this provision that is
2  basically unrelated to terrorism since the two provisions
3  directly preceding it are related to those who would have been
4  excludable because of terrorist activity, it would be a
5  mistake to insist that it be taken up in this bill, especially
6  if we were going to have within a few weeks the same provision
7  in the Immigration Act and we can have some hearings on
8  whether we have the ability to alter the due process
9  requirements that the court says is attached to individuals
10 and just to make a counter argument, in some cases these are
11 people who have been living and paying taxes in the United
12 States for 20 or 30 years who have U.S. citizen spouses and
13 children and that is why the court has initially gotten into
14 the due process issues, but I just think it is the wrong time
15 and place and if this were to remain in the bill, has the
16 potential of creating a constitutional issue that none of us
17 want in a bill that should move forward.

18     Mr. Goodlatte.  Reclaiming my time, let me first say that
19 it does have implications in situations involving terrorism.
20 We took this up during the hearing yesterday and that is the
21 situation where there is no ability on the part of the
22 government to take prosecutorial action related to suspected
23 terrorist activities, but for which they do not have
24 sufficient evidence to act in that regard and I think it is
25 entirely appropriate for the Immigration Service to have the

ability to exclude people on that basis.

I do, however, also agree with the Chairman's assessment that there should be no distinction drawn and I would point out in a case of an individual who is married to a United States citizen, they do have other rights and protections that they can avail themselves of, including the requirement that if they entered the country illegally, they were at some point during that 20 years supposed to have gone out of the country to adjust their status and come back in again. This would in no way deprive them of still having that right to do that. However, I do not see that we should have something built into the law that would create an incentive for people to bypass what is the proper procedure for presenting themselves for admission and effectively saying to the person who does comply with the law that you have fewer rights than somebody who has not complied with the law. That is my concern about this.

That theme runs throughout our immigration law and this is a good step to correct it, I believe. The gentleman from California.

Chairman Hyde. The gentlelady has been recognized. The gentleman from California will be recognized if you wish to yield to the gentlelady.

Ms. Lofgren. If I may, I understand the issue and, frankly, I am queasy about the two provisions that precede the section I am suggesting that we delete, but those would allow

**148**

1   with a very loose standard of proof, without right to counsel

2   in a nonpublic proceeding exclusion of individuals who are

3   suspected of terrorism activity that I think more than

4   adequately deals with the issue brought out in the hearing

5   yesterday.

6   What we are talking about here is fundamental change that

7   affects potentially millions of people that have nothing to do

8   with terrorism.  You and I in the end may disagree on what

9   should happen on this issue.  But I think it would be a

10  terrible shame to mix in that argument about a fundamental

11  change in the immigration laws of the United States where a

12  terrorism bill, when it doesn't really belong here, I think we

13  ought to delete it and save that argument for another time

14  that I think will be here in a few weeks if the Chairman, if I

15  am understanding him correctly.

16  Mr. Berman.  Just to reclaim my time.

17  Chairman Hyde.  All right.  The gentleman who was very

18  generous yielding his time is recognized for such time as he

19  may have left.

20  Mr. Berman.  And I support the gentlelady's position.  It

21  is probably true that there are higher percentage of

22  terrorists among the population of people who have come here

23  illegally than in the population of people who have not come

24  here illegally.  It is probably true that there is a higher

25  percentage of terrorists along the male population than the

1  female population. There are a lot of generalizations that we

2  can make, but the gentlelady is correct. This particular

3  provision, which is a very significant change in the law is

4  unconnected with whether or not the person involved is a

5  suspected terrorist, a plausible terrorist, a profile of a

6  terrorist.

7  It has no relationship whatsoever to the base subject of

8  the bill and it makes a funny, different distinction, which is

9  if, as I understand it, if you come here on a tourist visa and

10  spend your three months and then stay and don't go back, this

11  provision doesn't affect you. If you cross the border

12  illegally, this provision does affect you.

13  I can't think for the life of me why there is that kind

14  of a distinction. The fact is, by and large, if it is not the

15  general -- I have no quarrel with the notion of summary

16  exclusion of people who came here illegally except those very

17  rare instances where we have recognized a right to stay here.

18  The person, in fact, didn't go through the correct process,

19  but has a well-founded fear of persecution all of a sudden,

20  all of the traditional asylee protections are zippo, gone as a

21  result of this amendment. This amendment.

22  We have to do something about this problem. People have

23  misused the ability -- the protection in the deportation

24  process and backed up the system and wrongfully. We have to

25  correct that. I do believe the immigration proposal is the

right place to do it.  This isn't related to terrorism as the
gentlelady mentioned.  And I think there are -- there are
going to be some cases here where some real terrible abuse is
going to be done by virtue of this change and I just wonder
why we need it.

    Mr. Goodlatte.  Would the gentleman yield?

    Mr. Berman.  I would be happy to yield to the gentleman.

    Mr. Goodlatte.  I thank the gentleman for yielding.
First of all, the distinction between somebody who chooses to
come here legally and then stays, they have submitted
themselves to the inspection process at least once to give the
law enforcement authorities of this country the opportunity to
determine whether or not they are a desirable person to admit
to the country.  The person who has bypassed that process has
never done that.

    Secondly, just by invoking this section does not deprive
that individual the right, as any person who is subject to
examination seeking entry admission, to raise an asylum claim
in returning them to their native country or another native
country would pose a risk of a well-founded fear of
persecution.  And finally, I do think it bears very much on
the issue of terrorism because the gentleman himself said that
there is far likely greater percentage of the illegal
population prone to that kind of activity than the legally
admitted population and therefore I think it is well founded.

Mr. Berman. 100th of 1 percent versus 1,000.

Mr. Gallegly. Would the gentleman yield? Is the gentleman advocating that we add those overstays as well?

Mr. Berman. I think there is a certain parity in that. Although the gentleman actually gave a logical -- I mean he did provide -- if this issue is terrorism, he provided a link because of inspection process, but I find it funny that it focused just on the people who crossed the border illegally since I don't believe this is a -- this is really an immigration reform not an antiterrorism proposal. I think the distinction between the people who crossed illegally versus the people who overstayed is a strange one.

Chairman Hyde. The question occurs on the --

Mr. Becerra. Mr. Chairman.

Chairman Hyde. The gentleman from California.

Mr. Becerra. I move to strike the last word.

Chairman Hyde. The gentleman is recognized for five minutes.

Mr. Becerra. Thank you, Mr. Chairman. I must differ with the characterizations of the difference between what we would do if this language were passed and what we have currently right now. It seems to me that we have two distinct ways of trying to remove individuals who are in this country without permission either by deporting those who are here and have proven to not have a basis to be here and by denying

Chairman Hyde. I thank the gentleman.

I would like to come to closure on this. It is an important amendment, but I want to make sure everybody understands just what is at stake.

When an alien enters illegally, illegally, a consular officer at the departure point and an INS officer at the point of entry, they are precluded from determining whether the individual falls within the terrorism ground of exclusion. That is a stealthy entrance.

Nobody gets to interview or see the person or talk to the person, and they never get to determine whether or not this person might be a terrorist. Although persons who enter after inspection may violate the terms of their admission, possibly by overstaying, at least we can observe that there has been at least one opportunity for a U.S. official to prevent entry.

Such inspection is imperfect, but it is better than nothing. Where an alien thwarts any such opportunity, we have no reason at all to extend special protections with our focus on terrorism today, we therefore have more reason to give particular attention to those who enter illegally and defer the issue of treatment of those who fall out of status to another day.

The principle of denying preferential treatment to those who enter illegally, logically has application beyond the context of terrorism. For that reason, 623, Section 623 is

not terrorist specific, although one of the major
considerations in including it in this bill is the potential
for terrorists to enter the country illegally, and then take
advantage of our laws to prolong their stays excessively and
perhaps gain discretionary relief.

So I thank the gentleman for yielding, and I urge the
defeat of the gentlelady's amendment and that we reinforce
what is in the bill, which I think is appropriate and has a
nexus with counterterrorism. Now, does anybody else seek
recognition?

If not, the question is on the gentlelady's amendment.

All those in favor say aye.

All opposed nay.

The Chair probably recognizes that the gentlelady would
like a record vote, and so the clerk will call the roll.

The Clerk. Mr. Moorhead.

Mr. Moorhead. No.

The Clerk. Mr. Moorhead votes nay.

Mr. Sensenbrenner.

Mr. Sensenbrenner. No.

The Clerk. Mr. Sensenbrenner votes nay.

Mr. McCollum.

[No response].

The Clerk. Mr. Gekas.

[No response].

1    Chairman Hyde.  Without objection, Becerra Amendments 1

2    and 2 will be considered en bloc.  The clerk will report the

3    amendments and the gentleman from California is --

4    The Clerk.  Amendments offered by Mr. Becerra,

5    page 101-103, strike section 622; and the other amendment

6    offered by Mr. Becerra is page 97-101, strike section 621.

7    Chairman Hyde.  The gentleman is recognized for five

8    minutes in support of his en bloc amendment.

9    Mr. Becerra.  Thank you, Mr. Chairman.

0    Again, these amendments deal with the issue of

1    immigration provision changes under this particular

2    legislation.  I won't belabor the point.  We have discussed

3    some of these points in previous amendments.

4    This is a bill trying to deal with terrorism.  Some of

5    the provisions under the immigration section do go beyond the

6    terrorist provisions that we have in most of the other

7    portions of the bill.  It is a sweeping change in many

8    instances, I think, under sections 622 and 621; and I believe

9    this is a little broader than perhaps we might want to do in

0    something that is considered terrorist legislation, which we

1    are trying to urgently get through both Houses and to the

2    president's signature.

3    In this case, the President in his administration's bill

23   did not propose these changes, the Senate in its bill did not

24   propose these changes, we have not yet held hearings on these

25

1    particular changes which can be sweeping in scope, and in some

2    cases -- for example, the case of section 622 where we

3    preclude things like class action lawsuits -- we actually

4    deprive individuals of significant rights; and I will mention,

5    in particular, rights that have been found to have been

6    violated in the past.  There is a case which was called the

7    ABC case where thousands of Salvadoran immigrants were found

8    to have been deprived of the rights to asylum by adjudications

9    handled by the INS in which these individuals, these

10   Salvadoran individuals, were not found to have credible claims

11   for asylum, yet after judicial review, their case was remanded

12   to the INS for further consideration.  And in fact, at this

13   stage, we are going through the process of trying to do an

14   adequate job of providing asylum relief for thousands of

15   individuals.

16   There are other circumstances which cause a great deal of

17   problem under sections 621 and 622, but again it is more that

18   we are going beyond the scope of the terrorism legislation and

19   changing things like class action review, judicial review.  In

20   the case of section 621, we are changing the standard of

21   review for well-founded fear of prosecution; for asylum

22   claims, we are changing well-founded fear to credible fear.

23   It makes it very difficult for someone who may just have

24   arrived, just have escaped persecution, to be able to make the

25   higher standard of presentation of evidence that might be

1  required under this legislation to be able to make a claim in
2  such a quick fashion; and I think in many cases we will end up
3  depriving those who have a very credible fear of persecution
4  the opportunity to escape from that persecution and escape
5  from the threat of death, so I would urge Members to consider
6  striking these provisions until we have a chance to consider
7  them.   I suspect in the next few weeks we will start
8  considering immigration reform legislation.

Mr. Sensenbrenner.  Mr. Chairman.

Chairman Hyde.  The gentleman from Wisconsin.

Mr. Sensenbrenner.  Mr. Chairman, I rise in opposition to
the Becerra amendments en bloc.

Chairman Hyde.  The gentleman is recognized for five
minutes.

Mr. Sensenbrenner.  Mr. Chairman, the provisions in this
bill relative to expedited exclusion are intended to plug a
massive loophole in our immigration laws which folks like
Sheikh Rahman have been able to exploit in order to keep
themselves in the country for a long period of time.  I think
it is important to differentiate between applicants for
political asylum, which section 621 deals with, and applicants
for refugee status, which are not dealt with in this bill
whatsoever.

When the Refugee Act of 1980 was enacted by the Congress,
it was intended to replace wholesale applications for

political asylum, and to have people who have a well-founded fear of political or religious persecution in their home country to have their cases adjudicated as applicants for refugee status in the United States, leaving the political asylum route to be a rare exception when the government was overthrown, for example, and we wanted to bring someone who had been friendly to the United States into our country. Since 1980, the whole intent of the Refugee Act of 1980 has been thwarted, and as a result, many people have abused our immigration laws by coming to this country, claiming that they want political asylum when they reach the border, and because there are no expedited procedures, being allowed in, they are told to show up at an immigration office somewhere months later.

If they do show up -- and that also is the exception rather than the rule -- and an immigration judge rules against their claim for political asylum, then they appeal forever and are able to stay in this country forever.

Now, immigration questions under our laws are much different than legal processes that deal with United States citizens. People who are aliens under our immigration laws and all of the court decisions that have flown from them are there by sufferance of the United States Government, and it seems to me that we ought to be a little less patient with those who are abusing our immigration laws, particularly

1    terrorists like Sheikh Rahman is accused of being, and that
2    provide the Immigration and Naturalization Service the
3    authority to prevent them from coming in in the first place,
4    or if they do get in and are found to be deportable, to get
5    them out of the country as quickly as possible.
6        The expedited exclusion procedures that are contained in
7    subtitle B, most of which the gentleman from California wishes
8    to strike, are intended to do that.
9        I would urge a vote in favor of expedited exclusion and a
10   vote against the Becerra amendment.  I think that the
11   antiterrorism bill is on a fast track.  The immigration reform
12   bill will not be.  I would like to get the little Dutch boy's
13   finger in the dike on the abuses of political asylum, and this
14   is the best shot of getting it signed into law, so I would
15   urge a no vote on the Becerra amendments.
16        Chairman Hyde.  The gentleman from New York, Mr. Nadler.
17        Mr. Nadler.  Mr. Chairman, I don't think there is much
18   question that our asylum procedures have been abused by some
19   people, and I don't think there is much question that our
20   present procedures for reviewing applications for asylum, for
21   judicial review and rereview, are too cumbersome, and I don't
22   think there is much question that we ought to reform those
23   procedures, make them less cumbersome, make them quicker, make
24   them more efficient, but not completely eliminate any due
25   process rights for people who may legitimately seek asylum.

1    Mr. Sensenbrenner refers to people, that we ought to be

2  less gentle with people or less tender -- I forget the word he

3  used -- with people who are abusing our system; but some of

4  these people are not abusing our system.  They may be entitled

5  to political asylum, and this amendment or this bill goes too

6  far.

7    Mr. Becerra and I prepared amendments last year, which

8  went in the middle, which said you get at least one

9  judicial -- you are entitled at one point to one judicial

10  review and to one review above the person at the airport.

11  What this amendment says is that someone who comes and applies

12  for asylum at the airport can be determined by an officer to

13  not be entitled to it, and the review of his decision is the

14  guy at the next table, the other officer.  That doesn't make

15  much sense; it provides no protection at all.

16    Frankly, one of the problems we have is that the people

17  who are most legitimately entitled to political asylum, the

18  person who really would be persecuted were he to go back home,

19  the person who fled under the guns of the East German border

20  guards or fled across the wall in East Berlin or fled from

21  some tyranny is the least likely to show up at our border with

22  proper documents duly stamped and notarized by the Gestapo or

23  the KGB or by Walter Ulbricht and the most likely to be turned

24  away right there, under this amendment; and frankly, this bill

25  simply goes a little too far.

1    Yes, we should greatly simplify what we do now, but this

2    just tears it up and says, we will make no distinctions

3    between legitimate and illegitimate applicants.

4        Mr. Moorhead.  Would the gentleman yield?

5        Mr. Nadler.  Yes.

6        Mr. Moorhead.  You know, basically the problem is this:

7    Most of the people that show up at the airport for one reason

8    or another do not have adequate documents, claim asylum, and

9    they are told to come back in two weeks.  Now in New York --

10       Mr. Nadler.  Reclaiming my time.  I am well aware of that

11   problem, sir, and they don't show up again.

12       Mr. Moorhead.  Ninety-four percent of them do not show

13   up.

14       Mr. Nadler.  Because they make no attempt.  The fact of

15   the matter is, Mr. Moorhead, we could solve this problem.

16   Last year I had all the statistics.  I don't remember them; I

17   didn't realize it was coming up in this bill.  I don't

18   remember them off the top of my head.  But if we would have a

19   couple hundred more immigration judges or officials and if we

20   would -- if we properly utilize our detention facilities

21   instead of wasting them in ways as we do now, this is not a

22   difficult problem to solve; and there is no reason -- there is

23   no reason for people simply being let go into the general

24   population, being sent a notice eight months later to come

25   back to the wrong address.

1    It is an administrative problem; it is a problem of some

2    resources, for a couple hundred administrative judges.  We can

3    deal with that and we should deal with it.  I have no use for

4    allowing people to just say the words "political asylum" and

5    disappear into the population, but there are people who really

6    would be persecuted if they went back home, who are fleeing

7    from the Communists or the Nazis or the Shah or the Ayatollahs

8    or whoever, and they will be treated --

9        Mr. Moorhead.  Will the gentleman yield?

10       Mr. Nadler.  Yes, sir.

11       Mr. Moorhead.  When they do come back, when they do come

12   back, if they have a legitimate claim, they are immediately

13   given a permit to work and get a green card.

14       Mr. Nadler.  But not under this bill.  Under this bill,

15   as I understand this bill -- under this bill, at the

16   airport -- they show up at the airport coming in, they don't

17   have adequate documentation, the officer, whatever you call

18   him, the immigration officer on the spot who has some

19   training, decides that in the country of Baluchistan he is

20   intimately familiar with whether people are really being

21   persecuted, he is up to date on what is really going on in

22   Baluchistan and he decides that the persecution of people who

23   are Christian in Baluchistan isn't really happening because

24   that is what his training told him.  His training is now six

25   months out of date or whatever, and he says no.  The appeal is

*the* guy at the next table and there is no further appeal.

Chairman Hyde.  The gentleman's time has expired.

The Chair would say that what the gentleman from New York wants is foreign nationals who aren't even here yet to have the same rights as citizens of the United States, a disastrous situation, especially in New York, where people get off without any documentation, without any proof that they are indeed eligible as refugees or asylees; and we have to do something with that problem, and we are trying to get control of it.

In any event, the question is on the gentleman's amendment.  All those in favor, say aye.

Opposed, nay.

In the opinion of the Chair --

Mr. Becerra.  Roll call, Mr. Chairman.

Chairman Hyde.  The gentleman from California has requested a roll call.  The clerk will call the roll.

The Clerk.  Mr. Moorhead.

Mr. Moorhead.  No.

The Clerk.  Mr. Moorhead votes nay.

Mr. Sensenbrenner.

Mr. Sensenbrenner.  No.

The Clerk.  Mr. Sensenbrenner votes nay.

Mr. McCollum.

[No response.]

# EXHIBIT L

Coalition for Humane Immigrant Rights, et al. v. Noem et al., 1:25-cv-00872 (JMC)

104TH CONGRESS } HOUSE OF REPRESENTATIVES { REPORT
2d Session } { 104–828

## ILLEGAL IMMIGRATION REFORM AND IMMIGRANT RESPONSIBILITY ACT OF 1996

---

SEPTEMBER 24, 1996.—Ordered to be printed

---

Mr. HYDE, from the committee of conference,
submitted the following

## CONFERENCE REPORT

[To accompany H.R. 2202]

The committee of conference on the disagreeing votes of the two Houses on the amendment of the Senate to the bill (H.R. 2202) to amend the Immigration and Nationality Act to improve deterrence of illegal immigration to the United States by increasing border patrol and investigative personnel, by increasing penalties for alien smuggling and for document fraud, by reforming exclusion and deportation law and procedures, by improving the verification system for the eligibility for employment, and through other measures, to reform the legal immigration system and facilitate legal entries into the United States, and for other purposes, having met, after full and free conference, have agreed to recommend and do recommend to their respective Houses as follows:

That the House recede from its disagreement to the amendment of the Senate and agree to the same with an amendment as follows:

In lieu of the matter proposed to be inserted by the Senate amendment, insert the following:

**SECTION 1. SHORT TITLE; AMENDMENTS TO IMMIGRATION AND NATIONALITY ACT; APPLICATION OF DEFINITIONS OF SUCH ACT; TABLE OF CONTENTS; SEVERABILITY.**

*(a) SHORT TITLE.—This Act may be cited as the "Illegal Immigration Reform and Immigrant Responsibility Act of 1996".*

*(b) AMENDMENTS TO IMMIGRATION AND NATIONALITY ACT.—Except as otherwise specifically provided—*

*(1) whenever in this Act an amendment or repeal is expressed as the amendment or repeal of a section or other provision, the reference shall be considered to be made to that section or provision in the Immigration and Nationality Act; and*

27–298

## JOINT EXPLANATORY STATEMENT OF THE COMMITTEE OF CONFERENCE

The managers on the part of the House and the Senate at the conference on the disagreeing votes of the two Houses on the amendment of the Senate to the bill (H.R. 2202) to amend the Immigration and Nationality Act to improve deterrence of illegal immigration to the United States by increasing border patrol and investigative personnel, by increasing penalties for alien smuggling and for document fraud, by reforming exclusion and deportation law and procedures, by improving the verification system for eligibility for employment, and through other measures, to reform the legal immigration system and facilitate legal entries into the United States, and for other purposes, submit the following joint statement to the House and the Senate in explanation of the effect of the action agreed upon by the managers and recommended in the accompanying conference report:

The Senate amendment struck all of the House bill after the enacting clause and inserted a substitute text.

The House recedes from its disagreement to the amendment of the Senate with an amendment that is a substitute for the House bill and the Senate amendment. The differences between the House bill, the Senate amendment, and the substitute agreed to in conference are noted below, except for clerical corrections, conforming changes made necessary by agreements reached by the conferees, and minor drafting and clerical changes.

### TITLE I—IMPROVEMENTS TO BORDER CONTROL, FACILITATION OF LEGAL ENTRY, AND INTERIOR ENFORCEMENT

#### SUBTITLE A—IMPROVED ENFORCEMENT AT THE BORDER

Section 101—House recedes to sections 101 (a) and (b) of the Senate amendment, with modifications, and the Senate recedes to House section 101(c) with modifications. This section increases the number of Border Patrol agents by 1000 per year from FY 1997 through 2001. It further provides that the Attorney General, in each fiscal year from 1997 through 2001, may increase by 300 the number of support personnel for the Border Patrol. The additional border patrol agents are to be deployed in sectors along the border in proportion to the level of illegal crossings of the border in such sectors. Border Patrol resources should be used primarily at the border to deter illegal crossings and to apprehend at the earliest possible juncture those who have made such crossings. This section also requires the forward deployment of Border Patrol agents to provide a visible deterrent to illegal immigration, and includes the requirement in Senate amendment section 109 regarding the preservation of immigration enforcement functions in interior areas. The managers intend that for purposes of this section, border sec-

208

who is the spouse or son or daughter of a United States citizen or lawful permanent resident, and the refusal of admission to the alien would cause extreme hardship to that citizen or lawfully resident spouse or parent.

This subsection also provides that an alien who has been present unlawfully in the United States for more than 1 year or has been ordered removed from the United States, and who subsequently enters or attempts to enter the United States without being lawfully admitted, is permanently barred from admission. Such an alien may be admitted not earlier than 10 years after the alien's last departure from the United States, but only if the Attorney General gives prior consent to the alien's reapplying for admission.

Section 301(c)—Senate recedes to House section 301(b), with modifications. This subsection states that an alien who is present in the U.S. without being admitted or paroled, or who has arrived in the U.S. at any time or place other than as designated by the Attorney General, is inadmissible. This ground of inadmissibility shall not apply if: (I) the alien qualifies for immigrant status as the spouse or child of a United States citizen or lawful permanent resident; (II) the alien or the alien's child has been battered or subject to extreme cruelty; and (III) there was a substantial connection between the cruelty or battery and the alien's unlawful entry into the United States. As a matter of transition, the requirements under (II) and (III) shall not apply if the alien establishes that he or she first entered the United States prior to the effective date of Title III of this legislation, as set forth in section 309(a). This subsection also provides that an alien who without reasonable cause fails to attend or remain in attendance at any proceeding regarding the alien's removal from the United States is barred from admission for 5 years.

Section 301(d)—Senate recedes to House section 301(g), which makes a number of conforming references regarding the change in nomenclature in INA section 212(a) from "excludable" to "inadmissible." Subparagraph (B) of INA section 241(a)(1) (entry without inspection) will be amended to state that an alien present in the United States in violation of law is deportable. The current category of persons who are deportable because they have made an entry without inspection will, under the amendments made by section 301(c) of this bill, instead be considered inadmissible under revised paragraph (6)(A) of subsection 212(a).

Section 302—Senate recedes to House section 302, with modifications. This section will amend INA section 235, regarding the inspection of aliens arriving in the U.S. New section 235(a) provides that an alien present in the United States who has not been admitted to the U.S., or who arrives in the United States, (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters), shall be deemed an applicant for admission.

An arriving alien who is a stowaway is not eligible to apply for admission or to be admitted and shall be ordered removed upon inspection by an immigration officer. A stowaway shall not be eligible to apply for asylum in the United States unless the stowaway es-

209

tablishes a credible fear of persecution pursuant to the expedited review process in section 235(b)(1).

Aliens seeking admission, readmission, or transit through the United States shall be inspected by an immigration officer, who shall have the same authority to take statements and receive evidence as under current INA section 235. An alien applying for admission may, at the discretion of the Attorney General, be permitted to withdraw the application for admission and depart immediately from the United States.

New section 235(b) establishes new procedures for the inspection and in some cases removal of aliens arriving in the United States.

Expedited Removal of Arriving Aliens: New paragraph (b)(1) provides that if an examining immigration officer determines that an arriving alien is inadmissible under section 212(a)(6)(C) (fraud or misrepresentation) or 212(a)(7) (lack of valid documents), the officer shall order the alien removed without further hearing or review, unless the alien states a fear of persecution or an intention to apply for asylum. This provision shall not apply to an alien arriving by air who is a national of a Western Hemisphere nation with which the United States does not have diplomatic relations. The provisions also may be applied, in the sole and unreviewable discretion of the Attorney General, to an alien who has not been paroled or admitted into the United States and who cannot affirmatively show to an immigration officer that he or she has been continuously present in the United States for a period of 2 years immediately prior to the date of the officer's determination. The purpose of these provisions is to expedite the removal from the United States of aliens who indisputably have no authorization to be admitted to the United States, while providing an opportunity for such an alien who claims asylum to have the merits of his or her claim promptly assessed by officers with full professional training in adjudicating asylum claims.

An alien who states a fear of persecution or an intention to apply for asylum shall be referred for interview by an asylum officer, who is an immigration officer who has had professional training in asylum law, country conditions, and interview techniques comparable to that provided to full-time adjudicators of asylum applications. The officer shall be, for purposes of determinations made under this section, under the supervision of an immigration officer with similar training and substantial experience in adjudicating asylum applications. If the officer finds that the alien has a credible fear of persecution, the alien shall be detained for further consideration of the application for asylum under normal non-expedited removal proceedings. If the alien does not meet this standard and, if the alien requests administrative review, the officer's decision is upheld by an immigration judge, the alien will be ordered removed. To the maximum extent practicable, review by the immigration judge shall be completed within 24 hours, but in no case shall such review take longer than 7 days. Throughout this process of administrative review, the alien shall be detained by the INS. An alien may consult with a person of his or her choosing before the interview, at no expense to the Government and without unreasonably delaying the interview. A "credible fear of persecution"

210

means that there is a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, that the alien could establish eligibility for asylum.

There is no other administrative review of a removal order entered under this paragraph, but an alien claiming under penalty of perjury to be lawfully admitted for permanent residence, or to have been admitted as a refugee or granted asylum, shall be entitled to administrative review of such an order as the Attorney General shall provide by regulation. An alien ordered removed under this paragraph may not make a collateral attack against the order in a prosecution under section 275(a) (illegal entry) or 276 (illegal reentry).

The availability of judicial review is described below in the explanation of section 306 of this Act.

New paragraph (b)(2) provides that an alien determined to be inadmissible by an immigration officer (other than an alien subject to removal under paragraph (b)(1), or an alien crewman or stowaway) shall be referred for a hearing before an immigration judge under new section 240.

Subsection (c) restates the provisions of current INA section 235(c) regarding the removal of aliens arriving in the United States who are inadmissible on national security grounds. This subsection is not intended to apply in the case of aliens who are inadmissible under new section 212(a)(6)(A) because they are already present in the United States without having been admitted or paroled. Such aliens could, however, be subject to the special removal procedures provided in Subtitle B of this Title.

New subsection (d) restates provisions currently in INA section 235(a) authorizing immigration officers to search conveyances, administer oaths, and receive evidence, and to issue subpoenas enforceable in a United States district court.

Section 303—Senate recedes to House section 303, with modifications. This section amends INA section 236, as described in the next paragraphs below. (The provisions in current section 236 regarding hearings on the exclusion of aliens are reflected in new section 240, as amended by section 304 of this report.)

New section 236(a) restates the current provisions in section 242(a)(1) regarding the authority of the Attorney General to arrest, detain, and release on bond an alien who is not lawfully in the United States. (The current authority in section 242(a) for a court in habeas corpus proceedings to review the conditions of detention or release pending the determination of the alien's inadmissibility or deportability is not retained.) The minimum bond for an alien released pending removal proceedings is raised from $500 to $1500. New section 236(b) restates the current provisions in section 242(a)(1) that the Attorney General may at any time revoke an alien's bond or parole.

New section 236(c) provides that the Attorney General must detain an alien who is inadmissible under section 212(a)(2) or deportable under new section 237(a)(2). This requirement does not apply to an alien deportable under section 237(a)(2)(A)(i) on the basis of an offense for which the alien has not been sentenced to at least 1 year in prison. This detention mandate applies whenever

# EXHIBIT M

| 104TH CONGRESS | | REPORT |
|---|---|---|
| 1st Session | HOUSE OF REPRESENTATIVES | 104–383 |

# COMPREHENSIVE ANTITERRORISM ACT OF 1995

---

DECEMBER 5, 1995.—Committed to the Committee of the Whole House on the State of the Union and ordered to be printed

---

Mr. HYDE, from the Committee on the Judiciary,
submitted the following

# R E P O R T

together with

## DISSENTING VIEWS

[To accompany H.R. 1710]

[Including cost estimate of the Congressional Budget Office]

The Committee on the Judiciary, to whom was referred the bill (H.R. 1710) to combat terrorism, having considered the same, report favorably thereon with an amendment and recommend that the bill as amended do pass.

## CONTENTS

|  | Page |
|---|---|
| The Amendment | 2 |
| Purpose and Summary | 37 |
| Background and Need for Legislation | 41 |
| Hearings | 63 |
| Committee Consideration | 66 |
| Vote of the Committee | 67 |
| Committee Oversight Findings | 76 |
| Committee on Government Reform and Oversight Findings | 76 |
| New Budget Authority and Tax Expenditures | 76 |
| Congressional Budget Office Cost Estimate | 76 |
| Inflationary Impact Statement | 80 |
| Section-by-Section Analysis and Discussion | 80 |
| Changes in Existing Law Made by the Bill, as Reported | 106 |
| Dissenting Views | 176 |

21–276

40

information is provided to the United States by a foreign government, or by an individual who fears for his life, the government is prevented from removing the terrorist or potential terrorist from the United States. This is true no matter how credible and reliable the classified information that the foreign national is, in fact, a terrorist.

Thus, the provisions contained in Title VI will allow the government, for deportation purposes only, to utilize the classified information against foreign nationals alleged to be terrorists. That finding must be made by a U.S. district court judge. Before the judge can order the alien's deportation, the judge must find that there is clear and convincing reliable evidence supporting the terrorist allegation.[3]

Title VI, section 621, also establishes an expedited asylum procedure for those individuals who arrive in the United States without proper immigration documents and fail to demonstrate a credible fear of persecution in their countries of origin. This provision would assist in discouraging alien terrorists from seeking asylum in the United States.

Section 623 of title VI subjects illegal aliens to exclusion from the United States following an administrative adjudication where the alien is found to have unlawfully entered the United States. Once such a finding is made, the alien will be subject to expulsion, subject only to administrative review of the exclusion order and habeas corpus protections. This type of expedited expulsion procedure will apply regardless of the length of time the illegal entrant has been unlawfully present within the United States. The provision recognizes that there is an obvious and fundamental difference between aliens, who entered the United States lawfully and later become deportable, and those whose initial entry was wholly illegal.

Title VII authorizes funding for the Federal Bureau of Investigation to hire additional personnel to support law enforcement efforts aimed at terrorist activity. These provisions also would authorize the establishment of a domestic counterterrorism center and finance other additional costs associated with preventive efforts by federal law enforcement to interdict future terrorist crimes.

Section 702 proposes a civil monetary penalty surcharge as a means of funding essential technologies so that law enforcement will be provided with an on-going capability to engage in legitimate electronic surveillance. With the dawn of digital telecommunications technologies, the effectiveness of this law enforcement tool is jeopardized. In the 103rd Congress, the "Digital Telephony Act"

---

[3] The Supreme Court has stated that permanent legal resident aliens enjoy a greater liberty interest than other classes of aliens in remaining in the United States, see *Landon* v. *Plasencia,* 459 U.S. 21, 34 (1982); *Mathews* v. *Eldridge,* 424 U.S. 319, 333 (1979); see also *Rafeedie* v. *Immigration and Naturalization Service,* 880 F.2d 506, 520, 522 (D.C. Cir. 1989). In light of this, additional procedural protections are supplied for those particular aliens facing deportation under this special procedure. For those individuals, a special attorney will be selected from a panel of attorneys who have been given security clearances by the government. The attorney will be appointed by the presiding judge. The special attorney will have an opportunity to review all of the classified information and to challenge the veracity and reliability of the classified information supporting the terrorist allegation. The appointment of the special attorney will benefit the court in its determination of the truth of the underlying allegations informing its decision of whether or not to deport the foreign national. The legal permanent resident alien also benefits from this additional process because he is given an opportunity to have the classified facts challenged by cross-examination. He can be secure in the knowledge that he will not suffer deportation without having the evidence against him directly confronted by the special attorney.

58

Under these provisions, an alien will be inadmissible if the alien is a representative of a terrorist organization or a member of an organization that the alien knew or should have know was a terrorist organization. This distinction is intended to ensure that aliens who are most active as directors, officers, commanders, or spokespersons for terrorist organizations are strictly barred from entering the United States. An alien who is merely a member of a terrorist organization will be considered under a slightly less strict standard that incorporates a scienter requirement that the alien knew or should have known that the organization is terrorist in nature. Thus, an alien innocent of involvement with or knowledge of terrorist activity on the part of an organization of which he or she was merely a member would not necessarily be inadmissible to the United States.

An organization will be considered "terrorist" for purposes of these provisions only if it has been designated as such by the Secretary of State after consultation with the Attorney General, and after consultation with the Committees on the Judiciary of the House of Representatives and the Senate. It is important to stress that only foreign organizations and subsidiary foreign groups that have engaged in, or are engaging in, terrorist activity (as that term is currently defined in the INA) and whose acts pose a threat to the national security of the United States, can be so designated. The designation is subject to judicial review upon its being made public and, by law, may be removed by Congress.

Subtitle B of H.R. 1710 provides for the expedited exclusion of aliens who arrive seeking entry into the United States without valid entry documents. Section 621 provides that an arriving alien can be denied entry into the United States by an immigration officer because of misrepresentation, use of fraudulent documents, or lack of any documents. The alien may be ordered removed without a hearing before an immigration judge, and without administrative or judicial review. This provision is based upon legislation approved by the Subcommittee on International Law, Immigration, and Refugees during the 103rd Congress.

This provision is necessary because thousands of aliens arrive in the United States at airports each year without valid documents to enter the United States Unless such aliens claim to be U.S. nationals, or state a fear of persecution, there is no requirement under the Constitution or international treaty to do anything other than return them, as promptly as possible, to where they boarded the plane to come here. Neither international law nor the Due Process Clause of the Fifth Amendment require that such aliens be given a hearing before an immigration judge or a right to appeal.

Section 621 also requires that an alien subject to expedited removal who claims persecution or otherwise indicates a desire to apply for asylum be interviewed by an asylum officer to determine if the alien has a "credible fear" of persecution. A "credible fear" is established if the alien is more likely than not telling the truth, and if there is a reasonable probability that the alien will meet the definition of refugee and otherwise qualify for asylum. This standard, therefore, is lower than the "well-founded fear" standard needed to ultimately be granted asylum in the United States—the arriving alien need only show a probability that he will meet the well-

59

founded fear standard. The credible fear standard is designed to weed out non-meritorious cases so that only applicants with a likelihood of success will proceed to the regular asylum process. If the alien meets this threshold, the alien is permitted to remain in the U.S. to receive a full adjudication of the asylum claim—the same as any other alien in the United States.

Under this system, there should be no danger that an alien with a genuine asylum claim will be returned to persecution. The initial screening, which should take place in the form of a confidential interview, will focus on two questions: is the alien telling the truth; and does the alien have some characteristic that would qualify the alien as a refugee. As in other cases, the asylum officer should attempt to elicit all facts relevant to the applicant's claim. It is not unreasonable to expect the applicant to be truthful in such an interview. Nor is it unreasonable to expect that, in the case of a person genuinely fleeing persecution, that the interview will yield sufficient facts to determine that the alien has a reasonable likelihood of being successful in the full asylum process.

Section 621 permits the interview itself to be carried out by a full-time INS asylum officer, or by an INS inspector or other official who has received the complete training provided to full-time asylum officers and has reasonable access to country condition reports and other resources that are used by asylum officers to assess the credibility and foundation of asylum claims.

TAGGANTS

H.R. 1710's deterrent approach to fighting terrorism is not limited to immigration reforms and the previously discussed investigative techniques and tools. Deterrence, with respect to the creation of explosives through the use of common agricultural fertilizers and the use of commercially manufactured explosives in criminal activities, is also an important element of this measure. The Committee considered the proposal which would have required the inclusion of tracer element taggants to commercially manufactured explosives, and considered whether it is feasible to make fertilizer products inert without negating their utility.

Section 305 calls for a thorough study of these issues in order to fully understand the consequences of including tracer element taggants in commercially manufactured explosives or mandating the insertion of a particular chemical compound in commonly used fertilizer before a specific course of action is taken. It was determined that Congress ought to be fully informed as to the means and methods available to effectively address these issues. The Committee recognizes the impact any legislation in this area would have on the explosives manufacturing industry, as well as on the sand, glass, silica, and building materials industry. The Committee was careful not to overreact to a problem that might be solved another way, especially in light of today's advancing technology. The purpose of section 305 is to examine whether there are ways to detect the existence of the presence of an explosive before the explosion; to identify and trace explosives and precursor chemicals following a criminal act of bombing; and to determine whether there is a way to make common chemicals available to the public, such as ammonium nitrate (a common fertilizer available to the public),

99

wise not in accordance with the law, lacking substantial support in the administrative record taken as a whole or is classified information * * * contrary to constitutional right, power, privilege, or immunity, or not in accord with the procedures required by law."

