**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

COALITION FOR HUMANE IMMIGRANT RIGHTS, *et al*.,

    *Plaintiffs*,

    *v.*

KRISTI NOEM, in her official capacity as Secretary of Homeland Security, *et al.*,

    *Defendants*.

Case No.: 1:25-cv-0872

**DECLARATION OF HILLARY LI IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

    1.    My name is Hillary Li, I am over the age of 18, and my business address is P.O. Box 27280, Los Angeles, CA 90027.

    2.    I am an attorney at Justice Action Center, and counsel of record for the Plaintiffs in the above-captioned action. I am a member in good standing of the State Bar of Georgia, and I have been admitted to practice in this court.

    3.    I respectfully submit this declaration in connection with Plaintiffs' Motion for Summary Judgment.

    4.    On October 14, 2025, Defendants' counsel informed Plaintiffs' counsel that DHS was taking the position that, even though this Court's August 1, 2025 stay order remained in place, DHS would continue to place previously paroled individuals in expedited removal pursuant to the government's regulations.

    5.    Attached as **Exhibit A** is a true and correct copy of the January 23, 2025 Memorandum from Benjamine C. Huffman, Acting Secretary of the Department of Homeland

Security ("DHS"), entitled "Guidance Regarding How to Exercise Enforcement Discretion" ("January 23 Huffman Memorandum").

6.     Attached as **Exhibit B** is a true and correct copy of the January 20, 2025 Memorandum from Benjamine C. Huffman, Acting Secretary of DHS, entitled "Exercising Appropriate Discretion Under Parole Authority."

7.     Attached as **Exhibit C** is a true and correct copy of the Federal Register Notice published on January 24, 2025, entitled "Designating Aliens for Expedited Removal," 90 Fed. Reg. 8139.

8.     Attached as **Exhibit D** is a true and correct copy of the February 18, 2025 Email Guidance from Acting Assistant Director, Field Operations, ICE Enforcement and Removal Operations, Marcos Charles, entitled "Ending Catch-and-Release Consistent with Executive Order 14165, *Securing Our Borders*" ("February 18 ICE Directive").

9.     Attached as **Exhibit E** is a true and correct copy of Executive Order 14165, "Securing Our Borders," dated January 20, 2025, 90 Fed. Reg. 8467.

10.     Attached as **Exhibit F** is a true and correct copy of the Federal Register Notice published on March 25, 2025, entitled "Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans," 90 Fed. Reg. 13611 ("March 25 CHNV Termination Notice").

11.     Attached as **Exhibit G** is a true and correct copy of the Certification and Index of Administrative Record ("AR") produced by Defendants for the January 23 Huffman Memorandum.

12.     Attached as **Exhibit H** is a true and correct copy of the Certification and Index of AR produced by Defendants for the February 18 ICE Directive.

13.     Attached as **Exhibit I** is a true and correct copy of the Certification and Index of AR produced by Defendants for the March 25 CHNV Termination Notice.

14.     Attached as **Exhibit J** is a true and correct copy of the news article authored by Kyle Cheney & Josh Gerstein and published in Politico on August 3, 2025, *DOJ is Walking Back the White House's Goal to Arrest 3,000 Immigrants Per Day,* available at https://www.politico.com/news/2025/08/03/white-house-doj-immigration-quota-mismatch-00490406.

15.     Attached as **Exhibit K** is a true and correct copy of the news article authored by Ximena Bustillo and published in N.P.R. on June 12, 2025, *ICE's Novel Strategy Allows for More Arrests From Inside Immigration Courts*, available at https://www.npr.org/2025/06/12/nx-s1-5409403/trump-immigration-courts-arrests.

16.     Attached as **Exhibit L** is a true and correct copy of the U.S. Commission on International Religious Freedom's Report on Asylum Seekers in Expedited Removal: Volume I: Findings & Recommendations (2005), available at https://bit.ly/1GkjQfK.

17.     Attached as **Exhibit M** is a true and correct copy of Human Rights Watch's report, "You Don't Have Rights Here: US Border Screening and Returns of Central Americans to Risk of Serious Harm," dated Oct. 16, 2014, available at https://bit.ly/1GocBhZ.

18.    Attached as **Exhibit N** is a true and correct copy of two DHS Notices of Termination of Parole, dated April 11, 2025 and June 20, 2025, produced by Defendants in the AR for the January 23 Huffman Memorandum.

19.    Attached as **Exhibit O** is a true and correct copy of a comment letter from Dan Kesselbrenner, National Immigration Project of the National Lawyers Guild, dated Jan. 31, 1997, produced by Defendants in the AR for the "arriving alien" definition.

20.    Attached as **Exhibit P** is a true and correct copy of a comment letter from Sarah B. Ignatius, Political Asylum/Immigration Representation Project, Comment Letter, dated Jan. 31, 1997, produced by Defendants in the AR for the "arriving alien" definition.

21.    Attached as **Exhibit Q** is a true and correct copy of a comment letter from Nancy Kelly, Deborah Anker, and John Willshire-Carrera, Harvard Law School, Refugee Law Center and the Women Refugees Project, dated Feb. 3, 1997, produced by Defendants in the AR for the "arriving alien" definition.

22.    Attached as **Exhibit R** is a true and correct copy of a comment letter from Edward M. Kennedy & Paul Wellstone, United States Senate, dated Feb. 3, 1997, produced by Defendants in the AR for the "arriving alien" definition.

23.    Attached as **Exhibit S** is a true and correct copy of a comment letter from Spencer Abraham, United States Senate, Committee on the Judiciary, Subcommittee on Immigration, dated Feb. 3, 1997, produced by Defendants in the AR for the "arriving alien" definition.

24.    Attached as **Exhibit T** is a true and correct copy of a comment letter from Lamar Smith, U.S. House of Representatives, Committee on the Judiciary, Subcommittee on Immigration

and Claims, dated Feb. 3, 1997, produced by Defendants in the AR for the "arriving alien" definition.

25.     Attached as **Exhibit U** is a true and correct copy of a comment letter from Lamar Smith, U.S. House of Representatives, Committee on the Judiciary, Subcommittee on Immigration and Claims, dated July 7, 1997, produced by Defendants in the AR for the "arriving alien" definition.

26.     Attached as **Exhibit V** is a true and correct copy of a comment letter from Elisa Massimino, Lawyers' Committee for Human Rights, dated Feb. 3, 1997, produced by Defendants in the AR for the "arriving alien" definition.

27.     Attached as **Exhibit W** is a true and correct copy of a comment letter from Karen T. Grisez, Washington Lawyers' Committee for Civil Rights and Urban Affairs, dated July 7, 1997, produced by Defendants in the AR for the "arriving alien" definition.

28.     Attached as **Exhibit X** is a true and correct copy of the Certification and Index of the AR produced by Defendants for Legacy INS 1788-96, Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings (1997 rulemaking that included the regulatory definition of "arriving alien").

29.     Attached as **Exhibit Y** is a true and correct copy of a comment letter from Michael [Last Name Unintelligible], dated January 21, 1997), produced by Defendants in the AR for the "arriving alien" definition.

30.    Attached as **Exhibit Z** is a true and correct copy of a comment letter from Edward M. Kennedy, United States Senate, dated July 3, 1997, produced by Defendants in the AR for the "arriving alien" definition.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Columbia, Maryland, on March 3, 2026.

_/s/ Hillary Li_
Hillary Li
DC Bar No. GA0052
Justice Action Center
P.O. Box 27280
Los Angeles, CA 90027
Telephone: (323) 841-2781
Hillary.Li@justiceactioncenter.org

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| COALITION FOR HUMANE IMMIGRANT RIGHTS, *et al*.,<br><br>    *Plaintiffs*,<br><br>    *v.*<br><br>KRISTI NOEM, in her official capacity as Secretary of Homeland Security, *et al.*,<br><br>    *Defendants.* | Case No.: 1:25-cv-0872 |

**INDEX OF EXHIBITS IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

| Exhibit | Document | Admin. Record |
|---|---|---|
| A | Memorandum from Benjamine C. Huffman, Acting Secretary of the Department of Homeland Security ("DHS"), "Guidance Regarding How to Exercise Enforcement Discretion" (Jan. 23, 2025) ("January 23 Huffman Memorandum") | SDOE00000001-2 |
| B | Memorandum from Benjamine C. Huffman, Acting Secretary of DHS, "Exercising Appropriate Discretion Under Parole Authority" (Jan. 20, 2025) | SDOE00000003-4 |
| C | Designating Aliens for Expedited Removal, 90 Fed. Reg. 8139 (Jan. 24, 2025) | SDOE00000016-17 |
| D | Email Guidance from Acting Assistant Director, Field Operations, ICE Enforcement and Removal Operations, Marcos Charles, "Ending Catch-and-Release Consistent with Executive Order 14165, Securing Our Borders" (Feb. 18, 2025) ("February 18 ICE Directive") | ICE-Guidance-001-2 |
| E | Executive Order 14165, "Securing Our Borders," 90 Fed. Reg. 8467 (Jan. 20, 2025) | ICE-Guidance-003-5 |
| F | Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans, 90 Fed. Reg. 13611 (Mar. 25, 2025) ("March 25 CHNV Termination Notice) | -- |
| G | Certification & Index of Administrative Record ("AR") for January 23 Huffman Memorandum | -- |
| H | Certification & Index of AR for February 18 ICE Directive | -- |

| I | Certification & Index of AR for March 25 CHNV Termination Notice | -- |
|---|---|---|
| J | Kyle Cheney & Josh Gerstein, *DOJ is Walking Back the White House's Goal to Arrest 3,000 Immigrants Per Day*, Politico (August 3, 2025), https://www.politico.com/news/2025/08/03/white-house-doj-immigration-quota-mismatch-00490406. | -- |
| K | Ximena Bustillo, *ICE's Novel Strategy Allows for More Arrests From Inside Immigration Courts*, N.P.R. (June 12, 2025), https://www.npr.org/2025/06/12/nx-s1-5409403/trump-immigration-courts-arrests. | -- |
| L | U.S. Comm'n on Int'l Religious Freedom, Report on Asylum Seekers in Expedited Removal: Volume I: Findings & Recommendations (2005), https://bit.ly/1GkjQfK. | -- |
| M | Human Rights Watch, "You Don't Have Rights Here: US Border Screening and Returns of Central Americans to Risk of Serious Harm" (Oct. 16, 2014), https://bit.ly/1GocBhZ. | -- |
| N | Department of Homeland Security, Notices of Termination of Parole (April 11, 2025 and June 20, 2025) | SDOE00000140-141 |
| O | Dan Kesselbrenner, National Immigration Project of the National Lawyers Guild, Comment Letter (Jan. 31, 1997) | AA-REG-00837-860 |
| P | Sarah B. Ignatius, Political Asylum/Immigration Representation Project, Comment Letter (Jan. 31, 1997) | AA-REG-00861-883 |
| Q | Nancy Kelly, Deborah Anker, John Willshire-Carrera, Harvard Law School, Refugee Law Center and the Women Refugees Project, Comment Letter (Feb. 3, 1997) | AA-REG-01148-1165 |
| R | Edward M. Kennedy & Paul Wellstone, United States Senate, Comment Letter (Feb. 3, 1997) | AA-REG-00895-897 |
| S | Spencer Abraham, United States Senate, Committee on the Judiciary, Subcommittee on Immigration Comment Letter (Feb. 3, 1997) | AA-REG-01145-1147 |
| T | Lamar Smith, U.S. House of Representatives, Committee on the Judiciary, Subcommittee on Immigration and Claims, Comment Letter (Feb. 3, 1997) | AA-REG-00681-696 |
| U | Lamar Smith, U.S. House of Representatives, Committee on the Judiciary, Subcommittee on Immigration and Claims, Comment Letter (July 7, 1997) | AA-REG-00632-638 |
| V | Elisa Massimino, Lawyers' Committee for Human Rights, Comment Letter (Feb. 3, 1997) | AA-REG-00930-963 |
| W | Karen T. Grisez, Washington Lawyers' Committee for Civil Rights and Urban Affairs, Comment Letter (July 7, 1997) | AA-REG-00615-631 |
| X | Certification & Index of AR for Legacy INS 1788-96, Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings (1997 rulemaking that included the regulatory definition of "arriving alien") | -- |

| Y | Michael [Last Name Unintelligible], Comment Letter (Jan. 21, 1997) | AA-REG-00029-30 |
|---|---|---|
| Z | Edward M. Kennedy, United States Senate, Comment Letter on Interim Final Rule (IFR) (July 3, 1997) | AA-REG-00327-329 |

# EXHIBIT A

Coalition for Humane Immigrant Rights, et al. v. Noem et al., 1:25-cv-00872 (JMC)



Secretary
**U.S. Department of Homeland Security**
Washington, DC 20528

January 23, 2025

MEMORANDUM FOR:    Caleb Vitello
Acting Director
U.S. Immigration and Customs Enforcement

Pete R. Flores
Senior Official Performing the Duties of the Commissioner
U.S. Customs and Border Protection

Jennifer B. Higgins
Acting Director
U.S. Citizenship and Immigration Services

FROM:    Benjamine C. Huffman
Acting Secretary

SUBJECT:    Guidance Regarding How to Exercise Enforcement Discretion

On January 20, 2025, I signed a memorandum entitled *Exercising Appropriate Discretion Under Parole Authority.* That memorandum clarifies DHS's position regarding the scope of the parole statute, 8 U.S.C. § 1182(d)(5), and directs a variety of actions to implement the memorandum. The memorandum also authorizes DHS components to pause, modify, or terminate, effective immediately, any parole program that is inconsistent with the memorandum—subject to certain conditions designed to ensure any such actions are lawful.

On January 21, 2025, I signed and transmitted to the Federal Register a notice entitled *Designating Aliens for Expedited Removal.* That notice expands the scope of expedited removal to the statutory maximum under 8 U.S.C. § 1225(b)(1) which, as further explained in the notice, includes certain aliens who have not been continuously present in the United States for two years.

This memorandum provides guidance regarding how to exercise enforcement discretion in implementing these policies.

"[T]he Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case." *United States v. Nixon,* 418 U. S. 683, 693 (1974). That principle applies with equal force to immigration enforcement. *United States v. Texas,* 599 U.S. 670, 679 (2023); *see*

1

*also Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 484 (1999) (Scalia, J.) (describing the Executive Branch's broad discretion to initiate or abandon removal proceedings).

To effectively implement these two new policies, consistent with the principles of enforcement discretion discussed above, I am directing you to take the following actions.

(1) For any alien DHS is aware of who is amenable to expedited removal but to whom expedited removal has not been applied:

    a. Take all steps necessary to review the alien's case and consider, in exercising your enforcement discretion, whether to apply expedited removal. This may include steps to terminate any ongoing removal proceeding and/or any active parole status.

(2) For any alien DHS is aware of who does not meet the conditions described in (1) but has been granted parole under a policy that may be paused, modified, or terminated immediately under the January 20 memorandum:

    a. Take all steps necessary to review the alien's case and consider, in exercising your enforcement discretion, whether any such alien should be placed in removal proceedings; and

    b. Review the alien's parole status to determine, in exercising your enforcement discretion, whether parole remains appropriate in light of any changed legal or factual circumstances.

The actions contemplated by this memorandum shall be taken in a manner consistent with applicable statutes, regulations, and court orders. They shall also be taken in a manner that takes account of legitimate reliance interests. It should be noted, however, that parole is a positive exercise of enforcement discretion to which no alien is entitled and that parole "shall not be regarded as an admission of the alien." 8 U.S.C. § 1182(d)(5)(A). Further, the expedited removal process includes asylum screening, which is sufficient to protect the reliance interests of any alien who has applied for asylum or planned to do so in a timely manner. *See* 8 U.S.C. § 1225(b)(1). To maximize efficiency in the short term, DHS components may wish to prioritize aliens eligible for expedited removal who failed to apply for asylum within the statutory deadline. *See* 8 U.S.C. § 1158(a)(2)(B) (setting a one-year deadline); *but see id.* § 1158(a)(2)(D) (discussing a very narrow exception to that deadline).

2

# EXHIBIT B

Coalition for Humane Immigrant Rights, et al. v. Noem et al., 1:25-cv-00872 (JMC)



*Secretary*

**U.S. Department of Homeland Security**
Washington, DC 20528

January 20, 2025

MEMORANDUM FOR:     Caleb Vitello
                    Acting Director
                    U.S. Immigration and Customs Enforcement

                    Pete R. Flores
                    Senior Official Performing the Duties of the Commissioner
                    U.S. Customs and Border Protection

                    Jennifer B. Higgins
                    Acting Director
                    U.S. Citizenship and Immigration Services

FROM:               Benjamine C. Huffman
                    Acting Secretary

SUBJECT:            Exercising Appropriate Discretion Under Parole Authority

Congress granted to the U.S. Department of Homeland Security (DHS) authority to parole certain otherwise inadmissible aliens into the United States when, in the discretion of the Secretary of DHS, doing so either provides a significant public benefit to the American public or permits the United States to respond to an urgent humanitarian need.

Authority to grant parole is discretionary and may be exercised only on a case-by-case basis by immigration officers in the employ of DHS. When in the opinion of the Secretary of DHS the purposes of an alien's parole have been served, the alien must be returned to the custody of DHS and the alien's case must be dealt with in the same manner as any other case for admission to the United States involving an alien found inadmissible.

The Secretary of DHS's parole authority is set forth in 8 U.S.C. § 1182(d)(5). The statutory language and context make it abundantly clear that it is a *limited use* authority, applicable only in a very narrow set of circumstances. Congress retained its authority to legislatively determine which categories of aliens are admissible or inadmissible to the United States, while simultaneously providing DHS with the operational flexibility to deal with extraordinary situations including, but not limited to: inadmissible aliens with emergency medical conditions and the temporary entry of otherwise inadmissible aliens coming to the United States whose presence is required in legal proceedings as a defendant or witness.

Although parole is a discretionary authority to be exercised in narrow circumstances and only on a case-by-case basis, it has been repeatedly abused by the Executive Branch over the past several

1

decades in ways that are blatantly inconsistent with the statute. Most important, the parole statute does not authorize categorical parole programs that make aliens presumptively eligible on the basis of some set of broadly applicable criteria.

Furthermore, 8 U.S.C. § 1182(d)(5)(B) limits the circumstances under which an alien who is a refugee as defined in 8 U.S.C. § 1101(a)(42) may be paroled into the United States. This means it is generally unlawful to parole into the United States aliens with pending applications for refugee status filed abroad, and aliens found to have *prima facie* asylum claims who are being allowed into the United States to await adjudication of those claims. The sole exception to this bar is when the Secretary of DHS determines that compelling reasons in the public interest with respect to that particular alien require that the alien be paroled into the United States rather than admitted as a refugee.

It is evident that many current DHS policies and practices governing parole are inconsistent with the statute.

Therefore, I order the following:
(1) Within sixty (60) days of the date of this order, the Director of U.S. Immigration and Customs Enforcement; the Commissioner of U.S. Customs and Border Protection; and the Director of U.S. Citizenship and Immigration Services are directed to:
   a. Compile a list of all instructions, policies, procedures, rules, and regulations pertaining to parole;
   b. Review all such instructions, policies, procedures, rules, and regulations and determine, in consultation with the DHS General Counsel, which are not strictly in accord with the text and structure of 8 U.S.C. § 1182(d)(5);
   c. Formulate a plan for phasing out any such instructions, policies, procedures, rules, and regulations, accompanied by a proposal and timeline for any necessary public notices to be published pursuant to the terms of the Administrative Procedure Act or any other applicable law;
   d. Provide the Secretary of DHS with a report summarizing the results of the following reviews and inquiries.

(2) Pending the review contemplated by paragraph (1), DHS Components have discretion to pause, modify, or terminate any parole program described in paragraph (1) to the extent:
   a. The policy was not promulgated pursuant to the procedural requirements of the Administrative Procedure Act or any comparable scheme;
   b. The DHS Component can do so in a manner that protects any legitimate reliance interests; and
   c. Doing so is otherwise consistent with applicable statutes, regulations, and court orders.

The purpose of this memorandum is to ensure that all future actions taken by DHS with regard to the exercise of the parole authority are consistent with law and within the scope of DHS's authority. Having said that, should any court disagree with the interpretation of the parole statute articulated in this memorandum, I clarify that I am also implementing this policy as a matter of my discretion to deny parole in any circumstance.

SDOE00000004

# EXHIBIT C

Coalition for Humane Immigrant Rights, et al. v. Noem et al., 1:25-cv-00872 (JMC)

## DEPARTMENT OF HOMELAND SECURITY

### Office of the Secretary

### Designating Aliens for Expedited Removal

**AGENCY:** Office of the Secretary, Department of Homeland Security.

**ACTION:** Notice.

**SUMMARY:** This Notice rescinds the March 21, 2022 Notice, *Rescission of the Notice of July 23, 2019, Designation for Expedited Removal.* This Notice also restores the scope of expedited removal to the fullest extent authorized by Congress.

**DATES:** This designation is effective on 6:00 p.m. EST on Tuesday January 21, 2025.

**FOR FURTHER INFORMATION CONTACT:** Joseph Mazarra, Office of the General Counsel, Department of Homeland Security, 202–282–9256.

**SUPPLEMENTARY INFORMATION:**

### I. Background

This Notice rescinds the March 21, 2022 Notice, *Rescission of the Notice of July 23, 2019, Designating Aliens for Expedited Removal,*[1] which limited the application of expedited removal procedures to certain aliens under the Immigration and Nationality Act (INA), to the extent the March 21, 2022 Notice is inconsistent with this Notice. This Notice enables the U.S. Department of Homeland Security (DHS) to exercise the full scope of its statutory authority to place in expedited removal, with limited exceptions, aliens[2] determined to be inadmissible under sections 212(a)(6)(C) or (a)(7) of the INA who have not been admitted or paroled into the United States and who have not affirmatively shown, to the satisfaction of an immigration officer, that they have been physically present in the United States continuously for the two-year period immediately preceding the date of the determination of inadmissibility. Presently, immigration officers may apply expedited removal to aliens apprehended anywhere in the United States for up to two years after the alien arrived in the United States, provided that the alien arrived by sea and the other conditions for expedited removal were satisfied. For aliens who entered the United States by crossing a land

border other than at a port of entry, with the March 21, 2022 Notice, the Secretary of DHS effectively exercised his discretion under the INA to limit the use of expedited removal to aliens apprehended by an immigration officer within 100 air miles of the United States international land border and who were continuously present in the United States for less than 14 days immediately prior to the date of encounter.

The INA grants the Secretary of Homeland Security the ''sole and unreviewable discretion'' to modify at any time the discretionary limits on the scope of the expedited removal designation. The Secretary is exercising his statutory authority through this Notice to designate for expedited removal the following categories of aliens not currently designated: (1) Aliens who did not arrive by sea, who are encountered anywhere in the United States more than 100 air miles from a U.S. international land border, and who have been continuously present in the United States for less than two years; and (2) aliens who did not arrive by sea, who are encountered within 100 air miles from a U.S. international land border, and who have been continuously present in the United States for at least 14 days but for less than two years. Therefore, the designation in this Notice restores the scope of expedited removal to the fullest extent authorized by Congress, as was previously established in the July 23, 2019 Notice, *Designating Aliens for Expedited Removal.* To the extent there is an ambiguity in this Notice, the intended effect of this notice is to apply expedited removal to the fullest extent authorized by statute.

The effect of this change will be to enhance national security and public safety—while reducing government costs—by facilitating prompt immigration determinations. In particular, the full application of expedited removal authority will enable DHS to address more effectively and efficiently the large volume of aliens who are present in the United States unlawfully, without having been admitted or paroled into the United States, and ensure the prompt removal from the United States of those not entitled to enter, remain, or be provided relief or protection from removal.

### II. This Notice Is Immediately Effective

In keeping with the practice followed in announcing the previous designations, and consistent with implementing regulations at 8 CFR

235.3(b)(1)(ii),[3] this designation is effective without prior notice and comment or a delayed effective date. *See, e.g.,* 67 FR 68923, 68925 (2002 Notice); 69 FR 48877, 48880 (2004 Notice); 82 FR 4769, 4769 (2017 elimination of exception for Cuban nationals arriving by air); 82 FR 4902, 4902 (2017 elimination of exception for Cuban nationals encountered in the United States or arriving by sea); 84 FR 35409, 35413 (2019 Notice); 87 FR 16022, 16024 (2022 Notice).

Congress explicitly authorized the Secretary to designate categories of aliens to whom expedited removal procedures may be applied. It also made clear that ''[s]uch designation shall be in the sole and unreviewable discretion of the [Secretary] and may be modified at any time.'' *See* INA 235(b)(1)(A)(iii)(I), 8 U.S.C. 1225(b)(1)(A)(iii)(I)(emphasis added). Therefore, the Secretary's designation, within statutory bounds, is ''committed to agency discretion by law and . . . there is no cause of action to evaluate the merits of the Secretary's judgment under APA standards.'' *Make the Road N.Y.* v. *Wolf,* 962 F.3d 612, 633–634 (D.C. Cir. 2020). Furthermore, as the D.C. Circuit held, based on the statutory language allowing for modification of the designation ''at any time'' and in his ''sole and unreviewable discretion,'' the Department does not have to undertake the notice-and-comment rulemaking process. *Id.* at 635. As discussed above, the rulemaking procedures of the APA do not apply to this Notice and the expansion or contraction of a designation may be made ''at any time.'' *Id.* at 634–635 (internal quotation marks omitted).

### III. Notice of Designation of Aliens Subject to Expedited Removal

Pursuant to INA 235(b)(1)(A)(iii), 8 U.S.C. 1225(b)(1)(A)(iii), and 8 CFR 253.3(b)(1)(ii), I order, in my sole and unreviewable discretion, as follows:

(A) The Notice titled *Designating for Expedited Removal,* 87 FR 16022 (March 21, 2022), is hereby rescinded, effective immediately.

(B) I designate for expedited removal the following categories of aliens not

---

[1] The 2022 notice was published at 87 FR 16022. The 2019 notice was published at 84 FR 35409.

[2] The term ''alien'' is defined in statute as ''any person not a citizen or national of the United States.'' 8 U.S.C. 1101(a)(3). Going forward, DHS will adhere to statutory language and use the proper terminology.

[3] 8 CFR 235.3(b)(1)(ii) (providing that ''[t]he Commissioner shall have the sole discretion to apply the provisions of section 235(b)(1) of the Act, *at any time,* to any class of aliens described in this section'' and that this ''designation shall become effective upon publication of a notice in the **Federal Register**'' as well as that, ''if the Commissioner determines, in the exercise of discretion, that the delay caused by publication would adversely affect the interests of the United States or the effective enforcement of the immigration laws, the Commissioner's designation shall become effective immediately upon issuance, and shall be published in the **Federal Register** as soon as practicable thereafter'' (emphasis added)).

SDOE00000016

currently designated: (1) Aliens who did not arrive by sea, who are apprehended anywhere in the United States more than 100 air miles from a U.S. international land border, and who have been continuously present in the United States for less than two years; and (2) aliens who did not arrive by sea, who are apprehended within 100 air miles from a U.S. international land border, and who have been continuously present in the United States for at least 14 days but for less than two years. Each alien placed in expedited removal under this designation bears the affirmative burden to show to the satisfaction of an immigration officer that the alien has been present in the United States continuously for the relevant period. This designation does not apply to aliens who arrive at U.S. ports of entry, because those aliens are already subject to expedited removal. Nor does this designation apply to or otherwise affect aliens who satisfy the expedited removal criteria set forth in any of the previous designations. *See* 82 FR 4902, 69 FR 48877; 67 FR 68923.

(C) With the exception of the March 21, 2022 Notice rescinded above, this Notice does not supersede, abrogate, or amend or modify any of the Pre-2019 Designations,[4] which shall remain in full force and effect in accordance with their respective terms.

Signed at Washington, DC.

**Benjamine C. Huffman,**

*Acting Secretary of Homeland Security.*

[FR Doc. 2025–01720 Filed 1–21–25; 4:45 pm]

**BILLING CODE 9110–9M–P**

---

**INTERNATIONAL TRADE COMMISSION**

**[Investigation Nos. 701–TA–606 and 731–TA–1416 (Review)]**

**Quartz Surface Products From China**

**Determinations**

On the basis of the record[1] developed in the subject five-year reviews, the United States International Trade Commission ("Commission") determines, pursuant to the Tariff Act of 1930 ("the Act"), that revocation of the countervailing duty and antidumping duty orders on quartz surface products from China would be likely to lead to continuation or recurrence of material injury to an industry in the United

States within a reasonably foreseeable time.

**Background**

The Commission instituted these reviews on June 3, 2024 (89 FR 47614) and determined on September 6, 2024 that it would conduct expedited reviews (89 FR 97653, December 9, 2024).

The Commission made these determinations pursuant to section 751(c) of the Act (19 U.S.C. 1675(c)). It completed and filed its determinations in these reviews on January 17, 2025. The views of the Commission are contained in USITC Publication 5578 (January 2025), entitled *Quartz Surface Products from China: Investigation Nos. 701–TA–606 and 731–TA–1416 (Review)*.

By order of the Commission.

Issued: January 17, 2025.

**Lisa Barton,**

*Secretary to the Commission.*

[FR Doc. 2025–01632 Filed 1–23–25; 8:45 am]

**BILLING CODE 7020–02–P**

---

**INTERNATIONAL TRADE COMMISSION**

**[Investigation No. 337–TA–1433]**

**Certain Glass Substrates for Liquid Crystal Displays, Products Containing the Same, and Methods for Manufacturing the Same; Notice of Institution of Investigation**

**AGENCY:** U.S. International Trade Commission.

**ACTION:** Notice.

**SUMMARY:** Notice is hereby given that a complaint was filed with the U.S. International Trade Commission on December 18, 2024, under section 337 of the Tariff Act of 1930, as amended, on behalf of Corning Incorporated, Corning, New York. A supplement to the Complaint was filed on January 7, 2025. The complaint, as supplemented, alleges violations of section 337 based upon the importation into the United States, the sale for importation, and the sale within the United States after importation of certain glass substrates for liquid crystal displays, products containing the same, and methods for manufacturing the same by reason of the infringement of certain claims of U.S. Patent No. 7,851,394 ("the '394 patent"); U.S. Patent No. 8,627,684 ("the '684 patent"); and U.S. Patent No. 9,512,025 ("the '025 patent"). The complainant, as supplemented, also alleges violations of section 337 based upon the importation and sale of certain glass substrates for liquid crystal displays, products

containing the same, and methods for manufacturing the same by reason of misappropriation of trade secrets the threat or effect of which is to destroy or substantially injure a domestic industry. The complaint, as supplemented, further alleges that an industry in the United States exists as required by the applicable Federal Statute. The complainant requests that the Commission institute an investigation and, after the investigation, issue a general exclusion order, or in the alternative a limited exclusion order, and cease and desist orders.

**ADDRESSES:** The complaint, except for any confidential information contained therein, may be viewed on the Commission's electronic docket (EDIS) at *https://edis.usitc.gov*. For help accessing EDIS, please email *EDIS3Help@usitc.gov*. Hearing impaired individuals are advised that information on this matter can be obtained by contacting the Commission's TDD terminal on (202) 205–1810. Persons with mobility impairments who will need special assistance in gaining access to the Commission should contact the Office of the Secretary at (202) 205–2000. General information concerning the Commission may also be obtained by accessing its internet server at *https://www.usitc.gov*.

**FOR FURTHER INFORMATION CONTACT:** Pathenia M. Proctor, The Office of Unfair Import Investigations, U.S. International Trade Commission, telephone (202) 205–2560.

**SUPPLEMENTARY INFORMATION:**

*Authority:* The authority for institution of this investigation is contained in section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. 1337, and in section 210.10 of the Commission's Rules of Practice and Procedure, 19 CFR 210.10 (2024).

*Scope of Investigation:* Having considered the complaint, the U.S. International Trade Commission, on January 17, 2025, *ordered that*—

(1) Pursuant to subsection (b) of section 337 of the Tariff Act of 1930, as amended, an investigation be instituted to determine:

(a) whether there is a violation of subsection (a)(1)(B) of section 337 in the importation into the United States, the sale for importation, or the sale within the United States after importation of certain products identified in paragraph (2) by reason of infringement of one or more of claims 1, 5, 6, and 8–10 of '394 patent; claims 1, 2, 4, 7, and 10–12 of the '684 patent; and claims 15–20 of the '025 patent, and whether an industry in the United States exists as required by subsection (a)(2) of section 337;

---

[4] *See, e.g.,* 82 FR 4902 (Jan. 17, 2017); 69 FR 48877 (Aug. 11, 2004); 67 FR 68924 (Nov. 13, 2002).

[1] The record is defined in § 207.2(f) of the Commission's Rules of Practice and Procedure (19 CFR 207.2(f)).

# EXHIBIT D

Coalition for Humane Immigrant Rights, et al. v. Noem et al., 1:25-cv-00872 (JMC)

**From:** ERO Assistant Directors
**Subject:** Ending Catch-and-Release Consistent with Executive Order 14165, Securing Our Borders
**Date:** Tuesday, February 18, 2025 7:14:31 PM
**Attachments:** image001.png
image003.png

Graphical user interface, text, application  Description automatically generated

**To:**          All ERO Personnel

**Subject:**     **Ending Catch-and-Release Consistent with Executive Order 14165,** *Securing Our Borders*

On January 20, 2025, President Donald J. Trump issued Executive Order 14165, *Securing Our Borders*, in which he highlighted that "catch-and-release policies undermine the rule of law and our sovereignty, create substantial risks to public safety and security, and divert critical resources away from stopping the entry of contraband and fugitives into the United States" and directed "the appropriate and consistent use of lawful detention authority under the INA, including the termination of the practice commonly known as 'catch-and-release,' whereby illegal aliens are routinely released into the United States shortly after their apprehension for violations of immigration law." 90 Fed. Reg. 8467, 8468.

**Unprocessed Cases**

ERO officers should consider for expedited removal (ER) all aliens previously released by U.S. Customs and Border Protection (CBP) who have not affirmatively filed an application for asylum with U.S. Citizenship and Immigration Services, when they report to an ERO Field Office. This includes: (1) paroled arriving aliens; (2) aliens issued a CBP "Notice to Report" (NTR); and (3) aliens processed for "Parole + ATD" or "Parole with Conditions" (PWC).

*Arriving Aliens*

ERO officers may process for ER any arriving alien (i.e., encountered at a port of entry) who CBP determined to be inadmissible and released, as long as the alien is inadmissible under INA § 212(a)(6)(C) (fraud or willful misrepresentation) or 212(a)(7) (lack of valid immigration documents). There is no time limit on the ability to process such aliens for ER.

*NTR Cases, Parole + ATD, and PWC Cases*

Under the NTR process, certain aliens encountered at the Southwest Border were released into the United States without a Notice to Appear (NTA) or parole. Parole + ATD and PWC were two processes whereby aliens encountered at the Southwest Border were paroled without an NTA and instructed to report to ICE for further processing.

Aliens identified as having been subject to any of these processes are subject to ER if they are inadmissible under INA § 212(a)(6)(C) or (a)(7) and either (1) the initial CBP encounter was within 14 days and 100 air miles of the border; or (2) the alien has not been continuously physically present in the United States for two years prior to the finding of inadmissibility by ERO.

If an alien identified above is not processed for ER, he or she should be processed for section 240 removal proceedings with issuance of an NTA.

If the alien is on an active parole, the NTA or ER charging document will terminate the parole.

**Non-detained Reporting Generally**

Recognizing the unprecedented strides the Administration has made with regard to removal cooperation, ERO should carefully review for removal all cases reporting on the non-detained docket.

*Aliens Granted Withholding of Removal or CAT Protection*

Withholding of removal under the INA and under the regulations implementing U.S. obligations under the Convention Against Torture (CAT) and CAT deferral of removal (DCAT) are country-specific protections from removal. Accordingly, when an alien granted such protection reports on the non-detained docket, ERO officers should review the case to determine the viability of removal to a third country and accordingly whether the alien should be re-detained.

*Aliens Previously Released for Lack of SLRRFF*

ERO officers should review for re-detention the case of any alien reporting on the non-detained docket who was previously released due to no significant likelihood of removal in the reasonably foreseeable future (SLRRFF) in light of the Administration's significant gains with regard to previously recalcitrant countries and the potential for third country removals. Revocation of release is authorized for removal or to enforce conditions of release and is provided for in 8 C.F.R. §§ 241.4 and 241.13. If removal appears significantly likely in the reasonably foreseeable future, the arrest may proceed without further investigation. At the time of arrest, the alien should be provided written notification of the reason for his or her detention. Promptly, ideally, within two days, the arresting officer or another officer, if necessary, should conduct an informal interview of the alien and provide an opportunity for the alien to ask questions and tell the interviewer anything that the alien wishes in support of why he or she should be released.

Any questions regarding this guidance should be directed to your chain of command or the Office of the Principal Legal Advisor.

**Marcos Charles**
Acting Assistant Director
Field Operations
**Enforcement and Removal Operations**
**U.S. Immigration and Customs Enforcement**

This message expires one year from the date it was sent, pursuant to ERO policy.



NOTICE: This communication is UNCLASSIFIED//FOR OFFICIAL USE ONLY (U//FOUO). It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not to be released to the public or other personnel who do not have a valid "need-to-know" without prior approval of an authorized DHS official. No portion of this communication should be furnished to the media, either in written or verbal form.

# EXHIBIT E

Coalition for Humane Immigrant Rights, et al. v. Noem et al., 1:25-cv-00872 (JMC)

# Presidential Documents

**Executive Order 14165 of January 20, 2025**

## Securing Our Borders

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the Immigration and Nationality Act (INA), 8 U.S.C. 1101 *et seq.,* and section 301 of title 3, United States Code, it is hereby ordered:

**Section 1**. *Purpose.* Over the last 4 years, the United States has endured a large-scale invasion at an unprecedented level. Millions of illegal aliens from nations and regions all around the world successfully entered the United States where they are now residing, including potential terrorists, foreign spies, members of cartels, gangs, and violent transnational criminal organizations, and other hostile actors with malicious intent.

Deadly narcotics and other illicit materials have flowed across the border while agents and officers spend their limited resources processing illegal aliens for release into the United States. These catch-and-release policies undermine the rule of law and our sovereignty, create substantial risks to public safety and security, and divert critical resources away from stopping the entry of contraband and fugitives into the United States.

We have limited information on the precise whereabouts of a great number of these illegal aliens who have entered the United States over the last 4 years.

This cannot stand. A nation without borders is not a nation, and the Federal Government must act with urgency and strength to end the threats posed by an unsecured border.

One of my most important obligations is to protect the American people from the disastrous effects of unlawful mass migration and resettlement.

My Administration will marshal all available resources and authorities to stop this unprecedented flood of illegal aliens into the United States.

**Sec. 2**. *Policy.* It is the policy of the United States to take all appropriate action to secure the borders of our Nation through the following means:

(a) Establishing a physical wall and other barriers monitored and supported by adequate personnel and technology;

(b) Deterring and preventing the entry of illegal aliens into the United States;

(c) Detaining, to the maximum extent authorized by law, aliens apprehended on suspicion of violating Federal or State law, until such time as they are removed from the United States;

(d) Removing promptly all aliens who enter or remain in violation of Federal law;

(e) Pursuing criminal charges against illegal aliens who violate the immigration laws, and against those who facilitate their unlawful presence in the United States;

(f) Cooperating fully with State and local law enforcement officials in enacting Federal-State partnerships to enforce Federal immigration priorities; and

(g) Obtaining complete operational control of the borders of the United States.

ICE-Guidance-003

**Sec. 3**. *Physical Barriers.* The Secretary of Defense and the Secretary of Homeland Security shall take all appropriate action to deploy and construct temporary and permanent physical barriers to ensure complete operational control of the southern border of the United States.

**Sec. 4**. *Deployment of Personnel.* (a) The Secretary of Defense and the Secretary of Homeland Security shall take all appropriate and lawful action to deploy sufficient personnel along the southern border of the United States to ensure complete operational control; and

(b) The Attorney General and the Secretary of Homeland Security shall take all appropriate action to supplement available personnel to secure the southern border and enforce the immigration laws of the United States through the use of sections 1103(a)(2) and (4)–(6) of the INA (8 U.S.C. 1103(a)(2) and (4)–(6)).

**Sec. 5**. *Detention.* The Secretary of Homeland Security shall take all appropriate actions to detain, to the fullest extent permitted by law, aliens apprehended for violations of immigration law until their successful removal from the United States. The Secretary shall, consistent with applicable law, issue new policy guidance or propose regulations regarding the appropriate and consistent use of lawful detention authority under the INA, including the termination of the practice commonly known as "catch-and-release," whereby illegal aliens are routinely released into the United States shortly after their apprehension for violations of immigration law.

**Sec. 6**. *Resumption of Migrant Protection Protocols.* As soon as practicable, the Secretary of Homeland Security, in coordination with the Secretary of State and the Attorney General, shall take all appropriate action to resume the Migrant Protection Protocols in all sectors along the southern border of the United States and ensure that, pending removal proceedings, aliens described in section 235(b)(2)(C) of the INA (8 U.S.C. 1225(b)(2)(C)) are returned to the territory from which they came.

**Sec. 7**. *Adjusting Parole Policies.* The Secretary of Homeland Security shall, consistent with applicable law, take all appropriate action to:

(a) Cease using the "CBP One" application as a method of paroling or facilitating the entry of otherwise inadmissible aliens into the United States;

(b) Terminate all categorical parole programs that are contrary to the policies of the United States established in my Executive Orders, including the program known as the "Processes for Cubans, Haitians, Nicaraguans, and Venezuelans."

(c) Align all policies and operations at the southern border of the United States to be consistent with the policy of Section 2 of this order and ensure that all future parole determinations fully comply with this order and with applicable law.

**Sec. 8**. *Additional International Cooperation.* The Secretary of State, in coordination with the Attorney General and the Secretary of Homeland Security, shall take all appropriate action to facilitate additional international cooperation and agreements, consistent with the policy of Section 2, including entering into agreements based upon the provisions of section 208(a)(2)(A) of the INA (8 U.S.C. 1158(a)(2)(A)) or any other applicable provision of law.

**Sec. 9**. *DNA and Identification Requirements.* (a) The Attorney General and the Secretary of Homeland Security shall take all appropriate action to fulfill the requirements of the DNA Fingerprint Act of 2005, title X of Public Law 109–162, for all aliens detained under the authority of the United States; and

(b) The Secretary of Homeland Security shall take all appropriate action to use any available technologies and procedures to determine the validity of any claimed familial relationship between aliens encountered or apprehended by the Department of Homeland Security.

**Sec. 10**. *Prosecution of Offenses.* The Attorney General and the Secretary of Homeland Security shall take all appropriate action to prioritize the

ICE-Guidance-004

prosecution of offenses that relate to the borders of the United States, including the investigation and prosecution of offenses that involve human smuggling, human trafficking, child trafficking, and sex trafficking in the United States.

**Sec. 11**. *Additional Measures.* Within 14 days of the date of this order, the Secretary of State, the Attorney General, the Secretary of Health and Human Services, and the Secretary of Homeland Security shall provide recommendations to the President regarding the use of any other authority to protect the United States from foreign threats and secure the southern border.

**Sec. 12**. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*January 20, 2025.*

[FR Doc. 2025–02015
Filed 1–29–25; 8:45 am]
Billing code 3395–F4–P

# EXHIBIT F

Coalition for Humane Immigrant Rights, et al. v. Noem et al., 1:25-cv-00872 (JMC)

below in advance of the meeting. The open session will be videocast and can be accessed from the NIH Videocasting website (*http://videocast.nih.gov/*).

The meeting will be closed to the public in accordance with the provisions set forth in sections 552b(c)(4) and 552b(c)(6), Title 5 U.S.C., as amended. The grant applications and the discussions could disclose confidential trade secrets or commercial property such as patentable material, and personal information concerning individuals associated with the grant applications, the disclosure of which would constitute a clearly unwarranted invasion of personal privacy.

*Name of Committee:* Council of Councils.
*Date:* April 21, 2025.
*Open:* April 21, 2025, 10:00 a.m. to 12:15 p.m.
*Agenda:* Welcome and Opening Remarks; Announcements, and NIH Program Updates; Presentations; and Other Business of the Committee.
*Place:* National Institutes of Health Building 1, 1 Center Drive, Bethesda, MD 20892 (Virtual Meeting).
*Closed:* April 21, 2025, 12:15 p.m. to 01:15 p.m.
*Agenda:* Review of Grant Applications.
*Place:* National Institutes of Health Building 1, 1 Center Drive, Bethesda, MD 20892 (Virtual Meeting).
*Open:* April 21, 2025, 01:15 p.m. to 04:35 p.m.
*Agenda:* NIH Program Updates; Presentations; and Other Business of the Committee.
*Place:* National Institutes of Health Building 1, 1 Center Drive, Bethesda, MD 20892 (Virtual Meeting).
*Contact Person:* Franziska Grieder, D.V.M., Ph.D., Executive Secretary, Council of Councils, Director, Office of Research Infrastructure Programs, Division of Program Coordination, Planning, and Strategic Initiatives, Office of the Director, NIH, 6701 Democracy Boulevard, Room 948, Bethesda, MD 20892, *GriederF@mail.nih.gov*, 301–435–0744.

Any interested person may file written comments with the committee by forwarding the statement to the Contact Person listed on this notice. The statement should include the name, address, telephone number and when applicable, the business or professional affiliation of the interested person.

Information is also available on the Council of Council's home page at *http://dpcpsi.nih.gov/council/* where an agenda and any additional information for the meeting will be posted when available.

(Catalogue of Federal Domestic Assistance Program Nos. 93.14, Intramural Research Training Award; 93.22, Clinical Research Loan Repayment Program for Individuals from Disadvantaged Backgrounds; 93.232, Loan Repayment Program for Research Generally; 93.39, Academic Research Enhancement Award; 93.936, NIH Acquired Immunodeficiency Syndrome Research Loan Repayment Program; 93.187, Undergraduate Scholarship Program for Individuals from Disadvantaged Backgrounds, National Institutes of Health, HHS)

Dated: March 20, 2025.

**Bruce A. George,**
*Program Analyst, Office of Federal Advisory Committee Policy.*

[FR Doc. 2025–05010 Filed 3–24–25; 8:45 am]

**BILLING CODE 4140–01–P**

---

# DEPARTMENT OF HOMELAND SECURITY

## Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans

**ACTION:** Notice.

**SUMMARY:** The Department of Homeland Security (''DHS'') is terminating the categorical parole programs for inadmissible aliens from Cuba, Haiti, Nicaragua, and Venezuela and their immediate family members (hereinafter referred to as ''CHNV parole programs'') that DHS announced in 2022 and 2023. This **Federal Register** notice is intended to provide context and guidance to the public regarding the termination of the CHNV parole programs and related employment authorization.

**DATES:** DHS is terminating the CHNV parole programs as of March 25, 2025. The temporary parole period of aliens in the United States under the CHNV parole programs and whose parole has not already expired by April 24, 2025 will terminate on that date unless the Secretary makes an individual determination to the contrary. Parolees without a lawful basis to remain in the United States following this termination of the CHNV parole programs must depart the United States before their parole termination date.

**FOR FURTHER INFORMATION CONTACT:** Ihsan Gunduz, Border and Immigration Policy, Office of Strategy, Policy, and Plans, Department of Homeland Security, 2707 Martin Luther King Jr. Ave. SE, Washington, DC 20528–0445; telephone (202) 447–3459 (not a toll-free number).

**SUPPLEMENTARY INFORMATION:**

## I. Background

Over the previous two years, DHS has implemented programs through which inadmissible aliens who are citizens or nationals of designated countries, and their immediate family members, could request authorization to travel to the United States in order to be considered for parole into the country.[1] Under these categorical parole programs, potentially eligible beneficiaries were adjudicated on a case-by-case basis, for advance authorization to travel to a U.S. port of entry (''POE'') in the interior of the country to seek a discretionary grant of parole.

On January 20, 2025, President Trump issued Executive Order 14165, ''Securing Our Borders.''[2] Section 2 of the Order establishes a policy of the United States to take all appropriate action to secure the borders of our Nation through a range of means, including deterring and preventing the entry of illegal aliens into the United States, and removing promptly all aliens who enter or remain in violation of Federal law. Section 7 of the Order directs the Secretary of Homeland Security to, consistent with applicable law, take all appropriate action to ''[t]erminate all categorical parole programs that are contrary to the policies of the United States established in [the President's] Executive Orders, including the program known as the 'Processes for Cubans, Haitians, Nicaraguans, and Venezuelans.' ''

Consistent with the President's direction, and for the independent reasons stated in this notice, this notice terminates the CHNV parole programs. Although DHS established the categorical programs for each country through a separate notice in the **Federal Register**, the justification for the establishment of each of the four categorical programs was very similar,[3] and the rationale for termination is largely consistent for all four parole programs. Thus, DHS is announcing the termination of all four parole programs by publishing this single notice in the **Federal Register**.

## II. DHS Parole Authority

The Immigration and Nationality Act (''INA'') confers upon the Secretary of Homeland Security (''Secretary'') the narrow discretionary authority to parole inadmissible aliens into the United States ''temporarily under such conditions as [DHS] may prescribe only on a case-by-case basis for urgent

---

[1] Implementation of a Parole Process for Cubans, 88 FR 1266 (Jan. 9, 2023); Implementation of a

Change to the Parole Process for Cubans, 88 FR 26329 (Apr. 28, 2023); Implementation of a Parole Process for Haitians, 88 FR 1243 (Jan. 9, 2023); Implementation of a Change to the Parole Process for Haitians, 88 FR 26327 (Apr. 28, 2023); Implementation of a Parole Process for Nicaraguans, 88 FR 1255 (Jan. 9, 2023); Implementation of a Parole Process for Venezuelans, 87 FR 63507 (Oct. 19, 2022); Implementation of Changes to the Parole Process for Venezuelans, 88 FR 1279 (Jan. 9, 2023).

[2] *See* Executive Order 14165, Securing Our Borders, 90 FR 8467 (Jan. 20, 2025) (published Jan. 30, 2025).

[3] *Compare, e.g.,* 88 FR at 1260–63, *with* 88 FR at 1248–52 (setting out the justifications for the parole programs for Nicaragua and Haiti, respectively).

humanitarian reasons or significant public benefit.'' *See* INA 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A); *see also* 8 CFR 212.5(a) and (c) through (e) (discretionary authority for establishing conditions of parole and for terminating parole). Additionally, upon a finding by DHS that the purpose of the temporary, discretionary parole has been served, the alien is required to depart the United States ''or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States.'' INA 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A).

A review of the history of the parole authority supports the contention that discretionary parole determinations were intended by Congress to be narrowly tailored to specific instances and not based on a set of broadly applicable eligibility criteria.[4] Under the law, the determination to parole an alien into the country should only be made on a case-by-case basis, taking into account each alien's unique circumstances. The ultimate determination whether to parole an alien into the United States upon the alien's arrival at a POE is made by U.S. Customs and Border Protection (''CBP'') officers. *See* 8 CFR 212.5(a).

Parole is inherently temporary, and parole alone is not an underlying basis

for obtaining any immigration status, nor does it constitute an admission to the United States. *See* INA 101(a)(13)(B), 212(d)(5)(A), 8 U.S.C. 1101(a)(13)(B), 1182(d)(5)(A). Once an alien is paroled into the United States, the parole allows the alien to stay temporarily in the United States for the duration of the parole period unless and until the parole expires or is otherwise terminated. *See* 8 CFR 212.5(e).

Paroled aliens, including those paroled under the CHNV parole programs, may apply for any immigration benefit or status for which they may be eligible, including discretionary employment authorization under the (c)(11) employment eligibility category. *See* 8 CFR 274a.12(c)(11). In the absence of any subsequent application conferring an immigration benefit or status, and upon termination of parole, such alien will remain an arriving alien. *See* 8 CFR 1.2; *see also* INA 101(a)(13)(B), 8 U.S.C. 1101(a)(13)(B).

## III. Rationale for Initial Implementation

When DHS established the CHNV parole programs, DHS provided several justifications for their promulgation. *See, e.g.,* 88 FR at 1248–51 (Implementation of a Parole Process for Haitians). Overall, DHS stated that the programs would provide a significant public benefit for the United States and address the urgent humanitarian reasons underlying the high levels of migration from those countries.

With respect to the significant public benefit, DHS wrote that the CHNV parole programs would: (i) enhance border security by reducing illegal immigration between the POEs, (ii) minimize the domestic impact of high levels of illegal immigration by CHNV nationals, particularly in border communities; (iii) improve vetting for national security and public safety; (iv) reduce the strain on DHS personnel and resources; (v) disincentivize a dangerous journey that puts migrant lives and safety at risk and enriches smuggling networks; and (vi) fulfill important foreign policy goals to manage migration collaboratively in the hemisphere.

For the reasons discussed below, DHS has determined that it is now appropriate and necessary to terminate the CHNV parole programs. These programs do not serve a significant public benefit, are not necessary to reduce levels of illegal immigration, did not sufficiently mitigate the domestic effects of illegal immigration, are not serving their intended purposes, and are inconsistent with the Administration's

foreign policy goals.[5] Regarding previous arguments or determinations that these programs were consistent with the requirement of ''urgent humanitarian reasons'' for granting parole, DHS believes that consideration of any urgent humanitarian reasons for granting parole is best addressed on a case-by-case basis consistent with the statute, and taking into consideration each alien's specific circumstances. These reasons, independently and cumulatively, support termination of the CHNV parole programs.

Accordingly, the Secretary, in her discretion, is terminating the CHNV parole programs. Consistent with her statutory authority, the Secretary retains discretion to continue to extend parole to any alien paroled under CHNV—temporarily under such conditions as she may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit. *See* INA 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A). The decision to do so, or not do so, is committed to the Secretary's sole discretion.

### 1. The CHNV Parole Programs Are Unnecessary To Achieve Border Security Goals

From the announcement of the parole program for Venezuelans and their immediate family members on October 12, 2022, through the subsequent addition of the programs for Cubans, Haitians, Nicaraguans, and their immediate family members in January 2023, and until January 22, 2025, approximately 532,000 inadmissible aliens were granted advance authorization to travel to the United States and receive consideration for parole into the United States.[6]

One justification for these 532,000 discretionary paroles was to ''enhance border security'' at the southwest border of the United States.[7] DHS reasoned that by ''incentivizing individuals to seek a lawful, orderly means of traveling to the United States, while imposing

---

[4] Parole was codified into immigration law in the Immigration and Nationality Act of 1952. As envisioned then, the 1952 Act authorized the Attorney General to parole aliens temporarily under such conditions as he may prescribe for emergent reasons or reasons deemed strictly in the public interest. As expressed then, ''the parole of aliens seeking admission is simply a device through which needless confinement is avoided while administrative proceedings are conducted.'' *See Leng May Ma v. Barber,* 357 U.S. 185, 190 (1958). However, the parole authority, whether intended to be narrow or broad, has in fact been used in an increasingly broad manner since its inception, often earning the criticism of Congress, which in 1996 wrote, ''[i]n recent years, however, parole has been used increasingly to admit entire categories of aliens who do not qualify for admission under any other category in immigration law, with the intent that they will remain permanently in the United States. This contravenes the intent of section 212(d)(5), but also illustrates why further, specific limitations on the Attorney General's discretion are necessary.'' *See* H.R. Rep. 104–469, pt. 1, at 140 (1996). Furthermore, the Illegal Immigration Reform and Immigration Responsibility Act of 1996 (''IIRIRA'') struck from INA 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A), the phrase, ''for emergent reasons or for reasons deemed strictly in the public interest'' as grounds for granting parole into the United States and inserted ''only on a case-by-case basis for urgent humanitarian reasons or significant public benefit.'' *See* Public Law 104–208, div. C, § 602(a). ''The legislative history indicates that this change was animated by concern that parole under 8 U.S.C. 1182(d)(5)(A) was being used by the executive to circumvent congressionally established immigration policy.'' *Cruz-Miguel v. Holder,* 650 F.3d 189, 199 n.15 (2d Cir. 2011).

[5] *See* INA 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A) (''. . . when the purposes of such parole shall, in the opinion the Secretary of Homeland Security, have been served the alien shall forthwith return or be returned to the custody from which he was paroled.'').

[6] Office of Homeland Security Statistics (''OHSS'') analysis of advanced travel authorizations data provided by CBP Passenger Systems Program Directorate and valid as of January 22, 2025. Beneficiary travel authorizations excluded expired applications. The Venezuelan program started on October 18, 2022, and the Cuba, Haiti, Nicaragua parole programs started January 6, 2023.

[7] *See, e.g.,* 88 FR at 1255 (''The [Nicaraguan] parole process is intended to enhance border security by reducing the record levels of Nicaraguan nationals entering the United States between POEs.'').

consequences to irregular migration, . . . the new parole process will mitigate anticipated future surges'' of illegal immigration. *See, e.g.,* 88 FR at 1249 (Implementation of a Parole Process for Haitians). DHS pointed to past experience with rapidly increasing ''encounters of Guatemalan and Honduran nationals from January 2021 until August 2021'' along the southwest border, explaining that the resumption of repatriation flights to Guatemala and Honduras helped reduce the amount of illegal immigration but was insufficient to address the sheer numbers.[8] Accordingly, the CHNV parole programs contemplated enhancing border security by combining ''a consequence for [nationals seeking] to enter the United States [in an unlawful manner between POEs (*i.e.,* removal or return to a third country, such as Mexico), while introducing] an incentive to use [a] lawful process to request authorization to travel by air to and enter the United States, without making the dangerous journey to the border.''[9]

Upon review, DHS concludes that this ''deterrent'' and ''incentive'' approach did not result in a sufficient and sustained improvement in border security, and has exacerbated challenges associated with interior enforcement of the immigration laws. Encounters of CHNV nationals, particularly at POEs, remained unacceptably high while the CHNV parole programs were in effect, and overall migration of CHNV nationals to the United States increased between October 12, 2022 and January 22, 2025. In addition, the CHNV parole programs have at best traded an unmanageable population of unlawful migration along the southwest border for the additional complication of a substantial population of aliens in the interior of the United States without a clear path to a durable status.

As an initial matter, DHS acknowledges that in establishing the CHNV parole programs, and in subsequent DHS evaluations of these programs, DHS focused, in part, on a goal of reducing encounters of CHNV nationals between POEs.[10] And it is true that there was a reduction in encounters

of CHNV nationals between POEs from FY 2022 through FY 2024—from around 600,000 encounters in FY 2022 to 416,000 in FY 2023 and 183,000 in FY 2024.[11] But in implementing the CHNV parole programs, DHS also focused on the importance of reducing pressures at the southwest border generally. It was for this reason that the CHNV parole programs required, for instance, that CHNV nationals ''fly at their own expense to an interior [POE] rather than entering at a land POE''[12] and rendered ineligible those CHNV nationals who irregularly entered the United States, Mexico, or Panama after the programs' announcement.[13]

Consistent with that focus and in light of the reality that DHS's border security mission involves activities at southwest border POEs as well, DHS has concluded that the present assessment of the efficacy of the CHNV parole programs should include encounters at such land POEs. If one includes encounters of CHNV nationals at POEs, the actual reduction in southwest border encounters of CHNV nationals is much more muted: encounters of CHNV nationals at and between southwest border POEs dropped from approximately 626,000 in FY 2022 only to 584,000 in FY 2023 and 535,000 in FY 2024.[14] This is due to a significant increase in encounters of such aliens at southwest border POEs over that time period: from 26,250 in FY 2022 to 168,010 in FY 2023 and 352,790 in FY 2024.[15] The increase can be attributed to the use of the CBP One mobile application (''CBP One app'' or ''CBP One'') to schedule appointments at southwest border POEs,[16] which resulted in very high numbers of CHNV nationals placed into removal proceedings pursuant to section 240 of the INA, 8 U.S.C. 1229a, (''section 240 removal proceedings'') and released into

U.S. border communities,[17] exacerbating the immigration court backlog and the poor incentives that the backlog creates.[18] Finally, it is important to emphasize that in addition to these southwest border encounters, DHS must also consider the 532,000 parolees who entered the United States under the CHNV parole programs.

The decision to terminate the discretionary and temporary parole programs is further informed by the actions of the prior administration, which found the CHNV parole programs, even when paired with the Circumvention of Lawful Pathways rule, to be insufficient to address very high levels of illegal immigration.[19] For example, DHS and the Department of Justice (DOJ) promulgated the Securing the Border framework[20] as an emergency measure to address ongoing high levels of unlawful immigration between southwest border POEs.[21] The Departments explained that ''at the current levels of encounters and with current resources, [DHS] cannot predictably and swiftly deliver consequences to most noncitizens who cross the border without a lawful basis to remain . . . [DHS's] ability to refer and process noncitizens through expedited removal thus continues to be overwhelmed, creating a vicious cycle.''[22] This conclusion—that DHS's ability to swiftly impose consequences for illegal immigration ''continue[d] to be overwhelmed''[23]—followed nearly two years of the CHNV parole programs, whose chief justification had been facilitating operational control of the

---

[8] *See, e.g.,* 87 FR at 63509.

[9] *See, e.g.,* 87 FR at 63510.

[10] *See, e.g.,* 87 FR at 63507 (''The parole process is intended to enhance border security by reducing the record levels of Venezuelan nationals entering the United States between POEs, while also providing a process for certain such nationals to lawfully enter the United States in a safe and orderly manner.''); *see also* Circumvention of Lawful Pathways 88 FR 31314, 31317 (May 16, 2023) (noting that in the first weeks following implementation of the CHNV parole programs, encounters of CHNV nationals between POEs dropped significantly).

[11] OHSS analysis of January 2025 OHSS Persist Dataset.

[12] *See, e.g.,* 87 FR at 63507; *see also id.* at 63512 (explaining that by ''diverting flows of Venezuelan nationals to interior POEs through a safe and orderly process,'' DHS could relieve pressure on border communities).

[13] *See, e.g.,* 87 FR at 63515.

[14] OHSS analysis of January 2025 OHSS Persist Dataset.

[15] OHSS analysis of January 2025 OHSS Persist Dataset.

[16] Section 7 of Executive Order 14165 also directed the Secretary to, consistent with applicable law, take all appropriate action to cease using the CBP One app, as a method of paroling or facilitating the entry of otherwise inadmissible aliens into the United States. DHS has ceased the use of the CBP One app for this purpose. *See* CBP, Press Release, CBP Removes Scheduling Functionality in CBP One™ App (Jan. 21, 2025), *https://www.cbp.gov/newsroom/national-media-release/cbp-removes-scheduling-functionality-cbp-one-app* (last updated Jan. 22, 2025).

[17] A total of 582,800 CHNV nationals with CBP One registration numbers were encountered at southwest border POEs from Jan. 1, 2023–Jan. 31, 2025, including 576,900 (99 percent) that were issued NTAs. OHSS analysis of January 2025 OHSS Persist Dataset.

[18] *See, e.g.,* Securing the Border, 89 FR 81156, 81181 (Oct. 7, 2024) (explaining that particularly in light of the immigration court backlog, ''releasing individuals who may otherwise be referred for expedited removal may inadvertently incentivize increased irregular migration and the exploitation of the asylum system, especially by human smugglers who encourage migrants to claim fear once they are encountered by USBP as it will allow them to remain in the United States for years pending resolution of their case and, where appropriate, removal.'').

[19] 88 FR 31314 (May 16, 2023).

[20] *See* 89 FR 48710 (June 7, 2024) (interim final rule); 89 FR 81156 (Oct. 7, 2024) (final rule).

[21] ''On June 3, 2024, the President signed Proclamation 10773 under sections 212(f) and 215(a) of the INA, finding that because border security and immigration systems of the United States were unduly strained, the entry into the United States of certain categories of [aliens] was detrimental to the interests of the United States, and suspending and limiting the entry of such [aliens].'' *See* 89 FR at 81157–58.

[22] 89 FR at 48714.

[23] 89 FR at 48715.

southwest border of the United States. Promulgation of the Securing the Border interim final rule in June 2024 reflected the reality that the CHNV parole programs and Circumvention of Lawful Pathways rule did not sufficiently enhance border security.[24]

Finally, to whatever extent the CHNV parole programs could be characterized as reducing encounters of CHNV nationals at the southwest border from the very high levels that existed in late 2022, DHS does not believe that the programs are necessary to achieve such reductions at this time. In December 2022—the last full month prior to implementation of all four programs—the U.S. Border Patrol (USBP) encountered around 84,000 CHNV nationals at the southwest border.[25] That figure has been below 12,000 every month since January 2024, and below 6,000 every month since June 2024, when DHS and DOJ issued the Securing the Border rule.[26] In January 2025, even with the CHNV parole programs paused, USBP encountered around 3,400 CHNV nationals at the southwest border.[27] Whatever the need for these programs may have been in late 2022, the situation at the southwest border now, and the set of tools implemented by DHS to deter illegal immigration, are quite different.

Moreover, with the implementation of President Trump's policies beginning on January 20, 2025, border encounters generally have continued to drop notwithstanding the ongoing pause on these programs. Southwest border encounters between POEs fell from an average of about 1,180 aliens per day in the two-week period ending on January 20, 2025, to an average of about 640 per day in the two-week period from January 21 to February 3, 2025, and fell further to an average just under 260 per day in the two-week period from February 12, 2025 to February 25, 2025.[28] Over those same three time periods, southwest border releases from USBP custody fell from an average of about 240 per day to an average of about 50 per day and then an average of fewer than 5 per day.[29]

The need to break the "vicious cycle" of unlawful immigration supports this DHS action to terminate the CHNV parole programs in favor of new presidential directives that address the demand for enhanced border security beyond the 2024 Securing the Border framework.[30] Executive Order 14165, "Securing Our Borders," [31] and Executive Order 14159, "Protecting the American People Against Invasion," [32] exemplify more reasoned and realistic initiatives to control unlawful immigration at the southwest border of the United States.

*2. The Domestic Effects of Illegal Immigration Continued To Be Felt Throughout Implementation of the CHNV Parole Programs*

Although one goal of the CHNV parole programs was to "help minimize the burden on communities, state and local governments, and NGOs who support the reception and onward travel of arriving migrants at the SWB," the programs did not have this effect. As discussed in the preceding section, overall levels of CHNV migration at and between southwest border POEs did not fall dramatically year-over-year in FY 2023 and FY 2024. In addition, if one takes into account the 532,000 parolees who entered the United States at an interior POE, CHNV migration may have increased over the relevant time period. Recent policy interventions have proven more effective than the CHNV parole programs in addressing very high levels of illegal immigration.

Over the past few years, there has been extensive public discussion of the effects of high levels of illegal immigration and inadmissible aliens arriving in local communities. Although public accounts of these effects do not always distinguish between aliens strictly on the basis of how they entered the country or their status (*e.g.,* CHNV parolees; aliens whom DHS encountered at a southwest border POE placed in section 240 removal proceedings; and aliens present without admission or parole), localities nationwide have experienced the effects of very high levels of migration.[33] CHNV parolees and other recent arrivals have competed for limited resources such as housing, food, transportation, education, legal services, and public benefits.[34] Some localities experienced surges of CHNV parolees in particular.[35]

The domestic impact of the CHNV parole program was also felt at the Federal level in at least three ways. First, the CHNV parole programs resulted in expanded eligibility for Federal public benefits. This is because, for instance, an alien who is paroled into the United States under INA 212(d)(5) for a period of at least 1 year is considered a "qualified alien." *See* 8 U.S.C. 1641(b)(4). Because DHS generally issued two-year periods of parole from the outset, CHNV parolees generally were considered qualified aliens. Although qualified aliens are generally subject to a five-year waiting period before becoming eligible for certain Federal public benefits, *see, e.g.,* 8 U.S.C. 1613(a) (five-year waiting period for Federal means-tested public benefits); 8 U.S.C. 1612(a)(2)(L) (general five-year waiting period before a qualified alien can receive supplemental nutrition assistance program (SNAP) benefits), such waiting periods do not apply to all CHNV parolees with respect to all public benefit programs. For instance, a parolee under the age of 18 may be eligible for SNAP benefits, *see*

---

[24] DHS notes that on October 4, 2024, the prior administration announced that there would be no "re-parole" beyond the initial two-year period for the parolees who entered the United States under the CHNV parole programs. The decision of the prior administration to decline renewal or extension of the CHNV related parole coincided in large part with other actions of DHS to promulgate policies to reduce illegal immigration.

[25] OHSS analysis of January 2025 OHSS Persist Dataset.

[26] OHSS analysis of January 2025 OHSS Persist Dataset.

[27] OHSS analysis of January 2025 OHSS Persist Dataset.

[28] OHSS analysis of data downloaded from UIP February 25, 2025.

[29] OHSS analysis of data downloaded from UIP Feb. 25, 2025. DHS also notes that to whatever extent the incentives created by the parole programs for Cubans and Haitians deterred illegal immigration by sea—a particularly dangerous form of migration—the parole programs are not necessary for such deterrence and raise other issues, some of which are outlined in sections III.2–4 of this notice. DHS has adopted a more robust enforcement posture in general, and will monitor trends in maritime migration and respond as appropriate. Through early February 2025, DHS has yet to see a return to the very high levels of maritime migration observed in 2022.

[30] The streamlined procedures offered by the Securing the Border framework and complementary actions permitted DHS to more than triple the percentage of aliens processed for expedited removal under INA 235(b)(1), 8 U.S.C. 1225(b)(1), and decrease the number of aliens released by USBP pending immigration court proceedings by 89 percent, a number that has only improved further with the end of "catch and release." Encounters and releases based on OHSS analysis of January 2025 OHSS Persist Dataset. Processed for ER based on OHSS analysis of September 2024 OHSS enforcement Lifecycle and CBP data downloaded from UIP ER Daily Report Data Dashboard as of February 4, 2025.

[31] 90 FR 8611 (Jan. 20, 2025).

[32] 90 FR 8443 (Jan. 20, 2025).

[33] *See, e.g.,* Adam Shaw, Fox News, *Biden Admin Faces Mounting Pressure to Dismantle Migrant Parole Program Amid 'Stress' on Small Towns* (Oct. 31, 2024), *https://www.foxnews.com/politics/biden-admin-faces-mounting-pressure-dismantle-migrant-parole-program-stress-small-towns;* Muzaffar Chishti & Colleen Putzel-Kavanaugh, *After Crisis of Unprecedented Migrant Arrivals, U.S. Cities Settle into New Normal,* Migration Policy Institute (Aug. 1, 2024), *https://www.migrationpolicy.org/article/us-cities-innovations-integrate-arrivals.*

[34] *See* Muzaffar Chishti & Colleen Putzel-Kavanaugh, *After Crisis of Unprecedented Migrant Arrivals, U.S. Cities Settle into New Normal,* Migration Policy Institute (Aug. 1, 2024), *https://www.migrationpolicy.org/article/us-cities-innovations-integrate-arrivals.*

[35] Nick Mordowanec, *Map Shows Hotspots for Migrants Flying Into U.S.,* Newsweek (May 1, 2024), *https://www.newsweek.com/migrants-dhs-flying-border-illegal-1896239.*

**Federal Register** / Vol. 90, No. 56 / Tuesday, March 25, 2025 / Notices        **13615**

7 CFR 273.4(a)(6)(ii)(J), as might ''a Cuban or Haitian entrant (as defined in section 501(e) of the Refugee Education Assistance Act of 1980),'' *see* 7 CFR 273.4(a)(6)(ii)(E). Similarly, some states have extended Medicaid and Children's Health Insurance Program benefits without a five-year waiting period to ''lawfully residing'' children and pregnant women, which includes an alien who is paroled into the United States under INA 212(d)(5) for a period of at least 1 year.[36]

Second, the CHNV parole programs have exacerbated backlogs, or risked exacerbating backlogs, for the immigration system writ large. For example, the population of aliens paroled into the United States and who have filed an application for asylum contributes to an already taxed immigration system with historically high backlogs before USCIS and the Executive Office for Immigration Review (''EOIR'').[37] Many such parolees may not otherwise have come to the United States and have exacerbated such backlogs or are likely to eventually do so. U.S. Citizenship and Immigration Services (''USCIS'') recently reported that as of the end of December 2024, the USCIS asylum backlog had increased to over 1.4 million cases.[38] CHNV parolees account for approximately 75,000 affirmative asylum applications.[39] In addition, when a CHNV parolee's two-year parole period ends, if the CHNV parolee has no lawful basis to remain in the United States, DHS may place the alien in section 240 removal proceedings. But, due in part to the overwhelmed expedited removal system, EOIR's immigration court backlog has already been growing rapidly, and will be further strained by the initiation of additional removal proceedings for the CHNV parolee population once their parole period ends. The immigration court backlog increased by approximately 44 percent between the end of FY 2023 (2.5 million cases) and FY 2024 (3.6 million cases).[40]

Third, the CHNV parole programs had a disruptive impact for CBP operations at interior air POEs. A progressive increase in beneficiaries of the CHNV parole programs arriving at POEs with advance travel authorizations ''(ATAs)'' were ultimately not granted parole due to CBP's determination that the alien did not warrant a discretionary grant of parole, for instance due to evidence of fraud or confirmation that the alien was a citizen or resident of a non-CHNV country. As a result, CBP processed these aliens for another appropriate disposition under Title 8, including detention or referral into expedited removal proceedings or section 240 removal proceedings, as appropriate. This caused further processing delays and coordination with air carriers for return flights when appropriate, and further contributed to the immigration court backlog.

The overwhelmed immigration systems in particular may incentivize aliens to enter the United States, without regard to the strength of any potential claims for immigration status, as aliens who are subject to expedited removal may nevertheless be placed in section 240 removal proceedings when the system is strained beyond its processing capacity. As a result, many remain in the United States until their immigration benefit requests are adjudicated or their section 240 removal proceedings conclude and any resultant removal order is executed. Any further strain to the immigration systems resulting from aliens pursuing the CHNV parole programs exacerbates these detrimental incentives.

In short, the domestic impact of the CHNV parole programs do not warrant continuing to operate these programs. Implementation of these programs coincided with an overall increase in CHNV migration, significant pressures on localities throughout the country, an expansion of public benefits eligibility, and a further exacerbation of USCIS and immigration court backlogs.

*3. The CHNV Parole Programs Are Inconsistent With the Administration's Foreign Policy Goals*

One of the stated goals of the CHNV parole programs was to promote the foreign policy objectives of the prior administration. Indeed, DHS explained repeatedly in its notices promulgating the CHNV parole programs that their implementation would advance the foreign policy objectives of the then-current administration.[41] The foreign

policy objectives underlying the CHNV parole programs, however, are not consistent with those of the current Administration.

Executive Order 14150, ''America First Policy Directive to the Secretary of State'' (Jan. 20, 2025) clearly sets out the President's vision that ''the foreign policy of the United States shall champion core American interests and always put America and American citizens first.''[42] Executive Order 14159, ''Protecting the American People Against Invasion'' (Jan. 20, 2025) states that it is the policy of the United States to ''faithfully execute the immigration laws against all inadmissible and removable aliens, particularly those aliens who threaten the safety or security of the American people.'' Further, it is the policy of the United States to achieve the ''total and efficient enforcement of those laws, including through lawful incentives and detention capabilities.''[43]

Whereas implementation of the CHNV parole programs was contingent upon the Government of Mexico (''GOM'') making an independent decision to accept the return or removal of CHNV nationals who migrated illegally, the U.S. Government is pursuing a range of other policy initiatives that would allow DHS to return, remove, or deter the illegal migration of CHNV nationals and other aliens. Section 13 of that Executive Order 14159 specifically addresses repatriation, and directs the Secretaries of State and Homeland Security to take all appropriate action to cooperate and effectively implement, as appropriate, the sanctions provided by section 243(d) of the INA (8 U.S.C. 1253(d)), and ensure that diplomatic efforts and negotiations with foreign states include the foreign states' acceptance of their nationals who are subject to removal from the United States. Section 13 further directs the Secretaries to eliminate all documentary barriers, dilatory tactics, or other restrictions that prevent the prompt repatriation of aliens to any foreign state. The Order provides that any failure or delay by a foreign state to verify the identity of a national of that state shall be considered in carrying out section 243(d) sanctions and shall also be considered regarding the issuance of

[36] *See* 42 U.S.C. 1396b(v)(4) (Medicaid); 42 U.S.C. 1397gg(e)(1)(O) (CHIP).

[37] *See* Holly Straut-Eppsteiner, Cong. Rsch. Serv. IN12492, FY2024 EOIR Immigration Court Data: Caseloads and the Pending Cases Backlog (2025); *see also* Elizabeth Jacobs, *Affirmative Asylum Backlog Exceeds One Million for the First Time* (Center for Immigration Studies) (July 26, 2024), *https://cis.org/Jacobs/Affirmative-Asylum-Backlog-Exceeds-One-Million-First-Time.*

[38] USCIS, Performance Data, Asylum Division Monthly Statistics Report (Dec. 2024), *https://www.uscis.gov/sites/default/files/document/data/asylumfiscalyear2025todatestats_241231.xlsx* (last visited Feb. 25, 2025).

[39] USCIS Office of Performance & Quality.

[40] EOIR, Executive Office for Immigration Review Adjudication Statistics (Jan. 16, 2025), *https://www.justice.gov/eoir/media/1344791/dl?inline.*

[41] *See e.g.,* 87 FR at 63516 (''the implementation of [the Venezuela process] will advance the Administration's foreign policy goals''); 88 FR at

1253 (''[the Haiti process] is fully aligned with larger and important foreign policy objectives of this Administration'').

[42] See Executive Order 14150, America First Policy Directive to the Secretary of State, 90 FR 8337 (Jan. 20, 2025) (published Jan. 29, 2025).

[43] *See* Executive Order 14159, Protecting the American People Against Invasion, 90 FR 8443 (Jan. 20, 2025) (published Jan. 29, 2025).

any other sanctions that may be available to the United States.

Further, as noted above, Executive Order 14165, "Securing Our Borders" states that DHS shall "terminate all categorical parole programs that are contrary to the policies of the United States established in [the President's] Executive Orders, including the program known as the 'Processes for Cubans, Haitians, Nicaraguans, and Venezuelans.'"[44] In the same Order, the President directed that as soon as practicable, the Secretary of Homeland Security, in coordination with the Secretary of State and the Attorney General, shall take all appropriate action to resume the Migrant Protection Protocols in all sectors along the southern border of the United States and ensure that, pending section 240 removal proceedings, aliens described in section 235(b)(2)(C) of the INA (8 U.S.C. 1225(b)(2)(C)) are returned to the territory from which they came.

The President has pursued the cooperation of foreign partners in other ways as well. For instance:

• On January 23, 2025, President Trump in his call with Salvadoran President Nayib Bukele discussed working together to stop illegal immigration and crack down on transnational gangs like Tren de Aragua.[45]

• On January 26, 2025, the Government of Colombia agreed to the unrestricted acceptance of all illegal aliens from Colombia returned from the United States, including on U.S. military aircraft, without limitation or delay.[46]

• On January 27, 2025, President Trump had a productive conversation with Indian Prime Minister Narendra Modi, who agreed to "do what's right" in regard to illegal migration.[47]

• Beginning on February 1, 2025, President Trump has issued a number of tariff-related executive orders in connection with the situation at the southern border.[48]

• On February 16, 2025, Panama received a first U.S. military plane transporting 119 deportees of various nationalities, who will then be repatriated to their own respective countries. Panamanian President Jose Raul Mulino has offered his country as a stopover for aliens expelled from the United States.[49]

Multiple agencies of the U.S. Government are actively pursuing the President's foreign policy goals. For instance, the Department of State has announced multiple discussions with neighboring countries regarding DHS's ability to remove or return illegal aliens,[50] consistent with Secretary of State Rubio's January 22, 2025 announcement that a key priority of the Department of State is to curb mass migration and secure our borders.[51] In that announcement, the Department of State made clear that it "will no longer undertake any activities that facilitate or encourage mass migration" and that "[o]ur diplomatic relations with other countries, particularly in the Western Hemisphere, will prioritize securing America's borders, stopping illegal and destabilizing migration, and negotiating the repatriation of illegal immigrants."[52] Additionally, pursuant to his authority under section 219 of the INA, 8 U.S.C. 1189,[53] Secretary of State

Rubio designated the Venezuelan gang, Tren de Aragua, along with other cartels and gangs, as Foreign Terrorist Organizations.[54]

In other words, in addition to directly fulfilling the President's directive to terminate the CHNV parole programs, this action complements and underscores the Administration's pivot to a foreign policy that prioritizes the United States' interests in a secure border. Regardless of whether the prior Administration saw the CHNV parole programs as a component of a regional migration management strategy, the current Administration is not pursuing that strategy. Rather, as described above, the current Administration has focused its foreign policy attention on other measures to deter and prevent the entry of illegal aliens into the United States and obtain complete operational control of our borders.

These measures will allow DHS to better "achieve the total and efficient enforcement" of U.S. immigration law and, as such, champion a core American interest in accordance with the President's vision for American foreign policy.[55] In short, the continued implementation of the CHNV parole programs no longer accords with the President's stated priorities and foreign policy objectives.

## 4. Other Factors Do Not Counsel in Favor of Maintaining the Programs

The other factors cited by DHS in promulgating the CHNV parole programs also do not counsel in favor of maintaining the programs. For instance:

• DHS predicted that by allowing DHS to vet aliens before they travel to the United States, the programs would enhance national security as compared to high levels of illegal immigration. But as discussed above, these programs are unnecessary to counter high levels of illegal immigration. In addition, and critically, such vetting is inherently limited and, as has been reported publicly, there were significant gaps in the vetting process. In response to these problems, the CHNV parole programs were paused briefly in July 2024 to evaluate the program vulnerabilities.[56]

---

[44] *See* Executive Order 14165, Securing Our Borders, 90 FR 8467 (Jan. 20, 2025) (published Jan. 30, 2025).

[45] The White House, "Readout of President Donald J. Trump's Call with President Nayib Bukele" (Jan. 23, 2025), *https://www.whitehouse.gov/briefings-statements/2025/01/readout-of-president-donald-j-trumps-call-with-president-bukele/*.

[46] The White House, "Statement From the Press Secretary" (Jan. 26, 2025), *https://www.whitehouse.gov/briefings-statements/2025/01/statement-from-the-press-secretary/*.

[47] Meryl Sebastian, *Trump Says India 'Will Do What's Right' on Illegal Immigration* BBC News (Jan. 27, 2025), *https://www.bbc.com/news/articles/cj91z842wlmo*.

[48] *See, e.g.,* Executive Order 14194, Imposing Duties to Address the Situation at Our Southern

Border, 90 FR 9117 (Feb. 1, 2025) (published Feb. 7, 2025); Executive Order 14198, Progress on the Situation at Our Southern Border, 90 FR 9185 (Feb. 3, 2025) (published Feb. 10, 2025); Executive Order 14227, Amendment to Duties to Address the Situation at Our Southern Border, 90 FR 11371 (Mar. 2, 2025) (published Mar. 6, 2025).

[49] *Panama Receives First U.S. Deportation Flight Under Trump Administration,* The Tico Times (Feb. 16, 2025), *https://ticotimes.net/2025/02/16/panama-receives-first-us-deportation-flight-under-trump-administration.*

[50] *See, e.g.,* U.S. Department of State, Readout, Secretary Rubio's Meeting with Salvadoran President Nayib Bukele (Feb. 3, 2025) ("President Bukele agreed to take back all Salvadoran MS–13 gang members who are in the United States unlawfully. He also promised to accept and incarcerate violent illegal immigrants, including members of the Venezuelan Tren de Aragua gang, but also criminal illegal migrants from any country."), *https://www.state.gov/secretary-rubios-meeting-with-salvadoran-president-nayib-bukele/*; U.S. Department of State, Readout, Secretary Rubio's Meeting with Panamanian President Mulino (Feb. 2, 2025) ("Secretary Rubio also emphasized the importance of collaborative efforts to end the hemisphere's illegal migration crisis and thanked President Mulino for his support of a joint repatriation program, which has reduced illegal migration through the Darien Gap."), *https://www.state.gov/secretary-rubios-meeting-with-panamanian-president-mulino/*.

[51] U.S. Department of State, Press Statement, Priorities and Mission of the Second Trump Administration's Department of State (Jan. 22, 2025).

[52] *Id.*

[53] *See* Executive Order 14157, Designating Cartels and Other Organizations as Foreign Terrorist Organizations and Specially Designated Global

Terrorists, 90 FR 8439 (Jan. 20, 2025) (published Jan. 29, 2025).

[54] Foreign Terrorist Organization Designations of Tren de Aragua, Mara Salvatrucha, Cartel de Sinaloa, Cartel de Jallisco Nueva Generacion, Carteles Unidos, Cartel del Noreste, Cartel del Golfo, and La Nueva Familia Michoacana, 90 FR 10030 (Feb. 20, 2025).

[55] *See* Executive Order 14159, Protecting the American People Against Invasion, 90 FR 8443 (Jan. 20, 2025) (published Jan. 29, 2025).

[56] Stephen Dinan, *'Parole' program put on hold amid massive fraud; Homeland Security promises to set up safeguards,* Wash. Times (Aug. 2, 2024),

• DHS also initially reasoned that the CHNV parole programs would disincentivize a dangerous journey that puts aliens' lives and safety at risk and enriches smuggling networks. As noted above, however, although these programs were accompanied by a significant decrease in CHNV encounters between southwest border POEs, they were also accompanied by a significant increase in CHNV encounters at southwest land border POEs. This indicates that CHNV nationals continued to engage in dangerous migration to the southwest border, even if the overall level of migration to the southwest border dropped somewhat and CHNV aliens did not cross between POEs with the same frequency. And, as also noted above, the U.S. Government has implemented other policies that have more effectively deterred illegal immigration.

• Another stated goal of the CHNV parole programs was to reduce the burden on DHS personnel and resources that would otherwise be required for detention, monitoring, processing, and removal. However, as noted above, significant resource burdens persisted even after the programs' implementation, including with respect to encounters at and between POEs. Program implementation itself occupied significant resources. For instance, there have been approximately 2,970,000 Forms I–134 and I–134A filed with USCIS since October 2022,[57] which includes 2,140,000 pending review, 642,410 confirmed by USCIS, and 181,820 non-confirmed by USCIS.[58] Further, DHS needed additional resources to counter the fraud, national

security concerns, and public safety concerns discussed above. In addition, due to the originating location of beneficiaries of the CHNV parole programs and available travel routes via commercial airlines, over 80 percent of the aliens who were issued an ATA under the CHNV parole programs flew to Florida POEs. The unexpected increase in approximately 25,000 inadmissible aliens per month resulted in CBP experiencing a decrease in enforcement operations and an increase in wait times, overtime expenditures, and other needs at Florida POEs. Processing an alien requesting parole under the CHNV parole programs requires secondary processing and enrollment of biometrics, resulting in a more extensive and prolonged time in CBP facilities.

## IV. Reliance Interests of Prospective Supporters and Parolees

In deciding whether and how to terminate the CHNV parole programs, DHS has considered potential reliance interests of a range of potential supporters and beneficiaries of these programs. At the outset, however, DHS observes that the temporary and discretionary nature of the programs indicate that reliance on the continued existence of the CHNV parole programs would be unwarranted. The notices establishing the CHNV parole programs expressly advise the public that, "[t]he Secretary retains the sole discretion to terminate the [Parole Program] . . . at any point"[59] and that "DHS may terminate parole in its discretion at any time."[60] The CHNV parole programs were "being implemented as a matter of the Secretary's discretion. [They are] not intended to and [do] not create any rights, substantive or procedural, enforceable by any party in any matter, civil or criminal."[61]

In addition, DHS observes that on October 4, 2024, the prior administration announced that there was no re-parole process under CHNV, informing participants that, "if you have not sought a lawful status or period of authorized stay, you will need to leave the United States before your authorized parole period expires, or you may be placed in removal proceedings after your period of parole expires."[62] Finally, as noted above, Executive Order 14165 directs the Secretary to terminate

the CHNV parole programs consistent with law.

Notwithstanding that DHS made very clear that reliance on these programs would be inappropriate, that DHS made clear months ago that there would be no "re-parole" process under the CHNV parole programs, and the additional notice provided in Executive Order 14165, DHS has analyzed the effects of this action on any potential reliance interests in an abundance of caution.[63]

### 1. Reliance Interests of Potential Supporters and Beneficiaries

DHS first considered the potential reliance interests of those U.S.-based supporters who had intended to file or have filed a Form I–134A in support of a potential parolee. In general, the costs associated with such filings are minimal. The potential supporter may have incurred the opportunity cost of completing Form I–134A, estimated at 2.60 hours per response, and a few potential supporters who submitted Form I–134A may have submitted their biometrics (photograph and fingerprints) at a USCIS Application Support Center for biometric screening and vetting by USCIS as part of the review of their Form I–134A.[64]

At this early stage in the process, the costs incurred by a potential beneficiary are also minimal. Once a supporter is confirmed, the potential beneficiary receives instructions to create a USCIS online account, confirm their biographic information in their online account, and attest to meeting the eligibility requirements, including public health requirements, and certain vaccination requirements. It is also possible that a beneficiary who has received instructions to create an online account may have obtained vaccinations in anticipation of the required attestation. After confirming their biographic information, the beneficiary received instructions to access the CBP One mobile application to enter biographic information and submit a live photo. CBP One was used to collect the beneficiary's biographic information and photo and was an additional step in the process prior to the alien being authorized to travel to the United States to seek parole. The estimated time to complete the CBP One part of the

---

*https://www.washingtontimes.com/news/2024/aug/2/dhs-suspends-parole-program-amid-rampant-fraud/.*

[57] Under the parole program for Venezuelans, a U.S.-based supporter would initiate consideration for parole under the program by filing Form I–134, *Declaration of Financial Support* (Online), along with supporting evidence. 87 FR at 63515. In January 2023, when DHS expanded the programs to cover Cubans, Haitians, and Nicaraguans and their immediate family members as well, DHS announced that it would instead begin accepting the Form I–134A *Online Request to be a Supporter and Declaration of Financial Support*, along with supporting evidence, to initiate consideration for parole under all four programs. *See, e.g.,* 88 FR at 1279. Neither form could be filed on paper by mail and neither form required the payment of a fee.

[58] OHSS analysis of USCIS Form I–134/Form I–134A data as of January 22, 2025. The Venezuelan parole program started on October 18, 2022, and the Cuba, Haiti, Nicaragua parole programs started January 6, 2023. "Confirmed" in this context meant that USCIS had determined that the supporter was eligible to be a supporter and that they demonstrated the ability to financially support the beneficiary, while "non-confirmed" meant that USCIS had determined that the potential supporter had been determined to be ineligible to be a supporter or failed to demonstrate ability to financially support the beneficiary.

[59] *E.g.,* 88 FR at 1268 (Cuba).

[60] *E.g.,* 88 FR at 1272 (Cuba).

[61] *E.g.,* 88 FR at 1277 (Cuba).

[62] Camilo Montoya-Galvez, *U.S. Won't Extend Legal Status For 530,000 Migrants Who Arrived Under Biden Program,* CBS News (Oct. 4, 2024), *https://www.cbsnews.com/news/venezuelans-legal-status-chnv-program/.*

[63] *See* USCIS, Frequently Asked Questions About the Processes for Cubans, Haitians, Nicaraguans, and Venezuelans (Oct. 4, 2024), available at *https://web.archive.org/web/20250104043158/https://www.uscis.gov/humanitarian/frequently-asked-questions-about-the-processes-for-cubans-haitians-nicaraguans-and-venezuelans.*

[64] Biometrics submission is estimated to require 1.17 hours per respondent. 89 FR 104557 (Dec. 23, 2024).

ATA process was 10 minutes. *See* 88 FR 62810, 62812 (Sept. 13, 2023).

In general, these costs are not significant and pale in comparison to the U.S. Government's sovereign interest in determining who is paroled into the United States. DHS intends to issue a notice of non-confirmation for all remaining pending Forms I–134A. DHS will also rescind the confirmation of all Form I–134A that were previously confirmed and issue updated notices of non-confirmation for any potential beneficiaries who have not yet traveled to a POE to seek parole. Potential beneficiaries will no longer be able to execute any attestations or seek ATA through a USCIS online account based on a previously confirmed Form I–134A.

### 2. Reliance Interests of Potential Beneficiaries With Approved ATAs and Their Supporters

A beneficiary with an approved ATA may travel to the United States to seek a discretionary grant of parole. Authorization is generally valid for 90 days, and beneficiaries are responsible for securing their own travel, at no cost to the U.S. government, via commercial air to the United States.[65] DHS intends to cancel all pending applications for advance authorizations to travel to the United States to seek a discretionary grant of parole under the CHNV parole programs. There are no currently approved ATAs upon which an alien may travel under the CHNV parole programs.[66]

A beneficiary whose application for an ATA is cancelled may have, for example, provided notice to their landlord, sold property, and/or resigned from employment. In addition, a confirmed Form I–134A supporter may have incurred expenses, for example, to secure living quarters or furniture for the beneficiary in anticipation of their process being completed through parole into the United States.

DHS recognizes that the potential costs incurred by supporters and potential beneficiaries at this point could be viewed as significant. Nevertheless, as explained above, supporters and potential beneficiaries were apprised that DHS could terminate the programs at any point. Moreover, the notices for each parole program made it clear that the approval of an

ATA or grant of parole at a POE was entirely discretionary. *See, e.g.,* 88 FR 1243, 1252 (noting that a potential beneficiary may be "ineligible for advance authorization to travel to the United States as well as parole under this process" for a range of reasons, including if the alien "fails to pass national security and public safety vetting or is otherwise deemed not to merit a favorable exercise of discretion"); 88 FR at 1253 ("Approval of advance authorization to travel does not guarantee parole into the United States. Whether to parole the [aliens] is a discretionary determination made by CBP at the POE at the time the [alien] arrives at the interior POE"); 88 FR at 1253 ("[Aliens] who . . . otherwise do not warrant parole pursuant to [section 212(d)(5)(A) of the INA], and as a matter of discretion upon inspection, . . . may be referred to ICE for detention."). While the termination of the CHNV parole programs as provided in this notice may result in costs incurred by both the supporter and potential beneficiary who have prepared to travel to the United States, those parties chose to incur such expenses knowing that completion of the process was never guaranteed by the terms of the program, and the termination of the programs was possible at any time. DHS has concluded that any such reliance interests are outweighed by other interests and policy concerns as explained in this notice.[67]

### V. Effect of Termination on Current Parolees Under the CHNV Parole Programs and Corresponding Reliance Interests

The notices establishing the CHNV parole programs explain that parole is not an admission of the alien to the United States, and a parolee remains an applicant for admission during the period of parole in the United States. *See also* INA 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A). DHS may set the duration of the parole based on the purpose for

granting the parole request and may impose reasonable conditions on parole. *Id.* Aliens may be granted advance authorization to travel to the United States to seek parole. *See* 8 CFR 212.5(f). The Secretary may terminate parole in her discretion at any time when, in her opinion, neither urgent humanitarian reasons nor significant public benefit warrants the continued presence of the alien in the United States, and parole shall be terminated when the purpose for which it was authorized has been accomplished. *See* 8 CFR 212.5(e). And, finally, aliens who are paroled into the United States, including those paroled through the CHNV parole programs, may generally apply for and be granted employment authorization under the (c)(11) employment eligibility category. *See* 8 CFR 274a.12(c)(11).

As noted above, between October 19, 2022, and January 22, 2025, approximately 532,000 inadmissible aliens received parole into the United States pursuant to the CHNV parole programs. DHS has determined that as one aspect of the termination of the CHNV parole programs, consistent with the Secretary's statutory and regulatory authority,[68] the parole of aliens who have been paroled into the United States under the CHNV parole programs and whose parole has not already expired by April 24, 2025 will terminate on that date unless the Secretary makes an individual determination to the contrary.

Following this termination, and consistent with the direction in Executive Order 14165, DHS generally intends to remove promptly aliens who entered the United States under the CHNV parole programs who do not depart the United States before their parole termination date and do not have any lawful basis to remain in the United States. DHS retains its discretion to commence enforcement action against any alien at any time, including during the 30-day waiting period created by this notice. Parolees without a lawful basis to remain in the United States following the termination of the CHNV programs must depart the United States

---

[65] Authorization to travel does not guarantee parole. Parole of the individual is a discretionary determination made by CBP when the individual arrives at the interior POE. *See, e.g.,* 88 FR 1255, 1264 (Jan. 9, 2023).

[66] OHSS analysis of advance travel authorization data provided by CBP PSPD and valid as of February 27, 2025.

[67] DHS has considered the alternative of allowing any approved ATAs to remain in place until they were used or expired by their terms. Even if there were currently approved ATAs, DHS would not pursue this route, because DHS would not wish to incentivize aliens flying to the United States to seek parole under policies that DHS no longer supports or appear to encourage them to incur additional expenses based on a belief that they will be paroled upon arrival at the POE. Such an approach would risk exacerbating the problems created by the CHNV parole programs. As is always the case, however, CBP may consider a request for parole under DHS's existing parole authority, on a case-by-case basis for urgent humanitarian reasons or significant public benefit. If parole is not granted, the alien may be returned to their home country at U.S. Government expense or processed for another appropriate disposition under the INA.

[68] *See* INA 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A) ("when the purposes of such parole shall, in the opinion of the Secretary of Homeland Security, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States"); 8 CFR 212.5(e)(2)(i) ("[U]pon accomplishment of the purpose for which parole was authorized or when in the opinion of one of the officials listed in paragraph (a) of this section, neither humanitarian reasons nor public benefit warrants the continued presence of the alien in the United States, parole *shall be terminated upon written notice to the alien. . . .*" (emphasis added)).

before their parole termination date. Aliens departing the United States via land border POEs should report their departure once outside the United States via the CBP Home mobile app. Aliens should visit *https:// i94.cbp.dhs.gov/home* for more information about voluntarily reporting their departure.

In implementing this approach, DHS intends to prioritize for removal those who (1) have not, prior to the publication of this notice, properly filed an immigration benefit request, with appropriate fee (or fee waiver request, if available) to obtain a lawful basis to remain in the United States (*e.g.,* adjustment of status, asylum, Temporary Protected Status, or T or U nonimmigrant status) and (2) are not the beneficiary of an immigration benefit request properly filed by someone else on their behalf (*e.g.,* petition for alien relative, fiancé petition, petition for immigrant employee), with appropriate fee (or fee waiver request, if available). Aliens who have since obtained a lawful immigration status or other basis that permits them to remain in the United States are not required to depart the United States pursuant to this notice.

Parole-based employment authorization under 8 CFR 274a.12(c)(11) automatically terminates upon (1) the expiration date specified on the employment authorization document, (2) DHS's institution of removal proceedings against the alien, or (3) a grant of voluntary departure. *See* 8 CFR 274a.14(a). Such employment authorization may also be revoked on notice consistent with the procedures in 8 CFR 274a.14(b). DHS has determined that, after termination of the parole, the condition upon which the employment authorization was granted no longer exists and thus DHS intends to revoke parole-based employment authorization consistent with those revocation on notice procedures. 8 CFR 274a.14(b).

DHS has considered the impacts on parolees who are affected by this discretionary decision to terminate their parole prior to the expiration of the parole period. DHS recognizes the costs incurred by some aliens who have been granted parole and traveled to the United States.[69] Parolees will have departed their native country; traveled to the United States; obtained housing, employment authorization, and means of transportation; and perhaps commenced the process of building connections to the community where they reside.

However, any assessment of the reliance interests of CHNV parolees must account for CHNV parolees' knowledge at the outset that (1) the Secretary retained the discretion to terminate the parole programs at any point in time, and to terminate any grants of parole at any time when, in her opinion, the purposes of such parole have been served[70]; and that (2) the initial term of parole would be limited to a maximum of two years. These clear, limiting conditions of the parole programs served to attenuate any long-term expectations and interests amongst CHNV parolees. Accordingly, DHS has taken these limiting conditions, along with CHNV parolees' knowledge of them, into consideration when weighing their reliance interests.[71]

DHS has concluded that the potential reliance interests among aliens paroled into the United States under the CHNV parole programs do not outweigh the U.S. government's strong interest in promptly removing parolees when the basis for the underlying program no longer exists. To effectuate their prompt removal, the U.S. government may in its discretion initiate expedited removal proceedings where appropriate. Expedited removal is available only when an alien has not been continuously present in the United States for at least the two years preceding the date of the inadmissibility determination. INA 235(b)(1)(iii)(II), 8 U.S.C. 1225(b)(1)(iii)(II); 8 CFR 235.3.[72] If DHS were to allow the CHNV parolee population to remain for the full duration of their two-year parole, DHS would be compelled to place a greater proportion of this population in section 240 removal proceedings to effectuate their removal, further straining the already over-burdened immigration court system discussed in Section III.1.

To the extent that current parolees have obtained housing and employment authorization, or created new ties within the community while in the United States, DHS notes these interests are qualitatively less than any reliance interests that might be attributed to the Deferred Action for Childhood Arrival (DACA) recipient population consistent with the discussion in *DHS* v. *Regents of the Univ. of Cal.*[73] In *Regents,* the Supreme Court reviewed whether DHS had appropriately considered the reliance interests of DACA recipients when rescinding DACA.[74] The reliance interests of DACA recipients, all of whom had been present in the United States for far longer than two years, included their enrollment in degree programs, the beginning of their careers, the starting of businesses, and the purchase of homes.[75] As the Court noted, these interests, though noteworthy, were not "necessarily dispositive," and "DHS may determine, in the particular context before it, that other interests and policy concerns [in rescinding DACA] outweigh any reliance interests."[76] For the purposes of the actions announced in this notice, DHS notes the reliance interests of those paroled under the CHNV parole programs are far less than the population in *Regents.* Further, as stated above, the reliance interests under the CHNV parole programs must take into account the express, discretionary terms of the parole program. Accordingly, the reliance interests are outweighed by the U.S. government's strong interest in promptly returning parolees when the basis for the underlying parole no longer exists.

Third parties, including employers, landlords, and others, may also have indirect reliance interests in the availability of individual CHNV parolees, but even if DHS had allowed the grants of parole to expire at the end of their designated terms, such third parties would have experienced the effects of such expiration. By providing 30 days' notice, DHS balances the benefits of a wind-down period for aliens and third parties with the exigency of promptly enforcing the law against those aliens lacking a lawful basis to remain in the United States. For the same reasons set forth above, DHS finds the U.S. government's interest in terminating these grants of parole outweigh any reliance interest of third parties.

DHS has considered the alternative of permitting CHNV participants' parole to remain in effect until the natural expiration of the parole, as DHS has in

---

[69] *See Encino Motorcars, LLC* v. *Navarro,* 579 U.S. 211, 221–22 (2016) ("Agencies are free to change their existing policies as long as they provide a reasoned explanation for the change. . . . But the agency must at least display awareness that it is changing position and show that there are good reasons for the new policy. In explaining its changed position, an agency must also be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." (cleaned up)).

[70] As explained throughout this notice, the Secretary has determined that the purposes of parole under the CHNV programs have been served because, *inter alia,* the CHNV parole programs are unnecessary to achieve border security goals; the domestic impact of the CHNV parole programs was too great; and the programs are inconsistent with this Administration's foreign policy goals.

[71] *See DHS* v. *Regents of the Univ. of Cal.,* 591 U.S. 1, 32 (2020) (noting that DHS could conclude that reliance is "unjustified in light of the express limitations" in relevant immigration policy).

[72] *See* Designating Aliens for Expedited Removal, 90 FR 8139 (Jan. 24, 2025).

[73] 591 U.S. 1 (2020).

[74] *Id.* at 31.

[75] *Id.*

[76] *Id.*

the past done with some parole terminations. *See, e.g.,* 82 FR 38926, 38927 (Aug. 16, 2017). However, DHS has opted to not pursue this route. As explained above, this would essentially foreclose DHS's ability to expeditiously remove those CHNV parolees with no lawful basis to remain in the United States. Under this alternative, CHNV parolees may begin to accrue more than two years of continuous presence in the United States, such that DHS would have to initiate section 240 removal proceedings to effectuate their removal. *See* INA 235(b)(1)(iii)(II), 8 U.S.C. 1235(b)(1)(iii)(II). As a result, the already overburdened immigration court system would be further taxed with adjudicating the section 240 removal proceedings for the pertinent CHNV beneficiary population, a result DHS finds unacceptable.

DHS has also considered the alternative of a longer than 30-day wind-down period. After due consideration, DHS has also decided not to pursue this option. As discussed above, DHS has a strong interest in preserving the ability to initiate expedited removal proceedings to the maximum extent possible for the appropriate CHNV population to prevent further straining of the over-burdened immigration court system. Any lengthening of the wind-down period will increase the likelihood that additional CHNV parolees are no longer subject to expedited removal.[77] DHS has determined that a 30-day wind-down period provides affected parties sufficient notice while also preserving DHS's ability to enforce the law promptly against those CHNV parolees lacking a lawful basis to remain in the United States. Accordingly, DHS is opting not to increase the wind-down period to more than 30 days.

## VI. Federal Register Notice as Constructive Notice

This **Federal Register** notice serves as notice of the termination of the CHNV parole programs and satisfies the requirement that DHS provide written notice upon the termination of parole. *See* 8 CFR 212.5(e)(2)(i) (". . . Upon accomplishment of the purpose for which parole was authorized or when in the opinion of one of the officials listed in paragraph (a) of this section, neither humanitarian reasons nor public benefit warrants the continued presence of the alien in the United States, *parole shall*

*be terminated upon written notice to the alien. . . .*" (emphasis added)). For the reasons set forth above, the Secretary has concluded that neither urgent humanitarian reasons nor significant public benefit warrants the continued presence of aliens paroled under the CHNV programs and the purposes of such parole therefore have been served. This notice accordingly serves as written notice to CHNV parolees.

DHS has determined that publication of this notice in the **Federal Register** is legally sufficient notice to all interested or affected persons regardless of actual knowledge or hardship resulting from ignorance. *See* 44 U.S.C. 1507; *Friends of Sierra R.R., Inc.* v. *I.C.C.,* 881 F.2d 663, 667–68 (9th Cir. 1989); *see also Fed. Crop Ins. Corp.* v. *Merrill,* 332 U.S. 380, 385 (1947) ("Congress has provided that the appearance of rules and regulations in the **Federal Register** gives legal notice of their contents.").

DHS finds **Federal Register** publication of the decision to terminate existing grants of parole to be the most practicable approach in light of the size of the affected population and potential noncompliance with change-of-address reporting requirements. *See* 8 U.S.C. 1305; 8 CFR 265.1. Because all CHNV parolees should have a USCIS online account and all processing under these parole programs took place electronically, DHS will also provide individual notice to each parolee through their USCIS online account. *Cf., e.g.,* 8 CFR 103.2(b)(19)(ii)(B) ("For applications or petitions filed electronically, USCIS will notify both the applicant or petitioner and the authorized attorney or accredited representative electronically of any notices or decisions. . . ."). This notice, and the individual notice through the USCIS online account, each independently constitute "written notice to the alien" under 8 CFR 212.5(e)(2)(i).

## VII. Administrative Procedure Act

This notice is exempt from notice-and-comment rulemaking requirements because DHS is merely adopting a general statement of policy, 5 U.S.C. 553(b)(A). *i.e.,* a "statement [ ] issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power." *Lincoln* v. *Vigil,* 508 U.S. 182, 197 (1993) (quoting *Chrysler Corp.* v. *Brown,* 441 U.S. 281, 302 n.31 (1979)). By terminating the CHNV parole programs—which themselves constituted general statements of policy, *see, e.g.,* 88 FR at 1277—DHS is explaining how it will implement the Secretary's broad

discretion for exercising her narrow parole authority. Accordingly, this notice of termination constitutes a general statement of policy and is exempt from the notice-and-comment rulemaking requirements under the Administrative Procedure Act (APA).[78]

When an agency merely explains how it will enforce a statute or regulation by describing how it will exercise its broad enforcement discretion, as was the case with the CHNV parole programs, it is a general statement of policy. *See Lincoln,* 508 U.S. at 197. Section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A) provides the Secretary broad discretion in exercising the parole authority, with parole decisions made by the Secretary of Homeland Security "in [her] discretion." The CHNV parole programs therefore were general statements of policy.

Because the CHNV parole programs constitute general statements of policy and were exempt from notice-and-comment rulemaking requirements under the APA, their termination likewise is a mere general statement of policy exempt from the notice and comment rulemaking requirements. Through the termination of the CHNV parole programs and for the reasons given, DHS is merely making a change to a previous policy statement on the exercise of its discretionary parole authority.[79] Accordingly, there is no requirement to publish notice prior to the termination's effective date, and it is therefore amenable to immediate issuance and implementation.[80]

Even if the changes were considered to be a legislative rule that would normally be subject to notice and comment rulemaking and a delayed effective date, these changes—like the implementation of the parole programs themselves[81]—pertain to a foreign affairs function of the United States, and are exempt from such procedural requirements on that basis.[82] Consistent

---

[77] According to OHSS analysis of data provided by USCIS, for each month from March 2025 through September 2026, there are thousands of CHNV parolees who will become ineligible for expedited removal upon the natural expiration of their two-year parole.

[78] *Cf. Perez* v. *Mortg. Bankers Ass'n,* 575 U.S. 92, 101 ("Because an agency is not required to use notice-and-comment procedures to issue an initial interpretive rule, it is also not required to use those procedures when it amends or repeals that interpretive rule.").

[79] *See Encino Motorcars,* 579 U.S. at 221 ("Agencies are free to change their existing policies as long as they provide a reasoned explanation for the change.").

[80] *See* 5 U.S.C. 553(d)(2).

[81] *See* 5 U.S.C. 553(a)(1); 88 FR at 1277; 88 FR at 1253; 88 FR at 1264; 87 FR at 63516 (as modified by 88 FR 1279).

[82] *See Am. Ass'n of Exps. & Imps.-Textile & Apparel Grp.* v. *United States,* 751 F.2d 1239, 1249 (Fed. Cir. 1985) (noting that foreign affairs exception covers agency actions "linked intimately with the Government's overall political agenda concerning relations with another country"); *Yassini* v. *Crosland,* 618 F.2d 1356, 1361 (9th Cir.

with the Secretary of State's February 21, 2025 determination that "all efforts, conducted by any agency of the federal government, to control the status, entry, and exit of people, and the transfer of goods, services, data, technology, and other items across the borders of the United States, constitute a foreign affairs function of the United States[,]" DHS finds that these changes are connected to the entry and exit of people and thereby constitute a foreign affairs function.[83]

Moreover, although the APA does not require the agency to show that such procedures may result in "definitely undesirable international consequences" to invoke the foreign affairs exemption to notice-and-comment rulemaking, some courts have required such a showing,[84] and DHS can make one here. Delaying rescission of the CHNV parole programs to undertake rulemaking would undermine the U.S. Government's ability to conduct foreign policy, including the ability to shift governmental policies and engage in delicate and time-sensitive negotiations following a change in Administration. It is the view of the United States that the termination of these parole programs will fulfill important foreign policy goals that the President has repeatedly articulated and urged DHS to implement swiftly; any delay in achieving such goals is definitely undesirable.

As explained in Section III.3 of this notice, the CHNV parole programs were implemented as an integral part of negotiations with regional neighbors, including Mexico, to address unlawful migratory flows challenging immigration systems throughout the region. For instance, in announcing the Venezuela parole program, DHS explained that even if the program were considered to be a legislative rule that would normally be subject to requirements for notice-and-comment rulemaking and a delayed effective date, the program would be exempt from such requirements because it involves a foreign affairs function of the United

States.[85] DHS cautioned that it "will not implement the new parole process without the ability to return Venezuelan nationals who enter [unlawfully] to Mexico, and the United States' ability to execute this process thus requires the GOM's willingness to accept into Mexico those who bypass this new process and enter the United States [unlawfully] between POEs." DHS explained that "initiating and managing this process will require careful, deliberate, and regular assessment of the GOM's responses to this unilateral U.S. action and ongoing, sensitive diplomatic engagements."[86] DHS noted that the program was "not only responsive to the interests of key foreign partners—and necessary for addressing migration issues requiring coordination between two or more governments—[but] also fully aligned with larger and important foreign policy objectives of [the prior] Administration and fits within a web of carefully negotiated actions by multiple governments."[87] When implementing the Cuba, Haiti, and Nicaragua parole programs, DHS invoked the foreign affairs exemption on similar grounds.[88]

Yet, as also discussed in Section III.3 of this notice, U.S. foreign policy has changed in critical respects, and DHS must expeditiously align its policies to that change. Whereas implementation of the CHNV parole programs was contingent upon the GOM making an independent decision to accept the return or removal of CHNV nationals who migrated illegally, the U.S. Government is pursuing a range of other policy initiatives that would allow DHS to return or remove CHNV nationals, including re-implementation of the Migrant Protection Protocols and improved cooperation and coordination with other countries regarding return or removal of their or third country nationals.

In the context of these complex and time-sensitive diplomatic negotiations, it would be counterproductive to retain vestiges of a foreign policy approach that the United States is no longer pursuing, even temporarily, to allow for a period of public comment about matters that implicate our foreign affairs and are ultimately within the Executive's discretion. Continuing to administer the CHNV parole programs pending notice-and-comment would adversely affect the United States' ability to pivot rapidly to a more effective approach in these negotiations

and may result in an even greater number of CHNV nationals requiring removal or return. Further delay in pursuing these more effective approaches would be particularly pernicious in the context of ongoing negotiations, as discussed in section III.3 of this notice, with countries to accept the removal of illegal aliens, including inadmissible CHNV nationals.

Finally, and for the same reasons that a delay in implementing this action would result in undesirable international consequences, even if notice-and-comment and a delayed effective date were required, DHS has determined that the good cause exemptions to notice-and-comment rulemaking and the 30-day effective date apply and that the delay associated with implementing these changes through notice-and-comment rulemaking or delaying the effective date would be impracticable and contrary to the public interest. Any delay for such procedures would harm the U.S. Government's ability to timely implement the current Administration's foreign policy approach and exacerbate the challenges associated with the CHNV parole programs, as explained throughout this notice, contrary to the President's direction to protect the American people against invasion and to secure the border. Such an outcome would also be inconsistent with the fundamentally discretionary nature of DHS's parole authority.[89]

## VIII. Severability

DHS intends for the decisions announced in this notice to be severable from each other and to be given effect to the maximum extent possible, such that if a court holds that any provision is invalid or unenforceable—whether in their entirety or as to a particular person or circumstance—the other provisions will remain in effect as to any other person or circumstance.[90] The various decisions in this notice are designed to function sensibly without the others, and DHS intends for them to be severable so that each can operate independently.

---

1980) (because an immigration directive "was implementing the President's foreign policy," the action "fell within the foreign affairs function and good cause exceptions to the notice and comment requirements of the APA").

[83] U.S. Secretary of State, *Determination: Foreign Affairs Functions of the United States*, 90 FR 12200 (Feb. 21, 2025) (published Mar. 14, 2025). The Secretary of State's determination references and implements numerous Presidential actions reflecting the President's top foreign policy priorities, including Executive Order 14165. As noted above, Executive Order 14165 specifically directs the Secretary of Homeland Security to, consistent with applicable law, take all appropriate action to terminate the CHNV parole programs.

[84] *See, e.g., Rajah* v. *Mukasey*, 544 F.3d 427, 437 (2d Cir. 2008).

[85] *See* 87 FR at 63516.

[86] *Id.*

[87] *Id.*

[88] *See* 88 FR at 1277 (Cuba), 88 FR at 1253–54 (Haiti), 88 FR at 1265 (Nicaragua).

[89] *See* 5 U.S.C. 553(b)(B), 553(d)(3); *see Util. Solid Waste Activities Grp.* v. *EPA*, 236 F.3d 749, 754–55 (D.C. Cir. 2001) ("a situation is 'impracticable' when an agency finds that due and timely execution of its functions would be impeded by the notice otherwise required"); *see also* Executive Order 14159, 90 FR 8443 (Jan. 20, 2025) (published Jan. 29, 2025).

[90] Courts have uniformly held that the APA, 5 U.S.C. 706(2), authorizes courts to sever and set aside "only the offending parts of the rule." *Carlson* v. *Postal Regulatory Comm'n*, 938 F.3d 337, 351 (D.C. Cir. 2019); *see, e.g., K Mart Corp.* v. *Cartier, Inc.*, 486 U.S. 281, 294 (1988).

For example, DHS would intend that the termination of the CHNV parole programs be implemented immediately, even if the termination of ATAs or existing grants of parole were to be enjoined in whole or in part. This approach ensures that DHS is able to implement its policy choices, and the President's direction in Executive Order 14165, to the maximum extent possible.

## IX. Paperwork Reduction Act (PRA)

This rule does not promulgate new or revise existing "collection[s] of information" as that term is defined under the Paperwork Reduction Act of 1995, Public Law 104–13, 109 Stat. 163, 44 U.S.C. chapter 35, and its implementing regulations, 5 CFR part 1320.

**Kristi Noem,**

*Secretary of Homeland Security.*

[FR Doc. 2025–05128 Filed 3–21–25; 4:15 pm]

**BILLING CODE 9110–9M–P**

---

## DEPARTMENT OF HOMELAND SECURITY

### Finding of Mass Influx of Aliens

On January 23, 2025, the Acting Secretary of Homeland Security issued a Finding of Mass Influx of Aliens. This finding went into effect immediately (on January 23, 2025) and remained in effect for 60 days (until March 23, 2025). The Acting Secretary's finding published in the **Federal Register** on January 23, 2025. *See* 90 FR 8,399. Upon review of the current situation at the border, I am extending that finding.

The Immigration and Nationality Act (INA), at 8 U.S.C. 1103(a), provides an expansive grant of authority, stating that in the event of a mass influx of aliens off the coast of the United States or a land border, the Secretary may authorize a State or local law enforcement officer, with the consent of the officer's superiors, to perform duties of immigration officers under the INA. In turn, section 65.83 of Title 28 of the Code of Federal Regulations allows the Secretary [1] to "request assistance from a

---

[1] Although the regulations reference the "Attorney General," Congress has, since the publication of these regulations, transferred the authority and responsibility for administering and enforcing the immigration laws to the Secretary of Homeland Security. See Homeland Security Act of 2002 471, 6 U.S.C. 291 (abolishing the former Immigration and Naturalization Service); id. S 441, 6 U.S.C. 251 (transferring immigration enforcement functions from the Department of Justice to the Department of Homeland Security); Immigration and Nationality Act 103(a)(1), 8 U.S.C. 1103(a)(1) ("the Secretary of Homeland Security shall be charged with the administration and enforcement of this chapter and all other laws relating to the immigration and naturalization of aliens.")

---

State or local government in the administration of the immigration laws of the United States" under certain specified circumstances. Among those circumstances are when "[t]he [Secretary] determines that there exist circumstances involving the administration of the immigration laws of the United States that endanger the lives, property, safety, or welfare of the residents of a State or locality." 28 CFR 65.83(b).

In making such a determination, the Secretary may also determine that there is an "immigration emergency." The regulations define an immigration emergency as "an actual or imminent mass influx of aliens which either is of such magnitude or exhibits such other characteristics that effective administration of the immigration laws of the United States is beyond the existing capabilities of [the Department of Homeland Security (DHS)] in the affected area or areas." 28 CFR 65.83(d)(1) (using identical language as 8 U.S.C. 1103(a)(10)).

Such a determination is based on "the factors set forth in the definitions contained in" 28 CFR 65.81. Characteristics of an influx of aliens, other than magnitude, which may be considered in determining whether an immigration emergency exists include: the likelihood of continued growth in the magnitude of the influx; an apparent connection between the influx and increases in criminal activity; the actual or imminent imposition of unusual and overwhelming demands on law enforcement agencies; and other similar characteristics.

Upon review of the current data, I have determined that there continues to exist circumstances involving the administration of the immigration laws of the United States that endanger the lives, property, safety, or welfare of the residents of all 50 States and that an actual or imminent mass influx of aliens is arriving at the southern border of the United States and presents urgent circumstances requiring a continued federal response. I make this finding for the reasons discussed below.

First, over the last four years, our southern border has been overrun. As noted in Proclamation 10,888, *Guaranteeing the States Protection Against Invasion,* "[o]ver the last 4 years, at least 8 million illegal aliens were encountered along the southern border of the United States, and countless millions more evaded detection and illegally entered the United States."

Second, as of March 12, 2025, DHS estimates that there are likely approximately 20,000 aliens across the

Southwest border waiting to illegally enter. While encounters along the southwest border declined in February 2025, historical trends over the past four years strongly indicate that without this finding, aliens are likely to resume crossing the border, and border crossing numbers are likely to rise again before DHS can gain operational control. It is precisely measures, such as this one, that have kept the numbers under control.

Third, as stated in the January 23, 2025 notice, when border crossing numbers are high, much detention capacity is required of U.S. Immigration and Customs Enforcement (ICE). Mandatory detention of aliens apprehended at the border serves important public safety and national security purposes. Aliens who have not completed this process have not been effectively vetted for criminality or national security threats. Current databases do not allow for comprehensive and rapid searching for foreign convictions or other public safety and national security risks. As a result, the fact that the numbers at the border are effectively forcing DHS to engage in catch-and-release practices is eliminating or thwarting legally mandated screenings and it is threatening public safety and national security. This does not account for so-called gotaways, of which there have been millions over the last four years, who are not screened in any manner. Without controls in place at the border to stem the influx, DHS loses its capacity to hold all aliens as required by the INA. 8 U.S.C. 1225(b). As of March 13, 2025, ICE has a detention population of 47,372, with a maximum capacity of 54,500. ICE's facilities are currently at nearly at 87% occupancy, and ICE's priority for detention space is removing aliens with criminal records, public safety risks, and national security risks. Should this finding not be extended, ICE would be hampered in this critical effort.

Fourth, an influx of aliens presents significant concerns with respect to increased criminal activity. Between FY 2017 and 2019, ICE removed 485,930 aliens with criminal convictions or pending criminal charges. However, between FY 2021 and FY 2023, ICE removed 158,931 aliens with criminal convictions or pending criminal charges. Assuming that the crime rate of foreign nationals has remained unchanged over the year, this 67% decrease (in removals) suggests that tens of thousands of criminal aliens remain in the United States. Where there is an increase in criminal aliens, there is

# EXHIBIT G

Coalition for Humane Immigrant Rights, et al. v. Noem et al., 1:25-cv-00872 (JMC)

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| COALITION FOR HUMANE IMMIGRANT RIGHTS, *et. al.*, | Case No.: 1:25-cv-0872 |
| *Plaintiffs*, | **CERTIFICATION OF** |
| v. | **ADMINISTRATIVE RECORD** |
| KRISTI NOEM, in her official capacity as Secretary of Homeland Security, *et. al.*, | |
| *Defendants*. | |

## CERTIFICATION

I, Juliana Blackwell, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury as follows:

1.    I am employed with the U.S. Department of Homeland Security ("DHS"), as the Deputy Executive Secretary. I am responsible for the oversight and management of the Office of the Executive Secretary, which oversees the management of written communications intended for, and originated by, the Secretary and Deputy Secretary of Homeland Security, and the maintenance of official Department records. I have held this position since August 2019.

2.    I certify that, to the best of my knowledge, information, and belief, the documents listed in the accompanying Index and annexed hereto constitute the nonprivileged documents and materials directly or indirectly considered by DHS and that these documents constitute the administrative record the agency considered in issuing the memorandum dated January 23, 2025 regarding the subject: Guidance Regarding How to Exercise Enforcement Discretion.

1

I certify under penalty of perjury that the foregoing is true and correct.

Executed on: <u>December 1, 202</u>5

<u>Juliana Blackwell</u>
Juliana Blackwell

Deputy Executive Secretary

2

**Certified Administrative Record Index:**
**Benjamine C. Huffman Memo, "Guidance Regarding How to Exercise Enforcement Discretion"**
**(Jan. 23, 2025)**

| Starting Bates No. | Citation Details & Title |
|---|---|
| SDOE00000001 | Memorandum from Benjamine C. Huffman, Acting Secretary, to Caleb Vitello, Acting Director, U.S. Immigration and Customs Enforcement, Pete R. Flores Senior Official Performing the Duties of the Commissioner, U.S. Customs and Border Protection, and Jennifer B. Higgins, Acting Director, U.S. Citizenship and Immigration Services, Guidance Regarding How to Exercise Enforcement Discretion (Jan. 23, 2025) |
| SDOE00000003 | Memorandum from Benjamine C. Huffman, Acting Secretary, to Caleb Vitello, Acting Director, U.S. Immigration and Customs Enforcement, Pete R. Flores, Senior Official Performing the Duties of the Commissioner, U.S. Customs and Border Protection, and Jennifer B. Higgins, Acting Director, U.S. Citizenship and Immigration Services, Exercising Appropriate Discretion Under Parole Authority (Jan. 20, 2025) |
| SDOE00000005 | Bureau of Population, Refugees, and Migration; Central American Minors Program, 88 Fed. Reg. 21694 (Apr. 11, 2023) |
| SDOE00000016 | Designating Aliens for Expedited Removal, 90 Fed. Reg. 8139 (Jan. 24, 2025) |
| SDOE00000018 | EO 14159, Protecting the American People Against Invasion, 90 Fed. Reg. 8443 (Jan. 29, 2025) |
| SDOE00000024 | EO 14165, Securing Our Borders, 90 Fed. Reg. 8467 (Jan. 30, 2025) |
| SDOE00000027 | Implementation of a Change to the Parole Process for Cubans, 88 Fed. Reg. 26329 (Apr. 28, 2023); |
| SDOE00000030 | Implementation of a Change to the Parole Process for Haitians, 88 Fed. Reg. 26327 (Apr. 28, 2023); |
| SDOE00000033 | Implementation of a Parole Process for Cubans, 88 Fed. Reg. 1266 (Jan. 9, 2023) |
| SDOE00000047 | Implementation of a Parole Process for Haitians, 88 Fed. Reg. 1243 (Jan. 9, 2023); |
| SDOE00000060 | Implementation of a Parole Process for Nicaraguans, 88 Fed. Reg. 1255 (Jan. 9, 2023); |
| SDOE00000072 | Implementation of a Parole Process for Venezuelans, 87 Fed. Reg. 63507 (Oct. 19, 2022); |
| SDOE00000083 | Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 86 Fed. Reg. 46906 (Aug. 20, 2021) |
| SDOE00000128 | Memorandum from Raul L. Ortiz, Chief, U.S. Border Patrol, to All Chief Patrol Agents and Deputy Chief Patrol Agents, U.S. Border Patrol, Parole Plus Alternative to Detention (Nov. 2, 2021) |
| SDOE00000131 | Memorandum from Raul L. Ortiz, Chief, U.S. Border Patrol, to All Chief Patrol Agents, U.S. Border Patrol, Policy on the Use of Parole Plus Alternatives to Detention to Decompress Border Locations (July 20, 2022) |
| SDOE00000133 | Memorandum from Raul L. Ortiz, Chief, U.S. Border Patrol, to All Chief Patrol Agents, U.S. Border Patrol, Policy on Parole with Conditions in Limited Circumstances Prior to the Issuance of a Charging Document (Parole with Conditions) (May 10, 2023) |
| SDOE00000140 | Department of Homeland Security, Notice of Termination of Parole (April 11, 2025) |
| SDOE00000141 | Department of Homeland Security, Notice of Termination of Parole (June 20, 2025) |

# EXHIBIT H

Coalition for Humane Immigrant Rights, et al. v. Noem et al., 1:25-cv-00872 (JMC)

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

COALITION FOR HUMANE IMMIGRATION RIGHTS, *et. al*.,

　　　　　　　　*Plaintiffs*,

　　　v.

KRISTI NOEM, *et al*.

　　　　　　　　*Defendants*.

25 Civ. 00872

**CERTIFICATION OF ADMINISTRATIVE RECORD**

I, Patrick E. Divver, Jr., pursuant to 28 U.S.C. §1746, declare under penalty of perjury as follows:

　　　　1.　　　I am the Acting Deputy Assistant Director for U.S. Immigration and Customs Enforcement ("ICE" or the "Agency"). I have held this position since November 11, 2025. In this capacity, I oversee twelve Immigration and Customs Enforcement (ICE), Enforcement and Removal Operations (ERO) field offices in the Eastern United States. Prior to this current position, I was the Field Office Director for the ICE ERO Field Office in San Diego, California, and the Acting Field Office Director for the ICE ERO Field Office in Washington, DC. I have also held a position as Deputy Field Office Director for the ICE ERO Field Office in Washington, DC. In total, I have thirty years of law enforcement experience with the United States Army, United States Department of Defense Police, and United States Immigration and Customs Enforcement.

2.    The facts attested to herein are based upon my personal knowledge or upon information provided to me in my official capacity, and upon conclusions and determinations reached and made in accordance therewith.

3.    The documents listed in the accompanying Administrative Record Index and contained in the files annexed hereto, constitute to the best of my knowledge and belief, a true and complete copy of all non-privileged documents and materials considered by ICE in issuing the February 18, 2025 Email Guidance, titled *Ending Catch-and-Release Consistent with Executive Order 14165, Securing Our Borders.*

I certify under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this __1st__ day of December, 2025 in Washington, D.C.

_____
Acting Deputy Assistant Director
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

COALITION FOR HUMANE IMMIGRATION RIGHTS, *et. al.*,

*Plaintiffs*,

v.

KRISTI NOEM, *et al.*

*Defendants*.

Civil Action No. 25-cv-06872

**UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT ADMINISTRATIVE RECORD FOR FEBRUARY 18, 2025 EMAIL GUIDANCE: Ending Catch-and-Release Consistent with Executive Order 14165, Securing Our Borders**

## CERTIFIED INDEX TO ADMINISTRATIVE RECORD

| DOCUMENT | PAGE |
|---|---|
| 1. Email Guidance from Acting Assistant Director, Field Operations, Enforcement and Removal Operations, Marcos Charles, *Ending Catch-and-Release Consistent with Executive Order 14165, Securing Our Borders* (May 27, 2025). | 1-2 |
| 2. Executive Order 14165, *Securing Our Borders* (January 20, 2025). | 3-5 |
| 3. Memorandum from Acting Secretary Benjamine C. Huffman, *Guidance Regarding How to Exercise Enforcement Discretion* (January 23, 2025). | 6-7 |

# EXHIBIT I

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| COALITION FOR HUMANE IMMIGRANT RIGHTS, *et. al.*,<br><br>                              *Plaintiffs*,<br><br>      v.<br><br>KRISTI NOEM, in her official capacity as Secretary of Homeland Security, *et. al.*,<br><br>                              *Defendants*. | Case No.: 1:25-cv-0872<br><br>**CERTIFICATION OF ADMINISTRATIVE RECORD** |

**CERTIFICATION**

I, Juliana Blackwell, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury as follows:

1.      I am employed with the U.S. Department of Homeland Security ("DHS"), as the Deputy Executive Secretary. I am responsible for the oversight and management of the Office of the Executive Secretary, which oversees the management of written communications intended for, and originated by, the Secretary and Deputy Secretary of Homeland Security, and the maintenance of official Department records. I have held this position since August 2019.

2.      I certify that, to the best of my knowledge, information, and belief, the documents listed in the accompanying Index and annexed hereto constitute the nonprivileged documents and materials directly or indirectly considered by DHS and that these documents constitute the administrative record the agency considered in issuing the Federal Register Notice entitled *Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans*, 90 Fed. Reg. 13611 (Mar. 25, 2025).

1

I certify under penalty of perjury that the foregoing is true and correct.


Executed on: <u>September 18, 2025</u>


JULIANA J
BLACKWELL

Digitally signed by JULIANA J
BLACKWELL
Date: 2025.09.18 15:39:13
-04'00'

Juliana Blackwell

Deputy Executive Secretary

**Certified Administrative Record Index:**
*Termination of Parole Processes for Cubans, Haitians,*
*Nicaraguans, and Venezuelans,* **90 Fed. Reg. 13611 (Mar. 25, 2025)**

| Starting Bates No. | Document Title |
|---|---|
| CHNV-FRN-00001 | Adam Shaw, *Biden Admin Faces Mounting Pressure to Dismantle Migrant Parole Program Amid 'Stress' on Small Towns*, Fox News (Oct. 31, 2024) |
| CHNV-FRN-00005 | Agency Information Collection Activities; Extension, Without Change, of a Currently Approved Collection: Online Request to be a Supporter and Declaration of Financial Support, 89 FR 104557 (Dec. 23, 2024) |
| CHNV-FRN-00009 | America First Policy Directive to the Secretary of State, 90 FR 8337 (Jan. 20, 2025) |
| CHNV-FRN-00010 | Camilo Montoya-Galvez, *U.S. Won't Extend Legal Status For 530,000 Migrants Who Arrived Under Biden Program*, CBS News (Oct. 4, 2024) |
| CHNV-FRN-00015 | Circumvention of Lawful Pathways, 88 FR 31314 (May 16, 2023) |
| CHNV-FRN-00154 | Dep't of Homeland Sec'y, Decision Document, USCIS Notice: Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans (Mar. 21, 2025) |
| CHNV-FRN-00155 | Dep't of Homeland Sec'y, Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans |
| CHNV-FRN-00204 | Designating Aliens for Expedited Removal, 90 FR 8139 (Jan. 24, 2025) |
| CHNV-FRN-00206 | Determination Foreign Affairs Functions of the United States, 90 Fed. Reg. 12200 (Mar. 14, 2025) |
| CHNV-FRN-00207 | Elizabeth Jacobs, *Affirmative Asylum Backlog Exceeds One Million for the First Time*, Ctr. for Immigr. Stud. (July 26, 2024) |
| CHNV-FRN-00213 | EOIR, Adjudication Statistics, Pending Cases, New Cases, and Total Completions (Jan. 16, 2025) |
| CHNV-FRN-00214 | Executive Order 14157, Designating Cartels and Other Organizations as Foreign Terrorist Organizations and Specially Designated Global Terrorists, 90 FR 8439 (Jan. 20, 2025) (published Jan. 29, 2025) |
| CHNV-FRN-00216 | Executive Order 14159, Protecting the American People Against Invasion, 90 FR 8443 (Jan. 20, 2025) (published Jan. 29, 2025) |
| CHNV-FRN-00222 | Executive Order 14165, Securing Our Borders, 90 FR 8467 (Jan. 20, 2025) (published Jan. 30, 2025) |
| CHNV-FRN-00225 | Foreign Terrorist Organization Designations of Tren de Aragua, Mara Salvatrucha, Cartel de Sinaloa, Cartel de Jallisco Nueva Generacion, Carteles Unidos, Cartel del Noreste, Cartel del Golfo, and La Nueva Familia Michoacana, 90 FR 10030 (Feb. 20, 2025) |
| CHNV-FRN-00227 | Holly Straut-Eppsteiner, Cong. Rsch. Serv. IN12492, FY2024 EOIR Immigration Court Data Caseloads and the Pending Cases Backlog (2025) |
| CHNV-FRN-00232 | Implementation of a Change to the Parole Process for Cubans, 88 FR 26329 (Apr. 28, 2023) |
| CHNV-FRN-00235 | Implementation of a Change to the Parole Process for Haitians, 88 FR 26327 (Apr. 28, 2023) |

| Starting Bates No. | Document Title |
|---|---|
| CHNV-FRN-00237 | Implementation of a Parole Process for Cubans, 88 FR 1266 (Jan. 9, 2023) |
| CHNV-FRN-00252 | Implementation of a Parole Process for Haitians, 88 FR 1243 (Jan. 9, 2023) |
| CHNV-FRN-00264 | Implementation of a Parole Process for Nicaraguans, 88 FR 1255 (Jan. 9, 2023) |
| CHNV-FRN-00277 | Implementation of a Parole Process for Venezuelans, 87 FR 63507 (Oct. 19, 2022) |
| CHNV-FRN-00288 | Implementation of Changes to the Parole Process for Venezuelans, 88 FR 1279 (Jan. 9, 2023) |
| CHNV-FRN-00292 | Interim Staff Report of H. Comm. on the Judiciary, The Biden-Harris Administration's CHNV Parole Program Two Years Later: A Fraud-Ridden, Unmitigated Disaster (Nov. 20, 2024) |
| CHNV-FRN-00306 | Jason Richwine, *The Cost of Welfare Use by Immigrant and Native Households*, Ctr. for Immigr. Stud. (May 2016) |
| CHNV-FRN-00324 | Memorandum from Acting Sec'y Huffman to Component Heads, Guidance Regarding How to Exercise Enforcement Discretion (Jan. 23, 2025) |
| CHNV-FRN-00326 | Memorandum from Acting Sec'y Huffman to Component Heads, Exercising Appropriate Discretion Under Parole Authority (Jan. 20, 2025) |
| CHNV-FRN-00328 | Memorandum from Andrew Davidson, Acting Deputy Dir., U.S. Citizenship & Immigr. Servs. to Assoc. Dirs., Administrative Hold on All USCIS Benefit Requests filed by Parolees Under the Uniting for Ukraine (U4U) Process, Processes for Haitians, Cubans, Nicaraguans, and Venezuelans (CHNV) Process, or Family Reunification Parole (FRP) Process (Feb. 14, 2025) |
| CHNV-FRN-00331 | Memorandum from Graham Dudley, Dir., U.S. Customs & Border Prot. to File, Impact of the Parole Programs for Cubans, Haitians, Nicaraguans, and Venezuelans (Mar. 14, 2025) |
| CHNV-FRN-00336 | Memorandum from Ray Provencio, Acting Exec. Dir., U.S. Customs & Border Prot. to Exec. Dirs., Implementation of Active Executive Orders - January 27 2025 (Jan. 27, 2025) |
| CHNV-FRN-00338 | Meryl Sebastian, *Trump says India 'will do what's right' on illegal immigration*, BBC (Jan. 27, 2025) |
| CHNV-FRN-00342 | Muzaffar Chishti & Colleen Putzel-Kavanaugh, *After Crisis of Unprecedented Migrant Arrivals, U.S. Cities Settle into New Normal*, Migration Pol'y Inst. (Aug. 1, 2024) |
| CHNV-FRN-00350 | Nick Mordowanec, *Map Shows Hotspots for Migrants Flying Into US*, NEWSWEEK (May 1, 2024) |
| CHNV-FRN-00367 | *Panama Receives First US Deportation Flight Under Trump Administration*, Tico Times (Feb. 16, 2025) |
| CHNV-FRN-00371 | Proclamation No. 10773, Securing the Border, 89 Fed. Reg. 48487 (June 7, 2024) |
| CHNV-FRN-00378 | Proclamation No. 10817, Amending Proclamation 10773, 89 Fed. Reg. 80351 (Oct. 2, 2024) |
| CHNV-FRN-00381 | Proclamation No. 10886, Declaring a National Emergency at the Southern Border of the United States, 90 Fed. Reg. 8327 (Jan. 29, 2025) |

| Starting Bates No. | Document Title |
|---|---|
| CHNV-FRN-00384 | Securing the Border FR, 89 FR 81156 (Oct. 7, 2024) |
| CHNV-FRN-00514 | Securing the Border IFR, 89 FR 48710 (June 7, 2024) |
| CHNV-FRN-00577 | Stephen Dinan, *'Parole' program put on hold amid massive fraud; Homeland Security promises to set up safeguards*, Wash. Times (Aug. 2, 2024) |
| CHNV-FRN-00586 | Stephen Dinan, *Welfare recipients, criminals allowed to sponsor illegal immigrants under Biden 'parole' program*, Wash. Times (Nov. 20, 2024) |
| CHNV-FRN-00597 | The White House, Briefings & Statements, Statement From the Press Secretary (Jan. 26, 2025) |
| CHNV-FRN-00599 | The White House, Briefings & Statements, Readout of President Donald J. Trump's Call with President Nayib Bukele (Jan. 23, 2025) |
| CHNV-FRN-00602 | U.S. Citizenship and Immigr. Serv., Asylum Div., Performance Data, Monthly Statistics Report, Fiscal Year 2025 (Jan. 28, 2025) |
| CHNV-FRN-00603 | U.S. Citizenship and Immigr. Serv., Check Case Processing Times (acessed Feb. 22, 2025) |
| CHNV-FRN-00607 | U.S. Citizenship and Immigr. Serv., Form I-134A NON CONFIRM Notice |
| CHNV-FRN-00608 | U.S. Citizenship and Immigr. Serv., Fraud Detection & Nat'l Sec. Directorate, *I-134A Filing Trend Analysis* (May 10, 2024) |
| CHNV-FRN-00620 | U.S. Citizenship and Immigr. Serv., Frequently Asked Questions About the Processes for Cubans, Haitians, Nicaraguans, and Venezuelans (Oct. 4, 2024) |
| CHNV-FRN-00642 | U.S. Citizenship and Immigr. Serv., Immigr. Recs. & Identity Servs. Directorate, *Form I-134A - Reviewers Guide* (Dec. 2, 2024) |
| CHNV-FRN-00705 | U.S. Citizenship and Immigr. Serv., Immigr. Recs. & Identity Servs. Directorate, *Form I-134A - Reviewers Guide* (July 9, 2024) |
| CHNV-FRN-00768 | U.S. Citizenship and Immigr. Serv., *Notice Of Revocation Of Parole-Based Employment Authorization* (Mar. 13, 2025) |
| CHNV-FRN-00769 | U.S. Citizenship and Immigr. Serv., Processes for Cubans, Haitians, Nicaraguans, and Venezuelans (Jan. 20, 2025) |
| CHNV-FRN-00784 | U.S. Citizenship and Immigr. Serv., *Special Humanitarian Parole Program Dashboard* (Feb. 13, 2025) |
| CHNV-FRN-00785 | U.S. Citizenship and Immigr. Serv., *Ukraine & CHNV Parolee Immigrant Benefit Tracking: Cumulative Statistics* (Feb. 9, 2025) |
| CHNV-FRN-00793 | U.S. Citizenship and Immigr. Serv., *Ukraine & CHNV Parolee Immigrant Benefit Tracking: Cumulative Statistics* (Mar. 9, 2025) |
| CHNV-FRN-00794 | U.S. Citizenship and Immigr. Serv., Update on Form I-134A (Jan. 28, 2025) |
| CHNV-FRN-00795 | U.S. Customs & Border Prot., Carrier Liaison Program, Executive Order on Securing Our Borders (Jan. 22, 2025) |
| CHNV-FRN-00796 | U.S. Customs & Border Prot., Carrier Liaison Program, Updated Guidance: Executive Order on Securing Our Borders (Jan. 24, 2025) |
| CHNV-FRN-00797 | U.S. Customs & Border Prot., Press Release, CBP Removes Scheduling Functionality in CBP One™ App (Jan. 21, 2025) |

| Starting Bates No. | Document Title |
|---|---|
| CHNV-FRN-00801 | U.S. Dep't of Homeland Sec'y, DHS Reinstates Migrant Protection Protocols, Allowing Officials to Return Applicants to Neighboring Countries (Jan. 21, 2025) |
| CHNV-FRN-00802 | U.S. Dep't of Homeland Sec'y, Off. of Homeland Sec. Stats.,  Data Table for CHNV Notice (Feb. 26, 2025) |
| CHNV-FRN-00803 | U.S. Dep't of Homeland Sec'y, Off. of Homeland Sec. Stats., CBP Encounters (accessed Jan. 29, 2025) |
| CHNV-FRN-00812 | U.S. Dep't of Homeland Sec'y, Off. of Homeland Sec. Stats., Immigration Enforcement and Legal Processes Monthly Tables (Jan. 16, 2025) |
| CHNV-FRN-00823 | U.S. Dep't of State, Off. of the Spokesperson, Readout, Secretary Rubio's Meeting with Panamanian President Mulino (Feb. 2, 2025) |
| CHNV-FRN-00826 | U.S. Dep't of State, Off. of the Spokesperson, Readout, Secretary Rubio's Meeting with Salvadoran President Nayib Bukele (Feb. 3, 2025) |
| CHNV-FRN-00829 | U.S. Dep't of State, Press Statement, Priorities and Mission of the Second Trump Administration's Department of State (Jan. 22, 2025) |
| CHNV-FRN-00832 | U.S. Secretary of State, *Determination: Foreign Affairs Functions of the United States*, 90 FR 12200 (Feb. 21, 2025) (published Mar. 14, 2025). |
| CHNV-FRN-00833 | Agency Information Collection Activities; Revision of an Existing Collection of Information; Advance Travel Authorization (ATA), 88 FR 62810 (Sept. 13, 2023). |

# EXHIBIT J

Coalition for Humane Immigrant Rights, et al. v. Noem et al., 1:25-cv-00872 (JMC)

# POLITICO

## DOJ is walking back the White House's goal to arrest 3,000 immigrants per day

It's another discrepancy between what White House advisers say and the administration's legal posture.



Federal agents stand in Los Angeles on July 7, 2025, as part of the Trump administration's immigration crackdown there. | Damian Dovarganes/AP

By **KYLE CHENEY** and **JOSH GERSTEIN**
08/03/2025 07:00 AM EDT
Updated: 08/03/2025 01:24 PM EDT

   

Stephen Miller was unequivocal: Immigration and Customs Enforcement officers would seek to arrest 3,000 or more immigrants per day, a staggering target that he said was necessary to carry out President Donald Trump's mass deportation agenda.

"Under President Trump's leadership, we are looking to set a goal of a minimum of 3,000 arrests for ICE every day and President Trump is going to keep pushing to get that number up higher each and every day," the senior White House adviser told Fox News' Sean Hannity in May.

Advertisement

AD

2/26/26, 10:02 AM
Judges scrutinize latest mismatch between White House deportation plans and legal position in court - POLITICO

Case 1:25-cv-00872-JMC    Document 55-13    Filed 03/03/26    Page 56 of 368

But when federal judges pressed for details about that figure last week, the administration denied any such quota existed. The contradiction came in a lawsuit that alleged the intense pressure to rack up arrests had led ICE to conduct illegal sweeps in Los Angeles.

It's not the only case that has featured the 3,000-arrest-per-day target as a crucial piece of evidence that the administration's single-minded drive to rack up arrests may have prompted immigration authorities to cut corners or break the law. Washington-based Judge Jia Cobb, a Biden appointee, cited the figure when she ruled Friday that the administration's dramatic expansion of "expedited" deportation proceedings violated the law. And Judge Trina Thompson, a Biden appointee in San Francisco, pointed to the purported goal Thursday when she blocked the administration's bid to end temporary protected status for tens of thousands of Nicaraguan, Honduran and Nepali immigrants.

But on Wednesday, the Justice Department said no such orders had ever been given.

"DHS has confirmed that neither ICE leadership nor its field offices have been directed to meet any numerical quota or target for arrests, detentions, removals, field encounters, or any other operational activities that ICE or its components undertake in the course of enforcing federal immigration law," a Justice Department attorney reported to the 9th Circuit Court of Appeals.

Advertisement

AD

Case 1:25-cv-00872-JMC    Document 55-13    Filed 03/03/26    Page 57 of 368

While DOJ attorney Yaakov Roth attributed the quota claim to "anonymous reports in the newspapers," he didn't mention that Miller — Trump's deputy chief of staff and homeland security adviser — had publicly confirmed the 3,000-daily-arrest "goal" in the televised interview on Fox.

The discrepancy is the latest example of a gulf between what White House advisers say in public and what the Justice Department says in court. In this instance, the chasm may be undermining the DOJ's already strained credibility with judges.

Homeland Security officials did not respond to requests for comment. A White House spokesperson, Abigail Jackson, did not directly respond to questions about the discrepancy between Miller's comments and the administration's position in court.

"The Trump Administration is committed to carrying out the largest mass deportation operation in history by enforcing federal immigration law and removing the countless violent, criminal illegal aliens that Joe Biden let flood into American communities," Jackson said.

A Justice Department spokesperson said there is no disconnect between the DOJ's court filings and the White House's public statements.

"The entire Trump Administration is united in fully enforcing our nation's immigration laws and the DOJ continues to play an important role in vigorously defending the President's deportation agenda in court," the DOJ spokesperson said.

Advertisement

AD

Immigration advocates have pointed to reports about the daily 3,000-arrest quota as proof that the administration's most extreme tactics — ones they contend violate due process and other constitutional or legal principles — are the result of a single-minded drive to hit numerical targets. Judges have pointed to those reports as well, figuring them into the analysis of whether the administration's tactics are legal.

The existence of the target has created particular complications in the case challenging the immigration sweeps in Los Angeles. The administration is fighting an order that a federal judge issued last month prohibiting ICE from conducting "roving" immigration arrests based on broad criteria such as presence at a home improvement store or car wash.

2/26/26, 10:02 AM    Judges scrutinize latest mismatch between White House deportation quotas and DOJ position in court - POLITICO

Case 1:25-cv-00872-JMC    Document 55-13    Filed 03/03/26    Page 58 of 368

The claim of a quota featured prominently in oral arguments at the 9th Circuit last week on the administration's bid to overturn that order. And when the 9th Circuit ruled Friday night, leaving the order largely intact, the judges seemed to highlight the contradiction by quoting the entirety of DOJ's denial and then taking note of Miller's statement to Fox about a "goal."

The three Democratic-appointed judges assigned to the case said the vague factors ICE appeared to be relying on "impermissibly cast suspicion on large segments of the law-abiding population, including anyone in the District who appears Hispanic, speaks Spanish or English with an accent, wears work clothes, and stands near a carwash, in front of a Home Depot, or at a bus stop."

During the arguments Monday, the appeals judges assigned to the case pressed the Justice Department for an answer on whether ICE officers were under pressure to meet some numerical target that might encourage them to detain people based on grounds that fall short of the "reasonable suspicion" the law required.

Advertisement

AD

Roth conceded that such a quota, if it existed, could support claims that some arrests did not meet the legal standard. But he said it wouldn't justify the proactive order that Judge Maame Ewusi-Mensah Frimpong imposed three weeks ago, barring "roving" arrests in the federal judicial district centered in Los Angeles.

"That might increase the risk of a constitutional violation in a particular case, but I don't think that alone would be sufficient for an injunction," Roth replied.

A lawyer fighting the immigration arrests, Mohammad Tajsar of the ACLU, told the appeals court in a filing Thursday that the government's statements do not rule out the existence of some sort of quota motivating ICE officers.

"Defendants' carefully worded letter does not negate an arrest quota," Tajsar wrote. "Those actions can heavily influence agents' and officers' conduct."

**FILED UNDER:**
DEPARTMENT OF JUSTICE, LEGAL, STEPHEN MILLER,
IMMIGRATION AND CUSTOMS ENFORCEMENT



## POLITICO Forecast

Global power is in flux. Your daily guide to what comes next.

**EMAIL**



Your Email

# EXHIBIT K

Coalition for Humane Immigrant Rights, et al. v. Noem et al., 1:25-cv-00872 (JMC)



Play Live Radio



MY PLAYLIST

n p r                                                                    DONATE

---

DEEP DIVE    IMMIGRATION

# ICE's novel strategy allows for more arrests from inside immigration courts

UPDATED JUNE 12, 2025 · 5:02 AM ET

HEARD ON ALL THINGS CONSIDERED

 Ximena Bustillo

**3-Minute Listen**                                    PLAYLIST    TRANSCRIPT

![Federal agents wait outside an immigration courtroom]

Federal agents wait outside an immigration courtroom at the Jacob K. Javits Federal Building in New York on June 10, 2025.

*Yuki Iwamura/AP*

Immigration courts work with ICE to boost arrests : NPR

Vadzim Bulaty, a political asylee from Belarus who opposed the country's seven-term president Alexander Lukashenko, was sitting in a Minnesota immigration courtroom last month.

It was the first immigration court hearing for his eldest son, Aliaksandr Bulaty. Aliaksandr had come to the U.S. to join his father around May 2024 by seeking asylum through the app formerly known as CBP One, which allowed migrants to schedule appointments at legal ports of entry.

The goal of the first court hearing was to ask for more time for a lawyer to help get Aliaksandr's asylum application connected to his father's. But they never got a chance to tell the judge.

**Sponsor Message**



**IMMIGRATION**

**He was fired under Biden. Under Trump, he's now leading an immigration court**

Immigration courts work with ICE to boost arrests : NPR

During the hearing in May, the attorney representing the Department of Homeland Security (DHS) requested that the case be dismissed, his father recalled in an interview to NPR.

"I understood the prosecutor's words as the case was being dismissed, and you can be free," Vadzim Bulaty said. "I didn't expect it to be a legal trap, a verbal trap."

Father and son went to leave the building, believing their cases were now going to continue as one. Instead, officers with Immigration and Customs Enforcement met them just a few steps from the exit with handcuffs and told Aliaksandr he was subject to expedited removal within three days.

Aliaksandr has spent weeks at the Freeborn Adult Detention Center, with his lawyer fighting his deportation to a country where his father says he's likely to get immediately imprisoned.

He is one of over 100 people who have been arrested at immigration courts across the country as a part of ICE's latest strategy to meet its steep new 3,000-person daily arrest quota.



**IMMIGRATION**

**Migrants who entered the U.S. via CBP One app should leave 'immediately,' DHS says**

The strategy of DHS dismissing cases and then arresting migrants at court at first caught judges and lawyers off guard.

The Executive Office for Immigration Review (EOIR), which oversees immigration courts and is part of the Department of Justice, detailed the approach for judges in a May 30 email obtained by NPR. NBC was first to report that email.

It's one of several tactics the Trump administration has used in order to streamline cases and more quickly deport people without legal status from the U.S.

**Sponsor Message**

The tactics seem to be paying off: Last week, the administration touted two days of national arrest numbers topping 2,000, their highest since President Trump took office, according to DHS.

"This is all part of a strategy by the current administration to essentially bypass the legal system, to bypass courts, deny people the opportunity of getting a fair day in court in order to rapidly deport as many people as possible without respect for the rule of law," said Greg Chen, senior director of government relations for the American Immigration Lawyers Association.

In response to questions about the new strategy in immigration courts, ICE said most people who entered the U.S. illegally within the past two years can be quickly deported.

"ICE is now following the law and placing these illegal aliens in expedited removal, as they always should have been," a spokesperson for the agency said in an email to NPR.

Not everyone caught up in this tactic entered the country illegally; those who entered using the CBP One app during the Biden administration were granted temporary permissions to reside in the U.S., which Trump has since revoked.


**INTERVIEW HIGHLIGHTS**
**DHS spokesperson defends Trump administration's use of military in LA**

## Change from past practice

The May 30 email from the Executive Office for Immigration Review, addressed to court supervisors, mentioned that the courts' "caseload has greatly increased in the past few months."

In order to reduce the backlog, judges are encouraged to immediately make a decision on whether to dismiss a case from the bench, and without giving migrants the typical 10 days to dispute it.



Federal agents take someone into custody after an immigration court hearing outside immigration court on May 21, 2025, in Phoenix.
*Ross D. Franklin/AP*

Veronica Cardenas, former assistant chief counsel at DHS under three prior presidents, including during Trump's first term, said that a motion to "dismiss" a case in immigration courts used to be a good thing.

In the past, she said, that motion would remove the case from the court calendar and the migrant could seek relief from deportation through other ways such as by applying for asylum.

Sponsor Message

"But now we're seeing that that dismissal actually means something worse for noncitizens, where ICE officers are waiting outside to handcuff them," said Cardenas, now an immigration lawyer in New Jersey.



**LAW**

**Lawyers warn clients of increased arrest risk at immigration check-ins**

Under the new approach, after their case is dismissed, immigrants are arrested again, at times before even leaving the building — as happened with Aliaksandr Bulaty. Then they're put in a process called expedited removal: a fast-track for deportation that does not guarantee the right to a day in court and comes with a five-year restriction on attempting to return to the U.S.

ICE arrested hundreds of people within the first few days of deploying this strategy in late May in immigration courts, according to a count from the American Immigration Lawyers Association.

Immigration attorneys first noticed the new strategy in about 14 cities, and over the past few weeks has seen it expanded to other states and courts, including Boston, New York City and Northern Virginia.

Lora Ries, director of the Border Security and Immigration Center at the conservative Heritage Foundation think tank, said the new policy aligns with

Trump's mass deportation effort by helping courts reduce their case backlog — which currently sits at about 4 million cases.

She also said part of the strategy could also be encouraging people in detention to leave rather than fighting their claims.

"The alien uses that factor [detention] to weigh what they're going to do as well," Ries said. "We can't overlook self-deportation."



**IMMIGRATION**

**Trump offers $1,000 incentive to migrants who leave the country voluntarily**

But immigration lawyers argue that this tactic of pulling people out of the court process sidesteps their due process.

The situation puts immigrants in a situation where they may face arrest or an order of removal even if they're following the steps to try to stay in the U.S., Cardenas said.

And if immigrants fail to show up for their scheduled court dates, that results in a final order of removal, too. Cardenas said the policy penalizes those who thought they were doing things "the right way."

"What this administration is doing is instilling that fear, because the rules are changing every day and there's no stability," she said.



**LAW**

**Trump wants to bypass immigration courts. Experts warn it's a 'slippery slope.'**

## Fears of returning to dictatorship

Aliaksandr Bulaty is still fighting his removal. It helps that, unlike many other migrants, he has a lawyer: Malinda Schmiechen, who also represented his father's case.

"My client is someone who has no criminal background. He had filed an asylum application," Schmiechen said. "He is now detained in a county jail and he's going to be there for a while."

This week, Schmiechen was able to successfully argue before an immigration judge to reopen Aliaksandr's immigration case. This means that for now he won't be imminently deported, though he will stay in detention. His case now returns to the removal proceedings it was in before he was detained.

Vadzim Bulaty said he is able to regularly talk to his son — and hears about his overcrowded detention room shared with 30 others; the lights don't turn off and they're not allowed to go outside for fresh air.



**LAW**

**How does deportation work, and how much does it cost? We break it down**

Since immigrating to the U.S. in 2022, Vadzim Bulaty said he has generally felt welcome. The family has adjusted well, learned to smile and greet strangers in their small suburb of Otsego, Minn.

"We are very glad that we ended up in America, because America is an amazing country in relation to immigrants," he said. "In no other country in the world would we be so at home."

However, even with his own legal status, he is now worried for himself, his wife and his other sons. And he fears what could happen to his eldest.

"I ran away from one dictatorship," he said. "And I would not want another dictatorship in America."

NPR's Anna Yukhananov contributed to this report.

immigration courts     immigration detention     deportation



## The news you need to start your day

Our journalists summarize the biggest stories in the Up First newsletter so you can stay informed, not overwhelmed.

| Email address | | SIGN UP |

See more subscription options

By subscribing, you acknowledge and agree to NPR's Terms of Use and Privacy Policy. NPR may share your name and email address with your NPR station. See Details.

## More Stories From NPR

# EXHIBIT L

Coalition for Humane Immigrant Rights, et al. v. Noem et al., 1:25-cv-00872 (JMC)



# UNITED STATES COMMISSION ON INTERNATIONAL RELIGIOUS FREEDOM

# Report on Asylum Seekers in Expedited Removal

## VOLUME I: FINDINGS & RECOMMENDATIONS

*As authorized by Section 605 of the International Religious Freedom Act of 1998*

# REPORT ON
# ASYLUM SEEKERS
# IN
# EXPEDITED REMOVAL

**FEBRUARY 2005**

U.S. Commission on International Religious Freedom
800 North Capitol Street, NW
Suite 790
Washington, DC 20002
202-523-3240
202-523-5020 (fax)

*www.uscirf.gov*

# United States Commission on International Religious Freedom

Preeta D. Bansal

*Chair*

Felice D. Gaer

Nina Shea[*]

*Vice Chairs*

Archbishop Charles J. Chaput

Michael Cromartie

Khaled Abou El Fadl

Elizabeth H. Prodromou

Bishop Ricardo Ramirez

Michael K. Young

Ambassador John V. Hanford, III, *ex officio*

Joseph R. Crapa
*Executive Director*

Tad Stahnke                      Mark Hetfield
*Deputy Director of Policy*      *Immigration Counsel*

*Asylum Seekers in Expedited Removal Subcommittee*

Preeta D. Bansal

Michael Cromartie

Bishor Ricardo Ramirez

Michael K. Young

Felice D. Gaer, *ex officio*

---

[*] Due to personal demands on her time, Commissioner Shea did not review or participate in the Study.

# STUDY ON ASYLUM SEEKERS IN EXPEDITED REMOVAL

## AUTHORS

### REFUGEE AND ASYLUM EXPERTS

Mark Hetfield, *Editor and Director of Study*
*(U.S. Commission on International Religious Freedom)*

Kate Jastram
*(University of California at Berkeley, Boalt Hall School of Law)*

Allen S. Keller, M.D.
*(NYU School of Medicine, Bellevue-NYU Program for Survivors of Torture)*

Charles H. Kuck[*]
*(Weathersby, Howard, and Kuck, LLC, Atlanta)*

### DETENTION ADVISOR

Craig Haney, Ph.D.
*(University of California at Santa Cruz)*

### CHIEF METHODOLOGIST

Fritz Scheuren, Ph.D.
*(National Opinion Research Center, University of Chicago)*

### LEADING RESEARCH STAFF

Patrick Baier, *Statistician*
*(National Opinion Research Center)*

Cory Fleming, *Statistician*
*(National Opinion Research Center)*

Tala Hartsough, *Research Coordinator*
*(University of California at Berkeley, Boalt Hall School of Law)*

Susan Kyle, *Research Coordinator*
*(U.S. Commission on International Religious Freedom)*

Andrew Rasmussen, Ph.D., *Research Director*
*(Bellevue-NYU Program for Survivors of Torture)*

Kim Reeves, *Research Coordinator*
*(Bellevue-NYU Program for Survivors of Torture)*

Barry Rosenfeld, Ph.D., *Port of Entry Study Methodologist*
*(Fordham University)*

---

[*] Replaced Robert C. Divine, who resigned on June 30, 2004 to accept an appointment at the Department of Homeland Security as the Chief Counsel to U.S. Citizenship and Immigration Services.

## RESEARCHERS

U.S. COMMISSION ON INTERNATIONAL RELIGIOUS FREEDOM
Claire Morris Clark
Robin Gary
Anne Marie Harkins
Karen Luong

NATIONAL OPINION RESEARCH CENTER
Ali Mushtaq

UNIVERSITY OF CALIFORNIA AT BERKELEY BOALT HALL SCHOOL OF LAW
Michael Burstein
Shelley Cavalieri
Carol Chacon
Amy Cucinella
Allison Davenport
Kathleen Glynn
Steven Herman
Olivia Horgan
Tara Lundstrom
Lauri Owen
Kyra Sanin
Rani Singh
Rebecca Tanner
Kaja Tretjak
Kristie Whitehorse

BELLEVUE-NYU PROGRAM FOR SURVIVORS OF TORTURE

| | |
|---|---|
| Monica Aguirre | Jonathan Hill |
| Christopher Barrett | Jessica Hood |
| Pamela Blair | Marissa Huang |
| Rona Carter | Allison Korn |
| Charlotte Labys | Charlotte Labys |
| Tracy Chu | Christina Luna |
| Adam Cohen | Jane Marshall |
| R. Meghan Davis | Christina Mathieson |
| Nirva Delva | Melody Moezzi |
| Mariel Diaz | Valentina Nikulina |
| Tia Dole | Lorelei Prevost |
| Darlene Dowling | Claudia Rincón |
| Cristina Fernandez | Jamie Rosenman |
| Lara Gamble | Evan Silverman |
| Sanida Halebic | Sylvia Sullivan |

**TABLE OF CONTENTS**
**REPORT ON ASYLUM SEEKERS IN EXPEDITED REMOVAL**
**VOLUME I: FINDINGS & RECOMMENDATIONS**

ACKNOWLEDGEMENTS……………………………………………………… vii

EXECUTIVE SUMMARY…………………………………………………………1

INTRODUCTION…………………………………………………………………10

STUDY EXPERT BIOGRAPHIES…………………………………………………17

BACKGROUND BRIEF AND GLOSSARY ON EXPEDITED REMOVAL……………………20

EXPEDITED REMOVAL FLOW CHART…………………………………………… 29

ORGANIZATIONAL CHART FOR DEPARTMENT OF HOMELAND SECURITY……………………..31

QUICK STATISTICS……………………………………………………………… 32

HIGHLIGHTS OF THE STUDY METHODOLOGY……………………………………… 36

U.S. AND INTERNATIONAL ASYLUM STANDARDS………………………………………40

STUDY FINDINGS…………………………………………...…………………… 50

STUDY RECOMMENDATIONS……………………………………………………63

SUMMARY TABLE OF CONTENTS
REPORT ON ASYLUM SEEKERS IN EXPEDITED REMOVAL
VOLUME II: EXPERT REPORTS

EVALUATION OF CREDIBLE FEAR REFERRAL IN EXPEDITED REMOVAL AT PORTS
OF ENTRY IN THE UNITED STATES
Allen Keller, Andrew Rasmussen, Kim Reeves, and Barry Rosenfeld……………………..   1

A-FILE AND RECORD OF PROCEEDING ANALYSIS OF EXPEDITED REMOVAL
Kate Jastram and Tala Hartsough……………………………………………………………   44

REPORT ON CREDIBLE FEAR DETERMINATIONS
Mark Hetfield………………………………………………………………………………165

CONDITIONS OF CONFINEMENT FOR DETAINED ASYLUM SEEKERS SUBJECT TO
EXPEDITED REMOVAL
Craig Haney……………………………………………………………………………   178

LEGAL ASSISTANCE FOR ASYLUM SEEKERS IN EXPEDITED REMOVAL: A
SURVEY OF ALTERNATIVE PRACTICES
Charles Kuck………………………………………………………………………………..232

STATISTICAL REPORT ON EXPEDITED REMOVAL, CREDIBLE FEAR, AND
WITHDRAWAL,
FY 2000-2003
Cory Fleming and Fritz Scheuren…………………………………………………………..281

STATISTICAL REPORT ON DETENTION, FY 2000-2003
Cory Fleming and Fritz Scheuren…………………………………………………………..323

STATISTICAL REPORT ON IMMIGRATION COURT PROCEEDINGS, FY 2000-2004

Susan Kyle, Cory Fleming, and Fritz Scheuren……………………………………………383

SELECTED STATISTICAL ANALYSES OF IMMIGRATION JUDGE RULINGS ON
ASYLUM APPLICATIONS, FY 2000-2003
Patrick Baier………………………………………………………………………………...674

ACKNOWLEDGEMENTS

*The authors of this Study would like to express our appreciation to the following individuals and organizations who were of great assistance during our research. We would especially like to thank the Commissioners on the Expedited Removal Subcommittee for their tireless support, their counsel, and for accompanying us to numerous detention centers and ports of entry. We would also like to express our gratitude to the many men and women around the country at the Department of Homeland Security and the Executive Office for Immigration Review who provided us with their time and insights on the Expedited Removal Process.*

DEPARTMENT OF HOMELAND SECURITY

**Customs and Border Protection (CBP)** – especially our primary liaison, Linda Loveless, as well as Salvador Flores and Dana Graydon;

**Immigration and Customs Enforcement (ICE)** – especially our primary liaison, Elizabeth Herskovitz, as well as John Bjerke and Teresa Logue;

**Office of Immigration Statistics** – especially our primary liaison, Michael Hoefer, and Jim Fitzsimmons; and

**U.S. Citizenship and Immigration Services (USCIS)** – especially our primary liaison, Georgia Papas, as well as Karen Fitzgerald and Marc Sanderson.

DEPARTMENT OF JUSTICE

**Executive Office for Immigration Review (EOIR)** – especially our primary liaison, Marta Rothwarf, as well as Isabelle Chewning, Steven Lang, Scott Rosen, Brett Endres and Pamela Calvert.

GOVERNMENT ACCOUNTABILITY OFFICE (GAO) – especially Richard Stana and Jim Blume, who interrupted his retirement to discuss the GAO Study with us.

UNITED NATIONS HIGH COMMISSIONER FOR REFUGEES (UNHCR) – especially Larry Katzman, Dianne Curran, Elizabeth Dallam, Jane Kochman, Janice Marshall and Andrew Painter.

NON-GOVERNMENTAL ORGANIZATIONS AND ACADEMIC INSTITUTIONS

**American Bar Association, Washington, D.C.** – especially Andrea Siemens for her invaluable guidance on the detention standards;

**Center for Gender and Refugee Studies, UC Hastings College of the Law, San Francisco** – especially Karen Musalo for sharing her extensive expertise and groundbreaking efforts;

**Florida Immigrant Advocacy Center (FIAC), Miami** – especially Cheryl Little for facilitating meetings with clients to hear about their experiences in Expedited Removal;

**Georgetown University, Washington, D.C.** – especially Dean T. Alexander Aleinikoff of the Law Center, and Andrew Schoenholtz at the Institute for the Study of International Migration, for hosting a roundtable on the Study;

**Hebrew Immigrant Aid Society (HIAS), New York** – especially Frank Lipiner, Reena Arya and Simon Wettenhall for facilitating meetings to hear about their clients' experiences;

**Human Rights First, New York** – especially Eleanor Acer, Archi Pyati, Erin Corcoran and Anwen Hughes for facilitating meetings to hear about their clients' experiences; and

**Migration Policy Institute (MPI), Washington, D.C.** – especially Kathleen Newland for hosting a roundtable marking the beginning, and a briefing marking the end, of the Study.

***And the many other NGOs around the country who met with us on Expedited Removal.***

**ASYLUM SEEKERS IN EXPEDITED REMOVAL**

*A Study Authorized by Section 605 of the International Religious Freedom Act of 1998*

(The entire study is available at www.uscirf.gov)

## EXECUTIVE SUMMARY

### THE UNITED STATES COMMISSION ON INTERNATIONAL RELIGIOUS FREEDOM

The U.S. Commission on International Religious Freedom (USCIRF) was established by the International Religious Freedom Act of 1998 (IRFA). USCIRF is an independent and bipartisan federal agency created to monitor religious freedom in other countries and advise the President, Secretary of State and Congress on how best to promote it.

IRFA also authorized the Commission to appoint experts to conduct a study to advise whether certain legislative changes to asylum, enacted in 1996, were impairing America's obligation – and founding tradition – of offering refuge to those suffering persecution.

The Study examined how the new immigration procedure – known as "Expedited Removal" – was affecting asylum seekers, regardless of whether or not the claim was based on religion, race, nationality, membership in a particular social group, or political opinion.

### EXPEDITED REMOVAL

In 1996, President Bill Clinton signed the Illegal Immigration and Immigrant Responsibility Act (IIRAIRA), the most comprehensive immigration reform legislation in over 30 years. Among other reforms, the legislation established Expedited Removal, which was intended to strengthen the security of America's borders, without closing them to those fleeing persecution.

Specifically, prior to IIRAIRA, immigration inspectors could not compel an improperly documented alien to depart the United States. The inspector had the discretion to offer the alien the opportunity to withdraw his application for admission, or to refer the alien to an immigration judge for a hearing. If the inspector did refer the alien to an immigration judge, the alien could be detained until the hearing, but would generally be released due to bed-space shortages.

Under IIRAIRA, immigration inspectors were authorized to summarily remove aliens who lacked appropriate travel documents, or who obtained their travel documents through fraud or misrepresentation. Concerned, however, that *bona fide* asylum seekers not be removed to countries where they may be persecuted, Congress also included provisions to prevent the Expedited Removal of refugees fleeing persecution.[1] Specifically, an alien who indicates an

---

[1] Under the 1967 Protocol to the 1951 Convention relating to the Status of Refugees, which the United States has ratified, as implemented by the Refugee Act of 1980 and other amendments to the Immigration and Nationality Act, the United States may not return any individual to a country where that individual may face persecution on the basis of race, religion, nationality, membership in a particular social group or political opinion. In addition, the United

1

intention to apply for asylum or a fear of return is entitled to a "credible fear interview" by an asylum officer.  If the asylum officer determines that an alien has a "significant possibility" of establishing eligibility for asylum, he is entitled to ask the immigration judge for relief from removal.[2]  If credible fear is not found, the asylum officer orders the alien removed (although this decision is subject to review by an immigration judge).

Congress also required that aliens, including asylum seekers, subject to Expedited Removal be detained until the United States physically removes them, after which they may not return to the United States for five years.  If an asylum officer determines that an alien has credible fear, however, the alien may be considered for release while waiting for an asylum hearing.  While decisions of release ("parole") are discretionary, agency memoranda instruct that "parole is a viable option and should be considered for aliens who meet the credible fear standard, can establish identity and community ties, and are not subject to any possible bars to asylum involving violence or misconduct."[3]

On March 1, 2003, the Immigration and Naturalization Service (INS), the lead agency on Expedited Removal, was abolished by the Homeland Security Act of 2002.  The functions of the former INS were dispersed to various components within the newly created Department of Homeland Security.  The immigration judges, however, remained in the Executive Office for Immigration Review (EOIR) within the Department of Justice. [4]

Expedited Removal is mandatory for aliens arriving at ports of entry.  Congress, however, also authorized the Attorney General to exercise discretion in applying Expedited Removal in the interior of the United States to undocumented aliens apprehended within two years after entry.  On November 13, 2002, Expedited Removal was expanded by the INS to apply to undocumented non-Cubans who entered the United States by sea within the prior two years.

On August 11, 2004, the Department of Homeland Security announced that, effective immediately, it was exercising its discretion to further expand Expedited Removal authority to the Border Patrol for undocumented aliens apprehended within 14 days after entry and within 100 miles of the border, in the Tucson and Laredo Border Patrol sectors.[5]

---

States has ratified and implemented regulations to execute the Convention Against Torture (CAT), and may not remove anyone to a country where (s)he is in danger of being tortured.

[2] "Credible fear" is defined in section 235(b)(1)(B)(v) of the Immigration and Nationality Act, 8 USC 1225(b)(1)(B)(5) (2004).

[3] INS Memorandum, *Expedited Removal: Additional Policy Guidance* (Dec. 30, 1997) from Michael A. Pearson, Executive Associate Commissioner for Field Operations, Office of Field Operations, to Regional Directors, District Directors, Asylum Office Directors, reproduced in 75 *Interpreter Releases* 270 (Feb. 23, 1998).

[4] EOIR oversees the Immigration Judges who review negative credible fear determinations made by asylum officers and who hear asylum claims from aliens placed in Expedited Removal. It also houses the Immigration Judges' appellate review unit, the Board of Immigration Appeals (BIA).

[5] Designating Aliens for Expedited Removal, 69 Fed. Reg. 48,877 (2004).

***THE STUDY***

In the International Religious Freedom Act of 1998 (IRFA), Congress authorized the USCIRF to appoint experts to examine whether immigration officers, in exercising Expedited Removal authority over aliens who may be eligible for asylum, were:

(1)  Improperly encouraging withdrawals of applications for admission;
(2)  Incorrectly failing to refer such aliens for credible fear determinations;
(3)  Incorrectly removing such aliens to countries where such aliens may face persecution; or
(4)  Improperly detaining such aliens, or detaining them under inappropriate conditions.

Congress authorized the USCIRF-appointed experts to have virtually unrestricted access to Expedited Removal proceedings.

IRFA also required the Government Accountability Office (GAO) to complete its own study on asylum seekers in Expedited Removal, which was released in September 2000.   That study found that, in spite of some deficiencies in the process, INS was generally in compliance with its own Expedited Removal procedures.  GAO, however, relied primarily on the review of INS records, statistical analyses, and whether INS was following its own procedures.  GAO chose not to critically review legal determinations made by INS or the Executive Office for Immigration Review.

The Commission began its effort in the Fall of 2003, after the absorption of most Expedited Removal operations into the Department of Homeland Security (DHS).  Like the GAO, USCIRF appointed experts chose to avoid reviewing legal analyses performed by the Departments of Homeland Security and Justice, focusing instead on building on the file review and statistical analyses gathered by GAO.  The USCIRF Study, however, also differed from the GAO effort in several respects.  Specifically, the USCIRF-appointed experts chose to:

- Observe inspections at seven major ports of entry (GAO did not collect data from observations of Expedited Removal proceedings);
- Compare the detention standards to correctional standards, and ascertain whether correctional standards where "appropriate" for a non-criminal asylum seeker population (GAO instead accepted the INS detention standards, and measured INS compliance with some of those standards);
- Review the use of documents created during the Expedited Removal process are used as evidence during asylum hearings; and
- Examine the impact of representation on asylum claimants subject to Expedited Removal.

In collecting data for the Study, under the guidance of a chief methodologist and other experts in research methods, the experts:

- Observed, and collected data from, 404 secondary inspections and interviewed 194 aliens in Expedited Removal proceedings (with 155 of those aliens being both interviewed and observed);

- Reviewed randomly selected subsamples of an additional 339 files from the Ports of Entry; 32 files of aliens who dissolved their asylum claims; 163 records of proceeding from the Board of Immigration Appeals; and 321 Alien Files of Asylum Seekers who were referred for credible fear;
- Surveyed all eight asylum offices and 19 detention facilities;
- Interviewed, and collected data from, 39 asylum seekers who were dissolving their asylum claim;
- Reviewed 50 files provided by DHS of negative credible fear determinations; and
- Compiled nation-wide statistics with the assistance of EOIR and DHS.

## *OVERVIEW OF FINDINGS AND RECOMMENDATIONS OF THE USCIRF STUDY*

The Study found mandatory procedures in place to ensure that asylum seekers are protected under Expedited Removal.  Some procedures were applied with reasonable consistency, but compliance with others varied significantly, depending upon where the alien arrived, and which immigration judges or inspectors addressed the alien's claim.  Most procedures lacked effective quality assurance measures to ensure that they were consistently followed.   Consequently, the outcome of an asylum claim appears to depend not only on the strength of the claim, but also on which officials consider the claim, and whether or not the alien has an attorney.   Similarly, while DHS has developed criteria relating to the release of detained asylum seekers, the implementation of these criteria also varies widely from place to place.

There are a few areas, however, where the Study identified problems other than inconsistent practices.  For example, with regard to detention, the Study found that asylum seekers are consistently detained in jails or jail-like facilities, which the experts found inappropriate for non-criminal asylum seekers.  There were, however, a small number of exceptions to this rule, the most prominent being a contract facility in Broward Country, Florida, which represents a secure, but appropriate and non-correctional, environment for non-criminal asylum seekers.

The Study also found that asylum seekers without a lawyer had a much lower chance of being granted asylum (2 percent) than those with an attorney (25 percent).  This difference was consistent whether the alien resided – or was detained – in an area with a high rate of representation, or a low rate of representation.  The Study does, however, identify a number of locations where public-private initiatives involving DHS, the Executive Office for Immigration Review, and non-governmental organizations, have put legal assistance within reach of more detained asylum seekers.  These programs, however, are limited to only a few select locations.

With regard to credible fear determinations, the Study found that  asylum officers screened-in more than 90 percent of credible fear applicants, and made a negative credible fear finding in only 1 percent of cases.  Quality assurance procedures – requiring much more extensive documentation and review of negative claims than of positive ones, may have created a built-in bias in the credible fear screening, undermining the objectivity of the process.

Each stage of the Expedited Removal Process relies upon the information collected in previous stages:

(1) The alien is referred by Customs and Border Protection (CBP) for a credible fear interview, or removed; then

(2) Referred by an asylum officer at U.S. Citizenship and Immigration Services (USCIS) for an asylum hearing, or ordered removed (subject to immigration judge review of the negative credible fear determination); then

(3) Detained or paroled by Immigration and Customs Enforcement (ICE); and then

(4) With the participation in the courtroom by an ICE Trial Attorney, granted or denied asylum, withholding, or Convention Against Torture (CAT) relief by the immigration judge (in the Department of Justice Executive Office for Immigration Review – EOIR).

The impediments to communication and information sharing within DHS, however, are serious. By the end of the process – the asylum hearing – unreliable and/or incomplete documentation from CBP and USCIS is susceptible to being misinterpreted by the ICE Trial attorney, misapplied by the Immigration Judge, and may ultimately result in the denial of the asylum-seeker's claim.  The Study did not seek to determine whether asylum claims were incorrectly denied, but did determine that immigration judges, even within the same court, had significantly different rates of granting or denying asylum claims.  Furthermore, in denying asylum applications on the basis of credibility, immigration judges frequently cited documents which the Study found to be unreliable and incomplete records.  The unreliability of the documentation was documented by the Port of Entry study (Keller, et al), and its incompleteness and its use in immigration proceedings were documented by the File Review (Jastram, et al).

The Study also noted that Expedited Removal has been expanded twice in recent years, without first addressing the flaws in the system which undermine the protections for asylum seekers.

The Study urges the incoming Secretary of Homeland Security to ensure that it is no longer he – but a high ranking official who reports to him – who is responsible for coordinating refugee and asylum matters among the various bureaus.  Without day-to-day oversight of asylum policy and its implementation department-wide, the flaws in the system identified in this Study cannot be effectively addressed, leaving asylum seekers in Expedited Removal at risk of being returned to countries where they may face persecution.

**SPECIFIC FINDINGS AND RECOMMENDATIONS**

***FINDINGS***

**Question One**

*ARE IMMIGRATION OFFICERS, EXERCISING EXPEDITED REMOVAL AUTHORITY, IMPROPERLY ENCOURAGING ASYLUM SEEKERS TO WITHDRAW APPLICATIONS FOR ADMISSION?*

*Department of Homeland Security (DHS) regulations, and Customs and Border Protection (CBP) procedures and training materials make it clear to CBP inspectors that the withdrawal of an application for admission is "strictly voluntary" and "must not be coerced in*

*any way." While most officers observed complied with these procedures, in one port of entry the Study observed a few instances in which immigration officers improperly encouraged asylum seekers to withdraw their applications for admission.*

## Question Two

*ARE IMMIGRATION OFFICERS, EXERCISING EXPEDITED REMOVAL AUTHORITY, INCORRECTLY FAILING TO REFER ASYLUM SEEKERS FOR A CREDIBLE FEAR INTERVIEW?*

*DHS regulations state that an immigration inspector must refer an alien for a credible fear determination if that alien indicates "an intention to apply for asylum, a fear of torture, or a fear of return to his or her country." In accordance with these regulations, nearly 85 percent (67/79) of arriving aliens observed by the Study expressing a fear of return were referred for a credible fear interview. CBP Guidelines, however, provide the inspector with more discretion than the regulations, allowing the inspector to decline referral in cases where the fear claimed by the applicant is unrelated to the criteria for asylum. Indeed, in 15 percent (12/79) of observed cases when an arriving alien expressed a fear of return to the inspector, the alien was not referred. Moreover, among these twelve cases were several aliens who expressed fear of political, religious, or ethnic persecution, which are clearly related to the grounds for asylum. Of particular concern, in seven of these twelve cases, the inspector incorrectly indicated on the sworn statement that the applicant claimed he had no fear of return.*

*DHS regulations require immigration inspectors to follow a standard script informing each alien that (s)he may ask for protection if (s)he has a fear of returning home. In approximately half of inspections observed, inspectors failed to inform the alien of the information in that part of the script. Aliens who did receive this information were seven times more likely to be referred for a credible fear determination than those who were not.*

*While DHS guidance requires that asylum seekers at land ports of entry be placed in Expedited Removal and referred for a credible fear interview, the Study interviewed two groups of aliens (one from the Middle East, the other from East Africa) who requested the opportunity to apply for asylum but were refused and "pushed back" at primary inspection. We became aware of these cases only because, in each case, the asylum seekers tried again on a different day and were referred into Expedited Removal as well as for a credible fear interview. CBP has stated that it is "very concerned and dismayed that this is happening contrary to policy, and is taking steps to address this."[6]*

## Question Three

*ARE IMMIGRATION OFFICERS, EXERCISING AUTHORITY UNDER EXPEDITED REMOVAL, INCORRECTLY REMOVING ASYLUM SEEKERS TO COUNTRIES WHERE THEY MAY FACE PERSECUTION?*

---

[6] Letter from Michael J. Hrinyak, Acting Executive Director , Immigration Policy and Programs, Office of Field Operations, to Mark Hetfield, USCIRF (February 2, 2005). *See also* "Aliens Seeking Asylum at Land Border Ports of Entry," Memorandum from Michael A. Pearson, Executive Associate Commissioner, Office of Field Operations, Immigration and Naturalization Service, to Regional Directors (2/6/2002).

The second Study question concerned bona fide asylum seekers who are improperly denied a referral for a credible fear determination. While such asylum seekers may be removed to a country where they may face persecution, those findings are not repeated here. Rather, to respond to this question, the focus is on asylum seekers who are removed after the credible fear interview. In addressing this question, it is also appropriate to examine asylum seekers ordered removed by the immigration judge at the conclusion of their asylum hearing, focusing on the characteristics of the proceeding which are unique to cases that originate in Expedited Removal.

Asylum officers reach a negative credible fear determination in only one percent of cases referred. Moreover, a negative credible fear determination is subject to strict quality assurance procedures by Asylum headquarters, and may then be reviewed by an immigration judge, who vacates negative credible fear findings reached by asylum officers more than ten percent of the time.

Under the current system, immigration judges – not asylum officers – determine eligibility for asylum for aliens in Expedited Removal proceedings. We found very significant variations in the asylum approval rates of individual judges Furthermore, in nearly 40% of the immigration judge decisions examined where relief was denied, the judge cited that the applicant's testimony was inconsistent with his or her initial asylum claim, as expressed to the immigration inspector or the asylum officer at the time of the credible fear interview. In nearly one-fourth of these cases, the Judge found that the asylum-seeker's testimony was not credible because the alien "added detail" to the prior statements. Such negative credibility findings fail to take into account that the records of these prior statements are, according to the findings of the Study, often unreliable and incomplete. Finally, immigration judges granted relief to 25 percent of represented asylum applicants but only two percent of unrepresented asylum seekers.

After being denied asylum, an alien who continues to claim a fear of persecution or torture may appeal a negative immigration judge decision to the Board of Immigration Appeals (BIA). While the BIA sustained 23 percent of Expedited Removal asylum appeals in FY2001, only two to four percent of such appeals have been granted since 2002, when the court began allowing the issuance of "summary affirmances" rather than detailed decisions. Statistically, it is highly unlikely that any asylum seeker denied by an immigration judge will find protection by appealing to the BIA.

## Question Four

ARE IMMIGRATION OFFICERS, EXERCISING AUTHORITY UNDER EXPEDITED REMOVAL, DETAINING ASYLUM SEEKERS IMPROPERLY OR UNDER INAPPROPRIATE CONDITIONS?

Asylum seekers subject to Expedited Removal must, by law, be detained until an asylum officer has determined that they have a credible fear of persecution or torture, unless release (parole) is necessary to meet a medical emergency need or legitimate law enforcement objective. The Study found that most asylum seekers are detained in jails and in jail-like facilities, often with criminal inmates as well as aliens with criminal convictions. While DHS has established detention standards, these detention facilities closely resemble, and are based on, standards for correctional institutions.

In one particularly innovative Immigration and Customs Enforcement (ICE) contract facility, located in Broward County, Florida, asylum seekers are detained in a secure facility which does not closely resemble a jail. While Broward could be the model in the United States for the detention of asylum seekers, it is instead the exception among the network of 185 jails, prisons and "processing facilities" utilized by DHS to detain asylum seekers in Expedited Removal.

DHS policy favors the release of asylum seekers who have established credible fear, identity, community ties, and no likelihood of posing a security risk. However, there was little documentation in the files to allow a determination of how these criteria were actually being applied by ICE.

In FY2003, only 0.5 percent of asylum seekers subject to Expedited Removal in the New Orleans district were released prior to a decision in their case. In Harlingen, Texas, however, nearly 98 percent of asylum seekers were released. Release rates in other parts of the country varied widely between those two figures.

## RECOMMENDATIONS

### Recommendation One

IN ORDER TO MORE EFFECTIVELY PROTECT BOTH HOMELAND SECURITY AND BONA FIDE ASYLUM SEEKERS, THE DEPARTMENT OF HOMELAND SECURITY SHOULD CREATE AN OFFICE- HEADED BY A HIGH-LEVEL OFFICIAL- AUTHORIZED TO ADDRESS CROSS CUTTING ISSUES RELATING TO ASYLUM AND EXPEDITED REMOVAL.

### Recommendation Two

THE BURDEN ON THE DETENTION SYSTEM, THE IMMIGRATION COURTS, AND BONA FIDE ASYLUM SEEKERS IN EXPEDITED REMOVAL THEMSELVES SHOULD BE EASED BY ALLOWING ASYLUM OFFICERS TO GRANT ASYLUM IN APPROVABLE CASES AT THE TIME OF THE CREDIBLE FEAR INTERVIEW, JUST AS THEY ARE ALREADY TRAINED AND AUTHORIZED TO DO FOR OTHER ASYLUM SEEKERS. ALIENS WHO ESTABLISH CREDIBLE FEAR BUT, FOR WHATEVER REASON, HAVE NOT YET ESTABLISHED AN APPROVABLE ASYLUM CLAIM, SHOULD CONTINUE TO BE REFERRED TO AN IMMIGRATION JUDGE.

### Recommendation Three

DHS SHOULD ESTABLISH DETENTION STANDARDS AND CONDITIONS APPROPRIATE FOR ASYLUM SEEKERS. THE AGENCY SHOULD ALSO PROMULGATE REGULATIONS TO PROMOTE MORE CONSISTENT IMPLEMENTATION OF EXISTING PAROLE CRITERIA, TO ENSURE THAT ASYLUM SEEKERS WITH A CREDIBLE FEAR OF PERSECUTION- WHO ESTABLISH IDENTITY AND THAT THEY POSE NEITHER A FLIGHT NOR A SECURITY RISK- ARE RELEASED FROM DETENTION.

### Recommendation Four

EXPAND EXISTING PRIVATE-PUBLIC PARTNERSHIPS TO FACILITATE LEGAL ASSISTANCE FOR ASYLUM SEEKERS SUBJECT TO EXPEDITED REMOVAL, AND IMPROVE ADMINISTRATIVE REVIEW AND QUALITY

ASSURANCE PROCEDURES TO IMPROVE CONSISTENCY IN ASYLUM DETERMINATIONS BY IMMIGRATION JUDGES.

## Recommendation Five

THE DEPARTMENT OF HOMELAND SECURITY SHOULD IMPLEMENT AND MONITOR QUALITY ASSURANCE PROCEDURES TO ENSURE MORE RELIABLE INFORMATION FOR HOMELAND SECURITY PURPOSES, AND TO ENSURE THAT ASYLUM SEEKERS ARE NOT TURNED AWAY IN ERROR.

SPECIFICALLY, IT SHOULD:

- CREATE A RELIABLE INTER-BUREAU SYSTEM THAT TRACKS REAL-TIME DATA OF ALIENS IN EXPEDITED REMOVAL PROCEEDINGS.
- RECONCILE CONFLICTING FIELD GUIDANCE TO REQUIRE THAT ANY EXPRESSION OF FEAR AT THE PORT OF ENTRY MUST RESULT IN EITHER A REFERRAL FOR A CREDIBLE FEAR DETERMINATION OR, IN CASES WHERE THE INSPECTOR OR BORDER PATROL AGENT BELIEVES THE ALIEN WOULD "CLEARLY NOT QUALIFY" FOR ASYLUM OR CAT RELIEF, CONTACT WITH AN ASYLUM OFFICER TO SPEAK TO THE ALIEN VIA A TELEPHONIC INTERPRETATION SERVICE TO DETERMINE WHETHER OR NOT THE ALIEN NEEDS TO BE REFERRED.
- IMPROVE QUALITY ASSURANCE BY EXPANDING AND ENHANCING THE VIDEOTAPE SYSTEMS CURRENTLY USED AT HOUSTON AND ATLANTA TO ALL MAJOR PORTS OF ENTRY AND BORDER PATROL STATIONS TO UNINTRUSIVELY RECORD ALL SECONDARY INTERVIEWS, AND CONSIDER EMPLOYING THE USE OF UNDERCOVER "TESTERS" TO VERIFY THAT EXPEDITED REMOVAL PROCEDURES ARE BEING PROPERLY FOLLOWED.
- INCLUDE, ON SWORN STATEMENT FORM I-867B, AN EXPLANATION OF THE SPECIFIC PURPOSE FOR WHICH THE DOCUMENT IS DESIGNED TO SERVE, AND ITS LIMITATIONS.
- ENHANCE THE EFFICIENCY OF THE EXPEDITED REMOVAL PROCESS BY AMENDING DHS QUALITY ASSURANCE PROCEDURES FOR THE CREDIBLE FEAR INTERVIEW TO SUBJECT NEGATIVE AND POSITIVE DETERINATIONS TO SIMILAR QUALITY ASSURANCE PROCEDURES.

## Recommendation Summary

*THIS STUDY HAS PROVIDED TEMPORARY TRANSPARENCY TO EXPEDITED REMOVAL – A PROCESS WHICH IS OPAQUE NOT ONLY TO THE OUTSIDE WORLD, BUT EVEN WITHIN THE DEPARTMENT OF HOMELAND SECURITY. AS A RESULT OF THIS TRANSPARENCY, SERIOUS – BUT NOT INSURMOUNTABLE – PROBLEMS WITH EXPEDITED REMOVAL HAVE BEEN IDENTIFIED. THE STUDY'S RECOMMENDATIONS CONCERNING BETTER DATA SYSTEMS, QUALITY ASSURANCE MEASURES, ACCESS TO REPRESENTATION, AND A DHS REFUGEE COORDINATOR WOULD ALL CONTRIBUTE TO A MORE TRANSPARENT AND EFFECTIVE EXPEDITED REMOVAL PROCESS. WE ALSO RECOMMEND THAT CONGRESS REQUIRE THE DEPARTMENTS OF JUSTICE AND HOMELAND SECURITY TO PREPARE AND SUBMIT REPORTS, WITHIN 12 MONTHS OF THE RELEASE OF THIS STUDY, DESCRIBING AGENCY ACTIONS TO ADDRESS THE FINDINGS AND RECOMMENDATIONS OF THIS STUDY.*

**ASYLUM SEEKERS IN EXPEDITED REMOVAL:**
*A Study Authorized by Section 605 of the International Religious Freedom Act of 1998*

## INTRODUCTION

The U.S. Commission on International Religious Freedom (USCIRF) was established by the International Religious Freedom Act of 1998 (IRFA). As stated in the preamble of the Commission's founding legislation,

> The right to freedom of religion undergirds the very origin and existence of the United States. Many of our Nation's founders fled religious persecution abroad, cherishing in their hearts and minds the ideal of religious freedom. They established in law, as a fundamental right and as a pillar of our Nation, the right to freedom of religion. From its birth to this day, the United States has prized this legacy of religious freedom and honored this heritage by standing for religious freedom and offering refuge to those suffering religious persecution.

The Commission is an independent and bipartisan federal agency created to monitor religious freedom in other countries and advise the President, Secretary of State and Congress on how best to promote it.

Consistent with the language in the preamble of the legislation, IRFA also authorized the Commission to appoint experts to conduct a study to advise whether certain legislative changes to asylum, enacted in 1996, were impairing America's obligation – and founding tradition – of offering refuge to those suffering religious persecution.

The Congress authorized the Commission to appoint experts to examine how the new immigration procedure – known as "Expedited Removal" – was affecting asylum seekers, regardless of whether or not the claim was based on religion, race, nationality, membership in a particular social group, or political opinion.

As authorized by section 605 of IRFA, the Commission appointed independent experts to undertake the Study. While not involved in the development of the Study methodology, the Commissioners formed an active subcommittee to liaise with the experts, and visit some of the ports of entry, Border Patrol stations, asylum offices, and detention centers with them.

After substantial discussion and deliberation, the Commission concurs with the findings and recommendations of the experts. The Commission is convinced that, if carried out, these recommendations will allow Expedited Removal to protect our borders while protecting *bona fide* asylum seekers. This is how Expedited Removal was intended to work, and how it often does work.

The Commission regrets, however, that serious problems were also identified, which put some asylum seekers at risk of improper return (*refoulement*). We also found that most asylum seekers in Expedited Removal are detained under conditions which may be suitable in the criminal justice system, but are entirely inappropriate for asylum seekers fleeing persecution.

Nevertheless, we and the experts are confident that these issues can be addressed without amending to the Immigration and Nationality Act.

WHAT IS EXPEDITED REMOVAL?

Prior to 1996, if an alien arrived in the United States – to seek asylum or for any other purpose – but lacked the proper documentation, an immigration inspector could refer the alien to an immigration judge for an "exclusion" hearing.  The inspector, however, could not compel the alien to leave the United States.  While aliens awaiting an exclusion proceeding could be detained by the Immigration and Naturalization Service (INS), limited INS bedspace meant that they were frequently not detained while waiting to see an immigration judge.

After the 1993 bombing of the World Trade Center, questions were raised about whether immigration inspectors could protect our borders if they were powerless to turn away improperly documented aliens.  There was growing concern that terrorists and other aliens without valid identity documents could exploit the system to enter and disappear into the United States.  At the same time, human rights advocates argued that bona fide asylum seekers are often forced to flee without proper documents.  They asserted that authorizing immigration inspectors to summarily remove arriving aliens would result in the return (*refoulement*) of legitimate asylum seekers to countries where they may face persecution.

In 1996, Congress passed the Illegal Immigration Reform and Immigrant Responsibility Act (IIRAIRA), the most comprehensive immigration reform legislation in over 30 years.  Among other reforms, the legislation established Expedited Removal, which was intended to strengthen the security of America's borders, without closing them to those fleeing persecution.

Under Expedited Removal, an alien without proper documents at the port of entry may be ordered removed by an immigration inspector.  In most cases, the alien may neither consult with an attorney nor be heard before an immigration judge.

Congress also included provisions to prevent the Expedited Removal of refugees fleeing persecution.[1]  Specifically, an alien who indicates an intention to apply for asylum or a fear of return is entitled to a credible fear screening by an asylum officer.

Congress also required that aliens, including asylum seekers, subject to Expedited Removal be detained until the United States physically removes them, after which they may not return to the United States for five years.  If an asylum officer determines that an alien has a credible fear of persecution, however, the alien may be considered for release.  While decisions of release ("parole") are discretionary, memoranda of the Immigration and Naturalization

---

[1] Under the 1967 Protocol to the 1951 Convention relating to the Status of Refugees, to which the United States is a signatory, as implemented by the Refugee Act of 1980 and other amendments to the Immigration and Nationality Act, the United States may not return any individual to a country where their face persecution on the basis of race, religion, nationality, membership in a particular social group or political opinion.  In addition, the United States ratified the Convention Against Torture (CAT), and may not remove anyone to a country where (s)he is, in danger of being tortured.

Service (INS), at that time the lead agency on Expedited Removal, instruct that "parole is a viable option and should be considered for aliens who meet the credible fear standard, can establish identity and community ties, and are not subject to any possible bars to asylum involving violence or misconduct."[2]

Expedited Removal is mandatory for aliens arriving at ports of entry. Congress, however, also authorized the Attorney General to exercise discretion in applying Expedited Removal in the interior of the United States to undocumented aliens apprehended within two years after entry. When the Department of Justice implemented Expedited Removal by regulation on March 15, 1997, however, Attorney General Janet Reno limited the application of Expedited Removal to arriving aliens at ports of entry.

CONGRESSIONALLY AUTHORIZED STUDIES ON EXPEDITED REMOVAL

In IIRAIRA, Congress also required the General Accounting Office (GAO) to conduct a study on the Expedited Removal, including "the effectiveness of procedures in processing asylum claims by undocumented aliens who assert a fear of persecution…"[3]

The GAO released its report in 1998. Less than seven months later, Congress passed the International Religious Freedom Act of 1998 (IRFA), which directed the General Accounting Office to undertake a second study – one specifically focused on the impact of Expedited Removal on asylum seekers. The GAO was asked to address four questions:

*Whether, with regard to aliens who may be eligible for asylum in Expedited Removal proceedings, immigration officers were:*

*(1) Improperly encouraging such aliens to withdraw their applications for admission;*

*(2) Incorrectly failing to refer such aliens for an interview by an asylum officer for a determination of whether they have a credible fear of persecution (within the meaning of section 235(b)(1)(B)(v) of the Immigration and Nationality Act);*

*(3) Incorrectly removing such aliens to a country where they may be persecuted; or*

*(4) Detaining such aliens improperly or in inappropriate conditions.*

In addition, Congress authorized the nascent U.S. Commission on International Religious Freedom (USCIRF), an independent government commission created by IRFA, to

---

[2] INS Memorandum, *Expedited Removal: Additional Policy Guidance* (Dec. 30, 1997) from Michael A. Pearson, Executive Associate Commissioner for Field Operations, Office of Field Operations, to Regional Directors, District Directors, Asylum Office Directors, reproduced in 75 *Interpreter Releases* 270 (Feb. 23, 1998).

[3] 8 USC 1225 note (1996). The GAO released this report on March 31, 1998. (ILLEGAL ALIENS: Changes in the Process of Denying Aliens Entry Into the United States. GAO/GGD-98-91.).

appoint independent experts to address the same four questions on Expedited Removal that were posed to the GAO.  Congress granted both GAO and the USCIRF experts "unrestricted access" to Expedited Removal proceedings.

On September 1, 2000, the General Accounting Office released its Expedited Removal study, as required by IRFA.[4]  The GAO Study relied primarily on a review of alien records and statistics maintained by the INS, but did not directly address the four questions posed to it by Congress.[5]  The GAO found that (1) INS was "generally" following its procedures for documenting the Expedited Removal process at selected ports: (2)  INS was "generally" following its procedures for documenting the credible fear process at selected asylum offices; (3) in response to the GAO's preliminary findings, INS had clarified requirements for documentation needed for aliens who recanted their fear of persecution or torture; and (4) "many" released aliens found to have credible fear did not appear for their merits hearings.

POST 9/11 CHANGES TO EXPEDITED REMOVAL

After the terrorist attacks against the United States on September 11, 2001, a number of significant changes to Expedited Removal occurred.

On November 13, 2002, INS Commissioner James Ziglar announced that, effective immediately, he was expanding Expedited Removal to apply to undocumented non-Cubans who entered the United States by sea within the prior two years.  The rationale was to "deter surges in illegal mass migration at sea" which would threaten "national security by diverting valuable United States Coast Guard and other resources from counter-terrorism and homeland security responsibilities."[6]

On March 1, 2003, the INS, the lead agency on Expedited Removal, was abolished by the Homeland Security Act of 2002.  The functions of the former INS were transferred to the newly created Department of Homeland Security.  The Executive Office for Immigration Review (EOIR), however, remained within the Department of Justice.[7]

The former INS functions related to Expedited Removal were dispersed among the different parts of the Department of Homeland Security (DHS).  Immigration inspections, after being merged into Customs and Border Patrol were absorbed as separate components of the Bureau of Customs and Border Protection (CBP).  The detention function, as well as the trial attorneys who represent the government before immigration judges, were absorbed into the Bureau of Immigration and Customs Enforcement (ICE).  And the Asylum Division, whose

---

[4] ILLEGAL ALIENS:  Opportunities Exist to Improve the Expedited Removal Process  GAO/GGD-00-176).
[5] According to discussions between Mark Hetfield and James Blume, Assistant Director (retired), GAO, the General Accounting Office declined to directly address the four questions, because it believed it would require GAO to re-evaluate legal decisions made by INS, which GAO felt would be inappropriate.   Furthermore, GAO felt that the four questions were too qualitative for it to develop a feasible methodology to address them.
[6] Notice Designating Aliens Subject to Expedited Removal Under Section 235(b)(1)(A)(iii) of the Immigration and Nationality Act, 67 Fed. Reg. 68,924 (2002).
[7] EOIR oversees the Immigration Judges who review negative credible fear determinations made by asylum officers and who hear asylum claims from aliens placed in Expedited Removal. It also houses the Immigration Judges' appellate review unit, the Board of Immigration Appeals (BIA).

officers conduct the "credible fear" screening in Expedited Removal proceedings, was placed in the United States Citizenship and Immigration Services (USCIS).

Asylum seekers in Expedited Removal were further affected on the eve of the invasion of Iraq.  Two days after the creation of DHS, the White House announced "Operation Liberty Shield."  This initiative mandated that "asylum applicants from nations where al-Quaeda, al Quaeda sympathizers, and other terrorist groups are known to have operated will be detained for the duration of their processing period…to (allow) authorities to maintain contact with asylum seekers while the validity of their claim (is determined)."[8]

The USCIRF Study

In the meantime, the Commission decided to proceed with appointing experts to conduct the study to answer the four questions on asylum seekers in Expedited Removal posed by Congress in IRFA.  The Commission had been concerned by anecdotal reports of irregularities at ports of entry and in INS detention centers.  In addition, with the dissolution of INS and the absorption of Expedited Removal into the Department of Homeland Security, the Commission concluded the importance of examining Expedited Removal in an environment dramatically different than the one studied by GAO.  The Commission also intended the study to distinguish itself from the earlier GAO effort by employing direct observation of Expedited Removal proceedings at ports of entry.  The GAO Study had relied primarily on file review, instead of observing Expedited Removal proceedings themselves.

In May 2003, the Commission appointed its first expert, Mark Hetfield, to direct the Expedited Removal Study.  While Mr. Hetfield secured access to Expedited Removal proceedings with the Department of Justice and the Department of Homeland Security, the Commission appointed a lead methodologist and additional experts to conduct the Study, representing a broad swath of experience and expertise in government,  inter-governmental and non-governmental organizations, academia, and private practice.

The Study employed a multi-pronged approach in order to answer the questions posed by Congress.  The methodology of the Study  combined the file review, site visits, surveys and statistical analyses similar to those performed by the General Accounting Office, as well as methods not applied by the GAO, including monitors stationed at major ports of entry and "exit interviews" with aliens being expeditiously removed and asylum seekers referred for credible fear interviews.

Study experts and Commissioners did preliminary site visits to inspection and detention facilities in the following areas:  Arizona; Atlanta; Chicago; Detroit; Houston; Laredo; Los Angeles; Miami; New York/Newark; Puerto Rico; San Ysidro; San Francisco; and Washington,

---

[8]  White House Fact Sheet: Operation Liberty Shield.  (March 17, 2003).  Operation Liberty Shield was terminated one month later.  Department of Homeland Security Press Release:  Remarks by Secretary of Homeland Security Tom Ridge to the National Press Club (April 29, 2003).  While all asylum seekers in Expedited Removal proceedings must be detained until an asylum officer determines whether they have a credible fear of persecution, release after the credible fear determination is usually at the discretion of the ICE Area Director.  Operation Liberty Shield temporarily revoked the use of that discretion to release aliens from certain countries.

D.C.  During these visits, experts and commissioners met with inspectors (CBP), detention officials (ICE), asylum officers (USCIS); immigration judges (EOIR); asylum seekers who have experienced Expedited Removal proceedings; and non-governmental organizations.  In Washington, Commission experts also met with officials from DHS Headquarters, the Executive Office for Immigration Review, and the Regional Office of the United Nations High Commissioner for Refugees (UNHCR) for the United States and the Caribbean.

After the Commission commenced the Study, Expedited Removal continued to evolve and expand.  On August 11, 2004, the Department of Homeland Security announced that, effective immediately, it was further expanding Expedited Removal authority to the Border Patrol for undocumented aliens apprehended within 14 days after entry and within 100 miles of the Mexican or Canadian border.  DHS announced that Expedited Removal would be applied primarily to non-Mexicans and non-Canadians, but that undocumented migrants from Mexico and Canada with histories of immigration or criminal violations would also be subject to the procedure.[9]

In light of this, the Study experts, along with two Commissioners, met with DHS officials in the Tucson Border Patrol Sector.  Experts also traveled to Laredo, Texas to observe the early application of Expedited Removal by the Border Patrol.  These two sectors were the first in which the Border Patrol exercised Expedited Removal authority.

In February 2005, the Commission experts concluded the Study and finalized their reports after receiving valuable feedback on earlier drafts from the GAO (now known as the Government Accountability Office), as well as from the interested bureaus and offices within the Departments of Justice and Homeland Security.  The Commission acknowledges and appreciates the cooperation with the Study demonstrated by  all of these agencies.

THE STUDY'S CONCLUSIONS

The findings and recommendations of the Study represent the consensus reached among the experts.  The Commission concurs with those findings and recommendations.  We remain convinced that implementing the recommendations contained in this Study will advance Congress' objective to establish a system which protects our borders but also protects asylum seekers.  In particular, the Commission hopes that the new leadership at the Department of Homeland Security will act on the Study's over-arching recommendation, that a high level Refugee Coordinator office at DHS be established.  Once that occurs, DHS will have a forum in which to more effectively tackle these concerns, and ensure that Expedited Removal can co-exist with our tradition of allowing those who flee persecution – religious or otherwise – to find refuge on our shores

REFUGEE PROTECTION AND ASYLUM TRENDS

Finally, the Study uncovered statistics which, the Commission believes require further investigation and analysis.  Since September 11, while the number of aliens traveling to the

---

[9] Designating Aliens for Expedited Removal, 69 Fed. Reg. 48,877 (2004).

United States has declined by 20 percent, the number of asylum seekers who arrive through Expedited Removal proceedings has plummeted by 50 percent.

Under U.S. law, an alien has a legal right to apply for asylum once he or she arrives in the United States. No one, however, has a legal right to travel to the United States in order to apply for asylum. Indeed, increasing numbers of DHS employees stationed overseas are being enlisted to help foreign airline personnel identify improperly documented aliens to prevent them from boarding planes to the United States. Whatever the implications of these actions are for national security, they will likely have an adverse impact on the number of bona fide asylum seekers fleeing to the United States, as they are often unable to obtain legitimate travel documents from the state which persecutes them. Moreover, U.S. Consular officers have long denied visas when they suspect the applicant intends to apply for asylum after landing in the United States.

Recognizing that asylum seekers who cannot get a visa to the United States may still have serious protection needs, the Department of State, in consultation with Congress, developed discretionary mechanisms to allow such individuals to be referred for resettlement. One such mechanism allows embassies and consular officers to refer individuals with protection needs to the U.S. Refugee Program. In order to promote better understanding and use of this protection mechanism, section 602 of IRFA requires the Secretary of State to "provide sessions on refugee law and adjudications and on religious persecution to each individual seeking a commission as a United States consular officer." The Commission has raised concerns regarding the State Department's failure to implement this requirement.[10]

Given the dramatic decline in the number of asylum seekers entering the United States, we would urge Congress to authorize a study on the reasons for the decline and the extent to which consular officers are being trained in, and utilizing, the refugee referral mechanism, referred to in section 602 of IRFA.

Indeed, the data collected in this Study answered the four questions about Expedited Removal posed to the experts by Congress, but poses many more. We do not consider publication and release to mark the end of this study. It is our hope that the hundreds of pages of data compiled will continue to be reviewed and analyzed by others to provide further guidance on how the process can be improved.

Preeta D. Bansal
Chair
U.S. Commission on International
 Religious Freedom

---

[10] USCIRF Annual Report 2004, p. 101.

ASYLUM SEEKERS IN EXPEDITED REMOVAL:
*A Study Authorized by Section 605 of the International Religious Freedom Act of 1998*

EXPERTS

**Mark Hetfield, J.D.,** Study Director (*Report on Credible Fear Determinations*)

Mark Hetfield joined the US Commission on International Religious Freedom in May 2003 after fourteen years of working in immigration and refugee law at the U.S. Immigration and Naturalization Service (INS) as well as in the private and non-profit sectors, serving in New York, Rome, Washington, Port-au-Prince, and Guam. In addition to practicing immigration law and supervising INS Adjudicators, he has served as Director of International Operations as well as Washington Representative for a faith-based NGO focused on refugee protection and resettlement. Mr. Hetfield is a specialist in Russia and the former Soviet Union. He holds a Bachelor of Science in Foreign Service (BSFS) from Georgetown University, where he earned a certificate in Russian Area Studies. He also graduated cum laude with a juris doctor from Georgetown University Law Center.

**Kate Jastram, M.A., J.D.** (*A-File and Record of Proceeding Analysis of Expedited Removal*)

Kate Jastram teaches refugee law, advanced asylum issues, and global migration issues at the University of California, Berkeley, Boalt Hall School of Law.  Prior to joining  the faculty at UC-Berkeley, she worked for the Office of the United Nations High Commissioner for Refugees; her responsibilities included serving as UNHCR's Deputy Representative for the United States and the Caribbean from 1994-1997.  Before that, she directed a pro bono asylum program in Minneapolis, and practiced immigration law in San Francisco. Her scholarly work has focused on human rights and migration issues; recent publications include "Human Rights in Refugee Tribunals" (forthcoming, Refugee Law Quarterly) and "Family unification, including migration of children" (Migration and Legal Norms, 2003).  Ms. Jastram received her B.A. from San Francisco State University 1980, her M.A. from Sarah Lawrence College 1982, and her J.D. from UC Berkeley (Boalt Hall) in 1986.

**Allen Keller, M.D.** (*Evaluation of Credible Fear Referral in Expedited Removal at Ports of Entry in the United States*)

Dr. Allen Keller is Assistant Professor of Medicine at New York University School of Medicine and  Director of the Bellevue/NYU Program for Survivors of Torture.  Since 1995, the Bellevue/NYU Program has provided comprehensive, multi-disciplinary care to more than 1,500 victims of torture, many of whom are asylum seekers or asylees, and their families from over 70 countries. Dr. Keller is recognized internationally as an expert in the evaluation and treatment of torture victims and asylum seekers. Dr. Keller is on the advisory board of Physicians For Human Rights (PHR) and has written and spoken about a number of issues relating to health and human rights including the evaluation and treatment of torture victims, political asylum, access to health care for prisoners, and the medical and social consequences of land mines. Dr. Keller has conducted several studies on refugee/asylum seeker populations in the United States, Eastern Europe, and India. In 2003, Dr. Keller completed a study examining the health of asylum seekers

detained in the United States by the INS.  This study, jointly conducted by the Bellevue/NYU Program and PHR, was the first of its kind.  In 2003, Dr. Keller received the Barbara Chester Award, an international award given to a clinician in recognition of outstanding care provided to victims of torture. He was also honored in 1999 and again in 2001 with the NYU School of Medicine Humanism in Medicine Award.

**Charles H. Kuck, J.D.**[*] (*Legal Assistance for Asylum Seekers in Expedited Removal: A Survey of Alternative Practices*)

Charles H. Kuck is an Adjunct Professor of Law at the University of Georgia, School of Law. Mr. Kuck is also the managing partner of Weathersby, Howard & Kuck, LLC., located in Atlanta, Georgia. Mr. Kuck practices all areas of family, business and removal based immigration law, including federal court immigration litigation.  Mr. Kuck is Editor-in-Chief of AILA's *Litigation Toolbox*, and currently serves at the elected National Treasurer of AILA.  He previously served as an elected Director of AILA for six years. Among other activities, he has chaired AILA's USCIS HQ Liaison Committee and AILA's UPL/CPAR Committee.  He also served as chair of AILA's 2002 Annual Conference.  Mr. Kuck is a past recipient of AILA's Minsky Young Lawyer Award, and Catholic Social Services' Pro Bono Award.  Mr. Kuck has written numerous articles on U.S. immigration law and policy, and has spoken to many industry, legal and professional groups on these same issues.

DETENTION ADVISOR

**Craig Haney, J.D., Ph.D.** (*Conditions of Confinement for Detained Asylum Seekers Subject to Expedited Removal*)

Craig Haney received his Ph.D. in psychology and J.D. degrees from Stanford University in 1978. One of the principal researchers on the highly publicized "Stanford Prison Experiment" in 1971, he has been studying the psychological effects of living and working in actual prison environments since then. His work has taken him to dozens of maximum security prisons across the United States and in several different countries where he has evaluated conditions of confinement and interviewed prisoners about the mental health consequences of incarceration. Professor Haney has published widely on prison-related topics in a variety of scholarly journals, including the American Psychologist, and Psychology, Public Policy, and Law. In addition, he has a forthcoming book that focuses on the nature and psychology of contemporary imprisonment and will be published by the American Psychological Association in 2005. He also has served as a consultant to various governmental agencies, including the White House, Department of Justice, California Legislature, and various state and federal courts. His research, writing, and testimony have been cited in many judicial opinions that address the psychological consequences of incarceration. Professor Haney has testified as an expert witness in many trials around the country, addressing a variety of important issues in the areas of criminal justice and constitutional law.

---

[*] Replaced **Robert C. Divine**, who participated as an expert in the Study from October 2003 through June 2004, when he resigned to accept an appointment as Chief Counsel at United States Citizenship and Immigration Services at the Department of Homeland Security.

LEAD METHODOLOGIST AND STATISTICIAN

**Fritz Scheuren, Ph.D.** (*Statistical Report on Expedited Removal, Credible Fear, and Withdrawal, FY 2000-2003*; *Statistical Report on Detention, FY 2000-2003*; *Statistical Report on Immigration Court Proceedings, FY 2000-2004*)

Fritz Scheuren is the Vice-President for Statistics at the National Opinion Research Center (NORC) and a statistical consultant for the Human Rights Data Analysis Group of the AAAS Science and Human Rights Program. Dr. Scheuren has also been recently named president elect of the American Statistical Association (ASA). He has had a long career of public service and presently focuses on human rights activities, working on projects for the U.S. Commission on International Religious Freedom, on Native American Trust Fund issues, and, most recently, on improvements in vote counting for the 2004 presidential election. He has also consulted on the methods of statistical analysis for Peru's Truth and Reconciliation Commission. Dr. Scheuren has received numerous awards and honors including: the ASA Founders Award (1998); Shiskin Award for contributions to U.S. Economic Statistics (1995); Finalist, Senior Executive Association Executive Excellence Award, (1992); Elected Member, the International Statistical Institute (1988); Elected Fellow, the American Association for the Advancement of Science (1984); Elected Fellow, the American Statistical Association (1981).

## ASYLUM SEEKERS IN EXPEDITED REMOVAL:
*A Study Authorized by Section 605 of the International Religious Freedom Act of 1998*

## BACKGROUND INFORMATION

### MANDATE OF THE STUDY

Four questions asked of the U.S. Commission on International Religious Freedom (The Commission) experts by Section 605 of the International Religious Freedom Act:

> *Whether, with regard to individuals potentially eligible for asylum or Convention Against Torture relief in Expedited Removal proceedings, immigration officers are:*
>
> (A) Improperly encouraging such aliens to withdraw their applications for admission.
>
> (B) Incorrectly failing to refer such aliens for an interview by an asylum officer for a determination of whether they have a credible fear of persecution.
>
> (C) Incorrectly removing such aliens to a country where they may be persecuted.
>
> (D) Detaining such aliens improperly or in inappropriate conditions.

The Experts appointed by the Commission were authorized unfettered access to the Expedited Removal process in order to conduct the Study. Expedited Removal proceedings are normally closed. The applicants may not even have family members or an attorney present during Expedited Removal proceedings conducted at ports of entry.

### EXPERTS APPOINTED TO CONDUCT THE STUDY

**Mark Hetfield**, (Director of the Study, Commission Staff)

**Prof. Kate Jastram,** (UC-Berkeley Boalt Hall School of Law)

**Allen Keller, M.D.** (NYU School of Medicine, Bellevue Program for Survivors of Torture)

**Charles H. Kuck**, (Attorney, Atlanta, Georgia, National Treasurer, American Immigration Lawyers Association)

### METHODOLOGIST

**Fritz Scheuren, Ph.D.** (Vice President, Statistics, NORC of the University of Chicago and President, American Statistical Association)

DETENTION ADVISOR

**Craig Haney, Ph.D.** (Professor of Psychology, UC-Santa Cruz)

AN OVERVIEW OF THE EXPEDITED REMOVAL PROCESS

Expedited Removal, initiated on March 1, 1997 pursuant to the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRAIRA), allows immigration inspectors at ports of entry to remove (deport) aliens on-the-spot when they conclude that the aliens are seeking entry to the United States through misrepresentation, lack of documentation or fraudulent documents. Previously, such aliens could only be removed after an exclusion hearing before an immigration judge.

It is important to emphasize that asylum seekers represent only a small percentage of aliens placed in Expedited Removal. In FY2003, out of 177,040 aliens who were found to be subject to Expedited Removal, only 5,376 (3 percent) were asylum seekers referred for a credible fear determination.

Under Expedited Removal, an alien with a "credible fear" of persecution may not be expeditiously removed without first having access to an immigration judge to make an asylum claim.

The process works as follows:

**(1) Inspection**

At the port of entry, an inspector determines that an alien has presented him or herself for admission with (a) fraudulent documents; (b) no documents; (c) facially valid documents obtained by misrepresentation of a material fact; or (d) the intent to apply for asylum. In such cases, the inspector will take a sworn statement and order that the alien be removed. Prior to the sworn statement, the inspector is to read three paragraphs to the alien from Form I-867A, which explains (1) the Expedited Removal process and the five year bar which applies if the alien is ordered removed; (2) the penalties for failing to tell the truth; and (3) that the alien should inform the inspector – "privately and confidentially" – if the alien has any fear or concern about being returned home, since U.S. law "provides protection to certain persons who face persecution, harm or torture upon return."

During the sworn statement, the alien is asked four questions which are written on Form I-867B to elicit information about whether the applicant has any fear of being returned (for any reason). If the alien indicates that (s)he has such a fear, (s)he is referred for a "credible fear" interview before an asylum officer. Throughout his or her time in the secondary inspection area, the alien is not permitted to meet with, or contact, counsel (or anyone else other than Customs and Border Patrol personnel).

**(2) Detention and Non-Adversarial Credible Fear Interview**

After a "cooling off" period of at least 48 hours, during which the alien must remain in the custody of the Department of Homeland Security (DHS), an asylum officer interviews the alien to determine whether the fear expressed by the alien is "credible" and whether there is a nexus to a fear of torture or to the five grounds for asylum (political opinion, race, religion, nationality, or membership in a particular social group), or a fear of torture (for relief under the Convention Against Torture). A negative credible fear determination may be appealed to an immigration judge for a final unreviewable determination. During the credible fear interview, an alien may have an advisor of his choosing present, but during the interview the advisor is not permitted to represent the applicant (and may only speak if the asylum officer permits him to at the end of the interview). The Asylum officer's notes and findings are written on Form I-870 ("Record of Determination/Credible Fear Worksheet").

If credible fear is not found, an Expedited Removal Order is issued, and the alien is removed from the United States.

**(3) Adversarial Asylum Hearing**

If the asylum officer finds "credible fear," the alien is referred to an adversarial proceeding before an immigration judge to determine whether the applicant's fear is "well-founded" and is tied to one of the five grounds for asylum, or if the alien is eligible for relief under Withholding of Removal or the Convention Against Torture. During the months-long wait for an asylum hearing, the DHS Bureau of Immigration and Customs Enforcement (ICE) has discretionary authority to release – or detain – the alien. Practices and policies on release ("parole") vary widely from office to office, and there is no appeal from a negative parole determination.

During the asylum hearing before the immigration judge, the alien may be represented by counsel (at no expense to the government). If the immigration judge finds that the alien qualifies for asylum or relief under the Convention Against Torture, the order to remove him or her is vacated and, in most cases, the alien is eligible for employment authorization and, ultimately, lawful permanent residence (a "Green Card"). The immigration judge's ruling may, however, be appealed to the Board of Immigration Appeals (BIA) – either by the alien or by the DHS Security Trial Attorney who represented the Department before the immigration judge.

If asylum is not granted (and the alien does not appeal), the Expedited Removal order is reinstated and executed.

**(4) Discretionary Uses of Expedited Removal**

Expedited Removal is mandatory for aliens arriving at ports of entry. Congress, however, also authorized the Attorney General to exercise discretion in applying Expedited Removal in the interior of the United States to undocumented aliens

apprehended within two years after entry.  When the DOJ implemented Expedited Removal by regulation on March 15, 1997, however, Attorney General Janet Reno limited the application of Expedited Removal to arriving aliens at ports of entry.

On November 13, 2002, the INS Commissioner announced that, effective immediately, he was expanding Expedited Removal to apply to undocumented non-Cubans who entered the United States by sea within the prior two years.

On August 11, 2004, DHS announced that, effective immediately, it was further expanding Expedited Removal authority to the Border Patrol for undocumented aliens apprehended within 14 days after entry and within 100 miles of the Mexican or Canadian border.  DHS announced that Expedited Removal would be applied primarily to non-Mexicans and non-Canadians, but that undocumented migrants from Mexico and Canada with histories of immigration or criminal violations would also be subject to the procedure.

Any alien ordered "Expeditiously Removed" at any stage in the proceeding is subject to a five-year bar from applying to re-enter the United States (DHS may also use its discretion to allow an alien subject to Expedited Removal to withdraw his or her application for admission, which would *not* impose such a bar).

GLOSSARY OF EXPEDITED REMOVAL TERMS

**ASYLUM** – The legal protective status accorded within the United States to individuals who meet the "refugee definition" found in section 101(a)(42) of the Immigration and Nationality Act. (INA) (*See* "Refugee Definition").

A successful asylee may remain in the United States, work, and eventually adjust to lawful permanent residence (a Green Card) and citizenship. (The number of asylees who may adjust to lawful permanent resident status, however, is limited to 10,000 per year, by statute). Consequently, asylum seekers must now expect to wait longer than ten years to obtain a Green Card.

> **Affirmative Asylum** is the process in which aliens in the United States may voluntarily present themselves to ask for asylum through a non-adversarial interview with an asylum officer. An applicant who does not convince an asylum officer that (s)he meets the refugee definition is referred to an immigration judge. The immigration judge then decides the asylum claim without prejudice but, if the claim is denied and no other relief is available, will result in a removal order against the alien. All proceedings before an immigration judge are adversarial, meaning the asylee will face a DHS trial attorney who usually opposes the grant of asylum, but the asylee may also be represented by counsel (at no expense to the government).

> **Defensive Asylum** is the process by which someone who is in removal (or "deportation") proceedings may claim asylum in an adversarial hearing before an immigration judge. Under the regulations, aliens in Expedited Removal only have access to the Defensive Asylum process.

**ARRIVING ALIEN** – An applicant for admission coming or attempting to come into the United States at a port-of-entry, or an alien seeking transit through the United States at a port-of-entry, or an alien interdicted in international or United States waters and brought into the United States by any means, whether or not to a designated port-of-entry, and regardless of the means of transport. 8 CFR 1.1(q).

**ASYLUM CORPS** – A national corps of asylum officers, with offices in New York, Newark, Miami, Chicago, Los Angeles, San Francisco, Houston, and Arlington, Virginia, who adjudicate Affirmative Asylum claims (see "Affirmative Asylum"). They also determine whether aliens referred from Expedited Removal have a "credible fear" of persecution. This entitles the alien to see an immigration judge to prove that (s)he is entitled to a full grant of asylum.

**ASYLUM REFORM OF 1995** – Prior to 1995, asylum applicants, including arriving aliens, were entitled to employment authorization upon applying for asylum. This, combined with a years long backlog wait for asylum, overwhelmed the asylum system with frivolous claims, further exacerbating the backlog. The 1995 Reform addressed the issue by instituting a "last in, first out" policy, meaning that the most recent asylum

applications would be adjudicated first, with employment authorization granted only to some of those whose applications were not adjudicated within six months after application.  Unsuccessful asylum applicants are now referred to an immigration judge who, if (s)he does not grant asylum or some other form of relief, will order the alien removed.  This decoupling of asylum from work authorization has largely ended abusive asylum claims and put the backlog under control.  However, for at least six months after applying for asylum, asylum-seekers are now entitled to neither employment authorization nor public assistance, making it difficult for many to legally support themselves.

**BIA (THE BOARD OF IMMIGRATION APPEALS) –** This is the administrative body, part of the Executive Office for Immigration Review (EOIR), which decides appeals from decisions by immigration judges.  Even after the creation of the Department of Homeland Security, EOIR and the BIA remained in the Department of Justice.

**CAT –** See Convention Against Torture Relief

**CBP (BUREAU FOR CUSTOMS AND BORDER PROTECTION) –** CBP, established on March 1, 2003, is an arm of the Department of Homeland Security.  It contains the Border Patrol as well as the Immigration, Customs and Agricultural inspectors at ports of entry (Immigration Inspectors initiate Expedited Removal proceedings, and have unreviewable authority to decide whether the alien may see an asylum officer for a credible fear determination before being removed).

**CONVENTION AGAINST TORTURE RELIEF (CAT)** – A form of relief from removal given to aliens, including those in Expedited Removal, who establish before an immigration judge that it is more likely than not that (s)he will be persecuted upon return to his or her country of nationality or last habitual residence.  CAT is distinguishable from asylum in several ways, some of which include: (1) statutory bars to asylum (for criminal or terrorist grounds, etc.) do not apply to CAT applicants; (2) the burden of proof is higher for CAT claimants (torture must be "more likely than not" upon return for CAT claimants, as opposed to a "well-founded fear of persecution" for asylum applicants); (3) a CAT claimant need not establish any connection between the treatment feared and his race, religion, nationality, political opinion, or membership in a particular social group; and (4) while CAT relief may lead to employment authorization for aliens not subject to mandatory detention, it will not lead to lawful permanent residence (a "Green Card")  and may be revoked once torture is no longer probable upon return.

**CREDIBLE FEAR** – A legal standard implemented as part of Expedited Removal Proceedings in March 1997 under the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA).  Once an arriving alien is placed in Expedited Removal, he or she can only see an immigration judge to make an application for asylum if the immigration inspector at the port of entry refers him or her for a credible fear interview, *and* if the asylum officer conducting the interview decides the applicant has a "credible fear" of persecution in the country of origin.  As implemented, credible fear is a very low threshold to establish.

In the statute, the term "credible fear of persecution" means that there is a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, that the alien could establish eligibility for asylum…Section 235(b)(1)(B)(v) of the Immigration and Nationality Act.

**DETENTION STANDARDS** – The hundreds of pages of standards to which DHS holds itself and its private contractors accountable concerning the treatment of aliens in detention. Federal, state, and local jails may, however, adopt their own standards provided they "meet or exceed" the ICE detention standards.

**DHS (DEPARTMENT OF HOMELAND SECURITY) –** Created by an act of Congress on March 1, 2003. Among more than 20 other agencies, DHS absorbed the former Immigration and Naturalization Service, and dispersed immigration responsibilities into various bureaus. The major ones are the CBP – the Bureau of Customs and Border Protection (Border Patrol and Inspections), ICE – the Bureau of Immigration and Customs Enforcement (Detention and Removal), and USCIS – the Bureau of Citizenship and Immigration Services (the only Bureau in which immigration is by itself; i.e. not housed with customs or other non-immigration functions. USCIS adjudicates immigration benefits, including asylum, green cards, citizenship, and temporary visitor and worker classifications).

**DISSOLVE** – The term used to describe an alien who is referred for a credible fear interview, but who decides not to pursue his application before a credible fear or an asylum determination is made.

**DRO –** The DHS Immigration and Customs Enforcement office of Detention and Removal Operations (ICE-DRO).

**EOIR (EXECUTIVE OFFICE FOR IMMIGRATION REVIEW) –** EOIR is within the Department of Justice. EOIR houses Immigration judges as well as the Board of Immigration Appeals. While EOIR is a quasi-judicial institution, it is not independent, but is subject to review by the Attorney General.

**EXCLUSION PROCEEDINGS** – The legal proceedings before an immigration judge, prior to the enactment of IIRAIRA, to determine whether or not an arriving alien referred by an immigration inspector may be admitted or "excluded."

**ICE (The Bureau of Immigration and Customs Enforcement, or BICE) –** Together with some customs enforcement functions, the ICE Detention and Removal Operations (DRO) is responsible for the detention and removal of aliens, including those in Expedited Removal.  It also houses the government trial attorneys who represent DHS in immigration court, including those stemming from Expedited Removal cases, being entertained by an immigration judge.

**IIRAIRA (The Illegal Immigration Reform and Immigrant Responsibility Act of 1996) –** The most comprehensive immigration reform in decades. IIRAIRA established the Expedited Removal process.

**Immigration Judge** – Working for the Executive Office for Immigration Review (EOIR) within the Department of Justice, immigration judges decide whether aliens brought before them by the Department of Homeland Security should be removed or should be accorded some form of relief (including asylum or Convention Against Torture relief for aliens subject to Expedited Removal who are referred to them after a "credible fear" determination).

**INA** – The Immigration and Nationality Act.

**INS (The Immigration and Naturalization Service) –** The agency, housed in the Department of Justice, which oversaw the administration and enforcement of immigration laws.  Abolished by an act of Congress effective March 1, 2003, INS functions were assumed by the Department of Homeland Security (DHS).  Officials or functions within DHS which were formerly in INS are often referred to as "Legacy INS," as opposed to "Legacy Customs," etc.

**Mandatory Detention** – Until an alien subject to Expedited Removal is found to have a credible fear of persecution, the Immigration and Nationality Act (INA) requires that (s)he remain in DHS custody.  After a positive credible fear determination, DHS policies (though no applicable regulations have been promulgated) allow the applicant to be released ("paroled") while waiting for an asylum hearing if (s)he is not a flight risk, has some ties to the community, and if identity has been established.

**ORR (Office of Refugee Resettlement)** – Within the Department of Health and Human Services, ORR shares responsibility with the State Department for coordinating assistance for resettled refugees in the U.S.  As of March 1, 2003, ORR also assumed responsibility from INS for all alien minors in detention for immigration reasons.

**PAROLE** – Refers to discretionary authority of the Department of Homeland Security to allow an alien to enter the United States for humanitarian reasons (or the public interest), even though (s)he does not have a valid visa or immigration status.  It also refers to releasing an "arriving alien" from detention.  While not in the regulations, field guidance endorses considering parole for asylum seekers who have received a positive credible fear determination, if an ICE detention officer determines that the applicant is not a flight risk, has ties to the community, and has established identity.

**REFUGEE** – An individual who meets the refugee definition but, unlike an asylum applicant, is overseas at the time of application.  Contrary to a popular misconception, refugee applications are not generally accepted by U.S. Embassies overseas, but may only be filed by individuals who fall into one of the "Processing Priority" groups defined by the Department of State.  These priorities do not apply to asylum applicants.

**REFUGEE DEFINITION** – Any person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.  Section 101(a)(42)(A) of the Immigration and Nationality Act.

**UNHCR –** The Office of the United Nations High Commissioner for Refugees, established by the United Nations General Assembly in 1951 to provide international protection to refugees and to seek permanent solutions to their problems.

**USCIS (THE BUREAU OF CITIZENSHIP AND IMMIGRATION SERVICES, OR BCIS)** – The Bureau in the Department of Homeland Security which administers benefits under the Immigration and Nationality Act, such as refugee status, asylum, green cards, temporary worker and visitor classifications, and naturalization.

**VISA WAIVER** – The program allows individuals from certain countries (which have a very low incidence of visa violators or over-stayers) to visit the United States for up to 90 days without a visa.   Argentina and Uruguay were recently removed from this list, which now includes Canada, Japan, Singapore, Brunei, and Western Europe.  Applicants who attempt to enter the United States under a visa waiver, but whom the immigration inspectors believe are attempting to do so through misrepresentation or fraud, are subject to removal without a hearing, but may seek an asylum-only hearing before an immigration judge.  While visa waiver applicants are not subject to Expedited Removal, the process by which they are removed is similar to Expedited Removal by its summary nature.  Moreover, any alien from a non-visa waiver country who attempts to enter the country under a visa waiver using false documents is not placed in Expedited Removal, but is treated according to the visa waiver provisions.

**The Asylum Application Process**
**Expedited Removal Proceedings**



**Primary Inspection**
CBP (Inspections)
Arrival with documents that are missing, false, or obtained by misrepresentation

**Apprehension by Border Patrol (CBP)**
within 100 miles of border and within 14 days after entry without inspection

**Arrival by Sea**
Apprehension by DHS, within 24 months of entry without inspection

**Secondary Inspection**
CBP (Inspections)

Sworn Statement on Form I-867AB – Read aloud to alien and provide in writing specific protection questions asked and recorded – no allowance for consultation with family, attorney, etc.

Possible offer of withdrawal at discretion of officer - no bar to subsequent re-entry

Expression of fear needed for credible fear referral

**Detention**
ICE (DRO)

Generally 2-14 days opportunity for consultation with family, attorney, etc.

May be released only if "necessary to meet a legitimate law enforcement objective" or for "medical emergency"
ICE (DRO)

**Credible Fear Interview**
USCIS (Asylum)

Asylum Officer conducts nonadversarial interview using credible fear standard - Alien has no right to legal representation but may have attorney, family, etc. present

Complete "Record of Determination /Credible Fear Worksheet" (Form I-870)

Supervisory review (paper)

If negative, expedited removal order issued; alien may request review by Immigration Judge (Form I-869)
EOIR

**No Fear Expressed**
If alien does not indicate intent to apply for asylum or fear of persecution, expedited removal order prepared

Supervisory review (paper)

Expedited removal order issued; once removed, alien barred from re-entry to the US for 5 years

**Detention**
until removal
ICE (DRO)/CBP

**Fear Expressed**
If alien indicates intent to apply for asylum or fear of persecution, additional information provided about credible fear interview (Form M-444)

Supervisory review (paper)

**Asylum Hearing**
Regular Immigration Judge adversarial hearing under Sec 240 INA; alien may apply for asylum, withholding of removal, or Convention Against Torture relief; alien may be represented by counsel (at no cost to the government)
EOIR

**Appeal**
Government or alien may appeal decision to Board of Immigration Appeals
EOIR (BIA)

**Affirmed**

At alien's request, Immigration Judge conducts telephonic or in person review of negative decision within 24 hours - 7 days
EOIR

**Reversed**

May be released, at discretion of Field Office Director (FOD)
ICE (DRO)

**Favorable Credible Fear Determination**

**Negative Credible Fear Determination**

Prepared for USCIRF Expedited Removal Study by Mark Hetfield and Susan Kyle          November 2004

**The Asylum Application Process**
**Expedited Removal Proceedings**

<u>**Acronyms**</u>

| | |
|---|---|
| BIA: | Board of Immigration Appeals (within EOIR) |
| CBP: | Customs and Border Protection (DHS) |
| DHS: | Department of Homeland Security |
| DOJ: | Department of Justice |
| DRO: | Detention and Removal Operations (within ICE) |
| EOIR: | Executive Office for Immigration Review (DOJ) |
| FOD: | Field Office Director (DRO-ICE) |
| ICE: | Immigration and Customs Enforcement (DHS) |
| USCIS: | U.S. Citizenship and Immigration Services (DHS) |

**Department of Homeland Security Organizational Chart**



-- Components with direct role on Expedited Removal darkened
-- Dotted lines denote subcomponents involved in Expedited Removal issues. Only subcomponents with a role in Expedited Removal are included on this chart.

February 2005

Prepared for USCIRF Study of Asylum Seekers in Expedited Removal by Mark Hetfield and Susan Kyle

**ASYLUM SEEKERS IN EXPEDITED REMOVAL:**

*A Study Authorized by Section 605 of the International Religious Freedom Act of 1998*

QUICK STATISTICS

INSPECTIONS

Aliens inspected in FY 2001:     **331,304,422**[i]
Aliens inspected in FY 2003:     **264,335,230**[ii]

Aliens subject to Expedited Removal[iii] (ER) FY 2001:  **215,398**[iv]
Aliens subject to ER FY 2003:     **177,040**[v]

Aliens subject to ER who were allowed to withdraw their application for admission to the U.S. FY 2001:     **134,023**[vi]
Aliens subject to ER who were allowed to withdraw their application for admission to the U.S. FY 2003:     **128,328**[vii]

Aliens who were expeditiously removed FY 2001:     **69,055**[viii]
Aliens who were expeditiously removed FY 2003:     **43,336**[ix]

Aliens referred for credible fear determination FY 2001:     **12,320**[x]
Aliens referred for credible fear determination FY 2003:     **5,376**[xi]

% of aliens subject to ER who arrived by air FY 2000-2003:     **12%**[xii]
% of aliens referred for credible fear determinations who arrived by air FY 2000-2003: **86%**[xiii]

Top 3 land ports of entry (POEs) for aliens expeditiously removed FY 2000-2003:[xiv]

**San Ysidro, CA  43.8% of expedited removals at land/sea POEs**
                58.8% of credible fear referrals at land/sea POEs

**Calexico, CA  12.2% of expedited removals at land/sea POEs**
                2.9% of credible fear referrals at land/sea POEs

**Nogales, AZ  9.1% of expedited removals at land/sea POEs**
                Less than 1% of credible fear referrals to land/sea POEs

Top 3 airports for aliens expeditiously removed FY 2000-2003:[xv]

**New York  29.4% of expedited removals at airports**
                6.4% of credible fear referrals at airports

**Miami  15.7% of expedited removals at airports**
                41.1% of credible fear referrals at airports

| **Los Angeles** | **11.1% of expedited removals at airports** |
| | 20.8% of credible fear referrals at airports |

CREDIBLE FEAR (ASYLUM)

% of aliens referred for credible fear determination in FY 2000-2003 who were approved for credible fear:   **93%**[xvi]

DETENTION

Average length of detention in FY 2003 for asylum seekers subject to ER:   **64 days**[xvii]

% of asylum seekers subject to ER in FY 2003 detained for 90 days or more:   **32%**[xviii]

% of asylum seekers subject to ER released prior to final decision in asylum case FY 2001:   **86.1%**[xix]

% of asylum seekers subject to ER released prior to final decision in asylum case FY 2003:   **62.5%**[xx]

3 districts with highest rate of release prior to asylum decision FY 2003:[xxi]
**Harlingen, TX   97.6%** (620/635)
**San Antonio, TX 94%** (109/116)
**Chicago, IL      81.1%** (120/148)

3 districts with lowest rate of release prior to asylum decision FY 2003:[xxii]
**New Orleans     0.5%** (1/191)
**Newark, NJ      3.8%** (14/391)
**New York, NY    8.4%** (18/215)

Number of facilities used by Department of Homeland Security (DHS) to detain asylum seekers in ER FY 2003:   **182**[xxiii]

ASYLUM HEARINGS

Top 5 nationalities of aliens in ER referred for asylum hearing FY 2000-2004:[xxiv]
**China        9277**   (31.1% of total cases completed)
**Colombia     3152**   (10.6% of total cases completed)
**Cuba         3079**   (10.3% of total cases completed)
**Haiti        2675**   (9% of total cases completed)
**Sri Lanka    1785**   (3% of total cases completed)
**Total        29835**

% of asylum seekers subject to ER granted relief (asylum or CAT relief) FY 2000-2004: **28%**[xxv]

% of asylum seekers subject to ER denied relief or withdrew application for relief FY 2000-2004: **72%**[xxvi]

% of unrepresented asylum seekers subject to ER granted relief FY 2000-2004: **2%**[xxvii]
% of represented asylum seekers subject to ER granted relief FY 2000-2004: **25%**[xxviii]

APPEALS

% of appeals filed by asylum seekers subject to ER sustained by Board of Immigration Appeals (BIA) FY 2001:  **23%** (53/291)[xxix]
% of appeals filed by asylum seekers subject to ER sustained by BIA FY 2002: **2%** (19/1251)[xxx]
% of appeals filed by asylum seekers subject to ER sustained by BIA FY 2003: **3%** (58/2750)[xxxi]
% of appeals filed by asylum seekers subject to ER sustained by BIA FY 2004: **4%** (49/2879)[xxxii]

---

[i] 1/4/05 email from John Bjerke, Statistician, Office of Detention and Removal (DRO), Immigration and Customs Enforcement (ICE), DHS
[ii] Id.
[iii] Includes aliens who were expeditiously removed, referred for a credible fear determination, or withdrew their application for admission (i.e. aliens who could otherwise have been expeditiously removed).
[iv] Fleming and Scheuren, *Statistical Report on Expedited Removal, Credible Fear, and Withdrawal, FY 2000-2003*, DHS table 2, (Feb 2005).
[v] Id.
[vi] Id.
[vii] Id.
[viii] Id.
[ix] Id.
[x] Id.
[xi] Id.
[xii] Fleming and Scheuren, *Statistical Report on Expedited Removal, Credible Fear, and Withdrawal, FY 2000-2003*, DHS table 1a, (Feb 2005).
[xiii] Fleming and Scheuren, *Statistical Report on Expedited Removal, Credible Fear, and Withdrawal, FY 2000-2003*, DHS chart 2 and table 2, (Feb 2005).
[xiv] Fleming and Scheuren, *Statistical Report on Expedited Removal, Credible Fear, and Withdrawal, FY 2000-2003*, DHS table 6 and 1, (Feb 2005).
[xv] Fleming and Scheuren, *Statistical Report on Expedited Removal, Credible Fear, and Withdrawal, FY 2000-2003*, DHS table 3 and 1, (Feb 2005).
[xvi] Hetfield, *Report on Credible Fear Determinations*, Asylum Table 1.0, (Feb 2005).
[xvii] Fleming and Scheuren, *Statistical Report on Detention, FY 2000-2003*, DRO table 6.3, (Feb 2005).
[xviii] Id.
[xix] Fleming and Scheuren, *Statistical Report on Detention, FY 2000-2003*, DRO chart 7, (Feb 2005).
[xx] Id.
[xxi] Id.
[xxii] Id., n>100
[xxiii] Fleming and Scheuren, *Statistical Report on Detention, FY 2000-2003*, DRO table 4.1, (Feb 2005).
[xxiv] Kyle, Fleming and Scheuren, *Statistical Report on Immigration Court Proceedings, FY 2000-2004*, EOIR table A, (Feb 2005).
[xxv] Id.
[xxvi] 65% denied relief, 7% withdrew their application for asylum or CAT relief.

[xxvii] Kyle, Fleming and Scheuren, *Statistical Report on Immigration Court Proceedings, FY 2000-2004*, EOIR table P, (Feb 2005).

[xxviii] Id.

[xxix] Kyle, Fleming and Scheuren, *Statistical Report on Immigration Court Proceedings, FY 2000-2004*, EOIR table T, (Feb 2005).

[xxx] Id.

[xxxi] Id.

[xxxii] Id.

**ASYLUM SEEKERS IN EXPEDITED REMOVAL:**
*A Study Authorized by Section 605 of the International Religious Freedom Act of 1998*

**HIGHLIGHTS OF THE STUDY METHODOLOGY**
By Susan Kyle and Fritz Scheuren

The Study employed a varied methodology to examine the treatment of asylum seekers in Expedited Removal. In all there have been eleven reports, including this one, produced by the experts engaged by the U.S. Commission on International Religious Freedom (USCIRF or "the Commission") to conduct the work. The methods used in each of these reports are highlighted briefly below.

Stress is placed on the interlocking nature of what was learned and our belief that together the results provide a solid basis for the conclusions in the Commission's final report ("the Study").[1] Naturally, as with any statistical work, data limitations abound and hence the results obtained need to be treated with the usual caution. Nevertheless, we are confident that the main findings are sound.

USE OF EXISTING ADMINISTRATIVE DATA

Some results come directly from the extensive operating administrative systems of the Department of Homeland Security (DHS) and the Department of Justice (DOJ). These results, covering most of the period from FY2000 to FY2003 or FY2004, were not subject to sampling error, but they did suffer from other forms of deficiencies, mainly because a full integration of DHS systems has yet to be accomplished.[2]

Partly to combat these deficiencies, several samples were drawn from operating DHS and DOJ systems during the spring and summer of 2004. These samples were designed to help interpret the extensive overall statistical tabulations provided by agency personnel, whose assistance was invaluable.[3]

As with the 2000 Government Accountability Office (GAO) Study, heavy reliance was placed on an extensive series of alien file (A-file) sample reviews of asylum seekers, including those who later dissolved their claim.[4] Additionally, a Records of Proceeding sample and a sample of A-files of aliens who were either expeditiously removed or withdrew their application for admission at ports of entry were reviewed.[5] These file reviews allowed us to deepen our

---

[1] US Commission on International Religious Freedom, *Report on Asylum Seekers in Expedited Removal*, Feb 2005.
[2] Cory Fleming and Fritz Scheuren, *Statistical Report on Expedited Removal, Credible Fear, and Withdrawal, FY 2000-2003*, Feb 2005;Susan Kyle, Cory Fleming, and Fritz Scheuren, *Statistical Report on Immigration Court Proceedings, FY 2000-2004*, Feb 2005;Tala Hartsough, *A-file Forms Abstracted for Analysis* (Working Paper), Aug 2004.
[3] Kate Jastram and Tala Hartsough, *A-file and Record of Proceedings Analysis of Expedited Removal*, Feb 2005.
[4] United States General Accounting Office, *Illegal Aliens: Opportunities Exist to Improve the Expedited Removal Process*, GAO/GGD-00-176, September 2000.
[5] The Records of Proceeding sample was provided by the DOJ, while the A-file sample was provided by the DHS.

understanding of the extensive 100 percent tallies generated for the Study, and to look in some detail at issues not focused on in the existing general purpose electronic administrative systems.

While the file reviews were based on moderately large samples, sampling error remains a factor. Since the data were specially captured for the Commission, other limitations arose that had to be addressed by a series of quality checks (and cross-checks) introduced to keep measurement errors small. The controls employed are deemed to be sufficient to assure the reliability sought for samples of the size used. There were and are concerns raised by the fact that not all the files sought for the sample could be obtained.

AUGMENTING ADMINISTRATIVE DATA WITH DIRECT OBSERVATIONS AND INTERVIEWS

Reliance on the existing DHS and DOJ systems alone was viewed as insufficient. This was, in fact, among the criticisms made of the earlier GAO Study. To address these criticisms, direct observations of secondary inspection were made to augment what was being learned from the DHS record reviews and the statistics gleaned from DHS and DOJ operating systems. Specially recruited and trained data collectors, operating under close supervision, made these observations at various land and air ports of entry around the country.[6]

The observers used carefully tested, highly structured data gathering instruments. The goal of these instruments was to capture independently what was actually happening at secondary inspection. The A-file records created by the inspector were obtained, along with an observational record by the independent observer. Whenever possible, the asylum seekers themselves were interviewed immediately after secondary inspection. The three versions of the secondary inspection process (inspector, independent observer, and asylum seeker) were then analyzed together and the consistency of each assessed, relative to the other two.

To buttress this strong observational Study design, many additional checks were made. For example, two observers coded the same experience independently and then compared the results obtained to develop inter-observer reliability measures. Only data that passed these reliability tests was brought forward for the analyses that undergird the main results.

As in any sample, these observational data are subject to sampling errors. The observations were, moreover, taken from a judgmentally selected set of ports of entry. The ports of entry chosen were, however, based on the largest volume of Expedited Removals (e.g., San Ysidro), credible fear referrals (e.g., Miami), and geographic diversity (e.g., Los Angeles and New York).

Another limitation was the timing of the studies (mainly early to mid summer), their short duration (the median was four weeks at each location), and the number of researchers allowed present during each shift. Nevertheless, the Report offers a major new perspective on asylum seekers subject to Expedited Removal. Moreover this part of the Study confirms, complements, and adds to key insights learned from the file reviews, both those completed by this Study and those completed earlier by the GAO.

---

[6] Allen Keller, Andrew Rasmussen, Kim Reeves, and Barry Rosenfeld, *Evaluation of Credible Fear Referral in Expedited Removal at Ports of Entry in the United States*, Feb 2005.

OTHER DATA COLLECTION EFFORTS

Detention of asylum seekers is a major aspect of the Expedited Removal process and, as such, deserved special attention. Extensive statistical tabulations, provided by DHS, were requested and analyzed.[7] Additionally, there were numerous site visits to jails and other detention facilities housing asylum seekers waiting for their cases to be heard. Nineteen detention centers, with the largest populations of asylum seekers, participated in a telephonic survey to enable us to learn about their policies and practices, and examine how asylum seekers treatment was similar or different from that of persons incarcerated for other reasons.[8] Interviews with 39 asylum seekers dissolving their claims were also analyzed to determine what effect, if any, detention had on their decisions to dissolve their claims.

The Study also examined a series of alternative legal representation models and, in particular, the extent to which representation by an attorney was a factor in the final disposition of an asylum seekers case.[9] Complementing this were interviews conducted with DHS asylum officials to look at the credible fear determination process.[10] Finally, the Study undertook a series of analyses of DOJ final disposition statistics for FY 2000-2003. Court-by-court differences in final dispositions were examined and within courts differences judge-by-judge.[11] Since in an observational Study like the one sponsored by the Commission, attributing cause cannot be done directly, the reports that cover these points are silent as to why these statistical disparities are so large. At a minimum, the large statistically significant difference found would seem to warrant a systematic root cause analysis.

SOME OVERALL CONCLUSIONS

In these methodological highlights there has been a frank, albeit brief, discussion of the overall strengths and especially the weaknesses of the work done. In many ways, the work is pioneering and thus subject to all the caveats of a first time effort. Still, the interlocking nature of the work and its multi-team character lead to the conclusion that its main results are sound and merit reliance. The work has greatly profited from a thorough agency review where misunderstandings, mostly in exposition and occasionally on matters of fact, were clarified.

Clearly, more analyses are needed of the storehouse of data and statistics created. To this end, a considerable effort has been made to document the work done, to put the data in a reusable form, and to make it possible for an outside review of the work to be conducted by an independent organization, subject, of course, to the strict confidentiality provisions to which the Commission experts have been subjected.

---

[7] Cory Fleming and Fritz Scheuren, *Statistical Report on Detention, FY 2000-2003,* Feb 2004.
[8] Craig Haney, *Conditions of Confinement for Detained Asylum Seekers Subject to Expedited Removal*, Feb 2005.
[9] Charles Kuck, *Legal Assistance for Asylum Seekers in Expedited Removal: A Survey of Alternative Practices*, Feb 2005.
[10] Mark Hetfield, *Report on Credible Fear Determination*, Feb 2005.
[11] Patrick Baier, *Selected Statistical Analyses of Immigration Judge Rulings on Asylum Applications, FY 2000-2003*, Feb 2005.

In conclusion, a good result has been accomplished which can, with due care, be relied upon. More analyses of the data are worthwhile and further studies, especially those seeking causal links, are highly recommended.

**ASYLUM SEEKERS IN EXPEDITED REMOVAL:**
*A Study Authorized by Section 605 of the International Religious Freedom Act of 1998*

## U.S. AND INTERNATIONAL ASYLUM STANDARDS
By Kate Jastram

The International Religious Freedom Act of 1998 (IRFA) authorized the United States Commission on International Religious Freedom to appoint experts to conduct a study (the Study) on whether immigration officers performing duties under Section 235(b) of the Immigration and Nationality Act with respect to aliens who may be eligible to be granted asylum or protection from torture are engaging in any of the following conduct:

(A) *Improperly* encouraging such aliens to withdraw their applications for admission,
(B) *Incorrectly* failing to refer such aliens for an interview by an asylum officer for a determination of whether they have a credible fear of persecution,
(C) *Incorrectly* removing such aliens to a country where they may be persecuted, or
(D) Detaining such aliens *improperly* or in *inappropriate* conditions (emphasis added).

The first two questions posed by IRFA concern entry procedures at the border.[1] The third Study question addresses the ultimate aim of the procedures, which is to allow U.S. officials to identify aliens in need of protection. Without accurately identifying those in need of protection, the United States cannot meet its obligation under both domestic and international law not to return persons fleeing from persecution or torture. The fourth Study question calls for an examination of policies and practices relating to the detention of asylum seekers.

For the purposes of determining the standards by which to assess whether Department of Homeland Security and Department of Justice actions are 'improper', 'incorrect' or 'inappropriate', guidance was sought from relevant domestic and international law norms. This chapter sets forth those standards.

THE FIRST THREE STUDY QUESTIONS, ON PROCEDURES:
OVERALL LEGAL FRAMEWORK

### Standards from U.S. law

Under U.S. law, Congress may establish procedures to deal with aliens seeking entry.[2] In enacting Expedited Removal as part of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Congress chose to transfer the authority to deport certain aliens from immigration judges to immigration inspectors.

---

[1] In August 2004, Expedited Removal was expanded in certain sectors to include aliens encountered within 100 miles of the border who have been present in the United States for less than 14 days. Expedited Removal procedures in the interior are carried out by the Border Patrol. The expansion of Expedited Removal took place after our period of data collection had ended; we therefore did not examine the actions of the Border Patrol.
[2] "Whatever the procedure authorized by Congress, it is due process as far as an alien denied entry is concerned." *Knauff v. Shaughnessy*, 338 U.S. 537, 544 (1950).

At the same time, Congress provided special protections for asylum seekers subject to Expedited Removal that go far beyond the process afforded to other aliens in Expedited Removal.  By so doing, Congress crafted a procedure in which asylum seekers, even those arriving with false documents or no documents at all, will still be able to present their claims for protection to an immigration judge.   This procedure requires DHS officials responsible for inspections and for asylum pre-screening to move the asylum seeker's case forward to the immigration court if certain minimal threshold requirements are met.[3]

**Standards from international law**

International law does not address the means by which States should determine who is entitled to the protection of the 1951 Convention relating to the Status of Refugees and its 1967 Protocol,[4] or that of the Convention against Torture.  The Refugee Convention and Protocol, and the Convention against Torture, are silent on procedures.  States parties are obliged as a matter of international law to protect certain categories of persons from forced return; how States go about identifying which aliens may not be forcibly returned is a matter for domestic law.  From the perspective of international law, the procedures used to determine asylum and torture protection claims are sufficient if they meet their intended purpose, which is to protect eligible claimants from forced return.[5]

Nevertheless, the inter-governmental Executive Committee of the United Nations High Commissioner for Refugees (UNHCR), of which the United States is a member, has provided general guidance on minimum basic procedural standards for refugee status determinations, including standards for expeditious procedures designed to handle asylum claims that are manifestly unfounded or abusive.[6]  These standards call for issuing clear instructions to border officials to refer asylum seekers to a higher authority; giving the 'necessary facilities' to the asylum seeker for submitting his or her claim; ensuring a personal interview by a qualified official; and providing the possibility of review of a negative decision before removal.

---

[3] Courts have dismissed challenges to these procedures, albeit in the context of the limited possibilities prescribed by Congress for judicial review; INA 242(e)(3) required that all lawsuits challenging Expedited Removal be filed in the U.S. District Court for the District of Columbia within 60 days of its implementation on April 1, 1997.  There were three lawsuits filed, which the District Court consolidated into one case and dismissed.  The Court of Appeals for the District of Columbia Court affirmed.  *American Immigration Lawyers Association v. Reno,* 1999 F.3d 1352 (D.C. Cir. 2000) (affirmed District Court's dismissal); *American Immigration Lawyers Association v. Reno,* 18 F. Supp.2d 38 (D.D.C., Aug. 20, 1998) (dismissed three consolidated challenges to Expedited Removal on jurisdictional grounds).

[4] The United States is a State Party to the 1967 Protocol relating to the Status of Refugees, which incorporates the substantive provisions of the 1951 Convention relating to the Status of Refugees.

[5] UNHCR *Handbook on Procedures and Criteria for Determining Refugee Status,* 1979, para. 189.

[6] UNHCR Executive Committee Conclusions No. 8 (1977) on Determination of Refugee Status; No. 15 (1979) on Refugees without an Asylum Country; No. 28  (1982) Follow-up on Earlier Conclusions of the Sub-Committee of the Whole on International Protection on the Determination of Refugee Status, Inter Alia, with Reference to the Role of UNHCR in National Refugee Status Determination Procedures; and No. 30 (1983) on The Problem of Manifestly Unfounded or Abusive Applications for Refugee Status or Asylum.

THE FIRST STUDY QUESTION:
IMPROPERLY ENCOURAGING WITHDRAWALS

**Standards from U.S. law**

The Immigration and Nationality Act provides for an alien applying for admission to be permitted, in the discretion of the Secretary of Homeland Security, to withdraw his or her application for admission and depart immediately from the United States.[7]  Regulations further specify that any such withdrawal must be voluntary.[8]

THE SECOND STUDY QUESTION:
INCORRECTLY FAILING TO REFER FOR A CREDIBLE FEAR DETERMINATION

**Standards from U.S. law**

The Immigration and Nationality Act requires inspectors to make a credible fear referral for aliens who indicate either an intention to apply for asylum or a fear of persecution.[9] Regulations require a referral for those who fear torture, persecution, or any other fear of returning to the country of origin.[10]

---

[7]Immigration and Nationality Act (INA) Sec. 235(a)(4): "Withdrawal of application for admission.-An alien applying for admission may, in the discretion of the [Secretary of Homeland Security] and at any time, be permitted to withdraw the application for admission and depart immediately from the United States."

[8]  8 Code of Federal Regulations (CFR) Sec. 235.4: "Withdrawal of application for admission. The [Secretary of Homeland Security] may, in his or her discretion, permit any alien applicant for admission to withdraw his or her application for admission in lieu of removal proceedings under section 240 of the Act or Expedited Removal under section 235(b)(1) of the Act. The alien's decision to withdraw his or her application for admission must be made voluntarily, but nothing in this section shall be construed as to give an alien the right to withdraw his or her application for admission."

[9]INA Sec. 235 (b)(1)(A) "Screening  (ii) Claims for asylum.-If an immigration officer determines that an alien (other than an alien described in subparagraph (F)) who is arriving in the United States or is described in clause (iii) is inadmissible under section 212(a)(6)(C) or 212(a)(7) and the alien indicates either an intention to apply for asylum under section 208 or a fear of persecution, the officer shall refer the alien for an interview by an asylum officer under subparagraph (B)."

[10] 8 CFR 235.3 (b)(4) Claim of asylum or fear of persecution or torture. If an alien subject to the Expedited Removal provisions indicates an intention to apply for asylum, or expresses a fear of persecution or torture, or a fear of return to his or her country, the inspecting officer shall not proceed further with removal of the alien until the alien has been referred for an interview by an asylum officer in accordance with 8 CFR 208.30.

THE THIRD STUDY QUESTION:
INCORRECTLY REMOVING AN ASYLUM SEEKER TO PERSECUTION

**Credible fear: Standards from U.S. law**

The Refugee Act of 1980 was designed to bring the U.S. into compliance with the U.N. Refugee Protocol.[11] The fundamental obligation which the United States assumed in ratifying the Refugee Protocol is the prohibition on returning a refugee in any manner whatsoever to the frontiers of territories where his or her life or freedom would be threatened on account of race, religion, nationality, membership of a particular social group or political opinion.[12]

Asylum seekers subject to Expedited Removal must first establish that they have a credible fear of persecution or torture in order to present their full claim for protection to an immigration judge. A credible fear is defined as a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the asylum officer, that the alien could establish eligibility for asylum.[13]

**Manifestly unfounded or abusive: Standards from international law**

The UNHCR Executive Committee's guidance on expeditious procedures recommends that such procedures be used for persons whose claims are manifestly unfounded or abusive, defined as clearly fraudulent or not related to the criteria for the granting of refugee status laid down in the Refugee Convention.[14] In UNHCR's view, a lack of appropriate documentation or the use of false documents should not in itself render a claim abusive or fraudulent.[15]

**Interpreting the refugee definition: Standards from U.S. and international law**

There is an extensive body of case law in the United States, ranging from the Board of Immigration Appeals, through the federal courts of appeal, to the U.S. Supreme Court, which provides interpretive guidance to immigration judges on various aspects of the refugee definition.[16] Different elements of the refugee definition have been the subject of agency memos[17], federal regulations[18], and statute[19]. Because the refugee definition under U.S. law is

---

[11] "If one thing is clear from the legislative history of the new definition of 'refugee,' and indeed the entire 1980 Act, it is that one of Congress' primary purposes was to bring United States refugee law into conformance with the 1967 United Nations Protocol Relating to the Status of Refugees." *INS v. Cardoza-Fonseca*, 480 U.S. 421 (1987).

[12] Art. 33 of the Convention relating to the Status of Refugees; the corresponding provision under U.S. law is restriction on removal, found in INA Sec. 241(b)(3).

[13] INA Sec. 235 (b)(1)(B)(v).

[14] UNHCR Executive Committee Conclusion No. 30 (1983) on The Problem of Manifestly Unfounded or Abusive Applications for Refugee Status or Asylum, para (d).

[15] *See* UNHCR, *Asylum Processes (Fair and Efficient Asylum Procedures),* EC/GC/01/12 (31 May 2001), para. 50 (l).

[16] For guidance on this body of law, see, e.g., Anker, *The Law of Asylum in the United State;* Germain, *AILA's Asylum Primer*, 3d ed.; and Musalo, Moore and Boswell, *Refugee Law and Policy*, 2d ed.

[17] *See*, e.g., *Considerations for Asylum Officers Adjudicating Asylum Claims from Women* (Memorandum from Phyllis Coven, Office of International Affairs, U.S. Immigration and Naturalization Service, to All INS Asylum Officers HQASM Coordinators, May 26, 1995).

[18] *See*, e.g., 8 C.F.R. Sec. 208.15 on firm resettlement.

the same as the international definition, U.S. adjudicators can and do draw upon UNHCR's expertise.[20]

Given this body of legal standards, which are also employed by immigration judges in asylum cases whether or not originating in Expedited Removal, as well as by asylum officers in the context of affirmative applications, the Study did not assess whether immigration judges had correctly applied the refugee definition to the cases before them. Instead, the Study focused on evidentiary issues particular to the Expedited Removal process.

**Evidentiary issues: Standards from U.S. law**

In contrast to the abundance of guidance on applying the refugee definition, U.S. law and procedures provide less direction to immigration judges on evidentiary matters such as credibility determinations. Credibility is a particularly important issue in asylum adjudication, since most asylum seekers are not able to supply documentary evidence to corroborate their claims of persecution, except perhaps for human rights reports on conditions in their country of origin. Some asylum seekers do not even have valid personal identification documents –– precisely the reason why they are subject to Expedited Removal – because escaping from their persecutors would be even more dangerous or simply impossible if they attempted it with their own passport or identification papers.

For this reason, U.S. law recognizes that the asylum seeker's credible testimony alone may be sufficient to establish his or her claim, as long as it is consistent with available information on human rights conditions in the country of origin.[21] The nature of asylum adjudications places great emphasis on the judge's assessment of the asylum seeker's credibility.[22]

U.S. case law is clear that 'adding detail' to the claim is not a basis for an adverse credibility finding when an asylum seeker provides more complete information to the immigration judge than to the inspector or the asylum officer.[23]

**Evidentiary issues: Standards from international law**

UNHCR advises generally that it may be necessary for the adjudicator to clarify any apparent inconsistencies and to resolve any contradictions, and stresses that the adjudicator will

---

[19] *See*, e.g. INA Sec. 101(a)(42)(B), adding to the refugee definition by specifying that persecution for resistance to coercive population control measures be deemed to be persecution on account of political opinion.

[20] UNHCR *Handbook on Procedures and Criteria for Determining Refugee Status*, 1979, cited by the U.S. Supreme Court as providing "significant guidance" in construing U.S. obligations under the Refugee Protocol. *INS v. Cardoza-Fonseca*, 480 U.S. 421, 439 n. 22 (1987). UNHCR periodically issues additional or updated guidelines, *see*, e.g., *Guidelines on International Protection No. 6: Religion-Based Refugee Claims under Article 1A(2) of the 1951 Convention and/or the 1967 Protocol relating to the Status of Refugees* (HCR /GIP/04/06) (28 April 2004).

[21] 8 C.F.R. Sec. 208.13(a).

[22] The Immigration Judge Benchbook, Part. 1, Ch. One, I. A. 6.(Oct. 2001), advises that detailed credibility findings are a must in asylum cases.

[23] *Li v. Ashcroft*, 378 F.3d. 959 (9th Cir. 2004), *Chen v. Ashcroft*, 376 F.3d 215, 224 (3d Cir. 2004).

need to gain the confidence of the asylum seeker in order to assist him or her to fully explain the claim.[24]

## Representation: Standards from U.S. law

Aliens seeking admission are not entitled to counsel, even at their own expense, in primary or secondary inspection, unless they become subject to a criminal investigation. An asylum seeker referred for a credible fear interview may consult with a person or persons of his or her choosing prior to the interview, at no expense to the government.[25]  An asylum seeker may be represented at the merits hearing on his or her asylum claim, at no expense to the government, by counsel of his or her choosing.[26]

## Representation: Standards from international law

UNHCR advises that at all stages of the procedure, including at the admissibility stage, asylum seekers should receive guidance and advice on the procedure and have access to legal counsel.  Where free legal aid is available, asylum seekers should have access to it in case of need.[27]

THE FOURTH STUDY QUESTION:
IMPROPER DETENTION AND INAPPROPRIATE CONDITIONS

The fourth Study question raises two distinct issues pertaining to detention.  The first issue has to do with who should be detained; i.e. whether detention in a given asylum seeker's case is proper or improper.  The second issue calls for an assessment of the conditions of confinement, specifically, whether they are inappropriate for asylum seekers.

## Detention decisions: Standards from U.S. law

Whether an asylum seeker subject to Expedited Removal is being detained improperly under U.S. law depends in part on where he or she is in the process, and in part on which one of several potentially overlapping standards governs.  Detention is mandatory until a positive credible fear determination is made[28], unless parole is required to meet a medical emergency or is necessary for a legitimate law enforcement objective.[29]

---

[24] UNHCR *Handbook on Procedures and Criteria for Determining Refugee Status*, 1979, paras. 199-200.

[25] INA Sec. 235(b)(1)(B)(iv).

[26] INA Sec. 240 (b)(4)(A).

[27] *See* UNHCR*, Asylum Processes (Fair and Efficient Asylum Procedures),* EC/GC/01/12 (31 May 2001), para.50 (g).

[28] INA Sec. 235(b)(1)(B)(IV) Mandatory Detention.-Any alien subject to the procedures under this clause shall be detained pending a final determination of credible fear of persecution and, if found not to have such a fear, until removed.

[29] 8 CFR 235.3(b)(2)(iii) Detention and parole of alien in Expedited Removal. An alien whose inadmissibility is being considered under this section or who has been ordered removed pursuant to this section shall be detained pending determination and removal, except that parole of such alien, in accordance with section 212(d)(5) of the Act, may be permitted only when the Attorney General determines, in the exercise of discretion, that parole is required to meet a medical emergency or is necessary for a legitimate law enforcement objective.

Once the asylum seeker is found to have a credible fear of persecution, he or she is referred to a removal hearing under Sec. 240 of the INA, and is still required to be detained.[30] Parole may be considered for urgent humanitarian reasons or significant public health benefit.[31] These reasons could include serious medical conditions, pregnancy, or continued detention not in the public interest.[32]

In addition, then-INS promulgated internal parole guidelines in 1997 for asylum seekers who have a credible fear of persecution.[33]  These guidelines clarified that parole is a viable option and should be considered for aliens who meet the credible fear standard, can establish identity and community ties, and are not subject to any possible bars to asylum involving violence or misconduct.  As noted in a subsequent memo, "although parole is discretionary in all cases where it is available, it is INS policy to favor release of aliens found to have a credible fear of persecution, provided that they do not pose a risk of flight or danger to the community."[34]

---

[30] INA Sec. 235 (b) (1)(B) (ii) Referral of certain aliens.-If the officer determines at the time of the interview that an alien has a credible fear of persecution (within the meaning of clause (v)), the alien shall be detained for further consideration of the application for asylum.

[31] INA Sec. 212 (d) (5)(A) The Attorney General may, except as provided in subparagraph (B) or in section 214(f), in his discretion parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Attorney General, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States.

[32] 8 CFR § 212.5 (b): "The parole of aliens within the following groups who have been or are detained in accordance with § 235.3 (b) *(Expedited Removal)* or (c) *(arriving aliens placed in proceedings under section 240 of the Act, includes those who passed credible fear)* of this chapter would generally be justified only on a case-by-case basis for "urgent humanitarian reasons" or "significant public benefit," provided the aliens present neither a security risk nor a risk of absconding: (1) aliens who have serious medical conditions…; (2) women who have been medically certified as pregnant; (3) juveniles; (4) aliens who will be witnesses in proceeding being, or to be, conducted by judicial, administrative, or legislative bodies in the United States; or (5) aliens whose continued detention is not in the public interest…."

[33] INS Memorandum, *Expedited Removal: Additional Policy Guidance* (Dec. 30, 1997) from Michael A. Pearson, Executive Associate Commissioner for Field Operations, Office of Field Operations, to Regional Directors, District Directors, Asylum Office Directors, reproduced in 75 *Interpreter Releases* 270 (Feb. 23, 1998).

[34] INS Memorandum, *INS Detention Use Policy*, (Oct. 9, 1998) *reproduced at* 75 Interpreter Releases 1505, 1523 (Nov. 2, 1998).

**Overview of Standards for Release**

**Authority:** INA § 212(d)(5)(A); 8 CFR § 212.5

**Language:** "The Attorney General may, except as provided for in subparagraph (B) *(related to refugees)* or in section 214 (f) *(crewmembers)*, in his discretion parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit **any alien applying for admission** to the United States...."

| For Arriving Aliens | For Arriving Aliens in Expedited Removal | For Asylum Seekers in ER determined to have credible fear |
|---|---|---|
| 8 CFR § 212.5 (c): "In the case of all other arriving aliens, **except those detained under § 235.3 (b)** *(Expedited Removal)* **or (c)** *(arriving aliens placed in proceedings under section 240 of the Act, includes those who passed credible fear)* of this chapter and paragraph (b) of this section, those officials listed in paragraph (a) of this section may, after review of the individual case, parole into the United States temporarily in accordance with section 212(d)(5)(A) of the Act, **any alien applicant for admission**, under such terms and conditions, including those set forth in paragraph (d) of this section, as he or she may deem appropriate." | 8 CFR § 212.5 (b): "**The parole of aliens within the following groups who have been or are detained in accordance with § 235.3 (b)** *(Expedited Removal)* **or (c)** *(arriving aliens placed in proceedings under section 240 of the Act, includes those who passed credible fear)* of this chapter would generally be justified only on a case-by-case basis for "urgent humanitarian reasons" or "significant public benefit," provided the aliens present neither a security risk nor a risk of absconding: (1) aliens who have serious medical conditions…; (2) women who have been medically certified as pregnant; (3) juveniles; (4) aliens who will be witnesses in proceeding being, or to be, conducted by judicial, administrative, or legislative bodies in the United States; or (5) aliens whose continued detention is not in the public interest...." | 8 CFR § 235.3 (c): "**Arriving aliens placed in proceedings under section 240 of the Act**. Except as otherwise provided in this chapter, any arriving alien who appears to the inspecting officer to be inadmissible, and who is placed in removal proceedings pursuant to section 240 of the Act in accordance with section 235(b) of the Act. **Parole of such alien shall only be considered in accordance with § 212.5 (b) of this chapter**." |

| | | |
|---|---|---|
| | **But see: (limiting instances of parole)**<br>8 CFR § 235.3 (b)(2)(iii): "Detention and parole of alien in Expedited Removal. An alien whose inadmissibility is being considered under this section or who has been ordered removed pursuant to this section shall be detained pending determination and removal, except that parole of such alien, in accordance with section 212(d)(5) of the Act, may be permitted only when the Attorney General determines, in the exercise of discretion, that **parole is required to meet a medical emergency or is necessary for a legitimate law enforcement objective.**"<br><br>**And see:**<br>8 CFR § 235.3 (b)(4)(ii): "**Detention pending credible fear interview**. Parole…may be permitted only when the Attorney General determines, in the exercise of discretion, that **parole is required to meet a medical emergency or is necessary for a legitimate law enforcement objective**." | **But see:**<br>INS Memorandum "Expedited Removal: Additional Policy Guidance," 1997: "Parole Consideration for Detainees Who Meet Credible Fear Standard….Parole is a viable option and should be considered for aliens who meet the credible fear standard, can establish identity and community ties, and are not subject to any possible bars to asylum involving violence or misconduct." |
| | **And see:**<br>INS Memorandum for Regional Officers, "Detention Guidelines Effective October 9, 1998": "Any alien placed in Expedited Removal must be detained until removed from the United States and may not be released from detention unless (1) parole is required to meet a medical emergency or legitimate law enforcement objective, or (2) the alien is referred for a full removal proceeding under § 240 (for example, upon a finding of 'credible fear of persuasion')." *Appears that parole criteria will be applied to those who fall under (2) above.* | **And see:**<br>INS Memorandum for Regional Officers, "Detention Guidelines Effective October 9, 1998": "Any alien placed in Expedited Removal must be detained until removed from the United States and may not be released from detention unless (1) parole is required to meet a medical emergency or legitimate law enforcement objective, or (2) the alien is referred for a full removal proceeding under § 240 (for example, upon a finding of 'credible fear of persuasion')." *Appears that parole criteria will be applied to those who fall under (2) above.* |

## Detention decisions: Standards from international law

International law clearly states that refugees are not to be penalized for their illegal entry or presence.[35]  UNHCR's Executive Committee, of which the United States is a member, has formulated recommendations on the detention of refugees and asylum seekers, noting at the outset that detention should normally be avoided.[36]  If necessary, detention should be imposed

---

[35] Art. 31, Convention relating to the Status of Refugees.
[36] UNHCR Executive Committee Conclusion No. 44 (1986) on Detention of Refugees and Asylum Seekers, para. (b).

only to verify identity, to determine the elements of the claim, to deal with cases where asylum seekers have destroyed documents in order to mislead the authorities in the country of asylum, or to protect national security or public order.  UNHCR has issued additional guidance on detention, which elaborates on the Executive Committee recommendations.[37]

## Conditions of confinement: Standards from U.S. law

Regulations require that immigration detention centers provide 24 hour supervision of detainees, conform with any applicable federal, state or local safety and emergency codes, provide food service, and guarantee access to emergency medical care.[38]

DHS has established national detention standards, which specify the living conditions appropriate for detainees in three areas: detainee services, health services, and security and control.  These standards have been collated and published in the <u>Detention Operations Manual</u>.  The Manual provides uniform policies and procedures concerning the treatment of individuals detained by Immigration and Customs Enforcement's (ICE) Detention and Removal Operations (DRO).[39]

Implementation of the detention standards is mandatory for all DHS Service Processing Centers, Contract Detention Facilities, and state and local government facilities that house DHS detainees for more than 72 hours.  ICE-DRO monitors these facilities for compliance. Additional standards are supplied by the American Correctional Association, which administers the only national accreditation program for adult correctional institutions.[40]

U.S. law does not provide standards specific to non-criminal asylum seekers in detention. Instead, the relevant standards mentioned above are based on a correctional model, and were initially imported into immigration practice to deal with criminal aliens.

## Conditions of confinement: Standards from international law

UNHCR's Executive Committee has recommended that national legislation and administrative practice make the necessary distinction between refugees and asylum seekers, and other aliens.[41]  UNHCR's guidelines on detention advise that States must avoid commingling asylum seekers and common criminals, and stress the importance of separate detention facilities to accommodate asylum seekers.  The guidelines set forth specific standards on a number of other aspects of conditions of detention[42] perhaps best summed up by the overall advice that conditions should be "humane with respect shown for the inherent dignity of the person."

---

[37] UNHCR, *Revised Guidelines on Applicable Criteria and Standards Relating to the Detention of Asylum Seekers* (Feb. 1999).
[38] 8 C.F.R. 235.3.
[39] The Detention Operations Manual can be found at http://www.ice.gov/graphics/dro/opsmanual/index.htm, last consulted Jan. 23, 2004.
[40] See http://www.aca.org, last consulted Jan. 23, 2004.
[41] UNHCR Executive Committee Conclusion No. 44 (1986) on Detention of Refugees and Asylum Seekers, para. (d).
[42] UNHCR, *Revised Guidelines on Applicable Criteria and Standards Relating to the Detention of Asylum Seekers* (Feb. 1999).

**ASYLUM SEEKERS IN EXPEDITED REMOVAL:**
*A Study Authorized by Section 605 of the International Religious Freedom Act of 1998*

**FINDINGS**

QUESTION ONE

*(1) ARE IMMIGRATION OFFICERS, EXERCISING EXPEDITED REMOVAL AUTHORITY, IMPROPERLY*
*ENCOURAGING ASYLUM SEEKERS TO WITHDRAW APPLICATIONS FOR ADMISSION?*

 *Department of Homeland Security (DHS) regulations, and Customs and Border*
*Protection (CBP) procedures and training materials make it clear to CBP inspectors that the*
*withdrawal of an application for admission is "strictly voluntary" and "must not be coerced in*
*any way." While most officers observed complied with these procedures, in one port of entry the*
*Study observed a few instances in which immigration officers improperly encouraged asylum*
*seekers to withdraw their applications for admission.*

**Specific Findings**

 **A. Department of Homeland Security (DHS) policy and training aims to prevent**
  **immigration inspectors from encouraging asylum seekers to withdraw their**
  **applications for admission.**

  DHS procedures make it clear to inspectors that a withdrawal of an application for
admission "is strictly voluntary, and should not be coerced in any way." Moreover, the training
materials instruct that "if an alien is (subject to Expedited Removal but offered withdrawal), a
sworn statement should be taken whenever possible, using Form I-867A and B. This ensures
that all the facts of the case are recorded, especially in potentially controversial cases, and
protects against accusations of coercing the alien into withdrawing, especially when there may
have been an issue of fear of persecution."

 **B. In only one port of entry (Houston) did the Study observe inspectors pressuring**
  **individuals to retract their fear claims (4/4 cases in which fear was expressed).**

  In two of these four cases, the aliens actually withdrew their applications for admission.
However, in the other two instances, the asylum seekers persisted with their credible fear claims
and were referred to an asylum officer. In these four cases the officers used strong language to
coerce applicants into withdrawing.

  There were, however, cases in other ports of entry in which CBP officers told aliens
about other consequences of pursuing asylum claims "off script." Two were told that because
they entered illegally they might not have a chance to present their cases. Five were told they
would be held in detention for three weeks or more, three of these for over a month. Because it
was sometimes difficult to differentiate between appropriate factual responses to alien questions
and deliberate attempts to discourage fear claims, the Study did not consider these disclosures to

reflect deliberate coercion; nevertheless they could arguably be construed as encouraging asylum seekers to withdraw their claims.

### C. Customs and Border Protection (CBP) quality assurance mechanisms are inadequate to ensure that all officers comply with the policy that all withdrawals be "strictly voluntary."

As described above, even when being monitored, a few inspectors engaged in conduct encouraging asylum seekers to withdraw their applications for admission. While a handful of ports of entry use video cameras to help protect inspectors from allegations of coercive behavior, most ports rely primarily on supervisory review of paper files to determine whether inspectors are following procedures. Paper files created by an unobserved inspector are not sufficient to monitor whether that inspector engaged in improper coercive conduct. The Study was not made aware of any other quality assurance mechanisms in place, such as direct observations of interviews by supervisors.

While the regulations require that Forms I-876A and B must be used for any alien who is ordered expeditiously removed, the regulations do not *require* that they be used for withdrawals. Rather, CBP training materials instruct immigration inspectors to use those forms "whenever possible." According to the CBP Inspector Training Materials on Expedited Removal, the forms should be used to prevent allegations that immigration inspectors improperly encouraging asylum seekers to withdraw their applications for admission. Form I-867A contains a script that informs the applicant that, if ordered removed, (s)he will be barred from re-entry for "a period of 5 years or longer." (This is in contrast to a withdrawal, which does not carry with it any such bar.)

The script also requires the CBP inspector to inform the alien that if (s)he has any reason to fear persecution, torture, or other harm upon being returned to his or her home country, (s)he should inform the inspector during the interview and may seek protection from return under U.S. law.

The inspector is not required to inform the alien of the possibility of withdrawing his or her application for admission, which does not carry the penalties associated with Expedited Removal. This is because withdrawal is offered only at the discretion of the inspector. The alien does not have the "right" to request a withdrawal of his or her application for admission.

The Study found that, when Form I-867A is used, aliens are frequently informed of the penalties of Expedited Removal but not of the availability of protection if they fear being returned. When subject to Expedited Removal, a potential asylum seeker who is offered withdrawal may be led to believe (s)he has only two choices: (1) to withdraw his or her application for admission, without penalty or (2) to be expeditiously removed with a five year bar from admission. Even in cases which resulted in the issuance of an order of Expedited Removal, the Study found that a significant percentage of aliens are not informed of a third choice: the right to apply for protection from return. Inspectors observed using Form I-867A and B during the Study failed to convey the protection information to the applicant approximately half of the time, even though that information was on the I-867A script.

**D. The role of asylum officers in the "dissolve" process reduces the risk that asylum seekers will be improperly encouraged to withdraw their applications for admission.**

The Study examined whether aliens might be "improperly encouraged" to withdraw their applications for admission by DHS detention officers after they have been referred for credible fear. We interviewed 45 aliens who were dissolving (i.e. abandoning) their asylum claims while in detention, and asked each of them whether any DHS official had encouraged them to withdraw their applications for admission. While a substantial number reported that the conditions of their detention influenced their decision to withdraw their application for admission, no one in this sample indicated that any detention official had improperly encouraged him or her to withdraw his or her application for asylum.

DHS has procedures in place at detention facilities to ensure against improper withdrawals of applications for admission. Specifically, before a detention officer can permit an alien to withdraw his or her application for admission or otherwise abandon his or her credible fear claim, an asylum officer "must speak to the alien to ensure that (s)he is aware of the consequences of dissolving an asylum claim, and to ascertain why the alien no longer wishes to remain in the credible fear process…(The asylum officer) must also read and explain the contents of the (form) *Request for Dissolution of Credible Fear* to the alien.[1] If, after the (asylum officer) explains the contents of the form, the alien changes his or her mind and wants to remain in the credible fear process, the (officer) continues processing the alien through the credible fear process."[2]

The role of asylum officers (who belong to U.S. Citizenship and Immigration Services (USCIS), a different agency than Immigration and Customs Enforcement, Office of Detention and Removal Operations (ICE-DRO), whose detention officials would authorize the withdrawal) in the dissolution process leaves detained asylum seekers less vulnerable to improperly encouraged withdrawals than aliens at ports of entry. ICE cannot authorize an applicant to withdraw his application for admission until an asylum officer has had the opportunity to talk to the alien and document the voluntary nature of his decision to dissolve the credible fear claim and, if applicable, withdraw the application for admission. This is different than the withdrawal of applications for admission at ports of entry, as the decision to authorize withdrawals is solely at the discretion of CBP inspectors.

---

[1] The dissolution form confirms that an asylum officer explained to the applicant that (s)he has "freely and voluntarily" decided to stop pursuing protection from removal, that (s)he understands that DHS will either permit him or her to withdraw his or her application for admission or issue an order of removal which would bar him or her from seeking readmission to the US for five years or more. The form also reiterates that, if the alien changes his or her mind again any time prior to departure from the United States, (s)he may again ask for protection from removal through the credible fear process. Finally, the alien is required to state the reason (s)he has decided not to ask for protection at this time.
[2] USCIS Credible Fear Procedures Manual, p. 35.

QUESTION TWO

*(2)* *ARE IMMIGRATION OFFICERS, EXERCISING EXPEDITED REMOVAL AUTHORITY, INCORRECTLY FAILING TO REFER ASYLUM SEEKERS FOR A CREDIBLE FEAR INTERVIEW?*

*DHS regulations state that an immigration inspector must refer an alien for a credible fear determination if that alien indicates "an intention to apply for asylum, a fear of torture, or a fear of return to his or her country." In accordance with these regulations, nearly 85 percent (67/79) of arriving aliens observed by the Study expressing a fear of return were referred for a credible fear interview. CBP Guidelines, however, provide the inspector with more discretion than the regulations, allowing the inspector to decline referral in cases where the fear claimed by the applicant is unrelated to the criteria for asylum. Indeed, in 15 percent (12/79) of observed cases when an arriving alien expressed a fear of return to the inspector, the alien was not referred. Moreover, among these twelve cases were several aliens who expressed fear of political, religious, or ethnic persecution, which are clearly related to the grounds for asylum. Of particular concern, in seven of these twelve cases, the inspector incorrectly indicated on the sworn statement that the applicant stated he had no fear of return.*

*While DHS guidance requires that asylum seekers at land ports of entry be placed in Expedited Removal and referred for a credible fear interview, the Study interviewed two groups of aliens (one from the Middle East, the other from East Africa) who requested the opportunity to apply for asylum but were refused and "pushed back" at primary inspection. We became aware of these cases only because in each case, the asylum seekers tried again on a different day and were referred into Expedited Removal as well as for a credible fear interview. CBP has stated that it is "very concerned and dismayed that this is happening contrary to policy, and is taking steps to address this."[3]*

**Specific Findings**

**A. DHS policy does not clearly define whether all expressions of fear by an alien in Expedited Removal proceedings should result in a referral for a credible fear determination.**

DHS policy requires that immigration inspectors ask scripted questions from the Form I-867B to determine whether the alien should be referred for a credible fear interview on the basis of a fear of return.[4] DHS instructs its inspectors that for any alien who responds to these questions by expressing a fear of return, verbally or otherwise, a CBP inspector must refer the alien for a credible fear determination. Section 17.15 of the Inspector Field Manual, however, is not entirely consistent with DHS regulations. The Manual states that an inspector may choose

---

[3] Letter from Michael J. Hrinyak, Acting Executive Director , Immigration Policy and Programs, Office of Field Operations, to Mark Hetfield, USCIRF (February 2, 2005). *See also* "Aliens Seeking Asylum at Land Border Ports of Entry," Memorandum from Michael A. Pearson, Executive Associate Commissioner, Office of Field Operations, Immigration and Naturalization Service, to Regional Directors (2/6/2002).

[4] Those four questions are: (1) "Why did you leave your home country or country of last residence"; (2) Do you have any fear or concern about being returned to your home country or being removed from the United States"; (3) "Would you be harmed if you returned to your home country or country of last residence"; and (4) "Do you have any questions or is there anything else you would like to add."

not to refer a case when the alien's expression of fear "would clearly not qualify that individual for asylum."  We observed examples of failures to refer aliens who expressed a fear of return that may have ensued from this unclear guidance.

**B. DHS regulations require immigration inspectors to follow a standard script informing each alien that (s)he may ask for protection if (s)he has a fear of returning home.  In approximately half of inspections observed, inspectors failed to inform the alien of the information in that part of the script.  Aliens who did receive this information were seven times more likely to be referred for a credible fear determination than those who were not.**

**C. DHS inspectors observed by Study researchers asked, "Do you have any fear or concern about being returned to your home country or being removed from the United States?" 94 percent of the time; DHS inspectors observed by Study researchers asked, "Would you be harmed if you were returned to your home country or country of last residence?" 87 percent of the time.  At least one of these questions was asked 95 percent of the time.**

**D. Approximately 85 percent (67/79) of arriving aliens whom the Study observed expressing a fear of return were referred for a credible fear interview, in accordance with DHS regulations.  However, in 15 percent of observed cases (12/79) where an arriving alien expressed a fear of return to the inspector, that alien was not referred.**

The 12 cases that were not referred included expressions of economic fear but also fear related to political, religious, or ethnic persecution, as well as unspecified fear, fear of spouse abuse, and fear of smugglers.  Under DHS regulations, all of these aliens should have been referred for a credible fear interview.

**E. While monitoring the San Ysidro land border port of entry, researchers interviewed two groups of aliens who were previously refused a referral to secondary inspection, despite expressing an intention to apply for asylum.  Aliens at busy land ports of entry are particularly vulnerable to improper denials of credible fear referrals, even though this is contrary to DHS policy.**

While monitoring the San Ysidro port of entry, the Study became aware of two instances in which primary inspectors improperly refused entry to the United States for applicants lacking proper documentation and "pushed back" those applicants without referring them to secondary inspection or creating a record of the primary inspection.  In contrast, at airports, aliens cannot simply be put on a return flight without an inspector documenting the interaction.  Moreover, primary inspections at any busy port of entry are difficult for observers or supervisors to monitor.  This is particularly true in San Ysidro, where primary inspectors inspect an average of 25,000 pedestrians per day and 50,000 automobile passengers, with 24 lanes of traffic.  Nevertheless, while in San Ysidro, Study researchers encountered two small groups of aliens who reported asking for asylum at primary inspection, but were nevertheless refused a referral to secondary

inspection or a credible fear determination in clear violation of DHS procedures.[5]  These aliens came to the attention of the Study after they made a subsequent, successful request for a credible fear referral the following day.

F. **Files of cases resulting in Expedited Removal generally included the required documents used to screen aliens to determine whether the alien had a fear of return, and whether he or she should be referred for a credible fear interview.   The reliance of Customs and Border Protection (CBP) on file reviews for quality assurance, however, is insufficient to ensure that aliens who express a fear of return are referred for a credible fear determination.**

CBP does not have sufficient controls in place to ensure that inspectors are referring all aliens who express a fear of return for a credible fear determination.  While a handful of ports of entry use video cameras to help protect inspectors from allegations of improper conduct during secondary inspections, most ports rely heavily on paper files to determine whether inspectors are following procedures.  While the paper files generally appear to be complete, Study observations indicate that paper files created by the inspector are not always reliable indicators of whether that inspector should have referred an alien for a credible fear determination.   Study researchers found that the file often indicated that all four fear questions were asked of the alien, even when they were not.  Conversely, when the questions were asked, the file occasionally indicated they had not been.  Of special concern in the 12 cases mentioned above where the alien responded to the fear question by asserting that (s)he had a fear of return, seven of the files memorializing those inspections incorrectly indicated that the alien responded that (s)he had no fear of return.

---

[5] While field guidance was distributed on February 6, 2002 instructing INS Inspectors on these procedures for referring asylum seekers at land ports of entry, it appears that the Inspectors Field Manual has not yet been updated to reflect those instructions, in spite of an indication in the memorandum that it would be.

QUESTION THREE

*(3) ARE IMMIGRATION OFFICERS, EXERCISING AUTHORITY UNDER EXPEDITED REMOVAL, INCORRECTLY REMOVING ASYLUM SEEKERS TO COUNTRIES WHERE THEY MAY FACE PERSECUTION?*

*The second Study question concerned bona fide asylum seekers who are improperly denied a referral for a credible fear determination. While such asylum seekers may be removed to a country where they may face persecution, those findings are not repeated here. Rather, to respond to this question, the focus is on asylum seekers who are removed after the credible fear interview. In addressing this question, it is also appropriate to examine asylum seekers ordered removed by the immigration judge at the conclusion of their asylum hearing, focusing on the characteristics of the proceeding which are unique to cases that originate in Expedited Removal.*

*Asylum officers reach a negative credible fear determination in only one percent of cases referred. Moreover, a negative credible fear determination is subject to strict quality assurance procedures by Asylum headquarters, and may then be reviewed by an immigration judge, who vacates negative credible fear findings reached by asylum officers more than ten percent of the time.*

*Under the current system, immigration judges – not asylum officers – determine eligibility for asylum for aliens in Expedited Removal proceedings. We found very significant variations in the asylum approval rates of individual judges. Furthermore, in nearly 40% of the immigration judge decisions examined where relief was denied, the judge cited that the applicant's testimony was inconsistent with his or her initial asylum claim, as expressed to the immigration inspector or the asylum officer at the time of the credible fear interview. In nearly one-fourth of these cases, the Judge found that the asylum-seeker's testimony was not credible because the alien "added detail" to the prior statements. Such negative credibility findings fail to take into account that the records of these prior statements are, according to the findings of the Study, often unreliable and incomplete. Finally, immigration judges granted relief to 25 percent of represented asylum applicants but only two percent of unrepresented asylum seekers.*

*After being denied asylum, an alien who continues to claim a fear of persecution or torture may appeal a negative immigration judge decision to the Board of Immigration Appeals (BIA). While the BIA sustained 23 percent of Expedited Removal asylum appeals in FY2001, only two – four percent of such appeals have been granted since 2002, when the court began allowing the issuance of "summary affirmances" rather than detailed decisions. Statistically, it is highly unlikely that any asylum seeker denied by an immigration judge will find protection by appealing to the BIA.*

**Specific Findings**

**A. DHS and the Executive Office for Immigration Review (EOIR) have implemented a screening standard and procedures which ensure that asylum officers conducting the credible fear screening do not incorrectly remove asylum seekers subject to Expedited Removal to countries where they may face persecution.**

According to statistics compiled for the Study, in FY2003 90 percent of aliens referred were found to have a credible fear of persecution, nine percent withdrew their credible fear claims, and only one percent were found by the asylum officer not to have a credible fear. Furthermore, among those aliens who requested that an immigration judge review the negative credible fear determination, ten percent were ultimately found to have a credible fear. In addition to the right of review by an immigration judge, USCIS requires that the Asylum office at USCIS headquarters review every negative credible fear determination.

The Form I-870 documents that an alien has a credible fear of persecution due to "a significant possibility" that during a full asylum hearing, (1) "the applicant would be found to be credible"; and (2) the applicant has a fear of torture or would establish a fear of return which could have a nexus to one of the grounds for asylum. Nevertheless, because USCIS imposes much more labor intensive quality assurance procedures for negative credible fear findings than for positive ones, the agency may be inadvertently encouraging its asylum officers to find "credible fear" even in cases where it may not be warranted.

**B. The "Record of Sworn Statement" (Form I-867A and B) records created at ports of entry during the Expedited Removal process are often incomplete and less than reliable. Reliance on these records by immigration judges for purposes of assessing the credibility of an asylum applicant's testimony in court could, therefore, lead to the incorrect removal of asylum seekers to countries where they may face persecution. In 31 percent (43/137) of transcripts reviewed, immigration judges denying asylum cited the asylum seeker's statement made to the immigration inspector at the port of entry, as recorded on Form I-867A and B.**

The Form I-867A and B is written in question and answer format, implying that it is a verbatim transcript. Moreover, it includes a paragraph informing the applicant that (s)he may apply for protection if (s)he has a fear of return. The Study observed that this paragraph, which is part of the sworn statement "verbatim" script, is in fact read to the applicant only 44 percent of the time (164/354). In addition, while each of the required questions relating to the applicant's fear of return was asked approximately 95 percent of the time, in 32 of the 37 cases when a particular fear question was not asked, the sworn statement in the file inaccurately indicated that it had been asked – and answered. Finally, the form indicates that the information on the sworn statement was read back to and verified by the alien. However, the statement was not, in fact, reviewed by the alien, interpreter, or interviewing officer in 72 percent of the cases observed (268/373).

The Inspector Field Manual instructs immigration inspectors taking the sworn statement: "Do **not** go into detail on the nature of the alien's fear of persecution or torture (emphasis in original)." Nevertheless, in 23.3 percent of cases (10/43) reviewed in which the judge cited the sworn statement as a basis for denying asylum, the judge found that the applicant was not credible because the alien's testimony in court reflected additional detail not in the original document from the port of entry.

Finally, with the exception of Houston and Atlanta airports, the ports of entry observed did not create an audio or videotape of the secondary inspection interview, but relied entirely on

an unwitnessed statement as transcribed by the interviewing officer.  Even in Atlanta and Houston, where secondary inspections are videotaped, the videos are taped over within a few months.  They are, therefore, seldom available to the government or the alien during consideration of the alien's asylum application before the immigration judge.

**C.  The asylum officer's notes from the asylum seeker's credible fear interview, as recorded on the Form I-870, are generally incomplete summaries of the asylum seeker's claim and not a verbatim transcript of the credible fear interview itself. Nevertheless, in 29 percent (40/137) of transcripts reviewed, immigration judges denying asylum on credibility grounds cited these notes.**

In a survey conducted at all eight regional asylum offices, the offices unanimously affirmed the Study's characterization that the statement taken at the time of the credible fear interview is used "to record just the basics of a positive determination, to show whether the alien has met the threshold for credible fear.  The credible fear statement does not generally represent a complete description of the alien's asylum claim."  Nonetheless, in 25 percent (10/40) of the cases in which the credible fear notes were cited as a basis to find that the applicant lacked credibility, the immigration judge specified that the applicant was not credible because at the immigration hearing, (s)he added detail to the claim originally expressed during the credible fear interview.

After a revision of the Form I-870 (November 21, 2003), the form indicated that:  "The following notes are not a verbatim transcript of this interview…There may be areas of the individual's claim that were not explored or documented for purposes of this threshold screening."  While this language on the form I-870 was not in effect until after the period covered by the Study, it nevertheless confirms the limitations of the evidentiary value of the form.

**D.  The outcomes of asylum claims for asylum seekers who were placed in Expedited Removal vary significantly across courts and judges.**

The Study identified wide statistical variations of grant rates of individual immigration judges for asylum seekers in Expedited Removal proceedings, even among aliens of the same nationality or among judges with the same caseload sitting in the same court.

**E.  In recent years, there has been a substantial decrease in the granting of alien appeals by the Board of Immigration Appeals (BIA).**

Moreover, statistics gathered in the Study demonstrate that since the BIA decision to permit "affirmances without opinion" (rather than opinions specifying the reasons for the decision) for asylum, withholding, and relief under the Convention Against Torture (CAT), the BIA, in deciding appeals filed by asylum seekers subject to Expedited Removal, has gone from reversing 23 percent of immigration judge decisions to reversing only two to four percent of such decisions.  With wide variations in asylum approval rates among judges (discussed above), and only two to four percent of those decisions now being overturned on appeal, the BIA may now offer little protection from the possibility of erroneous immigration judge decisions.

**F.  Asylum seekers subject to Expedited Removal who are represented by an attorney are granted relief 25 percent of the time; this contrasts with asylum seekers representing themselves, who are granted relief two percent of the time.**

Asylum hearings before an immigration judge are adversarial proceedings, where an asylum applicant faces not only the immigration judge but also a DHS trial attorney who almost without exception argues that the alien should be removed.  Asylum applicants in Expedited Removal proceedings are entitled to counsel, but only at no expense to the government.  The Executive Office for Immigration Review (EOIR), the Arlington Asylum Office (in cooperation with the Capital Area Immigrants' Rights Coalition), and numerous non-profit organizations have developed various programs which assist detained asylum seekers in receiving legal advice and finding legal counsel.  Most of these, however, are largely dependent on the local supply of legal representation.  However, many of the approximately 185 detention facilities used by DHS to house asylum seekers subject to Expedited Removal are in areas, which are served by neither of these programs nor by private asylum attorneys.

QUESTION FOUR

*(4) ARE IMMIGRATION OFFICERS, EXERCISING AUTHORITY UNDER EXPEDITED REMOVAL, DETAINING ASYLUM SEEKERS IMPROPERLY OR UNDER INAPPROPRIATE CONDITIONS?*

*Asylum seekers subject to Expedited Removal must, by law, be detained until an asylum officer has determined that they have a credible fear of persecution or torture, unless release (parole) is necessary to meet a medical emergency need or legitimate law enforcement objective. The Study found that most asylum seekers are detained in jails and in jail-like facilities, often with criminal inmates as well as aliens with criminal convictions. While DHS has established detention standards, these detention facilities closely resemble, and are based on, standards for correctional institutions.*

*In one particularly innovative Immigration and Customs Enforcement (ICE) contract facility, located in Broward County, Florida, asylum seekers are detained in a secure facility which does not closely resemble a jail. While Broward could be the model in the United States for the detention of asylum seekers, it is instead the exception among the network of 185 jails, prisons and "processing facilities" utilized by DHS to detain asylum seekers in Expedited Removal.*

*DHS policy favors the release of asylum seekers who have established credible fear, identity, community ties, and no likelihood of posing a security risk. However, there was little documentation in the files to allow a determination of how these criteria were actually being applied by ICE.*

*In FY2003, only 0.5 percent of asylum seekers subject to Expedited Removal in the New Orleans district were released prior to a decision in their case. In Harlingen, Texas, however, nearly 98 percent of asylum seekers were released. Release rates in other parts of the country varied widely between those two figures.*

**Specific Findings**

**A. The law and regulations require that aliens in Expedited Removal be detained until it is determined that they have a credible fear of return unless parole is necessary to meet a medical emergency or legitimate law enforcement objective.**

**B. The overwhelming majority of asylum seekers in Expedited Removal are detained in jails and jail-like facilities, often with criminal inmates and aliens with criminal convictions.**

The standards applied by ICE for all of their detention facilities are identical to, and modeled after, correctional standards for criminal populations. In some facilities with "correctional dormitory" set-ups, there are large numbers of detainees sleeping, eating, going to the bathroom and showering out in the open in one brightly lit, windowless and locked room. Recreation in ICE facilities often consists of unstructured activity of no more than one hour per day in a small outdoor space surrounded by high concrete walls or a chain link fence. All

detainees must wear prison uniforms, and a guard is posted in each dormitory room all day and night. Conditions do vary from facility to facility, but nearly all are prisons or prison like. In contrast, the Executive Committee of the United Nations High Commissioner for Refugees, of which the United States is a member, has recommended that national legislation and administrative practice make the necessary distinction between criminals, refugees and asylum seekers, and other aliens.[6]

**C.  DHS detains some asylum seekers in Expedited Removal in a secure facility which does not resemble a conventional jail and at a cost comparable to that of other DHS detention centers.[7] The facility, located in Broward County, Florida, has the potential to be copied in other locations, but has not yet been.**

The Broward County facility allows detainees to walk outside in a secure grassy courtyard during all daylight hours, use the toilet and the shower without anyone else watching, wear civilian clothing, and freely walk to class or other programmed activities without an armed escort.

**D.  DHS Policy Guidance, while not set in regulation, favors the release of asylum seekers who establish credible fear, identity, community ties, and who do not pose a security or flight risk.**

**E.  The decision-making criteria applied by Immigration and Customs Enforcement (ICE) in considering parole are not readily discernible from the information contained in the file.**

ICE has not developed a form that documents the decision-making process for parole. Thus, it cannot be easily ascertained from ICE records whether the criteria are being appropriately applied to asylum seekers subject to Expedited Removal.

**F.  The USCIS (U.S. Citizenship and Immigration Services) Form I-870, completed by an asylum officer during the credible fear interview, collects information relating to some of the criteria which DHS guidance indicates should be applied to parole decisions. The asylum officer, however, does not make a recommendation to ICE concerning release. ICE and USCIS, however, seem to have different interpretations of key definitions relevant to the release criteria. For example, while**

---

[6] UNHCR Executive Committee Conclusion No. 44 (1986) on Detention of Refugees and Asylum Seekers, paragraphs (a), (d) and (f). In that conclusion, the Executive Committee "(a) *Noted* with deep concern that large numbers of refugees and asylum seekers in different areas of the world are currently the subject of detention or similar restrictive measures by reason of their illegal entry or presence in search of asylum, pending resolution of their situation; …(d) *Stressed* the importance for national legislation and/or administrative practice to make the necessary distinction between the situation of refugees and asylum seekers, and that of other aliens; and (f) *Stressed* that conditions of detention of refugees and asylum seekers must be humane. In particular, refugees and asylum seekers shall, whenever possible, not be accommodated with persons detained as common criminals, and shall not be located in areas where their physical safety is endangered…"

[7] The Broward County facility costs DHS approximately $83 per bed per night, compared to a national average cost of $85.

**ICE does not define its interpretation of release criteria, USCIS determines identity on the basis of "a reasonable degree of certainty."**

According to the file review, 20 percent of asylum seekers whom USCIS determined identity with a reasonable degree of certainty and collected community ties information were not released from detention by ICE prior to their asylum hearing. From most of these files, the Study could not ascertain the basis for ICE's decision whether or not to release the alien.

## G. The Study found no evidence that ICE is consistently applying release criteria.

Statistical review also revealed that while the average ICE district releases 63 percent of asylum seekers prior to their asylum hearing, release rates varied in major districts from .5 percent (New Orleans) to 97.6 percent (Harlingen). With such variations, the Study concludes that the formal release criteria are not being consistently applied. Moreover, the Study's statistical review found that variations in parole rates from ICE facilities across the country are associated with factors other than the established parole criteria, including port of entry and country of origin.

## H. DHS regularly places aliens with facially valid documents in Expedited Removal and mandatory detention, for the sole reason that they expressed an intention to apply for asylum.

According to the review of 353 files, 18 asylum seekers with facially valid documents were placed in Expedited Removal proceedings and were subject to mandatory detention, solely because they informed the inspector of an intention to apply for asylum. Six of these asylum seekers volunteered their intention to apply for asylum at primary inspection. According to CBP, such asylum seekers "in most cases" are subject to Expedited Removal because, while they hold a temporary visa, their intention to apply for asylum indicates that they intend to reside in the United States permanently.[8]

---

[8] In its policy memorandum on the topic, DHS (then INS) does not define "most cases." *See* "Aliens Seeking Asylum at Land Border Ports of Entry," Memorandum from Michael A. Pearson, Executive Associate Commissioner, Office of Field Operations, Immigration and Naturalization Service, to Regional Directors (2/6/2002).

**A**SYLUM **S**EEKERS IN **E**XPEDITED **R**EMOVAL:
*A Study Authorized by Section 605 of the International Religious Freedom Act of 1998*

## RECOMMENDATIONS

### OVERVIEW

In establishing Expedited Removal, Congress included a number of safeguards and mandated that the Attorney General ensure that legitimate asylum seekers fleeing persecution or torture would not be "expeditiously removed" to the countries they had fled. The Immigration and Naturalization Service (INS), indeed, implemented procedures intended to protect bona fide asylum seekers from involuntary return, and those procedures remain in effect today.  INS (now Department of Homeland Security) officers were, and continue to be, trained in these procedures.[1]  With some exceptions, however, such procedures have not been enforced through effective quality assurance measures.  The Study observed several failures to comply with a number of required procedures.  It also observed some aliens who expressed a fear but were nevertheless returned without being referred to an asylum officer, as the CBP inspector is required to do by law.

### DHS detention practices are ill-suited to the non-criminal asylum seeking population

Prior to the establishment of Expedited Removal, criminal aliens generally took priority over arriving asylum seekers in the allocation of INS detention bed space.  With the establishment of Expedited Removal, however, INS was required to detain nearly all arriving asylum seekers.  In spite of this, INS did not create any program to oversee the new challenges posed by its growing population of non-criminal asylum seekers in detention.  No new procedures or trainings were created within INS to address challenges posed by its mandate to detain non-criminal asylum seekers at least until their credible fear hearing.  The Study found that asylum seekers subject to Expedited Removal are detained under the same conditions as criminal inmates, and that standardized procedures have not been implemented to determine whether – or not – an asylum seeker should be released.

### Agency Coordination

On March 1, 2003, INS was abolished and its components separated into different lines of reporting within the newly created Department of Homeland Security (DHS).  Four different components of DHS are now involved in Expedited Removal.  Under the current structure of DHS, any differences among these agencies must be resolved by the Secretary or Deputy Secretary of Homeland Security.  This makes it exceedingly difficult to address inter-bureau issues regarding Expedited Removal, as those officials already oversee an amalgamation of 22 former federal agencies, including INS.  As a practical matter, procedural difficulties regarding credible fear, parole, and conditions of detention cannot compete with the myriad of demands on the Secretary's time and attention and indeed should be resolved at lower levels.  In addition, the prominent role in asylum matters retained by the Executive Office for Immigration Review

---

[1] INS, an agency within the Department of Justice, was abolished by the Homeland Security Act of 2002 and its functions were folded into the Department of Homeland Security (DHS) in March 2003.

(EOIR), which remained in the Department of Justice, further complicates the capability of DHS to address cross-cutting issues of Expedited Removal policy, implementation and quality assurance.

While the refugee and asylum programs are housed within U.S. Citizenship and Immigration Services (USCIS) at DHS, neither USCIS nor any other office has been given the authority to resolve, or even to act as a forum on, inter-bureau issues relating to the impact of Expedited Removal on asylum seekers and refugees. Rather, DHS has relied on ad hoc "working groups," such as the recently formed working group on credible fear determinations, to address particular issues after they arise.

**Expansion of a System with Serious Flaws**

Congress mandated that Expedited Removal be applied to improperly documented aliens at ports of entry. It also permitted Expedited Removal to apply, at Departmental discretion, to aliens apprehended within 24 months after an entry without inspection. In November 2003, the Commissioner of the INS exercised his discretion to expand Expedited Removal to aliens who entered without inspection by sea within 24 months prior to apprehension. In August 2004, the Secretary of Homeland Security further expanded Expedited Removal to aliens who enter without inspection by land and are apprehended within 100 miles of the border within 14 days after their last entry. Both of these expansions of Expedited Removal occurred at a time when coordination among the different actors in Expedited Removal was particularly difficult, i.e. as the INS was being disassembled and its components placed in different sections of DHS.

The Study has cited several ways in which asylum seekers who express a fear of return are nevertheless at some risk of being returned without being permitted to speak to an asylum officer. If referred, they are almost certain to be detained in jail or under jail-like conditions.

We are concerned that Expedited Removal has been expanded several times without an official mechanism – such as a Refugee Coordinator - to resolve the problems which arise in its implementation, particularly those requiring inter-bureau or inter-agency cooperation. We are also concerned that the following recommendations would be difficult to implement without such a mechanism.

RECOMMENDATION ONE

IN ORDER TO MORE EFFECTIVELY PROTECT BOTH HOMELAND SECURITY AND BONA FIDE ASYLUM SEEKERS, THE DEPARTMENT OF HOMELAND SECURITY SHOULD CREATE AN OFFICE- HEADED BY A HIGH-LEVEL OFFICIAL- AUTHORIZED TO ADDRESS CROSS CUTTING ISSUES RELATING TO ASYLUM AND EXPEDITED REMOVAL.

**1.1** ***The Department of Homeland Security should create an office headed by a high-level Refugee Coordinator, with authority to coordinate DHS policy and regulations, and to monitor the implementation of procedures affecting refugees or asylum seekers, particularly those in the Expedited Removal process.***

The Study found that responsibilities for the treatment of asylum seekers in Expedited Removal are divided among several entities within DHS; therefore, resolving policy or procedural issues in this area currently requires the involvement of the Secretary or Deputy Secretary.[2]

The Study also found that there was no effort or program at DHS to assess on an agency-wide basis the treatment of asylum seekers in Expedited Removal.  Nor were there adequate quality control measures in place to assess the impact on asylum seekers of the individual pieces of the process.

The Study also identifies significant problems in implementing and maintaining the safeguards for asylum seekers that Congress established.  In order for these problems to be addressed, and given the current structure and lines of authority at DHS, a coordinating office is necessary to (a) ensure consistent asylum policy and legal interpretations Department-wide; (b) coordinate implementation of necessary changes set forth in the Study's recommendations; and (c) monitor the system on an agency-wide basis to see that changes take hold and that emerging problems are addressed as they arise.  For example, the office would address problems identified in this Study concerning credible fear referrals at ports of entry; credible fear determinations; decisions concerning withdrawals of applications for admission; dissolutions of credible fear claims; the development of detention standards and facilities specific to asylum seekers; and information relating to parole criteria and conditions of detention specific to asylum seekers.  Addressing these problems would require a consistent DHS-wide asylum and refugee policy, as well as inter-bureau discussions of how the various pieces of the process function and relate to one another.[3]

With the expansion of Expedited Removal authority, there are now four entities within DHS that can enter an Expedited Removal order:  CBP Inspectors at ports of entry (for arriving aliens); Border Patrol (for aliens apprehended in the interior pursuant to the inland Expedited Removal procedures promulgated on August 11, 2004); the Office of Asylum (for aliens who fail to establish a credible fear of persecution); and Immigration and Customs Enforcement (ICE).  It is critical to have these four entities treating asylum seekers by the same rules and procedures,

---

[2] Although overall DHS was cooperative, difficulties in liaising with the agency during this study re-enforced the conclusion concerning the need for an individual with coordinating authority across bureaus.  Specifically, DHS was unable to name any individual in a position to act as the primary liaison between the Department and Commission experts.  While DHS assigned USCIS as the nominal primary contact, conducting the Study required establishing separate working relationships with Detention and Removal Operations within the Bureau of Immigration and Customs Enforcement (ICE-DRO), Inspections, Border Patrol, USCIS, the Office of Immigration Statistics, as well as the Executive Office for Immigration Review (EOIR), in the Department of Justice.  While the Study was being conducted, the experts were unable to discern who at DHS had responsibility for inter-bureau policy or DHS-wide operational asylum issues.  Nevertheless, all agencies with whom we worked were cooperative in working with the Study.  A number of agency officials confirmed that inter-bureau differences in approach are currently difficult to resolve.

[3] We recognize, however, that such an office need not be focused exclusively on Expedited Removal issues, but other inter-bureau refugee and asylum issues as well; e.g. refugee issues arising from interdictions of aliens at sea; asylum issues arising from the Memorandum of Understanding on Asylum with Canada; the detention of asylum seekers other than those in Expedited Removal proceedings; linkages between overseas enforcement programs and the refugee resettlement program, etc.

and to ensure that information is being adequately shared.  At this point, such coordination is only possible if done by the Office of the Secretary.  The Secretary should delegate this responsibility to an individual who is authorized to coordinate the various entities' work relating to the protection of refugees and asylum seekers. Otherwise, with the recent expansions of Expedited Removal, and its serious flaws, the United States' tradition of protecting asylum seekers – not to mention those asylum seekers' lives – continues to be at risk.

## RECOMMENDATION TWO

DECREASE THE BURDENS ON IMMIGRATION COURTS, THE DETENTION SYSTEM, AND THE APPLICANTS BY PERMITTING ASYLUM OFFICERS TO GRANT ASYLUM CLAIMS DURING THE CREDIBLE FEAR INTERVIEW.

**2.1** *The burden on the detention system, the immigration courts, and bona fide asylum seekers in Expedited Removal themselves should be eased by allowing asylum officers to grant asylum in approvable cases at the time of the credible fear interview, just as they are already trained and authorized to do for other asylum seekers.*

With some amendments to the regulations, the credible fear interview could further expedite both the removal of aliens without bona fide asylum claims and the adjudication of asylum claims.  These changes would reduce the time spent in, and government funds spent on, detention.

Asylum officers are already trained and authorized to adjudicate asylum claims; therefore, they should be permitted to grant asylum at the time of the credible fear interview for those asylum seekers in Expedited Removal who are able to establish that they meet the criteria at that early juncture.  This is precisely what asylum officers do for asylum seekers whose claims are addressed in the "affirmative asylum" process.  In that process, asylum officers are already trained in, and accustomed to, adjudicating full asylum applications from applicants who entered without inspection, or who successfully passed through the inspection process in spite of a lack of proper documentation.

Under this proposal, at the time of the credible fear interview, asylum officers would either (1) order the alien removed if (s)he fails to meet the credible fear standard (subject to review by an immigration judge); (2) grant the applicant asylum if (s)he establishes a well-founded fear of persecution; or (3) refer the alien to an immigration judge for a *de novo* proceedings if the alien's fear is credible but the case requires further consideration or corroboration to warrant a grant of asylum.  Allowing asylum officers to grant asylum at this stage would reduce demands on detention beds, EOIR resources, trial attorney time, and reduce the time the bona fide asylum seeker spends in detention.

Moreover, in informal interviews with asylum seekers in Expedited Removal, it became evident that the high screen-in rate at the credible fear stage may give aliens a false sense of confidence about their eligibility for asylum. By allowing for an asylum determination at the time of the credible fear interview, an asylum seeker who is merely referred to an immigration judge rather than granted asylum may be in a position to better understand whether or not (s)he is

eligible for asylum.  Therefore, this reform may lead to more aliens dissolving their asylum claims and spending less time in detention.

However, such reform would require an understanding among attorneys and aliens that continuances could not be granted by an asylum officer to delay the credible fear interview and that asylum seekers who needed more time would still have the benefit of a referral to an immigration judge.  This reform would not require a change in the Immigration and Nationality Act, as the statute does not specify who shall make the asylum determination in the case of an asylum seeker with a credible fear of persecution.

INS had once endorsed this idea in the early years of Expedited Removal.  One argument against the proposal was that an asylum officer's decision not to approve an asylum claim at the time of the credible fear interview could prejudice the immigration judge's consideration of the asylum claim.  However, this concern is not supported by statistics made available to the Study by EOIR.  As seen in EOIR Table V, each year immigration judges grant asylum to approximately 20 percent of affirmative cases referred to them by asylum officers.  This compares with an approval rate of approximately 25 percent for credible fear cases referred to immigration judges by asylum officers.  By granting relief in 20 percent of cases where asylum officers have declined to, immigration judges do not appear to be prejudiced by asylum officer determinations in the affirmative process.  With proper training and an understanding that compressed time frames may make it difficult for asylum seekers in Expedited Removal to establish eligibility at the time of the credible fear interview, immigration judges would not likely be prejudiced by asylum officer decisions not to grant asylum at the credible fear stage.

## RECOMMENDATION THREE

ESTABLISH DETENTION STANDARDS AND CONDITIONS APPROPRIATE FOR ASYLUM SEEKERS.  DHS SHOULD ALSO PROMULGATE REGULATIONS TO PROMOTE MORE CONSISTENT IMPLEMENTATION OF EXISTING PAROLE CRITERIA, TO ENSURE THAT ASYLUM SEEKERS WITH A CREDIBLE FEAR OF PERSECUTION- AND WHO POSE NEITHER A FLIGHT NOR A SECURITY RISK- ARE RELEASED FROM DETENTION.

### 3.1 *DHS should address the inconsistent application of its parole criteria by codifying the criteria into formal regulations.*

The INS established criteria for the release of asylum seekers (i.e. credible fear, community ties, establishment of identity, and not a suspected security risk) and these criteria continue, in theory, to be in effect at DHS. The Study, however, found that rates of release vary dramatically in different parts of the country and there is no evidence that these criteria are being applied consistently.  Codification of the parole criteria into regulations will help ensure that DHS consistently detains those aliens who do not meet the criteria and releases those who do.

### 3.2 *DHS should develop standardized forms and national review procedures to ensure that its parole criteria are more consistently applied nation-wide.*

In addition to codifying its criteria in formal regulations, DHS should create standardized forms and review procedures to address inconsistent application of its release criteria for asylum

seekers.  In trying to understand the wide variations in release rates, the Study found no evidence of quality assurance procedures to ensure that these criteria are being followed.  Nor do DHS files usually include the information or forms necessary to ascertain whether or not the criteria are being applied. Detention and Removal Operations (ICE-DRO) should develop a form, perhaps modeled after the USCIS Form I-870, as well as associated national review procedures, to assess consistent application of the parole criteria.  This will help ensure that asylum seekers who do not pose a security risk and who establish a credible fear of persecution, community ties, and identity are not improperly detained.  The form would require DHS to document its assessment of each of the parole criteria.

**3.3 *When non-criminal asylum seekers in Expedited Removal are detained, they should not be held in prison-like facilities, with the exception of those specific cases in which DHS has reason to believe that the alien may pose a danger to others.  Rather, non-criminal asylum seekers should be detained in "non-jail-like" facilities such as the model developed by DHS and INS in Broward County, Florida.  DHS should formulate and implement nationwide detention standards created specifically for asylum seekers. The standards should be developed under the supervision of the proposed Office of the Refugee Coordinator, and should be implemented by an office dedicated to the detention of non-criminal asylum seekers, developing a small number of centrally managed facilities specific to and appropriate for, asylum seekers.  The current DHS standards – based entirely on a penal model -- are inappropriate.***

U.S. law and DHS regulations are silent on whether asylum seekers should have detention standards that are different from those applied to other aliens.  The Executive Committee of the United Nations High Commissioner on Refugees (UNHCR) has, however, spoken on the subject.  Specifically, in UNHCR Executive Committee Conclusion No. 44 (1986) on Detention of Refugees and Asylum Seekers, the Executive Committee noted "deep concern" that large numbers of asylum seekers are the "subject of detention" and "stressed the importance for national legislation or administrative practice to make the necessary distinction between the situation of refugees and asylum seekers, and that of other aliens" and "stressed that conditions of detention of refugees and asylum seekers must be humane and that, in particular, refugees and asylum seekers shall, whenever possible, not be accommodated with persons detained as common criminals…."

We have found that detained asylum seekers in Expedited Removal are subjected to conditions of confinement that are virtually identical to those in prisons or jails.  These conditions create a serious risk of institutionalization and other forms of psychological harm. They are inappropriate, particularly for an already traumatized population of asylum seekers, and unnecessary.  ICE's own "non-jail-like detention" model in Broward County, Florida has demonstrated that asylum seekers may be securely detained in an environment which does not resemble a jail and which is no more expensive than more secure facilities.  Broward is, however, the only such non-jail-like detention facility among the 185 jails, prisons, and detention centers where ICE detains asylum seekers.

The Study concurs with the UNHCR Executive Committee that asylum seekers have different issues and needs than those faced by prisoners or even other aliens, and standards should be developed in recognition of this important distinction.   While DHS has its own

"Detention Standards" to ensure that aliens are detained under acceptable conditions, these standards are virtually identical to, and indeed are based on, correctional standards. Asylum seekers who are not criminals should not be treated like criminals.

We recommend that the proposed Office of the Refugee Coordinator oversee the development and implementation of those standards, and that an office be established to oversee the centralized development and management of non-jail-like asylee detention facilities. Standards appropriate for asylum seekers cannot be implemented in the existing decentralized network of 185 detention facilities, nearly all of which are either jails or jail-like detention centers.

**3.4** ***DHS should ensure that personnel in institutions where asylum seekers are detained are given specialized training to better understand and work with a population of asylum seekers, many of whom may be psychologically vulnerable due to the conditions from which they are fleeing.***

In the Study's survey of approximately 20 detention facilities that house more than 70 percent of the population of asylum seekers subject to Expedited Removal, only one facility indicated that line officers or guards were explicitly told which detainees were asylum seekers. In addition, staff at very few facilities were given any specific training designed to inform them of the special needs or concerns of asylum seekers, and in only one facility did the staff receive any training to enable them to recognize or address any of the special problems which victims of torture or other victims of trauma may have experienced. As noted above, asylum seekers have different needs than, and should be distinguished from, other aliens. Indeed, unlike other migrants, bona fide asylum seekers have a well-founded fear of persecution, and may also have special needs and problems stemming from that fear. This distinction underscores the need for specialized training for guards and other detention center employees.

**3.5** ***DHS should exercise discretion and not place a properly documented alien in Expedited Removal – and mandatory detention – when the sole basis for doing so is the alien's expression of a desire to apply for asylum at the port of entry***.

Under DHS policy, when an alien at a port of entry indicates a desire to seek asylum, that alien is placed in Expedited Removal after being charged with inadmissibility as an intending immigrant under section 212(a)(7)(A)(i)(l) of the Immigration and Nationality Act for having misrepresented the purpose of obtaining a visa to the United States. According to DHS, the intention to apply for asylum is not permissible with a visa for a temporary stay in the United States. The Study reviewed 353 files of aliens referred for credible fear from FY2002 to FY2003, and found 18 asylum seekers who had valid documents and were placed in Expedited Removal proceedings after expressing an intention to apply for asylum.[4]

---

[4] Recently, this practice was the subject of press attention, when the 81 year old Reverend Joseph M. Dantica, a frequent visitor to the United States in possession of a valid visitor visa from Haiti, was placed in Expedited Removal proceedings. Rev. Dantica was placed in Expedited Removal because, when asked by the inspector how long he intended to remain, the Reverend responded that he intended to apply for "temporary asylum." Dantica was sent to the Krome detention center in Florida, where he collapsed during his credible fear interview and died shortly thereafter.

The Study questions whether it is necessary or desirable to place such aliens with facially valid documents and whose identity is not in doubt in Expedited Removal and mandatory detention solely because the alien expresses an intention to apply for asylum. We urge DHS to revisit its presumption that an intention to apply for asylum is tantamount to an intention to "immigrate" to the United States. Asylee status is not "immigrant" status. In fact, asylees may not apply for "immigration" status (i.e. lawful permanent residence) until twelve months after they receive asylum. Even then, asylees can only become lawful permanent residents after an "asylum adjustment" number becomes available, which now takes more than a decade.

## RECOMMENDATION FOUR

EXPAND EXISTING PRIVATE-PUBLIC PARTNERSHIPS TO FACILITATE LEGAL ASSISTANCE FOR ASYLUM SEEKERS SUBJECT TO EXPEDITED REMOVAL, AND IMPROVE ADMINISTRATIVE REVIEW AND QUALITY ASSURANCE PROCEDURES TO IMPROVE CONSISTENCY IN ASYLUM DETERMINATIONS BY IMMIGRATION JUDGES.

**4.1** ***Statistics specific to Expedited Removal establish that asylum seekers without legal representation are at a significant disadvantage in presenting their asylum claim to the immigration judge. At the same time, other studies have shown that legal assistance actually improves the efficiency of the removal hearing process. Two programs in particular should be expanded:***

4.1.a *The Legal Orientation Program (LOP), administered by the Executive Office for Immigration Review (EOIR) in partnership with non-governmental organizations (NGO's), should be expanded beyond the seven facilities in which it is currently administered.*

With approval rates of 25 percent for represented asylum seekers in Expedited Removal and 2 percent for those who are unrepresented, the findings of the Study clearly underscore that unrepresented applicants have serious difficulties presenting their claim for asylum in an adversarial asylum proceeding. The LOP, directed by EOIR in partnership with numerous NGOs, has proven to be an effective and efficient model of facilitating representation for asylum seekers and other detainees at seven facilities. EOIR and a major study by the Department of Justice have demonstrated that such programs not only assist aliens with meritorious claims, but assist the government as well. Because they provide aliens without a realistic possibility of relief a better understanding of their prospects, legal orientation programs result in more efficient use of court and detention resources.

Regrettably, while Congress instructed that INS (now ICE) transfer $1 million in appropriated funds to EOIR for the LOP program each year from FY2002-2004, the funds for FY2003 have yet to be transferred. ICE did, however, agree to transfer $1 million in FY2005 funding on February 1, 2005. LOP funding should continue and, to the extent possible, be expanded system-wide.

4.1.b *Each of the local eight asylum offices should form partnerships with service providers in their area to ensure that asylum seekers have an attorney to consult with during the credible fear process. Such a collaborative project between the Arlington,*

*Virginia Asylum Office and the Capital Area Immigrants Rights Coalition has already demonstrated that it can enhance the efficiency of the asylum process.*

The partnership developed between the Arlington asylum office (DHS-USCIS) and the Capital Area Immigrants' Rights Coalition, which endeavors to facilitate legal assistance for asylum seekers awaiting a credible fear interview, serves as another efficiency model. Specifically, since the launch of the program, the frequency of asylum seekers dissolving their claims in Arlington has increased by 50 percent, and it now has the highest dissolve rate of any asylum office in the country. After receiving legal counseling, an alien with no available relief is more likely to retract his or her claim and ask to be returned home, saving the government detention and immigration court costs and the alien wasted time in detention. Moreover, in many cases, legal assistance facilitated for purposes of the credible fear interview extends to representation at the time of the asylum hearing and helps ensure that asylum seekers with valid claims will not be returned to countries where they may face persecution.

Both of these public-private partnerships should be expanded for asylum seekers subject to Expedited Removal on a national basis to supplement other effective, but under-resourced, models of pro bono representation in various parts of the United States. Facilitating asylum seekers' access to legal assistance, however, will remain logistically difficult until DHS implements the Study's recommendation that detained asylum seekers be concentrated in a limited number of detention centers appropriate to asylum seekers.

*4.1.c  ICE and EOIR should also collaborate with local service providers to ensure that NGO's, particularly those that conduct "Know Your Rights Presentations" at DHS detention facilities in LOP, should have access to aliens in Expedited Removal proceedings, including those aliens who have not been referred for a credible fear determination, so long as such interviews do not delay the Expedited Removal process.*

The LOP model, and similar programs such as the "Know Your Rights Presentations" conducted by the Florence Immigrant and Refugee Rights Project (FIRRP), may also be useful in helping DHS identify cases which should be referred for a credible fear interview. When Commissioners and Study Experts visited Arizona in August 2004 in order to learn about the implementation by the Border Patrol of Expedited Removal, Border Patrol officials erroneously assured the delegation that all aliens in Expedited Removal would, while detained, be able to attend "Know Your Rights" presentations at the detention facility in Florence. According to subsequent conversations with other DHS officials and the FIRRP, which conducts such presentations, the only aliens who are able to meet with FIRRP are those scheduled for a hearing with an immigration judge. By definition, this limitation means that the only aliens in Expedited Removal who may meet with FIRRP are those whom Border Patrol has referred for a credible fear determination *and* who have then been found to have a credible fear of persecution by an asylum officer. By facilitating meetings with all aliens in Expedited Removal, DHS could both instill confidence that the Expedited Removal process is properly referring asylum seekers for a credible fear determination, and also allow organizations to bring to DHS' attention aliens who should *not* be returned without first seeing an asylum officer.

EOIR has already taken steps in this direction by allowing its contractors in the Legal Orientation Program to provide "self-help" training workshops when needed for unrepresented

aliens interested in pursuing relief from removal or subject to special procedures. The Study hopes that EOIR will be given the necessary resources to help ensure that aliens have the information they need to make the system both more efficient, and more just as well.

***4.2 The Study found significant variations in immigration judge grant rates for asylum claims referred through the Expedited Removal process. This is true not only from court to court, but also from judge to judge within individual courts. The Study also found that many immigration judges are relying heavily on Expedited Removal documents, which the Study found to be incomplete and less than reliable. We recommend that these quality assurance and administrative review issues be addressed in the following ways:***

4.2.a *The Board of Immigration Appeals (BIA) should revisit its recently adopted practice of allowing summary affirmances for asylum, withholding, and Convention Against Torture (CAT) relief since there are indications that this practice may be undermining the Board's effectiveness as the primary review mechanism for decisions by immigration judges.*

The BIA is the primary means for reviewing immigration judge decisions and correcting judicial error. Three years ago, in order to "increase efficiency," the BIA authorized the use of one-sentence summary affirmances of immigration judge decisions. Since that time, the sustain rate for appeals filed by asylum seekers subject to Expedited Removal has fallen from 23 percent to 4 percent. This difference has not been adequately explained by EOIR and should be thoroughly investigated. By making it significantly easier to affirm - rather than vacate - an immigration judge decision, the BIA may be inadvertently undermining its effectiveness as a quality assurance mechanism. The application of summary affirmances to cases involving asylum, withholding and CAT relief should be revisited to ensure that the review process is equitable.

4.2.b *EOIR should reinstate funding for immigration judge training and consider additional quality assurance procedures (i.e. peer review) to address the significant variations in approval and denial rates among immigration judges. In particular, immigration judges should be provided training specific to issues related to the reliability of DHS forms that they use to ascertain the credibility of testimony; e.g. the Forms I-867 and I-870 analyzed by this study.*

The Study's statistical findings on the variability of immigration judge decisions on relief for asylum seekers in Expedited Removal highlight the need for these differences to be examined and explained in order to develop and implement appropriate training and quality assurance mechanisms. Moreover, immigration judges should be trained and otherwise advised on the mechanics of the Expedited Removal process (i.e. the extremely limited probative value of the I-867 and I-870 forms). Other methods of quality assurance, e.g. peer review panels, should be considered as well. Yet, due to budget shortfalls, the immigration judges have not held a training conference for several years. Such trainings are necessary, and should be re-established.

RECOMMENDATION FIVE

IMPLEMENT AND MONITOR QUALITY ASSURANCE PROCEDURES TO ENSURE MORE RELIABLE
INFORMATION FOR HOMELAND SECURITY PURPOSES, AND TO ENSURE THAT ASYLUM SEEKERS ARE
NOT TURNED AWAY IN ERROR.

**System Wide**

**5.1** ***Create a reliable inter-bureau system that tracks real-time data of aliens in Expedited
Removal proceedings.***

The Office of Immigration Statistics within DHS is currently dependent on each of the
organizational components (USCIS, ICE, CBP) spread across this vast agency – and beyond
(with the EOIR in the Department of Justice) – in order to obtain statistics on immigration
activities in general, and Expedited Removal/Asylum activities in particular.  There is currently
no capability to track statistics of aliens from the beginning of the Expedited Removal process –
at the port of entry, through detention, and up until the completion of the hearing before the
immigration judge at the Department of Justice.  Most of the statistics in this Study had to be
cobbled together from different non-interactive systems with different data.  Other statistics
sought – such as breakdowns by nationality of aliens permitted to withdraw their applications for
admission – were simply not being tracked by DHS databases.  Quality assurance and integrated
operations cannot be done until DHS develops an agency-wide (and beyond) system that tracks
real time data of aliens in Expedited Removal proceedings.  The lack of reliable real time data
shared among the bureaus in the DHS raises concerns about its ability to protect not only asylum
seekers, but homeland security as well.

Simply put, DHS should have an information system that will allow it to readily monitor
the types of issues which were examined during the Study.

**Inspections and Border Patrol**

**5.2** ***Reconcile conflicting field guidance to require that any expression of fear at the port of
entry must result in either a referral for a credible fear determination or, in cases
where the inspector or Border Patrol agent believes the alien would "clearly not
qualify" for asylum or CAT relief, contact with an asylum officer to speak to the alien
via a telephonic interpretation service to determine whether or not the alien needs to be
referred.***

CBP regulations and guidance provide conflicting instructions to CBP officers on
whether all expressions of fear by the alien during inspection should result in a referral to an
asylum officer.  We recommend that the conflicting guidance be clarified.  When an inspector
has a question about whether the fear is related to the grounds for asylum, the regulations do not
provide him or her with discretion to make that determination, and the alien should be referred to
an asylum officer.  The Field Manual, however, authorizes inspectors not to refer aliens whose
expression of fear "would clearly not qualify that individual for asylum."  DHS guidance also
instructs immigration inspectors to contact the asylum office point(s) of contact "when necessary

to obtain guidance on questionable cases involving an expression of fear or a potential asylum claim."

Immigration inspectors and Border Patrol agents are not trained in asylum law and should not make determinations about whether a fear is related to the grounds of asylum or CAT relief. On the other hand, if an alien's expression of fear has no relationship to the grounds for asylum or CAT relief, there is no benefit to subjecting the alien to detention for several days at government expense.

DHS should require that, when an alien expresses a fear of return, the immigration inspector or Border Patrol agent must either (1) refer the alien for a credible fear determination or (2) when the inspector believes the alien's expression of fear is not related to grounds for relief, initiate an interview, with appropriate privacy, between the alien and an asylum officer via a telephonic interpretation service. The asylum officer would then determine whether the alien should be referred for a credible fear determination and provide a short form documenting the consultation for the file.

**5.3 *DHS should improve quality assurance by expanding and enhancing the videotape systems currently used at Houston and Atlanta to all major ports of entry and Border patrol stations to unintrusively record all secondary interviews, and consider employing the use of undercover "testers" to verify that Expedited Removal procedures are being properly followed.***

The Study found current CBP quality assurance procedures to be inadequate and to rely entirely on "self-reporting" by immigration inspectors. The Study has shown that sworn statements taken at ports of entry are often inaccurate and are almost always unverifiable. The unintrusive video-taping systems currently in place in Houston and Atlanta should be expanded to all major ports of entry and the tapes should be reviewed and retained for a sufficient period of time to be useful for quality assurance purposes. The Study found the tapes to be useful because they may be used to protect aliens from improper conduct by inspectors, and to protect inspectors from specious allegations of improper conduct. In addition, video should also be used by CBP to monitor the accuracy of sworn statements and the proper implementation of all CBP procedures. As a quality assurance measure, CBP should also consider utilizing "testers" (undercover actors) who could verify that aliens with fraudulent documents are placed in Expedited Removal and that asylum seekers are properly referred for a credible fear determination. A "tester" would have the benefit of verifying compliance with procedures without the intrusiveness of a third-party monitor in the room, which would likely have an effect on the conduct of the officer.[5] In the meantime, however, CBP should monitor ports of entry on a periodic basis much in the way this Study has done.

Primary inspection at land ports of entry, however, is much more difficult to monitor due to the volume of inspections performed. While monitoring San Ysidro, the Study became aware of two separate incidents in which religious asylum seekers from Africa and the Middle East were turned away at primary inspection instead of being referred to Expedited Removal

---

[5] Testers are already routinely used by DHS at the Transportation Security Administration (TSA), which employs them to test the effectiveness of airport passenger and baggage screening procedures.

proceedings and a credible fear interview as required. In both cases, the asylum seekers were eventually referred to secondary inspection, but only after returning on a subsequent day and describing their difficulties to the secondary inspector. When a secondary inspector or an asylum officer becomes aware of such incidents, employees should be reminded of their responsibility to refer such cases for secondary inspection and the incident should be reported to both CBP and Asylum Headquarters.

**5.4** *Sworn Statement Form I-867B should include an explanation of the specific purpose for which the document is designed to serve, and its limitations.*

The Study found that immigration judges frequently deny asylum claims on the basis of aliens "adding detail" to claims originally expressed in the sworn statement taken by CBP officers at the secondary inspection. The Study also found that such forms are often incomplete and less than reliable. CBP should amend its sworn statement forms (I-867B) in the same way that USCIS recently amended its credible fear assessment form (I-870), with a prominently displayed notation that the form is not a transcript and, echoing the language in the Inspector Field Manual, is "not intended to go into detail about any fear of persecution or torture."

**5.5** *Current DHS procedures concerning the administration of the Form I-867A and B should be maintained, but should be more vigorously monitored.*

Current CBP procedures are designed to protect bona fide asylum seekers from being removed without a hearing. They already require that immigration inspectors (1) explain the Expedited Removal process to the alien by reading the script on the Form I-867A; (2) ask the alien all four of the "fear questions," as written on Form I-867B; (3) review the alien's Sworn Statement, as recorded on the Form I-867A and B, by reading it back to the alien (with the assistance of an interpreter, if necessary); (4) inquire whether the alien understood what was read back to him; and (5) correct any inaccuracies pointed out by the alien and ask him or her sign the statement to confirm its accuracy.

The Study, however, found lapses in compliance with these procedures. Implementation of the procedures, could be maintained and enforced through more effective quality assurance efforts including the use of videotapes, testers, as well as ongoing training.

Finally, while the use of language specific videotape presentations to explain the Expedited Removal and credible fear process to the alien could be a useful tool to help ensure that the alien better understands the process, at least one port of entry sometimes plays a video tape in lieu of the officer reading the script to the alien. This practice falls short of the Inspector Field Manual guidance that an immigration inspector must be "absolutely certain that all required procedures have been adhered to and that the alien has understood the proceedings against him or her." A videotape presentation is a good addition to, but should not substitute for, the required steps mentioned above.

**Asylum**

**5.6** ***The efficiency of the Expedited Removal process should be enhanced by amending DHS quality assurance procedures for the credible fear interview.***

The credible fear determination by an asylum officer, which – by law – is reviewable by an immigration judge, has proven successful at ensuring that bona fide asylum seekers referred from the port of entry will not be removed without a full asylum hearing. The credible fear process fails, however, at making asylum more efficient by failing to screen out invalid claims and thus putting more strain on detention and immigration court resources. With a screen-in rate consistently exceeding 90 percent, and a negative determination rate of approximately 1 percent, some view the credible fear process itself as somewhat lacking in credibility. The Asylum Division subjects negative determinations to a much more intensive quality assurance process than positive determinations. This lopsided treatment may be resulting in lopsided credible fear determinations. We would suggest that this bias in favor of positive credible fear determinations be addressed by subjecting them to similar quality assurance procedures as negative determinations, and that immigration judges continue to review negative determinations, unless the asylum seeker indicates he does not wish for the decision to be reviewed.

## RECOMMENDATION SUMMARY

THIS STUDY HAS PROVIDED TEMPORARY TRANSPARENCY TO EXPEDITED REMOVAL – A PROCESS WHICH IS OPAQUE NOT ONLY TO THE OUTSIDE WORLD, BUT EVEN WITHIN THE DEPARTMENT OF HOMELAND SECURITY. AS A RESULT OF THIS TRANSPARENCY, SERIOUS – BUT NOT INSURMOUNTABLE – PROBLEMS WITH EXPEDITED REMOVAL HAVE BEEN IDENTIFIED. THE STUDY'S RECOMMENDATIONS CONCERNING BETTER DATA SYSTEMS, QUALITY ASSURANCE MEASURES, ACCESS TO REPRESENTATION, AND A DHS REFUGEE COORDINATOR WOULD ALL CONTRIBUTE TO A MORE TRANSPARENT AND EFFECTIVE EXPEDITED REMOVAL PROCESS. WE ALSO RECOMMEND THAT CONGRESS REQUIRE THE DEPARTMENTS OF JUSTICE AND HOMELAND SECURITY TO PREPARE AND SUBMIT REPORTS, WITHIN 12 MONTHS OF THE RELEASE OF THIS STUDY, DESCRIBING AGENCY ACTIONS TO ADDRESS THE FINDINGS AND RECOMMENDATIONS OF THIS STUDY.

# EXHIBIT M

Coalition for Humane Immigrant Rights, et al. v. Noem et al., 1:25-cv-00872 (JMC)



"You Don't Have Rights Here"          DONATE NOW

October 16, 2014

# "You Don't Have Rights Here"
## US Border Screening and Returns of Central Americans to Risk of Serious Harm



Returned migrants at the Attention Center for the Returned Migrant, San Pedro Sula airport, Honduras. © 2014 Stephen Ferry for Human Rights Watch

---

## "You Don't Have Rights Here"

Case 1:25-cv-00872-JMC    Document 55-13    Filed 03/03/26    Page 161 of 368



**"You Don't Have Rights Here"**

    DONATE NOW

Summary

Methodology

I. Background on Threats in Honduras

II. First-Hand Accounts: Threats Facing Returned Hondurans

III. Expedited Removal, Reinstatement of Removal, and Screening for Credible Fear

IV. First-Hand Accounts: Asylum Seekers' Experiences in Expedited Removal

V. Detention and Access to Counsel

VI. US Law and International Refugee Law

Recommendations

Acknowledgments

# Summary

*I told them, I cried, that I couldn't go back to my country... but they deported us.*

—Alicia R., deported from the United States following Border Patrol screening in August 2014 with her two children, ages 3 and 10, feared retribution from gang members in Honduras after witnessing the murder of her mother.[1]

Migrants from Central America and Mexico seek to enter the United States without authorization for many reasons. Some seek economic opportunity. Others are fleeing violent gangs in countries such as Guatemala, El Salvador, and Honduras, where local officials may be complicit with gangs or otherwise unable or unwilling to provide meaningful protection. Many have mixed motives for leaving, including poverty, gang violence, and reuniting with separated family members.

At the US-Mexico border, US immigration officers issue deportation orders to unauthorized migrants in accelerated processes known as "expedited removal" or "reinstatement of

2/26/26, 12:09 PM
"You Don't Have Rights Here" | US Border Screening and Returns of Central Americans to Risk of Serious Harm | HRW

Case 1:25-cv-00872-JMC   Document 55-13   Filed 03/03/26   Page 162 of 368



   DONATE NOW

this report, this cursory screening is failing to effectively identify people fleeing serious risks to their lives and safety.

In the past two decades, US laws and policies have become less responsive to the risks faced by arriving migrants seeking asylum from persecution. In 1996, and subsequently in 2006, the US government severely undermined the system for identifying asylum seekers through the establishment and expansion of expedited removal. The flaws of that approach are readily apparent today at the US-Mexico border.

This report is based on 35 interviews with Central American migrants in detention in the US or recently deported to Honduras. While focusing on the situation facing Hondurans, our findings and recommendations apply to others coming to the US from Central America and Mexico.

All migrants we interviewed expressed a fear of returning to Honduras. Some of those who had returned to Honduras had fear so acute that they were living in hiding, afraid to go out in public. Several who were recently deported provided accounts that, if true, should qualify them for asylum in the US. They said that, prior to attempting to enter the US, they had been subject to serious threats from gangs in Honduras. These included small business owners who refused to make demanded payments to gangs; victims of or witnesses to gang crimes, including murder and rape; and fear of a gang forcibly recruiting a family's young son. Others fled abusive domestic partners or violence related to sexual orientation, both grounds for asylum under US law.

Virtually all of those we interviewed who had been apprehended at or near the border were deported summarily, via expedited removal or reinstatement of removal. Many said they had expressed their fears to US Border Patrol officials charged with screening for fear of return before being deported, but fewer than half of these were referred by US Border Patrol for a further assessment of whether they had a "credible" or "reasonable" fear of returning to Honduras. US law requires that when a migrant in expedited or reinstatement of removal expresses a fear of return to their country of origin, they be referred to a US Citizenship and Immigration Services (USCIS) asylum officer for an interview to determine whether their fear might qualify them for asylum or other protection.

Human Rights Watch was unable to corroborate claims about the specific dangers interviewees said they faced in Honduras. However, the experiences they described and the

2/26/26, 12:09 PM  "You Don't Have Rights Here" | US Border Screening and Returns of Central Americans at Risk of Serious Harm | HRW

Case 1:25-cv-00872-JMC    Document 55-13    Filed 03/03/26    Page 163 of 368

  

the right not to be returned to a place where one would likely face threats to life or freedom or other serious harm, recognized under both US and international law, demands as much.

\*   \*   \*

The vast majority of migrants crossing the US-Mexico border without authorization are placed in detention and undergo a hasty two-part assessment by US officials under either "expedited removal," for first-time border crossers, or "reinstatement of removal," for migrants who have previously been deported from the United States.

In either case, to pass the first stage an agent from Customs and Border Protection (CBP) or another US immigration agency must flag the person for a "credible fear" or "reasonable fear" assessment. To pass the second stage, migrants meet with an asylum officer from USCIS who determines whether their fear of return is "credible," or in reinstatement cases, "reasonable" – that is, whether there is a significant possibility they will prevail in immigration court on their claim for asylum or protection from deportation to a country where they are likely to face torture.

While there is evidence that fewer people are passing through this second stage,[2] Human Rights Watch's investigations in Honduras suggests that many asylum seekers are being turned away in the first stage. The failure of CBP and other US immigration agencies to identify asylum seekers raises concerns that the US government is violating its international human rights obligations to examine asylum claims before returning them to places where their lives or freedom would be threatened.

Data for 2011 and 2012 that Human Rights Watch obtained from Customs and Border Protection under the Freedom of Information Act indicate that few Central American migrants are identified by CBP as people who fear return to their country in the first stage of the expedited removal process. The data show that the vast majority of Hondurans, at least 80 percent, are placed in fast-track expedited removal and reinstatement of removal proceedings but only a minuscule minority, 1.9 percent, got flagged for credible fear assessments by CBP. The percentages for Mexico, Honduras, El Salvador, and Guatemala are similar, ranging from 0.1 to 5.5 percent. By comparison, 21 percent of migrants from other countries who underwent the same proceedings in the same years were flagged for credible fear interviews by CBP.



"You Don't Have Rights Here"

      DONATE NOW

reinstatement of removal. However, a migrant may be identified as fearing return to their country by an immigration official after they have left CBP custody and entered the custody of Immigration and Customs Enforcement (ICE), the agency responsible for more prolonged detention of migrants. ICE, however, does not have a duty to proactively screen all migrants in its custody for their fear of return. It is telling, then, that the majority of credible and reasonable fear referrals that USCIS received in 2011 and 2012 did not come from CBP, but from ICE and other immigration agencies that learn of migrants' fear of return on an ad-hoc basis. In 2012, for example, CBP referred only 615 of the 2,405 Hondurans who eventually were flagged for credible fear interviews by USCIS.[3] Approximately three-quarters of the credible fear referrals USCIS conducted in 2012 came from agencies other than the CBP, even though that year CBP was responsible for approximately 57 percent of all noncitizen apprehensions.

Migrants who feared returning to Honduras told Human Rights Watch about problems they encountered at all stages of the summary removal process: some said that US border officials ignored their expressions of fear and removed them with no opportunity to have their claims examined; others said border officials acknowledged hearing their expressions of fear but pressured them to abandon their claims. For those who were referred for "credible fear" interviews, some said they were intimidated and confused by the interview process and complex immigration court asylum proceedings that they had to navigate on their own while detained and without legal assistance.

When immigration officials place potential asylum seekers from Honduras and other Central American countries in summary removal without putting them into the "credible fear" process, the migrants have no opportunity to have an asylum officer or immigration judge consider their case. US immigration courts are badly backlogged, but many migrants apprehended in the interior of the country – and thus not subject to Customs and Border Protection custody – are able to present their defenses against removal from the United States, including any claims to asylum, before a decision-maker who can make a more thorough examination of their claims.

Things are different at the border. Research by Human Rights Watch and others show that the CBP's methods for interviewing migrants in expedited removal procedures are seriously flawed. Unlike "credible or reasonable fear" assessments, which usually last over 45 minutes and take place at least 48 hours after a migrant is in ICE custody, Border Patrol screening

2/26/26, 12:09 PM    "You Don't Have Rights Here" | US Border Screening and Returns of Central Americans at Risk of Serious Harm | HRW

Case 1:25-cv-00872-JMC    Document 55-13    Filed 03/03/26    Page 165 of 368



**"You Don't Have Rights Here"**          DONATE NOW

days later their holsters are empty but visible; they often conduct interviews in crowded settings, without confidentiality from family members or others. All of these factors appear to hamper the ability of officers to identify those in need of more in-depth screening. The migrants we interviewed said that the CBP officers whom they encountered seemed singularly focused on removing them from the United States, which impeded their ability to make their fears known.

One man who was deported in September 2014 told Human Rights Watch that when he informed a Border Patrol officer of the threats to his life in Honduras, "He told me there was nothing I could do and I didn't have a case so there was no reason to dispute the deportation.... I told him he was violating my right to life and he said, 'You don't have rights here.'"

Arriving migrants in expedited removal or reinstatement of removal are subject to mandatory detention under US law. In recent years, this has meant US immigration officials have exercised their discretion not to use these accelerated procedures for most arriving families with children, which would mean they would be mandatorily detained, opting instead to place families in removal proceedings before immigration judges. In 2009, facing lawsuits and under pressure from rights organizations, the Obama administration ended family detention at the T. Don Hutto Detention Center, which had 490 beds for the detention of migrant families with children. Since it was one of two migrant facilities in the country equipped to detain families with children (the other, in Berks, Pennsylvania, has 85 beds), this decision indicated an intention to drastically reduce the practice of detaining families.

Since that time, however, the US government has reversed its plans. In June 2014, the Department of Homeland Security (DHS) established two detention facilities in Artesia, New Mexico, and Karnes, Texas, with between 500 and 700 beds each to hold arriving families. In September 2014, DHS announced plans to contract with a private prison company, the Corrections Corporation of America, to build a 2,400-bed family detention facility in Dilley, Texas. The facilities now in operation have been used to detain families primarily from Honduras, Guatemala, and El Salvador who are in the process of expedited removal.

International law prohibits the detention of migrant children and discourages the detention of asylum seekers. Detention interferes with individuals' ability to assert claims to asylum, access counsel, and harms the physical and mental health of children as they struggle with



"You Don't Have Rights Here"          DONATE NOW

Human Rights Watch urges the Obama administration and the Congress to immediately address US border policies that are risking the lives of Central American migrants. They should cease fast-tracking Central American migrants for deportation to ensure migrants have an adequate opportunity to make a claim for asylum. If fast-tracking continues, the US should take immediate measures to ensure all migrants who express fear are being flagged for further screening. The administration should also reverse its decision to expand the detention of migrant families, evidenced by the creation of two new family detention facilities in June and July and plans announced in September to build a 2,400-bed facility in Dilley, Texas. Finally, the government should increase migrants' access to legal counsel, which would improve handling of asylum claims and better ensure the US does not return people to countries where they face persecution or torture.

---

## Methodology

This report is based largely on interviews conducted by Human Rights Watch from September 4 to 12, 2014 in three cities in Honduras—San Pedro Sula, Comayagua, and Tegucigalpa—as well as interviews in July and September 2014 in family detention facilities in Artesia, New Mexico, and Karnes, Texas. We also interviewed officials at Border Patrol facilities in McAllen, Texas in July 2014. Human Rights Watch interviewed 25 Hondurans who were recently deported from the United States, 10 Central American detainees in family detention centers, and one in an adult detention center in the United States. We also interviewed migrant services providers, lawyers, academics, and government officials in Honduras and in the United States.

Human Rights Watch carried out interviews in English or in Spanish, depending on the preference of the interviewee, without interpreters. We informed the interviewees of the purpose of our research and did not pay them or offer them other incentives to speak with us. In some cases in the report, we have used pseudonyms and withheld other identifying information to protect interviewees and their families from possible retaliation.



"You Don't Have Rights Here"   DONATE NOW

fiscal years 2011 and 2012 (more than 683,000 apprehensions). Analysis is focused on descriptive statistics of the nationality and disposition variables.

# I. Background on Threats in Honduras

Honduras suffers from rampant crime and impunity for human rights abuses. The murder rate, which has risen consistently over the last decade, was the highest in the world in 2013. [4]For young adult males between the ages of 20 and 34, the murder rate in Honduras exceeds 300 per 100,000.[5]

Violence in Honduras is largely the result of conflict over control of drug trafficking routes and turf wars between criminal groups,[6] although, as in many other countries, these groups target other people in their communities as well. Local street gangs, the key drivers of violence, are primarily affiliated with transnational gangs such as the Mara Salvatrucha (or MS-13) or Barrio 18 (also known as Calle 18, La 18 or Mara-18).[7] Both groups exert influence over entire neighborhoods, profiting economically by levying an *impuesto de guerra* or "war tax" on residents and local business people.[8] Failure to pay this "tax" can result in violent retaliation by gangs.[9]

Witnesses to gang-related crimes in Honduras fear retaliatory violence, whether or not they speak out about what they have seen.[10] "Here in Honduras, you can't make a complaint, because then the gang comes and finishes your family," said one man who survived a near-fatal attack by a gang member.[11]

Gang death threats may follow a person wherever they go within the country. As Central American gang expert Thomas Boerman puts it, "if you go to a new community everyone recognizes you as a stranger including the police officers and the gang members. It takes only a little bit of time for anyone looking for you to find you."[12]

Young people are often targeted by gangs for recruitment and to carry out crime.[13] Gangs typically recruit poor, homeless, or marginalized youth, sometimes putting them through

2/26/26, 12:09 PM | "You Don't Have Rights Here": US Border Screening and Returns of Central Americans at Risk of Serious Harm | HRW

 HUMAN RIGHTS WATCH     "You Don't Have Rights Here"         DONATE NOW

Rights Watch, "I'm scared for him. They already start making them do things at 10."[14]

Girls may also be targeted by gangs for forced recruitment or sexual harassment and abuse. [15] Cecilia N., a 14-year-old girl who was deported from the US with her mother, said, "I'm terrified because they have taken girls from my school and raped them."[16] After her visit to Honduras in July 2014, the United Nations special rapporteur on violence against women noted that violent deaths among women had increased by 263 percent between 2005 and 2013 and that reports indicated a 95 percent rate of impunity for femicide and sexual violence crimes.[17]

Bias-motivated attacks on lesbian, gay, bisexual, transgender, and intersex (LGBTI) people are also a serious problem. The alleged involvement of Honduran police in some of these violent crimes is of particular concern. In 2011 and 2012, the government established special prosecutors' units to investigate these crimes, yet there is no evidence that these efforts have resulted in a significant increase in prosecutions.[18]

Perpetrators of killings and other violent crimes in Honduras are rarely brought to justice. The institutions responsible for providing public security continue to be largely effectual and are marred by corruption and abuse, while efforts to reform them have made little progress. [19] Criminal groups have reportedly deeply penetrated the Honduran national police, demanding bribes and passing information to criminal groups.[20]

## II. First-Hand Accounts: Threats Facing Returned Hondurans

Hondurans interviewed by Human Rights Watch who had been recently deported from the United States said they were subject to specific threats that, if true, would make them eligible for asylum in the United States. Many described threats from gangs in Honduras. Some of these threats arose from the common practice of gangs demanding extortion payments from small business owners. Others were victims or witnesses to crimes such as murder and rape and targeted on that basis. One said that he feared the forced recruitment of his young son



**"You Don't Have Rights Here"**

     DONATE NOW

Some said their fear was so acute that they were afraid to go out in public after they were deported to Honduras.[21] One 27-year-old man told Human Rights Watch he could not leave his sister's house nor tell his four young children that he was back in the country for fear of being found by gangs. He described leaving the house only rarely and, even then, only when wearing a motorcycle helmet with a darkened visor.[22] A deported woman described moving from house to house among her relatives every few days for fear of retaliation by the gang that she had witnessed murder her mother.[23]Almost everyone suffering these kinds of threats told Human Rights Watch that they planned to try to flee the country again as soon as possible.

Mateo S., who was deported from the United States to Honduras on September 9, 2014, told Human Rights Watch:

> It's run by a gang where I live. I can't say the name, because it wouldn't be safe, but they are in charge.... I had my own business here in my city. I sold bleach and other cleaning supplies from house to house. At some point, the gang started to ask me for money. Here, they call it a "war tax." Eventually, they were asking me for about US$300 dollars a month, which is the same thing here as the minimum wage. It was impossible for me. They saw that I couldn't pay this money so they started to mess with my family, with my son, who is seven years old, and with my wife. Eventually, they were threatening me all the time. I was paying them money for six to eight months, every month. And then I couldn't pay it anymore and my business went bankrupt and then I was using our savings to pay the gang members. I had to pay because I was afraid they would do something to my family.

> Then they tried to kidnap my son in June 2014. I usually come early to school to pick up my son at lunchtime. They got there maybe 10 or 20 minutes before the kids come out. I recognized them. They had already told me that something was going to happen to my son and to my wife. I didn't hesitate. I jumped the school fence with my son. I pushed him over and then I jumped. Later in the day, the teachers told me that [the gang members] were looking for a kid of my son's age. I didn't send him back

Case 1:25-cv-00872-JMC    Document 55-13    Filed 03/03/26    Page 170 of 368



"You Don't Have Rights Here"          DONATE NOW

too.[24]

Mercedes R. also felt threatened because of her inability to pay "taxes" to the gangs in Honduras. She said, "I was facing threats from the gangs because I had a store that sold food. Starting in 2013, I spent a year paying them dollars and then I couldn't anymore. I felt like I wasn't living anymore. I mistrusted everyone. I didn't feel safe."[25]

People who witness murders or other crimes committed by gangs often fear for their lives. Roberto L., who was deported from the United States to Honduras in September 2014, said:

> They killed my mother right in front of me. She had a small clothing shop. I was shot at the same time. This was in September 2013. I have been fleeing since, because I know they are looking for me. I have two kids here but I can't see them because that would put them in danger. They can't know I'm here. The assassins who are looking for me are at a national level, they will find me anywhere. I'm just going to be here for three weeks, then I'll try again.[26]

Alicia R. explained that her witnessing her mother's murder put her at risk from gang members:

> They took my mother's life…. The day that she died I was going to pick her up because she had some money to give me. I got there and then the criminals who killed her arrived. I witnessed everything that happened…. They were coming to kill somebody who was there and she was there too. She didn't have any problems. The issue is that I saw it and they saw me. They were supposedly from a gang called "18" here. The people from the gangs don't have any heart, whether with adults, children. They don't have hearts.
>
> We buried my mother … and then I had to leave the house we lived in because they came to look for us. I left everything. I went to my mother in law's house and then an aunt's house. I keep moving between these places for protection because when you get to one place or another, they find



**"You Don't Have Rights Here"**

     DONATE NOW

always lived here but now I have to stay on the move from place to place
to protect myself from them and to protect the lives of my children. I
don't have any peace. I don't want to be in this country because my life is
in danger.[27]

Jacobo E., who was deported from the United States to Honduras in August 2014, said he was
living in fear for his life. He told Human Rights Watch,

> I've always worked. I've never been in a gang. I was baptized as a Mormon
> in 1994 and I have four kids with my wife. I had to flee though because my
> wife started an affair with a guy from "18." … I saw the guy leaving my
> house one day and we had a fight. Then they told my sister that the gang
> was going to kill me, so I fled. Now that I'm back here again I don't go
> out. I can't. My parents are supporting me and I live with my sister…. I put
> on a motorcycle helmet inside the house to come here.

> I can't work. If I look for work they'll see me. They are in charge in many
> places, the "18" is nearly everywhere. Being locked up like this is ugly. I
> think about my children all the time. I can't contact them or tell them
> that I'm back in the country though. That would be dangerous.

The pervasive nature of gang violence in Honduras places random individuals under threat.
Marlon J., who was deported from the United States to Honduras in August 2014, said,

> I was a door-to-door salesman in a neighborhood called La Canada. One
> day I was passing by a corner with three guys just standing there. I wasn't
> afraid because I usually walked around there. But then one of them ran at
> me and shot me seven times in the back. They left me for dead … I spent
> two months in the hospital and it took seven months to be able to walk.

> When I came back to work one of my clients told me the gang was after
> me because that guy was going through a test. He had to kill the first
> person who walked by, to show he was brave. He would have to kill me
> now since I was supposed to be dead. I went to another part of the city,



**"You Don't Have Rights Here"**       DONATE NOW

> I'm a father of two kids, two and five years old. I have a lot to live for.
> When they deported me from the United States they said they would put
> me in prison for six months if I come back. It doesn't matter to me if I get
> six months, at least in Port Isabel [detention center in Texas], it's safe.
> What I want is to be out of here.[28]

Returned migrants to Honduras did not feel the Honduran authorities were able or willing to
protect them. As Marlon J., put it, after receiving seven gunshot wounds at the hands of a
gang initiate, "Here in Honduras, you can't file a police complaint because after that the gang
comes and finishes your family. Delinquency is what governs."[29]

Alicia R., who witnessed her mother's murder, also felt she could not seek protection from
Honduran police:

> I never filed a complaint because sometimes in this country there is a lot
> of corruption.... Sometimes the police work together with the criminals....
> If you go do something like that [lodge a complaint] sometimes that
> means they are going to be waiting for you outside of the police station.
> [30]

## III. Expedited Removal, Reinstatement of Removal, and Screening for Credible Fear

The Universal Declaration of Human Rights provides that "[e]veryone has the right to seek
and to enjoy in other countries asylum from persecution."[31] In the past two decades, US
laws and practices have increasingly narrowed that right.

In 1996, as part of the Illegal Immigration Reform and Immigrant Responsibility Act
(IIRIRA), the US Congress enacted a new provision called "expedited removal." It allows the

  


no documents. Unless they express a fear of persecution or torture upon return to their home countries or indicate an intention to apply for asylum, they may be deported immediately and will be barred from returning to the US for at least five years, and often much longer.[32]

Initially, the US government applied expedited removal provisions only to noncitizens arriving at official entry points along the border or at airports known as "ports of entry." Over the last decade, however, the Department of Homeland Security (DHS), which was established in 2002 after the September 11, 2001 attacks on the United States, has applied expedited removal procedures to people apprehended along the entire US border. Under DHS regulations this includes people apprehended within 100 miles of the border.[33]

For asylum seekers—those in need of protection from forced return—the IIRIRA created another hurdle, called reinstatement of removal. If an individual is removed or voluntarily leaves under an order of removal, and subsequently reenters the United States illegally, they face the reinstatement of the previous order.[34] A border crosser whose order has been reinstated is barred from applying for asylum but may access other remedies such as withholding of removal or protection from return to torture under the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("Convention against Torture"), to which the US is a party.[35]

Many individuals crossing the border first discuss their cases with a Customs and Border Protection agent who, under US law, is supposed to inform them that they may ask for protection if they have a fear of returning home. If a fear of return is expressed, the agent should flag them for a more thorough assessment known as a "credible fear" interview.[36] Research by Human Rights Watch and others show that the CBP's methods for interviewing migrants in expedited removal procedures are seriously flawed.[37]

A primary finding of Human Rights Watch's investigation in Honduras is that individuals seeking asylum are not being flagged for credible fear interviews by CBP officers. This is supported by US government data. Between October 2010 and September 2012, the vast majority of Hondurans, 81 percent, were placed in the fast-track expedited removal and reinstatement of removal proceedings; only a miniscule minority, 1.9 percent, were flagged for credible fear assessments by CBP.[38]



"You Don't Have Rights Here"

    DONATE NOW

percent of Salvadorans in expedited or reinstatement of removal were referred to a credible or reasonable fear interview by CBP. However, 21 percent of migrants from countries other than these, who underwent the same proceedings in the same years, were flagged for credible fear interviews by CBP. On October 9, 2014, Human Rights Watch requested updated apprehension data from CBP, which could shed light on the trends in CBP credible fear referral rates during the 2013 and 2014 influx of migrant adults, families and children from Central America.

## APPREHENSION OF NON-CITIZENS BY U.S. CUSTOMS AND BORDER PROTECTION
### By Disposition, October 2010 – September 2012

Customs and Border Protection deports the overwhelming majority of Central Americans it apprehends through accelerated procedures known as "expedited removal" or "reinstatement" of a deportation order. CBP flags only a tiny minority of these for a more extended interview with an asylum officer to determine if their fear of returning home is "credible."

| | |
|---|---|
| **HONDURAS** | |
| Apprehensions processed for immediate deportation by CBP without referral for having expressed fear of return → 81% | |
| **GUATEMALA** | |
| → 81% | |
| **EL SALVADOR** | |
| → 70% | |
| **MEXICO** | |
| → 55% | |
| **ALL OTHER COUNTRIES** | |
| → 34% | |

**DISPOSITION CATEGORIES:**

**EXPEDITED REMOVAL**
Ordered deported by immigration officer with no further processing.

**REINSTATEMENT OF PREVIOUS DEPORTATION ORDER**
Ordered deported by immigration officer with no further processing.

**EXPEDITED REMOVAL WITH CREDIBLE FEAR**
Flagged as expressing fear of return and referred to an asylum officer for more extended "credible" fear interview.

**WARRANT OF ARREST / NOTICE TO APPEAR**
Granted immigration court hearing.

**VOLUNTARY RETURN**

**ALL OTHER CATEGORIES**

Source: CBP data on apprehensions provided to Human Rights Watch through the Freedom of Information Act.



**HUMAN RIGHTS WATCH**

"You Don't Have Rights Here"

      DONATE NOW

### FY2011-2012, countries with > 100 apprehensions

| COUNTRY | NUMBER OF APPREHENSIONS | PERCENTAGE REFERRED TO CREDIBLE FEAR INTERVIEW |
|---|---|---|
| Mexico | 537,136 | 0.1% |
| Guatemala | 52,472 | 0.8% |
| Honduras | 42,093 | 1.9% |
| El Salvador | 31,986 | 5.5% |
| Ecuador | 3,380 | 3.3% |
| India | 3,150 | 57.1% |
| China | 1,837 | 66.8% |
| Romania | 1,503 | 6.7% |
| Nicaragua | 1,478 | 2.4% |
| Cuba | 1,377 | 0.1% |
| Dominican Republic | 1,282 | 6.4% |
| Brazil | 643 | 3.7% |
| Peru | 627 | 5.9% |
| Canada | 564 | 0.0% |
| Colombia | 534 | 7.9% |
| Sri Lanka | 326 | 63.8% |
| Nepal | 224 | 75.4% |
| Haiti | 209 | 27.3% |
| Costa Rica | 208 | 1.0% |
| Jamaica | 196 | 2.0% |
| Bangladesh | 180 | 77.8% |
| Belize | 102 | 2.9% |

Source: CBP data acquired by Human Rights Watch via FOIA request

2/26/26, 12:09 PM    "You Don't Have Rights Here" US Border Screening and Returns of Central Americans at Risk of Serious Harm | HRW

Case 1:25-cv-00872-JMC    Document 55-13    Filed 03/03/26    Page 176 of 368

  
they can establish persecution or fear of persecution before an immigration judge.[39]

In recent years, migrants from Honduras, Guatemala, and El Salvador have formed an increasing proportion of the credible fear referrals received by USCIS.[40] Absolute numbers of Central Americans identified for credible or reasonable fear screening have also been increasing. Referrals of Hondurans, for instance, have increased from 1,108 individuals in 2006 to 8,539 in 2013.[41]

Most of these referrals, however, do not come from CBP, despite CBP's proactive duty to screen migrants it places in expedited or reinstatement of removal for fear of return to their country of origin. In 2012, for example, CBP referred only 615 of the 2,405 Hondurans who eventually received credible fear interviews.[42] Approximately three-quarters of the credible fear referrals USCIS conducted in 2012 came from agencies other than the CBP, even though that year CBP was responsible for approximately 57 percent of all noncitizen apprehensions. [43]

A migrant may be referred by an immigration official after they have left CBP custody and entered the custody of Immigrations and Customs Enforcement (ICE), the agency responsible for more prolonged detention of migrants. ICE, however, does not have a duty to proactively screen all migrants in its custody for their fear of return. The majority of credible and reasonable fear referrals that USCIS received in 2011 and 2012 did not come from CBP but other immigration agencies, which learn of migrants' fear of return on an ad-hoc basis.

For those who are referred to credible fear interviews, the likelihood of being permitted to apply for asylum appears to have fallen significantly in recent months. This comes in the wake of problematic new guidance for asylum officers conducting interviews (referred to as the "lesson plan") issued in February 2014.[44] Before the lesson plan was enacted, in January 2014, 83 percent of those who received credible fear interviews were permitted to apply for asylum. In July 2014, six months later, that figure was 63 percent.[45] While this could be an artifact of a larger number of credible fear referrals or a smaller sample size of the months since the plan, this evidence suggests that the lesson plan has reduced the proportion of interviews in which credible fear is found. The precipitous apparent decline occurred in the period after the release of the new lesson plan, and not in tandem with the rise in referrals. Asylum law experts have criticized the lesson plan for inappropriately raising the burden of proof required at the credible or reasonable fear stage.[46]



"You Don't Have Rights Here"          DONATE NOW

a judge to make their claim for protection, they have no right to a government-appointed lawyer to assist them. ICE may detain noncitizens going through these immigration court procedures for the duration of the deportation process on a discretionary basis, though some become eligible for release on bond or on their own recognizance once they are transferred to immigration court.

## IV. First-Hand Accounts: Asylum Seekers' Experiences in Expedited Removal

US Customs and Border Protection officers are required to screen people in expedited removal for fear of return to their country and, if the noncitizen expresses fear, refer them for a credible fear interview.[47] Despite this requirement, Human Rights Watch spoke with deportees who reported that they were not informed of the availability of protection or that they were not referred to an asylum officer for a credible fear interview after they told a Border Patrol agent they were afraid to return to their country.[48] Some would-be asylum seekers also reported that Border Patrol officers harassed, threatened, and attempted to dissuade them from applying for asylum.

Additionally, CBP officers conduct interviews about fear of return in a sometimes crowded and public enforcement setting and without confidentiality from family members or others, factors that appear to hamper the ability of the officers to identify those in need of more in-depth screening. Human Rights Watch observed the interview location for detainees at the McAllen Border Patrol station in Texas in July 2014. CBP officers showed Human Rights Watch a large public space in which they process migrants at a horseshoe-shaped table designed to accommodate multiple officer-migrant pairs in close proximity. Holding cells ring the room, with concrete floors and walls and toilets behind half-high barriers. CBP officers told and demonstrated to Human Rights Watch how they check their weapons before entering, but wear their uniform with holsters – which can be particularly intimidating to persons fearful of the security forces in their home countries.[49] CBP officers told Human Rights Watch that the McAllen Border Patrol station was physically similar to many other such stations along the Mexican border.

2/26/26, 12:09 PM
Case 1:25-cv-00872-JMC Document 55-13 Filed 03/03/26 Page 178 of 368
"You Don't Have Rights Here": US Border Screening and Returns of Central Americans at Risk of Serious Harm | HRW


  
deportation, such as bars to return for set periods of time, rather than exploring their fear of return. "The officers don't pay attention to you. If you say you are afraid they say they 'can't do anything," Marlon J. told Human Rights Watch. "All they said to me was that if I came back they would give me six months in prison."[50]

Some Border Patrol officers apparently tried to convince border crossers not to apply for asylum. "I asked for asylum," said Jacobo E., who fled after being shot and seeing his mother killed for her failure to pay fees to gang members to run her small clothing business. "The officer told me don't apply, 90 percent of the people who don't get it."[51] Some deportees and detainees with whom we spoke reported that they resisted signing forms offered by Border Patrol, or were coerced into signing something they did not understand. "'Fingerprint, fingerprint,' they just kept saying, I didn't know what I was signing," said Jacobo E. who was in hiding in Honduras after being deported.[52] Maribel V., who was deported from the Artesia, New Mexico family detention center with her children, said:

> They made me sign the deportation in the "icebox" [slang for the cold Border Patrol detention cells]. No judge or lawyer spoke with me. They called me and they said that I had to sign this paper. They told me that it was for a judge to see my case. But I never saw a judge and they told me I had a deportation order. They told me I was already deported.[53]

Mateo S., who had fled death threats from a gang, said he tried to not sign papers agreeing to his deportation:

> I was detained for six days in the cold rooms. They just asked me my name, where I came from, and they told me I was punished for five years and I had to sign the deportation. I didn't want to sign. When the moment of the interview came I said I wouldn't sign. The officer insulted me. They started waking me up every couple of hours and moving me from cell to cell. It was hard.... The officer filled out all the paperwork and told me to sign, I told him I wouldn't sign and I hoped the US government would admit me. He ripped up all the paper and threw it almost at my face. He told me I was deported anyway. He said he "had the law in his hand and he was going to sign for me." I told him he was violating my right to life and he said, "You don't have rights here."[54]



**"You Don't Have Rights Here"**

   DONATE NOW

it would keep her from being deported to Honduras, she also told them she was from Mexico:

> The truth is because I didn't want to come back here [to Honduras], I told them that I was from Mexico. I told them, I cried, I said I couldn't return to my country. Sometimes you are so afraid ... to be sent back so you just say something.[55]

After two days, US officials turned Alicia and her children over to the Mexican government, which deported them two weeks later back to Honduras.[56]

Some migrants told Human Rights Watch that when they tried to tell US officials about their fear of returning, they were denied further exploration of that claim, and were put in touch with consular officers from their country of origin. This practice runs counter to international protection standards, which recognize the problematic relationship asylum seekers may have with officials from their home countries. "The [US] officers don't speak with you. They just set it up so you can speak with a consular officer and then so you sign the papers," said Marlon J.[57]

In some cases, migrants reported that consular officers dissuaded them from making international protection claims. Mateo S. explained,

> They put me in touch with someone who they said was the consul of Honduras on a video screen. I explained to him in total confidence that I was fleeing my country and the threats I was facing. He told me I didn't have a case, so why try?[58]

---

## V. Detention and Access to Counsel

None of the asylum seekers Human Rights Watch met with who had been deported to Honduras had had lawyers while in the United States, though several had tried to obtain



"You Don't Have Rights Here"

      DONATE NOW

near the border and put in expedited proceedings.

Detention of noncitizens in expedited removal proceedings and reinstatement of removal is mandatory under US law.[59] Because nearly all arriving Central Americans without authorization are placed in expedited removal proceedings, the vast majority are also detained prior to deportation.

Detention adds to the burdens and fears asylum seekers face. The fact that it is administrative rather than criminal detention may be of little practical consequence. Several told Human Rights Watch how being detained weighed on them. "I didn't have any idea what a prison was," said Jacobo E. "They just treated me like a criminal."[60]

Detention also makes it more difficult for asylum seekers to gather evidence that might be useful in their cases. Roberto L. was detained for six months while he attempted to apply for asylum on the basis of threats and past harm. "They said I needed proof," he said. "But they said you have to be detained for [an additional] six months [to keep applying for asylum], so I signed the deportation."[61]

Detainees also face considerable obstacles in obtaining legal counsel, a challenge made more difficult when they are held in detention facilities. "I need to find a lawyer but it seems impossible," one woman from Honduras then detained in Artesia, New Mexico told Human Rights Watch. "I will die if I am sent back to my country."[62] Maria F. was deported in September after being detained at Karnes family detention center with her 8-year-old daughter. "They give you a paper with [the names of] free lawyers. But nobody answers when you call."[63]

One legal service provider in San Francisco agreed that detained migrants had difficulty locating legal counsel:

> We get many calls from people whose family members are in detention, including in Texas. Usually we get the call after they've called multiple other organizations or lawyers. The few legal service providers who have called them back charge very high fees. There's just a very high demand and not enough supply. We never get initial calls from detainees

2/26/26, 12:09 PM
"You Don't Have Rights Here": US Border Screening and Returns of Central Americans at Risk of Serious Harm | HRW

Case 1:25-cv-00872-JMC   Document 55-13   Filed 03/03/26   Page 181 of 368


  
In 2005, the United States Commission on International Religious Freedom (USCIRF), a government agency, found that the expedited removal process lacks adequate safeguards to prevent improper removal and extended detention of bona fide refugees in the United States. [65] USCIRF's analysis also found that asylum seekers in expedited removal who are represented by an attorney were granted relief 25 percent of the time, while asylum seekers who were representing themselves were granted relief 2 percent of the time.[66] Robert A. Katzmann, a judge of the US Court of Appeals for the Second Circuit, summed up the results of a two-year study on immigrant representation in New York: "The two most important variables affecting the ability to secure a successful outcome in a case (defined as relief or termination) are having representation and being free from detention."[67]

Human Rights Watch has previously documented how detaining noncitizens, sometimes far from family members and friends, affects their access to counsel.[68] The Executive Office for Immigration Review recently reported that the percentage of represented cases in immigration court has increased in the past five years from 35 percent in 2009 to 59 percent in 2014.[69] Yet there is a large gap between representation rates for detained versus non-detained immigrants in immigration court proceedings. The New York Immigrant Representation Study found in 2011 that 40 percent of detained immigrants and 73 percent of non-detained immigrants in the New York City area had lawyers.[70]

Things are even worse for migrants detained in south Texas, like most of those interviewed for this report. Texas Appleseed, a non-profit legal services organization, found 86 percent of immigration detainees in Texas were unrepresented in 2009.[71] Several more recent reports indicate that systematic problems with detainees' access to counsel have not been resolved. [72] The American Immigration Council and Penn State Law found in 2012 that,

> ICE fails to provide or facilitate access to counsel when questioning represented individuals, restricts attorney-client communications in detention facilities, and has also discouraged noncitizens from seeking legal counsel.[73]

Dani A., one of the few individuals interviewed by Human Rights Watch who had passed the credible fear interview stage, ended up deported to Honduras apparently due to her inability to secure counsel while in detention. At 21, Dani had been in an abusive relationship for four

2/26/26, 12:09 PM    "You Don't Have Rights Here" US Border Screening and Returns of Central Americans at Risk of Serious Harm | HRW



"You Don't Have Rights Here"          DONATE NOW

report the rape, but "nothing was resolved."[74] Not knowing she had made a complaint, the cousin told her that if she told anyone about the attack he would kill her. She feared the cousin would harm her again and that her husband would seek her out and harm her.

After entering the United States and being identified by CBP for further screening, Dani spoke with an asylum officer who found that there was "a significant possibility" she could establish in a full hearing that she would qualify for refugee status.[75] A recent decision by the Board of Immigration Appeals recognizes domestic violence as a basis for asylum, establishing a formally binding precedent upholding earlier immigration court rulings.[76]

Detained in Houston, Texas, with only three years of formal schooling and no money to pay a lawyer, Dani tried to move forward with her asylum claim. Gender-based asylum claims, including those related to domestic violence like Dani experienced, are particularly legally complex. Officials gave her a list of free legal services providers in the area but she said, "They never answered my calls." With the help of other detainees who spoke more English, she filled out the application for asylum or withholding of removal. To the question "Are you afraid of being subjected to torture in your home country or any other country to which you may be removed?," Dani's asylum application read, "Am afraid to go back to abusers. Nature of turture: sexual assault and beat to death." [sic] Where the form asked if she feared harm or mistreatment if she returned to her home country the form stated: "1) Kill by gang husband gang members 2) Husband and husband gang members 3) because I am running away from my husband, he can kill me and sexsually asult." [sic]

These two responses formed the substance of Dani's asylum application. She told Human Rights Watch that the judge in charge of her case ordered her deported at the first hearing after she filed the application. "I wanted to get a lawyer," she said. "I didn't have one."

Family detention presents particular due process problems. In its guidelines on international protection for child asylum claims, the United Nations High Commissioner for Refugees (UNHCR), the UN refugee agency, recommends separate and confidential interviews for all family members to give each an opportunity to discuss any independent claims for protection.[77] UNHCR has also found that a lack of confidentiality could hinder the ability of women to fully access asylum procedures and recommended that "a confidential personal interview, that is gender and culturally sensitive, should be guaranteed in the asylum process, to help ensure access."[78]



**"You Don't Have Rights Here"**          DONATE NOW

presence of their children. The children's presence may have inhibited women from speaking frankly, interfering with their ability to make their claim, and may further traumatize both the mother and her children.

Noemi M., who was detained while awaiting an asylum interview, told Human Rights Watch that she would only speak about the death threats she received from gangs in Honduras when her 8- and 11-year-old children were out of earshot.[79] DHS officials have since told Human Rights Watch that women in Artesia are being interviewed by asylum officers separately from their children.[80]

Once a noncitizen in expedited removal has passed a credible fear interview, detention is no longer legally mandated but at the discretion of immigration officials. US officials in Artesia told Human Rights Watch that women and children who file for asylum in immigration court could be detained throughout the entire process, which can last months or even years. Immigration attorneys report that ICE is opposing bond requests from women and children in family detention, arguing that the families pose national security threats.[81] Such prolonged detention, with no defined end date, can cause serious psychological harm, especially for children, including anxiety, depression, and long-term cognitive damage.[82] Marleen V. from El Salvador, who had been detained with her 2-year-old daughter for two weeks at the time she spoke with Human Rights Watch, said of her daughter, "I notice her losing weight. She just won't eat."[83]

## VI. US Law and International Refugee Law

The United States committed to the central guarantees of the 1951 Refugee Convention by its accession to the Refugee Convention's 1967 Protocol.[84] The US government passed the Refugee Act of 1980 in order to bring the country's laws into compliance with the Refugee Convention and Protocol, by incorporating into US law the convention's definition of a "refugee" and the principle of nonrefoulement, which prohibits the return of refugees to countries where they would face persecution.[85]



"You Don't Have Rights Here"                          DONATE NOW

danger of being subjected to torture."[86]

As described above, Human Rights Watch is concerned that the US system of expedited removal and reinstatement of removal fails to ensure that the US complies with these international legal obligations, and defeats other mechanisms already in place in US law (specifically the asylum process in US immigration courts) to ensure that asylum seekers are identified and have a fair process through which to present their claims.

In particular, the Hondurans interviewed for this report described rushed interviews and unsympathetic reactions from CBP officials that run contrary to international standards on appropriate procedures for the determination of refugee status. The UNHCR's authoritative Handbook on Procedures and Criteria for Determining Refugee Status ("UNHCR Handbook"), states,

> It should be recalled that an applicant for refugee status is normally in a particularly vulnerable situation. He finds himself in an alien environment and may experience serious difficulties, technical and psychological, in submitting his case to the authorities of a foreign country.[87]

CBP's role in the process—involving the same uniformed and armed agents responsible for apprehending migrants that screen them for fear of return—conflicts with additional guidance from the UNHCR Handbook:

> A person who, because of his experiences, was in fear of the authorities in his own country may still feel apprehensive vis-à-vis any authority. He may therefore be afraid to speak freely and give a full and accurate account of his case.[88]

The rapid-fire nature of the expedited removal process, in particular the role played by CBP at the outset, is at odds with the recognition by UNHCR's Executive Committee ("Excom") that expedited procedures may be fair only when applied to cases that are "clearly fraudulent or not related to the criteria for the granting of refugee status laid down in the [1951 Refugee Convention]."[89]



| | HUMAN RIGHTS WATCH | "You Don't Have Rights Here" |    | DONATE NOW |

states that, by definition, a refugee's relationship with their country of origin may be severely strained. The Handbook also states that, "it is, of course, of the utmost importance that the applicant's statements will be treated as confidential." In all cases in which a migrant has expressed a fear of returning home to US border or immigration officials, it is a serious breach of confidentiality to encourage and facilitate meetings between an asylum seeker and an official of the asylum seeker's home government. US immigration officials, first, should take all reasonable measures to determine whether a migrant is an asylum seeker, and, second, should preserve confidentiality, which includes insulating them from home government officials while their claims are pending.

Detention of asylum seekers should always be a measure of last resort and should only be for reasons clearly recognized in international law, such as concerns about danger to the public, or an inability to confirm an individual's identity.

Expanding family detention is inconsistent with international standards, particularly the fundamental principle—reflected in both international and US law—that "best interest of the child" should govern the state's actions toward children.[90] If detention of children is used at all, it should only be in rare and exceptional cases, and for the shortest amount of time and in an appropriate setting where the children's needs can be addressed without causing further trauma or harm.[91] Deprivation of liberty has a negative effect on children's capacity to realize various fundamental rights, including the rights to education, health, and family unity.79

Previously, the US government made greater use of alternatives to detention for families, such as proven "appearance support" programs that ensure migrants in immigration proceedings understand how and when to appear.[92]

Finally, using detention explicitly as a deterrent to entry into the United States for people seeking international protection is unlawful under international law[93] and US law.[94] However, the Obama administration has openly stated that one purpose for the increase in family detention beds is to deter all unauthorized migrants from entering the country. DHS Secretary Jeh Johnson has referred to detention as part of an "aggressive deterrence strategy" in Senate testimony and has told the media that he believed detention "would deter future illegal crossings."[95] The ICE Assistant Director of Investigative Programs for Homeland Security Investigations has stated that "[i]mplementing a 'no bond' or 'high bond' policy would help alleviate these disruptions by deterring further mass migration."[96] The ICE

Case 1:25-cv-00872-JMC    Document 55-13    Filed 03/03/26    Page 186 of 368



"You Don't Have Rights Here"

      DONATE NOW

international obligations, while deterring others from taking the dangerous journey and illegally crossing into the United States."[97]

As we were finalizing this report, the Obama administration on September 30, 2014 announced a targeted program to process from inside their home countries children with lawfully present parents in the United States for admission to the United States as refugees. [98] The program, according to administration officials, would provide a safe alternative to the dangerous journey to the United States through Mexico for those children who would qualify to be reunited with a lawfully present parent.

While this program could potentially assist the relatively small group of children who would qualify, it would do nothing to address the protection needs of the vast majority of children and adults who do not have a lawfully present parent in the United States or who did have such a parent but who would be too afraid to wait for months or years to be processed after being threatened by a gang. The existence of this program should not be used as an excuse for continuing or even expanding the harsh measures already in place at the border—and in Mexico—to block Central Americans from seeking asylum and to summarily return them to places where they face a serious risk of harm.

Whatever policies the Obama administration seeks to put in place to deter unauthorized migration, it needs to preserve the right to seek asylum from persecution. The US government should ensure that it does not deport people crossing the US-Mexico border without proper consideration of their need for international protection.

# Recommendations

The recommendations below apply to US treatment of unauthorized migrants not only from Honduras, the research focus of this report, but from similarly situated countries where large numbers of migrants and asylum seekers are fleeing violence by non-state actors and conditions that prevent that country's nationals from returning to a situation of basic security, notably Mexico, El Salvador, and Guatemala.

2/26/26, 12:09 PM
Case 1:25-cv-00872-JMC Document 55-13 Filed 03/03/26 Page 187 of 368
"You Don't Have Rights Here": US Border Screening and Returns of Central Americans at Risk of Serious Harm | HRW



"You Don't Have Rights Here"

    DONATE NOW

protection or protection under the Convention Against Torture:

## The Department of Homeland Security should:

- Cease the use of expedited removal for individuals and families arriving at the US border with Mexico from countries experiencing conditions that prevent the country's nationals from returning to a situation of basic security;

- Ensure via training; modification of oversight mechanisms; accountability measures, including better quality assurance supervision; and any and all other appropriate measures that initial interviews of arriving noncitizens conducted by Customs and Border Protection (CBP) properly identify individuals who express fear of return so that they are afforded "credible" or "reasonable" fear assessments;

- Until that time, instruct CBP to apply a presumption of fear of return for migrants in expedited removal or reinstatement of removal who are nationals of countries experiencing conditions that prevent the country's nationals from returning to a situation of basic security; and

- Unless and until Department of Homeland Security (DHS) can implement appropriate protection interviews as a part of expedited removal or it instructs CBP to adopt a presumption for asylum screening for Central Americans, instruct Immigration and Customs Enforcement (ICE) to conduct a proactive screening for fear of return for every non-citizen arriving in its custody from CBP custody.

**To ensure that credible and reasonable fear interviews are fair and efficient:**

## The Department of Homeland Security should:

- Ensure that United States Citizenship and Immigration Services (USCIS) has adequate staffing levels, training, and supervision; and

- Review guidance for USCIS staff to ensure that the procedures used in "credible fear" interviews do not unduly bar asylum seekers from access to immigration courts.



"You Don't Have Rights Here"          DONATE NOW

- Adopt legislation that would allow the USCIS to conduct timely in-person "credible fear" and "reasonable fear" screening interviews and address backlogs, without creating delays for affirmative asylum interviews;

- Adopt legislation to address removal-hearing delays, eliminate backlogs and conduct prompt hearings, including by increasing the number of immigration court judges, law clerks, government immigration lawyers and related resources, as well as increasing incentives for legal aid and private lawyers to represent migrants in underserved areas.

**To protect children and adults from the harmful effects of detention and ensure the due process rights of asylum seekers:**

## The Department of Homeland Security should:

- Revert to previous US government policy that limited the detention of arriving migrant families with children. This would entail closing the new family detention center in Artesia, New Mexico, reverting the family detention center in Karnes, Texas back to a civil detention facility for adults, and converting plans to build a 2,400-bed facility in Dilley, Texas from family detention to adult civil detention. DHS should augment alternative custody and monitoring programs that ensure court appearances instead of detention for families and other border arrivals who present no danger or need assistance to appear in court; and

- Apply a presumption in favor of release on bond or parole for asylum seekers who have passed credible or reasonable fear screenings.

**To respect asylum seekers' right to access counsel, improve disposition of asylum claims, and better ensure that the US does not return people to countries where they face repression or torture:**

## The administration and Congress should:

- Approve reallocation of already appropriated funds to increase access to counsel for indigent asylum seekers and those requesting protection under the Convention Against Torture;



**"You Don't Have Rights Here"**

   DONATE NOW

2013 that mandates the US attorney general to appoint counsel, at government expense if necessary, for unaccompanied minors, people with mental disabilities, and other non-citizens "considered particularly vulnerable;" and

- Consider passing legislation to allow immigration judges the discretion to appoint counsel for indigent non-citizens in all standard immigration removal proceedings.

---

# Acknowledgments

This report was researched and written by Clara Long, US Program researcher on immigration and border policy at Human Rights Watch. Antonio Ginatta, advocacy director for the US program, conducted interviews in the Karnes family detention facility. Brian Root, quantitative analyst at Human Rights Watch, conducted data analysis.

Alison Parker, US program director, edited and contributed to research and writing of the report. The report was also edited by Bill Frelick, refugee rights director; José Miguel Vivanco, Americas director; Meghan Rhoad, women's rights researcher; and Alice Farmer, child rights researcher. Samantha Reiser and W. Paul Smith, associates in the US Program, also contributed to editing. James Ross, legal and policy director, provided legal review. Joe Saunders, deputy program director, provided program review. Grace Choi, publications director, provided photo editing and layout design.

Human Rights Watch thanks the government officials, lawyers, social service providers and others who spoke with us during the research for this report. We are especially grateful to the Central American migrants and asylum seekers whose participation in this research made this report possible.

---

## Region / Country

**Americas, Honduras, United States, Immigrants' Rights and Border Policy**

Case 1:25-cv-00872-JMC Document 55-13 Filed 03/03/26 Page 190 of 368



"You Don't Have Rights Here"    DONATE NOW

Children's Rights, Migrant and Refugee Children, Refugees and Migrants, Asylum Seekers

## Protecting Rights, Saving Lives

**Human Rights Watch defends the rights of people in close to 100 countries worldwide, spotlighting abuses and bringing perpetrators to justice**

### DONATE NOW



## Get Updates On Rights Issues Worldwide

Enter an email address     Sign Up

## Connect With Us

Contact Us | Corrections | Privacy Policy | Permissions | Site Map | Child Safeguarding | Text Version

© 2026 Human Rights Watch

**Human Rights Watch** | 350 Fifth Avenue, 34th Floor | New York, NY 10118-3299 USA | **t** 1.212.290.4700

**Human Rights Watch** is a 501(C)(3) nonprofit registered in the US under **EIN:** 13-2875808

# EXHIBIT N

Coalition for Humane Immigrant Rights, et al. v. Noem et al., 1:25-cv-00872 (JMC)

**From:** NoResponses@cbp.dhs.gov <NoResponses@cbp.dhs.gov>
**Sent:** Friday, April 11, 2025 11:21 AM
**To:** ████████████████████████████████
**Subject:** Notice of Termination of Parole

**U.S. Department of Homeland Security**
**Washington, DC 20528**



04/11/2025

**<u>Notice of Termination of Parole</u>**

It is time for you to leave the United States.

You are currently here because the Department of Homeland Security (DHS) paroled you into the United States for a limited period. Pursuant to 8 U.S.C. § 1182(d)(5)(A) and 8 C.F.R. § 212.5(e), DHS is now exercising its discretion to terminate your parole. Unless it expires sooner, your parole will terminate 7 days from the date of this notice.

If you do not depart the United States *immediately* you will be subject to potential law enforcement actions that will result in your removal from the United States — unless you have otherwise obtained a lawful basis to remain here. Any benefits you receive in the United States connected with your parole — such as work authorization — will also terminate. You will be subject to potential criminal prosecution, civil fines, and penalties, and any other lawful options available to the federal government.

DHS encourages you to leave immediately on your own. You can use the CBP Home mobile app on your phone to make arrangements for your departure. If you are departing the United States via land, you should report your departure once outside the United States via that same app. If you are having trouble reporting your departure via land, visit https://i94.cbp.dhs.gov/home for more information about voluntarily reporting your departure.

Again, DHS is terminating your parole. Do not attempt to remain in the United States - the federal government will find you. Please depart the United States immediately.

**U.S. Department of Homeland Security**

**Washington, DC 20528**

**June 20, 2025**



**Notice of Termination of Parole**

JOHN Q PUBLIC
123 ANY STREET
SOMEWHERE, ST 12345
▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌

**Name of alien:** JOHN Q PUBLIC

It is time for you to leave the United States.

You are currently here because the Department of Homeland Security (DHS) paroled you into the United States for a limited period. Pursuant to the applicable standards in 8 U.S.C. § 1182(d)(5)(A) and 8 C.F.R. § 212.5(e)(2)(i), DHS is exercising its discretion to terminate your parole, or has already terminated your parole.

If you do not depart the United States *immediately* you will be subject to potential law enforcement actions that will result in your removal from the United States unless you have otherwise obtained a lawful basis to remain here. Any benefits you receive in the United States connected with your parole — such as work authorization — will also be terminated. If you are in a pending process with U.S. Citizenship and Immigration Services (USCIS), you may wish to contact https://www.uscis.gov regarding your present status. You will be subject to potential criminal prosecution, civil fines and penalties, and any other lawful options available to the federal government if you do not depart.

DHS encourages you to leave immediately on your own. You can use the CBP Home mobile app on your phone to notify DHS of your intent to depart the United States and make arrangements for your departure. If you are departing the United States via land, you should report your departure once outside the United States via that same app. If you are having trouble reporting your departure via land, visit https://i94.cbp.dhs.gov/home for more information about voluntarily reporting your departure.

Again, DHS is terminating your parole. Do not attempt to unlawfully remain in the United States - the federal government will find you. Please depart the United States immediately.

If you have received this notification in error because you have obtained lawful status that allows you to remain in the United States, or this notice is not addressed to you, this notice may be disregarded and no further action is required.

# EXHIBIT O

Coalition for Humane Immigrant Rights, et al. v. Noem et al., 1:25-cv-00872 (JMC)



# NATIONAL IMMIGRATION PROJECT
### of the NATIONAL LAWYERS GUILD

**National Steering Committee**

Susan Compernolle, Co-Chair
  Chicago, IL
Debbie Smith, Co-Chair
  Oakland, CA
Susan Alva
  Los Angeles, CA
Roberto Cornelio
  Chicago, IL
Esther Olavarría Cruz
  Miami, FL
Terry Helbush
  San Francisco, CA
Robert Hilliard
  New York, NY
Deeana Jang
  San Francisco, CA
María Jiménez
  Houston, TX
Cheryl Little
  Miami, FL
Sheila Neville
  Los Angeles, CA
Rogelio Nuñez
  Harlingen, TX
Judy Rabinovitz
  New York, NY
Daniel Hoyt Smith
  Seattle, WA
Marc Van Der Hout
  San Francisco, CA
Charles Wheeler
  San Fraancisco, CA
John Willshire-Carrera
  Boston, MA

Dan Kesselbrenner
  Director
Gail Pendleton
  Coordinator
Mona Dahan
  Office Manager

January 31, 1997

Director
Policy Directives and Instructions Branch
Immigration and Naturalization Service
425 I Street NW, Room 5307
Washington, DC 20536

RE: INS Number 1788-96

Dear Sir or Madam:

The National Immigration Project of the National Lawyers Guild (hereinafter NIPNLG or National Immigration Project) offers the following comments to proposed regulations published in 62 Federal Register 443. As required, we are submitting these comments in triplicate.

As author of <u>Immigration Law and the Family</u>, <u>Immigration Law and Crimes</u>, <u>Immigration Law and Defense</u>, <u>Naturalization Handbook</u>, and the <u>Immigration Act of 1990 Handbook</u>, all published by Clark Boardman Callaghan, the National Immigration Project is thoroughly familiar with immigration and nationality law. As an organization whose members practice regularly before the Immigration and Naturalization Service, the Executive Office for Immigration Review and the federal courts, the National Immigration Project offers comments that reflect the rich history of its members and its great familiarity with immigration law, practice and procedure. We thank you for the opportunity to submit these comments and urge you to consider our comments carefully.

Sincerely,

Dan Kesselbrenner

**Comment**
**of the**
**National Immigration Project of the National Lawyers Guild**

INS No. 1786-96

**I.    Court Rules**

    A.    <u>Section 3. 14: Jurisdiction and commencement of proceedings.</u>

The Attorney General should allow a respondent to commence a case by filing a charging document with the Executive Office for Immigration Review (EOIR). The Attorney General should restore this provision that existed under former regulations. During the years the regulations allowed a respondent to commence a case, that ability mitigated the INS' frequent failure to file charging documents with EOIR. The INS routinely fails to file timely charging documents, even in instances when it is detaining an individual as a suspected deportable noncitizen. <u>See CARECEN v. Reno</u>, No. 93-4162-Kn (C.D. Cal.). Had the INS allowed a respondent to file a charging document, individuals who suffer from this practice would not have needed to litigate this issue.

    B.    <u>Section 3.39: Finality</u>.

Congress now specifies when a first level removal decision becomes final. Under 8 U.S.C. § 1101(a)(47(B), an order becomes final either when:

        (i) a determination by the Board of Immigration Appeals affirming such order; or

        (ii) the expiration of the period in which the alien is permitted to seek review of such order the Board of Immigration Appeals

Under the plain meaning of the statute, the Attorney General has no power to review a removal order. Accordingly, the Attorney General must amend this provision to delete the reference to review by the Attorney General. The regulation seeking to confer review to the Attorney General is inconsistent with the plain language in the statute. Plainly, congress did not want the Attorney General to have the authority to review BIA decisions.

**II.    Political Asylum Issues**

    A.    <u>The changed circumstances exception</u>

The proposed rule states that the term "changed circumstances" in Section 208 (a) (2) (D) of the Act shall refer to circumstances materially affecting the applicant's eligibility for asylum that have arisen (for purposes of the deadline) after the one-year deadline has expired. This explanation is too limited in three respects:

--    it fails to take account of cases in which circumstances change materially just before the deadline expires,

--    it fails to make provision for the situation in which the applicant did not become aware of a change in human rights violations in the applicant's home country until more than one year after entry, and

--    it fails to make explicit that a valid "changed circumstance" is the applicant's genuinely belated discovery of the existence of the deadline.

Proposed Section 208.4 (a) (2) is unfortunately silent about a type of "changed circumstance" that will arise with some frequency: the applicant's genuinely belated discovery of the existence of an asylum filing deadline. It is certain that some applicants will file more than a year after entering the United States simply because they do not learn about the deadline in a timely fashion. For them, the changed circumstance will be their discovery that they must seek asylum by a certain date. The discovery might occur either shortly before or well after the deadline. To avoid inconsistent decision-making by individual adjudicators, INS should make it clear that if an applicant can prove belated discovery of the requirement, the changed circumstances exception should apply.

B.    The "extraordinary circumstances" exception

The Attorney General should specify certain circumstances that would clearly fall within each of the exceptions. A list of such circumstances would not resolve every case, but it would provide guidance to applicants, asylum officers and immigration judges in some cases, avoid inconsistent decision-making, and avoid needless and costly litigation regarding circumstances that INS regards as covered. If examples of these exceptions are not included in the regulations, identical claims regarding a changed or extraordinary circumstance would have to be decided de novo by each asylum officer and immigration judge, and would be subject to appeal to the BIA. It seems inappropriate for the Attorney General to forgo an opportunity that would allow both refugees and the Service to avoid needless litigation with respect to circumstances that clearly fall within the terms of the Act. Of course, the examples of extraordinary circumstances should not constitute an exclusive list, because the Attorney General would not be able to foresee all potential conditions that fall within the terms of the exception.

C.    Safe Third Countries

Proposed section 208.13 (d) would permit asylum officers and immigration judges to deny asylum applications if the applicant can be removed to a safe third country which has offered resettlement. This proposed regulation is inconsistent with INA Section 208 (a) (2) (A), which provides for denials when an alien may be removed pursuant to a bilateral or multilateral agreement to a safe third country. The requirement of a pre-existing agreement was an essential procedural safeguard agreed among members of Congress, to prevent arbitrary denials of asylum.

2

III.    **Section 235: Summary Removal-Overview**

    A.    <u>To Conform to Congressional Intent and to Avoid Erroneous  Denials to Admissible Persons, the Attorney General Must Apply the Definition of "Arriving Alien" and the Summary Removal Provisions Only to individuals  with No Possible Claim to Admissibility</u>

        1.    "Arriving Aliens"

Although Congress did not define "arriving alien," it did say that summary removal is intended to target those "who <u>indisputably</u> have no authorization to be admitted to the United States" (emphasis supplied).  Since "arriving aliens" are those most affected by summary removal, to conform to this Congressional intent INS must limit its application to those with no possible claim to admissibility.  As noted below, the process for removing arriving aliens completely lacks essential features of fundamental fairness and due process.  No person physically present in the United States may, therefore, be included in the definition of arriving alien.   They do not "indisputably" lack authorization for admission..

By including all parolees, the definition in the proposed regulations already goes too far.  Parolees are exempt from the application of the second part of the summary removal provision, that allows the Attorney General great latitude in expanding the category of noncitizens subject to summary removal.  The INS can not circumvent clear Congressional intent to except parolees (and those admitted) from summary removal by categorizing them as "arriving aliens."

At most, "arriving aliens" should include only those arriving at a port of entry with no claim to admissibility.  This could include a noncitizen whom the Attorney General had paroled previously into the United States, who subsequently left and is again seeking parole. The introductory material to the proposed regulations recognizes that this is the intended scope for parolees. Considering the defects of the summary removal process, applying it to even this limited category of noncitizens will raise serious concerns.

        2.    Summary Removal

The summary removal process lacks essential features of fundamental fairness and due process. An  alleged noncitizen subject to the summary removal provisions apparently has no right to counsel, no right to a written explanation of  why a low-level examining officer believes they are inadmissible, no right to challenge a finding of inadmissibility, and no right to present evidence to an independent fact finder.  Everyone should receive a notice of rights at the first stage of the proceeding.  Applying such a process to any person raises serious concerns.

If the Attorney General wishes to expand the application of summary removal, she should wait to see how the system works.  Given its novelty and numerous defects, it would be prudent to limit its application to as small a group as possible.  This would make correcting problems easier and

3

reduce the potential burden on the federal courts, which will be flooded with complaints by those wrongfully removed. The Attorney General also should provide notice and opportunity for the public to comment on any plan to expand the categories of alleged noncitizens who may be subject to summary removal. Immigration "crises" should not be used as a pretext for targeting certain populations of noncitizens or particular areas of the United States. Summarily removing new groups of alleged noncitizens without notice and feedback will justifiably raise a public outcry and a flurry of legal action.

In sum, the Attorney General sets the example for all other officials implementing our laws. For this reason alone, she should endeavor to enforce the new law in as fair and equitable manner as possible. Where Congress has failed to provide safeguards necessary to achieve these goals, she should require them by regulation. Where the law violates constitutional rights, she should refrain from enforcing it.

Where it is not possible to implement the statute without violating the Constitution or erroneously depriving citizens and lawful permanent residents of their rights, refugees, or bona fide nonimmigrant visa holders, the Attorney General should decline to implement the statute. If the Attorney General determines that it is possible to implement all portions of the statute, the regulations must specify procedures ensuring fundamental fairness and due process. The summary removal provisions should be implemented flexibly, so they do not undermine other compelling public policy goals evinced by Congress.

Essential elements of any procedure for expelling or repelling alleged noncitizens include access to counsel, the right to know the specific charges and reasons for rejection, and the right to challenge such charges and findings before being removed. For these rights to be meaningful, noncitizens must receive written notice of their rights in a language they understand, must have time and opportunity to exercise their rights, and must have access to a written record articulating the charges and findings against them. In addition to including these features assuring due process, the regulations should explicitly allow examining officers to exercise discretion in favor of applicants for admission.

    **B.**    **Attorney General Should Increase Procedural Protections To Ensure that United States Citizens, Lawful Permanent Residents and Asylum Seekers Are Not Erroneously Removed**

The likelihood of a low-level INS officer inaccurately rejecting bona fide U.S. citizens and lawful permanent residents is too high to allow summary removal to result from such decisions. The goal of expeditiousness does not justify eliminating vital checks against erroneous determinations. Rather than streamlining removal of applicants ineligible to enter the United States, the contemplated process will likely result in a flood of habeas petitions in federal court.

AA-REG-00841

C.    The Attorney General Lacks Authority to Conduct Summary Removal
        Proceedings Against Any Person with a Claim to United States Citizenship

Seventy-five years ago, the Supreme Court held that it was unconstitutional to allow Executive
Branch personnel  the sole power to determine whether a person claiming United States
citizenship had the right to enter the United States. Ng Fung Ho v. White, 259 U.S. 276 (1922).
The Attorney General's willingness to treat a person with a claim of citizenship as a noncitizen is
not consistent with Ng Fung Ho.  To  protect adequately against the erroneous removal of  U.S.
citizens, the Attorney General must do more.[1]  No less than an individual hearing before an
immigration judge would satisfy the fifth amendment rights of United States citizens seeking to
enter the United States.[2]

Casual monitoring reveals a significant problem lurking beneath the surface of calm waters.
Determining whether an individual respondent is a citizen or noncitizen is often highly technical
and requires specialized legal knowledge as well as detailed information about an individual's
family history.  See, e.g., Daniel Levy,  Naturalization Handbook, (1996) (devoting two full
chapters to derivative and acquired citizenship).  Thus, individuals who were not born in the
United States and acquired U.S. citizenship through their parents are often unaware of this fact.
An immigration examiner, lacking knowledge of the respondent's family history, will not discover
that the respondent is a United States citizen.

Each year, the INS denies entry  to a shockingly high number of  individuals who are in fact
United States citizens.  The Department of Justice Immigration Czar, Alan D. Bursin, twice
acknowledged within the past six months that the INS unlawfully denies entry to United States
citizens.[3]    In one case, the INS denied entry to a developmentally disabled United States citizen
who was carrying a valid birth certificate from Chicago and a social security card.[4]  The
individual went homeless in Tijuana for eleven days because of INS' error.  A Harrisburg,
Pennsylvania newspaper chronicled the disturbing situation of a United States citizen whom the
INS deported eleven times.[5]  In Tucson, Arizona,  three attorneys represented five individuals
who  had been citizens of the United States when the INS initiated the proceedings against the

---

[1] See, e.g., Hernandez v. Cremer, 913 F.2d 230 (5th Cir. 1990) (criticizing insufficient
process that banished United States citizen for 46 days and caused him to lose his job).

[2] Id.

[3] Correspondence between Alan D. Bursin and Jennifer Bailey, Human Rights Watch (Oct.
18, 1996); submission from Alan D. Bursin and Amalia L. Mack to the Human Rights Watch
(Aug. 1996).

[4] Id.

[5] "Citizenship Evidence May Rescue Detainee", Harrisburg Patriot, p.1 (Nov. 2, 1996).

AA-REG-00842

individuals.[6]  "U.S. citizens wrongfully detained" blared a headline from a Texas newspaper reporting on the five United States citizens whom the INS refused to admit despite having birth certificates.[7]  These incidents are the tip of the iceberg.  Any enhancement of the INS' power to deny admission will exacerbate a problem that is already at intolerably high levels.  See Human Rights Watch 1997 Report on INS Misconduct.

The Attorney General should automatically parole anyone with a colorable claim to citizenship.

      D.     Section 235.1(d) :Alien applicants for admission.

To ensure lawful permanent residents are not summarily removed, add the following sentence at the end:  "If an applicant for admission fails to satisfy the examining immigration officer that he or she has been lawfully admitted for permanent residence to the United States, he or she shall thereafter be inspected as an alien in accordance with section 235(b)(2) of the Act."

      E.     Section 235.3(b) Expedited removal-determination of inadmissibility.

To ensure examining officers conducting summary removal interviews first screen for United States citizens lawful permanent residents, asylum seekers and others, add at beginning of first sentence:  "After inspection under sections 235.1(b) and 235.1(d)(1), [a]n alien who is arriving..."

      F.     Section 235.3(b)(5) Claim to lawful permanent resident status.

To ensure that lawful permanent residents are not unnecessarily subject to removal proceedings, examining officers should give them an opportunity to contact counsel or others who may possess the necessary evidence of their immigration status.  If an examining officer discovers he or she has detained a lawful permanent resident for summary removal inspection, and the lawful permanent resident does not fall in one of the limited exceptions of lawful permanent residents seeking admission enumerated in section 101(a)(13) of the Act, the Attorney General should immediately release him or her from custody.  In the first sentence, replace the phrase "shall not order the alien removed pursuant to section 235(b)(1) of the Act" with "shall immediately release the lawful permanent resident from custody."

      G.     Section 235.3(b)(5)(iv):  Review of order.

To ensure lawful permanent residents are not deprived of their rights in the summary removal process, this section should add the phrase contained in the parallel section for those subject to

---

[6] Lynn Marcus, Edward Coughlin, and Gloria Goldman reported these incidents to the National Immigration Project.

[7] Del Rio News Herald, p.1  (July 1995);  see also San Antonio Express News,  p. 1, (April. 13, 1995).

AA-REG-00843

removal for national security reasons: "the hearing and all further proceedings in the matter shall be conducted in accordance with the provisions of section 240 of the Act. . ."

    H.    <u>Due Process Requirements</u>.

Whether a person lacks proper documents or is using fraudulent documents often is not a straightforward decision. Low-level examining officers should not be given unfettered power to expel people from the United States based on their ignorance or personal interpretation of the law. The current regulations provide insufficient guidance to examiners and their supervisors and lack the necessary checks against incorrect decisions and wrongful removals.

Fundamental fairness requires that all applicants for admission, regardless of the proceeding, be afforded the right to counsel, the right to know and challenge the charges against them, and the right to an independent review of a decision that he or she should be removed. To be able to challenge removal, the examining officer must specify the reasons for denial in writing, in a language the applicant understands.

    I.    <u>Section 235.3(b)(8): Removal procedures relating to expedited removal</u>.

Although the NIPNLG does not believe the summary removal proceedings are constitutional, if the Attorney General implements the procedures she should only attempt to apply them to remove noncitizens subject to summary removal for noncitizens that are arriving at ports of entry.

    J.    <u>Discretion To Parole and Defer Inspection of Arriving Noncitizens</u>.

Summary removal should not be implemented inflexibly. Examining officers and their supervisors should be able to exercise discretion in favor of arriving aliens for humanitarian or public policy reasons. This is especially important when to summarily remove an arriving alien would undermine other Congressionally mandated goals, such as strengthening family integrity or combating domestic violence. Thus, for example, examining officers should be able to refer to a district director the cases of applicants for admission whose rejection would harm U.S. families and of spouses and children of abusive United States citizens or of lawful permanent residents.

    K.    <u>Section 235.3(b): Expedited removal-Determination of inadmissibility</u>.

Parole should be available to all who are eligible under section 212(d)(5) of the Act. Modify the last sentence of this section to read:

> An alien whose admissibility is being considered. . . ., except that parole of such alien, in accordance with section 212(d)(5) of the Act, may be permitted when the Attorney General determines, in the exercise of discretion, that parole is required for urgent humanitarian reasons or significant public benefit.

7

L.    Section 235.3(c): Other inadmissible aliens.

If, at the time of inspection, an examining officer believes an arriving alien should be admitted for humanitarian or public policy reasons, regardless of possible inadmissibility under sections 212(a)(6)(C) or 212(a)(7), he or she should have the discretion to refer that applicant for admission to a district director. The Attorney General should add the phrase "and deferred inspection" to the title of this section. In addition, the Attorney General should include the following language as the second sentence:

> Alien applicants for admission who may be inadmissible under §§ 212(a)(6)(C) or 212(a)(7) of the Act may be paroled for deferred inspection under § 235.2(b) for humanitarian or public policy reasons.

M.    Procedural Requirements for Expanding the Scope of Summary Removal and Due Process Protections for Those Affected by the Commissioner's Designation.

The process contemplated in the regulations for expanding the scope of those subject to summary removal violates basic notions of procedural fairness. Moreover, if the Attorney General decides to subject noncitizens in the United States to summary removal, the fifth amendment demands that the process for removing such persons contain all the essential features of due process. Since it is unlikely that subjecting persons in the United States to the summary removal provisions would survive Constitutional scrutiny, the Attorney General should decline to exercise this option. Application of this provision will surely result in burdening the federal courts with challenges to unlawful deprivation of rights.

By permitting low-level INS officers to make determinations regarding such complex matters, the Attorney General is inviting erroneous denials. Proposed sections 235.3(b)(2) and (6) provide insufficient guidance on how to make such determinations and completely lack the necessary checks against erroneous removal of those lawfully in the United States.

Section 235.3(b)(6) also should explicitly state that the examining officer bears the burden of proving the alienage of any person in the United States subject to summary removal, before the burden shifts to the alleged alien. The examining officer must proffer evidence of alienage to a third party; the same person may not both make an allegation and adjudicate the veracity of the charge. This section also implies that even those who show they have been admitted or paroled may be summarily removed. This would be unlawful. An examining officer who believes a person admitted or paroled is deportable or inadmissible must refer that person to section 240 proceedings. Summary removal is not an option.

N.    Discrimination Against Persons Arriving From Canada or Mexico.

Section 235 (b)(2)(C) of Immigration and Nationality Act purports to allow the INS return to

AA-REG-00845

Canada or Mexico alleged noncitizens arriving at border ports of entry. The Attorney General should decline to enforce this provision that offends the Constitution and the sovereignty of our neighbors. A federal district court has held that the INS' policy of denying entry is unlawful. <u>See Ascenscio v. Tremenski,</u> (S.D. Tex). Not only does this section deprive a limited class of alleged noncitizens of fundamental due process rights, it also constitutes thinly disguised nationality- and race-based discrimination.

Proposed 8 C.F.R. § 235.3(d) does nothing to ameliorate these concerns, perhaps because they are insuperable. It is not possible to ensure proper notice or meaningful access to counsel when a respondent is in another country. Allowing immigration judges to make in absentia findings because respondents fail to appear under such conditions reinforces the conclusion that this provision is designed to punish Mexican and Canadian nationals.

  O. <u>The Attorney General May Not Expand the Scope of Expedited Removal Without Notice and Comment</u>.

Proposed 8 C.F.R. 235.3 (b)(2)(ii) states that the Attorney General can expand the scope of the expedited removal provisions without providing for notice and public comment

> ... if the Commissioner determines, in the exercise of discretion, that the delay caused by publication would adversely affect the interests of the United States or the effective enforcement of the immigration laws.

The provisions of 5 U.S.C. § 553(b)(A)-(B) require that the public have the opportunity to comment on rules unless they are interpretative rules or unless allowing for comment would be impracticable, unnecessary or contrary to the public interest. Allowing for post-effective date comment periods do not cure the defect. Thus, the Administrative Procedure Act (APA) requires that the public have the opportunity to comment about substantive regulations unless the agency establishes good cause for not complying with the APA's requirements. In addition, the APA imposes a requirement that regulations be published at least thirty days prior to becoming effective. Although the thirty day requirement is also subject to a "good cause" exception, each exception has distinct requirements. <u>Rowell v. Andrus</u>, 631 F.2d 699, 703 (10th Cir. 1980); <u>Kollet v. Harris</u>, 619 F.2d 132, 145 (1st Cir. 1980). The federal courts have repeatedly emphasized the narrowness of each of these good cause exceptions. <u>See, e.g., American Federation of Government Emp. v. Block</u>, 655 F.2d 1153,1156 (D.C.Cir. 1981).

The legislative history of the APA establishes that the exceptions should be limited to emergency situations and not be "escape clauses" for an agency to avoid its notice and comment obligations. <u>See</u> S. Rep. No. 752. 79th Cong., 1st Sess. (1945). In the proposed regulations, the Attorney General contemplates expanding the scope of expedited removal without even publishing interim regulations. The federal courts have restricted agencies from publishing interim regulations unless the interim regulations are subject to one of the statutory exceptions. <u>Levesque v. Block</u>, 723 F.2d 175 (1st Cir. 1983); <u>State of N.J. v. U.S. Environmental Protection Agency</u>, 626 F.2d

AA-REG-00846

1038,1045 (D.C.Cir. 1980). The Administrative Conference of the United States' (ACUS') Rule Making Guide echoes this view.

    1.      Impracticability

When an agency both cannot perform its statutory duties and comply with APA notice and requirements then it would be impracticable to require the agency to comply. Manifestly, the proposed regulations do not come within this exception. The Attorney General would rely on a concluso determination to justify not providing the public with the opportunity to comment on any expansion of the scope of expedited removal. A concluso statement from the Commissioner would not satisfy that notice and comment would be impracticable. Moreover, the Attorney General is not facing any implementation deadlines concerning the expansion of expedited removal. Even if she were, an agency's need to comply with deadlines, even when set by statute or by court is insufficient cause, without more, to avoid the notice and comment requirements of the APA. State of N.J., supra at 1042. 1980); United States Steel Corp. v. EPA, 595 F.2d 207, 213, (5th Cir. 1979).

    2.      Necessity

The United States Supreme Court has held that deporting a United States citizen constitutes cruel and unusual punishment. Trop v. Dulles, 356 U.S. 86 (1958). As such, United States citizens who face erroneous expedited removal have a paramount liberty interest in the fairness of expedited removal proceedings. Newspapers and casebooks contain many instances where U.S. citizens have been improperly removed from the United States. Moreover, since the INS never verifies whether a respondent in proceedings has acquired United States citizenship, this problem is dramatically under-reported. As such, this problem is common and not an extreme example of potential harm. avoiding comment prior to expanding the scope of expedited removal would affect citizens and non-citizens alike. at as it is for a respondent in deportation proceedings, the public has a right to comment. By failing to publish proposed regulations concerning any expansion of expedited removal, the Attorney General would frustrate public input regarding substantive changes having a bearing on the rights of U.S. citizens and all persons who are now or who may be placed in expedited removal proceedings.

    3.      Weight of public interest favors publication of regulations

The Attorney General offers no public interest justification for invoking the "good cause" exception. The Attorney General's attempt to circumvent the publication of the expansion of expedited removal thwarts public participation in government and precludes the agency from receiving valuable input. In so doing, the Attorney General is acting contrary to the public interest. The Attorney General should publish specific proposed regulations before expanding the scope of expedited removal.

AA-REG-00847

    4.    The Attorney General lacks "good cause" established for circumventing notice and comment regarding future expansion of scope of expedited removal

The Attorney General cannot circumvent the notice and comment provisions the APA because of the INS Commissioner exercises her discretion. Similarly a conclusory statement from the Commissioner, without more, does not constitute "good cause." for failing to comply with the APA's public comment requirements. "Good cause" requires more than boiler-plate conclusions from the INS Commissioner to justify an exception from the APA's notice and comment requirements. As stated above, complying with a deadline alone is insufficient. If the Attorney General has good cause, the APA requires she justify her conclusions. Established principles of good government mandate that the Attorney General comply with the letter and the spirit of the APA.

In sum, the Attorney General has not established any of the exceptions governing the publication of interim regulations, much less offering a justification to avoid notice and comment altogether. By attempting to circumvent the notice and comment provisions of the APA regarding future expansion of the scope of expedited removal, the Attorney General insults the general public and demonstrates disrespect for fundamental principles of good government. The Attorney General's proposed regulations affect the rights of thousands of people, citizen and non-citizen alike. First, it would not be impracticable for the Attorney General to publish proposed regulations before expanding the scope of expedited removal. Second, it is not "necessary" that the Attorney General expand the scope of expedited removal without allowing for notice and comment. Third, it is not in the public interest for the Attorney General to expand the scope of expedited removal without providing for notice and comment. Finally, principles of good government require the Attorney General to provide notice and comment prior to expanding the scope of expedited removal, absent emergent circumstances..

## IV.    Section 238: Expedited Removal of Aggravated Felons.

As a threshold matter, the elimination of deportation hearings for any group of individuals who are present within the United States raises serious constitutional questions. The Supreme Court has long held that all persons within the United States are entitled to due process of law under the Fifth Amendment, even if their presence in this country is illegal. See Wong Wing v. United States, 163 U.S. 228, 238 (1896); Yamataya v. Fisher, 189 U.S. 86, 100 (1903); Wong Yang Sung v. McGrath, 339 U.S. 33, 50 (1950). Thus, the proposed regulations are plainly subject to the due process requirements of the fifth amendment.

At the very least, due process requires that procedural safeguards provide individuals with "the right to be heard before being condemned to suffer a grievous loss of any kind." Joint Anti-Fascist Refugee Committee v. McGrath, 341 U.S. 123, 168 (1951). There is no dispute that deportation constitutes such a grievous loss, particularly for individuals who have strong ties to the United States, including close family members from whom they will be separated. See Landon

11

AA-REG-00848

v. Placensia, 459 U.S. 21, 34 (1982); Bridges v. Wixon, 326 U.S. 135, 147 (1945). Therefore, under the balancing test established in Mathews v. Eldridge, 424 U.S. 319, 334 (1976), the government's interest in streamlined deportation procedures must be weighed against the risk that, by eliminating deportation hearings, individuals who have a right to remain in this country will be erroneously deported.

For the reasons set forth below, we have strong doubts that the elimination of deportation hearings in the manner contemplated by this statute can survive such a balancing. However, even assuming that it could, the procedures INS sets forth in these proposed regulations do not pass constitutional muster. Under these procedures, numerous individuals who have a right to remain in this country, both United States citizens and noncitizens, will risk erroneous removal.

As discussed more fully below, the high risk of erroneous removals is due to two principle factors: (1) the complexity of the underlying determinations that will trigger an administrative order of removal, and (2) the failure of INS's proposed regulations to provide meaningful procedures for making these determinations.

    A.    <u>Complexity of the Underlying Determinations that will Trigger an Administrative Order of Removal</u>.

The Attorney General's proposed regulations rest on the flawed assumption that little or no inquiry is necessary to determine whether a person is a noncitizen convicted of an aggravated felony. In fact, the two determinations that are necessary to trigger administrative removal proceedings -- that an individual (1) is not a citizen or national of the United States (2) has not been admitted to permanent residence and (3) is convicted of an aggravated felony are often factually and legally complex. Moreover, it is precisely these kinds of determinations that removal hearings are intended to resolve.

Neither the INS nor the EOIR ask questions to determine whether a respondent is a citizen. As a result of this failure, there are no reliable statistics on the frequency with which the INS deports United States citizens. Since the INS does not take reasonable steps to identify United States citizens who are unaware of their citizenship status, the Attorney General lacks the requisite statistical information to assess the scope of this problem. It is not possible to quantify the number of United States citizens the INS mistakenly removes from the United States. The INS cannot legitimately claim that providing increased procedural safeguards that would identify derivative and acquired citizens is excessive because the agency lacks a statistical reference point to measure the scope of the foreseeable harm.

    B.    <u>The Prevalence of Illegal Repatriation of United States Citizens Appears to be Under reported Dramatically</u>.

Several factors lead to what appears to be a massive under reporting of the banishment of United States citizens. First, the citizenship law of the United States are enormously complex. Second,

AA-REG-00849

the overwhelming percentage of detainees are not represented by counsel. Third, citizens themselves are often unaware of their true citizenship because the laws even seem counterintuitive to the unrepresented respondents who lack training in the law. Fourth, the statute and the case law interpreting the statute change constantly. Fifth, the ongoing absence of universal health care means that many low income individuals in rural areas were not born in hospitals. These citizens by birth lack conclusive proof of their citizenship status. That these claims may be difficult to verify does not lessen the INS' obligation to ascertain a respondent's citizenship status. Each time the United States banishes a United States citizen, it violates the Eighth Amendment. Accordingly, the INS should spare no effort to avoid widespread infringement of fundamental rights. Sixth, the variety of possible citizenship claims makes it more difficult to spot these claims without it. Certain difficult to identify citizens were born abroad but acquired U.S. citizenship at birth because one or both of their parents were U.S. citizens. Other difficult to identify citizens were born abroad but later acquired citizenship when their parents naturalized while they were still minors. Still other difficult to identify citizens lack conventional documentation of their citizenship. Finally, neither the INS nor the EOIR ask basic questions that would both prevent the harm and create a reliable statistical baseline for the scope of the problem.

C.    The Attorney General Lacks Reliable Statistical Information to Determine the Prevalence of Illegal Removal of United States Citizens.

The INS cannot claim that banishment of United States citizens is a marginal problem because it lacks reliable statistics about the scope of this problem. The INS does not systematically ascertain the citizenship status of respondents in immigration proceedings. Although the National Immigration Project regularly receives anecdotal reports of each of these fact situations, it cannot state with any statistical certainty how many United States citizens the INS banishes. In light of the forseeable systemic statistical underreporting of the problem, and the liberty interest at stake, the Attorney General's proposed regulations do not proivde sufficient procedural protection against forseeable and widespread infringement of a fundamental liberty interest. See Trop v. Dulles, 356 U.S. 86 (1958).

Only through questioning by an advocate or an immigration judge about their family history does information about their possible citizenship claim become known. In fact, even with the protection of a hearing, errors occur. See, e.g., Murphy v. INS, 54 F.3d 605 (9th Cir. 1995). (reversing BIA's finding of alienage and terminating removal proceedings in face of respondent's claim of U.S. citizenship).

D.    Proposed Regulations Understate Risk of Erroneous Deprivation.

1.    High risk of error in determining wheher an offense is a conviction for an aggravated felony

Whether the definition of "aggravated felonies" covers a specific offense is open to interpretation. Therefore, the involvement of an immigration judge and the Board of Immigration Appeals may

13

be necessary in order to resolve problems of statutory interpretation.  See, e.g., Matter of L-G-, Int. Dec. #3254 (BIA 1994) (rejecting INS's position that Louisiana state conviction for possession of cocaine constituted aggravated felony).  The determination of whether an individual has been convicted of an aggravated felony is often highly complex.  Since 1988, Congress has enacted at least six pieces of legislation defining and redefining the crimes that constitute aggravated felonies.  Determination of whether a given conviction is an aggravated felony requires looking at the nature of the crime, determining which statute classified the crime an aggravated felony, and the effective date of that statute.  Significantly, Congress' most recent changes to the definition apply to "actions taken" after the effective date.  Moreover, since neither the BIA nor the federal courts have interpreted the provision, there is a forseeable risk that the agency will not interpret the phrase uniformly.  Accordingly, making these determinations is particularly problematic.

Finally, examination of a conviction record alone is insufficient for determining whether a conviction carries removal consequences, since the conviction record may lack critical information such as whether all direct appeals have been waived or exhausted, whether post-conviction relief has been granted, or whether a chief executive officer of a state or the United States has granted a pardon.  Under any of these circumstances, the conviction would no longer form a basis for removal.  Yet this information may not be readily apparent from mere examination of the conviction record.  See, e.g., Matter of V-, 7 I & N 577 (BIA 1957) (highlighting danger of relying solely on conviction record where record did not reflect that conviction was subsequently vacated).

### 2. Eligibility for relief.

Although INA § 238 states that a respondent in expedited administrative proceedings is not eligible for any relief, INA § 245 permits a noncitizen who is not a lawful permanent resident to adjust his or her status and obtain a waiver even if she or he has a final conviction for an aggravated felony.  Under governing Supreme Court precedent, the Attorney General must construe these conflicting provisions narrowly and in the noncitizen's favor.  INS v. Errico, 385 U.S. 214 (1966).

For example, a respondent in these expedited administrative removal proceedings who has a conviction under 18 U.S.C. 902(g) for an aggravated felony (involving certain firearms) remains statutorily eligible for adjustment of status.  Since there is no ground of inadmissibility for firearms, such a respondent would not even need a waiver.  In addition, a respondent in expedited removal proceedings who has an aggravated felony conviction involving theft remains statutorily eligible to adjust her or his status and can seek a waiver for her or his ground of inadmissibility.  A noncitizen's eligibility to adjust her or his status will depend on the specific nature of the conviction (i.e., whether it is waivable) and  the continued viability of her or his relationship with the petitioner.

14

a.     Proposed Regulations Should Specify that Respondents Are
Eligible To Apply for Withholding

Not all noncitizens convicted of an aggravated felony are ineligible for withholding of
deportation. The IIRIRA allows noncitizens who do not receive a sentence in the aggregate of at
least five years may apply for withholding of removal. IIRIRA § 305(a). In addition, the Board
of Immigration Appeals applied that same test to cases under INA § 243(h)(3). Matter of Q-T-
M-T, Int. Dec. 3300 (BIA 1996).

Other forms of relief may be even more difficult to ascertain without additional factual and legal
investigation. For example, individuals whose criminal convictions were obtained in violation of
their constitutional rights may be able to seek relief from those convictions even though the
convictions are currently considered final. Although there is no right to a continuance of removal
proceedings on such grounds, it is within the authority of the immigration judge to grant a
continuance "for good cause". 8 C.F.R. §§ 3.29, 242.13. Thus, as long as the possibility exists
that an immigration judge would grant a continuance to allow the alien to apply for
post-conviction relief, and the grant of such relief would protect the alien from removal, the alien
should not be deemed ineligible for relief from removal.

Finally, individuals may possess relief from removal on the grounds that INS misconduct would
warrant termination of the removal proceedings. It is well established that where INS's conduct is
so egregious as to violate fundamental fairness, evidence that was obtained through such conduct
is inadmissible in the removal proceeding and must be suppressed. See, e.g., Matter of Sandoval,
17 I & N Dec. 70 (BIA 1979). Suppression, and even termination of proceedings, may also be
required when INS violates its own regulations that were intended to protect significant interests
of the individual and the individual can show harm. See, e.g., Matter of Garcia -Flores, 17 I& N
Dec. 325 (BIA 1980). See also Montilla v. INS, 926 F.2d 162 (2d Cir. 1991) (no showing of
harm required where regulation that was violated was intended to protect respondent's right to
counsel). Clearly, determinations of whether evidence that is being used against an alien was
obtained by INS in violation of due process or INS regulations will require extensive factual
inquiry, including presentation and cross examination of witnesses.

b.     Proposed regulations must include mechanism to provide
protection under the Convention Against Torture.

International law is part of the law of the land. See U.S. Const. art. III, § 2. As such, the
Attorney General must honor treaty obligations of the United States in carrying out expedited
administrative removals. The United States has signed the Torture Convention. Under this
instrument, contracting parties, among other things, cannot return a person to a country where
she or he faces torture. Although this situation will not arise frequently, the Attorney General's
obligation to enforce the laws of the United States do not include an exception for infrequent
events. As a result, the Attorney General must include regulations that ensure that the United
States honors its obligations under the Torture Convention.

AA-REG-00852

E.     Adequacy of Procedures.

      1.     The proposed regulations fail to ensure that a neutral party renders decisions.

The proposed regulations authorize INS officers without specific legal training to initiate administrative removal proceedings and render final orders of administrative removal. Moreover, the regulations provide only limited guidance for making these determinations.

For example, proposed 8 C.F.R. § 238.1(b)(1) would allow an "issuing service officer" to issue a Notice of Intent if he or she determines that the individual (1) is an alien (2) is not a lawful conditional or permanent resident, (3) has a final conviction for an aggravated felony and (4) is deportable for an aggravated felony conviction.. As discussed above, these determinations often require detailed knowledge of the complexities of immigration law. And yet the proposed regulations would relegate this decision to individuals such as patrol agents who may lack any specialized legal training for making these determinations. See proposed section 238.1(a) (defining "issuing service officers" as all individuals authorized to issue notices to appear). Furthermore, under the proposed regulations the issuing officer need only be "satisfied" that sufficient evidence exists to support such a finding, a standard that is vague at best.

Similarly, proposed 8 C.F.R. § 238.1(d) of the proposed regulations would allow a "deciding service officer" to issue a final administrative removal order as long as (1) no written response is received within ten days, or (2) the officer finds the written response to be insufficient to rebut the charges. Under the proposed regulations, this decision can be relegated to any designee of a district director. See proposed 8 C.F.R. § 238.1(a). Once again, there is no requirement that such individual receive any specialized training in immigration law, nor that he or she make an independent evaluation of the evidence supplied by the issuing service officer. Instead, administrative removal orders can issue by default, based solely upon the unproven allegations contained in the Notice of Intent.

Finally, the regulations are flawed in that they allow investigatory and adjudicatory functions to reside within a single entity, since both issuing and deciding officers will primarily be agents of the District Director and involved in enforcement functions.

The only protection -- that the issuing service officer and the deciding service officer cannot be the same person -- is clearly inadequate. The regulations contain no safeguards to prevent ex parte communication between the two officers. Moreover, merely preventing one INS officer from issuing both the notice of intent and the final removal order in a particular case does not guarantee a fair and impartial proceeding when that officer may be acting both as an investigator and as a final adjudicator in other matters. This combining of functions is "a recipe for fundamentally unfair and erroneous decision making." Schweiker v. McClure, 456 U.S. 188 (1982). In fact, this is the very reason that the Attorney General established the Executive Office of Immigration Review as a separate entity in 1983.

16

AA-REG-00853

2.    Proposed Regulations Fail to Provide Meaningful Procedures for Making these Determinations

Given the complexity of the determinations that are required to support an order of administrative removal, the procedures proposed by INS for arriving at these determinations are woefully inadequate. The hallmarks of due process include a neutral and competent adjudicator, meaningful notice and an opportunity to respond, plus an opportunity for review. As set forth below, INS's proposed regulations are deficient in each of these aspects:

3.    The Proposed Regulations Do Not Provide the Respondent a Meaningful Opportunity To Respond

The proposed regulations also fail to provide any meaningful mechanism by which individuals who have been served with administrative removal notices can effectively rebut the charges. Proposed section 238.1(c)(1) would provide affected individuals with the opportunity to submit a written rebuttal within ten days after being served with the Notice of Intent. In light of the vital interest at stake, and the obstacles to preparing such a written response, the lack of any opportunity to be heard orally in person is especially troubling.

In Goldberg v. Kelly, 397 U.S. 254 (1970), the Supreme Court held that a regulation that terminated welfare benefits unless the recipient submitted a written rebuttal violated due process. The Court stated that due process guaranteed the right to be heard orally in person, a right that may be especially important to individuals who lack the capacity to write effectively on their own behalf. Id. at 269. Similar reasoning applies to the individuals who face administrative removal, many of whom will also be unable to write effectively on their own behalf. In addition, ten days is clearly insufficient to prepare an adequate written rebuttal. Although the regulations authorize extensions of this time period, they fail to designate specific criteria that would automatically justify an extension, such as the need for additional time to secure counsel or evidence. Instead, they appear to leave unfettered discretion in this matter to the deciding service officer.

The requirement of a written response is particularly egregious in light of the nature of the affected population. As already noted, most of the individuals who will be affected by the administrative removal procedures are incarcerated or detained and will have little or no access to typewriters, legal materials or counsel. A respondent who cannot read or write in any language faces insurmountable obstacles that would prevent him or her from submitting a written response. Furthermore, proposed regulation section 238.1(c)(2) requires that the respondent submit affidavits, documentary information and other supportive evidence, together with her or his response. For the respondent who is pro se, this requirement may be plainly beyond their level of sophistication. Unless the respondent is trained in the intricacies of immigration law, it is unlikely that he or she would even know what information to include in a rebuttal. Moreover, the regulations are themselves unclear about what information would be necessary to constitute a sufficient rebuttal.

17

Notably, a removal hearing provides even unrepresented respondents with an opportunity to interact with at least one individual who is well-versed in the law -- the immigration judge. Thus, even when respondents are without counsel, the immigration judge may be able to advise them of potential defenses to removal or claims for relief of which they would otherwise be unaware. Unrepresented individuals who face administrative removal will be deprived of this important safeguard. The opportunity for a written rebuttal is a poor substitute and one of dubious value.

Due process requires more than mere notice; it requires notice reasonably calculated to apprise the individual of the pendency of the action and how to respond. Mullane v. Central Hanover Trust Co., 339 U.S. 306, 314 (1950). Because the proposed notice requirements do not meaningfully inform affected individuals about the administrative removal hearings they face and how to respond, the demands of due process are not satisfied.

The regulations do not require that individuals be provided with a record of the evidence that forms the basis of the charges against them, except upon request. Without this evidence it would likely be impossible to effectively rebut the charges. Considering that the Notice itself may fail to meaningfully inform the alien of this crucial right, provision of the record should be automatic.

The above-mentioned deficiencies are particularly significant in light of the population that will be subjected to administrative removal proceedings. Most of these individuals will be incarcerated or in INS detention and will thus have limited access to counsel. In addition, they may also face language and literacy barriers which will make them less able to fully understand the written notice that is provided. Under such circumstances, and without the assistance of counsel or the benefit of a hearing, an individual is unlikely to appreciate the gravity of the pending action.

In addition, ten days (13 if service by mail) is clearly insufficient to prepare an adequate written rebuttal. Although the regulations authorize extensions of this time period, they fail to designate specific criteria that would automatically justify an extension, such as the need for additional time to secure counsel or evidence. Instead, they refer generally to a "no genuine issue of material fact" test. The standard in proposed 8 C.F.R. § 238.2(d)(2)(i) is identical to the summary judgment standard under Fed. R. Civ. P. 56. Since federal casebooks are full of decisions reversing federal judges decisions granting summary judgment, it is unreasonable to expect immigration officials to make proper determinations on this complex subject.

F.    Inadequate Review

As discussed above, proposed section 238 would allow for a final order of administrative removal to be issued by an INS officer who has no specific legal training and who is not even required to make an independent evaluation of the evidence. Because the risk of unqualified officers issuing erroneous removal orders is so high under these standards, the Attorney General should decline to enforce the provision because she cannot do so in a manner consistent with her obligation to enforce the Constitution of the United States.

18

AA-REG-00855

In fact, the elimination of all administrative review will likely undermine the purpose of the new administrative removal provisions, which was increased efficiency. Instead, the burden will shift to the federal judiciary, which will be faced with an increased number of habeas petitions. Nor would allowing for administrative review frustrate the government's interest in expedited removals. Since most affected individuals will still be incarcerated serving their criminal sentences, an administrative appeal would not further delay their removal from the United States.

For the reasons set forth above, INS's proposed regulations for expediting the removal of nonresident noncitizens convicted of aggravated felonies fail to satisfy the requirements of due process. Under these procedures, numerous individuals -- both U.S. citizens and noncitizens -- will face a significantly increased risk of erroneous removal.

As already noted, we do not believe that Congress can constitutionally eliminate removal hearings in the manner contemplated by this statute. At a minimum, however, the implementation of these regulations must assure affected individuals the opportunity for face to face contact with a neutral decisionmaker possessing legal expertise in the relevant issues. For example, the INS could appoint an ombudsperson or special inquiry officer, trained in immigration law and separate from the INS's enforcement functions, to conduct personal interviews with the affected individuals. Such ombudspersons or inquiry officers would serve dual roles. First, they could use the personal interview to impart meaningful notice to the individual facing administrative removal. Second, they would be able to review potentially complex issues of citizenship, criminal convictions, and eligibility for relief, and elicit relevant information from the affected individual. This would insure that the overwhelming number of individuals who are unrepresented would at least be afforded some minimal opportunity to understand and object to the administrative removal notice and order.

Of course, other procedural safeguards would be essential during such an interview, such as the right to an interpreter, the right to the presence and assistance of counsel, and creation of a written record of the interview to allow for meaningful review. Furthermore, full administrative and judicial review should be restored. Additionally, individuals who are most likely to be eligible for relief from removal should be automatically excluded from the ambit of the administrative removal provisions.

We urge the INS to revise the proposed regulations to provide such procedural safeguards. The need for more efficient, streamlined procedures cannot override the demands of due process, particularly when the interests at stake are so great and the risk of erroneous deprivation so high. As the Supreme Court noted in Fuentes v. Shevin, 407 U.S. 67 (1972), "A prior hearing always imposes some costs in time, effort and expense. But these rather ordinary costs cannot outweigh the constitutional right." Id. at 90.

## V.    Notices to Appear

### A.    Section 239.1(a): Commencement

AA-REG-00856

The Attorney General should modify the regulation to allow a noncitizen to file a notice to appear with the Immigration Court. Allowing for either the INS or a noncitizen to file a notice to appear would promote uniform administration of the immigration laws. The fair and evenhanded administration of the immigration laws should be among the Attorney General's highest priorities. In addition, it would ensure that an eligible noncitizen could apply for certain relief that Congress made available. When the regulations allowed either the INS or a noncitizen to file a charging document there were no significant problems. The officers listed are authorized to decide whether cases implicate the foreign policy interests of the United States. See proposed 8 C.F.R. 239.3(d). Manifestly, many, if not all, of the officers listed are not qualified to perform these tasks.

      B.     Section 239.2: Cancellation of notice to appear.

As an agency of the United States, the INS must follow all federal laws, including labor laws. The INS recently issued an Operating Instructions governing enforcement activities during labor disputes. The regulation should specify the safeguarding of labor law rights as a basis for canceling a notice to appear. The Attorney General should specify that the INS may cancel a notice to appear that a notice when INS agents obtain evidence unlawfully. See, e.g., Orhorhaghe v. INS, 38 F. 3d 488 (9th Cir. 1994); Gonzalez-Rivera v. INS, 22 F. 3d 1441 (9th Cir 1994). Rather than require a noncitizen to litigate the lawfulness of proceedings whenever the INS uses racially impermissible motives or other invidious bases to conduct enforcement, the Attorney General should voluntarily cancel the notice to appear in such cases. In so doing, the Attorney General would promote governmental accountability and confidence in the INS' evenhandedness. Although it is unlikely that the INS would voluntarily cancel a notice to appear often, including such a provision would send a powerful message that the Attorney General does not tolerate racially based enforcement or other unlawful conduct.

      C.     Section 239.2(d): Motion for remand.

The proposed regulation contemplates that the INS remand a case that implicates the foreign relations of the United States. The Department of State is responsible for the foreign relations of the United States. Since the officers listed in paragraph (a) are not qualified to determine foreign policy implications, the Attorney General should withdraw the proposed regulation. If the Attorney General does not withdraw the proposed regulation, the Attorney General should specify that foreign policy considerations cannot play a role in determining whether a noncitizen is eligible for political asylum. See, e.g., American Baptist Churches v. Thornburgh, 760 F. Supp 796 (N.D. Cal. 1991).

      D.     Section 240.7: Evidence in removal proceedings.

This proposed regulation is unnecessary since prior statements are already admissible. By proposing to do so, the Attorney General clouds existing case law regarding the admissibility of

AA-REG-00857

prior statements. A plea that results in less than a conviction does not constitute an admission. See, e.g., Matter of Seda, 17 I& N 550 (BIA 1990) overruled on other grounds Matter of Ozkok, 19 I&N 546 (BIA 1988)   The Attorney General should clarify that prior statements are not admissible unless they are reliable.  The Attorney General should further clarify the matter for the public by including language that states that a factfinder must still decide how much weight to accord such prior reliable statements.

E.    Section 240.10: Hearing.

The proposed regulation fails to require the Immigration Judge to determine that the court has personal jurisdiction over the respondent.  Unless the Immigration Judge determines that the INS served the respondent, the court lacks jurisdiction to hear the case.

1.    Section 240.10 (d): Issues of removability.

This regulation refers to determinations of whether a person is subject to removal "under the provisions of paragraph (b) of this section..."  Since subparagraph (b) refers to public hearings and does not include any substantive provisions, the proposed regulation does not make sense.  It appears that the Attorney General intends to refer to "paragraph (c)."  If that is not the case, the Attorney General should republish a proposed regulation to give the public a meaningful opportunity to comment.

2.    Section 240.10(e): Additional charges

The regulation should allow the respondent to withdraw her or his pleading to the original charges.  In some instances the respondent may have given up defenses to deportability in order to apply for relief.  If the additional charges would make the respondent ineligible for relief, the respondent might have plead differently. See, e.g., Reyes-Hernandez v. INS, 89 F.3d 490 (7th Cir. 1996) (recognizing that respondent may concede deportability to secure relief).  Since the Attorney General has an interest in the integrity of the hearings, she should allow the respondent to plead again to the original charges every time she adds new charges.  Accordingly, the regulations should permit the respondent to withdraw pleadings and enter a new response to the charges every time the INS amends the grounds.

F.    Section 240.14: Finality.

Congress now specifies when a first level removal decision becomes final.  Under 8 U.S.C. § 1101(a)(47(B), an order becomes final either when:

(i)  a determination by the Board of Immigration Appeals affirming such order; or

(ii) the expiration of the period in which the alien is permitted to seek review of such order the the Board of Immigration Appeals

21

AA-REG-00858

Under the plain meaning of the statute, the Attorney General has no power to review a removal order. Accordingly, the Attorney General must amend 8 C.F.R. § 3.39 to delete the reference to review by the Attorney General. The regulation seeking to confer review to the Attorney General is inconsistent with the plain language in the statute. Plainly, congress did not want the Attorney General to have the authority to review BIA decisions.

G.    Section 240.15: Appeals

1.    Appeals of In Absentia Orders

The Attorney General should allow for appeals of in absentia orders. The INS still bears the burden of proof in such cases and if the proof is lacking the respondent's absence does not eliminate the Attorney General's obligation to seek the truth. If for example, the INS did not introduce any evidence of alienage, an administrative appeal should lie from an immigration judge's decision for which there is no evidence.

2.    Exception for Incarcerated or Detained Respondents

A prisoner has no control over when the institution delivers her or his mail. The institution's tardy delivery could defeat an inmate's right to appeal. The Supreme Court has recognized this problem and held that a prisoner's notice of appeal is filed when she or he deposits the notice in the prison mail system. Houston v. Lack, 487 U.S. 266 (1988). A recent amendment to the Federal Rules of Appellate Procedure adopts the rule in Houston. Fed R. App. P. 25(a) (1993). There are many prisoners in immigration proceedings. In attempting to perfect their immigration appeals, these prisoners face the identical mail system that the Supreme Court held impermissibly interfered with their right to appeal. At an absolute minimum, the Attorney General should adopt the rule in Houston for a prisoner appealing the decision in her or his immigration case.

The INS detains people in hundreds of contract facilities across the United States. There is no meaningful difference between the mail delivery system of these institutions and the facilities covered by the Fed. Rules of App. P. 25(a). As a result, the Attorney General should adopt the rule in Houston v. Lack, 487 U.S. 266 (1988) for all persons in immigration proceedings who are held in an institutional setting. The Attorney General should add language to the regulation that would treat the date a person deposits a notice of appeal in the institution's mail system as the date of filing for all persons facing immigration proceedings who are held in an institutional setting.

H.    Section 240.16: New procedures.

The Attorney General may not expand the Scope of the application of new procedures or termination in old proceedings without notice and comment

Proposed 8 C.F.R. 235.3 (b)(2)(ii) states that the Attorney General can expand the the scope of

22

the application of new procedures or termination in old proceedings provisions without providing for notice and public comment

> ... if the Commissioner determines, in the exercise of discretion, that the delay caused by publication would adversely affect the interests of the United States or the effective enforcement of the immigration laws.

The provisions of 5 U.S.C. § 553(b)(A)-(B) require that the public have the opportunity to comment on rules unless they are interpretative rules or unless allowing for comment would be impracticable, unnecessary or contrary to the public interest. Allowing for post-effective date comment periods do not cure the defect. Thus, the Administrative Procedure Act (APA) requires that the public have the opportunity to comment about substantive regulations unless the agency establishes good cause for not complying with the APA's requirements. In addition, the APA imposes a requirement that regulations be published at least thirty days prior to becoming effective. Although the thirty day requirement is also subject to a "good cause" exception, each exception has distinct requirements. Rowell v. Andrus, 631 F.2d 699, 703 (10th Cir. 1980); Kollet v. Harris, 619 F.2d 132, 145 (1st Cir. 1980). The federal courts have repeatedly emphasized the narrowness of each of these good cause exceptions. See, e.g., American Federation of Government Emp. v. Block, 655 F.2d 1153,1156 (D.C.Cir. 1981).

The legislative history of the APA establishes that the exceptions should be limited to emergency situations and not be "escape clauses" for an agency to avoid its notice and comment obligations. See S. Rep. No. 752. 79th Cong., 1st Sess. (1945). In the proposed regulations, the Attorney General is contemplating expanding the scope of the application of new procedures or termination in old proceedings without even publishing interim regulations. The federal courts have restricted agencies from publishing interim regulations unless the interim regulations are subject to one of exceptions.

I.     Section 240.25: Voluntary departure

Until an Immigration Judge has determined that a respondent is subject to removal, it is premature for a respondent to request voluntary departure. To so require would be the equivalent of having the damages phase of a tort trial before there is any finding that a defendant is liable for the plaintiff's injuries.

AA-REG-00860

# EXHIBIT P

Coalition for Humane Immigrant Rights, et al. v. Noem et al., 1:25-cv-00872 (JMC)

(67)

# POLITICAL ASYLUM/IMMIGRATION REPRESENTATION PROJECT

John W. McCormack Post Office, P.O. Box 2137, Boston, MA 02106
Telephone: (617) 742-9296 Fax: (617) 742-9385

Detention Center Initiative, Boston College Law School
885 Centre Street, Newton, MA 02159 (617) 552-2956

**Staff**
**Sarah Ignatius**
  *Executive Director*
**Laura E. Flores**
  *Asylum Project Attorney*
**Renee Mapa**
  *Detention Center Attorney*

**Board of Directors**
**Alan Jay Rom,** *President*
  *Sherwin L. Kantrovitz, P.C.*
**Joan Heminway,** *Vice-President*
  *Skadden, Arps, Slate, Meagher & Flom*
**Steven Hansen,** *Secretary*
  *Bingham, Dana & Gould, LLP*
**George Lester,** *Treasurer*
  *Foley, Hoag & Eliot, LLP*
**Mulume Ambila**
  *Zaire*
**Susan Cohen**
  *Mintz, Levin, Cohn, Ferris, Glovsky,*
  *& Popeo*
**Sandy Feman**
  *Hewlett-Packard Company*
**Susan Finegan**
  *Mintz, Levin, Cohn, Ferris, Glovsky,*
  *& Popeo*
**Kent Greenfield**
  *Boston College Law School*
**Angelica Harter**
  *Refugee Immigration Ministry*
**Ilana Hurwitz**
  *Attorney*
**Jamal Hussein**
  *Somalia*
**Daniel Kanstroom**
  *Boston College Law School*
**Harvey Kaplan**
  *Kaplan, O'Sullivan & Friedman*
**Karen V. Kelly**
  *Davis, Malm & D'Agostine*
**Kurt Kusiak**
  *Todd & Weld*
**Tom Lebach**
  *Attorney*
**Paolo Morante**
  *Harvard Law School Student*
**Alan Musgrave**
  *Palmer & Dodge, LLP*
**Benoit Nyonga Mubikayi**
  *Zaire*
**Tamara Wolfson**
  *Palmer & Dodge, LLP*

**Advisory Committee**
**Nelson Brill**
  *Attorney*
**David Hoffman**
  *Hill & Barlow*
**Gail Pendleton**
  *NLG Nat'l Immigration Proj.*
**Joshua Rubenstein**
  *Amnesty International*
**Robert Sable**
  *Greater Boston Legal Services*

January 31, 1997

Director
Policy Directives and Instructions Branch
Immigration and Naturalization Service
425 I Street NW, Room 5307
Washington, DC 20536

RE: INS Number 1788-96

Dear Sir or Madam:

The Political Asylum/ Immigration Representation Project (hereinafter PA/IR  Project) offers the following comments to proposed regulations published in the Federal Register.  As an organization that trains members of the private bar and provides <u>pro</u> <u>bono</u> assistance to detained asylum seekers and other respondents in immigration proceedings, the PA/IR Project is thoroughly familiar with immigration law, practice and procedure. The PA/IR Project's comments reflect its day-today exposure to the Executive Office for Immigration Review and the Immigration and Naturalization Service.

We thank you for the opportunity to submit these comments and urge you to consider our comments carefully.

Sincerely,

Sarah B Ignati

Sarah B. Ignatius

AA-REG-00861

**Comment**
**of the**
**Political Asylum/Immigration Representation Project**

INS No. 1786-96

## I.    Court Rules

### A.    Section 3. 14: Jurisdiction and commencement of proceedings.

The Attorney General should allow a respondent to commence a case by filing a charging document with the Executive Office for Immigration Review (EOIR). The Attorney General should restore this provision that existed under former regulations. During the years the regulations allowed a respondent to commence a case, that ability mitigated the INS' frequent failure to file charging documents with EOIR. The INS routinely fails to file timely charging documents, even in instances when it is detaining an individual as a suspected deportable noncitizen. See CARECEN v. Reno, No. 93-4162-Kn (C.D. Cal.). Had the INS allowed a respondent to file a charging document, individuals who suffer from this practice would not have needed to litigate this issue.

## II.    Political Asylum Issues

### A.    The changed circumstances exception

The proposed rule states that the term "changed circumstances" in Section 208 (a) (2) (D) of the Act shall refer to circumstances materially affecting the applicant's eligibility for asylum that have arisen (for purposes of the deadline) after the one-year deadline has expired. This explanation is too limited in three respects:

--     it fails to take account of cases in which circumstances change materially just before the deadline expires,

--     it fails to make provision for the situation in which the applicant did not become aware of a change in human rights violations in the applicant's home country until more than one year after entry, and

--     it fails to make explicit that a valid "changed circumstance" is the applicant's genuinely belated discovery of the existence of the deadline.

Proposed Section 208.4 (a) (2) is unfortunately silent about a type of "changed circumstance" that will arise with some frequency: the applicant's genuinely belated discovery of the existence of an asylum filing deadline. It is certain that some applicants will file more than a year after entering

AA-REG-00862

the United States simply because they do not learn about the deadline in a timely fashion. For them, the changed circumstance will be their discovery that they must seek asylum by a certain date. The discovery might occur either shortly before or well after the deadline. To avoid inconsistent decision-making by individual adjudicators, INS should make it clear that if an applicant can prove belated discovery of the requirement, the changed circumstances exception should apply.

      B.    The "extraordinary circumstances" exception

The Attorney General should specify certain circumstances that would clearly fall within each of the exceptions. A list of such circumstances would not resolve every case, but it would provide guidance to applicants, asylum officers and immigration judges in some cases, avoid inconsistent decision-making, and avoid needless and costly litigation regarding circumstances that INS regards as covered. If examples of these exceptions are not included in the regulations, identical claims regarding a changed or extraordinary circumstance would have to be decided de novo by each asylum officer and immigration judge, and would be subject to appeal to the BIA. It seems inappropriate for the Attorney General to forgo an opportunity that would allow both refugees and the Service to avoid needless litigation with respect to circumstances that clearly fall within the terms of the Act. Of course, the examples of extraordinary circumstances should not constitute an exclusive list, because the Attorney General would not be able to foresee all potential conditions that fall within the terms of the exception.

      C.    Safe Third Countries

Proposed section 208.13 (d) would permit asylum officers and immigration judges to deny asylum
applications if the applicant can be removed to a safe third country which has offered resettlement. This proposed regulation is inconsistent with INA Section 208 (a) (2) (A), which provides for denials when an alien may be removed pursuant to a bilateral or multilateral agreement to a safe third country. The requirement of a pre-existing agreement was an essential procedural safeguard agreed among members of Congress, to prevent arbitrary denials of asylum.

## III.    Section 235: Summary Removal-Overview

      A.    To Conform to Congressional Intent and to Avoid Erroneous Denials to Admissible Persons, the Attorney General Must Apply the Definition of "Arriving Alien" and the Summary Removal Provisions Only to individuals with No Possible Claim to Admissibility

          1.    "Arriving Aliens"

Although Congress did not define "arriving alien," it did say that summary removal is intended to target those "who indisputably have no authorization to be admitted to the United States" (emphasis supplied). Since "arriving aliens" are those most affected by summary removal, to

2

conform to this Congressional intent INS must limit its application to those with no possible claim to admissibility.  As noted below, the process for removing arriving aliens completely lacks essential features of fundamental fairness and due process.  No person physically present in the United States may, therefore, be included in the definition of arriving alien.  They do not "indisputably" lack authorization for admission..

By including all parolees, the definition in the proposed regulations already goes too far.  Parolees are exempt from the application of the second part of the summary removal provision, that allows the Attorney General great latitude in expanding the category of noncitizens subject to summary removal.  The INS can not circumvent clear Congressional intent to except parolees (and those admitted) from summary removal by categorizing them as "arriving aliens."

At most, "arriving aliens" should include only those arriving at a port of entry with no claim to admissibility.  This could include a noncitizen whom the Attorney General had paroled previously into the United States, who subsequently left and is again seeking parole. The introductory material to the proposed regulations recognizes that this is the intended scope for parolees.  Considering the defects of the summary removal process, applying it to even this limited category of noncitizens will raise serious concerns.

2.    Summary Removal

The summary removal process lacks essential features of fundamental fairness and due process.  An  alleged noncitizen subject to the summary removal provisions apparently has no right to counsel, no right to a written explanation of  why a low-level examining officer believes they are inadmissible, no right to challenge a finding of inadmissibility, and no right to present evidence to an independent fact finder.  Only when an asylum seeker makes it to the "credible fear" stage does anyone receive any notice of rights.  Applying such a process to any person raises serious concerns.  The Attorney General should certainly refrain from expanding the class of those affected.

If the Attorney General wishes to expand the application of summary removal, she should wait to see how the system works.  Given its novelty and numerous defects, it would be prudent to limit its application to as small a group as possible.  This would make correcting problems easier and reduce the potential burden on the federal courts, which will be flooded with complaints by those wrongfully removed.  The Attorney General also should provide notice and opportunity for the public to comment on any plan to expand the categories of alleged noncitizens who may be subject to summary removal.  Immigration "crises" should not be used as a pretext for targeting certain populations of noncitizens or particular areas of the United States.  Summarily removing new groups of alleged noncitizens without notice and feedback will justifiably raise a public outcry and a flurry of legal action.

In sum, the Attorney General sets the example for all other officials implementing our laws.  For this reason alone, she should endeavor to enforce the new law in as fair and equitable manner as

3

possible. Where Congress has failed to provide safeguards necessary to achieve these goals, she should require them by regulation. Where the law violates constitutional rights, she should refrain from enforcing it.

Where it is not possible to implement the statute without violating the Constitution or erroneously depriving citizens and lawful permanent residents of their rights, refugees, or bona fides nonimmigrant visa holders, the Attorney General should decline to implement the statute. If the Attorney General determines that it is possible to implement all portions of the statute, the regulations must specify procedures ensuring fundamental fairness and due process. The summary removal provisions should be implemented flexibly, so they do not undermine other compelling public policy goals evinced by Congress.

Essential elements of any procedure for expelling or repelling alleged noncitizens include access to counsel, the right to know the specific charges and reasons for rejection, and the right to challenge such charges and findings before being removed. For these rights to be meaningful, noncitizens must receive written notice of their rights in a language they understand, must have time and opportunity to exercise their rights, and must have access to a written record articulating the charges and findings against them. In addition to including these features assuring due process, the regulations should explicitly allow examining officers to exercise discretion in favor of applicants for admission.

      B.      <u>Attorney General Should Increase Procedural Protections To Ensure that United States Citizens, Lawful Permanent Residents and Asylum Seekers Are Not Erroneously Removed</u>

The likelihood of a low-level INS officer inaccurately rejecting bona fide U.S. citizens and lawful permanent residents is too high to allow summary removal to result from such decisions. The goal of expeditiousness does not justify eliminating vital checks against erroneous determinations. Rather than streamlining removal of applicants ineligible to enter the United States, the contemplated process will likely result in a flood of habeas petitions in federal court.

      C.      <u>The Attorney General Lacks Authority to Conduct Summary Removal Proceedings Against Any Person with a Claim to United States Citizenship</u>

Seventy-five years ago, the Supreme Court held that it was unconstitutional to allow Executive Branch personnel the sole power to determine whether a person claiming United States citizenship had the right to enter the United States. <u>Ng Fung Ho v. White</u>, 259 U.S. 276 (1922). The Attorney General's willingness to treat a person with a claim of citizenship as a noncitizen is not consistent with <u>Ng Fung Ho</u>. To protect adequately against the erroneous removal of U.S. citizens, the Attorney General must do more.[1] No less than an individual hearing before an

---

[1] <u>See</u>, <u>e.g.</u>, <u>Hernandez v. Cremer</u>, 913 F.2d 230 (5th Cir. 1990) (criticizing insufficient process that banished United States citizen for 46 days and caused him to lose his job).

4

immigration judge would satisfy the fifth amendment rights of United States citizens seeking to enter the United States.[2]

Determining whether an individual respondent is a citizen or noncitizen is often highly technical and requires specialized legal knowledge as well as detailed information about an individuals's family history. See, e.g., Daniel Levy, Naturalization Handbook, (1996) (devoting two full chapters to derivative and acquired citizenship). Thus, individuals who were not born in the United States and acquired United States citizenship through their parents are often unaware of this fact. An immigration examiner, lacking knowledge of the respondent's family history, will not discover that the respondent is a United States citizen.

Each year, the INS denies entry to a shockingly high number of individuals who are in fact United States citizens. The Department of Justice Immigration Czar, Alan D. Bursin, twice acknowledged within the past six months that the INS unlawfully denies entry to United States citizens.[3]     In one case, the INS denied entry to a developmentally disabled United States citizen who was carrying a valid birth certificate from Chicago and a social security card.[4]  That individual went homeless in Tijuana for eleven days because of INS' error. A Harrisburg, Pennsylvania newspaper chronicled the disturbing situation of a United States citizen whom the INS deported eleven times.[5]

The Attorney General should automatically parole anyone with a colorable claim to citizenship.

    D.    Section 235.1(d) :Alien applicants for admission.

To ensure lawful permanent residents are not summarily removed, add the following sentence at the end:  "If an applicant for admission fails to satisfy the examining immigration officer that he or she has been lawfully admitted for permanent residence to the United States, he or she shall thereafter be inspected as an alien in accordance with section 235(b)(2) of the Act."

    E.    Section 235.3(b) Expedited removal-determination of inadmissibility.

To ensure examining officers conducting summary removal interviews first screen for United States citizens lawful permanent residents, asylum seekers and others, add at beginning of first

---

[2] Id.

[3] Correspondence between Alan D. Bursin and Jennifer Bailey, Human Rights Watch (Oct. 18, 1996); submission from Alan D. Bursin and Amalia L. Mack to the Human Rights Watch (Aug. 1996).

[4] Id.

[5] "Citizenship Evidence May Rescue Detainee", Harrisburg Patriot, p.1 (Nov. 2, 1996).

AA-REG-00866

sentence: "After inspection under sections 235.1(b) and 235.1(d)(1), [a]n alien who is arriving..."

F.     Section 235.3(b)(5) Claim to lawful permanent resident status.

To ensure that lawful permanent residents are not unnecessarily subject to removal proceedings, examining officers should give them an opportunity to contact counsel or others who may possess the necessary evidence of their immigration status. If an examining officer discovers he or she has detained a lawful permanent resident for summary removal inspection, and the lawful permanent resident does not fall in one of the limited exceptions of lawful permanent residents seeking admission enumerated in section 101(a)(13) of the Act, the Attorney General should immediately release him or her from custody. In the first sentence, replace the phrase "shall not order the alien removed pursuant to section 235(b)(1) of the Act" with "shall immediately release the lawful permanent resident from custody."

G.     Section 235.3(b)(5)(iv):  Review of order.

To ensure lawful permanent residents are not deprived of their rights in the summary removal process, this section should add the phrase contained in the parallel section for those subject to removal for national security reasons: "the hearing and all further proceedings in the matter shall be conducted in accordance with the provisions of section 240 of the Act. . ."

H.     Due Process Requirements.

Whether a person lacks proper documents or is using fraudulent documents often is not a straightforward decision. Low-level examining officers should not be given unfettered power to expel people from the United States based on their ignorance or personal interpretation of the law. The current regulations provide insufficient guidance to examiners and their supervisors and lack the necessary checks against incorrect decisions and wrongful removals.

Fundamental fairness requires that all applicants for admission, regardless of the proceeding, be afforded the right to counsel, the right to know and challenge the charges against them, and the right to an independent review of a decision that he or she should be removed. To be able to meaningfully challenge removal, the examining officer must specify the reasons for denial in writing, in a language the applicant understands. .

I.     Section 235.3(b)(8): Removal procedures relating to expedited removal.

It is only appropriate to remove noncitizens subject to summary removal under the procedures at INA § 241(c) if the noncitizens are arriving at ports of entry. Any other arriving alien, and any other alleged alien subject to summary removal by designation of the Attorney General, should be removed under the procedures at INA § 241(a).

6

J.    <u>Discretion To Parole and Defer Inspection of Arriving Noncitizens.</u>

Summary removal should not be implemented inflexibly.  Examining officers and their supervisors should be able to exercise discretion in favor of arriving aliens for humanitarian or public policy reasons.  This is especially important when to summarily remove an arriving alien would undermine other Congressionally mandated goals, such as strengthening family integrity or combating domestic violence.  Thus, for example, examining officers should be able to refer to a district director the cases of applicants for admission whose rejection would harm U.S. families and of spouses and children of abusive United States citizens or of lawful permanent residents.

K.    <u>Section 235.3(b): Expedited removal-Determination of inadmissibility.</u>

Parole should be available to all who are eligible under section 212(d)(5) of the Act.  Modify the last sentence of this section to read:

> An alien whose admissibility is being considered. . . ., except that parole of such alien, in accordance with section 212(d)(5) of the Act, may be permitted when the Attorney General determines, in the exercise of discretion, that parole is required for urgent humanitarian reasons or significant public benefit.

L.    <u>Section 235.3(c): Other inadmissible aliens.</u>

If, at the time of inspection, an examining officer believes an arriving alien should be admitted for humanitarian or public policy reasons, regardless of possible inadmissibility under sections 212(a)(6)(C) or 212(a)(7), he or she should have the discretion to refer that applicant for admission to a district director.  The Attorney General should add the phrase "and deferred inspection" to the title of this section.  In addition, the Attorney General should include the following language as the second sentence:

> Alien applicants for admission who may be inadmissible under §§ 212(a)(6)(C) or 212(a)(7) of the Act may be paroled for deferred inspection under § 235.2(b) for humanitarian or public policy reasons.

M.    <u>Procedural Requirements for Expanding the Scope of Summary Removal and Due Process Protections for Those Affected by the Commissioner's Designation.</u>

The process contemplated in the regulations for expanding the scope of those subject to summary removal violates basic notions of procedural fairness.  Moreover, if the Attorney General decides to subject noncitizens in the United States to summary removal, the fifth amendment demands that the process for removing such persons contain all the essential features of due process.

7

Since it is unlikely that subjecting persons in the United States to the summary removal provisions would survive Constitutional scrutiny, the Attorney General should decline to exercise this option. Application of this provision will surely result in burdening the federal courts with challenges to unlawful deprivation of rights.

By permitting low-level INS officers to make determinations regarding such complex matters, the Attorney General is inviting erroneous denials. Proposed sections 235.3(b)(2) and (6) provide insufficient guidance on how to make such determinations and completely lack the necessary checks against erroneous removal of those lawfully in the United States.

Section 235.3(b)(6) also should explicitly state that the examining officer bears the burden of proving the alienage of any person in the United States subject to summary removal, before the burden shifts to the alleged alien. The examining officer must proffer evidence of alienage to a third party; the same person may not both make an allegation and adjudicate the veracity of the charge. This section also implies that even those who show they have been admitted or paroled may be summarily removed. This would be unlawful. An examining officer who believes a person admitted or paroled is deportable or inadmissible must refer that person to section 240 proceedings. Summary removal is not an option.

     N.    <u>Discrimination Against Persons Arriving From Canada or Mexico.</u>

Section 235 (b)(2)(C) of Immigration and Nationality Act purports to allow the INS return to Canada or Mexico alleged noncitizens arriving at border ports of entry. The Attorney General should decline to enforce this provision that offends the Constitution and the sovereignty of our neighbors. A federal district court has held that the INS' policy of denying entry is unlawful. <u>See Ascenscio v. Tremenski,</u> (S.D. Tex). Not only does this section deprive a limited class of alleged noncitizens of fundamental due process rights, it also constitutes thinly disguised nationality- and race-based discrimination.

Proposed 8 C.F.R. § 235.3(d) does nothing to ameliorate these concerns, perhaps because they are insuperable. It is not possible to ensure proper notice or meaningful access to counsel when a respondent is in another country. Allowing immigration judges to make <u>in absentia</u> findings because respondents fail to appear under such conditions reinforces the conclusion that this provision is designed to punish Mexican and Canadian nationals.

     O.    <u>The Attorney General May Not Expand the Scope of Expedited Removal Without Notice and Comment</u>.

Proposed 8 C.F.R. 235.3 (b)(2)(ii) states that the Attorney General can expand the scope of the expedited removal provisions without providing for notice and public comment

> ... if the Commissioner determines, in the exercise of discretion, that the delay caused by publication would adversely affect the interests of the United States or

AA-REG-00869

the effective enforcement of the immigration laws.

The provisions of 5 U.S.C. § 553(b)(A)-(B) require that the public have the opportunity to comment on rules unless they are interpretative rules or unless allowing for comment would be impracticable, unnecessary or contrary to the public interest. Allowing for post-effective date comment periods do not cure the defect. Thus, the Administrative Procedure Act (APA) requires that the public have the opportunity to comment about substantive regulations unless the agency establishes good cause for not complying with the APA's requirements. In addition, the APA imposes a requirement that regulations be published at least thirty days prior to becoming effective. Although the thirty day requirement is also subject to a "good cause" exception, each exception has distinct requirements. Rowell v. Andrus, 631 F.2d 699, 703 (10th Cir. 1980); Kollet v. Harris, 619 F.2d 132, 145 (1st Cir. 1980). The federal courts have repeatedly emphasized the narrowness of each of these good cause exceptions. See, e.g., American Federation of Government Emp. v. Block, 655 F.2d 1153,1156 (D.C.Cir. 1981).

The legislative history of the APA establishes that the exceptions should be limited to emergency situations and not be "escape clauses" for an agency to avoid its notice and comment obligations. See S. Rep. No. 752. 79th Cong., 1st Sess. (1945). In the proposed regulations, the Attorney General contemplates expanding the scope of expedited removal without even publishing interim regulations. The federal courts have restricted agencies from publishing interim regulations unless the interim regulations are subject to one of the statutory exceptions. Levesque v. Block, 723 F.2d 175 (1st Cir. 1983); State of N.J. v. U.S. Environmental Protection Agency, 626 F.2d 1038,1045 (D.C.Cir. 1980). The Administrative Conference of the United States' (ACUS') Rule Making Guide echoes this view.

1.    Weight of public interest favors publication of regulations

The Attorney General offers no public interest justification for invoking the "good cause" exception. The Attorney General's attempt to circumvent the publication of the expansion of expedited removal thwarts public participation in government and precludes the agency from receiving valuable input. In so doing, the Attorney General is acting contrary to the public interest. The Attorney General should publish specific proposed regulations before expanding the scope of expedited removal.

2.    The Attorney General lacks "good cause" established for circumventing notice and comment regarding future expansion of scope of expedited removal

The Attorney General cannot circumvent the notice and comment provisions the APA because of the INS Commissioner exercises her discretion. Similarly a conclusory statement from the Commissioner, without more, does not constitute "good cause." for failing to comply with the APA's public comment requirements. "Good cause" requires more than boiler-plate conclusions from the INS Commissioner to justify an exception from the APA's notice and comment

AA-REG-00870

requirements.  As stated above, complying with a deadline alone is insufficient.  If the Attorney General has good cause, the APA requires she justify her conclusions.  Established principles of good government mandate that the Attorney General comply with the letter and the spirit of the APA.

In sum, the Attorney General has not established any of the exceptions governing the publication of interim regulations, much less offering a justification to avoid notice and comment altogether. By attempting to circumvent the notice and comment provisions of the APA regarding future expansion of the scope of expedited removal, the Attorney General insults the general public and demonstrates disrespect for fundamental principles of good government.  The Attorney General's proposed regulations affect the rights of thousands of people, citizen and non-citizen alike.  First, it would not be impracticable for the Attorney General to publish proposed regulations before expanding the scope of expedited removal.  Second, it is not "necessary" that the Attorney General expand the scope of expedited removal without allowing for notice and comment. Third, it is not in the public interest for the Attorney General to expand the scope of expedited removal without providing for notice and comment.  Finally, principles of good government require the Attorney General to provide notice and comment prior to expanding the scope of expedited removal, absent emergent circumstances.

## IV.  Section 238:  Expedited Removal of Aggravated Felons.

As a threshold matter, the elimination of deportation hearings for any group of individuals who are present within the United States raises serious constitutional questions.  The Supreme Court has long held that all persons within the United States are entitled to due process of law under the Fifth Amendment, even if their presence in this country is illegal.  See Wong Wing v. United States, 163 U.S. 228, 238 (1896); Yamataya v. Fisher, 189 U.S. 86, 100 (1903); Wong Yang Sung v. McGrath, 339 U.S. 33, 50 (1950).  Thus, the proposed regulations are plainly subject to the due process requirements of the fifth amendment.

At the very least, due process requires that procedural safeguards provide individuals with "the right to be heard before being condemned to suffer a grievous loss of any kind."  Joint Anti-Fascist Refugee Committee v. McGrath, 341 U.S. 123, 168 (1951).  There is no dispute that deportation constitutes such a grievous loss, particularly for individuals who have strong ties to the United States, including close family members from whom they will be separated.  See Landon v. Placensia, 459 U.S. 21, 34 (1982); Bridges v. Wixon, 326 U.S. 135, 147 (1945). Therefore, under the balancing test established in Mathews v. Eldridge, 424 U.S. 319, 334 (1976), the government's interest in streamlined deportation procedures must be weighed against the risk that, by eliminating deportation hearings, individuals who have a right to remain in this country will be erroneously deported.

For the reasons set forth below, we have strong doubts that the elimination of deportation hearings in the manner contemplated by this statute can survive such a balancing.  However, even assuming that it could, the procedures INS sets forth in these proposed regulations do not

10

pass constitutional muster. Under these procedures, numerous individuals who have a right to remain in this country, both United States citizens and noncitizens, will risk erroneous removal.

As discussed more fully below, the high risk of erroneous removals is due to two principle factors: (1) the complexity of the underlying determinations that will trigger an administrative order of removal, and (2) the failure of INS's proposed regulations to provide meaningful procedures for making these determinations.

    A.    <u>Complexity of the Underlying Determinations that will Trigger an Administrative Order of Removal</u>.

The Attorney General's proposed regulations rest on the flawed assumption that little or no inquiry is necessary to determine whether a person is a noncitizen convicted of an aggravated felony. In fact, the two determinations that are necessary to trigger administrative removal proceedings -- that an individual (1) is not a citizen or national of the United States (2) has not been admitted to permanent residence and (3) is convicted of an aggravated felony are often factually and legally complex. Moreover, it is precisely these kinds of determinations that removal hearings are intended to resolve.

Neither the INS nor the EOIR ask questions to determine whether a respondent is a citizen. As a result of this failure, there are no reliable statistics on the frequency with which the INS deports United States citizens. Since the INS does not take reasonable steps to identify United States citizens who are unaware of their citizenship status, the Attorney General lacks the requisite statistical information to assess the scope of this problem. It is not possible to quantify the number of United States citizens the INS mistakenly removes from the United States. The INS cannot legitimately claim that providing increased procedural safeguards that would identify derivative and acquired citizens is excessive because the agency lacks a statistical reference point to measure the scope of the foreseeable harm.

    B.    <u>The Prevalence of Illegal Repatriation of United States Citizens Appears to be Under reported Dramatically</u>.

Several factors lead to what appears to be a massive under reporting of the banishment of United States citizens. First, the citizenship law of the United States are enormously complex. Second, the overwhelming percentage of detainees are not represented by counsel. Third, citizens themselves are often unaware of their true citizenship because the laws even seem counterintuitive to the unrepresented respondents who lack training in the law. Fourth, the statute and the case law interpreting the statute change constantly. Fifth, the ongoing absence of universal health care means that many low income individuals in rural areas were not born in hospitals. These citizens by birth lack conclusive proof of their citizenship status. That these claims may be difficult to verify does not lessen the INS' obligation to ascertain a respondent's citizenship status. Each time the United States banishes a United States citizen, it violates the

11

eighth amendment. Accordingly, the INS should spare no effort to avoid widespread infringement of fundamental rights. Sixth, the variety of possible citizenship claims makes it more difficult to spot these claims without it. Certain difficult to identify citizens were born abroad but acquired U.S. citizenship at birth because one or both of their parents were U.S. citizens. Other difficult to identify citizens were born abroad but later acquired citizenship when their parents naturalized while they were still minors. Still other difficult to identify citizens lack conventional documentation of their citizenship. Finally, neither the INS nor the EOIR ask basic questions that would both prevent the harm and create a reliable statistical baseline for the scope of the problem.

        C.      The Attorney General Lacks Reliable Statistical Information to Determine the Prevalence of Illegal Removal of United States Citizens.

The INS cannot claim that banishment of United States citizens is a marginal problem because it lacks reliable statistics about the scope of this problem. The INS does not systematically ascertain the citizenship status of respondents in immigration proceedings. Although the National Immigration Project regularly receives anecdotal reports of each of these fact situations, it cannot state with any statistical certainty how many United States citizens the INS banishes. In light of the foreseeable systemic statistical underreporting of the problem, and the liberty interest at stake, the Attorney General's proposed regulations do not provide sufficient procedural protection against foreseeable and widespread infringement of a fundamental liberty interest. See Trop v. Dulles, 356 U.S. 86 (1958).

Only through questioning by an advocate or an immigration judge about their family history does information about their possible citizenship claim become known. In fact, even with the protection of a hearing, errors occur. See, e.g., Murphy v. INS, 54 F.3d 605 (9th Cir. 1995). (reversing BIA's finding of alienage and terminating removal proceedings in face of respondent's claim of U.S. citizenship).

        D.      Proposed Regulations Understate Risk of Erroneous Deprivation.

            1.      High risk of error in determining whether an offense is a conviction for an aggravated felony

Whether the definition of "aggravated felonies" covers a specific offense is open to interpretation. Therefore, the involvement of an immigration judge and the Board of Immigration Appeals may be necessary in order to resolve problems of statutory interpretation. See, e.g., Matter of L-G-, Int. Dec. #3254 (BIA 1994) (rejecting INS's position that Louisiana state conviction for possession of cocaine constituted aggravated felony). The determination of whether an individual has been convicted of an aggravated felony is often highly complex. Since 1988, Congress has enacted at least six pieces of legislation defining and redefining the crimes that constitute aggravated felonies. Determination of whether a given conviction is an aggravated felony requires looking at the nature of the crime, determining which statute

AA-REG-00873

classified the crime an aggravated felony, and the effective date of that statute. Significantly, Congress' most recent changes to the definition apply to "actions taken" after the effective date. Moreover, since neither the BIA nor the federal courts have interpreted the provision, there is a forseeable risk that the agency will not interpret the phrase uniformly. Accordingly, making these determinations is particularly problematic.

Finally, examination of a conviction record alone is insufficient for determining whether a conviction carries removal consequences, since the conviction record may lack critical information such as whether all direct appeals have been waived or exhausted, whether post-conviction relief has been granted, or whether a chief executive officer of a state or the United States has granted a pardon. Under any of these circumstances, the conviction would no longer form a basis for removal. Yet this information may not be readily apparent from mere examination of the conviction record. See, e.g., Matter of V-, 7 I & N 577 (BIA 1957) (highlighting danger of relying solely on conviction record where record did not reflect that conviction was subsequently vacated).

    2.    Eligibility for relief.

Although INA § 238 states that a respondent in expedited administrative proceedings is not eligible for any relief, INA § 245 permits a noncitizen who is not a lawful permanent resident to adjust his or her status and obtain a waiver even if she or he has a final conviction for an aggravated felony. Under governing Supreme Court precedent, the Attorney General must construe these conflicting provisions narrowly and in the noncitizen's favor. INS v. Errico, 385 U.S. 214 (1966).

For example, a respondent in these expedited administrative removal proceedings who has a conviction under 18 U.S.C. 902(g) for an aggravated felony (involving certain firearms) remains statutorily eligible for adjustment of status. Since there is no ground of inadmissibility for firearms, such a respondent would not even need a waiver. In addition, a respondent in expedited removal proceedings who has an aggravated felony conviction involving theft remains statutorily eligible to adjust her or his status and can seek a waiver for her or his ground of inadmissibility. A noncitizen's eligibility to adjust her or his status will depend on the specific nature of the conviction (i.e., whether it is waivable) and the continued viability of her or his relationship with the petitioner.

    a.    Proposed Regulations Should Specify that Respondents Are
          Eligible To Apply for Withholding

Not all noncitizens convicted of an aggravated felony are ineligible for withholding of deportation. The IIRIRA allows noncitizens who do not receive a sentence in the aggregate of at least five years may apply for withholding of removal. IIRIRA § 305(a). In addition, the Board of Immigration Appeals applied that same test to cases under INA § 243(h)(3). Matter of Q-T-M-T, Int. Dec. 3300 (BIA 1996).

13

Other forms of relief may be even more difficult to ascertain without additional factual and legal investigation. For example, individuals whose criminal convictions were obtained in violation of their constitutional rights may be able to seek relief from those convictions even though the convictions are currently considered final. Although there is no right to a continuance of removal proceedings on such grounds, it is within the authority of the immigration judge to grant a continuance "for good cause". 8 C.F.R. §§ 3.29, 242.13. Thus, as long as the possibility exists that an immigration judge would grant a continuance to allow the alien to apply for post-conviction relief, and the grant of such relief would protect the alien from removal, the alien should not be deemed ineligible for relief from removal.

Finally, individuals may possess relief from removal on the grounds that INS misconduct would warrant termination of the removal proceedings. It is well established that where INS's conduct is so egregious as to violate fundamental fairness, evidence that was obtained through such conduct is inadmissible in the removal proceeding and must be suppressed. See, e.g., Matter of Sandoval, 17 I & N Dec. 70 (BIA 1979). Suppression, and even termination of proceedings, may also be required when INS violates its own regulations that were intended to protect significant interests of the individual and the individual can show harm. See, e.g., Matter of Garcia -Flores, 17 I& N Dec. 325 (BIA 1980). See also Montilla v. INS, 926 F.2d 162 (2d Cir. 1991) (no showing of harm required where regulation that was violated was intended to protect respondent's right to counsel). Clearly, determinations of whether evidence that is being used against an alien was obtained by INS in violation of due process or INS regulations will require extensive factual inquiry, including presentation and cross examination of witnesses.

> b.    Proposed regulations must include mechanism to provide protection under the Convention Against Torture.

International law is part of the law of the land. See U.S. Const. art. III, § 2. As such, the Attorney General must honor treaty obligations of the United States in carrying out expedited administrative removals. The United States has signed the Torture Convention. Under this instrument, contracting parties, among other things, cannot return a person to a country where she or he faces torture. Although this situation will not arise frequently, the Attorney General's obligation to enforce the laws of the United States do not include an exception for infrequent events. As a result, the Attorney General must include regulations that ensure that the United States honors its obligations under the Torture Convention.

> E.    Adequacy of Procedures.

> 1.    The proposed regulations fail to ensure that a neutral party renders decisions.

The proposed regulations authorize INS officers without specific legal training to initiate administrative removal proceedings and render final orders of administrative removal. Moreover, the regulations provide only limited guidance for making these determinations.

14

AA-REG-00875

For example, proposed 8 C.F.R. § 238.1(b)(1) would allow an "issuing service officer" to issue a Notice of Intent if he or she determines that the individual (1) is an alien (2) is not a lawful conditional or permanent resident, (3) has a final conviction for an aggravated felony and (4) is deportable for an aggravated felony conviction.. As discussed above, these determinations often require detailed knowledge of the complexities of immigration law. And yet the proposed regulations would relegate this decision to individuals such as patrol agents who may lack any specialized legal training for making these determinations. See proposed section 238.1(a) (defining "issuing service officers" as all individuals authorized to issue notices to appear. Furthermore, under the proposed regulations the issuing officer need only be "satisfied" that sufficient evidence exists to support such a finding, a standard that is vague at best.

Similarly, proposed 8 C.F.R. § 238.1(d) of the proposed regulations would allow a "deciding service officer" to issue a final administrative removal order as long as (1) no written response is received within ten days, or (2) the officer finds the written response to be insufficient to rebut the charges. Under the proposed regulations, this decision can be relegated to any designee of a district director. See proposed 8 C.F.R. § 238.1(a). Once again, there is no requirement that such individual receive any specialized training in immigration law, nor that he or she make an independent evaluation of the evidence supplied by the issuing service officer. Instead, administrative removal orders can issue by default, based solely upon the unproven allegations contained in the Notice of Intent.

Finally, the regulations are flawed in that they allow investigatory and adjudicatory functions to reside within a single entity, since both issuing and deciding officers will primarily be agents of the District Director and involved in enforcement functions.

The only protection -- that the issuing service officer and the deciding service officer cannot be the same person -- is clearly inadequate. The regulations contain no safeguards to prevent ex parte communication between the two officers. Moreover, merely preventing one INS officer from issuing both the notice of intent and the final removal order in a particular case does not guarantee a fair and impartial proceeding when that officer may be acting both as an investigator and as a final adjudicator in other matters. This combining of functions is "a recipe for fundamentally unfair and erroneous decision making." Schweiker v. McClure, 456 U.S. 188 (1982). In fact, this is the very reason that the Attorney General established the Executive Office of Immigration Review as a separate entity in 1983..

      2.      Proposed Regulations Fail to Provide Meaningful Procedures for Making these Determinations

Given the complexity of the determinations that are required to support an order of administrative removal, the procedures proposed by INS for arriving at these determinations are woefully inadequate. The hallmarks of due process include a neutral and competent adjudicator, meaningful notice and an opportunity to respond, plus an opportunity for review. As set forth below, INS's proposed regulations are deficient in each of these aspects:

AA-REG-00876

3.    The Proposed Regulations Do Not Provide the Respondent a Meaningful
       Opportunity To Respond

The proposed regulations also fail to provide any meaningful mechanism by which individuals
who have been served with administrative removal notices can effectively rebut the charges.
Proposed section 238.1(c)(1) would provide affected individuals with the opportunity to submit a
written rebuttal within ten days after being served with the Notice of Intent. In light of the vital
interest at stake, and the obstacles to preparing such a written response, the lack of any
opportunity to be heard orally in person is especially troubling.

In Goldberg v. Kelly, 397 U.S. 254 (1970), the Supreme Court held that a regulation that
terminated welfare benefits unless the recipient submitted a written rebuttal violated due process.
The Court stated that due process guaranteed the right to be heard orally in person, a right that
may be especially important to individuals who lack the capacity to write effectively on their own
behalf. Id. at 269. Similar reasoning applies to the individuals who face administrative removal,
many of whom will also be unable to write effectively on their own behalf. In addition, ten days
is clearly insufficient to prepare an adequate written rebuttal. Although the regulations authorize
extensions of this time period, they fail to designate specific criteria that would automatically
justify an extension, such as the need for additional time to secure counsel or evidence. Instead,
they appear to leave unfettered discretion in this matter to the deciding service officer.

The requirement of a written response is particularly egregious in light of the nature of the
affected population. As already noted, most of the individuals who will be affected by the
administrative removal procedures are incarcerated or detained and will have little or no access
to typewriters, legal materials or counsel. A respondent who cannot read or write in any
language faces insurmountable obstacles that would prevent him or her from submitting a written
response. Furthermore, proposed regulation section 238.1(c)(2) requires that the respondent
submit affidavits, documentary information and other supportive evidence, together with her or
his response. For the respondent who is pro se, this requirement may be plainly beyond their
level of sophistication. Unless the respondent is trained in the intricacies of immigration law, it
is unlikely that he or she would even know what information to include in a rebuttal. Moreover,
the regulations are themselves unclear about what information would be necessary to constitute a
sufficient rebuttal.

Notably, a removal hearing provides even unrepresented respondents with an opportunity to
interact with at least one individual who is well-versed in the law -- the immigration judge.
Thus, even when respondents are without counsel, the immigration judge may be able to advise
them of potential defenses to removal or claims for relief of which they would otherwise be
unaware. Unrepresented individuals who face administrative removal will be deprived of this
important safeguard. The opportunity for a written rebuttal is a poor substitute and one of
dubious value.

Due process requires more than mere notice; it requires notice reasonably calculated to apprise

16

the individual of the pendency of the action and how to respond. <u>Mullane v. Central Hanover Trust Co.</u>, 339 U.S. 306, 314 (1950). Because the proposed notice requirements do not meaningfully inform affected individuals about the administrative removal hearings they face and how to respond, it does not provide due process of law.

The regulations do not require that individuals be provided with a record of the evidence that forms the basis of the charges against them, except upon request. Without this evidence it would likely be impossible to effectively rebut the charges. Considering that the Notice itself may fail to meaningfully inform the alien of this crucial right, provision of the record should be automatic.

The above-mentioned deficiencies are particularly significant in light of the population that will be subjected to administrative removal proceedings. Most of these individuals will be incarcerated or in INS detention and will thus have limited access to counsel. In addition, they may also face language and literacy barriers which will make them less able to fully understand the written notice that is provided. Under such circumstances, and without the assistance of counsel or the benefit of a hearing, an individual is unlikely to appreciate the gravity of the pending action.

In addition, ten days (13 days, if served by mail) is clearly insufficient to prepare an adequate written rebuttal. Although the regulations authorize extensions of this time period, they fail to designate specific criteria that would automatically justify an extension, such as the need for additional time to secure counsel or evidence. Instead, they refer generally to a "no genuine issue of material fact" test. The standard in proposed 8 C.F.R. § 238.2(d)(2)(i) is identical to the summary judgment standard under Fed. R. Civ. P. 56. Since federal casebooks are full of decisions reversing federal judges decisions granting summary judgment, it is unreasonable to expect immigration officials to make proper determinations on this complex subject.

F.    <u>Inadequate Review</u>

As discussed above, proposed section 238 would allow for a final order of administrative removal to be issued by an INS officer who has no specific legal training and who is not even required to make an independent evaluation of the evidence. Because the risk of unqualified officers issuing erroneous removal orders is so high under these standards, the Attorney General should decline to enforce the provision because she cannot do so in a manner consistent with her obligation to enforce the Constitution of the United States.

In fact, the elimination of all administrative review will likely undermine the purpose of the new administrative removal provisions, which was increased efficiency. Instead, the burden will shift to the federal judiciary, which will be faced with an increased number of habeas petitions. Nor would allowing for administrative review frustrate the government's interest in expedited removals. Since most affected individuals will still be incarcerated serving their criminal sentences, an administrative appeal would not further delay their removal from the United States.

17

For the reasons set forth above, INS's proposed regulations for expediting the removal of nonresident noncitizens convicted of aggravated felonies fail to satisfy the requirements of due process. Under these procedures, numerous individuals -- both U.S. citizens and noncitizens -- will face a significantly increased risk of erroneous removal.

As already noted, we do not believe that Congress can constitutionally eliminate removal hearings in the manner contemplated by this statute. At a minimum, however, the implementation of these regulations must assure affected individuals the opportunity for face to face contact with a neutral decisionmaker possessing legal expertise in the relevant issues. For example, the INS could appoint an ombudsperson or special inquiry officer, trained in immigration law and separate from the INS's enforcement functions, to conduct personal interviews with the affected individuals. Such ombudspersons or inquiry officers would serve dual roles. First, they could use the personal interview to impart meaningful notice to the individual facing administrative removal. Second, they would be able to review potentially complex issues of citizenship, criminal convictions, and eligibility for relief, and elicit relevant information from the affected individual. This would insure that the overwhelming number of individuals who are unrepresented would at least be afforded some minimal opportunity to understand and object to the administrative removal notice and order.

Of course, other procedural safeguards would be essential during such an interview, such as the right to an interpreter, the right to the presence and assistance of counsel, and creation of a written record of the interview to allow for meaningful review. Furthermore, full administrative and judicial review should be restored. Additionally, individuals who are most likely to be eligible for relief from removal should be automatically excluded from the ambit of the administrative removal provisions.

We urge the INS to revise the proposed regulations to provide such procedural safeguards. The need for more efficient, streamlined procedures cannot override the demands of due process, particularly when the interests at stake are so great and the risk of erroneous deprivation so high. As the Supreme Court noted in Fuentes v. Shevin, 407 U.S. 67 (1972), "A prior hearing always imposes some costs in time, effort and expense. But these rather ordinary costs cannot outweigh the constitutional right." Id. at 90.

## V.    Notices to Appear

### A.    Section 239.1(a): Commencement

The Attorney General should modify the regulation to allow a noncitizen to file a notice to appear with the Immigration Court. Allowing for either the INS or a noncitizen to file a notice to appear would promote  uniform administration of the immigration laws. The fair and evenhanded administration of the immigration laws should be among the Attorney General's highest priorities. In addition, it would ensure that an eligible  noncitizen could apply for certain relief that Congress made available. When the regulations allowed either the INS or a noncitizen

AA-REG-00879

to file a charging document there were no significant problems. The officers listed are authorized to decide whether cases implicate the foreign policy interests of the United States. See proposed 8 C.F.R. 239.3(d). Manifestly, many, if not all, of the officers listed are not qualified to perform these tasks.

B.    Section 239.2: Cancellation of notice to appear.

As an agency of the United States, the INS must follow all federal laws, including labor laws. The INS recently issued an Operating Instructions governing enforcement activities during labor disputes. The regulation should specify the safeguarding of labor law rights as a basis for canceling a notice to appear. The Attorney General should specify that the INS may cancel a notice to appear that a notice when INS agents obtain evidence unlawfully. See, e.g., Orhorhaghe v. INS, 38 F. 3d 488 (9th Cir. 1994); Gonzalez-Rivera v. INS, 22 F. 3d 1441 (9th Cir 1994). Rather than require a noncitizen to litigate the lawfulness the of proceedings whenever the INS uses racially impermissible motives or other invidious bases to conduct enforcement, the Attorney General should voluntarily cancel the notice to appear in such cases. In so doing, the Attorney General would promote governmental accountability and confidence in the INS' evenhandedness. Although it is unlikely that the INS would voluntarily cancel a notice to appear often, including such a provision would send a powerful message that the Attorney General does not tolerate racially based enforcement or other unlawful conduct.

C.    Section 239.2(d): Motion for remand.

The proposed regulation contemplates that the INS remand a case that implicates the foreign relations of the United States. The Department of State is responsible for the foreign relations of the United States. Since the officers listed in paragraph (a) are not qualified to determine foreign policy implications, the Attorney General should withdraw the proposed regulation. If the Attorney General does not withdraw the proposed regulation, the Attorney General should specify that foreign policy considerations cannot play a role in determining whether a noncitizen is eligible for political asylum. See, e.g, Baptist Churches v. Thornburgh, 760 F. Supp. 796 (N.D. Cal. 1990).

D.    Section 240.7: Evidence in removal proceedings.

This proposed regulation is unnecessary since prior statements are already admissible. By proposing to do so, the Attorney General clouds existing case law regarding the admissibility of prior statements. A plea that results in less than a conviction does not constitute an admission. See, e.g., Matter of Seda, 17 I& N 550 (BIA 1990) overruled on other grounds Matter of Ozkok, 19 I&N 546 (BIA 1988) The Attorney General should clarify that prior statements are not admissible unless they are reliable. The Attorney General should further clarify the matter for the public by including language that states that a factfinder must still decide how much weight to

19

accord such prior reliable statements.

E.    <u>Section 240.10: Hearing</u>.

The proposed regulation fails to require the Immigration Judge to determine that the court has personal jurisdiction over the respondent. Unless the Immigration Judge determines that the INS served the respondent, the court lacks jurisdiction to hear the case.

1.    Section 240.10 (d): Issues of removability.

This regulation refers to determinations of whether a person is subject to removal "under the provisions of paragraph (b) of this section..." Since subparagraph (b) refers to public hearings and does not include any substantive provisions, the proposed regulation does not make sense. It appears that the Attorney General intends to refer to "paragraph (c)." If that is not the case, the Attorney General should republish a proposed regulation to give the public a meaningful opportunity to comment.

2.    Section 240.10(e): Additional charges

The regulation should allow the respondent to withdraw her or his pleading to the original charges. In some instances the respondent may have given up defenses to deportability in order to apply for relief. If the additional charges would make the respondent ineligible for relief, the respondent might have plead differently. <u>See</u>, <u>e.g.</u>, <u>Reyes-Hernandez v. INS</u>, 89 F.3d 490 (7th Cir. 1996) (recognizing that respondent may concede deportability to secure relief). Since the Attorney General has an interest in the integrity of the hearings, she should allow the respondent to plead again to the original charges every time she adds new charges. Accordingly, the regulations should permit the respondent to withdraw pleadings and enter a new response to the charges every time the INS amends the grounds.

F.    <u>Section 240.14: Finality</u>.

Congress now specifies when a first level removal decision becomes final. Under 8 U.S.C. § 1101(a)(47(B), an order becomes final either when:

(i)  a determination by the Board of Immigration Appeals affirming such order; or

(ii) the expiration of the period in which the alien is permitted to seek review of such order the the Board of Immigration Appeals

Under the plain meaning of the statute, the Attorney General has no power to review a removal order. Accordingly, the Attorney General must amend 8 C.F.R. § 3.39 to delete the reference to review by the Attorney General. The regulation seeking to confer review to the Attorney General is inconsistent with the plain language in the statute. Plainly, congress did not want the Attorney

20

General to have the authority to review BIA decisions.

    G.    <u>Section 240.15: Appeals</u>

        1.    Appeals of <u>In Absentia</u> Orders

The Attorney General should allow for appeals of <u>in absentia</u> orders. The INS still bears the burden of proof in such cases and if the proof is lacking the respondent's absence does not eliminate the Attorney General's obligation to seek the truth. If for example, the INS did not introduce any evidence of alienage, an administrative appeal should lie from an immigration judge's decision for which there is no evidence.

        2.    Exception for Incarcerated or Detained Respondents

A prisoner has no control over when the institution delivers her or his mail. The institution's tardy delivery could defeat an inmate's right to appeal. The Supreme Court has recognized this problem and held that a prisoner's notice of appeal is filed when she or he deposits the notice in the prison mail system. <u>Houston v. Lack</u>, 487 U.S. 266 (1988). A recent amendment to the Federal Rules of Appellate Procedure adopts the rule in <u>Houston</u>. Fed R. App. P. 25(a) (1993). There are many prisoners in immigration proceedings. In attempting to perfect their immigration appeals, these prisoners face the identical mail system that the Supreme Court held impermissibly interfered with their right to appeal. At an absolute minimum, the Attorney General should adopt the rule in <u>Houston</u> for a prisoner appealing the decision in her or his immigration case.

The INS detains people in hundreds of contract facilities across the United States. There is no meaningful difference between the mail delivery system of these institutions and the facilities covered by the Fed. Rules of App. P. 25(a). As a result, the Attorney General should adopt the rule in <u>Houston v. Lack</u>, 487 U.S. 266 (1988) for all persons in immigration proceedings who are held in an institutional setting. The Attorney General should add language to the regulation that would treat the date a person deposits a notice of appeal in the institution's mail system as the date of filing for all persons facing immigration proceedings who are held in an institutional setting.

    H.    <u>Section 240.16: New procedures.</u>

The Attorney General may not expand the Scope of the application of new procedures or termination in old proceedings without notice and comment

Proposed 8 C.F.R. 235.3 (b)(2)(ii) states that the Attorney General can expand the the scope of the application of new procedures or termination in old proceedings provisions without providing for notice and public comment

21

> ... if the Commissioner determines, in the exercise of discretion, that the delay caused by publication would adversely affect the interests of the United States or the effective enforcement of the immigration laws.

The provisions of 5 U.S.C. § 553(b)(A)-(B) require that the public have the opportunity to comment on rules unless they are interpretative rules or unless allowing for comment would be impracticable, unnecessary or contrary to the public interest. Allowing for post-effective date comment periods do not cure the defect. Thus, the Administrative Procedure Act (APA) requires that the public have the opportunity to comment about substantive regulations unless the agency establishes good cause for not complying with the APA's requirements. In addition, the APA imposes a requirement that regulations be published at least thirty days prior to becoming effective. Although the thirty day requirement is also subject to a "good cause" exception, each exception has distinct requirements. Rowell v. Andrus, 631 F.2d 699, 703 (10th Cir. 1980); Kollet v. Harris, 619 F.2d 132, 145 (1st Cir. 1980). The federal courts have repeatedly emphasized the narrowness of each of these good cause exceptions. See, e.g., American Federation of Government Emp. v. Block, 655 F.2d 1153,1156 (D.C.Cir. 1981).

The legislative history of the APA establishes that the exceptions should be limited to emergency situations and not be "escape clauses" for an agency to avoid its notice and comment obligations. See S. Rep. No. 752. 79th Cong., 1st Sess. (1945). In the proposed regulations, the Attorney General is contemplating expanding the scope of the application of new procedures or termination in old proceedings without even publishing interim regulations. The federal courts have restricted agencies from publishing interim regulations unless the interim regulations are subject to one of
exceptions.

I.    Section 240.25: Voluntary departure

Until an Immigration Judge has determined that a respondent is subject to removal, it is premature for a respondent to request voluntary departure. To so require would be the equivalent of having the damages phase of a tort trial before there is any finding that a defendant is liable for the plaintiff's injuries.

AA-REG-00883

# EXHIBIT Q

Coalition for Humane Immigrant Rights, et al. v. Noem et al., 1:25-cv-00872 (JMC)

02/03/97  MON 18:52 FAX 6174951110      HLS                                    ☑001



# HARVARD LAW SCHOOL

### CAMBRIDGE · MASSACHUSETTS · 02138

## FAX # (617) 495-1110

92
received
2-3-97

TO: _Richard Sloane_

Organization: _INS_

Location: _____

Fax Number: _202  305  0143_

FROM: _Anker_

HLS Address: _____

Phone #: _____

Description: _____    Departmental Account #: _Fzally_

Priority: ___Overnight ___ASAP    Total Number of Pages (*including cover sheet*) _18_

Date sent: / /    Time Sent: _____    Processed by: _____

Notes:

AA-REG-01148

# COMMENTS ON DRAFT REGULATIONS OF THE IMMIGRATION & NATURALIZATION SERVICE
## (INS # 1788-96)

Submitted to: The Director, Policy Directives and Instructions Branch, Immigration & Naturalization Service, 425 I Street, NW, Room 5307, Washington, DC 20536.

Submitted by: The Refugee Law Center, and the Women Refugees Project of the Harvard Law School Immigration and Refugee Program

## I. Background to Comments:

The Refugee Law Center and the Women Refugees Project (WRP), of the Harvard Law School Immigration and Refugee Program are the first United States organizations devoted specifically to issues of legal status for women refugees seeking political asylum and related protection. Through policy and educational initiatives, the Refugee Law Center and WRP encourage the incorporation of international human rights standards in the interpretation of United States asylum law and the recognition of "women's rights as human rights" in all phases of the asylum determination process.

In 1994, the WRP submitted model guidelines for analysis of women's gender-related asylum claims; these model guidelines became the basis for official INS Guidelines issued in May 1995. The Refugee Law Center and WRP have developed particular expertise in this area of the law and have been engaged by the Justice Department in the training of immigration judges, asylum officers and supervisors on women's gender-related asylum claims. The Refugee Law Center and WRP have an interest in the non-discriminatory application and development of the law, so that claims by women for asylum protection receive fair consideration under existing standards of law.

The comments on proposed regulations below relate generally to the interpretation and application of the asylum provisions of the Illegal Immigrant Reform and Immigrant Responsibility Act of 1996 (IIRAIRA) as well as the proposed regulations' particular impact on women refugees seeking legal status

AA-REG-01149

and protection.  These comments do not discuss the impact on women refugees of all of IIRIRA's relevant provisions, including that related to safe third country. The absence of comments on these provisions is not meant to imply in any way that Refugee Law Center and WRP do not consider them of great importance, but efficiency and time considerations resulted in the focus on the specific issues addressed below.

## II.  IIRIRA Did Not Alter Substantive Refugee and Asylum Law:

IIRIRA makes major changes to the procedures for adjudication of asylum claims.  These procedural changes do not, however, purport to alter the substance of asylum and refugee law or the obligations of the United States under international law.  Accordingly, the major asylum provisions of IIRIRA, including the new procedure for expedited removal, the credible fear screening, and the one-year filing deadline, must be interpreted and applied with due attention to the fundamental principles at the core of refugee and asylum law.  If these principles are ignored through restrictive interpretations and implementation of the procedural provisions of IIRIRA, the United States risks violating its fundamental international legal obligations and undermining the institution of refugee and asylum law at a time when it is clearly in a world-wide crisis.   Many have argued that globalization and problems of global political stability -- including the collapse of multinational empires, nation-state formation and other familiar forces that triggered the development of modern refugee law and protection norms in the twentieth century -- once again require not only the maintenance but the development and continued maturation of refugee and asylum law.

It is now broadly accepted that respect for human rights is one necessary pillar of world order..The foreign policy of good governance requires states to respect human rights as a precondition for development, aid, and security.  Yet these commitments run hollow if affluent states do not abide by human rights standards themselves.   In the post-cold war era, the litmus test for a commitment to human rights is the willingness to provide asylum. This is so because few other policies so starkly place in question the immediate commitment of affluent

2

AA-REG-01150

states to the welfare and human rights of identifiable individuals.[1]

While many other States have used similar provisions to undermine protection and preclude access to asylum processes, Congress and the President did not intend to undermine this protection when they enacted and signed IIRIRA into law. President Clinton stated "We [will not ] sacrifice our proud tradition of refugee protection and support for the principles of the Convention Relating to the Status of Refugees. Moreover, our efforts to urge other governments to comply with its provisions has been a major element of our diplomacy on international humanitarian issues."[2] The proposed regulations and other implementing instructions must reflect this intent, and the United States' continued leadership and commitment to refugee protection.

## III. Comments on Specific Provisions of the Proposed Regulations

### A. The Regulations Implementing Time Limits on Filing Asylum Claims Should Eliminate Only Those Claims That Are Clearly Abusive

In enacting the time limit on filing for asylum found in INA §208(a)(2)(B), Congress intended to eliminate from the process persons with fraudulent purposes and abusive claims. Apparently, Congress was concerned that persons who did not come forward in a timely manner were more likely to have such manifestly unfounded claims. On the other hand, Congress was also concerned, as in the credible fear screening provision discussed below, to ensure that all those with genuine fear and sincere claims would have an opportunity to apply for asylum.

To ensure that only abusive claims are precluded by these time limits, the law provides for exceptions to the time limits where the applicant can "demonstrate . . . the existence of changed circumstances which materially affect the applicant's eligibility for asylum or extraordinary circumstances relating to the delay in filing the application within the period specified . . ." Significantly, the

---

[1]  Andrew Schacknove, "From Asylum to Containment" 5 INT'L J. OF REFUGEE L. No.4, 500,531 (1993)

[2]  As quoted in 142 Cong Rec S11886 at 11901 (1996).

3

language of this provision was modified in the Fall of 1995 by the Judiciary Committee of the House from the original proposed language of "changed circumstances in the alien's country of nationality." Congress wanted all material circumstances to be considered, including serious and substantial circumstances personal to the applicant, and generally "beyond her control."[3] Congress intended an inclusive "good cause" exception "to cover a broad range of circumstances that may have changed and that affect the applicant's ability to obtain asylum."[4] Senator Hatch expressed the intent to embrace "circumstances that changed after the applicant entered the United States and that are relevant to the applicant's eligibility for asylum."[5] The examples listed in the conference report include changes in the person's home country, the applicant's obtaining of more information about possible retribution upon return, "and other situations that Congress may not anticipate."[6]

     In implementing the regulations, the Service must also consider the barriers to filing presented by the technical requirements of making an asylum application. These include, *inter alia*, the existence of a one year filing deadline, correctly completing the I-589, filing all supporting material in triplicate, filing with the correct service center, etc. To someone recently arrived in this country, particularly one fleeing persecution, the filing requirements are often overwhelming and prohibitive. Moreover, such applicants may be distrustful of the entire process, considering that in many countries filing such "complaints" is ignored or merely results in retribution. Therefore, the totality of the circumstances surrounding a late filing must be carefully reviewed on a case by case basis by a trained asylum officer. Such a late filing should not be the reason for rejection of review of an asylum application altogether. Indeed, this seemed to have been what Congress had in mind. Senator Hatch explained that the extraordinary circumstances exception

> applies to reasons that are, quite literally, out of
> the ordinary and that explain the alien's failure
> to meet the one-year deadline. Extraordinary

---

   [3] For a discussion of this part of the legislative history, *see* 73 INTERPRETER RELEASES (October 23, 1995).

   [4] 142 Cong Rec S11838 at 11840.

   [5] *Id.*

   [6] *Id.*

4

AA-REG-01152

☑ 006

> circumstances excusing delay could include, for instance, physical or mental disability, unsuccessful efforts to seek asylum that failed due to technical defects or errors for which the alien was not responsible, and other extenuating circumstances.[7]

The Refugee Law Center and WRP agree that the proposed regulations generally define "changed circumstances" and "extraordinary circumstances" appropriately. However, the definition of "changed circumstances" should be clarified to include explicitly any changes in the interpretation of United States asylum law, and to prevent narrowing of the statutory definition of changed circumstances. Such a clarification will protect women refugees, whose claims were often inadequately evaluated in the past.

### 8 C.F.R. §208.4(a)(2)

The Refugee Law Center and WRP propose that this section be changed to read as follows:

> The term "changed circumstances" in Section 208(a)(2)(D) of the Act shall refer to circumstances materially affecting the applicant's eligibility for asylum, including changes in the interpretation of asylum law.

### 8 C.F.R. §208.4(a)(2)(A) & (B)

These subsections should be eliminated from the proposed regulations altogether. These proposed subsections impermissibly narrow the statutory language of INA §208(2)(D). Such a narrowing of the statutory language is inconsistent with Congressional intent to ensure that those with genuine fear and sincere asylum claims be heard in a full and fair adjudicative process.

### 8 C.F.R. §208.4(a)(4) (Proposed addition to regulations)

---

[7] *Id.*

AA-REG-01153

The intent of the regulations, at all times and in all respects, must be to ensure that refugees in need of protection are provided every opportunity to be recognized. It is not only unconscionable, but also violates international law, to return a person with genuine fear to the country to which she fears returning because she missed an administrative deadline or submitted an incomplete application. The Refugee Law Center and WRP therefore propose adding the following subsection to the regulations:

> Where an alien can demonstrate that she had no notice of the prohibition contained in INA §208(a)(2)(B), or where an alien can demonstrate that her failure to meet the deadline in INA §208(a)(2)(B) was due to an administrative error in the submission of her application, the prohibition contained in INA §208(a)(2)(b) shall not apply.

### 8 C.F.R. § 208.9(a)

This proposed regulation should be revised to add the following language:

> In the case of an application that appears to fall under the proscription of either section 208(a)(2)(B) or 208(a)(2)(C), an asylum officer will interview the applicant within the context of a hearing on the merits and will determine whether the applicant qualifies for one of the exceptions enumerated in 208(a)(2)(D).

### B. The Regulations Implementing The Provisions Regarding Prior Denial Of An Asylum Claim Should Protect Family Members Whose Claims May Not Have Been Considered Adequately When The Principal Person's Application Was Denied

INA §208(a)(2)(C) provides that an alien is not permitted to file an asylum application if the alien "has previously applied for asylum and had such application denied." The proposed regulations implementing this statute provide that "an asylum application has not been denied unless denied by an immigration judge or the Board of Immigration Appeals." See 8 C.F.R. §208.4(a)(1). This proposed regulation does not discuss the common situation where one family member (typically the male head of household) files an asylum application on

6

02/03/97  MON 18:54 FAX 8174951110        HLS        @008

behalf of himself, his spouse, and his children.  In such a case, the principal applicant's spouse and children may have claims separate and distinct from his own.  Due to the dynamics of the family situation, the claims of the spouse and children may not be adequately addressed in the context of the principal applicant's case.  For example, a woman might have a distinct, gender-based asylum claim that her husband may not raise when he advances his asylum claim and includes her in his application.

### 8 C.F.R. §208.4(a)(1)

The regulation should be changed to add the following language:

> An asylum claim has not been denied if the claim is raised by a derivative asylum applicant in a separate asylum application, and if the facts giving rise to the claim raised by the derivative asylum applicant were not raised by the principal asylum applicant as a basis for the principal alien's asylum claim.

### C. The Credible Fear Determination Should Eliminate Only Those Applicants With Clearly Abusive Claims

A person cannot avail herself of the protection of asylum if she has no opportunity to present her claim.  The difficult challenges presented in the creation of effective and fair adjudication systems -- difficulties which INS and EOIR have met by instituting some important enhancements to and improvements in the determination process -- should not be resolved by denying protection to persons with genuine fear through procedural hurdles that prevent them from accessing the asylum process.  The only arguably legitimate purpose of the procedural provisions -- and the only purpose Congress intended[8] -- is to screen

---

[8] See statement of Rep. Roukema stating that the law in intended to close legal "loopholes" that have resulted in "immigration scams."  Rep. Tate stressed the importance of "bring[ing] honesty and integrity" back to the immigration system.  Rep. Seastrand stated "No more warnings, no more slaps on the wrist...When we catch you, you're gone." (See 73 INTERPRETER RELEASES April 1, 1996).  Rep. Smith of New Jersey commented that "[i]t is important we exclude persons who would abuse our generous immigration laws." 142 Cong. Rec. S11886 at S11901.  Others noted that some changes were unnecessary given the 1995 regulatory reforms resulting in a drop in asylum applications.  See discussion of these comments by Senators DeWine and Kennedy in " (See 73 INTERPRETER RELEASES April 1, 1996).

7

AA-REG-01155

out persons who have clearly fraudulent purposes in using the asylum process, who present obvious, facially and in the words of UNHCR "clearly abusive" or "manifestly unfounded" claims.[9] UNHCR defines such claims as "those which are clearly fraudulent or not related to the criteria for the granting of refugee status laid down in the 1951 United Nations Convention relating to the Status of Refugees nor to any other criteria justifying the granting of asylum.."[10]

Every effort must be made to interpret and apply the credible fear standard so that only persons presenting such obviously abusive claims are removed and denied the right to a full and fair determination of their claims. In this regard, it should be noted that all applicants who pass the credible fear screening will continue to be detained through the full hearing process -- so there is no possibility that those who were erroneously screened-in [*i.e.*, those whose intent was fraudulent and who present manifestly unfounded claims] will be able to enter the United States and disappear.[11]

Accordingly, the Refugee Law Center and WRP believe that the credible fear screening standard should be implemented in a way that provides the benefit of the doubt to anyone who has a genuine fear. It is clear from the language of the statute -- and emphasized repeatedly in the legislative record -- that Congress' only purpose in providing expedited removal and credible fear screening was to exclude abusers; Congress was specifically concerned to ensure that all others be given the opportunity for a hearing.

The credible fear standard is a low one -- lower than the well-founded fear standard, which itself is considerably less than a probability. In specifically noting the rejection of the formulation of a higher standard originally proposed in the House Bill, Senator Hatch explained that "[t]he standard adopted in the conference report is intended to be a low screening standard for admission

---

[9] UNHCR Executive Committee (1983), "Conclusion No. 30: The Problem of Manifestly Unfounded or Abusive Applications for Refugee Status or Asylum" in Office of the United Nations High Commissioner for Refugees, CONCLUSIONS ON THE INTERNATIONAL PROTECTION OF REFUGEES Adopted by the Executive Committee of the UNHCR Programme.

[10] *Id.*

[11] Reference is made, for example, to the 1993 comments of Representative McCollum made during debates over proposed asylum porvisions. He described his concern with those who seeking to enter the United States, merely state the desire to apply for asylum and then disappear, never again to be heard from. (Cited in 70 INTERPRETER RELEASES October 25, 1993).

8

into the usual full asylum process."[12]  Similarly, Representative Smith of New Jersey commented that

> "[i]t is important we exclude persons who would abuse our generous immigration laws, and it is important that the process of exclusion be a speedy one. *It is also important, however, that the process be fair -- and particularly that it not result in sending genuine refugees back to persecution . . . I think it should also be clear that our asylum officers will need to be very careful in applying the credible fear standard. In a close case, they must give the benefit of the doubt to the applicant.*" (emphasis added)[13]

The benefit of the doubt principle, first articulated by UNHCR, has specific meaning and significance in international refugee law.[14]

Although there can be no percentage measure of an appropriate screening process, it is instructive that Canada and the Denmark, which have applied another similar screening standard ("credible basis") have screened-out from the opportunity for a full determination only 8% and under 20% of the claimants respectively. [15]

Asylum may be granted to a person who meets the statutory definition of a refugee -- a person "who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political

---

[12]  142 Cong. Rec. S11491.

[13]  142 Cong. Rec.H3605 at 3616 S11901.

[14]  See UNHCR HANDBOOK ON PROCEDURES AND CRITERIA FOR DETERMINING REFUGEE STATUS UNDER THE 1951 CONVENTION AND THE 1968 PROTOCOL RELATING TO THE STATUS OF REFUGEES (Geneva 1988) at paras. 203 and 204.

[15]  See Rosemary Byrne and Andrew Schacknove, "The Safe Third Country Notion in European Asylum Law" 9 HARVARD HUMAN RIGHTS J. 185, 199 (1996).

9

AA-REG-01157

opinion."[16]  As the Supreme Court held in INS v. Cardoza-Fonseca,[17] the full asylum standard -- well-founded fear of persecution -- has both subjective (fear) and objective (well-founded) elements.  Importantly, the statutory language of the credible fear screening refers only to the subjective element -- fear -- of the asylum standard.  In the context of a limited and speedy process, the purpose of which is to screen out only clearly abusive claims, Congress wanted the primary focus to be on the subjective element -- a determination of whether or not the applicant expresses a genuine fear of return.

This focus is consistent with Congress' overarching intent in enacting IIRIRA: to screen-out persons with fraudulent claims, who deliberately abuse the process, while at the same time ensuring that all others who are sincerely in fear have an opportunity to present their claims, even though many of them may not ultimately prevail on the merits.  Those persons who do not prevail on the merits will be kept in detention so that they will be readily removable at the end of the process.

The definition of credible fear in the legislation puts the emphasis explicitly on the subjective element, with a check on facts "known to the officer," which must be interpreted to refer to known, well-established facts.  It is clear that Congress did not want a detailed legal determination of eligibility, or complex evaluation of the legal criteria in the definition.  Thus, Congress required simply that the fear appear to be genuine and that it have some factual basis (or at least that it not be inconsistent with known facts to the officer).  The credible fear screening is not a complex evaluation of legal doctrine --particularly difficult in the asylum process -- but only a factual determination that is largely based on the sincerity of the applicant's statements.

This interpretation is consistent with definitions of credible fear and similar screening standards in other contexts.  The "credible fear" concept was first used in 1991 by asylum officers screening Haitians at Guantanamo Bay for entry into the United States to pursue asylum claims.  "Credible fear" was defined in an INS policy memorandum as "an apprehension or awareness, which appears to be truthful to an Asylum Pre-Screening Officer (APSO), of serious danger or threat of harm on account of race, religion, nationality, membership in a particular social group, or political opinion.  An applicant at the pre-screening stage need only have

---

[16]  INA §101(42)(A).

[17]  480 U.S. 421 (1987).

10

a story that a reasonable person would believe to establish a credible fear, not the higher standard of establishing that a reasonable person in his or her cirucmstances would in fact have a fear."[18]

Similarly, in the Canadian determination of "credible basis," the governing interpretation is "as long as [any of the adjudicators] believes that there is any credible evidence.....that the person is a Convention refugee, they will have to allow his claim to go forward."

Because of the expedited, yet extremely consequential, nature of the new expedited removal proceedings, the "significant possibility" that the alien could establish eligibility for asylum under section 208 should be given the broadest possible interpretation. Immigration officers should be required to interview aliens who are subject to expedited removal individually and in private to make the initial determination regarding "credible fear." Couples, families, and/or groups travelling together should be afforded separate and independent credible fear hearings and given every opportunity to articulate a credible fear.

The need for private and individual hearings is especially acute in the credible fear hearings involving women. Frequently, a female asylum-seeker is in fact travelling with the instrument of her persecution. In other cases, a women may not want her spouse to hear of any sexual abuse she may have suffered, either because of shame or because of a fear of retribution. In order to allow these women to speak as freely as possible, interviews of female aliens should be conducted by asylum officers who have specific training regarding gender-specific abuse.

With these concepts in mind, the proposed regulations do not go far enough to provide procedural protections to aliens who may have such a fear.

## 8 C.F.R. § 208.30(f)

This proposed regulation should be revised to read as follows:

Review by immigration judge. When the asylum officer makes a determination that an applicant has not demonstrated a credible fear, the asylum officer shall inform the applicant both orally and in writing, in a language that the applicant

---

[18]    Memorandum from Ricardo Inzunza, Deputy Commissioner, INS. (November 22, 1991).

11

understands, of the applicant's right to request review by an immigration judge. The asylum officer's negative decision regarding credible fear shall be subject to review by an immigration judge upon the applicant's oral or written request, in accordance with section 235(b)(1)(B)(iii)(III) of the Act. (continue with language of proposed regulations as written)

## 8 C.F.R. § 235.3(b)(4)

This proposed regulation should be modified to add the following language at the beginning of the regulation:

Every alien subject to the expedited removal provisions will be advised orally and in writing, in a language that he or she understands, of the opportunity to apply for asylum. Every alien subject to the expedited removal provisions will be interviewed individually and privately to determine if the alien has an intention to apply for asylum, a fear of persecution, or a fear of return to his or her country. If an alien subject to the expedited removal (continued with proposed regulation as written)

The following language shall also be added to the same regulation:

The referring officer shall provide information to the alien concerning available legal assistance in the area, and shall provide access to such assistance.

## D. The Regulations Should Specifically Recognize Women's Rights and the Legitimacy of Women Refugees Claims to Protection

All of the issues raised above related to implementation of IIRAIRA's asylum provisions are especially salient in cases of women applicants. As discussed above, women applicants may have particular difficulties in elaborating their claims so that they can be appropriately evaluated in an abbreviated screening process. The 1995 INS Memorandum on Considerations for Asylum Officers Adjudicating the Claims of Women ("INS Guidelines") specifically notes that women have "inhibitions in discussing sexual violence," which often is the basis for or a critical aspect of their claims. The INS Guidelines also explain that victims of sexual abuse applying for asylum may be "psychologically traumatized" and that such trauma "may have a significant impact on the ability to present

12

testimony."  As noted above, women may be frightened or inhibited from speaking because they are accompanied by other family members, particularly male family members.

Because in the past violence against women has been ignored or trivialized, and until recently (and still incompletely), women's rights have not been recognized as universal and part of the body of fundamental human rights, the claims of women to asylum protection are relatively new and remain largely untested.  They raise novel issues that cannot and should not be determined in the credible fear screening abbreviated, procedurally truncated process. The country condition information that often is relevant to women's claims is not readily available; it is only recently that human rights organizations have engaged in specific efforts to document violations of women's rights in various countries, and sources to verify particular instances or contexts may not be immediately available.

All of this underscores the importance of sensitive application of the provision related to filing deadlines and of limiting the credible fear screening inquiry to whether or not the applicant expresses genuine fear and whether the facts are contradicted by well-established, known facts to the officer.  If not women applicants in particular --the few that manage to escape--will be especially injured and unjustly returned to their persecutors.

The Refugee Law Center and the WRP believe that the regulations should affirmatively state that the special circumstances of women claimants must be taken into account, and that women's rights must be recognized explicitly in the asylum process, including pre-hearing screenings.  International law and instruments relating to womens human rights require States to take affirmative steps to ensure the protection of these rights, previously ignored.  INS must do so in these regulations.


A regulation should be added stating that:

These regulations in all respects shall be interpreted and applied in a manner sensitive to the particular circumstances of women, including a recognition of the human rights of women.

13

AA-REG-01161

## E. The Regulations Should Require INS to Notify Non-Governmental Organizations With An Interest in Asylum Claims Whenever A Person Is Subject to Expedited Removal

In order to be assured the United States does not violate its international obligation of non-refoulement by sending a genuine refugee back to the country of persecution, the Service should work in conjunction with voluntary agencies (VOLAGS), the UNHCR, and other organizations versed in refugee and asylum law to provide oversight of the expedited removal process. Where one or more of these agencies have volunteered to be "on call" at no expense to the government, the Service should be required to notify them, and provide them with a reasonable opportunity to provide advice and assistance to an alien who is being subjected to the expedited removal process. Representatives from such agencies could explain that they are not government officials, but rather volunteers who could provide the alien with assistance in presenting her "credible fear" to an interviewing immigration agent or asylum officer.

## III. Comments on Additional Aspects of the Proposed Regulations:

### 8 C.F.R. §1.1(q)

The definition of "arriving alien" in the proposed regulations includes "aliens arriving at a port of entry, aliens interdicted at sea, and aliens previously paroled upon arrival." This definition should not included aliens who have been previously paroled. The concept of "parole" rests on the legal fiction that someone has not yet physically come into the United States, when in fact the person is here. The new law is designed to do away with that fiction, and by including aliens who have been paroled within the definiton of "arriving alien," the Service is preserving that fiction and essentially negating the changes in the law that Congress sought to make.

The definition of "arriving alien" should not be expanded even further to include those aliens apprehended crossing a land border between ports of entry. Including those persons within the definition of "arriving alien" would inadvertently subject those persons to the restrictions on arriving aliens found in other parts of the proposed regulations. For example, "arriving aliens" are not, according to the new 8 C.F.R. §245.2, permitted to apply for adjustment of status before an immigration judge in removal proceedings; they can only apply before

14

AA-REG-01162

the district director. Should the definition of "arriving alien" be expanded beyond the current proposed definition, it would create a dramatic reduction in the authority of immigration judges to grant relief in removal proceedings, and create an unanticipated burden on the district offices, which would now be required to adjudicate these adjustment petitions in coordination with the immigration judge's removal proceedings.

### 8 C.F.R. §3.27

The Service's change to the regulations to close hearings regarding abused spouses and children to the public is laudable. This same consideration should be given to applicants for asylum whose cases are heard in deportation, exclusion, or removal proceedings. An additional section should be added to this regulation:

> (d) In any proceeding before an Immigration Judge concerning claims of rape, sexual abuse, genital mutilation, or similar persecution asserted by an applicant for asylum, the hearing and the Record of Proceeding shall be closed to the public unless the asylum applicant agrees that the hearing and the Record of Proceeding shall be open to the public.

The Service should give consideration to the possibility of closing all asylum hearings to the public. Such a policy would support the confidentiality 8 C.F.R. §208.6.

### 8 C.F.R. §217.4

This section provides that an alien who is "in possession of and presents fraudulent or counterfeit documents" will be refused admission and removed without further proceedings before an immigration judge. There is no definition of what constitutes a "fraudulent or counterfeit" document. This provision is troubling because some Service employees at some ports of entry deem a legitimate visa or other entry document to be "fraudulent" even when the visa or other entry document was issued legitimately by a United States consular officer. For example, immigration inspectors have been known to deem a legitimate visa "fraudulent" where the immigration inspectors make the factual determination that the alien did not disclose certain information to the consular officer, and if the consular officer had known this factual information, the consular officer would not have issued the visa. Under previous law, the alien could request review of the immigration inspector's determination before an immigration

15

judge; often, such a review would lead to the determination by the immigration judge that the immigration inspector had erred. Given the drastic consequences in the new law of a determination that a travel document is "fraudulent," the draft regulations do not contain sufficient safeguards to protect aliens who are in possession of legitimately-issued travel documents, but who are wrongfully accused of having committed "fraud" when they applied for these documents.

### 8 C.F.R. §235.3(2)(ii)

This section provides that expedited removal procedures may be applied to certain aliens "who have not established to the satisfaction of the immigration officer that they have been physically present in the United States continuously for the 2-year period immediately prior to the date of determination of inadmissibility." There is no provision in the proposed regulations discussing how the alien can prove this physical presence, whether the alien is to be given time to gather the requisite proof, or what happens when there is a factual disagreement as to whether the alien has provided the requisite proof. The regulations should be revised to reflect that where the alien asserts that he or she has been physically present in the United States for the requisite period, the alien must be provided time to gather evidence to support his or her assertion, and must be provided access to legal assistance to assist in documenting his or her claim prior to being removed. Furthermore, the regulations should provide that an immigration judge will review any factual disputes between the alien and the Service over the issue whether the supplied proof is satisfactory.

### 8 C.F.R. §235.4(a)

This proposed regulation does not provide for the reality that some Service employees occasionally apply significant amounts of pressure to aliens to convince the aliens to withdraw their applications for admission to the United States. There are documented cases where aliens have been told that they would be incarcerated for lengthy periods of time if they did not withdraw their applications for admission, and have not been advised of the right to apply for asylum, even where the aliens had asserted a fear of persecution if they withdrew their applications for admission and returned to their country of origin. This regulation should be revised to provide that no alien shall be permitted to withdraw his or her application for admission unless the alien has been advised orally and in writing, and in a language that he or she understands, of the right to apply for asylum in the United States.

16

Nancy Kelly, Deborah Anker, John Willshire-Carrera
(Refugee Law Center, Women Refugees Project)


Margaret D. Stock
Atkinson, Conway and Gagnon
420 L St. 5th Flr.
Anchorage, AK 99501-1989


Suzanne Seltzer
Jennifer Levy
Law Offices of Stephen D. Jeffries
1560 Broadway, Room 914
New York, N.Y. 10036


Bahar Khoshnoudi
2L, Harvard Law School

17

AA-REG-01165

# EXHIBIT R

EDWARD M. KENNEDY
MASSACHUSETTS

## United States Senate

WASHINGTON, DC 20510–2101

received
2-3-97

February 3, 1997

Director
Policy Directives and Instructions Branch
Immigration and Naturalization Service
425 I Street, NW
Room 5307
Washington, DC  20536

     Re:  INS Number 1788-96

Dear Sir or Madam:

     We are writing to comment on the asylum and removal regulations published for public comment in the Federal Register on January 3, 1997.  These regulations are designed to implement Title III of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA) and the removal provisions of the Antiterrorism and Effective Death Penalty Act (AEDPA) of 1996.

     With the passage of IIRIRA, Congress presented the Immigration and Naturalization Service with the significant challenge of developing regulations to implement major new reforms that affect virtually every aspect of the enforcement functions of the INS.  We recognize the complex and weighty responsibility before the Immigration and Naturalization Service in formulating these regulations.  The Title III regulations touch many aspects of immigration law and the due process rights of arriving immigrants.  It is because the Title III regulations affect our refugee and asylum policy so significantly that we are compelled to file these comments.

     United States refugee policy is governed not only by the Immigration and Nationality Act, but also by the United Nations Refugee Protocol and the Torture Convention.  The overriding goal of U.S. refugee policy is that no one should be returned to any country where there are substantial grounds for believing that person would be subject to persecution or torture.  In furtherance of this principle, the goal of any regulations or laws affecting refugees should be to ensure that the above principle is applied consistently, so that all potential refugees and asylum seekers are treated equally and fairly.

     At the outset, we note the need to specifically mention the Torture Convention in the regulations.  Although it was ratified in 1994, the Torture Convention still has no regulations

to govern its implementation. We recommend, therefore, that INS specifically reference the Torture Convention in the Title III regulations, particularly with regard to the ban on return of torture victims contained in Article Three of the Convention.

Overall, the regulations succeed in many aspects. We are particularly pleased that the INS will not apply the expedited removal provisions to those who enter without inspection or via a land border. In addition, we are pleased that INS will not charge a fee for asylum applications, and that at least a limited right to counsel for asylum seekers has been preserved. These important protections for refugees should be retained in the final regulations.

There are, however, other areas of the regulations which present serious concerns, particularly the one-year deadline for filing asylum applications and secondary inspection procedures. We are aware that others are providing INS with detailed comments on the regulations, many of which we support. Our comments, however, will be limited to the two above-mentioned subjects.

The One-Year Asylum Deadline

Under IIRIRA, asylum seekers have one year from the date they enter the U.S. to file their asylum applications, with exceptions for extraordinary or changed circumstances. Currently, the regulations do not state what types of circumstances are extraordinary or changed. H.R.2202, as passed by the Senate, listed several exceptions which would clearly constitute extraordinary circumstances. These included, for example, threats of retribution against the applicant's family, attempts to file asylum that were unsuccessful because of technical defects, and death, incapacity or temporary unavailability of legal representation. This non-exclusive list should be incorporated into the final regulations. In addition, the one-year deadline for asylum applications will be especially difficult to satisfy for those severely traumatized by torture. The regulations should also specify that severe trauma from torture falls within the extraordinary circumstances exception. By providing clear examples of what is covered by the exception, INS can avoid inconsistent decision making by immigration judges, and costly litigation over which circumstances should fall within the exception.

Secondary Inspection

IIRIRA mandated INS to develop an expedited process for removing immigrants who arrive with false documents or no documents. This system must also ensure that true refugees are not returned to their persecutors. Refugees often arrive in the U.S. having just fled their persecutors. They are usually exhausted, jet-lagged and terrified. Many times, they do not know they can ask for asylum. It is imperative, therefore, that INS inform arriving immigrants of their right to apply for asylum before they reach a stage in the process in which they may be removed without further review. In addition, the types of questions asked during the secondary inspection process should be designed to encourage asylum seekers to come forward with their claims.

We applaud the draft field instructions on expedited removal contained in section

17.15 of the INS Inspectors Field Manual. These instructions properly indicate that immigration officers need to be alert to immigrants' non-verbal, as well as verbal, reactions which may signify a fear of return to their country. This manual also properly states that a fear of return can be based on either a fear of persecution or a fear of torture. We recommend incorporation of this language from the draft Inspectors Field Manual into the regulations, as well as the addition of questions designed to elicit asylum responses.

Additionally, we are pleased that INS has preserved a asylum seeker's right to seek representation. It is important that asylum seekers have access to counsel as early as possible in the exclusion process. Therefore, the final regulations should allow asylum seekers to obtain representation in any situation which could result in their immediate removal from the United States, such as secondary inspection.

Finally, it is imperative that all inspection and asylum officers receive thorough training in refugee law, country conditions and customs, body language, and interviewing techniques. Specific training is also necessary on how to interview and evaluate responses by torture victims. Wherever possible, INS should use highly trained asylum officers to interview potential applicants. This is particularly important in the secondary inspection process, as arriving immigrants may be immediately removed from the U.S. at this stage. We urge INS to provide in the regulations for the use of highly trained inspection or asylum officers in the secondary inspection process.

Again, these regulations affect the heart of U.S. refugee policy, and we hope INS will uphold our historic commitment to helping refugees in promulgating the final regulations.

Sincerely,

Edward M. Kennedy
United States Senator

Paul Wellstone
United States Senator

# EXHIBIT S

ORRIN G. HATCH, UTAH, CHAIRMAN

STROM THURMOND, SOUTH CAROLINA
CHARLES E. GRASSLEY, IOWA
ARLEN SPECTER, PENNSYLVANIA
FRED THOMPSON, TENNESSEE
JON KYL, ARIZONA
MIKE DeWINE, OHIO
JOHN ASHCROFT, MISSOURI
SPENCER ABRAHAM, MICHIGAN
JEFF SESSIONS, ALABAMA

PATRICK J. LEAHY, VERMONT
EDWARD M. KENNEDY, MASSACHUSETTS
JOSEPH R. BIDEN, Jr., DELAWARE
HERBERT KOHL, WISCONSIN
DIANNE FEINSTEIN, CALIFORNIA
RUSSELL D. FEINGOLD, WISCONSIN
RICHARD J. DURBIN, ILLINOIS
ROBERT G. TORRICELLI, NEW JERSEY

MANUS COONEY, Chief Counsel and Staff Director
BRUCE A. COHEN, Minority Chief Counsel

## United States Senate

### COMMITTEE ON THE JUDICIARY
### WASHINGTON, DC 20510–6275

February 3, 1997

Director
Policy Directives and Instructions Branch
Immigration and Naturalization Service
425 I Street, NW
Room 5307
Washington, DC 20536

     Re: <u>INS Number 1788-96</u>

Dear Sir or Madam:

     I am writing to comment on the asylum and expedited removal regulations published for public comment in the <u>Federal Register</u> on January 3, 1997. These regulations will implement important provisions of Titles III and VI of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA) and the removal provisions of the Antiterrorism and Effective Death Penalty Act (AEDPA) of 1996. I am keenly interested in the implementation of these provisions and particularly concerned that they safeguard the interests of those who may have legitimate claims of asylum.

     While many of the proposed regulations are excellent, certain aspects of them do raise serious concerns. I understand that other members of Congress and other interested individuals and organizations are providing detailed comments on the regulations, many of which I agree with. I would, however, like to raise separately my concerns with two areas of the proposed regulations: those concerning the one-year deadline for filing asylum applications, and those implementing the expedited exclusion provisions.

<u>One-Year Asylum Deadline</u>

     Under IIRIRA and subject to two very important statutory exceptions, asylum seekers will have one year from the date they enter the U.S. to file an asylum application. Exceptions to the filing deadline are provided for extraordinary circumstances relating to the delay in filing and for changed circumstances affecting an alien's eligibility for asylum. To ensure consistent application and to facilitate adjudications, I would encourage INS to consider listing examples of situations that could constitute extraordinary or changed circumstances.

2

In the Senate-passed illegal immigration reform bill, for example, several exceptions were listed as part of a "good cause" exception included in that bill. Those included threats of retribution against an applicant's family, attempts to file asylum that were unsuccessful because of technical defects, and the unavailability of legal representation. In discussing the provisions adopted in the final legislation passed by Congress, I agreed with Senator Hatch in a colloquy on the Senate floor that "the changed circumstances provision will deal with situations like those in which the situation in the alien's home country may have changed, the applicant obtains more information about likely retribution he or she might face if the applicant returned home, and other situations that we in Congress may not be able to anticipate at this time." The proposed regulations do not state what types of circumstances are extraordinary or changed. I encourage INS to consider including in the regulations a non-exclusive list of examples of circumstances that will excuse filing beyond the one-year asylum deadline. This will go a long way toward ensuring uniformity and fairness in the implementation of the statutory requirements. I am also especially concerned that the implementation of these provisions take into account the circumstances of asylum applicants who have faced torture and who may suffer from effects of persecution preventing them from meeting the one-year time limit. Including some specific examples will particularly assist in that regard.

Expedited Exclusion Procedures

While AEDPA mandated that INS develop an expedited process for removing immigrants who arrive with false documents or no documents, Congress revised those mandates when it passed IIRIRA to provide added protections to ensure that those with valid claims of asylum would not be returned to face persecution. I remain concerned that the secondary inspection process, under which those who indicate that they would like to seek asylum are interviewed and processed, must be designed to ensure that those with legitimate claims of asylum are not erroneously excluded from the United States without the opportunity to have their claims fully reviewed.

Particularly since potential asylees may arrive in the U.S. following an exhausting and stressful escape from persecution, the INS should ensure that a consistent process is employed that provides potential asylees with an adequate opportunity to be heard and to explain their situation to properly trained asylum officers. I believe that would best be done by providing more detail in the regulations, rather than in other instructions or manuals, as to the procedures to be followed for adjudicating the claims of arriving aliens. While I respect the INS's role in promulgating regulations, in my view it would be more helpful if the regulations provided greater guidance to INS officials as to how to proceed with interviews and as to what records to make. A consistent record of the application of the expedited removal process to those raising a claim of asylum, including the supervisory review of those claims, will provide those of us in Congress with more effective means of overseeing the implementation of these new procedures, which could have extremely serious consequences for some individuals.

In addition, I suggest that the regulations might specify that an arriving alien have the opportunity to communicate with an INS official through an interpreter, to ensure that a failure to communicate does not result in the erroneous return of a potential asylee. The INS should also consider taking extra measures in the regulations to make the important clarification that Senator Hatch and I discussed on the floor of the Senate, namely, that the credible fear standard under which

AA-REG-01146

3

asylum claims are to be screened is a low screening standard quite distinct from the ultimate standard under which asylum is granted or denied. While I respect the need for some flexibility in implementing the procedures, I encourage the INS to provide for sufficient time and an appropriate place for the screening interviews to be conducted by asylum officers. In my view, these interviews will probably be most effective if conducted away from airports and other ports of entry and instead at detention facilities near the local asylum offices. That certainly should be able to take place without unduly delaying the process.

Finally, let me express my agreement with many aspects of the regulations. I agree that INS should not charge a fee for asylum applications, and that counsel should remain among the persons with whom potential asylum applicants can consult in the expedited removal process. I urge that these protections be retained in the final regulations. I agree with your decision not to apply the expedited removal provisions to those who enter without inspection (EWIs). Other measures in the legislation designed to address the problem of EWIs should be given an opportunity to take effect, as should the improvements INS has made in processing asylum claims raised during removal proceedings.

Sincerely,

Spencer Abraham
Chairman
Subcommittee on Immigration

# EXHIBIT T

Coalition for Humane Immigrant Rights, et al. v. Noem et al., 1:25-cv-00872 (JMC)

MAJORITY MEMBERS

HENRY J. HYDE, ILLINOIS, CHAIRMAN

F. JAMES SENSENBRENNER, JR., WISCONSIN
BILL McCOLLUM, FLORIDA
GEORGE W. GEKAS, PENNSYLVANIA
HOWARD COBLE, NORTH CAROLINA
LAMAR S. SMITH, TEXAS
STEVEN SCHIFF, NEW MEXICO
ELTON GALLEGLY, CALIFORNIA
CHARLES T. CANADY, FLORIDA
BOB INGLIS, SOUTH CAROLINA
BOB GOODLATTE, VIRGINIA
STEVE BUYER, INDIANA
SONNY BONO, CALIFORNIA
ED BRYANT, TENNESSEE
STEVE CHABOT, OHIO
BOB BARR, GEORGIA
WILLIAM L. JENKINS, TENNESSEE
ASA HUTCHINSON, ARKANSAS
EDWARD A. PEASE, INDIANA
CHRISTOPHER B. CANNON, UTAH

ONE HUNDRED FIFTH CONGRESS

# Congress of the United States
## House of Representatives
### COMMITTEE ON THE JUDICIARY
2138 Rayburn House Office Building
Washington, DC 20515–6216

(202) 225–3951

MINORITY MEMBERS

JOHN CONYERS, JR., MICHIGAN
BARNEY FRANK, MASSACHUSETTS
CHARLES E. SCHUMER, NEW YORK
HOWARD L. BERMAN, CALIFORNIA
RICK BOUCHER, VIRGINIA
JERROLD NADLER, NEW YORK
ROBERT C. "BOBBY" SCOTT, VIRGINIA
MELVIN L. WATT, NORTH CAROLINA
ZOE LOFGREN, CALIFORNIA
SHEILA JACKSON LEE, TEXAS
MAXINE WATERS, CALIFORNIA
MARTIN T. MEEHAN, MASSACHUSETTS
WILLIAM D. DELAHUNT, MASSACHUSETTS
ROBERT WEXLER, FLORIDA
STEVEN R. ROTHMAN, NEW JERSEY

GENERAL COUNSEL/STAFF DIRECTOR
ALAN F. COFFEY, JR.

MINORITY STAFF DIRECTOR
JULIAN EPSTEIN

February 3, 1997



received
2-3-97

Director, Policy Directives and Instructions Branch
Immigration and Naturalization Service
Room 5307
425 Eye Street NW
Washington, DC 20536

**Re: INS 1788-96, RIN 1115-AE47**

Dear Mr. Sloan:

The following comments are submitted in response to the Notice of Proposed Rulemaking referenced above, and published at 62 Fed. Reg. 444 (Jan. 3, 1997).

In general, the proposed rules appear to comport with the major revisions to the Immigration and Nationality Act ("INA") enacted by the 104th Congress. However, there are several areas in which the rules should be further revised in order to comport more closely to the legislative intent. In addition, there appear to be a number of proposed changes to the Code of Federal Regulations that are neither necessitated by the legislative changes made in the 104th Congress, nor fully explained in the Supplementary Information to this proposed rule. A number of these are noted in the text that follows. However, we believe that the Supplementary Information for the interim rule to be published on or about March 1, 1997, should provide more specific notification of all of the substantive changes included in that rule, as well as more detailed information regarding the justification for such changes.

## Background and Legislative History

Congress enacted Title III of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA") to respond to the ongoing crisis of illegal migration to the United States. Based on estimates provided by the Immigration and Naturalization Service ("INS"), close to 5 million illegal aliens are resident in the United States, a figure that grows by approximately 300,000 per year. These estimates do not include the thousands of illegal aliens who come to the United States on a regular basis, sometimes for months at a time, and work in this country without establishing residence.

Director, Policy Directives and Instructions Branch
Page 2

Against the monumental size of this crisis, the Government's effort to remove illegal aliens from the United States pales in comparison. Only about 45,000 illegal aliens were deported from the interior of the United States in FY 1996, this is approximately one percent of the total of illegal aliens. An additional 15,000 aliens attempting illegal entry into the United States were removed after exclusion proceedings; this is approximately five percent of the net increase in the illegal resident alien population in any given fiscal year. Finally, approximately 100,000 aliens accepted a "voluntary return" in lieu of exclusion or deportation proceedings in FY 1996; but as is commonly known, these "voluntary returnees" often repeat their attempt at illegal entry, and often succeed.

Most troubling is the inefficiency and ineffectiveness of the system in promptly adjudicating the cases of those illegal aliens who are apprehended, and in promptly removing those who are found ineligible to remain in the United States. A Department of Justice Inspector General Report I-96-03, issued in March 1996, reported that a mere *11 percent* of non-detained aliens who have received final orders of deportation actually depart from the United States. This means that in 9 out of 10 non-detained cases, the effort expended to obtain a final order of deportation is wasted, and the alien remain a part of the illegal resident population. The percentage of deportations in detained cases is quite different: 94 percent. This contrast of statistics alone demonstrates the fundamental failures of the current deportation system, and why it can truly be said that in our efforts to control illegal migration, we are moving backward on a very fast treadmill.

Subtitle A of Title III, most of which is effective April 1, 1997, re-wrote and re-organized sections 231 through 244 of the Immigration and Nationality Act. This was done to provide a coherent structure and organization to provisions that had been amended in a patchwork fashion since the enactment of the Immigration and Nationality Act of 1952. Redundant and archaic provisions have not been retained, and procedures have been streamlined. These structural changes were intended by Congress to make the law easier to understand and enforce.

Within this new structure, Congress has imposed several fundamental changes in policy designed to increase the effectiveness of our procedures to remove illegal aliens, and to increase the number of illegal aliens so removed. These are as follows:

1. *Expedited Removal:* Section 302 of the IIRIRA requires that aliens arriving in the United States who are inadmissible under INA section 212(a)(6)(C) (fraud or misrepresentation in obtaining a travel document) or section 212(a)(7) (not in possession of a valid travel document) shall be ordered removed from the United States without further hearing or review. An alien claiming to be a lawful permanent resident, or to be a refugee or asylee, is entitled to a hearing limited to that claim. In addition, an arriving alien who seeks to apply for asylum shall be referred to an interview with an asylum officer to determine if the alien has a credible fear of persecution. The intent of these provisions is to deter alien smuggling and other attempts to enter

AA-REG-00682

Director, Policy Directives and Instructions Branch
Page 3

the United States illegally, and to prevent abuse of the asylum system by providing full hearings only to those applicants who have a reasonable possibility of being granted asylum.

2. *Reform of the "Entry" Doctrine:* Currently, aliens subject to removal from the United States were accorded separate treatment on the basis of whether or not they had made an "entry" into the United States. Thus, an alien who has illegally entered the United States is given the same procedural rights as an alien who has lawfully entered the United States, but has become subject to removal due to criminal activity or otherwise violating the terms of a visa. Section 301 of the IIRIRA replaces this "entry" doctrine by a doctrine of "admission": henceforth, the aliens are divided on the basis of whether they have been admitted to the United States after inspection by an immigration officer. Aliens who have entered the United States without inspection are now classified as "inadmissible" rather than "deportable." As such, they have the burden of proof in proceedings before immigration judges to establish that they are entitled to be admitted to and remain in the United States.

3. *Consolidation of Proceedings:* Under current law, there are two forms of proceedings to remove aliens from the United States: exclusion and deportation. Over time, the procedural differences between these hearings have virtually disappeared: both take place before immigration judges, aliens have the right to counsel and to cross-examine witnesses, and there is the right of appeal to the Board of Immigration Appeals and from there to the Federal courts. Yet, substantive differences involving entitlement to certain forms (chiefly voluntary departure and suspension of deportation) remain, leading to prolonged litigation over jurisdiction. This has truly resulted in a triumph of form over substance. Consistent with the decision to treat illegal entrants as inadmissible aliens, section 304 of the IIRIRA consolidates exclusion and deportation into one form of proceeding, a removal hearing. Eligibility for various forms of relief from removal will be determined on the basis of the alien's status, not on the type of proceeding in which the alien is adjudicated.

4. *Limitations on Relief:* Section 304 of the IIRIRA also re-defines the criteria for aliens to obtain relief from an order of removal. One of the most abused forms of relief under the current system is voluntary departure: aliens who are ordered deported are typically granted this relief, which allows them to depart the United States within a set period of time and avoid the bar to readmission imposed upon those who are forcibly deported. There is no reliable system to determine if such aliens actually depart, and many never leave. Two additional forms of discretionary relief, suspension of deportation and "section 212(c)" relief, also have been extended to a broader range of cases than originally intended by Congress. In addition, aliens have used dilatory tactics to extend their stay in the United States and thus gain eligibility for these forms of relief. Section 304 of the IIRIRA limits voluntary departure to a one-time only delay of not more than 90 days and, depending on when the relief is granted, either permits or requires the Department of Justice to demand that the alien post a bond to secure his or her departure from the United States. Section 304 also consolidates suspension of deportation and

AA-REG-00683

Director, Policy Directives and Instructions Branch
Page 4

section 212(c) relief into a single form of relief, "cancellation of removal." Eligibility for this relief is tightened, removing the incentive for aliens to engage in dilatory tactics and avoiding litigation over issues such as the length of the alien's residence in the United States.

5. *Detention and Removal:* Current law provides no clear mandate to restrain and promptly deport those aliens who have been ordered removed from the United States. It is perhaps not surprising, therefore, that only 11 percent of non-detained aliens ordered deported actually leave the country. Section 305 of the IIRIRA mandates the detention of aliens who have been ordered removed and requires that removal be completed within 90 days after the order. Aliens released due to the lack of detention space must be placed under a form of supervision to ensure that they do not abscond. The INS also is required to detain criminal aliens from the time of their apprehension until they are removed from the United States.

6. *Limitations on Appeals:* The Department of Justice has developed a sophisticated system of administrative tribunals under the Executive Office of Immigration Review to adjudicate issues relating to the removal of aliens. Decisions of the EOIR may be appealed to the Attorney General. Appeals to the Federal courts, therefore, should be extraordinary and limited to situations where there is a likelihood of a contested issue of law or fact relating to an alien's right to remain in the United States. Hence, section 306 of the IIRIRA reserves appeal of an order of removal to the issue of whether the alien is inadmissible or deportable. Issues pertaining to purely discretionary relief, including cancellation of removal and voluntary departure, should remain within the sole discretion of the Attorney General and thus are no longer appealable to the Federal courts. Asylum, which is not purely a discretionary form of relief, remains appealable. In addition, there is no right of judicial review in the case of an alien who is removable on the grounds of a criminal conviction. Section 306 also places new time limits on appeals and provides, in the case of an alien who has not been admitted to the United States, that the filing of an appeal does not automatically stay the order of removal.

The import of these changes is clear. The prosecutorial efforts of the INS and the adjudications process within the EOIR should be focused on the prompt apprehension, adjudication, and removal of aliens who are not lawfully present in the United States. Immigration tribunals exist to ensure that an alien receives due process before an order of removal is rendered; they do not exist to adjudicate claims for immigration benefits or grant equitable relief from removal (even though such relief may be granted under extraordinary circumstances). There should be a clear linear progression from apprehension of an illegal alien to the alien's removal. The system should not be a revolving door; nor should it waste resources generating orders of removal that are not enforced. While the INS and the EOIR are independent, they are not competitors. Officers in both agencies, including immigration judges, must cooperate in the missions of deterring illegal migration and of removing illegal aliens from the United States.

AA-REG-00684

Director, Policy Directives and Instructions Branch
Page 5

The propriety of the rules proposed in this Notice must be assessed in light of these fundamental changes in policy enacted by the IIRIRA. These require a change in direction, philosophy, and approach. We are pleased to see such change reflected in the proposed rules, which appear to conform in most important respects to the text and legislative intent of Title III of the IIRIRA. The remainder of this letter will discuss the proposed rules as they relate to the six major areas of reform outlined above. Since it is impossible to provide comment on each provision of such a lengthy proposed rule, we request that the following be kept in mind in preparing the interim that will become effective on April 1, 1997. First, authoritative guidance regarding the interpretation of Title III of the IIRIRA may be located in the Report of the Committee on the Judiciary on H.R. 2202, Report No. 104-469, Part I (March 4, 1996) and in the Report of the Conference Committee, Report No. 104-828 (September 24, 1996). Second, the provisions in Title III of the IIRIRA were supported by overwhelming bipartisan majorities in the relevant Committees and on the floor of the House and Senate. There is no uncertainty or room to debate the overall intent of Congress in enacting these provisions. They take a firm and uncompromising stand against illegal migration, and they direct the Attorney General and her designees in the INS and the EOIR to make fundamental changes in various aspects of the adjudications process. In light of this clear and detailed Congressional intent, doubts should be resolved in favor of the procedures or policies that, consistent with the law, will expedite the apprehension, adjudication, and removal of the maximum possible number of illegal aliens.

## Comments on Specific Provisions

*"Arriving Aliens:"* The Notice requests comments on the proposed definition of the term "arriving alien," which is employed at several points in the IIRIRA to distinguish aliens at the border of the United States from those who have made a substantial physical entry into the United States. The legislation does not specifically define the term "arriving alien," but it is appropriate to define the term in regulations in order to avoid confusion and potential litigation. It would be completely contrary to the intent of this legislation for dispute over the meaning of "arriving alien" to merely supplant the long-standing dispute over whether an alien has made an "entry" into the United States.

*The definition proposed in 8 CFR §1.1(q) is too narrow in that it does not include aliens who apprehended between land border ports of entry, or near seacoasts after arrival by boat. The definition should be amended to include such aliens.*

The term "arriving alien" was selected specifically by Congress in order to provide a flexible concept that would include all aliens who are in the process of physical entry past our borders, regardless of whether they are at a designated port of entry, on a seacoast, or at a land border. *Thus, an "arriving alien" will in many cases include an alien who, under the current interpretation of section 101(a)(13) of the INA (definition of "entry"), would have been found to have made an "entry." In specific terms, an alien who has entered U.S. territory between ports*

AA-REG-00685

Director, Policy Directives and Instructions Branch
Page 6

*of entry on our land borders, or who has come ashore on a smuggling boat, should be considered an "arriving alien" even if that alien has penetrated several hundred yards or even further into United States territory and has been in that territory for several hours.* "Arrival" in this context should not be considered ephemeral or instantaneous but, consistent with common usage, as a process. An alien apprehended at any stage of this process, whether attempting to enter, at the point of entry, or just having made entry, should be considered an "arriving alien" for the various purposes in which that term is used in the newly revised provisions of the INA.

Clearly, some specific definition will be necessary. In keeping with the pro-enforcement philosophy of this legislation and the specific problems that arise when groups of illegal aliens arrive in one place and then scatter to avoid apprehension, the definition should be inclusive. *An appropriate benchmark would be to include any alien apprehended within 24 hours of having crossed the border.* Criteria based on time are preferable to those based on distance because of the greater sophistication in alien smuggling operations. Illegal aliens are often loaded into vans, moving trucks, and similar vehicles immediately after having crossed the border, and are driven to regions far away from the border. Basing the definition on distance, even one as great 100 miles, would not include these aliens. The use of time criteria would embrace both those who remain close to the border as well as those who escape shortly after having made an entry.

One difficulty with a strictly timed-based criteria, however, is determining the exact time of the alien's arrival. Depending on circumstances, witnesses or even the aliens themselves might provide this information. One reason to select 24 hours, as opposed to a shorter period, is to give flexibility to the INS in making this determination. Selecting a shorter period, such as 4 hours, would promote a "race against the clock" and perhaps even tempt the INS officials to shade the truth in order to meet the deadline. A longer period, still consistent the notion of arrival as a process, provides a more realistic window in which the alien can be apprehended without undue concern about the clock. Briefly put, if the alien is caught on the day he or she arrives, the alien is an "arriving" alien, but not otherwise. This is a common sense approach that should be easy for INS officials to understand and implement.

Regarding proof, it should ordinarily be the Government's burden to establish that the alien has been apprehended within 24 hours of arrival. However, if the Government does not charge that the alien is an "arriving alien," and the alien seeks to be so designated for the purpose of being able to request withdrawal of his or her application for admission (under revised section 235(a)(4) of the INA), the alien should bear the burden of proof.

*Parole of Aliens:* The proposed rule will permit chief patrol agents to exercise authority under 8 CFR § 212.5 to permit release of apprehended aliens who will, under the changes made in section 301 of the IIRIRA, now be considered applicants for admission. As a technical matter, this is an appropriate amendment. However, the parole authority should be rarely exercised to release an alien from custody in this circumstance because the vast majority of illegal aliens

AA-REG-00686

Director, Policy Directives and Instructions Branch
Page 7

apprehended by the Border Patrol near our land borders are arriving or recently-arrived aliens who are likely to abscond. The parole authority is more appropriately exercised to permit an alien to remain in the United States, in custody, for the purpose of completing proceedings to order the alien removed from the United States.

*Custody of Aliens Applying at Land Borders:* The proposed rule implements the provision in new section 235(b)(2) of the INA requiring certain aliens to wait in Canada or Mexico pending the scheduling of their removal hearing under section 240, and allows the alien to be ordered removed in absentia if the alien fails to appear. This is a proper interpretation of the statute and should not be altered or amended.

*Withdrawal of Application for Admission:* The proposed rule accurately implements the provision in new section 235(a)(4) of the INA. Ordinarily, the decision to grant permission to withdraw the application for admission should be in the discretion of the immigration judge, acting upon the advice of the INS trial counsel. However, the INS and the EOIR should cooperate in defining criteria for the types of cases in which such permission should not be granted and the alien should be compelled to take part in full removal proceedings under section 240. Such cases could include criminal aliens, aliens who have repeatedly attempted to cross the border illegally, and others for whom the entry of an order of removal would serve the purposes of more effective border control and immigration law enforcement. Such criteria need not be stated in regulations, but should nevertheless be communicated clearly to INS counsel and immigration judges.

*Expedited Removal:* In general, the regulatory scheme to implement new section 235(b)(1) of the INA is sound. Several aspects deserve specific comment.

1. The Notice requests comment regarding the applicability of expedited removal to certain categories of aliens. Consistent with the previous comments, when it is certain beyond doubt that an alien has been apprehended within 24 hours of arrival, and the alien otherwise meets the criteria in new section 235(b)(1), the alien should be subject to *mandatory* expedited removal as an alien "arriving" in the United States. This high standard of certainty is appropriate in order to avoid allegations that the *mandatory* expedited removal process is being applied improperly.

However, Congress also has provided (in new section 235(b)(1)(A)(iii)) for discretionary application of expedited removal to any alien apprehended within 2 years of arrival. Accordingly, *in cases where it is clear that an alien has arrived very recently, but there is doubt regarding whether the entry into the United States occurred within 24 hours of apprehension, the Commissioner should elect to employ the discretionary authority under section 235(b)(1)(A)(iii). This should be a standard practice and thus specified in the interim rule to be effective on April 1, 1997.*

AA-REG-00687

Director, Policy Directives and Instructions Branch
Page 8

*Thus, expedited exclusion should not be applied exclusively to "arriving aliens" as that term is defined in either the proposed rule's version of 8 CFR § 1.1(q) or in the amended version of that definition suggested in this comment.* The *mandatory* expedited removal authority should be limited to such cases. *However, the discretionary authority should be used in the cases of all recent border-crossers, particularly those apprehended in close proximity to the border or in transit from the border to other regions of the United States.* We understand that for practical reasons, it may not be advisable at this point to apply expedited removal to *all* aliens who cannot establish 2 years of residence in the United States. However, the discretionary authority should not be kept "in reserve" for emergencies; it should be an ordinary tool of enforcement against illegal migration, directed specifically at recent illegal entrants.

2. The proposed rule includes an amendment to give INS district directors discretionary authority to accept an application for a refugee travel document from an alien who is outside of the United States. This initiative arises from the provision in new section 235(b)(1)(C) of the INA allowing administrative review of an order of expedited exclusion in the case of an alien claiming to be a lawful permanent resident, a refugee, or an asylee. Even if the administrative review finds the alien to be a refugee or asylee, in the absence of a refugee travel document, there is no formal document to validate that the alien is admissible to the United States. (A lawful permanent resident, in contrast, will have been issued a Resident Alien Card, Form I-551).

*While an amendment to give district directors this discretionary authority is not inconsistent with the provisions of the IIRIRA, we have several concerns with the specific language proposed in this Notice.* As stated in the proposed rule, the alien must have held bonafide asylee or refugee status at the time of departing the United States, must not have intended to abandon such status, and must have done nothing while outside of the United States inconsistent with such status. These are valid criteria, *but should be further clarified to state that a post-departure application for a refugee travel document will be disfavored if the alien has returned to the country of nationality or last habitual residence in which arose the alien's claim of persecution. Such an application should be granted only if the alien can establish that his or her return to the country of persecution was necessitated by urgent humanitarian concerns.*

An additional criterion is that the alien have been outside of the United States for less than 1 year. *This period is too long. Consistent with the provisions regarding returning lawful permanent residents in revised section 101(a)(13)(C) of the INA, the period should be limited to 180 days.*

The proposed rule specifies that if an alien establishes that he or she is a returning lawful permanent resident, refugee, or asylee, the alien should be referred to proceedings under revised section 240 of the INA. This is an appropriate interpretation of the statute.

Director, Policy Directives and Instructions Branch
Page 9

3.  The proposed rule makes several important interpretations regarding the procedures to be applied for the review of asylum claims in the expedited removal process.

The intent of the sponsors of expedited removal was that asylum screening would take place at the port of entry.  The proposed rule indicates that screening also may take place at an INS or other detention facility.  While not literally consistent with the sponsors' intent, this practice is acceptable as long as the screening takes place promptly after the alien's arrival.  We understand that such arrangements may be most necessary in cases where the alien has arrived or been apprehended at a location to which an asylum officer must travel for purposes of the interview.

The intent of the sponsors also was that the interviews would be conducted by highly-trained INS officers.  We approve of the plan to use full-time asylum officers.  However, in order to provide maximum flexibility in this process, we encourage the INS to provide comprehensive asylum training to a cadre of officers in other career positions, including experienced inspectors and examiners.  Such officers should be capable of meeting the responsibilities related to conduct of the "credible fear" interview.  It may be more efficient in many circumstances to use full-time asylum officers as supervisory officers who review the work of others.  *We believe that this layer of "quality control," while not required by the statute, can be an effective tool in ensuring the uniformity of decisions and even in expediting the process.  To meet these objectives, the supervisory review should take place almost immediately after the initial decision of the interviewing asylum officer.  In addition, all decisions, including those favorable and unfavorable to the applicant, should be reviewed by the supervisory asylum officer.  The supervisory officer should have the authority to reverse any determination that has been made by the interviewing officer.*

While the alien should have a reasonable opportunity to consult with any person prior to the interview, the interview itself should be private and confidential.  *In particular, neither counsel or other persons should be present during the interview, as this could tend to delay the proceedings and convert a non-adversarial screening interview into an adversarial hearing.  Nor should counsel participate in the review proceeding before an immigration judge.  If a counsel or friend of the applicant wishes to submit a statement to the asylum officer, this should be done in writing and made part of the interview file.*

The proposed rule provides that aliens who are found to have a credible fear of persecution will be referred to an immigration judge for proceedings under section 240 of the INA.  Section 235(b)(1)(B)(ii) drafted deliberately to leave flexibility regarding how the asylum adjudication would take place.  However, the point of the referral is to provide for adjudication of the asylum claim, not an adjudication of the alien's right to be admitted to the United States on other grounds.  Hence, we are concerned with the decision to provide such aliens with a full right to a hearing under section 240.  *The proposed rule should be amended to provide that such aliens*

AA-REG-00689

Director, Policy Directives and Instructions Branch
Page 10

*shall receive an "asylum-only" hearing before an immigration judge, with right of appeal to the Board of Immigration Appeals. This is consistent with the proposed rule's provisions regarding stowaways who are found to have a credible fear of persecution. All aliens subject to expedited exclusion should be treated alike in this regard. The immigration officer's determination that the alien is inadmissible under section 212(a)(6)(C) or 212(a)(7) should be final and not subject to review by an immigration judge.*

4. The proposed rule does not specify that an alien found to have a credible fear of persecution shall be detained pending completion of the adjudication of the alien's asylum claim. *The rule should be amended to require the detention of such aliens. Release should be permitted only in cases of urgent humanitarian concern and under such circumstances that will ensure the alien's appearance at future hearings.* The plain language of section 235(b)(1)(B)(ii) states that in cases where there has been a positive "credible fear" determination, the alien should be "detained" for further proceedings. The intent of Congress is that these further proceedings be conducted promptly, keeping in mind that these are aliens who are prima facie inadmissible to the United States. Adjudications are more likely to be accelerated if the alien is in detention; if the aliens are released, there is likely to be further delay and a certain number of aliens will abscond.

There is a firm and rational basis for detaining such aliens. We can reasonably anticipate an effort by alien smugglers to coach arriving aliens to tell stories in their initial interview that are designed to meet the low threshold of "credible fear." It will not be possible in the initial process to screen out all such cases. The more exacting review conducted by an immigration judge in an adversarial proceeding will hopefully be more successful in this regard. Allowing "screened in" aliens to be paroled from custody will send a signal to alien smugglers that the expedited removal process, intended to be an absolute bulwark against abuse of the asylum system, has loopholes to be exploited. Given the history of this form of abuse, detention must be employed as a deterrent.

*Conforming Rules on Implementation of New Section 241(b)(3):* Prior to April 1, 1997, new rules regarding application of current section 243(h)(3) are slated to go into effect. These rules were imposed by section 413(f) of the Antiterrorism and Effective Death Penalty Act of 1996, a provision eliminated by section 307 of the IIRIRA. We support the proposed rule's mechanism for dealing with the potential administrative problems of implementing section 413(f) of AEDPA for the short period prior to the effective date of the repeal of that provision.

*Appointment of Guardian in Removal Proceedings:* The appointment of a guardian ad litem for a minor or incompetent respondent in removal proceedings raises a potential conflict with the long-standing practice of not providing counsel to aliens at Government expense. There may be sufficient reasons to make an exception in such cases. *However, such a proposal should be the subject of a separate notice of proposed rule making and thus should not be incorporated*

Director, Policy Directives and Instructions Branch
Page 11

*in the interim regulations effective April 1, 1997, the sole purpose of which is to provide the regulatory basis necessary to implement the statutory changes that are effective on that date. Any proposal for appointment of guardians ad litem should be considered separately and on its own merits.*

   *Application of New Removal Provisions:* The restructuring proposed to preserve the text of the regulations superseded by the implementation of Title III-A of the IIRIRA appears to be sound. For practical purposes, a certain number of cases should consider to be adjudicated under the "old" rules. *However, we strongly encourage the Attorney General and the Commissioner to reconsider the apparent decision not to use the authority granted by section 309(c)(2) of the IIRIRA to elect to apply the new procedures in Title III-A to pending cases by issuing a new Notice to Appear to the respondents.* Clearly, in cases where there has not been any substantial adjudication, the current proceedings could be terminated and future proceedings conducted under the streamlined rules established in the IIRIRA. This would facilitate transition to the new rules and limit the period of "transition" in which proceedings are conducted in the same courts under two different sets of rules. In short, the minimum possible number of aliens should be "grandfathered" under the old provisions.

   *Application of "Old" Removal Procedures:* Congress, by providing a blanket authority to the Attorney General to re-initiate proceedings under the new rules, has made it clear that no alien is "entitled" to consideration under the "old" provisions. *Thus, the statement in the Supplementary Information inviting comment on "unintended consequences," such as "the inclusion of new sections which encompass aliens entitled to consideration under 'old' provisions" is misplaced and misguided.* To the extent practicable, all aliens in proceedings should be integrated into the new system established by Title III-A. To state otherwise is to raise expectations for which there is no legal basis and to provide potential grounds for litigants to challenge the application of the new procedures to clearly where such application was clearly mandated or permitted by Congress. The intent of Congress is not to have two parallel systems of adjudication, but to replace the current deficient system as rapidly as possible.

   *Accordingly, the interim rule should provide that, unless there is further notice to the contrary, published in the Federal Register with opportunity for public comment, the "old" rules superseded by Title III-A of the IIRIRA and reserved in this proposed rule for pending cases shall expire not later than March 31, 1998. Such notice shall be provided not later than January 31, 1998. If there is continued need to operate under the "old" rules 18 months after the enactment of the IIRIRA, the reasons should be made known to Congress and to the public with appropriate opportunity for comment.*

   *Notice to Appear and Service Upon Respondents:* Revised section 239 of the INA includes some of the key reforms in this legislation: to make it easier to establish effective service of the Notice to Appear and thus render it more difficult for illegal aliens to avoid or

Director, Policy Directives and Instructions Branch
Page 12

appeal orders of removal. The burden is placed squarely upon the alien to provide a current record of address to immigration authorities. In addition, proof of attempted delivery at that address is sufficient to established service of the Notice. The proposed rule incorporates this and other statutorily-mandated reforms. Since these provisions implement specific mandates of Congress, they should not be substantively altered or amended in the interim rule.

*Detention and Parole of Criminal Aliens:* Section 236.1(c)(5) of the proposed rule provides that the authority of immigration judges to redetermine custody and bond decisions made by the INS district directors shall not apply with respect to certain types of aliens, including inadmissible aliens, arriving aliens, and aliens deportable on security and related grounds. However, immigration judges are to retain the ability to make bond and custody redeterminations in the case of criminal aliens who are described in section 236(c)(1) of the INA until the expiration of the "Transition Period Custody Rules" authorized under section 303(b)(3) of the IIRIRA.

*Immigration judges, after April 1, 1997, have no authority under the INA to make custody and bond redeterminations in the case of any alien described in revised section 236(c)(1) of the INA.* The Transition Period under section 303(b)(3) was included in this legislation at the request of the Administration based on representations that the *INS* required flexibility to make custody decisions due to the lack of available space to detain all aliens described in section 236(c)(1). It was not intended provide any right, entitlement, or claim to any criminal alien to be released from custody during that period. In short, the Transition Period was enacted to serve the administration of justice, not to provide a benefit to criminal aliens.

Congress expects that to the greatest extent possible, all aliens described in revised section 236(c)(1) of the INA will be detained, even during the Transition Period. Criminal aliens *only* should be released where there is no detention space. This is a determination that should lie exclusively with the INS district director and his or her supervisors. There is simply no role for immigration judges to play in this determination, since there is nothing to adjudicate: the alien has no right, under the law, either to be released or to seek specific conditions on release. If there is detention space, the alien must be detained. If there is no detention space, the alien may be released, but only under the terms set by the INS. The clear legislative intent is to end, immediately, the litigation in immigration court of custody and bond issues regarding criminal aliens. *The interim rule should be amended to strike the phrase "After the expiration of section 303(b)(3) of Pub. L. 104-208" from section 236.1(c)(5)(iv).*

*Voluntary Departure:* The Supplementary Information notes that the proposed regulatory changes "represent a significant departure from the predecessor provisions for voluntary departure." *These changes represent nothing more or less than what has been mandated by Congress, and there is no basis on which they can be substantively altered or amended in the promulgation of the interim rule.* Voluntary departure is one of the most frequently-abused

AA-REG-00692

Director, Policy Directives and Instructions Branch
Page 13

"benefits" in immigration law.   Hence, Congress clearly intended that the function of voluntary departure in our immigration system be fundamentally, even radically, altered.

First, voluntary departure is to be considered a benefit granted by discretion, not an entitlement.  Second, conditions must be placed on a grant of voluntary departure to ensure that the alien departs from the United States.  Third, this form of relief is temporary and short-term: it is not meant to extend an alien's stay in the United States.  The process of departure should commence upon the entry of the final order of deportation; voluntary departure provides an opportunity to complete that process within specified limits and, where appropriate, to mitigate the restrictions on future admissions that would attach to forced repatriation under an order of removal.  Fourth, voluntary departure should be sought at an early point in the adjudications process in order to avoid the unnecessary expenditure of resources.

Accordingly, in cases where voluntary departure is granted under the authority of section 304(a) of the IIRIRA, it would be unlawful to extend or renew voluntary departure beyond the single period of 60 or 120 days specified in that section.  Similarly, no alien granted voluntary departure should be provided authorization to work in the United States.  An alien granted voluntary departure must offer specific proof that he or she intends to depart the United States by a specified date.  These mandates are implemented by the proposed rule and should not be altered in the interim rule.

*Reinstatement of Removal Orders:*  The proposed amendment to eliminate the requirement for a hearing before an immigration judge in the case of an alien previously ordered removed and who has illegally reentered the United States is consistent with the language and intent of the IIRIRA, and should be retained in the interim rule.

*Detention and Removal of Aliens Ordered Removed:*  The proposed rule in this regard is consistent with the language and intent of the IIRIRA and should be retained in the interim rule.

*Detention and Removal of Stowaways:*  The proposed rule in this regard is consistent with the language and intent of the IIRIRA and should be retained in the interim rule.

*Adjustment of Status:*  The Supplementary Information states that the Attorney General will not exercise her discretion to adjust the status of arriving aliens who are ordered removed under the procedures for expedited removal or who are placed in removal proceedings under section 240 of the INA.  We support this statement of policy, and urge that the Attorney General extend the bar on adjustment of status to all inadmissible aliens placed in proceedings under section 240, except to the extent that such aliens are eligible for cancellation of removal under section 240A.

Director, Policy Directives and Instructions Branch
Page 14

The discretion to parole an arriving alien and allow such alien to apply for adjustment should be exercised only in the most extraordinary circumstances. An alien eligible for status as an immigrant or nonimmigrant should apply for such status at a United States consulate overseas, and should obtain no benefit or advantage due to the fact that the alien has attempted or accomplished an unlawful entry into the United States.

*Elimination of Mexican Border Visitor's Permit:* This aspect of the proposed rule is not required in order to implement Title III-A of the IIRIRA and deals with a major substantive change to current procedures for admitting Mexican nationals in lieu of the standard visa process. For these reasons alone, the proposed change should not have been included in this rule and should be withdrawn when the interim rule is published.

Furthermore, this proposed change is seriously flawed and has not been adequately justified or explained in the Supplementary Information. While the intent of the proposed change is to combat one form of immigration fraud, i.e., the counterfeit use of Form I-444, the effect of the change may be to increase another type of fraud, i.e., the issuance of open-ended permission to enter the United States to Mexican nationals who intend to work illegally or otherwise violates the terms of their admission.

The fundamental problem, which is addressed by section 104 of the IIRIRA but is not addressed by this proposed change, lies in the rampant fraudulent use of the Border Crossing Identification Card (BCC). Under the changes proposed here, any holder of a BCC will be eligible to enter the United States as a B-2 visitor provided that he or she pays the appropriate fee and receives a Form I-94. The assumption underlying this change, that the holder of BCC has been adjudicated as eligible for a visitor's visa and thus can be issued an I-94 without compromising the integrity of the visa process, fails to take into account the disparity between the very restrictive conditions imposed on one who enters the United States with a BCC, and the virtual absence of conditions imposed on one who enters on an I-94. The Supplementary Information provides no justification for not imposing the same conditions with regard to length of stay (30 days) or limitation on travel (to one of 5 border region States) that are currently imposed in connection with the I-444. In other words, the fact that it is advisable to get rid of the I-444 as a matter of document security does not mean that the conditions placed on I-444 entrants should be revised.

*Removal of Procedural Matters:* The proposed rule would eliminate from Title 8 of the CFR a variety of matters that are described as governing purely internal procedures of the INS.

While periodic "clean-up" of regulations is appropriate and, in the case of Title 8, both long overdue and still-incomplete, there is some cause for concern in the statement that these matters will be treated in "Service Field Manuals." The Operations Instructions of the INS are notorious for being incomplete, inaccurate, and unwieldy. There is cause for concern that the

Director, Policy Directives and Instructions Branch
Page 15

system for creating "Field Manuals" and similar operation guidance may not be adequate to the task of communicating these procedures. The virtue of retaining them in regulations is that they can be located in a completely authoritative source. We recommend that these provisions not be removed from 8 CFR until they have already been included in Field Manuals or other operational guidance that are widely-promulgated, current, and complete.

   *Asylum Reform:* The proposed rule includes a number of substantive changes regarding the adjudication of asylum applications, certain of which are mandated by section 604 of the IIRIRA.

   One of the major reforms made by section 604 was the imposition of a 1-year deadline after date of entry for filing an asylum application. Exceptions to this deadline were provided in the case of "changed circumstances" or "extraordinary circumstances." The regulatory definitions of these terms in the proposed rule replicate what it is in the statute, but offer no guidance regarding the *weight* of the evidence that will be required to grant an exception to the 1-year deadline. The interim rule should provide more specific guidance to immigration judges and INS officials on this issue. By exercising prospectively her authority to interpret these terms, the Attorney General can prevent needless rounds of litigation in immigration court over their basic meaning of these terms, and more importantly, ensure that only evidence of a certain weight is permitted to justify a waiver of the deadline. Litigation would then be reserved to application of these regulatory definitions to specific cases. As the proposed rule is currently stated, it invites the expansive application of these terms.

   *The requirement that the changed circumstances "materially affect" the claim should be interpreted to mean that the alleged changed circumstances must be tied to objective, as opposed to subjective, factors that would support the applicant's claim.* Among these are changed political conditions in the applicant's home country; a specific threat or act of persecution directed against the applicant's family or other individuals, provided that such persecution provides an objective basis for determining that the *applicant* has a well-founded fear of persecution; or changed circumstances in the applicant's life that provide an objective basis for a fear of persecution that was not present before passage of the 1-year deadline. *In addition, the standard should be interpreted to require that the changed circumstances provide a quantum of proof that would be considered dispositive or highly persuasive in a decision to grant asylum to the applicant. "New" evidence that is merely cumulative or reflects a slight change or evolution in country conditions or the applicant's personal circumstances should not be sufficient to waive the deadline, since such evidence would be unlikely in the final adjudication to materially affect the decision one way or the other.*

   The standard for "extraordinary circumstances" should be more narrowly defined. The proposed definition, referring to "events or factors beyond the alien's control that caused the failure" to meet the deadline leaves open-ended what it meant by "caused." The standard should

AA-REG-00695

Director, Policy Directives and Instructions Branch
Page 16

be analogous to the tort standard of "but for" causation: but for the circumstances cited, the application would have been filed on time. In this regard, the guidance provide in the Supplementary Information is useful, but incomplete. The suggestion that "ineffective assistance of counsel" might excuse a late filing seems misplaced, since this is not a criminal proceeding and the alien is neither entitled to counsel nor required to obtain counsel in order to pursue an application for asylum. If an alien were clearly defrauded by an attorney who had been instructed to file an application and failed to do so, there might be a case for waiving the deadline. But the responsibility to present the application within the allotted time lies with the applicant, and late filing should be excused only when the applicant is clearly unable, through not fault of his or her, to meeting that deadline. The interim rule or, at least the Supplementary Information, should make this more clear.

    In general, the other revisions to Part 208 appear to be consistent with section 604 of the IIRIRA. However, there are some gaps, particularly with regard to identifying the circumstances and procedures under which an alien will not be permitted to apply for asylum, or will have asylum terminated, on the ground that there is a safe third country willing to accept the alien. We understand that implementation of this provision will not be complete by April 1, 1997, but we expect that progress will be made in implementing these important statutory provisions.

    We look forward to reviewing the interim rule when it is published, and to the further opportunity to comment on that rule before publication of a final rule.

                              Sincerely,

                              *Lamar Smith*

                              Lamar Smith
                              Chairman
                              Subcommittee on Immigration and Claims

cc:    Anthony Moscato, Director
       Executive Office for Immigration Review

# **EXHIBIT U**

Coalition for Humane Immigrant Rights, et al. v. Noem et al., 1:25-cv-00872 (JMC)

MAJORITY MEMBERS

HENRY J. HYDE, ILLINOIS, CHAIRMAN

F. JAMES SENSENBRENNER, JR., WISCONSIN
BILL McCOLLUM, FLORIDA
GEORGE W. GEKAS, PENNSYLVANIA
HOWARD COBLE, NORTH CAROLINA
LAMAR S. SMITH, TEXAS
STEVEN SCHIFF, NEW MEXICO
ELTON GALLEGLY, CALIFORNIA
CHARLES T. CANADY, FLORIDA
BOB INGLIS, SOUTH CAROLINA
BOB GOODLATTE, VIRGINIA
STEVE BUYER, INDIANA
SONNY BONO, CALIFORNIA
ED BRYANT, TENNESSEE
STEVE CHABOT, OHIO
BOB BARR, GEORGIA
WILLIAM L. JENKINS, TENNESSEE
ASA HUTCHINSON, ARKANSAS
EDWARD A. PEASE, INDIANA
CHRISTOPHER B. CANNON, UTAH

ONE HUNDRED FIFTH CONGRESS

# Congress of the United States

## House of Representatives

COMMITTEE ON THE JUDICIARY

2138 RAYBURN HOUSE OFFICE BUILDING

WASHINGTON, DC 20515-6216

(202) 225-3951
http://www.house.gov/judiciary

July 7, 1997

MINORITY MEMBERS

JOHN CONYERS, JR., MICHIGAN
BARNEY FRANK, MASSACHUSETTS
CHARLES E. SCHUMER, NEW YORK
HOWARD L. BERMAN, CALIFORNIA
RICK BOUCHER, VIRGINIA
JERROLD NADLER, NEW YORK
ROBERT C. "BOBBY" SCOTT, VIRGINIA
MELVIN L. WATT, NORTH CAROLINA
ZOE LOFGREN, CALIFORNIA
SHEILA JACKSON LEE, TEXAS
MAXINE WATERS, CALIFORNIA
MARTIN T. MEEHAN, MASSACHUSETTS
WILLIAM D. DELAHUNT, MASSACHUSETTS
ROBERT WEXLER, FLORIDA
STEVEN R. ROTHMAN, NEW JERSEY

THOMAS E. MOONEY, SR.
CHIEF OF STAFF — GENERAL COUNSEL

JOSEPH V. WOLFE
STAFF DIRECTOR — COUNSEL

JULIAN EPSTEIN
MINORITY STAFF DIRECTOR



Director, Policy Directives and Instructions Branch
Immigration and Naturalization Service
Room 5307
425 Eye Street NW
Washington, DC 20536

**received**
 pdi 7/7/97

**Re: INS 1788-96, RIN 1115-AE47 (62 Fed. Reg. 10312, March 6, 1997)**

Dear Mr. Sloan:

     The following comments are submitted in response to the interim rule with request for comments referenced above. These comments are to be considered together with those submitted previously in response to the Notice of Proposed Rulemaking (NPRM) published at 62 FR 443 (1997); all comments previously presented are hereby incorporated. This letter will focus on the most important areas in which the interim rule has failed to give full expression to the plain language and intent of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (P.L. 104-208, Div. C).

     *"Arriving Aliens:"* The original NPRM invited comment on the proper scope of the regulatory definition of "arriving alien." Our previous response noted that the definition proposed in 8 CFR §1.1(q) is too narrow in that it does not include aliens who are apprehended in the process of entry between land border ports of entry, or near seacoasts after arrival by boat. However, no modification to this definition was made in the interim rule.

     As previously noted, the term "arriving alien" was selected specifically by Congress in order to provide a flexible concept that would include all aliens who are in the process of physical entry past our borders, regardless of whether they are at a designated port of entry, on a seacoast, or at a land border. Section 302 of the IIRIRA [revising INA section 235(a)(1)] refers to aliens who "arrive[ ] in the United States (whether or not at a designated port of arrival....)." This indicates a clear Congressional intent to include as "arriving" aliens those who enter between land border ports of entry or who enter by sea.

     Failure to give full effect to this language is a serious flaw that should not be perpetuated in the final rule. The interim rule does *not* give operative effect to the language "whether or not at a port of arrival" by including in the definition those aliens who are apprehended at sea and brought to the United States. This is so because the phrase "whether

AA-REG-00632

Director, Policy Directives and Instructions Branch
Page 2

or not at a designated port of arrival" is followed immediately in the statute by the phrase "and including an alien who is brought to the United States after having been interdicted in international or United States waters." Thus, the statute has made a specific and separate provision for the cases of interdicted aliens; such cases do not subsume the class of aliens arriving other than at a designated port of entry. The inclusion of interdicted aliens in the definition of "arriving alien," therefore, does nothing more than give effect to the specific mandate of the statute regarding such aliens. It does not give full effect to the operative language in section 302 of the IIRIRA regarding aliens who arrive otherwise than at a designated port of entry.

Failure in the final rule to conform the regulatory definition of "arriving alien" to the language of section 302 of the IIRIRA likely will make it more difficult to make any such change in the future. A decision in the final rule to limit the scope of the term to port of entry arrivals and interdictees will be given heightened deference by the courts; a later rescission of that decision and broadening of the regulatory definition will undergo heightened judicial scrutiny under the standards articulated in *Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 42 (1983). While a later revision of the definition could meet the "reasoned decisionmaking" standard set forth by the Supreme Court, the better course is to avoid the risk of such litigation altogether and to define "arriving alien" *now* in accordance with the statute.

The difficulty in some circumstances of deciding whether an alien apprehended near the border is an "arriving alien" should not foreclose all efforts to devise a definition that gives full effect to the statute, while preserving sufficient flexibility for fair implementation in the field. Apprehensions do present a different situation than arrivals at a port of entry. Previously, we suggested that a temporal standard for determining whether an alien is an "arriving alien," coupled with a administrative policy of referring doubtful cases to full proceedings under section 240 of the Immigration and Nationality Act, could address these concerns. Measures other than time of arrival may present an equivalent or even preferable option.

The interim rule, however, does not reflect full consideration of these options. This is disturbing, for it suggests that a decision has been made not to implement an important provision of the IIRIRA not on legitimate grounds of statutory interpretation, but because the agency believes it would difficult to administer the statute as it is written. The statute, we believe, is capable of being so administered. Should the INS believe otherwise, the appropriate remedy is to communicate that judgment to the Congress and to seek an amendment or revision to the statute. The course that has been taken thus far—to use problems of administration as a justification for not giving the statute its full effect—is not appropriate.

The final rule should be amended to reflect the suggestion made in our previous comment letter or to otherwise give full effect to the language of section 302 of the IIRIRA.

Director, Policy Directives and Instructions Branch
Page 3

*Use of New Procedures:* For the reasons stated in our previous letter, a specific target date should be set for using the authorities in section 309(c)(2) and section 309(c)(3) of the IIRIRA to convert virtually all "removal" proceedings to the new procedures established by the IIRIRA. So far, neither the interim rule nor guidelines from the Attorney General, INS, or EOIR indicate that the Government will *ever* exercise its option to conduct pending cases as of April 1, 1997, under the new post-IIRIRA rules. Congress did not mandate such a transition in all cases because it desired to preserve flexibility for cases near completion to proceed under the pre-IIRIRA rules. Congress intended, however, for the option in section 309(c)(2) and (3) of the IIRIRA to be used; otherwise, it would have enacted these provisions into law. This is a second example of where, for reasons of administrative convenience or policy preference, a decision has been made not to fully implement a key provision of the IIRIRA.

Furthermore, by providing a blanket authority to the Attorney General to re-initiate proceedings under the new rules, Congress has made it clear that no alien is "entitled" to consideration under the "old" provisions. To the extent practicable, all aliens in proceedings should be integrated into the new system established by Title III-A of the IIRIRA. To proceed otherwise is to raise expectations for which there is no legal basis and to provide potential grounds for litigants to challenge the application of the new procedures where such application was clearly mandated or permitted by Congress. The intent of Congress is not to have two parallel systems of adjudication, but to replace the current deficient system as rapidly as possible.

*Expedited Removal:* The interim rule provides, as did the proposed rule, that aliens who are found to have a credible fear of persecution will be referred to an immigration judge for proceedings under section 240 of the INA. Section 235(b)(1)(B)(ii) was drafted deliberately to leave flexibility regarding how the asylum adjudication would take place in the case of an alien found to have a "credible fear of persecution." However, the point of the referral is to provide for adjudication of the asylum claim, not an adjudication of the alien's right to be admitted to the United States on other grounds. Hence, the decision to provide such aliens with a full right to a hearing under section 240 is inconsistent with the plain language of the statute.

The final rule should be amended to provide that such aliens shall receive an "asylum-only" hearing before an immigration judge, with right of appeal to the Board of Immigration Appeals. This is consistent with the regulatory provisions regarding stowaways who are found to have a credible fear of persecution. All aliens subject to expedited exclusion should be treated alike in this regard. The immigration officer's determination that the alien is inadmissible under section 212(a)(6)(C) or 212(a)(7) must remain final and not be subject to review by an immigration judge.

Finally, the NPRM requested comment regarding the applicability of expedited removal to certain categories of aliens. Consistent with the previous comments, when it is certain beyond doubt that an alien has been apprehended within 24 hours of arrival (or meets other

Director, Policy Directives and Instructions Branch
Page 4

objective criteria for being considered an "arriving alien" not limited to the alien's presence at a port of entry or status as an alien interdicted at sea), and the alien otherwise meets the criteria in new section 235(b)(1), the alien should be subject to *mandatory* expedited removal as an alien "arriving" in the United States. This high standard of certainty is appropriate in order to avoid allegations that the *mandatory* expedited removal process is being applied improperly.

However, Congress also has provided (in new section 235(b)(1)(A)(iii)) for discretionary application of expedited removal to any alien apprehended within 2 years of arrival. Accordingly, in cases where it is clear that an alien has arrived very recently, but there is doubt regarding whether the entry into the United States occurred within 24 hours of apprehension, the Commissioner should elect to employ the discretionary authority under section 235(b)(1)(A)(iii). This should be a standard practice and thus specified in the interim rule to be effective on April 1, 1997.

Thus, expedited exclusion should not be applied exclusively to "arriving aliens" as that term is defined in either the proposed rule's version of 8 CFR § 1.1(q) or in the amended version of that definition suggested in this comment. The *mandatory* expedited removal authority should be limited to such cases. However, the discretionary authority should be used in the cases of all recent border-crossers, particularly those apprehended in close proximity to the border or in transit from the border to other regions of the United States. We understand that for practical reasons, it may not be advisable at this point to apply expedited removal to *all* aliens who cannot establish 2 years of residence in the United States. However, the discretionary authority should not be kept "in reserve" for emergencies; it should be an ordinary tool of enforcement against illegal migration, directed specifically at recent illegal entrants.

*Returning Refugees:* There is continued cause for concern, set forth in more detail in the previous letter, regarding the interim rule's provisions giving INS district directors discretionary authority to accept an application for a refugee travel document from an alien who is outside of the United States.

As previously noted, allowing an alien who has not previously obtained a refugee travel document to remain outside of the United States for up to 1 year and still be eligible for re-admission compromises the general requirement that the refugee travel document be obtained prior to departure. The fact that a travel document may be valid for up to 1 year in the case of a person who has *complied* with the ordinary requirements of application before departure from the U.S. does not mean that the same period should apply to those who failed to so comply—even if there are favorable grounds for exercising discretion to admit the alien. Six months is an appropriate period. It is long enough to encompass situations where departure was impelled by a true emergency, and also should be long enough for the INS to process a meritorious application for discretionary issuance of the travel document overseas. For these

Director, Policy Directives and Instructions Branch
Page 5

reasons, and those stated in the previous letter, the criterion should be reduced from 1 year to 6 months.

The prefatory comments to the interim rule specify that the authority of the District Director to issue travel documents in such cases is discretionary in nature and should not be considered as a general waiver of the requirement to obtain a document before traveling. The Department should clarify its intention, as stated in the prefatory statement, that "if it is apparent that the alien knew of the general requirement and simply chose to ignore it (e.g., the alien had previously been issued a refugee travel document through this 'overseas procedure' and there was no emergency necessitating the most recent departure), the director may determine that favorable exercise of discretionary authority is not warranted." 62 FR at 10315. In addition, as stated in the previous letter, the Department should clarify that aliens who return to their country of persecution should not, save for exceptional circumstances, receive a favorable exercise of discretion when they apply overseas for a travel document to return to the United States. The best means by which to clarify these intentions is to spell them out in the regulation. The final rule should be so amended.

*Detention of Asylum-Seekers:* The interim rule does not specify that an alien found to have a credible fear of persecution shall be detained pending completion of the adjudication of the alien's asylum claim. The final rule should be amended to require the detention of such aliens. Release should be permitted only in cases of urgent humanitarian concern and under such circumstances that will ensure the alien's appearance at future hearings. The plain language of section 235(b)(1)(B)(ii) states that in cases where there has been a positive "credible fear" determination, the alien should be "detained" for further proceedings. The intent of Congress is that these further proceedings be conducted promptly, keeping in mind that these are aliens who are prima facie inadmissible to the United States. Adjudications are more likely to be accelerated if the alien is in detention; if the aliens are released, there is likely to be further delay and a certain number of aliens will abscond.

There is a firm and rational basis for detaining such aliens. We can reasonably anticipate an effort by alien smugglers to coach arriving aliens to tell stories in their initial interview that are designed to meet the low threshold of "credible fear." It will not be possible in the initial process to screen out all such cases. The more exacting review conducted by an immigration judge in an adversarial proceeding will hopefully be more successful in this regard. Allowing "screened in" aliens to be paroled from custody will send a signal to alien smugglers that the expedited removal process, intended to be an absolute bulwark against abuse of the asylum system, has loopholes to be exploited. Given the history of this form of abuse, detention must be employed as a deterrent.

*Detention and Parole of Criminal Aliens:* Section 236.1(c)(5) of the interim rule provides that the authority of immigration judges to redetermine custody and bond decisions made by the INS district directors shall not apply with respect to certain types of aliens,

Director, Policy Directives and Instructions Branch
Page 6

including inadmissible aliens, arriving aliens, and aliens deportable on security and related
grounds. However, immigration judges are to retain the ability to make bond and custody
redeterminations in the case of criminal aliens who are described in section 236(c)(1) of the
INA until the expiration of the "Transition Period Custody Rules" authorized under section
303(b)(3) of the IIRIRA.

Immigration judges, after April 1, 1997, have no authority under the INA to make
custody and bond redeterminations in the case of any alien described in revised section
236(c)(1) of the INA. The Transition Period under section 303(b)(3) was included in this
legislation at the request of the Administration based on representations that the *INS* required
flexibility to make custody decisions due to the lack of available space to detain all aliens
described in section 236(c)(1). It was not intended provide any right, entitlement, or claim to
any criminal alien to be released from custody during that period. In short, the Transition
Period was enacted to serve the administration of justice, not to provide a benefit to criminal
aliens.

The interim rule acknowledges these comments, made in the previous letter, and states
that the "Department intends to issue a separate proposed rule in the near future establishing
both substantive limitations and procedural safeguards concerning the release of criminal aliens
eligible to be considered for release under the Transition Rules." 62 FR at 10323. Such
proposed rules are appropriate and should be issued at the earliest possible date. But neither
the final rulemaking on Title III of the IIRIRA, nor the anticipated proposed rulemaking on
detention, should depart from the principle that, to the greatest extent possible, all aliens
described in revised section 236(c)(1) of the INA will be detained, even during the Transition
Period. Criminal aliens should be released *only* where there is no detention space. This is a
determination that should lie exclusively with the INS district director and his or her
supervisors. As previously stated, there is simply no role for immigration judges to play in
this determination, since there is nothing to adjudicate: the alien has no right, under the law,
either to be released or to seek specific conditions on release. If there is detention space, the
alien must be detained. If there is no detention space, the alien may be released, but only
under the terms set by the INS. The clear legislative intent is to end, immediately, the
litigation in immigration court of custody and bond issues regarding criminal aliens. Pending
further clarification in the expected proposed rule on detention, the final rule should be
amended to strike the phrase "After the expiration of section 303(b)(3) of Pub. L. 104-208"
from section 236.1(c)(5)(iv).

AA-REG-00637

Director, Policy Directives and Instructions Branch
Page 7

     We expect that on these and other important issues, the final rule will fully implement the plain language enacted in the IIRIRA.

Sincerely,

Lamar Smith
Chairman
Subcommittee on Immigration and Claims

cc:    Anthony Moscato, Director
      Executive Office for Immigration Review

AA-REG-00638

# EXHIBIT V

Coalition for Humane Immigrant Rights, et al. v. Noem et al., 1:25-cv-00872 (JMC)

# Lawyers Committee
# for Human Rights

100 Maryland Avenue, N.E., Suite 502
Washington, D.C. 20002
Telephone: (202) 547 5692
Facsimile: (202) 543 5999
E-mail: WDC@lchr.org

**Joseph Eldridge,** Director, Washington Office
**Elisa Massimino,** Legal Director, Washington Office
**Cynthia Breslauer,** Office Administrator


*received 2-3-97*

**Board of Directors**

Norman Dorsen, Chairman
Tom A. Bernstein, President
Marvin E. Frankel,
  Chairman Emeritus

M. Bernard Aidinoff
Alice L. Brown
Michael I. Davis
Mitchell F. Dolin
A. Whitney Ellsworth
Kenneth R. Feinberg
John G. Finley
R. Scott Greathead
Deborah M. Greenberg
Rita Hauser
Louis Henkin
Robert D. Joffe
Lewis B. Kaden
Kerry Kennedy Cuomo
Nancy Kuhn
Philip A. Lacovara
Jo R. Backer Laird
R. Todd Lang
Barbara A. Schatz
Steven R. Shapiro
Warren R. Stern
Jay Topkis
Robert F. Van Lierop
George A. Vradenburg, III
Sigourney Weaver
William D. Zabel

Susan Berkwitt-Malefakis
  Counsel

**Main Office**
Michael Posner, Executive Director
Stefanie Grant, Director
Program and Policy
330 Seventh Avenue, 10th Floor
New York, New York 10001
Telephone: 212 629 6170
Facsimile: 212 967 0916
E-mail: NYC@lchr.org
Telex: 5106005783 (LCHRNYC)

February 3, 1997

*By Hand Delivery*
Richard A. Sloan
Director
Policy, Directives and Instructions Branch
Room 5307
Immigration and Naturalization Service
425 I Street, N.W.
Washington, D.C. 20536

        Re:    INS. No. 1788-96: January 3, 1997 Proposed Rule

Dear Mr. Sloan:

        Enclosed are three copies of the comments of the Lawyers Committee
for Human Rights on the proposed rule to amend regulations of the
Immigration and Naturalization Service ("Service") and the Executive Office
for Immigration review ("EOIR") governing the conduct of expedited and
regular removal proceedings and handling of asylum claims. Inspection and
Expedited Removal of Aliens; Detention and Removal of Aliens; conduct of
Removal Proceedings; Asylum Procedures, 62 Fed. Reg. 444 (January 3,
1997) ("Notice"). These comments are timely filed within the deadline
established by the Notice.

        Please contact us should you have any questions regarding the filing of
these comments.

                Sincerely,

                *Elisa Massimino*

                Elisa Massimino
                Acting Director, Washington office

        enclosures

**Washington Advisory Council**

| | | | | |
|---|---|---|---|---|
| Joseph L. Brand | Robert F. Drinan, S.J. | Ronald I. Meltzer | Jerold Oshinsky | Ralph G. Steinhardt |
| Patrick J. Carome | Bruce J. Ennis | Frank H. Menaker, Jr. | Raymond Paretzky | Donald B. Verrilli, Jr. |
| Bert Carp | Kenneth R. Feinberg | Thomas H. Milch | Susan Rappaport | Philip J. Ward |
| Lynda M. Clarizio | William T. Garcia | Martha R. Moffett | Margaret E. Roggensack | Burton V. Wides |
| Mitchell F. Dolin | Daryl Libow | Joan E. Neal | James C. Snipes | Michael C. Williams |
| | Laurel Pyke Malson | Diane F. Orentlicher | Roxane N. Sokolove | |

The Lawyers Committee has formal relations with the United Nations, The Organization of African Unity, and the Organization of American States.

COMMENTS OF THE

LAWYERS COMMITTEE FOR HUMAN RIGHTS


ON


INS NO. 17-88; AG ORDER NO. 2065-96

INSPECTION AND EXPEDITED REMOVAL OF ALIENS;
DETENTION AND REMOVAL OF ALIENS;
CONDUCT OF REMOVAL PROCEEDINGS;
ASYLUM PROCEDURES

Elisa Massimino
Beth Lyon
100 Maryland Avenue, N.E.
Suite 502
Washington, DC 20002
(202) 547-5692

Eleanor Acer

330 Seventh Avenue
10th floor
New York, NY 10001
(212) 629-6170 ex.123

AA-REG-00931

*Introduction*

For more than fifteen years, the Lawyers Committee for Human Rights has worked to ensure protection of the rights of refugees, including the right to seek and enjoy asylum. The Lawyers Committee grounds its work on refugee protection in the international standards of the Convention relating to the Status of Refugees and its Protocol and other international human rights instruments, and we advocate adherence to these standards in U.S. law and policy. The Committee operates the largest and most successful pro bono asylum representation program in the country. With the assistance of volunteer attorneys, the Lawyers Committee provides legal representation, without charge, to hundreds of refugees each year. This extensive experience dealing directly with refugees seeking protection in the United States is the foundation for our advocacy work, and informs the comments that follow below.

As a signatory to the 1967 Protocol relating to the Status of Refugees, the United States is bound by an international standard of treatment of those who flee persecution and seek protection within its borders. In particular, the United States is prohibited under Article 33 of the Convention from returning a refugee to any country in which the refugee's "life or freedom would be threatened on account of his race, religion, nationality, membership in a particular social group or political opinion." Article 34 of the Convention requires that signatory states "shall as far as possible facilitate the assimilation and naturalization of refugees." And Article 14 of the Universal Declaration of Human Rights guarantees all persons the right to seek and enjoy asylum. Implicit in these standards is the obligation of States to ascertain the bona fides of claims for protection by persons within their jurisdiction; a State may not avoid its obligations simply by failing to determine whether or not an individual is a refugee.

The Lawyers Committee vigorously opposed certain provisions of the recently-enacted Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (hereinafter, "the new law") -- among them the asylum application filing deadline and the expedited removal provisions -- because we believe they will severely impede the right of refugees to seek and enjoy asylum and will result in the denial of protection to victims of torture and persecution. We recognize that the Administration was critical of and voiced strong opposition to many of these same provisions during the legislative process and that the President himself, upon signing the bill, expressed concern about and pledged to "seek to correct provisions of this bill that are inconsistent with international principles of refugee protection."

Short of new legislation, however, there is much that can be done in the implementing regulations to ensure, to the extent possible under the new law, U.S. compliance with international obligations regarding the treatment of refugees. Our specific recommendations stem from the following basic principles of refugee protection, drawn from international treaty obligations undertaken by the United States, as interpreted by the office of the United Nations High Commissioner for Refugees (hereinafter, "UNHCR"):

1

AA-REG-00932

1.   *The failure of an asylum-seeker to present valid travel documents upon arrival does not absolve a government of its protection obligation and should not, therefore, operate to bar a refugee from obtaining protection.*

2.   *Application filing deadlines should not constitute a final bar to protection of refugees.*

3.   *Refugee protection should not be dependent on the ability of a refugee to pay an application fee.*

4.   *Detention of asylum-seekers, particularly of those who have demonstrated a prima facia claim for refugee status, should be avoided.*

5.   *Asylum-seekers should be informed of their rights, in particular of the right to apply for protection and the right to representation by counsel, in a timely manner and in a language they understand.*

The sweeping nature of the proposed rule and the extremely short comment period allotted by it make it impossible for us to address every issue implicated by these principles. Yet despite its "breadth and complexity," the proposed rule fails to address many of the procedures necessitated by the new law that will, in their details, have serious implications for refugee protection. For these reasons, our comments must be considered preliminary only.

*Specific Comments*

1.   The one-year filing deadline.

Section 604(a) of the new law amended Section 208(a) of the Immigration and Naturalization Act (as amended by IIRIRA, the "Amended INA") bars consideration of asylum applications not filed within one year of the applicant's arrival in the United States. This provision has widespread potential for impeding access to protection for refugees with legitimate asylum claims. We recognize that the Administration strongly opposed this provision, as did we and the UNHCR, and that the President made specific reference in his signing statement to the application filing deadline as being violative of international principles of refugee protection. The Administration thus has a duty to construe the statutory language in as broad a manner as possible, consistent with its international obligations, in order to minimize the risk that imposition of the deadline will result in denial of protection to deserving refugees. To this end, we suggest that the final regulations incorporate the following suggestions.

a.   Asylum-seekers should be informed of the right to apply for asylum protection and of the asylum filing deadline.

The filing deadline imposed by the new law was designed to encourage asylum-seekers to present their claims as soon as possible after arrival in the United States. In order to accomplish

AA-REG-00933

this purpose, arriving asylum-seekers must be made aware of their right to apply for asylum protection, and of the filing deadline, immediately upon arrival in the United States. The United States has a worldwide reputation for generosity in offering refugees protection within its borders. The new deadline provisions constitute an unprecedented restriction on access to that protection and demand that special care be taken to inform asylum-seekers of the new requirement. To minimize the risk that refugees will be barred from access to asylum for failure to comply with the deadline provision of which they are unaware, the final rule should include a section providing that all arriving aliens be informed in writing of their right to apply for asylum if they fear persecution in their country of origin and their responsibility to do so within one year of having arrived in the United States.

Just such a notification requirement was, in fact, contemplated by the key drafter of the filing deadline provision. Rep. Bill McCollum (R-Fla.), the principal sponsor of the deadline provision in the House of Representatives, presumed that the Service would provide notice of the filing deadline. "Pork", America Online, November 15, 1995 ("the Immigration Service would be required to tell people who came in that they could apply for asylum and this is how long it would take.")

In addition to informing arriving aliens of the new provision, notice of the filing deadline should also be highlighted in the Instructions for the revised Form I-589 Application for Asylum and Withholding of Removal. Section 299.1 of the Proposed Regulations indicates that Form I-589 will be revised as of April 1, 1997. We suggest that notification of the filing deadline and the exceptions, including the availability of withholding of removal, be included in bold face print on the cover page of the Instructions and in the section of the Instructions entitled "Basis of Eligibility." Revisions to Form I-589 and its instructions should be subject to notice and public comment, as has been the case with prior revisions.

      b.      The Regulations should explicitly state what constitutes "filing" for purposes of complying with the application deadline.

The new law requires that, in order to satisfy the filing deadline, an applicant for asylum must demonstrate that the application has been filed within 1 year after the date of the alien's arrival in the United States. However, neither the law nor the Proposed Regulations set forth under what circumstances an asylum application is deemed "filed" for purposes of meeting the deadline requirement. For example, the Proposed Regulations do not state whether the application is deemed filed on the date the application is mailed to the Service or on the date the Service receives the application. Likewise, the Proposed Regulations to not address the situation of misfiled or incomplete applications. Under current procedure, date of filing is relevant primarily for determining when the waiting period, during which an applicant may not apply for work authorization, begins. For this purpose, the INS may return an asylum application -- and deem it not filed -- if, for example, the applicant has failed to answer a question on the form, or includes the right number of photographs but of the wrong dimension, or submits the application to the wrong INS office. Few asylum-seekers have access to counsel to assist them in preparing

3

their applications; many are not fluent in English and have difficulty understanding the complex instructions for filing. Prior to enactment of the new law, failure to effect proper filing had the relatively minor consequence of delaying the start of the work authorization waiting period; an applicant could perfect the filing simply by submitting a new form and correcting the defect.

Under the new law, however, such errors could ultimately bar a refugee's claim from ever being heard. The central presumption behind the one-year filing deadline is that those who arrive in this country genuinely fearful and seeking protection will promptly seek to identify themselves as asylum applicants. An asylum-seeker who files an application within that period, however defective, has demonstrated bona fides under this rationale. We suggest, therefore, that §208.4 of the Proposed Regulation be revised to specifically provide that, for purposes of determining compliance with the filing deadline, an application for asylum will be deemed "filed" on the date the application is mailed or otherwise sent (or delivered by hand) to the INS or EOIR, even if such application is technically deficient or filed at the wrong location.

The regulations should also provide that, for purposes of determining compliance with the filing deadline, an applicant included as a dependent on a principal's asylum application, who subsequently loses eligibility as the principal's derivative or who is not issued a Notice to Appear when the principal application is referred, be deemed to have filed a timely application so long as the original application on which he was included as a dependent was timely filed. This clarification will encourage continuation of the current practice, urged on practitioners by the INS, whereby dependents of a principal applicant refrain from applying separately when the factual basis of the claim is indistinguishable from that of the principal.

     c.     The determination of whether an application is not timely filed should be made by an asylum officer or an immigration judge.

Under current practice, determinations of when an asylum application is "filed" are left to INS personnel at the Regional Service Centers. However, this practice will not suffice to protect the rights of refugees who, if their applications are deemed not timely, may be ineligible to apply for protection. Determinations concerning the timeliness of asylum applications, and the applicability of the exceptions to these provisions, should not be the province of Service Center personnel. Only trained asylum officers or immigration judges, in the context of an adjudication of the merits of the asylum application, should make these determinations. We suggest that §208.4 of the Proposed Regulations be amended to reflect these recommendations.

     d.     The statutory exceptions to the filing deadline should be broadly construed and explicitly delineated in the Proposed Regulations.

President Clinton expressed concern in his statement accompanying the signing of the new law that the "imposition of rigid deadlines for asylum applications" may be "inconsistent with international principles of refugee protection." Indeed, UNHCR instructs that "[t]he United States is obliged to protect refugees from return to danger regardless of whether a filing deadline

4

has been met." UNHCR Executive Committee Conclusion No. 15 (1979). Short of a legislative repeal of the deadline provision, a broad and flexible application of the exceptions to the one-year filing deadline can go a long way towards ensuring that the United States does not exclude eligible refugees from protection on technical grounds. We believe the statutory language, as supported by the legislative history, provides ample room for a generous interpretation of the exceptions to the deadline. Senator Orin Hatch (R-Utah), expressed the view that the exceptions to the filing deadline, which he supported, should be broadly interpreted to protect those with legitimate asylum claims. Senator Hatch noted that, "if the time limit and its exceptions do not provide adequate protections to those with legitimate claims of asylum, I will remain committed to revisiting this issue in a later Congress." 142 Cong. Rec. S11492 (September 27, 1996).

We believe the best way to ensure that the exceptions are applied consistent with congressional intent is to provide in the regulations a clear, non-exclusive list illustrating the types of circumstances that would excuse a failure to meet the one-year deadline. This approach has a number of benefits. Given the increased adjudicatory burden placed on the Service by the imposition of the one-year filing deadline, promulgation of examples of circumstances that would trigger an exception will provide needed guidance to asylum officers and immigration judges faced with administering a new and unique requirement of the statute. Regulatory guidance will help ensure consistency and fairness, and is particularly necessary in light of the unavailability of judicial review. Promulgation of a list of examples will help protect asylum applicants from the vagaries of inconsistent interpretation of the exceptions to the filing deadline, and will assist potential asylum applicants and their counsel, if any, in determining whether there are grounds to apply for asylum even if the filing deadline has passed.

  i.  The Changed Circumstances Exception

Section 208(a)(2)(D) of the Amended INA provides that an application for asylum may be considered despite a failure to meet the filing deadline if the "applicant demonstrates to the satisfaction of the Attorney General the existence of changed circumstances which materially affect the applicant's eligibility for asylum." Section 208.4(a)(2)(ii) of the Proposed Regulations further limits the scope of the exception by requiring that the changed circumstances must have arisen "since the 1-year period has expired."

The Proposed Regulations provide no guidance as to what may constitute circumstances materially affecting the applicant's eligibility. In fact, the Supplementary Information preceding the text of the Proposed Regulations concedes that "[t]he regulation provides minimal guidance on the meaning of the term "changed circumstances." 62 Fed. Reg. at 447. Yet, in addition to the reasons set forth above, regulatory guidance is especially necessary in this case to prevent any confusion of the "changed circumstances" exception with the narrower concept of changed country conditions under 208.13(b)(1) (required in order to rebut the presumption that a victim of past persecution has a well-founded fear of future persecution). That concept of changed conditions is more limited, focusing on conditions in the applicant's home country, and not on other sorts of changed circumstances that would be covered by the broader filing deadline

5

exception.

The legislative history offers a great deal of detail concerning the scope of the exception. Senator Hatch (R-Utah) stated that the changed circumstances provision would include:

> situations like those in which an alien's home government may have stepped up its persecution of people of the applicant's religious faith or political beliefs [and] where the *applicant may have become aware* through reports from home or the news media just how dangerous it would be for the alien to return home.

In another discussion of the changed circumstances provision, Senator Hatch similarly explained that:

> the changed circumstances provision will deal with situations like those in which the situation in the alien's home country may have changed, the *applicant obtains more information* about likely retribution he or she might face if the applicant returned home, *and other situations that . . . Congress may not be able to anticipate at this time*.[2]

Senator Hatch's comments highlight several important points. First, his comments confirm that material changes relating to conditions in the applicant's home country would include an increase in the level of ongoing persecution. Second, Senator Hatch's comments demonstrate that the changed circumstances exception was meant to include changes relating to the asylum applicant's awareness or knowledge of circumstances. Third, Senator Hatch's reference to "other situations that...Congress may not be able to anticipate" confirms that the provision should be interpreted broadly to meet other situations.

We believe it is both consistent with statutory intent and essential to ensure compliance with international standards that the changed circumstances exception be defined to expressly include changes relating to the applicant's awareness or knowledge of the fact that he or she might be eligible to apply for asylum protection, including knowledge that such eligibility might be affected by the existence of the new asylum filing deadline. Through years of experience representing asylum seekers, we have learned that the vast majority of asylum seekers lack knowledge of the legal requirements for asylum eligibility. For example, many understandably assume that "political asylum" is available only to those who are politically active -- and consequently individuals who are victims of persecution because of their religion or ethnicity often do not realize that they are eligible for asylum protection. It is quite apparent to us that, of the many potential asylum applicants who have come to our offices seeking legal representation since the enactment of the new law, virtually none are aware of the filing deadline requirement. When a potential asylum applicant becomes aware of the new filing deadline and learns that, as a result,

---

1.    142 Cong. Rec. S11491 (daily ed. September 27, 1996) (emphasis added).

2.    142 Cong. Rec. S11840 (daily ed. September 30, 1996) (emphasis added).

AA-REG-00937

his or her eligibility for asylum may be affected -- indeed may be barred -- this unquestionably constitutes learning of "the existence of changed circumstances which materially affect the applicant's eligibility for asylum."

The changed circumstances exception should also cover changes relating to an asylum applicant's immigration status in the United States. In our experience, many individuals who fit the refugee definition are in the United States pursuant to valid non-immigrant visas or Temporary Protected Status and do not learn of or begin to consider the possibility of applying for asylum while they are "in status." In our experience, these individuals may spend several years in the U.S. on non-immigrant visas, and only have reason to seek information about applying for asylum when their visas expire and they realize that, despite their hopes, conditions at home have not improved. If the changed circumstances exception is not defined to include such situations, such refugees may be barred from applying for asylum.

Finally, §208.4 of the Proposed Regulations should be amended to delete the provision requiring that, in order to excuse a failure to meet the filing deadline, the changed circumstances must have arisen since the expiration of the one-year period. This provision is neither required nor contemplated by the statute. Moreover, it could have the absurd and, one hopes, unintended effect of barring consideration of an asylum application of a refugee who learned of the changed circumstances one day before the filing deadline.

We propose that Section 208.4 be amended to provide that:

The term "changed circumstances" in Section 208(a)(2)(D) shall include, without limitation, the following:

(1)     changes relating to the applicant's home country, including increased persecution or increased reports of persecution;

(2)     changes relating to the applicant's knowledge of relevant events that may support his or her asylum application;

(3)     changes in the applicant's knowledge that he or she may be eligible to apply for asylum or that such application may be subject to a filing deadline;

(4)     changes in the applicant's immigration status or Temporary Protected Status or status as a dependent on a previously filed application;

(5)     pertinent changes in the applicant's personal circumstances;[3] or

---

3.     For example, if the applicant married and, as a result of such marriage, has a genuine fear of persecution.

7

(6)     other changes or combination of changes affecting an applicant's eligibility
for asylum or knowledge of matters relating to his or her eligibility.

ii.     Extraordinary circumstances

Section 208(a)(2)(D) of the Amended INA provides that an asylum applicant may
overcome the filing deadline by "demonstrat[ing] extraordinary circumstances relating to the delay
in filing an application" within the deadline. Section 208.4 of the Proposed Regulations
introduces several new -- and restrictive -- concepts to this exception by defining extraordinary
circumstances as "events or factors *beyond the alien's control* that *caused* the failure to meet the
one-year deadline" (emphasis added) and by limiting the benefit of the exception only to those
applicants who file their applications "as soon after the deadline as practicable given those
circumstances."

Limiting the reach of the "extraordinary circumstances" exception only to those events or
factors "beyond the alien's control" (a concept not present in the statutory provision) and
requiring a direct causal relationship between the circumstances and the failure to meet the
deadline (as opposed to the weaker "relating to" connection) not only conflicts with the clear
statutory language, but also directly contravenes the expressed intent of Congress, as found in the
legislative history, that the exception be interpreted broadly. Moreover, the requirement that an
application be filed "as soon as practicable" after the occurrence of an event or factor constituting
an "exceptional circumstance," though it may seem reasonable on its face, has no foundation
whatsoever in the statutory language and must, in light of the variety of factors that may
constitute the exception, be extremely subjective in its implementation. The problems with this
tack are exacerbated by the failure to provide illustrative examples in the regulations, combined
with the listing, in the Supplementary Information, of several extremely narrow examples of
circumstances the INS "can imagine" would likely qualify as "exceptional."

We recommend a different approach. For many of the same reasons we advocate amending
amending the regulations to include an illustrative list of "changed circumstances" that would
excuse failure to meet the filing deadline, a similar approach should be taken with regard to
"exceptional circumstances." In the Supplementary Information to the Proposed Regulations, the
INS itself notes the "novelty" of the "extraordinary circumstances" language. The risk of
inconsistent application of this novel exception is great, particularly since guidance will not be
available from the federal courts. This risk will be substantially decreased if more detailed
instruction is provided in the regulations. An extensive list of examples should aid adjudicators in
making these difficult decisions and increase both efficiency and consistency of decision-making.

UNHCR lists the following as examples of circumstances which should excuse an asylum
seeker's failure to comply with a filing deadline: "lack of information about the asylum process,
preoccupation with meeting basic survival needs, inability to communicate in English, and
insufficient resources for obtaining counsel." 142 Cong. Rec. S11905 (daily ed. September 30,
1996). Senator Hatch informed the Senate that extraordinary circumstances "could include, for

8

instance, physical or mental disability, efforts to seek asylum that were thwarted due to technical defects or errors for which the alien was not responsible, *or other extenuating circumstances*." 142 Cong. Rec. S11491-11492 (September 27, 1996) (emphasis added). In Senator Hatch's view, "most of the circumstances covered by the Senate's good cause exception will be covered either by the changed circumstances exception or the extraordinary circumstances exception." 142 Cong. Rec. S11491 (daily ed. September 27, 1996). The "good cause" exception to which Senator Hatch referred, included "threats of retribution against the applicant's relatives abroad; attempts to file affirmatively that were unsuccessful because of technical defects; efforts to seek asylum that were delayed by the temporary unavailability of professional assistance; [and] the illness or death of the applicant's legal representative." H.R. 2202 (originally § 1664), as passed and renumbered by the Senate, 142 Cong. Rec. S4730 (daily ed. May 6, 1996).

We suggest that Section 208.4(a)(3) of the Proposed Regulations be amended to read as follows:

> The term "extraordinary circumstances" in Section 208(a)(2)(D) of the Act shall include, without limitation, the following events or factors relating or contributing to delay in filing:
>
> (1)    a physical or mental condition, including, without limitation, injury, trauma or post-traumatic stress disorder;
>
> (2)    a legal disability (*e.g.*, applicant was a minor or was suffering a mental impairment);
>
> (3)    inability to obtain counsel, including, without limitation, lack of resources to obtain counsel, or ineffective assistance of counsel;
>
> (4)    applicant's awareness of threats to, or credible fear of retribution against, his or her relatives abroad;
>
> (5)    technical defects or errors relating to the filing of the asylum application;
>
> (6)    applicant's lack of knowledge of asylum procedure or the asylum filing deadline;
>
> (7)    serious illness, other incapacity or death of applicant's legal representative or immediate family member;
>
> (8)    the impact of the mistreatment or abuse received by the applicant in his or her country or former place of residence; or
>
> (9)    other extenuating circumstances or combination of circumstances.

9

AA-REG-00940

### iii.    Burden of proof

Pursuant §208.13(c) of the Proposed Regulations, an applicant who has not filed within one year must prove "by clear and convincing evidence" that he is eligible.  This appears to be an attempt to implement Section 208(a)(2)(B) of the Amended INA, which provides that an alien applying for asylum must "demonstrate by clear and convincing evidence" that his or her application has been filed within one year of having arrived in the United States.

As currently drafted, however, the Proposed Regulation risks being interpreted as requiring not only that an applicant establish compliance with the filing deadline by "clear and convincing evidence," but also that the applicant must establish eligibility for one of the exceptions or otherwise prove eligibility for asylum by "clear and convincing evidence."  In order to prevent confusion, §208.13(c) should be revised to clarify that the "clear and convincing evidence" standard applies only to the demonstration of compliance with the filing deadline, not to establishing applicability of the filing deadline exceptions or to eligibility for asylum.[a]

### 2.    Discretionary denial based on "safe third country" option

Section 208.13(d) of the Proposed Regulations provides that "[a]n asylum application may be denied in the discretion of the Attorney General if the alien can be removed to a third country which has offered resettlement and in which the alien would not face harm or persecution."  This section appears to revise and replace current 8 C.F.R. §208.14(e), but there appears no longer to be a statutory basis for such a provision.  To the extent that the Proposed Regulation is an attempt to implement §208(a)(2)(A) of the new law, it is inconsistent with that provision.  Section 208(a)(2)(A) sets out a scenario under which an otherwise eligible asylum-seeker may not *apply for* asylum protection; it does not address eligibility on the merits, and therefore does not relate to the grant or denial of relief.  Moreover, §208(a)(2)(A) provides a number of prerequisites which must be satisfied before the provision may operate to bar an asylum-seeker from applying for relief, including the existence of a bilateral or multilateral agreement between the United States

---

[a]The ancient canon of statutory construction known as *expressio unius est exclusio alterius* (the mention of one impliedly excludes others) instructs that, as Congress required clear and convincing evidence only in the case of proving compliance with the one year time limit, Congress impliedly decided against imposing such a heightened standard elsewhere. *See, e.g.,* Greene v. United States, 79 F.3d 1348, 1355 (2d Cir. 1996).  In other words, when Congress wanted to require that aliens make a higher showing than a preponderance of the evidence, it did so explicitly, and its failure to do so in this portion of section 208(a)(2)(D) of the Amended INA should be dispositive. *See* B.F. Goodrich Co. v. Murtha, 958 F.2d 1192, 1200 (2d Cir. 1992).  Second, a construction of this statute by which the alien must always prove facts by clear and convincing evidence would improperly render the "clear and convincing" language in §208(a)(2)(B) mere surplusage. *See* Ratzlaf v. United States, 510 U.S. 135, 140-41 (1994).

AA-REG-00941

and the country to which the alien may be removed.

In light of these considerations, §208.13(d) should be removed from the Proposed Regulations.

3.    Termination of asylum or withholding of removal

Section 208.22 of the Proposed Regulations sets forth the grounds and procedures for termination of asylum or withholding of removal.  With regard to termination of asylum, §208.22 appears to implement §208(c)(2) of the Amended INA.  However, under the new statutory scheme, there is no provision for withholding of removal.  The withholding provision appears at §241(b)(3)(A) of the Amended INA and, although it outlines exceptions to eligibility for relief, it does not appear to contemplate termination once relief has been granted.  Therefore, we suggest at the outset that §208.22 be revised to eliminate reference to termination of withholding and deal solely with termination of asylum.

Amended INA §208(c)(2) provides a list of ten broad grounds upon which a final grant of asylum may be terminated, including:  a fundamental change in circumstances such that the asylee no longer meets the refugee definition; the asylee is found to be a persecutor; the asylee, having been convicted by a final judgement of a particularly serious crime, constitutes a danger to the community; the asylee committed a serious nonpolitical crime prior to arrival in the United States; the asylee is a danger to the security of the United States; the asylee committed terrorist activities and is a danger to the security of the United States; the asylee was firmly resettled in another country prior to arriving in the United States; the asylee may be removed to a safe third country pursuant to a treaty; the asylee has returned to and has a reasonable possibility of permanent residence in the country of feared persecution; and the asylee acquired new nationality in safe third country.

Proposed Regulation 208.22 would add yet another ground to this extensive list -- there is a showing of fraud such that the asylee was not eligible when granted asylum.  We believe this expansion of the grounds for termination is, for two reasons, unwarranted and impermissible. First, asylum adjudicators of first instance -- asylum officers and immigration judges -- are already well equipped with procedures to detect material fraud, including country conditions resources and consultation with the Department of State.  Second, post-grant discovery of fraud in an initial application does not fall within one of the six grounds of "cessation" (termination) enumerated in the 1951 Refugee Convention[5], to which the United States bound itself when it ratified the 1967 Protocol relating to the Status of Refugees.  According to the UNHCR *Handbook,*[6] which has

---

[5] 1951 Refugee Convention relating to the Status of Refugees, Art. C 1.

[6]United Nations' Handbook on Procedures and Criteria for Determining Refugee Status Under the 1951 Convention and the 1967 Protocol Relating to the Status of Refugees (Geneva, 1992).

AA-REG-00942

been recognized by the Supreme Court as persuasive authority in interpretation of the Protocol,[7] "the cessation clauses are negative in character and are exhaustively enumerated. They should therefore be interpreted restrictively, and no other reasons may be adduced by way of analogy to justify the withdrawal of refugee status."[8]

Section 208.22(a)(3) of the Proposed Regulations would allow termination of asylum based on applications filed before April 1, 1997, if it is determined that "the alien no longer has a well-founded fear of persecution upon return due to a change of country conditions . . . or the alien has committee any act that would have been grounds for denial of asylum under §208.14(e)(2)." For the reasons stated above, the Lawyers Committee suggests that the grounds for termination be limited to those listed in the current INA.[9] Moreover, we suggest that the language of this provision be revised to track the broader language of the current statute: "the alien is no longer a refugee within the meaning of section 101(a)(42)(A) owing to a change in circumstances in the alien's country of nationality or, in the case of an alien having no nationality, in the country in which the alien last habitually resided."[10] The proposed regulatory language, would seem to contradict to the pre-April 1, 1997 statutory language in its potentially negative impact on those who were legitimately granted asylum based on past persecution pursuant to U.S. law.[11]

Finally, we are concerned by the lack of procedural safeguards afforded to asylees whose status may be subject to termination. In particular, §208.22(a) should provided that the INS must establish by a preponderance of the evidence that an asylee is no longer eligible for asylum or withholding. If status is terminated by an asylum officer, that decision must be subject to a de novo review by an immigration judge, with backdated reinstatement of overturned termination decisions. In any event, it should be clearly stated in the final regulations that termination of asylum under §208.22(a) does not bar reassertion of the claim in removal proceedings. And finally, §208.22(c) of the Proposed Regulations should be amended to delete the provision allowing an immigration judge to terminate asylum or withholding that was granted by the Service "at any time" after the asylee has been notified of the Service's intent. This provision eviscerates all other procedural safeguards and could be

_____

[7]See INS v. Cardoza-Fonseca, 480 U.S. 421, 438-39.

[8]UNHCR *Handbook* ¶ 117.

[9]It appears that the additional ground we advocate eliminating from 208.22(a)(3) should be revised to read "208.13(c)(2)" rather than "208.14(e)(2).

[10]8 U.S.C. § 1158(b) (1996) (emphasis added).

[11] *See, e.g., Matter of H-,* Int. Dec. 3276 (BIA 1996); Matter *of Chen,* Int. Dec. 3104 (BIA 1989).

AA-REG-00943

construed to permit termination without the opportunity to rebut the Service's allegations.

4.    Other asylum provisions

    a.    Definition of "frivolous"

Amended INA §208(b)(6) provides that "[i]f the Attorney General determines that an alien has knowingly made a frivolous application for asylum . . . the alien shall be permanently ineligible for any benefits under this Act."  In the Supplementary Information to the proposed rule, the INS explains that the statute and accompanying regulation are designed to "discourage applicants from making patently false claims." 62 Fed. Reg. at 447.  However, §208.18 of the Proposed Regulations would expand the statutory provision significantly, by providing that an application is frivolous "if it is fabricated or brought for an improper purpose" (emphasis added).

The phrase "brought for an improper purpose" is nowhere present in the statute, nor is it defined in the Proposed Regulations.  As written, the provision could operate to permanently bar a refugee from protection if, for example, he filed a truthful application (which established eligibility for refugee status) but did so only for the purpose of obtaining work authorization, having been unaware of the benefits of asylum.  Extreme care must be taken with language creating such a severe and permanent penalty.

We suggest that the "improper purpose" language be deleted from the proposed regulation.  Moreover, any regulatory language implementing Amended INS §208(b)(6), should reflect the reality that most asylum applicants cannot afford to hire counsel to advise them on the legal merits of their asylum claims, and many do not speak English.  The regulatory provision should not punish individuals who may have a genuine subjective fear of returning home -- even if the legal merits of their asylum claim may be weak.

Finally, every asylum applicant should be advised of the consequences of filing a frivolous application.  No consequences should attach to such filing if the applicant voluntarily withdraws his or her application prior to the final determination on such application before an asylum officer or an immigration judge.

13

b.     Disclosure to third parties of information contained in asylum applications

We note that §208.6 of the Proposed Regulations changes the current regulation governing disclosure to third parties by removing from subsection (a) the discussion of the deletion of identifying details from copies of asylum or deportation decisions maintained in public reading rooms.  The importance of confidentiality to refugees, particularly those who fear for the safety of family members outside the United States, cannot be overstated.  Without knowing the rationale for this shift, we must object and urge that the current confidentiality provision remain.

c.     Consideration of persecution for unauthorized departure

The Proposed Regulations delete the requirement currently found at 8 C.F.R. 208.16(b)(4) and 208.13(b)(2)(ii) that adjudicators give "due consideration to evidence that the government of the applicant's country of nationality or last habitual residence persecutes its nationals or residents if they leave the country without authorization or seek asylum in another country."  The stated rationale for eliminating these provisions is that they "accomplish little and are potentially misleading in their current form" because " the term 'due consideration' provides little guidance," and "[u]nder current law, prosecution for migration-related offenses does not ordinarily amount to persecution."  We believe these provisions are of value in encouraging adjudicators to attend to the unusual but highly relevant phenomenon of retaliation by a government or non-governmental entity, in the form of persecution, for fleeing and/or seeking protection of the international community.  If the current language has in fact been misleading, it should be clarified and not deleted.

d.     Filing Fee

We applaud the decision of the INS not to impose a filing fee on asylum applications.  This decision not only comports with international obligations, but reflects a judgment that, in light of the fact that the United States' obligation to protect refugees does not depend on a refugee's ability to pay a fee, the cost of adjudicating the necessary fee waivers would make a fee structure for asylum unworkable.  Now that bona fide asylum applicants are no longer eligible for employment, imposition of fee would be an even stronger impediment to protection for indigent refugees that it was when the proposal to charge a fee was first considered in 1994.[12]

---

12/     UNHCR Executive Committee Conclusion No. 22 (1981) states that asylum-seekers "should receive all necessary assistance and be provided with the basic necessities of life, including food, shelter and basic sanitary and health facilities."  The imposition of a fee would exacerbate the situation for many asylum applicants who, in light of the limitation on receiving work-

14

AA-REG-00945

5.    Expedited Removal

Through our extensive experience dealing with arriving asylum-seekers, we know that the use of false travel documents is often the only means of escape for some refugees, and that the failure to produce valid documents on arrival bears little relationship to the validity of the refugee claim.  Although the new law targets those without valid documents for expedited removal, much can be done to ensure, within the confines of the statutory language, that asylum-seekers who arrive without documents are afforded access to an adjudication procedure that comports with traditional notions of fairness and due process.

Regardless of the manner in which a person enters or seeks to enter the United States, the procedure by which such person's immigration status is evaluated to determine whether the person should be removed must recognize and account for the possibility that the person is a refugee.  As such, the expedited removal procedures must include adequate safeguards to protect refugees, and no one should be subject to removal procedures that do not contain such safeguards.

a.    Scope of application

At least initially and consistent with its statutory mandate, the Service should apply the expedited removal procedures narrowly.  These procedures are unprecedented and are being devised and implemented within a very narrow time period.  As such, there is a substantial possibility that there will be unforeseen problems and unintended adverse consequences.  Moreover, because of the extremely limited time frame within which these procedures will be executed on a case-by-case basis, there will be little if any opportunity to correct mistakes made during the expedited removal process.  Given the often life-or-death consequences of erroneous decisions in these circumstances, every effort must be made to ensure that refugees entitled to protection are not be removed by mistake during the initial start-up phase of this new program.  We expect that the Attorney General would seek to minimize the scope of this provision by limiting the categories of aliens subjected to expedited removal, and we are pleased that this appears to be the initial approach.

The Service also will benefit from implementing the expedited removal procedures incrementally.  Implementation undoubtedly will prove to be a monumental task, stretching the Service's already thin administrative resources to the limit.  As such, the Service should limit the applicability of the expedited removal procedures at least until it has had an opportunity to evaluate the efficacy of the procedures and to correct any problems and address any issues that have not been anticipated.  In particular, we urge that the program be limited in application only to those persons apprehended upon arrival, and not be applied to those who "entered" without inspection.  Such an approach would be consistent with the position taken by the

---

authorization, are already faced with the difficult task of providing for the necessities of life.

15

Administration in the past and would, by reducing the numbers of people who would be subject to the new procedure, help to minimize the risk that refugees would be erroneously excluded. [13]

b.    Secondary Inspection

As Congress considered various forms of summary removal, particular attention was given to the form and content of the so-called "credible fear" screening interview through which an arriving refugee would have to successfully pass in order to be permitted to apply for asylum. Little thought seemed to be given to the previous hurdle raised by the new law which, if not crossed, will bar an arriving refugee from accessing even the credible fear screening interview. The INS faces a daunting challenge under the new law in that it must identify, in very difficult circumstances, which individuals arriving without proper travel documents should receive a credible fear screening interview. If mistakes are made at this stage of the process, there is no opportunity for corrective action, and the consequences for a refugee erroneously denied the opportunity for an interview could be quite dire.

The proposed regulations are largely silent on this issue and provide little guidance to immigration inspectors. This is perhaps due to the flawed assumption that the inspections process need not change from current practice in order to accommodate the new expedited removal process. Today, secondary inspection operates as a sort of "triage" or sorting mechanism at ports of entry. It cannot result in the forced expulsion of an applicant for admission; applicants who press their claims for admission over INS challenge are held over for a hearing before an immigration judge where these issues are explored in an adversarial setting.

But on April 1, the import of secondary inspection will change dramatically. Decisions made in the context of secondary inspection can be permanent, unreviewable, and carry severe penalties. Because of the heightened importance of secondary inspection, and in particular because secondary inspection is an extraordinarily ill-suited venue for expression of fears by a refugee who may be suffering from the physical and psychological effects of torture, secondary inspection must be transformed. The INS should take concrete and demonstrable steps to ensure that protections are in place at this stage of the process to prevent life-threatening errors and to ensure compliance with international obligations. In light of these

---

13/    The Justice Department apparently agrees with this view. In a February 14, 1996 letter sent to Senator Orrin Hatch, [then-]Deputy Attorney General Jamie Gorelick wrote that for "aliens who have been here for lengthy periods after having entered without inspection, the determination of when they entered will be difficult. . . . If such [expedited review] authority is to be used at all, it should be invoked only in extraordinary migration situations and only in circumstances that would support a strong presumption that the person's entrance was quite recent."

AA-REG-00947

important purposes, this transformation of secondary inspection should be set forth in the final regulations, not simply outlined in an internal procedures manual.

     i.     Training of Interviewing Immigration Officers

No matter how effective the substantive and procedural safeguards established later in the expedited removal process may be, failure to accurately identify refugees during secondary inspection may mean a death sentence for some. Moreover, it can often be quite difficult to communicate effectively in an interview setting with individuals who are genuinely fearful. Although specialized training was not required under previous regulations, given the added burden and responsibility placed on immigration officers by the new law, and the heightened import of their decisions, such training is essential. We recommend that the final regulations incorporate a training requirement for inspectors and their supervisors which the elements outlined below.

Immigration officers assigned to conduct these secondary inspection interviews must receive comprehensive and detailed training in the proper identification of those entitled to a credible fear interview. The existing regulations require asylum officers to "receive special training in international human rights law, conditions in countries of origin, and other relevant national and international refugee laws." 8 C.F.R. §208.1(b) (1996). Training in these areas (although not necessarily the same amount required of asylum officers) would help to ensure proper conduct of the inspection interview.

Specialized training is particularly necessary to provide guidance on how to identify whether an alien "indicates an intention to apply for asylum, a fear of persecution, or a fear of return." 8 C.F.R. §235.3(b)(4). Although this language may at first glance seem straightforward, the range of statements and conduct that might reflect an indication of a "fear" are varied and often not self-evident. Training in this area will be particularly needed as many immigration officers may have pre-existing concepts of "fear" based on their understanding of the "fear" necessary to establish asylum eligibility

Moreover, training will provide an opportunity to instruct immigration officers that their inquiry need not go beyond identification of a "fear" or the desire to apply for asylum; any fear will warrant reference to a credible fear interview. For example, the fear need not necessarily be a fear of physical harm; the fear need not be a fear of governmental actors and can, under certain circumstances, be a fear of family members. It must also be stressed that the immigration officer is not charged with determining whether that fear is credible, and must refer an individual who indicates a fear to a credible fear interview -- even if the officer believes that the fear is not credible.

In addition to training on the characteristics which qualify an individual for referral to a credible fear interview, inspectors will need training on how to elicit this information, and how to ensure that language, culture, trauma and other factors do not obscure the communication of

17

AA-REG-00948

fear. Our direct experience with hundreds of asylum-seekers has taught us that many refugees arrive here exhausted, weak, hungry, scared and disoriented from their ordeals and flight from danger. Indeed, many may be suffering from post-traumatic stress disorder as a result of imprisonment, interrogation, torture or other persecution. Others may be uneducated, unable to speak English or to clearly articulate their fears, or unaware that there is a procedure for seeking formal asylum protection in the US. In addition, many refugees are fearful of confiding in a governmental official, particularly one in uniform, having been persecuted by government agents in their own countries. Thus, while these concerns need not trouble inspectors today, since these issues may be sorted out in the context of an exclusion hearing, they take on critical importance on April 1.

To ensure that those who are fearful of return are appropriately referred to a credible fear interview, inspectors may therefore need to rely on more than a refugee's responses to questions in making this determination. Inspectors should receive specialized training in how to identify those exhibiting indicia of fear and on how to identify signs that in individual may be suffering from post-traumatic stress disorder or other debilitating effects of torture.

Furthermore, inspectors must be informed of and trained to execute their duty to implement the obligations of the United States under Article 3 of the Convention Against Torture and Other Cruel Inhuman or Degrading Treatment or Punishment, i.e., under no circumstances should any individual who expresses a fear of being tortured be issued an expedited removal order.

Training is particularly crucial for supervisory immigration officers, as they are the only check on the immigration officer's decision to issue an order of expedited removal. Supervisory officers should be provided with additional specialized training and should receive training commensurate to that received by trained asylum officers. See 8 C.F.R. 208.1(b). In particular, they should receive extensive training in human rights conditions world-wide.

ii.    Provision of Interpreters

A major obstacle for many refugees arriving in the United States is their inability to communicate painful experiences and complex and subjective feelings of fear and anxiety in a language understood by the Service officer. To ensure that lack of communication or miscommunication does not inadvertently lead to the improper return of refugees, qualified interpreters must be provided throughout the expedited removal process, including during secondary inspection. The final regulations should include such a requirement.

Although some provision is made for an interpreter at the subsequent credible fear interview, if a refugee and an immigration officer are unable to effectively communicate during the inspection interview, the refugee may be erroneously denied a credible fear interview and, as a result, may be improperly returned to his or her home country to face further persecution.

18

AA-REG-00949

Current practice, which allows inspectors to communicate with an applicant in a number of irregular ways, including by using fellow passengers or airline personnel (who could, in the case of some airlines, actually be employees of the government from which a refugee is fleeing) as interpreters, is simply unacceptable under the new summary removal process. Because of the heightened importance of the interview and the sensitive nature of the information elicited by inspectors, we strongly recommend that, when an immigration officer and an alien cannot communicate fluently, the INS must provide for a qualified interpreter, fluent in the individual's native language or other language of fluency/choice. Consistent with the proposed rule on the use of interpreters in credible fear determinations, see 8 C.F.R. § 208.30(b), the interpreter used in an inspection interview must not be "a representative or employee of the applicant's country of nationality or, if the applicant is stateless, the applicant's country of last habitual residence."

The regulations should specifically provide that INS will provide, upon request, for interpreters of a specific gender. Many refugees' asylum claims are based on the fact that they were the victims of rape or other sexual abuse. Such refugees may, because of the trauma they have suffered, be unable to communicate their fear -- which relates to highly sensitive and personal information -- to an interpreter of a particular gender.

       iii.     Notice to those Subject to Process

Because of their unique circumstances, arriving refugees cannot reasonably be expected to self-identify unless it is made clear at the outset that the adjudicative process requires articulation of a fear or reluctance to return immediately upon arrival. Thus, it is critical that the regulations include a requirement that those arriving without documents be informed, orally and in writing, of the availability of asylum and how to go about seeking such protection. In addition, they should be notified, at the inspections phase, of the right to counsel and be provided the information and means to exercise that right.

Recognizing this need for information, §235(b)(1)(B)(iv) of the new law specifically directs the Attorney General to provide information concerning the credible fear interview to "aliens who may be eligible." In order for the information be provided to all "aliens who may be eligible," it must be distributed at the earliest stage possible -- and certainly prior to the inspection interview during which the alien's right to a credible fear interview will be determined.

The notice should inform those subject to an inspection interview that if they fear returning to their home country or fear persecution they may be eligible for protection in the United States. It should further inform them that, if they desire to seek such protection, they must inform the immigration officer immediately. The notice should inform individuals that if they fail to express their fears or desire to seek protection to an immigration officer, they will lose the opportunity to seek asylum protection from the United States. The notice should include the right to consult with UNHCR, an attorney or a family member or friend, prior to

19

the inspection interview, if they so request.  The notice should also inform applicants that they can be represented by an attorney during the interview if they wish, and a list of non-profit legal counsel should be attached.

The notice should be provided to applicants in a language he or she understands.  It should be furnished to the applicant prior to the secondary inspection interview, perhaps by the immigration officer at the initial inspection post.  The alien must be instructed to read the notice and be given time to do so.

Providing for such a notice in the regulations will assist in fulfilling the statutory obligation under section 235 (b)(1)(B)(iv) and will reduce the chances of returning a legitimate refugee to further persecution in violation of international obligations.

iv.    Conduct of the Initial Interview

The regulations do not contain provisions regarding the manner of conducting the inspection interview.  Given that one of the most critical purposes of the interview is to identify whether the individual is fearful (thereby triggering the need for a credible fear interview), the regulations should contain provisions confirming that the interview will be conducted in a manner that will not undermine this purpose.

In order to minimize the possibility of miscommunication and confusion resulting from exhaustion, lack of sleep, hunger or trauma, the arriving individual should be afforded an opportunity to rest and eat prior to the interview.  During this period, the individual can review the notice described above and contact family, legal counsel or the UNHCR, if they so request.

Trusting a government official, in an atmosphere of confrontation and interrogation, is difficult for many genuine refugees, particularly those who have been subject to governmental interrogation or torture or held in windowless cells that may be no larger than the inspection interview room.  In order to minimize the possibility that a fearful refugee will be too uncomfortable or frightened to reveal information regarding his or her fear during the interview, the inspection  interviews must be conducted in private surroundings with the assurance of confidentiality, and to the extent physically possible in rooms that are large enough to hold several people comfortably.  As with the credible fear interviews conducted by asylum officers, the regulations should require that the initial inspection interviews be conducted "separate and apart from the general public."  8 C.F.R. §208.30(b).  The regulations should also provide that the individual be advised that the information elicited will not be divulged publicly or to representatives of their home country.

The regulations should require that the immigration officer, at the outset of the inspection interview, confirm that the translator is qualified and then read and review the notice previously provided. If the individual then wishes to contact a family member, the

20

UNHCR or legal counsel, he or she should be permitted to do so. The regulations should specifically provide that an individual may, upon his or her request, be represented by counsel during the inspection interview.

The regulations should also specify that the immigration officer must confirm on a questionnaire/checklist that the notice has been read to and reviewed with the individual, and that a series of questions designed to elicit possible fear have been asked of the individual. Such questions should explore, for example, why the individual left his or her home country, any and all other reasons the individual left his or her home country, any difficulties the individual had in his or her home country, what the individual thinks will happen if he or she is returned home, and whether he or she would have any trouble with or would fear returning to his or her home country.

When the immigration officer observes an intent to apply for asylum or an indication of fear, questioning regarding that intent or fear should not proceed further. To avoid any confusion on this point, the language in Proposed Regulation §235.3(b)(4) should be clarified. The proposed rule currently provides that, if an alien indicates fear, "the inspecting officer shall before proceeding further with the case, detain the alien and refer him or her for an interview by an asylum officer ...." We suggest that the phrase "without further questioning regarding such intention or fear," be added after the word "shall."

Once the inspecting immigration officer observes the intent or fear, the immigration officer should provide the information (outlined in Proposed Regulation §235.3(b)(4)) concerning the "nature and purpose of the credible fear interview" and the right to consult prior to the credible fear interview. The regulations should provide more detail regarding the information that must be provided and should specify that the alien be notified of the right to contact family, friends, legal counsel and the UNHCR, to be provided with a list of non-profit legal organizations, to consult with persons of their choosing prior to the credible fear interview, to be accompanied by a representative during the interview.

This information should include notification of the right to seek review of an adverse determination by an immigration judge. See 8 C.F.R. § 208.30(f). To ensure uniformity and to maximize efficiency, the Service should also consider providing this information in writing and on videotape. Access to information provided by UNHCR and non-profit organizations should also be specifically permitted under the regulations.

      v.     Guidance for Recognizing an Indication of "Fear"

Section 235 (b)(4) of the new law charges immigration officers with the duty of recognizing an indication of an intent to apply for asylum or a "fear of persecution, or a fear of return." As discussed above in the context of training, recognizing an indication of "fear" is not necessarily as straightforward as it might seem. The possibility that a genuine refugee with an atypical asylum claim, e.g., a woman fleeing imposition of genital mutilation by family

21

elders, will be ordered removed without being afforded a credible fear interview should be foreclosed.

Specifically, the regulations should provide that, for purposes of determining whether an individual is entitled to a credible fear interview: (i) any indication of fear will suffice, whether verbal or non-verbal [15] and regardless of whether the immigration officer believes that the indication is credible; (ii) fear includes an indication of fear of harm, arrest, threats, discrimination, harassment, deprivation of educational or economic benefits; (iii) fear includes fear of governmental and non-governmental actors, including armed groups, individuals and family members; and (iv) the individual's fear does not have to be based on one of the five statutory bases included in the definition of "refugee."

      vi.     Review by a Supervisor

Section 235.3(b)(7) of the Proposed Regulations requires supervisory review of all expedited removal orders. This review is the only check on the immigration officer's decision to remove an individual without a credible fear determination. Thus, as discussed above, these supervisors should be given extensive training commensurate with that presently given all asylum officers, on topics including international human rights law, country conditions, and national and international refugee laws. See 8 C.F.R. § 208.1(b) (1996).

In addition, the regulations should require that supervisors, before approving any removal order, confirm that the interviewing officer: (i) secured a qualified interpreter; (ii) read and reviewed the notice with the individual; (iii) made the inquiries reflected on the questionnaire/checklist; and (iv) is satisfied that the individual does not have any fear whatsoever. In addition, the supervisory officer should be required to conduct follow-up inquiries when the individual is from a country whose nationals may qualify for Temporary Protected Status or a country with a record of human rights abuses.

Finally, should the supervisor approve an order of expedited removal or should at any point the individual decide to withdraw his or her application to enter the United States, a brief reiteration of the right to seek asylum should be included in a final form read to and signed by the individual before he or she is removed.

      vii.    Opportunity to Seek Reopening of Removal Order

As a final safeguard against erroneous removal of refugees, the regulations should

---

[5] An individual who exhibits any indication, verbal or nonverbal, of fear or reluctance to return must be referred to an asylum officer for a credible fear determination. As discussed above, immigration officers must be trained to be sensitive to the physical signs of past torture or trauma, such as depression or unresponsiveness, and must treat these signs as indications of fear.

AA-REG-00953

include a procedure by which individuals in detention and awaiting expedited removal who are fearful of return may request to have their cases reopened, or otherwise request a credible fear interview.

      c.     Credible Fear Interviews

          i.     Training of Interviewing Officers

The proposed regulations are silent regarding training for the officers charged with conducting credible fear interviews, and the statute does not provide for any training beyond that currently received by all asylum officers. *See* INA §235(b)(1)(E) (defining asylum officer for purposes of credible fear determinations as "an immigration officer who . . . has had professional training in country conditions, asylum law, and interview techniques comparable to that provided to full-time adjudicators of applications under section 208").

The new law imposes a substantial burden on asylum officers who conduct credible fear interviews. These asylum officers will be responsible for deciding who is permitted to apply for asylum protection, and such decisions will be insulated from judicial review and subject only to limited administrative review. The substantive screening standard they will employ is new to the law. To add to these challenges, their decisions must be taken in the context of a "fast-track" process, without the amount of time generally permitted for country research, assessment, and determination of a case.

These factors combined entail that special training be provided to these decision-makers. In particular, such training should include detail about the "credible fear" standard, the expedited removal process, up-to-date country condition information and international treaty obligations, such as the obligation under Article 3 of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment. We understand that INS in fact plans to conduct specialized training for "credible fear" determinations. By expressly including such a provision in the regulations, the US will ensure that such training is conducted and demonstrate its commitment to conducting credible fear determinations in compliance with international law.

The regulations should also provide that credible fear interviews be conducted by experienced asylum officers, preferably with at least one year of asylum adjudication experience. Determinations will be more efficient and accurate if they are made by asylum officers with greater experience in questioning asylum applicants, greater familiarity with asylum law and human rights conditions throughout the world, and greater understanding of the difficulties that asylum-seekers often face in discussing their experiences and concerns.

          ii.     Opportunity to recuperate, consult and prepare

Both INA §235(b)(1)(B)(iv) and §208.30(b) of the Proposed Regulations provide that an

23

alien eligible for a credible fear interview may "consult with a person or persons of the alien's choosing prior to the interview," without unreasonably delaying [6] the process. The alien may present additional evidence during the interview. §208.30(b). In addition, the person with whom the alien consults may also be present at the credible fear interview and may make a statement on his or her behalf. *Id.* To give meaning to these provisions, and to allow persons to recuperate from their often tiring and stressful journeys, the regulations should provide for credible fear interviews to be conducted only after applicants have had the opportunity to recover from the exhaustion of travel, to contact and consult with counsel, family and friends, and to prepare for the interview. Generally, at least seven days should be allowed for this process.

Those subject to a credible fear interview should be provided with a notice describing the proceedings and a list of non-profit legal organizations. During this time, applicants should have access to phones to make free non-collect calls to potential legal counsel.

This approach is consistent not only with the statute itself, which sets no rigid time frame for conduct of the interview, but also with the legislative history of the new law. In fact, in enacting the new law, Congress repealed a section of the recently-enacted AEDPA that would have required that these interviews be conducted "promptly."

      iii.     Representation at interview

Section 208.30(b) of the Proposed Regulations states that "[a]ny person or persons with whom the alien chooses to consult may be present at the interview and may be permitted, in the discretion of the asylum officer, to present a brief statement at the end of the interview." 8 C.F.R. §208.30(b). The confirmation, in a specific regulation, of an individual's right to be *represented* at a credible fear interview, will help to ensure consistency and fairness.

However, as currently worded, §208.30(b) of the Proposed Regulations would seem to permit an asylum officer to prohibit, in his or her discretion, an alien's representative from making even a *brief* statement at the end of the interview. We suggest that this Proposed Regulation be revised so that it is consistent with the analogous provision regarding regular asylum office interviews, *i.e.*, that a representative "*shall* have an opportunity to make a statement or comment on the evidence presented." *See* 8 C.F.R. §208.9(d).

      iv.     Provision of interpreters

---

[6] In this connection, the regulations should provide guidance in interpreting the phrase "unreasonable delay." This will be particularly crucial if credible fear interviews are conducted at remote or inaccessible locations or other locations where there may be limited access to counsel. Accordingly proposed regulation 208.30(b) should be revised to indicate that among the factors to consider in accessing the reasonableness of any delay, are the availability and proximity of counsel.

AA-REG-00955

As currently written, the Proposed Regulations provide for an interpreter "[i]f the alien is unable to proceed in English, and if the asylum officer is unable to proceed *competently* in a language chosen by the alien." 8 C.F.R. §208.30(b) (emphasis added). However, given the high stakes of the credible fear interview and the sensitivity of the information to be discussed, merely competent language skills are insufficient. This provision should be strengthened in order to reduce the risk of miscommunication which could lead to unnecessary immigration court proceedings or erroneous expedited removal. The regulations should provide that interpreters will be provided in all cases in which the alien and the asylum officer cannot communicate fluently in the same language. The Service should provide qualified interpreters, fluent in the alien's native language or other language of fluency/choice.

For the same reasons outlined above, we fear that use of a telephonic interpreter service may seriously undermine the accuracy of credible fear determinations. In a procedure where so much emphasis is placed on an applicant's demeanor and outward indicia of credibility, and where the subject of the interview may relate to complex and emotional issues, telephonic interpreters should be employed only in extremely rare cases where the Service is not able to identify an interpreter available for in-person translation in the applicant's chosen language.

Finally, for the same reasons outlined above in our recommendations concerning interpretation during inspection interviews, the regulations should specifically provide that the Service will, upon the applicant's request, provide interpreters of a specific gender.

v.    Conduct and conditions of credible fear interviews

The proposed regulations provide some helpful guidance on the conduct of credible fear interviews. *See, e.g.*, §208.9(b); §208.30(b). During credible fear interviews, potential asylum applicants will be questioned about traumatic events, including persecution, imprisonment and torture. Recognizing the nature of such an inquiry, the proposed regulations appropriately require that the credible fear interviews must be conducted "in a nonadversarial manner," and permit the potential applicant to be [represented] and to present additional evidence at the interview. 8 C.F.R. §208.30(b).

Additional regulatory guidance is, however, needed. For survivors of torture and trauma, being questioned about the details of their persecution is a stressful and difficult experience. The experience can be even more difficult for an applicant when the setting for questioning recalls situations of interrogation the applicant may have experienced, or is conducted in a tiny, windowless room which may be reminiscent of surroundings in which he or she was detained and tortured. Accordingly, the credible fear interviews should be conducted in rooms that are large enough to hold several people comfortably and, to the extent physically possible, in rooms that have outdoor windows.

The Proposed Regulations similarly recognize the need for these interviews to be conducted in privacy and confidence, and accordingly provide that they be conducted "separate

25

and apart from the public." *Id.* Encouraging a victim of persecution to trust an asylum officer will be even more difficult than in regular asylum interviews, since many such individuals will have come to the United States seeking safety and freedom, only to find themselves imprisoned on arrival in a county jail or detention center. In order to minimize such understandable distrust, the final regulations should provide that the individual will be advised about the confidential nature of the interview and told that the information provided will not be divulged publicly or to representatives of the home country. The regulations should provide that, absent any special security considerations relating to the particular applicant, the applicant should not be physically restrained during the interview.

In addition, to minimize the possibility of miscommunication and unnecessary referral to immigration court proceedings, all credible fear interviews must be conducted in person, not by telephone or video. Given the sensitive nature of the interviews and the mistrust many refugees have for government officials and institutions, a legitimate credible fear interview requires the openness and intimacy of a face-to-face exchange.

The regulations should specifically require that the asylum officer, at the outset of the inspection interview, confirm that the translator is qualified and then read and review the notice previously provided by the immigration officer during the inspection interview. This review will include an explanation of the "nature and purpose of the credible fear interview" and the right to consult with a representative or be represented at the interview. By requiring the asylum officer to also review the notice with the alien, the regulations will minimize -- at the outset of the interview -- the potential for misunderstanding and confusion about the purpose of the interview and provide an additional level of reassurance to the applicant in any cases where the inspecting immigration officer (perhaps inadvertently or due to poor translation or miscommunication) did not adequately provide the required notice.

The inspection officers initially interviewing arriving aliens are authorized only to determine whether such aliens express a fear of persecution or return, or an intent to apply for asylum. They are not authorized or trained to assess the credibility of the alien's fears. Therefore, the regulations should explicitly recognize the credible fear interview as a *de novo* determination. As such, it would clearly be inappropriate for the asylum officers who conduct the credible fear interviews to have access to the notes taken by the immigration officers in the initial interviews. Starting each credible fear interview with a clean slate will minimize the risk of bias and misunderstanding, and lead to more accurate determinations.

Finally, as discussed above in the context of representation, we recommend that §208.30(b) of the Proposed Regulations regarding statements made by a representative at the interview, be revised to be consistent with 8 C.F.R. §208.9(d).

     vi.     Legal Standard for Credible Fear

Section 235 (b)(1)(B)(v) of the Amended INA defines "credible fear of persecution" as "a

AA-REG-00957

significant *possibility*, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, that the alien *could* establish eligibility for asylum under section 208." INA §235(b)(1)(B)(v) (emphasis added). The regulations provide absolutely no guidance with respect to the interpretation of this standard. We urge adoption in the final regulations of additional guidance on the meaning of this standard.

The new law charges asylum officers and immigration judges with applying a new and potentially confusing legal standard. As was evident in the legislative discussions surrounding this provision, the content of this standard is not self-evident. The term "significant possibility" needs particular explanation. Because of the lack of federal judicial or even BIA review of these determinations, asylum officers and immigration judges will not have the guidance on which they can ordinarily rely for interpretation of novel concepts in the law. Regulatory guidance is critical to minimize the risk of inconsistent determinations and potential confusion with the much higher standard for establishing eligibility for asylum itself -- a standard that asylum officers and immigration judges have been applying for years.

Fortunately, the legislative history of the new law can assist in formulating the guidance to be included in the regulations. In adopting the standard ultimately included in the statute, the Conference Committee declined to include the higher "preponderance of the evidence" standard that had been included in the House version of the bill. In addition, Senator Hatch, a principal sponsor of the legislation, in discussing the Conference Committee's rejection of the higher standard, confirmed that "[t]he standard adopted ... is *intended* to be a *low screening standard* for admission into the usual full asylum process." Cong. Rec. S11491 (Sept. 27, 1996) (daily ed.) (emphasis added).

In providing guidance regarding the "well-founded fear" standard required to establish eligibility for asylum itself, the Supreme Court has explained that "'[so long as an objective situation is established by the evidence,] it need not be shown that the situation will probably result in persecution, but it is enough that persecution is a *reasonable possibility*.'" INS v Cardoza-Fonseca, 480 U.S. 421, 107 S.Ct. 1207 (1987) (quoting INS v. Stevic, 467 U.S. __, 424-45, 104 S.Ct. __, 2498 (19__). In Cardoza-Fonseca, the Supreme Court clearly indicated that an asylum applicant with only a 10% chance of persecution can be found to have a well-founded fear of persecution. 480 U.S. at 440; 107 S.Ct. at 1217. Thus, one need only demonstrate no more that the existence of a significant possibility of a 10% chance of persecution in order to demonstrate the requisite "credible fear." Consistent with international standards, the regulations should specifically provide that an applicant's testimony alone may be sufficient to establish credible fear, and that all doubts are to be resolved in favor of the individual seeking protection.

Finally, the law of asylum in the United States is subject to administrative and judicial interpretation, and thus is in a constant state of evolution as the INS, the BIA and the federal courts interpret the law to ensure compliance with international standards. Thus, claims that might seem tenuous or unprecedented today may, in a few months, serve to establish asylum

27

eligibility. *See, e.g.*, Matter of Kasinga, Board of Immigration Appeals, Int. Dec. 3278 (1996). To assist credible fear adjudicators faced with such a situation, the regulations should specifically provide that, in assessing the legal possibility of establishing asylum eligibility, a significant possibility should be found despite the fact that the claim to asylum might be based on an unprecedented or novel legal theory.

Cases should be referred for further removal proceedings if the adjudicator is not certain that the conduct amounts to persecution or if the adjudicator is not certain that the "on account of" requirement is met.

### vii.    Opportunity to correct

Differences in language and culture can create severe barriers to communication between refugees, their representatives or consultants, and asylum officers. Under these circumstances, misunderstandings can occur in interviews conducted by even the most experienced officers. Fortunately, these types of errors can easily be corrected by having asylum officers explain their understanding of an applicant's claim and the basis for their determination at the end of each interview. The final regulations should require this procedure and should permit applicants to correct any mistaken impressions or factual errors at that point. This simple procedure will increase the accuracy and the efficiency of the process.

### d.    Review by an immigration judge

For refugees fleeing persecution who are unable to convince an asylum officer that they meet the "credible fear" screening standard, the immigration judge's review is the crucial and final chance to gain access to protection. Therefore, it is critical that an applicant fully understand the right to this review, have access to counsel and be prepared to rebut the asylum officer's finding. We recommend that the following suggestions be incorporated into the final rule.

### i.    Notice of right to immigration judge review

Section 235(b) of the new law provides for review by an immigration judge after an immigration officer reaches an adverse credible fear decision. *See* Amended INA Section 235(b)(1)(B)(iii)(III) ("[t]he Attorney General shall provide by regulation and upon the alien's request for prompt review by an immigration judge ...."). This provision, which was not originally included in the AEDPA or the House version of the immigration bill, was intended to provide an additional layer of protection for refugees.

Proposed Regulation §208.30(e) provides that, after reaching an adverse credible fear determination, an asylum officer "shall ... advise the alien of his or her right to request that an immigration judge review the negative decision." While this provision is a step towards implementing the statutory mandate, it does not provide sufficient protection to ensure that the important safeguard of immigration judge review is afforded to genuine refugees. The regulation

28

should be revised in order to provide that, after reaching an adverse credible fear finding, the case of an alien who has indicated fear or an intent to apply for asylum "shall be referred to an immigration judge." Such a regulatory provision would minimize the chances that disputes will arise regarding whether or not the alien was actually and adequately advised of the right of immigration judge review. In any event, as the overwhelming majority of those indicating a fear or intent for asylum would, if properly informed of the right, choose review, the entire process would be conducted more efficiently and consistently if the referral is automatic. Moreover, given the severe consequences of erroneously returning a refugee to persecution, the suggested regulation would ensure that the additional protection of immigration judge review will be provided to all who claim to fear persecution.

Proposed Regulation §208.30(f) provides that upon the applicant's verbal or written request for a review, the asylum officer shall serve the alien with a Form I-863 "Notice of Referral to Immigration Judge." The Notice of Referral, in order to be effective, should make the alien fully aware of the finality of the review process, and of the procedural safeguards to which he is entitled. As currently drafted, the proposed rule does not require that the proposed rule provide any particular information. Section 208.30(f) should be revised to require that Form I-863 contain information pertaining to the nature of the immigration judge review, similar to the type of notice that is provided by statute before removal proceedings under Section 240. INA § 239(a)(1) requires that the written notice in regular removal cases must specify the nature of the proceedings, information pertinent to the charges against the alien, information about the right to counsel, the time and place of the removal proceedings and the consequences for failure to appear.

Similarly, the Notice of Referral for a credible fear review should advise the alien of all the rights to which he is entitled during the review of the credible fear determination, including: (1) his right to consult with persons of his choosing prior to review and the right to representation; (2) the right to have a qualified interpreter present if necessary; (3) the nature of the proceeding, including the *de novo* standard of review and finality of the immigration judge's finding, the consequences of a reversal of the asylum officer's determination (*i.e.*, to make it clear to the alien that he has not conclusively proven his case and still must file an asylum application), as well as administrative details such as the time, place, and manner of the review hearing.

ii.    Opportunity to consult and prepare

Among the most disturbing provisions of the new expedited removal process is its requirement that review by an immigration judge be concluded within 24 hours to the maximum extent practicable, and in no case later than 7 days after the asylum officer's determination. Amended INA § 235(b)(1)(B)(iii)(III). The Proposed Regulations track this language in §3.42(e). This timing provision, however, must be interpreted in conjunction with other relevant provisions of the new law -- specifically Amended INA 235(b)(1)(B)(iv) and the corresponding Proposed Regulation §3.42(c) which entitle aliens to consult with persons of their choosing prior to the immigration judge review. This opportunity to consult is absolutely essential, and may, for

example, enable a refugee who was not previously able to meet the "credible fear" standard to confer with legal counsel or family -- and take steps to obtain additional corroborating evidence to assist in meeting the "credible fear" standard.

We suggest that addition language be added to Proposed Regulation §3.42(e) to make clear scheduling review proceedings must not eviscerate an applicant's right to consult prior to the review.

       iii.      Representation during the immigration judge review

The Proposed Regulations fail to include a provision confirming the alien's right to have a legal representative or other person present during the review proceeding. This failure is most likely an oversight, as the Proposed Regulations do confirm that during the credible fear interview an alien may indeed have a representative present who may make a brief statement. *See* Proposed Regulation §208.30(b). Certainly the need for representation is even more crucial at the stage of immigration judge review -- a refugee's last chance to satisfy the "credible fear" legal standard before being returned to their country of persecution.

We suggest that individuals subject to expedited removal proceedings before an immigration judge be afforded the same opportunity to be represented by counsel as those subject to regular removal proceedings.

       iv.      Conduct of immigration judge review

       (a)      interpreters

Proposed Regulation §3.42(c) provides that "[i]f an interpreter is necessary, one will be provided by the Immigration Court." However, for the reasons detailed above in connection with inspection interviews and asylum officer interviews, this provision should be revised to provide that if the alien is not fluent in English, a qualified interpreter who is fluent in the alien's native language or other language of fluency will be provided.

       (b)      telephonic and video testimony

From the statute and the proposed regulations, it is clear that the review proceedings will include an opportunity for the potential asylum applicant and other witnesses to testify and will also include an opportunity for the immigration judge to question the potential asylum applicant. *See* Amended INA 235(b)(1)(B)(iii)(III). In reaching a credible fear determination, the immigration judge must make a specific finding -- in circumstances where an asylum officer has already found that the applicant does not possess a credible fear -- of the applicant's credibility. Such a determination will be exceedingly difficult given the expedited nature of the proceedings and the immigration judge will be afforded little or no time to seek additional information (such as State Department opinions) that can assist in assessing credibility.

30

This already difficult task will be rendered impossible if the credibility assessment and the rest of the determination are conducted by telephone conference call or video. The proposed regulations, as currently drafted, allow immigration judges to conduct credible fear proceedings by telephone conference or by video -- without the consent of the alien. *See* Proposed Regulation §3.42(c) ("The *Immigration Judge shall determine* whether the review shall be in person, or through telephonic or video connection ...") and Proposed Regulation §3.25(c) ("credible fear determinations may be reviewed by the Immigration Judge through a telephone conference *without the consent of the alien.*"). It should be emphasized that while the new law permits telephonic or video review, it does not require it, and it certainly does not mandate that such procedures be applied without consent. *See* Amended INA §235(b)(1)(B)(iii)(III) (review "shall include an opportunity for the alien to be heard and questioned by the immigration judge either in person or by telephonic or video connection.").

Recognizing the intrinsic deficiencies of taking and assessing live testimony by telephone conference call, the EOIR prohibited the conduct of evidentiary hearings on the merits by telephone conference call, unless the alien consents, after being advised of his right to appear in person or by video. *See* §3.25(c). Ironically, however, the regulations allow for this type of hearing, without the consent of the alien, in cases where individuals may be most penalized by them, *i.e.,* victims of persecution, torture and rape who will find it difficult or impossible to coherently relate the details of their abuse and torture to a faceless voice over a speaker phone or standing before a video camera in full view of an anonymous audience, and as a result will be returned home to face further persecution.

We strongly urge that the Proposed Regulations be revised to require in-person review by an immigration judge.

(c)    De novo review standard

Section 208.30(f) of the Proposed Regulations provide that the asylum officer shall forward his notes and other materials upon which the credible fear determination was based to the immigration judge. However, review by the immigration judge is a *de novo* determination of whether the individual satisfies the credible fear screening standard. §3.42(d). Accordingly, §208.30(f) should be revised to make clear that such notes will not be part of the record of proceedings on which the immigration judge may base a ruling.

(d)    Credible fear standard

As discussed in detail above in the context of our comments on the credible fear interview, the "credible fear" standard must be applied as a screening standard only. Thus, while the applicant may provide live testimony, he or she cannot be expected -- particularly given the speed of the review process -- to present corroborating evidence or witnesses beyond his or her own testimony.

31

e.      Record-keeping

To assess fully and accurately whether the expedited removal procedures are being implemented consistently, fairly and in compliance with U.S. and international law, the Service must make and keep accurate records of those who are processed under the expedited removal procedures. For each individual issued an expedited removal order, referred to a credible fear interview, or whose adverse credible fear finding is reviewed by an immigration judge, the records should include the following information: the name, age, gender, race, nationality, ethnicity, religion and originating country of the detainee; the name of the interviewing officer; the date and time of the interview; the individual's attorney and other family or friend contact information; the individual's means and date of arrival; the questionnaire/checklist form and any statement of the individual; and the date and means of the individual's return.

As part of its implementation of the expedited removal procedures, the INS should specifically provide for periodic review of these records to determine whether the statutory and regulatory provisions for expedited removal are being correctly and fairly applied, and to monitor and correct any systematic problems. In addition, statistics relating to the expedited removal provisions should be made available to the public.

32

AA-REG-00963

# EXHIBIT W

Coalition for Humane Immigrant Rights, et al. v. Noem et al., 1:25-cv-00872 (JMC)

(35)

# FRIED, FRANK, HARRIS, SHRIVER & JACOBSON

A PARTNERSHIP INCLUDING PROFESSIONAL CORPORATIONS

1001 PENNSYLVANIA AVENUE, N.W., SUITE 800
WASHINGTON, DC 20004 · 2505
202 · 639 · 7000
FAX · 202 · 639 · 7008

July 7, 1997



WRITER'S DIRECT LINE

(202) 639-7043

**VIA HAND DELIVERY**

Director, Policy Directives
 and Instructions Branch
Immigration and Naturalization Service
425 I Street, N.W.
Room 5307
Washington, D.C. 20536

     RE:   **Comments on Proposed Regulations
            INS No. 1788-96**

Dear Sir or Madam:

     The following comments on the above-referenced proposed rule implementing the Illegal Immigration Reform And Immigrant Responsibility Act of 1996 ("IIRAIRA" or "the Act") are submitted for your consideration on behalf of the Washington Lawyers' Committee for Civil Rights and Urban Affairs (the "Committee").

     As you know, the Committee's Asylum and Refugee Rights Law Project has represented people fleeing persecution for nearly twenty years, and has a longstanding history of working with the Immigration and Naturalization Service ("INS" or "the Agency") to develop policies and procedures that implement the law without losing sight of the circumstances and practical realities confronting the very refugees and asylum seekers the law is designed to protect. The Committee submitted detailed comments on the proposed rule published on January 3, 1997, and wishes to commend the Agency for its thoughtful consideration, and ultimate adoption, of a number of those comments. The Committee's comments on the interim regulations submitted herein will focus on those provisions it believes still pose a serious risk of returning those who satisfy the definition of "refugee" set forth in the Immigration and Nationality Act to persecution or even death. It urges the INS to consider these comments seriously, particularly with regard to adjudicating eligibility for the exceptions to the one-year filing deadline for asylum applications, and to the expedited removal process.

NEW YORK · WASHINGTON · LOS ANGELES · LONDON

AA-REG-00615

FRIED, FRANK, HARRIS, SHRIVER & JACOBSON

Director, Policy Directives
  and Instructions Branch
July 7, 1997
Page 2

## I.  **ASYLUM**

### A.  The One Year Filing Deadline

The Committee wishes to express to the INS its deep appreciation for the decision to apply the one year filing deadline imposed by IIRAIRA only to applications filed on or after April 2, 1998. In order to fairly give notice of this deadline to persons who will be subject to it, the Committee urges the INS is to give specific, written notice of the deadline to arriving aliens, and to undertake a broad public education campaign about the deadline to protect persons already physically present in the United States.

The Committee urges the INS to add a provision to the regulations stating that the filing deadline for persons in lawful status will not begin to run until the first day they are out of status. Students, researchers, and others, (just like those with Temporary Protected Status) entering the United States lawfully, are often unaware that they need to take any action until their status is about to expire. In addition, country conditions may improve before their status expires, making an asylum application unnecessary. Applying the one year deadline beginning only with any period out of status would protect those individuals with meritorious claims, and simultaneously decrease the burden on the INS of adjudicating eligibility for exceptions in such cases.

### B.  Exceptions

IIRAIRA amends § 208(a)(2)(B) of the Act to provide exceptions to the one year filing deadline in cases in which the applicant demonstrates "either the existence of changed circumstances which materially affect the applicant's eligibility for asylum or extraordinary circumstances relating to the delay in filing the application . . . ."

The Committee is pleased that the regulations now limit the authority to determine whether an application is timely filed to asylum officers, immigration judges, and the BIA. However, it is important that as a threshold matter, the new Form I-589 and its accompanying instructions **should not suggest that the application may not be filed if more than one year has passed since the date of entry**. Rather, they should clearly indicate on their face that if the application is being filed more than one year after the date of entry, an explanation for the delay must be provided and that an interview or hearing will be provided to determine the possibility of an exception.

The Committee remains concerned about the procedures by which the timeliness of filing will be determined. An application should **never** be rejected as untimely without an interview or hearing. Many of the circumstances supporting an exception, particularly if they are related to

74468

AA-REG-00616

FRIED, FRANK, HARRIS, SHRIVER & JACOBSON

Director, Policy Directives
  and Instructions Branch
July 7, 1997
Page 3

torture or other trauma, may not be written on the face of the I-589 but may emerge during the actual asylum interview. Consequently, eligibility for the exceptions should be probed in person and should be construed in a just manner to permit claims to proceed on the merits whenever possible.

In affirmative cases, if the exception is not clearly warranted by the explanation provided on the face of the application, the asylum officer should schedule the case for an asylum interview, at which the eligibility for an exception would be the first issue considered. After the interview, the supervisor should review the asylum officer's recommendation concerning the requested exception, as well as the recommended decision on the merits. The need for an interview to determine eligibility for an exception, as well as a review of that determination by a supervisor, are critical, because there will be no judicial review on the issue of whether the filing deadline was met. When the asylum claim is raised for the first time in deportation proceedings, the Immigration Judge should evaluate the eligibility for an exception at the hearing.

1.    The "Changed Circumstances" Exception

The Committee commends the INS for removing the proposed language in § 208.4(a)(4) that would have restricted this exception to circumstances that arose after the one year deadline. The Agency obviously recognized that a change occurring late in the one year period could reasonably prevent a person from making a complete application by the statutory deadline. The Committee urges the INS to remain cognizant of the fact that eligibility for asylum is highly case-specific, and that even a small change in country conditions may tip the balance in favor of a grant. Consequently, even incremental changes should qualify for this exception.

2.    The "Extraordinary Circumstances" Exception

First, the Committee commends the INS for adopting the language requiring applications to be filed "within a reasonable period" rather than the previously proposed "as soon as practicable." However, proposed § 208.4(a)(5) in the interim regulations continues to define extraordinary circumstances as "events or factors beyond the alien's control that caused the failure to meet the 1- year deadline." As the Committee pointed out in its initial comments, the restriction of this exception to events or factors "beyond the alien's control" is unsupported by the statute and unnecessarily interposes yet another point at which an applicant risks possible return to persecution. This language should not be included, because it shifts the focus of the inquiry away from the substance of the cause of the delay to whether the circumstances were "beyond the alien's control."

74468

AA-REG-00617

FRIED, FRANK, HARRIS, SHRIVER & JACOBSON

Director, Policy Directives
  and Instructions Branch
July 7, 1997
Page 4

        Next, the Committee urges the INS to state clearly in the body of the final regulations
(rather than only in the preamble) that the list of examples provided in § 208.4(a)(5) is merely
illustrative, not exhaustive, and that each request for an exception will be considered on its
merits.

        The Committee particularly urges the INS to consider expressly including the availability
of pro bono counsel as one of the enumerated examples in the final version of this regulation.  It
is indisputable that applicants are much more likely to be granted asylum if they are represented
by counsel, and the burden on asylum officers to attempt to develop a thorough record as well as
the time required to do so are greatly reduced when counsel is involved.  However, most asylum
applicants are unable to afford paid counsel, and pro bono counsel understandably need more
flexibility in meeting filing deadlines.  Strict application of filing deadlines and narrow
interpretation of the grounds for exceptions will preclude pro bono attorneys from accepting
otherwise meritorious cases.  A regulation that expressly includes the temporary unavailability of
counsel as an extraordinary circumstance giving rise to an exception to the deadline will serve
the goal of maintaining the availability of asylum to all those with truly meritorious claims.

        The INS should be especially sensitive in considering the application of the filing
deadline to claims by minors, women, and victims of torture.  It is well-recognized that
applicants in these categories are frequently unable to relate the details of their experiences to a
complete stranger in an initial meeting.  Victims of torture may have great difficulty in telling
their story to a uniformed official, because often the officials were the torturers in their native
countries.  It is much more common that several meetings with counsel are necessary before
these applicants are able to tell their stories.  The reason for the delay in filing in these cases may
not be an event occurring after their arrival, but an inability to recount the trauma they have
sustained.  The Agency should be mindful of this in adjudicating requests for exceptions from
this group of applicants.

        In cases in which more than one extraordinary circumstance can be demonstrated, the
regulation should confirm that multiple periods of tolling should be combined.  For example, the
Committee previously represented a client who had been the victim of a politically motivated
rape by a high-ranking government official in her native country.  It took eleven months of
working with her before she could fully describe what had happened to her.  Once the facts
supporting her claim were known, the Committee worked with pro bono counsel who began
preparing her asylum application.  When it was almost complete, the client became seriously ill
and was incapacitated for varying periods of time due to chemotherapy.  Pro bono counsel was
involved in a car accident and substitute counsel was then located.  The application was
ultimately filed and asylum granted, but a narrow interpretation of the extraordinary
circumstances exception could preclude the filing of a case like this one.  In the absence of

74468

AA-REG-00618

FRIED, FRANK, HARRIS, SHRIVER & JACOBSON

Director, Policy Directives
 and Instructions Branch
July 7, 1997
Page 5

judicial review of eligibility for exceptions, a broad interpretation of eligibility is essential in order for meritorious cases to go forward.

### C.    Burden of Proof Regarding Filing Deadline

The Committee believes that proposed §208.13(c) of the regulations should be amended to clarify that the applicant's burden of proof pursuant to § 208(a)(2)(B) of the Act is to show by clear and convincing evidence only that the application was filed within one year of entry. Alternatively, if seeking an exception to the 1-year filing deadline pursuant to § 208(a)(2)(D) of the Act, the Act requires an applicant to demonstrate only "to the satisfaction of the Attorney General" that an exception is justified. The "clear and convincing" standard does not apply to eligibility for exceptions. Section 208.13(a) should also clarify that the applicable standard for establishing that an applicant is a refugee as defined in INA § 101(a)(42) remains the preponderance of the evidence standard.

### D.    The Completeness Requirement

The Committee remains extremely concerned that the current version of the regulation concerning "completeness" is unduly harsh, particularly for pro se applicants, and completely overlooks the possibility of error on the part of Agency employees.

The enumerated deficiencies that will render an application incomplete will undoubtedly be common. If an applicant does not understand a question, or is uncertain how to answer it, the natural inclination is to leave that question blank. Moreover, the Committee has direct experience in a number of cases in which the INS has returned an application on the grounds that required attachments, such as copies or photographs were not included, when the very items claimed to be missing were returned along with the application!  For these reasons, this regulation should be amended to clarify that an application returned by the INS because it is deemed incomplete **for any reason** may be refiled within a specified period of time, i.e. 30 or 60 days, and that the submission of an incomplete application will not cause an application to be rejected as untimely pursuant to §208(a)(2)(B). In addition, the regulation should clarify that the postmark date or date of hand delivery constitutes the filing date.

Proposed §208.4(c) continues to provide that an asylum officer or immigration judge may permit an alien to amend or supplement an asylum application "upon request" and that the right to do so will be a matter of discretion. The Committee believes that this provision is inadvisable, because as complete a record as possible is clearly always in the best interests of the applicant and also aids the adjudicator in properly evaluating the claim. Amendment or supplementation

74468

FRIED, FRANK, HARRIS, SHRIVER & JACOBSON

Director, Policy Directives
  and Instructions Branch
July 7, 1997
Page 6

should always be permitted, and the case should be adjudicated on its merits, not on technicalities.

E.    Termination of Asylum

The Committee feels very strongly that any termination of asylum, withholding of removal or deportation should be accomplished with an abundance of caution and due process. At a minimum, it should be accomplished in accordance with Article 1C(5) of the 1951 Refugee Convention regarding nationals whose reasons for becoming a refugee have ceased to exist, as explained in the UNHCR *Handbook On Procedures And Criteria For Determining Refugee Status Under the 1951 Convention and the 1967 Protocol Relating to the Status of Refugees* ("UNHCR Handbook"). As stated in Paragraph 135:

> A refugee's status should not in principle be subject to
> frequent review to the detriment of his sense of security,
> which international protection is intended to provide.

The Committee is deeply concerned that the proposed regulation abandons many of the current procedural protections, particularly with regard to the persons who can order termination, and the elimination of review. The Service should continue to permit a procedure with such serious implications to occur only with the current protections, including:

- Motion by the Assistant Commissioner

- Hearing before an asylum officer

- A clear delineation of the standards for revocation

- An opportunity to re-assert an asylum or withholding claim in any subsequent removal proceeding

- Review by the office of the Deputy Attorney General

Proposed § 208.22(a) provides that the INS may terminate asylum in one of three enumerated circumstances. One of the bases for termination of asylum is set forth in § 208.22(a)(3), pertaining to changed country conditions. The Committee is extremely concerned that persons granted asylum prior to issuance of final regulations who are either not yet eligible to adjust status or whose applications to adjust have not yet been adjudicated should

74468

AA-REG-00620

FRIED, FRANK, HARRIS, SHRIVER & JACOBSON

Director, Policy Directives
  and Instructions Branch
July 7, 1997
Page 7

not have their grant of asylum terminated so soon absent extremely strong evidence of a change in country conditions. Any change should be proven to be "fundamental and durable" in keeping with international law to justify termination. Any change that has occurred within a year prior to the notice of intent to terminate is unlikely to be sufficiently stable to permit the return of an individual at risk of persecution.

The procedure governing termination, including the issuance of a notice of intent to terminate and the scheduling of an interview are set forth in § 208.22(c). However, it is unclear what circumstances could give rise to the notice of intent to terminate, and when such action can be taken by the INS. The Committee assumes that this regulation is only intended to apply to asylees who have not yet applied for or been granted adjustment of status, but this should be clarified.

In addition, § 208.22(d) provides for automatic termination of asylum for anyone who was a derivative beneficiary of a principal applicant whose asylum is terminated. It further provides that the derivative beneficiary shall not be precluded from separately asserting their own claim for asylum, or withholding of deportation or removal. This extremely limited relief from termination is sorely inadequate. Innocent derivative beneficiaries should not be be subject to termination if they were not involved in, or aware of, the facts giving rise to the termination of the principal.

F.    Other Asylum Issues

The Committee expresses its gratitude to the INS for its decision not to impose a filing fee for asylum applications at this time, despite the fact that IIRAIRA would enable it to do so. The Committee thanks the Agency for maintaining its historical position on this issue and recognizing that the right to be protected from persecution or torture should not depend on the ability to pay a fee. It urges the INS to continue to maintain this position in the future.

The Committee also commends the INS for adopting the change to proposed § 208.9(g), to permit the applicant to provide an interpreter who is fluent in English and in any other language in which the applicant is also fluent.

The Committee again urges the INS to consider the following concerns:

Proposed § 208.2(b) provides that after a Form I-863 (Notice of Referral) has been filed with the Immigration Court, the Immigration Judge shall have exclusive jurisdiction over an asylum claim filed by a person not entitled to a proceeding under Section 240 of the Act. This

74468

FRIED, FRANK, HARRIS, SHRIVER & JACOBSON

Director, Policy Directives
  and Instructions Branch
July 7, 1997
Page 8

regulation should be revised to permit the Immigration Judge in such cases to have jurisdiction over any other claim to relief the alien may have.

Proposed § 208.3(c)(4) subjects "the person" who knowingly places false information on an asylum application to criminal and civil penalties, but does not define "knowingly," "person," or "places." This provision has very serious consequences. The INS should take care to identify how these terms will be defined, and who will determine when they apply and in what circumstances.

Similarly, proposed § 208.3(c)(5) renders an asylum applicant who "knowingly" files a frivolous application permanently ineligible for any benefits under the Immigration and Nationality Act pursuant to § 208.18. That regulation now defines an application as frivolous "if any of its material elements are deliberately fabricated." The Committee does not want the sanctions for filing a "frivolous" application to be imposed for misrepresentations that, even if knowing, had no bearing on statutory eligibility. A "material element" should be narrowly defined and only apply to a representation such that, without such representation, asylum could not have been granted.

Proposed § 208.5 contains special provisions for providing alien crewmen or stowaways who indicate a fear of returning to their home country with a credible fear interview and a referral to an Immigration Judge for adjudication of the asylum claim. The same procedural safeguards afforded to all other asylum applicants, both before and during the credible fear interview and during the preparation of and hearing on the asylum application, should be afforded to these persons.

Proposed § 208.6 contains provisions regarding the confidentiality of asylum applications and protecting information "contained in or pertaining to" an application from disclosure. The Committee urges the INS to revisit the method by which it delivers "referrals" when a case is not granted. The current practice of calling names and delivering decisions in a large public room where any bystander can hear the discussion violates both the letter and the spirit of the non-disclosure requirement.

Proposed § 208.7(a) should be clarified to confirm that the "denial by an asylum officer" that stops the running of the 150 day period refers only to denial of **in-status applicants**, and that a "referral" by an asylum officer to an Immigration Judge does not stop the employment authorization clock from running.

Proposed § 208.9(d) currently provides for the applicant to pick up the asylum officer's decision in person, with any delay in doing so to be treated as a delay attributable to the applicant

74468

AA-REG-00622

FRIED, FRANK, HARRIS, SHRIVER & JACOBSON

Director, Policy Directives
  and Instructions Branch
July 7, 1997
Page 9

for purposes of the 150-day work authorization period. The Committee urges the INS to develop a procedure whereby the applicant could authorize a representative who has entered an appearance in the matter to pick up the decision or accept service by mail without any interruption of the 150-day period.

Proposed § 208.9(d) also provides that the asylum officer may require the applicant's representative to submit any statement or comment on the evidence **in writing**. This should be changed to an **opportunity** to submit in writing. Pro bono counsel in particular may be able to respond orally to any question raised or evidence presented in the interview, but may not be able to prepare a written submission within the time period available for the asylum officer to make a recommended decision. This is particularly true because asylum officers are evaluated on the rapidity with which they issue recommended decisions; a delay of even one day to wait for a written submission would cause the asylum officer to receive a lower rating on that case.

Proposed § 208.12(b) provides that an asylum applicant may not conduct "discovery" directed toward the records, officers, agents or employees of an enumerated list of government agencies. The INS should clarify that the term "discovery" does not include FOIA requests.

Discretionary denials pursuant to § 208.13(d) should be rare. There should be a presumption in favor of a grant if the applicant satisfies the definition of a "refugee."

Under proposed § 208.17 letters "communicating denial of the application" must "state the basis for denial of the asylum application" and contain a credibility assessment. An applicant must appear in person to receive the decision. Under the existing scheme, asylum officers issue approvals or "referrals" in cases where the applicant is out of status, and notices of intent to deny when an applicant is in status. In status applicants are not required to appear in person. The Committee strongly urges the INS to require referrals to include the same information regarding credibility and the reasons for lack of approval as denials under proposed § 208.17.

Migration-related prosecution as a consideration for asylum eligibility: Although not mandated by the Act, the regulations have eliminated 8 C.F.R. § 208.13(b)(2)(ii) and 8 C.F.R. § 208.16(b)(4) which required adjudicators to give "due consideration to evidence that the government of the applicant's country of nationality or last habitual residence persecutes its nationals or residents if they leave the country without authorization to such asylum in another country." This section should be reinstated. The regulations should clarify rather than eliminate this ground. This provision is enumerated as a potential basis for asylum in the UNHCR Handbook.

74468

AA-REG-00623

FRIED, FRANK, HARRIS, SHRIVER & JACOBSON

Director, Policy Directives
and Instructions Branch
July 7, 1997
Page 10


## II.    CREDIBLE FEAR INQUIRY

The Committee again wishes to express its gratitude to the INS for declining to apply the summary removal procedures to persons discovered within the borders who have been present for less than two years, and urges it to maintain this position.  Should there be any change in this decision, there should be opportunity for notice and comment.  We also urge the Agency to continue to support the recommendation of the U.S. Commission on Immigration Reform that expedited removal procedures be applied only in exceptional circumstances.

  A. <u>Eligibility for Credible Fear Interview</u>

In many ways, the decision of the immigration officer at secondary inspection as to whether or not a credible fear interview will be provided is the most significant step in the entire summary removal process.  It is at this juncture that persons fleeing persecution or torture will first encounter the INS.  If they are turned back at this stage, they may be returned to persecution or death, with no recourse or remedy.  Preliminary data indicate that asylum applications at ports of entry are down by approximately 50% since April 1, 1997.  Consequently, it is critical that this stage of the summary removal process be monitored and revised as needed to maximize the opportunity of persons arriving at the border to seek asylum, and to minimize the risk that anyone with a potentially meritorious claim will be turned away.

The Committee urges the INS to provide, at a minimum, the following procedural safeguards to all persons at risk of summary removal, as soon as a decision is made to refer them to secondary inspection:

  1. <u>Information</u>

- inform arriving aliens orally and in writing about the right to apply for asylum in the U.S. and the requirements for eligibility. (The forms used in the screening process and the training provided to inspecting officers should expressly include "an intention to apply for asylum" as one of the factors resulting in an interview.)

- provide this information in a standardized, written and video format in the 30 most commonly used languages

74468

FRIED, FRANK, HARRIS, SHRIVER & JACOBSON

Director, Policy Directives
  and Instructions Branch
July 7, 1997
Page 11

2.     <u>Interpreters</u>

- provide interpreters for anyone for whom written and video materials are not available. These interpreters should be those chosen by the individual or certified by INS. They should **not** be airline employees or telephone operators.

3.     <u>Counsel</u>

- provide access to free telephones and a list of telephone numbers for information and assistance

- provide private interview rooms for counsel

- provide true opportunity for counsel both before and during the screening interview. This must include the right for counsel to participate, not just be physically present.

4.     <u>Other</u>

- provide opportunity for food and rest if necessary before conducting the initial screening

- design the questions to be used for the preliminary screening as broadly as possible to elicit information about fear of returning in every case in which it might possibly exist. (See comment above including reference to "intention to apply for asylum.")

- provide access for volunteers to conduct "know your rights" sessions, including suitable space and interpreters when necessary

- ensure that immigration officers are trained to recognize symptoms of torture and trauma

74468

AA-REG-00625

FRIED, FRANK, HARRIS, SHRIVER & JACOBSON

Director, Policy Directives
 and Instructions Branch
July 7, 1997
Page 12

- ensure that immigration officers are trained to be sensitive to gender-related and other sexual abuse issues, and to ask female aliens if they would prefer to talk with a female officer and vice-versa

- provide officers with specific standards for determining eligibility, to prevent "gut" reactions and inconsistent results

- adopt procedures that will create a written record for every screening interview

- guarantee that the review by a supervisor will occur <u>before</u> the alien is removed, regardless of any "ideal" processing times, and is face-to-face, either in person or by video.

B.    Conduct of Credible Fear Interview

The Committee urges the INS to construe § 302 of the Act as broadly as necessary to afford every potential asylum applicant the opportunity to consult with an attorney or another source of asylum information, if he wishes to do so, and to take the position that no delay for this purpose is unreasonable.

Specific steps the INS should take to ensure the availability of counsel, particularly pro bono counsel, at the credible fear interview, include the following:

- The INS should work with NGOs to identify desirable locations for the conduct of credible fear interviews. The locations should be chosen to maximize the availability of counsel, and should be accessible by public transportation whenever possible.

- In the event that no detention space is available in an agreed-upon facility, the overflow should be directed to the closest alternative facility where representation is available.

74468

AA-REG-00626

FRIED, FRANK, HARRIS, SHRIVER & JACOBSON

Director, Policy Directives
  and Instructions Branch
July 7, 1997
Page 13

- All interpreters, regardless of by whom provided, should be expressly advised of the confidentiality requirements.

- If credible fear is established, the applicant should not be transferred without agreement of the parties.

- If credible fear is not established at the interview, review by the Immigration Judge should be at the same location.

- Locations for detention, transfers, and scheduling hearings should be handled with flexibility to accommodate access to counsel, and to permit continuing representation by the same attorney, once counsel is obtained.  No transfers should be made at all.  At a minimum, they should not be made without prior notice to counsel.

- No formal entry of appearance should be required for "know your rights" presentations or for initial screening interviews.

- "Limited appearances" should be permitted for credible fear interviews.

- Asylum officers conducting credible fear interviews cannot possibly be expected to be personally familiar with current conditions for every country worldwide.  Therefore, immediate on-site access to the Resource Information Center, by computer and by telephone, must be available.  If it is unavailable, or if additional factual development is necessary, the officer should continue the interview until information can be obtained.  The applicant should have the right to submit evidence at his disposal, or to request a continuance to permit him to obtain and submit evidence.

74468

FRIED, FRANK, HARRIS, SHRIVER & JACOBSON

Director, Policy Directives
 and Instructions Branch
July 7, 1997
Page 14

- The INS should not separate families, particularly when children, elderly persons, incompetent persons, or persons with other infirmities are involved.

- Halfway houses or other appropriate "foster care" should be provided for these groups, for whom traditional detention is inappropriate. Families should be kept intact and housed in accommodations that respect and maintain family unity.

- Any minor dependent of an adult who successfully establishes credible fear should be deemed to have established credible fear derivatively.

- Any minor accompanying an adult who does not successfully establish credible fear should be entitled to an independent credible fear interview. (Minors age 14-21 should not be subject to a credible fear inquiry, but should be deemed to have a credible fear.)

- All unaccompanied minors should be presumed to have a credible fear of persecution. A guardian ad litem should be appointed to protect their rights during the pendency of asylum proceedings.

- INS should provide significant funding for informational materials, and for the expenses of NGOs or individual attorneys providing pro bono representation.

- Information or materials consulted by the asylum officer should be provided to the applicant for review and comment.

- An interpreter should be provided at government expense for "know your rights" sessions.

74468

AA-REG-00628

FRIED, FRANK, HARRIS, SHRIVER & JACOBSON

Director, Policy Directives
  and Instructions Branch
July 7, 1997
Page 15

- INS should continue to consult with NGOs on development of training materials for all first-line immigration officers, asylum officers, and others involved in the summary removal process.

- INS should designate a high-level ombudsman to resolve problems as they occur. An emergency contact person should be available on a 24-hour basis.

## III.    SPECIAL OBLIGATION TO VICTIMS OF TORTURE

The Committee reminds the INS that the United States has a binding obligation pursuant to Article 3 of the Convention Against Torture not to return a person to another nation "where there are substantial grounds for believing that he would be in danger of being subjected to torture." 5 Treaty Doc. No. 20, 100th Cong., 2nd Sess. 20 (1988). Even if an individual does **not** qualify for asylum under U.S. law, he may still be entitled to protection under the Convention Against Torture. The Committee appreciates the Agency's discussion on this point in the Preamble to the proposed regulations, but notes that in its current form it is sorely inadequate to comply with U.S. obligations under international law.

The Committee again endorses the comments submitted on this issue by Pierson Semmes and Bemis and expounded upon in their letter of today's date, and urges the INS to amend the proposed regulations to address specifically the concerns raised therein.

## IV.    VOLUNTARY DEPARTURE

The Committee is most concerned about the elimination of employment authorization for persons granted voluntary departure. The statute does not require this, and will increase the hardship of the impending departure on U.S. citizen or Lawful Permanent Resident family members by depriving them of the financial support of a breadwinner during the period of time preceding departure. This provision will also increase the likelihood that departing individuals may be unable to pay their debts, and that remaining family members may be forced to seek public benefits. Contrary to the suggestion in the preamble to the regulations, although opportunity for employment may have been a magnet drawing people to the U.S., the opportunity to obtain employment based on grant of voluntary departure was not. This measure seems completely unwarranted when eligibility for voluntary departure requires a determination

74468

AA-REG-00629

FRIED, FRANK, HARRIS, SHRIVER & JACOBSON

Director, Policy Directives
  and Instructions Branch
July 7, 1997
Page 16

of good moral character, a showing of the means to depart and the posting of a bond to guarantee timely departure.

Other concerns about voluntary departure include:

- Provision in §240.25 that the INS may attach to the grant of voluntary departure "any conditions it deems necessary." This far exceeds the scope of the statute and presents the danger of overreaching.  Congress has already identified the conditions necessary to establish eligibility; no more is necessary.

- Duration of time allowed for voluntary departure – proposed §240.25(c) provides that the total period of time allowed including extensions, shall not exceed 120 days. This is inconsistent with the statute, which provides for a maximum of 120 days at any one time; nothing prevents the INS from authorizing additional 120 day increments for humanitarian reasons, such as continuation of medical treatment in progress or completion of an academic year or term.

- Restrictions on Availability of Voluntary Departure – §240.26(b)(1) provides that voluntary departure can only be requested at a Master Calendar Hearing, and allows a person to be granted voluntary departure only if he makes no other requests for relief, concedes removability and waives appeal of all issues.  These provisions make the availability of voluntary departure into a carrot-and-stick, where it is only available if the alien abandons all his other legal rights.  Nothing in the statute supports this outrageous "either/or" approach.  Voluntary departure has historically been available as an alternative form of relief, and it should remain so.  It is to the benefit of the INS to have persons depart voluntarily at their own expense if no other relief is available.  That choice should not have to be made **before** other relief can be pursued.  Requiring voluntary departure to be requested at the Master Calendar prevents the

AA-REG-00630

FRIED, FRANK, HARRIS, SHRIVER & JACOBSON

Director, Policy Directives
   and Instructions Branch
July 7, 1997
Page 17

possibility of an agreement for voluntary departure during
the pendency of removal proceedings.

- Proposed §240.26(g) precludes an alien from appealing the
denial of voluntary departure, and §240.25(f) prohibits
appeal from revocation.  However, the INS is not precluded
from appealing a grant.  Any appeal rights available should
be reciprocal.

- In addition to the problem with elimination of the right to
appeal, voluntary departure should not be revoked without
notice and an opportunity to be heard.

- Section 240.26(b)(3)(B)(ii) should be amended to provide
an exemption in cases where the failure to obtain a travel
document within the time period allowed is not the fault of
or was not within the control of the applicant.

## V.    REFUGEE TRAVEL DOCUMENT

The Committee applauds the language in the preamble stating that the INS does not have
discretion in whether to accept applications for refugee travel documents filed abroad.
Accordingly, section 223(b)(2)(ii) should be amended to clarify that while district directors have
discretion in whether to grant the application, they do not have discretion in whether to accept
the application.  We urge that approvals be granted generously in recognition of the exigent
circumstances under which many refugees flee are forced to leave the United States.

The Committee thanks the INS for its consideration of these comments, and requests the
opportunity for a meeting with any appropriate INS personnel to discuss these issues.

Sincerely,

Karen T. Grisez

74468

74468

AA-REG-00631

# EXHIBIT X

Coalition for Humane Immigrant Rights, et al. v. Noem et al., 1:25-cv-00872 (JMC)

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

COALITION FOR HUMANE IMMIGRATION RIGHTS, *et. al.*,

                    *Plaintiffs*,

         v.

KRISTI NOEM, *et al.*

                    *Defendants*.

25 Civ. 00872

**DECLARATION OF AMY BESSADA**

I, Amy Bessada, pursuant to 28 U.S.C. §1746, declare under penalty of perjury as follows:

1.  I am currently employed by the U.S. Department of Homeland Security ("DHS"), U.S. Immigration and Customs Enforcement ("ICE" or the "Agency"), Office of Regulatory Affairs and Policy ("ORAP"), as the Regulations Unit Chief, where I provide management and direction for the regulatory priorities of ICE.  I joined ORAP in October 2019 as a Regulatory and Policy Analyst.  I served as Acting Regulations Unit Chief from August 2021 until November 2022 when I transitioned permanently to the position.  Part of my duties include overseeing a staff of Regulatory and Policy Analysts, developing and reviewing ICE regulatory initiatives in support of ICE rulemaking, collaborating with internal agency, departmental and interdepartmental partners to

achieve ICE and DHS mission goals through rulemaking, and ensuring that ICE is

meeting all statutory and executive branch requirements.

2.      The facts attested to herein are based upon my personal knowledge or upon

information provided to me in my official capacity, and upon conclusions and determinations

reached and made in accordance therewith.

3.      After a diligent search of records, ORAP did not locate a complete rulemaking or

administrative record relative to Legacy Immigration and Naturalization Service ("INS") 1788-

96, Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of

Removal Proceedings.

4.      The search did yield documents listed in the accompanying Index and contained

in the files annexed thereto, which contains public comments relative to Legacy INS 1788-96,

Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of

Removal Proceedings.

I declare, under penalty of perjury under 28 U.S.C. § 1746, that the foregoing is true and

correct to the best of my knowledge and based on information obtained from other individuals

employed by ICE.

Executed this 3rd day of December 2025 in Washington, D.C.

_____
Office of Regulatory Affairs and Policy
U.S. Immigration and Customs Enforcement

**RECORD INDEX**

***Inspection and Expedited Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures***, **62 Fed. Reg. 10,312 (Mar. 6, 1997)**

| PDF | Starting Bates No. | Citation Details & Title[1] |
|---|---|---|
| PART 2 | | |
| 1 | AA-REG-00001 | Andrew Knapp, Comment Letter (Jan. 9, 1996) |
| 4 | AA-REG-0000X | Philip G. Schrag, Georgetown University Law Center, Comment Letter (Jan. 17, 1997) |
| 29 | | Michael [Last Name Unintelligible], Comment Letter (Jan. 21, 1997) |
| 31 | | Amada Orendain, American Friends Service Committee, Comment Letter (Jan. 24, 1997) |
| 32 | | Tova Indritz, National Association of Criminal Defense Lawyers, Comment Letter (Jan. 23, 1997) |
| 34 | | Paul Monsky, Comment Letter (Jan. 15, 1996) |
| 37 | | Clare Cherkasky, Catholic Charities, Diocese of Arlington, Comment Letter (Jan. 27, 1997) |
| 38 | | Beatriz D. Taveras, Catholic Charities, Archdiocese of New York, Comment Letter (Jan. 28, 1997) |
| 49 | | John R. Long, Vive, Comment Letter (Jan. 27, 1997) |
| 81 | | Roger P. Winter, U.S. Committee for Refugees, Comment Letter (Jan. 28, 1997) |
| 87 | | Food & Allied Service Trades, Comment Letter (Jan. 29, 1997) |
| 88 | | Priscilla Labovitz, Comment Letter (Jan. 28, 1997) |
| 90 | | Judy Carlisle, Lutheran Refugee Services, Comment Letter (Jan. 30, 1997) |
| 95 | | Frances C. Berger, The Association of the Bar of the City of New York, Comment Letter (Jan. 31, 1997) |
| 100 | | Susan M. Lydon, Immigrant Legal Resource Center, Comment Letter (Jan. 30, 1997) |
| 108 | | Caterina S. Kretz, Albuquerque Border City Project, Comment Letter (Jan. 30, 1997) |
| 111 | | Carlos O. Miranda, U.S. Catholic Conference, Comment Letter (Feb. 3, 1997) |
| 127 | | Linton Joaquin, National Immigration Law Center, Comment Letter (Jan. 31, 1997) |
| 131 | | Kenneth L. George, National Ministries' Immigration and Refugee Services of the American Baptist Churches USA, Comment Letter (Jan. 31, 1997) |
| 134 | | Nicole H. Nelson, Comment Letter (Jan. 31, 1997) |
| 139 | | Randye S. Retkin, Gay Men's Health Center, Comment Letter (Jan. 30, 1997) |
| 143 | | Mrk Handelman, New York Association for New Americans, Inc., Comment Letter (Jan. 30, 1997) |

---

[1] Unless stated otherwise, the Comment Letter is to *Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures*, 62 Fed. Reg. 444 (Jan. 3, 1997).

| | | |
|---|---|---|
| 154 | | Margaret H. Taylor, Wake Forest University School of Law, Comment Letter (Jan. 31, 1997) |
| 174 | | Jessica L. Su, Asian Law Caucus, Comment Letter (Jan. 31, 1997) |
| 178 | | Ralston H. Deffenbaugh, Jr., Lutheran Immigration and Refugee Services, Comment Letter (Jan. 31, 1997) |
| 188 | | James J. Orlow, American Immigration Lawyers Association, Comment Letter (Jan. 31, 1997) |
| 200 | | Linda Rabben, Human Rights Umbrella, Inc., Comment Letter (Feb. 2, 1997) |
| 205 | | Alberto Manuel Benitez, The George Washington University, Comment Letter (Feb. 3, 1997) |
| 210 | | Sister Bernadette Palma, Family Health/La Clinica, Comment Letter (Jan. 29, 1997) |
| 212 | | Estelle R. Fletcher, Arvin & Fletcher, Comment Letter (Jan. 30, 1997) |
| 213 | | Paul M. Blayney, U.S. Coast Guard, U.S. Department of Transportation, Comment Letter (Jan. 27, 1997) |
| 215 | | Christine Longenecker, Catholic Charites, Diocese of Harrisburg, PA, Inc., Comment Letter (Jan. 31, 1997) |
| 216 | | Gerald A. Noel, Catholic Social Services, Comment Letter (Jan. 31, 1997) |
| 221 | | Anne Pilsbury, Central American Legal Assistance, Comment Letter (Jan. 28, 1997) |
| 225 | | University of Minnesota, Twin Cities, Comment Letter (Feb. 3, 1997) |
| 227 | | Patrick Delahanty, Archdiocese of Louisville, Office of Catholic Charities, Comment Letter (Feb. 3, 1997) |
| 228 | | Lawrence B. Fabacher, Comment Letter (Jan. 29, 1997) |
| 229 | | Laurie Hoefer, Latino Workers Center, Comment Letter (Jan. 30, 1997) |
| 231 | | Anita R. Schneider, Refugee and Immigration Services, Catholic Diocese of Richmond, Comment Letter (Feb. 1, 1997) |
| 237 | | Elizabeth M. Mendoza, Comment Letter (Jan. 31, 1997) |
| 241 | | Elisabeth Stickney, International Institute of Boston, Comment Letter (Feb. 1, 1997) |
| 244 | | Jamie B. Roskie, Sponsors Organized to Assist Refugees, Comment Letter (Jan. 31, 1997) |
| 247 | | Nancy A. Falgut, Comment Letter (Feb. 2, 1997) |
| 254 | | Salvador Colon, Comment Letter (Feb. 2, 1997) |
| PART 3 | | |
| 1 | | Philip G. Schrag, Georgetown University Law Center, Comment Letter (undated) |
| 36 | | Richard B. Cook, Comment Letter (March 31, 1997) |
| 39 | | Tammy Fox-Isicoff, American Immigration Lawyers Assoc. South Florida Chapter, Comment Letter (March 18, 1997) |
| 42 | | Jonathan D. Loo, United Nations High Commissioner for Refugees, Comment Letter (Apr. 13, 1997) |
| 44 | | Unidentified Author, "Parents and their supporters", Comment Letter (May 1, 1997) |
| 45 | | Raul Atler, Gonzales and Gonzales Bonds and Insurance Agency, Inc., Comment Letter (May 5, 1997) |

| | | |
|---|---|---|
| 48 | | United States General Accounting Office, Comment Letter (undated) |
| 57 | | Unidentified Author, Comment Letter (June 9, 1997) |
| 58 | | Barbara Morehouse, American Speech Language Hearing Assoc., Comment Letter (June 2, 1997) |
| 60 | | William F. Glinka, Immigration and Naturalization Service, Comment Letter (June 2, 1997) |
| 62 | | Trevor Long, Qantas Airways Limited, Comment Letter (June 10, 1997) |
| 66 | | Una F. Brien, Comment Letter (July 1, 1997) |
| 67 | | Edward M. Kennedy, United States Senate, Comment Letter (July 3, 1997) |
| 70 | | Philip G. Schrag, Georgetown University Law Center, Comment Letter (June 12, 1997) |
| 73 | | James F. Moseley, The Maritime Law Association of the United States, Comment Letter (July 2, 1997) |
| 83 | | David Cleveland, Foundry Methodist Church, Comment Letter June 30, 1997) |
| 85 | | Robert D. Evans, American Bar Association, Comment Letter (July 7, 1997) |
| 109 | | Anne Willem Bijleveld, United Nations High Commissioner for Refugees, Comment Letter (July 7, 1997) |
| 152 | | C. M. LeGrand, Department of the Navy Office of the Judge Advocate General, Comment Letter (July 1, 1997) |
| 156 | | Nicholas J. Rizza, Amnesty International USA, Comment Letter (July 3, 1997) |
| 159 | | Leonard S. Rubenstein, Physicians for Human Rights, Comment Letter (July 7, 1997) |
| 178 | | Beth Lyon, Lawyers Committee for Human Rights, Comment Letter (July 7, 1997) |
| PART 4 | | |
| 1 | | Elizabeth Dallam, Florence Immigrant and Refugee Rights Project Inc., Comment Letter (July 5, 1997) |
| 23 | | Lynn Marcus, University of Arizona Immigration Law Clinic, Comment Letter (July 5, 1997) |
| 31 | | Angela M. Lloyd, Covenant House New York, Comment Letter (July 3, 1997) |
| 37 | | Janet Thomas, Air Transport Association, Comment Letter (July 3, 1997) |
| 38 | | Henry G. Eager, Comment Letter (July 5, 1997) |
| 42 | | Virgil Wiebe, Interfaith Community Services, Comment Letter (July 1, 1997) |
| 44 | | Iris Gomez, Massachusetts Law Reform Institute, Comment Letter (July 7, 1997) |
| 49 | | Frank Pangas, Detroit Metro Airport, Comment Letter (June 27, 1997) |
| 50 | | Dan Kesselbrenner, National Immigration Project of the National Lawyers Guild, Comment Letter (July 3, 1997) |
| 57 | | American Immigration Lawyers Association, Comment Letter (July 7, 1997) |
| 66 | | Mark E, Greenwold, Washington Lawyers' Committee for Civil Rights and Urban Affairs, Comment Letter (July 7, 1997) |
| 75 | | Martin A. Wenick, The Hebrew Immigrant Aid Society, Comment Letter (July 7, 1997)) |
| 89 | | Karen T. Grisez, Washington Lawyers' Committee for Civil Rights and Urban Affairs, Comment Letter (July 7, 1997) |

| 106 | | Lamar Smith, U.S. House of Representatives, Committee on the Judiciary, Subcommittee on Immigration and Claims, Comment Letter (July 7, 1997) |
|---|---|---|
| 113 | | Gary Sampliner, McKenna & Cuneo LLP, Comment Letter (July 7, 1997) |
| 117 | | Lamar Smith, U.S. House of Representatives, Committee on the Judiciary, Subcommittee on Immigration and Claims, Comment Letter (July 7, 1997) |
| 124 | | Karen T. Grisez, Washington Lawyers' Committee for Civil Rights and Urban Affairs, Comment Letter (July 8, 1997) |
| 142 | | Leslye E. Orloff, Ayuda Inc., Comment Letter (July 7, 1997) |
| 152 | | Henry G. Eager, Comment Letter (July 9, 1997) |
| 154 | | David P. Hofheins, Columbia Basin Health Association, Comment Letter (July 22, 1997) |
| PART 5 | | |
| 1 | | Lamar Smith, U.S. House of Representatives, Committee on the Judiciary, Subcommittee on Immigration and Claims, Comment Letter (Feb. 3, 1997) |
| 17 | | Karen F. Ellingson, Immigrant Law Center of Minnesota, Comment Letter (Jan. 31, 1997) |
| 18 | | Iris Gomez, Massachusetts Law Reform Institute, Comment Letter (Jan. 31, 1997) |
| 22 | | Amada Orendain, American Friends Service Committee, Comment Letter (Jan. 24, 1997) |
| 23 | | Susan Schreiber, Travelers and Immigrants Aid, Comment Letter (Jan. 31, 1997) |
| 26 | | David Marzahl, Illinois Coalition for Immigrant and Refugee Protection, Comment Letter (Jan. 31, 1997) |
| 33 | | Joyce Antila Phipps, El Centro Hispanoamericano, Comment Letter (Jan. 30, 1997) |
| 36 | | Phyllis J. Robinson, State of Illinois Department of Children and Family Services, Comment Letter (Jan. 31, 1997) |
| 39 | | Daniel P. Cooper and Leonard S. Rubenstein, Physicians for Human Rights, Comment Letter (Feb. 3, 1997) |
| 101 | | Roberta L. Farkas-Huezo, Vive, Comment Letter (Jan. 30, 1997) |
| 106 | | Morton Sklar, World Organization Against Torture USA, Comment Letter (Jan. 28, 1997) |
| 115 | | Richard T. Foltin, The American Jewish Committee, Comment Letter (Feb. 3, 1997) |
| 120 | | Susan Campernolle, Legal Assistance Foundation of Chicago, Comment Letter (Jan. 31, 1997) |
| 125 | | Mary Kenney, The Lawyers' Committee for Civil Rights Under Law of Texas, Comment Letter (Jan. 31, 1997) |
| 134 | | John P. Salzberg, The Center for Victims of Torture, Comment Letter (Jan. 31, 1997) |
| 140 | | Frances C. Berger, The Association of the Bar of the City of New York, Comment Letter (Jan. 31, 1997) |
| 145 | | Martin A. Wenick, The Hebrew Immigrant Aid Society, Comment Letter (Feb. 3, 1997) |

| | | |
|---|---|---|
| 157 | | Dan Kesselbrenner, National Immigration Project of the National Lawyers Guild, Comment Letter (Jan. 31, 1997) |
| 181 | | Sarah B. Ignatius, Political Asylum/Immigration Representation Project, Comment Letter (Jan. 31, 1997) |
| 204 | | Raul Yzaguirre, National Council of La Raza, Comment Letter (Feb. 3, 1997) |
| **PART 6** | | |
| 1 | | Raul Yzaguirre, National Council of La Raza, Comment Letter (Feb. 3, 1997) |
| 8 | | Benjamin A. Gilman, Christopher A. Smith, Howard L. Berman, United States House of Representatives, Comment Letter (Feb. 3, 1997) |
| 11 | | Edward M. Kennedy & Paul Wellstone, United States Senate, Comment Letter (Feb. 3, 1997) |
| 14 | | Anne Willem Bijlevald, United Nations High Commissioner for Refugees, Comment Letter (Feb. 3, 1997) |
| 46 | | Elisa Massimino, Lawyers' Committee for Human Rights, Comment Letter (Feb. 3, 1997) |
| 80 | | Karen K. Narasaki, National Asian Pacific American Legal Consortium, Comment Letter (Feb. 3, 1997) |
| 88 | | Robert D. Evans, American Bar Association, Comment Letter (Feb. 3, 1997) |
| 113 | | Lynn Frendt Shotwell, American Council on International Personnel, Comment Letter (Feb. 3, 1997) |
| 115 | | Thomas J. Shea, Comment Letter (Feb. 3, 1997) |
| 117 | | Lynn Marcus, University of Arizona Immigration Law Clinic, Comment Letter (Jan. 31, 1997) |
| 131 | | Gustavo Torres, CASA of Maryland, Comment Letter (Feb. 3, 1997) |
| 132 | | Maria Reff, CASA of Maryland, Comment Letter (Feb. 3, 1997) |
| 134 | | James O'Brien, Comment Letter (Feb. 3, 1997) |
| 140 | | Matthew Welch, Florence Immigration and Refugee Rights Project Inc., Comment Letter (Feb. 3, 1997) |
| 154 | | American Immigration Lawyers Association, Comment Letter (Feb. 3, 1997) |
| **PART 7** | | |
| 1 | | Larry Katzman, Northwest Immigrant Rights Project, Comment Letter (Jan. 29, 1997) |
| 15 | | Karen T. Grisez, Washington Lawyers' Committee for Civil Rights and Urban Affairs, Comment Letter (Feb. 3, 1997) |
| 32 | | Mark E. Greenwold, Washington Lawyers' Committee for Civil Rights and Urban Affairs, Comment Letter (Feb. 3, 1997) |
| 38 | | Eloise Rosas, Immigration and Naturalization Service, Comment Letter (Feb. 3, 1997) |
| 39 | | Gary H. Sampliner, McKenna & Cuneo, LLP, Comment Letter (Feb. 3, 1997) |
| 43 | | Elizabeth G. Ferris, InterAction, Comment Letter (Jan. 31, 1997) |
| 46 | | Janet M. C. Thomas, Air Transport Association, Comment Letter (Feb. 3, 1997) |
| 55 | | Benjamin A. Gilman, Christopher A. Smith, Howard L. Berman, United States House of Representatives, Comment Letter (Feb. 3, 1997) |
| 58 | | Spencer Abraham, United States Senate, Committee on the Judiciary, Subcommittee on Immigration Comment Letter (Feb. 3, 1997) |

| 61 | | Nancy Kelly, Deborah Anker, John Willshire-Carrera, Harvard Law School, Refugee Law Center and the Women Refugees Project, Comment Letter (Feb. 3, 1997) |
|---|---|---|
| 79 | | Virgil Wiebe, Interfaith Community Services, Comment Letter (Feb. 1, 1997) |
| 82 | | Christopher H. Smith, United States House of Representatives, Committee on International Relations, Subcommittee on Internal Operations, Comment Letter (Feb. 3, 1997) |
| 85 | | Monica Schurtman, St. Mary's University, Comment Letter (Jan. 29, 1997) |
| 88 | | Leslye Orloff, Ayuda Inc., Comment Letter (Feb. 3, 1997) |
| 100 | | Bruce Goldstein, Farmworker Justice Fund, Inc. Comment Letter (Feb. 3, 1997) |
| PART 8 | | |
| 1 | | Carolyn Patty Blum, University of California School of Law, Comment Letter (Feb. 3, 1997) |
| 5 | | Mary Diaz, Women's Commission for Refugee Women and Children, Comment Letter (Feb. 1, 1997) |
| 12 | | Robert A. Davidson, International Air Transport Association, Comment Letter (Feb. 4, 1997) |
| 20 | | Cecelia M. Espenoza, University of Denver College of Law, Comment Letter (Feb. 4, 1997) |
| 24 | | Robert P. DeVecchi, International Rescue Committee, Comment Letter (Feb. 3, 1997) |
| 30 | | [Unidentified Author], Comment Letter (Jan. 29, 1997) |
| 34 | | C.M. LeGrand, Department of the Navy, Office of the Judge Advocate General, Comment Letter (Feb. 4, 1997) |
| 36 | | Elizabeth Dallam, Florence Immigrant and Refugee Rights Project Inc., Comment Letter (Feb. 3, 1997) |
| 51 | | Steven C. Thal, Steven C. Thal, P.A., Comment Letter (Jan. 31, 1997) |
| 55 | | S.O. Bossier, Jr., New Orleans Steamship Association, Comment Letter (Jan. 30, 1997) |
| 57 | | Deborah BeBare, Rhode Island Coalition Against Domestic Violence, Comment Letter (Jan. 31, 1997) |
| 58 | | Sid L. Mohn, Heartland Alliance, Comment Letter (Jan. 30, 1997) |
| 63 | | Jessica L. Cates & Kathleen Krenek, Wisconsin Coalition Against Domestic Violence, Comment Letter (Jan. 30, 1997) |
| 65 | | Benjamin A. Gilman, Christopher A. Smith, Howard L. Berman, United States House of Representatives, Comment Letter (Feb. 4, 1997) |
| 68 | | Leni Marin, Family Violence Prevention Fund, Comment Letter (Feb. 4, 1997) |
| 75 | | James J. Friedberg, West Virginia University College of Law, Comment Letter (Jan. 31, 1997) |
| 76 | | Lloyd Henry, New York City Council Subcommittee on Immigration, Comment Letter (Jan. 30, 1997) |
| 81 | | John R. Long, Vive, Comment Letter (Jan. 30, 1997) |
| 86 | | Susan Alva, Coalition for Humane Immigrant Rights of Los Angeles, Comment Letter (Jan. 31, 1997) |

| 91 | | Bruno J. Sukys, International Institute of Rhode Island, Comment Letter (Jan. 30, 1997) |
|---|---|---|
| 97 | | Hichem Kefi, Vive, Comment Letter (Jan. 30, 1997) |
| 102 | | Leni Marin, Family Violence Prevention Fund, Comment Letter (Feb. 4, 1997) |
| 108 | | Patricia G. Mattos, Comment Letter (Jan. 29, 1997) |
| 111 | | Monica Schurtman, St. Mary's University Immigration and Human Rights Clinic, Comment Letter (Jan. 29, 1997) |
| 114 | | Sherry Frohman, New York State Coalition Against Domestic Violence, Comment Letter (Jan. 29, 1997) |
| 116 | | Raul Atler, Gonzales and Gonzales Bonds and Insurance Agency, Inc., Comment Letter (Jan. 30, 1997) |
| 118 | | Richard D. Steel, Steel, Rudnick & Ruben, Comment Letter (Jan. 31, 1997) |
| 120 | | Nalina Narain, Massachusetts Coalition of Battered Women Service Groups, Comment Letter (Jan. 29, 1997) |
| 122 | | Margaret McHugh, The New York Immigration Coalition, Comment Letter (Jan. 30, 1997) |
| 126 | | James O'Brien, Comment Letter (Feb. 3, 1997) |
| 131 | | Julie Goldscheid, NOW Legal Defense and Education Fund, Comment Letter (Feb. 4, 1997) |
| 133 | | Leslye Orloff, Ayuda, Inc. Comment Letter (Feb. 3, 1997) |
| 139 | | Sylvia Baiz, Law Offices of Sylvia Baiz, Comment Letter (Feb. 3, 1997) |
| 141 | | Phyllis DeMott, A Safe Place Lake County Crisis Center, Comment Letter (Feb. 3, 1997) |
| 144 | | Leslye Orloff, Ayuda, Inc., Comment Letter (Feb. 3, 1997) |
| 150 | | Frank J. Schorn & Lisa L. Johnston, Emerald Isle Immigration Center, Comment Letter (Feb. 3, 1997) |
| 157 | | Anne Willem Bijleveld, United Nations High Commissioner for Refugees, Comment Letter (Feb. 3, 1997) |
| 191 | | Marilucy Gonzalez & Evette Soto, Puerto Rican Legal Defense and Education Fund, Comment Letter (Feb. 5, 1997) |
| 193 | | Muzaffar A. Chishti, Union of Needletrades, Industrial and Textile Employees, Comment Letter (Jan. 31, 1997) |
| 199 | | C.M. LeGrand, Department of the Navy, Office of the Judge Advocate General, Comment Letter (Feb. 4, 1997) |
| 201 | | C.M. LeGrand, Department of the Navy, Office of the Judge Advocate General, Comment Letter (Feb. 4, 1997) |
| 203 | | American Immigration Lawyers Association, Comment Letter (Feb. 3, 1997) |
| 228 | | Edward M. Kennedy, United States Senate, Comment Letter (feb. 3, 1997) |
| PART 9 | | |
| 1 | | Lamar Smith, U.S. House of Representatives, Committee on the Judiciary, Subcommittee on Immigration and Claims, Comment Letter (Feb. 3, 1997) |
| 17 | | Phyllis J. Robinson, Illinois Department of Children and Family Services, Comment Letter (Jan. 31, 1997) |
| 20 | | Joyce Antila Phipps, Esq., Hispanamericano, Comment Letter (Jan. 30, 1997) |

| 23 | | David Marzahl, Illinois Coalition for Immigrant and Refugee Protection, Comment Letter (Jan. 31, 1997) |
|----|--|----------------------------------------------------------------------------------------------------------|
| 30 | | Margaret H. Taylor, Wake Forest School of Law, Comment Letter (Jan. 31, 1997) |
| 50 | | Mark Handelman, New York Association for New Americans, Inc., Comment Letter (Jan. 30, 1997) |
| 61 | | Nicole Hope Nelson, Willamette University College of Law, Comment Letter (Jan. 31, 1997) |
| 66 | | Kenneth L. George, National Ministries, Comment Letter (Jan. 31, 1997) |
| 69 | | Linton Joaquin, National Immigration Law Center, Comment Letter (Jan. 31, 1997) |
| 73 | | Linton Joaquin, National Immigration Law Center, Comment Letter (Jan. 31, 1997) |
| 77 | | Jessica L. Su, Asian Law Caucus, Comment Letter (Jan. 31, 1997) |
| 81 | | Jamie Baker Roskie, Sponsors Organized to Assist Refugees, Comment Letter (Jan. 31, 1997) |
| 84 | | Elizabeth M. Mendoza, Elizabeth M. Mendoza, P.C., Comment Letter (Jan. 31, 1997) |
| 88 | | Anita R. Schneider, Refugee and Immigration Services, Catholic Diocese of Richmond, Comment Letter (Feb. 1, 1997) |
| 94 | | Laurie Hoefer, Latino Workers Center, Comment Letter (Jan. 30, 1997) |
| 96 | | Anne Pilsbury, Central American Legal Association, Comment Letter (Jan. 28, 1997) |
| 100 | | Gerard A. Noel, Catholic Social Services, Comment Letter and Attachment (Jan. 31, 1997) |
| 105 | | Estelle R. Fletcher, Arvin & Fletcher, Comment Letter (Jan. 30, 1997) |
| 106 | | Linda Rabben, Human Rights Umbrella, Inc., Comment Letter (Feb. 2, 1997) |
| 107 | | Ralston H. Deffenbaugh, Jr., Lutheran Immigration and Refugee Service, Comment Letter (Jan. 31, 1997) |
| 117 | | Cecelia M. Espenoza, University of Denver College of Law, Comment Letter (undated) |
| 120 | | Cecelia M. Espenoza, University of Denver College of Law, Comment Letter (Feb. 4, 1997) |
| 123 | | Rebecca Acevedo-Holliday, Comment Letter (Jan. 31, 1997) |
| 124 | | Rebecca Acevedo-Holliday, Comment Letter (Jan. 31, 1997) |
| 125 | | Rebecca Acevedo-Holliday, Comment Letter (Jan. 31, 1997) |
| 126 | | Salvador Colon, Salvador Colon, P.C., Comment Letter (Feb. 2, 1997) |
| 133 | | Nancy A. Falgout, Attorney at Law, Comment Letter (Feb. 2, 1997) |
| 140 | | Muzaffar A. Chishti, Esp. UNITE Immigration Project, Comment Letter (Jan. 31, 1997) |
| 146 | | Muzaffar A. Chishti, Esp. UNITE Immigration Project, Comment Letter (Jan. 31, 1997) |
| 152 | | Frank J. Schorn & Lisa L. Johnston, Emerald Isle Immigration Center, Comment Letter (Feb. 3, 1997) |
| 159 | | Frank J. Schorn & Lisa L. Johnston, Emerald Isle Immigration Center, Comment Letter (Feb. 3, 1997) |

| 166 | | Frank J. Schorn & Lisa L. Johnston, Emerald Isle Immigration Center, Comment Letter (Feb. 3, 1997) |
|---|---|---|
| 173 | | Frank J. Schorn & Lisa L. Johnston, Emerald Isle Immigration Center, Comment Letter (Feb. 3, 1997) |
| 180 | | Leslye Orloff & Minty Siu Chung, Ayuda, Inc., Comment Letter (Feb. 3, 1997) |
| 186 | | Leslye Orloff & Minty Siu Chung, Ayuda, Inc., Comment Letter (Feb. 3, 1997) |
| 192 | | Leslye Orloff & Minty Siu Chung, Ayuda, Inc., Comment Letter (Feb. 3, 1997) |
| 193 | | Leslye Orloff & Minty Siu Chung, Ayuda, Inc., Comment Letter (Feb. 3, 1997) |
| 194 | | Leslye Orloff & Minty Siu Chung, Ayuda, Inc., Comment Letter (Feb. 3, 1997) |
| 200 | | Phyllis DeMott, Lake County Crisis Center, Comment Letter (Feb. 3, 1997) |
| 203 | | Phyllis DeMott, Lake County Crisis Center, Comment Letter (Feb. 3, 1997) |
| 206 | | Patricia G. Mattos, Attorney at Law, Comment Letter (Jan. 29, 1997) |
| 210 | | S.O. Bossier, Jr., New Orleans Steamship Association, Comment Letter (Jan. 30, 1997) |
| 212 | | Edward M. Kennedy, United States Senate, Comment Letter (Jul. 3, 1997) |
| 213 | | Allen Erenbaum,  Immigration and Naturalization Service, Response Letter to Hon. Edward M. Kennedy (Oct. 17, 1997) |
| 214 | | Allen Erenbaum,  Immigration and Naturalization Service, Response Letter to Hon. Edward M. Kennedy (Oct. 17, 1997) |
| 215 | | Edward M. Kennedy, United States Senate, Comment Letter (Jul. 3, 1997) |
| 218 | | Edward M. Kennedy, United States Senate, Comment Letter (Jul. 3, 1997) |
| 221 | | Greg Guma, Albuquerque Border City Project, Comment Letter and Attachment (Jan. 30, 1997) |
| 228 | | Greg Guma, Albuquerque Border City Project, Comment Letter (Jan. 30, 1997) |
| 230 | | Caterina S. Kretz, Albuquerque Border City Project, Comment Letter (Jan. 30, 1997) |
| 233 | | Frances C. Berger, The Association of the Bar of the City of New York, Comment Letter (Jan. 31, 1997) |
| 238 | | Philip G. Schrag & Michele R. Pistone, Georgetown University Law Center, Comment Letter (Jan. 17, 1997) |
| PART 10 | | |
| 1 | | Lamar Smith, U.S. House of Representatives, Committee on the Judiciary, Subcommittee on Immigration and Claims, Comment Letter (Feb. 3, 1997) |
| 17 | | Phyllis J. Robinson, Illinois Department of Children and Family Services, Comment Letter (Jan. 31, 1997) |
| 20 | | Joyce Antila Phipps, Esq., HispanAmericano, Comment Letter (Jan. 30, 1997) |
| 23 | | David Marzahl, Illinois Coalition for Immigrant and Refugee Protection, Comment Letter (Jan. 31, 1997) |
| 30 | | Margaret H. Taylor, Wake Forest School of Law, Comment Letter and Attachment (Jan. 31, 1997) |
| 50 | | Mark Handelman, New York Association for New Americans, Inc., Comment Letter (Jan. 30, 1997) |
| 61 | | Nicole Hope Nelson, Willamette University College of Law, Comment Letter (Jan. 31, 1997) |

| 66 | | Kenneth L. George, National Ministries, Comment Letter and Attachment (Jan. 31, 1997) |
| 69 | | Linton Joaquin, National Immigration Law Center, Comment Letter (Jan. 31, 1997) |
| 73 | | Linton Joaquin, National Immigration Law Center, Comment Letter (Jan. 31, 1997) |
| 77 | | Jessica L. Su, Asian Law Caucus, Comment Letter and Attachment (Jan. 31, 1997) |
| 81 | | Jamie Baker Roskie, Sponsors Organized to Assist Refugees, Comment Letter (Jan. 31, 1997) |
| 84 | | Elizabeth M. Mendoza, Elizabeth M. Mendoza, P.C., Comment Letter (Jan. 31, 1997) |
| 88 | | Anita R. Schneider, Refugee and Immigration Services, Catholic Diocese of Richmond, Comment letter (Feb. 1, 1997) |
| 94 | | Laurie Hoefer, Latino Workers Center, Comment Letter (Jan. 30, 1997) |
| 96 | | Anne Pilsbury, Central American Legal Association, Comment Letter (Jan. 28, 1997) |
| 100 | | Gerard A. Noel, Catholic Social Services, Comment Letter and Attachment (Juan. 31, 1997) |
| 105 | | Estelle R. Fletcher, Arvin & Fletcher, Comment Letter (Jan. 30, 1997) |
| 106 | | Linda Rabben, Human Rights Umbrella, Inc., Comment Letter (Feb. 2, 1997) |
| 107 | | Ralston H. Deffenbaugh, Jr., Lutheran Immigration and Refugee Service, Comment Letter (Jan. 31, 1997) |
| 117 | | Cecelia M. Espenoza, University of Denver College of Law, Comment Letter (undated) |
| 120 | | Cecelia M. Espenoza, University of Denver College of Law, Comment Letter (undated) |
| 123 | | Rebecca Acevedo-Holliday, Comment Letter (Jan. 31, 1997) |
| 124 | | Rebecca Acevedo-Holliday, Comment Letter (Jan. 31, 1997) |
| 125 | | Rebecca Acevedo-Holliday, Comment Letter (Jan. 31, 1997) |
| 126 | | Salvador Colon, Salvador Colon, P.C., Comment Letter and Attachment (Feb. 2, 1997) |
| 133 | | Nancy A. Falgout, Attorney at Law, Comment Letter and Attachment (Feb. 2, 1997) |
| 140 | | Muzaffar A. Chishti, Esp. UNITE Immigration Project, Comment Letter (Jan. 31, 1997) |
| 146 | | Muzaffar A. Chishti, Esp. UNITE Immigration Project, Comment Letter (Jan. 31, 1997) |
| 152 | | Frank J. Schorn & Lisa L. Johnston, Emerald Isle Immigration Center, Comment Letter (Feb. 3, 1997) |
| 159 | | Frank J. Schorn & Lisa L. Johnston, Emerald Isle Immigration Center, Comment Letter (Feb. 3, 1997) |
| 166 | | Frank J. Schorn & Lisa L. Johnston, Emerald Isle Immigration Center, Comment Letter (Feb. 3, 1997) |
| 173 | | Frank J. Schorn & Lisa L. Johnston, Emerald Isle Immigration Center, Comment Letter (Feb. 3, 1997) |
| 180 | | Leslye Orloff & Minty Siu Chung, Ayuda, Inc., Comment Letter (Feb. 3, 1997) |

| 186 | | Leslye Orloff & Minty Siu Chung, Ayuda, Inc., Comment Letter (Feb. 3, 1997) |
|---|---|---|
| 192 | | Leslye Orloff & Minty Siu Chung, Ayuda, Inc., Comment Letter First Page (Feb. 3, 1997) |
| 193 | | Leslye Orloff & minty Siu Chung, Ayuda, Inc., Comment Letter First Page (Feb. 3, 1997) |
| 194 | | Leslye Orloff & Minty Siu Chung, Ayuda, Inc., Comment Letter (Feb. 3, 1997) |
| 200 | | Phyllis DeMott, Lake County Crisis Center, Comment Letter (Feb. 3, 1997) |
| 203 | | Phyllis DeMott, Lake County Crisis Center, Comment Letter (Feb. 3, 1997) |
| 206 | | Patricia G. Mattos, Attorney at Law, Comment Letter and Attachment (Jan. 29, 1997) |
| 210 | | S.O. Bossier, Jr., New Orleans Steamship Association, Comment Letter (Jan. 30, 1997) |
| 212 | | Edward M. Kennedy, United States Senate, Comment Letter First Page (Jul. 3, 1997) |
| 213 | | Allen Erenbaum, U.S.D.O.J. Immigration and Naturalization Service, Response Letter to Hon. Edward Mr. Kennedy (Oct. 17, 1997) |
| 214 | | Allen Erenbaum, U.S.D.O.J. Immigration and Naturalization Service, Response Letter to Hon. Edward Mr. Kennedy (Oct. 17, 1997) |
| 215 | | Edward M. Kennedy, United States Senate, Comment Letter (Jul. 3, 1997) |
| 218 | | Edward M. Kennedy, United States Senate, Comment Letter (Jul. 3, 1997) |
| 221 | | Greg Guma, Albuquerque Border City Project, Comment Letter and Attachment (Jan. 30, 1997) |
| 228 | | Greg Guma, Albuquerque Border City Project, Comment Letter (Jan. 30, 1997) |
| 230 | | Caterina S. Kretz, Albuquerque Border City Project, Comment Letter (Jan. 30, 1997) |
| 233 | | Frances C. Berger, The Association of the Bar of the City of New York, Comment Letter (Jan. 31, 1997) |
| 238 | | Philip G. Schrag & Michele R. Pistone, Georgetown University Law Center, Comment Letter (Jan. 17, 1997) |

# EXHIBIT Y

Comments directed to the Proposed Rule , 8 CFR Part 1, et al.
INS # 1788-96

These comments are being submitted by an INS career employee in my private capacity.

The proposed rule sets forth the regulations to implement the expedited removal established by Congress in Sec. 302 of the IIRIRA. The expedited removal process as proposed would generally apply only to "arriving aliens" under the proposed rule, and would limit the application of the expedited removal procedures to those in the United States who have entered the United States without having been admitted or paroled to "any class of aliens....specifically designated by the Commissioner", though no class is designated in the proposed section.

In essence, this proposed rule establishes from the outset that the expedited removal procedures would only apply to aliens who appear at a designated port of entry and attempt to enter the United States under the procedural system of safeguards in place there. It would require those who successfully evade these safeguards by entering without inspection to be placed into removal proceedings before the Immigration Judge.

Congress indicated a great deal of interest in this new expedited removal process by requiring the GAO to report back by April, 1998 on the effectiveness of these new procedures in deterring illegal entry and the level of cost savings of detention and adjudications resources.

If we were to assume that Congress' intent was to provide a disincentive to illegal entry by these new provisions, it is not clear that the proposal does so. In fact, it appears that by not designating any class of aliens already in the U.S. susceptible to the penalties of expedited removal, the proposed rule actually will, if implemented as is, provide an *incentive* to illegal entry. The Executive Office for Immigration Review has indicated that the provisions of the proposed rule will actually increase the costs of immigration judges and legal support (the estimated amount was $21,300,000) rather than result in adjudicative cost savings. By instituting this proposed rule without defining any class of alien already in the U.S. as being susceptible to it's provisions, it seems to me to preordain the findings of the GAO in its report required in little more than a year from now.

We have read of cases throughout the United States where large numbers of illegal aliens have been apprehended on the highways while in transit from the border area where they illegally entered to their destination in the interior. It would seem to me that these aliens, who are and readily admit to being recent arrivals, would fit exactly the class envisioned by the Congress to be covered by these procedures.

I feel that by codifying the class expressly provided for in the statute in Sec. 302(b)(1)(A)(iii)(II) as amenable to the expedited removal procedures, the Government would institute significant efficiencies from the outset, yet if there were to develop problems in the execution of the provisions, they would be subject to Congressional review very early on and could be remedied quickly. It's also much easier to ease up on a strict policy than it is to

AA-REG-00029

institute stricter ones. By instituting the proposed procedure for supervisory review in the expedited removal process, the INS has shown its concern for procedural safeguards designed to provide a greater level of protection to the aliens concerned than even Congress actually legislated. The requirement to determine whether or not an alien has demonstrated continuous physical presence for the previous two years provides the Service substantial discretion to allow for the handling of the removal process by the Immigration Judge.

I believe that the alternative proposal which was highlighted by the Department in the request for comment at 62 FR 445 - "(2) application of expedited removal to all aliens not admitted or paroled (and not described in section 235(b)(1)(F) who cannot demonstrate continuous physical presence for the previous two years" - comports most closely with the intent of Congress.

Michael J. Devine

# EXHIBIT Z

Coalition for Humane Immigrant Rights, et al. v. Noem et al., 1:25-cv-00872 (JMC)

EDWARD M. KENNEDY
MASSACHUSETTS

# United States Senate

WASHINGTON, DC 20510–2101



July 3, 1997

Director, Policy Directives and Instructions Branch
Immigration and Naturalization Service
425 I Street, NW
Room 5307
Washington, DC 20536

**Re:   INS Number 1788-96**

Dear Sir or Madam:

I am writing to comment on the interim rule published in the Federal Register on March 6, 1997. At the outset, I wish to commend the Immigration and Naturalization Service for providing an extended period for public comment on the interim rule before writing a final rule later this year.

Overall, the March 6 interim rule is an improvement over its predecessor. There are, however, three areas where the regulations still present serious concerns. These concern the definition of "extraordinary circumstances", monitoring of secondary inspection by outside organizations, and the role of attorneys in appeals from findings that an immigrant lacks credible fear.

Under the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), asylum seekers have one-year from the date they entered the U.S. to file their asylum applications, with exceptions for extraordinary and changed circumstances. In its previous rule, INS failed to give examples of the types of circumstances that are extraordinary or changed. I am pleased that in the March 6, 1997 interim rule, INS listed several examples of extraordinary and changed circumstances.

In addition, INS correctly clarified that the list of examples of extraordinary or changed circumstances is not exclusive. This language, however, is in the Preamble to the rule, not the rule itself. The Preamble states that "it is recognized that there are many other circumstances that might apply if the applicant is able to show that but for such circumstances the application would have been filed within the first year." This language

1

PRINTED ON RECYCLED PAPER

provides an important interpretation of the interim rule, and as such should appear in the rule itself. It is the actual rule, not the Preamble, which is published in the Code of Federal Regulations. If this language is not moved into the text of the rule, asylum seekers and representatives, as well as immigration judges, will not necessarily know the language exists. This could result in erroneous interpretations of this section of the regulation. I urge INS to include this important Preamble language in the final rule.

Second, I am concerned about the lack of outside monitoring of the secondary inspection process. It is during the secondary inspection process that the types of questions are asked which are designed to encourage asylum seekers to come forward with their claims. INS must properly train its immigration inspectors on their need to be alert to immigrants' non-verbal, as well as verbal, reactions which may signify a fear of return to their country. To ensure that inspectors are properly implementing secondary inspection, it is imperative that outside human rights organizations be allowed to monitor the secondary inspection process.

My office has received numerous reports that INS has not yet permitted outside groups to monitor secondary inspections. It is impossible, therefore, to receive any information on the effectiveness of secondary inspection. Without proper monitoring, we will never know whether inspectors are properly informing arriving immigrants of the possibility of obtaining asylum in the US, or whether the inspectors are creating an atmosphere conducive to revealing immigrants fears of return to their home country, or fears of torture. It is in the best interest of INS to show the public that true asylum seekers are not being returned to their countries of persecution or torture, and that the expedited removal system is working effectively. This cannot happen unless outside groups are permitted to observe the expedited removal process. I urge INS to establish procedures to allow representatives of independent organizations to observe secondary inspection at various ports of entry.

Third, I was pleased that in the first interim rule, INS preserved an asylum seeker's right to seek representation. I am disturbed, however, at the implementation of this provision to representation in appeals from negative credible fear determinations. Immigrants who are determined not to have a credible fear of persecution if returned to their home country are, under IIRIRA, allowed to appeal that decision to an immigration judge. This is the immigrant's only opportunity for appeal. If unsuccessful, the immigrant is removed from the United States. Representation by counsel or a legal representative is critical at this appeal stage.

On March 27, 1997, Chief Immigration Judge Michael J. Creppy issued a memorandum (Memorandum 97-3) to all immigration judges advising them that, based on the interim rule, asylum seekers have no right to representation prior to or during an immigration judge review of their case. My office has received numerous complaints that, as a result of this memorandum, immigration judges have not allowed counsel to actively represent their clients on appeal from negative credible fear determinations. They have been

2

AA-REG-00328

allowed only to observe the proceedings, and have not been allowed to intervene, offer evidence or call and question witnesses. The final rule should correct this interpretation of the interim rule, and allow representatives of asylum seekers to advocate on their behalf at hearings on negative determinations of credible fear.

Finally, I commend INS on its decision not to expand the expedited exclusion process at this time. Expedited exclusion affects the heart of refugee policy. It is important that the Service takes a measured approach to this new process, and ensures that the process is satisfactory for all parties before considering its expansion.

Sincerely,

Edward M. Kennedy

3