# EXHIBIT A

No. 25-5289

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

COALITION FOR HUMANE IMMIGRANT RIGHTS, *et al.*,
*Appellees*,

v.

KRISTI NOEM, in her official capacity as
Secretary of Homeland Security, *et al.*,
*Appellants*.

On Appeal from the U.S. District Court
for the District of Columbia
No. 1:25-cv-00872 (Cobb, J.)

BRIEF FOR APPELLANTS

PAPU SANDHU
*Assistant Director*
U.S. Department of Justice
Civil Division
Office of Immigration Litigation
General Litigation & Appeals
P.O. Box 878, Ben Franklin
Station
Washington, DC 20044

BRETT A. SHUMATE
*Assistant Attorney General*
DREW C. ENSIGN
*Deputy Assistant Attorney General*
TYLER J. BECKER
*Counsel to the Assistant Attorney General*
U.S. Department of Justice,
Civil Division
950 Pennsylvania Avenue, NW
Washington, DC 20530
(202) 514-2000

## CERTIFICATES AS TO PARTIES, RULINGS, AND RELATED CASES

### A.    **Parties and Amici**

Plaintiffs are the following organizations: the Coalition for Humane Immigrant Rights; CASA, Inc.; and UndocuBlack Network.

Defendants are Kristi Noem, in her official capacity as Secretary of Homeland Security; Todd M. Lyons, in his official capacity as the Acting Director of Immigration and Customs Enforcement ("ICE"); Rodney Scott, in his official capacity as the Commissioner of Customs and Border Protection ("CBP"); Joseph B. Edlow, in his official capacity as the Director of U.S. Citizenship and Immigration Services ("USCIS"); and Donald J. Trump in his official capacity as the President of the United States.

No amici or intervenors participated in the district court.

### B.    **Rulings under Review**

The ruling under review consists of an order (Docket No. 40) and opinion (Docket No. 41) regarding Plaintiffs' motion for a stay of agency action under 5 U.S.C. §705, which the district court issued on August 1, 2025.  The opinion and order are reproduced in the Joint Appendix.

C.    **Related Cases**

This case has not previously been before this Court.  Overlapping

issues are present in the following cases:  *Make the Road New York vs.*

*Noem*, No. 1:25-cv-00190 (D.D.C.); *appeal filed* No. 25-5320 (D.C. Cir.).

/s/ *Drew C. Ensign*                        .
Drew C. Ensign
U.S. Department of Justice, Civil
Division
950 Pennsylvania Avenue, NW
Washington, DC 20530
(202) 514-2000

## TABLE OF CONTENTS

INTRODUCTION .......................................................................... 1

STATEMENT OF JURISDICTION ......................................... 5

STATUTES AND REGULATIONS ........................................ 6

STATEMENT OF THE ISSUES ............................................. 6

STATEMENT OF THE CASE ................................................. 7

    A. Expedited Removal ......................................................7

    B. Parole ..........................................................................11

    C. DHS Documents Plaintiffs Challenged ..........................12

    D. District Court Proceedings............................................14

    E. Proceedings in this Court ..............................................16

STANDARD OF REVIEW ..................................................... 21

ARGUMENT............................................................................ 22

    I.    The Government Is Likely To Succeed on the Merits..............22

    A. Plaintiff's Alleged Harms are not Redressable....................22

    B. The INA Authorizes Expedited Removal for Paroled Arriving Aliens ...........................................................................30

        1. "Arriving in" Authority.................................................30

        2. "Designation" Authority................................................37

    C. The Agency's Actions are not Arbitrary and Capricious......45

II.   The Remaining Equitable Factors Weight Strongly in the Government's Favor.................................................47

III.  The District Court's Relief Exceeded its Authority ..................54

   A. The District Court's stay Is Prohibited by 8 U.S.C. §1252(f)(1) ......................................................................54

   B. The District Court's Order Violates Traditional Equitable Principles............................................................59

CONCLUSION................................................................. 67

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## CASES

*Amoco Prod. Co. v. Gambell,*
480 U.S. 531 (1987) .................................................................. 60

*Arredondo-Martinez,*
No. 10-525, 2011 WL 13196331 (C.D. Cal. 2011) .......................... 9, 27

*Bondi v. VanDerStock,*
145 S. Ct. 857 (2025) .................................................................. 35

*Bouarfa v. Mayorkas,*
604 U.S. 6 (2024) ....................................................................... 61

*Chaplaincy of Full Gospel Churches v. England,*
454 F.3d 290 (D.C. Cir. 2006) ..................................................... 47

*Coal. for Humane Immigrant Rts. v. Noem,*
No. 25-5289, 2025 WL 2649100 (D.C. Cir. Sept. 12, 2025).... 16, 30, 53

*Cordon-Linarez v. Garland,*
No. 3:24-cv-00488, 2024 WL 4652824 (M.D. Pa. 2024) ................. 9, 27

*Corrales-Gonzalez v. Emmerich,*
No. 24-CV-638-WMC, 2025 WL 1638423 (W.D. Wis. 2025) ........... 9, 27

*Cuomo v. NRC,*
772 F.2d 972 (D.C. Cir. 1985) ..................................................... 21

*Department of Homeland Security v. Thuraissigiam,*
591 U.S. 103 (2020) ....................................................... 32, 38, 49, 50

*Doe v. Noem,*
152 F.4th 272 (1st Cir. 2025) ....................................................... 40

*Garland v. Aleman Gonzalez,*
596 U.S. 543 (2022) ....................................... 3, 4, 20, 54, 55, 56, 58

*Geo Grp., Inc. v. Newsom,*
  50 F.4th 745 (9th Cir. 2022) .............................................................. 52

*Haaland v. Brackeen,*
  599 U.S. 255 (2023) .......................................................................... 25

*Halo Electronics, Inc. v. Pulse Electronics, Inc.,*
  579 U.S. 93 (2016) ............................................................................ 62

*Hecht Co. v. Bowles,*
  321 U.S. 321 (1944) .......................................................................... 60

*Hewitt v. United States,*
  145 S. Ct. 2165 (2025) ........................................................ 38, 39, 42

*Immigrant Defs. L. Ctr. v. Noem,*
  145 F.4th 972 (9th Cir. 2025) ................................ 4, 5, 21, 58, 60, 65

*eBay, Inc. v. MercExchange, L.L.C.,*
  547 U.S. 388 (2006) .......................................................................... 61

*Jennings v. Rodriguez,*
  583 U.S. 281 (2018) .......................................................................... 51

*Kaplan v. Tod,*
  267 U.S. 228 (1925) .......................................................................... 32

*Leng May Ma v. Barber,*
  357 U.S. 185 (1958) .................................................................... 32, 33

*Liu v. SEC,*
  591 U.S. 71 (2020) ............................................................................ 57

*Loper Bright Enters. v. Raimondo,*
  603 U.S. 369 (2024) .......................................................................... 36

*Lujan v. Defs. of Wildlife,*
  504 U.S. 555 (1992) ................................................................... 22, 27, 29

*M.M.V. v. Garland,*
  1 F.4th 1100 (D.C. Cir. 2021) ........................................................... 24

*Make the Rd. N.Y. v. Wolf,*
  962 F.3d 612 (D.C. Cir. 2020) .......................................................... 21

*Matter of E-R-M- & L-R-M-,*
  25 I&N Dec. 520 (BIA 2011) ............................................................ 37

*N.S. v. Dixon,*
  141 F.4th 279 (D.C. Cir. 2025) .................................................... 54, 55

*National Wrestling Coaches Ass'n v. Dep't of Educ.,*
  366 F.3d 930 (D.C. Cir. 2004) .......................................................... 27

*Nielsen v. Preap,*
  586 U.S. 392 (2019) ......................................................................... 54

*Noem v. National TPS Alliance,*
  145 S. Ct. 2728 (2025) ....................................................................... 5

*Noem v. Perdomo,*
  606 U.S. __, 2025 WL 2585637 (Sept. 8, 2025) ............................... 53

*Nuclear, Info. & Res. Serv. v. Nuclear Regul. Comm'n,*
  457 F.3d 941 (9th Cir. 2006) ............................................................ 28

*Obregon-Calcedo v. Thompson,*
  No. 25-1048, 2025 WL 1805464 (D.N.J. 2025) ........................... 10, 27

*Renal Physicians Ass'n v. HHS,*
  489 F.3d 1267 (D.C. Cir. 2007) ........................................................ 29

*Russello v. United States,*
  464 U.S. 16 (1983) ........................................................................... 57

iv

*S. Utah Wilderness All. v. Norton,*
542 U.S. 55 (2004) ................................................................. 63

*Scenic Am., Inc. v. DOT,*
836 F.3d 42 (D.C. Cir. 2016) ............................................. 26, 28, 29

*Skidmore v. Swift & Co.,*
323 U.S. 134 (1944) ............................................................... 35

*Starbucks Corp. v. McKinney,*
602 U.S. 339 (2024) ......................................... 60, 61, 62, 65

*Succar v. Ashcroft,*
394 F.3d 8 (1st Cir. 2005) ..................................................... 42

*Taggart v. Lorenzen,*
587 U.S. 554 (2019) ............................................................... 33

*Texas v. EPA,*
726 F.3d 180 (D.C. Cir. 2013) ............................................. 25

*Trump v. CASA, Inc.,*
606 U.S. 831 (2025) ............................... 4, 20, 21, 52, 59, 60

*Trump v. Orr,*
__ S. Ct. __, 2025 WL 3097824 (Nov. 6, 2025) ...................... 52

*U.S. ex rel. Accardi v. Shaughnessy,*
347 U.S. 260 (1954) ............................................................... 31

*United States v. Burr,*
25 F.Cas. 30 (C.C.D. Va. 1807) ............................................. 62

*United States v. Texas,*
599 U.S. 670 (2023) ............................................................... 24

*Weinberger v. Romero-Barcelo,*
456 U.S. 305 (1982) ............................................................... 60

v

*Wildlife v. Gutierrez,*
  532 F.3d 913 (D.C. Cir. 2008) ............................................................. 26

*Winter v. NRDC,*
  555 U.S. 7 (2008) ................................................................................. 61

