**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

COALITION FOR HUMANE IMMIGRANT RIGHTS, *et al.*,

    *Plaintiffs,*

    *v.*

KRISTI NOEM, in her official capacity as Secretary of Homeland Security, *et al.*,

    *Defendants.*

Case No.: 1:25-cv-0872

**BRIEF OF *AMICI CURIAE* IMMIGRATION & CONSTITUTIONAL LEGAL SCHOLARS IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

JESSICA A. DAWGERT
Ariela Lake Law & Consulting PLLC
3355 Hudson St., #7098
Denver, CO 80207
(303) 531-6634
jess@allc.law

KERRY E. DOYLE
Green and Spiegel LLC
1524 Delancey St., 4th Floor
Philadelphia, PA 19102
(617) 216-1248
kdoyle@gands-us.com

SARAH S. WILSON
Colombo Hurd PL
301 E. Pine St., #450
Orlando, FL 32801
(407) 478-1111
swilson@colombohurd.com

## TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................................. ii

TABLE OF AUTHORITIES ........................................................................................................ iii

PRELIMINARY STATEMENT ..................................................................................................... 1

LEGAL BACKGROUND ............................................................................................................... 3

     A.     Focus on Inspection and Admission ........................................................................... 3

     B.     Expedited Removal....................................................................................................... 4

     C.     Parole ........................................................................................................................... 6

    ARGUMENT ........................................................................................................................ 8

    I.    The legislative history leading up to IIRIRA demonstrates that Congress had no intention of subjecting parolees to expedited removal. ........................................................................... 8

    II.   Congress did not intend to subject parolees whose parole expired, was terminated, or was revoked to expedited removal. ......................................................................................................... 18

CONCLUSION.............................................................................................................................. 21

## TABLE OF AUTHORITIES

### STATUTES

8 U.S.C. § 1182 ........................................................................................................... 3

8 U.S.C. § 1182(a)(6)(C) ................................................................................... 4, 5, 6, 14

8 U.S.C. § 1182(a)(7) ................................................................................................... 4

8 U.S.C. § 1182(d)(5) ................................................................................................... 7

8 U.S.C. § 1182(d)(5)(A) .......................................................................................... 7, 15

8 U.S.C. § 1225(b)(1) ................................................................................................... 6

8 U.S.C. § 1225(b)(1)(A) ............................................................................................. 1

8 U.S.C. § 1225(b)(1)(A)(i) ................................................................................... 1, 4, 6

8 U.S.C. § 1225(b)(1)(A)(iii) ................................................................................... 1, 5

8 U.S.C. § 1225(b)(1)(A)(iii)(II) .............................................................................. 5, 19

8 U.S.C. § 1225(b)(1)(F) ............................................................................................. 1

8 U.S.C. § 1227 ........................................................................................................... 3

8 U.S.C. § 1229a ......................................................................................................... 4

8 U.S.C. § 1252 ........................................................................................................... 4

### CASES

*Abbott Laboratories v. Gardner*,
    387 U.S. 136 (1967) ............................................................................................. 17

*Cheng v. Immigration and Naturalization Service*,
    534 F.2d 1018 (2d Cir. 1976) .............................................................................. 18

*Coalition for Humane Immigrant Rights (CHIRLA) v. Noem*,
    805 F. Supp. 3d 48 (D.D.C. 2025) .......................................................... 3, *passim*

*De Leon v. Holder*,
    761 F.3d 336 (4th Cir. 2014) ............................................................................... 18

*Landon v. Plasencia*,
    459 U.S. 21 (1982) ............................................................................................... 19

*Lindahl v. Office of Personnel Management,*
470 U.S. 768 (1985) ............................................................................................ 17

*Make the Road New York v. Noem,*
2025 WL 3563313 (D.C. Cir. Nov. 22, 2025) ...................................... 1, *passim*

*Mariscal-Sandoval v. Ashcroft,*
370 F.3d 851 (9th Cir. 2004) ............................................................................. 19

*Matter of Pierre,*
14 I. & N. Dec. 467 (BIA 1973) ......................................................................... 18

*Matter of R-,*
3 I. & N. Dec. 45 (BIA 1947) ............................................................................... 7

*Siu Fung Luk v. Rosenberg,*
409 F.2d 555 (9th Cir. 1969) ............................................................................. 19

*Vartelas v. Holder,*
566 U.S. 257 (2012) ............................................................................................. 3

*Yang v. Maugans,*
68 F.3d 1540 (3d Cir. 1995) ............................................................................... 19

**REGULATIONS**

8 C.F.R. § 235.3(b)(1) ............................................................................................ 5

8 C.F.R. § 235.3(b)(4) ............................................................................................ 6

**FEDERAL REGISTER**

62 Fed. Reg. 10312 (March 6, 1997) ...................................................................... 5

67 Fed. Reg. 68924 (Nov. 13, 2002) ...................................................................... 5

69 Fed. Reg. 48877 (Aug. 11, 2004) ...................................................................... 5

84 Fed. Reg. 35409 (July 23, 2019) ....................................................................... 5

87 Fed. Reg. 16002 (March 21, 2002) .................................................................... 5

90 Fed. Reg. 8139 (Jan. 24, 2025) ......................................................................... 5

**LEGISLATION AND REPORTS**

1917 Immigration Act, Pub. L. No. 64-301, 39 Stat. 874 (1917) .................................................. 7

Antiterrorism and Effective Death Penalty Act of 1996,
Pub. L. 104-132, 110 Stat. 1214 (1996) ................................................................ 14

Antiterrorism and Effective Death Penalty Act of 1996,
S.735, 104th Cong. (1995-96) .............................................................................. 11

Asylum at Ports of Entry Systems Improvements Acts,
H.R. 3162, 103rd Cong. (1993) ............................................................................ 10

