**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

COALITION FOR HUMANE IMMIGRANT
RIGHTS, *et al.*,

     *Plaintiffs*,

       v.

KRISTI NOEM, in her official capacity as
Secretary of Homeland Security, *et al.*,

     *Defendants*.

Case No. 25-cv-872 (JMC)

**BRIEF OF *AMICUS CURIAE* AMERICAN IMMIGRATION LAWYERS ASSOCIATION
IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

Hassan Ahmad (D.C. Bar No. 1030682)
   *Counsel of Record*
Andrew S. White
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
(202) 662-6000
hahmad@cov.com

Addison B. Thompson, Jr.
Alessandra C. Elliott
Aja I. Johnson
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, CA 94105
(415) 591-6000

*Counsel for* Amicus Curiae

## CORPORATE DISCLOSURE STATEMENT

*Amicus curiae* the American Immigration Lawyers Association ("AILA") is a 501(c)(3) nonprofit organization and not a publicly traded corporation. It does not have a parent corporation, and no publicly held corporation holds 10% or more of its stock.

**TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT ................................................................ i

TABLE OF AUTHORITIES ................................................................................ iii

INTEREST OF *AMICUS CURIAE* ....................................................................... 1

INTRODUCTION ............................................................................................ 2

ARGUMENT .................................................................................................. 3

I.      Parole Is an Implied Assurance of Safety and Stability that Individuals Have Relied Upon. ...................................................................................... 3

II.     Parolees Contribute to Their New Communities. ........................................ 6

III.    Expedited Removal Imposes Severe Consequences on Parolees' Lives. .......... 10

CONCLUSION ............................................................................................... 13

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Gonzalez v. Noem*,
  No. 25-cv-13323, 2025 WL 3204602 (N.D. Ill. Nov. 17, 2025) ...............................................12

*Matter of Q. Li*,
  29 I. & N. Dec. 66 (B.I.A. 2025) ...........................................................................................6

*Matter of Yajure Hurtado*,
  29 I. & N. Dec. 216 (B.I.A. 2025) .........................................................................................5

**Statutes & Regulations**

8 U.S.C. § 1182 ...........................................................................................................................4, 11

8 U.S.C. § 1225 ............................................................................................................................4, 6

8 U.S.C. § 1226 ................................................................................................................................5

8 C.F.R. § 274a.12 ...........................................................................................................................4

**Other Authorities**

Amnesty International, *Torture and Enforced Disappearances in the Sunshine
  State* (Dec. 2025), https://perma.cc/85WT-SVY7 .....................................................................13

## INTEREST OF *AMICUS CURIAE*[1]

The American Immigration Lawyers Association ("AILA") is a national, nonpartisan, nonprofit voluntary bar association of more than 18,000 attorneys and law professors in the United States who practice and teach in the field of immigration and nationality law.  AILA provides continuing legal education, professional services, information, and expertise through its 39 chapters in the United States.  AILA's mission is to promote justice, advocate for fair and reasonable immigration law and policy, advance the quality of the practice of immigration and nationality law, and enhance the professional development of its members.  AILA members regularly represent detained immigrants in immigration court and in habeas cases before federal courts.  As a result, AILA has significant interest in, and expertise regarding, the legal and factual issues in this case.

---

[1] No party's counsel authored this brief in whole or in part.  Moreover, no party or party's counsel made a monetary contribution intended to fund the preparation or submission of this brief, and no person other than *amicus curiae,* its members, or its counsel made such a monetary contribution. Plaintiffs have consented to the filing of this amicus brief.  Counsel requested Defendant's position on March 3, 2026, but received no response.

**INTRODUCTION**

Parole is a durable authority that successive presidential administrations have relied on for more than seven decades to respond effectively to international humanitarian crises around the world. Although Congress has refined the parole framework over time, its core purpose has remained unchanged: to allow certain individuals—such as prospective asylum applicants—to lawfully enter the United States and, for the duration of their parole, live, work, and pursue permanent status without facing immediate removal.

