**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

COALITION FOR HUMANE
IMMIGRANT RIGHTS, *et al.*,

        Plaintiffs,

v.

MARKWAYNE MULLIN, in his official
capacity as Secretary of Homeland Security,
*et al.*,

        Defendants.

Civil Action No. 1:25-cv-00872 (JMC)

Hon. Jia M. Cobb

**DECLARATION OF ARIC A. ANDERSON IN SUPPORT OF DEFENDANTS'**
**OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**
**AND DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**

I, Aric A. Anderson, declare as follows:

1.      My name is Aric A. Anderson. I am over the age of 18. My business address is P.O. Box 878, Ben Franklin Station, Washington, D.C., 20044.

2.      I am a Trial Attorney in the U.S. Department of Justice, Civil Division, Office of Immigration Litigation. I am a member in good standing of the bars of New York and the District of Columbia. I have entered an appearance in this matter.

3.      Counsel for Defendants previously received four agency records from DHS, including the record for the arriving alien regulation. As part of my responsibilities as counsel for Defendants, I have reviewed the agency record of the arriving alien regulation.

4.      I respectfully submit this declaration in connection with Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment and Defendants' Cross-Motion for Summary Judgment.

5.      Attached as **Exhibit A** is a true and correct copy of a comment on the proposed rule defining "arriving alien" by Catholic Diocese of Richmond, Refugee and Immigration Services, dated February 1, 1997, and included in the administrative record of the regulation defining "arriving alien."

6.      Attached as **Exhibit B** is a true and correct copy of a comment on the proposed definition of "arriving alien" by Central American Legal Assistance, dated January 28, 1997, and included in the administrative record of the regulation defining "arriving alien."

7.      Attached as **Exhibit C** is a true and correct copy of a comment on the proposed definition of "arriving alien" by Rebecca Acevedo-Holliday, dated January 31, 1997, and included in the administrative record of the regulation defining "arriving alien."

8.      Attached as **Exhibit D** is a true and correct copy of a corrected comment on the proposed rule by Congressmen Benjamin A. Gilman, Christoper H. Smith, and Howard L. Berman, dated February 3, 1997, and included in the administrative record of the regulation defining "arriving alien."

9.      Attached as **Exhibit E** is a true and correct copy of a comment on the proposed rule by Congressman Christoper H. Smith, dated February 3, 1997, and included in the administrative record of the regulation defining "arriving alien."

10.      Local Rule 7(n) requires the agency to file a certified list of the contents of the administrative record.  Defendants previously served Plaintiffs with certified lists, and Plaintiffs

2

have provided those lists of the contents of the four administrative records in this case with their

pleading accompanying their motion for partial summary judgment.  Declaration of Hillary Li

(Dkt 55-13) Ex. G, H, I & X.

11.    Counsel for Plaintiffs did not contact counsel for Defendants to confer regarding

an appendix of documents from the certified administrative records.  LCvR 7(n)(2).

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 16, 2026

 s/Aric A. Anderson
ARIC A. ANDERSON
*Trial Attorney*
U.S. Department of Justice
Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, DC  20044
202-532-4434
Aric.Anderson@usdoj.gov

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

COALITION FOR HUMANE
IMMIGRANT RIGHTS, *et al.*,

      Plaintiffs,

v.

MARKWAYNE MULLIN, in his official
capacity as Secretary of Homeland Security,
*et al.*,

      Defendants.

Civil Action No. 1:25-cv-00872 (JMC)

Hon. Jia M. Cobb

**INDEX OF EXHIBITS IN SUPPORT OF DEFENDANTS'**
**OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**
**AND DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**

| Exhibit | Document | Administrative Record |
|---|---|---|
| A | Anita R. Schneider, Catholic Diocese of Richmond, Refugee and Immigration Services, Letter Dated Feb. 1, 1997 | AA-REG-00231 |
| B | Anne Pilsbury, Central American Legal Assistance, Letter Dated Jan. 28, 1997 | AA-REG-00221 |
| C | Rebecca Acevedo-Holliday, Letter Dated Jan. 31, 1997 | AA-REG-01216 |
| D | Congressmen Benjamin A. Gilman, Christoper H. Smith, and Howard L. Berman, Corrected Letter Dated Feb. 3, 1997 | AA-REG-01258 |
| E | Congressman Christoper H. Smith, Letter Dated Feb. 3, 1997 | AA-REG-01169 |

