BRETT A. SHUMATE
*Assistant Attorney General*
*Civil Division*
DREW C. ENSIGN
*Deputy Assistant Attorney General*
PAPU SANDHU
*Assistant Director*
ARIC A. ANDERSON
*Trial Attorney*
U.S. Department of Justice
Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
202-532-4434
Aric.Anderson@usdoj.gov

Counsel for Defendants

## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| COALITION FOR HUMANE IMMIGRANT RIGHTS, *et al.*, | Civil Action No. 1:25-cv-00872 (JMC) |
| Plaintiffs, | Hon. Jia M. Cobb |
| v. | |
| MARKWAYNE MULLIN, in his official capacity as Secretary of Homeland Security, *et al.*, | |
| Defendants. | |

### DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF MATERIAL FACTS AND COUNTERSTATEMENT OF MATERIAL FACTS NOT IN DISPUTE

This Court does not require a statement of undisputed material facts for "cases in which

judicial review is based solely on the administrative record." LCvR 7(h)(2).  Because Plaintiffs

provided a statement of facts in support of their motion for partial summary judgment (Dkt 55-2), the government provides this response, and then proposes its own undisputed material facts.

**RESPONSE TO PLAINTIFFS' STATEMENT OF MATERIAL FACTS**

1.      Plaintiff Coalition for Humane Immigrant Rights ("CHIRLA") is a nonprofit membership organization headquartered in Los Angeles, California. Declaration of Angelica Salas, Dkt. No. 22-3 ("Salas Decl.") ¶ 2.

**Response:** Not disputed.

2.      CHIRLA's members include noncitizens who were previously paroled into the United States at a port of entry. Salas Decl. ¶¶ 15-16.

**Response:** Not disputed.

3.      CHIRLA's members who were previously paroled into the United States at a port of entry are at risk of being, or already have been, arrested, detained, and subject to expedited removal due to Defendants' policies described below in ¶¶ 41-58. Salas Decl. ¶¶ 15-16.

**Response:** Disputed.  Plaintiffs' members are not "at risk of being, or already have been, arrested, detained, and subject to expedited removal due to" the cited policies.

4.      CHIRLA's mission is to ensure that immigrant communities are fully integrated into society with full rights and access to resources. This work includes advocating for immigrant rights, and organizing, educating, serving, and defending immigrants and refugees in Los Angeles and throughout California. Salas Decl. ¶¶ 3-4.

**Response:** Not disputed.

5.     CHIRLA's membership includes E.I.R.M., a noncitizen who was granted humanitarian parole at a port of entry in 2023 following an appointment made with the CBP One application and was placed in regular removal proceedings pursuant to 8 U.S.C. § 1229a ("Section 240 removal proceedings"). Salas Decl. ¶ 17; Declaration of Bianca Torres, Dkt. No. 22-7 ("Torres Decl.") ¶ 3.

**Response:** Not disputed.

6.     E.I.R.M. appeared for all his scheduled immigration court hearings and timely filed an asylum application with the immigration court. He was subsequently arrested and detained in March 2025 and placed in expedited removal proceedings after DHS moved to dismiss his Section 240 removal proceedings. Salas Decl. ¶ 17; Torres Decl. ¶¶ 4-6.

**Response:** Not disputed.

7.     E.I.R.M. was released from detention on bond while his appeal at the Board of Immigration Appeals was pending. In October 2025, the BIA dismissed his appeal, so he is at imminent risk of re-detention and being processed for expedited removal. Supplemental Declaration of Angelica Salas ("Salas Suppl. Decl.") ¶ 21; Supplemental Declaration of Bianca Torres ("Torres Suppl. Decl.") ¶¶ 4-6, 7-8.

**Response:** Not disputed.

8.     E.I.R.M.'s U.S.-citizen wife filed a family-based visa petition for E.I.R.M. and they filed an adjustment of status application with USCIS. Torres Suppl. Decl. ¶ 6.

**Response:** Not disputed.

9.      E.I.R.M. cannot freely travel because he is required to check in with ICE and may only travel within a certain parameter within his state. Because they fear E.I.R.M. may be detained again or removed, E.I.R.M. and his wife have postponed decisions regarding long-term plans. Torres Suppl. Decl. ¶¶ 6-8.

**Response:** Not disputed.

10.     Another CHIRLA member, R.H.H., was paroled into the United States at a port of entry along with her minor children, C.M.H. and M.M.H., following a CBP One appointment in November 2024. They were granted parole through April 18, 2025, and they were issued Notices to Appear at an immigration court hearing on June 5, 2025. They resided with R.H.H.'s partner—C.M.H. and M.M.H.'s father—and the children were enrolled in elementary school. Declaration of Elizabeth Hercules-Paez, ("Hercules-Paez Decl.") ¶¶ 3-4; Salas Suppl. Decl. ¶ 19.

**Response:** Not disputed.

11.     At their initial master calendar hearing on June 5, 2025, DHS moved to dismiss R.H.H. and her children's removal proceedings, which the immigration judge granted over R.H.H.'s opposition. ICE agents arrested and detained R.H.H. and her children as they walked out of the courtroom and detained them for over a month. Hercules-Paez Decl. ¶¶ 5-6; Salas Suppl. Decl. ¶ 19.

**Response:** Not disputed.

12.     While R.H.H. and her children were detained, their attorney appealed the dismissal of their removal proceedings. R.H.H. also underwent a credible fear interview, without the

presence of counsel, and received a negative credible fear determination. Their counsel requested immigration judge review of that negative fear determination and submitted a release request. Hercules-Paez Decl. ¶ 8; Salas Suppl. Decl. ¶ 19.

**Response:** Not disputed.

13.   On July 11, 2025, R.H.H. and her children were released from detention on parole, which expires in July 2026. Hercules-Paez Decl. ¶ 9.

**Response:** Not disputed.

14.   On July 14, 2025, the immigration judge affirmed R.H.H.'s negative credible fear determination, and on December 5, 2025, their appeal was dismissed. Hercules-Paez Decl. ¶¶ 8-10; Salas Suppl. Decl. ¶ 19. They are subject to a final order of expedited removal. Hercules-Paez Decl. ¶¶ 14.

**Response:** Not disputed.

15.   CHIRLA's membership also includes J.L., a noncitizen who attended a CBP One appointment and was paroled into the United States at a port of entry in June 2024 with her two children. Salas Suppl. Decl. ¶ 20.

**Response:** Not disputed.

16.   J.L. applied for asylum and obtained work authorization associated with her application. Given the government's targeting of parolees for expedited removal, she and her family live in constant fear of being detained and being forcibly returned to Venezuela, where she believes she would be persecuted by the government. Salas Suppl. Decl. ¶ 20.

**Response:** Not disputed.

17. CHIRLA's members who were previously paroled into the country at a port of entry were first subjected to expedited removal in 2025. Salas Suppl. Dec. ¶¶ 19-22.

**Response:** Disputed. The numbered statement of material fact is not limited to the cited declarant's knowledge.

18. Plaintiff UndocuBlack Network ("UndocuBlack") is a nonprofit membership organization incorporated in 2022. Supplemental Declaration of Patrice Lawrence, ("Lawrence Suppl. Decl.") ¶ 4.

**Response:** Not disputed.

19. UndocuBlack's mission is to foster community, facilitate access to resources, and contribute to transforming the realities of its members, who are Black immigrants. This work includes providing legal assistance to sponsors and beneficiaries of humanitarian parole programs. Declaration of Patrice Lawrence, Dkt. No. 22-4 ("Lawrence Decl.") ¶¶ 3-5.

**Response:** Not disputed.

20. UndocuBlack's members include nationals from Haiti who were previously paroled into the United States at a port of entry, including through the parole processes for Cubans, Haitians, Nicaraguans, and Venezuelans ("CHNV" parole) or following appointments made through the CBP One application. Lawrence Decl. ¶ 11.

**Response:** Not disputed.

21.     UndocuBlack's members who were previously paroled into the United States at a port of entry are at risk of being, or already have been, arrested, detained, and subject to expedited removal due to Defendants' policies described below in paragraphs 41-58. Lawrence Decl. ¶ 13.

**Response:**  Disputed.  Plaintiffs' members are not "at risk of being, or already have been, arrested, detained, and subject to expedited removal due to" the cited policies.

22.     UndocuBlack's membership includes J.P., a noncitizen who was paroled into the United States at a port of entry in December 2024 after attending a CBP One appointment. He was issued a Notice to Appear before an immigration judge on July 25, 2025. J.P. timely filed an asylum application with the immigration court. Lawrence Supp. Decl. ¶ 13; Declaration of Ida De Luca ("De Luca Decl.") ¶¶ 2, 3-4. J.P. is also a member of CHIRLA. De Luca Decl. ¶ 2; Salas Suppl. Decl. ¶ 22.

**Response:**  Not disputed.

23.     At his master calendar hearing on July 25, 2025, DHS moved to dismiss J.P.'s removal proceedings, which the immigration judge granted. Immediately after the hearing, ICE agents arrested J.P. at the Immigration Court and detained him, and when his attorney made a request for him to be released and any expedited removal order against him to be vacated, ICE refused. He remains detained. De Luca Decl. ¶¶ 4-7.

**Response:**  Not disputed.

24.     Another UndocuBlack member, UBN Jane Doe 3, was paroled into the United States in April 2024 through the CHNV parole processes. She applied for asylum, but her

application is currently suspended due to the USCIS suspension on processing immigration benefits for nationals from Haiti. Because of this and the government's termination of grants of CHNV parole, Jane Doe 3 is at risk of being targeted for expedited removal at any time. Lawrence Suppl. Decl. ¶¶ 11-12.

**Response:** Not disputed.

25.     UndocuBlack's members who were previously paroled into the country at a port of entry were first subjected to expedited removal in 2025. Lawrence Suppl. Decl. ¶¶ 11-14.

**Response:** Disputed. The numbered statement of material fact is not limited to the cited declarant's knowledge.

26.     Plaintiff CASA, Inc. ("CASA") is a national nonprofit membership organization headquartered in Langley Park, Maryland. Declaration of George Escobar, Dkt. No. 22-2 ("Escobar Decl.") ¶ 1.

