# EXHIBIT 1

Coalition for Humane Immigrant Rights, et al. v. Noem et al., 1:25-cv-00872 (JMC)

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT


- - - - - - - - - - - - - - x
COALITION FOR HUMANE       :
IMMIGRANT RIGHTS, ET AL,   :
                           :
        Appellees,         :
                           :
   v.                      :    No. 25-5289
                           :
KRISTI NOEM, IN HER        :
OFFICIAL CAPACITY AS       :
SECRETARY OF HOMELAND      :
SECURITY, ET AL,           :
                           :
        Appellants.        :
- - - - - - - - - - - - - - x

                              Monday, March 16, 2026

                              Washington, D.C.


    The above-entitled action came on for oral argument
pursuant to notice.

    BEFORE:

        CHIEF JUDGE SRINIVASAN, AND CIRCUIT JUDGES RAO
        AND WALKER

    APPEARANCES:

        ON BEHALF OF THE APPELLANTS:

        TYLER J. BECKER, ESQ.

        ON BEHALF OF THE APPELLEES:

        ESTHER SUNG



2

C O N T E N T S

ORAL ARGUMENT OF:                                        PAGE

    TYLER J. BECKER, Esq.                                  3
    On Behalf of the Appellants

    ESTHER SUNG, Legal Director                           64
    On Behalf of the Appellees



P R O C E E D I N G S

THE CLERK:  Case Number 25-5289, Coalition for Humane Immigration Rights, et al. v. Kristi Noem, in her official capacity as Secretary of Homeland Security, et al, appellants.  Mr. Becker for the appellants and Ms. Sung for the appellees.

JUDGE SRINIVASAN:  Good morning, Counsel.

Mr. Becker, please proceed when you're ready.

ORAL ARGUMENT OF TYLER BECKER, ESQ.

ON BEHALF OF THE APPELLANTS

MR. BECKER:  Good morning, Your Honors, and may it please the Court.  Tyler Becker from the Department of Justice on behalf of appellants.  I'd like to reserve two minutes for rebuttal.

The district court below entered a universal 705 stay against three DHS documents that plaintiffs contend authorize expedited removal for aliens whose parole has been revoked.  Yet plaintiffs lack standing to seek a 705 stay because their 705 motion did not challenge regulations that allow the very same conduct they allege is harming their members, namely, the application of expedited removal to former parolees.

Plaintiffs' 705 motion thus failed to demonstrate that a 705 stay was likely to redress their alleged injury under Lujan.  Even if plaintiffs had

standing to bring their 705 motion, it would fail on the merits. Two provisions of the 1996 IIRIRA permit expedited removal as parolees whose parole has been terminated.

First, former parolees are subject to expedited removal under what is commonly known as the arriving alien provision, 8 U.S.C. 1225(b)(1)(A)(i), because former parolees remain arriving aliens once their parole is ends or is revoked. That accords with longstanding Supreme Court precedent on the entry fiction where aliens paroled into the country are viewed as remaining at the border for due process purposes because parole is not an admission to the United States.

And it accords with the parole statute, which makes clear that parole shall not be regarded as an admission, and when the purposes of such parole have been served, the alien shall continue to be dealt with in the same manner as that of any other applicant for admission.

JUDGE SRINIVASAN: And before we go too far down the road on that, can I just take you back to your threshold argument --

MR. BECKER: Yes, Your Honor.

JUDGE SRINIVASAN: -- for redressability? So one feature of the redressability argument that I'm not quite getting my mind around here is that typically, in a

5

case standing in redressability turn on the ultimate relief sought, and here, we have an interim stay.  So it sort of functions kind of like a preliminary injunction is to keep this in place while the litigation is underway.

And is there -- are there cases that say that a court is supposed to independently address redressability/standing as to the interim relief, because I know there's cases that say that standing has to be shown as to each type of relief sought.  That principle is well established, but usually that has to do with the type of relief that's sought at the end of the day.  So if a plaintiff is seeking both injunctive relief and damages, then the plaintiff has to show standing as to each.

I guess what's odd about this case, and I don't know that there's another case like it, and I didn't see one cited in the briefs, is that here, there's no doubt that there's -- at least I don't think there's any doubt for our purposes that there would be standing and redressability at the end of the day, because in the complaint, the regulation that you're relying on for redressability challenge is being challenged.  It's just that the -- there's not a request for an interim stay of that regulation.

And so what your argument basically says, and I think -- I'm not sure this is right, maybe, is that we

www.escribers.net | 800-257-0885

treat that request for interim relief as if it were its own case or controversy for Article III purposes as to which an independent standing/redressability analysis applies as to that.  Do you understand what I'm saying?

MR. BECKER:  Yes, Your Honor.  I understand what you're saying.  And I think the government has looked for cases on this, and we're relying on the cases that say you have to have standing for each form of relief sought.  And here, there was a 705 stay entered.  And for whatever reason, the plaintiffs chose not to challenge in district court and even admitted in district court that the DHS could still use the arriving alien regulations to apply expedited removal to the same parolees.  And this is, again, I think, an unusual case.  And I think we're -- I think that's what we're relying on.  I don't have another case on that too.

JUDGE SRINIVASAN:  And then is there something in first principles or something that tells you -- because you've got an argument that says, even if there is redressability or as I'm hypothesizing, we may not even look to redressability independently for the interim stay as opposed to relief at the end of the day.  There's still a question at the back end as to whether there can be irreparable injury for interim stay purposes when there's, under your argument, an independent regulatory basis for

the same actions.

MR. BECKER: Yes, Your Honor. I think that's right. And the government would be fine with the Court going down that route as well. I mean, I don't think plaintiffs can show that they had any that they were irreparably injured if DHS can still apply the same -- going to apply regulations that they didn't challenge in their stay motion.

JUDGE SRINIVASAN: So here's my question about that then is under your view, you look at it's happening either at the front end or at the back end. Either way, the existence of the regulation, the underlying regulation, and the absence of a request on an interim basis for a stay of that regulation means that the stay can't be affirmed.

And my question about that is, if there's a practical difference between the extent to which expedited removal is being pursued based on the regulation alone or based on the regulation plus the directives that are being challenged and that have been stayed, then would that, under your view, mean that you get past the redressability or back end irreparable injury parts because there would be a difference?

The directors are doing some work, even if the same actions could be taken under the regulation, they're

just not the directors are doing some work because they're acting as an instruction to officers to act in a particular way.  And so they're, in fact, helping the plaintiffs in some measure.  That's not to the exclusion of any arguments you may have on the merits, but just for these purposes on the effect of the lack of an argument that the regulation should be stayed on an interim basis with that kind of delta matter.

MR. BECKER:  Your Honor, here, I think the question under Lujan is these plaintiffs sought a prospective stay, something that was going to prevent in the future the alleged harm, which was expedited removal to former parolees.  And it's entirely speculative what sort of harm that is actually -- what sort of harm that's actually going to have by not actually staying the regulations.  I mean, it may be that DHS would apply expedited removal less.  It could be that they would apply it the same.  There's just no evidence in the record as to what DHS would do in the future if the stay was reversed, for example.

JUDGE SRINIVASAN:  And what's been the experience?

MR. BECKER:  Your Honor, DHS is continuing to apply the expedited removal to former parolees with this using the regulations instead.  It has received some

pushback from certain district courts.  In our reply brief on page 7, note 2, we list some cases where district courts have ruled against DHS on this ground.

And right now, DHS is only able to use the arriving alien regulations to do this because the designation -- functionally, the designation provision and the expanded designation that occurred at the beginning of the administration has been stayed with respect to parolees.  So we can essentially only use the arriving alien provision, and a lot of district courts are just following what this district court did here in DDC.

JUDGE SRINIVASAN:  But when you say, you can only use the arriving alien regulations, I thought the way the arguments are nested, the arriving alien authority gives you everything you need.  Why does the designation authority even matter if you have the arriving alien regulation?

MR. BECKER:  That's correct, Your Honor.  It matters to the extent that we're not even able to -- as to these particular aliens, we're not even able to argue that they're subject to the designation provision at all when we think they are under the language of that provision, because they have not been paroled.

JUDGE RAO:  But does that --

JUDGE WALKER:  So are you saying that these


www.escribers.net | 800-257-0885

10

district courts in footnote 2 have disagreed with you about the arriving provision, and you think you might be able to win with them if you could argue the designation provision?

MR. BECKER:  Your Honor, I think that's one thing that we just aren't even able to use this designation authority.

JUDGE WALKER:  You're quite the optimist. They've ruled against you on what is probably your best argument, so it seems maybe optimistic to think they would rule for you on your second-best argument.

MR. BECKER:  Yes, Your Honor.  I think that the issue here is that the other issue, I would say, and that goes to what I think gets at maybe some of the government's irreparable harm, which I think may relate to the standing questions as well, is that right now in the district court, we're technically under a stay order.  And the stay order is a little unclear whether it even reaches the arriving alien regulations.  It purports to hold the regulations ultra vires.  So it's technically an advisory opinion because the plaintiffs didn't challenge the regulations here.  And now, the government --

JUDGE WALKER:  Surely, it's the case that it did not stay, vacate, and join officials who are applying the 1997 regulation, because if it did, then you would be

committing actions worthy of contempt every time that you apply that.

MR. BECKER: Yes, Your Honor. But as I think you recognized -- Your Honor recognized in the concurrence when denying the government's stay application in this case, the government has been -- since having -- to use the arriving alien regulations, had to make a decision about whether to actually even use these given the district court's opinion.

JUDGE WALKER: You've made the correct decision based on the best reading of the injunction. And then going back to some of the earlier questions, I'm curious too, you know, there was, I guess, a certain amount of applying expedited removal to parolees before the -- probably even before the March -- for the March document. There's probably some amount of it before, and this is brief, I'm not just pulling this from the news, but before the directive went out to hit a 3,000 person a day quota, there was probably some amount going on after the district court's stay in this case and probably some amount going on still today.

And I am curious, like roughly, what are the numbers there? Because I'm curious whether the stay has slowed down considerably the pace that expedited removal was before the stay being applied to parolees.

MR. BECKER:  Well, Your Honor, I don't have any particular numbers to offer you on this point.  And I will say, one of the reasons I think that's important is here, the question is what would happen if the district court's stay was actually reversed.  And I think that what plaintiffs are saying is that they think that some of their injury actually is being redressed by the stay and by having the stay in place.  And we just don't think that's the case, given that in the future, plaintiffs have no evidence as to what the Department of Homeland Security would do if the stay was reversed, if we had two authorities make a lot of problems.

JUDGE WALKER:  But if you were doing this to the members, but if you're doing this to thousand people a day before the district court's stay, and then that dropped to five people a day for the past months since the district court's stay, that would be some reason to think that a stay can redress the injury.  But on the other hand, if you were doing a thousand a day before the stay and you continue to do a thousand a day after the day, that would be some strong evidence, I think for you, that this stay is not checking the redressability box that's standing requires.

MR. BECKER:  Your Honor, I think that it is -- it would be proper to look at that, but I think it's also

important to take a look at what the -- what's standing under <u>Lujan</u> actually requires. The plaintiffs need to show that their injury would likely be redressed. And maybe there are some evidence -- and whether there's some evidence or not as to if there was less expedited removal under the arriving alien regulations, it does suggest that there's no evidence in the record as to what DHS would do in the case that there was no standing.

JUDGE WALKER: But do you have an answer for what is the evidence about what has been happening during the stay compared to the week before the stay?

MR. BECKER: I do not, Your Honor. And I'll note that I think some of the plaintiffs' claims about arrest quotas and the like, this has to do with other things that have nothing to do with the stay or with expedited removal for the -- for parolees at all. So I'm not really sure that specific numbers would actually help in this regard, but it would be entirely speculative what --

JUDGE SRINIVASAN: But what if the plaintiffs -- and you're -- I know your position is that the -- it's the plaintiffs' burden, but I'm just hypothesizing. Suppose the plaintiffs introduced evidence or an affidavit or something that said the pace of expedited removals has slowed considerably since this day. Then at that point,

14

would you say that your redressability argument and your irreparable injury argument on this score at the back end don't work because the pace has considerably slowed since this day?

MR. BECKER:  Well, Your Honor, I think the --

JUDGE SRINIVASAN:  The parolees.

MR. BECKER:  I think the issue here is that where we're looking at standing is technically from looking at when the complaint was filed and/or in this case, when the stay was filed.  So I'm not sure that evidence -- well, the government is under a court order to not apply expedited removal, and that actually says the arriving alien regulations are ultra vires.  That would be enough evidence to suggest that plaintiffs actually have standing because then it would be that plaintiffs would be able to -- that --

JUDGE SRINIVASAN:  So then does that mean that no matter what, that there's no way in a case like this in which -- because, I mean, I guess the plaintiffs could forecast before the fact, before the stay was entered, they could forecast that the pace of expedited removal would go down significantly if the requested stay were entered.  But is that what you're saying had to have been -- suppose that had been done?

MR. BECKER:  Yeah.  I think that would be a



different situation. I think here, we have plaintiffs admitting that you could just apply the same regulation.

JUDGE SRINIVASAN: But it's different to say that you can apply it and then to say how often it's applied. I mean, I think nobody disagrees. I mean, we can ask the plaintiff. I don't think anybody disagrees, it sounds like, that the regulation can be applied and it would result in some expedited removals. I think the case -- and it has apparently, you've represented that it has, and I haven't seen a dispute about that.

But I think the question would be, is there a reason to think that it's just not happening as often? For example, if you have a directive that just tells officers you have to do this, and then they're under an order from a supervisor or a directive to do it, whereas if that directive is no longer in place, then maybe they just don't have the same hydraulic pressure and institutional dynamic that brings this about.

MR. BECKER: Well, Your Honor, that's where I go to some of these -- and some of these are in a different context. But I think the best case on this is Doc Society from this court where there was a situation where visa officers or people that were investigating these applications, there was a mandatory policy that the state department created, and in 2019 there were regulations

that allowed visa officials to consider an individual's interviews, whether those applicants' social media handles and would ask for them. But the mandatory policy plaintiffs were alleging actually made them go and reduce their speech as a result.

JUDGE SRINIVASAN: But I think the difference there is -- and you're right to point to that case because there's the mandatory, and then the idea that the panel on which the panel rested its decision is that there's still discretionary authority. And as long as there's still discretionary authority, then the plaintiffs still have an issue. And so there wasn't anything that the plaintiffs had submitted explaining why the existence -- the remaining existence of discretionary authority wouldn't have had the same effect.

