**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| COALITION FOR HUMANE IMMIGRANT RIGHTS, *et al.*,<br><br>    *Plaintiffs*,<br><br>    *v.*<br><br>KRISTI NOEM, in her official capacity as Secretary of Homeland Security, *et al.*,<br><br>    *Defendants.* | Case No.: 1:25-cv-0872 |

**PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR
PARTIAL SUMMARY JUDGMENT (Dkt. 55) AND OPPOSITION TO DEFENDANTS'
CROSS-MOTION FOR SUMMARY JUDGMENT (Dkt. 69)**

## TABLE OF CONTENTS

Page

INTRODUCTION ...........................................................................................................................1

ARGUMENT ...................................................................................................................................2

I.     Plaintiffs' Challenge to the Arriving Alien Regulation is Not Time-Barred. .......................2

        A.     Sections 1252(a)(2)(A) and 1252(e)(3)(B) do not apply. ........................................2

        B.     Even if Section 1252(e)(3)(B) did apply, the 60-day filing requirement is non-jurisdictional and should be equitably tolled. ...................................................4

                i.     The 60-day time limit is non-jurisdictional. .................................................4

                ii.     The 60-day time limit can and should be equitably tolled. ...........................9

II.     Plaintiffs have Standing. ....................................................................................................12

III.     The Inclusion of Paroled Individuals as "Arriving Alien[s]" in 8 C.F.R. § 1.2 is Contrary to Law. .................................................................................................................18

IV.     The Challenged Directives are Contrary to Law and Violate Agency Procedures. ...........31

V.     The Challenged Directives are Inconsistent and Arbitrary and Capricious ......................38

VI.     The Court Has the Authority to Grant Vacatur and Declaratory Relief. ...........................42

        A.     8 U.S.C. § 1252(f)(1) does not bar vacatur or declaratory relief. ........................42

        B.     The Court should not limit its vacatur. ................................................................44

CONCLUSION ..............................................................................................................................45

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Akhtar v. Gonzales*,
    450 F.3d 587 (5th Cir. 2006) ..................................................................................22

*Am. Textile Mfrs. Inst., Inc. v. Donovan*,
    452 U.S. 490 (1981)...............................................................................................41

*Arellano v. McDonough*,
    598 U.S. 1 (2023)...................................................................................................10

*Avila v. Bondi*,
    No. 25-3248 (8th Cir. Jan. 23, 2026) .....................................................................25

*Barney v. Rogers*,
    83 F.3d 318 (9th Cir. 1996) ...................................................................................22

*Biden v. Tex.*,
    597 U.S. 785 (2022)...............................................................................................42

*Bouchikhi v. Holder*,
    676 F.3d 173 (5th Cir. 2012) ...........................................................................22, 24

*Bridgeport Hosp. v. Becerra*,
    108 F.4th 882 (D.C. Cir. 2024)..............................................................................45

*Calcutt v. FDIC*,
    598 U.S. 623 (2023)...............................................................................................41

*CHIRLA v. Noem*,
    No. 25-5289, 2025 WL 2649100 (D.C. Cir. Sept. 12, 2025)..................................15

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*,
    603 U.S. 799 (2024)...........................................................................................4, 44

*Defs. of Wildlife v. Gutierrez*,
    532 F.3d 913 (D.C. Cir. 2008)...........................................................................12, 16

*DHS v. Regents of the Univ. of Cal.*,
    591 U.S. 1 (2020)...................................................................................................41

*Diamond Alt. Energy, LLC v. EPA*,
    606 U.S. 100 (2025)...............................................................................................13

*Doc Society v. Rubio*,
   141 F. 4th 1273 (D.C. Cir. 2025).......................................................................................17

*Doe v. Noem*,
   152 F.4th 272 (1st Cir. 2025).............................................................................................34

*E.V. v. Raycraft*,
   No. 4:25-cv-2069, 2025 WL 2938594 (N.D. Ohio Oct. 16, 2025).......................................34

*Enbridge Energy, LP v. Nessel*,
   146 S.Ct. 1074 (2026).........................................................................................................9

*Encino Motorcars, LLC v. Navarro*,
   579 U.S. 211 (2016)...................................................................................................40, 41

*FCC v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009)..........................................................................................................40

*Fong Haw Tan v. Phelan*,
   333 U.S. 6 (1948)..............................................................................................................21

*Fort Bend Cnty. v. Davis*,
   587 U.S. 541 (2019)..........................................................................................................10

*Franklin v. Mass.*,
   505 U.S. 788 (1992)....................................................................................................15, 43

*Garland v. Aleman Gonzalez*,
   596 U.S. 543 (2022)....................................................................................................42, 43

*Gonzalez Castillo v. Bondi*,
   140 F.4th 777 (6th Cir. 2025) ...........................................................................................21

*Gonzalez v. Crosby*,
   545 U.S. 524 (2005)..........................................................................................................11

*Griffin v. Oceanic Contractors, Inc.*,
   458 U.S. 564 (1982)..........................................................................................................25

*Guerrero Orellana v. Moniz*,
   Nos. 25-2152, 26-1094 (1st Cir. Mar. 16, 2026) ...............................................................25

*Harrow v. Dep't of Defense*,
   601 U.S. 480 (2024)....................................................................................................5, 6, 8

*Harrow, Boechler, P.C. v. Commissioner*,
   596 U.S. 199 (2022)......................................................................................................6, 8

iii

*Hewitt v. United States*,
606 U.S. 419 (2025).............................................................................................32, 33, 34

*Hibbs v. Winn*,
542 U.S. 88 (2004)..............................................................................................................23

*Holland v. Fl.*,
560 U.S. 631 (2010)....................................................................................................9, 11, 12

*Husted v. A. Philip Randolph Inst.*,
584 U.S. 756 (2018)............................................................................................................38

*IBP, Inc. v. Alvarez*,
546 U.S. 21 (2005)..............................................................................................................19

*INS v. Nat'l Ctr. for Immigrants' Rights*,
502 U.S. 183 (1991)............................................................................................................20

*Irwin v. Dep't of Veterans Affairs*,
498 U.S. 89 (1990)..........................................................................................................7, 9

*Khogiani v. Raycraft*,
No. 25-cv13744, 2025 WL 3753532 (E.D. Mich. Dec. 29, 2025) ...........................................34

*Kirboga v. LaRose*,
No. 25-cv-3706-GPC-DDL, 2025 WL 3779426 (S.D. Cal. Dec. 31, 2025)............................34

*Konstantinidis v. Chen*,
626 F.2d 933 (D.C. Cir. 1980).............................................................................................25

*Kucana v. Holder*,
558 U.S. 233 (2010)..........................................................................................................2, 3

*Larson v. Valente*,
456 U.S. 228 (1982)............................................................................................................12

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024)............................................................................................................26

*M.M.V. v. Garland*,
1 F.4th 1000 (D.C. Cir. 2021).........................................................................................4, 5, 6

*Make the Road New York v. Noem*,
2025 WL 3563313 (D.C. Cir. Nov. 22, 2025) ........................................................................44

*Make the Rd. N.Y. v. Wolf*,
962 F.3d 612 (D.C. Cir. 2020).........................................................................................3, 24

*Matter of C-P-Y-*,
29 I&N Dec. 610 (BIA 2026) ..........................................................................19, 20, 24

*Matter of G-*,
20 I&N Dec. 764 (BIA 1993), 1993 WL 522159 ...................................................21

*Matter of Pierre*,
14 I&N Dec. 467 (BIA 1973), 1973 WL 29484 .....................................................21

*Mendoza-Linares v. Garland*,
51 F.4th 1146 (9th Cir. 2022) ................................................................................4

*Menominee Indian Tribe of Wis. v. U.S.*,
577 U.S. 250 (2016) (*per curiam*) .........................................................................12

*Menominee Indian Tribe of Wis. v. U.S.*,
764 F.3d 51 (D.C. Cir. 2014) ...............................................................................11

*Miot v. Trump*,
818 F. Supp. 3d 126 (D.D.C. Feb. 2, 2026) ...........................................................42

*Munoz Materano v. Arteta*,
No. 25 Civ. 6137 (ER), 2025 WL 2630826 (S.D.N.Y. Sept. 12, 2025) ...................34

*N.H. v. Me.*,
532 U.S. 742 (2001).............................................................................................25

*N.S. v. Dixon*,
141 F.4th 279 (D.C. Cir. 2025).............................................................................42

*Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*,
145 F.3d 1399 (D.C. Cir. 1998).............................................................................44

*Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*,
366 F.3d 930 (D.C. Cir. 2004)..............................................................................16

*Negusie v. Holder*,
555 U.S. 511 (2009)............................................................................................19

*Nelson v. Sec. & Exch. Comm'n*,
138 F.4th 514 (D.C. Cir. 2025)..............................................................................10

*Nixon v. Mo. Mun. League*,
541 U.S. 125 (2004)........................................................................................24, 25

*Niz-Chavez v. Garland*,
593 U.S. 155 (2021)............................................................................................19

*Noem v. Al Otro Lado*,
 No. 25-5 (Jan. 6, 2026) ....................................................................................................18

*Nutraceutical Corp. v. Lambert*,
 586 U.S. 188 (2019)..........................................................................................................10

*Oxlaj-Perez v. Blanche*,
 __ F. 4th __, 2026 WL 1162694 (6th Cir. Apr. 29, 2026).........................................................9

*Pace v. DiGuglielmo*,
 544 U.S. 408 (2005)......................................................................................................10, 11

*Pension Ben. Guar. Corp. v. LTV Corp.*,
 496 U.S. 633 (1990)..........................................................................................................39

*Pereira v. Sessions*,
 585 U.S. 198 (2018)..........................................................................................................19

*Phillips v. Heine*,
 984 F.2d 489 (D.C. Cir. 1993).............................................................................................11

*Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Mullin*,
 No. 25-5243, 2026 WL 1110616 (D.C. Cir. Apr. 24, 2026).......................................28, 42, 44

*Renal Physicians Ass'n v. HHS*,
 489 F.3d 1267 (D.C. Cir. 2007)...........................................................................................16

*Reno v. American-Arab Anti-Discrimination Comm.*,
 525 U.S. 471 (1999)........................................................................................................6, 42

*Riley v. Bondi*,
 606 U.S. 259 (2025)......................................................................................................6, 7, 8

*Russello v. United States*,
 464 U.S. 16 (1983).....................................................................................................5, 19, 43

*Sanchez v. Mayorkas*,
 593 U.S. 409 (2021)..........................................................................................................33

*Santos-Zacaria v. Garland*,
 598 U.S. 411 (2023)............................................................................................................6

*Scenic Am., Inc. v. DOT*,
 836 F.3d 42 (D.C. Cir. 2016)...............................................................................................16

*SEC v. Chenery Corp.*,
 318 U.S. 80 (1943)............................................................................................................41

vi

*Steffel v. Thompson*,
   415 U.S. 452 (1974)..................................................................................................42

*Texas v. EPA*,
   726 F.3d 180 (D.C. Cir. 2013) ................................................................................17

*Texas v. United States*,
   50 F.4th 498 (5th Cir. 2022) ....................................................................................42

*The Fair v. Kohler Die & Specialty Co.*,
   228 U.S. 22 (1913).....................................................................................................2

*Trump v. CASA, Inc.*,
   606 U.S. 831 (2025)..................................................................................................44

*Yang v. Maugans*,
   68 F.3d 1540 (3d Cir. 1995).....................................................................................22

## Statutes

5 U.S.C. § 702..................................................................................................................14

5 U.S.C. § 706(2)..............................................................................................................45

5 U.S.C. § 7703..................................................................................................................6

5 U.S.C. § 7703(b)(1) .........................................................................................................5

6 U.S.C. § 202(4)..............................................................................................................33

8 U.S.C. § 1101(a)(13)(A) ...........................................................................................19, 33

8 U.S.C. § 1158(a)(2)(B) ..................................................................................................24

8 U.S.C. § 1182(a)(9)(A)(i) ..............................................................................................20

8 U.S.C. § 1182(a)(9)(B)(ii) .............................................................................................34

8 U.S.C. § 1225(a)(2).......................................................................................................20

*8 U.S.C. § 1225(b)(1) ...........................................................................1, 3, 5, 14, 20, 30

8 U.S.C. § 1225(b)(1)(A)..................................................................................................31

8 U.S.C. § 1225(b)(1)(A)(iii)...........................................................................20, 23, 32, 37

8 U.S.C. § 1226(a) (1994).................................................................................................21

*8 U.S.C. § 1252(a)(2)(A) ...............................................................................2, 3, 4, 5, 6, 8

8 U.S.C. § 1252(e)(1)..................................................................................................4, 5, 43

8 U.S.C. § 1252(e)(2)..........................................................................................................43

*8 U.S.C. § 1252(e)(3)...................................................................................5, 12, 13, 15, 45

8 U.S.C. § 1252(e)(3)(A) ...............................................................................................5, 14

*8 U.S.C. § 1252(e)(3)(B) ................................................2, 4, 5, 6, 8, 9, 10, 11, 12

8 U.S.C. § 1252(f)(1) ...................................................................................................1, 42, 43

8 U.S.C. § 1255(a) ......................................................................................................25, 33, 34

8 U.S.C § 1252(g) ...............................................................................................................7

28 U.S.C. § 1295.................................................................................................................6

28 U.S.C. § 1346(f)............................................................................................................7

28 U.S.C. § 2401(a) ........................................................................................................2, 4

28 U.S.C. § 2409a(g) .........................................................................................................7

Act of Nov. 6, 2000, Pub. L. No. 106-429......................................................................35

Act of Nov. 21, 1989, Pub. L. No. 101-167.....................................................................35

Cuban Adjustment Act, Act of Nov. 2, 1966, Pub. L. No. 89-732..................................35