This section also adds a new clause (v) to section 212(a)(3)(B), defining "representative" to include an officer, official, or spokesman of the organization and any person who directs, counsels, commands, or induces the organization to engage in terrorist activity. The determination of the Secretary of State or Attorney General than an alien is a representative of a terrorist organization is also subject to judicial review. The extent of judicial review contemplated here is limited to the record established by the Immigration and Naturalization Service (INS), and includes any and all classified information available to the INS in making its designation. Appellate review of this designation is also limited and shall be based upon the substantial evidence rule.

*Sec. 612. Denial of asylum to alien terrorists*

This section amends section 208 to provide that an alien may not be granted asylum if the alien is excludable under the provisions of section 212(a), or deportable under the provisions of section 241(a) relating to alien terrorists.

*Sec. 613. Denial of other relief for alien terrorists*

This section amends sections 243(h)(2) (withholding of deportation), 244(a) (suspension of deportation), 244(e)(2) (voluntary departure), 245(c) (adjustment of status), and 249(d) (registry) to provide that an alien who is deportable under section 241(a)(4)(B) is not eligible for these forms of relief.

## Subtitle B—Expedited Exclusion

*Sec. 621. Inspection and exclusion by immigration officers*

This section amends section 235(b), regarding the inspection and exclusion of aliens arriving at a port of entry. New section 235(b)(1) provides that if an examining immigration officer determines that an alien is inadmissible under section 212(a)(6)(C) (fraud or misrepresentation) or 212(a)(7) (lack of valid documents), the officer may order the alien removed without further hearing or review.

An alien who states a fear of persecution, or wishes to apply for asylum, will be referred for interview by an asylum officer. If the officer finds that the alien has a credible fear of persecution, the alien shall be detained for further consideration of the application for asylum. If the alien does not meet this standard, and the officer's decision is upheld by a supervisory asylum officer, the alien will be ordered removed. An alien may consult with a person of his or her choosing before the interview, at no expense to the Government and without delaying the interview. A "credible fear of persecution" means that it is more likely than not that the alien is telling the truth and the alien has a reasonable possibility of establishing eligibility for asylum. The Attorney General is required to write and promulgate regulations for these procedures consistent with the intent of this provision.

100

There is no administrative review of a removal order entered into under this paragraph, but an alien claiming under penalty of perjury to be lawfully admitted for permanent residence shall be entitled to administrative review of such an order. An alien ordered removed under this paragraph may not make a collateral attack against the order in a prosecution under section 275(a) (illegal entry) or 276 (illegal reentry).

New section 235(b)(2) provides that an alien who is not clearly and beyond a doubt entitled to enter (other than an alien subject to removal under paragraph (b)(1), or an alien crewman or stowaway) shall be detained for a hearing before a special inquiry officer (immigration judge).

*Sec. 622. Judicial review*

Subsection (a) of this section amends section 106 of the INA to add a new subsection (e). Subsection (e) precludes judicial review, subject to the provisions of paragraph (e)(2), of a decision to exclude an alien from entry under the expedited exclusion provisions of new section 235(b)(1). Paragraph (e)(2) allows for habeas corpus review limited to the issues of whether the petitioner is an alien (provided the alien makes a non-frivolous claim of U.S. nationality), whether the alien was ordered specially excluded pursuant to section 235(b)(1)(A), and whether the petitioner is a lawful permanent resident alien entitled to judicial review according to section 235(b)(1)(e)(i).

A reviewing court may not order any relief other than to require that the alien receive an exclusion hearing pursuant to section 236, or a determination in accordance with section 235(c) (special procedures for aliens excludable on national security grounds) or section 273(d) (procedures for stowaways).

Subsection (b) of this section amends section 235 of the INA by adding a new subsection (d), which precludes collateral attack in an action for assessment of penalties for improper entry or re-entry under section 275 or 276 of the validity of an order of exclusion, special exclusion, or deportation made under section 235, 236, or 242 of the INA.

*Sec. 623. Exclusion of aliens who have not been inspected and admitted*

This section amends section 241 of the INA by adding a new subsection (d). Subsection (d) provides that an alien present in the United States, who has not been admitted after inspection in accordance with section 235 of the INA, is deemed to be seeking entry and admission and shall be subject to examination and exclusion in accordance with Chapter 4 of Title II of the INA. Such an alien must be provided the opportunity to establish that he or she has been lawfully admitted to the United States.

This section by operation of law, returns "to the border" any alien who has entered the United States unlawfully, regardless of the duration of his or her presence in the United States. The Committee expects that such aliens will be subject to the procedures for examination and exclusion of arriving aliens set forth in sections 235 and 236 of the INA, and that the alien will have the opportunity to prove his claim of legal entry. As long as this opportunity

101

is provided, however, the Committee believes that the alien can and should be subject to expedited exclusion and removal from the United States. There ought to be no constitutional impediment to the expedited removal from the United States of an alien who has entered the United States illegally. The fact that an alien has successfully evaded requirements for lawful entry should not provide that alien with an entitlement to procedural protections and relief (other than the opportunity to contest the allegation of illegal entry) that are not available to an alien who seeks entry through the normal admissions process.

### Subtitle C—Improved Information and Processing

#### PART 1—IMMIGRATION PROCEDURES

*Sec. 631. Access to certain confidential INS files through court order*

Subsection (a) amends section 245(A)(c)(5) of the INA by redesignating Subparagraphs (A) through (C) and by adding a new subparagraph (C) to permit the Attorney General to make an application to a Federal judge, and for such Federal judge to authorize disclosure of information in an application for legalization for the following purposes: to identify an alien believed to be dead or severely incapacitated; or for criminal law enforcement purposes if the alleged criminal activity occurred after the legalization application was filed and involves terrorist activity, is a crime prosecutable as an aggravated felony (without regard to length of sentence), or poses an immediate risk to life or national security.

Subsection (b) makes parallel amendments to the confidentiality provisions in section 210(b) (Special Agricultural Worker Program).

The purpose of this section is to amend the provisions in sections 210 and 245A protecting the confidentiality of applications for legalization and to ensure that information contained in such applications would not be used for purposes of immigration law enforcement. A limited waiver of such confidentiality, subject to prior approval by a federal judge, is appropriate in order to identify an alien who is dead or severely incapacitated, or if the alien is alleged to have committed a serious criminal offense after the date of the application. Disclosure in these limited circumstances will not undermine the initial policy of confidentiality. An alien filing for legalization did not have a reasonable expectation, under the laws existing at that time, that information in his or her application could not be used for the purpose of identifying that alien for compelling circumstances, unrelated to immigration enforcement, that would arise after the filing of the application. The government interest in securing such information is compelling, and the requirement of judicial approval will further ensure that the legitimate confidentiality rights of legalization applicants are protected.

*Sec. 632. Waiver authority concerning notice of denial of application for visas*

This section amends section 212(b) of the INA to permit the Secretary of State to waive the requirement that the alien be provided notice of the reasons for denial, in the case of an alien denied a visa by a consular officer on the basis of the exclusion grounds in

181

of the Constitution's due process clause, and cannot be deported on the basis of evidence not disclosed to them.[21] In the 1976 case of *Matthews* v. *Diaz*, the Court wrote:

> There are literally millions of aliens within the jurisdiction of the United States. The Fifth Amendment as well as the Fourteenth Amendment, protects every one of these persons from deprivations of life, liberty, or property without due process of law. Even one whose presence in this country is unlawful, involuntary, or transitory is entitled to that constitutional protection.[22]

Only last month in *Arab-American Anti-Discrimination Committee* v. *Reno*,[23] the Ninth Circuit reaffirmed this principle when it found that "[a]liens who reside in this country are entitled to full due process protections" and noted that "the very foundation of the adversary process assumes the use of undisclosed information will violate due process * * *"[24] The Court acknowledged that while "not all of the rights of criminal defendants are applicable in the civil context, the procedural due process notice and hearing requirements have 'ancient roots' in the rights to confrontation and cross-examination" and should be fully provided for in deportation proceedings.[25]

Although we have previously allowed the use of secret evidence to exclude aliens who have not yet entered this country, our experience with such procedures highlights the dangers present in denying any party due process. In the infamous case *U.S. ex rel. Knauff* v. *Shaughnessy*,[26] secret evidence was used to exclude from the United States the German wife of a U.S. citizen who had fled to England when Hitler came to power. In his dissenting opinion, Justice Jackson argued, "[t]he plea that evidence of guilt must be secret is abhorrent to free men, because it provides a cloak for the malevolent, the misinformed, the meddlesome, and the corrupt to play the role of informer undetected and uncorrected."[27] In a subsequent hearing necessitated by public outrage over the denial of Mrs. Knauff's visa it was learned that the "confidential source" offering the secret evidence was a jilted lover. When the Immigration and Naturalization Service sought to use secret evidence to expel an alien several years ago, the D.C. Circuit likened the alien's position to that of "Joseph K. in The Trial," finding that "[i]t is difficult to imagine how even someone innocent of all wrongdoing could meet such a burden."[28]

H.R. 1710 also includes a number of additional immigration law amendments which bear little if any relationship to the problem of terrorism. For example, section 621 of the bill eliminates alien exclusion hearings and grants low level immigration officers at air-

---

[21] See *Kwong Hai Chew* v. *Colding*, 344 U.S. 590 (1953) (INS could not subject returning permanent resident alien to "summary exclusion" based on secret evidence); *Rafeedie* v. *INS*, 795 F. Supp. 13 (D.D.C. 1992) (INS attempt to expel a permanent resident alien on the basis of undisclosed classified information held to be unconstitutional).
[22] *Matthews* v. *Diaz*, 426 U.S. 67, 77 (1976).
[23] *American-Arab Anti-Discrimination Committee* v. *Reno* No. 94–55405, 1995 U.S. App. LEXIS 31415, *1, *42 (9th Cir., Nov. 8, 1995) (per curiam).
[24] Id. at *52, *62.
[25] Id. at *61.
[26] *U.S. ex rel. Knauff* v. *Shaughnessy*, 338 U.S. 537 (1950).
[27] Id. at 551.
[28] *Rafeedie* v. *INS*, 880 F.2d 506, 516 (D.C. Cir. 1989).

182

ports and other ports of entry non-reviewable authority to exclude and deport aliens seeking entry without proper documents. The section also severely limits the review rights of those seeking asylum due to fear of persecution in their homeland. Section 623 seeks to strip away aliens' due process rights by creating a legal fiction treating any alien shown to be present unlawfully to summary "exclusion" (rather than deportation) proceedings.[29] Section 631 grants federal law enforcement officials access to otherwise confidential immigration files.[30] There was little testimony offered at the hearings concerning these provisions, which while unlikely to deter terrorists, will have a profound impact on the lives of many aliens and their families. Whatever their conceivable merits, we see no reason to consider these provisions in the context of counterterrorism legislation at a time when separate omnibus immigration legislation has been ordered reported by the Committee.[31]

## C. Expanded investigatory and search and seizure authority—A threat to our privacy

Title III of the legislation represents an unprecedented expansion of the federal government's authority to intrude upon our privacy. The bill not only expands the government's wiretap and electronic surveillance authority, but authorizes a number of intrusive new investigatory techniques in cases involving so-called "foreign counterintelligence investigations." Neither of these expansions is likely to have any effect on the government's ability to investigate or deter terrorist activity.

### 1. Expanded wiretap and electronic surveillance authority

Section 301 of H.R. 1710 adds twelve new crimes to the list of offenses that will support a wiretap order under the Electronic Communications Privacy Act.[32] It does so despite the fact that there has been no showing that any additional authority is needed or that the FBI has ever failed to obtain a desired wiretap because a particular predicate offense was not on the list. In fact, it has been reported that not once since 1988 has the FBI sought electronic surveillance authority in a case involving bombing, arson, or firearms.[33]

Section 306 of the bill creates a "good faith" exception to the wiretap statute's exclusionary rule. The current wiretap exclusionary rule is based on the Constitutional requirement that evidence obtained from an unlawful search may not be introduced as evi-

---

[29] Pursuant to the "entry doctrine" aliens who have effected entry, rather than being detained at the border, are subject to more formal deportation proceedings protected by Fifth Amendment due process rights. See, e.g., *Leng May Ma* v. *Barber,* 357 U.S. 185, 188 (1958); *Shaughnessy* v. *United States ex rel. Mezei,* 345 U.S. 206, 215 (1953); *Kaplan* v. *Tod,* 267 U.S. 228, 230 (1925). However, any effort to strip away these rights from aliens who have developed ties in the United States, even where they have entered without documentation may well be unconstitutional. See *Landon* v. *Plasencia,* 459 U.S. 21, 33 (1982); *Rosenberg* v. *Fleuti,* 374 U.S. 449, 460 (1963); *Kwong Hai Chew* v. *Colding,* 344 U.S. 590, 596 (1953).
[30] These files were made confidential as part of an effort to encourage aliens to come forward and register for general amnesty pursuant to the Immigration Reform and Control Act of 1986. Immigration Reform and Control Act of 1986, Pub. L. No. 99–603 (1986).
[31] See H.R. 2202, 104th Cong., 1st Sess. (1995) (ordered reported by the House Judiciary Comm. on Oct. 24, 1995).
[32] 18 U.S.C. 2510 et seq.
[33] Wiretap Report for the Period January 1, 1994 to December 31, 1994, Administrative Office of the United States Courts, at 21 (Apr. 1995).

# EXHIBIT N

| 104TH CONGRESS | } | HOUSE OF REPRESENTATIVES | { | REPORT |
|---|---|---|---|---|
| *2d Session* | | | | 104–518 |

## TERRORISM PREVENTION ACT

———————

APRIL 15, 1996.—Ordered to be printed

———————

Mr. HYDE, from the committee of conference,
submitted the following

# CONFERENCE REPORT

[To accompany S.735]

The committee of conference on the disagreeing votes of the two Houses on the amendments of the House to the bill (S. 735), to prevent and punish acts of terrorism, and for other purposes, having met, after full and free conference, have agreed to recommend and do recommend to their respective Houses as follows:

That the Senate recede from its disagreement to the amendment of the House to the text of the bill and agree to the same with an amendment as follows:

In lieu of the matter proposed to be inserted by the House amendment, insert the following:

**SECTION 1. SHORT TITLE.**

*This Act may be cited as the "Antiterrorism and Effective Death Penalty Act of 1996".*

**SEC. 2. TABLE OF CONTENTS.**

*The table of contents of this Act is as follows:*

*Sec. 1. Short title.*
*Sec. 2. Table of contents.*

*TITLE I—HABEAS CORPUS REFORM*

*Sec. 101. Filing deadlines.*
*Sec. 102. Appeal.*
*Sec. 103. Amendment of Federal Rules of Appellate Procedure.*
*Sec. 104. Section 2254 amendments.*
*Sec. 105. Section 2255 amendments.*
*Sec. 106. Limits on second or successive applications.*
*Sec. 107. Death penalty litigation procedures.*
*Sec. 108. Technical amendment.*

*TITLE II—JUSTICE FOR VICTIMS*

*Subtitle A—Mandatory Victim Restitution*

*Sec. 201. Short title.*
*Sec. 202. Order of restitution.*
*Sec. 203. Conditions of probation.*
*Sec. 204. Mandatory restitution.*

29–006

117

of section 212(a), or deportable under the provisions of section 241(a) relating to alien terrorists.

Section 414—Senate recedes to House amendment section 623. This section amends section 241 of the INA by adding a new subsection (d). Subsection (d) provides that an alien present in the United States, who has not been admitted after inspection in accordance with section 235 of the INA, is deemed to be seeking entry and admission and shall be subject to examination and exclusion in accordance with Chapter 4 of Title II of the INA. Such an alien must be provided the opportunity to establish that he or she has been lawfully admitted to the U.S. This section by operation of law, returns "to the border" any alien who has entered the United States unlawfully, regardless of the duration of his or her presence in the United States.

### Subtitle C—Modifications to Asylum Procedures

Section 421—Senate recedes to House amendment section 611. This section bars the granting of asylum to an alien excludable as a terrorist unless the Attorney General determines that the individual seeking asylum will not be a danger to the security of the United States.

Section 422—Senate recedes to House amendment section 621. This section amends section 235(b), regarding the inspection and exclusion of aliens arriving at a port of entry. New section 235(b)(1) provides that if an examining immigration officer determines that an alien is inadmissible under section 212(a)(6)(C) (fraud or misrepresentation) or 212(a)(7) (lack of valid documents), the officer may order the alien removed without further hearing or review.

An alien who states a fear of persecution, or wishes to apply for asylum, will be referred for interview by an asylum officer. If the officer finds that the alien has a credible fear of persecution, the alien shall be detained for further consideration of the application for asylum. If the alien does not meet this standard, and the officer's decision is upheld by a supervisory asylum officer, the alien will be ordered removed. An alien may consult with a person of his or her choosing before the interview, at no expense to the Government and without delaying the interview. A "credible fear of persecution" means that it is more likely than not that the alien is telling the truth and the alien has a reasonable possibility of establishing eligibility for asylum. The Attorney General is required to write and promulgate regulations for these procedures consistent with the intent of this provision.

There is no administrative review of a removal order entered into under this paragraph, but an alien claiming under penalty of perjury to be lawfully admitted for permanent residence shall be entitled to administrative review of such an order. An alien ordered removed under this paragraph may not make a collateral attack against the order in a prosecution under section 275(a) (illegal entry) or 276 (illegal reentry).

New section 235(b)(2) provides that an alien who is not clearly and beyond a doubt entitled to enter (other than an alien subject to removal under paragraph (b)(1), or an alien crewman or stowaway) shall be detained for a hearing before a special inquiry officer (immigration judge).

118

Section 423—Senate recedes to House amendment section 622. Subsection (a) of this section amends section 106 of the INA to add a new subsection (e). Subsection (e) precludes judicial review, subject to the provisions of paragraph (e)(2), of a decision to exclude an alien from entry under the expedited exclusion provisions of new section 235(b)(1). Paragraph (e)(2) allows for habeas corpus review limited to the issues of whether the petitioner is an alien (provided the alien makes a non-frivolous claim of U.S. nationality), whether the alien was ordered specially excluded pursuant to section 235(b)(1)(A), and whether the petitioner is a lawful permanent resident alien entitled to judicial review according to section 235(b)(1)(e)(i).

A reviewing court may not order any relief other than to require that the alien receive an exclusion hearing pursuant to section 236, or a determination in accordance with section 235(c) (special procedures for aliens excludable on national security grounds) or section 273(d) (procedures for stowaways).

Subsection (b) of this section amends section 235 of the INA by adding a new subsection (d), which precludes collateral attack in an action for assessment of penalties for improper entry or re-entry under section 275 or 276 of the validity of an order of exclusion, special exclusion, or deportation made under section 235, 236, or 242 of the INA.

### Subtitle D—Criminal Alien Procedural Improvements

Section 431—Senate recedes to House amendment section 664. This section shortens the period under which a permanent resident alien can be considered excludable under certain circumstances.

Section 432—House amendment section 631 recedes to Senate section 304. This section permits the Immigration and Naturalization Service to release certain confidential information on individual aliens for law enforcement purposes.–

Section 433—Senate recedes to House amendment section 666. This section expands and clarifies the purpose of the Criminal Alien Tracking Center established by section 130002 of the Violent Crime Control and Law Enforcement Act of 1994 (P.L. 103–322).–

Section 434—Senate recedes to House amendment section 667. This section adds several alien smuggling related crimes to the list of offenses that are RICO predicates.–

Section 435—Senate recedes to House amendment section 668. This section adds wiretap authority for the investigation of various immigration offenses.–

Section 436—Senate recedes to House amendment section 669. This section clarifies that for purposes of deportability, crimes of moral turpitude are crimes punishable by imprisonment for a year or more.–

Section 437—Senate recedes to House amendment section 670. This section permits deportation proceedings to be conducted telephonically.–

Section 438—Senate recedes to House amendment section 675. This section directs the development of a program to repatriate to the interior of a bordering country any alien who has entered the US illegally 3 or more times.–

# EXHIBIT O

faithfully executed the budget enacted by the Congress.

The Library of Congress is a unique and treasured institution. It is the greatest repository of knowledge in the history of the world, and for 196 years the Congress of the United States has supported and nurtured its development. Today the Library faces the challenge of providing new electronic services to all its constituent groups while maintaining its traditional services to the Congress and the Nation, all in a time of severe fiscal constraint.

John O. Hemperley was a unique and treasured individual. For the past 23 years, he supported and nurtured the Library of Congress in its relationship with the Committee on Appropriations. He will be sorely missed, not only by those who knew and loved him here in the Senate and in the Library, but by all those who may never have known him but who benefit daily from the enormous resources the Library provides. The challenges the Library faces will be more daunting without him.

Mr. President, I know I speak for Senator MACK, the chairman of our Legislative Branch Appropriations Subcommittee, and for all other members of the Appropriations Committee, and our staff, in expressing our great sorrow and extending sincere condolences to John's wife, Bess Hemperley, their children, and grandchildren. And may John rest in peace with God.

## CHANGE OF VOTE

Mr. MOYNIHAN. Mr. President, on rollcall vote 50, I voted yea. My intention was to vote nay. I ask unanimous consent that I be permitted to change my vote which in no way would change the outcome of the vote.

The PRESIDING OFFICER. Without objection, it is so ordered.

## THE BAD DEBT BOXSCORE

Mr. HELMS. Mr. President, I have mentioned many times that memorable evening in 1972 when the television networks reported that I had won the Senate race in North Carolina.

At first, I was stunned because I had never been confident that I would be the first Republican in history to be elected to the U.S. Senate by the people of North Carolina. When I got over that, I made a commitment to myself that I would never fail to see a young person, or a group of young people, who wanted to see me.

I have kept that commitment and it has proved enormously meaningful to me because I have been inspired by the estimated 60,000 young people with whom I have visited during the 23 years I have been in the Senate.

A large percentage of them have been concerned about the total Federal debt which recently exceeded $5 trillion. Of course, Congress is responsible for creating this monstrous debt which coming generations will have to pay.

Mr. President, the young people and I almost always discuss the fact that

under the U.S. Constitution, no President can spend a dime of Federal money that has not first been authorized and appropriated by both the House and Senate of the United States.

That is why I began making these daily reports to the Senate on February 25, 1992. I decided that it was important that a daily record be made of the precise size of the Federal debt which, at the close of business yesterday, Tuesday, April 16, stood at $5,142,250,889,027.95. This amounts to $19,430.38 for every man, woman, and child in America on a per capita basis.

The increase in the national debt since my report yesterday—which identified the total Federal debt as of close of business on Monday, April 15, 1996—shows an increase of more than two billion dollars $2,239,481,250.00, to be exact. That 1-day increase is enough to match the money needed by approximately 332,070 students to pay their college tuitions for 4 years.

## CONCLUSION OF MORNING BUSINESS

The PRESIDING OFFICER. Morning business is closed.

## TERRORISM PREVENTION ACT— CONFERENCE REPORT

The PRESIDING OFFICER. Under the previous order, the Senate will now resume consideration of the conference report accompanying S. 735, which the clerk will report.

The assistant legislative clerk read as follows:

A conference report to accompany S. 735, an act to prevent and punish acts of terrorism and for other purposes.

The Senate resumed the consideration of the conference report.

### MOTION TO RECOMMIT

Mr. LEAHY. Mr. President, I move to recommit the conference report on the bill S. 735 to the committee of conference with instructions to the managers on the part of the Senate to disagree to the conference substitute recommended by the committee of conference and insist on striking the text of section 414 (relating to summary exclusion), section 422 (relating to modification of asylum procedures) and section 423 (relating to preclusion of judicial review) from the conference substitute.

The PRESIDING OFFICER. There are 30 minutes on the motion, to be equally divided.

Who yields time?

Mr. LEAHY. Mr. President, I yield myself 6 minutes.

Mr. President, I will ask for the yeas and nays on this at the appropriate time but, I understand that the distinguished chairman of the committee is on his way to the floor. I would not make such a request until he was on the floor.

I am not taking this action lightly. I understand there is a real concern on

motions to recommit, but this is a very, very serious matter.

I understand the symbolism of trying to have this conference report adopted by the House on the 1-year anniversary of the terrible bombing of the Federal building in Oklahoma City and, for that matter, the 3-year anniversary of the tragic end of the siege near Waco. It is one thing to say we want to schedule a resolution or sense of the Congress to coincide with a memorial day but here we are talking about a very significant piece of legislation. While I think that all of us abhor what happened in Oklahoma—certainly, no sane American could take any pleasure in what happened in the tragedy in Oklahoma City—we also have a responsibility as U.S. Senators, no matter which party we belong to, to pass the best law we can. After all, that is what the American people expect.

The vast majority of Americans are opposed to terrorism, terrorism of any sort, and they assume that their elected officials, both Republicans and Democrats, are going to pass good antiterrorism legislation. If it takes a day or two more or two more to get it right, then let us take the day or two more. We are doing this for a nation of 250 million Americans, a very powerful nation, threatened by terrorism.

The Senate passed S. 735 on June 6, 1995, almost a year ago. The House only considered its version last month. The conference committee apparently met a couple of evenings ago, and we were handed the conference report yesterday with instructions to pass it post haste. Having seen almost 10 months elapse since the Senate passed this bill, I hope we take time to at least to read the conference report. And, I dare suggest, there are not five Senators in here who have even read the conference report or have the foggiest notion of what it is they are voting on.

This is what we are talking about. We are talking about a bill being rushed through here about antiterrorism, because we are all against terrorists. But I am willing to bet my farm in Middlesex, VT, you are not going to find 5 to 10 Senators in this body who have read every word of this conference report.

In particular, my motion to recommit concerns profound changes to our asylum process that were not previously considered by the Senate in our deliberations on antiterrorism last year. The provisions I am objecting to have nothing to do with preventing terrorism. That is one reason why they were not in the antiterrorism bill that we considered and passed last summer. These provisions were added in the conference.

They do not have to do with terrorism. I am asking only to strike sections 414, 422, and 423. These are general immigration matters. They should be in the immigration bill. They should not be in this antiterrorism bill.

I tried to amend these provisions during the Judiciary Committee consideration of the immigration bill. I failed

Case 1:25-cv-00872-JMC    Document 55-12    Filed 03/03/26    Page 145 of 280

on a tie vote. I circulated a ''Dear Colleague'' earlier this week, making clear my intention to try to change this. These provisions are bad policy. They are going to make bad law, and they are put in here for the first time in a conference report.

I disagree as well with the habeas corpus sections of the conference report, but at least we had the opportunity to debate and amend those provisions. The asylum rewrite was done in the dark of the night and it is being forced on us today. I think that is wrong.

Look no further than the front page of the New York Times on Monday. You see the most recent example of why we must not adopt the summary exclusion provision in the bill. There is an article on the case of Fauziya Kasinga and her flight from Togo to avoid female genital mutilation. She has sought for 2 years to find sanctuary in this country, only to be detained, tear-gassed, beaten, isolated and abused—not in some distant land, but the United States of America. The case has outraged women and men all over this country.

What you may not know is that the conference report that we have before us would summarily exclude Ms. Kasinga from ever having made an asylum claim, a claim that I hope, based on the reported facts, is going to be granted without her enduring more suffering. You see she traveled from Germany coming to America, and traveled on a false British passport in order to escape mutilation in Togo.

Under the legislation before us, she would be out. ''Tough. Go back and get mutilated. We do not care. We have a law—that none of us ever saw, none of us ever debated, none of us ever spent time on—that allows for your summary exclusion. You are out.''

Fidel Castro's daughter is another recent example of a refugee who came here using a disguise and phony Spanish passport to seek asylum. She came through Spain. Under the provisions of this bill, she might have been turned away at the border after a summary interview by a low-level immigration officer. We all know that there are political reasons why Fidel Castro's daughter should be granted asylum. Under the provisions of the conference report before us, slipped into the bill in the middle of the night, are barriers that could make that impossible.

I yield myself 2 more minutes.

In my ''Dear Colleague'' letter on my proposed amendment to these sections in the immigration bill and in the additional views I filed with the committee report on the immigration bill I also recall victims of the Holocaust and their use of false identification provided by the brave diplomats Raoul Wallenberg and Chiune Sugihara during World War II. Think of Oskar Schindler, think of ''Schindler's List.'' These are the kind of things that we need to consider before adopting this conference report.

My concern is not to defend alien smuggling or false documentation or terrorists, but to acknowledge that there are some circumstances and oppressive regimes in the world where, if you are going to escape, you may well need to rely on false papers.

It would be ironic if we were to pass these provisions on an antiterrorism bill that would prohibit victims of terror, torture, and oppression around the world from seeking refuge in this, the world's greatest democracy.

I hope that the United States will not abandon its historic role as a refuge for the oppressed and persecuted. Our country is a beacon of hope and freedom, let it not be extinguished. Let us not abandon our leadership role in international human rights. Let us not abandon the world's true refugees, let us not restrict the due process that protects the people who look to us for asylum. Unfortunately, the impact of the provisions in this bill would be to deny refugees any opportunity to claim political asylum and would, instead, summarily exclude them from the United States and send them back to their persecutors without a hearing, without due process protections, without assistance to help them describe their plight and without judicial review of any kind.

Sections 421 and 422 of the conference report prohibit an asylum claim by refugees who enter this country with false identification. I could understand that we might want to consider as potentially relevant factors to an asylum claim that the refugee arrived with false documents and the route that the refugee traveled to get here. But those factors should not be dispositive. The examples to which I have previously alluded indicate that there are times when the use of false documentation is not something that we would want to punish. I fear that the bill goes too far and sends the wrong signal by putting the burden on the refugee, without counsel and in a summary proceeding, to establish that the person is the exception and to create a clear record of ''credible fear'' and that it was necessary to present the false document to depart from the persecuting country.

The Committee to Preserve Asylum has sent each of us a letter outlining the ways in which similar provisions in the immigration bill would harm human rights and endanger refugees. In their April 8 letter supporting the Leahy amendment they outline cases in which these provisions would have been disastrous.

The U.N. High Commissioner for Refugees sent our chairman a letter dated March 6 objecting to these provisions as inconsistent with the 1967 Protocol Relating to the Status of Refugees and remains critical of the bill.

The asylum process was reorganized and reformed in January 1994. The bill fails to take these changes into account. In fact, in 1995 asylum claims decreased greatly and were being timely processed. Only 20 percent were

granted. Thus, the bill's provisions are a bad solution in search of a problem. The INS and Department of Justice report that they have matters in hand.

The Department of Justice counsels that we should allow immigration judges rather than asylum officers to make these determinations. Under the circumstances, I believe that we have moved too far too fast and allowed a few cases from the distant past to create bad law.

The asylum provisions in the bill would place undue burdens on unsophisticated refugees who are truly in need of sanctuary but may not be able to explain their situation to an overworked asylum officer. The bill would establish summary exclusion procedures and invest low-level immigration officers with unprecedented authority to deport refugees without allowing them a fair opportunity to establish a valid claim to asylum. Even before being permitted to apply for asylum, refugees who flee persecution without valid documents, would be met with a series of procedural hurdles virtually impossible to understand or overcome.

This is a radical departure from current procedures that afford an asylum hearing before an immigration judge during which an applicant may be represented by counsel, may cross-examined and present witnesses, and after which review is available by the Board of Immigration Appeals. Such hearings have been vitally important to refugees who may face torture, imprisonment or death as a result of an initial, erroneous decision by an INS official. Indeed, human rights organizations have documented a number of cases of people who were ultimately granted political asylum by immigration judges after the INS denied their release from INS detention for not meeting a ''credible fear'' standard. Under the summary screening proposed in the bill conference report, these refugees would have been sent back to their persecutors without an opportunity for a hearing.

Under international law, an individual may be denied an opportunity to prove an asylum claim only if the claim is ''manifestly unfounded.'' This bill would establish a summary screening mechanism that utilizes a ''credible fear'' standard without meaning or precedent in international law. These summary exclusion provisions have been criticized by international human rights organizations and the United Nations High Commissioner for Refugees.

Furthermore, the proposed legislation would deny the Federal courts their historic role in overseeing the implementation of our immigration laws and review of individual administrative decisions. The bill would allow no judicial review whether a person is actually excludable. These proposals thereby portent a fundamental change in the role of our coordinate branches of Government and a dangerous precedent.

Besides being fundamentally unfair to a traumatized and fatigued refugee, who would be allowed no assistance and no interpreter, the proposed summary screening process would impose a burdensome and costly diversion of INS resources. In 1995 for example, only 3,287 asylum seekers arrived without valid documents—hardly the tens of thousands purported to justify these changes. The bill would require that a phalanx of specially trained asylum officers be created and posted at airports, sea ports and other ports of entry across the country to be available to conduct summary screening at the border. There is simply no need to divert these resources in this way when the asylum process has already been brought under control.

There are no exigent circumstances that require this Nation to turn its back on its traditional role as a refuge from oppression and to resort to summary exclusion processes. Neither the Department of Justice nor the INS support these provisions or believe them necessary.

I urge my colleagues to reject this gutting of our asylum laws and support the motion to recommit.

Mr. LEAHY. Mr. President, I suggest the absence of a quorum and ask unanimous consent that it not be charged to my time.

The PRESIDING OFFICER. Without objection, it is so ordered. The clerk will call the roll.

The legislative clerk proceeded to call the roll.

Mr. HATCH. Mr. President, I ask unanimous consent that the order for the quorum call be rescinded.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. HATCH. Mr. President, regarding the motion to recommit the conference report by the distinguished Senator from Vermont, now, look, this bill is a tough bipartisan measure. Stated simply, it is a landmark piece of legislation. My colleagues on the other side of the aisle know it. We have crafted a bill that puts the Nation's interests above partisan politics.

Some of my colleagues however have criticized this bill for not being tough enough on terrorists. In truth, many oppose this bill because it is too tough on vicious, convicted murderers—not my friend from Vermont, but others. My colleagues are aware that this motion to recommit will not improve the bill. Instead, if it passes it will scuttle the antiterrorism bill. In other words, it will kill it.

Accordingly, on behalf of Senator DOLE and myself, I move to table the pending motion and ask for the yeas and nays.

Mr. LEAHY. Mr. President, would the Senator withhold just a moment?

Mr. HATCH. I will be happy to withhold.

Mr. LEAHY. Mr. President, as I understand it, we are under a time agreement. Such a motion would not be in order until—or at least a vote on such a motion would not be in order until all time is either used or yielded back. Am I correct?

Mr. HATCH. I thought maybe the Senator had used his time.

I withdraw my request.

The PRESIDING OFFICER. The motion would not be in order until the time is used or yielded back.

Mr. LEAHY. If the Senator asks unanimous consent to make his motion to get the yeas and nays on it now, to be done at the expiration of time or yielding back——

Mr. HATCH. We can wait until then.

Mr. LEAHY. Mr. President, would the Senator yield further, on my time?

Mr. HATCH. I certainly do.

The PRESIDING OFFICER. The Chair recognizes the Senator from Vermont.

Mr. LEAHY. Mr. President, I ask unanimous consent that a letter from the Committee to Preserve Asylum and various attachments in support of my amendment, signed by the American Friends Service Committee, the American Jewish Committee, Amnesty International, Associated Catholic Charities of New Orleans, Jesuit Social Ministries, Jewish Federation of Metropolitan Chicago, Indian Law Resource Center, and a number of others in support of my amendment be included in the RECORD.

There being no objection, the material was ordered to be printed in the RECORD, as follows:

COMMITTEE TO PRESERVE ASYLUM,
*Washington, DC, April 8, 1996.*

Hon. PATRICK J. LEAHY,
*Russell Senate Office Building,*
*Washington, DC.*

DEAR SENATOR LEAHY: We are an ad hoc coalition of religious groups, human rights organizations, concerned physicians, and immigration and civil rights advocates that have come together to oppose the new bars to applying for asylum contained in S. 269.

The right to seek asylum is an internationally recognized human right, incorporated into U.S. law by Congress in the 1980 Refugee Act. It protects individuals fleeing persecution on account of race, religion, nationality, political opinion, or membership in a particular social group. Each year the U.S. grants asylum to about 8,000 people, less than 1% of legal immigrants. The new bars to asylum contained in S. 269, the Immigration Control and Financial Responsibility Act, would seriously undermine human rights protections for these bona fide refugees.

The new bars to asylum, found in sections 133 and 193 of the bill, would give low level immigration officers the authority to exclude and deport without a fair hearing refugees who were forced to flee persecution without valid travel documents. For reasons illustrated in the attached documents, this section would effectively deny asylum to many human rights victims. It will also cost more money. Senator Leahy will offer an amendment on the Senate floor that will preserve procedural protections for people escaping religious and political persecution.

We urge you to vote for the Leahy amendment.

Sincerely yours,

American Civil Liberties Union.
American Friends Service Committee.
American Jewish Committee.
Amigos de los Sobrevivientes.
Amnesty International.
Associated Catholic Charities of New Orleans.
Asylum and Refugee Rights Law Project, Washington Lawyers' Committee for Civil Rights and Urban Affairs.
Ayuda, Inc., Washington, DC.
Center for Immigrants Rights, Inc.
Central American Resource Center—CARECEN of Washington, DC.
Central America Political Asylum Project, American Friends Service Committee, Miami, FL.
Church World Services Immigration and Refugee Program.
Columban Fathers' Justice & Peace Office.
Comité Hispano de Virginia.
Committee for Humanitarian Assistance to Iranian Refugees.
Committee to Protect Journalists.
Council of Jewish Federations.
Dominican Sisters of San Rafael, CA.
El Centro Hispanoamericano.
FIRN, Inc. (Foreign-born Information and Referral Network).
Friends Committee on National Legislation.
Heartland Alliance for Human Needs & Human Rights.
Hebrew Immigrant Aid Society.
Hogar Hispano.
Illinois Coalition for Immigrant and Refugee Protection.
Immigrant and Refugee Services of America.
Immigrant Legal Resource Center.
Indian Law Resource Center.
International Institute of Boston.
International Institute of Los Angeles.
Jesuit Social Ministries.
Jewish Federation of Metropolitan Chicago.
Las Americas Refugee Asylum Project.
Lawyers Committee for Human Rights.
Lutheran Immigration and Refugee Service.
Marjorie Kovler Center for the Treatment of Survivors of Torture.
Mennonite Central Committee.
Minnesota Advocates for Human Rights.
National Asian Pacific American Legal Consortium.
Network: A National Catholic Social Justice Lobby.
North Texas Immigration Coalition.
Northwest Immigrant Rights Project.
Peace Workers.
Physicians for Human Rights.
Political Asylum/Immigration Representation Project, Boston College Law School.
Proyecto Adelante.
Proyecto San Pablo.
Robert F. Kennedy Memorial Center for Human Rights.
Sponsors Organized to Assist Refugees, OR.
Union of Council of Soviet Jews.
U.S. Committee for Refugees.
Vietnamese Association of Illinois.
VIVE, Inc., An Organization for World Refugees.