## STATUTES

5 U.S.C. §702 ........................................................................................ 63

5 U.S.C. §703 ........................................................................................ 62

5 U.S.C. §705 .................................... 2, 5, 14, 20, 21, 59, 61, 62, 64, 65

8 U.S.C. § 1182(d)(5) ..................................................................... 8, 9, 50

8 U.S.C. §1182(d)(5)(A) ......................................................................... 4

8 U.S.C. §1225 ...................................................................................... 44

8 U.S.C. §1225(b)(1) .................................................. 6, 7, 8, 34, 39, 45

8 U.S.C. §1225(b)(1)(B) .......................................................................... 7

8 U.S.C. §1225(b)(1)(F) ....................................................................... 34

8 U.S.C. §1225(b)(2)(C) ....................................................................... 34

8 U.S.C. §1225(c)(1) ............................................................................. 34

8 U.S.C. §1225(d)(2) ............................................................................ 34

8 U.S.C. §1229a ....................................................................................... 1

8 U.S.C. §1231(b) ................................................................................. 34

8 U.S.C. §1231(g)(1) ............................................................................ 52

8 U.S.C. §1252(e)(3)(B) .............................................................. 15, 23, 31

vi

8 U.S.C. §1252(f)(1) ................................................................ 19, 42, 57

8 U.S.C. §1252(f)(2) ....................................................................... 57

8 U.S.C. §1255(a) .......................................................................... 42

28 U.S.C. §1292(a)(1) ...................................................................... 5

## RULES

D.C. CIR. R. 8 .............................................................................. 16

FED. R. APP. P. 8(a)(2) ................................................................... 16

FED. R. CIV. P. 15(c)(1)(A) .............................................................. 24

FED. R. APP. P. 32(a)(5) ................................................................. 67

## REGULATIONS

8 C.F.R. §1.2 ................................................... 8, 22, 23, 25, 30, 34

8 C.F.R. §208.30(e) ......................................................................... 7

8 C.F.R. §212.5(e) ......................................................................... 44

8 C.F.R. §212.5(e)(2)(i) .................................................................. 45

8 C.F.R. §235.3 ........................................................................ 23, 43

8 C.F.R. §235.3(b)(4) ...................................................................... 48

8 C.F.R. §235.3(b)(6) ...................................................................... 43

## Other Authorities

62 Fed. Reg. 10,312 (March 6, 1997). ...................................................... 8

71 Fed. Reg. 27,585, 27,591 (May 12, 2006) ............................................ 9

90 Fed. Reg. 8,139 (Jan. 24, 2025) ........................................... 10, 12, 40

## INTRODUCTION

Congress created expedited removal in 1996 to provide an invaluable enforcement tool to remove inadmissible aliens quickly without the more cumbersome procedures under Immigration and Nationality Act (INA) §240, 8 U.S.C. §1229a. Congress provided that arriving aliens and unadmitted aliens not continuously present in the country for two years prior to their determination of inadmissibility could be subject to expedited removal. To avoid encumbering this new authority, Congress prohibited lower courts from enjoining or restraining the implementation of the expedited-removal statute. 8 U.S.C. §1252(f)(1). Less than a year later, the Clinton Administration promulgated regulations implementing expedited removal. As part of that effort, it defined the term "arriving alien" specifically to include aliens who have been paroled into the country at ports of entry. In doing so, it recognized that the statute authorized the use of expedited removal for such aliens based on Congress's well-established treatment of parolees, 8 U.S.C. §1182(d)(5)(A). That remained the settled law since 1997, which no court had ever disturbed.

The district court below issued a sweeping stay under 5 U.S.C. §705 of three recent actions by the Department of Homeland Security (DHS) "to the extent the Challenged Actions subject to expedited removal individuals who have been, at any time, paroled into the United States at a point of entry." The actual effect (if any) of the district court's partial stay is unclear—that stay notably left the 1997 regulation allowing use of expedited removal against arriving aliens completely untouched. But the district court's order appears to be an attempt to block the Secretary of DHS from utilizing expedited removal to remove hundreds of thousands of aliens whose parole was terminated. That order is profoundly flawed in many respects and should be reversed.

To start, Plaintiffs cannot establish Article III redressability because they did not ask the district court to enjoin the application of the arriving alien regulations, 8 C.F.R. §§1.2 and 235.3, which together provide an independent basis for DHS to apply expedited removal to paroled arriving aliens. Plaintiffs do not dispute that Defendants can proceed with expedited removal under this independent authority. Clearly, Plaintiffs alleged harms are not redressable.

Jurisdictional defects aside, the district court's stay fails on the merits too. Statutory text, context, and history demonstrate that aliens paroled on arrival to the United States are subject to expedited removal if that parole is revoked. In concluding otherwise, the district court fails to give full effect to Congress's directive in the parole statute that parole "shall not be regarded as an admission" and when the purposes of parole have been served "the *alien shall forthwith return … to the custody from which he was paroled*" and thereafter be treated "*in the same manner as that of any other applicant for admission* to the United States." 8 U.S.C. §1182(d)(5)(A) (emphasis added). Decades of well-established precedent from the Supreme Court interpret that statute to mean that a paroled arriving alien stands in the same legal position as one stopped at the border and therefore supports Defendants' reading that these aliens are amenable to expedited removal.

To compound its error, the district court lacked jurisdiction to issue its universal stay. Foremost, §1252(f)(1) prohibits any lower federal court from issuing non-party-specific relief that "restrain[s]" the Government from carrying out expedited removal. *Garland v. Aleman Gonzalez*, 596 U.S. 543, 550-51 (2022). That describes the stay below to the letter: It

3

applies nationwide to all aliens paroled at a port of entry. That is precisely the sort of order that *Aleman Gonzalez* bars.

The district court held otherwise, primarily by reasoning that §1252(f)(1) is limited purely to injunctions. But that construction defies §1252(f)(1)'s plain text, which applies to all orders that "enjoin *or* restrain" covered provisions (emphasis added). Nor does it make sense: The same Congress that barred non-individualized injunctions did not welcome universal §705 stays that have the exact same effect. There is simply no way to square §1252(f)(1)'s bar on non-individualized relief with the district court's nationwide blanket relief.

At a bare minimum, the district court's universal stay was overbroad and must be narrowed. As the Ninth Circuit has recently recognized, a stay issued under §705 of the APA is a form of "interim equitable relief," and must operate within traditional equitable limits. *Immigrant Defs. L. Ctr. v. Noem*, 145 F.4th 972, 995-96 (9th Cir. 2025). Chief among those limits is that equitable relief must be party-specific and cannot extend past providing plaintiffs complete relief. *Trump v. CASA, Inc.*, 606 U.S. 831, 851-52, 859 (2025). If nothing else, the district court's universal stay—which stretches *far* beyond Plaintiffs and its

4

members to reach *every* alien whose parole might ever be terminated—violates that clear limit and should be set aside as prohibited universal relief.

Finally, the district court's stay inflicts significant harm on the Government by sowing deep uncertainty over the application of expedited removal to potentially hundreds of thousands of aliens. The Court should reverse the district court's significant intrusion on the use of expedited removal for paroled arriving aliens.

## STATEMENT OF JURISDICTION

This Court has appellate jurisdiction under 28 U.S.C. §1292(a)(1) to review the district court's nationwide stay of agency action issued pursuant to 5 U.S.C. §705. The district court's stay operates no differently than an injunction and is thus appealable under §1292(a)(1). In fact, the district court's stay is premised on the same factors as a preliminary injunction. Joint Appendix at 26-27 (hereinafter "JA-__").

The Supreme Court and other Circuits have repeatedly "hear[d] interlocutory appeals of orders labeled as 5 U.S.C. §705 stays." *Immigrant Defs.*, 145 F.4th at 984 n.6 (collecting cases); *see Noem v.*

5

*National TPS Alliance*, 145 S. Ct. 2728, 2728-29 (2025) (granting a stay

of a §705 stay).   This Court has appellate jurisdiction.

## STATUTES AND REGULATIONS

Relevant statutes and regulations are included in an addendum.

## STATEMENT OF THE ISSUES

1.  Whether the district court lacked Article III standing to grant

the  §705 stay sought by Plaintiffs, where Plaintiffs did not request that

the district court stay or enjoin the application of 8 C.F.R. §§1.2 and

235.3—which they concede independently authorize DHS to apply

expedited removal to aliens whose parole is terminated.

2. Whether 8 U.S.C. §1252(f)(1) precluded the district court from

granting a stay of agency action where such action "enjoin[s] or

restrain[s]" the operation of 8 U.S.C. §1225(b)(1).

3. Whether the Immigration and Nationality Act authorizes DHS

to apply expedited removal under 8 U.S.C. §1225(b)(1) to aliens paroled

at ports of entry.

4. Whether the district court erred in granting a stay of agency

action where the likelihood of success and balance of harms weigh heavily

in the Defendants' favor.

5. Whether the district court exceeded its authority in granting relief, not only to Plaintiffs' members, but also to nonparties.

## STATEMENT OF THE CASE

**A. Expedited Removal**. In 1996, Congress created expedited removal, a removal procedure that allows the Government to deport, without a hearing before an immigration judge, certain inadmissible aliens who lack valid documentation or who present fraudulent documents.  8 U.S.C. §1225(b)(1).  An alien subject to expedited removal can claim a fear of persecution or torture, after which he will receive a credible fear screening before an asylum officer and, if he chooses, an immigration judge; if found to have a credible fear, he will be placed in §1229a removal proceedings, which he may apply for asylum, withholding of removal, and protection under the Convention Against Torture.  8 U.S.C. §1225(b)(1)(B); 8 C.F.R. §§208.30(e), (f), (g), 235.3(b)(4).

Two groups of aliens are potentially subject to expedited removal. The first group encompasses aliens "arriving in" the United States, 8 U.S.C. §1225(b)(1)(A)(i).  An alien who arrives at a port of entry and is subsequently paroled into the United States is subject to expedited removal because he retains his status as an alien "arriving in" the United

7

States.  8 C.F.R. §1.2.  The second group includes aliens designated by the Secretary within certain statutory limits.  *See* 8 U.S.C. §1225(b)(1)(A)(i), (iii).  The statute limits designation as follows:  "An alien … who has not been admitted or paroled into the United States, and who has not affirmatively shown, to the satisfaction of an immigration officer, that the alien has been physically present in the United States continuously for the 2-year period immediately prior to the date of the determination of inadmissibility under this subparagraph."  8 U.S.C. §1225(b)(1)(A)(iii)(II).

In 1997, DOJ promulgated implementing regulations, including a regulation defining "arriving alien." 62 Fed. Reg. 10,312, 10,312-13 (Mar. 6, 1997).  The Department adopted a regulation defining arriving alien to include "an alien who seeks admission to or transit through the United States, as provided in 8 CFR part 235, at a port-of-entry."  8 C.F.R. § 1.1(q) (1998) (currently at 8 C.F.R. §§ 1.2, 1001.1(q)).  As relevant here, that regulation also provided that "[a]n arriving alien *remains such even if paroled* pursuant to section 212(d)(5) of the Act [8 U.S.C. § 1182(d)(5)]." *Id.* (emphasis added).  During the notice and comment process, one of the commentators objected to including parolees in the category of arriving

8

aliens.  62 Fed. Reg. at 10,313.  The Department considered the objection and declined to adopt the commentator's suggestion explaining that "there is solid statutory basis" to include parolees within the arriving alien definition.  *Id.* (explaining that "[t]he inclusion of paroled aliens was based on the statutory language in section 212(d)(5) of the Act [8 U.S.C. § 1182(d)(5)]").  The rule went into effect on April 1, 1997.  62 Fed. Reg. at 10,312.