Comprehensive Antiterrorism Act of 1995,
H. Rept. 104-383, 104th Cong. (1995-96) ...................................................... 14, 15

Comprehensive Antiterrorism Act of 1995,
H.R. 1710, 104th Cong. (1995-96) ....................................................................... 12

Emergency Immigration Parole Correction Act of 1995,
H.R. 1597, 104th Cong. (1995-96) ....................................................................... 10

Expedited Exclusion and Alien Smuggling Enhanced Penalties Act of 1993,
H.R. 2836, 103rd Cong. (1993) ............................................................................ 10

Expedited Exclusion and Alien Smuggling Enhanced Penalties Act of 1993,
S. 1333, 103rd Cong. (1993) ................................................................................ 10

Immigrant Control and Financial Responsibility Act of 1995,
H.R. 2202, 104th Cong. (1995-96). ................................................................. 12, 16

Immigrant Control and Financial Responsibility Act of 1995,
S. 269, 104th Cong. (1995-96) ........................................................................ 11, 12

Immigration and Nationality Act,
Pub. L. 82-414, 66 Stat. 163 (1952) ....................................................................... 7

Immigration Control and Financial Responsibility Act of 1996,
S. Rept. 104-249, 104th Cong. (1995-96) ............................................................. 13

Immigration Enforcement and Asylum Reform Act of 1993,
H.R. 3363, 103rd Cong. (1993) ............................................................................ 10

Immigration in the National Interest Act of 1995,
H. Rept. 104-469(I), 104th Cong. (1995-96) ......................................................... 20

Immigration Reduction Act of 1994,
     H.R. 4934, 103d Cong. (1993-94) ...................................................................... 7

Immigration Reform and Control Act of 1982,
     S. 2222, 97th Cong. (1982) ................................................................................. 9

Immigration Reform and Control Act of 1983,
     S. 529, 98th Cong. (1983-84) .............................................................................. 9

Port of Entry Inspections Improvement Act of 1993,
     S. 667, 103rd Cong. (1993) ............................................................................... 10

Violent Crime Control and Law Enforcement Act of 1994,
     Pub. L. 103-322, 108 Stat. 1796 (1994) ............................................................ 11

## OTHER CONGRESSIONAL RECORDS

104 Cong. Rec. S3427 (daily ed. Apr. 17, 1996) ........................................................ 13

Support Urged for Committee Approach to Illegal Aliens, Congressional Record,
     103 Cong. Rec. H3632 (daily ed. March 2, 1994) ....................................... 11, 20

## OTHER PUBLICATIONS

Alison Siskin & Ruth Ellen Wasem, Cong. Research Serv., RL33109,
     *Immigration Policy on Expedited Removal of Aliens* (2005) .............................. 9

Daniel Kanstroom, Expedited Removal and Due Process:
     "A Testing Crucible of Basic Principle" in the Time of Trump,
     Washington & Lee Law Review (Summer 2018)
     75 WLLR 1323, 1329 .......................................................................................... 9

Hillel R. Smith, *Expedited Removal of Aliens: Legal Framework*, Congressional Research
     Service (Oct. 8, 2019).) ..................................................................................... 19

Larry M. Eig, *Immigration: Illegal Entry and Asylum Issues*,
     Congressional Research Service (Jan. 24, 1994) ............................................... 10

Owen "Bo" Cooper, Procedures for Expedited Removal and Asylum Screening
     Under the Illegal Immigration Reform and Immigrant Responsibility Act,
     Of 1996, 29 Conn. L. Rev. 1501 (1997) .................................................. 6, 10, 11

## PRELIMINARY STATEMENT

*Amici Curiae*, immigration and constitutional scholars, submit this brief in support of Plaintiffs, the Coalition for Human Immigrant Rights (CHIRLA), CASA, and UndocuBlack, in their challenge to policies the Department of Homeland Security is using to place noncitizens who were paroled into the United States into expedited removal proceedings, a summary removal authority outside the normal immigration court process that provides virtually no opportunity for judicial review. The legality of the challenged policies turns on the scope and meaning of the Immigration and Nationality Act's expedited removal provision, 8 U.S.C. § 1225(b)(1)(A)(i), (iii). Section 1225(b)(1)(A) permits DHS to apply expedited removal procedures to two specifically-enumerated and limited categories of noncitizens without valid documentation or authorization for admission: (1) those who are "arriving in the United States;" and (2) those in the interior who "have not been admitted or paroled into the United States" who cannot demonstrate continuous physical presence in the country for a designated period of time.[1] *See Make the Road New York v. Noem*, 2025 WL 3563313, at *3 (D.C. Cir. Nov. 22, 2025) (describing the two categories for expedited removal).

Noncitizens who have been paroled into the United States at a port of entry do not fall within either statutory category of noncitizens eligible for expedited removal. First, the statute's reference to "arriving" in the first category subjects only those noncitizens who present themselves for inspection at a port of entry and are in the process of physical entry. Hence, a noncitizen whom the government elects to parole into the country after inspection (and thus not place in expedited removal) is not thereafter subject to expedited removal. Second, the statute's second category

---

[1] These provisions do not apply to "a native or citizen of a country in the Western Hemisphere with whose government the United States does not have full diplomatic relations and who arrives by aircraft at a port of entry." 8 U.S.C. § 1225(b)(1)(F).

explicitly states that it applies only to noncitizens who have "not been admitted or paroled." This express exemption of noncitizens permitted to be physically present in the country by parole applies with equal force even if the noncitizen's parole has expired or been terminated.