The Department of Homeland Security ("DHS") recently departed from that long-standing and relied-upon approach to parole and now is engaged in the unprecedented and unlawful practice of placing parolees into expedited removal proceedings. As a result, individuals who entered the United States with the government's permission and are supporting their families or the communities they joined—while pursuing lawful paths to permanent status—suddenly find themselves in detention and facing the threat of imminent deportation.

The consequences of expedited removal are severe, as evidenced by the examples described below of clients represented by AILA members. Parolees are torn from their communities and often detained far from home, derailing their substantial efforts to rebuild their lives. In one case, a parolee who had sought asylum and was pursuing medical studies was arrested at a Master Calendar Hearing—i.e., a preliminary appearance before the immigration court managing his asylum claim—and sent to Guantanamo Bay, compounding the trauma of his past political persecution in Russia. Other parolees subject to expedited removal face serious barriers to defending themselves against government action and are unable to communicate reliably with counsel. Taken together, the accounts described herein demonstrate the profound harm that results from DHS's abrupt shift to utilizing expedited removal, abandoning the very framework it directed parolees to follow.

AILA submits this brief in support of the Plaintiffs in the above captioned action, who challenge the government's unlawful efforts to apply expedited removal to paroled individuals. The goal is not to reiterate Plaintiffs' legal arguments, but to provide the Court with a clearer picture of the many parolees whose lives have been upended by expedited removal throughout the United States. With the representative accounts included in this submission, AILA hopes to underscore the stakes of this action and illuminate why the legal questions presented cannot be separated from the parolees they affect.[2]

**ARGUMENT**

**I.  Parole Is an Implied Assurance of Safety and Stability that Individuals Have Relied Upon.**

Given DHS's unprecedented use of expedited removal, parolees seeking refuge on humanitarian grounds who have satisfied every legal requirement are now penalized for their compliance. Consider the example of C.W.A., a Venezuelan national. C.W.A. endured years of targeted persecution for her involvement with Voluntad Popular, a Venezuelan opposition party. After participating in protests against Nicolás Maduro's regime in 2017, the Venezuelan National Guard arrested her on fabricated charges and placed her under house arrest, during which she was surveilled by pro-government armed groups known as *colectivos*. C.W.A. unsuccessfully attempted to flee to Ecuador and later to Chile, but upon her return to Venezuela she was detained and threatened by Venezuelan authorities in 2023. Though she eventually was released, C.W.A. faced renewed threats of imprisonment by intelligence services known to use coercive tactics. As a result, she made the decision to seek safety in the United States.

---

[2] Many of the individual cases shared by AILA members and discussed below are non-public, and the referenced individuals fear repercussions if their full names were used in this brief. Accordingly, AILA has used pseudonyms.

C.W.A. traveled to Mexico, where she was able to book an appointment for inspection and processing at the Brownsville, Texas Port of Entry through the Customs and Border Protection ("CBP") One mobile application.  Consistent with the process prescribed by the Immigration and Nationality Act ("INA"), C.W.A. underwent inspection by a CBP officer, who adjudicated and granted her parole into the country for a one-year term.[3]  She then traveled from Texas to Chicago, where she found a supportive community that helped her rebuild her life.  In the ensuing months, C.W.A. applied for and received an Employment Authorization Document[4] and secured work as a cashier, with intentions to pursue a career in healthcare to improve the lives of others.  She also received a Notice to Appear—a government charging document initiating removal proceedings.  C.W.A. subsequently filed an application for asylum and withholding of such removal within the first year of her parole.

When C.W.A. attended her first Master Calendar Hearing in connection with her asylum application, DHS moved without advance notice to dismiss her removal proceedings.  C.W.A., appearing *pro se*, objected.  Still, the judge granted DHS's request without deliberation and informed C.W.A. that she had 30 days to procure legal assistance and file an appeal.  But she did not have an opportunity to do so because when she left the courtroom, U.S. Immigration and

---

[3] *See* INA § 235(a)(3), 8 U.S.C. § 1225(a)(3) (requiring that all applicants for admission be inspected by immigration officers); *id.* § 235(b), 8 U.S.C. § 1225(b) (setting forth further inspection, screening, and referral procedures for arriving aliens); *see also* INA § 212(d)(5)(A), 8 U.S.C. § 1182(d)(5)(A) (granting the Secretary of Homeland Security discretion to grant temporary parole into the United States "on a case-by-case basis for urgent humanitarian reasons or significant public benefit").