**EXHIBIT A**



# efugee and Immigration Services

### Catholic Diocese of Richmond



February 1, 1997

Director
Policy Directives and Instructions Branch
Immigration and Naturalization Service
425 I Street NW, Room 5307
Washington, DC  20536

RE:  INS Number 1788-96

Dear Sir or Madam:

I am writing on behalf of Refugee and Immigration Services of the Catholic Diocese of Richmond, a BIA recognized organization.   Our program offers part-time immigration counseling  services at four sites within the state of Virginia, including Richmond, Norfolk, Roanoke and Harrisonburg.  Three of our  immigration offices are  physically located within larger programs whose primary purpose is to resettle refugees within our diocese.

As an agency whose initial mission has been refugee resettlement,  we are most concerned about some of the  proposed regulations which would implement sections of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA").   We are  writing to comment on certain provisions of these regulations that affect refugees seeking asylum in the United States, as well as other regulations that  would adversely  and unfairly affect our immigrant clients.

Our organization strongly supports the comments made by Michele Pistone and Philip Schrag in their letter to you dated January 17, 1997.   Like Ms. Pistone and Mr. Schrag, we are most troubled by the regulations' failure to provide adequate procedural safeguards when aliens are pre-screened by immigration officers at airports.    In addition, we believe that it is necessary that the INS enumerate examples of changed or extraordinary circumstances in the regulations that would excuse belated filing of asylum applications.  By doing so, the INS would provide guidance to applicants, asylum officer and immigration judges, avoid inconsistent decision-making, and avoid needless and costly litigation regarding circumstances that the INS clearly intends to fall within the exceptions.   Below we would like to highlight some areas of key concern.

**Arrival and Pre-Screening Interview.**  We believe that the regulations should specify that arriving aliens be given information about the asylum process and information about and access to potential representatives before the pre-screening

811 Cathedral Place
Richmond, VA 23220-4801
(804) 355-4559

1802 Ashland Avenue
Norfolk, VA 23509-1236
(757) 623-9131

1106 9th Street, SE
Roanoke, VA 24013
(540) 342-7561

AA-REG-0231

2

interview. This information should be clearly communicated to the alien in his language and should stress the importance of indicating to the immigration officer any fear of persecution or desire to apply for asylum. This could be best guaranteed by a requirement that a standard statement be read to all arriving aliens subject to expedited removal or that they be asked standard questions designed to elicit any expressions of fear about removal. In addition, it is critical that the regulations require that aliens have access to interpreters before and during the pre-screening interview. Pre-screening interviews should be conducted only after arriving aliens are given time to rest, eat, and contact friends or family in the U.S.or organizations that may assist them. Interviews should be conducted in private, comfortable rooms away from other airport activities. In order to facilitate review by a supervisory officer, pre-screening officers should keep records of all determinations of individuals who do not indicate a fear of being returned.

**Credible Fear Interviews**. The regulations should specify that any asylum officer, before beginning the credible fear interview, will again explain the importance and consequences of the process, the right of the alien to be represented at no expense to the government, and the right to contact friends, family or human rights/refugee organizations to seek such representation. Credible fear interviews should be conducted, to the extent possible, at INS asylum offices or at detention facilities in or near major metropolitan areas. Access to counsel should be the key determinant in selecting sites for this screening. The asylum seekers should be given time to recuperate from their journey , contact counsel or friends and relatives and to become at least partially prepared before scheduling their credible fear interviews.

**Standard of Proof**. Credibility determinations should take into account the fact that the alien has only been in the United States for a short period of time, has been in detention, and has not been able to collect the corroborating documentation often presented in initial asylum applications. The regulation should state that in expedited removal interviews, an asylum officer or immigration judge should apply a low screening standard to determine whether there is a "significant possibility" of establishing a well-founded fear of persecution. The Supreme Court has said that "there is simply no room within the United Nations' definition [of 'well-founded fear,'] for concluding that because an applicant only has a 10% chance of being shot, tortured, or otherwise persecuted, that he or she has no "well-founded fear" of the event happening." INS v Cardoza-Fonseca, 480 US 421, 440 (1987). Therefore an applicant undergoing the "low screening standard" should be required only to show a "significant possibility" of establishing a 10% chance of being persecuted.