**Response:** Not disputed.

27.     CASA's members include noncitizens who were previously paroled into the United States at a port of entry. Escobar Decl. ¶¶ 10-12.

**Response:** Not disputed.

28.     CASA's members who were previously paroled into the United States at a port of entry are at risk of being, or already have been, arrested, detained, and subject to expedited removal due to Defendants' policies described below in ¶¶ 41-58. Escobar Decl. ¶¶ 10-13.

**Response:** Disputed. Plaintiffs' members are not "at risk of being, or already have been, arrested, detained, and subject to expedited removal due to" the cited policies.

29. CASA's mission is to build, power, and improve the quality of life in working-class Black, Latino/a/e, Afro-descendent, Indigenous, and immigrant communities. In furtherance of its mission, CASA offers a wide range of social, health, job, training, employment, and legal services to immigrant communities. Escobar Decl. ¶¶ 7-8.
**Response:** Not disputed.

30. CASA's membership includes E.M.P., a noncitizen who was granted humanitarian parole at a port of entry in 2023 following an appointment made with the CBP One application and was placed in Section 240 removal proceedings. Escobar Decl. ¶ 17; Declaration of Jessica Olive, Dkt. No. 22-10 ("Olive Decl.") ¶ 3.
**Response:** Not disputed.

31. E.M.P. appeared for all his scheduled immigration court hearings and filed an asylum application with the immigration court in 2024. He was subsequently arrested, detained, and placed in expedited removal proceedings on May 21, 2025 after DHS moved to dismiss his Section 240 removal proceedings. Escobar Decl. ¶ 17; Olive Decl. ¶¶ 5-6.
**Response:** Not disputed.

32. CASA's membership also includes L.Z.P., who was granted humanitarian parole and entered the United States with her three minor children in July 2024 after attending a

CBP One appointment. The expiration date of her parole status was June 2, 2026, and her work authorization was valid through July 1, 2026. Escobar Decl. ¶ 14.

**Response:** Not disputed.

33. Around May and June 2025, L.Z.P. received notice that her parole status and work authorization had been terminated. She awaits a hearing in her asylum case, which is scheduled for April 2026, and she is afraid that she will be detained and processed for expedited removal when she appears in court. Escobar Decl. ¶ 14; Supplemental Declaration of George Escobar ("Escobar Suppl. Decl.") ¶ 13.

**Response:** Not disputed.

34. D.S., a CASA member, was paroled into the country at a port of entry in March 2022. He applied for asylum in January 2023. Escobar Suppl. Decl. ¶ 14; Declaration of Dmitry Filimonov ("Filimonov Decl.") ¶¶ 2-4.

**Response:** Not disputed.

35. In August 2025, USCIS dismissed D.S.'s asylum application on the basis that DHS records indicated D.S. had been placed in expedited removal, and D.S. lost his employment authorization as a result, which has caused his family financial hardship. D.S. and his family fear that D.S. could be arrested at any point and processed for expedited removal. Escobar Suppl. Decl. ¶ 14; Filimonov Decl. ¶¶ 5-11.

**Response:** Not disputed.

36.	CASA member O.L.C. attended a CBP One appointment in September 2024 and was subsequently paroled into the United States. In May 2025, at a master calendar hearing, an Immigration Judge granted the government's motion to dismiss O.L.C.'s removal proceedings. O.L.C. was arrested at the courthouse following the hearing and was issued a Notice and Order of Expedited Removal. He has appealed the dismissal, and he remains detained while his appeal is pending. Escobar Suppl. Decl. ¶ 14; Supplemental Declaration of Laura Kelley ("Kelley Decl.") ¶¶ 2-3.

	**Response:**  Not disputed.

37.	Another CASA member, D.R.C., and her husband were granted humanitarian parole around 2024. They applied for lawful permanent residence status under the Cuban Adjustment Act. In July 2025, D.R.C. and her husband were pulled over while driving to work and detained. Upon being detained, D.R.C. learned her and her husband's grants of parole had been terminated. D.R.C. and her husband were separated, and D.R.C. remains detained. D.R.C.'s husband was processed for expedited removal and removed. Escobar Suppl. Decl. ¶ 14.

	**Response:**  Not disputed.

38.	CASA's membership also includes D.L.C., a noncitizen who was granted humanitarian parole at a port of entry in 2024 following an appointment made with the CBP One application, and who was placed in Section 240 removal proceedings. Declaration of Melissa Lim Chua, Dkt. No. 22-13 ("Chua Decl.") ¶¶ 2-4.

	**Response:**  Not disputed.

39.    D.L.C. appeared for all his scheduled immigration court hearings, filed an asylum application with the immigration court, and began the process of seeking Special Immigrant Juvenile Status ("SIJS"). In May 2025, he was subsequently arrested, detained, and placed in expedited removal proceedings after DHS moved to dismiss his Section 240 removal proceedings. Chua Decl. ¶¶ 6-8.

**Response:** Not disputed.

40.    CASA's members who were previously paroled into the country at a port of entry were first subjected to expedited removal in 2025. Escobar Suppl. Decl. ¶¶ 12-16.

**Response:** Disputed. The numbered statement of material fact is not limited to the cited declarant's knowledge.

41.    On January 23, 2025, Acting Department of Homeland Security ("DHS") Secretary Benjamine Huffman issued a memorandum (the "January 23 Huffman Memorandum") to the leadership of U.S. Immigration and Customs Enforcement ("ICE"), U.S. Customs and Border Protection ("CBP"), and U.S. Citizenship and Immigration Services ("USCIS") with the subject line, "Guidance Regarding How to Exercise Enforcement Discretion." Declaration of Hillary Li ("Li Decl."), ¶ 5 & Ex. A.

**Response:** The document is in the record and speaks for itself.

42.    The January 23 Huffman Memorandum references two other documents: first, a memorandum entitled "Exercising Appropriate Discretion Under Parole Authority," signed on January 20, 2025," that "clarifies DHS's position regarding the scope of the parole statute, 8 U.S.C. § 1182(d)(5)" (the "January 20 Parole Memorandum"); and

second, a Federal Register Notice entitled "Designating Aliens for Expedited Removal,"

signed on January 21, 2025 and published on January 24, 2025, that "expands the scope

of expedited removal to the statutory maximum under 8 U.S.C. § 1225(b)(1) which . . .

includes certain aliens who have not been continuously present in the United States for

two years" (the "January 24 Expanded Expedited Removal Notice"). Li Decl., ¶¶ 6-7 &

Exs. B-C.

**Response:** The document is in the record and speaks for itself.

43.    Through the January 24 Expanded Expedited Removal Notice referenced in the January

23 Huffman Memorandum, the Secretary of DHS "exercise[d] the full scope of [DHS's]

statutory authority to place in expedited removal, with limited exceptions, aliens

determined to be inadmissible under sections 212(a)(6)(C) or (a)(7) of the INA who have

not been admitted or paroled into the United States and who have not affirmatively

shown, to the satisfaction of an immigration officer, that they have been physically

present in the United States continuously for the two-year period immediately preceding

the date of the determination of inadmissibility." Li Decl., Ex. C.

**Response:** The document is in the record and speaks for itself.

44.    The legal basis of the January 24 Expanded Expedited Removal Notice's expanded

application of the expedited removal authority is "INA 235(b)(1)(A)(iii), 8 U.S.C.

1225(b)(1)(A)(iii), and 8 C.F.R. 253.3(b)(1)(ii)," Li Decl., Ex. C at 90 Fed. Reg. at 8139-

40, which are statutes and regulations that allow expedited removal to be applied to

individuals who have not been admitted or paroled and who have not been continuously present in the United States for two years.

**Response:** The document is in the record and speaks for itself.

45.    The January 23 Huffman Memorandum "provides guidance regarding how to exercise enforcement discretion in implementing" the January 20 Parole Memorandum and the January 24 Expanded Expedited Removal Notice. Li Decl., Ex. A.

**Response:** The document is in the record and speaks for itself.

46.    The January 23 Huffman Memorandum directs the leadership of ICE, CBP, and USCIS to "consider, in exercising your enforcement discretion, whether to apply expedited removal" to "any alien DHS is aware of who is amenable to expedited removal but to whom expedited removal has not been applied," which "may include steps to terminate any ongoing removal proceeding and/or any active parole status." Li Decl., Ex. A.

**Response:** The document is in the record and speaks for itself.

47.    Apart from the January 20 Parole Memorandum and the January 24 Expanded Expedited Removal Notice (which itself cites 8 U.S.C. § 1225(b)(1)(A)(iii) and 8 C.F.R. § 253.3(b)(1)(ii)), the January 23 Huffman Memorandum cites no authority for this directive to ICE, CBP, and USCIS leadership. Li Decl., Ex. A.

**Response:** Disputed. The document is in the record and speaks for itself, and it cites and quotes additional authority not listed in the numbered statement of material fact, including authority about the exercise of prosecutorial discretion.

14

48.    On February 18, 2025, the leadership of Immigration and Customs Enforcement ("ICE") issued a directive to its Enforcement and Removal Operations ("ERO") personnel (the "February 18 ICE Directive") that instructed "ERO officers [to] consider for expedited removal (ER) . . . paroled arriving aliens." Li Decl., ¶ 8 & Ex. D.

**Response:**  The document is in the record and speaks for itself.

49.    The February ICE Directive authorized "ERO officers [to] process for ER any arriving alien (i.e., encountered at a port of entry) who CBP determined to be inadmissible and released, as long as the alien is inadmissible under INA 212(a)(6)(C) (fraud or willful misrepresentation) or 212(a)(7) (lack of valid immigration documents)." Li Decl., Ex. D.

**Response:**  The document is in the record and speaks for itself.

50.    The February 18 ICE Directive authorized ERO officers to process "paroled arriving aliens" for expedited removal without regard to how long those individuals have been in the United States. Li Decl., Ex. D. ("There is no time limit on the ability to process such aliens for ER.").