But I think the difference is that in that case, the injury that was being claimed is that, look, as long as there's any authority at all, we're not going to try for this because we're worried about our social media stuff being laid bare. And so it didn't matter if it was mandatory or discretionary, because the existence of it in any measure, whether discretionary or mandatory, would have discouraged the plaintiffs from doing the thing that was at issue.

So it seems to me that it could be a little


www.escribers.net | 800-257-0885

different here, because if here, the injury is the actual prospect of expedited removal. And there's a practical difference between that likelihood when the directives are in effect and when they're not, notwithstanding the existence of the underlying regulatory authority, then it seems like that's a delta.

Now, I mean, I understand your point that that's something that needed to have been done, and you would say needed to have done before the fact, and it just wasn't. But the prospect of that delta would be a reason that your redressability/irreparable injury argument can't work.

MR. BECKER: Your Honor, then I'd probably go to the -- I'd probably add just to that that some of the -- I think this is -- there are slight -- in a slightly different context and there aren't many cases in this even like this, frankly, so the government is extrapolating from some of those. So the cases that I think plaintiffs criticize the government for as being involving third parties, that actions of third parties would need to occur in order to determine whether there was actually redressability.

And I think that those cases are really helpful in this context because they get at that, you just -- there's just really no way to know exactly what the -- what DHS would do on absent the stay. So for example, in

National Wrestling Coaches Association, there was -- plaintiffs didn't challenge a regulation that allowed -- that essentially allowed the same conduct that later guidance and policy interpretations allowed.

Well, that depended on what schools would actually do with wrestling programs. It related to gender and Title IX. It didn't actually -- it did -- as a result of not challenging the regulations, it was just entirely speculative what the schools would do and whether they would -- whether changing the interpretations or vacating these documents that are there would actually redress the plaintiffs' injury, which was losing these high school wrestling program.

JUDGE SRINIVASAN: Okay. So you're taking from those cases a kind of speculation rationale that says that unless there's some concrete indication that there would be a differential, it becomes speculative that third-party cases indicate that even if this is not a third-party case?

MR. BECKER: Yes, Your Honor, and we can see this is not a third-party case. It's just that we just don't think there's a lot of other cases like this, and we're extrapolating from those.

JUDGE SRINIVASAN: I have just one more question. Just to go back to something you talked about

earlier, which I'm not quite understanding, which is you've made the representation in your briefing that there are expedited removals going on right now under the arriving in regulation?

MR. BECKER: That's correct, Your Honor. Yes.

JUDGE SRINIVASAN: But then you've made the representation that it's unclear whether the district court's stay has an effect on your ability to use that regulation?

MR. BECKER: Your Honor, the district court's stay here does say that the regulation is ultra vires. Now, the government has relied on Haaland versus Brackeen, which is a Supreme Court decision that says that redressability depends on not on the opinion, but what's in the opinion, but on the actual relief, and the relief did not vacate that regulation.

Now, the district court's stay we do not believe actually vacates the regulation. It's from 1997. We don't think even that there would be a -- that we think there would be a jurisdictional time bar to even challenging it in this type of proceeding. But ultimately, the district court did purport to say that the regulation was ultra vires and that --

JUDGE SRINIVASAN: Right. And so what I'm not understanding is I think I understand everything you've



said, except for what I don't get is if you've reached the conclusion, at least in some instances, that notwithstanding the district court's opinion and its language about the regulation being ultra vires, which you think is only language, it actually doesn't stop you.

And in fact, the government has used the regulation to effect expedited removal as to parolees. Then why is that just not the government's practice writ large? Why is there -- why would there be any concern about the district court's language, if in fact, the government is using the regulation in some instances, why doesn't the government just think, all right, well, we can use the regulation in any instance?

MR. BECKER: Well, Your Honor, the district court did purport to rule that this regulation was ultra vires and that it didn't apply to these parolees, that are here. Obviously, that could lead to -- the government was obviously worried, although it hasn't happened, lead to contempt proceedings or other things, because the district court's opinion does include that language.

JUDGE SRINIVASAN: But are all the ones where the regulation has been used, did they predate this -- the district court's stay?

MR. BECKER: They did not, no.

JUDGE SRINIVASAN: Right. So that's what I'm



not getting.  If there are -- I think I'm just missing something basic, and you can just tell me what I'm missing, that if -- since the stay, the government has relied on the regulation to effect expedited removal of parolees, then the government has clearly reached the conclusion that the language in the stay opinion doesn't foreclose that, and I understand that.  If that's true, then I guess I'm just not understanding why the stay would have any effect on the government, and the opinion accompanying the stay would have any effect on the government's use of the regulation to effect expedited removal?

MR. BECKER:  Well, Your Honor, I think the reason that it is having an effect on the government is mostly from the fact that district courts are using the district court's opinion and saying that -- or the district court hears opinion and saying that that opinion applies to -- in the EV (phonetic) case, I think that we cite in our reply brief, note 7.  The plaintiffs there are challenging the government and saying that the government violated the stay in that case, in this case -- and that's happening throughout the country.

JUDGE WALKER:  So that's -- that means it's just having the same effect as if the district court judge had written a law review article?

MR. BECKER:  That's correct.  So I mean, we think this is ultimately an advisory opinion, and that's one of the dangerous things and why we think we actually have to.

JUDGE WALKER:  Why do you have standing to appeal?

MR. BECKER:  Your Honor, I think that -- I definitely thought through this question, given the make the road panels, Carson factors, which I think this Court has said apply here.  And I think that that it has to do with the fact with two reasons.  First of all, that district courts around the country are considering and there are claims against the government.  The government is violating the stay and can apply expedited removal under a lot of alien regulations.

JUDGE WALKER:  That would give you standing to appeal a law review article, so that can't be right.

MR. BECKER:  And secondly, the government is subject to potential contempt proceedings in district court as a result of the stay proceeding.

JUDGE RAO:  Mr. Becker, I mean, the government seems to be making a per se argument that all 705 stays are immediately appealable, but that's not what we said in -- is that argument open to us after the make the road stay decision which apply the Carson factors?

MR. BECKER:  Well, Your Honor, I think that make the road stay decision applied the Carson factors.  I don't think that the stay decision is abolish binding decision on the court.  However, we do think that we need it here, given the two things that I just mentioned.

JUDGE RAO:  What is the best argument that all 705 stays are immediately appealable?

MR. BECKER:  Well, Your Honor, any 705 --

JUDGE RAO:  The third case is saying that, or what's your best textual argument?

MR. BECKER:  Well, Your Honor, the 705 stay is very similar to a preliminary injunction.  It's because of if you have to find irreparable harm, you have to find likelihood of success.  And it would be passing strange if you could not appeal something that is functionally an injunction that is preventing the government from or vacating certain documents -- no, not vacating, staying certain documents and not allowing them to have effect.

JUDGE SRINIVASAN:  And as to that, is there any difference at that level between what you just said and what they make the road panel, the stay panel decided, because I think the same argument was before they make the road panel, and it didn't find that persuasive, right?

MR. BECKER:  I think to make the road panel focused on whether -- it focused on what harm there was



24

potentially to the government, and it assumed that if the government was successful on the merits, that the government would have.

JUDGE RAO:  Well, I asked this question because I think here it is harder, perhaps, for the government to meet the Carson factors.  So perhaps you can speak to why you meet the Carson factors in this case, where you're continuing to enforce the arriving in regulation even after the stay?

MR. BECKER:  Yes, Your Honor.  So I think that -- so the Carson factors -- under the Carson factors, there has to be -- there's a practical effects test, and it allows that it can only -- the stay, it can only -- or any sort of thing that's not -- that's like -- under 1291. Only if it might have a serious, perhaps irreparable consequence and can be effectively challenged only after immediate appeal.  Now here --

JUDGE RAO:  So why does the government meet that?

MR. BECKER:  Here, assuming the government prevails on the merits, the government has been subjected to a court order purporting to bar nationwide the use of expedited removal to parolees, including alleging or finding that the expedited -- that -- that the arriving alien regulations are ultra vires when the district court

25

did not even have jurisdiction to do so.  So it entered an advisory opinion, and at the end of the --

JUDGE RAO:  And the government is essentially saying it was an advisory opinion, so we're continuing to do expedited removals.  So what's the serious harm under the Carson factors?

MR. BECKER:  Well, Your Honor --

JUDGE RAO:  And the government's own, you know, representation that it's continuing to effectuate this policy.

MR. BECKER:  Well, Your Honor, I think that's a good question, but I think here, the problem is that we still have these other district courts that are treating this order like a binding or nationwide injunction against applying expedited removal using the arriving alien regulations and using these documents.

JUDGE RAO:  So the government's position is we have appellate jurisdiction here because district courts elsewhere are misreading our district court's stay order?

MR. BECKER:  Your Honor, I think that's one --

JUDGE RAO:  Is that your best argument for serious harm?

MR. BECKER:  I think that our best argument is that currently in district court, we are subject to a stay of these documents.  We are not allowed to rely on those

documents.  We cannot rely on the designation provision at all, because we can't rely on the expanded designation that occurred earlier in the administration.  And as a result, we are -- we're hampered in what sources of authority we can rely on.  And obviously, if a district court finds if we only apply the arriving alien regulations to apply expedited removal to an alien and we're not allowed and not being allowed to do that, we haven't been able to apply the designation provision.

JUDGE WALKER:  Can I just ask on that just to reconfirm, and that's -- I'll cut you off.  But it's adjacent to what Judge Rao was asking you about.  On the designation one, I just want to ask it again, am I right that the designation 1 doesn't matter if you've got authority under the arriving in regulation?

MR. BECKER:  As to these particular plaintiffs, that is true.  Those -- these are plaintiffs have only in their complaint, alleged, brought a complaint on behalf of parolees --

JUDGE WALKER:  Right.

MR. BECKER:  -- who were -- who entered -- who were granted parole at a --

JUDGE WALKER:  Format.

MR. BECKER:  -- border port of entry, as opposed --



JUDGE WALKER:  Yeah.

MR. BECKER:  -- to somebody who was, for example, entered illegally and then was granted for parole --

JUDGE WALKER:  So for purposes of this case, that the inability, the hypothesized inability to use the designation authority just doesn't matter if you have authority under the arriving in regulation?

MR. BECKER:  Well, the -- yeah, and the arriving alien regulation also allows the government to use it beyond the two-year continuous presence --

JUDGE WALKER:  That's --

MR. BECKER:  -- period.

JUDGE WALKER:  That's why -- I mean, it's the big circle and the designation 1 is within the big circle.

MR. BECKER:  That's correct, Your Honor.  And the issue here, I think, is that we're just not able to rely on the designation provision at all.  But again, like we could rely -- before we could rely on both authorities, and I think plaintiffs make some APA arguments about this, about how it's unclear, you know, what authority we're relying under and the like.  But ultimately, we were able to rely on both authorities and to the extent the government was self-limiting itself to only applying it for the past two years.  Obviously, it has two sources of


www.escribers.net | 800-257-0885

authority that it thinks are proper there --

JUDGE WALKER:  It is.

MR. BECKER:  -- whereas it doesn't otherwise.

JUDGE WALKER:  Yeah.  Okay.  Just out of curiosity, what if you copy and paste it, the three guidance documents, the three challenge documents and, you know, sent them out tomorrow?

MR. BECKER:  The same documents have been stayed by the district court, so I assume there would probably be proceedings about whether we were complying with the stay order.  But again, this gets to whether guidance that are just really --

JUDGE WALKER:  There's no -- there's not an injunction.  It's a stay of the previous action.  So I don't think a stay or even a vacatur of something in the past would stop you from doing it today.

MR. BECKER:  Well, Your Honor, this gets a little bit more complicated here because part of the documents that are being challenged here are also at issue in the make the case.  And the issue is that even if we -- we would have to do basically an entire redesignation, we would have to expand designation again to being up to the two-year statutory, that's all our --

JUDGE WALKER:  Did you think about standing -- both the standing of the plaintiffs and the district court



and your standing to appeal?  So for the purposes of this question, just pretend like to make the road case doesn't exist --

MR. BECKER:  Yes, Your Honor.

JUDGE WALKER:  -- which -- in any event what -- could you do my -- could you do what I'm hypothesizing?  Could you just redo, copy, and paste these three documents, send them out, perhaps the district court would stay there the next day.  You copy and paste, send them out the next day on and again and again and again.

MR. BECKER:  Your Honor, the documents here -- I mean, yes, I suppose you could do that, yes.

JUDGE WALKER:  Okay.  I mean, I think that -- again, makes it even harder to kind of grasp what you're standing on appeal is, but I'll let that go.

JUDGE RAO:  Do we really even need guidance documents to do what the guidance documents do?

MR. BECKER:  Well, Your Honor, I think that's the government's --

JUDGE RAO:  It's enforcement discretion.  So enforcement discretion can be -- I mean, you don't have to write down how enforcement discretion is going to be applied.

MR. BECKER:  Yes, Your Honor.  I think that's right.  And that's I think one of the problems in this



30

case is that the plaintiffs challenged enforcement documents. I mean, one of them is an email and what the one that actually applies, the -- or is using the arriving alien authority is actually just an email to staff members, and --

JUDGE RAO: Is that your best argument about redressability?

MR. BECKER: That the document is --

JUDGE RAO: Are basically enforcement discretion documents?

MR. BECKER: I mean, yes, Your Honor. I think that that actually is a good argument for -- as to why there's no redressability here. Because ultimately, all you can do is all the plaintiffs have done is challenge these enforcement discretion documents. There's old regulations from 1997 that they may not even be able to challenge in this type of proceeding here. And there may be no sort of -- and as -- because there's DHS can just choose to enforce those documents as it -- or it choose to enforce the regulations whether it was doing so in the past or now doesn't really matter if they can choose to do so. That, I think, is the reason that there's no redressability here.

JUDGE RAO: Are you focused on all these other third-party cases and all these other things, but I was



wondering.

MR. BECKER: Yeah. Your Honor, I think that the reason for that is because there's just -- this is a very odd situation where the plaintiffs below admitted that DHS could just use the same regulations. And the district court specifically considered this our redressability arguments below and found against the government. And said that there was redressability because some of their harm could be -- would be ameliorated by a stay, although we just didn't ever understood what exactly that harm was that could be redressed or that part of their harm.