Haitian Refugee Immigration Fairness Act of 1998, Pub. L. No. 105-277 .....................35

Help Haitian Adoptees Immediately to Integrate Act of 2010, Pub. L. No. 111-
    293.................................................................................................................................35

Immigration Reform and Control Act of 1986, Pub. L. No. 99-603, § 202, 100
    Stat. 3359, 3404-05 (1986) ..........................................................................................27

## Other Authorities

*8 C.F.R. § 1.2......................................1, 2, 3, 4, 5, 11, 12, 13, 14, 15, 16, 18, 24, 25, 40

8 C.F.R. § 208.4(a)(5)(iv) .................................................................................................24

8 C.F.R. § 235.3 ......................................................................................................3, 13, 35

8 C.F.R. § 235.3(b)(1)(i) ....................................................................................................2

8 C.F.R. § 235.3(b)(1)(ii)..................................................................................................36

8 C.F.R. § 235.3(b)(6)................................................................................................35, 36

8 C.F.R. § 245.1(b)(3)......................................................................................................34

8 C.F.R. § 245.1(d)(1)(v) ................................................................................................33

69 Fed. Reg. 48877, 48880 (Aug. 11, 2004)...................................................................36

84 Fed. Reg. 35409, 35410-14 (July 23, 2019) ...............................................................36

90 Fed. Reg. 8139, 8140 (Jan. 24, 2025) ........................................................................37

Fed. R. App. P. 2 ..............................................................................................................10

Fed. R. App. P. 26(b)(1) ..................................................................................................10

Fed. R. Civ. P. 23(f)........................................................................................................10

H.R. Rep. No. 104-383 (1995).....................................................................................28, 29

H.R. Rep. No. 104-469 (1996)..........................................................................................29

S. Rep. No. 86-1651 (1960) ..............................................................................................34

*The Chicago Manual of Style* § 5.132 (17th ed. 2017) .....................................................32

**INTRODUCTION**

Defendants' opposition and cross-motion for summary judgment (Dkt. 69)[1] mischaracterize Plaintiffs' arguments and repeat arguments this Court already rejected. They insist the Court lacks jurisdiction over Plaintiffs' challenge to the "arriving alien" definition at 8 C.F.R. § 1.2 but misconstrue the nature of that challenge and urge the incorrect standard for timeliness. Defendants dispute the redressability of Plaintiffs' members' harms attributable to the Challenged Directives given the existence of the regulations, ignoring that the undisputed facts establish that before the Challenged Directives issued in early 2025, the regulations were not interpreted in a way that caused injury to the Plaintiffs. Defendants' 8 U.S.C. § 1252(f)(1) and scope of relief arguments lack merit and are foreclosed by circuit precedent. And on the merits, Defendants continue to misconstrue language from statutes and regulations and ignore clear legislative history to argue, contrary to the text and structure of 8 U.S.C. § 1225(b)(1) and irreconcilably, that parolees fall under the Designation Provision only once parole is terminated but remain forever "arriving in the United States" under the Arriving In Provision—and thus perpetually subject to expedited removal, including during active parole status. Defendants ask the Court to disregard an undisputed record establishing that (1) parolees have long been considered to have "arrived" and not perpetually "arriving"; and (2) Congress never intended expedited removal to reach parolees.

The Court should deny Defendants' cross-motion, grant Plaintiffs' motion, vacate the Challenged Directives and the unlawful inclusion of parolees in § 1.2's "arriving alien" definition, and declare that paroled noncitizens are not amenable to expedited removal. It is Defendants who have constructed a "house of cards," Dkt. 69 at 1, and the Court should decline to prop it up.

---

[1] The documents Defendants filed at Dkt. 68 and 69 are identical. For clarity, Plaintiffs' filings (brief and response to Statement of Undisputed Facts, "SOMF") cite Dkt. 69 to refer to both Defendants' opposition and cross-motion for summary judgment.

## ARGUMENT

**I.     Plaintiffs' Challenge to the Arriving Alien Regulation is Not Time-Barred.**

Plaintiffs' challenge to the "arriving alien" definition in 8 C.F.R. § 1.2 is timely. The six-year statute of limitations under 28 U.S.C. § 2401(a) governs, and Plaintiffs' claim accrued within that period because Defendants first applied § 1.2's definition to subject Plaintiffs' members to expedited removal in 2025. *See* Dkt. 55-1 at 10-11. Defendants do not dispute that *if* § 2401(a) applies, Plaintiffs' claim is timely, *see* Dkt. 69 at 10 n.2, but they contend Plaintiffs' claim is governed by 8 U.S.C. § 1252(a)(2)(A) and therefore by § 1252(e)(3)(B)'s 60-day deadline, *id.* at 5-17. Defendants are wrong on two independent grounds: (1) § 1252(a)(2)(A) and § 1252(e)(3)(B) do not apply to a definitional regulation that does not itself implement expedited removal; and (2) even if § 1252(e)(3)(B)'s deadline applied, it is non-jurisdictional and should be equitably tolled.

**A.     Sections 1252(a)(2)(A) and 1252(e)(3)(B) do not apply.**

Because § 1.2 is a definitional regulation, not one that implements the expedited removal statute or reflects a decision to invoke expedited removal against someone, § 1252(a)(2)(A) does not apply. Defendants argue Plaintiffs' § 1.2 claim is "really a challenge to *both* 8 C.F.R. §§ 1.2 and 235.3(b)(1)(i)." Dkt. 69 at 5-6. But Plaintiffs are the masters of their complaint, *The Fair v. Kohler Die & Specialty Co.*, 228 U.S. 22, 25 (1913), and it is their actual challenge—not the one Defendants would prefer to defend against—that defines the jurisdictional inquiry, *Kucana v. Holder*, 558 U.S. 233, 251-52 (2010). Plaintiffs only challenge § 1.2's unlawful inclusion in the "arriving alien" definition of a category of people who are not "arriving." Dkt. 55-1 at 18-41; *see*

2

*infra* Part III. Defendants cannot bootstrap § 1.2 into the purview of § 1252(a)(2)(A) through such recharacterization.[2]

Beyond mischaracterizing Plaintiffs' challenge, Defendants mischaracterize § 1.2 itself. Section 1.2 is a general definitional regulation of more than thirty terms—among them, "Attorney," "Day," "Form," "Immigration judge," "Preparation," and "USCIS"—used throughout Title 8 of the Code of Federal Regulations for purposes far broader than expedited removal. As a definitional regulation, § 1.2 does not "implement the provisions of section 1225(b)(1)," so the § 1252(a)(2)(A)(iv) jurisdictional bar does not apply. Section 235.3's cross-reference to § 1.2's definition of "arriving alien" no more makes § 1.2 an implementing regulation of 8 U.S.C. § 1225(b)(1) than does § 235.3's use of the § 1.2-defined term "immigration officer." A regulation does not "implement" a statute merely by being cross-referenced in or defining a general term that appears in a regulation that does. Defendants' assertion that the "arriving alien" definition and § 235.3 "[t]ogether … implement a policy" within the meaning of § 1252(a)(2)(A), Dkt. 69 at 5, conflates a defined term with one of the many regulations that deploy it. Defendants' parallel invocation of § 1252(a)(2)(A)(ii), Dkt. 69 at 6, fails for the same reason. That provision reaches "a decision … to invoke" the expedited removal provision—an exercise of statutory authority, such as the Designation Provision authority "committed to the [Secretary's] sole and unreviewable discretion." *Make the Rd. N.Y. v. Wolf*, 962 F.3d 612, 632 (D.C. Cir. 2020) ("*MRNY*"). The "decision to invoke" expedited removal against parolees is nowhere reflected in a 1997 regulatory definition of general applicability across Title 8 of the Code of Federal Regulations.

---

[2] Plaintiffs' acknowledgement that § 1.2's definition "exposes" parolees to expedited removal, Dkt. 69 at 7, does not convert a challenge to a definitional regulation into a challenge to the expedited removal scheme. In any event, "[a] statute affecting federal jurisdiction 'must be construed both with precision and with fidelity to the terms by which Congress has expressed its wishes,'" *Kucana*, 558 U.S. at 251-52, and Plaintiffs' phrasing does not expand the bar's reach.

3

Section 1.2 thus neither "implement[s]" the expedited removal statute, § 1252(a)(2)(A)(iv), nor reflects a "decision to invoke it," § 1252(a)(2)(A)(ii). *O.A. v. Trump* proves the point. There, Judge Moss held that "§ 1252—as a whole—does not apply" to a challenge to a regulation governing credible fear determinations in expedited removal proceedings. 404 F. Supp. 3d 109, 140-41 (D.D.C. 2019). Plaintiffs' challenge to § 1.2—a definitional regulation that neither implements nor invokes expedited removal at all—also lies outside § 1252's jurisdictional bar.[3] Because § 1252(a)(2)(A) does not reach Plaintiffs' § 1.2 claim, § 1252(e)(3)(B)'s 60-day deadline does not govern. Plaintiffs' claim is timely under the default six-year limitations period for civil actions against the United States, 28 U.S.C. § 2401(a), which began in 2025 when Plaintiffs' claim accrued. *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 809 (2024).

**B.    Even if Section 1252(e)(3)(B) did apply, the 60-day filing requirement is non-jurisdictional and should be equitably tolled.**

Even if the Court holds that Plaintiffs' § 1.2 claim is subject to § 1252(e)(3)(B)'s 60-day filing deadline, that deadline is non-jurisdictional and therefore can—and should—be tolled.

**i.    The 60-day time limit is non-jurisdictional.**

The 60-day deadline in § 1252(e)(3)(B) is non-jurisdictional and therefore may be equitably tolled. The holding to the contrary in *M.M.V. v. Garland*, 1 F.4th 1000 (D.C. Cir. 2021), is inconsistent with the statutory text and no longer good law in light of subsequent Supreme Court precedent.

1. *M.M.V.*'s conclusion that § 1252(e)(1) conditions jurisdiction is inconsistent with the statutory text. The *M.M.V.* court treated § 1252(e)(1) as a parallel jurisdiction-stripping provision that "likewise" is framed in jurisdictional terms and "conditions jurisdiction on satisfying the

---

[3] *Mendoza-Linares v. Garland*, 51 F.4th 1146, 1154 (9th Cir. 2022), which Defendants cite, Dkt. 69 at 6, is inapposite, because that case considered § 1252(a)(2)(A) as applied to a challenge to an individual expedited removal order, not to a facial challenge to a definitional regulation.

requirements that follow later in the subsection," including § 1252(e)(3)(B). *M.M.V.*, 1 F.4th at 1109. Defendants argue that this language applies to any action instituted under § 1252(e)(3) and extends to them all the 60-day deadline by virtue of the clause in § 1252(e)(1)(A)—"except as specifically authorized in a subsequent paragraph of this subsection." Dkt. 69 at 10-11.

But by its own terms, § 1252(e)(1)(A) applies only to "any action pertaining to an order to exclude an alien in accordance with section 1225(b)(1)," which this is not. Rather, even accepting Defendants' argument that § 1252(e) applies to Plaintiffs' § 1.2 claim, Plaintiffs bring a facial challenge to a regulation under § 1252(e)(3). The "jurisdictional terms" in § 1252(e)(1) plainly have no bearing on Plaintiffs' challenge under § 1252(e)(3), and thus there is no clear jurisdictional statement. This is further evidenced by the fact that Congress used jurisdictional language in § 1252(e)(1) and could have extended that language to § 1252(e)(3)(B), but did not, and that decision is presumed deliberate. *Russello v. United States,* 464 U.S. 16, 23 (1983). Thus, even within *M.M.V.*'s framework, its reasoning as to § 1252(e)(1) is inapplicable to § 1252(e)(3)(B).[4]

2. *M.M.V.*'s conclusion that § 1252(e)(3) is jurisdictional is irreconcilable with subsequent Supreme Court cases, notwithstanding Defendants' effort to distinguish these cases as involving "jurisdiction[]-granting" rather than "jurisdiction-divesting" provisions, Dkt. 69 at 12-14.

As to *Harrow v. Department of Defense*, both § 1252(e)(3)(B) and the provision at issue there, 5 U.S.C. § 7703(b)(1),[5] "describe[] how a litigant can obtain judicial review" and "set[] a

---

[4] *M.M.V.* also reasoned that the "formulation" of § 1252(a)(2)(A) and (e)(1)—"restricting the courts rather than conferring rights and duties on the parties—is also framed in jurisdictional terms," 1 F. 4th at 1109, which too is in stark contrast with the provision relevant here, 8 U.S.C. § 1252(e)(3)(A) ("Judicial review of determinations under section 1225(b) of this title and its implementation *is available* in [this Court]." (emphasis added)).