---

THE NEW BARS TO ASYLUM WOULD RETURN HUMAN RIGHTS VICTIMS TO FURTHER PERSECUTION

VOTE FOR THE LEAHY AMENDMENT

Sections 133 and 193 of S. 269, the Immigration Control and Financial Responsibility Act, would give low-level immigration officers the authority to deport back to their persecutors refugees who were forced to flee persecution without valid travel documents. The new bars to asylum would punish people whose only means of fleeing repressive governments is by using invalid travel documents.

Many true refugees are forced to flee persecution without valid travel documents either

because they do not have time to acquire them or because applying for them would threaten their lives.

Under current law, a person who arrives in the United States without valid travel documents and fears persecution in his or her home country may go before an immigration judge and prove eligibility for asylum. The asylum seeker may be represented at the hearing at no cost to the government.

The new bars to asylum would preclude such a person from even applying for asylum until he or she has proven that he or she has a "credible fear" of persecution and used the invalid travel documents to flee directly from a country where there is a "significant danger" of being returned to persecution. This all may have to be proven immediately after a stressful journey, and without the assistance of counsel or an interpreter, and without the involvement of any judicial or quasi-judicial officer.

The new bars and summary procedures are problematic for several reasons.

A "false papers" rule would harm human rights victims. By definition, asylum seekers frequently fear persecution by the government of their home country—the same government that issues travel documents and checks identity papers and exit permits at the airports and border crossings. It should be recalled that the United States has long honored Raoul Wallenberg, who saved countless lives during the Holocaust by issuing unofficial travel documents so that refugees could flee further persecution.

Meritorious asylum seekers would be returned to persecution. The INS has made serious errors while trying to apply the "credible fear" test. Under current law, asylum seekers who arrive in the U.S. without valid travel documents are detained pending their hearing unless they prove a "credible fear" of persecution in their home country. Human rights organizations have documented many cases in which people were denied parole under this standard, but later were granted asylum at their hearing before an immigration judge. Under the new bars to asylum, they would have been returned to persecution. A summary of some of these case studies is attached.

The Department of Justice opposes the new bars to asylum. Deputy Attorney General Jamie Gorelick wrote in her February 14 letter to Judiciary Committee Chairman Orrin G. Hatch that the Justice Department opposes sections 133/193, noting that "Absent smuggling or an extraordinary migration situation, we can handle asylum applications for excludable aliens under our regular procedures."

The new bars would deny protection to refugees who had to change planes on route to the United States. Before being able to apply for asylum, a refugee who used false documents would have to prove that they were needed to leave her country or to transit through another country. This requirement would prejudice both asylum seekers who flee countries that do not have direct carrier routes to the U.S. and those who must travel over land through countries that do not have asylum laws, that may be friendly with the government they are fleeing, or that are hostile to people of their background or nationality. Refugees from Asian and African countries in particular face this situation.

The new bars to asylum are inconsistent with U.S. obligations under international law and will inevitably lead to errors. The new bars lack the minimal procedural safeguards to prevent the mistaken return of a genuine refugee to certain persecution. The UNHCR "fears that many bona fide refugees will be returned to countries where their lives or freedom will be threatened" if the new bars to asylum become law. (Letter to Sen.

Hatch, Chairman Judiciary Cmte, March 6, 1996).

VOTE FOR THE LEAHY AMENDMENT

Bob, a student at the University of Khartoum in Sudan, was an active member of the Democratic Unionist Party, an anti-government organization. After participating in a peaceful student protest, he was arrested by the Sudanese government. He was detained in a 6 by 11 foot cell with 10 other prisoners for 2 months. During his imprisonment, he was repeatedly interrogated and tortured—he was hung by his hands and feet, beaten and electrically shocked. As a result of the torture, his elbows are permanently deformed. He remained active in the democratic movement after his release from prison. Then, as he was walking to a democratic union meeting, he was again arrested and imprisoned. A few months later, while he was still in prison, he suffered a nervous breakdown because of the torture he suffered. He was transferred to a hospital, but remained under arrest. Wearing a nurse's uniform that his mother had smuggled into the hospital, Bob escaped from imprisonment.

Bob's colleagues from the democratic union smuggled him onto a freighter bound for Germany. In Germany, he borrowed another person's ID card to leave the ship. Knowing that the anti-immigration and NeoNazi movement in Germany had heightened and that it would be impossible to receive asylum there, Bob flew from Germany to the United States. He arrived without a passport. When he exited the plane, he immediately told the INS that he wanted to apply for asylum. He was placed in detention. Bob was not released from detention because the INS interviewer determined he did not have a "credible fear" of persecution. He was granted asylum by an immigration judge.

Alan, an Indian national, had been persecuted in Kashmir because of his religion. On several occasions, he and his family members were imprisoned and tortured by the Indian government. In July 1994 when the military police sought to detain him, he evaded arrest. A few months later his family's home was bombed.

Fearing for his life, Alan fled to the United States using a false passport. He told the INS he wanted asylum immediately. He explained to the INS officials that he and his family had been persecuted by the Indian government. The INS officers at the airport did not think he was credible. The officials verbally abused Alan and denied him food and water until he was brought to a detention center the next day. Alan was not released from detention because the INS did not think he had a credible fear of persecution even though he presented the INS with reports about religious persecution in Kashmir. Alan was later granted asylum by an immigration judge.

Sam, a Nigerian national, was an active member of a pro-democracy organization that was determined to ensure democratic elections in Nigeria. Shortly before the elections, the leader of the democracy organization was found murdered, and several members were arrested and subsequently disappeared. The State Secret Service went to Sam's house on election day searching for him. When Sam learned that the secret service was searching for him, he immediately went into hiding, afraid that if they found him, he too would "disappear" as his colleagues had.

Sam fled to the United States right out of hiding. He changed planes in Amsterdam. He traveled with a false U.S. passport. He was afraid that the Nigerian government would arrest him if he tried to leave the country with his own identification papers. When he

arrived in the United States, he immediately told the INS that he wanted asylum. He was placed in detention. The INS interviewed him to determine whether he had a credible fear of persecution; the INS concluded that he did not. He was granted asylum by a federal court.

Mr. LEAHY. Mr. President, I also ask unanimous consent that a letter from the U.N. High Commissioner for Refugees in support be included in the RECORD.

There being no objection, the letter was ordered to be printed in the RECORD, as follows:

UNITED NATIONS,
HIGH COMMISSIONER FOR REFUGEES,
Washington, DC, March 19, 1996.
Re Special Exclusion Provisions of S. 269.
Hon. PATRICK LEAHY,
U.S. Senate,
Washington, DC.

DEAR SENATOR LEAHY: I wish to express UNHCR's sincere appreciation for your efforts during the 14 March Judiciary Committee mark-up session to remove the special exclusion provisions of S. 269. These provisions, found in Sections 133, 141 and 193 of the bill, would almost certainly result in the U.S. returning bona fide refugees to countries where their lives or freedom would be threatened.

As noted in my 6 March letter to Judiciary Committee Chairman Orrin Hatch, we offer our views regarding S. 269 with the hope that you and the other members of the Judiciary Committee will seek to adhere to the standards and principles set forth in the 1967 Protocol Relating to the Status of Refugees, to which the U.S. acceded in 1968.

In particular, UNHCR is concerned with the following special exclusion provisions:

(1) Lack of due process—Sections 133, 141 and 193 provide few procedural safeguards to ensure that true refugees are not erroneously returned to persecution.

(a) No administrative review—Under Section 141, special exclusion orders are not subject to administrative review (p. IB-4, line 19). Minimum procedural guidelines for refugee status determinations specify that an applicant should be given a reasonable time to appeal for a formal reconsideration of the decision. This principle is set forth in UNHCR Executive Committee Conclusion No. 8 (1977).[1] The "prompt supervisory review" provided for in Section 193 (p. IC-36, line 12) does not meet these minimum procedural guidelines.

(b) Limitation on access to counsel—Under Section 193, asylum-seekers arriving at US ports of entry with false documents or no documents are permitted to consult with a person of their choosing, only if such consultation does "not delay the process" (p. IC-36, lines 23, 25). Such a limitation is in violation of the principle that applicants for asylum should be given the necessary facilities for submitting his/her case to the authorities, including the services of a competent interpreter and the opportunity to contact a representative of UNHCR (UNHCR Executive Committee Conclusion No. 8 (1977)).

(2) Limitation on access to asylum—Section 193 provides that individuals presenting false or no documents or who are escorted to the US from a vessel at sea are not permitted to apply for asylum unless they traveled to the US from a country of claimed persecution and that the false document

_____
[1] The UNHCR Executive Committee is a group of representatives from 50 countries, including the United States, that provides policy and guidance to UNHCR in the exercise of its refugee protection mandate.

used, if any, was necessary to depart from the country of claimed persecution. UNHCR requests the US to remove this limitation and to adhere to international principles which provide as follows:

(a) "[A]sylum should not be refused solely on the ground that it could be sought from another State. Where, however, it appears that a person, before requesting asylum, already has a connexion or close links with another State, he may if it appears fair and reasonable be called upon first to request asylum from that State" (UNHCR Executive Committee Conclusion No. 15 (1979) (emphasis added)).

(b) When refugees and asylum-seekers move in an irregular manner (without proper documentation) from a country where they have already found protection, they may be returned to that country if, in addition to being protected against refoulement (i.e. protected against return to a country where their lives or freedom would be threatened), they are treated in accordance with "recognized basic human standards" (UNHCR Executive Committee Conclusion No. 58 (1989)). UNHCR is prepared to assist in practical arrangement for the readmission and reception of such persons, consistent with these international standards.

(3) Credible fear standard—Sections 133, 141 and 193 create a new, heightened threshold standard that asylum-seekers must meet before they are permitted to present their claims in a hearing before an immigration judge. Under these sections, asylum-seekers who are brought or escorted to the US from a vessel at sea (Sections 133 and 141), who have entered the US without inspection, but have not resided in the US for two years or more (Section 141), who arrive during an "extraordinary migration situation" (Section 141) or who arrive at a port of entry with false documents or no documents (Section 193) must first establish a "credible fear" of persecution before they are permitted to present their claims in an asylum hearing before an immigration judge. UNHCR urges the adoption of a "manifestly unfounded" or "clearly abusive" standard which would reduce the risk that a bona fide refugee is erroneously returned to a country where s/he has a well-founded fear of persecution. This international standard for expeditious refugee status determinations is set forth in UNHCR Executive Committee Conclusion No. 30 (1983).

We are hopeful that you will support the elimination of a deadline for filing asylum applications. Failure to submit a request within a certain time limit should not lead to an asylum request being excluded from consideration (UNHCR Executive Committee Conclusion No. 15 (1979)). Under this international principle, the US is obliged to protect refugees from return to danger regardless of whether a filing deadline has been met.

Again, I thank you for your efforts to ensure that refugees are protected from return to countries of persecution. Please do not hesitate to contact my Office if UNHCR may be of any further assistance to you, your staff or other members of the Committee.

Sincerely,

ANNE WILLEM BIJLEVELD,
*Representative.*

Mr. LEAHY. Mr. President, I am not in any way trying to derail this bill. I am just saying that this is something that was tucked into it in the middle of the night. Nobody ever had a chance to debate it. It is in here. And it is going to make it impossible, or nearly impossible, for anyone from Fidel Castro's sister to somebody escaping torture and religious persecution to come to the United States, if traveling through a second country or traveling with a false passport to do it.

That makes no sense. That is not an antiterrorist situation. Look at "Schindler's List." Remember Raoul Wallenberg. Think about those who escaped persecution by using false passports as a way they could get out of the country. They may well have to go through an intermediate country to get to the greatest nation of freedom on Earth. Just because somebody slipped these provisions into the conference report, let us not go along with it. This is something that should be debated.

Our own Department of Justice does not support these provisions of the bill. I think in fact the Justice Department reiterated their opposition to them in an April 16 letter on similar provisions in the immigration bill to the majority leader. Deputy Attorney General Gorelick wrote us, "absent smuggling or an extraordinary migration situation, we can handle asylum applications for excludable aliens under our regular procedures."

I reserve the balance of my time and yield to the Senator from Utah.

Mr. HATCH addressed the Chair.

The PRESIDING OFFICER. The Chair recognizes the Senator from Utah.

Mr. HATCH. Mr. President, I do not really have anything more to say other than this is a very important piece of legislation. It is a key piece of legislation. It is desired by almost everybody who wants to do anything against terrorism. It is effective and strong. Even though we acknowledge we do not have everything everybody wants in this bill, it is a darn good bill that will make a real difference. If this motion or any motion to recommit passes, this bill is dead, it will be killed. So we simply have to defeat any and all motions to recommit. I will move to table the amendment at the appropriate time. I am prepared to yield back the balance of my time on this amendment.

Mr. BIDEN addressed the Chair.

The PRESIDING OFFICER. The Chair recognizes the Senator from Delaware.

Mr. BIDEN. Mr. President, the Senator from Utah, the distinguished chairman of the committee, keeps referencing that——

The PRESIDING OFFICER. Does the Senator from Vermont yield time to the Senator from Delaware?

Mr. LEAHY. Yes. I understand I have about 4 minutes. I yield 2 minutes to the Senator from Delaware.

Mr. BIDEN. Mr. President, the Senator from Utah keeps saying anything will kill this bill. That is not true. This is not "kill this bill." If we send this back to conference for one or two or 12 amendments it does not kill this bill. Every major bill we had, including the crime bill, we sent back to conference with instructions—at least on three occasions. This will not kill this bill.

Some of this has not been well thought out. Much of what we left out of the bill, I am convinced, on reconsideration by our friends in the House, they would change their view. But I want to make it clear, I do not believe there is any evidence to suggest that sending this back to conference with specific instructions would kill the bill.

I am prepared, if the chairman and if Senator LEAHY is, to yield back. I yield the floor.

Mr. LEAHY addressed the Chair.

The PRESIDING OFFICER. The Chair recognizes the Senator from Vermont.

Mr. LEAHY. Does the Senator from California care to speak on this?

Mrs. BOXER. No. I am waiting for the next motion.

Mr. LEAHY. Mr. President, I thought Senator KENNEDY wished to speak on this.

I am ready to yield back the balance of my time.

Mr. HATCH. I am prepared to yield back the balance of my time.

The PRESIDING OFFICER. All time has been yielded back.

Mr. HATCH. Mr. President, I ask unanimous consent that the pending Leahy motion to recommit be temporarily set aside with the vote to occur on or in relation to the Leahy motion after completion of debate on the next motion to recommit.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. HATCH. Senators should be aware there will be two consecutive rollcall votes following completion of all debate on the next motion.

Mr. President, I also ask unanimous consent to move to table the Leahy amendment and ask for the yeas and nays.

The PRESIDING OFFICER. Is there a sufficient second? There appears to be.

The yeas and nays were ordered.

Mr. BIDEN addressed the Chair.

The PRESIDING OFFICER. The Chair recognizes the Senator from Delaware.

Mr. BIDEN. Mr. President, for the benefit of my colleagues, to review the bidding from yesterday, the distinguished chairman of the committee and I agreed on a unanimous-consent proposal that we have one-half hour on each of up to as many as 14 motions. I doubt there will be that many. But we will move them out seriatim here. I see my distinguished colleague from California, Senator BOXER, is on the floor prepared to go with her motion, to begin to debate her motion. So I would, with the permission of the Senator from Utah, yield to the Senator from California for that purpose.

I will make one important point, Mr. President. At the appropriate time I will make the motion. As I understand the parliamentary situation, debate must be concluded before I make the motion, otherwise the motion is subject to immediately being tabled, which I do not think my friend has any

# EXHIBIT P

May 16, 1995

TO:        AKS

FROM:      Chip

RE:        Amendments to S. 269

Please review the amendments described below and indicate your approval, disapproval, or desire for more information.

I. EXCLUSION AND DEPORTATION

1. All aliens who have entered the U.S. without INS inspection ("EWIs") and who have been in the U.S. for less than [2] years would be subject to S. 269's expedited exclusion procedure. This amendment would place on the alien the burden of proving that he should be admitted to the U.S. (as in regular exclusion -- but not deportation, which is now used for EWIs). Furthermore, in the expedited exclusion procedure the administrative decision of excludability would be subject to very limited judicial review. This would place an alien who has tried to sneak across the border in a position no more favorable than the alien with no documents or with fraudulent documents who has presented himself for inspection. The [2]-year cutoff would mean that after this time the alien would be treated as he is now, with the right to deportation rather than exclusion. [AKS APPROVES X DISAPPROVES____ NEEDS MORE INFO____]

2. EWIs would be disqualified for immigration benefits for [10] years, subject to nonreviewable AG discretion to forgive. Those who have attempted to sneak into this country should be disqualified from visas, adjustments of status, and various forms of discretionary relief from deportation or exclusion. If AG has discretion to forgive such entry under appropriate circumstances, there appears to be little risk that it would have undesirable results. [AKS APPROVES X DISAPPROVES____ NEEDS MORE INFO____]

3. Institute disincentives for not showing up for hearings, deportation, voluntary departure -- e.g., fines and forfeiture of assets. The advantage of this proposal is obvious. The disadvantage is that additional due process requirements may result, e.g. right to counsel at government expense, etc. [AKS APPROVES X DISAPPROVES____ NEEDS MORE INFO____]

S. 269 Immigrant Control and Financial REsponsibility Act-1995
AKS Memos

2

4. Permit appeals and certain motions from abroad, but require earlier departure -- right after the immigration judge ("IJ") or Board of Immigration Appeals ("BIA") issues an adverse ruling -- except an alien who has made a threshold-credible asylum claim. This would place the alien in a position similar to that of persons who have received an adverse tax ruling (i.e., they must comply before they can appeal). The advantage is that the benefit sought by illegal aliens -- presence in the U.S., which the current practice of permitting appeals from inside the U.S. gives them -- is denied during the appeal. Thus, the harm of the illegal alien's presence is reduced. In addition, the alien's risk that entry will not lead to a lengthy stay is higher and so some of the incentive for illegal immigration is reduced.    [AKS APPROVES____ DISAPPROVES____ NEEDS MORE INFO____]

5. Limit judicial review of discretionary decisions of AG on relief from exclusion or deportation, and on asylum applications. A major cause of the delay of exclusion and deportation -- and of the litigation burden on the INS -- results from the adjudication in Article III courts, of claims that the AG abused discretion in denying various forms of relief from exclusion or deportation. This could be eliminated by a simple prohibition on judicial review of such discretionary decisions. Furthermore, a decision by the AG to deny asylum could be given more judicial deference than what is generally required in abuse of discretion cases. This is appropriate in a context so full of "political questions" and foreign policy consideration. For example, such decisions could be made conclusive unless "manifestly contrary to law or an unconscionable abuse of discretion." [AKS APPROVES____ DISAPPROVES____ NEEDS MORE INFO____]

6. Place venue of judicial review of immigration decisions in the Federal Circuit in Washington, D.C. This would eliminate the current variation across Federal circuits in many areas of immigration law. It would also lead to a court with special expertise in this complex area of Federal law. Moreover, since the BIA is located nearby, in Falls Church, the change could not be said to create any unreasonable additional burden. [AKS

S.269  Immigrant Control and
Financial REsponsibility Act -1995
AKS Memos

3

APPROVES ✗  DISAPPROVES____  NEEDS MORE INFO____]

7. Disqualify aliens previously deported for certain crimes from various forms of AG discretionary relief, if they unlawfully reenter and thereby become subject to reinstatement of the prior deportation order. Under current law the prior deportation order for such an alien is "deemed" to be reinstated as of the date the AG finds that such unlawful reentering took place. However, suspension of deportation and the other usual forms of relief are not barred. Opponents of such an amendment might argue that the same reasons for such relief in the usual situations may well apply here as well. Given that Michael Myers of Kennedy's staff did not seem troubled by this idea, it may not be controversial. [AKS APPROVES ✗ DISAPPROVES____  NEEDS MORE INFO____]

8. Require asylum claims within 30 days of entry or new circumstances. If an alien has a genuine fear of persecution at entry, 30 days seems enough time to prepare an application for asylum. If the fear arises later, because of new circumstances in his country, an additional 30 days beginning at that time should be adequate. Opponents might argue that those escaping persecution have such a great mistrust of government that they need more time than 30 days to adjust their expectations. [AKS APPROVES ✗ DISAPPROVES____  NEEDS MORE INFO____]

9. Prohibit judicial review of legalization claim not filed on time, unless INS refused to accept it. There is still litigation by aliens claiming that their late amnesty applications should be considered because they were misled somehow by INS or others. This amendment would prohibit judicial review of an INS decision that a late application would not be considered unless the alien attempted to submit it on time but INS refused to accept it. [AKS APPROVES ✗ DISAPPROVES____  NEEDS MORE INFO____]

10. Prohibit payment of attorney fees or costs under the Equal Access to Justice Act (EAJA) to any person who is not a citizen or lawful permanent resident (LPR). [AKS APPROVES ✗ DISAPPROVES____  NEEDS MORE INFO____]

4

## II. USE OF PUBLIC ASSISTANCE

1. Prohibit payment of social security benefits to any person for work performed while he was an alien not authorized to work in the U.S. (also: no refund of employee or employer contributions). Michael Myers and Adam Eisgrau (Feinstein) like this. [AKS APPROVES____ DISAPPROVES____ NEEDS MORE INFO____]

2. Prohibit payment of an earned income tax credit for any year in which the applicant was not, for the entire year, a citizen or a lawful permanent resident alien. [AKS APPROVES____ DISAPPROVES____ NEEDS MORE INFO____]

3. Prohibit States from providing routine maternity services to ineligible aliens under the emergency medical care exception. This would correct abuse of the system by many alien women, usually Mexican, who travel to the U.S. to have babies -- so that they will receive free high-quality medical care and so the child would be born a U.S. citizen. This amendment should probably be considered only in the context of an amendment to eliminate birthright citizenship (see below), so it could not be argued that the change might be harmful to the fetus soon to be a U.S. citizen. [AKS APPROVES____ DISAPPROVES____ NEEDS MORE INFO____]

*careful!*

## III. EMPLOYER SANCTIONS/VERIFICATION SYSTEM

1. Improvements in birth certificate, driver licenses, and other I.D.-related documents. [Already approved by AKS]

2. Reform of document-related employment discrimination provisions. At present an employer is caught between (a) the threat of sanctions for knowingly hiring an illegal alien or for failing to follow the verification procedures, and (b) the risk of penalties under the 1990 provision creating a violation for requiring too many or the wrong documents, or failing to honor documents. We have heard a number of horror stories on this. At a minimum, this provision should be modified to require that the alien has been denied the job, as the result of discrimination. Merely treating some applicants differently than others is not the primary evil that the original anti-discrimination provision was intended to combat. Indeed, it is questionable whether it is

8.209  Immigrant Control and
Financial Responsibility Act -1995
AKS Memos

5

an evil at all, if done with a good intent. Given that such a large portion of illegal aliens, especially in certain geographical areas and types of businesses, are of a particular ethnicity, it is only reasonable that an employer sincerely trying to avoid hiring illegal aliens would subject applicants of that ethnicity to greater scrutiny. As long as the person is given fair consideration once the determination is made that he is authorized to work in the U.S., then the original goal of this section has been achieved. [AKS APPROVES__X__ DISAPPROVES____ NEEDS MORE INFO____]

IV. NEW AREAS

1. Repeal of ban on warrantless open field searches. As you may recall, Larry Fuchs indicated at the March 14 hearing that when Congress voted to ban such searches "they took away an important enforcement tool of the INS" (see uncorrected transcript at p. 197). [AKS APPROVES__X__ DISAPPROVES____ NEEDS MORE INFO____]

2. Elimination of birthright citizenship. [AKS APPROVES____ DISAPPROVES____ NEEDS MORE INFO____]

3. Make voting by aliens a Federal crime. [AKS APPROVES__X__ DISAPPROVES____ NEEDS MORE INFO____]

4. Prohibit international transfer of funds by illegal aliens. [AKS APPROVES__X__ DISAPPROVES____ NEEDS MORE INFO____]

5. Authorize SSA, INS, IRS, State DMVs, _____ to exchange data. We have been told that various provisions of Federal law now prevent SSA and other State and Federal agencies from exchanging information that would enable the confirmation of immigration status, authorization to work, criminal history, and so forth. A carefully drafted amendment aimed at correcting this problem -- one with appropriate safeguards against misuse -- would be very beneficial. [AKS APPROVES__X__ DISAPPROVES____ NEEDS MORE INFO____]

S.269 Immigrant Control and
Financial Responsibility Act -1995
AKS Memos

# EXHIBIT Q



RG 46 Records of the U.S. Senate

103-104 Congress

JUDICIARY COMMITTEE
SUBCOMMITTEE ON IMMIGRATION
LEGISLATIVE FILES
REPUBLICAN

Box No. 4 OF 19

vr

VR

1

MARKUP SESSION

1

2

- - -

3

WEDNESDAY, JUNE 14, 1995

4

United States Senate,

5

Subcommittee on Immigration,

6

of the Committee on the Judiciary,

7

Washington, D.C.

8

The subcommittee met, pursuant to notice, at 9:39 a.m.,

9

in Room SD-226, Dirksen Senate Office Building, Hon. Alan K.

10

Simpson, chairman of the subcommittee, presiding.

11

Present: Senators Simpson, Grassley, Kyl, Simon, and

12

Feinstein.

13

Senator Simpson. The subcommittee will come to order.

14

Apparently, we have a roll call coming at 10:20, with a time

15

agreement of 20 minutes. So since we are in recess, we may

16

be able to skip along here for a while and then I think thee

17

will be three votes in succession. So we will try to

18

proceed, and we can do so with a quorum of three in the

19

subcommittee, according to subcommittee rules.

20

So at this time, since we are in subcommittee markup,

21

getting prepared to hopefully review, of course, and send

22

this on to the full committee, I am now calling for

23

additional amendments from any member of the subcommittee.

24

[S. 269 follows:]  [see 6/8/95 transcript]

1    and there are some who discriminate, sadly enough.  We will

2    never really reach them anyway, but "willful" is more than

3    "knowing," and I would hope that the amendment might be

4    rejected.

5        Is there further discussion of the amendment?  Any

6    further discussion?

7        [No response.]

8        Senator Simpson.  The clerk will call the roll.

9        Mr. Day.  Senator Grassley?

10       Senator Grassley.  No.

11       Mr. Day.  Senator Kyl?

12       Senator Kyl.  Aye.

13       Mr. Day.  Senator Specter?

14       [No response.]

15       Mr. Day.  Senator Kennedy?

16       Senator Simon.  No, by proxy.

17       Mr. Day.  Senator Simon?

18       Senator Simon.  No.

19       Mr. Day.  Senator Feinstein?

20       Senator Feinstein.  No.

21       Mr. Day.  Chairman Simpson?

22       Senator Simpson.  No.

23       Mr. Day.  The amendment is rejected, 5 to 1.

24       Senator Simpson.  We will now have an amendment from

25   this side of the aisle.

(16)

32

vr

1          Senator Simon.  Yes.  I have an amendment on judicial

2    review, and this would simply permit a class action judicial

3    review.  When people are excluded, it does not permit an

4    individual to go in for judicial review, but does permit--

5    just to use an example from Senator Feinstein's recent

6    amendment, if the Immigration Service is just blatantly

7    ignoring communicating to people in their language, then

8    there could be a class action suit.  So that we don't have a

9    lot of litigation and all kinds of judicial decisions, it

10   all has to take place in the D.C. court here, the district

11   court.  So, that is basically it.  It is a very narrowly

12   constructed kind of situation that permits a class action.

13          [The amendment follows:]

AMENDMENT NO. _____

Purpose:    To permit limited class action review in summary or emergency exclusion proceedings.

AMENDMENT intended to be proposed by Mr. SIMON (for himself and _____)

Viz:

(a) In section 142(f)(1), on page 36, strike ", or to certify a class under Rule 23 of the Federal Rules of Civil Procedure".

(b) In section 142(f), on page 36, add the following subparagraph (2) and renumber all subsequent subparagraphs accordingly:

   "(2) "Notwithstanding any other provision of law, the United States District Court for the District of Columbia shall have sole and exclusive original jurisdiction over class action lawsuits filed pursuant to Rule 23 of the Federal Rules of Civil Procedure that arise under this section.  Such jurisdiction is limited to actions under Rule 23 that challenge the validity or constitutionality of the practices, procedures and policies adopted by the Attorney General to implement the provisions of Section 235(e)."

(c) In section 142(f)(2), as amended herein, on page 36, strike "Judicial review of any cause, claim or individual determination" and insert in lieu thereof "Judicial review of any individual cause, claim, or determination".

vr

33

1    Senator Simpson.  Let me speak in opposition to the

2  amendment and say why, briefly.

3    The whole purpose of expedited exclusion here is to

4  accelerate the exclusion of those who would abuse our

5  hospitality and our generosity by surreptitious entry,

6  document fraud, and making fraudulent and frivolous asylum

7  claims.  That is what has given rise to a lot of public

8  interest in immigration reform, those things right there--

9  entry, sneaking in, phony documents, fraudulent claims for

10  asylum for people who have come through four countries and

11  could have stopped at any one of them to seek asylum if they

12  were really asylees and finally ending up here.  So those

13  are the things that people, I think, have begun to

14  understand.

15    If you permit class action challenges to these

16  procedures, I think it is going to shut down the process

17  every time it needs to be used.  That is my experience.

18  Class action suits are often used in ways by opponents of

19  particular Government policies, or any policy, individual,

20  collective, but let me give you an example of one that I saw

21  right here in this issue with class action suits.

22    Take a look at the amnesty for illegal aliens in the

23  1986 immigration bill.  You remember the amnesty program had

24  a 12-month application period.  This program should have

25  ended 7 years ago, but because of class action suits and

# EXHIBIT R

Coalition for Humane Immigrant Rights, et al. v. Noem et al., 1:25-cv-00872 (JMC)



RG 46 Records of the U.S. Senate

103 - 104 Congress

JUDICIARY Committee
SUBCOMMITTEE ON IMMIGRATION
LEGISLATIVE FILES
REPUBLICAN

Box No. 9 of 19

# TRANSCRIPT OF PROCEEDINGS

UNITED STATES SENATE

\* \* \*

COMMITTEE ON THE JUDICIARY

\* \* \*

COMMITTEE BUSINESS

\* \* \*

Washington, D.C.

March 14, 1996

MILLER REPORTING COMPANY, INC.
507 C Street, N.E.
Washington, D.C. 20002
(202) 546-6666

vr

61

1   deportation order in effect if they come back in?

2       Senator Kyl.  Right, but that is existing law, so I am

3   frustrated on how to make the Justice Department enforce

4   existing law.  I will forget the amendment for now.

5       The Chairman.  Well, I think people would vote for that

6   if you can come up with the right language.

7       Senator Kyl.  Well, perhaps to just suggest that for

8   the time being, my amendment number 10 would be a sense of

9   the Senate that we enforce this and probably try to do

10  something a little bit more meaningful when we get to the--

11      The Chairman.  That will be fine.  We will turn to

12  Senator Leahy, then.  We appreciate the cooperation and we

13  are moving pretty well.  I hope we can continue this because

14  I would like to get through this today if we can.  It makes

15  Senator Simpson's and Senator Kennedy's lives much more

16  easy, it seems to me.

17      Senator Leahy.  Mr. Chairman, in that regard, instead

18  of taking up all 10 of my amendments, why don't I take up

19  one and seek your support?

20      The Chairman.  I think that is a good suggestion.

21      Senator Leahy.  What I would do is strike sections 133

22  and 193 of the bill.  Let me explain what it is.  With only

23  some exceptions, the sections in here prohibit an asylum

24  claim to those who enter the country with false

25  identification.  I understand the reason for this.  We don't

vr

62

1   want alien smuggling, we don't want false documentation, but

2   there are, of course, some countries where the only way you

3   are going to get here if you are being oppressed or if you

4   are in danger of your life is escaping with false papers.

5       You don't necessarily go directly from the country of

6   origin.  This bill puts a premium on, even if you do use

7   false papers, if you are coming directly from the country of

8   origin.  Fidel Castro's sister, who came here on false

9   papers, went through Spain, not from the country of origin.

10  You go back to historical times--Raoul Wallenberg, Japanese

11  counsel Sukahara, Oscar Schindler--I mean, these are people

12  that provided all kinds of false documentation and saved

13  thousands of lives during World War II.

14      I have no problem with requiring the fact that asylum

15  officers consider as potentially relevant factors to an

16  asylum claim that the refugee came here with false

17  documents.  Then they should also give whatever route they

18  followed, and it can well be a relevant factor if they

19  didn't come directly from the country and they are trying to

20  escape or go through another country.

21      But I am afraid the way this is now written, Mr.

22  Chairman, that these factors could be dispositive that they

23  did not come directly from the country, but rather went

24  through a different country, or they come with false papers.

25  That might be dispositive and say that their claim of status

63

vr

1   either as being persecuted or their life endangered, or

2   whatever, would be dispositive.

3       What the bill does is it goes too far.  It puts the

4   burden on the refugee.  It says the refugee, without counsel

5   and in a summary proceeding, has to establish that he or she

6   is an exception and create a clear record of credible fear

7   and that it was necessary to present the false document to

8   depart from the persecuting country.  If they can't

9   establish that they came directly from that country, but

10  rather did like Fidel Castro's sister did, going through

11  another country, it puts another huge hurdle on them.

12      The United Nations High Commissioner on Refugees sent

13  you, Mr. Chairman, a letter dated March 6th objecting to

14  these provisions as inconsistent with the 1967 Protocol

15  Relating to the Status of Refugees.  Our own Department of

16  Justice in their comments say they don't support the

17  provisions of this bill.  They say that the sections appear

18  to override the discretionary waivers for fraud consistent

19  with a fair and humanitarian immigration policy.

20      I think what this is going to do is just end up costing

21  a lot of training for our asylum officers and it is not

22  going to do a great deal.  The Deputy Attorney General wrote

23  us that, quote, "Absent smuggling or an extraordinary

24  migration situation, we can handle asylum applications for

25  excludable aliens under our regular procedures."  The

vr

64

1    Department of Justice says we should allow immigration

2    judges rather than asylum officers make these

3    determinations.

4        I think the new screening standards don't take into

5    account the January 1994 reorganization of the asylum

6    process or the increased resources that we have.

7    Apparently, those, I am told, have increased our

8    productivity in resolving claims by more than 100 percent

9    since last year.

10       So I would be happy to work with anybody to create a

11   special screening procedure for mass migration settings, or

12   whatever INS needs, but I think that this goes too far.  I

13   think the hurdles this puts--obviously, because of the name,

14   Fidel Castro's sister could overcome some of these hurdles.

15   That becomes almost a political--almost--it becomes a

16   political issue, so she gets over the hurdle of going

17   through another country and having false papers.

18       But somebody escaping a genocidal situation, a human

19   rights situation, using false papers and can only get out by

20   going through other countries and then coming here, but do

21   not have a famous name, do not have something the press is

22   going to pay a lot of attention to, is going to be there

23   with that asylum officer all by themselves, with no help,

24   with somebody who is poorly trained to make this

25   determination.  They are going to look at the law and say,

65

vr

1    sorry, you didn't meet the burden.

2        [The amendment follows:]

vr

66

1       The Chairman.  Senator Simpson?

2         Senator Simpson.  You are right in the nub of the issue

3   now.  These two provisions, sections 133 and 139, are the

4   provisions which would be stricken here, which deny to

5   aliens who arrive in the United States using fraudulent

6   documents the right to apply for and be granted asylum.

7         My friend from Vermont is citing someone leaving a

8   genocidal situation or truly fleeing persecution, going

9   through two or three countries to get here.  Lady and

10  gentlemen, if you are truly fleeing persecution, the minute

11  you get to the country that is free, you have attained

12  asylum.  These people do not stay in that country.  They go

13  through one, two, three or four countries to get here.  That

14  is not asylum.  That is a gimmicking of the system.

15        If you are fleeing for your life and you get across the

16  border of your country to another country but it is not one

17  where you want to stay, that person is not an asylee.  That

18  person is seeking just to get to the United States, and then

19  using asylum to do so.

20        Now, these are the two important parts of the major

21  aims of the bill, and that is to be able to deal fairly and

22  promptly with those who have found a very successful way to

23  emigrate to the United States by using fraudulent documents

24  to board a plane--here is the pattern.  You board a plane,

25  give the document back to the alien smuggler on the plane or

EPORTING CO., INC.
eet, N.E.
n, D.C.  20002
6666

67

vr

1  flush it down the john on the plane, step off the plane and

2  claim asylum at the port of entry.

3      This problem is a very serious one. Many of us saw the

4  dramatically depicted "60 Minutes" program where the alien,

5  without any documents whatsoever and a pretty nice-looking

6  set of luggage, gave the magic words, which are "I want to

7  claim asylum," and shizzam, the golden door opened, just as

8  the smuggler had instructed the person. The program ended,

9  as you will remember, as the person walked out the door of

10  JFK, grabbed a taxi, and headed off into the city, very

11  likely never to be seen again. Even if he had been given a

12  paper to say you will appear at a certain time for your

13  hearing, very few of them show up. That was what was

14  depicted there.

15      The bill provides an opportunity for every single

16  person entering without documents to claim asylum. It has a

17  procedure for hearings. It has due process. This would be

18  removed; these procedures would be taken. A specially

19  trained asylum officer will hear his or her case. That is

20  in this bill. That would be stricken. If he has a credible

21  claim to asylum, he will be provided a full-fledged asylum

22  hearing, not just this more abbreviated form. But if he or

23  she does not have a credible claim, he will be excludable,

24  as are all persons who attempt to enter without documents or

25  with fraudulent documents.

vr

68

1    Remember, finally, that, as I say, if a person were
2    seriously fleeing for his life or freedom, they could have
3    sought safe haven in any one of the countries before they
4    got here. Many of the people, we find, don't even know what
5    passport they are carrying. They have just been handed the
6    thing.

7    Remember this as you think of asylum, and here it is.
8    Please hear this. Only 20 percent--and this is the Attorney
9    General and Doris Meissner doing a good job--20 percent of
10   those who come here and claim asylum are able to demonstrate
11   a well-founded fear of persecution, only 20 percent. That
12   is it. That is what is happening. This is an area of
13   serious gimmickry, and you remove the two sections of the
14   law that would have at least something to do with an
15   expedited procedure to just turn these people around and
16   say, we are not going to go for that, it won't work here.