Although the regulation has been revised since its adoption, the amendments only confirm the term "arriving alien" includes aliens paroled at ports of entry.  In 2006, the regulatory definitions were amended to specifically provide, as they do now, that an arriving alien includes aliens who are paroled "even after any such parole is terminated or revoked."  8 C.F.R. §§ 1.2, 1001.1(q); *see* 71 Fed. Reg. 27,585, 27,591 (May 12, 2006).

For years prior to the 2025 agency actions that Plaintiffs challenge, DHS applied expedited removal to aliens paroled at ports of entry.[1]  In

---

[1] *E.g., United States v. Arredondo-Martinez*, No. 10-525, 2011 WL 13196331, at *1, *4 (C.D. Cal. 2011), *aff'd*, 492 F. App'x 823 (9th Cir. 2012); *Cordon-Linarez v. Garland*, No. 3:24-cv-00488, 2024 WL 4652824 (M.D. Pa. 2024), *appeal pending*, No. 24-3068 (3d Cir.); *Corrales-Gonzalez* (continued . . .)

9

2011, the Executive Associate Director of U.S. Immigration and Customs Enforcement issued a memo on Strategic Use of Expedited Removal Authority ("2011 Memo"). JA-635-36. Although the specific provisions in that 2011 Memo are no longer in effect, they show prior directives that Enforcement and Removal Operations officers "should use [expedited removal] for all arriving aliens paroled into the United States for prosecution, regardless of how long they have been present in the United States." JA-636. The 2011 Memo also discussed applying expedited removal against aliens who were paroled for reasons other than to face prosecution but conditioned that application on certain limits. *Id.*

With respect to the expedited removal's designation provision the most recent designation occurred on January 24, 2025. *See* Designating Aliens for Expedited Removal, 90 Fed. Reg. 8,139 (Jan. 24, 2025). The notice enabled DHS to apply expedited removal to inadmissible aliens "who have not been admitted or paroled into the United States and who

---

*v. Emmerich*, No. 24-CV-638-WMC, 2025 WL 1638423 (W.D. Wis. 2025) (alien paroled and given expedited removal order issued on same day in July 2023); *Obregon-Calcedo v. Thompson*, No. 25-1048, 2025 WL 1805464 (D.N.J. 2025) (2015 parole and 2024 expedited removal order).

10

have not affirmatively shown, to the satisfaction of an immigration officer, that they have been physically present in the United States continuously for the two-year period immediately preceding the date of the determination of inadmissibility." The notice explained that this action aimed to "enhance national security and public safety—while reducing government costs—by facilitating prompt immigration determinations" and would "enable DHS to address more effectively and efficiently the large volume of aliens who are present in the United States unlawfully ... and ensure the prompt removal from the United States of those not entitled to enter, remain, or be provided relief or protection from removal." *Id.* at 8,139.

**B. Parole.** As amended in 1996, the parole statute provides that the Secretary of Homeland Security "may ... in [her] discretion parole" an "alien applying for admission," and specifies that such a parole is done "temporarily under such conditions as [the Secretary] may prescribe [and] only on a case-by-case basis for urgent humanitarian reasons or significant public benefit." 8 U.S.C. §1182(d)(5)(A). The statute further states that parole may be terminated "when the purposes of such parole

11

shall, in the opinion of the Secretary of Homeland Security, have been served." *Id.*

During the Biden Administration, DHS established several parole programs, including parole processes for individuals from Cuba, Haiti, Nicaragua, and Venezuela ("CHNV" programs), in which nationals of those countries who met eligibility requirements could be considered for discretionary advance authorization to travel to certain United States ports of entry to request discretionary consideration for parole for up to a two-year term. *See* JA-17. In a notice published on March 25, 2025, DHS Secretary Kristi Noem ended these parole program concluding that they "do not serve a significant public benefit, are not necessary to reduce levels of illegal immigration, did not sufficiently mitigate the domestic effects of illegal immigration, are not serving their intended purposes, and are inconsistent with the Administration's foreign policy goals." Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans, 90 Fed. Reg. 13,611, 13,612 (Mar. 25, 2025) ("CHNV Termination Notice").

**C. DHS Documents Plaintiffs Challenged:** The first of three documents Plaintiffs challenged is a memorandum issued January 23,

12

2025 by then-Acting Secretary of Homeland Security Benjamine C. Huffman to senior DHS officials setting forth guidance on how to exercise enforcement discretion in light of a recent "clarifi[cation]" of DHS's policy regarding the scope of the parole statute and its expansion of expedited removal.  Memorandum from Benjamine C. Huffman, Acting Secretary (Jan. 23, 2025) ("Huffman Memorandum"), *available at* https://www.dhs.gov/sites/default/files/2025-01/25_0123_er-and-parole-guidance.pdf (last accessed Nov. 10, 2025); *see also* JA-20.  For "any alien … who is amenable to expedited removal," the Memorandum instructs immigration officers to take "all steps necessary to review [an] alien's case and consider, in exercising [] enforcement discretion, whether to apply expedited removal," which "may include" terminating other removal proceedings or parole.  *Id.*  For aliens who are not subject to expedited removal and have "been granted parole under a policy that may be paused, modified, or terminated immediately under the January 20 memorandum," the Huffman Memorandum instructs DHS officials to "consider, in exercising [their] enforcement discretion, whether any such alien should be placed in removal proceedings" or whether "parole remains appropriate in light of any changed legal or factual

13

circumstances." *Id.* Finally, the Huffman Memorandum directs that "[t]he actions contemplated by this memorandum shall be taken in a manner consistent with applicable statutes, regulations, and court orders" and further "takes account of legitimate reliance interests." *Id.*

The second document Plaintiffs sought to stay is, according to Plaintiffs, a February 18, 2025 "directive" sent by ICE leadership to Enforcement and Removal Operations personnel "directing such officers to consider for expedited removal 'paroled arriving aliens' who have not applied affirmatively for asylum with USCIS." JA-138, ¶63; *see also* JA-21-22.

The third document Plaintiffs sought to stay is the CHNV Termination Notice ending certain parole programs (discussed, *supra*).

**D.  District Court Proceedings:** Three membership organizations filed suit on March 24, 2025 alleging that the challenged agency actions exceeded DHS's statutory authority and violated the Due Process Clause. On June 11, Plaintiffs filed an amended complaint adding two claims, including the claim that the "arriving alien" regulation was *ultra vires.* JA-171, ¶¶171-83. On that same day, Plaintiffs filed a motion for a stay of agency action under 5 U.S.C. §705,

14

requesting that the challenged documents be stayed "insofar as they subject individuals who have been previously granted parole at ports of entry to expedited removal." JA-176. Plaintiffs did not ask the district court to stay or enjoin the arriving alien regulations as part of their §705 stay motion. Plaintiffs further admitted that it was "correct" that "the government still remove [under expedited removal] individuals who have been paroled under the [unchallenged] regulations, even despite the [challenged] writings at issue." JA-538-39.

On August 1, 2025, the district court granted Plaintiffs' motion. JA-1. The court concluded that: (1) Plaintiffs' claims were redressable (JA-34-39); (2) it retained jurisdiction over Plaintiffs' claim notwithstanding the 60-day time bar of 8 U.S.C. §1252(e)(3)(B) (*id.* at 39-41); (3) the challenged agency actions exceeded DHS's authority because neither § 1225(b)(1)'s "arriving in" nor its "designation" authority authorizes expedited removal of aliens granted paroled (*id.* at 45-66); (4) the challenged actions were arbitrary and capricious because they lack adequate explanation and were inconsistent with each other (*id.* at 66-73); and (5) Plaintiffs established irreparable harm and the balance of equities and public interest favor a stay (*id.* at 74-81). The court also

15

rejected Defendants' arguments that §1252(f)(1) precluded the court from granting a §705 stay, and that under traditional equitable principles, relief should be limited to Plaintiffs' members.  JA-28-31; 81-84.

On August 4, Defendants moved the district court for a stay of its August 1 order pending appeal to this Court. District Court Docket (Dkt.) 42.  The district court denied the motion on August 13. Dkt. 49.

**E. Proceedings in this Court:**  On August 14, 2025, Defendants filed in this Court a motion for an immediate administrative stay and emergency stay pending appeal of the district court's order. *See* FED. R. APP. P. 8(a)(2); D.C. CIR. R. 8.  On August 18, the Court issued an administrative stay pending its review of the emergency motion, thus allowing DHS to again apply expedited removal to paroled arriving aliens.  On September 12, the Court dissolved the administrative stay and denied the emergency motion. *Coal. for Humane Immigrant Rts. v. Noem*, No. 25-5289, 2025 WL 2649100 (D.C. Cir. Sept. 12, 2025).  In its stay-denial order, the Court concluded that the Government failed to establish irreparable harm because it did not claim that it could not continue to apply expedited removal against parolees pursuant to 8 C.F.R. §§ 1.2 and 235.3(b)(1)(i) notwithstanding the district court's stay

16

order.  *Id.*  In a concurring opinion, Judge Walker noted that the Court should have clarified for the Government that it could continue to apply expedited removal against parolees pursuant to 8 C.F.R. §§1.2 and 235.3(b)(1)(i) under this Court's August 1 order.  *Id.*  (Walker, J., concurring).  Judge Walker explained that the district court's stay order is "best read not to preclude the Government from applying expedited removal to parolees pursuant to 8 C.F.R. §§ 1.2 and 235.3(b)(1)(i)."  *Id.*

In light of the Court's September 12 order, Defendants have applied expedited removal under 8 C.F.R. §§1.2 and 235.3 to paroled aliens.  Dkt. 51 at 1, 3; *see also* Dkt. 52.  Plaintiffs have not alleged that Defendants are in violation of the district court's stay but instead seek to file, as quickly as possible, a motion for "partial summary judgment" asking the district court to vacate the arriving alien regulations.  *See* Dkt. 53 (Plaintiffs' reply regarding their motion for relief from district court standing order on lapse of appropriations).

## SUMMARY OF ARGUMENT

This Court should reverse the district court's sweeping stay, which the court lacked jurisdiction to issue, is inconsistent with the parole statute and long-established Supreme Court precedent, and is overbroad in any event.

*First*, Plaintiffs' failure to challenge the longstanding arriving alien regulations that authorize the very conduct they challenge leaves Plaintiffs with an insurmountable Article III redressability problem. Plaintiffs still have not established what part of their members' injury would be redressed by the stay order if DHS can still apply 8 C.F.R. §§1.2 and 235.3 to remove the same paroled aliens who Plaintiffs represent. Nor could they: their stay request was too narrow to provide any effective relief—even if granted, it left an independent source of authority explicitly authorizing the very conduct at issue entirely untouched.