Excluding parolees from expedited removal reflects the language of the statute and is supported by the entire sweep of legislative history leading up to the passage of the expedited removal provision in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA). During that fifteen-year period, Congress considered dozens of summary exclusion, deportation, and removal proposals. The proposals consistently targeted noncitizens at the port of entry seeking to physically come into the United States and some proposals also targeted noncitizens who had avoided the port of entry inspection altogether and had illegally entered. No proposal targeted parolees whom the government has affirmatively determined should be allowed into the United States under the parole legal authority. In fact, just five months before the enactment of IIRIRA, Congress enacted a summary removal provision in the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) that was similarly aimed at those two populations but contained legislative text meaningfully different from that which was ultimately included in IIRIRA. The legislative history of the enactment of AEDPA and its replacement by IIRIRA makes clear that throughout this period, Congress's focus was on the two populations: port of entry and illegal entrant noncitizens. Congress never expressed an interest or intention of subjecting noncitizens paroled into the country to a summary removal regime. Because the final language enacted in IIRIRA—which remains operative today—excludes such parolees from expedited removal, amici urge the Court to grant Plaintiffs' motion for summary judgment.

2

**LEGAL BACKGROUND**

In 1996, Congress enacted IIRIRA, which comprehensively amended the Immigration and Nationality Act (INA) to address issues relating to border management, interior enforcement, and overall categories and qualifications for noncitizens who would seek to travel to or remain in the United States. As omnibus reform legislation, Congress addressed multiple policies and priorities and developed a complex and comprehensive scheme to address different categories of noncitizens in different circumstances differently. Relevant here, IIRIRA abandoned the prior focus on whether a noncitizen had "entered" the United States and instead adopted the current concept of "admission" into the United States. Second, it adopted an expedited removal process for two specific categories of noncitizens. Third, it redefined and retained prior authorization for the executive to "parole" noncitizens into the United States even if they were not "admitted."

A.      **Focus on Inspection and Admission**

One central change adopted by IIRIRA was to shift the INA's focus from distinguishing categories of noncitizens purely based on whether they had effectuated an "entry" into the United States to whether the government had inspected and "admitted" the migrant into the United States. *See Vartelas v. Holder*, 566 U.S. 257, 261 (2012); *Coalition for Humane Immigrant Rights (CHIRLA) v. Noem*, 805 F. Supp. 3d 48, 59 (D.D.C. 2025). As a result, noncitizens who have been "admitted" to the United States are subject to "deportability" grounds in 8 U.S.C. § 1227. In contrast, noncitizens who have not been admitted are subject to "inadmissibility grounds under 8 U.S.C. § 1182. Of that inadmissible group, a specified subset of inadmissible, removable noncitizens—namely those who either (a) are arriving in the United States at a port of entry and

3

are inadmissible on two enumerated grounds (i.e., lacking valid travel documents[2]), or (b) have entered the United States without inspection and admission or parole and are inadmissible on the enumerated two grounds—are vulnerable to a summary removal process: expedited removal. *See CHIRLA*, 805 F. Supp. 3d at 59 (calling expedited removal an "even more streamlined form of proceeding").

**B.      Expedited Removal**

The summary removal procedures adopted in IIRIRA were decades in the making. During the 1980s and 1990s, Congress considered dozens of proposals creating summary procedures—all of which truncated or eliminated immigration court hearings or judicial review of removal orders—to allow for the quick exclusion of certain noncitizens encountered at or near the border who lacked valid entry documents. These policies were rooted in Congress's desire to contend with both security concerns relating to individuals traveling through ports of entry without valid travel documents and an influx of unauthorized individuals crossing into the United States without inspection outside of ports of entry. Although IIRIRA's expedited procedures are not identical to some of the earliest proposals, they share a common focus on addressing recent arrivals who lack valid documentation and providing a summary removal process distinct from full immigration court proceedings that afford meaningful process and judicial review.[3]

---

[2] 8 U.S.C § 1225(b)(1)(A)(i) creates an expedited process to those found inadmissible due to immigration fraud, 8 U.S.C. § 1182(a)(6)(C) or those without proper immigration documents, 8 U.S.C. § 1182(a)(7).

[3] In ordinary, as opposed to expedited, removal cases, migrants who seek relief from removal may testify and present documentary evidence to a neutral immigration judge, may offer re-direct examination after any cross examination, and may cross examine any witness who testifies against them. The immigration judge must provide the respondent with a reasoned explanation for denying requested relief. The respondent may appeal to the Board of Immigration Appeals and, if necessary, to a U.S. Court of Appeals. 8 U.S.C. §§ 1229a, 1252.

IIRIRA's expedited removal regime applies only to two, carefully identified categories of noncitizens who lack valid travel or entry documents. First expedited removal applies to a noncitizen who "is arriving in the United States" at a port of entry. Second, the Attorney General (now the Secretary of Homeland Security) is authorized to apply the expedited removal provision to *some* other noncitizens, namely a noncitizen "who has not been admitted or paroled" and who has not shown that they have been physically present in the United States for two years or longer.[4] 8 U.S.C. § 1225(b)(1)(A)(iii)(II); *Make the Road New York*, 2025 WL 3563313, at *3. The expedited removal process begins with an initial inspection by an immigration officer who can issue a summary order of removal if the officer concludes that the noncitizen sought to procure a