[4] Pursuant to 8 C.F.R. § 274a.12(c)(11), parolees are eligible to apply for an employment authorization document and, once issued, may lawfully work in the United States.

– 4 –

Customs Enforcement ("ICE") immediately detained her without bond.[5]  She was then placed in expedited removal proceedings and transferred to a detention facility, where she remains, hundreds of miles from her support system.

Like C.W.A., J.D. relied in good faith on the United States' parole process to pursue a *bona fide* asylum claim, only to find himself suddenly in detention.  Born in Kyrgyzstan, J.D. is a young, gay man who learned to hide his identity to protect himself from intimidation, discrimination, and abuse.  To help support his mother, siblings, and grandparents, J.D. sought various jobs in his hometown, eventually finding work as a handyman for a local government official on the expectation that proximity to a powerful figure would offer him some measure of protection in a community hostile to LGBTQ+ people.  That belief proved unfounded.  One night, the official returned home intoxicated and brutally raped J.D.  Terrified, ashamed, and in need of medical attention, J.D. concocted a cover story to explain his injuries to hospital staff, aware that disclosure of the assault or his sexual orientation could expose him to further harm.  Making matters even more dire, the perpetrator threatened to kill J.D. if he told anyone what happened.

J.D. faced a stark choice: risk further violence or even death by staying, or seek safety in another country.  In a moment of great fear, J.D. made the difficult choice to leave Kyrgyzstan for the United States.  He flew to Mexico, where he was able to book a CBP One appointment for inspection by U.S. authorities at the Hidalgo, Texas Port of Entry.  During his appointment, and consistent with the prescribed statutory process, J.D. was granted parole and lawfully entered the

---

[5] Immigration judges often grant bond under INA § 236(a), 8 U.S.C. § 1226(a) to individuals, like C.W.A., who do not have disqualifying criminal records.  The Board of Immigration Appeals ("BIA") recently determined that immigration courts do not have jurisdiction to hear a bond request from a noncitizen who crosses the border unlawfully and is later detained.  *See Matter of Yajure Hurtado*, 29 I. & N. Dec. 216, 229 (B.I.A. 2025).  It is critical to note, however, that C.W.A. entered the United States lawfully and still was denied bond.

United States.  J.D. also received a Notice to Appear and, in accordance with his parole status, took steps to pursue a formal asylum claim, including timely filing his application for asylum and withholding of removal and attending all subsequent hearings over the next 18 months.  During that time, J.D. applied for and received work authorization, enabling him to support himself while his case proceeded.  Yet, as he walked out of a Master Calendar Hearing last fall, J.D.—who had legally represented himself and wore a suit to demonstrate his respect for the process—was suddenly and unexpectedly taken into ICE custody.  He remains in ICE detention under INA § 235(b).[6]

C.W.A. and J.D. are two of the many parolees who were pursuing lawful channels to obtain permanent status, only to have that opportunity vitiated without justification.  DHS's misuse of expedited removal has likewise harmed countless other individuals who did everything the United States government asked of them—they entered the United States at a recognized port of entry pursuant to a formal parole process, filed asylum claims in good faith, and appeared in immigration court in an effort to secure permanent status through a process long followed in this country.

## II. Parolees Contribute to Their New Communities.

Individuals paroled into the United States during the pendency of their claims for permanent relief are not transient.  Pursuant to their parole status, they can seek employment after obtaining work authorization, enroll in school, build families, worship, volunteer, and assume responsibilities that bind them to their communities.