The regulation should make clear that the adjudicator's job is to apply this low screening standard, not the higher standard that an asylum officer uses after an asylum applicant , during as much as a year of liberty and with the full assistance of counsel, has prepared a full asylum application. The asylum officer should rely on the alien's credible testimony to make the credible fear determination. The asylum seeker should not be expected to provide evidence to corroborate his statement.

AA-REG-00232

In addition, an alien whose claim presents a novel question of law should be referred for a full hearing before an immigration judge so that the legal issues are fully briefed and argued, with the opportunity for review by the BIA.

**Asylum Officer Preparation.** In order to assess whether an alien's fear of return is credible, the regulations should require that asylum officers who conduct "credible fear" interviews have up-to-date information about country conditions around the world and that interviewers review this information before determining that an alien's fear is not credible. Refugees are often forced to flee their home countries within days of human rights abuses and before the new developments are commonly reported by the press. For example, the press did not begin to report about the civil war in Somalia until weeks after the fighting first began in Mogadishu. Therefore, the immigration and asylum officers who conduct expedited removal interviews should be notified immediately by the State Department of significant human right developments.

**Record of Determination.** In order to assist the supervisory officer in determining whether the asylum officer conducting "credible fear" interviews is being sufficiently careful and thorough, the regulations should specify the format for a record of the asylum officer's determination. Such a record should include a thorough account of the alien's statement, any additional facts relied on by the officer, a description of the current country conditions, any inconsistencies on which the officer relied to determine the alien had no significant possibility of winning asylum, and a careful statement of the officer's analysis of why, in light of the facts, the order of removal should be entered.

**Review.** The INS should presume that an alien who expresses fear of returning home after receiving a negative determination by an asylum officer would want to take advantage of an opportunity to appeal and should automatically refer the alien to a hearing before an immigration judge. In the alternative, the regulations should require that the asylum officer or supervisor ask an alien receiving a negative determination if he would like to appeal that determination to an immigration judge. The law now provides for this review "upon the alien's request," but an alien without representation will rarely have the knowledge to make this request. Review by the immigration judge should should be in-person whenever possible.

**Treatment of Minors.** Minors should be exempted from expedited removal procedures, in light of their particular needs and vulnerabilities. A child cannot be realistically expected to comprehend the gravity of these proceedings, nor be expected to adequately represent his asylum claim in such a brief encounter. Lawyers who represent children often need to meet with the child over a long period of time in order to develop enough trust so that the child can relate his fears and concerns. Even then, the story often comes out in bits and pieces. We commend the INS for suggesting and seeking views on the appointment of guardians ad litem for unrepresented minors in removal proceedings. Such appointment will promote greater integrity in court proceedings, aid judges in

4

making more informed decisions, and promote fundamental fairness in INS judicial proceedings involving children.

**Detention of Aliens Who Establish a "Credible Fear".** Arriving aliens who establish a "credible fear" of persecution in an interview with an asylum officer should not be detained unless the government can demonstrate that the alien poses a danger to the community or a risk of flight. The final regulations should establish procedures to ensure prompt parole determinations for detainees who have passed the "credible fear" screening. Bona fide asylum-seekers should be embraced, not detained. Proposed 8 CFR § 208.5 provides that the INS will give "expedited consideration" to asylum claims of persons detained, "where possible. The regulations do not define these phrases. This leaves open the possibility of the long-term detention of persons who have established a "credible fear", an inhumane result. In practial terms as well, detention of legitimate asylum seekers constitutes an inefficient and inappropriate use of scarce detention resources, particularly at a time when the INS lacks the resources to enforce IIRIRA's mandatory detention provisions. The regulations should state that arriving aliens who establish "credible fear" are presumptively eligible for release.

**Adjudication of the Exceptions to the One-Year Deadline.** As proposed regulation 208.4 makes clear, INS will continue to require most new applications for asylum to be filed with its regional service centers. We are aware that the service centers perform only ministerial screening of applications, and that trained asylum officers do not work at the service centers. Whether or not an applicant who files late qualifies for an exception cannot be determined by an entry on a form, especially if the form was completed without assistance of counsel. An additional sentence should be added to the end of § 208.9(a) specifying that: "in the case of an application that appears to have been filed more than a year after the applicant entered the U.S., an asylum officer will interview the applicant regarding the reasons for late filing and will determine whether the applicant qualifies under one of the exceptions to the deadline."