**Response:**  The document is in the record and speaks for itself.

51.    The February 18 ICE Directive references Executive Order 14165, "Securing Our Borders," 90 Fed. Reg. 8467 (Jan. 20, 2025). Li Decl. ¶¶ 8-9 & Exs. D-E. Apart from the reference to Executive Order 14165, the February 18 ICE Directive cites no authority for its directives to ERO personnel. Li Decl., Ex. D.

**Response:**  Disputed.  The document is in the record and speaks for itself, and its use of the term "paroled arriving alien" invoked the authority under 8 C.F.R. § 1.2.  Dkt 41 at 70

("On its own, perhaps the February 18 ICE Directive's use of the regulatorily defined term sufficed to indicate that Directive's legal authority.").

52. The February 18 ICE Directive does not reference the January 23 Huffman Memorandum. Li Decl., Ex. D.

**Response:** The document is in the record and speaks for itself.

53. On March 25, 2025, DHS announced that it was terminating the parole processes for Cubans, Haitians, Nicaraguans, and Venezuelans. Notice, U.S. Dep't of Homeland Security, *Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans*, 90 Fed. Reg. 13611 (Mar. 25, 2025) (the "March 25 CHNV Termination Notice"). Li Decl. ¶ 10 & Ex. F.

**Response:** The document is published in the Federal Register and speaks for itself.

54. The March 25 CHNV Termination Notice also terminates all individual grants of parole under the CHNV parole processes. Li Decl., Ex. F, 90 Fed. Reg. at 13611 ("[t]he temporary parole period of aliens in the United States under the CHNV parole programs and whose parole has not already expired by April 24, 2025 will terminate on that date unless the Secretary makes an individual determination to the contrary.").

**Response:** The document is published in the Federal Register and speaks for itself.

55. DHS justified the premature termination of all grants of CHNV parole by explaining that "[e]xpedited removal is available only when an alien has not been continuously present in

the United States for at least the two years preceding the date of the inadmissibility determination." Li Decl., Ex. F, at 90 Fed. Reg. at 13619.

**Response:** Disputed. The document is published in the Federal Register and speaks for itself, and the document does not label the termination "premature."

56.     To support its assertion that expedited removal is only available when an individual has been present in the United States for less than two years, the March 25 CHNV Termination Notice cites INA § 235(b)(1)(iii)(II), 8 U.S.C. § 1225(b)(1)(iii)(II) and 8 CFR § 235.3, and—in a footnote—the January 24 Expanded Expedited Removal Notice, which itself cites the same authorities. Li Decl., Ex. F, 90 Fed. Reg. at 13619.

**Response:** The document is published in the Federal Register and speaks for itself.

57.     The March 25 CHNV Termination Notice further explained that "[i]f DHS were to allow the CHNV parolee population to remain for the full duration of their two-year parole, DHS would be compelled to place a greater proportion of this population in section 240 removal proceedings to effectuate their removal." Li Decl., Ex. F, 90 Fed. Reg. 13619.

**Response:** The document is published in the Federal Register and speaks for itself.

58.     Apart from 8 U.S.C. § 1225(b)(1)(A)(iii), 8 C.F.R. § 253.3(b)(1)(ii), and the January 24 Expanded Expedited Removal Notice, the March 25 CHNV Termination Notice cites no authority for its claim that expedited removal may be applied to CHNV parolees only if they have been continuously present in the United States for less than two years. Li Decl., Ex. F. The March 24 CHNV Termination Notice does not reference the January 23 Huffman Memorandum or the February 18 ICE Directive. Li Decl., Ex. F.

**Response:** The document is published in the Federal Register and speaks for itself.

59.    In 2011, DHS adopted a policy whereby ICE officers could use expedited removal "for all arriving aliens paroled into the United States for prosecution, regardless of how long they have been present in the United States." Dkt. No. 36-1 (Memo entitled "Strategic Use of Expedited Removal Authority") at 2.

**Response:** The document has been filed on the Court's docket and speaks for itself.

60.    This 2011 policy was not made public until 2025, *see* Dkt. No. 36, and it is not in the administrative records (discussed more *infra*) for any of the agency actions challenged here, *see* Li Decl. ¶¶ 11-13, 28 & Exs. G, H, I, X.

**Response:** Disputed. The date the document was made public is not material. Plaintiffs have not shown that it was first made public in 2025.

61.    In this litigation, DHS has identified four noncitizens whom it paroled into the country for purposes of criminal prosecution and whom it later subjected to expedited removal after they completed their criminal sentences. Brief for Appellants at 9-10 n.1, Doc. 2145851, *CHIRLA v. Noem*, No. 25-5289 (D.C. Cir. Nov. 17, 2025).

**Response:** Not disputed.

62.    Beyond these four individuals, Defendants have identified no other pre-2025 instance in which DHS subjected a noncitizen paroled into the country at a port of entry to expedited removal. Brief for Appellants at 9-10 n.1, Doc. 2145851, *CHIRLA v. Noem*, No. 25-5289 (D.C. Cir. Nov. 17, 2025).

18

**Response:** Not disputed.

63. Beginning in 2025, DHS has subjected other noncitizens paroled into the country at a port of entry to expedited removal, including those whose parole remained valid. Dkt. No. 22-2 – 22-5, 22-7 – 22-17; Salas Suppl. Decl.; Lawrence Suppl. Decl.; Escobar Suppl. Decl.; Torres Suppl. Decl.; Hercules-Paez Decl.; De Luca Decl.; Olive Suppl. Decl.; Declaration of Laura Kelley ("Kelley Decl."); Declaration of Dmitry Filimonov ("Filimonov Decl.").

**Response:** Not disputed.

64. In May 2025, White House deputy chief of staff Stephen Miller "set a goal of a minimum of 3,000 arrests for ICE every day and President Trump is going to keep pushing to get that number up higher each and every day." Li Decl. ¶ 14 & Ex. J.

**Response:** Disputed. Plaintiffs have not shown the fact is material, and Plaintiffs rely on evidence outside the administrative record.

65. In May 2025, pursuant to the direction of leadership, DHS attorneys representing ICE at immigration court hearings around the country moved to dismiss Section 240 removal proceedings of noncitizens. Li Decl. ¶ 15 & Ex. K.

**Response:** Disputed. Plaintiffs have not shown the fact is material, and Plaintiffs rely on evidence outside the administrative record.

19

66.   After the cases were dismissed, ICE enforcement officers arrested the noncitizens and detained them to process them for expedited removal. Li Decl., Ex. K; Dkt. No. 22-5, 22-7 – 22-17; Hercules-Paez Decl.; De Luca Decl.; Kelley Decl.

   **Response:**  Defendants cannot state whether this statement is disputed or undisputed because it does not identify who was allegedly arrested by ICE enforcement officers.

67.   Noncitizens previously paroled at a port of entry were among those targeted for expedited removal. Li Decl., Ex. K; Dkt. No. 22-5, 22-7 – 22-17; Hercules-Paez Decl.; De Luca Decl.; Kelley Decl.

   **Response:**  Not disputed.

68.   As of July 9, 2025, Defendants represented to this court that they were not aware of "DHS or its predecessors ever applying or subjecting to expedited removal procedures individuals who had been previously paroled but whose parole terminated for whatever reason." Dkt. No. 35 at 52:3-8.

   **Response:**  The document has been filed on the Court's docket and speaks for itself.

69.   Between this Court's August 1, 2025 order preliminarily staying the January 23 Huffman Memo, February 18 ICE Directive, and March 25 CHNV Termination Notice, and the September 12, 2025 D.C. Circuit order denying Defendants' motion for a stay pending appeal, DHS acknowledged that this Court's order prevents the expedited removal of people previously paroled into the country at a port of entry. Dkt. No. 53-1.

   **Response:**  Disputed.  The document filed at Dkt 53 speaks for itself.  Defendants' emergency motion in the D.C. Circuit asking for a stay of this Court's order did not

"acknowledge" that the order "prevents . . . expedited removal." Appellants' Emergency Motion, *CHIR v. Noem*, No. 25-5289, Document 2130201 (D.C. Cir. Aug. 14, 2025).

70. In September 2025, ICE canceled at least one expedited removal order of an individual who was previously paroled into the country, after Plaintiffs raised the case to Defendants as a violation of this Court's order. Dkt. No. 53-1.

**Response:** Not disputed.

71. As of October 2025, DHS took the position that, even though this Court's order remained in place, DHS would resume placing previously paroled individuals in expedited removal, but now pursuant to the government's regulations. Li Decl. ¶ 4.

**Response:** Disputed. The question mistakenly assumes that DHS was not previously applying expedited removal based on the regulations.

72. Since October 2025, DHS has been subjecting certain noncitizens paroled into the country at a port of entry to expedited removal pursuant to the government's regulations. Reply Brief for Appellants at 4-5, 26, Doc. 2159516, *CHIRLA v. Noem*, No. 25-5289 (D.C. Cir. Feb. 17, 2026); Torres Suppl. Decl. ¶ 7; Hercules-Paez Decl. ¶ 14; *see also* Filimonov Decl. ¶¶ 5-6.

**Response:** Not disputed.

73. Unlike Section 240 removal proceedings, which are conducted by Immigration Judges with the Department of Justice ("DOJ") who are sworn to serve as neutral judges,

expedited removal is a process initiated, conducted, and adjudicated by DHS enforcement officers. Declaration of Ashley Tabaddor ("Tabaddor Decl."), Dkt. No. 22-6 ¶¶ 4, 11, 17.

**Response:** This is a legal conclusion and not a statement of fact.

74. Individuals subject to expedited removal do not receive a hearing before an IJ, and they are not entitled to seek or be represented by counsel even at their own expense. Tabaddor Decl. ¶ 11. They are not given reasonable time to gather and submit documents, witness testimony, or legal motions to defend against their deportation. Tabaddor Decl. ¶ 17.

**Response:** This is a legal conclusion and not a statement of fact.

75. In Section 240 removal proceedings, noncitizens are afforded the opportunity to retain counsel and request continuances to secure representation. Tabaddor Decl. ¶ 17. They are given reasonable time to gather and submit documents, witness testimony, or legal motions to defend against their deportation. Tabaddor Decl. ¶ 17.