JUDGE WALKER: I have some merits questions, but I don't want to change the topic if you have any understanding. So I'm a little unsure what your position is for parolee who has been paroled his entire time and has been paroled for, let's say, three years. I understand that -- if that person is still on parole, then expedited removal is okay. But let's say that that parole is lifted today, can that person be put in expedited removal tomorrow?

MR. BECKER: Your Honor, under the arriving alien regulations, yes.

JUDGE WALKER: Okay. And so I mean, that just does -- and then let's say that they were paroled for a day upon arrival, and then that parole was lifted, and you



32

know, they've been in the United States for 20 years, your position is that they are still arriving so they can be put in expedited removal?

MR. BECKER: Your Honor, are you saying that they were illegally entered the United States 20 years ago, and they were given parole yesterday?

JUDGE WALKER: No, they were given parole on day 1, and then it was lifted on day 2, and they've been in the United States for 20 years since then.

MR. BECKER: I think under the text of the current arriving alien regulations, that would be the case, but I don't know that DHS would actually use its discretion to do so. And while the expedited removal statute, if you read it, says, shall (b)(i)(A) precedent that we cite in our brief, gives the ability to apply expedited removal, a discretion --

JUDGE WALKER: But I think being part of this case might depend on whether that 1997 arriving in regulation is properly interpreting the statute. And you seem on really solid ground with -- including because of a lot of the precedents going back a hundred or so years that, you know, if you're on parole, you are arriving, you're entering, we treat you as if you have been detained at the border. But I don't see any of those precedents saying that if you were detained for a day or paroled for



33

a day, and then running around the country out of parole for 20 years, that you're still considered an arriving alien?

MR. BECKER:  Well, Your Honor, at that point, somebody would have been able to -- if their parole was canceled, maybe they saw a different type of status.  I mean, if they had been in the country that long, I think that that's probably what would --

JUDGE WALKER:  And when they say --

MR. BECKER:  -- actually happen there.

JUDGE WALKER:  -- they have been living in the shadows.

MR. BECKER:  But I will say --

JUDGE WALKER:  And after -- assuming that person is arriving, living in the shadows for 20 years, but not on parole.

MR. BECKER:  Your Honor, I think that here, the alien would likely have sought another status, but I will say, I think the make the road stay panel, two of the judges on that panel had some language about parolees. And parolees enter on the condition with the understanding that they remain legally at the border.  Any connections they make with the United States are with knowledge of their status.  People that come in on parole --

JUDGE WALKER:  You think they were talking



34

about -- maybe they were, but were they talking about people on parole or people whose parole was 20 years ago?

MR. BECKER:  Your Honor, I don't think that was considered there because I think the issue there was that in the due process context, it doesn't matter how long somebody has been here.  They still only get -- if you came in on parole, you only have gotten -- even if it's, I think the Kaplan versus Tod case is one that's long.  I think it's eight or nine years.  There's no additional process than whatever process is provided.

JUDGE WALKER:  I guess, you, at least, say, someone paroled for a day, then released, and let's say, ten years after that somehow got a legal status.  I guess you would say that person is no longer an arriving alien.

MR. BECKER:  Yes, Your Honor.  If you have the legal status, you would not be subject to expedited removal.

JUDGE SRINIVASAN:  Can you get parole before you show up at the port of entry?

MR. BECKER:  Your Honor, it cannot be granted until you're at the port of entry formally, but they can issue you something that allows you to come to the border to do so.  So that was what was going on with the CBP One app.

And one of the reasons that this is even going



on that this -- that there's so many parolees is that in -- under the parole programs that that existed during the Biden administration, there were, I mean, a million plus people that came in under these parole programs. There was a mobile app that was created in order to try to have less -- in order to have less folks coming in, trying to come in through the southern border. People were able to, frankly, fly in to ports of entry using -- and you get approval to do so and use this app in order to put in their information and the like, and to schedule appointments to be granted parole at a port of entry.

JUDGE SRINIVASAN: So with -- I was trying to adapt Judge Walker's hypothetical scenario, but what about -- and it sounds like it can't be done with respect to somebody getting parole before they show up at the border, because that doesn't happen. You only get the grant of parole when you get to the port of entry.

MR. BECKER: That's how I understand it.

JUDGE SRINIVASAN: So suppose you have a situation in which a person is paroled, comes into the country, and then leaves and then comes back, but isn't paroled the second time, then would the arriving regulation apply?

MR. BECKER: Your Honor, I'm not sure in that precise scenario. I think that given -- usually, parole



is only for one entry --

JUDGE SRINIVASAN:  And then they have to do --

MR. BECKER:  It's not an entry into the country, so I think at that point, they may be subject -- they may be just a regular alien that would be subject under the designation provision if they were caught within a couple of years.  I'm not sure --

JUDGE SRINIVASAN:  That person wouldn't be subject to expedited removal if they -- if they're paroled, they come, they leave, they come back the next day on not on parole status that time, and then they're here for 15 years.

MR. BECKER:  And they come back unlawfully through the border, yeah.  In that case, the person -- I think the person would be -- I think would be in a different -- would likely be in a different category.  Now if they're -- in the system, it might be difficult because the -- they were in the -- the parole system is -- as they make their own stay panel, I think, recognize like this parole system is very comprehensive, like you would be able to look up the person and they may be seen as somebody who was on parole at the time --

JUDGE SRINIVASAN:  Um-hum.

MR. BECKER:  -- but it would depend on what knowledge there was about their status.  I think that,



www.escribers.net | 800-257-0885

again, if they were here for two year -- if they were here not able to prove to the officer that they were not here for two years -- for the prior two years, I think they would be subject to expedited removal.

JUDGE SRINIVASAN:  Under the designation --

MR. BECKER:  Under the designation provision.

JUDGE SRINIVASAN:  I was just talking about the arriving regulation.  Okay.

MR. BECKER:  Yeah, Your Honor.  And one thing about the arriving alien regulation, I think this gets at is whatever the scope of the term "arriving alien" means, I mean, if somebody has been paroled or if somebody has been in the country for a year unlawfully and then is paroled into the interior or whatever while they're awaiting their removal proceedings, that person would probably only -- would not qualify under the arriving alien provision.  They would qualify under the designation provision to be subject to expedited removal if their parole was canceled or if their parole was canceled during those prior two years.

JUDGE SRINIVASAN:  And that's because the regulation speaks strictly -- speaks about the regulations of the parole?

MR. BECKER:  The regulations that -- the arriving alien regulations specifically speaks to arriving



www.escribers.net | 800-257-0885

aliens as being grant -- as aliens arriving at a port of entry --

JUDGE SRINIVASAN:  Port of entry.

MR. BECKER:  -- I'm not saying that the statute couldn't be read broader than that.  It's just the regulation for a long time has stated that.

JUDGE SRINIVASAN:  Right.  Attempting to come into the United States at a port of entry.  Got it.  Okay.

MR. BECKER:  Yeah.  And that's why I think why we -- our interpretation of the arriving alien regulation is what it -- or the arriving alien portion of the statute is partly what it is, because the person goes back to that situation under the parole statute, which is somebody who was arriving into the United States at a port of entry.

JUDGE RAO:  Mr. Becker, can I ask you about the government's argument that a 705 stay has to be limited by traditional equitable principles?  If we were to agree with that, would that principle also apply to vacatur under 706, does it have to?

MR. BECKER:  Your Honor, the government's position on that is that it would apply to a vacatur under 706 --

JUDGE RAO:  That's --

MR. BECKER:  -- but we don't think it necessarily has to.  Because the language specifically in



705, and 705 clearly incorporates traditional rule -- traditional equitable principles.  For example, the language of 705 is saying that to prevent irreparable injury, a court may issue all necessary and appropriate process to stay administrative action or preserve status and rights.  And we think this is very similar language to that the Supreme Court considered in the Starbucks case, where the Court was saying -- said that that similar language about necessary and appropriate just invoked traditional equitable principles.

JUDGE RAO:  And so it would be a coherent reading of the APA to apply those traditional equitable principles under 705, and then perhaps reach a different conclusion under 706?

MR. BECKER:  Your Honor, we think that the government thinks that 705 very clearly invokes traditional equitable principles.  And we have also taken the position that 706 should also be limited in the scope of relief.

JUDGE RAO:  But you don't -- but you've said that the language is different in the two provisions?

MR. BECKER:  That's correct, Your Honor.

JUDGE RAO:  The same words, the many words, I think, in 705 that basically refer to traditional equitable principles are not present in 706?



MR. BECKER: Yes, Your Honor. This is not a 706 case, but we are -- and the government has maintained its position as to 706, but as to 705, we think it's -- the language is pretty clear under Supreme Court precedent invoke traditional equitable principles. And I think one of those principles is causes principle -- a complete relief principle.

JUDGE WALKER: Is your position on the arriving provision consistent with your position on the designation provision? And here's why I'm asking. I think for the arriving position, you say arriving equals paroled. And that can mean paroled even if just paroled in the past as a historical fact and no longer it's -- but for the designation provision, I think you mean paroled does not equal paroled. Just in the past, paroled means having the current status of being paroled. Aren't those inconsistent?

MR. BECKER: Your Honor, we think the language here is different. So under the designation provision, the language has not been admitted or paroled. So that present perfect tense, we think here means that the provision is looking at whether the person is not subject to expedited removal because it's under the designation provision, which is a broader provision. It applies to a bigger group of aliens than arriving aliens. For example,

it would apply to parolees who were granted parole not at a port of entry. They maybe came in illegally and then were paroled pending their removal proceedings.

JUDGE WALKER: Yeah. And for the designation provision, you think paroled means currently paroled; is that right?

MR. BECKER: Has not been paroled means that they're --

JUDGE WALKER: It's not currently paroled?

MR. BECKER: They're not -- yeah. That they're not --

JUDGE WALKER: And then for the arriving provision, you think that arriving means currently paroled or not currently paroled, but paroled in the past?

MR. BECKER: Yes, Your Honor. Those -- so this is a little bit different because we're talking about people who are granted parole at ports of entry, I think, whereas the designation provision, I think encompasses both those groups. So under the arriving alien provision, someone that's granted parole at a port of entry doesn't enter with any sort of expectation -- any sort of expectations that they're able to stay in the United States, and certainly not after their period of parole has expired or that it's been terminated. So the -- so if I'm understanding your question, I think the issue here is



that some people may be subject to both provisions and some people may not be depending on --

JUDGE WALKER:  It's not so much that, it's more of just sort of a like a grammar textualism concern for the designation provision.  You think paroled means past or present, and for the arriving, you think paroled means -- I'm sorry, for designation, you think paroled requires present, but for arriving, you think paroled can mean past or present?

MR. BECKER:  That may be right, Your Honor, but I'd also take a look at -- I think it's the full language in the designation provision has not been paroled.  And I think that is a different text.  I mean, I think that you could say -- I think if the designation provision said something like "was paroled", that might suggest that in the past that that parole in the past would prevent you from being the subject (indiscernible, simultaneous speech).

JUDGE WALKER:  Yeah, but the past tense verb like was not a present --

MR. BECKER:  Correct, Your Honor.

JUDGE WALKER:  -- tense ending like -ing as in arriving, which sounds pretty present, and you want that to mean was in the past once paroled?

MR. BECKER:  Your Honor, that's why I think that


www.escribers.net | 800-257-0885

43

the term "arriving alien" is important to consider separately here, because it just is dealing with an entirely different issue, which is whether somebody -- I mean, this is just the entry fiction is always complicated because you're trying to think about what position somebody would go -- somebody maintains their position at the border.  They're an arriving alien, no matter whether they've been paroled or whether they've -- or whether --

JUDGE WALKER:  I did the entry fiction, and I'm not averse to it, but like, even fiction books end, so.

MR. BECKER:  You might be right about this, Your Honor, that it's a -- but we think that -- or nonetheless that both provisions would allow us to subject these aliens to removal.

JUDGE WALKER:  Okay.

JUDGE SRINIVASAN:  So the one final question on something that's a little bit down in the weeds, but I just want to make sure I understand what happened --

MR. BECKER:  Yes, Your Honor.

JUDGE SRINIVASAN:  -- that in the CHNV designation, the one in the Federal Register?

MR. BECKER:  Yes.

JUDGE SRINIVASAN:  So there's a question about arbitrary and capricious and all that.  I just don't -- I'm not trying to get down to the weeds of this, but I'm


www.escribers.net | 800-257-0885

just trying to understand what was intended here. So there's a critical language in the middle column that you're undoubtedly aware of. And it says to effectuate the prompt removal, the U.S. Government made its discretion to initiate expedited removal proceedings where appropriate.

Expedited removal is available only when an alien has not been continuously present for at least two years, the two years preceding the date of the inadmissibility determination, and then citing the statute and the regulations that deal with the designation part. So I understand that part of your argument that there's no inconsistency there, because that has to do with the designation part, not the arriving part.

But then what I'm not following is the next sentence. The next sentence says, "If DHS were to allow CHNV, does CHNV parolee population to remain for the full duration of their two-year parole, DHS would be compelled to place a greater proportion of this population in Section 240, removal proceedings to effectuate the removal." So why -- that just doesn't seem true if you think that you have the authority that you say you do under the arriving regulation?

MR. BECKER: Your Honor, I think maybe DHS, I think here -- I see with the word "compelled". I think

that what is going on here is that DHS is only applying expedited removal to the folks for the prior two years under the designation provision. The arriving alien regulation is broader authority than I think that they -- there -- my best explanation for it is that this is really based on what the statute allows. And they could have been applying it under the arriving alien and just regulation and just we're not doing that.

JUDGE SRINIVASAN: It was not compelled. DHS is not compelled. And it says that DHS would be compelled to place a greater proportion in Section 240, removal proceedings. But if you've got that -- if DHS has the authority under the arriving regulation, then it wouldn't be compelled because it could use the arriving regulation unless I'm misreading this.

MR. BECKER: That may be right, Your Honor. I think under our argument now, our argument is that they could use the arriving alien regulation for people whose parole was revoked. I think that -- or for people whose parole was revoked, and I guess even people who were still on parole.

JUDGE SRINIVASAN: Well, it's for the relevant population is the CHNV parolee population to remain for the full duration of their two-year parole. So the -- what the DHS appears to be saying in this Federal Register

notice is that if DHS allowed those folks to stay for the full two years, then they'd be compelled to use something other than expedited removal. They'd have to use 240 removal. But as I understand your argument, that's actually not true because the arriving regulation would still give the authority even for somebody who's here for the full two years, it would still give DHS the authority to use expedited removal as to that population?