[5] "[A] petition to review a final order or final decision of the Board shall be filed in the United States Court of Appeals for the Federal Circuit. Notwithstanding any other provision of law, any petition for review shall be filed within 60 days after the Board issues notice of the final order or decision of the Board." 5 U.S.C. § 7703(b)(1).

deadline" of 60 days. 601 U.S. 480, 485 (2024). Neither, however, "speaks to a court's authority to hear a case" or mentions courts' "jurisdiction, whether generally or over untimely claims." *Id.* at 485-86. And 5 U.S.C. § 7703, like 8 U.S.C. § 1252(e)(3)(B), is cross-referenced by a separate jurisdictional provision. That provision—28 U.S.C. § 1295—requires that an appeal be filed "pursuant to" 5 U.S.C. § 7703's 60-day filing deadline. The *Harrow* Court explained that the cross-reference could not transform a "bevy of procedural rules" into jurisdictional requirements and rejected as "untenable" the government's arguments otherwise. 601 U.S. at 488. *M.M.V.* follows this same logic that the Supreme Court rejected: turning the time limit in § 1252(e)(3)(B) into a jurisdictional provision by virtue of its reference in § 1252(a)(2)(A). *M.M.V.*, 1 F.4th at 1109-10. But applied broadly, Defendants' logic, Dkt. 69 at 9-11, would make much of § 1252 jurisdictional, which courts have rejected. *See*, *e.g., Santos-Zacaria v. Garland*, 598 U.S. 411, 422-23 (2023) ("[T]he Government suggests that § 1252(d)(1) is jurisdictional because it falls within § 1252 …. [E]ven if some provisions in a statutory section qualify as jurisdictional, that does not suffice to establish that all others are. This argument … fails to demonstrate that it is 'clea[r]' that Congress made § 1252(d)(1)'s exhaustion requirement jurisdictional.") (internal citations omitted). Despite being cross-referenced, § 1252(e)(3)(B), like the provisions at issue in *Harrow, Boechler, P.C. v. Commissioner*, 596 U.S. 199 (2022), and *Riley v. Bondi*, 606 U.S. 259 (2025), say nothing of courts' power or jurisdiction to hear a claim.[6]

---

[6] Defendants further argue that what distinguishes this case from *Harrow* is that the language § 1252(a)(2)(A) uses in cross-referencing § 1252(e)—"except as provided in subsection (e)"—is "clearer and more precise" than that at issue in *Harrow*—"pursuant to." Dkt. 69 at 12-13. But the phrase "except as provided"—which appears *thousands* of times across the U.S. Code—is just as unclear as "pursuant to." *See, e.g.*, *Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 478 (1999) (stating that the meaning of "except as provided in this section" in 8 U.S.C § 1252(g) "depends upon the scope of the quoted text" and "creates an interpretive anomaly").

6

*Wilkins v. United States* further undermines Defendants' claimed distinction between jurisdiction-granting and jurisdiction-divesting provisions. 598 U.S. 152, 158-59 (2023). The statute at issue there—the Quiet Title Act—combines a jurisdictional waiver of sovereign immunity with a statute of limitations barring actions unless commenced within twelve years of accrual.[7] *Id.* But the Supreme Court still required a clear statement and—finding none—held the statute of limitations non-jurisdictional. *Id.* at 159. The majority noted that, decades prior, the "Court in '*Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89 (1990)] … foreclose[d] th[e] argument' that 'time limits' are jurisdictional simply because they 'function as conditions on the Government's waiver of sovereign immunity.'" *Id.* (citation omitted, alterations in original). It concluded that "[c]ontrary to the dissent's suggestion, *Irwin* extends to the 'many statutes that create claims for relief against the United States or its agencies [and] apply only to Government defendants.'" *Id.* (citation omitted, alteration in original).

*Riley* makes the point even more directly. Where *Wilkins* applied the clear-statement rule to an analogous statute, *Riley* applied it to § 1252 itself, holding § 1252(b)(1)'s filing deadline non-jurisdictional because the "exceedingly strong" signal Congress must give to render a rule jurisdictional was "not met." *Riley*, 606 U.S. at 274. Section 1252(e)(3)(B) is, in relevant part, materially indistinguishable from the deadline *Riley* construed. *Riley* reasoned that § 1252(b)(1)— "[t]he petition for review must be filed not later than 30 days after the date of the final order of removal"—"tells aliens what they must do if they want judicial review, but … provides no directives to courts," "makes no reference to jurisdiction," and "lacks any language demarcat[ing]

---

[7] 28 U.S.C. § 1346(f) ("The district courts shall have exclusive original jurisdiction of civil actions under section 2409a to quiet title to an estate or interest in real property in which an interest is claimed by the United States."); 28 U.S.C. § 2409a(g) ("Any civil action under this section, except for an action brought by a State, shall be barred unless it is commenced within twelve years of the date upon which it accrued.").

a court's power." *Id.* (quoting *Harrow*, 601 U.S. at 484). Section 1252(e)(3)(B) is framed identically: "[a]ny action instituted under this paragraph must be filed no later than 60 days after" the challenged measure "is first implemented"—a directive to the party filing, silent as to judicial power. What *Riley* held of § 1252(b)(1) therefore holds as to § 1252(e)(3)(B): it imposes a deadline on litigants, not a jurisdictional limit on this Court's power.

Defendants' two attempts to distinguish *Riley* both fail. First, Defendants argue *Riley* "did not involve a true jurisdiction-divesting statute akin to § 1252(a)(2)(A)." Dkt. 69 at 14. But § 1252(b)(1) operates within § 1252—the same statute Defendants insist is jurisdiction-divesting—and *Riley* held it non-jurisdictional anyway. Second, Defendants assert a distinction based on a statutory cross-reference: § 1252(e)(3)(B) is jurisdictional, they assert, because § 1252(a)(2)(A) cross-references subsection (e), somehow imbuing it with jurisdictional character. Dkt. 69 at 10. Yet that is the precise interpretative inference *Harrow* held "untenable": a deadline does not "becom[e] a jurisdictional prerequisite" merely because a jurisdictional provision cross-references the subsection housing it. 601 U.S. at 488. *Riley* changes nothing about that; it applied *Harrow*'s reasoning to § 1252 itself. *Riley*, 606 U.S. at 274.

*Boechler* confirms that result. There, as here, the provision at issue admitted of "multiple plausible interpretations," so "it is difficult to make the case that the jurisdictional reading is clear." *Id.* at 205; Dkt. 55-1 at 16. Defendants' only response—that *Boechler* is "clearly limited in its application" to the structure of the provision at issue there, Dkt. 69 at 23—is offered without explanation and ignores the operative test: whether the statute "plainly show[s] that Congress imbued a procedural bar with jurisdictional consequences." 596 U.S. at 203. Defendants identify no "exceedingly strong" signal that Congress, having set substantive limits on expedited removal,

8

intended to deny courts jurisdiction to determine whether the Executive stayed within them. *Riley*, 606 U.S. at 274.

### ii.    The 60-day time limit can and should be equitably tolled.

Defendants contend that, assuming the 60-day time bar applies and is non-jurisdictional, it is a mandatory claims-processing rule that cannot be equitably tolled. Dkt. 69 at 15-17. Not so. While Defendants acknowledge that non-jurisdictional provisions are "presumptively subject to equitable tolling," they argue that § 1252(e)(3)(B) is "almost identical" to the language of the statutory provision at issue in *Riley*—§ 1252(b)(1)—which they argue the *Riley* Court found to be mandatory, and therefore ineligible for equitable tolling. Dkt. 69 at 16. But Defendants misread *Riley*. As the Sixth Circuit recently explained:

> *Riley* queries at the outset whether the deadline is 'simply a mandatory claim-processing rule' or a 'jurisdictional requirement.' But *Riley* then turns to an analysis of whether the deadline is jurisdictional or a 'claims-processing rule,' and concludes that 'the better argument' is that § 1252(b)(1) is a 'quintessential claim-processing rule,'—without the mandatory label.

*Oxlaj-Perez v. Blanche*, __ F. 4th __, 2026 WL 1162694, at *2 (6th Cir. Apr. 29, 2026) (citations omitted). Because the *Riley* defendants did not seek dismissal of the plaintiff's case as untimely, the *Riley* court "left open the question of whether equitable tolling applies to § 1252(b)(1)." *Id.*[8]

The equitable tolling analysis here therefore begins with the "rebuttable presumption in favor of equitable tolling." *Holland v. Fl.*, 560 U.S. 631, 645 (2010) (citing *Irwin*, 498 U.S. at 95-96); *see also Young*, 535 U.S. at 49 ("It is hornbook law that limitations periods are customarily subject to equitable tolling."). Beginning from this presumption, the Court must assess whether there are "good reasons" to deviate from it, *Enbridge Energy, LP v. Nessel*, 146 S.Ct. 1074, 1084-

---

[8] While other circuits "have applied the 'mandatory' label based on citations to *Riley*," such applications have been "without ever examining whether the statute, when analyzed as a claims-processing rule, would permit tolling." *Oxlaj-Perez*, 2026 WL 1162694, at *2 (collecting cases).

9

85 (2026), i.e., if "equitable tolling is inconsistent with the statutory scheme," *Arellano v. McDonough*, 598 U.S. 1, 6-7 (2023). Defendants identify no such inconsistency.

Beyond the *Riley* analogy, Defendants offer only that § 1252(e)(3)(B)'s language is "emphatic" and signals Congress's intent for the deadline to be "strictly enforced." Dkt. 69 at 16. But the Supreme Court, in a case Defendants themselves cite, Dkt. 69 at 16, forecloses that argument: "the simple fact that a deadline is phrased in an unqualified manner does not necessarily establish that tolling is unavailable." *Nutraceutical Corp. v. Lambert*, 586 U.S. 188, 193 (2019). Defendants' broader reliance on *Nutraceutical* fares no better. There, the Supreme Court held Federal Rule of Civil Procedure 23(f)'s appeal deadline is not subject to equitable tolling for a reason unique to the Rules: the express interlock of that rule and Appellate Rules 2 and 26(b)(1), which together "single out Civil Rule 23(f) for inflexible treatment" by forbidding any extension of "the time to file … a petition for permission to appeal." *Id.* at 194-95. The *Nutraceutical* Court was explicit that whether a deadline precludes tolling "turns not on its jurisdictional character but rather on whether the text of the rule leaves room for such flexibility," *id.* at 192-93, and that Rule 23(f) could not be tolled only "[b]ecause [it] is found in a procedural rule, not a statute," *id.* at 192. No comparable text forecloses tolling of § 1252(e)(3)(B). And as the D.C. Circuit recently observed, the Supreme Court has expressly reserved whether that constraint extends to statutory deadlines. *Nelson v. Sec. & Exch. Comm'n*, 138 F.4th 514, 523 (D.C. Cir. 2025) (citing *Fort Bend Cnty. v. Davis*, 587 U.S. 541, 549 n.5 (2019)). *Nutraceutical* thus does not speak to the statutory deadline at issue here, and equitable tolling is therefore presumptively available.

If the Court finds Plaintiffs' challenge is subject to the 60-day deadline, it should equitably toll that deadline, as Plaintiffs have shown both due diligence and the existence of extraordinary circumstances. *Nelson*, 138 F.4th at 523 (citing *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005)).

10

Whether to equitably toll a deadline is a "fact-intensive inquiry," *Holland*, 560 U.S. at 653 (citing *Gonzalez v. Crosby*, 545 U.S. 524 (2005)), to be determined "case by case," *Menominee Indian Tribe of Wis. v. U.S.*, 764 F.3d 51, 58 (D.C. Cir. 2014). Here, the facts warrant tolling of § 1252(e)(3)(B)'s deadline.

Plaintiffs have established that an extraordinary circumstance "beyond [their] control" stood in their way for nearly three decades. *Id.* at 58. Defendants do not dispute that any suit filed to challenge § 1.2 would have failed for lack of standing or ripeness, because—except for a small handful of criminal cases—Defendants did not subject paroled noncitizens to expedited removal. Lack of justiciability is a paradigmatic circumstance "beyond [Plaintiffs'] control": no action by Plaintiffs could have produced a justiciable claim before Defendants began interpreting the rules to apply to the general class of paroled noncitizens. And since tolling is meant to "shelter[] the plaintiff from the statute of limitations in cases where strict application would be inequitable," *Phillips v. Heine*, 984 F.2d 489, 491 (D.C. Cir. 1993), the deadline should be tolled here, where strict application would mean a regulation that has injured Plaintiffs for the first time in 2025 became immune to challenge in 1997, before any Plaintiff had standing to challenge it.

Plaintiffs have also pursued their rights diligently. Defendants complain only that Plaintiffs have failed to explain why they could not have raised their challenge to the "arriving alien" regulation in their original complaint. Dkt. 69 at 17. But Plaintiffs raised that challenge shortly thereafter in their amended complaint, and before Defendants began relying on the regulations to subject paroled noncitizens to expedited removal. SOMF Nos. 71-72. In any event, Plaintiffs did not "wait[] years, without any valid justification, to assert … claims," but rather "advanced [their] claim[] within a reasonable time of [its] availability." *Pace*, 544 U.S. at 419. Plaintiffs have met the due diligence standard, which requires "reasonable diligence," not "maximum feasible

11

diligence," *Holland*, 560 U.S. at 653 (internal quotations omitted), and Defendants have not shown otherwise.

Moreover, Defendants would face no prejudice from tolling the deadline. *See Menominee Indian Tribe of Wis. v. U.S.*, 577 U.S. 250, 259 (2016) (explaining that where plaintiffs have identified "a factor that might justify … tolling," "the absence of prejudice is a factor to be considered in determining whether the doctrine of equitable tolling should apply") (*per curiam*). Plaintiffs raised their challenge to § 1.2 early in the litigation, before substantial briefing had taken place. Because Plaintiffs have shown their diligence and the existence of extraordinary circumstances, and because Defendants would not be prejudiced, the Court should equitably toll § 1252(e)(3)(B)'s deadline and find Plaintiffs' challenge to 8 C.F.R. § 1.2 is timely.

## II. Plaintiffs have Standing.

This Court correctly found that Plaintiffs have standing to challenge the Challenged Directives. Dkt. 41 at 33-38. In opposing Plaintiffs' partial summary judgment motion, Defendants limit their challenge to the redressability of Plaintiffs' claims. Dkt. 69 at 17-22. But Plaintiffs satisfy redressability under the ordinary *Lujan v. Defenders of Wildlife* framework, and—if the Court finds Plaintiffs' challenge to § 1.2 subject to § 1252(e)(3)'s 60-day filing requirement—they independently qualify for the "relaxed" redressability showing *Massachusetts v. EPA* affords litigants to whom Congress has accorded a procedural right.