17   So those are the things that, to me, are important in
18   considering the rejection of the amendment.

19   Senator Leahy. Mr. Chairman?

20   The Chairman. Senator Leahy.

21   Senator Leahy. I might say that, for one thing, the
22   Justice Department says they can handle this. INS says they
23   can handle this without putting what they see as further
24   burdens and removing basic due process.

25   The fact of people going through other countries and

vr

1   persecution, with all of the implications that that has had

2   in horrific kinds of circumstances--everybody has got their

3   list of the people that came through with fancy luggage.  I

4   have got a list of people over here, too, that have been

5   killed and murdered in their countries, and even

6   circumstances where people went back there and that happened

7   to them.

8       So it seems that if you meet that first criteria, and

9   it ought to be a tough one made by competent people, that

10  ought to be sufficient.  Worrying about where the documents

11  are, I think, just opens up the situation for undermining

12  the earlier test, which ought to be a well-founded fear of

13  persecution.

14      Senator Feinstein.  Mr. Chairman?

15      Senator Kyl.  Mr. Chairman?

16      Senator Simon.  Mr. Chairman?

17      The Chairman.  Senator Kyl was next, and then I will

18  come to Senator Simon, Senator Feinstein, and then finally

19  Senator Simpson.

20      Senator Kyl.  Mr. Chairman, this is a very difficult

21  issue, but it is an issue which Senator Simpson has

22  attempted to address in this legislation and I think we have

23  got to address it.  One can always point to the exception,

24  the person who has a good claim and somehow was excluded,

25  but this is very haphazard process and we just have to

ER REPORTING CO., INC.
C Street, N.E.
hington, D.C.  20002
) 546-6666

74

vr

1   recognize in the real world there are literally, probably,
2   tends of thousands, perhaps hundreds of thousands of people
3   in the world right this very moment who are being
4   persecuted. Yet, we are not taking them in because they
5   haven't gotten here, basically, and we can't take in
6   everybody in the world.
7       This is a very difficult situation, and when someone
8   finally does--and it is a totally haphazard process--make it
9   to this country, we want to give them every opportunity to
10  make that claim. While you can always cite the exception to
11  the rule where someone has not been handled in an
12  appropriate fashion, the statistics point to the other side
13  of the story as the issue that the Senator from Wyoming is
14  trying to deal with where tens of thousands of people each
15  year are coming to our country and disappearing in our
16  society.
17      I will just cite one anecdote and then, in the interest
18  of time, just make my point that way. In the little town of
19  Douglas, where in just the first 15 days of January about
20  half the population of Douglas came across the border
21  illegally--and they are apprehending like 6,000 people very
22  15 days--the big group of people coming across there are
23  large groups that are being smuggled in by smuggling rings
24  from Asian countries and their category is "other than
25  Mexican." The reason they have that category is that, of

vr

1  course, on the Arizona border so many of the illegal

2  immigrants are from Mexico.

3      The "other than Mexican" category approaches 40 to 50

4  percent.  These are professional smuggling rings, and what

5  do they do?  These people have families in Chicago or New

6  York, or wherever.  They come in, and because they can't be

7  held because the facilities aren't there, they make their

8  claim in the first instance and then they are gone and you

9  never see them again.  There were 50,000 claims for asylum

10  last year.  Only 20,000 percent were deemed valid.  That is

11  40,000 who were not deemed valid.  I don't know the number

12  of those that disappeared and never were found.  I don't

13  know that we can know that number.

14      My only point is this.  We will always be able to find

15  the one example of someone who very unfortunately wasn't

16  able to gain asylum and we wish they could have.  We have

17  got to look at the other side of this, too, and the

18  detriment to society caused by the fact that we have tens of

19  thousands of people staying here who shouldn't be.  Senator

20  Simpson's bill is an attempt to at least begin to get at

21  that problem.

22      It is not unfair.  Trained people will make a threshold

23  determination.  It is a very low threshold.  Once that has

24  been satisfied, you go through the full process with all of

25  the hearings and the appeals and everything else.  The

vr                                                                          76

1  standard is not different.  The "fear of persecution"

2  standard remains the same.

3      So it seems to me that considering the large nature of

4  this problem, Senator Simpson's bill, while it may not be

5  perfect, is a good-faith attempt to solve it and I think we

6  ought to move it forward in that form and not with the Leahy

7  amendment.

8      Senator Leahy.  Mr. Chairman?

9      Senator Feinstein.  Mr. Chairman?

10     Senator Kennedy.  Can I ask a question?

11     The Chairman.  Senator Simon was next.  Could you defer

12  to Senator Kennedy?

13     Senator Simon.  Yes.

14     Senator Kennedy.  Were those people that came across

15  the border all granted asylum?

16     Senator Kyl.  No.

17     Senator Kennedy.  Well, that is what you have to have

18  in order to be released, a credible fear of persecution.

19     Senator Kyl.  Yes.

20     Senator Kennedy.  I mean, let's not confuse this.

21  Let's not say that people that come over get released and

22  that is what we are really dealing with.  That is not what

23  we are dealing with.  You don't get released unless you have

24  a preliminary finding that they had a credible fear of

25  persecution.  I can't understand how the people moving over

ING CO., INC.
.E.
C. 20002

vr

76

1   standard is not different.  The "fear of persecution"

2   standard remains the same.

3       So it seems to me that considering the large nature of

4   this problem, Senator Simpson's bill, while it may not be

5   perfect, is a good-faith attempt to solve it and I think we

6   ought to move it forward in that form and not with the Leahy

7   amendment.

8       Senator Leahy.  Mr. Chairman?

9       Senator Feinstein.  Mr. Chairman?

10      Senator Kennedy.  Can I ask a question?

11      The Chairman.  Senator Simon was next.  Could you defer

12  to Senator Kennedy?

13      Senator Simon.  Yes.

14      Senator Kennedy.  Were those people that came across

15  the border all granted asylum?

16      Senator Kyl.  No.

17      Senator Kennedy.  Well, that is what you have to have

18  in order to be released, a credible fear of persecution.

19      Senator Kyl.  Yes.

20      Senator Kennedy.  I mean, let's not confuse this.

21  Let's not say that people that come over get released and

22  that is what we are really dealing with.  That is not what

23  we are dealing with.  You don't get released unless you have

24  a preliminary finding that they had a credible fear of

25  persecution.  I can't understand how the people moving over

77

vr

1  from Mexico in the first 15 days has anything to do with

2  this provision.

3      Senator Kyl.  Well, Mr. Chairman, since Senator Kennedy

4  has raised the question, I explicitly said that I don't know

5  the breakdown of the statistics of those who sought asylum,

6  were released, and then didn't show up.  I specifically

7  indicated that I didn't have that number.  But I also

8  indicated that having talked to the INS people in the Tucson

9  sector, which covers Nogales and Douglas--and I cited the

10  statistics of the number of people coming across at Douglas

11  who are not just from Mexico.  These are people who are from

12  professional smuggling organizations.

13      This is a big business; it is huge numbers.  I don't

14  have the numbers, but they are very, very large.  I was

15  simply trying to make the point that we somehow have to deal

16  with that aspect of the problem.  We in this country are

17  always concerned that not one innocent person be found

18  guilty, that not one person being persecuted be turned away,

19  but we have got to look at the other side of this equation,

20  too, and that was really my only point.

21      The Chairman.  I would like to hurry along here.  I

22  think we are having a pretty good debate, but we can overdo.

23      Senator Simon, we will go to you, and then we are going

24  to go to Simpson, Senator Feinstein--excuse me--Senator

25  Simon, Senator DeWine, Senator Feinstein, and then finally

# EXHIBIT S

Coalition for Humane Immigrant Rights, et al. v. Noem et al., 1:25-cv-00872 (JMC)

COPIED FROM THE AMERICAN HERITAGE CENTER, UNIVERSITY OF WYOMING. THIS MATERIAL MAY BE RESTRICTED BY UNITED STATES COPYRIGHT LAW. IT IS THE RESPONSIBILITY OF THE RESEARCHER TO OBTAIN COPYRIGHT APPROVAL PRIOR TO QUOTATION OR PUBLICATION.

# C O V E R

# S H E E T

# FAX

# IMMIGRATION & NATURALIZATION SERVICE

**To:** Dick Day

**Fax #:** 228-4506

**Subject:** Terrorism Bill - INS issue

**Date:** 4/16/96

**Pages:** 7

**COMMENTS:**

As we discussed. Let's talk when you can.

From the desk of...

**Pamela Barry**
Executive Director
Office of Congressional &
Intergovernmental Relations
Immigration & Naturalization Service
425 I Street, NW
Washington, DC 20536

(202) 514-9904
Fax: (202) 514-1117

COPIED FROM THE AMERICAN HERITAGE CENTER, UNIVERSITY OF WYOMING. THIS MATERIAL MAY BE RESTRICTED BY UNITED STATES COPYRIGHT LAW. IT IS THE RESPONSIBILITY OF THE RESEARCHER TO OBTAIN COPYRIGHT APPROVAL PRIOR TO QUOTATION OR PUBLICATION.

▸ The "tentative draft" conference report on the Antiterrorism Bill (H.R. 2703/S. 735) contains a number of sections that make substantial technical and substantive changes to the Immigration and Nationality Act that are unrelated to terrorism. Some of these changes did not appear in terrorism bills passed by either the House or the Senate.

▸ The inclusion of such substantial changes to the immigration laws at the conference committee on terrorism legislation and without public debate raises grave concerns, thwarts more careful changes to the immigration laws that have been worked out in the debates on immigration reform legislation, and would impose enormous and unnecessary administrative burdens on INS.

## Entrants Without Inspection (EWIs) treated as exclusion cases

▸ Aliens who have not been inspected and admitted by an immigration officer are considered applicants for admission. This makes aliens who have entered without inspection ineligible for the relief of suspension of deportation. This form of relief is reserved for aliens of good moral character who have resided in the United States for seven years or more and whose removal would result in extreme hardship. The House immigration bill would also treat EWIs as applicants for admission, but it contains a carefully crafted series of conforming amendments to limit the serious negative effects that such a change might otherwise bring.

## Expedited Exclusion

▸ Expedited exclusion is made applicable to aliens excludable for presenting fraudulent documents or no documents; it is mandatory; and would be applied to aliens who have entered the U.S. without inspection, wherever encountered and irrespective of the length of their stay in the U.S. These individuals would never have their cases heard by an immigration judge; all exclusion decisions would be made by immigration officers or, in some circumstances, asylum officers. The immigration bills, on the other hand, give the Attorney General discretion regarding when and where to apply the special exclusion proceedings. The mandatory approach taken by this draft will require a substantial and unnecessary commitment of resources at the ports of entry and also throughout the country, because of its application to EWIs.

## Criminal Aliens

▸ The draft would amend the definition of a crime involving moral turpitude for deportation purposes to include felony convictions for which a sentence of one year or more may be imposed. Under current law, an alien must have been sentenced to confinement for one year or more. This change will subject a large number of aliens, including permanent residents who have been convicted of relatively minor crimes, to deportation. The magnitude of this change is multiplied by amendments made in later sections that treat most crimes involving moral turpitude in the same manner as aggravated felonies for custody purposes and eligibility for relief. This provision is not included in either of the

COPIED FROM THE AMERICAN HERITAGE CENTER, UNIVERSITY OF WYOMING. THIS MATERIAL MAY BE RESTRICTED BY UNITED STATES COPYRIGHT LAW. IT IS THE RESPONSIBILITY OF THE RESEARCHER TO OBTAIN COPYRIGHT APPROVAL PRIOR TO QUOTATION OR PUBLICATION.

immigration bills.

• The draft would eliminate judicial review for virtually all aliens who are found excludable or deportable on the basis of a criminal conviction. This restriction applies to review of applications for relief as well as the underlying determination of excludability or deportability. This provision is overly broad in its restrictions on judicial review. As written, it would not permit even challenges based on mistaken identity or constitutional issues. We have objected to a similar provision included in the immigration bill reported by the Senate Judiciary Committee.

• The draft provides for mandatory detention, without discretion to release, of all aggravated felons and virtually all other alien criminals. The Attorney General must remove all criminal aliens, other than certain cooperating witnesses, within thirty days of a final order of deportation (current law is six months). These provisions are likely to have a serious negative effect on our detention capabilities and the expeditious removal of the most serious criminals.

• The draft makes long term lawful permanent residents with convictions for aggravated felonies and crimes involving moral turpitude ineligible for relief from exclusion or deportation under section 212(c) of the INA. This provision would remove an important form of relief for permanent residents and would produce a hardship for such aliens and their permanent resident and U.S. citizen family members. It is also inconsistent with another provision of the draft report which would render ineligible for 212(c) relief only those aliens who have been sentenced to confinement for five years or more for an aggravated felony conviction.

• The draft report would include among those aliens with criminal convictions who may be deported without a hearing, lawful permanent residents whose permanent residence is conditional (principally because they gained status based on a marriage of less than two years' duration). This provision raises due process concerns.

COPIED FROM THE AMERICAN HERITAGE CENTER, UNIVERSITY OF WYOMING. THIS MATERIAL MAY BE RESTRICTED BY UNITED STATES COPYRIGHT LAW. IT IS THE RESPONSIBILITY OF THE RESEARCHER TO OBTAIN COPYRIGHT APPROVAL PRIOR TO QUOTATION OR PUBLICATION.

**Sec.414** would amend the "entry" doctrine which now provides that aliens who have entered the United States, even clandestinely, are entitled to a full due process deportation proceeding, rather than exclusion proceedings, if INS seeks their removal.  Under section 414, aliens who have not been inspected and admitted by an immigration officer would be considered applicants for admission, thus amenable to exclusion proceedings.

We support amending the Immigration and Nationality Act to eliminate the "entry" distinction between deportation and exclusion, but the approach taken in the draft conference report would make other changes in immigration law that are better addressed in the comprehensive immigration reform legislation, H.R. 2202, passed by the House.  The House immigration bill would also treat EWIs as applicants for admission, but it contains a carefully crafted series of conforming amendments to limit the serious negative effects that such a change might otherwise bring.

For example, by treating aliens who have entered the United States without inspection as applicants for admission, this section would virtually eliminate suspension of deportation as a form of relief from deportation. Suspension of deportation is an important form of humanitarian relief.  In order to be granted suspension, an applicant must have resided in the U.S. for at least seven years, be of good moral character, and prove that his or her deportation would result in extreme hardship to the applicant and/or a U.S. citizen or permanent resident spouse, child, or parent.  It can be granted only after a full evidentiary hearing before an immigration judge.

In 1994, 4,254 applications were received and suspension was granted in 2,405 cases. Suspension of deportation was created largely to avoid the need for members of Congress to file private bills for deserving constituents.  If suspension is eliminated, the Judiciary Committees can expect to see a substantial increase in private bills.

**Sec.422** provides for the expedited exclusion of arriving aliens found to be inadmissible for having presented fraudulent documents or no documents for admission. It would require the Attorney General to order an alien excluded and deported without the opportunity for an immigration judge hearing and without any further administrative review.  Judicial review would be limited. An exception is created for aliens who demonstrate a credible

COPIED FROM THE AMERICAN HERITAGE CENTER, UNIVERSITY OF WYOMING. THIS MATERIAL MAY BE RESTRICTED BY UNITED STATES COPYRIGHT LAW. IT IS THE RESPONSIBILITY OF THE RESEARCHER TO OBTAIN COPYRIGHT APPROVAL PRIOR TO QUOTATION OR PUBLICATION.

fear of persecution upon return to their country, but even they would not go before an immigration judge.

Obtaining expedited exclusion authority is critically important to our ability to deal with organized alien smuggling and fraud at our ports of entry. Accordingly, the Administration has strongly supported expedited exclusion provisions that have appropriate safeguards and reflect a proper concern for practical and sensible administration. In this light, the draft conference report raises two major concerns.

First, the bill would provide for expedited exclusion procedures to operate at all times in parallel with the normal exclusion process. We believe this is unnecessary and an inappropriate use of resources. The Administration's proposal and the Senate immigration bill, on the other hand, would authorize expedited exclusion; but would provide the Attorney General the flexibility to determine the circumstances in which it should be implemented.

Second, the conference draft would make expedited exclusion applicable not only to all arriving aliens, as the Administration bill does, but also to aliens in the United States who were never inspected and admitted. These individuals would never have their cases heard by an immigration judge; all exclusion decisions would be made by immigration officers or, in some circumstances, asylum officers. While we agree that aliens who have never been admitted should be subject to exclusion, as opposed to deportation, procedures, we believe the ordinary exclusion procedures are more appropriate to address issues typically involved in the case of an alien who has been in the United States for some time.

**Sec. 436** amends the definition of a crime involving moral turpitude for deportation purposes to include felony convictions for which a sentence of one year or more may be imposed. Under current law, an alien must have been sentenced to confinement for one year or more. This change will subject a large number of aliens, including permanent residents who have been convicted of relatively minor crimes, to deportation. The magnitude of this change is multiplied by amendments made in later sections that treat most crimes involving moral turpitude in the same manner as aggravated felonies for custody purposes and limitations on eligibility for relief.

COPIED FROM THE AMERICAN HERITAGE CENTER, UNIVERSITY OF WYOMING. THIS MATERIAL MAY BE RESTRICTED BY UNITED STATES COPYRIGHT LAW. IT IS THE RESPONSIBILITY OF THE RESEARCHER TO OBTAIN COPYRIGHT APPROVAL PRIOR TO QUOTATION OR PUBLICATION.

**Sec. 441** would eliminate judicial review for virtually all aliens who are found excludable or deportable on the basis of a criminal conviction. This restriction applies to review of applications for relief as well as the underlying determination of excludability or deportability.  This restriction would apply to both immigration judge orders and those orders issued by District Directors.  We oppose this provision as being overly broad in its restrictions on judicial review.  As written, it would not permit even challenges based on mistaken identity or constitutional issues.  While we favor limitations on judicial review for criminal aliens, we urge the Conference to retain a provision for review of the alien's identity and whether the appropriate procedure for administrative orders has been applied.

Sec. 441(c) requires the Attorney General to assume custody of all aggravated felons and most other criminal aliens and to maintain custody without exception until removal. We can not support this amendment as currently written because it too severely restricts the Attorney General's discretion and cannot be implemented without a massive increase in detention resources. Under an amendment added in 1990, current law permits release of a lawfully admitted alien who has been convicted of an aggravated felony, if he or she is not found to be a threat to the community and is likely to appear for hearings.  Before that amendment, numerous court decisions had questioned the constitutionality of the previous "no-release" rule or held it invalid.  The draft conference report would essentially reinstate the earlier provision and invite a renewal of the litigation.  We believe the Attorney General should be allowed to retain her discretion to determine who must be held in custody during the pendency of the hearing process.

Sec. 441(d) makes long term lawful permanent residents with convictions for aggravated felonies and crimes involving moral turpitude ineligible for relief from exclusion or deportation under section 212(c) of the INA.  This provision would remove an important form of relief for permanent residents and would produce a hardship for such aliens and their permanent resident and U.S. citizen family members.  It is also inconsistent with another provision of the draft report which would render ineligible for 212(c) relief only those aliens who have been sentenced to confinement for five years or more for an aggravated felony conviction.

COPIED FROM THE AMERICAN HERITAGE CENTER, UNIVERSITY OF WYOMING. THIS MATERIAL MAY BE RESTRICTED BY UNITED STATES COPYRIGHT LAW. IT IS THE RESPONSIBILITY OF THE RESEARCHER TO OBTAIN COPYRIGHT APPROVAL PRIOR TO QUOTATION OR PUBLICATION.

Sec. 441(e) adds a number of crimes to the definition of aggravated felony and reduces the predicate sentences for several existing aggravated felonies. As a result, the definition of aggravated felony would include a number of lesser offenses. The grave consequences of being considered an aggravated felon include being ineligible for withholding of deportation and asylum, and being subject to mandatory detention and expedited deportation proceedings, and should be imposed only on serious criminals. Current law gives immigration judges the discretion to weigh the seriousness of the crime against the positive equities of each individual case and to grant relief only where it is appropriate. Immigration judges should be allowed to retain this discretion. The expanded definition would also impose a burden on the operations of the INS which would be required to detain all aggravated felons, without exception, under the draft conference report.

Sec. 441(f) applies the expedited deportation provisions of the INA to virtually all criminal aliens.

Sec. 441(g) provides that the Attorney General must remove all criminal aliens, other than certain cooperating witnesses, within thirty days of a final order of deportation (current law provides six months). The amendment presents serious difficulties primarily because it is often impossible to obtain the travel documents needed to remove an alien to his or her country within 30 days.

Sec. 443 would expand the categories of criminal aliens who may be removed by an immigration officer without an immigration judge hearing. Under current law an aggravated felon who is not a lawful permanent resident is subject to such a removal order. This subsection would include aliens whose permanent residence is conditional (principally persons who gained status based on a marriage of less than two years' duration). This section would also limit judicial review to the question of whether the alien is an alien described in the administrative removal section of the INA. As drafted, this provision raises due process concerns.

# EXHIBIT T

Coalition for Humane Immigrant Rights, et al. v. Noem et al., 1:25-cv-00872 (JMC)

Case 1:25-cv-00872-JMC Document 55-12 Filed 03/03/26 Page 188 of 280

Americans to contribute to campaigns and to run for office," said a newspaper ad that ran in the Minnesota Democrat's district. "The next time you see Rep. David Minge ask him this simple question: Why do you want more millionaires in Congress?"

NABPAC also is encouraging its members to cut off contributions to lawmakers who support the bill, and last month sent a memorandum to members of Congress enclosing copies of its ads. "The plans are to aggressively market this in other appropriate areas of the country," NABPAC executive vice president Steven F. Stockmeyer said in the memo.

Three sponsors of the campaign finance bill in the House, Reps. Christopher Shays (R-Conn.), Martin T. Meehan (D-Mass.) and Linda A. Smith (R-Wash.), fired back at NABPAC in a letter to its members last week, calling the memorandum a "thinly veiled threat to keep members from co-sponsoring" the legislation.

"[I]ntimidating members into staying off of the bill by either subtly or blatantly threatening to withhold campaign contributions is disgraceful and justifies why our legislation is needed," they wrote. "Frankly, these efforts simply inspire us further to try to end the system of checkbook lobbying in Washington."

But Shays said yesterday that "some members are [scared] because they don't want to be the enemy of these groups." A Common Cause study released last week found that NABPAC members gave $106 million to current members of Congress from 1985 to 1995.

In addition to abolishing PACs, the campaign finance bill, sponsored in the Senate by Sens. John McCain (R-Ariz.), Russell Feingold (D-Wis.) and Fred D. Thompson (R-Tenn.), would set voluntary state-by-state spending limits and, for those who agree to the limits, require television stations to offer 30 minutes of free time in evening hours and cut rates for other advertising before primary and general elections.

Critics contend that abolishing PACs would diminish the ability of average citizens to join together to have their voices head and would increase the influence of wealthy citizens.

Mr. FEINGOLD. Mr. President, what this article is about is a reaction to the effort that Senator McCAIN and I and others have been preparing to try to change our Nation's campaign financing system. There are those who have indicated that the effort will go nowhere because it is already too late in the 104th Congress, and that it is just going to go the way of all other campaign finance reform efforts in the past.

Frankly, Mr. President, this article gives me heart. It is eloquent testimony to the reason why we have got to have campaign finance reform in this country and why we need it now. What happened yesterday was, according to the article, an unusual alliance of unions, businesses, and liberal-conservative groups trying to defeat campaign finance legislation that would abolish political action committees and other restrictions on election spending, got together, all together, to try to kill the McCain-Feingold bill. It included groups such as the AFL-CIO, the NEA, National Association of Letter Carriers, the National Association of Business Political Action Committees, Cato Institute, Conservative Caucus, Americans for Tax Reform, EMILY's List—you name it—National Association of Broadcasters, the American Dental Association. This was a gathering of all the special interests in Washington, even before we have had the bill come up, saying, "Let's kill it before it has a chance to live."

The reason it gives me heart, Mr. President, really, there are two reasons. First of all, if this bill is not going anywhere, what are they worried about? Why are they coming together, as they so infrequently do, to kill a piece of legislation that is the first bipartisan effort in 10 years in this body to try to do something about the outrageous amount of money that is spent on campaigns and the outrageous influence that this community, Washington, has on the entire political process in this country?

I recall when I ran for the U.S. Senate, I might talk to somebody from the labor community or to an independent banker, and they would say, "Gee, we think you are a pretty good candidate, but first I have to check with Washington to see if I can support you." That is how the current system works. You have to check in with Washington first. I think that gives way too much power to this town and way too much power to these special interests that want to kill campaign finance reform in this Congress.

It gives me heart that there is concern. It also gives me heart that they are drawing attention to the fact. In fact, this article is eloquent testimony to what is really going on in this country. There is too much money in this town; there is too much money in these elections. What they are trying to do, Ann McBride of Common Cause pointed out, is to preserve the status quo, the meeting of labor and business coming together and agreeing on the one thing they can agree on, which is maintaining the status quo and their ability to use money to buy outcomes on Capitol Hill.

What our bipartisan effort is about is returning the power back to the people in their own home States, to let them have more influence over elections than the special interests that run this town. We will join this issue on the floor, and we will fight these special interests head on, regardless of their new coalitions.

Mr. President, I simply indicate we are prepared, as I did a couple of days ago along with other Senators, we are prepared to offer this as an amendment to a bill in the near future, or if the leadership sees it this way, to bring this up as separate legislation. The time is drawing near for campaign finance reform.

I thank the Chair. I yield the floor.

## IMMIGRATION CONTROL AND FINANCIAL RESPONSIBILITY ACT OF 1996

The Senate continued with consideration of the bill.

AMENDMENT NO. 3780 TO AMENDMENT NO. 3743

(Purpose: To provide minimum safeguards in expedited exclusion procedure to prevent returning bona fide refugees to their persecutors)

Mr. LEAHY. Mr. President, I send an amendment to the desk.

The PRESIDING OFFICER. The clerk will report.

The legislative clerk read as follows:

The Senator from Vermont [Mr. LEAHY], for himself, Mr. DEWINE, Mr. HATFIELD, and Mr. KERRY, proposes an amendment numbered 3780 to amendment No. 3743.

Mr. LEAHY. Mr. President, I ask unanimous consent reading of the amendment be dispensed with.

The PRESIDING OFFICER. Without objection, it is so ordered.

The amendment is as follows:

Strike sections 131 and 132.

Strike section 141 and insert the following:

SEC. 141. SPECIAL EXCLUSION IN EXTRAORDINARY MIGRATION SITUATIONS.

(a) IN GENERAL.—The Immigration and Nationality Act is amended by adding after section 236 (8 U.S.C. 1226) the following new section:

"SPECIAL EXCLUSION IN EXTRAORDINARY MIGRATION SITUATIONS

"SEC. 236A. (a) IN GENERAL.—

"(1) Notwithstanding the provisions of sections 235(b) and 236, and subject to subsection (c), if the Attorney General determines that the numbers or circumstances of aliens en route to or arriving in the United States, by land, sea, or air, present an extraordinary migration situation, the Attorney General may, without referral to a special inquiry officer, order the exclusion and deportation of any alien who is found to be excludable under section 212(a) (6)(C) or (7).

"(2) As used in this section, the term 'extraordinary migration situation' means the arrival or imminent arrival in the United States or its territorial waters of aliens who by their numbers or circumstances substantially exceed the capacity of the inspection and examination of such aliens.

"(3) Subject to paragraph (4), the determination whether there exists an extraordinary migration situation within the meaning of paragraphs (1) and (2) is committed to the sole and exclusive discretion of the Attorney General.

"(4) The provisions of this subsection may be invoked under paragraph (1) for a period not to exceed 90 days, unless within such 90-day period or extension thereof, the Attorney General determines, after consultation with the Committees on the Judiciary of the Senate and the House of Representatives, that an extraordinary migration situation continues to warrant such procedures remaining in effect for an additional 90-day period.

"(5) No alien may be ordered specially excluded under paragraph (1) if—

"(A) such alien is eligible to seek asylum under section 208; and

"(B) the Attorney General determines, in the procedure described in subsection (b), that such alien has a credible fear of persecution on account of race, religion, nationality, membership in a particular social group or political opinion in the country of such person's nationality, or in the case of a person having no nationality, the country in which such person last habitually resided.

"(6) A special exclusion order entered in accordance with the provisions of this section is not subject to administrative review other than as provided in this section, except that the Attorney General shall provide by

regulation or for a prompt administrative review of such an order against an applicant who claims under oath, or as permitted under penalty of perjury under section 1746 of title 28, United States Code, after having been warned of the penalties for falsely making such claim under such conditions, to have been, and appears to have been, lawfully admitted for permanent residence.

"(7) A special exclusion order entered in accordance with the provisions of this section shall have the same effect as if the alien had been ordered excluded and deported pursuant to section 236.

"(8) Nothing in this subsection shall be construed as requiring an inquiry before a special inquiry officer in the case of an alien crewman.

"(b) PROCEDURE FOR USING SPECIAL EXCLUSION.—(1) When the Attorney General has determined pursuant to this section that an extraordinary migration situation exists and an alien subject to special exclusion under such section has indicated a desire to apply for asylum or withholding of deportation under section 243(h) or has indicated a fear of persecution upon return, the immigration officer shall refer the matter to an asylum officer.

"(2) Such asylum officer shall interview the alien to determine whether the alien has a credible fear of persecution (or of return to persecution) in or from the country of such alien's nationality, or in the case of a person having no nationality, the country in which such alien last habitually resided.

"(3) The Attorney General shall provide information concerning the procedures described in this section to any alien who is subject to such provisions. The alien may consult with or be represented by a person or persons of the alien's choosing according to regulations prescribed by the Attorney General. Such consultation and representation shall be at no expense to the Government and shall not unreasonably delay the process.

"(4) The application for asylum or withholding of deportation of an alien who has been determined under the procedure described in paragraph (2) to have a credible fear of persecution shall be determined in due course by a special inquiry officer during a hearing on the exclusion of such alien.

"(5) If the officer determines that the alien does not have a credible fear of persecution in (or of return to persecution from) the country or countries referred to in paragraph (2), the alien may be specially excluded and deported in accordance with this section.

"(6) The Attorney General shall provide by regulation for a single level of administrative appellate review of a special exclusion order entered in accordance with the provisions of this section.

"(7) As used in this section, the term 'asylum officer' means an immigration officer who—

"(A) has had extensive professional training in country conditions, asylum law, and interview techniques;

"(B) has had at least one year of experience adjudicating affirmative asylum applications of aliens who are not in special exclusion proceedings; and

"(C) is supervised by an officer who meets the qualifications described in subparagraphs (A) and (B).

"(8) As used in this section, the term 'credible fear of persecution' means that, in light of statements and evidence produced by the alien in support of the alien's claim, and of such other facts as are known to the officer about country conditions, a claim by the alien that the alien is eligible for asylum under section 208 would not be manifestly unfounded.

"(c) ALIENS FLEEING ONGOING ARMED CONFLICT, TORTURE, SYSTEMATIC PERSECUTION, AND OTHER DEPRIVATIONS OF HUMAN RIGHTS.—Notwithstanding any other provision of this section, the Attorney General may, in the Attorney General's discretion, proceed in accordance with section 236 with regard to any alien fleeing from a country where—

"(1) the government (or a group within the country that the government is unable or unwilling to control) engages in—

"(A) torture or other cruel, inhuman, or degrading treatment or punishment;

"(B) prolonged arbitrary detention without charges or trial;

"(C) abduction, forced disappearance or clandestine detention; or

"(D) systematic persecution; or

"(2) an ongoing armed conflict or other extraordinary conditions would pose a serious threat to the alien's personal safety.".

(b) CONFORMING AMENDMENTS.—(1)(A) Section 235(b) of the Immigration and Nationality Act (8 U.S.C. 1225b) is amended to read as follows:

"(b) Every alien (other than an alien crewman), and except as otherwise provided in subsection (c) of this section and in section 273(d), who may not appear to the examining officer at the port of arrival to be clearly and beyond a doubt entitled to land shall be detained for further inquiry to be conducted by a special inquiry officer. The decision of the examining immigration officer, if favorable to the admission of any alien, shall be subject to challenge by any other immigration officer and such challenge shall operate to take the alien, whose privilege to land is so challenged, before a special inquiry officer.".

(B) Section 237(a) of the Immigration and Nationality Act (8 U.S.C. 1227a) is amended—

(i) in the second sentence of paragraph (1), by striking "Subject to section 235(b)(1), deportation" and inserting "Deportation"; and

(ii) in the first sentence of paragraph (2), by striking "Subject to section (b)(1), if" and inserting "If".

(2)(A) Section 106 of the Immigration and Nationality Act (8 U.S.C. 1105a) is amended—

(i) by striking subsection (e); and

(ii) by amending the section heading to read as follows: "JUDICIAL REVIEW OF ORDERS OF DEPORTATION AND EXCLUSION".

(B) Section 235(d) (8 U.S.C. 1225d) is repealed.

(C) The item relating to section 106 in the table of contents of the Immigration and Nationality Act is amended to read as follows:

"106. Judicial review of orders of deportation and exclusion.".

(3) Section 241(d) (8 U.S.C. 1251d) is repealed.

In section 142, strike the new section 106(f) of the Immigration and Nationality Act (8 U.S.C. 1105f).

Strike section 193.

On page 178, line 8, strike "and subject to subsection (b),".

Strike section 198(b).

Mr. LEAHY. Mr. President, this amendment is offered on behalf of myself, the distinguished Presiding Officer, the distinguished senior Senator from Oregon [Mr. HATFIELD], and the distinguished Senator from Massachusetts [Mr. KERRY].

I offer this amendment to the provisions in the bill that I believe gut our asylum law. This is not just my opinion but is the opinion of at editorial boards from newspapers that normally do not agree with each other.

Let me first refer to the editorial in The Washington Times yesterday. It says:

In their rush to pass an anti-terrorism bill, lawmakers perhaps unwillingly and unnecessarily restricted the present rights of persons seeking asylum in this country to escape political or religious persecution in their own countries. Such persons used to get a hearing before an immigration judge. Now they can be sent home without a hearing or judicial review. Lawmakers should restore procedural protections for asylum-seekers.

Then the Washington Post, in another editorial today, speaks of the antiterrorism law being revisited and says, again, that this amendment should be supported.

I ask unanimous consent to have printed in the RECORD those two editorials.

There being no objection, the material was ordered to be printed in the RECORD, as follows:

[From the Washington Times, Apr. 30, 1996]

IMMIGRANTS AND OTHER ORDINARY PEOPLE

The story goes that Texas Sen. Phil Gramm was attending a National Republican Senatorial Committee meeting with political supporters a few years ago when a woman rose and asked an awkward question. "Sen. Gramm," she said, "why do all the people here talk funny?" As it happened, about 80 percent of those supporters were first-generation Americans—immigrants—and Mr. Gramm says you could hear the collective gulp from the room about 100 miles away. His answer? "Ma'am, 'cause this is America."

He elaborated on that answer in memorable remarks to the Senate last week. "If we ever get to the point where we do not have a few citizens who talk funny, if we ever get to the point where we do not have a new infusion of energy and a new spark to the American dream, then the American dream is going to start to die. It is not going to fade, and it is not going to die on my watch in the U.S. Senate."

No doubt in part because of his emotional speech, the Senate last week defeated legislation that would have effectively limited immigration. But the chamber is not done with this issue. If you want to see just how far some lawmakers would go to restrict people who, as Mr. Gramm puts it, talk funny, then consider some of the immigration legislation up for a vote as early as this week.

Perhaps the most controversial issue involves so-called demonstration projects intended to test the use of verification systems for workers in this country. The idea is that if the government could just figure out how to keep illegal immigrants from working then fewer would come here in the first place. Presto, no more illegal immigration.

This editorial page has said from the beginning of this debate that it sees nothing wrong with a person's coming here to work. As the quotable Mr. Gramm put the matter the other day, "We have room in America for people who come with their sleeves rolled up, ready to go to work. But we do not have room for people who come with their hand out." Exactly right.

Laying the groundwork for a national identification system, as the demonstration projects do, sets a terrible precedent. What has this country come to that it would require aspiring workers to get permission from the government before they can roll up their sleeves and get to work? Work is not an entitlement to be disbursed by the politically powerful for the benefit of the politically favored. Nor is it something to be trusted to some distant federal worker.

Even if one assumes the government can manage a national ID system, how is it going to match the ID with the worker? With fingerprints? With blood and tissue samples?

That's the sort of treatment ordinarily reserved for criminals, not mere workers.

There's one other thing to keep in mind when senators take up immigration reform. In their rush to pass an anti-terrorism bill, lawmakers perhaps unwittingly and unnecessarily restricted the present rights of persons seeking asylum in this country to escape political or religious persecution in their own countries. Such persons used to get a hearing before an immigration judge. Now they can be sent home without a hearing or judicial review. Lawmakers should restore procedural protections for asylum-seekers.

There's room here for workers. There's room here for people who genuinely need asylum. ''America is not a great and powerful country because the most brilliant and talented people in the world came to live here,'' said Mr. Gramm. ''America is a great and powerful country because it was here that ordinary people like you and me have had more opportunity and more freedom than any other people who have ever lived on the face of the Earth. And with that opportunity and with that freedom, ordinary people like us have been able to do extraordinary things.''

---

[From the Washington Post, May 1, 1996]

THE TERRORISM LAW REVISITED

Think back about 10 days to the celebratory pictures of the president signing the terrorism bill. That measure, deeply flawed by provisions restricting habeas corpus, allowing the use of secret evidence at deportation proceedings and providing for summary exclusion of asylum-seekers, was hailed as a vital bulwark protecting Americans against international terrorists. In the rush to pass that legislation by April 19, the first anniversary of the Oklahoma City bombing, scant attention was paid to Sen. Patrick Leahy, who pointed out some of these flaws. But this week, when the immigration bill to repeal one of them, the administration is on his side.

Every year, thousands of individuals arrive in this country seeking asylum from persecution. Until recently, this process was subject to a lot of abuse. Claimants were admitted, given a work permit and released with the understanding that they would show up some time in the distant future (there were terrible backlogs then) for a hearing. Most of them simply disappeared into the general population and were never heard from again. But the Immigration and Naturalization Service (INS) instituted reforms early in 1994—streamlining procedures, withholding work permits and keeping many claimants in custody until their hearings—which have reduced the problem substantially. The system now in place works well, and both the Justice Department and the INS say there is no need for change.

But in the rush ''to combat terrorism'' Congress passed, and the president signed, new restrictions that create a presumption that anyone seeking asylum who enters with false documents, or has traveled through other countries to get here, does not have a valid claim. In these cases, the claimant would have to make his case to an immigration officer on site, without any guarantee that he can be represented by a lawyer or even have an interpreter. If he does not persuade this official, he can be returned to his own country summarily without further hearing before an immigration judge or review by the Board of Immigration Appeals.