*Second*, DHS has statutory authority to apply expedited removal to paroled arriving aliens under both its designation authority and the "arriving in" authority. DHS may apply expedited removal under 8 U.S.C. §1225(b)(1)(A)(i) for an alien "arriving in the United States." Notably this authority contains no exception for aliens whose parole is

18

still current.  The district court, however, committed numerous errors in concluding that DHS lacked authority under this provision.    In particular, the court engaged in a constrained reading of the term "arriving" by failing to consider the unique statutory and historical context of parole in which Congress legislated.  As then-Attorney General Reno recognized over 28 years ago—and which was never disputed until this case—aliens who are paroled at ports of entry fall within the category of "arriving alien."

DHS may also apply its designation authority to aliens whose parole has been revoked as long as they have been in the country less than two years.  The district court erred in concluding otherwise based on the designation provision's language: "has not been … paroled."  If, as the district court found, that language means "has not ever been granted parole on a past occasion," an alien whose parole is terminated would *not* be "dealt with in the *same* manner as that of *any other* applicant for admission," as the INA requires, 8 U.S.C. 1182(d)(5)(A) (emphases added).  Any "other" applicant—i.e., one who was never paroled—who lacks two years of continuous presence would be subject to expedited removal while a paroled arriving alien would not.

19

*Third*, the district court lacked authority to issue relief here. 8 U.S.C. §1252(f)(1), by its terms, strips district courts from issuing any order that commands "federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions," except in regard to "individual cases." *Aleman Gonzalez*, 596 U.S. at 550. The district court's order here cannot be squared with the plain text of the statute. It plainly "restrain[s]" the operation of one of the covered provisions. Indeed, the reference to both enjoin and restrain in 8 U.S.C. §1252(f)(1) indicates that a court may not impose coercive relief that "interfere[s] with the Government's efforts to operate" the covered provisions in a particular way. *Id.* at 551. That meaning comfortably encompasses the stay of agency action in this case. A contrary interpretation would read the word "restrain" out of the statute and violate bedrock principles of statutory interpretation.

Finally, the district court exceeded its authority by issuing a *universal* stay. Section 705 only allows courts to issue stays "to the extent necessary to prevent irreparable injury," 5 U.S.C. §705, and "irreparable injury" in the context of interim equitable relief refers to the Plaintiffs— not third parties, *CASA*, 606 U.S. at 841-46. As the Ninth Circuit has

20

recently recognized, a stay issued under §705 of the APA is a form of "interim equitable relief," and must operate within the bounds of traditional equitable limits. *Immigrant Defs.*, 145 F.4th at 995-96. Thus, an equitable remedy cannot go beyond awarding a party complete relief. *CASA*, 606 U.S. at 851-52. And the district court's universal stay—which stretches well beyond Plaintiffs and its members—violates that critical limitation, and should be set aside on that basis.

The district court's issuance of a universal stay under 5 U.S.C. §705 should be reversed.

## STANDARD OF REVIEW

A stay of agency action under 5 U.S.C. §705 requires Plaintiffs to satisfy the same requirements as requests for preliminary injunctions: namely that the Plaintiffs are likely to succeed on merits, likely to be irreparably harmed absent a stay, and that the equities favor granting a stay. *Cuomo v. NRC*, 772 F.2d 972, 974 (D.C. Cir. 1985). Thus, like when reviewing a preliminary injunction, this Court reviews the issuance of a stay "for an abuse of discretion," but reviews "[t]he district court's underlying legal conclusions … de novo[.]" *See Make the Rd. N.Y. v. Wolf,*

21

962 F.3d 612, 623 (D.C. Cir. 2020) (reviewing grant of preliminary injunction).

## ARGUMENT

## I.    The Government Is Likely To Succeed on the Merits.

### A.    Plaintiffs' Alleged Harms are not Redressable.

Plaintiffs have not established Article III standing because they fail to show that it is "likely" that their members' alleged injury—being subject to expedited removal—will be "redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (quotation omitted).

Plaintiffs concede in their complaint that DHS's arriving alien regulation at 8 C.F.R. §1.2 allows DHS to apply expedited removal to aliens—like Plaintiffs' members—who are paroled at ports of entry. JA-172, ¶178. And yet, in their stay motion, Plaintiffs *did not* ask the court below to enjoin these regulations even though they provide DHS with independent authority to apply expedited removal. JA-509 n.12 (Plaintiffs do "challenge 8 C.F.R. §1.2 as *ultra vires*, Am. Compl. ¶¶171-83, but have not moved for preliminary relief as to it."). At the July 9 stay hearing, Plaintiffs conceded that even if the district court were to

22

grant Plaintiffs' requested §705 stay, DHS would still be able to apply

expedited removal to aliens paroled at ports of entry:

> **THE COURT**: [C]ould the government still remove individuals who have been paroled under the regulations, even despite the writings at issue?
>
> **PLAINTIFFS' COUNSEL**: Yes, under the regulations as they're currently written, yes, correct.

JA-538-39.

Plaintiffs' declination to challenge the "arriving alien" regulation is

understandable: it is egregiously time-barred.    Under 8 U.S.C.

§1252(e)(3)(B), challenges to the implementation of expedited removal,

which includes regulations used to implement that section, must be

brought "no later than 60 days" after the rule or directive "is first

implemented."  8 C.F.R. §1.2 was promulgated in 1997 and applied to

expedited removal by 8 C.F.R. §235.3 at the same time, 62 Fed. Reg. at

10,355, so any challenge by Plaintiffs would be time-barred by decades.

But that instant refusal to challenge regulations that authorize the very

23

conduct they challenge leaves Plaintiffs with an insurmountable redressability problem.[2]

When the district court asked Plaintiffs for their "best argument for redressability" given this concession, Plaintiffs' counsel responded: "the relief that the Court grants need not completely relieve all of the plaintiffs' harms." JA-539. But if the arriving alien regulations provide separate authority for DHS to apply expedited removal it is unclear how

---

[2] In its stay opinion, the district court concluded that 8 U.S.C. §1252(e)(3)(B)'s 60-day period runs from the date of the agency actions Plaintiffs challenge. JA-39-40. The court determined that Plaintiffs' claims were timely because their complaint was filed on March 24, 2025—within 60 days of the earliest challenged agency action. JA-41. But the court did not address the timeliness of Plaintiffs' challenge to the arriving alien regulations, which Plaintiffs §705 stay motion did not challenge. In any event, Plaintiffs' challenge to the arriving alien regulations is clearly time-barred by §1252(e)(3)(B). Even under the district court's interpretation of when the time-bar runs, Plaintiffs' challenge to the arriving alien regulations was not raised until June 11, 2025, when Plaintiffs filed their amended complaint and added Claim 5 arguing for the first time that the arriving alien regulations are ultra vires. *See* JA-171, ¶¶171-83. The latest agency action that Plaintiffs challenge (CHNV parole termination notice) was issued on March 24, 2025. Sixty days from that date is May 24, 2025 and the amended complaint was not filed until June 11, 2025, beyond the 60-day period for challenging any of the agency actions at issue in this case. And because the 60-day period is jurisdictional, the added claims do not "relate back" to the date of the original complaint. *See* FED. R. CIV. P. 15(c)(1)(A); *M.M.V. v. Garland*, 1 F.4th 1100, 1109 (D.C. Cir. 2021).

24

a §705 stay of the agency actions provides Plaintiffs *any* effective relief.

In these circumstances, Plaintiffs cannot establish redressability. *See United States v. Texas*, 599 U.S. 670, 689-93 (2023) (Gorsuch, J., concurring) (injury from DHS prosecutorial guidance not redressable by vacatur because immigration officers would still have discretion not to pursue removal); *Texas v. EPA*, 726 F.3d 180, 198 (D.C. Cir. 2013) (dismissing challenge to rules for lack of standing because vacating those rules "would not redress the State petitioners' injury," which was separately caused by statute).

The district court badly erred in holding otherwise. The court first determined that the "factual record" indicated that although "DHS has long asserted the authority to apply expedited removal to parolees," it "only beg[a]n doing so *en masse* since the Challenged Actions" and that made Plaintiffs' injuries redressable. JA-35. Such a judgment staying the challenged agency actions would provide Plaintiffs no "legally enforceable protection from the allegedly imminent harm." *Haaland v. Brackeen*, 599 U.S. 255, 293 (2023). DHS would still be able to place Plaintiffs' members in expedited removal proceedings using 8 C.F.R. §1.2, as Plaintiffs concede. Plaintiffs "simply assume[]" that DHS will "revert

to its pre-[directive] position as soon as the [directive] is invalidated," but that is nothing more than "unadorned speculation." *See Scenic Am., Inc. v. DOT*, 836 F.3d 42, 52 (D.C. Cir. 2016) (cleaned up). And the record also contains evidence that expedited removal has been applied to paroled arriving aliens prior to 2025. *See* n.1, *supra*. Thus, the decades' old regulations are in no way contingent on the agency actions issued just months ago.

Plaintiffs argue their claims are redressable because DHS allegedly began "subjecting" former parolees to expedited removal at an unprecedented rate after the Challenged Actions. JA-507-10; *see also* Plaintiffs' Opposition to Defendants' Emergency Stay (Opp.) at 6 (asserting DHS began applying expedited removal at a greater "scale only *after* Defendants adopted the Challenged Actions") (emphasis in original). But as Plaintiffs and the district court acknowledge, DHS *did* apply expedited removal to previously paroled aliens prior to the challenged agency actions. JA-35-36; Opp.7-8. Yet the district court accepted Plaintiffs' scale argument, concluding that Plaintiffs needed only to show that "relief … [is] likely to relieve the asserted injury 'in part,' not even the entirety of the injury." JA-38 (quoting *Defs. of Wildlife*

26

*v. Gutierrez*, 532 F.3d 913, 925 (D.C. Cir. 2008)).  And Plaintiffs still have not established what "part" of Plaintiffs' injury would be redressed if DHS could still apply 8 C.F.R. §§1.2 and 235.3 to remove the same previously paroled aliens who Plaintiffs represent.  It is thus "merely speculative" that a ruling on the three actions Plaintiffs challenge would have any impact on DHS subjecting their members to expedited removal; Article III redressability is therefore plainly wanting here.[3]  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (quotations omitted).

Courts have repeatedly concluded that plaintiff speculation about the effect of vacating agency action does not establish redressability.  For example, this Court concluded that a plaintiff failed to establish redressability where the plaintiff challenged only interpretive guidelines

---

[3] Plaintiffs' characterization of the status quo before the challenged actions is dubious at best. Case law demonstrates that DHS pursued expedited removal of such aliens prior to the challenged agency actions. *See, e.g., Arredondo-Martinez*, 2011 WL 13196331, *1, 4; *Corrales-Gonzalez*, 2025 WL 1638423 (2023 expedited removal order); *Obregon-Calcedo*, 2025 WL 1805464 (2024 expedited removal order); *Cordon-Linarez*, 2024 WL 4652824.  Plaintiffs' argument is further undermined by the fact that DHS issued guidance in 2011 to enforcement officers regarding the use of "expedited removal for aliens who were paroled for prosecution purposes and for other reasons as well."  JA-584; *see also* JA-635-36.

but did not challenge the "underlying … [r]egulations" that permitted the same practices plaintiff sought to challenge. *National Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930, 940 (D.C. Cir. 2004), *abrogated on other grounds by Perry Capital LLC v. Mnuchin*, 864 F.3d 591 (D.C. Cir. 2017).