---

[4] The statute authorizes the designation of expedited removal to apply to noncitizens inadmissible under 8 U.S.C. § 1182(a)(6)(C) and (a)(7) who have "not been admitted or paroled" and who cannot demonstrate continuous presence for at least two years. 8 U.S.C. § 1225(b)(1)(A)(iii); *see also* 8 C.F.R. § 235.3(b)(1). For many years after IIRIRA, the government "declined to invoke" the "full extent" of expedited removal, first issuing no designation at all. *See Make the Road New York*, 2025 WL 3563313, at *5 (noting that it was "deliberate" to not apply expedited removal "away from the border area" due to "serious concerns about accuracy and administrability"); *see also* 62 Fed. Reg. 10312, 10313 (March 6, 1997) (declining to issue a designation because "application of the expedited removal provisions to aliens already in the United States will involve more complex determinations of fact and will be more difficult to manage, and therefore wishes to gain insight and experience by initially applying these new provisions on a more limited and controlled basis."). The government later designated certain noncitizens who arrived by sea (but not at a port of entry), 67 Fed. Reg. 68924, 68925 (Nov. 13, 2002), and then certain noncitizens who are encountered within a short time period and limited distance of crossing into the country at a land border (not a port of entry), 69 Fed. Reg. 48877, 48880 (Aug. 11, 2004) (designating noncitizens inadmissible under 8 U.S.C. §§ 1182(a)(6)(C) or (a)(7) who are present without having been admitted or paroled and are encountered within 100 miles of the U.S. land border and had not been physically present in the U.S. continuously for the 14 days prior to encounter). It was not until 2019 that the government expanded expedited removal to its full statutory scope. 84 Fed. Reg. 35409, 35414 (July 23, 2019) (designating noncitizens inadmissible under §§ 1182(a)(6)(C) and (7) who have not been physically present in the United States continuously for the two-year period immediately preceding the inadmissibility determination). That designation was rescinded during the Biden administration, 87 Fed. Reg. 16002 (Mar. 21, 2002) (rescinding the 2019 designation and leaving the 2002 and 2004 designations in place), and again put in place by President Trump's second administration, 90 Fed. Reg. 8139 (Jan. 24, 2025) (returning to the 2019 designation), *stayed by Make the Road New York*, 2025 WL 3563313.

visa or admission through fraud or willful misrepresentation of a material fact, or is a not in possession of a valid visa or travel document at the time of applying for admission. 8 U.S.C. § 1225(b)(1)(A)(i) (citing 8 U.S.C. §§ 1182(a)(6)(C) and (a)(7)).

Noncitizens placed in expedited removal can be removed without ever seeing an immigration judge, and without the opportunity for an administrative appeal or judicial review of their removal order. 8 U.S.C. § 1225(b)(1); *Make the Road New York*, 2025 WL 3563313, at *5 ("A central feature of the Expedited Removal process is the near-total absence of judicial review."). This marked a "colossal change" in processing procedures. Owen "Bo" Cooper, *Procedures for Expedited Removal and Asylum Screening Under the Illegal Immigration Reform and Immigrant Responsibility Act of 1996*, 29 Conn. L. Rev. 1501, 1502 (1997). Prior to IIRIRA's effective date, any person who arrived at a United States airport without valid entry documents would be placed in proceedings before an immigration court where they would have the opportunity to be represented by counsel, testify, present witnesses, and the right to a decision from a neutral adjudicator. *Id*. Since IIRIRA, noncitizens subject to expedited removal are denied a full hearing before an immigration judge and do not qualify for any further procedure unless they first successfully demonstrate a credible fear of persecution or torture. 8 U.S.C. § 1225(b)(1)(B)(ii); 8 C.F.R. § 235.3(b)(4). Otherwise, DHS can remove them within "hours or days." *CHIRLA*, 805 F. Supp. 3d at 60.

### C.    Parole

Congress excluded parolees from the expedited removal provision. *Make the Road New York*, 2025 WL 3563313, at *23. Beginning long before IIRIRA, immigration officers had the authority to allow some noncitizens who were not entitled to lawful admission to nonetheless come into the United States upon inspection at a port of entry. With the creation of the INA in 1952,

Congress codified modern "parole" as a discretionary authority to allow noncitizens into the United States after inspection but without formal admission. Immigration and Nationality Act, Pub. L. 82-414, 66 Stat. 163 (1952). But the use of parole by executive officers long pre-dated the 1952 law.[5] *See* 1917 Immigration Act, Pub. L. No. 64-301, 39 Stat. 874 (1917). IIRIRA reiterated this discretionary authority to parole noncitizens, on a case-by-case basis, into the United States without admitting them, "for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A).

In enacting IIRIRA, Congress showed an intent to protect parolees from some of the harsher enforcement provisions that it applied to migrants who were in the country without authorization. For example, Congress specifically excluded parolees from inadmissibility grounds based on a period of unlawful presence in the United States and did not incorporate proposals from prior bills to restrict parole. In doing so, Congress distinguished parolees from the unauthorized migrants who were the target of this new immigration restriction.

Congress also declined to narrow access to parole in ways that had been proposed in the years leading up to IIRIRA, instead only modifying the definition of parole in IIRIRA to apply to noncitizens with "urgent humanitarian needs or significant public benefit" as compared to a prior standard of "emergent reasons or for reasons deemed strictly in the public interest." *See* 8 U.S.C. § 1182(d)(5) (1952). *Cf.* Immigration Reduction Act of 1994, § 105, H.R. 4934, 103d Cong (1993-94) and Emergency Immigration Parole Correction Act of 1995, H.R. 1597, 104th Cong. (1995-96). The legislation continued long-standing Congressional interest in permitting parole and treating parolees as persons who were in the United States legally. Since 1952, Congress has

---

[5] *See Matter of R-*, 3 I. & N. Dec. 45, 46 (BIA 1947) ("Parole is an administrative device of long standing. It has been employed for more than 25 years in many types of cases.").

passed more than twenty laws allowing specific parolees to apply for lawful permanent residence, demonstrating longstanding recognition of parolees as distinct from unauthorized entrants.[6]

## ARGUMENT

The legislative history demonstrates that parolees are not within the limited statutory categories of noncitizens subject to expedited removal. Congress created expedited removal as a means to prevent certain unauthorized entries, focusing on certain noncitizens arriving in the country at a port of entry and others physically present in the country without inspection. The expedited removal process was intended to involve rapid adjudications without access to immigration court removal proceedings (or judicial review) for this limited population of noncitizens. It was not intended to apply to parolees either during their parole or after any parole is terminated.