D.R., for instance, is a Russian national whose training as a urologist enabled him to contribute to the healthcare system in the United States.  A long-standing and outspoken critic of

---

[6] *See Matter of Q. Li*, 29 I. & N. Dec. 66, 67, 71 (B.I.A. 2025) (holding that applicants for admission apprehended without inspection—even if paroled and later re-detained—are "arriving aliens" subject to mandatory detention under INA § 235(b)).

the Russian government, he found himself subject to scrutiny by Russian authorities for his involvement in opposition activities. His actions came with great ramifications: he was detained and assaulted by Russian authorities repeatedly, requiring medical attention. Recognizing that staying in Russia was untenable, he traveled to Mexico, where a religious organization provided D.R. with food, temporary shelter, and assistance with submitting documents to U.S. border authorities, as well as transportation to the Hidalgo, Texas Port of Entry. On the day he presented himself at the port, and following a formal inspection, D.R. was granted parole into the United States for a term of one year on humanitarian grounds by a CBP officer.

Three months after lawfully entering the United States, D.R. affirmatively filed an application for asylum and withholding of removal with U.S. Citizenship and Immigration Services ("USCIS"), because no Notice to Appear had been issued to him at the time. His application was then forwarded to the Executive Office for Immigration Review ("EOIR"). Over the next two years, D.R. began rebuilding his life while his asylum claim was adjudicated. After receiving his employment authorization, D.R. began working as a medical assistant while pursuing the certification necessary to practice urology in the United States—a field in which he had decades of experience in Russia. He also fell in love with and married a U.S. citizen, quickly assuming the responsibility of caring for his autistic stepdaughter.

However, D.R. is no longer tending to his stepdaughter's care or making progress on his medical certification. Instead, he is detained in a crowded cell, in a DHS facility where the lights remain on throughout the night. He has a progressive autoimmune disorder requiring ongoing treatment, and the detention center notified him that it cannot provide the necessary care. As a devout Muslim, he is also routinely denied religious dietary accommodations.

D.R.'s story is indicative of the professional promise and deepening community ties that many parolees exhibit. He followed a lawful process that he, his family, and his employer reasonably depended on—and that process afforded all of these individuals the ability to plan responsibly if permanent relief was ultimately denied. DHS's use of expedited removal, however, shattered those expectations without notice, compromising his certification efforts and resulting in the abrupt and ongoing separation of his dependent child from the caregiver on whom she depends.

Similarly, J.D.'s case illustrates the careful economic and educational planning that a parolee pursues in reasonable reliance on the immigration process. Shortly after entering the United States and receiving his work authorization, J.D. began a job at a warehouse in Ohio. His wages helped pay rent and grocery bills, providing a measure of dignity and stability. While J.D. pursued his asylum application, he enrolled in English language classes, with the goal of eventually pursuing a degree in information technology or computer science at The Ohio State University. Now in ICE detention, J.D. has lost his freedom, wages, and path to educational improvement—everything he had worked to build in good-faith reliance on the parole process he followed to the letter.

This pattern is echoed in the experience of J.C.R.M. A Venezuelan national, J.C.R.M. sought protection in the United States due to his political opposition to the Venezuelan government. After attending a CBP One appointment for inspection and processing at the Paso del Norte Port of Entry in El Paso, Texas, J.C.R.M. received a two-year term of parole and, simultaneously, a Notice to Appear for removal proceedings. Following his grant of parole, J.C.R.M. began to establish a new life: he applied for and received employment authorization, moved to Oregon to live with his sister-in-law, and found community as a member of The Church of Jesus Christ of Latter-day Saints. Relying on his church as a vital source of stability, J.C.R.M.

attended weekly services and pursued English-language courses, with the goal of being able to contribute more to his congregation. During his first year of parole, J.C.R.M. also applied for asylum and withholding of removal. However, two months after submitting his application—still within his parole term—DHS moved to dismiss his removal proceedings, and he was subsequently arrested by ICE and placed into expedited removal. His detention meant the end of his nascent family reunification, and the sudden and unexpected separation from the faith-based community he steadily built while he pursued asylum.