**Definition of "Changed Circumstances".** The definition of "changed circumstances," which would exempt a person from the requirement that he file for asylum within one year of entering the U.S., is too narrow. The regulation should broaden the definition to include those cases in which circumstances change materially just before the deadline expires; an applicant did not *become aware* of a change in human rights violations in the applicant's home country until more than one year after entry; and those in which the applicant genuinely belatedly discovers the existence of a one-year deadline.

**Definition of "Extraordinary Circumstances".** The definition of "extraordinary circumstances" which would excuse a person from filing for asylum within one year of entering the U.S., should specify some types of circumstances that would clearly fall within this exception. If examples of these exceptions are not included in the regulations, identical claims would have to be decided <u>de novo</u> by each asylum

AA-REG-00234

officer and immigration judge, and would be subject to appeal to the BIA. A list of such circumstances would no resolve every case, but it would provide guidance to applicants, asylum officers, and immigration judges, avoid inconsistent decision-making, and avoid needless and costly litigation regarding circumstances that INS regards as covered. We support the proposed amendment to § 208.4 (a) (3) which is quoted on pages 8 and 9 of the comments submitted by Ms. Pistone and Mr. Schrag.

**Comments Regarding Voluntary Departure.** The restriction that voluntary departure may only be requested at a master calendar hearing should be removed. At this stage, most aliens without representation are not even aware of this form of relief. In addition, cases are often "settled" and voluntary departure is agreed to only after the master calendar hearing. In addition, the regulation denies aliens the opportunity to appeal a denial of voluntary departure while permitting the INS to appeal approvals. Both sides should be given the right to appeal, or both sides should be denied.

**Employment Authorization.** Any language denying employment authorization to aliens granted voountary departure should be removed as it goes beyond the scope of the legislation. Certainly aliens in this situation should still be able to receive work authorization. In addition, family unity beneficiaries should not have to pay a separate fee to receive work authorization. The Fifth Circuit Court of Appeals has upheld a challenge to the predecessor regulation of proposed § 236.15 (d) on this ground. Hernandez v. Reno, _____ F. 3d _____ (1996).

**Adjustment of Status.** In 8 CFR 245.1(c)(8) of the proposed regulations, INS eliminates from adjustment eligibility "any arriving alien who is in removal proceedings pursuant to section 235 (b) or section 240 of the Act." This regulation goes beyond congressional intent. The INS cannot, through regulation, eliminate an immigration remedy that has not been eliminated by an act of Congress. Nowhere in IIRIRA is there authority for the position that Congress intended to eliminate the right of arriving alines to adjust status. 8 CFR Section 1.1(q) defines arriving alien and states that "an arriving alien remains such even if paroled pursuant to section 212(d)(5). Thus, it would appear that paroled aliens would also be barred from adjusting status. By including paroled aliens as arriving aliens who are barred from adjustment of status, the regulations conflict with the Act. Section 245 is entitled "Adjustment of status of nonimmigrant inspected and admitted or paroled into United States." INA Section 245(a) provides that "[t]he status of an alien who was inspected and admitted or paroled into the United States may be adjusted ..." (emphasis added). By excluding a category of aliens which Congress explicitly allows to adjust status, the regulations are ultra vires.

Congress identified eight situations in which an alien may not adjust in section 245 (c) of the Act. However, nowhere does the statue make ineligible for adjustment arriving aliens in 235 (b)(1) or 240 removal proceedings. In fact, section 245(i) of the Act states that "[n]otwithstanding (INA section 245 (c))", "an alien physically present in the United States who (A) entered without inspection; or (B) is within one of the

AA-REG-00235

6

classes enumerated in (245(c)) may apply to the Attorney General for the adjustment of his or her status..." emphasis added. Proposed 8 CFR § 245.1(c)(8) contradicts the clear language of INA §245(i). The INS may not attempt to implement regulations in direct contradiction to the statute they purport to implement.

We thank you for this opportunity to express our most pressing comments and concerns on the Interim Regulation to the Immigration and Naturalization Service.