**Response:** This is a legal conclusion and not a statement of fact.

76. Expedited removal proceedings can result in deportation as quickly as within hours and days of detention. Tabaddor Decl. ¶ 11.

**Response:** Plaintiffs have not shown that this is a material fact.

77. Individuals in expedited removal are typically detained by DHS from the time of apprehension through the conclusion of their case. Tabaddor Decl. ¶ 19.

**Response:** Plaintiffs have not shown that this is a material fact.

78.    In Section 240 proceedings, noncitizens who are *prima facie* eligible for collateral relief (relief from removal that can be granted not by an immigration court but by another entity like USCIS), such as adjustment of status, Temporary Protected Status ("TPS"), or Special Immigrant Juvenile Status ("SIJS"), can request that the Immigration Judge allow them to pursue those applications. Tabaddor Decl. ¶ 9. The Immigration Judge can exercise various options to do so, including granting a continuance, administratively closing proceedings, placing the case on the status docket to provide USCIS with time to adjudicate the collateral relief, or terminating proceedings altogether. Tabaddor Decl. ¶ 9.

**Response:**  This is a legal conclusion and not a statement of fact.

79.    In expedited removal, there is no mechanism for individuals to pursue eligibility for any non-fear-based forms of relief, including family-based petitions, special immigration visas, TPS, or adjustment of status. Tabaddor Decl. ¶ 16. Individuals with valid claims of these kinds of relief lose their ability to pursue them when they are processed for expedited removal. Tabaddor Decl. ¶ 16.

**Response:**  This is a legal conclusion and not a statement of fact.

80.    Noncitizens in expedited removal who express a fear of returning to their home country are supposed to be referred for a credible fear screening interview. Tabaddor Decl. ¶ 12. These interviews are conducted by asylum officers who are also employees of DHS. Tabaddor Decl. ¶ 12.

**Response:**  This is a legal conclusion and not a statement of fact.

81.    There is no right to counsel during a credible fear interview. Tabaddor Decl. ¶ 12.

**Response:** Disputed. This is a legal conclusion and not a statement of fact. The statute and regulations provide a right to consult another person before the credible fear interview.

82.   As noncitizens are typically detained during expedited removal proceedings, and they are given on average 24 to 48 hours' notice before credible fear interviews, their ability to obtain counsel, or contact another trusted individual to accompany them during the interview is severely constrained. Tabaddor Decl. ¶ 12.

**Response:** Disputed. This is a legal conclusion and not a statement of fact. Plaintiffs have not shown that these are material facts.

83.   If after a credible fear interview the asylum officer finds no credible fear, the noncitizen can request a limited review by an Immigration Judge that focuses solely on whether the credible fear determination was proper. Tabaddor Decl. ¶ 14. If the Immigration Judge affirms the asylum officer's finding, there is no judicial review of the decision. Tabaddor Decl. ¶ 14.

**Response:** This is a legal conclusion and not a statement of fact.

84.   In Section 240 removal proceedings, Immigration Judge decisions are subject to appellate and judicial review in the circuit court of appeals. Tabaddor Decl. ¶ 17.

**Response:** This is a legal conclusion and not a statement of fact.

85.     The credible fear screening process has long been documented to lack basic and

necessary safeguards to protect against the erroneous removal of noncitizens to

dangerous situations abroad. Li Decl. ¶¶ 16-17 & Exs. L, M.

**Response:**  Disputed.  This is a legal conclusion and not a statement of fact.  Plaintiffs

rely on evidence outside the administrative record.

86.     In March 1980, Congress passed the Refugee Act, establishing the U.S. Refugee

Admissions Program for resettling in the United States refugees identified and processed

abroad and requiring the Attorney General to establish a procedure to allow noncitizens

"physically present in the United States or at a land border or port of entry" to apply for

asylum. Pub. L. No. 96-212, § 201(b), 94 Stat. 102, 105 (*codified as amended at* 8 U.S.C.

§ 1158(a)); Declaration of Yael Schacher, ("Schacher Decl.") ¶ 12.

**Response:**  This is a legal conclusion and not a statement of fact.  The statute speaks for

itself.  To the extent the statement is based on historical events, Plaintiffs rely on evidence

outside of the administrative record.

87.     After enactment but before the Attorney General established the required procedures to

allow for the filing of asylum applications, tens of thousands of Cubans sailed from the

port of Mariel and began arriving by boat in Florida. Thousands of Haitians also arrived

in Florida during the spring and summer of 1980. Many were paroled into the country.

Schacher Decl. ¶ 13.

**Response:** Plaintiffs have not shown the facts are material. To the extent the statement is based on historical events, Plaintiffs rely on evidence outside of the administrative record.

88.    In 1981, U.S. officials were concerned that additional large groups of Cuban or Haitian migrants might attempt to come to the United States by boat. The Reagan Administration and members of Congress of both parties began to propose legislation to create an expedited exclusion process for migrants with fraudulent documents or no documents at all who were in the process of arriving at our borders or who had just come into the country at a place that was not a designated port of entry. Schacher Decl. ¶¶ 14-15.

**Response:** Plaintiffs have not shown the facts are material. To the extent the statement is based on historical events, Plaintiffs rely on evidence outside of the administrative record.

89.    The Reagan administration's legislation containing the first expedited exclusion proposal was introduced in 1981 as S. 1765 and H.R. 4832, the "Omnibus Immigration Control Act," which authorized immigration officers during inspection to order noncitizens lacking necessary entry documents to be excluded and to "immediately deport[]" such noncitizens who are "arriving in the United States." Schacher Decl. ¶ 17 & Ex. B.

**Response:** Plaintiffs have not shown the facts are material. The material attached to the declaration speaks for itself. To the extent the statement is based on historical events, Plaintiffs rely on evidence outside of the administrative record.

90.    After debate over the administration's bill, Rep. Romano Mazzoli and Sen. Alan Simpson introduced bills both in 1982 and during the following Congress that allowed inspectors to exclude noncitizens in the physical act of seeking entry to the United States who lacked documents authorizing entry. Schacher Decl. ¶¶ 18-19.

**Response:**  Plaintiffs have not shown the facts are material.  The material attached to the declaration speaks for itself.  The material attached to the declaration does not support the adjective "physical."  To the extent the statement is based on historical events, Plaintiffs rely on evidence outside of the administrative record.

91.    Sen. Simpson's bills in both Congresses specified that the provision applied only "at the port of arrival" to people without entry documents who were described as "unlawfully seeking entry into the United States." Rep. Mazzoli's bills in both Congresses referred to people "seeking entry" who failed to provide required entry documents. Schacher Decl. ¶¶ 18-19.

**Response:**  Plaintiffs have not shown the facts are material.  To the extent the statement is based on historical events, Plaintiffs rely on evidence outside of the administrative record.  The material attached to the declaration speaks for itself.

92.    Each of these proposals was motivated, in part, by a desire to give the Immigration and Naturalization Service (INS) an expeditious exclusion tool to use against nonasylum seekers in the event of a future mass migration event. Schacher Decl. ¶¶ 14-19.

**Response:**  Plaintiffs have not shown the facts are material.  To the extent the statement is based on historical events, Plaintiffs rely on evidence outside of the administrative

record.  This is a legal conclusion and not a statement of fact.  The material attached to

the declaration speaks for itself.

93.     None of these legislative proposals would have subjected people previously paroled into

the country—including those Cuban and Haitian nationals who came in 1980 and were

paroled into the country—to the expedited exclusion procedures. Schacher Decl. ¶¶ 16-

20.

**Response:**  Disputed.  Plaintiffs have not shown the facts are material.  To the extent the

statement is based on historical events, Plaintiffs rely on evidence outside of the

administrative record.  The material attached to the declaration speaks for itself.  The

assertion ignores the entry fiction or doctrine.

94.     The legislative proposals that passed the House and the Senate in 1983 and 1984 that

containing expedited exclusion provisions also contained provisions allowing eligible

Cuban and Haitian nationals who had been paroled into the country during this period to

adjust status to lawful permanent residence. Schacher Decl. ¶¶ 18-20.

**Response:**  Disputed.  Plaintiffs have not shown the facts are material.  To the extent the

statement is based on historical events, Plaintiffs rely on evidence outside of the

administrative record.  This is a legal conclusion and not a statement of fact.  The

material attached to the declaration speaks for itself.

95.     Although none of the legislation with summary exclusion provisions proposed in the

1980s were enacted, Congress, in the Immigration Reform and Control Act of 1986,

enacted a provision allowing Cuban and Haitian parolees who were otherwise eligible

under the legislation to apply for adjustment of status to lawful permanent residence. Schacher Decl. ¶ 21.

**Response:** Disputed. Plaintiffs have not shown the facts are material. To the extent the statement is based on historical events, Plaintiffs rely on evidence outside of the administrative record. This is a legal conclusion and not a statement of fact. The material attached to the declaration speaks for itself.

96. Congress's interest in an expedited exclusion process generally faded toward the second half of the 1980s, but returned in the 1990s due to increased reports of noncitizens arriving at airports with no documents or with fraudulent documents, increased smuggling of migrants by boat, and after the February 1993 bombing of the World Trade Center. Schacher Decl. ¶¶ 23-25.

**Response:** Disputed. Plaintiffs have not shown the facts are material. To the extent the statement is based on historical events, Plaintiffs rely on evidence outside of the administrative record. The material attached to the declaration speaks for itself.

97. In response, Rep. Bill McCollum in March 1993 (H.R. 1355) and Sen. Simpson in May 1993 (S. 667) both introduced legislation that would have created an expedited exclusion process for people seeking entry with fraudulent documents and those who claimed asylum but could not pass a credible fear screening. Schacher Decl. ¶ 24.

**Response:** Plaintiffs have not shown the facts are material. To the extent the statement is based on historical events, Plaintiffs rely on evidence outside of the administrative record. The material attached to the declaration speaks for itself.

98.   During the May 1993 Senate Judiciary Committee hearing on Sen. Simpson's bill, S. 667, Members of Congress raised concerns about the need to address increased smuggling of Chinese migrants to the United States by boat. Schacher Decl. ¶ 25.