MR. BECKER: Your Honor, under the arriving alien regulation, DHS would be able to use that as to that population, because that population would be former parolees. There are people who would have -- CHNV only allowed granting parole at -- they wouldn't -- you wouldn't have been able to get -- my understanding is that under those programs, you actually wouldn't have been able to get that type of parole if you had been in the country and entered illegally, so I think that's correct.

JUDGE SRINIVASAN: Right. Okay. So I just want to make sure that this says would be compelled, but actually under your position in the case, DHS wouldn't be compelled. That's not necessarily saying there's a legal claim that arise --

MR. BECKER: Yes, Your Honor.

JUDGE SRINIVASAN: I want to make sure I understand your argument.



MR. BECKER: Yes, Your Honor. Our position is that these individuals would be subject to the available --

JUDGE SRINIVASAN: I get that part of removal.

MR. BECKER: -- even beyond the two-year period.

JUDGE SRINIVASAN: Okay.

JUDGE WALKER: I think two questions. One is a follow-up on that, and then one is a follow-up on something earlier. The follow-up on this is, let's say, that I look at this sentence the Chief Judge is describing, and I think it was probably meant to talk about what the designation provision allows and doesn't allow. But it is inaccurate as written because it says that something is compelled which the arriving in provision allows. Let me know if you're following.

MR. BECKER: Yes, Your Honor. I'm following.

JUDGE WALKER: Okay. Then what is your opinion about what our court in this posture should do about that?

MR. BECKER: Well, Your Honor, I think a lot of plaintiffs' arbitrary and capricious arguments that relate to these two different authorities sort of miss that. I think they -- I think they're basically arguments about what the statute and the regulations allow. I think there's other places in the CHNV termination notice that specifically reference the arriving alien regulation. I'm

looking at 13612, the absence of any subsequent application confirming an immigration benefit or status.

And upon termination of parole, such alien remains an arriving alien and goes back to that, that status. So I think that -- well, this notice may not specifically state the authority to use expedited removal as to those folks, it does state that they would be arriving aliens, and they would be subject to expedited removal even beyond that. Whether DHS was going to do that or not or would do that, I think is a different question. And I think that there's subsequent guidance that specifically states that the arriving aliens purports to that.

JUDGE WALKER: And let's say, I agree with all of that, I think I didn't quite get the answer to my question. What are we supposed to do? If there's something here that's inaccurate, it conflicts with other accurate sentences that you've been referring to. What is -- I mean, your answer can be we should do nothing, but I'm just wondering what is -- provision?

MR. BECKER: I think, Your Honor, as to that provision, I don't think plaintiffs have really alleged any sort of harm from that that as a result of not being --

JUDGE WALKER: I think their theory is that



49

maybe because of some Supreme Court precedents, the government needed to address reliance -- plaintiffs' reliance, part of how they addressed plaintiffs' reliance was saying, well, we, the government, have an interest in moving fast. So far, so good. Our interest in moving fast is this sentence. Well, if this sentence is legally incorrect, then I think the plaintiffs would argue that weakens your explanation for why you need it to move fast at the expense of their reliance. And again, I'm not saying this means we should affirm the stay. I'm just wondering why not?

MR. BECKER: Well, Your Honor, I think it's probably appropriate for the Court to clarify that there is of the ability to remove aliens under the expedited -- under the arriving alien regulation. I just don't think that DHS was necessarily relying on that before. I think plaintiffs make a lot of claims about that.

JUDGE WALKER: But I think your argument sounds like we should affirm this day in spite of the sentence the Chief Justice was reading, because even if it is inaccurate about what is compelled, it's harmless error.

MR. BECKER: I think that's right, Your Honor. I don't think that this affected --

JUDGE WALKER: And in my -- maybe it's not what you're -- maybe this is about what you're going to say if



50

I let you finish your sentence, but why is it harmless error?

MR. BECKER:  Your Honor, this is harmless error here, because the plaintiffs don't -- the plaintiffs are not alleging any particular harm from DHS limiting itself to that couple-of-year period.  They're not alleging that. This is not a case about the parole termination notice and whether that was appropriate at all.  I think that they're alleging that their harm here is from having expedited removal applied to former parolees.  And I don't think that -- I think that -- this isn't a challenge to the notice generally on why the parole programs are being terminated.  I think this is just a different case, so it's harmless error as to this case, certainly.

JUDGE WALKER:  Okay.  I'm going to -- I was going to change topics, but if you have a follow-up?

JUDGE SRINIVASAN:  Yeah.  I'm also not -- and then you -- I just want an interjection quickly because I'm -- we can -- when we can ask the plaintiffs, I don't -- I'm not recalling -- I could be off about this, but I'm not recalling that either the plaintiffs or the district court isolated this particular sentence as opposed to the previous sentence, which I think was doing most of the work for the arbitrary and capricious argument that may be true.  There's a question as to whether this


www.escribers.net | 800-257-0885

one was put into play, but I just wanted to make sure that I understood what the government's position was on this, given the apparent language of this.

JUDGE WALKER:  I'm grateful for the clarification because I had underlined both of those sentences.  So I think hopefully for your sake, you need -- your answer about the sentence I asked about and the sentence the Chief Justice was asked about to also be the right answer for the sentence.  Do you see where we are?  It's 13619 of the Federal Register.

JUDGE SRINIVASAN:  The middle column.  The set of sentences that have been kind of the focus of the -- at least one of the focuses of the arbitrary and capricious argument, that paragraph that begins, "DHS has concluded the national alliance interests" and then the sentences down, a couple sentences from that.

MR. BECKER:  Oh, yes.

JUDGE SRINIVASAN:  We're on footnote 71.

MR. BECKER:  To effectuate their prompt removal, the U.S. Government maintains discretion to initiate expedited removal proceedings were appropriate.

JUDGE SRINIVASAN:  Right.  And then the sentence, the one, I think that Judge Walker and I are focused on are the sentence after that, which is, "If DHS were to allow CHNV parolee population to remain", that



sentence where the second clause is, "DHS would be compelled to place a greater proportion of this population in Section 240 removal proceedings".

JUDGE WALKER:  Just to tweak that clarification, Mr. Becker, the sentence that Chief Justice just read that begins, if DHS, but then there's one sentence right before that that begins expedited removal.

MR. BECKER:  Yeah, I think the district court was focused on, if I remember right, it was focused on that first sentence, but I -- yeah, because the district court was saying that we were citing the incorrect -- the two documents cited two different legal authorities because the -- and I think that was the focus of what the district court was getting at, was that there was two -- that the termination notice was essentially not citing the correct -- not citing the arriving alien authority, but the email that the -- the enforcement email was citing the arriving alien authority and noting that it could be available for there was no time limit on.

JUDGE SRINIVASAN:  Yeah.  I thought the point was that the -- this sentence that Judge Walker has helpfully highlighted, the expedited removal is available only when an alien has not been continuously present in the U.S. for two -- at least the two years preceding. That was the subject of the arbitrary and capricious

53

conclusion on the theory that this says only has not been continued to be present for at least the two years. But then there's other documents that say there's no time dimension.

And your response to that was, well, this has to do with the designation authority, and those other documents have to do with something as to which there's, in fact, no temporal limitation, because that's the arriving authority as to which there isn't, and that I understand that argument. I guess I was focusing that on the sentence that follows it, and on that one, I'm not -- I think you're acknowledging that sentence is not fully accurate in saying that DHS would be compelled, and then there's a question of whether that matters.

MR. BECKER: Yeah, I think that's right, Your Honor. I think that under the arriving alien authority, they would -- under our position in this case, they would be able to apply expedited removal.

JUDGE WALKER: And one more time, why does it not matter that the sentence is wrong?

MR. BECKER: Your Honor, plaintiffs here are not challenging the -- I don't think are really challenging the reliance interest that we didn't consider reliance interest in actually terminating the removal or terminating the CHNV programs. I think what their



www.escribers.net | 800-257-0885

54

argument is, is that it was -- that between these couple of documents, it's just not clear what legal authority we're relying upon.

JUDGE SRINIVASAN: Maybe. Okay. I'm going to --

Do you have more questions? Okay. Let's go back to the merits a little bit unless the reasonably explained argument -- let's say that -- well, if you have an argument that, at first, I found appealing and now after I thought about it a little more, I wasn't as persuaded by someone. So tell me what the argument is you want to be persuaded by. You can tell me why you think I'm wrong. And then it might affect what remedy you would be entitled to.

You have a line in your brief that says the 1997 regulation has not been challenged, so we take it as correct. And of course, it hasn't been challenged because it can't be challenged, 60 days have passed. Because the 1997 provision can't be challenged, these three guidance documents can't be challenged for applying the 1997 regulation.

And so even if the 1997 regulations were unlawful, we -- there still should be no stay in this case because the 99 -- because the three documents challenged were -- I'm trying to think which argument that following

thing might be a metaphor for, but I'll let it go.

The three documents can't be challenged because they rely on a regulation that can't be challenged. Here's what I think that's probably wrong. Imagine the 1997 document had said something that was completely unconstitutional. So the government can run around summarily, you know, taking people's property whenever it wants to. Okay. And then -- okay, that document can't be challenged because of the 60-day time limit.

But then now in 2025, the government issues three documents that instruct government officials to go around summarily taking people's property, and they say, and we're doing it in reliance on the 1987. I think those current 2025 documents would be instructing government officials to do something illegal, something that the 1997 regulations said the government could do.

But because the 1997 regulation was wrong, these current documents are instructing the government to do something illegal. And since it's within 60 days to challenge these 2025-year documents, they could be challenged and ought to be stayed and eventually vacated if they are telling the government to do something that the constitution either prohibits or that a statute does not authorize. So am I right? I think I'm right about that, and if you think I'm wrong, tell me why.

escribers
www.escribers.net | 800-257-0885

MR. BECKER:  Your Honor, I think those -- I think in that case, if they're arguing and there's some sort of unconstitutional violation, there may be some sort of ultra vires at whatever --

JUDGE SRINIVASAN:  Well, I'm not going to say unconstitutionally.  Let's say that the 1997 regulation says a statute allows us to do this thing, but the statute doesn't allow it.  And so in 2025, the government issues three documents telling government officials, go do this thing that in 1997, we said a statute allows, but there is no authority for the government to do this thing in 2025 because no statute allows it.

MR. BECKER:  Well, Your Honor, I think that under 1252(e)(3), which is I think that which is what plaintiffs are bringing their challenge under, it's a facial challenge to these documents.  I don't think that prohibits aliens from raising in their individual expedited removal proceedings that this -- that the document is unlawful.  So I don't think this is the situation where we actually have that issue where you just could never raise this challenge.  And I'll say that district courts are, as I think we've described, considering challenges to the arriving alien regulation and whether it's appropriately applied to these aliens.

This is, I think, something that comes up a lot

in this court with regulations, for example, SEC regulations, you have to challenge within 60 days and the like. And the question is, after a certain amount of time after those 60 days, what do you do about that if those regulations were totally unconstitutional --

JUDGE SRINIVASAN: I think I get --

MR. BECKER: -- you would be able to an individual proceedings.

JUDGE SRINIVASAN: -- (indiscernible, simultaneous speech). I get that these plaintiffs could not ask us to stay or vacate the 1997 regulation. That's -- couldn't be clearer. But they can ask us to stay the 2025 documents. And if those 2025 documents tell government officials to do something illegal, I think a court is supposed to stay that, right?

MR. BECKER: If those documents are simply applying the 1997 regulation, I mean, I think that under our position in this case, because if the 1997 regulation says the same thing as those, I think that's what you're getting at, Your Honor; is that correct, the 1997 regulation is totally unconstitutional. If the 1997 regulation is totally unconstitutional, and these documents are just simply applying that regulation, I think that really the only relief plaintiffs could get is by going into their individual proceedings and alleging

that these are unconstitutional.

I don't think that that's -- this isn't a case where there would not be any sort of judicial review for such a thing. I think this just happens in many other contexts as well. It's just that you end up bringing it in an as applied context rather than in a facial challenge.

JUDGE RAO: I thought the government's position, though, is that even in an as applied challenge, the time bar would apply because it's a statute of repose. I mean, that's -- that was the government's position and make the road. Your position now is that the 60-day time bar and doesn't apply in individualized proceedings?

MR. BECKER: Well, Your Honor, what I'm saying is that I think the -- under the -- under a lot of what district courts have been doing, they've been considering whether these aliens are subject to expedited removal --

JUDGE SRINIVASAN: And you're saying that's --

MR. BECKER: -- in their individual proceedings.

JUDGE RAO: -- that's permissible under IIRIRA?

MR. BECKER: I don't think so, but I think plaintiffs would -- should -- would have to bring an individual case in D.C. to challenge.

JUDGE RAO: But you said that there would be judicial review available for an as applied challenge even



if the 60-day time bar had run.  You said this is a situation where judicial review is available, not the district courts are saying it's available, you're saying that it is available.  So I'm just wondering, has the government changed its position on what the --

MR. BECKER:  No, no.  I don't think --

JUDGE RAO:  -- statute of repose means?

MR. BECKER:  I don't think the government has changed its position.  I think that in that type of situation, I think that the -- that aliens would have to bring some sort of ultra vires or some sort of mandamus action or something of that nature.  There may just not be available regular judicial review.

JUDGE WALKER:  I'm pretty confused -- go ahead.  Sorry.

JUDGE SRINIVASAN:  Then we're back to what Judge Walker asked, which is that you're -- then the government's position is that even if the underlying regulation is patently unlawful, we just stipulate to that then -- and then the directives, applying that regulation to individuals even just can't be challenged?

MR. BECKER:  Those individuals would have to challenge that in their individual removal proceedings.  And I think that's something --

JUDGE SRINIVASAN:  And that has nothing you



can -- that can happen.

JUDGE RAO:  Is that it consistent with our -- with the circuit's opinion, M.M.V., about the 60-day statute of repose?

MR. BECKER:  I mean, that -- consistent with M.M.V., I don't know that the alien would be able to bring.  I mean, the alien certainly couldn't bring a facial challenge to these regulations as they often --

JUDGE WALKER:  It's very little an alien and expedited removal was allowed to argue --

MR. BECKER:  That's correct.