First, under the standard *Lujan* framework, the factual record (and Defendants' own admission) establishes that the Challenged Directives caused—and this Court's stay reduced—Plaintiffs' members' injuries. SOMF Nos. 69-70. As the Court already held, to prove redressability, Plaintiffs must show that "relief need only be likely to relieve the asserted injury '*in part*.'" Dkt. 41 at 37 (emphasis added) (citing *Defs. of Wildlife v. Gutierrez*, 532 F.3d 913, 925 (D.C. Cir. 2008); *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982)). The undisputed record evidence establishes that

12

although § 1.2 existed for nearly 30 years before the Challenged Directives were issued, Defendants did not rely on that regulation through § 235.3 to subject parole beneficiaries to expedited removal except in a vanishingly small number of cases involving individuals paroled for criminal prosecution.[9] Dkt. 41 at 34-35; *see also* SOMF Nos. 17, 25, 40, 61. The uncontroverted record reflects that following this Court's stay order, Defendants acknowledged the order prevented the expedited removal of parole beneficiaries, SOMF No. 69, and canceled at least one such order, SOMF No. 70, but then changed position several months later after the D.C. Circuit denied their request for a stay pending appeal, SOMF No. 71. The record is devoid of evidence that Plaintiffs' same injuries would have occurred "had none of the three Challenged Directives been issued." Dkt. 41 at 37; *see also* SOMF Nos. 17, 25, 40, 61. Vacatur of the Challenged Directives "would likely redress at least some" of Plaintiffs' injuries, which is sufficient to "satisfy the redressability component of Article III standing" for Plaintiffs' claims as to the Challenged Directives. *Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100, 114 (2025).

Second, even if the Court holds that Plaintiffs' challenge to § 1.2 is subject to § 1252(e)(3)'s 60-day filing requirement (which Plaintiffs dispute), Plaintiffs have established redressability under the procedural-right framework established in *Massachusetts v. EPA*, because Plaintiffs are litigants "to whom Congress has accorded a procedural right to protect [their] concrete interests," and may "assert that right without meeting all the normal standards for redressability and immediacy." 549 U.S. 497, 517-18 (2007) (quoting *Lujan*, 504 U.S. at 572 n.7). In *Massachusetts*,

---

[9] Defendants continue to cite the same two examples they previously identified, as well as two additional examples they identified to the Court of Appeals, of expedited removal being applied to individuals paroled for criminal prosecution before 2025. Dkt. 69 at 19 n.4. These examples provide no evidence that, "prior to the Challenged Actions, DHS ever applied expedited removal to the many parolees … who were paroled into the United States for a purpose other than criminal prosecution." Dkt. 41 at 35.

the statute at issue specifically channeled all judicial challenges to certain agency decisions on air quality standards to the D.C. Circuit. *See id.* at 517-18. The Supreme Court held that under such circumstances, when Congress has effectively created a bespoke procedural channel for judicial review of agency action and "accorded a procedural right" to a litigant "to protect his concrete interests," "that litigant has standing if there is some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant." *Id.* at 517.

Such circumstances are present here. In addition to and separate from standard APA review granted to any person "adversely affected or aggrieved by agency action," 5 U.S.C. § 702, 8 U.S.C. § 1252(e)(3)(A) mirrors *Massachusetts*'s features in two respects. First, it channels review of expedited-removal policies to this Court. Second, it enumerates the categories of decisions subject to review: "(i) whether [§ 1225(b)(1)] is constitutional," and "(ii) whether such a regulation, or a written policy directive, written policy guideline, or written procedure issued by or under the authority of the Attorney General to implement [§ 1225(b)(1)], is not consistent with applicable provisions of this subchapter or is otherwise in violation of law." 8 U.S.C. § 1252(e)(3)(A). Congress crafted this limited but unique procedural channel in a statute that otherwise sharply restricts judicial review of removal decisions and specifically restricts review of expedited removal decisions. The channel exists to enable challenges to written policies implementing the expedited removal statute, including the Challenged Directives and, if need be, § 1.2.

There can be no serious dispute that Plaintiffs' members have the requisite "concrete interest" that Congress intended to protect, as they are the very people the Challenged Directives and regulatory framework act upon. Nor can there be any serious dispute that Plaintiffs' requested relief—including vacatur of the Challenged Directives and § 1.2 and a declaration that noncitizens granted parole at ports of entry are not amenable to expedited removal—"will prompt the injury-

causing party to reconsider" its decision to subject Plaintiffs' members unlawfully to expedited removal. While Plaintiffs' members already satisfy the standard *Lujan* test for redressability, they also independently satisfy the *Massachusetts* framework for redressability, as Congress has clearly created a "procedural right," 549 U.S. at 517, for litigants to bring "challenges on [the] validity of the [expedited removal] system," 8 U.S.C. § 1252(e)(3), to protect their concrete interest in not being subjected to expedited removal through unlawful written policies and regulations.

Defendants' arguments that Plaintiffs' injuries are not redressable because Plaintiffs' challenge to § 1.2 is untimely fail. Dkt. 69 at 17-18. Even if Plaintiffs' challenge to § 1.2 were untimely—which it is not, *see supra* Part I—Plaintiffs' injuries are nevertheless redressable because in addition to vacatur of the Challenged Directives, Plaintiffs seek a declaration that—as this Court already found on a preliminary basis, Dkt. 41 at 65—noncitizens granted parole at ports of entry are not statutorily amenable to expedited removal. *See* Dkt. 21 at 54; Dkt. 55. Such a declaration has legal value and would at minimum partially redress Plaintiffs' injuries, not least because courts "assume it is substantially likely that the President and other executive and congressional officials would abide by an authoritative interpretation of the [] statute and constitutional provision by the District Court, even though they would not be directly bound by such a determination." *Franklin v. Mass.*, 505 U.S. 788, 803 (1992).

The two new arguments Defendants raise in urging reconsideration of the Court's prior redressability determination, Dkt. 69 at 18-20, do not persuade. First, Defendants place undue weight on the D.C. Circuit's unpublished denial of their request for a stay pending appeal of this Court's order. *Id.* at 18-19. The panel denied the stay on irreparable harm grounds alone; it did not reach the merits or redressability. *CHIRLA v. Noem,* No. 25-5289, 2025 WL 2649100 (D.C. Cir. Sept. 12, 2025). Defendants cannot convert Judge Walker's concurrence into the panel's reasoning.

15

Second, the new cases Defendants cite, Dkt. 69 at 19-22 & n.4, are distinguishable and share a common defect: they all involve unchallenged laws or regulations that independently authorized the same agency action as the separate policies the plaintiffs' lawsuits challenged. Here, however, Plaintiffs challenge *both* the Challenged Directives *and* § 1.2, and relief on all of Plaintiffs' claims would redress Plaintiffs' harms. Moreover, "in reviewing the standing question, the court must be careful not to decide the questions on the merits for or against the plaintiff, and must therefore assume that on the merits the plaintiffs would be successful in their claims." *Gutierrez*, 532 F.3d at 924 (punctuation and citations omitted).

Defendants' principal cases involved third parties whose independent conduct severed any causal chain between the challenged government policy and the plaintiffs' alleged harm.[10] *See Scenic Am., Inc. v. DOT*, 836 F.3d 42 (D.C. Cir. 2016); *Renal Physicians Ass'n v. HHS*, 489 F.3d 1267 (D.C. Cir. 2007); *Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930 (D.C. Cir. 2004). In each, unchallenged laws and regulations required certain conduct from third parties, and the plaintiffs failed to show the third-party conduct would change notwithstanding those unchallenged regulations. Here, however, no third party stands between Defendants' policies and Plaintiffs' injuries.

*Doc Society* fits the same pattern as *Scenic America*, *Renal Physicians*, and *National Wrestling Coaches* at the pleading stage. The *Doc Society* organizational plaintiffs alleged

---

[10] *See Scenic Am.*, 836 F.3d at 50-53 (no causation because, even before the challenged guidance issued, states routinely sought and received permission for digital billboards under existing regulatory scheme, and therefore the plaintiff could not show that without the challenged guidance, the agency would forbid states from erecting such billboards); *Renal Physicians Ass'n*, 489 F.3d at 1277-78 (plaintiffs failed to show vacatur of the challenged regulation would raise physician wages because the market had adjusted to the lower wage required by the regulation and a separate statute capped pay at "fair market value"); *Nat'l Wrestling Coaches Ass'n*, 366 F.3d at 939-40 (no redressability because Title IX and its implementing regulations "would still be in place," and schools could still eliminate or cap men's wrestling teams to comply with the them).

16

"informational" and "associat[ional]" injuries that depended on how third parties (visa applicants) would weigh comparative risks between the challenged blanket policy and an unchallenged discretionary regulation. *Doc Society v. Rubio*, 141 F. 4th 1273 (D.C. Cir. 2025). Because the complaint lacked specific allegations bridging that third-party perceptual gap, the D.C. Circuit held the plaintiffs lacked standing. *Id.* Neither defect is present here: the causal chain runs through Defendants' own conduct (no third-party-perception problem), and Defendants themselves acknowledged that the Court's stay order prevents the expedited removal of parole beneficiaries, even canceling at least one such order, before reversing position. SOMF Nos. 69-70. And this case is at summary judgment with an undisputed factual record, not at the pleading stage.

The single case Defendants cite involving unchallenged statutes or regulations governing agency action, rather than third-party action, is likewise inapposite. In *Nuclear Information & Resource Service v. Nuclear Regulatory Commission*, the unchallenged regulations *required* agency action. 457 F.3d 941 (9th Cir. 2006). That case thus has no relevance here, where the unchallenged regulations purport to *permit*, not *require*, Defendants to apply expedited removal to parolees, and where the undisputed factual record is devoid of any evidence that, before the Challenged Directives were issued to guide and prompt the actions of agency officers, "DHS ever applied expedited removal to the many parolees … who were paroled into the United States for a purpose other than criminal prosecution."[11] Dkt. 41 at 35.

---

[11] Defendants also cite *Texas v. EPA*, 726 F.3d 180 (D.C. Cir. 2013), but that case involved a self-executing statute that would have caused the alleged injury to the plaintiffs even in the absence of the challenged implementing regulations, and the plaintiffs challenged only the regulations and not the statute. Plaintiffs here have challenged all the pertinent sources of alleged authority for unlawfully subjecting parolees to expedited removal, and none of these sources is self-executing.

17

Defendants' cases are inapposite and Defendants fail to identify any law or evidence that undermine the redressability of Plaintiffs' claims. The record establishes that Plaintiffs' injuries would be redressed by the relief they seek and that Plaintiffs have standing.

### III.    The Inclusion of Paroled Individuals as "Arriving Alien[s]" in 8 C.F.R. § 1.2 is Contrary to Law.

In contesting Plaintiffs' arguments that paroled individuals are not "arriving" in immigration law and therefore are not properly included in the "arriving alien" definition at 8 C.F.R. § 1.2, Defendants conflate "admission" and "arrival"; ignore the long history of Congress, the courts, and DHS using "arriving" to refer to the physical process of coming into the United States; and misconstrue Plaintiffs' arguments about the unlawful consequences that flow from the inclusion of parolees in the definition.

1. Defendants agree with Plaintiffs that the use of the present progressive tense, "arriving," indicates that the term "continues to be true." Dkt. 69 at 23. However, Defendants then claim that because paroled individuals continue to be *unadmitted,* they also continue to be *arriving* (i.e., to have not arrived). *Id.* But "admission" and "arrival" are distinct concepts, and Defendants cite nothing to support conflating the two. Instead, Defendants again cite only the parole statute, *id.* at 23-24, which, as this Court previously found, provides no support that a parolee continues to be "arriving," Dkt. 41 at 58, 61-62. To the contrary, Plaintiffs have established that although parolees have not been admitted, they have long been considered to have arrived. *See infra* pp. 21-23; Dkt. 55-1 at 21-23.[12]

---

[12] Defendants argue the Government's position in *Noem v. Al Otro Lado* is not inconsistent with their position here, Dkt. 69 at 24 n.6, but Plaintiffs do not argue contradiction. Their point is more direct: in *Al Otro Lado*, Defendants accept that "arrives in the United States" carries its ordinary meaning of "com[ing] within the limits or bounds of the United States" and "reach[ing] a destination." Pet'rs' Br. at 14-15, *Noem v. Al Otro Lado*, No. 25-5 (Jan. 6, 2026); *see also* Dkt. 55-1 at 20. Plaintiffs urge this Court to adopt that meaning. Defendants may assert differences between

18

A recent precedential BIA decision interpreting the statutorily undefined terms "arrival" and "arrived" in other parts of the INA enacted in IIRIRA supports Plaintiffs' position. *Matter of C-P-Y-,* 29 I&N Dec. 610 (BIA 2026). In *Matter of C-P-Y-*, the BIA held that the terms "have their ordinary meaning and refer to the alien's reaching the United States," using dictionary definitions in effect in 1996 (i.e., at the time IIRIRA used the term "arriving" and the Immigration and Naturalization Service ("INS") promulgated the "arriving alien" definition at issue here). *Id.* at 613-14 (defining "arrival" as "the act of arriving" and "arrived" as "to reach their destination."). Based on those definitions, the BIA held that "the words 'arrival' and 'arrived' in their ordinary meaning are not synonymous with the words 'admission' or 'admitted,' which are specifically defined in the INA," *id.* at 614 (citing 8 U.S.C. § 1101(a)(13)(A)), and that Congress's choice to use "arrival" and "arrived" is presumed to be intentional, *id.* (citing *Russello*, 464 U.S. at 23).