It is fair to suspect anyone who enters the country with a false passport, or who has left a place of safety in Western Europe, for example, to ask for asylum here. But suspicions need to be proved. It should surprise no one that persecuted people might not be able to apply for passports in their own countries, or might have to use a false name to get out. And a two-hour layover in Germany or France on a long flight to freedom shouldn't disqualify an applicant for asylum. Sen. Leahy's effort, which has the backing of the people charged with enforcing the immigration laws, should be supported.

Mr. LEAHY. Now, we should be clear what the provisions of the bill do and what they and our amendment do not concern. These are not provisions that cover alien terrorists. It is safe to say that there is not a single Member of this body who wants to allow alien terrorists into our midst. That is not a partisan issue; every single Member of this body is against terrorists. We can accept that as a point of fact.

There are a number of other provisions in the antiterrorism law that the President signed last week that cover the exclusion of those affiliated with foreign terrorist organizations. They forbid the grant of asylum to alien terrorists.

We are not seeking to defend alien smuggling or false documentation used for that purpose. That is already a crime. Senators DEWINE, HATFIELD, KERRY, and I totally agree on that.

But we know that there are some circumstances and there are some oppressive regimes in the world from which escape may well entail the use of false papers. We want to make sure that we do not create barriers to true refugees and those deserving asylum, and prevent them from making an application for asylum.

Let me give an example, using first a hypothetical and then go to some real examples. You are in a country with an oppressive regime. You are in a country where you are being persecuted for your religious beliefs or your political beliefs. In fact, you may even face death for your religious beliefs or your belief in democracy. You know that the arm of that government is out to get you. These are not cases of just paranoia; they may already have gone and killed members of your family for similar beliefs. You look at the one great beacon of freedom: the United States of America. You figure, ''How do I get there?''

Now, you are facing the possibility of a death penalty for your religious beliefs. Do you think you could walk down to the government that is out to kill you for those religious beliefs and say, ''Could I please have a passport? Here is my name and address. And, by the way, I want to book passage, I want a visa and I want to go directly to the United States.''

We all know what would happen in a case like that. The realty of the situation is that people in those circumstances are probably going to get a forged or a false passport. They are not going to go on a flight that will go directly to the United States because that is something the government may be watching. They are going to go to another country—maybe a neighboring

country, maybe two or three countries—and then make it to the United States.

Under the immigration law that is before us, once they got here, because they used false passports and went through other countries, they are probably going to be summarily sent back. Summarily being sent back is in an equal amount of time to the summary execution or imprisonment that they face when they arrive back in their home country.

Now, let us be realistic. The Justice Department does not want these provisions and has not requested them. They were not recommended by the Jordan Commission. The Department has told us that they want a type of standby authority in case of immigration emergency, similar to what I have proposed in this amendment.

Think of some of the history of this country. Fidel Castro's daughter came to this country and was granted asylum, for appropriate reasons, and, of course, with great political fanfare. But Fidel Castro's daughter did not fly directly to the United States with a passport bearing her name. She took a false passport, she went to Spain, and then came here. Under this new law, we would likely have said, ''Sorry, you are out.''

The most recent and famous example of why we must not adopt the summary exclusion provisions of this bill is, of course, the case of Fauziya Kasinga and her flight from Togo to avoid female genital mutilation. We first talked about that case here in the Senate a couple of weeks ago.

There have been two extremely positive developments since then. First, the INS filed a brief with the Board of Immigration Appeals, arguing—I believe for the first time—that the fear of female genital mutilation should present a sufficient cause to seek asylum in the United States.

I do not think there should have been any question about this. If there is any doubt, we should amend this bill or law without hesitation to ensure that flight from such practices are covered by our asylum policies, as the Senator from Nevada [Mr. REID] has already suggested.

Second, last Thursday, April 25, after more than a year in detention under conditions that subjected her to unnecessary hardship, Ms. Kasinga was finally released by INS to await determination by the Board on her asylum application.

Her case was first reported on the front page of the April 15 New York Times by Celia Dugger. Both she and her newspaper deserve a great deal of credit for bringing this to our attention.

Ms. Kasinga has sought for 2 years to find sanctuary in this country, only to be detained, tear-gassed, beaten, isolated and abused.

Well, now we all realize how bad this is. It is something that should outrage men and women alike. I believe it does

outrage men and women in this country.

Unfortunately, one thing has not changed yet, that is the provision I am seeking to amend in this bill. The provisions in the bill would still summarily exclude Ms. Kasinga, and others like her, from ever making an asylum claim. She traveled through Germany on a false British passport in order to escape mutilation in Togo. Under the bill before us, she would be subjected to summary exclusion at the border without judicial review.

In fact, does anybody in this body believe that an immigration officer at her point of entry would, as a matter of first impression, have agreed with her claim that fear of female genital mutilation was a proper ground to seek asylum?

We should, instead, restore protections in our laws to protect her ability to get a fair opportunity to be heard.

On April 19, Anthony Lewis wrote a column for the New York Times that captured the essence of this issue. In his column, he notes, "The asylum provisions effectively impose the absurd presumption that anyone who flees a country without proper papers is not a genuine refugee." As Mr. Lewis puts it, "Political asylum is one saving grace in a world of too much political brutality. Why should Americans want to undermine the asylum concept?" Indeed.

This is what has always distinguished the United States in our 200 years of constitutional history—200 years as a Nation protecting democracy and individual freedoms and rights more than any other country in existence. No wonder people seek asylum in the United States. No wonder people facing religious persecution, or political persecution, or physical persecution, look to the United States, knowing that we are the symbol of freedom. But that symbol would be tarnished if we were to close our doors.

Mr. President, in Mr. Lewis' column, he wrote: "The Senate will in fact have another chance to consider the issue when it takes up the immigration bill."

I ask unanimous consent that a copy of Mr. Lewis' column be printed in the RECORD.

There being no objection, the article was ordered to be printed in the RECORD, as follows:

[From the New York Times, Apr. 19, 1996]

SLAMMING THE DOOR

(By Anthony Lewis)

BOSTON.—The case of 19-year-old Fauzlya Kasinga, who says she fled her native Togo to avoid the rite of female genital mutilation, has aroused much sympathy. She arrived at Newark Airport in 1994, told officials she was using someone else's passport, sought asylum, was turned down and has been held in prison ever since. The Board of Immigration Appeals will hear her appeal on May 2.

But in future we are not likely to know about desperate people like Ms. Kasinga. If their pleas for asylum are turned down by a low-level U.S. immigration officer, they will not be allowed to appeal—and review by the courts will be barred. They will be sent back at once to the land where they face persecution.

This extraordinary change in our law is part of the counter-terrorism bill awaiting President Clinton's signature. It is not directed at terrorists. It applies to anyone seeking asylum who arrives here with false documents or none—the situation of many people fleeing persecution.

The issue raised in Fauzlya Kasinga's case, female genital mutilation, is an important one: Does that cruel practice come within the grounds for asylum? But the new summary process of exclusion will affect many more people seeking asylum for traditional reasons: the man fleeing a Nigerian Government that executed his political colleagues, for example, or the Vietnamese who escaped from a re-education camp.

The asylum provisions effectively impose the absurd presumption that anyone who flees a country without proper papers is not a genuine refugee. By that test Fidel Castro's daughter was not a true refugee because she fled Cuba with a false passport. Nor were Jews who fled the Nazis without papers.

Political refugees are not the only losers. The bill trashes the American tradition of courts as the arbiters of law and guarantors of freedom. I have seen a good deal of nastiness in the work of Congress over the years, but I do not remember such detailed and gratuitous cruelty.

The bill gives virtually final authority to immigration officers at 300 ports of entry to this country. Each is directed to interview people seeking asylum and exclude them if he finds that they do not have "a credible fear of persecution." That phrase is unknown to international law.

The officer's summary decision is subject only to "immediate review by a supervisory office at the port." The bill prohibits further administrative review, and it says, "no court shall have jurisdiction" to review summary denials of asylum or to hear any challenge to the new process. (Our present system for handling asylum applications works efficiently, so there is no administrative need for change.)

Stripping away the protection of the courts may be the most alarming feature of the legislation. It is reminiscent of the period after the Civil War, when a Congress bent on punishing the South took away the jurisdiction of the Supreme Court to consider cases that radical Republicans thought the Court would decide against their desires.

Political asylum is one saving grace in a world of too much political brutality. Why should Americans want to undermine the asylum concept? And why should a bill supposedly aimed at terrorists be used as a vehicle to keep the victims of official terrorism from finding refuge?

Why should senators as decent as Orrin Hatch, chairman of the Judiciary Committee, stand still for such harshness? The asylum restrictions originated in the House and were kept in the bill by conferees, so the Senate was presented with a fait accompli. A motion by Senator Patrick Leahy to send the terrorism bill back to conference on that issue failed, 61 to 38.

President Clinton has been so eager for an anti-terrorism bill that he is not likely to veto this one, over the asylum sections any more than over the gutting of habeas corpus. But he could call on Congress to reconsider the attack on political asylum.

The Senate will in fact have another chance to consider the issue when it takes up the immigration bill, which has in it a similar provision for summary exclusion of asylum-seekers. On reflection, Senator Hatch and other's should see the threat to victims of persecution and to our tradition of law.

Mr. LEAHY. Mr. President, I have an editorial by the New York Times, entitled, "Not So Harsh on Refugees." I ask unanimous consent that it be printed in the RECORD.

There being no objection, the article was ordered to be printed in the RECORD, as follows:

[From the New York Times, Apr. 22, 1996]

NOT SO HARSH ON REFUGEES

The ordeal of a young woman from Togo who came to America to avoid the practice of female genital mutilation should give members of Congress pause before they approve any further limitations on the rights of refugees seeking sanctuary in the United States. As detailed last week by Celia Dugger of The Times, Fauzlya Kasinga was detained for months before she obtained a hearing, and she was strip-searched and held with convicted criminals. Shamefully, the anti-terrorism bill just passed by Congress and immigration bills still pending could subject many more refugees to similar treatment.

Ms. Kasinga's case involves female genital mutilation, a common practice in some two dozen African nations that involves cutting off portions of a young woman's genitals, often without anesthesia.

Ms. Kasinga fled Togo in 1994 to avoid mutilation after losing her status as a member of a privileged family. Her determination to avoid the practice could have subjected her to harsh treatment had she stayed, or if she is forced to return home. She may have a reasonable claim for asylum on the basis of membership in a social group vulnerable to persecution in her homeland.

But when Ms. Kasinga landed at Newark Airport in December 1994, seeking asylum with a phony passport, she was immediately detained. Under the law, people who have credible claims for asylum and family members already living in the United States can be released, pending a hearing. Ms. Kasinga has a cousin in the Washington area, but she was kept in custody anyway. After being held for months at a New Jersey detention center, Ms. Kasinga was transferred to a Pennsylvania prison and housed with convicted criminals.

Ms. Kasinga fared no better in court, where an immigration judge denied her claim. The Board of Immigration Appeals will hear her case in May.

If some members of Congress had their way, Ms. Kasinga would have been returned to Togo long ago. Under an immigration bill passed by the House, but now held up in the Senate, anyone attempting to enter the country without proper documents would only be entitled to a one-hour interview with an asylum officer. Denial of an asylum claim would be subject to review by a supervisor, but not by any other administrative or judicial body. These provisions, similar to ones in the anti-terrorism bill, would deny a fair hearing to many asylum seekers.

The House immigration bill also calls for detention of any asylum seeker who is awaiting a hearing, even when a credible claim has been presented. That could subject more would-be refugees to the harsh treatment suffered by Ms. Kasinga.

Senator Patrick Leahy of Vermont plans to offer an amendment that would not only override the harsh exclusion provisions in the immigration bill but also supersede the same provisions in the anti-terrorism bill. Congress should follow his lead.

Mr. LEAHY. It is hard to think of a time when you find the New York Times, the Washington Post, and the Washington Times all agreeing on an

Case 1:25-cv-00872-JMC    Document 55-12    Filed 03/03/26    Page 192 of 280

issue. But this is, as I said before, not an issue of political ideology, it is an issue of simple justice. It is an issue that reflect what is best in this country, what is the best in us as Americans.

In fact, it would be hard to think of a better example of how unworkable this provision is—the one in the bill that we seek to correct—than a woman who joined me at a press conference yesterday. Two years ago, she fled Peru. She had been horribly treated and threatened by rebel guerrillas there. She came to this country without proper documents. She was able to convince an immigration judge after an opportunity for a fair hearing that she would suffer persecution if she returned home.

Yesterday, I asked her to tell about her experience. Less than two sentences into her story, as the memories of what she had put up with 2 years ago played back, she broke down crying. Her case has been very well-documented. She was able to establish a basis for asylum. But now, 2 years later, the memories are so strong that, emotionally, she was unable to talk with us about it.

Can you imagine if the provisions in this bill had been the law and she got to the border, and an INS officer said, "Quick, tell me why you should stay here. What is going on? Why should you stay here?" This woman, who was unable to talk about it 2 years later after having been granted asylum, what would she have done, how would she have established her case? The answer would have been, "Well, obviously, you are not establishing the necessary criteria. You did not come here with a proper passport, so you are going back. Come back when you get a proper passport." What would she have gone back to?

Fortunately, instead of being sent back summarily to the hands of her abusers, she had a chance to be heard before a judge.

Mr. President, I am sure there are others who wish to speak. I will have more to say about this.

Mr. President, I withhold my time.

Mr. SIMPSON. Mr. President, there is no one I enjoy and regard more highly than my friend from Vermont. He and I have, fortunately, been on the same side of more issues than ever on opposite sides. I find him a fast and true friend whom I enjoy very, very much. When he speaks, he speaks with genuine clarity and authenticity about something in which he deeply believes.

Let me be very clear here. We are, as the Senator from Vermont said, not talking about an antiterrorism bill. There was an amendment on the antiterrorism bill which passed the Senate by a vote of 61 to 38 which is, in many cases, quite similar to this measure. It had to do with exclusion and summary proceedings. We are not speaking of that. What we are talking about is the bill itself, and Senator LEAHY is intending to strike—we are

not talking about female genital mutilation, we are not talking about terrorism; we are talking about the immigration laws of the United States. The bill as it stands before you has section 131, which is a new ground for exclusion of aliens, for aliens using documents fraudulently. That would be stricken by the Senator's amendment. There is a section 132 which is a limitation on withholding of deportation relief for aliens excludable for using documents fraudulently. There is a provision for summary exclusion. That would substitute a similar procedure for only situations which would be described as an extraordinary migration situation and not for other circumstances of the bill.

So, I speak against the amendment for these reasons. The committee's bill provision, which is in the version we are addressing now on the new ground of exclusion relating to document fraud, on summary exclusion, and on asylum applications, three things there—new ground, summary exclusion, and asylum application by those who have attempted to enter the U.S. with fraudulent documents—will greatly reduce the ability of aliens to unlawfully enter this country and then remain here for years through use, or misuse, of various administrative and judicial proceedings and appeals. It is almost what we would refer to as an overuse of due process.

These people in the past—this is what we are trying to correct—often receive more due process than a U.S. citizen receives. For example, the provisions relating to asylum and withholding of deportation will help the United States deal promptly and fairly with a very common scenario. Here is the scenario. For every example that touches our hearts—and this floor is filled with stories that touch our hearts; we will hear many of them today—for each one I get to tell another one. Here is a story that will not touch your heart.

A young person with no obligation to family, or anything else, who has decided to take off from his country to seek the promised land, and that is us—here is the common scenario used by those who would abuse the compassion of the American people. This is why the American people suffer compassion fatigue. This is what gives rise to proposition 187's. This is what gives rise to the continual polls saying 70 to 80 percent of these people should be excluded and so on—not excluded, but indeed that we should do something with both illegal and legal immigration.

The scenario is this: The young person with no family, no spouse over there in the country they are leaving, no children, no parents perhaps, maybe an orphan, whatever—they board the plane with documents. Then they give them back to the smuggler on the plane who is with them, or else flush them down the toilet of the aircraft. Some have eaten them. Then they come to the United States, and at the U.S. port of entry they claim asylum.

Many of us saw this so dramatically in the "60 Minutes" presentation. We are going to talk about dramatic things, where the alien without the document said the magic words. The magic words in any language, or their own, is, "I want asylum. I want to claim asylum," just as the smuggler instructed him or her to say. You need to know only one word when you are there, "asylum." The program of "60 Minutes" ended with the alien going forward out of the door of JFK, suitcase in hand with a rolling cart to disappear into America probably never to be heard from again because he is certainly going to tear up any notice to appear at some future time.

Mr. LEAHY. Mr. President, will the Senator yield?

Mr. SIMPSON. If I could finish my remarks, I would—I yield for a question. Yes.

Mr. LEAHY. One question: Is it not under the new procedures, when they ask for asylum, would they not be held in detention until a preliminary determination has been made about false documents?

Mr. SIMPSON. Mr. President, much of this is being relieved by the simple procedure of detention facilities. When those detention facilities are available—and we have provided significantly more money for detention facilities—we find that these things are going to be glimmering in more cases. But I wanted to cite it indeed.

Mr. President, I want to emphasize that the bill provides very clearly an opportunity for every single person, every single person without documents, or with fraudulent documents—please hear this—fraudulent documents or proper documents allow every person to seek asylum. A specially trained asylum officer will hear his or her case. This is the key. I want my friend from Vermont to share with me in the debate as we do this, which he will in fairness. A specially trained asylum officer will hear his or her case, and if the alien is found to have a "credible fear of persecution," he or she will be provided a full—full—asylum hearing. However, if he or she does not have such a credible claim, he or she will be subject to the summary exclusion procedures as will all persons who enter without documents or with fraudulent documents.

There is discussion about persons not being permitted to apply for asylum if they do not travel directly from the country in which they allegedly have a fear of persecution. This is always a difficult situation because we find people who will leave the country where they are being persecuted legitimately, or, if they are just simply using an inappropriate way to get here, they will go to one, or two, or three other countries all of which might be democracies, all of which would be free countries, all of which would be giving the precious refuge of a refugee or an aslyee. The only difference between a refugee and an aslyee is a refugee is

over in the home country and an aslyee is here. They are absolutely the same. But the term is used "aslyee" when they are here, and "refugee" when they are there.

So the United States cannot be expected to provide asylum. I am not talking about asylum. I am talking about people who are fleeing persecution or have a well-founded fear of persecution based on race, religion, national origin, or membership in a social or political organization. That is an aslyee. That is a refugee. That is the definition under the law of the United States of America and the United Nations. We will always provide asylum.

There are some great asylee-receiving countries in the world. Two of them have completely revised their asylum laws because of the absolute gimmickry that is taking place. One is my native land, my original native land, Holland, the most open country in the world, a country that gave solace and comfort to fleeing Jews 500 years ago and to those fleeing Nazi Germany. They have now changed their asylum laws the same as we are doing in order to avoid gimmickry. The other country is Germany. After the war, the horror of the war, and the imprint of the Nazis upon the German people, who were appalled—I believe this because I lived among them for 2 years—appalled at the Nazi regime, real Germans are appalled by that.

They realized that, because of what they had done during the war, they made the broadest, most extensive asylum laws in the world because they had to; people were watching them after the war. And being the most generous country, they have had now to simply shut down the process because of gimmickry.

So it is important to know that those who come from a safe country where they could have obtained asylum—normally someone who is fleeing, I mean fleeing in terror of their lives, with the dogs and the soldiers and the arms coming at them—they stop where it is safe to do so, not select or choose leaving one or more safe countries in order to enter the United States or another country for which he or she has a personal preference. And the ultimate personal preference is always the United States of America.

Mr. President, I do want to point out, however, that the Attorney General will have the discretion to waive, under my proposal, under extraordinary circumstances this requirement of direct travel to the United States.

I wish to conclude by saying a few words about the summary exclusion procedure in general. The present system is vulnerable to mass migration and other extraordinary situations and to persons who exploit the numerous levels of administrative and judicial review to stay in this country for years even though they have surreptitiously entered or sought to enter this country or have presented themselves for in-

spection with fraudulent documents or no documents and such individuals have no grounds for being in the United States of America except the possibility of asylum.

The bill's summary exclusion procedures provide a method for the Attorney General to significantly reduce this problem while still giving aliens a reasonable opportunity to seek asylum or withholding of deportation because of a fear of persecution for race, religion or one of the statutory or treaty grounds. And subject to the credible fear asylum procedure I have already described, an immigration officer can order an alien who has entered without documents or with fraudulent documents to be removed from the United States without bringing the alien before the immigration judge or the Board of Immigration Appeals. Only limited judicial review would be available. It would be limited to a habeas corpus proceeding devoted to no more than three issues:

First, Whether the individual is an alien or if he or she claims to be a U.S. citizen;

Second, Whether the individual was in fact specially excluded;

Third, Whether the individual has proven that he or she is a lawful permanent resident.

The court could order no relief other than the full exclusion hearings.

Finally, let me conclude, at least for this moment, and I hope we will continue toward a result here. We are talking here of immigration, and certainly there has been a reference to female genital mutilation. That is a very serious issue. I certainly concur totally as to the horror of that, and who could not? Certainly any compassionate person could not.

My colleague from Nevada, Senator HARRY REID, noted that Canada had made female genital mutilation a ground of asylum 3 years ago and had only two persons apply since that time. My information from the Canadian Embassy is a bit different, and I hope my colleagues will hear this. All of us admit that this is a hideous, barbaric thing. I understand, first, that this mutilation is not by itself grounds for a grant of asylum. This is our Canadian neighbors. But it is merely one of several factors to be considered in determining whether the applicant qualifies under the definition of a refugee.

Second—I think we must hear this—I understand that as victims of mutilation have come to Canada, they have brought their relatives along with them, or the relatives at least followed later. In any case, the result now has been that the practice of female genital mutilation has become a growing legal and criminal problem in Canada. It has now been imported into Canada, and one or more Provinces plan to make it a criminal offense. Police currently have to prosecute it under the assault statute, I say to my friend from Vermont, who has been a prosecutor, as I have, on the lower levels.

In other words, we have a situation where Canada has found that the victims end up being joined by the perpetrators. That fact suggests as well that we may be dealing here with a cultural practice—and that is exactly what we are dealing with, ladies and gentlemen, a cultural practice—and perhaps not a practice of official government-sanctioned persecution. This is going to be a real debate in the coming times because we in this body talk continually about respect of other cultures—cultures of the native American in my State, cultures of other ethnic groups, cultures of Hispanic-Americans, cultures of African-Americans.

The best practice is not to create some per se ground of asylum but do just as we do in all asylum and refugee determinations, and that is consider each one of them on a case-by-case basis. That is what we must do.

So, again, we get into these situations by our remarkable strength and our remarkable weakness, which is our compassion, and then we get the blend of emotion, fear, guilt, and racism and blend that in, and we do erratic things in immigration reform, or we would not be doing what we are doing in these last days. The reason this is so difficult, you will be on one side or the other and you say: "How can we do this? Why can't we do this? How can this be? How did I vote this way? How can I get out of this thicket?"

The reason is, you are going to stay right in it because this is about America. It is about America, and America is a very complex place, thank God. We still have one thing that binds us, or several—a common flag, a common language, and a public culture. When we break it all down into individual cultures, Balkanize these great States that were fought so hard for in this Chamber to unite and to unite in the great melting pot, we do a disservice.

We are about to pass what many in this body will describe as a tough illegal immigration bill, and it will be, and it will pass, whatever form it is. Win or lose your amendments, forget it. It is an accomplishment that we will proudly reflect to our constituents. But remember this: We take in more asylees than all the rest of the countries on Earth, total. We take in more refugees than all the rest of the countries on Earth, total. We take in more immigrants than all the rest of the countries on Earth, total, period.

Finally—you have all heard that a thousand times—and it is very important to someone listening, wherever these words fall, this bill explicitly provides that this special exclusion procedure does not apply if the alien has a credible fear of persecution on one of the required grounds—race, religion, membership in national organization, and so on. Therefore, nearly the entire argument of the Senator from Vermont, my friend, vests on the inadequacy of the procedure provided in the bill to determine whether an alien has a credible fear of persecution—that is

Case 1:25-cv-00872-JMC　　Document 55-12　　Filed 03/03/26　　Page 194 of 280

the intent of the Senator from Vermont, saying it is inadequate.

Let me read the standard that would be used by the specially trained asylum officers to determine whether an applicant for asylum has a credible fear of persecution and therefore should receive a full—full—asylum hearing and not be subject to the special exclusion. I cite the language in section 193 on page 173 of the bill, lines 6 through 14, saying:

As used in this section, the term ''credible fear of persecution'' means that (A) there is a substantial likelihood—

''Substantial likelihood'' that is,

that the statements made by the alien in support of the alien's claim are true, and (B) there is a significant possibility in light of such statements and of country conditions—

Which will be determined by the State Department,

that the alien could establish eligibility as a refugee within the meaning of section 101(a)(42)(A).

That is what this bill provides. It is not some swift or harsh provision. And this bill does not gut our asylum laws. The bill's provisions bring some sense and effectiveness to our asylum laws. These are laws that have been effectively gimmicked over the years because 400,000 backlogged asylum cases can well attest to that.

As my friend from Vermont says, if a person is fleeing for his life because of religious beliefs and must use forged papers and travel through several countries to get here under the bill that person will be summarily sent back—it is not so. If such a person arrives under the provisions of the bill he or she would get a hearing before a specially trained asylum officer. And if he or she had a credible fear of persecution, and there was a substantial likelihood the facts are true, as I have just cited, he or she will be permitted to remain in the United States and have a full asylum hearing when he or she is prepared and ready, with counsel.

So, I yield at this time.

The PRESIDING OFFICER (Mr. THOMAS). The Senator from Vermont.

Mr. LEAHY. Mr. President, I just want to make sure my colleagues understand the Senator from Wyoming and I have a longstanding friendship and affection and respect for each other, but we do look at this somewhat differently.

To begin with, regarding the vote on the anti-terrorism bill, while the issue may appear similar, the procedural situation was much different. There my motion would have required a recommitting of the whole conference report, a great burden to overcome.

As a matter of fact, I had a number of Senators come up to me and say, ''Why do you not do this on the immigration bill? We will have a lot easier time voting for you on the immigration bill.'' Well, God bless you all, you will now have a chance to vote with me on the immigration bill.

In addition, that motion did not include the creation of authority for the Attorney General to declare a special migration situation of immigration emergency. The amendment I offer today includes such provisions.

Further, when we talk about the people coming in with false passports fleeing persecution, they do not get a hearing under the bill. They get an interview. They get an interview by whoever is there at the border, and they can get kicked out right then and there. It is cruel, it is fundamentally unfair to a traumatized and fatigued refugee, who would be allowed no assistance and no interpreter, to treat them so summarily.

The kind of screening process provided in the bill will mean an investment of enormous resources for a special screening that we do not need. We would be requiring extra resources to do an ineffectual job.

In 1995, for example, after our asylum processes were reformed, we had only 3,287 asylum seekers who arrived without valid documents. They could be handled through the normal process. They do not have to be bounced out following some truncated and confusing interview. As we have heard, these people have faced such traumatic experiences. They are not likely to be prepared to respond when hit with that first, all important interview.

We reformed, in 1994 and 1995, our asylum processes. The Justice Department can handle it very well under my amendment.

Do not confuse illegal immigrants with refugees.

This bill would establish summary exclusion procedures for refugees seeking to claim asylum. It would give low-level immigration officers unprecedented authority to deport refugees without allowing them a fair opportunity to establish valid claims. These provisions should not even be in this bill, if it is intended to focus on the problems of illegal immigration. Refugees who seek asylum in the United States are not causing problems for America and Americans. They come to us for refuge. They come to us for protection. They come to us for what America promises in constitutional freedoms and protections. We should not turn them back, and turn our back on them or destroy our country's reputation for protecting human rights.

Look at the Washington Times editorial, look at the Washington Post editorial, look at the New York Times editorial. They express the feelings of so many in this country.

Think about a person who talked before a press conference here on Capitol Hill yesterday, Alan Baban, who was held 16 months in detention.

He is a Kurdish national who had been in prison for over a year in Iraq. He was tortured, both because of his Kurdish nationality and his political involvement with an organization committed to securing political freedom for Kurds. His body has the scars of that ordeal. At one point in his captivity he bribed a guard and he escaped. His family's possessions were seized by the Iraqis.

Finally, in November 1994, he and his mother, who had been hiding for close to 3 years, used false documents to get out and arrived in the United States.

Most of us know what terrible treatment the Kurds have had at the hands of the Iraqis. But somehow the immigration inspector at the airport did not believe Alan and did not think that he had established a credible claim of persecution. So Alan was placed in detention, in prison, in the United States. A year later, without a translator to help him, he was denied political asylum.

After 16 months in detention, when his true story came out, an immigration judge finally granted him asylum. Yesterday, he thanked the United States for finally listening to him and letting him out.

This is one of a number of examples of refugees who were initially ruled not to have satisfied a credible fear standard but who after a hearing were able to prove a claim for asylum.

I know the Senator from Massachusetts is seeking time.

Before I yield the floor, Mr. President, I ask for the yeas and nays on my amendment.

The PRESIDING OFFICER. Is there a sufficient second?

There is a sufficient second.

The yeas and nays were ordered.

Mr. LEAHY. Mr. President, I just might ask the distinguished manager, am I correct in my understanding, as we offer these various amendments they will then be set aside for others so there will be a series of votes? Is that correct?

Mr. SIMPSON. Mr. President, at least this amendment and the next amendment of Senator ABRAHAM and Senator FEINGOLD will come up at a time around the hour of 2 o'clock. We will stack votes on these two, or others we might have problems on, including, perhaps, that of Senator BRADLEY, who is here.

Mr. LEAHY. Mr. President, just before that vote will we follow the usual thing where each side has a minute or so?

Mr. SIMPSON. We will put that in the unanimous-consent request, that there be 2 minutes equally divided.

Mr. LEAHY. I yield the floor.

The PRESIDING OFFICER. The Senator from Massachusetts.

Mr. KENNEDY. Mr. President, I will just take a moment because the Senator from Vermont has made the presentation and made it exceedingly well, which he did in our judiciary markup as well.

What I want to do is just take a moment of the Senate's time to describe the conditions that we were facing a number of years ago, and where we are on the issues of asylum today. I think it reaches the core of the Leahy amendment. There is no question that, as he outlined, there are people who come here with a well-founded fear of persecution. They come here, few of

# EXHIBIT U

Coalition for Humane Immigrant Rights, et al. v. Noem et al., 1:25-cv-00872 (JMC)

Sep. 20, 1995 — HR 2202 markup

STENOGRAPHIC MINUTES
Unrevised and Unedited
Not for Quotation or
Duplication

ORIGINAL

## Committee on the Judiciary

## U.S. House of Representatives

## MARKUP SESSION
## H.R. 2202
## IMMIGRATION IN THE NATIONAL INTEREST ACT

### Wednesday, September 20, 1995

### Washington, D.C.

1995 SEP 21 AM 11: 59

### Nelson Reporting Associates, Inc.
202-434-8171

983 21-15-2   # 102

1   NELSON REPORTING ASSOCIATES, INC.

2   MARKUP SESSION -

3   IMMIGRATION IN THE NATIONAL INTEREST ACT

4   (H.R. 2202)


5   Wednesday, September 20, 1995




6   House of Representatives

7   Committee on the Judiciary

8   Washington, D.C.


9        The committee met, pursuant to notice, at 9:50 a.m., Room

10  2141, Rayburn House Office Building, Hon. Henry J. Hyde

11  [chairman of the committee] presiding.

12       Present:  Representatives Hyde, Moorhead, Sensenbrenner,

13  McCollum, Gekas, Coble, Smith, Schiff, Gallegly, Canady, Inglis,

14  Goodlatte, Bono, Heineman, Bryant of Texas, Chabot, Conyers,

15  Schroeder, Frank, Berman, Boucher, Reed, Nadler, Scott, Watt,

16  Serrano, and Lofgren.

17       Staff present:  Alan Coffey, general counsel; Tom Smeeton,

18  administrator; Peter Levinson, counsel; Dan Freeman,

19  Parliamentarian; Sam Stratman, press secretary; Cordia Strom,

20  counsel; Edward Grant, counsel; and George Fishman, assistant

21  counsel.

1834    establish the credible fear of persecution to the judge, to the

1835    administrative judge, not to the asylum officer right at the

1836    border.

1837        Basically, this amendment allows the Attorney General to

1838    focus the resources at the ports of entry and in situations

1839    where it's actually needed, rather than squandering the

1840    resources at every port of entry in the country.  It allows for

1841    careful review of asylum claims using streamlined procedures

1842    with definite deadlines to ensure that individuals attempting to

1843    take advantage of the asylum process cannot enter society, the

1844    economy, or enjoy appreciable delay simply by saying the word

1845    ''asylum.''

1846        While we don't want people to game the system, as some do

1847    now, we also don't want to have many fewer safeguards that are

1848    available for an accused traffick infraction.  Expedited

1849    exclusion of a bona fide applicant for asylum can have

1850    catastrophic consequences.  This amendment protects the

1851    integrity of the asylum process while minimizing that risk.

1852        And I, therefore, urge the adoption of this amendment, and

1853    I thank the chairman.

1854        The Chairman.  The gentleman from Texas, Mr. Smith, is

1855    recognized for five minutes.

1856        Mr. Smith.  Thank you, Mr. Chairman.

1857        I ask the members to bear with me.  This is a complicated

1858    amendment, and I'd like to go into some detail as to why I

81

1859  oppose it.

1860      The expedited exclusion authority in H.R. 2202 applies only
1861  to aliens who, because they have no valid entry document, are
1862  already clearly not entitled to be admitted to the U.S.  Unless
1863  such an alien claims to be a U.S. national or states a fear of
1864  persecution, there is no reason to do anything other than return
1865  them as promptly as possible to where they boarded the plane to
1866  come here.  For those who do claim asylum, it is appropriate to
1867  assess at the outset whether there's a credible basis for their
1868  claim.  In the current system, illegal aliens can enter the U.S.
1869  by simply claiming asylum.  Many are not detained due to lack of
1870  detention space.  Section 302 of this bill provides that the
1871  alien must establish a credible fear of persecution before being
1872  allowed to remain and pursue an asylum application.

1873      Under this amendment, an alien could not be summarily
1874  removed unless a senior asylum officer determined that the
1875  alien's asylum claim was frivolous or that the alien was firmly
1876  resettled in a third country.  When we look at the definition of
1877  that term ``frivolous,'' we can clearly see that the effect of
1878  this amendment is not to establish summary exclusion, but to see
1879  to it that no alien is every summarily excluded.

1880      First, ``frivolous'' is defined to mean a claim that is
1881  outside the scope of the refugee definition, totally lacking in
1882  substance or manifestly lacking in any credibility.  This is a
1883  weak standard, particularly on the issue of credibility.  Under

# EXHIBIT V

Coalition for Humane Immigrant Rights, et al. v. Noem et al., 1:25-cv-00872 (JMC)

Unrevised and Unedited
Not for Quotation or
Duplication

Original

## Committee on the Judiciary

## U.S. House of Representatives

## CONTINUATION OF THE MARKUP SESSION
## H.R 2202 - THE IMMIGRATION IN THE
## NATIONAL INTEREST ACT OF 1995
## MARK UP OF PRIVATE CLAIMS BILLS
## H.R. 418, H.R. 419, H.R. 1315

### Tuesday, October 24, 1995

### Washington, D.C.

Nelson Reporting Associates, Inc.
202-434-8171

F: [...] 2202 SCOTT 002

[Amendment #111-6E - preserve administrative review of asylum officer decision
to exclude refugees without documents]

H.L.C.

# AMENDMENT TO H.R. 2202

## OFFERED BY MR. SCOTT

Page 46, line 20, strike "WITHOUT FURTHER" and insert "AND".

Page 46, lines 23 and 24, strike "Subject to subclause (II),".

Page 47, lines 3 and 4, strike "without further hearing or review.".

Page 47, line 17, insert "shall be provided with a competent interpreter and" after "interview".

Page 48, strike lines 10 through 22 and insert the following:

1        "(C) LIMITATION ON ADMINISTRATIVE RE-
2     VIEW.—The Attorney General shall provide by
3     regulation for the prompt review of a deter-
4     mination under subsection 235(b)(1)(B)(iii)
5     that an alien does not have a credible fear of
6     persecution. Such review shall take place before
7     an immigration judge within 72 hours.".

295

7003    Mr. Sensenbrenner.  Mr. Chairman, parliamentary inquiry.

7004    Chairman Hyde.  State your parliamentary inquiry.

7005    Mr. Sensenbrenner.  Has the gentleman from Virginia

7006 received permission to go back to title III to offer this

7007 amendment?

7008    Mr. Scott.  Mr. Chairman, I don't remember.  This amendment

7009 was offered and was withdrawn.  Frankly, I don't remember

7010 whether we asked for unanimous consent.  We were supposed to be

7011 working something out with the gentleman from Texas.

7012    Chairman Hyde.  Has this been worked out with the gentleman

7013 from Texas?

7014    Mr. Smith.  No.  It has not.

7015    Mr. Scott.  No, it hasn't, Mr. Chairman.

7016    Mr. Sensenbrenner.  Mr. Chairman, I make a point of order

7017 that the amendment is not in order because he did not get

7018 unanimous consent to go back to title III.

7019    Chairman Hyde.  Well, the chair is constrained to sustain

7020 the point of order with some regret, I'm sorry.  The gentleman

7021 could ask for unanimous consent to offer it now.

7022    Mr. Scott.  I ask unanimous consent to offer the amendment,

7023 Mr. Chairman.

7024    Mr. Sensenbrenner.  Mr. Chairman, reserving the right to

7025 object.

7026    Chairman Hyde.  The gentleman reserves the right to object.

7027    Mr. Sensenbrenner.  Mr. Chairman, I am not going to object

7028 this time.   But it seems to me that if we keep on going back to

7029 other titles without unanimous consent, we're never going to get

7030 done here.   I am observing that there appears to be a filibuster

7031 by amendment going on, and withdraw my reservation.

7032        Chairman Hyde.   Well I share the gentleman's anxiety and I

7033 hope that the committee will behave.

7034        The gentleman from Virginia is recognized for five minutes

7035 in support of his amendment.

7036        Mr. Scott.   Mr. Chairman, in light of the courtesies that

7037 have been extended, I won't take the full five minutes.   I think

7038 we have discussed this before.   This amendment has to do with

7039 the review of a denial of a person who is seeking admission

7040 under credible fear of persecution.   Having been denied right

7041 now, there is virtually no real review.   This would require a

7042 review to take place before an immigration judge within 72

7043 hours.   That is what the amendment does.

7044        Chairman Hyde.   The gentleman from Texas, Mr. Smith.

7045        Mr. Smith.   Thank you, Mr. Chairman.   I do oppose this

7046 amendment.   We have visited this issue before.   Title III of

7047 this bill creates a procedure for the expedited removal of

7048 aliens who arrive in the United States with no valid entry

7049 documents.   The title includes a procedure to determine if any

0    such alien has a credible fear of persecution, and to permit any

1    alien with a credible fear to remain in the United States to

2    pursue an asylum claim.