This Court similarly held that plaintiffs failed to establish redressability when seeking to vacate Department of Transportation guidance interpreting agreements with states to allow digital billboards subject to certain criteria because it was mere speculation whether plaintiffs' injury—having to expend resources fighting states' approvals of digital billboards—would be remedied by vacating the guidance. *Scenic Am., Inc. v. DOT*, 836 F.3d 42, 50-53 (D.C. Cir. 2016). Plaintiffs there (as here) presented no evidence indicating whether fewer such billboards would actually be approved absent the guidance. *Id.* at 51, 53. And, more generally, redressability is absent where (as here) plaintiffs fail to challenge authority independently permitting the same conduct. *See, e.g., Nuclear Info. & Res. Serv. v. Nuclear Regul. Comm'n*, 457 F.3d 941, 955 (9th Cir. 2006) (redressability was lacking because plaintiffs did not challenge another regulation authorizing the same conduct).

28

Moreover, whether Plaintiffs have established redressability depends on whether Defendants would "behave any differently in the absence of the" challenged actions. *Scenic Am.*, 836 F.3d at 52. Plaintiffs have provided *no* evidence that staying the challenged actions would cause DHS not to apply expedited removal to previously paroled aliens, especially considering that unchallenged regulations would explicitly permit such actions. Even if Plaintiffs are correct that the challenged actions contributed to expedited removal being applied to previously paroled aliens more often than before, "the undoing of the governmental action" here "will not undo the harm, because the new status quo is held in place by other forces." *Renal Physicians Ass'n v. HHS*, 489 F.3d 1267, 1278 (D.C. Cir. 2007). Plaintiffs simply assume—without evidence—that DHS would apply expedited removal to Plaintiffs' members less often if the challenged actions are stayed. Article III demands more. *See, e.g.,* *Lujan*, 504 U.S. at 561.

Defendants' current application of the unchallenged arriving alien regulations to aliens paroled at ports of entry only confirms the lack of redressability. Plaintiffs do not contend that Defendants' actions are in violation of the district court's stay order, and they certainly have not,

29

even now, asked the Court to enjoin or restrain those regulations. As Judge Walker explained in his concurring opinion denying Defendants' emergency stay motion, the "best" reading of the district court's stay order is that it does not "preclude the Government from applying expedited removal to parolees pursuant to 8 C.F.R. §§1.2 and 235.3(b)(1)(i)." *Coal. for Humane Immigrant Rts.*, 2025 WL 2649100 at *1 (Walker, J., concurring).

Because Plaintiffs cannot demonstrate that their alleged harms will likely be remedied by their requested stay, Plaintiffs lack standing to seek it.

**B.    The INA Authorizes Expedited Removal for Paroled Arriving Aliens.**

**1. "Arriving in" Authority:**   For largely the same reasons, Plaintiffs' claims lack merit. The INA provides that an alien "arriving in the United States" who is inadmissible under one of the qualifying grounds is subject to expedited removal. 8 U.S.C. §1225(b)(1)(A)(i). Text, statutory context, and history demonstrate that the "arriving aliens" provision applies to aliens whose parole has been terminated.   In concluding otherwise, the district court made several errors. *See* JA-58-66.

30

As a threshold matter, 8 C.F.R. §1.2, which was promulgated in 1997, expressly provides that "[a]n arriving alien remains an arriving alien even if paroled pursuant to section 212(d)(5) of the Act, and even after any such parole is terminated or revoked." As noted above, Plaintiffs did not challenge that regulation in their stay motion, and the district court was therefore obliged to treat it as valid and controlling for present purposes. *Cf. U.S. ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 265-67 (1954). Indeed, failing to treat that regulation as valid would contravene Congress's express directive in 8 U.S.C. §1252(e)(3)(B) that challenges of the type Plaintiffs bring here may not be entertained by district courts more than 60 days after a regulation's promulgation, *see supra* at 23-24 & n.2. The validity of §1.2 fully resolves the merits here; this Court need go no further.

In any event, the district court erred in its statutory analysis. The court began by accepting Plaintiffs' invitation to read the word "arriving" in a vacuum and concluded it "would not naturally be read to refer" to someone who had already arrived and is paroled into the country. JA-60. But the INA makes clear that parole "shall not be regarded as an admission" and that once parole ends "the alien shall forthwith return ...

31

to the custody from which he was paroled" and thereafter be treated "in the same manner as that of any other applicant for admission." 8 U.S.C. §1182(d)(5)(A). Thus, Congress specified that parole is simply a temporary release of an alien into the United States that confers no vested immigration status. An alien paroled at the border then is subject to expedited removal because he retains his status as an "arriving alien" under the INA. The Attorney General's "inclusion of paroled aliens" in the arriving alien definition "was based on the statutory language in section 212(d)(5) [parole statute]." 62 Fed. Reg. at 10,313. The court thus erred in suggesting that the Attorney General unreasonably relied on that parole statute.

Indeed, the parole statute and regulation reflect a foundational "legal fiction" in immigration law that aliens paroled into the United States are legally in the same position as aliens standing at the border, regardless of the duration of that parole. The Supreme Court has repeatedly affirmed that legal fiction in an unbroken line of decisions spanning nearly a century. *See Department of Homeland Security v. Thuraissigiam*, 591 U.S. 103, 139 (2020); *Leng May Ma v. Barber*, 357 U.S. 185, 188-91 (1958); *Kaplan v. Tod*, 267 U.S. 228, 230 (1925)

32

(terminated parole had lasted more than 8 years). "The parole of aliens seeking admission is simply a device through which needless confinement is avoided while administrative proceedings are conducted. It was never intended to affect an alien's status, and to hold that petitioner's parole placed her legally within the United States is inconsistent with the congressional mandate, the administrative concept of parole, and the decisions of this Court." *Leng May Ma*, 357 U.S. at 190 (cleaned up).

The district court's other objections fare no better. The court's observation that none of the pre-expedited removal cases relied on by Defendants use the term "arriving" is beside the point. *See* JA-61. These specific principles concerning parole and paroled arriving aliens were well-established at the time of the expedited removal statute's enactment in 1996. Although a paroled arriving alien may have "arrived" at a port of entry in terms of a historical event, JA-62, the alien is nevertheless an "arriving alien" for purposes of the "arriving in" authority; the alien is positionally the same as an arriving alien and Congress legislated with awareness of that principle. *See, e.g., Taggart v. Lorenzen,* 587 U.S. 554,

33

560 (2019) ("When a statutory term is 'obviously transplanted from another legal source,' it 'brings the old soil with it.'" (citation omitted)).

The district court also wrongly reasoned that a paroled alien cannot be "arriving in" the United States because other provisions in the expedited removal statute "use 'arrive,' or some conjugation thereof, to refer to physical arrival at a port of entry." JA-60 (citing 8 U.S.C. §1225(b)(1)(F), (b)(2)(C), and (d)(2)). None of those statutory provisions is relevant. Subsection (b)(1)(F) excepts from the expedited removal process certain aliens from the Americas "with whose government the United States does not have full diplomatic relations and who arrives by aircraft at a port of entry." 8 U.S.C. §1225(b)(1)(F). Subsection (b)(2)(C) states that an alien "arriving on land … from a foreign territory contiguous to the United States" may be returned to "that territory" (as opposed to the alien's home country). 8 U.S.C. §1225(b)(2)(C); *cf.* 8 U.S.C. §1231(b). Subsection (d)(2) is entitled "Authority to order detention and delivery of arriving aliens," and the text (which does not use the word "arriving") authorizes the government to order certain persons in control of a "vessel or aircraft bringing an alien (except an alien crewmember) to the United States" to take certain actions. 8 U.S.C. §1225(d)(2). And

34

although the court did not cite it, Subsection (c)(1) states that an "arriving alien" suspected of being inadmissible on certain security or related grounds may be removed without "any further inquiry or hearing." 8 U.S.C. §1225(c)(1). None of those provisions is inconsistent with treating paroled aliens as still "arriving in" the United States.

The district court observed that under 8 C.F.R. §1.2, aliens are considered to be "arriving in" the United States "both when their parole is active and after it is terminated," and thus "a parolee never leaves th[e] status" of an "arriving alien." *See* JA-62-63. But that only makes the government's argument *stronger*, because it confirms that a parolee is "arriving in" the United States notwithstanding his presence in the country while on parole.

In addition, the district court failed to give sufficient weight to DHS's longstanding and contemporaneous interpretation of the statute in the "arriving alien" regulation. *See* JA-59-60. "[W]hile courts must exercise independent judgment in determining the meaning of statutory provisions, the contemporary and consistent views of a coordinate branch of government can provide evidence of the law's meaning." *Bondi v. VanDerStock*, 145 S. Ct. 857, 874 (2025) (quotation marks omitted); *see*

35

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394 (2024) ("[I]nterpretations issued contemporaneously with the statute at issue, and which have remained consistent over time, may be especially useful in determining the statute's meaning."); *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944). Yet the district court did not give DHS's longstanding interpretation meaningful weight even though the regulation is unchallenged and squarely answers the question presented.[4]

Additionally, the district court misapprehended the nature of parole in reasoning that "Defendants' interpretation creates an oddity," namely, that "a noncitizen who snuck into the country outside of an inspection point gets a full §1229a removal hearing as long as they have been physically present in the United States for two years," but parolees "can face expedited removal forever, regardless of how long they have

---

[4] In fact, one of the commentators raised the precise objection to the proposed rule that Plaintiffs raise here during the notice and comment period. *See* 62 Fed. Reg. at 10,313 (objecting "to the inclusion of parolee in the definition of arriving alien"). The Department of Justice considered the objection and declined to adopt the commentator's suggestion explaining that that "there is solid statutory basis" to include parolees within the arriving alien definition. *Id.*

36

been physically present." JA-64.  But Congress can choose to balance the burdens and benefits of immigration law as it sees fit; and here, Congress granted many benefits to parolees, including not accruing unlawful presence, and, in some cases, receiving work authorization—benefits that do not apply to aliens who enter illegally.  And DHS always retains discretion to place a paroled arriving alien in §1229a proceedings if circumstances warrant doing so.  *Matter of E-R-M- & L-R-M-*, 25 I&N Dec. 520, 524 (BIA 2011).  At all events, the supposed "oddity" would disappear if, consistent with the "designation" clause (discussed immediately below), the Court were to hold that parolees whose parole is terminated may be subject to expedited removal if they have not been continuously present for two years.