I.    **The legislative history leading up to IIRIRA demonstrates that Congress had no intention of subjecting parolees to expedited removal.**

In the fifteen years prior to the passage of IIRIRA, Congress considered dozens of summary removal proposals that focused on expeditious processing at ports of entry or limiting unauthorized entry. The clear import of the legislative history is that Congress consistently intended to focus its expedited removal authority on noncitizens in the process of "arriving" at ports of entry—and sometimes also on those who "illegally" entered without inspection (i.e., those who were present without having been admitted or paroled into the country)—with both categories being further limited to noncitizens with invalid or no entry documents at the time of applying for admission. Parolees are conceptually distinct from these groups because they are present in the country and

---

[6] *See, e.g.,* https://www.uscis.gov/green-card/green-card-eligibility/green-card-through-the-indochinese-parole-adjustment-act    and    https://www.uscis.gov/green-card/green-card-eligibility/green-card-for-a-cuban-native-or-citizen.

have therefore completed their arrival and they have been inspected and allowed in with authorization. They were thus not part of the targeted population of noncitizens Congress sought to quickly expel. As a result, Congress developed the expedited removal provisions without giving any consideration to including them. In fact, Congress's first mention of parole in connection with expedited removal was not until IIRIRA emerged from the Conference Committee in the bill's final form where the two categories were defined with greater precision and parolees were specifically excluded from coverage by the expedited removal provision targeted at people who had entered illegally. The complete history, therefore, reflects that Congress was not interested in applying summary procedures to anyone outside of its narrow focus, which did not include parolees.

Congress's motivations for adopting summary exclusion procedures have been well documented. In the 1980s, legislators proposed a series of summary exclusion proposals prompted by the large number of Cuban and Haitian migrants who came to South Florida in the 1980s. *See, e.g.*, Immigration Reform and Control Act of 1982, S. 2222, 97th Cong. (1982); Immigration Reform and Control Act of 1983, S.529, 98th Cong. (1983-84); *see also* Daniel Kanstroom, Expedited Removal and Due Process: "A Testing Crucible of Basic Principle" in the Time of Trump, Washington & Lee Law Review (Summer 2018), 75 WLLR 1323, 1329 (noting "[l]arge numbers of migrants from Cuba and Haiti fleeing to Florida in the 1980s provoked some legislators to propose a program of 'summary exclusion.'"). "While this dramatic influx of asylum seekers, commonly known as the Mariel boatlift, lasted only a few months, it cast a long shadow over U.S. immigration policy." Alison Siskin & Ruth Ellen Wasem, Cong. Research Serv., RL33109, *Immigration Policy on Expedited Removal of Aliens* 3 (2005)). At the time, all aliens arriving at a port of entry without proper immigration documents were eligible for a hearing before an

immigration judge, as well as administrative and judicial review, before they could be removed. Legislators were therefore preoccupied with building enforcement tools to deal with the next mass migration event. *See id*.

In the early 1990s, the summary exclusion proposals remained decidedly focused on quickly processing and expelling arriving noncitizens lacking valid entry documents. Cooper, 29 Conn. L. Rev. at 1508-09 (discussing proposals by Presidents Bush and Clinton to combat rising numbers of undocumented people arriving to the United States by air and sea). The proposals were now grounded in public concern about the ease of fraudulent entry through airports, particularly after the first bombing of the World Trade Center and CIA shootings in Langley, Virginia, both of which were perceived as linked to insufficient border security and the lack of summary exclusion measures. *See* Larry M. Eig, *Immigration: Illegal Entry and Asylum Issues*, Congressional Research Service, at 1 (Jan. 24, 1994). Many of these bills applied expedited proceedings only to people coming into the country who lacked proper documents and who did not indicate an intention to apply for asylum or express a fear of persecution. *See, e.g.*, Immigration Enforcement and Asylum Reform Act of 1993, H.R. 3363, 103rd Cong., Sec. 101 (1993); Expedited Exclusion and Alien Smuggling Enhanced Penalties Act of 1993, H.R. 2836, 103rd Cong., Sec. 2 (1993); Expedited Exclusion and Alien Smuggling Enhanced Penalties Act of 1993, S. 1333, 103rd Cong., Sec. 2 (1993); Port of Entry Inspections Improvement Act of 1993, S. 667, 103rd Cong., Sec. 2 (1993); Asylum at Ports of Entry Systems Improvements Acts, H.R. 3162, 103rd Cong., Sec. 2 (1993).

Congress's focus at the time is reflected in floor speeches and legislative statements. Speaking on the House Floor in support of expedited exclusion legislation for noncitizens lacking required entry documents who were "seeking entry to the United States," Rep. Romano Mazzoli

(D-KY) described the measure as focused on "keeping the people without documents out of the country in the first place." Support Urged for Committee Approach to Illegal Aliens, Congressional Record, 103 Cong. Rec. H3632 (daily ed. March 2, 1994) (statement of Rep. Mazzoli). This focus was echoed in the Senate provision that passed as part of the 1994 Crime Bill. Violent Crime Control and Law Enforcement Act of 1994, Pub. L. 103-322, 108 Stat. 1796 (1994). The legislation included a statement expressing the "sense of the Senate" that the laws should be amended to provide a process for noncitizens "who arrive[] at a port of entry" with "fraudulent documents, or no documents" and who make a "noncredible claim of asylum" to be expeditiously excluded. *Id*. at § 130010(b)(3).