Taken together, these accounts reflect important, shared experiences among parolees who relied in good faith on the parole process. Parolees build strong ties where they live. They organize their lives—work, education, family, and worship—around the expectation that, as lawfully admitted parolees, they would be able to remain in the United States while their claims for permanent status are adjudicated. And this reliance is mutual: employers make plans based on parolees' job attendance, spouses and children depend on their care, and civic and religious institutions thrive on their steady participation. To be clear, some uncertainty often exists as to how long a parolee can remain in the country lawfully, arising from the pendency of a parolee's application for permanent relief. But expedited removal introduces unprecedented and unwarranted instability into their lives, as well as those of their employers, families, and communities.

Expedited removal also has a chilling effect on behaviors that should be encouraged, such as pursuing official channels of entry. The parolees discussed in this brief, like many others, were exceptionally diligent about following every procedure and requirement asked of them. They were inspected and granted parole based on claims that they dutifully prepared and that authorities evaluated on a case-by-case basis. They applied for employment authorization so they could

lawfully earn incomes and support families and communities in the United States. But if painstakingly following the process of seeking parole now subjects individuals to expedited removal, they are situated no differently than an individual who unlawfully entered the United States and did not seek work authorization. This perversely removes the incentive for would-be asylum seekers and others to enter the United States through official and lawful channels, and undermines the generally held belief that rules, if followed, offer some measure of protection and predictability in the immigration system.

### III.    Expedited Removal Imposes Severe Consequences on Parolees' Lives.

Individuals swept into expedited removal encounter a process that moves with extraordinary speed and imposes severe, life-altering consequences. D.R.'s case, for example, illustrates how expedited removal forecloses access to forms of relief that are otherwise available when a parolee remains in ordinary removal proceedings. After D.R. was placed in expedited removal proceedings, his wife, a U.S. citizen, filed both an I-130 petition and a concurrent I-485 application for adjustment of status—relief for which he is eligible as a parolee with no disqualifying factors. Yet none of that mattered in expedited removal, as no judge was permitted to review whether he qualified for permanent status. Only after DHS was alerted to this Court's stay order did it affirmatively terminate D.R.'s expedited removal proceedings and issue a new Notice to Appear, placing him in regular removal proceedings. Once returned to regular removal proceedings, D.R.'s attorney sought to advance the pending adjustment application. None of this legal relief was possible while D.R. remained trapped in expedited removal proceedings, even

though he had followed every requirement of the parole process and was pursuing a lawful pathway to permanent status.[7]

These legal consequences are profound. Many parolees described in this brief had already been issued a Notice to Appear, placing them squarely within removal proceedings where they would have been entitled to a full evidentiary hearing before an immigration judge, the opportunity to present their asylum claim on the merits, and access to forms of relief unavailable in expedited removal. Other parolees may qualify for forms of protection such as non-lawful permanent resident cancellation of removal—relief that can be granted only in immigration court.

More fundamentally, placing paroled individuals with pending proceedings into expedited removal proceedings effectively strips them of lawfully granted due process protections. It also subjects them to mandatory detention in "far-flung locations away from their families and attorneys" and rushed credible fear interviews within a "truncated" process that makes adequate case preparation and presentation impossible and forecloses judicial review. ECF 41 at 76-77. This creates a substantial "risk of erroneous removal arising from lack of meaningful process," *id*. at 75, virtually guaranteeing wrongful deportations while destabilizing families, sponsors, employers, and communities. In some cases, DHS has even removed parolees before review could occur.