Sincerely,

Anita R. Schneider, J.D.
Refugee and Immigration Services
Catholic Diocese of Richmond

AA-REG-00236

**EXHIBIT B**

received

PDi 2/3/97   (39)

# CENTRAL AMERICAN LEGAL ASSISTANCE

## Ayuda Legal Para Refugiados Salvadoreños y Guatemaltecos

240 Hooper Street  Brooklyn  New York  11211  (718) 486-6800

January 28, 1997

Director, Policy Directives &
Instructions Branch
I.N.S.
425 Eye St. N.W.
Room 5307
Washington, D.C. 20536

## Comments on #1788-96

(Implementation of IIRIRA)

Dear INS:

Pursuant to the draft regulations published in the Federal Register on Jan. 3, 1997 relating to Inspection and Expedited Removal; Detention; Conduct of Removal Hearings, and Asylum under the new Illegal Immigration Reform and Responsibility Act of 1996 we make the following comments and observations:

1. *Lack of Adequate Comment Period*

Given the radical changes IIRIRA makes in immigration law, the 30 day comment period is inadequate. The comments that follow touch on only the most obvious concerns. We urge that comments made during the post-publication comment period will be seriously considered.

2. *Definition of "arriving alien"*

The draft's limitation of "arriving alien" to only those found at port of entry, at sea and in parole status is appropriate. A broader definition, to include persons found entering at unauthorized points, would subject aliens to new expedited proceedings at times and places where the aliens would be highly unlikely to have access to legal assistance. Given IIRIRA's harsh penalties, access to legal assistance becomes more necessary than ever. The population that would be most effected by a broader definition to include aliens crossing the land borders on foot and/or found within the U.S. would be the Mexican/Central American population. Many of these aliens already have some claim of legal

AA-REG-00221

2

status here -- many, for example, are members of the <u>ABC</u> class or persons already in deportation proceedings. The legal issues regarding the applicability (or not) of IIRIRA to this group are many and complex. Due process requires that persons with some claim to legal rights under prior law have the opportunity to seek counsel and be heard in a full hearing. Expedited removal proceedings would virtually eliminate this opportunity.

3. *Asylum Changes*

In general, we believe that the radical changes in asylum processing made by IIRIRA violate the commitment the United States has made to abide by the 1967 Protocol Relating to the Status of Refugees. We realize that this is a matter outside of the power of the INS to rectify by regulations but this concern informs our comments.

A. <u>Bar on applications filed after one year</u>

The regulations appear to leave us in the dark on how this provision, Sec.604, is going to be implemented. The IIRIRA places the burden on the alien seeking asylum to prove that he/she has filed within one year of entering the country. Sec.604(c) makes this requirement effective on/about April 1, 1997. Thus, the regulations appear to bar any asylum application after that date filed by an alien who entered the U.S. more than a year before (even though until September 1996 no affirmative requirement to file existed).

Asylum seekers, as opposed to persons recognized as refugees, have never been afforded governmental assistance in applying for status. In fact, federal civil legal service programs are <u>prohibited</u> from helping aliens apply for asylum. As a result, there is a critical shortage of affordable legal help for indigent asylum seekers. Even under ideal circumstances, an alien could not have known of his now affirmative duty to file for asylum until September 30, 1996 (the day the law was enacted). The alien then has only six months to find assistance and file. Since there has been no publicity surrounding this new requirement and most asylum seekers to do speak English, there are probably many eligible aliens in the U.S. who have yet to seek asylum and who will not do so by April 1997.

To alleviate the due process deprivation occasioned by the legislation, we urge consideration be given to allowing a year <u>after April 1997</u> during which applications will be accepted and by making an effort to publicize the requirement. In short, "extraordinary circumstances" should include, for the first year, the fact of this drastic change in asylum law. At the very least, the unavailability of legal help should be included among the examples of factors making it impossible for the alien to meet the one year requirement.

Finally, the one year bar should act, as IIRIRA states, only to bar <u>asylum</u> applications. Withholding of deportation (or

AA-REG-00222

3

removal) should always remain available in order to comply with international law which the U.S. has accepted that prohibits a country returning an individual to a place where they are likely to be persecuted.

### B. Definition of Frivolous Application

We support the proposed regulation to define as frivolous an application that is "fabricated". We urge that warning of this restriction be included in public information efforts done to warn aliens of the new one year requirement.

The proposed draft subsection, 8 C.F.R. 208.3(c)(2), which states that "the applicant's signature is evidence that the applicant is aware of the contents of the application" should be followed by a sentence allowing an applicant the possibility of rebutting this presumption. It is fundamentally unfair to bar an eligible asylum seeker from relief just because his application was written by a careless and unscrupulous person.