**Response:** Plaintiffs have not shown the facts are material. To the extent the statement is based on historical events, Plaintiffs rely on evidence outside of the administrative record. The material attached to the declaration speaks for itself.

99.   In July 1993, Reps. Mazzoli, McCollum, and Schumer introduced legislation, H.R. 2602, that combined the expedited exclusion of people seeking entry at ports of entry without proper documentation with provisions aimed at preventing smuggling. Schacher Decl. ¶ 25.

**Response:** Plaintiffs have not shown the facts are material. To the extent the statement is based on historical events, Plaintiffs rely on evidence outside of the administrative record. The material attached to the declaration speaks for itself.

100.   Speaking on the House Floor in support of this legislation, Rep. Mazzoli described the bill as "keeping people out of the United States who are attempting to travel with fraudulent papers" and providing "an expedited but fair hearing for those who plead asylum when they reach this shore." Schacher Decl. ¶ 25 & Ex. H.

**Response:** Plaintiffs have not shown the facts are material. To the extent the statement is based on historical events, Plaintiffs rely on evidence outside of the administrative record. The material attached to the declaration speaks for itself.

101.    In July 1993, Sen. Edward Kennedy introduced legislation, S. 1333, that applied expedited exclusion to those seeking entry at ports with fraudulent documents and those who tried to enter by boat and were brought by U.S. authorities to a port of entry for inspection. Schacher Decl. ¶ 26.

**Response:**  Plaintiffs have not shown the facts are material.  To the extent the statement is based on historical events, Plaintiffs rely on evidence outside of the administrative record.  The material attached to the declaration speaks for itself.

102.    In May 1994, Rep. Lamar Smith introduced legislation, H.R. 3860, that included an expedited exclusion provision. Like Rep. Mazzoli's bill, the legislation was focused on noncitizens seeking entry at ports without necessary documents. Schacher Decl. ¶ 27.

**Response:**  Plaintiffs have not shown the facts are material.  To the extent the statement is based on historical events, Plaintiffs rely on evidence outside of the administrative record.  The material attached to the declaration speaks for itself.

103.    None of these expedited exclusion provisions proposed between 1992 and 1994 mentioned people paroled into the country. Schacher Decl. ¶ 29.

**Response:**  Disputed.  Plaintiffs have not shown the facts are material.  To the extent the statement is based on historical events, Plaintiffs rely on evidence outside of the administrative record.  The material attached to the declaration speaks for itself.  The assertion ignores the entry fiction or doctrine.

104.    On September 13, 1994, Congress enacted the Violent Crime Control and Law Enforcement Act of 1994. The legislation contained a "sense of the Senate" that the

country's immigration and asylum laws should be amended to provide an expedited exclusion process for noncitizens "who arrive[] at a port-of-entry with fraudulent documents, or no documents" and who make a "noncredible claim of asylum." Schacher Decl. ¶ 28 & Ex. I.

**Response:**  Plaintiffs have not shown the facts are material.  To the extent the statement is based on historical events, Plaintiffs rely on evidence outside of the administrative record.  This is a legal conclusion and not a statement of fact.  The material attached to the declaration speaks for itself.

105.   The Violent Crime Control and Law Enforcement Act of 1994 contains no mention of people previously paroled into the country in connection with its support for the creation of an expedited exclusion authority. Schacher Decl. ¶ 28 & Ex. I.

**Response:**  Disputed.  Plaintiffs have not shown the facts are material.  To the extent the statement is based on historical events, Plaintiffs rely on evidence outside of the administrative record.  This is a legal conclusion and not a statement of fact.  The material attached to the declaration speaks for itself.  The assertion ignores the entry fiction or doctrine.

106.   On March 14, 1995, the Senate Judiciary Committee held a hearing on S. 269, the "Immigrant Control and Financial Responsibility Act of 1995," as well as a proposal advanced by the Clinton Administration, both of which contained expedited exclusion provisions. At the hearing, the discussion regarding these provisions focused exclusively

on people arriving at ports of entry or brought to the United States after interdiction at sea. Schacher Decl. ¶ 29.

**Response:** Plaintiffs have not shown the facts are material. To the extent the statement is based on historical events, Plaintiffs rely on evidence outside of the administrative record. The material attached to the declaration speaks for itself.

107. Although both expedited exclusion and reforms to the parole authority were discussed at the hearing, the two topics were treated as entirely separate subjects and no senator or witness argued that an expedited exclusion authority should be available for use against noncitizens paroled into the country at ports of entry. Schacher Decl. ¶ 29.

**Response:** Disputed. Plaintiffs have not shown the facts are material. To the extent the statement is based on historical events, Plaintiffs rely on evidence outside of the administrative record. This is a legal conclusion and not a statement of fact. The material attached to the declaration speaks for itself.

108. On April 19, 1995, a domestic terrorist attack took place in Oklahoma City, where the Alfred P. Murrah Federal Building was bombed. Schacher Decl. ¶ 30.

**Response:** Plaintiffs have not shown the facts are material. To the extent the statement is based on historical events, Plaintiffs rely on evidence outside of the administrative record.

109. Over the course of the next year and a half, Congress considered both immigration legislation that eventually became the Illegal Immigration and Immigrant Responsibility Act (IIRIRA) and antiterrorism legislation that eventually became the Antiterrorism and

Effective Death Penalty Act (AEDPA). Both pieces of enacted legislation included expedited removal provisions. Schacher Decl. ¶ 31.

**Response:** Plaintiffs have not shown the facts are material. To the extent the statement is based on historical events, Plaintiffs rely on evidence outside of the administrative record. The material attached to the declaration speaks for itself.

110. Exhibit J to the Declaration of Yael Schacher accurately reflects and summarizes key legislative moments in the 104th Congress leading to the enactment of both IIRIRA and AEDPA. Schacher Decl. ¶ 31 & Ex. J.

**Response:** Plaintiffs have not shown the facts are material. To the extent the statement is based on historical events, Plaintiffs rely on evidence outside of the administrative record. The material attached to the declaration speaks for itself.

111. AEDPA was enacted into law first, on April 24, 1996. Schacher Decl. ¶ 40; AEDPA, Pub. L. No. 104-132.

**Response:** Plaintiffs have not shown the facts are material. To the extent the statement is based on historical events, Plaintiffs rely on evidence outside of the administrative record. The statute speaks for itself.

112. AEDPA made noncitizens lacking entry documents who were "seeking entry" subject to expedited exclusion. Schacher Decl. ¶ 38 & Ex. N; AEDPA, Pub. L. No. 104-132, § 422.

**Response:** Plaintiffs have not shown the facts are material. To the extent the statement is based on historical events, Plaintiffs rely on evidence outside of the administrative record. The statute speaks for itself.

113.    Congress designed this "seeking entry" authority for noncitizens lacking entry documents who were arriving in the country at a port of entry. Schacher Decl. ¶¶ 35-36, 38.

     **Response:**  Plaintiffs have not shown the facts are material.  To the extent the statement is based on historical events, Plaintiffs rely on evidence outside of the administrative record.  This is a legal conclusion and not a statement of fact.  The statute and the material attached to the declaration speaks for itself.

114.    During markup of H.R. 1710, the House bill that first contained the expedited removal provisions ultimately enacted in AEDPA, Judiciary Committee Chairman Henry Hyde emphasized that the goal of the "seeking entry" provision was deal with "people who show up at the airport" without proper documents and to "get control" of the situation where people "get off [the plane] without documentation." Schacher Decl. ¶ 35 & Ex. K.

     **Response:**  Plaintiffs have not shown the facts are material.  To the extent the statement is based on historical events, Plaintiffs rely on evidence outside of the administrative record.  The material attached to the declaration speaks for itself.

115.    The House Judiciary Committee report for H.R. 1710 described the "seeking entry" provision as applying to noncitizens "arriving at the port of entry" and providing authority to return noncitizens at airports with fraudulent or no documents "as promptly as possible, to where they boarded the plane to come here." Schacher Decl. ¶ 36 & Ex. M.

**Response:**  Disputed.  Plaintiffs have not shown the facts are material.  To the extent the statement is based on historical events, Plaintiffs rely on evidence outside of the administrative record.  The material attached to the declaration speaks for itself.

116.  AEDPA also deemed noncitizens "found in" the country without having been admitted following inspection to be "seeking entry and admission" and exposed them not only to exclusion hearings, but also to expedited exclusion. Schacher Decl. ¶ 33; AEDPA, Pub. L. No. 104-132, § 414.

**Response:**  To the extent the statement is based on historical events, Plaintiffs rely on evidence outside of the administrative record.  This is a legal conclusion and not a statement of fact.  The statute speaks for itself.

117.  Congress designed this "found in" authority for noncitizens present in the country who entered without inspection, wholly unlawfully. Schacher Decl. ¶¶ 35-36, 38.

**Response:**  To the extent the statement is based on historical events, Plaintiffs rely on evidence outside of the administrative record.  This is a legal conclusion and not a statement of fact.  The material attached to the declaration speaks for itself.

118.  During markup, Chairman Hyde described the "found in" provision as focused on those who "evade our border controls," "succeed in crossing our borders illegally," and make a "stealthy entrance." The provision was meant as "an expression of our resolve" to end incentives "for terrorists to enter the country illegally." Schacher Decl. ¶ 35 & Ex. K.

**Response:**  Plaintiffs have not shown the facts are material.  To the extent the statement is based on historical events, Plaintiffs rely on evidence outside of the administrative record.  The material attached to the declaration speaks for itself.

119.    The House Judiciary Committee report for H.R. 1710 described the "found in" provision as applying to noncitizens who "entered the United States unlawfully" and "regardless of the length of time the illegal entrant has been unlawfully present within the United States." Schacher Decl. ¶ 36 & Ex. M. The INS described the "found in" provision in AEDPA as applying to noncitizens "who have entered the U.S. without inspection, wherever encountered and irrespective of their length of stay in the U.S." Schacher Decl. ¶ 46 & Ex. S.

**Response:**  Disputed.  Plaintiffs have not shown the facts are material.  To the extent the statement is based on historical events, Plaintiffs rely on evidence outside of the administrative record.  The material attached to the declaration speaks for itself.