JUDGE WALKER:  -- to the court.  I don't think this is one of those things.

MR. BECKER:  Again, I think they would have to bring some sort of -- I mean, they could try -- if it was a totally unconstitutional regulation, they would have to bring some sort of ultra vires action or some something of that nature then this is totally in that --

JUDGE WALKER:  Without a cause of action, could that be?

MR. BECKER:  No, I'm saying that I don't think they would have a --

JUDGE WALKER:  Right.

MR. BECKER:  -- cause of action to bring it.

JUDGE WALKER:  Okay.  Let's --



JUDGE RAO:  So there wouldn't be judicial review?

MR. BECKER:  Yes, I think that's right.

JUDGE WALKER:  I'm just going to disagree.  I think that if the 1997 regulation said you can apply expedited removal to, for example, someone lawfully here on a student visa, I think -- and then if a 2025 document says start putting people on student visas in expedited removal, that the 2025 document could within 60 days be challenged according to the cause of action here, and a court could stay it and vacate it.  You don't have to agree or disagree with that.  I'm just -- that's what I think.

And then if that's correct, and you can't totally rely on the 1997 to absolve -- totally absolve yourself of the merits here, then you might still win on the merits if the 1997 regulation is correct because here's where I very much agree with you.  I think if the 1997 regulation is correct, you haven't done anything illegal in these 2025 three documents, because all they're doing is just applying what you said you were going to do in 1997.

So that then raises the question was the 1997 regulation correct.  And it does seem to me like it was correct, except I'm not sure that and someone who's no



62

longer on parole and has been here longer than two years can be subject to expedited removal. I know you disagree. We already talked about why you disagree, and you might be right. But if you're wrong and I'm right, what do you think this panel and this posture on your appeal from the stay should do?

Assuming that I'm correct that there's a sliver of people out there that you are, say, you have the authority to apply expedited review to who you don't, and those are people no longer on parole who have been here longer than two years. What should we do?

MR. BECKER: Your Honor, I don't think there's anything to do, and that I would -- we just reverse the stay because the plaintiffs challenged the 1997 regulation in their complaint, and the case could be sent back to district court, and that can be litigated there.

JUDGE WALKER: But you -- in my -- and what I'm asking you to assume, the three challenge documents are telling government officials to do something that it is illegal for them to tell government officials to do. And that would be put into expedited removal for people who are no longer on parole and who have been here for longer than three years. And I'm asking you to assume that is unlawful and that there is a cause of action that would allow plaintiffs to get a court to stay that and vacate

that part of it.  And now I'm asking you, in that assumption, what do you think we should do?

MR. BECKER:  Well, if there is a cause of action, and I guess there is standing here to challenge that, I mean, in that case, then I think that would raise what the meaning of arriving alien is in the statute, which I do think is raised in this case.  So the Court would have to interpret what arriving alien meant in the statute, and I think that that is raised by the documents themselves.  But the issue here is that plaintiffs didn't challenge the regulation.  That includes a definition that is -- that I think encompasses people who are here for longer than the time period here.

JUDGE WALKER:  Okay.  And let's say that I think, okay, based on the merits, I think I'm just going to vacate, I'm going to uphold the stay.  And you say, no, no, no.  Even if you -- even if I think what I think about the merits, I should still not totally uphold the stay.  I should only uphold part of the stay because --

MR. BECKER:  Your Honor, I think in that case, this -- the -- I mean, I think the vast majority of people who this would be applying to, given this is a case that's most -- it's about the CHNV termination -- parole programs.  I don't even know that the kind of outer bounds of what arriving alien would qualify as is even really

raised in this case, so.

JUDGE WALKER: So it's possible that none of the people that I'm concerned about need to stay?

MR. BECKER: I don't think that plaintiffs have alleged any individual member that has been here for that long that needs to be -- that somehow needs to stay or as has been here for ten years. I don't think that's what the focus of the case has been on. It's on the cancellation of these termination programs, these parole programs, and whether those folks can be subject to expedited removal.

JUDGE SRINIVASAN: Maybe when it's the plaintiffs' turn, they can say if they disagree with that last thing that you said.

MR. BECKER: Yes, Your Honor.

JUDGE SRINIVASAN: My colleagues have additional questions at this point? Okay. We'll give you time for rebuttal.

MR. BECKER: Thank you, Your Honor.

JUDGE SRINIVASAN: Ms. Sung.

MS. SUNG: Yeah. Hold on. I'm shorter.

ORAL ARGUMENT OF ESTHER SUNG, ESQ.

ON BEHALF OF THE APPELLEES

MS. SUNG: Good morning, Your Honors, and may it please the Court. Esther Sung for the plaintiffs.



Congress established the expedited removal system in 1996, for people who arrive at our borders and who have entered illegally and have no entry documents. Now, those aren't actually my words. Those are the words that the United States government offered to the Supreme Court in their opening statement in United States versus Thuraissigiam.

And the plaintiffs here today simply agree with that plain text interpretation of the statute. The plaintiffs -- it's the plaintiffs' position that the plain language of the statute, the structure, the legislative history, all making clear that the expedited removal authority applies only to two distinct and limited populations.

First of all, people who are arriving in the United States without proper documentation, and second, people who have come to the country illegally, of course, subject to the designation of the Secretary of Homeland Security. But people who have come to the country illegally and who have been here physically present in the country for no more than two years. And parolees, people who have come to a port of entry, who have been inspected and who have been paroled into the country, do not fit in either of those two populations.

JUDGE SRINIVASAN: Before we go down to the road



on the merits, can we just talk a little bit about these threshold questions about the implications of the fact that for the interim stay purposes, as opposed to at the end of the day, you haven't sought to stay the regulation.

MS. SUNG:  This --

JUDGE SRINIVASAN:  It's just the government's position, obviously, is that if you haven't sought to stay the regulation, in fact, the complaint presumes that the regulation allows expedited removal, then how can you show redressability or how can you avert an inability to show irreparable injury if there's still authority to effect expedited removal as to this very population under the regulation?

MS. SUNG:  Sure.  The government does want to direct the Courts' attention to the regulation, and because of that, I think the import of this appeal is not what it once was.  And we've actually filed a motion for summary judgment in the district court that encompasses our claims relating to the regulation, and that's currently pending.  The government moved the district court to uphold that motion in abeyance pending the disposition of this appeal.  We oppose that.  And the district court indicated that she wanted to wait to rule on that motion to hold the -- our summary judgment motion in abeyance.



JUDGE SRINIVASAN: Right. I mean, because it was your choice whether to seek a stay of the regulation as part of the interim stay application. And you opted not to and could be for all kinds of reasons, including there's a timeliness issue, obviously, but for whatever reason, what we have before us is an interim stay only of the directives, but not of a regulation that your complaint itself assumes can be used to effect expedited removal. So where does that leave us with redressability --

MS. SUNG: I think --

JUDGE SRINIVASAN: -- or irreparable injury?

MS. SUNG: Well, the -- where that leaves us is the question is sort of whether the district court properly found that there was redressability as to the challenged actions with the record that the district court had before it at that time. The district court and frankly, the plaintiffs could not have predicted that the government would, in fact, change its position as to the regulation, because the record before the district court was very clear that -- and Your Honor, Judge Srinivasan, you pointed this out.

There is a difference between the extent to which expedited removal was being pursued based on just the regulation and the regulation plus the directives.



And the record is very clear that when we were in a world where it was just the regulation, the government was not, in fact, pursuing expedited removal of essentially humanitarian parolees, people who had been paroled at a port of entry and inspected and paroled into the country. The record before the district court was that there were only two instances of individuals being paroled into the country --

JUDGE SRINIVASAN: So I'm familiar with that record, and so I just want to follow up. And I guess what I'm wondering about that is let's just stipulate that that's the historical record. And that is definitely what the district court relied on to say that redressability had been shown. But this just gets, I think, to the question of enforcement priorities, if the regulation hadn't been used, but it could be used, which I think your complaint presupposes in a broader set of instances than it had been used.

And then there's a new administration that just has different enforcement priorities and wants to max out on the use of the regulation. Then the fact that there's been an uptick after the directors wouldn't be altogether surprising, because that's a reflection of the enforcement priorities having shifted and an increased emphasis on using the regulation.

And if that's the case, then I don't know that the right baseline is just what was the case beforehand, because what was the case beforehand was predicated on a different set of assumptions about the aggressiveness of the exercise of enforcement authority than might be the case now.

And so then one would say, well, if the regulation still could be used to the same extent as the regulation plus the directives, the fact that it wasn't being used to that extent at a prior period, wouldn't necessarily tell us if it still would be used now to that extent. And if the burden -- you're right that we have to address whether the district court -- to affirm the district court's conclusion as to redressability, but the burden is on the plaintiffs to show redressability. So what we have to address is whether the district court correctly concluded that the redressability had been shown based on what you put in the record.

And I guess on that set of assumptions, then why is there something in the record from which to conclude that given what the state of affairs is now with respect to enforcement priorities, we would expect that there would be a meaningful delta between what exists under a regime in which there's just a regulation and one in which there's the regulation plus the directives.

escribers

www.escribers.net | 800-257-0885

70

MS. SUNG:  Well, I think, first -- I have a couple of responses to that.

JUDGE SRINIVASAN:  Sure.

MS. SUNG:  First, the district court found as a factual matter that the defendants had failed to rebut evidence from the plaintiffs that the underlying regulation would have been used -- would have had the same result if the challenged actions hadn't issued.  And I think as probably as a practical matter, although I can't presume on the part of the government to the extent that there were changing enforcement priorities.

The challenge directives like effectuated that, implemented that and they are challengeable under 1252(e)(3), but I also think that this gets to sort of the speculation argument, right, that you were discussing with my colleague here.  And I think that this situation is a little bit different than some of the third-party cases, for example, in the nuclear regulatory case that the government cites.

Because you do have a very clear track record of sort of with the regulation and with -- regulation with the directives.  And the district court did not err in finding that staying the directives would have some effect, and in fact, it did.  And you can tell this from the positions that the government took in its briefing

before the district court.

The district court -- excuse me, the government said in opposing the motion for stay, that the relief that we requested would prevent DHS from applying expedited removal to potentially hundreds of thousands of paroled aliens. And of course, now they're taking a different position. They have changed position here, but that doesn't mean that the district court was wrong in finding redressability on the record that the court had in front of it, or that the district court's stay doesn't have any meaning or import.

And I think it's actually very similar to the tariffs case that the Supreme Court just decided, in which, as you know, the president turned around the very next day after the Supreme Court's decision and learning resources and reimposed basically the exact same tariff rules based on a different legal authority. But something that the president had always telegraphed that he was going to do if the original terrorists were ruled unlawful or unconstitutional. And in that instance, I don't think anybody would argue that the plaintiffs who challenged the original tariffs and learning resources and the related cases didn't have standing.

JUDGE SRINIVASAN: But they might have a claim as to that -- they might have an argument as to the other

use of authority. And I think what makes this case different, or at least complicated, is that your complaint itself presumes that the regulation could be used to effect the expedited removal. I mean, do you doubt -- so let's suppose that we just agree for -- just for purposes of this question, that there is a downtick because of this day of the directives and -- but do you dispute that the regulation on its own could be used to the same extent?

MS. SUNG: No, I don't dispute, but the point is that the stay did have that effect, and that is why the district court didn't err in finding with -- again, with the record before it at that time that that there was redressability and that a stay of the challenge directives would have -- would redress part of the plaintiffs' injuries.

JUDGE SRINIVASAN: I'm asking enough --

JUDGE RAO: I just, I mean -- when the question is, you know, ramping up or ramping down enforcement discretion, it's very hard to say that, like, if there is underlying legal authority, which you accept that the regulation provides legal authority for this. I mean, how can we say that the stay itself is like affecting whether there are more or fewer or more people put into expedited removal. I mean, it's a matter of discretion.

MS. SUNG: It is, but enforcement discretion, as



73

you can imagine is a huge enterprise.  It has many moving parts, and I think --

JUDGE RAO:  Which is exactly why it's hard to show redressability from a single stay when the underlying legal authority persists.

MS. SUNG:  But I don't think that's correct. The record shows that when you just have the regulation and all the immigration enforcement officers in the country can, again, exercise discretion as they will.  The record is very clear that when that was the state of affairs, there were only two instances, at least there --

JUDGE RAO:  There were different enforcement priorities in previous administrations.  I mean, this administration has made very clear what its enforcement priorities are, whether there is a document that says it or not.

MS. SUNG:  Yes.

JUDGE RAO:  And as the challenged actions here are just statements of administration policy of how discretion will be exercised.

MS. SUNG:  Yes, but I think the point is enforcement discretion to be communicated and implemented in some way as a practical matter.  I mean, enforcement officers can't define this from telepathy or something like that, and so that's what the challenge directives


www.escribers.net | 800-257-0885

74

represent.  They represent a new enforcement priorities by the administration, and they communicate to enforcement officers, you have this police --

JUDGE RAO:  This may -- but how is that -- I mean, how does that establish redressability for us here?

MS. SUNG:  Well, I think the district court -- I don't think that the district court erred and certainly the government hasn't disputed or shown any error in the district court's finding that the -- it was the challenged actions, the challenged agency actions that are the cause of the harm to the plaintiffs' member.

JUDGE RAO:  I think the independent error that the district court made by suggesting that the burden is on the government.

MS. SUNG:  Well --

JUDGE RAO:  Right?  The burden is on the plaintiffs to show redressability.  The burden is on the government.

MS. SUNG:  Yes.  And well, the record that we submitted that was not disputed by the government, I think that's maybe where the district court's language is coming from.  But the record that both parties developed before the court is very clear that after the challenged agency actions were issued and implemented, that is the cause of the harm to the plaintiffs' members.  There's a very clear



www.escribers.net | 800-257-0885

before and after picture, I think, in the record.

And so as a result, the -- I don't think that it was abuse and abuse of discretion for the district court to conclude that staying the challenged actions would, at least in part, redress the plaintiffs' harms.  And I think what we have here, frankly, is a little bit of whack a mole, right, there -- you know, what we thought we were dealing with was sort of three directives that were causing harm to the plaintiffs' members, and so we flagged all three.

JUDGE RAO:  Maybe that's the litigation error to not also raise the regulations --

MS. SUNG:  Well, so we --

JUDGE RAO:  -- for the purposes of the stay, right?  So that's not --

MS. SUNG:  But so we --

JUDGE RAO:  So we can fix.