Under the same-Act consistency canon, "identical words and phrases within the same statute should normally be given the same meaning." *IBP, Inc. v. Alvarez*, 546 U.S. 21, 34 (2005). The Supreme Court has applied that canon repeatedly to IIRIRA itself. *See Pereira v. Sessions*, 585 U.S. 198, 213 (2018); *Niz-Chavez v. Garland*, 593 U.S. 155, 167-68 (2021). The BIA's interpretation of "arrival" and "arrived" in other parts of IIRIRA—confirming that those terms bear their ordinary meaning and are "not synonymous with 'admission' or 'admitted,'" *Matter of C-P-Y-*, 29 I&N at 613-14—is controlling on Defendants. *See Negusie v. Holder*, 555 U.S. 511, 516-17 (2009). "Arriving," "arrival," and "arrived" all share a common root, all three were part of the same Act of Congress, and Congress gave no indication of different meanings. Dkt. 55-1 at 19-23.

---

the cases, but the operative interpretive principle is the one the Government itself has urged on the Supreme Court.

Defendants continue to argue that "arriving" is a "status" that paroled individuals maintain forever. Dkt. 69 at 23-24. But "arriving alien" is not defined in the INA, and "arriving" carries its ordinary meaning. *Matter of C-P-Y-*, 29 I&N Dec. at 613-14. Defendants identify no statutory text imbuing it with permanent-status significance. Defendants' two textual hooks—8 U.S.C. § 1225(a)(2) and 8 U.S.C. § 1182(a)(9)(A)(i)—do not bear the weight Defendants put on them. *See* Dkt. 69 at 24. Section 1225(a)(2) provides that "[a]n arriving alien who is a stowaway is not eligible to apply for admission." That language describes a person's status at the moment of inspection by an immigration officer; nothing in it suggests that "arriving" status persists indefinitely. And § 1182(a)(9)(A)(i)'s heading ("Arriving Aliens") proves too much for Defendants. The provision it labels covers all noncitizens ordered removed under § 1225(b)(1), including those removed under the Designation Provision. *See* 8 U.S.C. § 1182(a)(9)(A)(i) (referring to "an alien who has been ordered removed under section 1225(b)(1)"). If Defendants are correct that the heading uses "arriving" in a precise, status-defining sense, then it classifies as "arriving aliens" even those noncitizens removed under § 1225(b)(1)(A)(iii)—including, on Defendants' own reading of that provision, individuals who entered without inspection and were ordered removed within two years. Defendants do not maintain that such individuals are "arriving aliens" and, if they did, it would render the entire Designation Provision meaningless. The more sensible reading is that the heading uses "arriving" loosely, as a descriptive label for the subsection, not as evidence that Congress treated "arriving" as a permanent legal status. *Cf. INS v. Nat'l Ctr. for Immigrants' Rights*, 502 U.S. 183, 189 (1991) (statutory headings cannot limit or expand the meaning of operative text). Defendants' textual hooks thus do not support a permanent-status reading; they confirm only that Congress used "arriving" descriptively, in the same ordinary sense Plaintiffs urge—the physical process of reaching the United States. *See* Dkt. 55-1 at 20-21.

20

Finally, to the extent any residual ambiguity in "arriving" could favor Defendants' broader reading, the canon that ambiguities in removal statutes are resolved in favor of the noncitizen confirms Plaintiffs' interpretation. *Fong Haw Tan v. Phelan*, 333 U.S. 6, 10 (1948); *Gonzalez Castillo v. Bondi*, 140 F.4th 777, 781 (6th Cir. 2025) (Sutton, C.J.) (collecting cases).

2. Defendants do not engage with the record showing that Congress and the courts have long understood paroled individuals to have "arrived" and not be perpetually "arriving." Dkt. 55-1 at 21-23.[13] Instead, Defendants advance a syllogism: (i) pre-IIRIRA exclusion proceedings included "arriving aliens," (ii) parolees were subject to exclusion proceedings, therefore (iii) parolees were "arriving aliens." Dkt. 69 at 25. This syllogism fails for two reasons.

First, it rests on a false equivalence: pre-IIRIRA exclusion proceedings did not turn on whether a noncitizen was "arriving," but rather on entry. 8 U.S.C. § 1226(a) (1994); *Leng May Ma,* 357 U.S. at 187. Anyone who had not effected entry was subject to exclusion—including noncitizens at ports of entry; noncitizens who crossed between ports and were detected doing so (such as the Golden Venture passengers, who swam ashore but were detained on the beach); and parolees, who were physically present but legally treated as not having entered. *See Matter of Pierre,* 14 I&N Dec. 467, 468-69 (BIA 1973), 1973 WL 29484 (establishing entry test for exclusion proceedings without regard to arrival); *Matter of G-,* 20 I&N Dec. 764 (BIA 1993), 1993 WL 522159 (applying entry test to conclude exclusion proceedings were appropriate for certain Golden Venture passengers); *Yang v. Maugans*, 68 F.3d 1540, 1547 (3d Cir. 1995) (explaining that "[t]he INS may deport an alien who has effected an 'entry' only pursuant to a deportation proceeding,

---

[13] For example, immigration laws as far back as 1875 use "arriving" to refer to noncitizens coming to a port of entry; adjustment of status statutes for decades refer to parolees as having "arrived in the United States" and as having a "date of arrival in the United States"; and federal courts and the BIA refer to parolees as having "arrived in this country" or as having made an "arrival." *Id.*

whereas it may exclude an alien who has not 'entered' through to an exclusion hearing"). Defendants' syllogism infers from a shared procedural posture that arriving noncitizens and parolees were conterminous, but they were distinct subsets of a broader class (noncitizens who had not effected entry), and shared membership in that broader class does not make the subsets coextensive. Defendants' syllogism proves too much—which is to say it proves nothing.

Second, the cases Defendants cite don't support the inference they need. *Sale v. Haitian Centers Council, Inc.*—decided just three years before IIRIRA—described "[a]liens arriving at the border, *or* those who are temporarily paroled into the country," as both "subject to an exclusion hearing." 509 U.S. 155, 158-59 (1993) (emphasis added). The disjunction treats arriving aliens and parolees as distinct categories that are each subject to exclusion—precisely the distinction Defendants' syllogism erases.

Similarly, *Leng May Ma* describes the parolee-petitioner as a "native of China who *arrived* in this country in May 1951." 357 U.S. at 186 (emphasis added). The Supreme Court understood the parolee to have already arrived (past tense, completed action), not to still be "arriving," and never used the phrase "arriving alien." *Barney v. Rogers*, 83 F.3d 318 (9th Cir. 1996), is the same: the noncitizen's parole was relevant to whether she had effected entry, not to her arrival.

*Akhtar v. Gonzales*, 450 F.3d 587 (5th Cir. 2006), fares no better. Neither petitioner in the case challenged their treatment as an "arriving alien" and the court's statement that before IIRIRA "[p]aroled aliens were considered arriving aliens," *id.* at 590, was both devoid of any legal support and dictum. And even on the framing Defendants prefer—that "arriving alien" denotes a "status" a parolee can bear—the Fifth Circuit later rejected the temporal extension Defendants need. *Bouchikhi v. Holder*, 676 F.3d 173 (5th Cir. 2012), which Defendants themselves cite, Dkt. 69 at 25 n.7, held that even if a parolee has the "status of an 'arriving alien,'" that "does not support

22

[the] theory that a fictionally prolonged 'arriving' is continuously carried on during that time." 676 F.3d at 178. That is precisely the theory Defendants' reading of § 1225(b)(1)(A)(i) requires, yet the very circuit Defendants invoke has rejected it.

Finally, Defendants argue that Congress "legislated with awareness of the prior case law holding that an alien's parole at a port of entry does not exempt the alien from exclusion proceedings," and infer from that awareness that Congress meant to subject paroled individuals to expedited removal. Dkt. 69 at 26. While Defendants' premise is correct, their inference is not. As shown above, the prior case law established that parolees were subject to exclusion proceedings because they had not effected an "entry," not because they were continuously "arriving." Congress legislating against that background presumptively understood the distinction.

The text Congress chose confirms it. Had Congress intended to subject parolees to expedited removal, several straightforward statutory paths were available. Congress could have subjected "all applicants for admission" to expedited removal, with stated exceptions (e.g., those who could not establish two years' physical presence). It could have keyed expedited removal to lack of "entry," the pre-IIRIRA framework Defendants invoke. Or it could have left out the Designation Provision's parolee carve-out and let § 1225(b)(1)(A)(iii) sweep parolees in directly. Instead, Congress chose "arriving in the United States"—a phrase that, as Plaintiffs have shown and the BIA recently confirmed, refers to the physical process of reaching the country. *See supra* p. 19; Dkt. 55-1 at 22-23 & n.8 (collecting authorities).

The Designation Provision's parolee carve-out drives the point home. If "arriving in" already captured parolees under § 1225(b)(1)(A)(i), then (b)(1)(A)(iii)'s carve-out ("has not been … paroled into the United States") would be surplusage. The canon against surplusage forecloses Defendants' reading. *See Hibbs v. Winn*, 542 U.S. 88, 101 (2004).

23

3. Defendants' defense of § 1.2 further collapses on its regulations. The regulation that implements the statutory requirement that an asylum application be filed "within 1 year after the date of the alien's arrival in the United States," 8 U.S.C. § 1158(a)(2)(B), treats the "maintenance of parole status" until shortly before an application is filed as an "extraordinary circumstance" excusing an untimely filing. 8 C.F.R. § 208.4(a)(5)(iv). That works only if such a parolee had a specific, singular date of arrival on which the one-year clock began to run. *Cf. Matter of C-P-Y-*, 29 I&N Dec. at 614 ("Use of the definite article 'the' preceding the word 'arrival' … refers to a single date."). If "arriving" were instead a perpetual status that never ends, the one-year clock would never start, and the regulatory structure pertaining to parolees would be unintelligible. Dkt. 55-1 at 23 n.9. Defendants respond by citing to *Bouchikhi*, but the Fifth Circuit's rejection there of the petitioner's claim to be perpetually "arriving" per § 1.2 is fatal to Defendants' argument here.

Defendants also offer no response to the "oddity" this Court previously recognized, Dkt. 41 at 63-64, in Defendants' argument that expedited removal—designed to deter undocumented entry—reaches with no time limit noncitizens who came to a port of entry, were inspected and permitted to come into the country, and could potentially pursue adjustment of status, but immunizes completely those who entered without inspection and successfully avoided detection for two years. Defendants speculate only that Congress can "balance the burdens and benefits of immigration law as it sees fit,"[14] Dkt. 69 at 26-27, but that does not explain why the statute should be interpreted contrary to its plain meaning to produce an absurdity entirely in conflict with congressional purpose. *Nixon v. Mo. Mun. League*, 541 U.S. 125, 138 (2004) (refusing to "construe

---

[14] Defendants argue that parolees have lesser reliance interests, Dkt. 69 at 27, but the framing they seek to borrow from *MRNY* addresses substantive due process, not the statutory question of who falls within § 1225(b)(1)(A)(i). Whether parolees develop "reasonable expectations" of continued presence has nothing to do with whether they are "arriving" in the ordinary statutory sense.

24

a statute in a manner that leads to absurd or futile results"); *Griffin v. Oceanic Contractors, Inc.,* 458 U.S. 564, 575 (1982) ("[I]nterpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available.").[15]

Finally, Defendants have no real rejoinder to Plaintiffs' argument that a contemporaneous regulatory change restricting adjustment of status for certain arriving aliens resulted in unlawful consequences as to parolees. Defendants miss the point in observing that the cases challenging the adjustment-of-status bar did not find the inclusion of parolees in the "arriving alien" regulatory definition *ultra vires*. Dkt. 69 at 27. Plaintiffs' point is structural: § 1.2's overbroad definition is what made the application of the bar to "arriving aliens" a problem in the first place; if parolees had not been swept into the "arriving alien" definition, there would have been no conflict with the adjustment of status statute at 8 U.S.C. § 1255(a) and no need to unwind the bar. *See* SOMF No. 179 (commenter objecting that because parolees were included in the proposed "arriving alien" definition, "the definition would limit the availability of adjustment of status for parolees"). The prior litigation fixed the symptom (the adjustment regulation) and left the cause (§ 1.2) intact. The same is true here: as long as § 1.2 continues to define parolees as "arriving aliens," every downstream regulation keyed to the definition risks generating similarly unlawful consequences that the adjustment-of-status litigation exposed.

---

[15] Defendants themselves are now pressing the perverse-incentives argument in other pending litigation—just in the opposite direction. They argue that interpreting a related IIRIRA provision to permit bond hearings would create a "perverse regime" in which "the millions of aliens who have deliberately violated U.S. law are entitled to receive a bond hearing, while aliens who voluntarily present themselves at a port of entry to 'try to acquire or gain a lawful entry' *in accordance with law* are subject to mandatory detention." Appellants' Reply Br. 26, *Guerrero Orellana v. Moniz*, Nos. 25-2152, 26-1094 (1st Cir. Mar. 16, 2026) (emphasis in original); *accord* Reply Br. of Appellants 28-29 *Avila v. Bondi*, No. 25-3248 (8th Cir. Jan. 23, 2026). Courts are not required to ignore Defendants talking out both sides of their mouth. *N.H. v. Me.*, 532 U.S. 742, 750 (2001); *Konstantinidis v. Chen,* 626 F.2d 933, 937 (D.C. Cir. 1980).

4. The legislative history reinforces what the text and structure establish: at no point in the 15-year consideration of a summary removal authority did Congress propose subjecting paroled individuals to it. Dkt. 55-1 at 25-34; Dkt. 55-12, Declaration of Yael Schacher ("Schacher Decl."). And when Congress enacted such a provision in AEDPA and months later in IIRIRA repealed and replaced it with the one at issue here, Congress was consistent and unambiguous about to whom the provisions were to apply—and that did not include parolees. Dkt. 55-1 at 25-34, 37-41. Defendants do not engage with that record on its merits. They dismiss legislative history as "a last resort for ambiguous statutes," Dkt. 69 at 28, but Plaintiffs do not invoke it to resolve ambiguity. The text and structure foreclose Defendants' reading; the legislative history confirms it. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 393 (2024) ("The text of the APA means what it says. And a look at its history if anything only underscores that plain meaning.")