7053    In order for such a screening process to be consistent with
7054  the overall goal of expediting removal of illegal aliens, the
7055  process must be streamlined.  We have provided in the bill that
7056  the screening should be done by a trained asylum officer
7057  familiar with the country conditions and principles of refugee
7058  and asylum law, and the decision to be reviewed by a supervisory
7059  officer.  This amendment would add an additional and time
7060  consuming layer of review to this process, a mandatory review by
7061  an immigration judge.

7062    While the amendment requires that the review take place
7063  within 72 hours, it is not at all certain that the Department of
7064  Justice could make immigration judges available in such a short
7065  time at each airport.  In addition, this amendment would
7066  virtually guarantee that expedited removal will not take place
7067  for at least 72 hours, and perhaps much longer.  We have
7068  discussed this amendment with the INS, which opposes it for the
7069  same reasons.  I yield back the balance of my time.

7070    Chairman Hyde.  The question occurs on the amendment from
7071  the gentleman from Virginia.  All those in favor say aye.

7072    Opposed nay.

7073    In the opinion of the chair, the nays have it.  The
7074  amendment is not agreed to.

7075    Are there further amendments?  Mr. Becerra.  Mr. Becerra
7076  has an amendment at the desk.

7077    Mr. Sensenbrenner.  Mr. Chairman, I reserve a point of

# EXHIBIT W



RG 46 Records of the U.S. Senate

105th Congress

Senate Judiciary
Republican

Legislative and Hearing Files

Box No. 11 of 11

# Administration's Views
# Binder
# For
# House and Senate
# Conference
# on
# H.R. 2202

The Honorable Orrin Hatch
135 Russell Senate Office Building



**Office of the Deputy Attorney General**
Washington, D.C. 20530

May 31, 1996

The Honorable Alan K. Simpson
Chairman, Subcommittee on Immigration
Committee on the Judiciary
U.S. Senate
Washington, D.C. 20510

Dear Mr. Chairman:

This letter presents the views of the Administration on
H.R. 2202, the "Immigration Control and Financial Responsibility
Act of 1996". The Administration is reversing decades of neglect
in controlling illegal immigration. Many of the provisions in
both the House and Senate bills would ratify the Administration's
efforts in the field to combat illegal immigration. The
Administration's four-part strategy calls for regaining control
of our borders; protecting U.S. workers through worksite
enforcement; aggressively removing criminal and other deportable
aliens; and obtaining the resources that are necessary to make
the strategy work. Both the House and Senate bills contain many
provisions that support the Administration's enforcement
initiatives and are based on or similar to the Administration's
legislative and budget proposals.

We look forward to working with the conference committee to
craft a strong, fair, and effective immigration bill. However,
H.R. 2202 raises serious concerns in specific areas that we hope
the conference committee will examine thoroughly. In addition, a
number of amendments to the Immigration and Nationality Act (INA)
made by the Antiterrorism and Effective Death Penalty Act of
1996, Pub. L. 104 -132, present substantial obstacles to the
effective enforcement of the immigration laws. The conference
committee has an opportunity to remedy some of those problems
with a careful and more comprehensive approach to amending the
INA. The Administration's views include, but are not limited to
the following:

♦ The House-passed bill could result in the removal of many
children from schools. Children denied education are more likely
to engage in crime and other anti-social behavior and could fall
prey to drug dealers and gangs. If H.R. 2202 were presented to
the President with provisions that would jeopardize any child's
right to full participation in public elementary and secondary
education, including pre-school and school lunch programs, the
Secretary of Education and the Attorney General would recommend

The Honorable Alan K. Simpson
Page 2

that the bill be vetoed.  We urge the conference committee to adopt the Senate position.

♦    The Administration opposes providing welfare benefits to illegal immigrants and has effectively targeted its enforcement efforts at the cash and food assistance programs which are at risk for the most abuse.  H.R. 2202, however, goes too far in limiting benefits to legal immigrants and therefore could jeopardize public health.  The Administration strongly opposes broadening the application of deeming rules and the "public charge" provision from a well-defined set of cash assistance programs to nearly all means-tested programs including Medicaid and emergency medical services, child protective services, student financial assistance programs for postsecondary education, veterans benefits, and scores of additional programs. In addition, the Administration opposes applying the new deeming and eligibility restrictions to current program recipients as well as the disabled who are exempt under current law.

♦    We urge the conference committee to adopt the Senate provision which authorizes the hiring of 350 additional Wage and Hour investigators to enforce current Federal wage and hour laws in areas where there are high concentrations of illegal immigrants employed.  We urge the conference committee to adopt the House position on increasing penalties for and enforcement of employer sanctions.  Similar increases should be included for the enforcement of laws against immigration-related employment discrimination.

♦    Both the House and the Senate have made clear their intention to separate the issues of illegal and legal immigration.  Consistent with that clear intent, we urge the conferees to drop Section 806 of the House bill, which deals with criteria for admission of one class of employment-based nonimmigrants (H-1B workers).  Not only does the inclusion of this section in a bill on illegal immigration entangle two issues the Congress has decided to keep separate, but the provisions of Section 806 simply go in the wrong direction, eliminating essential U.S. worker protections in current law, which are already inadequate.  These amendments would have the overall effect of substantially weakening protections for U.S. workers from unfair competition with foreign temporary workers rather than fixing serious flaws in the existing H-1B program.

♦    We urge the conference committee to adopt special exclusion authority that may be invoked at the discretion of the Attorney General in extraordinary migration situations and for interdictions at sea that permits the prompt removal of inadmissible aliens and includes a fair process for assessing

The Honorable Alan K. Simpson
Page 3

fear of persecution.

♦    We urge the conference committee to adopt a comprehensive change in removal procedures that consolidates exclusion and deportation processes and that retains discretionary authority--with current exceptions--to cancel removal in compelling cases of aliens who have resided in the United States for a lengthy period and whose removal would present an extreme hardship.

♦    The intentional discrimination standard in the document abuse provision of the Senate bill will severely undermine anti-discrimination enforcement.  The House provision is also problematic and should be modified to require that employers may seek verification only if the employer has information that would lead a reasonable person to believe that the individual is not work authorized, and that the employer can terminate the individual only after the Immigration and Naturalization Service (INS) confirms that the individual is not work authorized.

♦    We urge the conference committee to adopt a streamlined process for judicial review that consolidates review in the courts of appeals and requires constitutional and statutory challenges to be raised in connection with the judicial review of an individual removal order.

♦    We strongly support the Senate's authorization of appropriations for the construction of appropriate physical barriers and the use of technology in high traffic areas along the southwest border.  The House version does not take into account the safety of our Border Patrol agents and unnecessarily waives the Endangered Species Act.

♦    We urge the conference committee to allow the existing adjustment of status program established by section 245(i) of the INA to run its course through Fiscal Year 1997, and then to evaluate what, if any, changes are required.

♦    We strongly support the Senate's authorization to conduct pilot studies of employment and benefits eligibility verification that includes privacy and anti-discrimination safeguards although we would recommend enhancing the Attorney General's flexibility to identify which projects will be most effective within technological capabilities.

   Attached is a discussion of some of the key issues.  We will shortly provide you a comprehensive side-by-side comparison.

   I appreciate this opportunity to provide the views of the Administration to the conference committee for the immigration

The Honorable Alan K. Simpson
Page 4

bill.  The Administration is committed to working with the
Congress to provide strong, fair, and effective measures for
addressing illegal immigration to the United States.

Sincerely,

Jamie S. Gorelick
Deputy Attorney General

cc:  The Honorable Orrin G. Hatch
     The Honorable Strom Thurmond
     The Honorable Charles E. Grassley
     The Honorable Arlen Specter
     The Honorable Jon L. Kyl
     The Honorable Edward M. Kennedy
     The Honorable Patrick J. Leahy
     The Honorable Paul Simon
     The Honorable Herbert H. Kohl
     The Honorable Dianne Feinstein

## DISCUSSION OF SOME OF THE KEY ISSUES

### Denying Public Education to Undocumented Children

Denying an education to any child is costly, to the child and to our country. Undocumented alien children could grow up to become illiterate, unskilled adults if they are denied schooling. Such individuals would be unable to participate effectively in our economy, which relies increasingly on a highly skilled workforce, and would swell the ranks of the unemployed and those dependent on public assistance. In addition, as President Clinton has stated, children denied education are more likely to engage in crime and other antisocial behavior. This view is widely shared throughout the law enforcement community. Opponents of this provision include the Executive Director of the National Association of Police Organizations, Inc., the National President of the Fraternal Order of Police, the Los Angeles County Sheriff, the Superintendent of Police for the City of Chicago, and the International Secretary-Treasurer and Legislative Liaison for the International Union of Police Associations AFL-CIO. Moreover, it is fundamentally unfair to punish children--possibly for the rest of their lives--for the conduct of their parents, which they are powerless to control. Finally, requiring school districts and the INS to verify the immigration status of public school students would be extremely burdensome and would divert carefully targeted resources from other enforcement priorities including border enforcement and criminal alien removal.

### Benefits

H.R. 2202's approach to immigrants' eligibility for benefits is preferable to the approach taken in H.R. 4, the welfare reform bill, which would have imposed an outright ban on benefits for most legal immigrants. However, the approach taken in H.R. 2202 is at variance with the Administration's position as stated in our welfare reform proposal, and therefore, the Administration opposes these provisions. By requiring states to apply new deeming rules to scores of programs including Medicaid, emergency medical services within Medicaid, child protection services, and student financial assistance for postsecondary education, H.R. 2202, as passed by the Senate, could jeopardize public health and safety and could create a significant unfunded mandate on local and state governments. Furthermore, the Senate bill's deeming provisions would establish an inequitable situation where legal immigrants could no longer receive benefits for which undocumented immigrants would still be eligible such as Medicaid's emergency medical services.

We urge the conference committee to clarify that non-U.S. citizens residing abroad should not be considered "ineligible aliens" for purposes of entitlement to various federal benefits,

including pensions. We also urge the conference committee to clarify that Cuban and Haitian entrants will continue to be eligible for assistance to avoid placing an undue burden on State and local governments. We oppose the House provisions to require that payments of public assistance benefits be made only "through" an individual who is not ineligible to receive such benefits on the basis of immigration status because it would likely harm children who are U.S. citizens and legal immigrants. This provision also requires the government to insert an outside third party into the family. In addition, we oppose provisions in both versions of the bill that would make a legal immigrant who received federal benefits and services for which they are eligible deportable on public charge grounds. This is particularly objectionable when the immigrant received the benefit without his or her knowledge such as subsidized child care and transportation services for the disabled and elderly. Finally, the House provision requiring that sponsors have an income equal to 200 percent of the federal poverty level would keep many U.S. families from being able to reunite with their immediate relatives.

Special Exclusion

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. 104-132, amended the INA to require the Attorney General to order the removal of an alien who is inadmissible for having presented fraudulent documents or because of a lack of proper documents without a hearing before an immigration judge. There is an exception for asylum applicants who can demonstrate a credible fear of persecution based on an interview with an asylum officer. Aside from a review of the officer's "credible fear" determination, there is no administrative review of such an order and judicial review is limited. These provisions would become effective on November 1, 1996. The special exclusion provisions of the House bill are virtually identical to those added by the AEDPA.

Expedited exclusion authority is critically important to our ability to deal with organized alien smuggling and fraud at our ports of entry. The Coast Guard frequently interdicts illegal aliens on the high seas and is required to keep the aliens at sea while arrangements are made for their repatriation or for a third country to accept the aliens so they may be resettled. This is neither resource efficient nor cost effective. Two interdiction cases in 1995 consumed a total of 105 cutter days and 548 aircraft hours in order to deliver the interdicted migrants to El Salvador and Mexico. Using standard rates, these cases cost in excess of $7 million. Rapid delivery of the aliens to the United States for special exclusion would allow the Coast Guard vessels to promptly return to their primary law enforcement mission, including drug interdiction and search and rescue. Accordingly, the Administration has strongly supported expedited exclusion

2

provisions that have appropriate safeguards and reflect a proper concern for practical and sensible administration.

In this light, the AEDPA changes raise a major concern. The expedited exclusion procedures would operate at all times in parallel with the normal exclusion process. This is unnecessary and an inappropriate use of resources. The Administration's proposal and the Senate immigration bill, on the other hand, would authorize expedited exclusion, but would provide the Attorney General the flexibility to determine the circumstances in which it should be implemented.

We recommend that the conference committee adopt the Senate provisions at section 141 with several important modifications: First, in addition to extraordinary migration situations, the Attorney General should have the explicit authority to apply special exclusion to aliens who are interdicted at sea without the need to find that an extraordinary migration situation exists. Second, the definition of "asylum officer" should be amended to afford more flexibility in assigning appropriately trained officers to assess asylum applications. Third, the conference report should make clear that by using the term "manifestly unfounded" the committee intends to adopt the international standard, as reflected, e.g., in the resolution on "manifestly unfounded" asylum applications adopted by the immigration ministers of the European Union, and not to revive the now repealed INS regulations defining "frivolous" asylum applications. Finally, the committee should adopt provisions for judicial review of special exclusion procedures and administrative review of special exclusion orders that afford prompt consideration appropriate for and consistent with an expedited process. We would be happy to work with the committee to develop language for such review.

<u>Normal Exclusion and Deportation Proceedings</u>

The House bill undertakes a comprehensive re-write of the procedures for removal of aliens. It would consolidate exclusion and deportation proceedings into one removal proceeding. Aliens who enter without inspection (EWI) would be subject to exclusion, but would continue to be eligible for relief from deportation upon a showing of seven years continuous presence, good moral character, and extreme hardship. This relief was eliminated for EWIs under the AEDPA amendments that become effective November 1, 1996, a change that will likely result in thousands of private bill requests being filed with the Congress on behalf of aliens in compelling circumstances. Both the Senate and the House provisions would restore, with specific exceptions, relief from deportation for long-term permanent residents who are deportable on the basis of criminal convictions, with an exception for aggravated felons who have been sentenced to imprisonment for five years or more.

3

We strongly recommend adoption of the House provisions contained in sections 301[1] (except 301(c) and (f)), 303, 304, 305, 307, 308, and 309.  However, an amendment must be made to strike section 241(d) (added by the AEDPA) which provides that aliens "found in" the United States without having been inspected and admitted are inadmissible.  This language is problematic; will lead to litigation; and is inconsistent with the House immigration bill.  In addition, there is no waiver provision for inadmissibility under the newly-created section 212(a)(9), even for immediate relatives of U.S. citizens.  We strongly recommend the inclusion of a discretionary waiver of inadmissibility.

We note that an error was apparently made in compiling the bill passed by the House.  The text should be amended at page 86, lines 14 and 15, by inserting "or excludable" after "is deportable."  We also note an inadvertent omission in compiling the House bill.  The text should be amended at page 90, line 3, by inserting 'or deportable under subparagraph (a)(4)(D) of section 241" after 'section 237(a)(4)'.  The Senate amendment (sec. 142(b)) to section 242B of the INA which limits stays of final orders of deportation should be incorporated into the House bill.

<u>Intent to Discriminate</u>

Under current law, an employer's request for additional or specific work authorization documents constitutes an unfair immigration-related employment practice.  The Senate immigration bill makes such a request an unfair immigration-related employment practice <u>only</u> if the request is made "for the purpose or with the intent of discriminating".  This intent requirement will severely undermine anti-discrimination enforcement.  Intent is hard to prove, and virtually all employers could allege that they requested additional or specific documents for the purpose of avoiding employer sanctions and not with the intent of discriminating.  An intent standard will deprive a U.S. citizen, denied employment because she did not have an employer-specified document, of a legal remedy.

---

[1] With regard to section 301(b), we support adding the ground of exclusion for aliens who are unlawfully present in the United States, but we object to the effect that section 301(b) in the absence of a waiver provision will have on aliens who are otherwise eligible to obtain a visa or to adjust status.  Accordingly, we strongly urge the committee to provide a discretionary waiver for the ground of inadmissibility added by section 301(b).  We also strongly support the exception for battered spouses and children; however, we believe that a waiver for such persons would be preferable to an exception for consistency and practicality.

While the House provision is less problematic, the vagueness of the phrases "reason to believe" and "confirmation" will lead to discrimination against "foreign" looking or sounding work authorized individuals. The conference report should require the employer to possess "information that would lead a reasonable person to believe" that the individual is not an authorized worker, and the employer should be able to terminate the individual only after the INS confirms the individual is not work authorized. Only with these modifications, we urge the conference committee to adopt the House provision.

## Judicial Review in Deportation and Exclusion Proceedings

Both bills would streamline judicial review by eliminating a layer of review in exclusion cases, shortening the time period to file for review, and permitting the removal of inadmissible aliens pending review in the case of exclusion proceedings. The Senate bill, however, goes too far in restricting judicial review. Under the Senate provisions there would be no judicial review of deportation orders against criminal aliens and no review of denials of discretionary relief from deportation. We support limiting judicial review in cases involving criminals, but not eliminating review altogether. We also support retaining judicial review of denials of discretionary relief, particularly in asylum cases. Accordingly, we recommend that the conference committee adopt the House provisions contained in section 306 with modifications.

We recommend adding the Administration's proposal regarding the standard of review of factual determinations. The Administration's proposal, S. 754, would provide that all findings of fact supporting an order of deportation or exclusion are conclusive unless a reasonable adjudicator would be compelled to conclude to the contrary. In addition, we recommend that the House bill be modified to include the Senate provisions eliminating the automatic stay of deportation upon the filing of a petition for review and requiring that constitutional and statutory challenges relating to removal actions be raised only in connection with review of an administratively final order of removal. We would be happy to work with the committee to craft the appropriate language to accomplish these recommendations.

## Mandatory Custody

Section 414(c) of the AEDPA amended the INA to require the Attorney General to assume custody of all aggravated felons and most other criminal aliens and to maintain custody without exception until removal. This provision severely restricts the Attorney General's discretion and cannot be fully implemented without a massive increase in detention resources. Under an amendment added in 1990, the INA permitted release of a lawfully admitted alien who had been convicted of an aggravated felony, if

5

he or she were found not to be a threat to the community and likely to appear for hearings. Before that amendment, numerous court decisions had questioned the constitutionality of the previous "no-release" rule or held it invalid. The AEDPA essentially reinstates the earlier questionable provision and invites renewal of litigation. A number of habeas corpus petitions challenging mandatory custody already have been filed. In addition, the AEDPA amendments require the detention of aliens who have been convicted of lesser crimes and who may not have been sentenced to confinement for those crimes. We believe the Attorney General should be allowed to retain her discretion to determine who must be held in custody during the pendency of the hearing process.

The capacity to detain non-criminal aliens is a vital component of a balanced immigration enforcement strategy. We must have the authority to release less serious criminal offenders who may be eligible for relief and who pose no danger to the community in order to continue to detain aliens apprehended at worksites, those encountered in anti-smuggling operations, and recidivist illegal entrants along the Southwest border. We recommend rejecting section 164 of the Senate bill and adopting the House provisions at sections 303 and 305 which will accomplish the goal of prompt removal of criminal aliens while providing the Attorney General with the appropriate discretion regarding the use of detention facilities. In addition, the conference committee should reject the Senate bill's expansion of the definition of aggravated felony in section 161. A similar definition is in the AEDPA. By expanding the group of aliens for whom detention is strictly required, the Senate approach would effectively negate the more favorable House provision related to mandatory custody.

## Verification of eligibility for employment and benefits

The Senate bill, which provides for the completion and evaluation of demonstration programs prior to the enactment by Congress of a new verification system for employment and benefit eligibility, is consistent with the Administration's proposal. We strongly support the approach to verification adopted in sections 111 through 113 with two reservations. First, section 112(a)(1)(A)(iv) limits the executive branch's discretion to choose appropriate demonstration projects by requiring the testing of three specified systems. The Administration recommends that the Attorney General retain flexibility to identify which projects will be the most instructive, taking into account technical feasibility and lessons learned from earlier pilots. Second, section 111(e) relieves an employer from liability under section 274A of the INA under certain conditions while section 111(g) limits liability under section 274A of the INA for any person who takes an action adverse to an individual in good faith reliance on information relating to that individual

he or she were found not to be a threat to the community and likely to appear for hearings.  Before that amendment, numerous court decisions had questioned the constitutionality of the previous "no-release" rule or held it invalid.  The AEDPA essentially reinstates the earlier questionable provision and invites renewal of litigation.  A number of habeas corpus petitions challenging mandatory custody already have been filed. In addition, the AEDPA amendments require the detention of aliens who have been convicted of lesser crimes and who may not have been sentenced to confinement for those crimes.  We believe the Attorney General should be allowed to retain her discretion to determine who must be held in custody during the pendency of the hearing process.

The capacity to detain non-criminal aliens is a vital component of a balanced immigration enforcement strategy.  We must have the authority to release less serious criminal offenders who may be eligible for relief and who pose no danger to the community in order to continue to detain aliens apprehended at worksites, those encountered in anti-smuggling operations, and recidivist illegal entrants along the Southwest border.  We recommend rejecting section 164 of the Senate bill and adopting the House provisions at sections 303 and 305 which will accomplish the goal of prompt removal of criminal aliens while providing the Attorney General with the appropriate discretion regarding the use of detention facilities.  In addition, the conference committee should reject the Senate bill's expansion of the definition of aggravated felony in section 161.  A similar definition is in the AEDPA.  By expanding the group of aliens for whom detention is strictly required, the Senate approach would effectively negate the more favorable House provision related to mandatory custody.

<u>Verification of eligibility for employment and benefits</u>

The Senate bill, which provides for the completion and evaluation of demonstration programs prior to the enactment by Congress of a new verification system for employment and benefit eligibility, is consistent with the Administration's proposal. We strongly support the approach to verification adopted in sections 111 through 113 with two reservations.  First, section 112(a)(1)(A)(iv) limits the executive branch's discretion to choose appropriate demonstration projects by requiring the testing of three specified systems.  The Administration recommends that the Attorney General retain flexibility to identify which projects will be the most instructive, taking into account technical feasibility and lessons learned from earlier pilots.  Second, section 111(e) relieves an employer from liability under section 274A of the INA under certain conditions while section 111(g) limits liability under section 274A of the INA for any person who takes an action adverse to an individual in good faith reliance on information relating to that individual

6

gained from the new verification system or a demonstration project. The presence of two provisions which seemingly address the same issue, i.e. employer liability under the INA, is confusing, and we recommend that section 111(g) be stricken because it excuses an employer from liability even if she fails to comply with her voluntarily assumed responsibilities under the pilot. If both provisions are to be retained, their relationship should be clarified. Overall, we prefer the verification system provisions contained in the Senate bill except for section 117, intent to discriminate which is discussed above.

We also support the limits in section 116 of the Senate bill upon the number of documents which establish both employment authorization and identity and the number of documents which establish employment authorization. The House bill deletes from section 274A(b)(1)(C), "other documentation evidencing authorization of employment in the United States which the Attorney General finds, by regulation, to be acceptable." These documents are critical to the transition phase of document reduction, and we recommend that they be retained. We strongly prefer the Senate bill provisions on document reduction, but recommend that the effective date be 18 months as provided by the House bill to permit appropriate time for the promulgation of regulations.

We support adoption of section 403(d) of the House bill which specifically defines the term "entity" to include an entity in any Branch of the Federal Government. But we strongly oppose adoption of section 403(f) which mandates that not later than 180 days after the date of the enactment of this Act, the Attorney General shall issue regulations which shall provide for the electronic storage of Forms I-9. The INS currently is conducting a demonstration project involving the electronic generation, completion, and storage of the Form I-9. At present, forensic examination of Form I-9 is essential to the successful prosecution of fraud cases. It is premature at this time for Congress to mandate regulations providing for electronic storage within 180 days.

However, we support the House provision to study and conduct pilot studies to eliminate the fraudulent use of birth certificates.

## Asylum

The House bill would require that all applications for asylum, both affirmative and defensive, must be filed within 180 days of arriving in the United States. There is an exception for "fundamentally changed" circumstances in the alien's country that affect eligibility for asylum. The Senate bill would require that defensive asylum claims (those filed for the first time in deportation or exclusion proceedings) must be filed within one

7

year of arrival.  There is a "good cause" exception for having failed to file timely.  The Administration is opposed to filing deadlines for asylum.  We believe enforcement of the deadlines would unnecessarily divert resources from the adjudication of claims, create a new class of fraud, and have a negative effect on productivity.  In our view, recent improvements in the asylum process make legislative asylum reform unnecessary.  In addition, we believe that returning a refugee to a country where he or she would face a threat to life or freedom simply because the refugee failed to make a timely request for protection substantially undermines U.S. leadership in refugee protection.  However, if the conference committee is intent on imposing a deadline on asylum applications, we recommend that the committee adopt the Senate version, as we believe it is essential to include an exception for good cause in order to maintain the flexibility to continue to protect bona fide refugees.

Pursuant to a presidential directive to address asylum abuse, the Department of Justice dramatically restructured the asylum process in January 1994.  In addition, the Administration requested and Congress provided the resources necessary to do the job in the Violent Crime Control and Law Enforcement Act of 1994 which more than doubled the authorized number of INS asylum officers from 150 to 377 and increased the number of Immigration Judges from 116 to 179.  By the end of Fiscal Year 1996, we expect to have approximately 210 immigration judges.  The new asylum process allows the INS to quickly identify and promptly grant valid claims, and to refer all other cases to immigration court for deportation proceedings; to grant work authorization only to applicants who are granted asylum or when an applicant's case is not adjudicated within 180 days; and to streamline procedures to help asylum officers keep current with incoming applications.

To date, these reforms have had tremendous positive results.  New asylum claims that are not part of the American Baptist Churches v. Thornburgh class action lawsuit (non-ABC) filed with the INS dropped 57 percent.  Asylum officers completed 126,000 cases in calendar year (CY) 1995 compared to 61,000 in CY 1994.  Immigration Judges completed 40,000 asylum cases in CY 1995 compared to 17,000 in CY 1994--an increase of 135 percent.  More than 98 percent of the new non-ABC cases were completed by Immigration Judges within 180 days from the initial INS receipt of the asylum application.  We have streamlined procedures without reducing the quality of our asylum decisions.  INS has instituted quality assurance procedures to monitor the new system.  Approval rates have not changed significantly.

In addition to restructuring the asylum process, the INS has stepped up its fraud investigation of preparers of spurious asylum claims.  Investigations have resulted in indictments of preparers in Los Angeles, San Francisco, New York, and Arlington,

VA. In addition, INS requested and received additional funding in Fiscal Year 1996 for detention of absconders, including failed asylum seekers.

## Triple Fence

This Administration has built and reinforced physical barriers along the Southwest border. Over the past several years, the INS with the support of military personnel and the National Guard has built miles of strategically placed fencing along the border to control drug trafficking, alien smuggling, crime, and illegal immigration. For example, there are now 28 miles of fencing in the San Diego Sector to support the Administration's increased deployment of Border Patrol agents, resources, and sophisticated technology. Recently, we began construction of a 1.3 mile fence along the border at Sunland Park, New Mexico. We support the Senate provision because it defers to the experience of the INS to determine whether multiple fencing would be safe and effective and allows for incorporation of necessary safety features to ensure the well-being of Border Patrol agents. We also support the Senate version because it does not waive the Endangered Species Act (ESA). We oppose providing ESA waivers to government agencies because it undercuts the general applicability of the ESA and undermines the government's credibility in enforcing it. Requirements and regulations under the ESA have been and continue to be streamlined to balance the interests underlying the ESA with those of the regulated community.

## Adjustment of Status

Section 245(i) of the INA permits otherwise qualified aliens who entered the United States illegally or who were employed in the United States without authorization to adjust status in the United States upon the payment of a substantial penalty fee to the Examinations Fee Account. Relatives of legalized aliens who are permitted to remain in the United States under the "family unity" provisions may adjust under this provision without payment of the fee. Section 245(i), which expires in 1997, was intended to eliminate pro forma immigrant processing overseas for qualified applicants who were residing in the United States. This provision has enabled the INS dramatically to improve its services and the State Department to reduce its overseas visa processing staff.

Section 808 of the House Bill would make 245(i) available only for family unity beneficiaries. Since family unity beneficiaries are exempt from the fee requirement, this amendment would eliminate a substantial source of funding which would be spent by applicants, instead, to travel abroad to obtain immigrant visas. Section 245(i) revenues totaled $135,000,000 in fiscal year 1995. If Congress either repeals or fails to extend

section 245(i), the new positions created by section 245(i) revenues will be eliminated and there will be a large adverse fiscal impact on the quality and level of services given to adjudicating petitions and applications for immigration benefits. Furthermore, as a result of 245(i), the Department of State has been able to reprogram positions to high priority anti-fraud and nonimmigrant visa work. Returning this pro forma immigrant visa processing to the Department of State without sufficient resources would cause severe disruption of service to the public. If the conference committee decides not to extend 245(i) adjustment authority beyond September 30, 1997, it should amend section 245(i) to provide adjustment authority for applications filed on or before that date. As currently written, the authority will sunset with respect to any application not adjudicated before September 30, 1997. Such an amendment would enable the INS to properly investigate and adjudicate pending cases without adversely affecting other priorities, e.g., naturalization, and will prevent forum shopping among INS district offices.

The Senate bill does not amend section 245(i) directly, but limits the underlying eligibility of certain alien status violators for immigrant status. Section 317 of the Senate bill provides that no petition may be approved on behalf of an alien who at any time has been apprehended for entering without inspection or who has failed to depart the U.S. within one year of the expiration date of any nonimmigrant visa (subject to a "good cause" exception) unless the alien has been outside of the U.S. for 10 years. Such an alien is inadmissible and ineligible to adjust status. This provision also prohibits such an alien from seeking a new nonimmigrant classification during the 10-year bar. Certain exceptions are prescribed, and Family Unity beneficiaries are exempt. Similarly, sections 301(b) and (c) of the House bill affect the eligibility of aliens to adjust status. Any alien present in the U.S. without inspection or who arrives in the U.S. without inspection is inadmissible. There is no waiver of this ground. Any alien who has been unlawfully present in the U.S. for an aggregate period of at least one year is inadmissible unless the alien remains outside the U.S. for at least ten years. There are waivers for close relatives of U.S. citizens and lawful permanent residents and those whose admission is deemed to be in the national interest.

The Administration opposes the restrictions on admissibility and eligibility to adjust contained in section 317 of the Senate bill and section 301 of the House bill. These provisions will not deter illegal immigration, but will likely result in a class of aliens who would otherwise be eligible for legal status remaining undocumented and in hiding. In particular, we oppose the provision in the House bill which attaches restrictions on those present unlawfully for a period of one year or more. This provision will generate needless and costly litigation on the

10

issue of the time period during which the alien was unlawfully present in the United States.

<u>International Obligations</u>

We are concerned over whether certain provisions in H.R. 2202 are consistent with U.S. international trade obligations, and would appreciate the opportunity for a discussion of these issues so that they may be taken up in the conference.

# EXHIBIT X

Coalition for Humane Immigrant Rights, et al. v. Noem et al., 1:25-cv-00872 (JMC)



**RG 46 Records of the U.S. Senate**

103-104 **Congress**

Judiciary Committee
Subcommittee on Immigration
Legislative Files
Republican

**Box No.** 15 of 19

*AKS' DESK PRIORITY*

June 25, 1996

TO:      AKS

FROM:    Dick Dh

SUBJECT: First Meeting of Republican Immigration Conferees


Smith is setting the first "pre-conference" meeting of Republican conferees for 5:00 pm today on the House side in HC-4 in the Capitol.

Smith apparently intends that there be some substantive discussions at this first meeting, and that we will continue meeting on Wednesday and Thursday, if necessary, until we reach a Republican position on the conference report. At some point this week the House conferees will be named, and upon our return from the 4th of July recess, the first official meetings of conferees will be held at which time the Republican proposal will be provided to all conferees for discussion and action.

The staff has been meeting over the last three weeks to resolve as many of the issues as possible, and there is a proposed resolution of most of them for the Members to consider. However, there are eight or so major issues yet to be resolved:


1.   Gallegly education amendment

2.   H-1B

3.   Summary exclusion/asylum reform

4.   Treatment of over-stayers and EWI's (entered without inspection)

5.   Poverty level for sponsors (125% or 200%?)

# EXPEDITED EXCLUSION; ASYLUM

**Which aliens should be subject to expedited exclusion?** The bill reported by the Senate Judiciary Committee covered: (1) aliens arriving at a port of entry with no or fraudulent documents, (2) aliens brought to the U.S. from interdicted vessels, (3) "extraordinary migration situations," and (4) "EWIs" ( entered without inspection). As the result of the Leahy amendment, the Senate-passed bill covers only "extraordinary migration situations." The House bill covers the fraudulent or no document and the interdiction cases. Senator Hatch made a proposal that covered all cases, except possibly EWIs.

**How should asylum claims be handled?** All the proposals provide an opportunity for aliens in the expedited exclusion proceeding to seek asylum through establishing a "credible fear" of persecution. The Senate-passed bill would require only that the asylum officer find that, given the alien's statements and other facts known to the officer, the alien's claim is not "<u>manifestly unfounded</u>." Administrative review would be the same as for expedited exclusion generally (see below). Normal judicial review would be available. The House-passed bill would require the alien to show (1) it is "<u>more probable than not</u>" that the alien's statements are true, and (2) "<u>significant possibility</u>," in light of the aliens statements and other facts known to the officer, that the alien could establish eligibility. There would be supervisory administrative review if the asylum officer found no credible fear. Judiciary review would be the same as for expedited exclusion generally (habeas).

Hatch has proposed a procedure similar to the Senate-passed bill (but would also require a full exclusion hearing if the alien came from a country in which various oppressive conditions existed). Under Hatch's proposal, an asylum officer's finding of no credible fear would be subject to administrative review by an immigration judge.

Lamar Smith has recently proposed a compromise: "substantial likelihood," rather than "more probable than not," that the alien was truthful).

**What kind of administrative and judicial review should be available?** The Senate-passed bill provided for a single level of administrative review plus normal judicial review. In other words it would not be very "expedited." Outside the asylum context, the House-passed bill provided for administrative review only if the alien claims LPR status. Judiciary review would be limited to habeas corpus.

**Should the expedited procedure be mandatory?** The Senate-passed bill made the procedure discretionary. Under the House-passed bill, use would be mandatory. Senator Hatch proposes discretionary use.

**What should be the deadline for asylum applications?** The Senate-passed bill contains a one-year limit on applications raised "defensively" (i.e., after a deportation hearing has been instituted). The House-passed bill contains a 180-day limit, whether or not a claim is made defensively. Lamar Smith has recently proposed a one-year limit.

# EXCLUSION OF OVERSTAYERS AND ENTRANTS WITHOUT INSPECTION

**THE ISSUE:** What is the most appropriate way to merge the similar but not identical provisions of the House and Senate bills regarding the exclusion of overstayers and aliens who "entered without inspection" (slipped across the border)? Specifically, what sort of exceptions should there be to new provisions excluding them?

**THE HOUSE BILL:** The House bill (Gallegly) contained tough new provisions making anyone "unlawfully present" in the U.S. for more than one year excludable for a period of ten years, with various exceptions and waivers attached. "Unlawfully present" includes visa overstayers and aliens who "enter without inspection." The House also provided (Tate) that anyone who entered without inspection after previously being excluded/deported, was *barred for life*, with only the narrowest exception.

**THE SENATE BILL:** The Senate also barred one-year visa overstayers for ten years, and applied the same bar to anyone entering without inspection. The Senate (Abraham) also provided that anyone who overstayed their visa by 60 days would be excludable for 3 years, or for 5 years in the case of an alien who failed to attend deportation proceedings. This provision carried an exception for "good cause," determined by the AG.

**THE PROPOSED CONSOLIDATION** of the Smith/Simpson staff provides a hierarchy of provisions for varying degrees of immigration violates. There is a three-year exclusion period for those who have overstayed their visas or entered without inspection for 120 days or more (we added 60 days to the Senate provision as a compromise to Hatch's request for 180 days). We have also built in the House exceptions for minors, asylees, Chafee's "family unity" cases, and battered women and children. There is a ten-year ban for those "unlawfully present" for more than one year. And finally, based on the permanent bar of the House (Tate) provision, there is a permanent bar for those who have been previously deported, or previously were "unlawfully present" for more than one year, and then tried to enter the country without inspection.

**HATCH'S PROPOSAL** would carry the water for the groups (business and other) with regard to the three- and ten-year provisions: it proposes an undefined "public interest" waiver which would be open to anyone, and an exception to the overstay provision for aliens who file a petition for extension of stay or change of status, or who overstay for any reason "not the fault of the alien."

Hatch and Abraham are now backing off their "get tough" provisions, advanced in committee to obviate the need for legal immigration changes. Hatch's language would seriously undermine the effectiveness of these exclusion provisions, which for the first time in memory would make entry without inspection or visa overstaying an excludable offense. There may be some room for compromise, but not much for us.

# EXHIBIT Y



American Heritage Center
UNIVERSITY
OF WYOMING

**Alan K. Simpson**

**Papers**

**Accession # 10449**

**Box 424**

JUL  9 1996

Memorandum

To: Cordia Strom
From: Mark R. Disler  MRD
Re: Immigration discussions
Date: July 9, 1996

In response to the House final offer dated June 27 and received the next day, in which only Cong. Gallegly's education provision (House bill section 616) is further negotiable: Senator Hatch appreciates very much the efforts of Cong. Smith on this bill and this most recent effort to resolve remaining differences, but he respectfully cannot agree to the offer and will not sign a conference report as so presented, even aside from disagreements over Section 616.

Speaker Gingrich and Senator Hatch spoke this morning. The Speaker said that he was willing to put an entitlement of federal reimbursement for any states who elect to educate illegal aliens in this bill. This would solve the Speaker's unfunded mandates problem. Senator Hatch very much wants to reach agreement on this bill. Therefore, he is willing to go with the Speaker's proposal, along with the GAO study and expedited procedures for a vote on termination as previously discussed, and drop grandfathering, so long as his positions on the remaining open issues are accepted, as he told the Speaker, as set forth in the attached document. This represents Senator Hatch's final offer.

cc: Republican conferee staff

6/27/96  THU 15:31 FAX 202 225 3672          IMMIGRATION & CLAIMS                    @001

Regarding Open Items

1. <u>Gallegly provision on public education for illegal aliens, House Section 616.</u> Please see attached. We do not have language for the entitlement provision.

2. <u>Mandatory detention of criminal aliens.</u> There is a somewhat different understanding on what was agreed to on June 25. Senator Hatch's understanding is that the Attorney General must certify, within 10 days of enactment, that DOJ cannot comply with Section 440(c) of the Terrorism law. Such certification will trigger a one-year suspension of that section. If, having so certified, the Attorney General determines, at the end of that first year, that DOJ still cannot comply, the Attorney General may again so certify, triggering a second and final year of suspension of Section 440(c) of the Terrorism law.