**2. "Designation" Authority:**  At a minimum, and independent of the "arriving in" clause, the INA authorizes expedited removal for former parolees with less than two years of continuous presence in the United States.  Under the designation provision, and with an exception not relevant here, *cf.* 8 U.S.C. §1225(b)(1)(F), Congress authorized expedited removal for any alien "designated by the [Secretary]" who "has not been admitted or paroled into the United States" and who cannot demonstrate

37

that he "has been physically present in the United States continuously for the 2-year period immediately prior to the date of the determination of inadmissibility." 8 U.S.C. §1225(b)(1)(A)(iii); *see Thuraissigiam*, 591 U.S. at 108-09. The district court misread the "has not been admitted or paroled" language to exclude anyone who was paroled at any time in the past, even if that parole has been revoked. But the present perfect tense ("has not been … paroled") may be used to indicate a continuing state, not just a past event, and that is the best reading of the statute here.

For example, in *Hewitt v. United States*, 145 S. Ct. 2165 (2025), the Supreme Court held that a statute permitting resentencing of a defendant whose sentence "has not been imposed" applied to defendants whose sentences were imposed but then vacated. *Id.* at 2168. The Court explained that the use of the present perfect tense "conveys to a listener that the event in question continues to be true or valid." *Id.* at 2172. The same is true here: an alien "has not been … paroled into the United States" once his parole has been terminated.

That interpretation is bolstered by the parole statute, 8 U.S.C. §1182(d)(5), which provides that when an alien's parole is revoked, "his case shall … be dealt with in the same manner as that of *any other*

applicant for admission."  8 U.S.C. §1182(d)(5) (emphasis added).  It is undisputed that an alien who is unlawfully present in the United States who has not been admitted is deemed to be an "applicant for admission" under the INA.  8 U.S.C. §1225(a)(1).  And such an alien who lacks two years of continuous presence generally may be placed in expedited removal.  *See* 8 U.S.C. §1225(b)(1)(A)(iii).  Section 1182(d)(5)(A)'s directive that an alien whose parole has been revoked be "dealt with in the same manner" as "any other applicant for admission" can be honored only if Section 1225(b)(1)(A)(iii)'s reference to "has not been … paroled" is interpreted, consistent with *Hewitt,* to refer to a continuing status.  As in *Hewitt,* that context compels the conclusion that "has not been … paroled" asks whether "the event in question continues to be true or valid."  145 S. Ct. at 2172.  To treat aliens whose parole has been terminated in the same manner as other applicants for admission, all such aliens must be potentially subject to expedited removal.  Any other result flouts Congress's explicit "dealt with in the same manner" language.

The district court reasoned that because *Hewitt* involved vacatur of a sentence, "it makes sense for an offender whose sentence was vacated"

39

to be treated as someone who was never sentenced; it then concluded that parole is different because termination "does not render that parole" void *ab initio*. JA-49-50. But in context, the designation provision refers to the alien's *status* at the time the alien is placed in removal proceedings: an alien who is *currently* in "admitted or paroled" status is ineligible for expedited removal, 8 U.S.C. §1225(b)(1)(A)(iii), whereas an alien who is present in the United States *without* a valid admission or parole may be subject to expedited removal under the designation provision.

A recent First Circuit case addressing the same statutory interpretation question supports the Government's position. *Doe v. Noem*, 152 F.4th 272, 289 (1st Cir. 2025). *Doe* involved a direct challenge to DHS's termination of the CHNV parole program. Among DHS's justifications for terminating the parole of aliens who were present in the United States pursuant to that program was to prevent their accruing two years of continuous presence, so as to preserve the ability to remove them through expedited removal. *See* 90 Fed. Reg. 13,619. In issuing a §705 stay, the district court in *Doe* found DHS's justification arbitrary and capricious because, in the court's view (and echoing the district court's reasoning in this case), any alien whose parole was terminated is

40

categorically ineligible for expedited removal because he "has been paroled" in the past. 152 F.4th at 288. The First Circuit reversed, finding that "the Government's interpretation of the statute is persuasive enough" to defeat a §705 stay. *Id.* at 289. The same result should obtain here.

The district court also reasoned that Congress's decision to pair "admitted" and "paroled" in the same phrase demonstrates that both terms refer to a completed act, not a continuing status, on the ground that "in immigration law, 'admission' is something that happens at a specific point in time; it is not a 'continuing status.'" JA-48-49. That reasoning is incorrect. Although "admission" (noun) might refer to a specific act, "admitted" in the statutory phrase "has not been admitted" refers to a status. For example, if an alien was admitted temporarily into the United States and then returned home, nobody would think that if he illegally enters the United States decades later, he would be immune from expedited removal on the ground that he "has been admitted" into the United States at some point in the past. In context, the statute is obviously concerned with whether the alien's *current* presence is

41

pursuant to a lawful admission—not his *past* manner of entry.  The same is true of parole.

Aliens who are present without inspection and arriving aliens whose parole has been revoked (former parolees) lack valid documentation and are unlawfully present within the country.  Neither the Plaintiffs nor the district court provide a persuasive reason why Congress would permanently exclude from expedited removal all aliens who were temporarily paroled for any time and are now unlawfully present.  And it makes sense that someone who is temporarily paroled— *e.g.*, to testify in a trial—but who does not leave upon termination of their parole could be subjected to expedited removal under this provision.

Moreover, if Congress wanted to distinguish between those who were once paroled and those who were not, it could have easily used the past tense "was paroled" (or, even better, "was at any time paroled"). *See Hewitt*, 145 S. Ct. at 2173 (noting that, in other provisions of the same act, Congress used simple past tense to convey events that occurred in the past as contrasted to its use of present perfect in other contexts).  For example, in 8 U.S.C. §1255(a), Congress provided that the Attorney General may adjust the status of an alien who "*was* inspected and ...

*paroled* into the United States" and meets other eligibility requirements. (emphasis added); *Succar v. Ashcroft*, 394 F.3d 8, 16 (1st Cir. 2005). As contrasted to the present perfect, the past tense is more likely to indicate an alien who was, in the past, paroled, regardless of whether he continues to enjoy parole status at the time of his adjustment application.

The district court also erroneously relied on DHS regulations to support its interpretation. First, the court invoked language in 8 C.F.R. §235.3—the expedited removal regulation—that refers to parole in the past tense. JA-53. That regulation provides that if the government determines that expedited removal is appropriate, the "alien will be given a reasonable opportunity to establish to the satisfaction of the examining immigration officer that he or she was admitted or paroled into the United States following inspection." 8 C.F.R. §235.3(b)(6). In context, that language plainly is referring to the alien's chance to prove that his *current* presence is pursuant to a lawful admission or parole; indeed, the regulation states that the "immigration officer will consider all such evidence and information [presented by the alien], make further inquiry if necessary, and will attempt to verify *the alien's status* through a check of all available Service data systems." *Id.* (emphasis added).

43

Second, the district court failed to give adequate weight to other regulations. An asylum regulation expressly authorizes expedited removal for certain aliens whose parole "has expired or been terminated." 8 C.F.R. §208.14(c)(4)(ii). The court improperly brushed away that regulatory text on the question-begging ground that it "contradict[ed]" the court's own flawed interpretation, and on the meritless ground that the regulation was promulgated in 1998 instead of "in the original 1997 rulemaking" implementing IIRIRA. JA-56. But the court's speculation that the regulation "envisioned expedited removal of parolees only" under the "arriving in" authority because the "arriving alien" regulation contains a similar dichotomy between aliens paroled before April 1, 1997 and after, JA-55-56, is incorrect because the language of that regulation explicitly authorizes expedited removal under *both* authorities. 8 C.F.R. §208.14(c)(4)(ii)(A) ("In the case of an applicant who is an arriving alien *or is otherwise subject to removal under §235.3(b)* of this chapter...." the asylum officer "shall proceed in accordance with §235.3(b)") (emphasis added).

The district court similarly failed to give due weight to 8 C.F.R. §212.5(e), entitled, "Termination of Parole." Section 212.5(e)(2)(i)

44

provides that after a "termination of parole," "further inspection or hearing shall be conducted under sections *235* or 240 of the Act." (Emphasis added). Section 235 of the INA is 8 U.S.C. §1225, which contains the expedited removal provision in Subsection (b)(1). The court observed that Subsection (b)(2) provides that an alien who is not subject to expedited removal may be placed in §240 proceedings, JA-56-57, but that is a *non sequitur* because the only "hearing" that is "*conducted under* §235," 8 C.F.R. §212.5(e)(2)(i) (emphasis added), is an expedited-removal hearing.

### C.    The Agency's Actions are not Arbitrary and Capricious

The district court erred in ruling that the challenged actions are arbitrary and capricious because the agency supposedly failed to sufficiently explain its reasoning and contradicted itself. JA-65-73.

First, the district court observed that the Huffman Memorandum states that the "maximum" "scope of expedited removal" "under 8 U.S.C. §1225(b)(1)" includes the two-year continuous-presence requirement, which the court viewed as being inconsistent with the government's "arriving in" argument (under which all parolees are eligible for expedited removal irrespective of their continuous presence). JA-69-70.

But the Huffman Memorandum merely notes that the "statutory maximum" scope "*includes* certain aliens" who lack two years of continuous presence, Huffman Memorandum at 1 (emphasis added), which is consistent with that scope's including even more aliens. Anyway, the government is under no obligation to implement policies that extend to the very boundaries of its statutory authority.

Second, the district court faulted the "February 18 ICE Directive"— in fact, merely an internal agency email, *see* perma.cc/S3LJ-AFJM—for not citing any statutory or regulatory provisions supporting the use of expedited removal on all "paroled arriving aliens." JA-70-71. But no principle of administrative law requires an internal email between Executive Branch personnel to contain citations as if it were published in the Federal Register.

Third, the district court thought the Huffman Memorandum and February 18 email contradicted each other because the former suggests that the government "must first terminate a noncitizen's parole before subjecting them to expedited removal" if the alien does not satisfy the two-year continuous-presence requirement, while the latter suggests that the government "can subject even active parolees to expedited

46

removal" with "'no time limit'" on continuous presence.  JA-72.  But the Huffman Memorandum nowhere contains that termination requirement and therefore the court's supposed inconsistency is illusory.

Finally, the district court was wrong because DHS's statements in the CHNV Termination Notice about being limited to a two-year time period simply do not constitute a renunciation of using expedited removal under its "arriving in" authority; indeed, such a renunciation would be contrary to the governing regulation at §1.2, which Plaintiffs failed to challenge.

## II.  The Remaining Equitable Factors Weigh Strongly in the Government's Favor.

The remaining considerations all favor the Government. Plaintiffs failed to demonstrate irreparable harm, and both the balance of equities and public interest cut against the decision below.

**1.** This Circuit "has set a high standard for irreparable injury. First, the injury must be both certain and great; it must be actual and not theoretical." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (quotations omitted).  "The moving party must show" that the "injury complained of is of such imminence that there is a clear and present need for equitable relief to prevent

47

irreparable harm." *Id.* (quotations omitted). "Second, the injury must be beyond remediation"; "[m]ere injuries, however substantial, … are not enough." *Id.* (quotations omitted). Plaintiffs failed to meet that standard.