In 1995, more than a decade into its efforts to pass an expedited exclusion provision, Congress began work on legislation that eventually became IIRIRA. *See* Cooper, 29 Conn. L. Rev. at 1509. After the Senate began work on its immigration proposal, S. 269,[7] which included an expedited removal provision, the bombing of the Alfred P. Murrah Federal Building in Oklahoma City in April 1995 caused many in Congress to turn their attention to the anti-terrorism legislation that would become the Antiterrorism and Effective Death Penalty Act (AEDPA). IIRIRA and AEDPA continued on parallel tracks. AEDPA moved faster and included the very first summary exclusion provision adopted by Congress (though as explained below, it never went into effect).

Although passage of a summary exclusion provision was becoming a near certainty, it was not a given that it would be included in AEDPA. The Senate's version of the legislation, S.735,[8] did not contain a summary exclusion provision. The House Judiciary Committee originated the

---

[7] Immigrant Control and Financial Responsibility Act of 1995, S. 269, 104th Cong. (1995-96).
[8] Antiterrorism and Effective Death Penalty Act of 1996, S.735, 104th Cong. (1995-96).

11

summary exclusion proposal in its version of AEDPA, H.R. 1710.[9] Judiciary Committee Chairman Henry Hyde took advantage of AEDPA's momentum to propose and advance a summary exclusion process far broader than what had been considered previously and was being simultaneously debated as part of IIRIRA. While the Senate AEDPA bill moved quickly, passing the Senate within a few weeks, the House bill moved later and then stalled, appearing unlikely to pass due to opposition from the National Rifle Association. *See* Philip G. Schrag, A WELL-FOUNDED FEAR: THE CONGRESSIONAL BATTLE TO SAVE POLITICAL ASYLUM IN AMERICA, at 150-51 (Routledge 2000). After some of the more controversial non-immigration provisions were dropped or modified in the weeks approaching the one-year anniversary of the bombing, the bill gained momentum and passed the House on March 14, 1996. *Id*.

During the period when the House's antiterrorism bill was stalled, both the House and Senate made significant progress on their respective immigration reform bills. By the time the House AEDPA bill regained momentum, both the House and Senate had introduced, held hearings on, and marked up their respective immigration measures, S. 269 (later reported as S.1664) and H.R. 2202.[10] The House bill, H.R. 2202, included an expedited removal provision that applied to noncitizens "arriving in the United States (whether or not at a port of entry)," language that was understood as referring both to those in the actual process of physically entering the country, whether or not at a port of entry. The Senate bill proposed an expedited removal process that could be applied to noncitizens who entered without inspection and were present for less than two

---

[9] Comprehensive Antiterrorism Act of 1995, H.R. 1710, 104th Cong. (1995-96).
[10] Immigration Control and Financial Responsibility Act of 1996, 104th Cong., (1995-96).

years;[11] noncitizens who present false or no documents at a port of entry; noncitizens interdicted at sea; and by Attorney General designation of "extraordinary migration circumstances." Immigration Control and Financial Responsibility Act of 1996, S. Rept. 104-249, 104th Cong. (1995-96) at 14.

As a result of the delay with the House antiterrorism measure and the intense pressure to have AEDPA enacted ahead of the one-year anniversary of the bombing, passage of the House version in mid-March 1996 left only a few weeks for the bill to be conferenced and passed by both chambers. At the time the bill emerged from conference, the House had just passed its immigration enforcement bill and the Senate was actively considering its version on the Senate Floor. Frustrated in part with the breadth of the AEDPA summary exclusion provision and its unfortunate timing, Senator Patrick Leahy moved on the Senate Floor to send the AEDPA bill back to the conference with instructions to strip three immigration-related provisions from the bill, including the summary exclusion provisions. *See* 104 Cong. Rec. S3427 (daily ed. Apr. 17, 1996) (statement of Sen. Leahy). He expressed frustration that these provisions were forced into non-immigration legislation while Congress appeared poised to pass major immigration reform legislation. *Id*. AEDPA's momentum was too strong, however, and the motion failed. AEDPA was passed by the House and Senate days before the anniversary of the Oklahoma City bombing with the House's summary exclusion language intact. It was signed by the President a few days later and had an effective date of November 1, 1996.

---

[11] Although the Senate Committee Report accompanying the legislation described the text as authorizing the summary removal process for people "who entered without inspection," the bill text—similar to the language eventually enacted in AEDPA—referred to noncitizens who have "entered the United States without having been inspected *and admitted* by an immigration officer." (emphasis added). So, like the similar provision in AEDPA, the actual reach of this provision intended for people who entered illegally and without inspection could have extended to noncitizens inspected and paroled into the country.

AEDPA's summary exclusion provisions, had they gone into effect, would have applied to any noncitizen "seeking entry" who was excludable under 8 U.S.C. §§ 1182(a)(6)(C) or (a)(7), for fraudulent or insufficient documents, and who did not indicate an intent to apply for asylum and establish a credible fear of persecution. *See* Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. 104–132, 110 Stat. 1214, at § 422(a) (1996). A second provision provided that any noncitizen "found in the United States who has not been admitted to the United States after inspection in accordance with section 235" would be deemed to be "seeking entry and admission" and "subject to examination and exclusion." AEDPA, Pub. L. 104–132, 110 Stat. 1214, at § 414(a).

The legislative history makes clear that the "seeking entry" provision was designed for "people *arriving* at a port of entry," to ensure that "an arriving alien can be *denied entry into the United States* by an immigration officer because of misrepresentation, use of fraudulent documents, or lack of any documents." Comprehensive Antiterrorism Act of 1995, H.R.104-383, 104th Cong. (1995-96) at 58 (emphases added). The intent behind the provision is further supported by the dissenting views of Members of the House Judiciary Committee, which described the provision as "grant[ing] low level immigration officers *at airports and other ports of entry* non-reviewable authority to exclude and deport aliens *seeking entry without proper documents*." H. Rept. 104-383 at 181-82 (emphases added). The Conference Report likewise reflects that the Senate receded to the House text in creating a summary exclusion process for "aliens arriving at a port of entry." H. Rept. 104-518 at 117.