These legal barriers are compounded by the realities of detention, which further impede access to counsel and inhibit the ability to prepare any meaningful claim for protection. J.D.'s attorney must request permission at least 48 hours in advance to speak with him at an ICE facility, a delay that severely hampers legal preparation. Similar obstacles exist in C.W.A.'s case, where

---

[7] Had D.R. been removed, the INA would have rendered him inadmissible for at least five years under 8 U.S.C. § 1182(a)(9)(A)(i), thereby precluding him from applying for a marriage-based visa during that time.

the facility permits only 30-minute Zoom calls with counsel and allows just one reservation at a time. On one occasion, when C.W.A. was notified of a last-minute hearing, her attorney could not secure adequate preparation time. Instead, C.W.A.'s counsel was forced to rely on a friend of C.W.A.'s to schedule consecutive 15-minute sessions on an iPad intended for personal calls. These conversations occurred in a public area, within view and earshot of other detainees and ICE officers. Such restrictions and interference make it exceedingly difficult for attorneys to prepare clients, safeguard statutory rights, and comply with federal immigration law.

Day-to-day conditions in detention facilities further compound these deprivations. C.W.A. has been forced to sleep on the floor in a windowless room with roughly 15 other women, confined indoors without fresh air or sunlight. Soap and shampoo were not provided for more than two weeks, and drinking water was available only from a sink attached to a shared toilet. Transfers occur with little or no notice, and access to religious services and non-English-language materials is sporadic at best.

The conditions in detention facilities contribute to detainees abandoning their cases altogether. Both J.D. and D.R. have observed ICE officers routinely distributing "voluntary" removal agreements drafted to waive detainees' statutory protections and authorize their immediate deportation. The circumstances in which detainees find themselves often make signing these agreements seem like the least-bad prospect.[8] For detainees with limited English proficiency and limited access to legal advice, these tactics are not only coercive, but unlawful.

---

[8] *See, e.g.*, *Gonzalez v. Noem*, No. 25-cv-13323, 2025 WL 3204602 (N.D. Ill. Nov. 17, 2025), at *1 (describing testimony about ICE officers pressuring detainees into signing English-only documents authorizing voluntary deportation while misrepresenting the documents' contents); Amnesty International, *Torture and Enforced Disappearances in the Sunshine State* 41 (Dec. 2025), https://perma.cc/85WT-SVY7 (noting widespread reports that people at "'Alligator Alcatraz' are being coerced into signing 'voluntary' departure removal forms and are being (continued…)

The experiences described above are not mere administrative byproducts. They are profound harms imposed on people who complied with every requirement imposed by federal immigration law. Such treatment cannot be squared with the notion of a just immigration system.

**CONCLUSION**

These accounts reveal a striking reality. Parolees who followed every directive of the United States government have been thrust into a process that moves too quickly to provide fair process and leaves devastation in its wake. The result is disrupted stability, endangered safety, and detention in lieu of the orderly procedures the law promises. Taking these realities into consideration, AILA respectfully asks the Court to grant Plaintiffs' Motion for Partial Summary Judgment, thereby preventing further needless harm and preserving the integrity of the parole framework on which these individuals reasonably relied.

Respectfully submitted,

/s/ Hassan Ahmad
Hassan Ahmad
  *Counsel of Record*
Andrew S. White
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street NW
Washington, DC 20001
(202) 662-6000
hahmad@cov.com

Addison B. Thompson, Jr.
Alessandra C. Elliott
Aja I. Johnson
COVINGTON & BURLING LLP

---

deported [] without due process"); *id.* at 52 (quoting a detained individual explaining that individuals agree "to sign a self-deportation or voluntary departure order[] because they'd rather get out" of detention facilities where they must "sleep[] on the cold concrete floor with little access to food, medicine, or the outside world").

Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, CA 94105
(415) 591-6000

*Counsel for* Amicus Curiae

March 5, 2026

## CERTIFICATE OF SERVICE

I hereby certify that on March 5, 2026, an electronic copy of the foregoing *amicus curiae* brief was filed with the Clerk of Court for the United States District Court for the District of Columbia using the Court's CM-ECF system and was served electronically by the Notice of Docket Activity upon registered CM-ECF participants.

Respectfully submitted,

March 5, 2026

  */s/ Hassan Ahmad*
Hassan Ahmad (D.C. Bar No. 1030682)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
(202) 662-6000
hahmad@cov.com

- 15 -