### C. Credible fear determinations

There are many concerns with this new section 235(b)(1). First, the proposed regulations seem to contradict the law by allowing INS personnel other than Asylum Officers to make "credible fear" determinations. Since the regulation does not clarify what is meant by "necessary training", we strongly oppose allowing anyone other than Asylum Officers to make the determination. The assurance that Asylum Officers would make the credible fear determination was one of the assurances made by Congress to the human rights community very troubled by the new legislation. No training session can substitute for experience. While it is true that many AO's lack depth of experience, non-asylum officers have none.

Second, we question whether the same Immigration Judge should review "credible fear" determinations and then hold the full section 240 asylum hearing (assuming a credible fear is found). If an Immigration Judge finds that a "credible fear" exists and then that same judge is assigned the plenary hearing, there may be a natural tendency to merge the two hearings together. Asylum seekers have few procedural protection under IIRIA and we are concerned that at least the two hearings be kept distinct.

Third, the regulation as drafted at 8 C.F.R. 3.42 (c) should explicitly state that the person "of the alien's choosing" may be present at the hearing. Fourth, subsection 3.42 (c) should read "The Immigration Judge shall [instead of "may] receive into evidence...".

Finally, we are concerned that eligible asylum seekers will be thrown out of the country before even reaching the "credible fear" interview stage due to the law's new expedited removal process for persons arriving with no or false documents. The regulations are silent on what procedures will be taken to make

AA-REG-00223

4

sure aliens encountered as "arriving aliens" are informed of their right to ask for asylum. We know of cases where through fear _bona fide_ asylum seekers did not divulge their fear to the arresting official. Now that there is no following hearing in such cases it becomes critical that the arresting or interrogating officer positively inform the alien of the need to affirmatively request asylum if that is the person's wish.

### D. No Fee for Asylum

We support the decision to not require a fee. Most asylum seekers are indigent and, by law, unable to work.

### 4. _Removal Proceedings_

### A. Guardian Ad Litem for minors

We oppose such a step. While there are situations where an unaccompanied minor needs help, and it would be desirable to give Judges the authority to assign representation, it is unfair to do so unless the INS also pays the representative.

### B. Applicability of Removal Proceedings after April 1, 1997.

The proposed regulations state in the introductory part (p. 448-449 of Fed. Reg.) that new removal proceedings and new forms of relief "will apply to all individuals placed into removal proceedings on or after April 1, 1997 and will not affect individuals who were in deportation or exclusion proceedings prior to April 1, 1997." This explanation is important and perhaps should be expanded to clarify that the prior law applies no matter when the hearing before the Immigration Judge occurs (i.e. even if after April).

Sincerely yours,

Anne Pilsbury, Director

AA-REG-00224

**EXHIBIT C**

January 31, 1997

Director, Policy Directives and Instructions Branch
Immigration and Naturalization Service
425 I Street NW, Room 5307
Washington, D.C. 20536

Subject:      Federal Register Comment Re:  INS 1788-96

I am writing as an Immigration Law Student at the University of Denver who has field experience assisting LPR's who are applying for citizenship and aliens seeking asylum in the United States.

My comments are in response to the January 3, 1997 publication of the Federal Register's proposed amendments to Section 302 of IIRIRA regarding "arriving aliens." The proposed definition of "arriving aliens" as aliens arriving at a port-of-entry, aliens interdicted at sea, aliens previously paroled upon arrival, those apprehended crossing a land border between ports-of-entry, is reasonable. The aliens that would be included in this category are merely in the class of aliens that were previously termed excludable under the old INS law before exclusion and deportation proceedings were combined to create one uniform set of removal proceedings.

Regarding the new expedited removal proceedings, I believe that they should only be applied to aliens who can be included in the above-mentioned "arriving aliens" definition. I vehemently disagree with the proposal that the Commissioner "may, however, elect to apply the expedited removal procedures to additional classes within the limits set by statute." This proposal would give the Commissioner the arbitrary power to expand the definition of "arriving aliens" based on his/her own subjective determination without being subject to some sort of administrative or legislative check on the reasonableness or the necessity for such action. A decision to expand the definition of "arriving aliens" should be subject to careful administrative /Congressional analysis, and to public commentary before it is implemented.