120.    At no point in the legislative history leading to the enactment of AEDPA, including the House Judiciary Committee hearings and markups on H.R. 1710 or consideration of the legislation on the House or Senate Floor, was there any mention of noncitizens who had been paroled into the country at a port of entry being treated as "seeking entry." Schacher Decl. ¶¶ 34-35, 37, 39.

**Response:**  Disputed.  Plaintiffs have not shown the facts are material.  To the extent the statement is based on historical events, Plaintiffs rely on evidence outside of the

administrative record. The material attached to the declaration speaks for itself. The assertion ignores the entry fiction or doctrine.

121. At no point in the legislative history leading to the enactment of AEDPA, including the House Judiciary Committee hearings and markups on the bill or consideration of the legislation on the House or Senate Floor, was there any mention of noncitizens who had been paroled into the country at a port of entry being treated as "found in" the country without inspection. Schacher Decl. ¶¶ 34-35, 37, 39.

Response: Disputed. Plaintiffs have not shown the facts are material. To the extent the statement is based on historical events, Plaintiffs rely on evidence outside of the administrative record. The material attached to the declaration speaks for itself. The assertion ignores the entry fiction or doctrine.

122. IIRIRA was enacted into law on September 30, 1996. Schacher Decl. ¶ 62; IIRIRA, Pub. L. No. 104-208, 110 Stat. 3009, Division C. The first purpose of IIRIRA was to "improve deterrence of illegal immigration to the United States." Schacher Decl. ¶ 63 & Ex. L.

Response: This is a legal conclusion and not a statement of fact. The statute speaks for itself.

123. IIRIRA rescinded both the "seeking entry" and "found in" provisions enacted in AEDPA. Schacher Decl. ¶ 41.

Response: This is a legal conclusion and not a statement of fact. The statute speaks for itself.

124. To replace the "seeking entry" expedited exclusion provision contained in AEDPA, Congress authorized in IIRIRA the use of expedited removal against noncitizens lacking entry documents who are "arriving in" the country. IIRIRA, Pub. L. No. 104-208, 110 Stat. 3009, Division C, Sec. 302; *see* Schacher Decl. ¶¶ 40, 42-66.

    **Response:** This is a legal conclusion and not a statement of fact. The statute speaks for itself.

125. To replace the "found in" expedited exclusion provision contained in AEDPA, Congress authorized in IIRIRA, subject to designation by the Attorney General, the use of expedited removal against noncitizens lacking entry documents who have not been admitted or paroled into the country and cannot establish two years of physical presence. IIRIRA, Pub. L. No. 104-208, 110 Stat. 3009, Division C, Sec. 302; *see* Schacher Decl. ¶¶ 40, 42-66.

    **Response:** This is a legal conclusion and not a statement of fact. The statute speaks for itself.

126. When the Senate Immigration Subcommittee marked up the Senate bill that would become IIRIRA, the bill sponsor, Sen. Simpson, emphasized that "[t]he purpose of expedited exclusion is just that, to accelerate the exclusion of those who would abuse our hospitality and generosity through surreptitious entry, document fraud, and by making fraudulent and wholly frivolous asylum claims." Schacher Decl. ¶ 43 & Ex. Q.

    **Response:** This is a legal conclusion and not a statement of fact. The material attached to the declaration speaks for itself.

39

127.    Similarly, the House Judiciary Committee markup debates for its versions of the bill confirm that the bill's proponents understood the expedited removal provision as applying to people in the process of physically coming into the country without valid documents. During the markup, Rep. Smith made it clear that expedited removal was designed to return "as promptly as possible to where they boarded the plane to come here" those without valid entry documents who had no fear of persecution. Schacher Decl. ¶ 50 & Ex. U.

**Response:**  Disputed.  Plaintiffs have not shown the facts are material.  The material attached to the declaration speaks for itself.  The material attached to the declaration does not support the adjective "physically."

128.    The Department of Justice's official views on the expedited exclusion provisions in the House- and Senate-passed versions of IIRIRA supported the Senate-passed version, with certain modifications, because it provided sufficient flexibility to use the authority when needed for people attempting to come into the country at ports of entry without proper documents. The Department wrote that, "[e]xpedited exclusion authority is critically important to our ability to deal with organized alien smuggling and fraud at our ports of entry." Schacher Decl. ¶ 55 & Ex. W.

**Response:**  Plaintiffs have not shown the facts are material.  This is a legal conclusion and not a statement of fact.  The material attached to the declaration speaks for itself.

129.    Unlike the expedited removal provisions that were enacted in AEDPA after receiving little scrutiny throughout the process, the expedited removal provisions that were being

considered in the House and Senate immigration bills underwent significant debate and discussion. But at no point during the process was there any discussion of creating a statutory authorization of expedited removal to be used against noncitizens who had already been paroled into the country at a port of entry. Schacher Decl. ¶ 41.

**Response:** Disputed. Plaintiffs have not shown the facts are material. The material attached to the declaration speaks for itself. The assertion ignores the entry fiction or doctrine.

130. At no point in the legislative history leading to the enactment of IIRIRA, which included extensive House Judiciary Committee and Senate Judiciary Committee hearings and markups on the bill, House and Senate Floor debates, and materials prepared and exchanged when the House and Senate bills were being conference was there any mention of noncitizens who had been paroled into the country at a port of entry being treated as "arriving in" the country. Schacher Decl. ¶¶ 41-66.

**Response:** Disputed. Plaintiffs have not shown the facts are material. The material attached to the declaration speaks for itself. The assertion ignores the entry fiction or doctrine.

131. At no point in the legislative history leading to the enactment of IIRIRA, which included extensive House Judiciary Committee and Senate Judiciary Committee hearings and markups on the bill, House and Senate Floor debates, and materials prepared and exchanged when the House and Senate bills were being conferenced was there any mention of noncitizens who had been paroled into the country at a port of entry being

41

subjected to expedited removal pursuant to a designation by the Attorney General. Schacher Decl. ¶¶ 41-66.

**Response:** Disputed. Plaintiffs have not shown the facts are material. The material attached to the declaration speaks for itself. The assertion ignores the entry fiction or doctrine.

132. The first time in the legislative history of IIRIRA that there is a reference to noncitizens paroled into the country in connection to exposure to expedited removal is in the version of the legislation reported by the Conference Committee, where the provision targeting noncitizens who entered the country without inspection now included language to specifically protect from expedited removal noncitizens who have been paroled into the country (just as the language already protected noncitizens who have been admitted to the country). Schacher Decl. ¶ 66.

**Response:** Disputed. Plaintiffs have not shown the facts are material. The material attached to the declaration speaks for itself. The assertion ignores the entry fiction or doctrine.

133. Congressional efforts to modify the parole authority prior to IIRIRA have always been distinct from efforts to create an expedited removal authority. Schacher Decl. ¶¶ 67-74.

**Response:** Plaintiffs have not shown the facts are material. To the extent the statement is based on historical events, Plaintiffs rely on evidence outside of the administrative record. This is a legal conclusion and not a statement of fact. The material attached to the declaration speaks for itself.

134.   In 1980, Congress replaced the conditional entry of refugees with a process for the admission of refugees and also amended the parole statute to limit the statutory authority to parole refugees into the country rather than admitting absent "compelling reasons in the public interest." Schacher Decl. ¶ 68.

**Response:** Plaintiffs have not shown the facts are material. To the extent the statement is based on historical events, Plaintiffs rely on evidence outside of the administrative record. This is a legal conclusion and not a statement of fact. The statute speaks for itself.

135.   In 1994 and 1995, legislation was proposed but not enacted to limit how many people and who could be paroled and the eligibility of parolees for work authorization or adjustment of status. Schacher Decl. ¶ 68.

**Response:** Plaintiffs have not shown the facts are material. To the extent the statement is based on historical events, Plaintiffs rely on evidence outside of the administrative record. This is a legal conclusion and not a statement of fact. The material attached to the declaration speaks for itself.

136.   In 1996, Congress in IIRIRA enacted several provisions pertaining to the parole authority and amended the parole statute itself. Schacher Decl. ¶¶ 69-71. These include: (1) requiring nearly all long-term parolees who have yet to become lawful permanent residents be counted against annual numerical caps on family-sponsored immigration; (2) requiring the Executive to report to Congress annually on the use of parole; and (3) and replacing the "emergent reasons or for reasons deemed strictly in the public interest"

language that had been in the parole criteria since 1952 with "urgent humanitarian reasons or significant public benefit." Schacher Decl. ¶¶ 69-71.

**Response:** Plaintiffs have not shown the facts are material. To the extent the statement is based on historical events, Plaintiffs rely on evidence outside of the administrative record. This is a legal conclusion and not a statement of fact. The statute speaks for itself.

137.    Congress did not in IIRIRA amend—or discuss amending—the parole statute to render noncitizens paroled into the country at a port of entry as "arriving" in the United States," regardless of whether their parole had expired or otherwise been terminated. Schacher Decl. ¶ 73.

**Response:** Disputed. Plaintiffs have not shown the facts are material. To the extent the statement is based on historical events, Plaintiffs rely on evidence outside of the administrative record. This is a legal conclusion and not a statement of fact. The assertion ignores the entry fiction or doctrine. The statute and material attached to the declaration speak for themselves.

138.    Congress did not in IIRIRA amend—or discuss amending—the parole statute to state that a noncitizen paroled into the country at a port of entry could be subject to removal under the contemporaneously enacted expedited removal authority at 8 U.S.C. § 1225(b)(1). Schacher Decl. ¶ 73.

**Response:** Disputed. Plaintiffs have not shown the facts are material. To the extent the statement is based on historical events, Plaintiffs rely on evidence outside of the

administrative record. This is a legal conclusion and not a statement of fact. The assertion ignores the entry fiction or doctrine. The statute and material attached to the declaration speak for themselves.

139. When legislative proposals regarding parole were being considered in the wake of the enactment of the Refugee Act and continuing through enactment of IIRIRA, there was no consideration given to subjecting noncitizens who previously had been paroled into the country to summary removal provisions also being considered. Schacher Decl. ¶ 73.