MS. SUNG:  But we've whacked those three, and -- but then I point out that, again, it's a change in position that the government is now taking that it can rely on the regulation independent of the challenged agency directives to apply expedited removal to parolees.  And so the mole is popping up in the fourth hole, but the district court again did not err in whacking the mole, as it were --



www.escribers.net | 800-257-0885

JUDGE RAO:  But plaintiffs agree that there is the fourth mole, and you agree that it's there.  You just chose not to whack it down in the stay.  That's not -- I mean, that's not the government's fault.  I mean that --

MS. SUNG:  Well --

JUDGE RAO:  And you agree that the regulation allows this type of actions and so --

MS. SUNG:  I don't mean to belabor the metaphor too much, but there wasn't a mole popping out of the fourth hole at the time that we moved for the stay from the district court.  It was the -- and it's sort of a 2020 hindsight thing.  But at the time when, you know, the directive from the administration was to ramp up to 3,000 apprehensions per day, et cetera, it seemed very clear at that time that what was driving this, what was causing the harm to the plaintiffs' members, was the three challenged agency directives.  That was what needed immediate address.

JUDGE RAO:  And it is a part of the problem, though, with litigation, attempting to use federal courts to control enforcement discretion.  Because, say, the secretary just announced, didn't write it down, just said, well, okay, you know, I direct people to enforce the -- you know, use the use the 1997 regulation --

MS. SUNG:  Perhaps, but --



www.escribers.net | 800-257-0885

JUDGE RAO:  -- for greater enforcement of expedited removal.

MS. SUNG:  Perhaps.  But --

JUDGE RAO:  Even plaintiffs' view, that would be permissible.

MS. SUNG:  But congress did make these types of written policy directives challengeable under 1252(e)(3). I think precisely because expedited removal is a very draconian enforcement action.  It's very stripped down. There's no process.  And so there is review available under 1252(e)(3), and we've brought the suit in a timely fashion.  And what was causing the harm to the plaintiffs' members again at that time?  What was the challenged agency directives?

And I would point out that after the -- unfortunately, it's not in the joint appendix, it's in the record below at ECF 53.  There was sort of an interim period during which the district court had issued its stay, but this Court had not yet denied the stay pending appeal request from the government.  And in that sort of interim period, we did bring the government's attention to an individual parolee who had been placed in expedited removal, and we suggested that this wasn't appropriate in light of the district court's stay.

And the next day, the government wrote back to



us and said, this person has been taken out of expedited removal and has been placed in regular removal proceedings.

JUDGE RAO:  So (indiscernible, simultaneous speech) government's, perhaps what they would now call over compliance of the stay is evidence against them?

MS. SUNG:  Well, I think it's an indication that they understood that the stay had effect and that it did redress the plaintiffs' harms.  I think that's the question of sort of what did -- what record did the district court have before it?  What was causing the plaintiffs' harms and what would redress the plaintiffs' harms, at least in part.

JUDGE WALKER:  If he filed the stay on what day --

MS. SUNG:  Oh.

JUDGE WALKER:  I think it was June 11th.  And are you saying that you didn't know that -- you didn't know at that time that the 1997 regulation --

MS. SUNG:  No, that's not what we're saying, but what we're saying is that, again --

JUDGE WALKER:  I mean, it was the 1997 regulation was injuring your clients at that time, correct?

MS. SUNG:  I suppose, yes, but the point is --



79

JUDGE WALKER:  I think you would have to say yes because you amended your complaint that day --

MS. SUNG:  Yes.

JUDGE WALKER:  -- challenge 1997 regulations --

MS. SUNG:  Um-hum.

JUDGE WALKER:  -- but you can't --

MS. SUNG:  Yes.

JUDGE WALKER:  -- you can't challenge a regulation that you don't have standing to challenge.

MS. SUNG:  No, I understand that, yes.  But again, I think here for purposes of redressability is that the relief doesn't have to address all of the plaintiffs' injury.  It has -- just has to address part of it, and --

JUDGE WALKER:  I think I'm curious about that too, and I know the district court said that.  And it makes sense if, you know, have you suffered $1 million in damages and you can get 10,000 of those, that's redressability part of your injury has been redressed, but I would think by being put an expedited removal is sort of a binary thing.  You're either in it, or you're not.  So I'm not sure how you could get partial redress when your injury is being put in expedited removal.

MS. SUNG:  It's partial redress in that the government was clearly relying on the challenged agency actions to subject people to expedited removal.  What we



www.escribers.net | 800-257-0885

want to do, like what the end goal of this litigation is, right, is to remove all the sources of authority that the government is relying on to say that parolees can be subject to expedited removal because --

JUDGE WALKER:  That maybe because you want to do at the end, but that's --

MS. SUNG:  Yes.

JUDGE WALKER:  -- not what you try to do in the stay.

MS. SUNG:  This is true.  But that's because, again, back in June or -- of 2025, the world was that -- as we understood, it was sort of regulation, essentially, de minimis application of expedited removal to parolees. Regulation plus directives, a huge explosion in enforcement.

JUDGE WALKER:  And if the regulation was only causing the de minimis injury, I'm not sure why you amended your complaint to challenge it.

MS. SUNG:  Well, it's still injury, and then again, what the government has now changed position and is saying, oh, well, now that the challenge agency directives have been taken off the table by the district court's order, we can still rely on the regulation.  But that is not the position that they were taking before we filed the lawsuit and before we moved for the preliminary relief



from the district court.

JUDGE WALKER: You know, I know that -- I'm not asking for a name because I take it some of the members, if not all, of the members of your organization, are proceeding under anonymous names. With that in mind, again, I'm not asking for a name. Can you identify someone who has been put in expedited removal who would not have been put in expedited removal? Absent the -- I guess actually know someone who is -- has not been put in expedited removal, but would if this stay is lifted?

MS. SUNG: Well, certainly the declarations from the organizational plaintiffs' talk about and identify some members who have -- who express harm, who've expressed fear of being subject to expedited removal. And again, all of the consequent problems that attend that they're afraid to leave their house, you know, all of that.

JUDGE WALKER: Again, I mean, I think that -- I don't doubt that the fear is real and that the fear is important. I'm wondering, as a matter of redressability under the third prong of standing, it's your burden to show a likelihood of redressability. So I think you need to show at least a 51 percent likelihood that this stay is the reason that at least one person has not been put into expedited removal. Who is that one person?

MS. SUNG: Obviously, I think that -- again, it goes back to what the state of affairs was at the time when we moved for relief and when the district court began with the record that it had in front of it, what the district court assessed to be addressable. And because the challenged agency actions are what was driving this increase in pursuit of expedited removal against parolees. Certainly, following the district court stay, everybody breathes a sigh of relief. Because this very obvious source of authority that the government had been relying on to subject parolees to expedite a removal had been stayed.

JUDGE WALKER: I get all that, but I --

MS. SUNG: Yeah.

JUDGE WALKER: -- I do think, like you haven't come close to identifying the pseudonym of the person I'm asking for.

MS. SUNG: Certainly, if -- it's in -- we can look it up in the declarations. If you'd like to, we can submit something to the Court to identify these people. There are definitely people identified in the declarations of the plaintiff organizations who had -- who have parole, CHNV parole or CBP One parole, and who are concerned, especially because of --

JUDGE WALKER: You don't have to prove --


www.escribers.net | 800-257-0885

MS. SUNG:  Yeah.

JUDGE WALKER:  -- to me that they're concerned. I think that has been established, and if you want to make a filing, that's your prerogative.  It's not -- I'm not asking for it.

MS. SUNG:  Okay.

JUDGE WALKER:  And I guess we would also have to consider whether it's too late at this point, because the burden was on you to do it before now.  But what you would need to show is not that someone has a fear, you would need to show a likelihood that the stay is the reason that that person has not been put into expedited removal, and that if the stay were lifted, there is at least a likelihood that that person would be put into expedited removal.  And I think in your defense, it's not your fault that you haven't shown it.  I think there's a pretty good chance that it just can't be shown, but that would mean you don't have standing.

MS. SUNG:  I think that part of this is due, in fact, the shifting position that the government has taken. It's really only after this Court denied the motion for stay pending appeal that they then started saying, you know what, don't worry about it.  We can rely on the regulation.  I think this is what --

JUDGE RAO:  This -- the underlying states of the



www.escribers.net | 800-257-0885

legal world is not a shifting position. There was -- the regulation was always there. And plaintiffs agree that the regulation can subject these --

MS. SUNG: Yes.

JUDGE RAO: -- folks to expedite -- so the -- I mean, this idea that there's a difference of degree there, I couldn't find any case suggesting that redressability in part can be satisfied where there's like a matter of degree and discretionary government action. Can you point to any case where that's the situation? Because your suggestion is, well, a hundred people would do expedited removal under the stay, that number is something less than a hundred, which redresses some group harm in part.

MS. SUNG: Well --

JUDGE RAO: The questions of degree, I'm not aware of any case where we've suggested that -- I mean, I think Judge Walker said if it's $1 million and it's $10,000, well, that makes sense. You're getting some of what you're seeking. But this matter of -- it's a matter of enforcement discretion as a matter of degree, how does that establish redressability?

MS. SUNG: Well, I think the -- again, the -- it's --

JUDGE RAO: Maybe plaintiffs made a mistake in not challenging the reg for the stay. That doesn't count,

and that's not a matter of the government's shifting position. I don't know what's the point after that.

MS. SUNG: I think that it -- well, I think that it is. I think that what causes fear in the plaintiffs' members and what has -- what actually prompted the apprehension of some of the plaintiffs' members and placement and expedited removal was the challenged agency actions and not the regulation.

And again, the record is clear, sort of what happens when you just have the regulation and what you have when you have regulation plus the challenged agency actions. And I think that -- I don't have a --

JUDGE RAO: That's the --

MS. SUNG: -- case for you on sort of scale, but certainly, this Court has held that if the district court's account of the evidence is plausible in light of the record viewed in its entirety, then it should not be reversed on appeal, and that -- that's what the district court had in front of it. The district court could not have predicted that, following its stay and following this Court's denial of the of the motion for stay pending appeal that the government would then begin relying actively on the regulation to subject parolees to expedited removal.

JUDGE RAO: But you agree that they can, so.


www.escribers.net | 800-257-0885

MS. SUNG:  Yes, but the record shows --

JUDGE RAO:  Submits --

MS. SUNG:  -- that they --

JUDGE RAO:  -- during the --

MS. SUNG:  -- didn't.  The record shows that they didn't.  I think that's --

JUDGE RAO:  But that's a matter of discretion, not as a --

MS. SUNG:  Sure.

JUDGE RAO:  -- matter of law, as a matter of discretion.

MS. SUNG:  Yes, but I think that this is what Judge Walker was getting at when he was discussing Document Society with my colleague here.  Right.  It's a question of whether -- certainly, the authority was always there, but sort of again, looking at the chilling effect, I guess in that case of, sort of, the enforcement on Doc Society, and I guess, it was their members and so on.  I mean, it's again, the record is very clear that sort of harm coming from just enforcement of the regulation. Again, de minimis harm coming from enforcement.

JUDGE RAO:  Okay.  So that's your --

MS. SUNG:  Yes.

JUDGE RAO:  -- only answer.

MS. SUNG:  So yes.



www.escribers.net | 800-257-0885

JUDGE RAO:  And there that -- we're just going --

JUDGE SRINIVASAN:  Can I ask you this question?

MS. SUNG:  Yeah.

JUDGE SRINIVASAN:  If suppose, and you'll resist this, understandably you would, but suppose that the reason -- that the stay gets overturned, but the reason it gets overturned is that there was no request for a stay of the regulation, and that created a gap, either for redressability purposes or for irreparable injury purposes, and that means that the stay can't be sustained. If it goes back down, would you immediately then ask for an interim stay, but then tack on that you're seeking an interim stay based also on the regulation?

MS. SUNG:  Well, we do have a motion for summary judgment already pending before the district court.  That does encompass our claims relating to both the challenge agency actions and the regulation, and so we have essentially teed up --

JUDGE SRINIVASAN:  But --

MS. SUNG:  -- the current --

JUDGE SRINIVASAN:  -- that's going to take some time to unwind and be resolved.  And I guess the question is and maybe your answer is it's not going to take that much time, so an interim stay just doesn't matter, but if

that's true then --

MS. SUNG:  Yeah.

JUDGE SRINIVASAN:  -- you know, what we're going to do is an interim stay anyway.  And so I think the question is -- I'm just asking a practical question.

MS. SUNG:  Um-hum.

JUDGE SRINIVASAN:  Would there then immediately just be depending on, of course, how the district court reacts to it, but would there immediately be a request for an interim stay?  But this time tacking on that, you're also seeking to stay the regulation while the litigation unfolds, and then the district court would have before it whether that kind of stay was warranted in light of whatever we would say and --

MS. SUNG:  Sure.

JUDGE SRINIVASAN:  -- hypothetically.

MS. SUNG:  Right.  I think we'd have to assess sort of a matter of person power.  But if I had all the resources in the world, yes, I think we would to prevent parolees from being subjected to expedited removal unlawfully in violation of the statute.

JUDGE SRINIVASAN:  And then can I ask you this other question, which is for -- at least for me, the notion of applying redressability just as to interim relief is a new animal.  It may be right.  It may be, and



www.escribers.net | 800-257-0885

I don't -- I haven't understood you to actually resist that proposition, because I think both parties are operating on the understanding that redressability needs independently to be shown as to interim relief. That may well be the case, and it seems like both parties are in alignment on that.

We still have to do our own thinking about that, but I'm not sure practically how much it matters at the end of the day, because it then surfaces at the back end in terms of irreparable injury anyway. And I guess my question is as to irreparable injury apart from redressability, if the authority still exists, regardless of the directives, the authority still exists because of the regulation, then can you show irreparable injury, given that there's still the -- at least the possibility that the regulation could be visited on the -- your clients based on something that's not being challenged for purposes of the interim stay.

MS. SUNG: Yeah. I mean, I think as a practical matter, first of all, the record does show -- and this is going to get back into my discussion with Judge Rao, I'm afraid, but that there were -- that there are people who are plaintiffs' members who are subject to expedited removal pursuant to the challenged agency actions when they shouldn't have been. And if they hadn't been

subjected to expedited removal, they would have continued in their normal Section 240 removal proceedings. They would have been with their family. They would have had access to all of those things.