Defendants initially argue that because early legislative efforts to create a summary exclusion authority did not use the modifier "physically," Dkt. 69 at 28, Plaintiffs improperly characterize these proposals as focused on noncitizens *physically* coming into the country without entry documents. But such proposals used phrases like "arriving in the United States," "at the port of arrival," and "seeking entry" that refer to physical arrival by their own terms. Dkt. 55-1 at 26. Defendants offer no legislative history or other evidence to substantiate the doubt they seek to cast and, in fact, agree there is "no doubt" Congress sought a summary removal authority to deal with noncitizens "'physically' at the border." Dkt. 69 at 28.

Defendants nevertheless argue that the "seeking entry" provision of bills advanced by Rep. Romano Mazzoli would have exposed parolees to summary exclusion and suggest Rep. Mazzoli would have wanted Cubans paroled during the Mariel Boatlift to be summarily excluded. Dkt. 69

26

at 28-29.[16] The legislative record shows the opposite. Rep. Mazzoli's bills—like other bills introduced during this period—proposed granting those Cuban (and Haitian) parolees temporary resident status and a path to lawful permanent residence and eventual citizenship; in 1986, Congress enacted exactly such a provision.[17] Dkt. 55-1 at 26-27 & n.12 (citing Schacher Decl. ¶¶ 17-21). Moreover, Rep. Mazzoli defended the "seeking entry" provision of a subsequent proposal as "keeping people *out of the United States* who are attempting to travel with fraudulent papers" by allowing them to be expeditiously excluded "when they reach this shore." Schacher Decl. ¶ 25 & Ex. H (emphasis added). The contemplated authority was prospective and border-facing: a tool to deal with people in the act of arriving at the border, not retrospective to summarily remove people paroled into the country during a prior emergency, whom Congress was simultaneously moving toward permanent residence. *See* Schacher Decl. ¶ 19 (recording congressional interest in giving the INS "'the ability to react to immigration emergencies'" so that it would "'have the capacity to handle and deal with future Mariel boatlifts'" upon arrival (quoting Sen. Alan Simpson and Rep. Bill McCollum)). Defendants' conjecture is belied by Congress' words and deeds.

Defendants notably have virtually nothing to say about the 1995-96 legislative history of AEDPA and IIRIRA. They again assert that parolees would have been subjected to expedited exclusion under AEDPA's "seeking entry" provision, Dkt. 69 at 30, but advance no argument for why a noncitizen previously paroled into the country would continually be considered "seeking

---

[16] Defendants also argue that, absent expedited removal for parolees, the government would be forced to use Section 240 removal proceedings if too many people were to present at a port of entry. Dkt. 69 at 29-30. This is a policy concern, not a statutory construction argument.

[17] In the 1986 law, Congress again recognized that Cuban and Haitian nationals paroled into the country "arrived in the United States" prior to a date certain. Immigration Reform and Control Act of 1986, Pub. L. No. 99-603, § 202, 100 Stat. 3359, 3404-05 (1986).

27

entry."[18] Defendants suggest this flows from the "entry fiction" and argue that dissenting members of the House Judiciary Committee evidenced their awareness of this fiction, Dkt. 69 at 30, but their argument misses the mark. The dissenting Members referenced the "entry doctrine" in objecting to AEDPA's "found in" provision, which stripped the right to *deportation* proceedings from noncitizens who had effected an entry into the country without inspection, in possible violation of the Fifth Amendment Due Process clause. H.R. Rep. No. 104-383, at 181-82 & n.29 (1995). This had nothing to do with treating parolees as "seeking entry" or being subject to expedited exclusion.

Defendants do not—and cannot—contest that the AEDPA Conference Report described the "seeking entry" provision as applying to "aliens arriving at a port of entry"; the House Judiciary Committee's Report said it would allow noncitizens "arriving at a port of entry" without documents to be returned "as promptly as possible, to where they boarded the plane to come here"; and the Judiciary Committee discussion of the provision focused on "people who show up at the airport" without proper documents and the need to "get control" of the situation where people "get off [the plane] without documentation." Dkt. 55-1 at 28-29.[19] In fact, the concept of immigration parole appears nowhere in AEDPA's text or committee reports on the legislation. In any event,

---

[18] The mere fact that a paroled noncitizen had not "already entered" was sufficient to place such a parolee in "'exclusion proceedings to determine whether' he should 'be allowed to enter.'" *Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Mullin,* No. 25-5243, 2026 WL 1110616, at *41 (D.C. Cir. Apr. 24, 2026) ("*RAICES*") (quoting *Leng May Ma*, 357 U.S. at 187). It did not require "seeking entry."

[19] Defendants imply Sen. Patrick Leahy's efforts on the Floor to remove AEDPA's expedited-exclusion provisions out of concern for asylum seekers demonstrate a lack of concern about protecting parolees from the reach of provision. *See* Dkt. 69 at 30. But Sen. Leahy's remarks describe the harm to asylum seekers as arising from summary screening "at the border" by immigration personnel "at airports, sea ports and other ports of entry," Schacher Decl. ¶ 39 & Ex. O—confirming, not undermining, Plaintiffs' reading that "seeking entry" targeted noncitizens in the physical act of coming into the country (i.e., arriving), not those (like parolees) already present.

AEDPA's "seeking entry" provision is relevant only as background elucidating what Congress did when it repealed and replaced that language with IIRIRA's Arriving In Provision.

Beginning from the erroneous premise that Congress intentionally included parolees in AEDPA's "seeking entry" provision, Defendants assert that "nothing in IIRIRA's legislative history indicates a Congressional intent not to include paroled arriving aliens within the category of aliens subject to expedited removal," Dkt. 69 at 30, albeit without engaging with that legislative history. Dkt. 55-1 at 30-34. Defendants argue that if Congress had wanted to protect parolees from expedited removal under IIRIRA's Arriving In Provision, it would have explicitly carved them out there just as it carved "parolees in an active parole period" out of the Designation Provision. Dkt. 69 at 30-31. The Court rejected this argument before, Dkt. 41 at 59-60, and should do so again. The legislative history need not affirmatively disclaim the exposure of parolees; the text "is arriving in the United States" plainly does not reach them, and the vigorous legislative debate over which populations should be subject to expedited removal never included parolees. *See* Dkt. 55-1 at 30-34.[20] Defendants next suggest IIRIRA's replacement of "entry" with "admission" and language reinforcing that parole is not an admission support their argument that Congress also intended to subject parolees to expedited removal as "arriving in the United States." Dkt. 69 at 30. Not so. The Arriving In Provision turns not on whether a noncitizen has been admitted but on whether such person "is arriving in the United States." Congress had enacted legislation for decades recognizing that noncitizens paroled into the country had "arrived" or had a specific "date

---

[20] To the extent that AEDPA's "seeking entry" provision might have inadvertently subjected parolees to expedited exclusion, the repeal and replacement of that language with IIRIRA's Arriving In Provision leaves no room for debate. IIRIRA's language tracked precisely how the AEDPA Conference Committee and House Judiciary Committee reports described the operative reach of "seeking entry": "the "inspection and exclusion of aliens arriving at a port of entry." H.R. Rep. No. 104-383 at 99; H.R. Rep. No. 104-469 at 117. By choosing "arriving in" over "entry," Congress chose language that carries no entry-fiction overlay.

of arrival." That parolees are statutorily not "admitted" tells us nothing about whether they are "arriving."

Finally, the text and structure of IIRIRA's expedited removal provisions confirm that Congress's express exclusion of parolees from the Designation Provision but not the Arriving In Provision supports Plaintiffs' reading, not Defendants'. *Compare* Dkt. 55-1 at 40-41 *with* Dkt. 69 at 31. First, as the Court found previously, Congress needed to expressly exclude parolees from the Designation Provision because parolees were understood to be "aliens" who are "physically present" in the country, but had no reason to exclude them from the Arriving In Provision because they were well-understood to have already "arrived" in the country. Dkt. 41 at 59-60. Second, Congress's recognition that parolees would have been subjected to expedited removal under the Designation Provision *but for* their express exclusion demonstrates that Congress also understood that parolees are not described in the Arriving In Provision at all. The header of 8 U.S.C. § 1225(b)(1) confirms the point: the two groups of noncitizens exposed to expedited removal are distinct and non-overlapping. The first includes those "arriving in the United States" and the second includes "certain *other* aliens." 8 U.S.C. § 1225(b)(1) (emphasis added). Congress's decision to carve parolees out of the second group confirms Congress understood them not to be included in the first.

5. The administrative record corroborates Plaintiffs' reading. Just months after enacting IIRIRA, Members of Congress's comments on the agency's proposed rulemaking reflected their understanding that noncitizens subject to the Arriving In Provision would all be in the process of physically arriving at ports of entry. *See* Dkt. 55-13, Declaration of Hillary Li ("Li Decl."), Ex. R (Sens. Edward Kennedy and Paul Wellstone expressing concerns about how expedited removal will be administered against "usually exhausted, jet-lagged and terrified" "arriving immigrants"

30

during secondary inspection at ports of entry); *Id.* Ex. S (Sen. Spencer Abraham's similar concerns regarding "arriving alien[s]" at secondary inspection who have just made an "exhausting and stressful escape from persecution"). While advocating unsuccessfully for a broader regulatory definition of the term "arriving alien" to include those arriving between land ports of entry or after coming ashore by boat, Rep. Lamar Smith stressed that the term "arriving alien" was "selected specifically by Congress in order to provide a flexible concept that would include all aliens who are *in the process of physical entry past our borders*." *Id*. Ex. T (emphasis added).

Defendants' response focuses on the small number (three) of commenters who objected to the inclusion of parolees in the "arriving alien" definition, treating those objections as evidence that commenters generally understood and accepted parolees to be perpetually "arriving." That argument gets the inference exactly backwards: the commenters objected precisely because the proposed definition departed from the ordinary meaning of "arriving." Their objections, together with the contemporaneous comments from Members of Congress discussed above, corroborate that Congress did not understand noncitizens physically present after having been inspected and granted parole at a port of entry to be "arriving" within the meaning of the immigration laws.

Defendants additionally have no response to Plaintiffs' argument that the agency nearly 30 years ago had no better answer in its interim rule to the structural, statutory objections several commenters made about the inclusion of parolees in the "arriving alien" definition than they have provided in response to similar arguments advanced in this litigation. *Compare* Dkt. 55-1 at 36-37 *with* Dkt. 69 at 31-33. The reason for this is simple. There was no more statutory basis for including parolees in the "arriving alien" regulatory definition in 1997 than there is today.

IV.    **The Challenged Directives are Contrary to Law and Violate Agency Procedures.**

In seeking to apply expedited removal to parolees, the Challenged Directives violate the expedited removal statute at 8 U.S.C. § 1225(b)(1)(A) and the agency's own regulations. On the

violation of the "arriving in" authority at § 1225(b)(1)(A)(i), Plaintiffs incorporate by reference the relevant briefing above on the meaning and legislative history of "arriving." *See supra* Part III.

The Challenged Directives also violate the Designation Provision, as the Court previously concluded. Dkt. 41 at 45. The Designation Provision, which can only be applied to an individual who "has not been admitted or paroled into the United States" and has not been physically present for two years, 8 U.S.C. § 1225(b)(1)(A)(iii), "forbids the expedited removal of noncitizens who have been, at any point in time, paroled into the United States," Dkt. 41 at 45. To assert that the Court was wrong, Defendants re-hash arguments the Court has considered and rightfully rejected.

1. As it has before, Defendants' argument focuses on a misreading of *Hewitt v. United States,* 606 U.S. 419 (2025), which addressed a section of the First Step Act that applied to an offense only "if a sentence for the offense *has not been imposed* [by the Act's] date of enactment." Dkt. 69 at 34. Defendants claim that the present perfect tense ("has not been") always "'conveys to a listener that the event in question continues to be true or valid,'" so a noncitizen who has their parole terminated is no longer someone who "has been paroled." *Id.* (quoting *Hewitt,* 606 U.S. at 429). That overreads *Hewitt*. In *Hewitt,* Justice Jackson explained that the present perfect tense ("has not been") can refer to *either* (1) "an act, state, or condition that is now completed" *or* (2) "a past action that comes up to and touches the present." *Hewitt,* 606 U.S. at 427-28 (quoting *The Chicago Manual of Style* § 5.132 (17th ed. 2017)); *accord* Dkt. 41 at 46. To determine which meaning applies, a court must—as this Court previously did—look to the statutory context, *Hewitt,* 606 U.S. at 427, 429, including provisions adjacent to the language at issue, to "determine whether its grammatical holding made sense in the context of the statute as a whole," Dkt. 41 at 47.