3. <u>Expedited exclusion.</u> Please see attached. The proposal is a compromise between the two bills, and is a long way from the Leahy-DeWine provision which prevailed in the Senate. Senator Hatch is willing to have broad coverage under an expedited exclusion procedure, so long as there is adequate protection against erroneous decisions to exclude persons genuinely deserving of asylum. He feels that the desirability of expeditious consideration does not outweigh the need to guard sufficiently against returning someone who faces persecution. That is why the standard, the nature of administrative review including a meaningful appeal, and some judicial check on INS's implementation are important. With respect to the latter: while asylum, like a variety of benefits granted by Congress, is provided at Congress's option, once having decided to permit people to claim asylum, he does not believe the INS should be entirely free of judicial review of its compliance with the statute and Constitution. The reason he wants INS policy directives, instructions, and procedures subject to a modicum of judicial review, in addition to regulations, is that it is easy for an agency to put many of its policies in subregulatory form, and evade judicial review altogether. Given that our proposal requires that any challenge occur within 60 days of implementation of these agency policies, and be brought only in the federal district court in the District of Columbia, this judicial check is about as minimal as it can be.

4. <u>Asylum.</u> Here, a different understanding of the agreement also exists. The exception for the one year time limit should be either "exceptional circumstances," which is what Senator Hatch believed he agreed to, or if you prefer, "extraordinary circumstances." "Extraordinary humanitarian cases" sounds too much like it goes to a determination on the merits, rather than an exception to a time limit.

5. <u>Sponsor income requirement.</u> Substitute 140% of the poverty line in the House proposal. Here, Senator Hatch's understanding of the June 25 meeting is that this issue was subject to further discussion, with an eye to reducing the percentage level. We take it that the House believes, instead, that the 185% figure was finally agreed to. In light of these much different understandings, it is apparent that no meeting of the minds occurred.

The basis for Senator Hatch's position is his concern that we not make it too difficult for otherwise qualified persons, including American citizens, to bring in legal immigrants. These immigrants can include a citizen's spouse and minor children.

6. <u>H-1B visas</u>. Recede to Senate; drop House provision.  The House final offer is the same here.

7. <u>House Section 607 -- payment of legal children's benefits through ineligible persons</u>. Recede to Senate; drop House provision.   The House final offer is the same here. We are willing to require a GAO study of this issue, per the suggestion of Cong. Gallegly's office.

8. <u>H2As</u>.  Accept Senate provision, a sense of the Congress provision and GAO study of this farmworker issue (House final offer is same here), or Kyl-Thurmond compromise of this provision.

9. <u>House section 342 regarding airline requirements</u>. Delete. This was discussed at the staff level and never resolved.  Carriers already provide much of this information.  They apparently are close to reaching a Memorandum of Understanding with a number of agencies, aside from INS, which also makes the Senate provision, calling for joint study of automated data collection at ports of entry, preferable.

10. <u>Terrorist Alien Removal Act</u>.  Senator Hatch does not want to accept changes to the Terrorist Alien Removal Act unless Cong. Barr agrees. These provisions were the subject of intense negotiations in connection with the Terrorism Law -- of which Cong. Barr was a major player -- and are a central feature of it.

EXPEDITED EXCLUSION COUNTERPROPOSAL TEXT:

SMITH PROPOSAL WITH HATCH COUNTERPROPOSAL EDITS NOTED

12   SEC. 302. INSPECTION OF ALIENS; EXPEDITED REMOVAL

13            OF INADMISSIBLE ARRIVING ALIENS; REFER-

14            RAL FOR HEARING (REVISED SECTION 235).

15   (a) Section 235 (8 U.S.C. 1225) is amended to read as

16   follows:

17   "INSPECTION BY IMMIGRATION OFFICERS; EXPEDITED

18            REMOVAL OF INADMISSIBLE ARRIVING ALIENS; RE-

19            FERRAL FOR HEARING

20            "SEC. 235. (a) INSPECTION.—

21                "(1) ALIENS TREATED AS APPLICANTS FOR AD-

22            MISSION.—An alien present in the United States

23            who has not been admitted, or who arrives in the Unit-

24            ed States (whether or not at a designated port of ar-

25            rival), or who is brought to the United States after
                      *and including an alien*

26            having been interdicted in international or United

-HR 2202 FH

57

1   States waters) shall be deemed for purposes of this

2   Act an applicant for admission.

3       "(2) STOWAWAYS.—An arriving alien who is a

4   stowaway is not eligible to apply for admission or to

5   be admitted and shall be ordered removed upon in-

6   spection by an immigration officer. Upon such in-

7   spection if the alien indicates an intention to apply

8   for asylum under section 208 or a fear of persecu-

9   tion, the officer shall refer the alien for an interview

10  under subsection (b)(1)(B). A stowaway may apply

11  for asylum only if the stowaway is found to have a

12  credible fear of persecution under subsection

13  (b)(1)(B). In no case may a stowaway be considered

14  an applicant for admission or eligible for a hearing

15  under section 240.

16      "(3) INSPECTION.—All aliens (including alien

17  crewmen) who are applicants for admission or other-

18  wise seeking admission or readmission to or transit

19  through the United States shall be inspected by im-

20  migration officers.

21      "(4) WITHDRAWAL OF APPLICATION FOR AD-

22  MISSION.—An alien applying for admission may, in

23  the discretion of the Attorney General and at any

24  time, be permitted to withdraw the application for

58

1 admission and depart immediately from the United
2 States.

3     "(5) STATEMENTS.—An applicant for admis-
4 sion may be required to state under oath any infor-
5 mation sought by an immigration officer regarding
6 the purposes and intentions of the applicant in seek-
7 ing admission to the United States, including the
8 applicant's intended length of stay and whether the
9 applicant intends to remain permanently or become
10 a United States citizen, and whether the applicant
11 is inadmissible.

12 "(b) INSPECTION OF APPLICANTS FOR ADMISSION.—

13     "(1) INSPECTION OF ALIENS ARRIVING IN THE
14 UNITED STATES.—

15         "(A) SCREENING.—If the examining immi-
16 gration officer determines that an alien arriving
17 in the United States (whether or not at a port
18 of entry) is inadmissible under section
19 212(a)(6)(C) or 212(a)(7) and the alien—

20         "(i) does not indicate either an inten-
21 tion to apply for asylum under section 208
22 or a fear of persecution, the officer shall
23 order the alien removed from the United
24 States without further hearing or review;
25 or

IMMIGRATION & CLAIMS        ☒018

59

1
2    "(ii) indicates an intention to apply

3    for asylum under section 208 or a fear of

4    persecution, the officer shall refer the alien

5    for an interview by an asylum officer under

6    subparagraph (B).

7    "(B) ASYLUM INTERVIEWS.—

8    "(i) CONDUCT BY ASYLUM OFFI-

9    CERS.—An asylum officer shall promptly

10    conduct interviews of aliens referred under

11    subparagraph (A)(ii),

12    *either at the POE or at such other place designated by the Attorney general.*    "(ii) REFERRAL OF CERTAIN

13    ALIENS.—If the officer determines at the

14    time of the interview that an alien has a

15    credible fear of persecution (within the

16    meaning of clause (v)), the alien shall be

17    detained for further consideration of the

18    application for asylum.

19
20    "(iii) REMOVAL WITHOUT FURTHER

    REVIEW IF NO CREDIBLE FEAR OF PERSE-

    CUTION.—

21    "(I) IN GENERAL.—Subject to

22    subclause (II), if the officer deter-

23    mines that an alien does not have a

24    credible fear of persecution, the officer

25    shall order the alien removed from the

•HR 2202 EH

7:26 FAX 202 225 3872    IMMIGRATION & CLAIMS

*[handwritten top annotation]* asylum officer engaged full-time in a supervisory role in the adjudication of applications under Section 20t, by an fff, or by an official with comparable qualifications and experience.

1

2

3

United States without further hearing

or review.

"(II) REVIEW OF DETERMINA-
TION BY SUPERVISORY OFFICER.—
The Attorney General shall promul-
gate regulations to provide for the ~~im-~~
~~mediate~~ review ~~by a supervisory asy-~~
~~lum officer at the port of entry~~ of a
determination under subclause (I).

HATCH PROPOSAL: Replace text of (II) with:

REVIEW OF DETERMINATION.— The Attorney
General shall provide by regulation for
prompt review by an immigration judge of
a determination that the alien does not
have a credible fear of persecution, upon
the alien's request. Such review shall
include an opportunity for the alien to be
heard and questioned by the immigration
judge, either in person or by telephonic or
video connection, but shall be concluded as
expeditiously as possible.

"(iv) INFORMATION ABOUT INTER-

10

11    VIEWS.—The Attorney General shall pro-

12    vide information concerning the asylum

13    interview described in this subparagraph to

14    aliens who may be eligible. An alien who is

15    eligible for such interview may consult with

16    a person or persons of the alien's choosing

17 *(circled, with "unreasonably")*    prior to the interview or any review there-

18    of, according to regulations prescribed by

19    the Attorney General. Such consultation

20    shall be at no expense to the Government

*[handwritten: ~~reasonably~~]* 21    and shall not delay the process.

22    "(v) CREDIBLE FEAR OF PERSECU-

23    TION DEFINED.—For purposes of this sub-

24    paragraph, the term 'credible fear of perse-

cution' means (I) that ~~it is more probable~~

*[handwritten circled:]* Here is a substantial likelihood

HATCH PROPOSAL: Remove first prong;
accordingly, delete from "(I)" through "(II)"

EH



61 *material*

~~than not~~ that the statements made by the
alien in support of the alien's claim are
true, and (II) that there is a significant
possibility, in light of such statements and
of such other facts as are known to the of-
ficer, that the alien could establish eligi-
bility for asylum under section 208.

"(C) LIMITATION ON ADMINISTRATIVE RE-
VIEW.—A removal order entered in accordance
with subparagraph (A)(i) or (B)(iii)(I) is not
subject to administrative appeal, except that the
Attorney General shall provide by regulation for
prompt review of such an order under subpara-
graph (A)(i) against an alien who claims under
oath, or as permitted under penalty of perjury
under section 1746 of title 28, United States
Code, after having been warned of the penalties
for falsely making such claim under such condi-
tions, to have been lawfully admitted for perma-
nent residence.

"(D) LIMIT ON COLLATERAL ATTACKS.—
In any action brought against an alien under
section 275(a) or section 276, the court shall
not have jurisdiction to hear any claim attack-

08/27/96  THU 15:31 FAX 202 225 3672          IMMIGRATION & CLAIMS          ☒001

*[handwritten left margin, top]* proposal at the end of line ten, ~~the period~~ insert "and has had ~~mental~~ experience adjudicating asylum ~~applications~~"

*[handwritten top]* It to be place at the ~~out~~ of ~~during~~ of the alien's ~~val. or~~ of the alien has not . . . at the meet ~~pre~~ ing the validity of an order of removal entered under subparagraph (A)(i) or (B)(iii)(I).

"(E)  ASYLUM OFFICER DEFINED.—As used in this paragraph, the term 'asylum officer' means an immigration officer who—

"(i) has had professional training in country conditions, asylum law, and interview techniques, *[handwritten: comparable to that provided to full-time adjudicators of officiers under section]* and

"(ii) is supervised by an officer who meets the condition described in clause (i).

*[handwritten left block]*
(F) Notwithstanding subparagraph (A), an alien who is a native or citizen of a country in the Western Hemisphere the government of which the United States does not recognize and with which the United States does not have full diplomatic relations who arrives by aircraft at a port of entry ~~during~~ ~~deported from~~ ~~such ruled~~ and who is inadmissible under section 212(a)(6)(C) or 212(a)(7) shall be inspected pursuant to paragraph (2).

*[line numbers]* 4 5 6 7 8 9 10 11 12 13 14 15 16 17 18 19 20 21 22 23 24

"(2) INSPECTION OF OTHER ALIENS.—

"(A) IN GENERAL.—Subject to subparagraph (B), in the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a hearing under section 240.

"(B)  EXCEPTION.—Subparagraph (A) shall not apply to an alien—

"(i) who is a crewman,

"(ii) to whom paragraph (1) applies

or

"(iii) who is a stowaway.

HATCH proposal on return to certain countries: in addition to the handwritten text of (F), include the following:
"(G) Notwithstanding any other provision of this section, the Attorney General may proceed in accordance with subsection 240 with respect to any alien fleeing from a country where_

"(A) the government (or a group within the country that the government is unable or unwilling to control) engages in_

"(I) torture or other cruel, inhumane, or degrading treatment or punishment;

"(II) prolonged arbitrary detention without charges or trial;

"(III) abduction, forced disappearance or clandestine detention; or

"(IV) systematic persecution; or

"(B) an ongoing armed conflict or other ~~violence~~

Committee Files Judiciary - Immigration
Legislation 104th Congress
H.R. 2202/S.1664 Conference Issues Hatch/Delay House Proposals and Resp...

06/27/96  THU 15:31 FAX 202 225 3672        IMMIGRATION & CLAIMS        @001

06/21/96  FRI 17:27 FAX 202 225 3672        IMMIGRATION & CLAIMS

entered                          63

ED.—As                           "(3) CHALLENGE OF DECISION.—The decision
                            of the examining immigration officer, if favorable to
                            the admission of any alien, shall be subject to chal-
                            lenge by any other immigration officer and such
HATCH Proposal for Report: Add a new   challenge shall operate to take the alien whose privi-
subparagraph (4) as follows:           lege to be admitted is so challenged, before an immi-
"(4) REPORT.—Within 18 months of the date   gration judge for a hearing under section 240.
of enactment, the General Accounting Office
shall submit a report to the House and   "(c) REMOVAL OF ALIENS INADMISSIBLE ON SECU-
Senate Judiciary Committees on the       RITY AND RELATED GROUNDS.—
implementation of the expedited exclusion
procedures under subsection 235(b)(1), with   "(1) REMOVAL WITHOUT FURTHER HEARING.—
particular reference to administrative and
other costs of complying with the provision   If an immigration officer or an immigration judge
and the accuracy of credible fear            suspects that an arriving alien may be inadmissible
determinations made thereunder.

an ap-        13    under subparagraph (A) (other than clause (ii)),

immi-         14    (B), or (C) of section 212(a)(3), the officer or judge

eeking        15    shall—

.bt en-       16         "(A) order the alien removed, subject to

tained        17    review under paragraph (2);

              18         "(B) report the order of removal to the At-

(A)           19    torney General; and

              20         "(C) not conduct any further inquiry or

              21    hearing until ordered by the Attorney General.

              22         "(2) REVIEW OF ORDER.—(A) The Attorney

              23    General shall review orders issued under paragraph

              24    (1).

              25         "(B) If the Attorney General—

•HR 2202 EH

17:27 FAX 202 225 3672    IMMIGRATION & CLAIMS    🖂023

64

1    "(i) is satisfied on the basis of confidential

2    information that the alien is inadmissible under

3    subparagraph (A) (other than clause (ii)), (B),

4    or (C) of section 212(a)(3), and

5    "(ii) after consulting with appropriate se-

6    curity agencies of the United States Govern-

7    ment, concludes that disclosure of the informa-

8    tion would be prejudicial to the public interest,

9    safety, or security,

10    the Attorney General may order the alien removed

11    without further inquiry or hearing by an immigra-

12    tion judge.

13    "(C) If the Attorney General does not order the

14    removal of the alien under subparagraph (B), the

15    Attorney General shall specify the further inquiry or

16    hearing that shall be conducted in the case.

17    "(3) SUBMISSION OF STATEMENT AND INFOR-

18    MATION.—The alien or the alien's representative

19    may submit a written statement and additional in-

20    formation for consideration by the Attorney General.

21    "(d) AUTHORITY RELATING TO INSPECTIONS.—

22    "(1) AUTHORITY TO SEARCH CONVEYANCES.—

23    Immigration officers are authorized to board and

24    search any vessel, aircraft, railway car, or other con-

•HR 2202 EH

committee Files Judiciary - Immigration
Legislation 104th Congress
H.R. 2202/S.1664 Conference Issues Hatch/Dieler/ House Proposals and Responses

1996

ACC.# 10449

17:27 FAX 202 225 3672    IMMIGRATION & CLAIMS    ⓪026

65

1 veyance or vehicle in which they believe aliens are
2 being brought into the United States.
3     "(2) AUTHORITY TO ORDER DETENTION AND
4 DELIVERY OF ARRIVING ALIENS.—Immigration offi-
5 cers are authorized to order an owner, agent, mas-
6 ter, commanding officer, person in charge, purser, or
7 consignee of a vessel or aircraft bringing an alien
8 (except an alien crewmember) to the United
9 States—

10     "(A) to detain the alien on the vessel or at
11     the airport of arrival, and

12     "(B) to deliver the alien to an immigration
13     officer for inspection or to a medical officer for
14     examination.

15     "(3) ADMINISTRATION OF OATH AND CONSID-
16 ERATION OF EVIDENCE.—The Attorney General and
17 any immigration officer shall have power to admin-
18 ister oaths and to take and consider evidence of or
19 from any person touching the privilege of any alien
20 or person he believes or suspects to be an alien to
21 enter, reenter, transit through, or reside in the Unit-
22 ed States or concerning any matter which is mate-
23 rial and relevant to the enforcement of this Act and
24 the administration of the Service.

66

1   "(4) SUBPOENA AUTHORITY.—(A) The Attor-

2   ney General and any immigration officer shall have

3   power to require by subpoena the attendance and

4   testimony of witnesses before immigration officers

5   and the production of books, papers, and documents

6   relating to the privilege of any person to enter, reen-

7   ter, reside in, or pass through the United States or

8   concerning any matter which is material and rel-

9   evant to the enforcement of this Act and the admin-

10   istration of the Service, and to that end may invoke

11   the aid of any court of the United States.

12   "(B) Any United States district court within

13   the jurisdiction of which investigations or inquiries

14   are being conducted by an immigration officer may,

15   in the event of neglect or refusal to respond to a

16   subpoena issued under this paragraph or refusal to

17   testify before an immigration officer, issue an order

18   requiring such persons to appear before an immigra-

19   tion officer, produce books, papers, and documents

20   if demanded, and testify, and any failure to obey

21   such order of the court may be punished by the

22   court as a contempt thereof.".

(b) Section 235(b)(1)(F) of the INA as added by
subsection (a) is repealed upon a determination
by the President under section 203(c)(3) of
P.L. 104-114, (that a democratically elected government
in Cuba is in power.)

•HR 2202 EH

HATCH PROPSAL: INSERT LIMITED JUDICIAL REVIEW PROVISION AS FOLLOWS-

HATCH LIMITED JUDICIAL REVIEW PROPOSAL: ADD

Section 242(f) of the Immigration and Nationality Act, as amended in section 306 of the bill, is amended to read as follows:

"(f) Judicial Review of Special Exclusion Orders._

"(1) Limitations on relief._ Without regard to the nature of the action or claim and without regard to the identity of the party or parties bringing the action pertaining to an order specially to exclude an alien in accordance with section 235(b)(1), no court may enter declaratory, injunctive or other equitable relief or certify a class under Rule 23 of the Federal Rules of Civil Procedure except in actions brought under paragraph (2) or (3) of this subsection.

"(2) Limitation to habeas corpus._ Judicial review of any individual determination made under section 235(b) shall be available only in habeas corpus proceedings, and shall be limited to determinations of_

"(A) whether the petitioner is an alien,

"(B) whether the petitioner was ordered removed under such section, and

"(C) whether the petitioner can prove by a preponderance of the evidence that the petitioner is an alien lawfully admitted for permanent residence, has been granted refugee status under section 207, has been granted asylum under section 208, is a nonimmigrant or is otherwise lawfully present in the United States, such status not having been terminated, and is entitled to such further inquiry as prescribed by the Attorney General pursuant to section 235(b).

"(3) Review of procedures._ (A) Review of subsection 235(b) and its implementation is available in actions instituted in the United States District Court for the District of Columbia, with review limited to_

"(i) the constitutionality of section 235(b);

"(ii) the consistency with this Act and the Constitution of any regulations implementing section 235(b); and

"(iii) whether policy directives, instructions or procedures implementing section 235(b) are in violation of law.

"(B) Any action instituted under this paragraph must be filed no later than sixty days after_

"(i) in the case of a facial challenge to regulations, the date on which final regulations implementing section 235(b) are published in the Federal Register, or

"(ii) the date on which the regulations, policy, instruction, or procedure was implemented.

"(C) A notice of appeal of an order issued by the District Court under this subsection may be filed not later than 30 days after the date of issuance of such order.

"(D) It shall be the duty of the district court, the court of appeals, and the Supreme Court of the United States to advance on the docket and to expedite to the greatest possible extent the disposition of any case considered under this paragraph.".

# EXHIBIT Z

June 26, 1996 [minor revisions 7/24/96]

TO:        AKS
FROM:    Chip
RE:        Expedited exclusion

**Background**

The term "expedited exclusion" refers to a relatively streamlined procedure for excluding from the U.S. certain classes of aliens or aliens in certain situations -- a procedure that involves an initial adjudication by an INS officer (not an immigration judge) and only limited administrative and judicial review. (The terms "special exclusion" and "summary exclusion" are also used for this kind of procedure. The House bill uses the term "expedited removal" because it has combined exclusion and deportation into a single "removal" proceeding.)

This memo compares the approaches to expedited exclusion in (1) the bill reported by the Senate Judiciary Committee (with Simpson language), (2) the bill passed by the Senate (after the Leahy amendment), (3) the House-passed bill, (4) the recent proposals of Senator Hatch, and (5) the recent proposal of Lamar Smith. The most controversial areas of difference between these various approaches include: the classes of aliens or situations to which expedited exclusion may be applied, the handling of asylum applicants, the administrative and judicial review that is available, and the amount of the Attorney General's discretion to use or not use expedited exclusion.

**Classes of aliens or situations to which expedited exclusion may be applied.**

The Senate Judiciary (Simpson) bill covered all four of the cases that have been discussed as suitable for this procedure: (1) aliens arriving at a port of entry with fraudulent documents or no documents (the situation publicized by "60 Minutes"), (2) aliens brought to the U.S. from vessels interdicted at sea, (3) "extraordinary migration situations" (determined by the Attorney General), and (4) "EWIs" (aliens who have entered without inspection) [the Judiciary bill limited coverage of EWIs to cases in which the alien has not established that he or she has been in the U.S. continuously for two years after the unlawful entry].

As the result of the Leahy amendment, the Senate-passed bill covers only "extraordinary migration situations" case.

The House bill covers the fraudulent or no document and the interdiction cases.

Senator Hatch made a proposal on June 14 which covers the extraordinary migration situation and interdiction cases. In response to Lamar Smith's June 21 proposal (see next paragraph), Hatch offered to accept what he called "[Smith's] mandatory, across-the-

2

board application of summary exclusion" -- provided that there are "stronger safeguards [for asylum applicants] in other parts of the proposal." Actually, however, Smith had not proposed "across-the-board" application, since his proposal did not cover EWIs (nor, apparently, "emergency migration situations"). Therefore, presumably, Hatch's offer also did not cover EWIs. Nevertheless, comments by Hatch's staff person on this issue (Liz Kessler) at a meeting of the House and Senate Republican conferee staff on Monday (June 24) indicated that Hatch would also support coverage of EWIs -- assuming that he viewed other parts of the procedure as adequate.

Last Friday (June 21) Lamar Smith made a "global" offer to Hatch covering many issues, including expedited exclusion. It appears that under that offer, expedited exclusion would cover the same cases as in the House-passed bill: the interdiction and the fraudulent or no documents cases.

You have stated that all four cases should be covered. This would make it possible to remove the greatest number of these illegal aliens as quickly as possible and at the least possible cost in resources, including use of scarce detention space. (The EWIs who would be covered are those who have been here for less than two years -- as in the Senate Judiciary bill.) You have also questioned why EWIs deserve more procedural rights than persons without documents who present themselves for inspection at a port of entry. Indeed, the wrongdoing of EWIs -- sneaking across the border -- may well be greater..

Some persons (e.g., Peter Levinson of Hyde's staff) argue that to subject EWIs to expedited exclusion would create too great a risk of excluding citizens or lawful aliens. We have pointed out that aliens have a legal obligation to carry their documents. If an alien has no documents, he likely to be unlawfully present. Furthermore, if a mistake is made with respect to a nonimmigrant (except in asylum cases; see next paragraph), the consequence is only that the alien must return home and obtain another visa.

The cases where there could be more serious consequences -- cases involving asylum applicants, citizens, and lawful permanent residents ("LPRs") -- are handled in a special manner, with additional administrative and judicial review. Therefore, mistakes involving these individuals are not significantly more likely than under current non-expedited exclusion.

All the bills and proposals have provided, first, for additional administrative review for persons claiming to be lawful permanent residents (the same could be provided for citizens through a simple amendment). Second, judicial review is available, in a habeas corpus proceeding, to persons claiming to be citizens or lawful permanent residents.

Asylum applicants are handled through a special procedure to determine whether they have a "credible fear" of persecution. If they do, they will receive a full asylum

3

adjudication. Various approaches to determining whether they do are considered below.

The asylum situation is what has caused the most concern about expedited exclusion. This is understandable, since if a mistake is made there, someone may be sent back to a country in which they will be persecuted.

If the conference adopts a reliable procedure for determining whether there is credible fear of persecution -- thus whether a full asylum hearing will be available -- there should be less concern about how widely the expedited exclusion is used. This is consistent with the statement of Senator Hatch quoted above, in which he offered to accept "[Smith's] mandatory, across-the-board application of summary exclusion" -- provided that there are "stronger safeguards [for asylum applicants] in other parts of the proposal."

Some might argue that since neither the Senate-passed nor the House-passed bill now covers EWIs, to do so would be beyond the scope of the conference. We do not believe this to be the case, since retaining current law is always a conference option -- and under the Terrorism Prevention Act, there will, apparently, be an expedited exclusion procedure for EWIs (all EWIs, not just those in the U.S. less than two years). That Act is now current law, though the special exclusion provision will not go into effect until October of this year. (Mr. Hyde argues that EWIs are not covered under that Act. However, this is a minority view and appears clearly to contradict the statute's text.)

## Handling of asylum applicants.

All the proposals provide an opportunity for aliens in the expedited exclusion proceeding to obtain a full asylum hearing before an immigration judge by establishing a "credible fear" of persecution. The major difference between the various approaches is in the standard of proof for establishing a "credible fear."

Under the Senate Judiciary bill, the alien would have to show: (1) a "substantial likelihood" that the statements made by the alien in support of the alien's claim are true, and (2) a "significant possibility," in light of the alien's statements and country conditions, that the alien could establish eligibility under the refugee definition. There would be supervisory administrative review of an adverse decision by the asylum officer. Judicial review would be the same as for expedited exclusion generally (see below).

The Senate-passed bill (Leahy) would require only that the asylum officer find that, given the alien's statements and other facts known to the officer, the alien's claim is not "manifestly unfounded." Administrative review would be the same as for expedited exclusion generally (see below). Normal judicial review would be available.

The House-passed bill would require the alien to show (1) it is "more probable than not" that the alien's statements are true, and (2) a "significant possibility," in light of the

4

alien's statements and other facts known to the officer, that the alien could establish eligibility for asylum. Administrative and judicial review would be essentially the same as in the Senate Judiciary bill (i.e., before Leahy's floor amendment).

In his June 14 proposal, Senator Hatch included a procedure similar to the Senate-passed bill (but which would require the AG to provide a full exclusion hearing if the alien came from a country in which various oppressive conditions existed). Senator Hatch argues that the two-part standard used in the Senate Judiciary bill and the House-passed bill is not reasonable, because (a) <u>the credibility of the alien is already an element of the second part of the standard</u> and (b) <u>to make it a separate requirement would mean that an applicant who has lied could not meet the standard even if the asylum officer believed -- on the basis of his own information about the applicant, country conditions, etc. -- that the alien would be persecuted if he were sent back</u>.

For your information, I agree with Hatch's view on this, but I appear to be the only one on your staff who does.

Under Senator Hatch's June 14 proposal, an asylum officer's finding of no credible fear would be subject to administrative review by an <u>immigration judge</u>, but the immigration judge could hear and question the alien by telephone or video conference, as well as in person. Judicial review would be the same as for expedited exclusion generally (for review of individual cases, this would be habeas corpus; in addition, there could be review of INS's implementing regs, etc.; see below).

In Hatch's response to the Lamar Smith June 21 offer, he offered to give up the "manifestly unfounded" standard -- which most supporters of expedited exclusion view as much too low -- if the "two-prong" standard were replaced with a standard containing the second prong alone ("significant possibility" of establishing asylum eligibility), "with the understanding that that standard <u>implicitly</u> includes a credibility determination." (Underlining added.)

Lamar Smith's June 21 offer to Hatch proposed to retain the two-prong standard, but to replace "more probable than not" with "substantial likelihood" -- the standard used in the Senate Judiciary (Simpson) bill. I note that some persons interpret the "substantial likelihood" standard as <u>above</u>, the "more probable than not" standard, though Smith does not seem to and that could be clarified somewhat in the conference report. Smith also offered to provide that the administrative review of an asylum officer's decision that no credible fear had been shown could be not only to a supervisor, but, alternatively, to an immigration judge or an "official with comparable qualifications and experience."

In my view, Hatch's latest proposal on the credible fear standard of proof is a reasonable one, and well worth considering, especially if it would be enough to cause him

5

to accept the rest of the desirable features of expedited exclusion, e.g., including EWIs.

One desirable change -- one that Hatch would most likely accept -- would be to explicitly include credibility of the asylum applicant as part of the one-prong standard. Thus, in order for the asylum officer to determine that there is a credible fear of persecution, the alien would have to show that there is a "significant possibility, in light of statements made by the alien in support of the alien's claim, the officer's judgment of the credibility of the alien, and such other facts as are known to the officer, that the alien could establish eligibility for asylum under section 208."

Hatch's proposal to designate the immigration judge as the adjudicator for the single administrative review of asylum officer determinations would be more acceptable if certain changes were made. Language could be added to clarify that the review would not be conducted like a regular deportation or exclusion hearing, but rather would be a special proceeding, with a standard of review that is very deferential toward the determination of the asylum officer. Even if that change were made, however, the process will be longer if immigration judges conduct the review. Also, the supervising asylum officer appears more qualified by training and experience than an immigration judge to conduct these reviews. Furthermore, immigration judges might not be available everywhere that an asylum officer was located. This may be especially likely if EWIs are covered by expedited exclusion. Thus, there are several reasons to resist this Hatch proposal. [7/24/96 note: immigration judge availability would be less of a problem if the immigration judge could interview the applicant by telephone, as Hatch has recently proposed. However, involvement of the immigration judge would likely still significantly delay the process.]

**Administrative and judicial review.**

Outside the asylum context, the Senate Judiciary bill (your bill) provided for administrative review only if the alien claimed, under penalty of perjury, to be a lawful permanent resident. Judicial review would be limited to three issues, in habeas corpus: whether the petitioner (a) is a alien, (b) is a lawful permanent resident alien, and (c) was specially excluded. The Senate-passed bill (incorporating the Leahy amendment), provided for a single level of administrative review and normal judicial review. In other words it would not be very "expedited." The House-passed bill provided for administrative and judicial review similar to that in the Senate Judiciary bill.

Under the Hatch proposal, expedited exclusion orders would be subject to administrative review if the alien claimed to be an LPR or to have any other lawful status. Judicial review would be available in habeas corpus. However, the habeas proceeding

6

consider not only whether the applicant was a citizen, was an LPR, or was in fact specially excluded (as in the Senate Judiciary bill and House-passed bill) but also whether the applicant had some other lawful status -- nonimmigrant visitor or otherwise -- and whether the alien was from a country where various oppressive conditions were present. This addition has not been proposed anywhere else and would create a major opportunity for delaying the process.

In addition, Hatch proposes that <u>judicial review of INS's implementation</u> of the expedited procedure be available in the Federal District Court in D.C. The court could review INS regulations, as well as "policy directives, instructions, or procedures," to determine whether they are consistent with the Constitution and with the statutory provision establishing the expedited procedure. The action would have to be brought within 60 days of promulgation of the INS regulation or implementation of the other covered INS actions. Decisions of the District Court could be appealed to the Court of Appeals and ultimately to the Supreme Court. The courts, including the Supreme Court, are directed to "expedite to the greatest extent possible the disposition of any case considered under this [provision]."

Hatch's proposal to add judicial review of INS regs, etc. appears to be potentially acceptable. If the proposal were modified to provide for a single review within 60 days [or 30 days?] of each INS regulation or <u>written</u> policy directive or other <u>written</u> instruction implementing expedited exclusion -- for consistency with the Constitution and the statute -- and if it were made clear that the Supreme Court's involvement would be solely through a writ of certiorari (the Court would decide if it wished to review these cases), the potential for delay would be lower.

**Amount of the Attorney General's discretion to use or not use expedited exclusion.**

The Senate Judiciary bill made the procedure discretionary for all aliens covered. So did the bill passed by the Senate. Under the House-passed bill, use would be mandatory. Senator Hatch proposes discretionary use. Under the Terrorism Prevention Act, use would also be mandatory.

The best approach may be to make use mandatory for the fraudulent or no documents case and the interdiction case (as in the House-passed bill and the Terrorism Prevention Act), but discretionary for EWIs (unlike in the Terrorism Prevention Act). (Use in extraordinary migration situations would, of course, also be discretionary.) Discretionary use for EWIs would enable use of a full deportation hearing, before an immigration judge, if an asylum officer were not available to conduct a "credible fear" determination.

# EXHIBIT AA

Coalition for Humane Immigrant Rights, et al. v. Noem et al., 1:25-cv-00872 (JMC)



RG 46 Records of the U.S. Senate

103-104 Congress

JUDICIARY COMMITTEE
SUBCOMMITTEE ON IMMIGRATION
LEGISLATIVE FILES
REPUBLICAN

Box No. 15 of 19

PRIORITY

July 24, 1996

TO:        AKS

FROM:      Dick

SUBJECT:   Stalemate on Immigration Conference

The three issues that are holding us up are:  Gallegly, expedited exclusion, and percent of poverty income required before one can sponsor an immigrant.

Gallegly is going to have to be settled between Hatch and the House people. Expedited exclusion is an issue that very much concerns Congressman McCollum who has worked on it for 15 years, and Hatch is the only one making an issue of it on our side.  Lamar Smith feels as strongly as any of the House conferees about the need for a high percent of poverty level to avoid poor people bringing in other poor people who will need welfare.

I believe the percent of poverty issue can be settled, with your help. Expedited exclusion is going to be tougher, but I'm not sure what you need to do (or can do).  I have made the arguments to Disler as have the House folks.

Attached are memos outlining those three provisions and discussing some of the pertinent issues involved.

*Also attached are talking points if you should wish to comment at the meeting the leadership will call*

Attachments

TALKING POINTS

EXPEDITED EXCLUSION

*   The Senate passed summary exclusion provisions twice in the 80's, and the House had at least two votes on summary exclusion in the 80's. In both Houses the bills, which contained the provisions, passed by wide margins. Unfortunately, we never got through conference on either bill.

*   If we had enacted expedited exclusion provisions in the 80's, it is unlikely that we would now have 400,000 pending asylum cases, some pending for longer than 5 years. I might also point out that these are cases, not persons; the 400,000+ cases represent over 1 million persons. These persons are living and working in the United States and are likely never to be returned to their home countries, despite the fact that less than 20% of those whose cases are heard qualify for asylum.

*   If we had expedited exclusion on the books, the spectacle at JFK airport so vividly portrayed on "60 Minutes" would

2

have been quickly stemmed. The Chinese on the Golden Venture in New York Harbor could have been quickly processed with those having a credible fear of persecution receiving a full asylum hearing, and the others swiftly returned to their homeland.

\* We need expedited exclusion -- and this should include an expedited process for considering asylum claims by excludable aliens, a process that cannot be delayed by unnecessary and time-consuming reviews.

POVERTY LEVEL FOR SPONSORSHIP

\* It is important to keep in mind that the fastest growing segment of SSI is SSI for elderly immigrants. Overall, immigrant households are now using welfare at a higher rate than native-born households, despite the fact that the immigrants could not have been admitted if it had been determined that they were "likely at any time to become a public charge."

* I don't believe in banning lawful immigrants from any public assistance program, but I do believe strongly that immigrants who have sponsors should not receive aid from taxpayers unless their sponsors cannot pay.

* If the sponsors are eligible for welfare themselves, are borderline, how in the world can we expect them to provide needed assistance to their immigrant relatives whom they bring here?

* I believe we do need to assure ourselves that the person in the United States who wants to bring his relatives here to live, is not only willing, but also able, to assist them, if necessary.

GALLEGLY AMENDMENT

* I have not been enthusiastic about the idea of denying a free public education to children who are living here.  However, I do see this as a "States' rights" issue.

3

\*    I don't believe in banning lawful immigrants from any public assistance program, but I do believe strongly that immigrants who have sponsors should not receive aid from taxpayers unless their sponsors cannot pay.

\*    If the sponsors are eligible for welfare themselves, are borderline, how in the world can we expect them to provide needed assistance to their immigrant relatives whom they bring here?

\*    I believe we do need to assure ourselves that the person in the United States who wants to bring his relatives here to live, is not only willing, <u>but also able</u>, to assist them, if necessary.

## GALLEGLY AMENDMENT

\*    I have not been enthusiastic about the idea of denying a free public education to children who are living here. However, I do see this as a "States' rights" issue.

4

*   Currently, the courts and Congress are in effect telling the States they must educate these illegal alien children -- children who are here due to the failure of Federal policy, the failure to enforce our immigration laws.

*   Congress cannot come up with the $4 billion per year to reimburse the States for this cost, but we seem to be willing to tell the States <u>they</u> must somehow find the money to pay for these students, who shouldn't even be in the country.

*   This issue is similar to the issue of when lawful immigrants should receive public assistance.

*   It is not fair to expect the taxpayers to pay for immigrants who their relatives want to bring here but are not willing to -- or cannot -- support.  It is also not fair to expect the States to pay for the education of illegal immigrants who the Federal government is not willing to -- or cannot -- deport.

# EXHIBIT BB

# Calendar No. 361

| 104TH CONGRESS<br>2d Session | SENATE | REPORT<br>104–249 |
|---|---|---|

## IMMIGRATION CONTROL AND FINANCIAL RESPONSIBILITY ACT OF 1996

———————

APRIL 10, 1996.—Ordered to be printed

Reported under authority of the order of the Senate of March 29, 1996

———————

Mr. HATCH, from the Committee on the Judiciary, submitted the following

# REPORT

together with

## ADDITIONAL AND MINORITY VIEWS

[To accompany S. 1664]

The Committee on the Judiciary reports an original bill (S. 1664) to amend the Immigration and Nationality Act to increase control over immigration to the United States by increasing border patrol and investigative personnel, and detention facilities; improving the system used by employers to verify citizenship or work-authorized alien status; increasing penalties for alien smuggling and document fraud; reforming asylum, exclusion, and deportation law and procedures; and to reduce the use of welfare by aliens; and for other purposes; and recommends that the bill do pass.