As an initial matter, it is difficult to understand how Plaintiffs' members could be suffering irreparable harm from the challenged agency actions themselves given that, even under Plaintiffs' view, DHS can still apply expedited removal to the same individuals under the arriving alien regulations at 8 C.F.R. §§1.2 and 235.3. *Supra* at 16-17.

Moving beyond that, the district court concluded "Plaintiffs' asserted irreparable injuries fall into two buckets: (1) the risk of erroneous removal arising from lack of meaningful process, whether as to asylum-based claims or other claims for immigration relief; and (2) injuries resulting from the fact of being in expedited removal …." JA-75. But the district court's analysis is flawed.

First, the court was wrong to suggest that credible fear proceedings "lack [] meaningful process" for "asylum-based" claims in light of the robust procedures available to aliens who claim a fear of persecution or torture. *See* 8 U.S.C. §1225(b)(1)(B)(i); 8 C.F.R. §§235.3(b)(4), 208.30.

48

The Supreme Court has upheld the constitutionality of the INA's preclusion of review of the "allegedly flawed credible-fear proceeding." *Thuraissigiam*, 591 U.S. at 138.   In so doing, it has observed that "[a]n alien subject to expedited removal [] has an opportunity at three levels to obtain an asylum hearing, and the applicant will obtain one unless the asylum officer, a supervisor, and an immigration judge all find that the applicant has not asserted a credible fear." *Id.* at 110.   The Supreme Court also noted that "nearly 77% of screenings have resulted in a finding of credible fear." *Id.* at 111.   Another 11% of claims "were closed for administrative reasons, including the alien's withdrawal of the claim." *Id.*   From these statistics the Court adduced that, "[a]s a practical matter,… the great majority of asylum seekers who fall within the category subject to expedited removal do not receive expedited removal and are instead afforded the same procedural rights as other aliens." *Id.* These aliens are thus effectively heard and in fact most are not removed through expedited removal.

Plaintiffs' own evidence illustrates that aliens with a legitimate credible fear are referred to section 1229a proceedings. *See* JA-316, ¶14 (finding alien to have credible fear); JA-357, ¶18 (same); JA-401, ¶9

49

(same). And in one of these cases, the Immigration Judge reversed an asylum officer's negative reasonable fear determination. JA-401, ¶9. While the district court complained that the credible fear procedures were not "as thorough" as §1229a procedures, *see* JA-75; *see also id*. at 76, 77, that does not amount to irreparable harm given the clear sufficiency of the credible fear process as recognized by the Supreme Court. *See Thuraissigiam*, 591 U.S. at 110-11, 138. Instead, those complaints merely demonstrate the district court's *policy disagreements* with Congress—something manifestly insufficient to warrant relief here.

The district court also erroneously relied on "detention and family separation during the expedited removal process" to find irreparable harm. *See* JA-77. In doing so the court overlooked that the INA requires Plaintiffs' members to be detained without a bond hearing *regardless* of whether or not they are subject to expedited removal. There is no dispute that paroled arriving aliens are applicants for admission because they have never been admitted to the country. As the parole statute states: Parole "shall not be regarded as an admission" and when the purposes of parole have been served "*the alien shall forthwith return ... to the custody from which he was paroled.*" 8 U.S.C. § 1182(d)(5)(A) (emphasis added).

50

Thus, Plaintiffs cannot claim any entitlement to release based on their initial parole into the country. Once the Secretary made a determination to revoke that parole, the statute requires the alien to be detained, regardless of which removal process DHS chooses. *Id.*; s*ee also Jennings v. Rodriguez*, 583 U.S. 281, 302 (2018) (Sections 1225(b)(1) and (b)(2) "mandate detention of aliens throughout the completion of applicable proceedings and not just until the moment those proceedings begin").

Finally, the record simply does not support the district court's finding that Plaintiffs have established that expedited removal caused irreparable harm in the form of poor conditions of confinement and being detained in "far-flung locations." *See* JA-77-78. For starters, of the four declarations upon which the court relied, only one involved an alien member of a Plaintiff organization. JA-77, JA-350, ¶2. And, as to that one member, the declaration establishes that DHS found him to have a credible fear and placed him in §1229a proceedings. JA-357, ¶18.

Additionally, the court's reliance on another declaration involving a non-member, who was transferred from a detention facility in Chicago to one in Oklahoma, which does not support the court's finding because the declaration indicates the alien was still in §1229a proceedings

following the transfer. JA-283, ¶16 (§1229a master calendar hearing set for June 5, 2025, before the Honorable Immigration Judge Jacinto Palomino.). Thus, the record does not establish that any harm from far-away detention facilities or overcrowding conditions was caused specifically by expedited removal rather than DHS's general exercise of its broad discretion to choose the location of an alien's custody and to transfer, if necessary, the alien from one facility to another. *See* 8 U.S.C. §1231(g)(1) (providing broad discretion to the Secretary to choose the place of detention for deportable aliens); *accord Geo Grp., Inc. v. Newsom*, 50 F.4th 745, 751 (9th Cir. 2022).

**2.** On the other side of the ledger, the district court's order significantly harms the Government and public interest. These final *Nken* factors merge when the Government is the opposing party. 556 U.S. at 435.

The Government "suffers a form of irreparable injury" "[a]ny time [it] is enjoined by a court from effectuating statutes enacted by representatives of its people." *CASA*, 606 U.S. at 861 (quotations omitted); *see Trump v. Orr*, __ S. Ct. __, 2025 WL 3097824, at *1 (Nov. 6, 2025) (No. 25A319) (government suffers irreparable injury where a court

"enjoins enforcement of an Executive Branch policy with foreign affairs implications," among other things). That is "particularly" true "given the millions of individuals illegally in the United States, the myriad significant economic and social problems caused by illegal immigration, and the Government's efforts to prioritize stricter enforcement of the immigration laws enacted by Congress." *Noem v. Perdomo*, 606 U.S. __, 2025 WL 2585637, at *4 (Sept. 8, 2025) (No. 25A169) (Kavanaugh, J., concurring) (quotation marks and citation omitted).

At an earlier stage of this case, a panel of this Court found that the government had not demonstrated irreparable harm for purposes of obtaining a stay pending appeal because it could continue to use expedited removal for parolees under 8 C.F.R. §§1.2 and 235.3. *See Coal. for Humane Immigrant Rts.*, 2025 WL 2649100, at *1; *see also id.* (Walker, J., concurring) ("Thus, that order is "best read not to preclude the Government from applying expedited removal to parolees pursuant to 8 C.F.R. §§ 1.2 and 235.3(b)(1)(i)."). But in this posture it is Plaintiffs who must show irreparable injury; the governmental harms above simply underscore that the balance of harms cuts against the district court's order. At a minimum, the district court's order creates needless

uncertainty for the government despite the unchallenged authority under 8 C.F.R. §§1.2 and 235.3. *Cf. id.* (Walker, J., concurring).

## III.    The District Court's Relief Exceeded its Authority.

The district court's universal relief was beyond its authority to issue for two independent reasons: Section 1252(f)(1) expressly prohibits non-party relief in this context, and Section 705 stays must comply with traditional equitable principles, which likewise prohibit such relief.

### A.    The District Court's Stay Is Prohibited by 8 U.S.C. §1252(f)(1)

Section 1252(f)(1) strips the lower federal courts of the "jurisdiction or authority" to "enjoin or restrain the operation of" certain INA provisions—including those governing expedited removal—"other than with respect to the application of such provisions to an individual alien against whom proceedings ... have been initiated." 8 U.S.C. §1252(f)(1); *see Nielsen v. Preap*, 586 U.S. 392, 402 (2019). By its terms, this provision bars the lower federal courts from issuing any order that commands "federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions," except in regard to "individual cases." *Aleman Gonzalez*, 596 U.S. at 550; *see N.S. v. Dixon,* 141 F.4th 279, 288-90 (D.C. Cir. 2025).

54

The district court's order squarely violates §1252(f)(1). The order runs to "an entire class of aliens," *Aleman Gonzalez*, 596 U.S. at 550-51—i.e., every alien paroled at a port of entry would not otherwise be eligible for expedited removal—rather than any "individual alien," 8 U.S.C. §1252(f)(1). JA-1. And it "restrain[s] the operation" of one of the covered provisions, *Aleman Gonzalez*, 596 U.S. at 550-51. JA-1.

Indeed, that was the entire point. The district court barred the Government from subjecting paroled arriving aliens to expedited removal. Put otherwise, the court ordered the government to "refrain" from "carry[ing] out" its expedited-removal authority under §1225(b)(1). *Aleman Gonzalez*, 596 U.S. at 550; *see N.S.*, 141 F.4th at 289-90 (holding that §1252(f)(1) barred a court order that "directly and substantially restricts the ability of those federal officials to 'carry out' provisions covered by §1252(f)(1) and pro tanto frustrates enforcement of the law").

That is exactly the type of order that *Aleman Gonzalez* held §1252(f)(1) forbids. There, the Supreme Court vacated an order that enjoined the Government class-wide from taking actions under a specified provision (detaining aliens under §1231(a)(6)) until it provided additional process (a bond hearing). 596 U.S. at 547. And here, the

district court has issued a universal stay barring the Government from subjecting certain aliens to expedited removal. That is the exact same error. The nationwide stay below "'enjoin[s] or restrain[s] the operation' of [§1225(b)(1)]" because it requires a federal official to "refrain from actions that (again in the Government's view) are allowed by [§1225(b)(1)]." *Id.* at 551.

The district court held otherwise, primarily on the ground that §1252(f)(1) bars only injunctions—and the order below is styled as a stay. JA-28-29. But §1252(f)(1)'s text extends beyond injunctions, to expressly include any order that "restrain[s]" the operation of a covered statute. And as the Supreme Court held, those terms have independent meaning and cut broadly to prevent orders that prohibit the Government from "carry[ing] out" any of the covered provisions. *Aleman Gonzalez*, 596 U.S. at 549-50. So regardless of whether a stay effectively "enjoins" an action, there is no colorable argument that a stay preventing the Government from taking certain actions does not "restrain" the Government from taking those actions. The Plaintiffs' own conduct following the district court's issuance of a §705 stay indicates that Plaintiffs read the district court's order to "restrain" the Government from subjecting paroled

56

arriving aliens to expedited removal.    Plaintiffs repeatedly emailed Government counsel accusing DHS of "violat[ing] Judge Cobb's order" by placing certain aliens in expedited removal and requesting that counsel intervene.    Dkt. 53-1, at 4-11.