AEDPA's "found in" provision was understood to target only persons who had entered the United States illegally. The House Committee Report is unambiguous that its intent was to apply to "any alien who has entered the United States *unlawfully*," someone who "successfully *evaded requirements* for lawful entry," and those whose "initial entry was *wholly illegal*." H. Rept. 104-

14

383 at 100-01, 40 (emphases added). The Committee Report also makes clear that the Congress intended for noncitizens covered by the "found in" provision to be subject to expedited exclusion: A noncitizens who "entered unlawfully" should get "expedited exclusion and removal from the United States," "regardless of the duration of his or her presence in the United States." *Id*. at 40. The Conference Report, again explaining the Senate's decision to recede to the House text, repeats the Committee Report's language that the "found in" provision focuses on "any alien who has entered the United States unlawfully." Terrorism Prevention Act, H.R. 104-518 at 117, 104th Cong. (1995-96).

Taken together, AEDPA's legislative history demonstrates a mismatch between the broad statutory text and the somewhat more limited categories of noncitizens Congress intended to target. Although the legislative history demonstrates that Congress viewed the "seeking entry" provision as exclusively applying to individuals arriving at the port of entry, the text itself could be read to apply to any noncitizen who had not effected an "entry" to the United States. This potentially included parolees, who were not considered to have effected an "entry." Similarly, Congress intended to target people who had entered illegally and without inspection through the "found in" provision, but used language that it is not so limited on its face. As parole does not constitute an admission, 8 U.S.C. § 1182(d)(5)(A), a noncitizen inspected and paroled into the country would nonetheless be someone present in the country who has not been admitted following inspection. These provisions, and the legislative history, do not include any reference to parolees, despite their potential to subject parolees to the new summary proceedings.[12]

---

[12] It is, of course, impossible to say with certainty how the summary exclusion provisions enacted in AEDPA would have been applied and interpreted because the provisions were rescinded and replaced before they ever took effect. But the potential jeopardy to noncitizens paroled into the country is evident from the text of the statute itself despite the contrary legislative history.

Although Senator Leahy's effort to eliminate these provisions from AEDPA initially failed, five months later, Congress repealed them prior to their effective date and replaced them with the more tailored approach taken in IIRIRA. In the months following the passage of AEDPA, Congress completed its work on IIRIRA. Both the House- and Senate-passed bills included expedited removal provisions. The House bill, H.R. 2202, maintained its expedited removal provision that applied to noncitizens "arriving in the United States (whether or not at a port of entry)." The Senate version was narrowed on the Floor to only provide the Attorney General with expedited removal authority that could be invoked for up to ninety days based on "extraordinary migration circumstances."

The final version that came out of conference and was enacted into law reflects a considered compromise between the House and Senate bills and a careful attempt to match the text of the statute to the clear (and consistent) legislative intent. In place of the "seeking entry" language used in AEDPA, Congress now used the term "arriving" that mirrors language Congress consistently used in the AEDPA committee and conference reports to describe its core concern of individuals actually in the physical process of presenting themselves at ports of entry without valid documents. IIRIRA also significantly narrowed the scope of the AEDPA provision that would have applied the summary exclusion provision to anyone "found in the United States who has not been admitted" to instead apply to a noncitizen physically present in the United States "who has not been admitted *or paroled*.[13] (emphasis added). IIRIRA therefore reflects Congress's narrowing of the AEDPA approach in order to align the expedited removal procedures with Congress's core purpose: creating a process to quickly deny entry to noncitizens arriving at a port of entry with

---

[13] The legislation additionally conditioned the use of this authority on a designation by the Attorney General and prohibited its use on any noncitizen who could establish continuous physical presence of at least two years.

fraudulent or insufficient documents, and facilitating the quick removal of certain unauthorized entrants.

The first time parole is mentioned in connection with summary exclusion or expedited removal in any committee or conference report for AEDPA or IIRIRA is in the Conference Report for the enacted version of IIRIRA. Noncitizens who have been paroled into the country are explicitly *carved out* of the expedited removal authorization. That is entirely consistent with the congressional focus on persons who are denied entry at the point of inspection or who illegally entered the country by circumventing inspection altogether. Those whom the government admits or paroles are processed at ports of entry, inspected, and affirmatively authorized to come into the United States.

The legislative history tells a complete story. Congress consistently viewed summary exclusion or removal procedures as a remedy to a specific set of problems, and with the enactment of IIRIRA crafted an expedited removal statute to target those problems. Congress was doubtless aware that expedited removal was a drastic departure from norms of due process, causing many migrants to lose the opportunity for full adversary hearings in immigration court and judicial review. *See Lindahl v. Office of Personnel Management*, 470 U.S. 768, 778 (1985) (courts will generally presume Congress did not intend to eliminate existing avenues of judicial review absent "'clear and convincing evidence' of a contrary legislative intent.") (quoting *Abbott Laboratories v. Gardner,* 387 U.S. 136, 141 (1967)). An intention to abrogate due process hearings and judicial review for people who have been paroled should not be presumed, absent a clear statement from Congress that it intended such a result.

17

**II.    Congress did not intend to subject parolees whose parole expired, was terminated, or was revoked to expedited removal.**

As discussed, there is no indication in either the text or the legislative history that the statute was intended to apply to individuals paroled into the United States, regardless of whether their parole status remains active or has expired or otherwise been terminated. This is because "parolees and those who are present without authorization are simply in different positions." *Make the Road New York*, 2025 WL 3563313, at *23. Namely, parolees have undergone inspection and a determination that they were entitled to physical presence in the United States and not summary removal. *Id.* at *24. Termination of parole does not change those facts.