Concerning the two proposed approaches to expedited removal, I think the most even-handed manner in dealing with such a procedure is to apply it only to "arriving aliens." The second alternative which would extend to aliens already physically present within the United States who cannot produce documentation to establish a continuous 2 year presence raises issues of due process. In my opinion, aliens within our nation are entitled to a higher standard of review of their right to remain in the United States than aliens at the border to whom our Constitution does not apply. I think other factors besides a paper trail should be considered such as the family and community ties these physically present aliens have established. In addition I would urge you to consider their contributions to their surrounding communities (e.g. property, state, federal taxes), affidavits of support and of good moral character.

Thank you for taking the time to review my comments and for considering my concerns as your agency revises its proposed regulations.

Sincerely,

Rebecca Acevedo-Holliday

AA-REG-01216

**EXHIBIT D**

# MEMORANDUM

**To:**   Mr. Rick Sloan

**From:**   Congressman Benjamin A. Gilman, Member of Congress
Congressman Christopher H. Smith, Member of Congress
Congressman Howard L. Berman, Member of Congress

**Date:**   February 4, 1997

---

Enclosed, please find a substitute letter for our public comments submitted to your office on February 3, 1997 at 5:00 pm.  This new letter includes a few minor grammatical and typographical corrections.

Please feel free to contact the staff of the Subcommittee on International Operations and Human Rights at (202) 225-5748 if you have any questions or concerns.

Thank you for your prompt attention to this matter.



AA-REG-01258

# Congress of the United States
## Washington, DC 20515

February 3, 1997

Mr. Rick Sloan
Director, Policy Directives and Instructions Branch
Immigration and Naturalization Service
Room 5307
425 I Street NW
Washington D.C. 20536

Re: INS No. 1788-96: Regulation relating to asylum and "expedited exclusion."

Dear Mr. Sloan:

These comments are submitted in reference to the proposed regulation on asylum and "expedited exclusion." Although we agree with many of the comprehensive comments submitted by organizations including the American Bar Association and the Lawyers' Committee for Human Rights, we confine our comments to three particularly important issues:

First, the proposed regulation should be amended in section 208.30 to make clear that the "asylum officers" who conduct credible fear interviews as part of expedited exclusion proceedings shall be experienced members of the INS Asylum Corps. In the alternative, the regulation should carefully define the conditions under which immigration officers other than experienced Asylum Corps members will be authorized to act as "asylum officers" within the meaning of the statute. Such a provision should also include a detailed definition of the training and experience that would be deemed equivalent to Asylum Corps training, as well as the officials who would be empowered to authorize non-Asylum Corps officers to make credible fear determinations. Ideally, the extraordinary power of summary exclusion should never be entrusted to officers other than full-time professional asylum adjudicators. Any exceptions should be limited to carefully defined extraordinary circumstances and should be authorized only by the Attorney General.

Second, the regulation should state clearly that summary exclusion should not result in the return of asylum seekers to countries in which ongoing armed conflict or other extraordinary and temporary conditions would render such return unsafe, or in which, according to the State Department's Country Reports on Human Rights Practices, the government engages in torture, systematic persecution, or certain other gross violations of human rights, or typically fails to protect people from such violations. The regulation should provide that a person who asserts a fear of persecution in a country in which such conditions exist should ordinarily be found to have a credible fear of persecution, and could therefore be returned to such country only after a full asylum hearing rather than in a summary procedure. It is particularly important that asylum

AA-REG-01259

Page two
Mr. Rick Sloan
February 3, 1997

seekers not be returned to countries that systematically impose harsh penalties on returnees simply because they attempted to leave the country without authorization. We note that the proposed regulation would eliminate the current rule that asylum adjudicators should give due consideration to evidence of such practices. This provision should instead be strengthened and clarified. At the very least, no asylum seeker should be returned to a country that systematically imposes such punishments on asylum seekers without a full and non-summary asylum hearing.

With respect to those who credibly claim a fear of torture, summary return would not only be unsound policy but would also risk violation of the United States obligation under the Convention against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment. The Convention prohibits return to torture irrespective of whether the torturer is motivated by one of the five grounds specified in the Immigration and Nationality Act. The regulation should be modified to ensure that the expedited exclusion procedure does not put the United States in contravention of its obligations under the Convention.

These safeguards will ensure that summary exclusion --- which will be far less time-consuming than current procedures because it eliminates most procedural stages in the exclusion process --- will nevertheless be conducted in accordance with traditional American notions of substantive fairness.