**Response:** Disputed. Plaintiffs have not shown the facts are material. To the extent the statement is based on historical events, Plaintiffs rely on evidence outside of the administrative record. This is a legal conclusion and not a statement of fact. The assertion ignores the entry fiction or doctrine. The statute and material attached to the declaration speak for themselves.

140. Rather, throughout this period—and even in IIRIRA itself—Congress regularly continued to enact legislation allowing such individuals physically present in the country pursuant to parole to adjust status to lawful permanent residence. Schacher Decl. ¶ 74.

**Response:** Disputed. Plaintiffs have not shown the facts are material. To the extent the statement is based on historical events, Plaintiffs rely on evidence outside of the administrative record. This is a legal conclusion and not a statement of fact. The statute and material attached to the declaration speak for themselves.

141.   The Administrative Record ("AR") that Defendants produced for the January 23 Huffman

Memorandum consists of 18 documents in PDF format totaling 141 pages. Li Decl., Ex.

G.

**Response:**  Not disputed.

142.   All 18 documents in the AR were already publicly available either because they were

published on a government website, printed in the Federal Register, or filed on the public

docket of a federal court case. Li Decl., Ex. G.

**Response:**  Disputed.  Calls for information outside the administrative record.

143.   The AR has no information about DHS subjecting of individuals who were paroled into

the country at a port of entry to expedited removal before 2025. Li Decl., Ex. G.

**Response:**  Disputed.  The January 23 Huffman Memorandum, which is part of the

relevant AR, is attached as Exhibit A to the Li Declaration, and the document speaks for

itself.

144.   Nothing in the AR provides an explanation as to why the government began subjecting

paroled individuals to expedited removal in 2025. Li Decl., Ex. G.

**Response:**  Disputed.  Plaintiffs have acknowledged that the government did not "beg[i]n

subjecting paroled individuals to expedited removal in 2025."  *See* Plaintiffs' Statement

of Material Facts (Dkt 55-2) ¶ 59.

145.   The AR includes the Federal Register Notice cited in the January 23 Huffman Memo,

"Designating Aliens for Expedited Removal," 90 Fed. Reg. 8139 (Jan. 24, 2025), which

expanded the use of expedited removal under 8 U.S.C. § 1225(b)(1)(A)(iii)(II). Li Decl., Ex. C.

**Response:** Not disputed.

146. The AR includes two notices of termination of parole, which instruct to the individual receiving the notice, "Do not attempt to unlawfully remain in the United State – the federal government will find you." Li Decl. ¶ 18 & Ex. N.

**Response:** Plaintiffs have not shown that the fact is material.

147. There is no information in the AR about the government's ability to subject paroled individuals to expedited removal while their parole is active. Li Decl., Ex. G.

**Response:** Disputed. The January 23 Huffman Memorandum, which is part of the relevant AR, is attached as Exhibit A to the Li Declaration, and the document speaks for itself.

148. There is no information in the AR about the government's ability to subject paroled individuals to expedited removal after they have been continuously present in the United States for at least two years. Li Decl., Ex. G.

**Response:** Disputed. The January 23 Huffman Memorandum, which is part of the relevant AR, is attached as Exhibit A to the Li Declaration, and the document speaks for itself.

149.  There is no information in the AR about the impact that applying expedited removal to parole beneficiaries have on those individuals, nor on any reasonable alternatives to applying expedited removal to paroled individuals that DHS considered. Li Decl., Ex. G.

**Response:** Disputed.  The January 23 Huffman Memorandum is attached as Exhibit A to the Li Declaration, and that document speaks for itself.

150.  There is no information in the AR about the reliance interests of parole beneficiaries or their families, sponsors, employers, and communities that would be implicated of the parole beneficiaries were to be subjected to expedited removal. Li Decl., Ex. G.

**Response:** Disputed.  The January 23 Huffman Memorandum is attached as Exhibit A to the Li Declaration, and that document speaks for itself.

151.  The AR that Defendants produced for the February 18 ICE Directive consists of three documents in PDF format totaling seven pages. Li Decl., Ex. H.

**Response:** Not disputed.

152.  The three documents that make up the AR are the February 18 ICE Directive itself, the January 23 Huffman Memorandum, and the Executive Order specifically referenced in the February 18 ICE Directive (Executive Order 14165, "Securing Our Borders," (January 20, 2025). Li Decl., Ex. H.

**Response:** Not disputed.

153.   All three documents in the AR were already publicly available either because they were published on a government website or made publicly available online (on news sites, for example). Li Decl. ¶ 12 & Ex. H.

   **Response:**  Disputed.  Calls for information outside the administrative record.

154.   The AR has no information about DHS's subjecting of individuals who were paroled into the country at a port of entry to expedited removal before 2025. Li Decl., Ex. H.

   **Response:**  Disputed.  The January 23 Huffman Memorandum, which is part of the relevant AR, is attached as Exhibit A to the Li Declaration, and the document speaks for itself.

155.   Nothing in the AR provides an explanation as to why the government, shortly after issuing the January 23 Huffman Memorandum, took the new position that there is no time limit on the ability to process paroled individuals for expedited removal. Li Decl., Ex. H.

   **Response:**  Disputed.  Plaintiffs have not shown that the position was new.  Plaintiffs have acknowledged a 2011 memo that did not include a deadline for employing expedited removal for individuals paroled for prosecution.  Dkt 36-1 (2011 memo that did not state a time limit on use of expedited removal for individuals paroled for prosecution); Plaintiffs' Statement of Material Facts (Dkt 55-2) ¶ 59.

156.   There is no information in the AR about the impact that applying expedited removal to parole beneficiaries has on those individuals, nor on any reasonable alternatives to applying expedited removal to paroled individuals that DHS considered. Li Decl., Ex. H.

**Response:** Disputed. The January 23 Huffman Memorandum is attached as Exhibit A to the Li Declaration, and that document speaks for itself.

157. There is no information in the AR about the reliance interests of parole beneficiaries or their families, sponsors, employers, and communities that would be implicated if the parole beneficiaries were to be subjected to expedited removal. Li Decl., Ex. H.

    **Response:** Disputed. The January 23 Huffman Memorandum is attached as Exhibit A to the Li Declaration, and that document speaks for itself.

158. The AR that Defendants produced for the March 25 CHNV Termination Notice has 68 entries consisting of two native format Excel spreadsheets and 66 documents in PDF format totaling 840 pages. Li Decl., Ex. I.

    **Response:** Plaintiffs have not shown this is a material fact.

159. Of the 66 PDF documents in the AR, all were already publicly available either because they were published on a government website, printed in the Federal Register, filed on the public docket of a federal court case, or otherwise made publicly available online (on news sites, for example). Li Decl., Ex. I.

    **Response:** Disputed. Calls for information outside the administrative record.

160. The AR does not include the February 18 ICE Directive. Li Decl., Ex. I.

    **Response:** Not disputed.

161.    Aside from the January 23 Huffman Memorandum and the March 25 CHNV Termination

Notice itself, there is no information in the AR about DHS's subjecting of individuals

who were paroled into the country at a port of entry to expedited removal. Li Decl., Ex. I.

**Response:** Disputed.  This AR includes the Federal Register Notice published at 89 Fed.

Reg. 48710 (June 7, 2024), Li Decl. Ex. I, and that document speaks for itself.

162.    Nothing in the AR provides an explanation as to why the government, after issuing the

February 18 ICE Directive, took the changed position that expedited removal is available

only when a noncitizen has not been continuously present in the United States for at least

two years. Li Decl., Ex. I.

**Response:** Disputed.  Plaintiffs have not shown that agency changed its position.

163.    There is no information in the AR about the government's ability to subject paroled

individuals to expedited removal while their parole is active. Li Decl., Ex. I.

**Response:** Disputed.  The January 23 Huffman Memorandum, which is part of the

relevant AR, is attached as Exhibit A to the Li Declaration, and the document speaks for

itself.

164.    There is no information in the AR about the government's ability to subject paroled

individuals to expedited removal after they have continuously resided in the United States

for more than two years. Li Decl., Ex. I.

**Response:** Disputed.  The January 23 Huffman Memorandum, which is part of the

relevant AR, is attached as Exhibit A to the Li Declaration, and the document speaks for

itself.

165. There is no information in the AR about the impact that applying expedited removal to parole beneficiaries have on those individuals, nor on any reasonable alternatives to applying expedited removal to paroled individuals that DHS considered. Li Decl., Ex. I.

**Response:**  Disputed.  The March 25 CHNV Termination Notice is attached as Exhibit F to the Li Declaration, and that document speaks for itself.

166. There is no information in the AR about the reliance interests of parole beneficiaries or their families, sponsors, employers, and communities that would be implicated of the parole beneficiaries were to be subjected to expedited removal. Li Decl., Ex. I.

**Response:**  Disputed.  The March 25 CHNV Termination Notice is attached as Exhibit F to the Li Declaration, and that document speaks for itself.

167. The AR that Defendants produced for the 1997 rulemaking that included the definition of "arriving alien" has 291 entries consisting of 9 documents in PDF format totaling 1,949 pages. Li Decl. ¶ 28 & Ex. X.

**Response:**  Plaintiffs have not shown this is a material fact.

168. The AR that Defendants produced for the 1997 rulemaking is entirely composed of public comments submitted on the notice of proposed rulemaking and the interim rule. Li Decl., Ex. X; Schacher Decl. ¶ 75.

**Response:**  Plaintiffs have not shown this is a material fact.

169.    Of the public comments in the AR, only three commenters identified and objected to the inclusion of people paroled into the country at ports of entry in the "arriving alien" definition. Li Decl. ¶¶ 19-21 & Exs. O, P, Q.

**Response:** Disputed.  Other commenters objected to including parolees among the group of arriving aliens.  *E.g.*, Declaration of Aric A. Anderson ("Anderson Decl.") Ex. A.  The material attached to the Li Declaration and the Anderson Declaration speaks for itself.

170.    Two of these commenters made the structural argument presented in this case that including paroled individuals as arriving aliens who would therefore be exposed to expedited removal as noncitizens "arriving in the United States" conflicts with the express statutory provision that protects individuals who have been paroled into the country from expedited removal. Li Decl., Exs. O, P.