JUDGE SRINIVASAN: So then I think I understand all that, and I guess it seems to me, then, your position is and this may be -- this is totally fine. This may be your position is that there's no difference in what you would need to show either to establish redressability or to establish irreparable injury. Either way, it's going to turn on whether for purposes of the interim stay. Either way, it's going to turn on whether the world, in the absence of the stay of the directives would look the same as the world if the --

MS. SUNG: Yes.

JUDGE SRINIVASAN: -- records remain in place, because notwithstanding the existence of the regulation, there's no difference between irreparable injury at the back end and redressability at the front end.

MS. SUNG: Well, so if we could -- if the government were forced to articulate the grounds on that it was relying on to place someone expedited removal, perhaps we would have a difference here because -- but of course, they don't state that, they haven't taken a position when we've asked them the basis for putting

someone in expedited removal, but --

JUDGE SRINIVASAN:  I mean, I'm not -- maybe I'm not understanding that.  I thought the basis for placing parolees in expedited removal is all the merits of the case is there.

MS. SUNG:  Well, what I mean is based on our understanding, speaking to plaintiffs' members.  And again, the record showing that there -- the government wasn't attempting to subject parolees to expedited removal before when it was just the regulations --

JUDGE SRINIVASAN:  Oh, I see.  I understand it. Right.

MS. SUNG:  Right.  It's our understanding that people who were being -- who were caught up in the courthouse sweeps in the nationwide blitz, as it were, and being subject to expedited removal last summer, essentially, that was pursuant to the challenged agency directives.  And then it's our understanding that following this Court's stay and this Court's denial of the stay pending appeal request, they started relying on the regulation instead.

And I do think this gets to sort of the whack a mole and the partial redressability of, like, what we are ultimately trying to do is to remove all of the sources of authority that the government might rely upon to subject

parolees to expedited removal.  And the district court's order has taken care of three, essentially.  And we're moving now, especially because the government has changed its position on how to enforce and implement the regulation on the fourth.  And that's in the motion for summary judgment pending before the district court.

JUDGE WALKER:  If we were to just affirm, say it was a single sentence.

MS. SUNG:  I would say, great, thank you very much, Your Honor.

JUDGE WALKER:  I know you might like -- I know you might like that.  Would you seek a stay in the district court of the 1997 regulation?

MS. SUNG:  That's a good question.  We did contemplate that, but we figured especially because it's sort of -- we did contemplate that, but what we decided was sort of the most efficient avenue was to move for summary judgment just to tee it all up for the district court.  We have an evidentiary record that we've put before the district court.  And again, thinking about sort of human resources and how much time things take, we just figured moving for summary judgment would probably be the most effective and efficient use of our --

JUDGE WALKER:  What if the day -- and you're -- and I think you're going to like this premise as well.



It's maybe not the question, but what if we affirmed with one word, and then the next day, the district court said to you, I'll give you a stay of the 1997 regulation without briefing if you want it, what would you say then?

MS. SUNG:  Well, I mean, sure, we would take that too, but I think that's probably -- that would probably be beyond --

JUDGE WALKER:  I'm not saying these are realistic, but I'm asking because I think you would take the stay.  Why would you take the stay?

MS. SUNG:  To again, whack the fourth mole, I guess, as it were.

JUDGE WALKER:  Yeah.  And so now, you're not going to like this as much, but I think that shows that you need to stay the 1997 regulation in order to redress the injury that this stay is supposed to redress?

MS. SUNG:  Well, I think this gets into probably like -- the reason why we're having issues with this is because we don't know -- and I think there were various questions about this to the government sort of at what -- is there a delta?  Right.  Is there -- has there been a change in how often expedited removal is being applied to parolees, and we're not in a position to assess that.  And certainly, if there are questions about that, I suppose the -- that this Court could to remand -- to send the case



94

back down to the district court and let the parties hash that out there.

And maybe that is the best avenue to get these questions answered, because we certainly, we don't have the information that the federal court does.  For our motion for summary judgment, we certainly do have declarations from private practitioners who are representing individuals who've been placed in expedited removal who, say, my client has been placed into expedited removal following all of the litigation around the district court's stay and this Court's denial of the stay pending appeal.  And yet notwithstanding the district court's stay of the challenged agency actions, my person is being put into expedited removal.  And that's the record -- that's all we have access to, right, not the --

JUDGE WALKER:  Right.  Which is why you would want the stay of the 1997 regulation --

MS. SUNG:  And well, we have shown --

JUDGE WALKER:  -- which you did --

MS. SUNG:  Yeah.

JUDGE WALKER:  -- which is also why it may be the case that stay on appeal --

MS. SUNG:  But I --

JUDGE WALKER:  -- is not redressing the injury. I think you've answered my question.



www.escribers.net | 800-257-0885

MS. SUNG:  Well, I just want to point out, I think that it's a little bit tough because I wonder if we had moved on all four, again, when it seemed pretty clear that the government was not relying on the regulation last summer, I mean, would we have an issue of being able to point to which of the three different challenged agency directives, or the regulation was ultimately responsible for a particular person being put in --

JUDGE WALKER:  You did say earlier that --

MS. SUNG:  -- expedited removal.

JUDGE WALKER:  -- that the day you filed the stay, the government was injuring you with the 1997 regulation.

MS. SUNG:  Yes, this is -- yes.  As a technical matter, yes, but --

JUDGE SRINIVASAN:  I assume your position is that if in the world that includes the directives, there's a mandate to use expedited removals.  So there's 100 percent likelihood that expedited removal will be visited on your clients.  But in a world without it that exists with the regulation, there's still a possibility.  But it's one percent because the government decides it's going to expand its resources elsewhere in the absence of the -- or at least immigration officers decide they're going to expand their resources elsewhere in the absence of the


www.escribers.net | 800-257-0885

directives.

Then yes, there's still the possibility.  Yes, it still causes injury, but it's what you -- the bulk of the concern has to do with 100 percent likelihood, as opposed to the 1 percent likelihood, which you might have thought was zero.  But actually your complaint indicates that you at least think that there's some possibility under the regulation, but that that delta would be enough.

Whether that's true, whether as long as it's discretionary, the delta could make a difference, I think is a question of law.  But I take it your position is that, you know, we would be dealing with the big enchilada, and then we would still like to deal with what's left, too.  But for purposes of redressability and irreparable injury, it still gives us something meaningful to take out the certainty, even if there's still a remote possibility and obviously loading into it what the delta --

MS. SUNG:  Yes.

JUDGE SRINIVASAN:  -- might or might not be.  It may be nothing, but it may be something.

MS. SUNG:  Yes, that's correct.  I think that the record before the district court shows that there was a delta and at the very least that the district court didn't err or abuse its discretion in finding that there

was a delta to support a finding of redressability.

JUDGE RAO: May not be abuse of discretion, but it might be legally insufficient for redressability, which would be a per se abuse of discretion.

MS. SUNG: I think that it's redressability, especially in this circumstance. It is a question of fact, but also a question of -- excuse me, a question of law, but also a question of fact. And the facts before the Court at that time, first of all, are not what they are here before this Court. And also the point is that the facts before the district court at that time supported the district court's conclusion in which we (indiscernible, simultaneous speech).

JUDGE SRINIVASAN: I think you at least have to accept this proposition, though. If, as a matter of law, the rule were that any possibility that the same consequence could befall your clients is enough to mean no redressability, then you can't prevail, because you acknowledge that there's at least some possibility under the regulation standing alone.

MS. SUNG: Yes, I think that's correct, but I think that --

JUDGE SRINIVASAN: That may or may not --

MS. SUNG: -- any possibility --

JUDGE SRINIVASAN: -- be as a matter of law.


www.escribers.net | 800-257-0885

MS. SUNG: Yeah.

JUDGE SRINIVASAN: That's -- that --

JUDGE RAO: And you've offered no -- I mean, even assuming the district court's findings are correct, I mean, there obviously has been a delta, even if we assumed it was attributable to the directives, you haven't given -- you haven't provided a legal reason why a delta that's based on enforcement discretion would satisfy redressability. And I know we've already gone around, but I mean, but you keep going back to the facts, but you haven't provided anything as to a legal reason why that would constitute redressability.

MS. SUNG: No, we can certainly look, and if we find anything, I'll say that in preparing for this argument, the factual record is just so stark that we have --

JUDGE RAO: That's our --

MS. SUNG: Yeah.

JUDGE RAO: So yes.

MS. SUNG: Yes. I can address the merits if you would like to, Your Honors. I don't know if you have questions about that?

JUDGE SRINIVASAN: No questions about it. I have a question about the characterization of the merits, just so I understand it. So there's the two sorts of



99

authority that the government is bringing to bear here, the designation one and the arriving one.

MS. SUNG:  Yes.

JUDGE SRINIVASAN:  Is it right -- do you agree with the understanding that if, and you'll resist the premise, but if the government has authority under the arriving source, then as for purposes of this case, because the plaintiffs' class consists of individuals who got parole at a port of entry --

MS. SUNG:  Uh-huh.

JUDGE SRINIVASAN:  -- then the designation authority doesn't matter?

MS. SUNG:  Well, I think that this is the legal oddity that the district court identified, which is that if you accept the government's interpretation of the statute then people who came to the port of entry and who were inspected and paroled and followed all the rules are forever subject to parole because they are forever considered to be arriving.

And then the language in the designation provision that exempts people from having been -- first of all, the language that exempts people who have been paroled from being subject to a designation under the designation provision basically has no meaning.  But then in addition to that, it means that people who enter the



country unlawfully and who come here and are able to evade detection and apprehension for two years, are then forever insulated from expedited removal.  And that puts the two populations that treats them very differently and that's --

JUDGE SRINIVASAN:  And the government's response to that, of course, is that, yes, for purposes of expedited removal, there's that seeming discrepancy, and I agree with you that that seems anomalous.  But then there's other consequences that attend unlawful coming here unlawfully and staying here that don't apply to someone who gets parole, and so there's just a question of whether that all washes out.

Because I mean, under -- I think with respect to whether the government's position is what you say it is, your complaint says it is right, because your complaint says that the overbroad definition of arriving alien and the regulation means that any paroled individual may be subject to expedited removal at any time regardless of the fact that they are lawfully.  So I think you -- it then collapses back into the question of whether this regulation is a valid interpretation of the statute, because if it is, then the regulation by its terms says doesn't matter when as long as you've been paroled in, you're subject to expedited removal.



MS. SUNG: Yes, it does go back to that. With respect to the arriving in provision --

JUDGE SRINIVASAN: Yeah.

MS. SUNG: -- it's also our position, of course, with the designation provision that if you have been paroled, you should not be subject to expedited removal pursuant to a designation made under the designation provision. But the point -- the government, certainly, has taken the position that it's both "and". Our position is neither nor.

JUDGE SRINIVASAN: And you have to be right on that, right? And you have to be right on that it can't be either. Now, with respect to the designation 1, then if the arriving doesn't work for the government, then you still have some benefit, because then anyone who is here for longer than two years is subject, even by the government's own argument, to the designation authority. So that doesn't sound like practically that would give you that much, but in terms of getting whole getting relief for you, it's not enough to win just under one or the other. You'd have to win under both, right?

MS. SUNG: We would like to win under both. And we think we should.

JUDGE SRINIVASAN: And you need to, because conversely, if the government can win, at least as the

arriving one, if they can win us to the arriving one, then they don't need the designation one.

MS. SUNG: This is correct.

JUDGE SRINIVASAN: The only scenario I could conceive of is along the lines of some of the questions that Judge Walker was asking, which is if there's somebody as to whom parole has been terminated, and they're here for longer than two years, and you think that the arriving authority doesn't apply to someone whose parole has been terminated as opposed to someone who's still parole, then it could be that there's relief available for that subpopulation.

MS. SUNG: Yes, but I'd like to point out that this position of the government articulated today, that the arriving provision doesn't apply to someone whose parole has been terminated, I think is new. It is not what it --

JUDGE SRINIVASAN: Well, I thought they were taking the other opposition. I thought they were taking the position --

MR. BECKER: My position --

JUDGE SRINIVASAN: I thought they were taking the position, per the language of the regulation, that even if parole has been terminated, the arriving authority continues to apply.

MS. SUNG: Yes, if that is their position -- yes, that if it doesn't matter -- as long as you are if you are a parolee, essentially, it's the government. It's our understanding from the government's briefing that you are subject to the arriving in provision sort of indefinitely that's then --

JUDGE SRINIVASAN: Right.

MS. SUNG: -- arriving. I mean, I don't know --

JUDGE SRINIVASAN: Not just indefinitely, but even if your parole has been terminated.

MS. SUNG: Yes, this is correct, and I --

JUDGE SRINIVASAN: I think that the plain terms of the regulation just say that. It says an arriving alien remains an arriving alien, even if paroled and even after any such parole is terminated.

MS. SUNG: Right. The effect is, were -- I mean, I guess this gets a little bit to the merits and sort of what was Congress trying to effectuate with these statutes, but the point of the arriving in provision was that the Congress was trying to address people who were coming to the port of entry -- well, coming to the United States without proper documentation. And it's our position that parolees shouldn't be encompassed in that in that population.

I can go into our arguments as to why, but then



104

the designation provision shows that there would be no reason for the Congress to try to exempt parolees from designations that the Secretary of Homeland Security could make, if forever they were subject to expedited removal under the arriving in provision.  Like, the structure of the expedited removal authority and the two populations that is trying to articulate that are subject to expedited removal just don't make sense, if you accept the government's position here.

JUDGE SRINIVASAN:  So the government's position, I take it, for the regulation applies to a subclass of parolees -- is those who get parole at a port of entry?

MS. SUNG:  Yes, I believe so. And that's what's --

JUDGE SRINIVASAN:  That's not everybody that gets parole, right?

MS. SUNG:  -- at issue.

JUDGE SRINIVASAN:  Or am I wrong about that?

MS. SUNG:  This is correct.  But what is that issue in our cases --

JUDGE SRINIVASAN:  You're --

MS. SUNG:  -- is individuals who have been paroled at a port of entry -- who've been inspected and paroled at a port of entry.  Yes.

JUDGE SRINIVASAN:  And then, can I ask you one



www.escribers.net | 800-257-0885

question arising from some of the questions that arose in the earlier colloquy with government counsel, which is we have to do the inquiry for ourselves, so it doesn't matter at the end of the day, but you haven't taken the position, as I recall, that because the government says it has independent authority to affect expedited removal under the regulation, regardless of the directives, that the government doesn't have standing to appear.