Here, part of the statutory context is Congress's decision to pair "paroled" with "admitted." 8 U.S.C. § 1225(b)(1)(A)(iii); Dkt. 41 at 47-48. The term "admitted" is defined in immigration law

32

as the "lawful entry of the alien into the United States after inspection and authorization by an immigration officer," 8 U.S.C. § 1101(a)(13)(A). "Admitted" refers to an event now completed (i.e., the entry), but *not* a continuing status: an admitted noncitizen who loses immigration status has still been admitted. *See Sanchez v. Mayorkas*, 593 U.S. 409, 415 (2021) ("Lawful status and admission … are distinct concepts in immigration law …. [A] foreign national can be admitted but not in lawful status—think of someone who legally entered the United States on a student visa, but stayed in the country long past graduation.") "Parole" can refer to both a manner of physically entering the country, *see* 6 U.S.C. § 202(4) (describing parole and visas as "forms of permission … to enter the United States"), *and* a status that one can lose, *see, e.g.,* 8 C.F.R. § 245.1(d)(1)(v) (defining "lawful immigration status" for specified purposes to include "parole status which has not expired, been revoked or terminated."). As this Court correctly assessed, the pairing of "paroled" with "admitted" makes clear that Congress referred to the manner of entry—an historical fact—and not a continuing status. Dkt. 41 at 47-48 (applying canon of *noscitur a sociis*).[21]

Defendants further misread *Hewitt* by disregarding entirely the significance of vacatur to its result. Dkt. 69 at 34. *Hewitt* held that vacatur of a criminal sentence means the sentence "has not been imposed" because upon vacatur, "the law acts as though the vacated order never occurred" and the defendant is "treated going forward as though he were never convicted." *Hewitt,* 606 U.S. at 431. By contrast, termination of parole does not mean parole has not been granted, as confirmed by the ongoing legal effects of that parole. Parolees may adjust status after their parole has ended, 8 U.S.C. § 1255(a) (authorizing adjustment of status of a noncitizen "who was inspected and

---

[21] Defendants' assertion that "admission" is a noun that "might refer to a specific act" that happens at a defined time, while "'admitted' … refers to a status," Dkt. 69 at 35, ignores that both "admitted" and "admission" are defined as "a lawful entry … after inspection," 8 U.S.C. § 1101(a)(13)(A).

admitted or paroled into the United States"); 8 C.F.R. § 245.1(b)(3); Dkt. 41 at 49, and time previously spent in active parole status does not convert to unlawful presence for inadmissibility purposes once parole ends, 8 U.S.C. § 1182(a)(9)(B)(ii). As this Court correctly held, applying *Hewitt*'s analysis to the Designation Provision's language and statutory context, it "make[s] sense for the [provision] to treat noncitizens who were paroled into the United States differently, even once their parole ends, than noncitizens who entered the country without parole." Dkt. 41 at 49. Defendants offer no explanation for why a terminated parole that has ongoing legal effects and "continued validity," *Hewitt*, 606 U.S. at 433, is akin to a sentence erased through vacatur. They simply assume the parallel and move on.[22]

2. Defendants argue that if Congress meant to exclude paroled individuals from expedited removal regardless of whether their parole status remains active, it could have used the simple past tense, "was paroled." Dkt. 69 at 35 (citing 8 U.S.C. § 1255(a) (INA § 245(a)), regarding adjustment of status). The distinction Defendants posit between "has been paroled" and "was paroled" is illusory given that Congress has long used the two terms interchangeably in this context. When Congress in 1960 amended INA § 245(a) to allow a noncitizen who "was" paroled into the country to adjust status, the Senate Report accompanying the measure explained that it would broaden the law "to include all aliens … who *have been* paroled into the United States." S. Rep. No. 86-1651

---

[22] Defendants' reference to *Doe v. Noem*, 152 F.4th 272 (1st Cir. 2025), does not help them. Dkt. 69 at 34. There, the First Circuit expressly declined to construe the expedited removal statute, holding only that the parties each proffered "plausible" interpretations. 152 F.4th at 288. *Doe* is also an outlier. Numerous courts have subsequently concurred with the district courts in that and this case, holding that noncitizens who have been paroled into the country are not amenable to expedited removal under the Designation Provision. *See, e.g., Kirboga v. LaRose*, No. 25-cv-3706-GPC-DDL, 2025 WL 3779426 (S.D. Cal. Dec. 31, 2025); *Khogiani v. Raycraft*, No. 25-cv13744, 2025 WL 3753532 (E.D. Mich. Dec. 29, 2025); *E.V. v. Raycraft*, No. 4:25- cv-2069, 2025 WL 2938594 (N.D. Ohio Oct. 16, 2025); *Munoz Materano v. Arteta*, No. 25 Civ. 6137 (ER), 2025 WL 2630826 (S.D.N.Y. Sept. 12, 2025). Defendants, on the other hand, fail to cite a single case adopting their novel, expansive, and absurd interpretation of the provision.

(1960), as reprinted in 1960 U.S.C.C.A.N. 3124, 3125 (emphasis added). The Department of Justice had the same interpretation. *See id.* at 3142. Where Congress and the Executive Branch understood that "was paroled" in INA § 245(a) meant the same thing as "has been paroled," it makes no sense to now ascribe the phrases distinct meaning. Also, Congress for years used the same interchangeable phrasing across parallel adjustment statutes for paroled noncitizens: "was" paroled in several country-specific acts, "has been paroled" in the comparable Cuban Adjustment Act.[23] There is no basis to believe Congress meant to treat Cuban parolees differently than parolees covered by the parallel statutes.[24] Defendants' argument is a distinction without a difference.

3. Defendants claim the Court "mistakenly relied on DHS regulations to support its interpretation" of the Designation Provision when it "invoked language in 8 C.F.R. § 235.3—the expedited removal regulation—that refers to parole in the past tense." Dkt. 69 at 35 (citing Dkt. 41 at 52-53). This regulation guarantees a noncitizen subjected to expedited removal under the Designation Provision a reasonable opportunity to establish he "*was* admitted or paroled into the United States following inspection at a port-of-entry." 8 C.F.R. § 235.3(b)(6) (emphasis added). An immigration officer must then "verify the alien's status"—that is, the noncitizen's "status" as someone who "was admitted or paroled into the United States following inspection at a port-of-

---

[23] *Compare* Help Haitian Adoptees Immediately to Integrate Act of 2010, Pub. L. No. 111-293 (authorizing adjustment of status for certain Haitian orphans who "[were] inspected and granted parole into the United States"); Act of Nov. 6, 2000, Pub. L. No. 106-429 (authorizing adjustment of status for certain Indochinese nationals who "[were] paroled into the United States"); Haitian Refugee Immigration Fairness Act of 1998, Pub. L. No. 105-277 (authorizing adjustment of status for certain Haitian nationals who "[were] paroled into the United States"); Act of Nov. 21, 1989, Pub. L. No. 101-167 (authorizing adjustment of status for certain Soviet and Indochinese nationals who "[were] inspected and granted parole into the United States") *with* Cuban Adjustment Act, Act of Nov. 2, 1966, Pub. L. No. 89-732 (authorizing adjustment of status for certain Cuban nationals who "ha[ve] been inspected and admitted or paroled into the United States").

[24] DHS agrees. *See* USCIS, Form I-485 Instructions ("You may apply for adjustment of status [under the CAA] if you are a native or citizen of Cuba who *was* inspected and admitted or paroled into the United States after January 1, 1959.") (emphasis added).

entry," as opposed to someone who entered without inspection. *See* 8 C.F.R. § 235.3(b)(1)(ii) (describing the Designation Provision as applying to "aliens who enter without inspection"). If the noncitizen establishes he "was" paroled, an immigration officer will determine whether parole "has been, or should be, terminated, and whether the alien is inadmissible." 8 C.F.R. § 235.3(b)(6). Defendants argue this means the noncitizen must establish that "his *current* presence is pursuant to an admission or parole," because the immigration officer must "verify the alien's *status*." Dkt. 69 at 35 (some emphasis omitted). But that is not what the regulation says. As this Court properly found, the regulation says only that the noncitizen will be subjected to expedited removal if the noncitizen "cannot satisfy the examining officer that he or she was lawfully admitted or paroled." 8 C.F.R. § 235.3(b)(6); *see* Dkt. 41 at 55.[25] Defendants' interpretation conflicts with the regulation. *See* Dkt. 22-1 at 16-18.

Moreover, Defendants do not and cannot contest that their past designations evidence their own understanding that the statutory phrase "has not been admitted or paroled" refers to noncitizens present without inspection. Dkt. 41 at 53. For instance, the 2019 designation, which asserts six times that it expands DHS's authority to use the Designation Provision to the maximum extent authorized by statute, says it will apply to certain noncitizens who "entered the United States without admission or parole," and that full expansion "is necessary to remove from the United States inadmissible aliens … who are encountered less than two years *after entering the United States without admission or parole*." 84 Fed. Reg. 35409, 35410-14 (July 23, 2019) (emphasis added).[26] The January 2025 designation from the current administration specifically states that it

---

[25] Defendants point to two regulations regarding asylum and parole termination as bolstering their position, Dkt. 69 at 35-36, but they do nothing to disturb the Court's prior conclusions that the regulations either provide little support or insight into the meaning of the statute or illustrate further inconsistencies in Defendants' regulations. Dkt. 41 at 54-56.

[26] The 2004 designation has the same understanding. 69 Fed. Reg. 48877, 48880 (Aug. 11, 2004).

"does not apply to aliens who arrive at U.S. ports of entry, because those aliens are already subject to expedited removal." 90 Fed. Reg. 8139, 8140 (Jan. 24, 2025). Given Defendants' position that noncitizens who have been paroled into the country at ports of entry remain indefinitely "arriving in" the country, including after their parole is terminated, the current designation evidences Defendants' belief that such paroled individuals are *not* covered by the Designation Provision because they are addressed in the Arriving In Provision. Dkt. 41 at 53.

4. Defendants do not contest Plaintiffs' contemporaneous evidence that AEDPA's "found in" provision was designed to authorize expedited exclusion of noncitizens who "entered the United States unlawfully," who "successfully evaded requirements for lawful entry," and "whose initial entry was wholly illegal," Dkt. 55-1 at 39, and that the INS similarly understood the provision to apply to "aliens who have entered the U.S. without inspection." Schacher Decl. ¶ 46 & Ex. S. Defendants respond only that the provision might have exposed parolees to expedited exclusion but offer no evidence to support their reading. Dkt. 69 at 37. Nevertheless, Plaintiffs acknowledge this possibility in AEDPA and additionally recognize that the version of IIRIRA reported by the Senate Judiciary Committee that applied expedited exclusion to those who "entered the United States without having been inspected and admitted by an immigration officer," similarly might have inadvertently reached parolees. Dkt. 55-1 at 40.[27] But when IIRIRA emerged from the Conference Committee and was enacted into law, the Designation Provision replaced AEDPA's "found in" provision to protect from expedited removal not only those physically present who have been admitted, but also those who have been "paroled into the United States." 8 U.S.C. § 1225(b)(1)(A)(iii). Congress's deliberate textual changes from AEDPA and the Senate Judiciary

---

[27] It is, of course, impossible to know how either provision would have been interpreted and applied as to parolees because the former never took effect and the latter was never enacted.

Committee's IIRIRA bill to the language enacted in IIRIRA must be given "real and substantial effect." *Husted v. A. Philip Randolph Inst.*, 584 U.S. 756, 772 (2018) (citation omitted).

The function of the explicit parolee carve-out—consistent with the undisputed legislative record that Congress intended for IIRIRA's Designation Provision to apply to noncitizens who entered without inspection, Dkt. 55-1 at 40; Schacher Decl. ¶¶ 42-46, 59-60, 65-66 & Exs. P, Q, R, S, Z, & BB—is to exclude parolees from the Designation Provision so that the text precisely targets those physically present in the country for not more than two years who entered without inspection. Defendants' contrary and paradoxical reading gets the provision backwards and makes a mess of the statutory structure. Under their reading, Congress included language to protect *active* parolees from expedited removal under the Designation Provision and *terminated* parolees from expedited removal under the Designation Provision after two years of physical presence (albeit without using either term to modify "parole") even as both groups of parolees remained entirely at risk of expedited removal without time limit under the Arriving In Provision. Defendants' argument makes as little sense of the statute's text and structure as it does of the legislative history.

## V.     The Challenged Directives are Inconsistent and Arbitrary and Capricious

The Court previously found the Challenged Directives arbitrary and capricious, Dkt. 41 at 65-73, and the administrative record only reinforces that conclusion. Defendants' opposition offers no new ground for revisiting it: they do not engage with the administrative record; they do not contest Plaintiffs' arguments about reliance interests and reasonable alternatives; and they repeat *post hoc* justifications the Court already considered and rejected. The Court's prior framing captures the underlying problem: the Challenged Directives present a "Schrödinger's legal justification," in which DHS believes both that a two-year limit as well as no time limit applies for applying expedited removal to parolees, and provides no coherent legal reasoning for either position. Dkt. 41 at 71-72.

38

First, the January 23 Huffman Memorandum provides no legal authority for its expansion of expedited removal beyond the Designation Provision's two-year limit. In response, Defendants argue only that the Memorandum does not "eschew[] its authority" to pursue expedited removal under the Arriving In Provision, and "merely refer[s] to the scope of expedited removal under the *Designation Provision*." Dkt. 69 at 38. That characterization confirms rather than refutes the APA problem: the Memorandum doesn't cite its legal authorities at all, much less "explain their legal basis and reasoning." Dkt. 41 at 69; *see Pension Ben. Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 654 (1990) (courts must be able to "evaluate the agency's rationale at the time of decision").

Defendants' attempt to defend the Memorandum collapses on its own logic. If Defendants are right that the Arriving In Provision authorizes expedited removal of all parolees indefinitely, then the Memorandum's reference to the Designation Provision is meaningless—as this Court already observed, there would be no population of parolees for whom the Designation Provision matters at all. Dkt. 41 at 69. The Memorandum's invocation of the Designation Provision is either substantive (in which case its scope-limit applies) or it is performative (in which case the agency has provided no legal reasoning). Either way, the APA problem stands.