## CONTENTS

|  |  | Page |
|---|---|---|
| I. | Purpose and summary | 2 |
| II. | Need for current legislation | 3 |
| III. | History of current legislation | 8 |
| IV. | Section-by-section analysis | 8 |
| V. | Committee action | 25 |
| VI. | Cost estimate | 36 |
| VII. | Regulatory impact statement | 37 |
| VIII. | Additional views of Senator Hatch | 38 |
| IX. | Additional views of Senator Abraham | 40 |
| X. | Additional views of Senators DeWine, Abraham, and Feingold | 42 |

29–010

14

PART 4—EXCLUSION AND DEPORTATION

*Sec. 141—Special exclusion procedure*

Establishes special exclusion proceeding (with limited administrative and judicial review) that may be used (1) for aliens who entered without inspection within the past 2 years; present false documents, or fail to present documents, at a port of entry; are brought ashore in the U.S. from an intercepted vessel and are otherwise excludable; and (2) in an "extraordinary migration situation". Exempts from special exclusion any alien who is eligible to seek and does seek asylum, and is determined to have a "credible fear of persecution." Permits aliens who enter from Canada or Mexico to be returned to those countries pending their exclusion hearing.

*Sec. 142—Streamlining judicial review of orders of exclusion or deportation*

Provides for the clarification and streamlining of judicial review of deportation and exclusion orders. Prohibits judicial review of the Attorney General's judgment regarding certain forms of discretionary relief from exclusion or deportation, voluntary departure, or adjustment of status. Also eliminates review of final orders of exclusion or deportation for certain criminal aliens (those described in the definition of "specially deportable alien" in bill sec. 164). Limits review of special exclusion orders and cases involving document fraud, and narrows review in asylum cases.

*Sec. 143—Civil penalties and visa ineligibility, for failure to depart*

Makes aliens subject to a final exclusion or deportation order liable for additional penalties of $500 per day for willful failure or refusal to depart the U.S. Provides that any lawfully admitted nonimmigrant who remains 60 days beyond the authorized period of stay shall be ineligible for any additional nonimmigrant or immigrant visa for 3 years (except an immigrant visa for a spouse of a citizen or permanent resident). The Attorney General may waive this 3-year exclusion for aliens who demonstrate good cause for failure to leave.

*Sec. 144—Conduct of proceedings by electronic means*

Authorizes the Attorney General to conduct deportation proceedings by electronic or telephonic means, or, with the consent of the parties, in the absence of the alien.

*Sec. 145—Subpoena authority*

Provides immigration judges with subpoena authority for exclusion and deportation hearings.

*Sec. 146—Language of deportation notice; right to counsel*

Eliminates the requirement that aliens be notified of deportation proceedings in both English and Spanish. Provides that deportation proceedings may begin within three days after a deportation notice has been provided to an alien held in custody, whether or not the alien has secured counsel during that time. Clarifies that privilege

53

Once the applicant or employee produces this document, and it appears authentic, it is illegal under current law for the employer to request additional or different documents from the person. The purpose of this provision is to prevent employers from harassing foreign looking and foreign sounding American citizens and legal immigrants by requesting additional or different documents as a condition of employment.

Unfortunately, employers have continued to discriminate against foreign looking and foreign sounding people. For example, the Justice Department has pursued a number of cases against employers who have refused to hire applicants of Puerto Rican descent unless they produced a green card. A naturalized citizen of Middle Eastern descent who spoke with an accent was fired for not complying with his employer's demand that he produce a green card. When he explained that he was a United States citizen, and produced a driver's license, social security card and voter registration card, the employer refused to accept them.

The motives of those who discriminate against foreign-looking or foreign-sounding job applicants are often mixed. Many claim that they do so purely out of a fear of employer sanctions, and not because they intend to treat certain Americans different from others. Whether these accounts are true, the bottom line is that it is virtually impossible to separate out the proper and improper motivations behind employers' discriminatory action. The bill ignores this reality and adds language in section 117 that would require a person filing a discrimination claim to demonstrate that the employer intended to discriminate on the basis of national origin or citizenship. This provision would impose a burden that is impossible to meet, and would exacerbate the already serious problem of discrimination. Under this provision, for example, employers who demand green cards from Puerto Ricans or naturalized Americans can escape liability for their actions.

There is also widespread agreement that the problems of discrimination are a function of employer concerns about the widespread availability of fraudulent documents. The bill addresses this problem in a number of constructive ways. For example, section 116 reduces the number of acceptable documents for establishing employment eligibility from 29 to six, and there are other provisions to prevent the production of fraudulent documents. It is unwise to attack discrimination by giving employers license to discriminate further.

It is important to keep in mind whom the victims are. They are American citizens and legal immigrants—law abiding people who have been playing by the rules and are simply attempting to make ends meet. In an era when we are attempting to promote economic self-sufficiency, it is unwise to erect new barriers to self-sufficiency.

### III. Even More Bad News: Abandoning Our Tradition of Asylum for Political Refugees

In addition to its other flaws, the bill imposes unnecessary and harmful new bars to an individual's ability to seek political asylum in the United States, and is contrary to our most cherished traditions of providing safe haven to those fleeing persecution.

54

Under current law, an individual claiming asylum may prove his entitlement to this status before an immigration judge. This bill instead requires individuals seeking to enter the United States with false documents to establish a "credible fear of persecution" before an asylum officer—in reality, a low-level bureaucrat—before being eligible to apply for asylum. In addition, before even being eligible to apply for asylum, the person claiming asylum must prove that he used the false documents to flee directly from a country where, if returned, a significant danger of persecution remains. Failure to meet these tests results in the exclusion of the individual from the United States, and in many instances in his return to the country of persecution.

These new provisions are both unreasonable and unnecessary.

First, the notion that a person fleeing persecution with the aid of false documents should be subjected to a barrage of new procedural requirements before being able even to apply for that status ignores the fact that those fleeing from persecution often need false documents to escape the country that persecutes them. Indeed, America has consistently honored the memory of Raoul Wallenberg, who saved countless lives during the Holocaust by issuing unofficial travel documents to individuals fleeing persecution. Under this bill, each of the people helped by Wallenberg would, at the moment of entry into the United States, after a long journey from persecution, without counsel or other assistance, before a non-judicial or quasi-judicial official, have to demonstrate that she (1) had a "credible fear of persecution" that caused her to leave; (2) took a direct route to the United States in escaping persecution;[18] (3) used her false documents to get away; and (4), if she were sent back, would face a "significant" danger of further persecution. This approach represents a 180-degree turn from our past.

The bill's draconian approach to asylum seekers is also unnecessary, and is a vestige of a time when the Immigration and Naturalization Service was struggling to assert control over a system run rampant. Less than two years ago, an individual could arrive in the United States without proper documentation, claim asylum, receive work authorization, disappear into the interior, and avoid ever having the asylum claim adjudicated. Needless to say, the rules in place at this time encouraged and resulted in fraudulent applications, and drove calls for the kind of measures included in this bill.

To its great credit, however, INS published regulations in March 1995 that altered the asylum landscape. These regulations denied work authorization to individuals claiming asylum, and placed all asylum cases on a fast-track review that enables a newly-expanded corps of immigration judges to adjudicate virtually all claims within 180 days. With the elimination of automatic work authorization and the guarantee of an expeditious determination of asylum has come a *57 percent reduction in asylum claims over the past year*. Clearly, our asylum system today creates little inducement for

---

[18] This "direct departure" requirement is particularly problematic given that a number of countries—including many in Asia or Africa—do not have direct carrier routes to the United States, and that a person seeking asylum in the United States may first have to stop off in a country that does not have asylum laws or is equally hostile to the escapee as his native country.

55

fraudulent claims. In approving the asylum provisions in this bill, however, the Committee has ignored recent developments and taken steps that are wholly obsolete today.

The Department of Justice has not asked for these new asylum provisions, and in fact opposes them on the grounds that "absent smuggling or an extraordinary migration situation, [it] can handle asylum applications for excludable aliens under our regular procedures." [19] Moreover, the United Nations High Commissioner for Refugees (UNHCR) has expressed serious concerns that the new provisions also are inconsistent with U.S. obligations under international law since the bill lacks the minimal procedural safeguards to prevent the mistaken return of a genuine refugee to certain persecution. In short, UNHCR "fear[s] that many bona fide refugees will be returned to countries where their lives or freedom will be threatened" if the new bars to asylum become law. [20] It is UNHCR's further concern that any action taken by the United States—long a leader in providing relief to victims of persecution—to restrict asylum will be taken as a signal by other countries seeking to do the same. The Committee has failed to consider this important ripple effect of its action.

In conclusion, we note that, in addition to the bars on people who travel without valid documents, the bill restricts the ability to obtain asylum in a number of other ways. For example:

• Section 141 precludes a person from applying for asylum—and renders him excludable from the United States—if he cannot prove a "credible fear of persecution," and (1) has lived in the United States for less than 2 years without ever being formally "admitted" into the United States; (2) has been interdicted at sea; or (3) has fled to the United States as a result of an "extraordinary migration situation."

• Section 142 broadly restricts judicial review of exclusion orders based on the individual's ability to demonstrate a credible fear of persecution or any of the other criteria required of an asylee, thereby eliminating most judicial oversight over the process and denying the federal judiciary its historic function of reviewing the implementation and execution of immigration laws.

As the Administration notes, these and the other provisions of the bill relating to asylum are simply not consistent "with a fair and humanitarian immigration policy." [21]

### IV: Good News: Cracking Down on Alien Smuggling, Sweatshops, and Other Criminal Acts

While we have focused thus far on the flaws in this bill—flaws which were considerable enough to cause us to oppose it—there is much in the legislation to recommend it as well. In particular, we are gratified that the bill undertakes long-needed reform of the criminal enforcement scheme for immigration-related crimes.

---

[19] See February 14, 1996 Letter from Deputy Attorney General Jamie Gorelick to Chairman Hatch, p. 46.

[20] Letter from Anne Willem Bijleveld, Representative of UNHCR, to Chairman Hatch, March 6, 1996, at 1.

[21] See February 14, 1996 Letter from Deputy Attorney General Jamie Gorelick to Chairman Hatch, p. 22.

enforcement of the immigration and nationality laws as may be by regulations prescribed.

   &ast;   &ast;   &ast;   &ast;   &ast;   &ast;   &ast;

(f) The records of the Department of State and of diplomatic and consular offices of the United States pertaining to the issuance or refusal of visas or permits to enter the United States shall be considered confidential and shall be used only for the formulation, amendment, administration, or enforcement of the immigration, nationality, and other laws of the United States, except that in the discretion of the Secretary of State certified copies of such records may be made available to a court which certifies that the information contained in such records is needed by the court in the interest of the ends of justice in a case pending before the court.

*(g)(1) In the case of an alien who has entered and remained in the United States beyond the authorized period of stay, the alien's nonimmigrant visa shall thereafter be invalid for reentry into the United States.*

*(2) An alien described in paragraph (1) shall be ineligible to be readmitted to the United States as a nonimmigrant subsequent to the expiration of the alien's authorized period of stay, except—*

 *(A) on the basis of a visa issued in a consular office located in the country of the alien's nationality (or, if there is no office in such country, in such other consular office as the Secretary of State shall specify); or*

 *(B) where extraordinary circumstances are found by the Secretary of State to exist.*

   &ast;   &ast;   &ast;   &ast;   &ast;   &ast;   &ast;

## CHAPTER 4—PROVISIONS RELATING TO ENTRY AND EXCLUSION

   &ast;   &ast;   &ast;   &ast;   &ast;   &ast;   &ast;

### INSPECTION BY IMMIGRATION OFFICERS

SEC. 235. (a) * * *

   &ast;   &ast;   &ast;   &ast;   &ast;   &ast;   &ast;

**[b]***(b)(1)* Every alien (other than an alien crewman), and except as otherwise provided in subsection (c) of this section and in section 273(d), who may not appear to the examining immigration officer at the port of arrival to be clearly and beyond a doubt entitled to land shall be detained for further inquiry to be conducted by a special inquiry officer. The decision of the examining immigration officer, if favorable to the admission of any alien, shall be subject to challenge by any other immigration officer and such challenge shall operate to take the alien, whose privilege to land is so challenged, before a special inquiry officer for further inquiry.

*(2) If an alien subject to such further inquiry has arrived from a foreign territory contiguous to the United States, either at a land port of entry or on the land of the United States other than at a designated port of entry, the alien may be returned to that territory pending the inquiry.*

   &ast;   &ast;   &ast;   &ast;   &ast;   &ast;   &ast;

110

*(d)(1) Subject to paragraph (2), any alien who has not been admitted to the United States, and who is excludable under section 212(a)(6)(C)(iii) or who is an alien described in paragraph (3), is ineligible for withholding of deportation pursuant to section 243(h), and may not apply therefor or for any other relief under this Act, except that an alien found to have a credible fear of persecution or of return to persecution in accordance with section 208(e) shall be taken before a special inquiry officer for exclusion proceedings in accordance with section 236 and may apply for asylum, withholding of deportation, or both, in the course of such proceedings.*

*(2) An alien described in paragraph (1) who has been found ineligible to apply for asylum under section 208(e) may be returned under the provisions of this section only to a country in which (or from which) he or she has no credible fear of persecution (or of return to persecution). If there is no country to which the alien can be returned in accordance with the provisions of this paragraph, the alien shall be taken before a special inquiry officer for exclusion proceedings in accordance with section 236 and may apply for asylum, withholding of deportation, or both, in the course of such proceedings.*

*(3) Any alien who is excludable under section 212(a), and who has been brought or escorted under the authority of the United States—*

*(A) into the United States, having been on board a vessel encountered seaward of the territorial sea by officers of the United States; or*

*(B) to a port of entry, having been on board a vessel encountered within the territorial sea or internal waters of the United States; shall either be detained on board the vessel on which such person arrived or in such facilities as are designated by the Attorney General or paroled in the discretion of the Attorney General pursuant to section 212(d)(5) pending accomplishment of the purpose for which the person was brought or escorted into the United States or to the port of entry, except that no alien shall be detained on board a public vessel of the United States without the concurrence of the head of the department under whose authority the vessel is operating.*

*(e)(1) Notwithstanding the provisions of subsection (b) of this section and section 236, the Attorney General may, without referral to a special inquiry officer or after such a referral, order the exclusion and deportation of any alien if—*

*(A) the alien appears to an examining immigration officer, or to a special inquiry officer if such referral is made, to be an alien who—*

*(i) has entered the United States without having been inspected and admitted by an immigration officer pursuant to this section, unless such alien affirmatively demonstrates to the satisfaction of such immigration officer or special inquiry officer that he has been physically present in the United States for an uninterrupted period of at least two years since such entry without inspection;*

*(ii) is excludable under section 212(a)(6)(iii);*

*(iii) is brought or escorted under the authority of the United States into the United States, having been on board*

111

*a vessel encountered outside of the territorial waters of the United States by officers of the United States;*

*(iv) is brought or escorted under the authority of the United States to a port of entry, having been on board a vessel encountered within the territorial sea or internal waters of the United States; or*

*(v) has arrived on a vessel transporting aliens to the United States without such alien having received prior official authorization to come to, enter, or reside in the United States; or*

*(B) the Attorney General has determined that the numbers or circumstances of aliens en route to or arriving in the United States, by land, sea, or air, present an extraordinary migration situation.*

*(2) As used in this section, the phrase "extraordinary migration situation" means the arrival or imminent arrival in the United States or its territorial waters of aliens who by their numbers or circumstances substantially exceed the capacity for the inspection and examination of such aliens.*

*(3)(A) Subject to subparagraph (B), the determination of whether there exists an extraordinary migration situation or whether to invoke the provisions of paragraph (1)(A) or (B) is committed to the sole and exclusive discretion of the Attorney General.*

*(B) The provisions of this subsection may be invoked under paragraph (1)(B) for a period not to exceed 90 days, unless, within such 90-day period or an extension thereof authorized by this subparagraph, the Attorney General determines, after consultation with the Committees on the Judiciary of the Senate and the House of Representatives, that an extraordinary migration situation continues to warrant such procedures remaining in effect for an additional 90-day period.*

*(4) When the Attorney General invokes the provisions of clause (iii), (iv), or (v) of paragraph (1)(A) or paragraph (1)(B), the Attorney General may, pursuant to this section and sections 235(e) and 106(f), suspend, in whole or in part, the operation of immigration regulations regarding the inspection and exclusion of aliens.*

*(5) No alien may be ordered specially excluded under paragraph (1) if—*

*(A) Such alien is eligible to seek, and seeks, asylum under section 208; and*

*(B) the Attorney General determines, in the procedure described in section 208(e), that such alien has a credible fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion, in the country of such person's nationality, or in the case of a person having no nationality, the country in which such person last habitually resided.*

*An alien may be returned to a country in which the alien does not have a credible fear of persecution and from which the alien does not have a credible fear of return to persecution.*

*(6) A special exclusion order entered in accordance with the provisions of this subsection is not subject to administrative review, except that the Attorney General shall provide by regulation for prompt review of such an order against an applicant who claims*

112

*under oath, or as permitted under penalty of perjury under section 1746 of title 28, United States Code, after having been warned of the penalties for falsely making such claim under such conditions, to be, and appears to be, lawfully admitted for permanent residence.*

*(7) A special exclusion order entered in accordance with the provisions of this subsection shall have the same effect as if the alien had been ordered excluded and deported pursuant to section 236, except that judicial review of such an order shall be available only under section 106(f).*

*(8) Nothing in this subsection may be construed as requiring an inquiry before a special inquiry officer in the case of an alien crewman.*

\*    \*    \*    \*    \*    \*    \*

EXCLUSIONS OF ALIENS

SEC. 236. (a) A special inquiry officer shall conduct proceedings under this section, administer oaths, present and receive evidence, *issue subpoenas,* and interrogate, examine, and cross-examine the alien or witnesses. He shall have authority in any case to determine whether an arriving alien who has been detained for further inquiry under section 235 shall be allowed to enter or shall be excluded and deported. \* \* \*

\*    \*    \*    \*    \*    \*    \*

(e)(1) Pending a determination of excludability, the Attorney General shall take into custody any alien convicted of an aggravated felony upon release of the alien (regardless of whether or not such release is on parole, supervised release, or probation, and regardless of the possibility of rearrest or further confinement in respect of the same offense.).

(2) Notwithstanding any other provision of this section, the Attorney General shall not release such felon from custody unless *(A) the Attorney General determines, pursuant to section 3521 of title 18, United States Code, that release from custody is necessary to provide protection to a witness, a potential witness, a person cooperating with an investigation into major criminal activity, or an immediate family member or close associate of a witness, potential witness, or person cooperating with such an investigation, and that after such release the alien would not be a threat to the community, or (B)* the Attorney General determines that the alien may not be deported because the condition described in section 243(g) exists.

*(f) The Attorney General shall provide by regulation for the entry by a special inquiry officer of an order of exclusion and deportation stipulated to by the alien and the Service. Such an order may be entered without a personal appearance by the alien before the special inquiry officer. A stipulated order shall constitute a conclusive determination of the alien's excludability and deportability from the United States.*

IMMEDIATE DEPORTATION OF ALIENS EXCLUDED FROM ADMISSION OR ENTERING IN VIOLATION OF LAW

SEC. 237. (a)(1) Any alien (other than an alien crewman) arriving in the United States who is excluded under this Act, shall be immediately deported, in accommodations of the same class in which

113

he arrived, unless the Attorney General, in an individual case, in his discretion, concludes that immediate deportation is not practicable or proper, *or unless the alien is an excluded stowaway who has applied for asylum or withholding of deportation and whose application has not been adjudicated or whose application has been denied but who has not exhausted every appeal right.* 【Deportation】 *Subject to section 235(d)(2), deportation* shall be to the country in which the alien boarded the vessel or aircraft on which he arrived in the United States, unless the alien boarded such vessel or aircraft in foreign territory contiguous to the United States or in any island adjacent thereto or adjacent to the United States and the alien is not a native, citizen, subject, or national of, or does not have a residence in, such foreign contiguous territory or adjacent island, in which case the deportation shall instead be to the country in which is located the port at which the alien embarked for such foreign contiguous territory or adjacent island. The cost of the maintenance including detention expenses and expenses incident to detention of any such alien while he is being detained, shall be borne by the owner or owners of the vessel or aircraft on which he arrived, except that the cost of maintenance (including detention expenses and expenses incident to detention while the alien is being detained prior to the time he is offered for deportation to the transportation line which brought him to the United States) shall not be assessed against the owner or owners of such vessel or aircraft if (A) the alien was in possession of a valid, unexpired immigrant visa, or (B) the alien (other than an alien crewman) was in possession of a valid, unexpired nonimmigrant visa or other document authorizing such alien to apply for temporary admission to the United States or an unexpired reentry permit issued to him, and (i) such application was made within one hundred and twenty days of the date of issuance of the visa or other document, or in the case of an alien in possession of a reentry permit, within one hundred and twenty days of the date on which the alien was last examined and admitted by the Service, or (ii) in the event the application was made later than one hundred and twenty days of the date of issuance of the visa or other document or such examination and admission, if the owner or owners of such vessel or aircraft established to the satisfaction of the Attorney General that the ground of exclusion could not have been ascertained by the exercise of due diligence prior to the alien's embarkation, or (C) the person claimed United States nationality or citizenship and was in possession of an unexpired United States passport issued to him by competent authority. *Any alien stowaway inspected upon arrival in the United States is an alien who is excluded within the meaning of this section. For purposes of this section, the term "alien" includes an excluded stowaway. The provisions of this section concerning the deportation of an excluded alien shall apply to the deportation of a stowaway under section 273(d).*

\*        \*        \*        \*        \*        \*        \*

(2) 【If】 *Subject to section 235(d)(2), if* the government of the country designated in paragraph (1) will not accept the alien into its territory, the alien's deportation shall be directed by the Attorney General, in his discretion and without necessarily giving any

114

priority or preference because of their order as herein set forth, either to—

\*        \*        \*        \*        \*        \*        \*

## CHAPTER 5—DEPORTATION; ADJUSTMENT OF STATUS

GENERAL CLASSES OF DEPORTABLE ALIENS

SEC. 241. (a) CLASSES OF DEPORTABLE ALIENS.—Any alien (including an alien crewman) in the United States shall, upon the order of the Attorney General, be deported if the alien is within one or more of the following classes of deportable aliens:

(1) EXCLUDABLE AT TIME OF ENTRY OR OF ADJUSTMENT OF STATUS OR VIOLATES STATUS.—

\*        \*        \*        \*        \*        \*        \*

(2) CRIMINAL OFFENSES.—

(A) GENERAL CRIMES.—

(i) CRIMES OF MORAL TURPITUDE.—Any alien who—

(I) is convicted of a crime involving moral turpitude committed within five years (or 10 years in the case of an alien provided lawful permanent resident status under 〚section 245(i)〛 )section 245(j)) the date of entry, and

\*        \*        \*        \*        \*        \*        \*

〚(5) PUBLIC CHARGE.—Any alien who, within five years after the date of entry, has become a public charge from causes not affirmatively shown to have arisen since entry is deportable.

〚(b) An alien, admitted as an nonimmigrant under the provisions of either section 101(a)(15)(A)(i) or 101(a)(15)(G)(i), and who fails to maintain a status under either of those provisions, shall not be required to depart from the United States without the approval of the Secretary of State, unless such alien is subject to deportation under paragraph (4) of subsection (a).

〚(c) Paragraphs (1)(A), (1)(B), (1)(C), (1)(D), and (3)(A) of subsection (a) (other than so much of paragraph (1) as relates to a ground of exclusion described in paragraph (2) or (3) of section 212(a)) shall not apply to a special immigrant described in section 101(a)(27)(J) based upon circumstances that existed before the date the alien was provided such special immigrant status.〛

*(5) PUBLIC CHARGE.—*

*(A) IN GENERAL.—Any alien who during the public charge period becomes a public charge, regardless of when the cause for becoming a public charge arises is deportable.*

*(B) EXCEPTIONS.—Subparagraph (A) shall not apply if the alien is a refugee or has been granted asylum, or if—*

*(i) the cause of the alien's becoming a public charge arose after entry (in the case of an alien who entered as an immigrant) or after adjustment to lawful permanent resident status (in the case of an alien who entered as a nonimmigrant), and*

*(ii) was a physical illness, or physical injury, so serious the alien could not work at any job, or a mental disability that required continuous hospitalization.*

# EXHIBIT CC

Coalition for Humane Immigrant Rights, et al. v. Noem et al., 1:25-cv-00872 (JMC)

| 104TH CONGRESS<br>*2d Session* | HOUSE OF REPRESENTATIVES | REPT. 104–469<br>Part 1 |
|---|---|---|

# IMMIGRATION IN THE
# NATIONAL INTEREST ACT OF 1995

———————

# R E P O R T

OF THE

# COMMITTEE ON THE JUDICIARY
# HOUSE OF REPRESENTATIVES

ON

# H.R. 2202

together with

## ADDITIONAL AND DISSENTING VIEWS

[Including cost estimate of the Congressional Budget Office]



MARCH 4, 1996.—Ordered to be printed

116

overall numbers are relatively low. This may be due in part to the limited number of nonimmigrant visas issued in some African nations. Both the overstay rate and overstay numbers from South America are modest.

The phenomenon of visa overstays presents specific problems for immigration enforcement. First, visa overstayers spread the illegal immigration problem to regions outside of the border states, and due to their diverse character (many visa overstayers have more advanced education and skills than typical illegal land border entrants), to various sectors of the economy. Second, visa overstayers account for a substantial portion of those waiting in the "asylum backlog"—the estimated 400,000 persons who are waiting for adjudication by the INS of their asylum claims. While some of these people have legitimate claims, many have filed the asylum claim as a means of remaining in the United States indefinitely. Third, obstacles to enforcement against this phenomenon are likely to remain (or increase) with the further globalization of the economy and rise in the number of legitimate visitors to the United States. A more lengthy or intrusive inspections process at ports of entry might identify more aliens who intend to overstay, but at the price of convenience for the vast majority of legitimate visitors. Another alternative would be more extensive processing by consular officers of requests for nonimmigrant visas. This would require a greater commitment of resources to the consular bureau within the Department of State.

Perhaps as a result of these difficulties, there have been fewer specific recommendations regarding enforcement measures against visa overstays. The Commission on Immigration Reform indicated that the solution lies in improved interior enforcement, chiefly by preventing employment of illegal aliens. (This topic is treated at greater length below.) The State Department now processes a vast majority of visas through an automated system that allows for quicker background checks, and most newly-issued visas are machine-readable, an additional security feature.[10] Stricter standards for issuing visas have been suggested. However, in many countries with a high visa overstay rate, State Department consular officers already deny a substantial percentage of visa applications.[11]

*Alien smuggling*

Alien smuggling contributes greatly to the overall problem of illegal immigration. Whether carried out by so-called coyotes (smugglers) along the Southwest border, or through sophisticated organized crime rings that smuggle aliens into the United States by land, sea, and air, alien smuggling both adds to the overall numbers of illegal aliens in the United States and increases the financial and other incentives for such trafficking to continue. Alien smuggling is often linked to other crimes, such as drug smuggling and trafficking, prostitution, racketeering, and severe labor law violations. Due to the inhumane living and working conditions they

---

[10] Hearing: Foreign Visitors Who Overstay, supra note 9, at 20 (Statement of Diane Dillard, Deputy Assistant Secretary for Visa Services, Bureau of Consular Affairs, Department of State).
[11] Id. at 32–33.

117

face, many smuggled aliens are victims, more than beneficiaries, of this criminal activity.[12]

Smuggling by boat is perhaps the most visible recent manifestation of alien smuggling carried out by organized crime syndicates. The arrival of the *Golden Venture* in New York City in June 1993 brought this problem to national attention: the vessel foundered on a sand bar, and hundreds of Chinese nationals struggled to reach the shore and escape, several of them drowning in the process. The remainder were apprehended and detained for exclusion proceedings, in which most claimed political asylum. Due to procedural delays inherent in the immigration hearing process, and the difficulty of arranging return travel to the People's Republic of China, most of these aliens remained in the United States more than 2 years after their arrival.

Other smuggling boats have landed or been apprehended in United States waters, while still others have been interdicted in international waters. However, due to greater enforcement efforts, the organized smuggling by sea from Asia has decreased somewhat since the arrival of the *Golden Venture.* (Illegal immigration by sea has long been prevalent from countries in the Caribbean, and this continues to be the case.)

Notwithstanding the public visibility of alien smuggling by boat, the vast majority of smuggled aliens arrive by more conventional means. Some travel directly to the United States, using fraudulent passports and visas, and attempt entry at international airports. Many such aliens have presented passports and visas prior to embarking overseas, but destroy the documents en route or surrender them to confederates. Probably the greatest number travel through more circuitous routes, travelling to other countries in the Western Hemisphere and then arranging onward travel to the United States either by air or through surreptitious crossing of the land border.

Whether they arrive by boat, directly by air, or through more complex routes, smuggled aliens (often with the assistance of smugglers) abuse immigration procedures to extend their stay in the United States. Thousands of smuggled aliens arrive in the United States each year with no valid entry documents and declare asylum immediately upon arrival. Due to lack of detention space and overcrowded immigration court dockets, many have been released into the general population. Not surprisingly, a majority of such aliens do not return for their hearings. In recent years, however, the number of aliens arriving at airports with no valid documents has decreased in districts, particularly in New York and Los Angeles, where detention capacity has increased and most mala fide aliens can be detained. The threat of expedited exclusion, which has been considered by Congress since 1993, may also have had a deterrent effect.

Finally, many aliens successfully smuggled into the United States have filed asylum claims as a means not only to extend their stay, but, under regulations in effect until January 1995, to obtain work authorization. Due to the huge backlog in asylum cases, and the inability of the INS to detain failed asylum applicants who are

---

[12] See generally, "Alien Smuggling: Hearing Before the Subcomm. on International Law, Immigration, and Refugees of the House Comm. on the Judiciary," 103rd Cong., 1st Sess. (June 30, 1993).

118

deportable from the United States, these aliens could reasonably expect that the filing of an asylum application would allow them to remain indefinitely in the United States. Under regulations effective in January 1995, asylum applicants no longer are entitled to receive work authorization. This has led to a substantial reduction in filing of new asylum applications. (The new asylum regulations are discussed below in more detail.)

## II. INSPECTION, APPREHENSION, AND REMOVAL OF CRIMINAL AND ILLEGAL ALIENS

### A. Populations of Criminal and Illegal Aliens

*Criminal aliens*

The number of criminal aliens incarcerated in Federal and State prisons has grown dramatically in recent years, and is now estimated as 100,000.[13] The "foreign-born"[14] population in institutions operated by the Bureau of Prisons (BOP) is 27,938, or 29 percent of all inmates (95,997). An estimated 75 percent are subject to deportation.[15] Compared to FY 1980, this is an increase from approximately 1,000, or less than 4 percent of all BOP inmates (27,825). According to the BOP, the increase in the Federal alien prisoner population is due largely to drug convictions; 75 percent of alien inmates are incarcerated for such offenses, compared to 61 percent of all Federal inmates. Foreign-born prisoners serve an average of 7.7 years. More than 85 percent are from Mexico, Central America, South America, and the Caribbean. The leading individual countries of origin are, in order, Mexico, Colombia, Cuba, the Dominican Republic, Jamaica, and Nigeria.

The INS reports that there are an estimated 69,926 foreign-born inmates in State prisons, and that 80 percent of these, or 55,640, are deportable.[16] (The remainder are not deportable because they are either naturalized citizens or lawful permanent residents with protection from deportation.) More than 81 percent (56,391) of the overall foreign-born state prison population are in seven high immigration states: California, Texas, Florida, New York, Illinois, New Jersey, and Arizona.[17] The INS believes that the number of criminal aliens in Federal or State prisons who are subject to final orders of deportation is small. The INS and the Executive Office for Immigration Review (EOIR) complete deportation proceedings

---

[13] See "Removal of Criminal and Illegal Aliens: Hearing Before the Subcomm. on Immigration and Claims of the House Comm. on the Judiciary," 104th Cong., 1st Sess. 4 (Statement of T. Alexander Aleinikoff, General Counsel, Immigration and Naturalization Service) (Hearing: Criminal and Illegal Aliens).

[14] "Foreign-born" prisoners may include naturalized citizens and certainly includes both legal permanent residents and people who are in violation of their immigration status (including visa overstays) or who entered the U.S. without permission. See "Criminal Aliens: Hearing Before the Subcomm. on Immigration, Refugees, and International Law of the House Comm. on the Judiciary," February 23, 1994, at 188–189 (Testimony of INS Deputy Commissioner Chris Sale). The Director of the BOP has testified that "[a]s of January 29, 1994, our inmate data base reflects that there were 22,326 inmates in BOP custody who were non-United States citizens (24.8 percent of the population). Id. at 166–167 (Statement of Kathleen M. Hawk). The BOP confirmed to the Committee by telephone in November 1995 that the non-citizen population remains at approximately 24 percent.

[15] Id.; "Management Practices of the Immigration and Naturalization Service: Hearing Before the Subcomm. on Immigration and Claims of the House Comm. on the Judiciary," 104th Cong., 1st Sess. 41 (February 8, 1995) (Hearing: Management Practices).

[16] Hearing: Criminal and Illegal Aliens, supra note 13, at 8 (Statement of T. Alexander Aleinikoff).

[17] Id.

157

TITLE II—ENHANCED ENFORCEMENT AND PENALTIES AGAINST ALIEN
SMUGGLING AND DOCUMENT FRAUD

Sections 201 through 205 permit the INS to seek wiretap authorization under 18 U.S.C. 2516(1) in investigations of alien smuggling and document fraud; make document fraud and alien smuggling crimes indictable as racketeering offenses under the Racketeer Influenced and Corrupt Organizations Act (RICO); increase criminal penalties for alien smuggling, particularly where the smuggling is done for financial gain, involves criminal aliens, or multiple illegal entries; increase the number of U.S. attorneys available for the prosecution of immigration crimes; and expand the undercover investigations authority of the INS.

Section 211 through 216 increase civil and criminal penalties for document fraud, and establish new penalties for knowing preparation or presentation of fraudulent documents, and for making false claims to citizenship. Section 221 extends asset forfeiture authority under 18 U.S.C. 982(a) in the case of aliens convicted of passport or visa fraud, and section 222 permits the issuance of subpoenas for bank records in investigating such crimes.

TITLE III—APPREHENSION AND REMOVAL OF ILLEGAL ALIENS

Subtitle A—Reform of Removal Procedures

Subtitle A of Title III (sections 301 through 309) streamlines rules and procedures in the Immigration and Nationality Act to make it easier to deny admission to inadmissible aliens and easier to remove deportable aliens from the United States. (Due to complexity of these provisions, detailed analysis and comment of some provisions is reserved to the section-by-section analysis.)

Section 301 provides that aliens who have entered the United States without being legally admitted are now classified as "inadmissible" and, if apprehended, bear the same burden of proof as an alien seeking to be admitted at a port of entry: to establish clearly and beyond doubt that they are entitled to be legally admitted. Aliens who have been legally admitted, but who overstay their visas or otherwise violate their immigration status (such as by committing crimes), must establish by clear and convincing evidence that they are lawfully present. Aliens who have been illegally present in the U.S. for an aggregate of 12 months will, with certain exceptions, not be eligible for permanent residence or other immigration benefits for 10 years.

Section 301(e) makes inadmissible to the United States any former U.S. citizen who officially renounces United States citizenship for the purpose of avoiding taxation by the United States. The Committee intends that this section shall apply solely to those individuals who officially renounce their U.S. citizenship after the date on which this section becomes effective.

Section 302 provides that an arriving alien can be denied entry into the U.S. by an immigration officer because of misrepresentation, use of fraudulent documents, or lack of any documents. The alien may be ordered removed without a hearing before an immigration judge, and without administrative or judicial review. This provision is based upon legislation approved by the Subcommittee

158

on International Law, Immigration, and Refugees during the 103rd Congress.

This provision is necessary because thousands of aliens arrive in the U.S. at airports each year without valid documents and attempt to illegally enter the U.S. Unless such aliens claim to be U.S. nationals, or state a fear of persecution, there is no requirement under the Constitution or international treaty to do anything other than return them, as promptly as possible, to where they boarded the plane to come here. Neither international law nor the Due Process Clause of the Fifth Amendment require that such aliens be given a hearing before an immigration judge or a right to appeal.

Section 302 also requires that an alien subject to expedited removal who claims persecution or otherwise indicates a desire to apply for asylum be interviewed by an asylum officer to determine if the alien has a "credible fear" of persecution. A "credible fear" is established if the alien is more likely than not telling the truth, and if there is a reasonable probability that the alien will meet the definition of refugee and otherwise qualify for asylum. This standard, therefore, is lower than the "well-founded fear" standard needed to ultimately be granted asylum in the U.S.—the arriving alien need only show a probability that he will meet the well-founded fear standard. The credible fear standard is designed to weed out non-meritorious cases so that only applicants with a likelihood of success will proceed to the regular asylum process. If the alien meets this threshold, the alien is permitted to remain in the U.S. to receive a full adjudication of the asylum claim—the same as any other alien in the U.S.

Under this system, there should be no danger that an alien with a genuine asylum claim will be returned to persecution. The initial screening, which should take place in the form of a confidential interview, will focus on two questions: is the alien telling the truth; and does the alien have some characteristic that would qualify the alien as a refugee. As in other cases, the asylum officer should attempt to elicit all facts relevant to the applicant's claim. It is not unreasonable to expect the applicant to be truthful in such an interview. Nor is it unreasonable to expect that, in the case of a person genuinely fleeing persecution, that the interview will yield sufficient facts to determine that the alien has a reasonable likelihood of being successful in the full asylum process.

Section 302 permits the interview itself to be carried out by a full-time INS asylum officer, or by an INS inspector or other official who has received the complete training provided to full-time asylum officers and has reasonable access to country condition reports and other resources that are used by asylum officers to assess the credibility and foundation of asylum claims.

Section 304 provides that there will be a single, streamlined "removal proceeding" before an immigration judge for all inadmissible and deportable aliens. This will replace the current exclusion proceedings under section 236 of the INA, and deportation proceedings under section 242. The consolidation will end procedural disputes contesting the type of proceeding an alien should be subject to, disputes that often turn on the elusive question of whether an illegal alien has been apprehended immediately upon entry, or evaded government control for a period of time. Instead, the focus will be