Moreover, the district court's reading violates bedrock principles of statutory interpretation.    While Congress used the words "enjoin or restrain" in §1252(f)(1), Congress used only "enjoin" in the very next provision.    Section 1252(f)(2) bars courts from "enjoin[ing] the removal of any alien pursuant to a final order under this section" absent certain conditions.    8 U.S.C. §1252(f)(2).    Reading §1252(f)(1) as limited to injunctions would not only render the term "restrain" superfluous—contrary to the "cardinal principle" of statutory construction that courts must "give effect, if possible, to every clause and word of a statute." *Liu v. SEC*, 591 U.S. 71, 89 (2020) (quotation marks omitted).    It would also violate the principle that "where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983) (cleaned up).    Congress's deliberate inclusion of the

broader phrase "enjoin or restrain" in §1252(f)(1), when considered alongside its use of only "enjoin" in §1252(f)(2), confirms that §1252(f)(1) cannot plausibly be read to apply only to injunctions.

And in all events, the district court's distinction makes little sense on its own terms. Section 1252(f)(1) is plainly concerned with the effect of a remedy on the operation of covered INA provisions. *Aleman Gonzalez*, 596 U.S. at 551. There is no reason why the same Congress that prohibited non-party-specific injunctions would be content with universal stays that accomplished the same ends under a different label; instead, it adopted a broad provision that prevents any order that "enjoins or restrains" one of the specified provisions.

The district court also reasoned that §1252(f)(1) cannot apply to §705 stays, because it does not apply to §706 vacaturs. JA-28-29. But even assuming the latter premise, the conclusion does not follow. A §705 stay is a form of "interim equitable relief" that functions exactly as a preliminary injunction—i.e., it prevents the Government from using an otherwise available source of legal authority. *Immigrant Defs.*, 145 F.4th at 995-96. Vacatur, by contrast, removes the source of authority itself.

58

That is, it is not a remedy that necessarily "enjoins or restrains" the use of a given power; instead, it eliminates that power in the first place.

## B.    The District Court's Order Violates Traditional Equitable Principles

The Supreme Court held in *CASA* that the district courts' equitable powers do not include the authority to grant universal equitable relief. 606 U.S. at 841.  The district court below refused to apply that rule to §705 stays under the APA and instead issued a universal stay of three agency documents.  JA-1.  At minimum, that overbroad remedy must be narrowed.

Section 705 states:

On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court … may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending the conclusion of review proceedings.

5 U.S.C. §705.

When a court grants interim relief under that provision, it must adhere to the traditional equitable principle that equitable remedies "should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs."  *CASA*, 606 U.S. at 852 (citation and emphasis omitted).  The Ninth Circuit recently concluded as much,

59

and "limit[ed a] district court's §705 Stay order" to plaintiff's clients on the basis that *CASA*'s "complete-relief principle provides some useful guidance for crafting interim equitable relief" in §705 cases, which use the same traditional equitable principles that govern the preliminary injunctions at issue in *CASA*. *Immigrant Defs.*, 145 F.4th at 995-96. That decision is undoubtedly correct.

Congress ordinarily legislates against the backdrop of "established principles" of equity. *Starbucks Corp. v. McKinney*, 602 U.S. 339, 346 (2024). If Congress seeks to "depar[t] from traditional equity practice," it ordinarily "ma[kes] its desire plain." *Hecht Co. v. Bowles*, 321 U.S. 321, 330 (1944). Courts therefore must presume that a statute adheres to longstanding equitable principles "absent a clear command" to the contrary. *Starbucks*, 602 U.S. at 346. The Supreme Court has "consistently employed this presumption when interpreting a wide variety of statutes." *Id.*; *see, e.g.*, *Nken v. Holder*, 556 U.S. 418, 433-36 (2009); *Amoco Prod. Co. v. Gambell*, 480 U.S. 531, 542-544 (1987); *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982); *Hecht*, 321 U.S. at 330. Section 705, however, contains no clear statement displacing "the

party-specific principles that permeate our understanding of equity." *CASA*, 606 U.S. at 844.

To the contrary, §705 provides that a court may award interim relief only "to the extent necessary to prevent irreparable injury." 5 U.S.C. §705. The phrase "irreparable injury," in the context of interim equitable relief, refers to irreparable injury to the plaintiff—not irreparable injury to third parties. *See, e.g.*, *Winter v. NRDC*, 555 U.S. 7, 20 (2008) ("A plaintiff seeking a preliminary injunction must establish … that *he* is likely to suffer irreparable harm in the absence of preliminary relief." (emphasis added)). Granting relief to non-parties is in no way "necessary to prevent irreparable injury" to the plaintiff. 5 U.S.C. §705.

Other language in §705, too, signals that the provision incorporates traditional equitable principles. Section 705 provides that a court "may issue" (not "shall") grant relief. 5 U.S.C. §705. The Supreme Court has concluded this "may issue" incorporates traditional equitable principles, rather than displacing them. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 392 (2006).

The word "may" further connotes discretion. *See Bouarfa v. Mayorkas*, 604 U.S. 6, 13 (2024); *see also Starbucks*, 602 U.S. at 346-37

61

(statute permitting a court to grant relief it "deems just and proper" invokes courts' traditional equitable discretion). Discretion, of course, "is not whim." *Halo Electronics, Inc. v. Pulse Electronics, Inc.*, 579 U.S. 93, 103 (2016) (citation omitted). "A motion to [a court's] discretion is a motion, not to its inclination, but to its judgment; and its judgment is to be guided by sound legal principles." *United States v. Burr*, 25 F.Cas. 30, 35 (C.C.D. Va. 1807) (Marshall, C.J., riding circuit).

Those principles include the "elementary principle that a court cannot adjudicate directly upon" the rights of bystanders to the litigation, *CASA*, 606 U.S. at 844 (citation omitted). Section 705 also authorizes a court to award only "necessary and appropriate process." 5 U.S.C. §705. In *Starbucks*, the Supreme Court interpreted a similar statutory phrase, "just and proper," to incorporate "the normal equitable rules." 602 U.S. at 347. "The word 'proper' means 'appropriate,'" the Court explained, and crafting " 'appropriate' equitable relief " requires following "'traditional rules.'" *Id.* (citations omitted). So too here.

Statutory context confirms that reading of §705. The APA elsewhere makes clear that APA suits ordinarily take the form of challenges for equitable relief—specifically, "actions for declaratory

judgments or writs of prohibitory or mandatory injunction." 5 U.S.C. §703. It therefore makes sense that interim relief in such suits would comport with traditional equitable principles. In addition, the APA provision that creates a right of judicial review states: "Nothing herein … affects … the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground." 5 U.S.C. §702.

That language expressly preserves the reviewing court's "duty" to "deny relief" on the "equitable ground" that such relief is unnecessary to provide complete relief to the plaintiff. Contemporaneous sources reinforce that interpretation of §705.

While Congress was debating the legislation, a congressional committee report explained that the authority granted by the provision now codified at §705 "is equitable" and that relief would "normally, if not always, be limited to the parties complainant." H. Rep. No. 1980, 79th Cong., 2d Sess. 43, 277 (1946). And soon after the enactment of the statute, the Attorney General explained that the "power to stay agency action [under §705] is an equitable power" and that courts must exercise that power consistent with the "historic" rules of "equity jurisdiction." U.S. Dep't of Justice, *Attorney General's Manual on the Administrative*

63

*Procedure Act* 106 (1947); *see S. Utah Wilderness All. v. Norton,* 542 U.S. 55, 63-64 (2004) (noting the Court has often found the Manual's reasoning persuasive).

The district court's contrary reading is untenable. The court's principal justification for its overbroad relief is that §705 stays are essentially temporary §706 vacaturs, which need not be limited to the parties before the court. JA-81-82. But the question of whether a court may grant universal interim relief under §705 is distinct from the question whether a court may grant universal vacatur under §706.

Sections 705 and 706 use different language: The former provides that a court "may" issue "necessary and appropriate process" "to the extent necessary to prevent irreparable injury," 5 U.S.C. §705, while the latter provides that a court "shall" "set aside" unlawful agency action, *id.* §706. As a practical matter, moreover, it is one thing for a court to grant universal vacatur at the end of a case based on a definitive determination that agency action is unlawful; it is quite another for a court to grant universal relief at a preliminary stage based on a tentative finding that the plaintiff is likely to succeed on the merits.

64

Moreover, the district court's contrary reading of §705 is internally inconsistent. The court applied the traditional multi-factor test for equitable relief, considering the likelihood of success on the merits, irreparable injury, the balance of the equities, and the public interest. JA-26-27. Section 705, however, explicitly refers only to "irreparable injury"; it does not mention the other three factors. 5 U.S.C. §705. In nonetheless considering those factors, the district court effectively acknowledged that §705 incorporates at least *some* background equitable principles—namely, the principles governing the factors that courts must consider when granting equitable relief. *See Immigrant Defs.*, 145 F.4th at 995-96. The district court did not identify any statutory language that selectively incorporates those factors while jettisoning the equally "fundamental" principle that equitable relief must be party-specific. *CASA*, 604 U.S. at 844 (citation omitted). In fact, at one point, the district court reasoned that because 5 U.S.C. §705 does not include a clear statement that relief must be limited to the parties, such as directing that relief may be provided "to the extent necessary to prevent irreparable injury *to the plaintiffs*," §705 must not be so limited. JA-82 (emphasis in original). Such reasoning would turn the rule that statutes incorporate

65

longstanding equitable principles "absent a clear command" otherwise on its head. *Starbucks*, 602 U.S. at 346.

The district court could have provided Plaintiffs "complete relief" by granting an appropriately tailored remedy to *Plaintiffs' members* who Plaintiff organizations identify and show have been harmed by the alleged unlawful conduct; complete relief does not extend to other paroled nonparty aliens. *See id.* at 2557. In concluding otherwise, the district court exceeded its authority.

66

## CONCLUSION

This Court should reverse the district court's grant of a §705 stay.

Respectfully submitted,

PAPU SANDHU
*Assistant Director*
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
General Litigation and Appeals
P.O. Box 868 Ben Franklin Station
Washington, DC 20044
(202) 616-9357

BRETT A. SHUMATE
*Assistant Attorney General*

/s/ *Drew C. Ensign*
DREW C. ENSIGN
*Deputy Assistant Attorney General*
*Drew.C.Ensign@usdoj.gov*
(202) 514-2000

TYLER BECKER
*Counsel to the Assistant Attorney General*
U.S. Department of Justice, Civil Division
950 Pennsylvania Avenue, NW
Washington, DC 20530

Dated:  November 17, 2025

67

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because:

1. This brief contains 12,830 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and D.C. Circuit Rule 32(e)(1).

2. The brief complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Century Schoolbook font.

/s/ *Drew C. Ensign*  
Drew C. Ensign

Dated: November 17, 2025     Attorney for Appellants

## CERTIFICATE OF SERVICE

I hereby certify that on November 17, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the D.C. Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

/s/ *Drew C. Ensign*
Drew C. Ensign

Dated: November 17, 2025    Attorney for Appellants