Notably, IIRIRA's focus on admission rather than entry further supports the conclusion that parolees, regardless of whether the parole has expired or been terminated, are not within the narrow category of inadmissible noncitizens who are subject to expedited removal. In the pre-1996 scheme, there were two different types of proceedings: exclusion and deportation. The critical distinction that determined which proceeding applied was whether a noncitizen had effectuated an "entry" into the United States. Entry in turn was determined under a specific framework. A non-citizen was deemed to have entered the United States if that person (1) crossed into the territorial United States; (2) was inspected and admitted *or* actually and intentionally evaded detection; and (3) was free from official restraint. *Matter of Pierre*, 14 I. & N. Dec. 467 (BIA 1973). A noncitizen who was under continuous surveillance from the moment of crossing into U.S. territory, for instance, was not considered to be free from official restraint and would not be said to have entered the United States. *See De Leon v. Holder*, 761 F.3d 336, 338-39 (4th Cir. 2014). Under the law prior to 1996, such a person would be subject to exclusion proceedings, not deportation proceedings. *Cheng v. Immigration and Naturalization Service*, 534 F.2d 1018 (2d Cir. 1976).

18

Thus, paroled individuals who were inside the country were subject to exclusion hearings (rather than deportation) because they had never made an "entry" into the U.S.  They did not have valid admission documentation and they had not successfully evaded inspection at the border. *See Landon v. Plasencia*, 459 U.S. 21, 25 (1982); *Yang v. Maugans*, 68 F.3d 1540, 1547 (3d Cir. 1995). Paroled individuals whose parole was terminated or expired were not considered to have effectuated an "entry" notwithstanding their physical presence in the United States. *Mariscal-Sandoval v. Ashcroft*, 370 F.3d 851, 855-56 (9th Cir. 2004); *see* Hillel R. Smith, *Expedited Removal of Aliens: Legal Framework*, Congressional Research Service (Oct. 8, 2019). This remained true even if the parole expired or was terminated; a noncitizen remained subject to exclusion, and not deportation, proceedings. *Mariscal-Sandoval*, 370 F.3d at 855; *Siu Fung Luk v. Rosenberg*, 409 F.2d 555, 558-59 (9th Cir. 1969).

IIRIRA's shift to focusing on "admission" minimized the significance of the entry determination because parolees are never admitted and hence are necessarily subject to inadmissibility grounds.  But the shift away from considering "entry" as a legal significance did not alter the fact that a parolee has been inspected and authorized to come into the United States. The termination, expiration, or revocation of parole does not erase the prior authorization to come into the United States, it only renders the noncitizen amenable to removal proceedings as inadmissible because the authorization to be in the United States was no longer valid.  However, becoming amenable to removal proceedings is not the same as being amenable to *expedited* removal, which Congress intended to apply only to individuals who are first being processed upon encounter. Indeed, Congress excluded noncitizens who have "been admitted or paroled" from the designation provision. 8 U.S.C. § 1225(b)(1)(A)(iii)(II), which demonstrates a clear Congressional

19

intent to carve out anyone who came into the country through inspection and parole from the expedited removal provision, not just those who still have parole.

This is because, as discussed above, one central focus of Congress regarding expedited removal was to "keep[] the people without documents out of the country in the first place." 103 Cong. Rec. H3632 (Mar. 2, 1994) (Statement by Rep. Mazzoli); *accord* Immigration in the National Interest Act of 1995, H.R. 104-469(I), 157-58 (stating that the proposed summary exclusion was "necessary because thousands of aliens arrive in the U.S. at airports each year without valid documents and attempt to illegally enter the U.S." and "there is no requirement under the Constitution or international treaty to do anything other than return them, as promptly as possible[.]").

In the case of a parolee, the government has made the decision to allow the person into the country. Having made that decision and vetting the individual before granting parole, the expiration of termination of parole has no effect on whether the noncitizen was allowed into the United States "in the first place." *See CHIRLA*, 805 F. Supp. 3d at 84, 93 (determining that Congress did not intend to incorporate the entry fiction into IIRIRA because expedited removal was not intended to address "a regime wherein noncitizens arriving at airports are paroled into the country and returned to their airport of origin months or years later."). Accordingly, the parolees encompassed by this lawsuit—including noncitizens who sought inclusion in a parole program in advance of traveling to the United States, those who scheduled an inspection at a port of entry through the CBPOne app, and those evacuated to the United States as part of a governmental initiative such as Operation Allies Refuge—were never part of the intended category of noncitizens amenable to expedited removal. As such, placing them in expedited removal after termination of their parole would be contrary to the text, history, and purpose of the expedited removal statute.

**CONCLUSION**

Because the plain text and purpose of the expedited removal statute narrowly addressed noncitizens whom Congress intended to summarily prevent from physically coming into the United States or to summarily remove following an unauthorized entry, and because parolees fall outside the scope of that intended population, amici urge this Court to grant Plaintiffs motion for summary judgment.

Respectfully submitted,

JESSICA A. DAWGERT
Ariela Lake Law & Consulting PLLC
3355 Hudson St., #7098
Denver, CO 80207
(303) 531-6634
jess@allc.law

KERRY E. DOYLE
Green and Spiegel LLC
1524 Delancey St., 4th Floor
Philadelphia, PA 19102
(617) 216-1248
kdoyle@gands-us.com

*/s/ Sarah S. Wilson*
SARAH S. WILSON
Colombo Hurd PL
301 E. Pine St., #450
Orlando, FL 32801
(407) 478-1111
swilson@colombohurd.com

March 4, 2026                                    Counsel for *Amici Curiae*

21