Sincerely,

Benjamin A. Gilman
Member of Congress

Christopher H. Smith
Member of Congress

Howard L. Berman
Member of Congress

**EXHIBIT E**

94

# SUBCOMMITTEE ON INTERNATIONAL OPERATIONS AND HUMAN RIGHTS

## COMMITTEE ON INTERNATIONAL RELATIONS
## UNITED STATES HOUSE OF REPRESENTATIVES

B358 RAYBURN HOUSE OFFICE BUILDING
WASHINGTON, D.C. 20515

(202) 225-5748
(202) 225-7485 (FAX)

CHRISTOPHER H. SMITH
CHAIRMAN

GROVER JOSEPH REES
STAFF DIRECTOR & CHIEF COUNSEL

DOUGLAS C. ANDERSON
COUNSEL

ROBERT KING
MINORITY STAFF DIRECTOR


received
2-3-97

DATE:

TO: Rick Sloan

FAX: 307-1269

FROM:

Rep. Chris Smith
— Comments on proposed regulation
— "Hard copy" is being
    hand-delivered.

NUMBER OF PAGES (INCLUDING THIS COVER PAGE):

AA-REG-01169

February 3, 1997

Mr. Rick Sloan
Director, Policy Directives and Instructions Branch
Immigration and Naturalization Service
Room 5307
425 I Street NW
Washington D.C. 20536

Re: INS No. 1788-96: Regulation relating to asylum and "expedited exclusion."

Dear Mr. Sloan:

These comments are submitted in reference to the proposed regulation on asylum and "expedited exclusion." Although we agree with many of the comprehensive comments submitted by organizations including the American Bar Association and the Lawyers' Committee for Human Rights, we confine our comments to three particularly important issues:

First, the proposed regulation should be amended in section 208.30 to make clear that the "asylum officers" who conduct credible fear interviews as part of expedited exclusion proceedings shall be experienced members of the INS Asylum Corps. In the alternative, the regulation should carefully define the conditions under which immigration officers other than experienced Asylum Corps members will be authorized to act as "asylum officers" within the meaning of the statute. Such a provision should also include a detailed definition of the training and experience will be deemed equivalent to Asylum Corps training, as well as the officials who would be empowered to authorize non-Asylum Corps officers to make credible fear determinations. Ideally, the extraordinary power of summary exclusion should never be entrusted to officers other than full-time professional asylum adjudicators. Any exceptions should be limited to carefully defined extraordinary circumstances and should be authorized only by the Attorney General.

Second, the regulation should state clearly that summary exclusion should not result in the return of asylum seekers to countries in which ongoing armed conflict or other extraordinary and temporary conditions would render such return unsafe, or in which, according to the State Department's Country Reports on Human Rights Practices, the government engages in torture, systematic persecution, or certain other gross violations of human rights, or typically fails to protect people from such violations. The regulation should provide that a person who asserts a fear of persecution in a country in which such conditions exist should ordinarily be found to have a credible fear of persecution, and could therefore be returned to such country only after a full asylum hearing rather than in a summary procedure. It is particularly important that asylum

AA-REG-01170

Case 1:25-cv-00872-JMC Document 68-1 Filed 04/16/26 Page 26 of 26

Page two
Mr. Rick Sloan
February 3, 1997

seekers not be returned to countries that systematically impose harsh penalties on returnees simply because they attempted to leave the country without authorization. We note that the proposed regulation would eliminate the current rule that asylum adjudicators should give due consideration to evidence of such practices. This provision should instead be strengthened and clarified. At the very least, no asylum seeker should be returned to a country that systematically imposes such punishments on asylum without a full and non-summary asylum hearing.

With respect to those who credibly claim a fear of torture, summary return would not only be unsound policy but would also risk violation of the United States obligation under the Convention Against Torture and Other Cruel and Inhuman Treatment. The Convention prohibits return to torture irrespective of whether the torturer is motivated by one of the five grounds specified in the Immigration and Nationality Act. The regulation should be modified to ensure that the expedited exclusion procedure does not put the United States in contravention of its obligations under the Convention.

These safeguards will ensure that summary exclusion — which will be far less time-consuming than current procedures because it eliminates most procedural stages in the exclusion process — will nevertheless be conducted in accordance with traditional American notions of substantive fairness.

Sincerely,

Christopher H. Smith
Member of Congress

AA-REG-01171