**Response:** Not disputed.

171.    The third commenter, a group of immigration and asylum law experts, argued that the inclusion of people previously paroled into the country appeared to rest on the "legal fiction" that parolees, though physically present, had not yet effected an entry into the country, but changes made in IIRIRA were largely designed to "do away with that fiction." Li Decl., Ex. Q.

**Response:** Disputed.  The changes made by IIRIRA are a legal conclusion and not a statement of material fact.  The material attached to the declaration speaks for itself.

172.    With the exception of these commenters who objected to the inclusion of parolees in the definition of "arriving alien," the public comments received in response to both the notice

of proposed rulemaking and the interim rule indicate that nearly everyone who commented was unaware of the potential application of expedited removal to parolees and instead understood the arriving alien definition and its application in the expedited removal context to be limited to people literally in the process of arriving in the United States. Schacher Decl. ¶ 77.

**Response:** Disputed. Plaintiffs do not establish that "nearly everyone who commented was unaware," or that a person or organization commenting on a proposed regulation is "unaware" of legal issues not explicitly discussed in her comment. Comments other than those provided by Plaintiffs acknowledged and approved the proposal to include parolees in the definition of arriving alien in the context of expedited removal. Anderson Decl. Ex. B & C. The material attached to the declarations speaks for itself.

173. Senators Edward Kennedy and Paul Wellstone's comment on the proposed rule evidenced their understanding that IIRIRA's authorization to use expedited removal on noncitizens "arriving in the United States" was limited to noncitizens at ports of entry during secondary inspection, as they focused on the fact that, "[r]efugees often arrive in the U.S. having just fled their persecutors. They are usually exhausted, jet-lagged and terrified." Li Decl. ¶ 22 & Ex. R.

**Response:** Disputed. The material attached to the declaration speaks for itself.

174. Senator Spencer Abraham's comment similarly evidenced his understanding that the use of expedited removal under the statute for noncitizens "arriving" with false or no

documents applied to people in secondary inspection at ports of entry, frequently

"following an exhausting and stressful escape from persecution." Li Decl. ¶ 23 & Ex. S.

**Response:** Disputed. The material attached to the declaration speaks for itself.

175. The comments from Representative Lamar Smith, who played a key role in House

passage of IIRIRA, highlight both that "arriving in the United States" was tied to the

process of physically entering into the country, and that the regulatory definition of

"arriving alien" was used for various purposes beyond expedited removal. Li Decl. ¶¶ 24-

25 & Exs. T, U.

**Response:** Disputed. The material attached to the declaration speaks for itself. The

material attached to the declaration does not support the adjective "physically."

**DEFENDANTS' COUNTERSTATEMENT OF MATERIAL FACTS NOT IN DISPUTE**

*The proposed definition of "arriving alien" provided notice that aliens paroled at a port of entry into the United States would be included as "arriving aliens" subject to expedited removal, and commenters were aware of this fact*

176. The expedited removal authority in INA § 235(b)(1), 8 U.S.C. § 1225(b)(1), was adopted

in IIRIRA, which was enacted on September 30, 1996, and took effect on April 1, 1997.

IIRIRA authorized expedited removal for aliens "arriving in the United States" and aliens

"described in" § 1225(b)(1)(A)(iii).

177. On January 3, 1997, the Department of Justice issued a proposed rule which defined

"arriving alien" to include aliens paroled at a port of entry. Inspection and Expedited

Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings;

Asylum Procedures, 62 Fed. Reg. 444, 455 (Jan. 3, 1997) (proposing 8 C.F.R. 1.1(q) and

including "an alien who seeks admission to or transit through the United States, as provided in 8 CFR part 235, at a port-of-entry" and specifying that "[a]n arriving alien remains such even if paroled pursuant to section 212(d)(5) of the Act"). The Department did not at that time employ its authority to designate aliens for expedited removal under § 1225(b)(1)(A)(iii). The proposed rule specifically invited comment on the definition of arriving alien. 62 Fed. Reg. at 445.

178.    Commenters on the rule indicated an awareness that the "arriving alien" definition included aliens paroled at a port of entry. Anderson Decl. Ex. A, B & C.

179.    Some commenters commented on the effect of including certain paroled aliens within the definition of arriving alien for reasons unrelated to the expedited removal statute. A letter on behalf of Catholic Diocese of Richmond, Refugee and Immigration Services, asserted that the definition would limit the availability of adjustment of status for parolees and objected to this consequence. Anderson Decl. Ex. A.

180.    The three commenters discussed by Plaintiffs who objected to the inclusion of certain parolees thereby demonstrated that they were aware of the proposed inclusion of certain parolees in the group of arriving aliens subject to expedited removal. Li Decl. (Dkt 55-3) Ex. O, P & Q.

181.    Two additional commenters not addressed by Plaintiffs acknowledged the inclusion of aliens paroled at a port of entry in the "arriving alien" definition as it would be applied in the expedited removal context. The January 28, 1997 comment by Central American

Legal Assistance stated: "The draft's limitation of 'arriving alien' to only those found at port of entry, at sea and in parole status is appropriate." Anderson Decl. Ex. B. A January 31, 1997 comment from a law student at the University of Denver stated: "The proposed definition of 'arriving aliens' as aliens arriving at a port-of-entry, aliens interdicted at sea, aliens previously paroled upon arrival, those apprehended crossing a land border between ports-of-entry, is reasonable. . . . . Regarding the new expedited removal proceedings, I believe that they should only be applied to aliens who can be included in the above-mentioned 'arriving aliens' definition." Anderson Decl. Ex. C.

182. These commenters (described in ¶ 181) were aware of the proposal to include aliens paroled at a port of entry as arriving aliens subject to expedited removal. Anderson Decl. Ex. B & C.

183. Several Congressmen and Senators submitted comments on the proposed rule. Plaintiffs provide some of these comments with their motion. Li Decl. (Dkt 55-3) Ex. R, S & T. Additional comments are attached to the Anderson Declaration. Anderson Decl. Ex. D & E. Not a single Congressman or Senator took issue with the proposal to include aliens paroled at a port of entry within the definition of arriving aliens subject to expedited removal. Li Decl. (Dkt 55-3) Ex. R, S, & T; Anderson Decl. Ex. D & E.

184. After receiving comments, the Department issued an interim rule, effective April 1, 1997, which adopted a definition of arriving alien that included aliens paroled at a port of entry who otherwise met the definition of an arriving alien. Inspection and Expedited Removal

of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures, 62 Fed. Reg. 10,312, 10,313 (Mar. 6, 1997).

185. Two Senators commented on the interim rule after it went into effect. Li Decl. (Dkt 55-3) Ex. U & Z. Neither of those comments objected to the interim rule which defined "arriving alien" to include aliens paroled at a port of entry.

*No timely lawsuit was filed challenging the inclusion of parolees in the group of arriving aliens subject to expedited removal, and Plaintiffs' lawsuit is not timely*

186. No lawsuit challenging the inclusion of paroled arriving aliens in the group of arriving aliens subject to expedited removal was filed within 60 days after the April 1, 1997, effective date of the regulation.

187. Plaintiffs challenge three guidance documents ("Challenged Actions"), the first of which was dated January 23, 2025, and the last of which was published in the Federal Register on March 25, 2025. Dkt 21 ¶¶ 144-170.

188. Plaintiffs filed a complaint on March 24, 2025, which did not challenge the regulatory definition of arriving alien. Dkt 1.

189. On June 11, 2025 – more than 60 days after the last of the three Challenged Actions – Plaintiffs filed an amended complaint adding a challenge to the regulatory arriving alien definition. Dkt 21 ¶¶ 171-183.

190. Plaintiffs agree that 8 CFR 1.2 and 235.3(b)(1)(i) provide DHS with authority, independent from the Challenged Actions, to apply expedited removal to aliens paroled at

ports of entry under the "arriving in" authority of 8 U.S.C. 1225(b)(1)(A)(i). Dkt 35 at 6-7.

***The history of the legislation does not support Plaintiffs' assertion that expedited removal was limited to those physically at a port of entry***

191. Plaintiffs provide and rely on a declaration by Yael Schacher (Schacher Decl., Dkt 55-12). At no point does the Schacher Declaration address or acknowledge the entry fiction or doctrine, under which an individual could be physically present in the United States but legally be considered at the border seeking entry or admission.

192. Schacher describes his research as establishing that Congress envisioned applying expedited removal to individuals physically seeking entry. Schacher Decl. ¶ 10 ("Members of Congress were focused on making expedited removal available for two groups of noncitizens: (1) those who are in the process of *physically* entering the country at a port of entry . . . .") (emphasis added), *id.* ¶ 18 ("Rep. Romano Mazzoli and Sen. Alan Simpson introduced bills in 1982 that allowed inspectors to exclude noncitizens in the *physical* act of seeking entry to the United States . . . .") (emphasis added); *id.* ¶ 50 ("The House Judiciary Committee markup debates for H.R. 2202, which occurred in September and October 1995, confirm that the bill's proponents understood the expedited removal provision as applying to people in the process of *physically* coming into the country . . . .") (emphasis added).

193. The research material accompanying Schacher's declaration does not use the modifier "physical" or "physically" to describe the aliens seeking entry or admission who would be subjected to expedited removal.

194.    The modifier "physical" or "physically" to describe aliens seeking entry or admission

subject to expedited removal is Schacher's own addition.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*
*Civil Division*

DREW C. ENSIGN
*Deputy Assistant Attorney General*

PAPU SANDHU
*Assistant Director*

 s/Aric A. Anderson
ARIC A. ANDERSON
*Trial Attorney*
U.S. Department of Justice
Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, DC  20044
202-532-4434
Aric.Anderson@usdoj.gov

April 16, 2026                              Counsel for Defendants

**CERTIFICATE OF SERVICE**

I hereby certify that on April 16, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of for the District of Columbia by using the CM/ECF system.  Counsel in the case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

*/s/ Papu Sandhu*
PAPU SANDHU
Assistant Director
U.S. Department of Justice