MS. SUNG: Yeah, this is an interesting question. I mean, as you know, the parties didn't really brief this. I mean, we don't contest the appealability of this matter, but --

JUDGE SRINIVASAN: And we still have to do this. It's a jurisdiction question, so we have to do the assessment ourselves, but I just wanted to make sure that I didn't miss something that -- you hadn't raised that.

MS. SUNG: No, we certainly didn't. We haven't contested the appealability of the district court's stay here.

JUDGE SRINIVASAN: My colleagues don't have questions for the chief -- questions?

JUDGE WALKER: Have you identified anyone who's a member who is no longer on parole and has been here for longer than three years? Sorry, longer than two years?

MS. SUNG: I don't think so.

JUDGE WALKER:  All right.

MS. SUNG:  But I did want to address one thing that your honor mentioned, Judge Walker, about you said that sort of the case along the precedent indicates that individuals who are who are paroled are forever on the threshold of entry.  They are always entered -- like, they have not entered, and they're always arriving, and I would submit that's -- we think that that's not correct.  I mean, if you'd like me to address it --

JUDGE WALKER:  No, I --

MS. SUNG:  I think you seem to get my argument, but if you -- I didn't want to let that go without --

JUDGE WALKER:  I noticed it in your brief.  Maybe you don't think that, and I think the topic you're talking about is someone who is still on parole and has been for any amount of time.  You don't think that is an arriving alien.

MS. SUNG:  Right, they have completed their process of arriving.

JUDGE WALKER:  I thought in your briefing, it --

MS. SUNG:  They are not arriving.

JUDGE WALKER:  -- was clear.

MS. SUNG:  Okay.

JUDGE SRINIVASAN:  I do have one last question on something that was flagged in the early colloquy, which

is -- I think if it goes to a legal issue, it goes to arbitrary and capriciousness, but this is about this sentence --

MS. SUNG:  Yes.

JUDGE SRINIVASAN:  -- in the middle column of the relevant page of the CHNV --

MS. SUNG:  Yes.

JUDGE SRINIVASAN:  -- that a register note --

MS. SUNG:  Yes, I know what you're talking about.

JUDGE SRINIVASAN:  So there's this sentence that we were focused on, which is if DHS were to allow, that parolee to remain for the full duration, the Department of Justice would be compelled to place a greater -- and that does seem problematic, and I think government counsel acknowledges that that doesn't actually work at the end of the day.

MS. SUNG:  Yes.

JUDGE SRINIVASAN:  And was your arbitrary and capriciousness argument -- did it go to that sentence or was it -- I understood it to be mainly about the previous sentence that had to do with somebody being present for at least the two years.

MS. SUNG:  I can go back and look at exactly what we argued in our briefing, but I think the point is


www.escribers.net | 800-257-0885

that there is this inconsistency, this unexplained inconsistency, including in the language about the government being compelled, and there's no explanation for it. And I think that with Judge Walker's colloquy, yes, it's correct that reliance interests weren't considered.

But even beyond that, the agency had still looked -- sorry, the agency still has to engage in reasoned decision making and explain the rationale for just making the decisions that it did, and that's not present here, well, in this document or any of the documents, for again, the notion that there is no time limit to apply expedited removal to parolees, but then here the Government would be compelled to terminate individuals' grants of parole before the two years, so that they can subject them to expedited removal, and there's no explanation for that. Everything that they're offering and their briefing, I would submit, is post-talk justification. It's not present in the document.

JUDGE SRINIVASAN: If they would have said for purposes in the designation authority we'd be compelled, that would be fine.

MS. SUNG: Yes, I suppose so, but that's not what they're talking about.

JUDGE SRINIVASAN: You can say that. It mentions the question is whether that's what was the kind



of background understanding, but it doesn't say that, and I think government counsel, forthrightly, acknowledged it doesn't say that.

MS. SUNG:  Right.

JUDGE SRINIVASAN:  If they were only talking about the designation authority, then they could mean compelled as to the designation authority, as opposed to compelled writ large.

MS. SUNG:  Yes, that is one way to harmonize what's going on here, but again, that's not in the document.

JUDGE SRINIVASAN:  Okay, let me make sure my colleagues don't have additional questions.  Thank you, Counsel.

MS. SUNG:  Yeah.

JUDGE SRINIVASAN:  Mr. Becker, we'll give you the two minutes you asked for for a rebuttal.

MR. BECKER:  Thank you very much, Your Honor. Just a couple of things.  First of all, I think that plaintiffs admitted that there's really nobody that they have identified who wouldn't have been -- who would have been subject to expedited removal -- who wouldn't have been subject to expedited removal as a result of the stay than if there was no stay.

And here, I also want to clarify the



government's position on M.M.V. and whether there would be review in this context. I think that under this -- and the government believes under this Court's precedent that if there was the issue that Judge Walker was referring to, whether there was a plainly unconstitutional directive that was simply applying a plainly unconstitutional regulation, that in this context, Congress has made the decision that there just isn't judicial review available for that regulation.

I think that the issue, like after the 60 days -- I think the issue here is that on an organization you would have thought might have challenged that regulation at the time, if that was the case, they would have had 60 days to do so. And even if you can't assume that, I think there's other situations where a court creates a certain order, and there's just no ability to challenge it later, and that applies the Constitution incorrectly.

JUDGE RAO: So you're walking back your claim that there would be an ultra vires challenge possible by the application --

MR. BECKER: Yes. Yes, Your Honor. I think that under this Court's precedent M.M.V., I think that there's just not really a -- there's just not an ability to challenge this in this context. You may disagree with

that, but I do think that under this court's precedent, that is -- the availability to review things in this particular context among the immigration provisions that are cited in 1252(e)(3)(B) is limited, and review of expedited removal generally is limited. Congress and this Court has recognized, going back to the original challenge to the expedited removal statute, that review is just very limited, and even if that review may be -- that lack of judicial review may be unfair.

I assume that district court proceedings -- I think right now the plaintiffs have -- plaintiffs said for months they were going to file a partial summary judgment motion. They recently did so a couple of weeks ago. We've moved to stay in consideration of that at this time.

Their motion focuses predominantly on the arriving-alien regulation, although it seems to incorporate their prior briefing on the designation provision, so I'm not exactly sure what that precedent could be about, but that's what's going on in district court currently. I don't think there's -- I think the government has at least an extension through April 16th on any sort of briefing in that case.

JUDGE SRINIVASAN: I have one question for you before we call today for this argument. So the questions come up for addressability and irreparable injury

purposes. Suppose that there is a hundred-percent likelihood that expedited removal will be applied to a Plaintiff if the directives are in place, but it's a one-percent possibility if the regulation is all that there is, which is to say there's still the possibility -- it's just quite limited, but there's a certainty with the directives in place.

I did not understand you to be taking the position that if that were the state of affairs -- and put aside whether it's the plaintiff's burden to show that's the state of affairs, whether there's evidence from which one could reach that conclusion. I'm just assuming all that away for now. I'm just asking the question as a legal proposition.

If that were the state of play, I did not understand you to be taking the position, but correct me if I'm wrong, that in that situation, there's no redressability and no reparable injury because of the possibility. That still could be the correct legal proposition, but I didn't understand you to be taking that position, but am I wrong?

MR. BECKER: Your Honor, if the regulation -- on that particular position, I think the government would say that the plaintiffs have presented no evidence that that's the case here, that it would be such a large discrepancy.

escribers
www.escribers.net | 800-257-0885

113

And number two, I don't think that this Court's case law really talks about the difference between that delta as mattering here. I mean, I think that's evident from the Doc Society case, as well as some of those third party cases where -- but I think there is some loose language in those cases saying that it might matter if there was more evidence as to --

JUDGE SRINIVASAN: No, the Doc Society evidence -- I'm just asking --

MR. BECKER: -- threat was going to be less.

JUDGE SRINIVASAN: -- for the legal proposition, which is -- I understood your argument to be that the plaintiffs haven't shown that there would be a difference in the practical likelihood that expedited removal will be applied, but I might be wrong about what I understood to your position to be.

Is your position that it doesn't matter if there would actually be a practical difference, as long as there's a legal possibility that expedited removal could be applied based on the regulation alone, no matter how small that possibility is, that's enough to mean there's no redressability and no reparable injury?

MR. BECKER: Your Honor, I appreciate that. I think that our position is actually both. I think it is the second, that as a legal matter on the redressability

114

context, if a plaintiff challenges of guidance document and doesn't challenge underlying regulations, that there is simply no redressability, if they're doing has had same thing.

JUDGE SRINIVASAN:  Even if the plaintiffs showed undisputedly that there's a hundred-percent likelihood with the directives, there's a one-percent likelihood with the regulation alone, and you don't contest that?

MR. BECKER:  Yes, Your Honor, because I think this gets to the enforcement discretion issue.  So in the documents here, as the designation provision, I think you have a document that's saying, we should apply expedited removal pretty much all the time to these folks that qualify.

And then in the February 18th email, the plaintiff includes language that expedited removal may be applied to arriving aliens.  So I think that whether the government is going to exercise its discretion in any individual situation, which I think the plaintiffs would have to show, in one manner or the other, I think would not be shown by that.

JUDGE SRINIVASAN:  So you think even if that evidentiary showing were made, the one that I hypothesized, as a matter of law, that still wouldn't be enough because there's some possibility that a particular

115

person could be subject to the expedited removal per the regulation.

JUDGE SRINIVASAN:  Yes, Your Honor, and I think in an associational standing challenge, it would be very difficult to assume that you're to find one member, and whether the government, the entirely separate actor, would actually decide to exercise their enforcement discretion one way or the other.  To be able to predict that as a core, I think that would be an entirely speculative exercise.

JUDGE SRINIVASAN:  Okay.

JUDGE WALKER:  So imagine that it's not this case.  It's a case where a court can issue an injunction, and the government is arresting 100 people a day and has been for months, and a court issues an injunction that enjoins every law enforcement officer, except one.  So the chance that the government continues to arrest someone is still, like, one percent, but people who would be arrested if all law enforcement officers were not enjoined --

MR. BECKER:  Your Honor, I think --

JUDGE WALKER:  Is your position the government wouldn't suffer an injury?  Like, let's say, the winter factors, there would not be a reparable injury to the Government there.

MR. BECKER:  Your Honor, I think there would be



116

irreparable injury to the government there.  And the reason, the thing that I think that this argument is a little difficult on, is that we have -- there's the factual issue that there would just be less enforcement officers or less ability to do it.  And then there's a legal issue, whether there is these legal documents, or like, regulations that allow the government to exercise enforcement discretion to do something or the other.

And I think that on the case of if all officers besides one were enjoined from acting, then in that case, that seems like a factual issue that would suggest the government had irreparable harm, because they just would functionally not be able to arrest as many people.

JUDGE WALKER:  Okay.  I think about whether -- sorry.

JUDGE SRINIVASAN:  No, go ahead.  You know I was going --

JUDGE WALKER:  I was going to change topics.

JUDGE SRINIVASAN:  Then go ahead.

JUDGE WALKER:  Imagine in 1997, the -- promulgates a regulation that says expedited removal can be applied to people who have been here for three years. We're not talking about parolees, okay?  Just take them out of the picture.  People who have been here for three years.  That would be an illegal regulation, right?  Will

you assume with me that?

MR. BECKER:  Expedited removal to people who were here for longer than three years?

JUDGE WALKER:  Well, the statute says two years, so I'm giving you --

MR. BECKER:  Oh, under the designation --

JUDGE WALKER:  The designation says three years.

MR. BECKER:  Under the designation provision, if the arriving alien provision didn't apply, yes, that would be able to appear.

JUDGE SRINIVASAN:  Yes.  Yeah, we're only doing designation provision.  For whatever reason, no one challenges that for 60 days.  I agree with the government.  I think no one can then go to court and seek vacatur of that regulation.  Like, stark as that consequence would be, I agree with you.

Here's where we disagree, and we give you one more chance to tell me why I'm wrong.  Imagine in 2025, the government promulgates a new regulation, and it says, we are going to increase expedited removal enforcement actions for people who have been here for two and a half years.  We have the authority to do it because of that 1997 regulation.  And then a plaintiff files within 60 days and seeks vacatur of that 2025 regulation and says this regulation is not authorized by statute, so the Court

118

should vacate it.

And the government says, oh, it's authorized by the 1997 regulation.  That would be a losing argument, right?

MR. BECKER:  Your Honor, I think if we're talking about two regulations -- I mean a new regulation, the new regulation they have reopened under this Court's reopener doctrine.  It may have reopened the old proceeding, so that would be different.

JUDGE SRINIVASAN:  I don't think you'd want to say that, because --

JUDGE WALKER:  Because then your March 25th CHNV notice might have reopened their ability to challenge the 1997 regulation that actually does exist and not in a hypothetical scenario, and I think that's --

MR. BECKER:  Well, Your Honor, the reason that I was saying that was you were referring to three years versus 2.5.  I mean, if you change the -- well, if you're actually changing the regulation, that's a little bit different.

JUDGE WALKER:  Okay, well, let's say three years.

MR. BECKER:  I mean, in that case, it's applying the 1997 regulation.

JUDGE WALKER:  Do you think the government could


www.escribers.net | 800-257-0885

119

promulgate a regulation in 2025 that the statute does not authorize and that no one could get it vacated within the 60-day limit?

MR. BECKER:  Your Honor, here the government was simply applying its enforcement discretion.

JUDGE WALKER:  No, no, no.  Not in my hypothetical.

MR. BECKER:  I mean, in your hypothetical, a new regulation would be challenged well within the 60-day limit.

JUDGE WALKER:  And if that new regulation conflicted with statute, it would have to be vacated, correct?

MR. BECKER:  Yes, that's correct, but the question would be what regulate -- the question would be the difference here or there would be because there actually is a new regulation.  So that's challengeable within 60 days.

JUDGE SRINIVASAN:  All right.

Thank you, Counsel.  Thank you to both counsel. We'll take this case under submission.

(Whereupon, the proceedings were concluded.)



## DIGITALLY SIGNED CERTIFICATE

I certify that the foregoing is a correct transcription of the electronic sound recording of the proceedings in the above-entitled matter.


_____        April 11, 2026
Michael Galate                         Date

eScribers, LLC

escribers

www.escribers.net | 800-257-0885