Second, Defendants try to excuse the lack of statutory or regulatory citations in the February 18 ICE Directive by arguing, without any support, that it is nothing more than an internal email. Dkt. 69 at 38. But Defendants do not contest that the directive is a final agency action subject to arbitrary and capricious review, and the February 18 ICE Directive did not simply lack citations. It lacked *any* stated basis for its legal conclusion that "no time limit" exists for the agency's ability to process paroled individuals for expedited removal, and any reasoning for why the agency changed position from the January 23 Huffman Memorandum. *See* Dkt. 41 at 69. The APA does not necessarily require an agency to provide citations for every assertion, but it does

39

require the agency to "give adequate reasons for its decisions," *Encino Motorcars, LLC v. Navarro,* 579 U.S. 211, 221 (2016), especially when the agency is changing position, *see FCC v. Fox Television Stations, Inc.,* 556 U.S. 502, 515 (2009). In the alternative, Defendants argue that the February 18 ICE Directive contains "legal justification" because its use of the term "paroled arriving alien" implicitly invokes 8 C.F.R. § 1.2. Dkt. 69 at 38. But even if the Directive cited the regulation (and it did not), that is no substitute for articulating reasoning for a change in position, and as this Court already concluded, the Directive remains "legally opaque." Dkt. 41 at 69.

Third, Defendants argue that the January 23 Huffman Memorandum does not contradict the February 18 Directive because the Huffman Memorandum does not require that individuals' parole be terminated before subjecting them to expedited removal. Dkt. 69 at 38-39. The Memorandum's text says otherwise. After citing the Designation Provision and its two-year continuous-presence requirement, Acting Secretary Huffman directs DHS components to "*[t]ake all steps necessary* to review the alien's case and consider … whether to apply expedited removal," including "*steps to terminate* any ongoing removal proceeding and/or any *active parole status*." Dkt. 55-13, Ex. A (emphases added).

Fourth, the March 25 CHNV Termination Notice itself confirms DHS's view that the Designation Provision's two-year limit governs. The Notice states that "[e]xpedited removal is available *only* when an alien has not been continuously present in the United States for at least the two years preceding the date of the inadmissibility determination," Dkt. 55-13, Ex. F (emphasis added). DHS prematurely terminated hundreds of thousands of grants of CHNV parole precisely so it could apply expedited removal under the Designation Provision before parolees reached two years of continuous presence; "[a]ny lengthening of the wind-down period [would] increase the likelihood that additional CHNV parolees are *no longer subject to expedited removal*." *Id.*

40

(emphasis added). Defendants nevertheless argue that the Notice presents a "both/and" and not an "either/or" situation—that it merely describes expedited removal under the Designation Provision and does not categorically disavow expedited-removal authority under the Arriving In Provision. Dkt. 69 at 39. The Notice's text forecloses that reading.

The Notice's two-year language confirms the "unacknowledged and unexplained inconsistency" at the heart of DHS's policy on expedited removal of parolees. Dkt. 41 at 71. The Notice asserts a two-year limit; the ICE Directive asserts "no time limit"; the Memorandum cites no authority for either. Defendants' attempts to harmonize these positions in litigation are *post hoc* rationalizations the Court may not consider. *DHS v. Regents of the Univ. of Cal.,* 591 U.S. 1, 22 (2020); *Am. Textile Mfrs. Inst., Inc. v. Donovan,* 452 U.S. 490, 539 (1981).

Finally, Defendants claim that "any alleged error would be harmless" because DHS believes it has statutory and regulatory authority to apply expedited removal to "paroled arriving aliens." Dkt. 69 at 39. That argument gets the APA backwards. The error is not a drafting glitch that could be cured by invoking better authority on appeal; it is the agency's failure to provide rational, reasoned decisionmaking in the first instance. The APA requires the agency to "give adequate reasons for its decisions," *Encino Motorcars*, 579 U.S. at 221, and the Court reviews the reasoning the agency actually provided, not the reasoning Defendants now construct in litigation. *See SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943); *Calcutt v. FDIC*, 598 U.S. 623, 629 (2023). Defendants' suggestion that they could have written better policies—and that this should excuse the policies they did write—confirms rather than dispels the arbitrary-and-capricious problem.

In sum, Defendants do nothing to disturb the Court's previous assessment that Defendants' "unacknowledged and unexplained inconsistency" is "the hallmark of arbitrary and capricious decision-making." Dkt. 41 at 71.

**VI.    The Court Has the Authority to Grant Vacatur and Declaratory Relief.**

**A.    8 U.S.C. § 1252(f)(1) does not bar vacatur or declaratory relief.**

Contrary to Defendants' position, 8 U.S.C. § 1252(f)(1) does not prohibit vacatur or declaratory relief because such remedies are not injunctive relief, and § 1252(f)(1) therefore does not apply. As the Supreme Court has held, § 1252(f)(1) is "nothing more or less than a limit on injunctive relief." *Reno v. American-Arab Anti-Discrimination Comm.,* 525 U.S. 471, 481 (1999). Declaratory relief does not "check, hold back, or prevent." *Garland v. Aleman Gonzalez,* 596 U.S. 543, 549 (2022). It is "persuasive, [though] not ultimately coercive." *Steffel v. Thompson*, 415 U.S. 452, 471 (1974). Vacatur under the APA likewise does not "check, hold back, or prevent." As Justice Sotomayor confirmed in *Aleman Gonzalez*, "the Court does not purport to hold that § 1252(f)(1) affects courts' ability to hold unlawful and set aside agency action, findings, and conclusions under the [APA]." 596 U.S. at 572-73 (Sotomayor, J., concurring in part) (cleaned up). Indeed, the Supreme Court has twice declined to extend *Aleman Gonzalez*'s holding on injunctions to other forms of relief. *Aleman Gonzalez*, 596 U.S. at 551 n.4 (declining to address if § 1252(f)(1) precludes class-wide declaratory relief); *Biden v. Tex.*, 597 U.S. 785, 801 n.4 (2022) (same).

Just last month, the D.C. Circuit held that "vacatur under the APA is distinct from injunctive relief and Section 1252(f)(1) addresses only the latter," and accordingly held § 1252(f)(1) "inapplicable to the vacatur." *RAICES,* 2026 WL 1110616, at *26. Other circuits and district courts agree. *See, e.g.*, *Texas v. United States*, 50 F.4th 498, 528 (5th Cir. 2022); *Miot v. Trump*, 818 F. Supp. 3d 126, 155-56 (D.D.C. Feb. 2, 2026). The D.C. Circuit has likewise held that "[Section] 1252(f)(1) does not proscribe issuance of a declaratory judgment." *N.S. v. Dixon*, 141 F.4th 279, 290 (D.C. Cir. 2025).

In addition to being foreclosed by circuit precedent, Defendants' reading is foreclosed by the statute's text and structure. Section 1252(f)'s title, "Limit on injunctive relief," is narrower than

42

§ 1252(e)(1)'s "Limitations on relief"; the difference is presumed deliberate. *Russello*, 464 U.S. at 23. Where Congress wanted to bar declaratory and other equitable relief, it said so. *See* 8 U.S.C. § 1252(e)(1) (barring "declaratory, injunctive, or other equitable relief").

Reading § 1252(f)(1) to bar declaratory relief and vacatur would also lead to absurd consequences. As Justice Sotomayor explained in *Aleman Gonzalez*, on Defendants' reading "no relief would be available in the lower courts." 596 U.S. at 572 n.9 (Sotomayor, J., concurring in part). This Court came to the same conclusion, noting that Defendants' interpretation would leave associational plaintiffs, like Plaintiffs here, with no option for relief, "despite [a] clear grant of jurisdiction for suits in this Court under section 1252(e)." Dkt. 41 at 29.

Defendants argue that a declaratory judgment here would "invite every single member of the class to immediately seek an injunction grounded on the authority of the declaratory judgment." Dkt. 69 at 42 (citation omitted). The argument fails twice over. First, this is not a class action. Second, even if the requested declaration issues, individuals contesting individual orders remain bound by § 1252(e)'s framework for habeas review. 8 U.S.C. § 1252(e)(2); § 1252(e)(5).

Nor is a declaratory judgment rendered improper by the possibility that the party against whom it issues may disregard it. Defendants' position effectively asks the Court to withhold relief now because Defendants might continue unlawful conduct later. If that were a sufficient reason to deny declaratory relief, no declaratory judgment could ever issue. *See Franklin*, 505 U.S. at 803 (declaratory relief is appropriate against executive officials on the assumption that they "would abide by an authoritative interpretation" of the statute by the court, "even though they would not be directly bound by such a determination").

Section 1252(f)(1) limits class-wide injunctions—not vacatur, declaratory judgment, further necessary or proper relief based on a declaratory judgment, or individual relief later sought

43

under the carefully circumscribed framework Congress provided in § 1252(e). Under D.C. Circuit precedent, this Court has the authority to grant the relief Plaintiffs seek.

### B.    The Court should not limit its vacatur.

Defendants assert that "any relief should be narrowly tailored to the Plaintiff organization's [sic] members who can demonstrate injury," and that the Court's August 1, 2025 decision relied on the incorrect assumption that § 706 vacatur need not be limited to the parties. Dkt. 69 at 43. Defendants' argument is belied by precedent and its criticisms are misplaced.

"[W]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to individual plaintiffs is proscribed." *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998); *see also Corner Post*, 603 U.S. at 830 (Kavanaugh, J., concurring) ("When a federal court concludes that an agency adjudicative order is unlawful, the court must vacate that order."). That remedy operates on the unlawful rule itself, not on the parties, and it is unaffected by the equitable-tailoring principles the Supreme Court addressed in *Trump v. CASA, Inc.*, 606 U.S. 831 (2025). *See CASA, Inc.*, 606 U.S. at 847 n.10 (explicitly reserving the APA-vacatur question); Dkt. 41 at 81-82.

Post-*CASA* D.C. Circuit authority directly forecloses Defendants' argument. Citing the textual and historical differences between the APA (1946) and the Judiciary Act of 1789 on which *CASA* relied, the D.C. Circuit held in *Make the Road New York v. Noem* that "[t]he Department's procrustean effort to stretch *CASA*'s plaintiff-specific remedial framework onto the APA defies 'countless' precedents to the contrary." 2025 WL 3563313, at *36 (D.C. Cir. Nov. 22, 2025). The D.C. Circuit reaffirmed the point last month in *RAICES*, explaining that "[v]acatur under Section 706 functions quite differently from an injunction." 2026 WL 1110616, at *26. Vacatur "operates on the rule or regulation itself," while injunctions "direct[] the conduct of a party," and vacatur of an unlawful regulation "does not 'enjoin' or 'restrain' anyone." *Id.* (cleaned up). That binding

44

precedent controls here. *CASA*'s equitable framework is not the APA's remedial framework. Defendants' alternative theory—that "set aside" in § 706(2) "does not pertain to remedies at all," Dkt. 69 at 43—is likewise contrary to controlling D.C. Circuit law. "[T]o 'set aside' a rule is to vacate it." *Bridgeport Hosp. v. Becerra*, 108 F.4th 882, 890 (D.C. Cir. 2024).

Defendants dismiss the practical challenges of limited relief as among the "policy pros and cons" discounted in *CASA*. Dkt. 69 at 44. The challenges the Court identified, however, relate directly to the availability of a remedy for noncitizens unlawfully subjected to expedited removal: the rapid pace of expedited-removal proceedings, the agency's failures to follow its own procedures, and the limited awareness affected individuals have of their rights. Dkt. 41 at 82. Defendants offer no answer to these concerns. They also propose shifting burdens onto Plaintiffs, Dkt. 69 at 44, in effect absolving themselves of any obligation to confirm the identity of those they subject to expedited removal.

Defendants suggest again that "percolation" justifies limited relief, Dkt. 69 at 44-45, but as this Court already explained, § 1252(e)(3)'s channeling provision, which confines challenges to expedited removal policies to this District, and appellate review to the D.C. Circuit, defeats the percolation rationale that anchors *CASA*'s plaintiff-specific framework, Dkt. 41 at 82. In the absence of percolation, nationwide vacatur is the only remedy that gives full effect to the statutory scheme. Congress prescribed "set aside" relief for agency action that violates the law, 5 U.S.C. § 706(2), and it is the relief this Court should grant.

**CONCLUSION**

Plaintiffs respectfully request that the Court deny Defendants' motion and grant Plaintiffs' motion, enter judgment for Plaintiffs on Claims 1, 2, 4, and 5, and issue Plaintiffs' requested relief.

Dated: May 28, 2026

Respectfully submitted,

*/s/Hillary Li*
Hillary Li (GA0052)
Esther H. Sung (CA00132)
Karen C. Tumlin (CA00129)
Laura Flores-Perilla (admitted *pro hac vice*)
Brandon Galli-Graves (admitted *pro hac vice*)
Vanessa Rivas-Bernardy (admitted *pro hac vice*)
**JUSTICE ACTION CENTER**
P.O. Box 27280
Los Angeles, CA 90027
Telephone: (323) 450-7272
esther.sung@justiceactioncenter.org
karen.tumlin@justiceactioncenter.org
hillary.li@justiceactioncenter.org
laura.flores-perilla@justiceactioncenter.org
brandon.galli-graves@justiceactioncenter.org
vanessa.rivas-bernardy@justiceactioncenter.org

Tom-Tsvi M. Jawetz (*pro hac vice*)
*JAC Cooperating Attorney*
1358 Jefferson St. NW
Washington, DC 20011
Telephone: (202) 413-5208
Tom.Jawetz@gmail.com

Carl Bergquist (*pro hac vice*)
**COALITION FOR HUMANE IMMIGRANT RIGHTS**
2533 West 3rd St, Suite 101
Los Angeles, CA 90057
Telephone: (310) 279-6025
cbergquist@chirla.org

Shana Khader (D.D.C. Bar No. 90011926)
**CASA, INC.**
P.O. Box 7277
Hyattsville, MD 20787
(240) 406-4348
skhader@wearecasa.org

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 28, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of for the District of Columbia by using the CM/ECF system. Counsel in the case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

*/s/Hillary Li*
Hillary Li