**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| COALITION FOR HUMANE IMMIGRANT RIGHTS, *et al.*, | |
| Plaintiffs, | |
| v. | Case No. 1:25-cv-00872 (JMC) |
| MARKWAYNE MULLIN, in his official capacity as Secretary of Homeland Security, *et al.*, | Hon. Jia M. Cobb |
| Defendants. | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF DEFENDANTS' REPLY TO PLAINTIFFS' OPPOSITION
TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**

## **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

ARGUMENT ...................................................................................................................... 2

I.   The Court Lacks Jurisdiction to Review the Arriving Alien Regulation
Because Plaintiffs' Challenge is Untimely. .......................................................... 2

    A.   8 U.S.C. §§1252(a)(2)(A) & (e) Apply to Preclude Review. ................... 2

    B.   Plaintiffs' Challenge is Time-Barred Under 8 U.S.C. §1252(e)(3)(B). ..... 6

        1.   Section 1252(e)(3)(B)'s 60-day Deadline is not Subject to
Equitable Tolling Because it is Jurisdictional................................. 6

        2.   Alternatively, Section 1252(e)(3)(B) is not Subject to Equitable
Tolling Because it is a Mandatory Deadline................................... 10

        3.   Even if the 60-Day Deadline Could be Tolled, Plaintiffs Have Failed to
Establish Due Diligence and Extraordinary Circumstances. ........... 13

II.   Plaintiffs Cannot Establish Redressability. ....................................................... 15

III.   The "Arriving Alien" Regulation at 8 C.F.R. §1.2 is a Proper
Interpretation of the "Arriving in" Provision..................................................... 20

IV.   Plaintiffs Lack Standing Over the Challenged Actions; Alternatively,
the Challenged Actions are Consistent with the INA. ....................................... 29

V.   The Challenged Actions are not Arbitrary and Capricious. .............................. 32

VI.   Alternatively, any Relief Must be Narrowly Tailored to Plaintiffs'
Members Only..................................................................................................... 34

CONCLUSION................................................................................................................. 35

CERTIFICATE OF SERVICE

i

## TABLE OF AUTHORITIES

### CASES

*Arellano v. McDonough*,
598 U.S. 1 (2023).......................................................................................................... 12, 13

*Blanche v. Lau*,
609 U.S. --, 2026 WL 1791339 (June 23, 2026)............................................................. 21, 22

*Bona v. Gonzales*,
425 F.3d 663 (9th Cir. 2005) ........................................................................................ 25

*Bouchikhi v. Holder*,
676 F.3d 173 (5th Cir. 2012) ........................................................................................ 26, 27

*California v. Trump*,
613 F. Supp. 3d 231 (D.D.C. 2020)............................................................................... 19

*Ctr. for Biological Diversity v. U.S. Dep't of Interi*or,
563 F.3d 466 (D.C. Cir. 2009) ...................................................................................... 19

*Doc Soc'y v. Rubio*,
141 F.4th 1273 (D.C. Cir. 2025)................................................................................... 18

*Duarte v. Mayorkas*,
27 F.4th 1044 (5th Cir. 2022) ...................................................................................... 21

*E.V. v. Raycraft*,
2025 WL 3122837 (N.D. Ohio Nov. 7, 2025)............................................................. 17

*Enbridge Energy, LP v. Nessel*,
608 U.S. __, 146 S. Ct. 1074 (2026)............................................................................. 10, 11, 12

*Gill v. Whitford*,
585 U.S. 48 (2018)......................................................................................................... 35

*Haaland v. Brackeen*,
599 U.S. 255 (2023)....................................................................................................... 20

*Hewitt v. United States*,
606 U.S. 419 (2025)....................................................................................................... 30

*Jennings v. Rodriguez*,
583 U.S. 281 (2018)....................................................................................................... 24

*Kaplan v. Tod*,
  267 U.S. 228 (1925)............................................................................................................ 2

*Karmamoldoyeva v. Warden*,
  2026 WL 266459 (S.D. Cal. Feb. 2, 2026) .................................................................... 17

*Kaspersky Lab, Inc. v. United States Dep't of Homeland Sec.*,
  311 F. Supp. 3d 187 (D.D.C. 2018) ............................................................................... 18

*Lawyers Ass'n v. Reno*,
  (*AILA*), 199 F.3d 1352 (D.C. Cir. 2000)......................................................... 11, 12, 35

*Leng May Ma v.* Barber,
  357 U.S. 185 (1958)................................................................................................... 22, 23

*Lighthiser v. Trump*,
  No. CV 25-54-BU-DLC, 2025 WL 2930569 (D. Mont. Oct. 15, 2025) ........................... 19, 20

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992)............................................................................................. 15, 16, 19

*Make the Rd. New York v. Noem* (*MRNY I*),
  No. 25-5320, 2025 WL 3563313 (D.C. Cir. Nov. 22, 2025)................................. 24, 25, 29, 34

*Make the Road N.Y. v. Mullin* (*MRNY II),*
  --- F.4th ---, 2026 WL 1792978 (D.C. Cir. Jun. 23, 2026) ......................................... 1, *passim*

*Massachusetts v. EPA*,
  549 U.S. 497 (2007)................................................................................................... 18, 19

*Matter of C-P-Y-,*
  29 I.&N. Dec. 610 (BIA 2026) ....................................................................................... 21

*Mendoza-Linares v. Garland*,
  51 F.4th 1146 (9th Cir. 2022) ........................................................................................... 3

*M.M.V. v. Garland*,
  1 F.4th 1100 (D.C. Cir. 2021)..................................................................................... 1, *passim*

*Montiel v. Raycraft*,
  2026 WL 32076 (W.D. Mich. Jan. 6, 2026) .................................................................... 17

*Mullin v. Al Otro Lado*,
  --- U.S. ---, 2026 WL 1825741 (June 25, 2026) ............................................................ 22

*Nat'l Wrestling Coaches Ass'n v. DOE*,
  366 F.3d 930 (D.C. Cir. 2004) .......................................................................... 15

*Nelson v. SEC*,
  138 F.4th 514 (D.C. Cir. 2025) ......................................................................... 14

*Nuclear Info. & Res. Serv. v. NRC*,
  457 F.3d 941 (9th Cir. 2006) ............................................................................ 18

*PDK Lab'ys Inc. v. U.S. D.E.A.*,
  362 F.3d 786 (D.C. Cir. 2004) .......................................................................... 34

*Refugee and Immigrant Ctr. For Educ. & Legal Servs. v. Mullin*,
  174 F.4th 81 (D.C. Cir. 2026) ........................................................................... 34

*Riley v. Bondi*,
  606 U.S. 259 (2025) ............................................................................... 6, 7, 13

*Rodriguez-Acurio v. Almodovar*,
  811 F. Supp. 3d 274 (E.D.N.Y. 2025) ............................................................... 17

*S.W. v. Noem*,
  2025 WL 3754067 & n.7 (S.D.N.Y. Dec. 29, 2025) .......................................... 17

*Sale v. Haitian Centers Council*, Inc.,
  509 U.S. 155 (1993) ......................................................................................... 23

*Santos-Zacaria v. Garland*,
  598 U.S. 411 (2023) ................................................................................. 6, 7, 8

*Scenic Am., Inc. v. DOT*,
  836 F.3d 42 (D.C. Cir. 2016) ............................................................................ 17

*Stone v. I.N.S.*,
  514 U.S. 386 (1995) ......................................................................................... 12

*Trump v. CASA, Inc.*,
  606 U.S. 831 (2025) ......................................................................................... 34

*United States v. Texas*,
  599 U.S. 670 (2023) ................................................................................... 15, 18

*United States v. Wilson*,
  503 U.S. 329 (1992) ......................................................................................... 31

iv

*Vijender v. Wolf*,
   No. 19-CV-3337 (APM), 2020 WL 1935556 (D.D.C. Apr. 22, 2020)....................................12

*Wilkins v. United States*,
   598 U.S. 152 (2023)............................................................................................................8, 9

*Zheng v. Gonzales*,
   422 F.3d 98 (3d Cir. 2005).....................................................................................................31

## STATUTES

**Immigration and Nationality Act of 1952, as amended:**

5 U.S.C. § 706(2) ......................................................................................................................34

8 U.S.C. § 1101(a)(13)(A) .........................................................................................................30

8 U.S.C. § 1105a(a) (1994) ........................................................................................................12

8 U.S.C. § 1158(a) .....................................................................................................................22

8 U.S.C. § 1158(a)(2).................................................................................................................26

8 U.S.C. § 1158(a)(2)(B) ...........................................................................................................25

8 U.S.C. § 1182(d)(5) ................................................................................................................30

8 U.S.C. § 1182(d)(5)(A)...........................................................................................................20

8 U.S.C. § 1225(a)(1).................................................................................................................30

8 U.S.C. § 1226(a) .....................................................................................................................23

8 U.S.C. § 1252(a)(2)(A) .................................................................................................2, *passim*

8 U.S.C. § 1252(b)(1) .................................................................................................................12

8 U.S.C. § 1252(e)(3)...............................................................................................................6, 35

8 U.S.C. § 1252(e)(3)(A) ...........................................................................................................11

8 U.S.C. § 1252(e)(3)(B) ..................................................................................................1, *passim*

8 U.S.C. § 1252(e)(3)(C) ...........................................................................................................12

8 U.S.C. § 1252(e)(3)(D) ...........................................................................................................12

8 U.S.C. § 1252(f)(1) ......................................................................................................... 35

8 U.S.C. § 1255(a) ............................................................................................................. 31

8 U.S.C. § 1252(e)(1)(B) ................................................................................................... 35

28 U.S.C. § 1295(a)(9) ......................................................................................................... 7

28 U.S.C. § 1346(f) .............................................................................................................. 9

## RULES

D.C. Cir. R. 36(e)(2) .......................................................................................................... 35

## REGULATIONS

8 C.F.R. § 1.2 .............................................................................................................. 1, *passim*

8 C.F.R. § 208.14(c)(4)(ii)(A) ........................................................................................... 31

8 C.F.R. § 208.4(a)(5)(iv) .................................................................................................. 25

8 C.F.R. § 235.3 ........................................................................................................... 1, *passim*

8 C.F.R. § 235.3(b) ............................................................................................................... 4

8 C.F.R. § 235.3(b)(6) ................................................................................................... 31, 32

8 C.F.R. § 245.1(c)(8) ........................................................................................................ 25

8 C.F.R. § 212.5(e)(2)(i) .................................................................................................... 31

## OTHER AUTHORITIES

*Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures,*
   62 Fed. Reg. 10,312, 10,312-13 (Mar. 6, 1997) ........................................................... 4

*Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans*
   90 Fed. Reg. 13611 (Mar. 25, 2025) ........................................................................... 33

H.R. Rep. No. 104–469 (1996) .......................................................................................... 24

H.R. Rep. No. 104-383 (1995) ........................................................................................... 29

**INTRODUCTION**

This Court lacks jurisdiction to review Plaintiffs' untimely challenge to the "arriving alien" regulation at 8 C.F.R. §1.2 and Plaintiffs fail to demonstrate Article III redressability on their remaining claims. Because this Court lacks the ability to grant Plaintiffs any effective relief, the Court should dismiss the amended complaint and grant Defendants summary judgment. If the Court reaches the merits, it should grant summary judgment to Defendants on all counts, except count III (due process), which the parties have not briefed on summary judgment.

To begin, Plaintiffs fail to establish that their challenge to 8 C.F.R. §1.2 is timely under the 60-day filing deadline at 8 U.S.C. §1252(e)(3)(B) for three independent reasons, any one of which is dispositive. *First*, as the D.C. Circuit has squarely held, §1252(e)(3)(B) is a jurisdictional deadline not subject to equitable tolling, *M.M.V. v. Garland*, 1 F.4th 1100, 1106 (D.C. Cir. 2021), and Plaintiffs fail to meet the high standard for showing that the Supreme Court has overruled *M.M.V*. In fact, the D.C. Circuit this week again stated in a published opinion that §1252(e)(3)(B) "is jurisdictional." *Make the Road N.Y. v. Mullin* (*MRNY II*), --- F.4th ---, 2026 WL 1792978, at *8 (D.C. Cir. Jun. 23, 2026). Second, even if the Court somehow ruled that §1252(e)(3)(B) is not jurisdictional, it is clearly a mandatory rule not subject to equitable tolling given its text, structure, and context. *Third*, even if equitable tolling could be applied, Plaintiffs fail to demonstrate it is even warranted here because they do not explain why they did not timely raise their challenge to §1.2 in their original complaint, along with several of their other claims.

Absent the ability to challenge 8 C.F.R. §1.2, Plaintiffs cannot show that any alleged harms to their members from the agency actions they challenge ("Challenged Actions") are redressable where §1.2 in tandem with 8 C.F.R. §235.3 provide an *independent* basis for DHS to apply expedited removal to Plaintiffs' members. Indeed, even though a stay of the Challenged Actions

1

has been in place since August 2025, it has not provided Plaintiffs' members with any apparent relief and Plaintiffs fail to show otherwise. DHS retains enforcement discretion under the regulations to apply expedited removal to the very same group of aliens—aliens who were paroled at a port of entry—whom Plaintiffs' standing is based, and has been doing so.

On the merits, the application of expedited removal to paroled arriving aliens as set forth in 8 C.F.R. §1.2 is consistent with the parole statute and decades of case law. Plaintiffs do not dispute that under bedrock principles of immigration law, an alien paroled at a port of entry is legally considered to be at the border "and ha[s] gained no foothold" in the United States. *Kaplan v. Tod*, 267 U.S. 228, 230 (1925). Congress undoubtedly had this in mind when it enacted expedited removal for aliens "arriving in" the United States. Congress is presumed to have been aware of established precedent prior to the enactment of expedited removal holding that a paroled "arriving alien" was not deemed to have made an "entry," and was therefore subject to the former "exclusion" proceedings, with fewer procedural protections than deportation proceedings.

ARGUMENT

I.    **The Court Lacks Jurisdiction to Review the Arriving Alien Regulation Because Plaintiffs' Challenge is Untimely.**

A.    **8 U.S.C. §§1252(a)(2)(A) & (e) Apply to Preclude Review.**

Plaintiffs' various attempts to avoid application of the expedited removal statute's jurisdictional bars fall flat. As an initial matter, Plaintiffs again attempt to argue (Dkt. 72 at 12-14)[1] that a challenge to the application of the "arriving alien" provision at 8 C.F.R. §1.2 to prevent DHS from removing a paroled arriving alien pursuant to an expedited removal order somehow

---

[1] Defendants' citation to docket entries uses the document's PDF page number rather than the document's internal pagination.

2

escapes the reach of 8 U.S.C. §1252(a)(2)(A)'s broad jurisdictional bar, even though "Congress obviously foreclosed judicial review." *M.M.V*, 1 F.4th at 1107; *see also Mendoza-Linares v. Garland*, 51 F.4th 1146, 1154 (9th Cir. 2022) (§1252(a)(2)(A)'s bar "cover[s] every aspect of the expedited removal process"). And once again, Plaintiffs cite zero authority in support of that position.

Plaintiffs' reasoning that the expedited removal statute's jurisdictional bars "do not apply to a definitional regulation that does not itself implement expedited removal," *see* Dkt. 72 at 12, is unpersuasive for multiple reasons. First, the jurisdictional bar at 8 U.S.C. §1252(a)(2)(A) is very "broad." *M.M.V*, 1 F.4th at 1107. "Congress could scarcely have been more comprehensive in its articulation of the general prohibition on judicial review of expedited removal orders." *Mendoza-Linares*, 51 F.4th at 1155. In particular, §1252(a)(2)(A)(iv) precludes review ("except as provided in §1252(e)") of any "polic[y] adopted by the Attorney General to implement the provisions of section 1225(b)(1)." This bar clearly covers the agency's policy choice to apply expedited removal to certain classes of aliens.[2] The Attorney General's "implementation" of this policy through a regulation defining "arriving alien" to include aliens paroled at ports of entry does not escape the broad reach of §1252(a)(2)(A)(iv); to conclude otherwise would frustrate Congress' "obvious[]" intent to "foreclose[] judicial review." *M.M.V*, 1 F.4th at 1107. Plaintiffs offer no explanation why Congress would allow generic review of this key policy decision apart from the narrow exception it carved out in §1252(e)(3) for systemic challenges. Plaintiffs' argument would require the Court to conclude that any "definitional" portion of a regulation is not a "policy." But that makes little sense. And here, Congress specifically carved out from §1252(a)(2)(A)(iv)'s jurisdictional bar

---

[2] *See also* 8 U.S.C. §1252(a)(2)(A)(ii) (similar jurisdictional bar precluding review of "a decision by the Attorney General to invoke the provisions of [section 1225(b)(1)]").

timely challenges brought under §1252(e)(3) to "regulation[s]" without qualification. 8 U.S.C. §1252(e)(3)(A)(ii); *see MRNY*, 2026 WL 1792978, at \*8 (noting that "Section 1252(e)(3) contemplates review of a specific written instrument," like a "regulation"). It would not have needed to broadly carve out all regulations for review under strict conditions if §1252(a)(2)(A)(iv) somehow did not prohibit review of certain regulations otherwise.

Second, the regulatory history supports the Government's position. Soon after Congress enacted expedited removal in 1996, the Attorney General made a policy choice to include aliens paroled at ports of entry in the definition of arriving alien. The regulatory history is crystal clear that, in choosing to include parolees under the category of "arriving aliens," the Attorney General was implementing expedited removal for this group. *See Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures*, 62 Fed. Reg. 10,312, 10,313-14 (Mar. 6, 1997) (discussing "Classes Subject to Expedited Removal"). Indeed, the Attorney General stated her policy choice clearly: "At this time, the Department will apply the [expedited removal] provisions only to 'arriving aliens,' as defined in §1.1(q)." *Id.* at 10,313. And the Rule explicitly tied the arriving alien provision to expedited removal by citing 8 C.F.R. §235.3(b), which authorizes expedited removal and references the arriving alien regulation. *Id.* at 10,314 ("The provisions contained in §235.3(b) of this interim rule will apply for now only to arriving aliens."). Section 235.3(b) was adopted simultaneously with the arriving alien regulation in the same rule that became effective in 1997. Thus, from its inception 8 C.F.R. §1.2 has been tied to the "implementation" of expedited removal.

Finally, it is telling that those who commented almost 30 years ago on the proposed regulation's inclusion of aliens paroled at ports of entry clearly understood—whatever their view of the proposal might be—that the Attorney General included such aliens in the "arriving alien"

4

definition to "implement" expedited removal for these aliens. For example, as Plaintiffs stated in their motion for summary judgment, two commenters made the argument that "including paroled individuals as arriving aliens *who would therefore be exposed to expedited removal* as noncitizens 'arriving in the United States'" is inconsistent with the INA. Dkt. 55-1 at 46 (emphasis added); *see* Dkt. 55-13 (Li Decl.) at 4, ¶19 & Ex. O at 198 ("The INS cannot circumvent clear Congressional intent to except parolees (and those admitted) to summary removal *by categorizing them as "arriving aliens."*) (emphasis added); *id.*, ¶ 20 & Ex. P at 223 (same). Another commenter, an immigration rights organization, plainly recognized the Attorney General was implementing expedited removal through the arriving alien definition. *See* Dkt. 69-1 (Anderson Decl.) at 2, ¶6 & Ex. B at 13 ("A broader definition [of arriving alien], to include persons found entering at unauthorized points, *would subject aliens to new expedited proceedings ….*") (emphasis added).[3]

As noted above, Plaintiffs themselves—before they had to craft an argument to avoid §1252(a)(2)(A)'s reach—characterized the arriving alien provision as one which "exposes" paroled arriving aliens to expedited removal. *See* Dkt. at 55-1 at 33. Regardless of Plaintiffs' attempt to distance themselves from their own words, *see* Dkt. 72 at 13 n.2, their *initial* position on this point was the correct one. As they stated previously in their amended complaint, "[t]he breadth of 8 C.F.R. §1.2's definition … means that, via 8 C.F.R. §235.3, *more classes of individuals are subject to expedited removal.*"[4] Dkt. 21 at 52, ¶176 (emphasis added). That is precisely what the Attorney General intended in 1997 when she enacted the arriving alien

---

[3] Plaintiffs protest that §1.2 is "far broader than expedited removal" or arriving aliens, *see* Dkt. 72 at 13, but that has no relevance here.

[4] Plaintiffs indeed are "masters of their complaint," *see* Dkt. 72 at 12; their characterization of §1.2 in their amended complaint supports Defendants' position.

regulation to implement her decision to apply expedited removal to aliens paroled at ports of entry pursuant to the "arriving in" authority at 8 U.S.C. §1225(b)(1)(A)(i).

**B.      Plaintiffs' Challenge is Time-Barred Under 8 U.S.C. §1252(e)(3)(B).**

**1.      Section 1252(e)(3)(B)'s 60-day Deadline is not Subject to Equitable Tolling Because it is Jurisdictional.**

Next, Plaintiffs argue that, even assuming 8 U.S.C. §1252(a)(2)(A) applies here, 8 U.S.C. §1252(e)(3) authorizes review over their challenge to the arriving alien regulation despite the untimeliness of their claim under §1252(e)(3)(B) because the 60-day deadline can and should be equitably tolled. Dkt. 72 at 14. Plaintiffs "recognize that the D.C. Circuit previously held that Section 1252(e)(3)(B)'s deadline is jurisdictional" and thus not subject to tolling, Dkt. 55-1 at 23. Yet they claim the Supreme Court has "effectively overrule[d]" that precedent. *Id.* In fact, however the D.C. Circuit just reaffirmed it jurisdictional ruling stating that §1252(e)(3)(B)'s deadline "is jurisdictional." *See MRNY II*, 2026 WL1792978, at *8. This Court need go no further, and should dismiss Plaintiffs' challenge to the arriving alien regulation.

1. In any event, Plaintiffs' argument that Circuit precedent has been overruled is fatally flawed because they fail to address the impact of 8 U.S.C. §1252(a)(2)(A)'s jurisdictional preclusion on §1252(e)(3). Nowhere in their response do Plaintiffs contest the D.C. Circuit's holding that §1252(a)(2)(A) is a jurisdictional bar. Nor could they. The Supreme Court itself has referred to §1252(a)(2)(A) as one example of a statutory provision in the INA that uses the "plainly jurisdictional language" of "no court shall have jurisdiction." *Santos-Zacaria v. Garland*, 598 U.S. 411, 418 & n. 5, 6 (2023); *see also Riley v. Bondi*, 606 U.S. 259, 274 (2025) (specifically pointing to §1252(a)(2)(A) as a "logical home[] for a true jurisdictional provision"). The fact that §1252(a)(2)(A)'s bar is jurisdictional is critical because that bar "conditions jurisdiction on satisfaction of the requirements of subsection (e)" including §1252(e)(3)(B). *M.M.V.,* 1 F.4th at

6

1109. None of the Supreme Court cases Plaintiffs rely on can reasonably be interpreted as irreconcilable with *M.M.V.* because none of them involved a jurisdictional-divesting statute like §1252(a)(2)(A) linked to a statutory time limit.

For example, Plaintiffs' discussion of *Harrow* fails to engage with Defendants' point that the jurisdictional provision containing the cross-reference in that case (28 U.S.C. §1295(a)(9)), was a jurisdictional-*granting* provision and therefore distinguishable from §1252(a)(2)(A). *See* Dkt. 69 at 20-22. Instead, Plaintiffs summarily state that *Harrow* makes Defendants' argument "untenable" because a deadline does not become jurisdictional "merely because a jurisdictional provision cross-references the subsection housing it." Dkt. 72 at 18. But that skirts the issue of the difference in jurisdictional statutes between *Harrow* and this case. As Defendants explained in their response, "an untimely suit under §1252(e)(3) cannot logically create jurisdiction if Congress has shut off jurisdiction in the first place through §1252(a)(2)(A)."  Dkt. 69 at 22. In short, *Harrow* is not irreconcilable with *M.M.V.* because it involved a jurisdiction-*granting* statute cross-referencing the statutory deadline. *Riley* is even more inapposite because the statutory deadline at issue in that case—§1252(b)(1) (30-day deadline for the filing of a petition for review)—is not referenced in a jurisdictional statute at all. 606 U.S. at 275-76.

Plaintiffs' contention that Defendants' "logic ... would make much of §1252 jurisdictional," *see* Dkt. 72 at 16, is not true. Defendants' argument is based on §1252(a)(2)(A)'s cross-reference to §1252(e) and does not implicate other provisions in §1252. The Supreme Court's decision in *Santos-Zacaria*, 598 U.S. 411, offers no support for Plaintiffs' assertion. There, the Court rejected a different argument by the Government in a case not involving a truly jurisdictional statute or discussing the effect of a cross-referenced exception. Instead, the issue was whether the INA's exhaustion statute at §1252(d)(1) was a jurisdictional rule. In finding it was

7

not, the Court rejected the Government's argument "that §1252(d)(1) is jurisdictional simply because it falls within § 1252," reasoning that "even if some provisions in a statutory section qualify as jurisdictional, that does not suffice to establish that all others are." *Id.* at 422-23. Defendants are not making that argument here, and the argument they are making does not "make much of §1252 jurisdictional."[5]

*Boechler* is also distinguishable on the basis that it involved a jurisdictional-*granting* provision linked to a time limit. Unlike *Boechler*, there is no ambiguity that §1252(a)(2)(A) precludes jurisdiction, and that an untimely suit under §1252(a)(3)(B) lacks any basis of jurisdiction. Plaintiffs once again ignore this critical difference. They claim that "Defendants' only response" is based on the unique statutory interpretation question at issue in *Boechler*. Dkt. 72 at 18. This ignores part of Defendants' argument. *See* Dkt. 69 at 23. To be sure, Defendants distinguish *Boechler* based on the "awkward structure" of the provision at issue, but that was not their "only response." *Id.* As Defendants argued, "[m]ore fundamentally, like *Harrow*, *Boechler* is distinguishable because it involved a jurisdictional-*granting* provision linked to a time limit." Dkt. 69 at 23. Plaintiffs have no answer to that point.

Plaintiffs also swing and miss on the final Supreme Court case they contend is "irreconcilable" with *M.M.V.*: *Wilkins v. United States*, 598 U.S. 152 (2023). *See* Dkt. 72 at 17 (relying on the "clear statement" rule). That case stands for the unremarkable proposition that the Quiet Title Act's 12-year time limit for bringing a claim against the United States is a nonjurisdictional claims-processing rule where "[n]othing about § 2409a(g)'s text or context gives reason to depart" from the normal presumption that "most time bars are nonjurisdictional." 598

---

[5] For the same reasons, Plaintiffs' similar argument in the context of their discussion of *Riley*, *see* Dkt. 72 at 18, is meritless.

U.S. at 158-59. The Court explained that "[t]he Quiet Title Act's jurisdictional grant is in 28 U.S.C. § 1346(f), well afield of § 2409a(g). And nothing conditions the jurisdictional grant on the limitations period or otherwise links those separate provisions." *Id.* at 159 (cleaned up). In contrast, and as this Circuit held in *M.M.V.*, given the plain jurisdictional language of §1252(a)(2)(A) and its conditioning of jurisdiction on the satisfaction of the 60-day deadline, the "clear-statement rule" is satisfied. 1 F.4th at 1109. Given the differing statutory schemes, *Wilkins* can hardly be read to overrule *M.M.V.*

In sum, none of the cases Plaintiffs rely on come anywhere close to meeting the "irreconcilable" standard because they do not involve a jurisdictional bar analogous to §1252(a)(2)(A) which conditions jurisdiction on the satisfaction of a statutory deadline.

2. Finally, Plaintiffs' contention that the D.C. Circuit in *M.M.V.* erred by relying on 8 §1252(e)(1), *see* Dkt. 72 at 14-15, fails for multiple reasons. First, as a preliminary matter, *M.M.V.* remains binding precedent and Plaintiffs' disagreement with that Court's statutory analysis does not provide a basis for declining to follow it. Second, regardless of §1252(e)(1), §1252(a)(2)(A) refers directly to §1252(e)(3) by cross-referencing §1252(e) generally. Thus, *M.M.V.*'s conclusion that §1252(e)(3)(B)'s 60-day time limit is jurisdictional is not contingent on the language of §1252(e)(1) but follows directly from §1252(a)(2)(A)'s cross-reference. 1 F.4th at 1109 ("Subsection [1252(a)(2)(A)] thus conditions jurisdiction on satisfaction of the requirements of subsection (e)").

Third, the D.C. Circuit's statutory analysis is right, and the Plaintiffs' is wrong. Plaintiffs concede that "Congress used jurisdictional language in § 1252(e)(1)" when it provided that "*no court* may enter declaratory, injunctive, or other equitable relief in any action pertaining to an order to exclude an alien in accordance with section 1225(b)(1) …." Dkt. 72 at 15 (emphasis added).

9

They contend, however, that §1252(e)(1)'s language covering "any action pertaining to an order to exclude an alien in accordance with section 1225(b)(1)" does not apply to this case. *Id.* But Plaintiffs' challenge in this case is indistinguishable from that in *M.M.V.*, which also involved a "facial challenge" to the Government's policy and procedures for expedited removal. *See* 1 F.4th at 1109 (challenging USCIS's credible fear procedures which are part of §1225(b)(1)'s expedited removal procedures). And further still, Plaintiffs' claims *do fall* within the statutory language Their request for relief in their amended complaint clearly implicates this language when they ask the Court to "[e]njoin Defendants from applying expedited removal to noncitizens who have previously been granted parole at a port of entry" and "[e]nter an order vacating the order of expedited removal of any member of a Plaintiff organization wrongfully subjected to expedited removal as a consequence of Defendants' action(s)." Dkt. 21 at 54 (prayer for relief).

For all these reasons, Plaintiffs fail to show that *M.M.V.* has been overruled. Therefore, their challenge to the arriving alien regulation is untimely and should be dismissed.

### 2.    Alternatively, Section 1252(e)(3)(B) is not Subject to Equitable Tolling Because it is a Mandatory Deadline.

Even if the Court somehow determines that *M.M.V.* is not controlling and the 60-day deadline is not jurisdictional, it should conclude the deadline is mandatory and not subject to equitable tolling. Indeed, much of *M.M.V.*'s jurisdictional analysis also supports Defendants' position that §1252(e)(3)(B)—at a minimum—is a mandatory rule. *See* Dkt. 69 at 20-21 (discussing text and structure of §1252(a)(2)(A), (e)).

The "text, structure, and context" demonstrate there are 'good reasons' to conclude that tolling should not be available." *Enbridge Energy, LP v. Nessel*, 608 U.S. __, 146 S. Ct. 1074, 1084-85 (2026). First, with regard to the text, Plaintiffs do not dispute the "emphatic" language of §1252(e)(3)(B), which supports strict enforcement of the rule. *See* Dkt. 72 at 20; *see also*

10

§1252(e)(3)(B) ("Any action instituted under this paragraph *must* be filed *no later than* 60 days after ….") (emphasis added). In *Enbridge*, the Supreme Court found that less emphatic language in a shorter statutory deadline (*i.e.*, "shall be filed within 30 days") "speaks in strict, mandatory terms." 146 S. Ct. at 1082. Although "this kind of mandatory language is not sufficient, on its own, to rebut the presumption of equitable tolling," it "is at least consistent with treating its deadline as mandatory and not subject to equitable tolling." *Id.*

Further, with respect to the text, the length of the deadline (here 60 days) and the fact that it is "focused on litigants' conduct, not courts' authority," does not require equitable tolling. *Enbridge*, 146 S. Ct. at 1084-85. As the Court explained in *Enbridge*, it "has found other deadlines that speak at least in part to a litigant's conduct, and with even shorter deadlines [than 30 days], not to be subject to equitable tolling when surrounding context led to that conclusion." *Id.* at 1085.

In addition to the text, further evidence of Congress's intent against tolling the 60-day deadline is reflected in the statutory structure and context of the provisions surrounding §1252(e)(3)(B). First, there is no dispute that §1252(a)(2)(A) is a jurisdictional bar and that it conditions jurisdiction on the satisfaction of the 60-day deadline. *M.M.V.,* 1 F.4th at 1109. The fact that §1252(e)(3) is a narrow exception to a jurisdictional bar strongly suggests that Congress intended for this exception, and its governing 60-day deadline, to be strictly construed. *See id.*

Further, the structure and context of §1252(e)(3) itself support this view. Congress directed that any challenge to the validity of the expedited removal system under §1252(e)(3)(A) be channeled to the District of Columbia and be filed "no later than 60 days after the date the challenged … regulation … is first implemented." 8 U.S.C. §1252(e)(3)(A) & (B). As the D.C. Circuit explained in *Am. Immigr. Lawyers Ass'n v. Reno* (*AILA*), 199 F.3d 1352, 1364 (D.C. Cir. 2000), "Congress imposed the 60-day limit on actions in order to cabin judicial review and to have

11

the validity of the new law decided promptly." Congress further reduced the normal 60-day deadline for appeals of district court decisions by requiring that an appeal of "an order issued by the District Court under [§1252(e)(3)] be filed not later than *30 days* after the date of issuance of such order." 8 U.S.C. §1252(e)(3)(C) (emphasis added). And, as if its concern about finality was not clear enough, Congress stated that "[i]t shall be the duty of the District Court, the Court of Appeals, and the Supreme Court of the United States to advance on the docket and to *expedite to the greatest possible extent* the disposition of any case considered under [§1252(e)(3)]." 8 U.S.C. §1252(e)(3)(D) (emphasis added).

"This highly detailed scheme matters" because it evidences Congress's goal of finality in resolving challenges to the validity of the system "promptly." *See Enbridge*, 146 S. Ct. at 1083; *AILA II*, 199 F.3d at 1364. "'[T]he nature of the subject matter' here underscores the unavailability of equitable tolling." *Enbridge*, 146 S. Ct. at 1084 (quoting *Arellano v. McDonough*, 598 U.S. 1, 14 (2023)). As with the statute in *Enbridge*, the expedited removal statutes at §1252(e)(3)(A)-(D) "have an 'obvious concern with efficiency,' and a 'general interest in avoiding prolonged litigation'" of systematic challenges. 146 S. Ct at 1084 (internal citations omitted). "Congress's desire for fast-tracked, narrowly cabined resolution of the legality of the expedited removal framework is inconsistent" with equitable tolling of §1252(e)(3)(B)'s deadline, *Vijender v. Wolf*, No. 19-CV-3337 (APM), 2020 WL 1935556, at *5 (D.D.C. Apr. 22, 2020), and "would undermine Congress's manifest interest in resolving" such challenges "early and conclusively."[6] *Enbridge*, 146 S. Ct. at 1084; *see also AILA II*, 199 F.3d at 1364.

---

[6] Defendants' argument is further supported by case law involving another statutory deadline in the INA with similar language, 8 U.S.C. §1252(b)(1). *See* Dkt. 69 at 26. In *Stone v. I.N.S.*, 514 U.S. 386, 390 (1995), the Supreme Court described the predecessor to §1252(b)(1), 8 U.S.C. §1105a(a) (1994)—which contained virtually identical language to §1252(b)(1)—as "mandatory and

In light of the text and overall structure and context of §1252(e)(3), there are "good reasons" to believe Congress did not want equitable tolling to apply to the 60-day deadline. *See Enbridge*, 146 S. Ct. at 1084-85; *Arellano*, 598 U.S. at 6-7 (2023) (the presumption is rebutted "if equitable tolling is inconsistent with the statutory scheme").

### 3.    Even if the 60-Day Deadline Could be Tolled, Plaintiffs Have Failed to Establish Due Diligence and Extraordinary Circumstances.

Alternatively, the Court should not toll the 60-day deadline because Plaintiffs have failed to show (1) due diligence in meeting the deadline; and (2) extraordinary circumstances preventing them from doing so, such that equitable tolling could be applied here. Plaintiffs allege that they could not challenge the 1997 arriving alien regulation until expedited removal "injured Plaintiffs for the first time in 2025" because of standing and ripeness issues. Dkt. 72 at 21. Assuming for the moment (but not conceding) that is true, Plaintiffs have not established due diligence.

At the very latest, the 60-day clock started ticking on March 25, 2025, the date when the last Challenged Action (DHS's Parole Termination Notice) became effective.[7] Plaintiffs, in fact, filed their original complaint a day earlier, on March 24, 2025, alleging that members of their organization who were paroled at ports of entry were subject to expedited removal and asking the Court to enjoin expedited removal. Dkt. 1 at 34. In that complaint, Plaintiffs raised various challenges to DHS's Challenged Actions including an *ultra vires* challenge, an arbitrary and

---

jurisdictional." *See* Dkt. 69 at 26. But *Riley* says nothing to cast doubt on its long-standing characterization of the 30-day deadline as "mandatory." 606 U.S. at 276-77.

[7] The 60-day deadline begins to run when the challenged action (the arriving alien regulation) is "first implemented." 8 U.S.C. §1252(e)(3)(B). Defendants preserve their position that the 60-day period began to run when the arriving alien regulation became effective on April 1, 1997. *See* Dkt. 26 at 33-34. That is consistent with the D.C. Circuit's recent holding that a challenge to the "written directives" must be filed within 60 days of when the directives was "first implemented"—here, in 1997. *MRNY II*, 2026 WL 1792978, at *8. Nevertheless, the Court need not even reach that issue to find Plaintiffs' challenge untimely.

13

capricious challenge, and a due process challenge. *Id.* Yet, they *did not raise* a challenge to the arriving alien regulation. *Id.*

Plaintiffs' only response is that they "raised that challenge shortly thereafter in their amended complaint, and before Defendants began relying on the regulations to subject paroled noncitizens to expedited removal." Dkt. 72 at 21. But even assuming the 60-day deadline for challenging the regulation somehow runs from the date the Challenged Actions were published, Plaintiffs filed their amended complaint challenging the arriving alien regulation on June 11, 2025. Dkt. 21 at 51-53. That was well beyond the 60-day deadline—108 days after the latest Challenged Action became effective (March 25, 2025) and 169 days after DHS issued the first Challenged Action (the January 23, 2025 Huffman Memorandum), which provided guidance to DHS officers on exercising expedited removal. *See MRNY II*, 2026 WL1792978, at *9 (finding challenge timely where Plaintiffs filed suit within 60 days of when the challenged written directives (including the Huffman Memorandum) "first took legal effect"). Plaintiffs offer no explanation for the untimeliness besides suggesting their delay was based on DHS not relying on the arriving alien regulation when it began applying expedited removal to paroled arriving aliens in 2025. *See* Dkt. 72 at 21. That explanation is confounding because Plaintiffs fail to explain why they assumed DHS was not applying the arriving alien regulation then, especially given that the regulation, in tandem with 8 C.F.R. §235.3, explicitly authorizes expedited removal of paroled arriving aliens. See *Nelson v. SEC*, 138 F.4th 514, 523 (D.C. Cir. 2025) ("Equitable tolling is not appropriate if the circumstance that stood in a litigant's way is a product of that litigant's own misunderstanding of the law or tactical mistakes in litigation.") (cleaned up). Moreover, Plaintiffs were certainly on notice that DHS officers had broad discretion to enforce expedited removal and nothing prevented

14

them from applying the arriving alien regulation to paroled arriving aliens in the future. Plaintiffs clearly fail to establish due diligence.

In short, Plaintiffs must clear several hurdles to establish that their challenge to the arriving alien regulation is timely. They fail at each step; their challenge should be dismissed.

## II.    Plaintiffs Cannot Establish Redressability.

Redressability is absent where "independent" legal authority would permit the challenged conduct to continue notwithstanding the requested relief. *Nat'l Wrestling Coaches Ass'n v. DOE*, 366 F.3d 930, 941 (D.C. Cir. 2004). Critically, Plaintiffs' response does not contest that: (1) this Court's August 1, 2025 stay order did not enjoin the Government from applying expedited removal to paroled arriving aliens pursuant to 8 C.F.R. §§1.2 and 235.3, *see* Dkt. 28 at 23 n.12; (2) the "breadth" of §1.2 covers expedited removal of paroled arriving aliens, Dkt. 21 at 52, ¶176; Dkt. 35 at 6:22-7:1; and (3) Defendants are currently applying such regulations to aliens paroled at ports of entry. *See* Dkt. 69 at 30. Given these undisputed facts, Plaintiffs cannot show it is "likely" that their members' alleged injury—being subject to expedited removal—will be "redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (quotation omitted).

1. At the threshold, Plaintiffs' arguments fail as a matter of law. In this context where DHS has wide enforcement discretion to apply the arriving alien regulations to aliens paroled at ports of entry it is irrelevant how often DHS applied those regulations in the past, *i.e.*, "for nearly 30 years before the Challenged Directives were issued," *see* Dkt. 72 at 23, or to what extent they are currently applying the regulations. DHS's enforcement discretion means that *any one* of Plaintiffs' paroled arriving alien members is subject to expedited removal at *any time*. Given this indisputable fact, it follows that Plaintiffs cannot establish that vacatur of the Challenged Actions will likely redress *any* of Plaintiffs' injuries. *See United States v. Texas*, 599 U.S. 670, 689-93 (2023)

(Gorsuch, J., concurring) ("A judicial decree rendering the Guidelines a nullity does nothing to change the fact that federal officials possess the same underlying prosecutorial discretion.").

2. In any event, Plaintiffs' record-based argument fails. They contend that the Court correctly found redressability was met because Defendants purportedly relied on 8 C.F.R. §§1.2 and 235.3 to apply expedited removal to paroled arriving aliens "in a vanishingly small number of cases" before the Challenged Actions. Dkt. 72 at 23. That characterization is dubious. *See* Dkt. 69 at 29 n.4.  And irrelevant too: the question here is not whether Plaintiffs' injury would be redressed based on DHS's past conduct. Plaintiffs are seeking *prospective* relief—not damages for past actions. The operative question under Article III is thus whether Plaintiffs' injury would "likely" be redressed *going forward* in the event of a favorable court ruling.[8] *See Lujan*, 504 U.S. at 561 (quotation omitted). Plaintiffs have provided no evidence that DHS—following the D.C. Circuit's stay denial—has not been applying expedited removal under the regulation to paroled arriving aliens as it did earlier in 2025, prior to the issuance of the stay order.[9] *See Lujan*, 504 U.S. at 561 (Plaintiffs bear the burden of establishing standing). In fact, as the many cases about the issue in

---

[8] Plaintiffs' argument based on a "vanishingly small number of cases" also ignores the fact that Administration priorities change over time. Once the current Administration canceled certain parole programs, there were hundreds of thousands of former parolees without lawful presence— a circumstance that did not exist previously. Given differing enforcement priorities, Plaintiffs fail to explain why it is accurate to compare, for standing purposes, the number of parolees subject to expedited removal at one point in time versus another point in time without taking into account the change in enforcement priorities.

[9] In their reply to Defendants' response to their statement of material facts (SOMF), Plaintiffs incorrectly claim Defendants' responses make Plaintiffs' assertions that their members have suffered or will suffer harm "due to Defendants' policies" in the Challenged Actions "undisputed." Dkt. 72-1, ¶¶3, 21, 28. But Defendants "disputed" these assertions in their response, *id.*, and continue to do so. Even if past harm were relevant, Plaintiffs have not and cannot establish that any harm from expedited removal arose from the Challenged Actions rather than the arriving alien regulations.

federal courts demonstrate, DHS has used and is using 8 C.F.R. §§1.2 and 235.3 to apply expedited removal to previously paroled arriving aliens.[10]

Plaintiffs' related argument that vacatur of the Challenged Actions "would likely redress at least some" of their injuries fails for similar reasons. *See* Dkt. 72 at 23. Because DHS can, and is, applying 8 C.F.R. §§1.2 and 235.3 to the same group of aliens after the Challenged Actions were stayed, Plaintiffs cannot establish their members' injury will likely be redressed by vacatur of the DHS Challenged Actions. Indeed, they still fail to demonstrate in their response which "part" of their members' injuries can be redressed. *See* Dkt. 72 at 22.[11]

3. Plaintiffs contest Defendants' reliance on case law finding a lack of redressability where the response of third parties to a court's ruling would impact whether Plaintiffs' injury would actually be redressed. Dkt. 72 at 26. But it is unclear why that distinction matters; those cases support the general point that redressability is absent where (as here) plaintiffs fail to challenge authority independently permitting the same conduct. It is, at best for Plaintiffs, merely speculative whether Defendants would "behave any differently" if the Challenged Actions were stayed, yet the arriving alien regulations were not. *See Scenic Am., Inc. v. DOT*, 836 F.3d 42, 50-53 (D.C. Cir. 2016).

---

[10] *E.g.*, *Karmamoldoyeva v. Warden*, 2026 WL 266459, at *6 (S.D. Cal. Feb. 2, 2026); *Montiel v. Raycraft*, 2026 WL 32076, at *3 (W.D. Mich. Jan. 6, 2026); *S.W. v. Noem*, 2025 WL 3754067, at *2,*5 & n.7 (S.D.N.Y. Dec. 29, 2025); *Rodriguez-Acurio v. Almodovar*, 811 F. Supp. 3d 274, 304-08 (E.D.N.Y. 2025); *E.V. v. Raycraft*, 2025 WL 3122837, at *7 (N.D. Ohio Nov. 7, 2025).

[11] Plaintiffs are also incorrect in attaching any relevance to Defendants' actions after this Court issued its stay order in August 2025. *See* Dkt. 72 at 23. Defendants have never conceded they could not proceed with expedited removal under the arriving alien regulation notwithstanding the Court's §705 stay; indeed, even Plaintiffs conceded a stay would not preclude Defendants from doing so. Dkt. 35 at 6:22-7:1. In any event, that issue is simply not relevant for purposes of redressability, especially given that Defendants have applied the regulation to paroled arriving aliens for months and continue to do so.

17

In any event, Plaintiffs acknowledge that one of the redressability cases Defendants cite does not involve third-party regulations but argue that it is "likewise inapposite" because the "unchallenged regulations purport to *permit*, not *require*" expedited removal to parolees. Dkt. 72 at 27 (citing *Nuclear Info. & Res. Serv. v. NRC*, 457 F.3d 941, 955 (9th Cir. 2006) (emphasis in original)). Yet this Circuit has found a lack of redressability even where the unchallenged regulations permitted discretion. Specifically, in *Doc Soc'y v. Rubio*, 141 F.4th 1273, 1278 (D.C. Cir. 2025), the D.C. Circuit held that because "a consular officer may still scrutinize a visa applicant's social media activities even if" a policy requiring visa applicants to provide their social-media accounts was vacated, Plaintiffs' alleged speech harms may not be redressed by a decision vacating the mandatory policy. That case refutes the mandatory vs. discretionary distinction.

In its opinion, this Court also appeared to rely on this distinction in distinguishing a serious of decisions by the D.C. Circuit finding a lack of redressability. Dkt. 41 at 37 (citing *Kaspersky Lab, Inc. v. United States Dep't of Homeland Sec.*, 311 F. Supp. 3d 187, 219 (D.D.C.)), *aff'd*, 909 F.3d 446 (D.C. Cir. 2018) (collecting cases). But that mandatory/discretionary distinction breaks down in the context of Executive enforcement discretion. The Court's stay order did not stay or enjoin the arriving alien regulation. Thus, it did "nothing to change the fact that federal officials possess the same underlying prosecutorial discretion" to apply expedited removal to any paroled arriving alien at any time. *See Texas*, 599 U.S. at 691 (Gorsuch, J., concurring). As such, the stay order provides *no relief* to Plaintiffs because they cannot point to even one of their members paroled at a port of entry who is protected by the stay order from DHS exercising its discretion to apply expedited removal under the arriving alien regulations.

4. Nor can Plaintiffs establish redressability under the purported "procedural-right framework" established in *Massachusetts v. EPA*, 549 U.S. 497 (2007). *See* Dkt. 72 at 23-25. As

18

this Circuit explained in *Ctr. for Biological Diversity v. U.S. Dep't of Interi*or, 563 F.3d 466 (D.C. Cir. 2009), "*Massachusetts* stands only for the limited proposition that, where a harm is widely shared, *a sovereign*, suing in its individual interest, has standing to sue where that sovereign's individual interests are harmed, wholly apart from the alleged general harm." *Id.* at 476–77 (emphasis added); *id.* at 476 ("it was 'of considerable relevance that the party seeking review ... is a sovereign State and not, as it was in *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992), a private individual'") (quoting *Massachusetts*, 549 U.S. at 518). "States are not normal litigants for the purposes of invoking federal jurisdiction." *Massachusetts*, 549 U.S. at 518. When a state sues in its sovereign capacity, it "'has an interest independent of and beyond the titles of its citizens, in all the earth and air within its domain." *Id.* at 518-19 (cleaned up).

Here, Plaintiffs are not states or other Governmental sovereigns seeking to protect sovereign interests. And they fail to cite any supporting authority for their argument that they, as private litigants, may invoke *Massachusetts*' provision for "special solicitude." "Outside of the very limited factual setting of *Massachusetts,* the Supreme Court's decision in [*Lujan*] sets forth the test for standing." *Ctr. for Biological Diversity*, 563 F.3d at 477; *see also California v. Trump*, 613 F. Supp. 3d 231, 242 (D.D.C. 2020) ("it is the unique and sweeping interests of the states, and the fact that a state—and only a state—may assert 'quasi-sovereign interests,' that affects the nature of the Court's Article III analysis").[12] Plaintiffs have failed to meet that test.

5. Because the Court lacks jurisdiction over Plaintiffs' challenge to the arriving alien regulation, *see* Section I, and thus any harms to Plaintiffs' members from the Challenged Actions

---

[12] *See also Lighthiser v. Trump*, No. CV 25-54-BU-DLC, 2025 WL 2930569, at *7 (D. Mont. Oct. 15, 2025) ("Here, because the youth Plaintiffs are private citizens alleging substantive constitutional claims, the Court cannot 'extend [ ] the holding of *Massachusetts v. EPA* to the present circumstances.'") (internal citation omitted).

are not redressable, the Court lacks jurisdiction to provide Plaintiffs any effective relief. The amended complaint should therefore be dismissed in its entirety and summary judgment granted to Defendants. Plaintiffs disagree, claiming their injuries "are nevertheless redressable" in those circumstances because the Court could issue a declaration that paroled arriving aliens are not subject to expedited removal. Dkt. 72 at 25. Plaintiffs reason that such a declaration would have "legal value" because public officials "would abide" by that interpretation though not legally binding. *Id.* Plaintiffs' analysis falters on both factual and legal grounds.

On the facts, the Court has already issued such an opinion finding the arriving alien regulation *ultra vires*, and Defendants have lawfully continued to apply expedited removal under the regulations. There is no reason to believe that Defendants will change course if the Court issues a similar ruling on summary judgment. On the law, Plaintiffs' theory is inconsistent with Supreme Court precedent reasoning that "[i]t is a federal court's judgment, not its opinion, that remedies an injury; thus, it is the judgment, not the opinion, that demonstrates redressability." *Haaland v. Brackeen*, 599 U.S. 255, 294 (2023). Given Plaintiffs' untimely challenge to the arriving alien regulation, they could "hope for nothing more than an opinion" stating that the Challenged Actions are *ultra vires*—not a judgment barring DHS's use of those regulations. *See id.*

## III.    The "Arriving Alien" Regulation at 8 C.F.R. §1.2 is a Proper Interpretation of the "Arriving in" Provision.

1. Plaintiffs double-down on their error of construing the term "arriving in" without regard to the immigration and statutory context in which Congress legislated. They contend that Defendants "cite only the parole statute" in support of their interpretation. Dkt. 72 at 28. But the parole statute, 8 U.S.C. §1182(d)(5)(A), is critical because it makes crystal clear that parole "shall not be regarded as an admission." Parole "allows the Government to pause the inspection at the border and defer it to a later time without having to detain the alien pending a final admissibility

20

decision." *Blanche v. Lau*, 609 U.S. --, 2026 WL 1791339, at \*3 (June 23, 2026). As Defendants explained in their cross-motion, an alien granted parole at a port of entry remains an unadmitted alien and hence, in the status of an alien "arriving in" the United States. Dkt. 69 at 33. Plaintiffs do not dispute the former point; instead, they reject the notion that "arriving" refers to a status and insist that it must be read only as a historical event. Dkt. 72 at 29-30. That is wrong. "[A]lthough a paroled alien is physically allowed to enter the country, the *legal status* of the alien is the same as if he or she were still being held at the border waiting for his or her application for admission to be granted or denied." *Duarte v. Mayorkas*, 27 F.4th 1044, 1058 (5th Cir. 2022) (emphasis added). In other words, "for legal purposes, the parolee is [] 'an applicant for admission *coming or attempting to come* into the United States at a port-of-entry' even if, in actuality, a paroled alien has already physically come into the United States." *Id.* at 1059-60 (emphasis added) (quoting 8 C.F.R. §1.2). "This is why a parolee normally fits the regulatory definition of an 'arriving alien'— for legal purposes." *Id.* at 1059.

In its August 1, 2025 decision, the Court distinguished *Duarte* and other similar cases by reasoning that "*Duarte* just said that parole allows a noncitizen 'physically ... to enter the country' even though his 'legal status' remains 'the same as if he or she were still being held at the border waiting for his or her application for admission to be granted or denied.'" Dkt. 41 at 51 (quoting *Duarte*, 27 F.4th at 1058). But *Duarte* says more than that. As part of the entry fiction, an alien paroled at a port of entry not only remains an applicant for admission, the alien is considered to be "coming or attempting to come into the United States." *Duarte*, 27 F.4th at 1059-60. In other words, they have the status of an alien "arriving in" the United States for purposes of §1225(b)(1).

Contrary to Plaintiff's argument, the BIA decision in *Matter of C-P-Y-*, 29 I.&N. Dec. 610 (BIA 2026)—which interpreted the serious nonpolitical crime eligibility bars for asylum and

21

withholding of removal at 8 U.S.C. §§1158(b)(2)(A)(iii), 1231(b)(3)(B)(iii)— provides no support for their interpretation. Dkt. 72 at 29. The statutory terms at issue in *C-P-Y-*, "arrival" and "arrive," are found in immigration relief bars having nothing to do with expedited removal or parole. Furthermore, the term, "arriving," has a specialized meaning in immigration law based on statutory history and case law. For similar reasons, the Supreme Court's recent decision interpreting the asylum statute's language, "arrives in the United States," 8 U.S.C. § 1158(a), in *Mullin v. Al Otro Lado*, --- U.S. ---, 2026 WL 1825741 (June 25, 2026), is not relevant because it did not involve aliens paroled at ports of entry. Rather, the Court held that "an alien who is standing in Mexico does not 'arriv[e] in the United States' by attempting, and failing, to set foot in this country." *Id.* at \*6. The Court reasoned that the specific "context in which the phrase 'arrives in'[] is used … supports an ordinary-meaning reading." *id.* at \*3, *i.e.*, "[a] person arrives in" the United States "only when he enters it." *Id.* at \*6. That analysis has no relevance here given the long-standing legal fiction that a paroled arriving alien is not considered to have "entered" the United States and the specialized meaning of the term "arriving" in immigration law as we explain below.

2. The Government's position is reinforced by Supreme Court precedent pre-IIRIRA holding that an alien's parole at a port of entry did not exempt the alien from former "exclusion proceedings." Paroled "arriving aliens" were afforded fewer procedural protections in the removal process because their parole was not considered to be an "entry" under the exclusion statute. *Leng May Ma v.* Barber, 357 U.S. 185, 186-88 (1958). Similarly, because arriving aliens who are paroled at ports of entry are not considered to have made an entry or admission, it follows that Congress intended such aliens to be afforded fewer procedural protections.

Plaintiffs' primary response is that these pre-IIRIRA exclusion cases turned on whether or not an alien had effected an "entry." *See* Dkt. 72 at 31, 33. While that is true, Plaintiffs fail to

22

grapple with the fact that, under the former exclusion statute, an immigration officer had authority "to determine whether an *arriving alien* who had been detained for further inquiry … shall be allowed to enter or shall be excluded and deported." 8 U.S.C. §1226(a) (1994) (emphasis added). Because immigration judges (in exclusion proceedings) and courts (on habeas review) concluded that aliens paroled at ports of entry were properly subject to exclusion proceedings, they necessarily determined that such aliens were "arriving;" otherwise those aliens would not qualify for exclusion proceedings in the first place as "arriving alien[s]." *See id*.

More generally, these cases inform the interpretation of "arriving alien" by demonstrating the scope of procedural rights of paroled arriving aliens in the former removal process. As noted, parolees were placed in exclusions proceedings with fewer procedural rights than aliens in deportation proceedings. Plaintiffs fail to explain why Congress would change this decades-old treatment of paroled arriving aliens. Instead, they confusingly cite *Leng May Ma*. Dkt. 72 at 32. But that case directly supports Defendants' position as noted above. Plaintiffs latch on to the Court's use of "arrived" in the factual background of the case describing a historical event—*i.e.*, that the alien "is a native of China who *arrived* in this county in May 1951." *Leng May* Ma, 357 U.S. at 186 (emphasis added). But their attempt to glean from the Court's singular use of the term "arrived" the conclusion that a paroled arriving alien is not "arriving" for purposes of §1225(b)(1) is meritless and entirely misses the central point of that case.[13] *See* Dkt. 72 at 32.

Plaintiffs do not quarrel with the assertion that Congress is presumed to have legislated with awareness of prior case law holding that an alien's parole at a port of entry does not exempt the alien from exclusion proceedings. Dkt. 72 at 33. That precedent is highly informative because,

---

[13] Likewise, Plaintiffs' reliance on a factual statement in the introduction of the decision in *Sale v. Haitian Centers Council*, Inc., 509 U.S. 155, 158-59 (1993), *see* Dkt. 72 at 32, is of no avail.

in interpreting "arriving alien," it is presumed Congress meant to apply a similar framework to the current scheme; *i.e.*, the parole of an alien at a port of entry does not exempt the alien from expedited removal proceedings.

Finally, Plaintiffs' claim that Congress could have chosen other statutory terms if it intended for paroled arriving aliens to be subject to expedited removal ignores Congress's purpose for expedited removal. *See* Dkt. 72 at 33. For example, using the term "applicants for admission" would have swept in *all* unadmitted aliens who illegally enter the country regardless of their length of time in the U.S. *See id.* at 29, 33. While aliens paroled at ports of entry are "applicants for admission," they also fall within the subset of that group subject to expedited removal under §1225(b)(1)(A)(i). Simply put, Congress used "arriving" to apply expedited removal to a subset of applicants for admission, including paroled arriving aliens. *See Jennings v. Rodriguez*, 583 U.S. 281, 287 (2018). Likewise, Plaintiffs' suggestion that Congress could have used the term "entry" ignores the fact that in IIRIRA Congress chose to replace the concept of "entry" with that of "admission" in order to avoid rewarding aliens who are able to successfully elude authorities at the border and enter the U.S. *See* H.R. Rep. No. 104–469 (1996), at 225, 1996 WL 168955 (1996). On the other hand, Congress was aware of the term "arriving" in the former exclusion statute and the voluminous case law applying that statute to aliens paroled at ports of entry.

3. Plaintiffs fare no better with their subsidiary arguments, none of which advance their position. They once again trot out the "oddity" argument maintaining their position that it would be unseemly to treat parolees worse than illegally entering aliens who have been in the U.S. more than two years. Dkt. 72 at 34-35. Even though a D.C. Circuit stay panel rejected a similar argument last December, *see Make the Rd. New York v. Noem* (*MRNY I*), No. 25-5320, 2025 WL 3563313, at *23 (D.C. Cir. Nov. 22, 2025), Plaintiffs hardly address that case, relegating their discussion to

24

a footnote and claiming only that the panel's reasoning "addresses substantive due process," not the statutory "arriving" question. Dkt. 72 at 34 n.14. But the D.C Circuit panel explained in detail why these two class of aliens are "simply in different positions," not only as to substantive due process but also because they face a "lower risk of erroneous removal" from expedited removal. *MRNY I*, 2025 WL 3563313, at *23-24.

Nor do Plaintiffs make any headway in relying on a "regulatory change restricting adjustment of status." Dkt. 72 at 35. Plaintiffs duck the Government's point that the very cases they cite applied 8 C.F.R. §1.2 to conclude that the aliens were arriving aliens, and therefore subject to the adjustment bar at 8 C.F.R. §245.1(c)(8). *See*, *e.g.*, *Bona v. Gonzales*, 425 F.3d 663, 667–68 (9th Cir. 2005). Instead of responding to the §1.2 analysis in this line of cases, Plaintiffs claim that their "point" is only "structural" in that §1.2 caused "a problem in the first place." Dkt. 72 at 35. But the circuits that found a problem with the adjustment bar at §245.1(c)(8) invalidated that bar; they did not invalidate §1.2 as *ultra vires*. That was mainly because aliens' counsel did not challenge the application of §1.2 in these cases, thus supporting Defendants' point that it was well-settled for decades that §1.2 properly defined a paroled arriving alien as an "arriving alien."

Finally, 8 C.F.R. §208.4(a)(5)(iv) sheds no light on the statutory term "arriving." That provision just follows the statutory language requiring the alien to file an asylum application "within 1 year after the date of the alien's *arrival* in the United States." 8 U.S.C. §1158(a)(2)(B) (emphasis added). Here, read in context, "arrival" is referring to an event; indeed, it would be absurd—in light of Congress's plain intent to limit asylum eligibility—to read that term otherwise. Contrary to Plaintiffs' claim, *see* Dkt. 72 at 34, that interpretation does not conflict with Defendants' reading of "arriving" in §1225(b)(1)(A)(i) as a status because of the differing contexts. Indeed, that was precisely what the Fifth Circuit found in *Bouchikhi* when it explained

that "[n]otwithstanding his subsequent status as an 'arriving alien,' Bouchikhi's 'arrival' for purposes of 8 U.S.C. § 1158(a)(2) and 8 C.F.R. § 1208.4(a)(2)(ii) occurred and was complete at the latest" on the day he entered the United States. *Bouchikhi v. Holder*, 676 F.3d 173, 178 (5th Cir. 2012). Plaintiffs fail to engage with the part of *Bouchikhi* that characterizes a paroled arriving alien as having the "status" of an "arriving alien" under §1.2.

4. Nothing Plaintiffs point to in the legislative history evinces Congress's intent to exclude parolees from the expedited removal process either. *See* Dkt. 72 at 36-40.

First, Plaintiffs do not contest Defendants' assertion that, despite Plaintiffs' declarant's characterization of the legislative history, *see* Schacher Decl., Dkt. 55-12, the research material accompanying Schacher's declaration does not support her use of the modifier "physical" or "physically" to describe the aliens' seeking entry or admission who would be subjected to expedited removal. *See* Dkt. 72 at 36; Dkt. 72-1, ¶¶192-194 (Plaintiffs failing to cite one bill that used the term "physical" or "physically"). Those characterizations are not in the legislative text but are subjective descriptors used by Plaintiffs' own declarant. *See id*.

Second, Plaintiffs fail to rebut Defendants' point that many of the bills Plaintiffs rely on from the 1980's and 1990's contained summary removal procedures for aliens "seeking entry," *see* Dkt. 55-12 at 4-9 (Schacher's Declaration describing such bills) meaning that Congress intended those summary procedures to apply to paroled arriving aliens. *See* Dkt. 72 at 36-37; *see also* Dkt. 55-1 at 35-38. Plaintiffs do not dispute these bills contained such provisions covering aliens seeking entry. *See* Dkt. 72 at 36-37. That is significant because *Plaintiffs themselves* in other parts of their brief admit that such summary removal provisions would encompass aliens paroled at ports of entry. *See* Dkt. 72 at 33 (stating "[h]ad Congress intended to subject parolees to expedited removal … It could have keyed expedited removal to *lack of 'entry'*") (emphasis added).

26

There is simply no indication Congress intended to deviate from the well-established entry doctrine by excluding parolees from these expedited procedures.

Plaintiffs' attempt to salvage their position by asserting that Congress proposed granting Cuban and Haitian parolees temporary resident status in some of the bills sponsored by Rep. Mazzoli, *see* Dkt. 72 at 37, does not rebut the conclusion—based on the "seeking entry" language of several bills—that Congress consistently intended to apply summary proceedings to paroled arriving aliens. Nor do the statements by Rep. Mazzolli undermine that conclusion. *See id.*

Likewise, Plaintiffs struggle to explain away AEDPA's "expedited exclusion" provision that would have applied to aliens "seeking entry," *see* AEDPA, §422, such as paroled arriving aliens. *See* Dkt. 72 at 37-38; *see also* Dkt. 55-1 at 38, 39. Instead of addressing the text of that summary removal provision, Plaintiffs recycle isolated statements from committee reports that state the obvious—Congress was concerned about aliens physically at the border who lack valid documentation. *See* Dkt. 72 at 38. But its concern about those aliens does not equate to the exclusion of paroled arriving aliens.

Third, Plaintiffs have no answer to Defendants' point that Congress would have a strong interest in removing paroled arriving aliens quickly and efficiently in mass migration emergencies other than to argue in a terse footnote that "[t]his is a policy concern, not a statutory construction argument," Dkt. 72 at 37 n. 16. That is inconsistent with Plaintiffs' brief, which presses policy arguments, including the alleged unfairness in treating paroled arriving aliens worse than certain aliens who illegally enter. *See* Dkt. 72 at 34-35. Regardless, given the "Mariel Boatlift" crisis and other migration crises in the 1980's, the ability of immigration authorities to remove paroled arriving aliens quickly and efficiently is consistent with Rep. Mazzoli's proposal to apply summary exclusion to aliens "seeking entry," and informs the interpretation of "arriving in."

27

5. Finally, the administrative record reinforces Defendants' points above. In particular, Plaintiffs have no response to Defendants' argument that none of the Congressional leaders objected to the "arriving alien" regulation's inclusion of aliens paroled at ports of entry. *See* Dkt. 72 at 40-41. That is a glaring omission. If Congress' leaders believed IIRIRA did not authorize expedited removal of paroled arriving aliens, they would certainly have submitted comments given the clear language in the proposed regulation. Take, for example, the comments of Senators Kennedy and Wellstone who generally advocated for a limited application of expedited removal and more process for aliens. They praised the former INS's decision to *not* invoke the Designation Provision in the proposed regulation, while also noting that other parts of the Rule regarding the one-year deadline and protections for refugees "present serious concerns." Dkt. 55-13, ¶22. & Ex. R at 264. Yet tellingly, the Senators raised no "serious concern[]" as to the Rule's application of expedited removal to paroled arriving aliens. *Id.* In fact, Plaintiffs fail to point to a single Congressman who took issue with this aspect of the proposed arriving alien rule or the interim regulation. *See* Dkt. 72 at 40-41; *see also* Dkt. 72-1, ¶¶183, 185.

To summarize, the statutory and historical context—including the pre-IIRIRA bills proposing summary removal procedures based on "seeking entry," as well as the unwavering case law in the former exclusion context treating aliens paroled at ports of entry as arriving aliens who have not effected an entry—is informative for interpreting §1225(b)(1)(A)(i)'s "arriving in" language.  What Plaintiffs are essentially proposing is that Congress—by using the term "arriving alien"—changed its approach from AEDPA and earlier bills and further changed the prior framework in which paroled arriving aliens were given fewer procedural rights with regard to their removal based on their status as aliens standing at the border. That proposed change is simply unpersuasive given the lack of any discussion in the legislative history evidencing Congress's

28

intent to deviate from the prior entry doctrine jurisprudence.[14] In short, Plaintiffs have it backwards. Given the statutory and historical context for paroled arriving aliens, the presumption is that §1225(b)(1)'s "arriving in" language includes such aliens.[15]

## IV. Plaintiffs Lack Standing Over the Challenged Actions; Alternatively, the Challenged Actions are Consistent with the INA.

As explained, Plaintiffs lack standing to challenge (1) the Huffman Memorandum; (2) the February 18, 2025 ICE Directive; and (3) the CHNV Termination Notice, because they lack Article III redressability. *See*, *supra*, Section II. Defendants incorporate by reference this briefing, as well as their prior briefing in this case on redressability. *See* Dkt. 26 at 29-30; Dkt. 69 at 27-32. On the merits question of whether DHS's documents are consistent with the "arriving in" authority, Defendants incorporate briefing from Section III of this brief, as well as their prior briefing. *See* Dkt. 26 at 41-45; Dkt. 69 at 33-43.

---

[14] *See* H.R. Rep. No. 104-383 (1996), at 182 n.29, 1995 WL 731698 (evidencing Congress' awareness of entry fiction doctrine at the time it enacted AEDPA). It makes no difference that this reference to the "entry doctrine" related to the Committee's discussion of the "found in" provision rather than the "seeking entry" provision, as Plaintiff posit. *See* Dkt. 72 at 38. In fact, the application of the entry doctrine to paroled arriving aliens was well-established at that time through Supreme Court precedent. The dissenting Members argued against the extension of that doctrine to aliens who illegally entered the country. H.R. Rep. No. 104-383 (1996), at 182 n.29. The key point is that Congressional Members were aware of and discussing that doctrine immediately prior to the passage of AEPDA; they would have assumed that the expedited exclusion provision would apply to aliens paroled at ports of entry. *See id.*

[15] Contrary to their assertions, *see* Dkt. 72 at 40, the dual-authority structure of §1225(b)(1) does not establish that Congress changed course and decided to treat paroled arriving aliens differently than it had in the past. The designation and "arriving in" provisions are separate sources of authority. Congress excluded *currently* paroled aliens from the designation provision, and the absence of an equivalent exclusion from the "arriving in" provision does not support Plaintiffs' position. The exclusion in the designated alien provision has a very specific purpose, which is to preclude the designation of an alien for expedited removal *for the duration of the alien's parole*. *See MRNY I*, 2025 WL 3563313, at *23.

In addition to its "arriving in" authority, DHS has authority under the Designation Provision to apply expedited removal to paroled arriving aliens if their parole has terminated. 8 U.S.C. §1225(b)(1)(A)(iii). Although the Court does not need to reach this issue given DHS's "arriving in" and regulatory authority, Defendants' interpretation of the Designation Provision is the best reading of that statute.

Plaintiffs reason that because *Hewitt v. United States*, 606 U.S. 419 (2025), involved vacatur of a sentence, this case is distinguishable because there are "ongoing legal effects" from the grant of parole even after it has been terminated. Dkt. 72 at 43. But in context, the Designation Provision refers to the alien's *status* at the time the alien is placed in expedited removal proceedings: an alien who is *currently* in "admitted or paroled" status is ineligible for expedited removal under 8 U.S.C. §1225(b)(1)(A)(iii), whereas an alien who is present in the United States *without* a valid admission or parole may be subject to expedited removal under that Provision. To be sure, "admitted" may refer to a completed act, but it may also refer to a status, and nothing in the INA's definition of that term, 8 U.S.C. §1101(a)(13)(A), precludes such application. *See* Dkt. 72 at 42-43. The critical point is that the context here focuses on whether the alien is currently in the United States pursuant to an admission or in a valid period of parole.  If so, they are ineligible for expedited removal under 8 U.S.C. §1225(b)(1)(A)(iii).

This interpretation is bolstered by the parole statute, 8 U.S.C. §1182(d)(5), which provides that when an alien's parole is terminated, "his case shall continue to be dealt with in the same manner as that of *any other* applicant for admission." 8 U.S.C. §1182(d)(5) (emphasis added). It is undisputed that an alien who is present in the United States who has not been admitted is deemed to be an "applicant for admission" under the INA. 8 U.S.C. §1225(a)(1). And such an alien who lacks two years of continuous presence at the time of determination of inadmissibility generally

30

may be placed in expedited removal. *See* 8 U.S.C. §1225(b)(1)(A)(iii). Section 1182(d)(5)(A)'s directive that an alien whose parole has been terminated be "dealt with in the same manner" as "any other applicant for admission" can be honored only if Section 1225(b)(1)(A)(iii)'s reference to "has not been … paroled" is interpreted, consistent with *Hewitt*, to refer to a continuing status.

Further, Congress could have easily used past tense language as it did in 8 U.S.C. §1255(a) ("was inspected and … paroled"). *See Zheng v. Gonzales*, 422 F.3d 98, 121 (3d Cir. 2005) (noting such language "does suggest that DHS might be unable to terminate adjustment eligibility simply by revoking parole"). Plaintiffs' only rejoinder is to claim Congress meant for the terms "has been" and "was" to mean the same thing. Dkt. 72 at 44-45. But that violates the principle that "use of a verb tense is significant in construing statutes." *United States v. Wilson*, 503 U.S. 329, 333 (1992).

Further, the Government's position is consistent with the regulations which contemplate expedited removal of parolees under the Designation Provision. Dkt. 69 at 45-46. As explained previously, two regulations strongly suggest that the Agency interpreted the Designation Provision to apply to aliens paroled at ports of entry where that parole was subsequently terminated. *See id.* (discussing 8 C.F.R. §§208.14(c)(4)(ii)(A) and §212.5(e)(2)(i)). Dkt. 69 at 45-46. Plaintiffs fail to engage substantively with the Government's arguments. Dkt. 72 at 46 n.25.[16]

Finally, Plaintiffs' attempt to rely on AEDPA's legislative history backfires. Although Plaintiffs claim AEDPA's "found in" provision shows Congress sought to limit expedited removal to aliens who illegally enter, they have to "acknowledge" that the provision could be read to apply

---

[16] Plaintiffs rely on 8 C.F.R. §235.3 in support of their position, *see* Dkt. 72 at 45-46, but that regulation can be read as referring to an alien's opportunity to prove that their *current* presence is pursuant to an admission or parole. The regulation provides that an immigration officer will consider the evidence to "verify the alien's *status*." 8 C.F.R. §235.3(b)(6) (emphasis added).  That suggests that the inquiry focuses on whether the alien is currently in a valid period of parole status. Nor does the preamble language in DHS' 2019 Designation shed light on this issue. *See* Dkt. at 46-47.

to parolees, *see* Dkt. 72 at 47; in fact, that provision authorizes expedited exclusion for undocumented aliens who were "found in the United States *who had not been admitted*." AEDPA §414 (emphasis added). While IIRIRA did not include the "found in" language Congress adopted in AEDPA, it did include the language "has not been admitted or paroled." As discussed above, given its use of the present perfect tense, Congress authorized the application of expedited removal under the Designation Provision to aliens whose parole has terminated and who cannot establish the two-year continuous physical presence requirement. That reading is consistent with Congress's expedited exclusion approach in AEDPA and earlier bills.

**V.      The Challenged Actions are not Arbitrary and Capricious.**

The DHS Challenged Actions are not inconsistent with each other and do not purport to justify applying expedited removal to paroled arriving aliens but merely provide guidance on DHS officers' enforcement discretion under already-existing expedited removal authorities. For these reasons, there is nothing arbitrary or capricious in DHS's actions.

First, the Huffman Memorandum's reference to the two-year continuous-presence requirement is not inconsistent with the Government's "arriving in" argument given the context of that reference. *See* Dkt. 69 at 48. Plaintiffs' claim that the Memo violates the APA because it "doesn't cite its legal authorities at all," *see* Dkt. 72 at 49, fails because the Memo clearly explains its purpose to provide guidance for the exercise of discretion in implementing two new policies. *See* Dkt. 41 at 20. For APA purposes, it was sufficient for DHS to cite these new policies and instruct that the actions contemplated by the Memo "shall be taken in a manner consistent with applicable statutes, regulations, and court orders." *Id.* Immigration officers are presumed to be aware of the statues and regulations governing expedited removal and are tasked with exercising their enforcement discretion based on the individual facts and circumstances of each case.

32

Second, Plaintiffs incorrectly place the burden on Defendants to establish their claim that the February 18 ICE Directive is arbitrary and capricious, *see* Dkt. 72 at 49-50; but that burden is on Plaintiffs who fail to cite one case requiring an internal email between Executive Branch personnel to explain its legal reasoning. In any event, its reasoning is self-evident. By using the term "paroled arriving aliens," the Directive was invoking its well-established "arriving alien" authority under 8 C.F.R. §1.2, which contains no time limit for applying expedited removal. *See* https://perma.cc/S3LJ-AFJM. Further, Plaintiffs are simply incorrect that the email guidance represented a "change in position." *See* Dkt. 72 at 50. That has been the Agency's position for over 30 years as set forth in §1.2.

Third, Plaintiffs fail to show there is a contradiction between the Huffman Memo and the ICE Directive. Dkt. 72 at 50. Nothing in the Huffman Memo requires that a DHS officer "must first terminate a noncitizen's parole before subjecting them to expedited removal," *see* Dkt. 41 at 71, and Plaintiffs do not allege so. Instead, they quote language from that Memo directing DHS officers to "[t]ake all steps necessary to review" the cases of aliens who are "amenable" to expedited removal and to consider, in their "enforcement discretion," whether expedited removal might be appropriate, including "steps to terminate … any active parole status." https://perma.cc/4HPX-45Z7. That guidance simply reiterates DHS's "enforcement discretion," *see MRNY II*, 2026 WL1792978, at *9, and reflects the dual statutory authority under §1225(b)(1). The Huffman Memo's suggestion to terminate "active parole status" in certain cases is consistent with DHS's interpretation of the Designation Provision and was appropriate given DHS had just issued a Notice terminating the CHNV programs and intended to use the Designation Provision to remove this population of parolees. *See* 90 Fed. Reg. 13611, 13619 (Mar. 25, 2025) (citing Designation Provision).

33

Fourth, DHS's statements in the CHNV Termination Notice should not be read to renounce its independent "arriving in" authority for paroled arriving aliens where the Notice cites only to the Designation Provision, not the "arriving in" provision. *Id.* Moreover, the purpose of the CHNV Termination Notice was *not* to clarify the legal authority for expedited removal of aliens paroled at ports of entry; it was to terminate the parole grants of aliens paroled under the CHNV programs. Plaintiffs fail to address this point. *See* Dkt.72 at 50.

In any event, any alleged incorrect language in the Termination Notice is harmless given DHS's plain statutory and regulatory authority to apply expedited removal to paroled arriving aliens. *See* 5 U.S.C. §706(2). Plaintiffs' suggestion that the harmless error rule does not apply to the APA is wrong. *See* Dkt. 72 at 51. "In administrative law, as in federal civil and criminal litigation, there is a harmless error rule." *PDK Lab'ys Inc. v. U.S. D.E.A.*, 362 F.3d 786, 799 (D.C. Cir. 2004) (citing 5 U.S.C. § 706(2)). "If the agency's mistake did not affect the outcome, if it did not prejudice the petitioner, it would be senseless to vacate and remand for reconsideration." *Id.* Here, Plaintiffs have failed to show how the agency's language in the Termination Notice prejudices their members if DHS has authority to apply expedited removal to parolees under the "arriving in" provision in the first place.

## VI.    Alternatively, any Relief Must be Narrowly Tailored to Plaintiffs' Members Only.

Under *Trump v. CASA, Inc.*, 606 U.S. 831, 841 (2025), the Court should limit vacatur relief to Plaintiff organization's members who can demonstrate injury. This issue is still open in this Circuit. The D.C. Circuit's recent decision in *Refugee and Immigrant Ctr. For Educ. & Legal Servs. v. Mullin*, 174 F.4th 81 (D.C. Cir. 2026), did not address this specific question as that case involved a class action suit, *see id.* at 116-17. And the D.C. Circuit's order denying the Government's request for emergency relief in *MRNY I*, 2025 WL 3563313, at *33-36 (addressing

34

*CASA* in the context of a 705 stay) is not binding precedent because it is unpublished. *See* D.C. Cir. R. 36(e)(2).[17]

Even prior to *CASA*, it was well-settled that a court may not issue relief that is broader than necessary to remedy actual harm shown by specific plaintiffs. *Gill v. Whitford*, 585 U.S. 48, 73 (2018). That principle is especially apt here because Congress has precluded class actions "in any action for which judicial review is authorized" pursuant to § 1252(e)(3). 8 U.S.C. § 1252(e)(1)(B). That bar "strengthens the judicial presumption against suits seeking relief for a large and diffuse group of individuals, none of whom are parties to the lawsuit." *AILA*, 199 F.3d at 1364.

Plaintiffs fail to explain why vacatur cannot be limited to their injured members. As organizations who keep records of their members, Plaintiffs are in the best position to gather information and identify affected members who would be entitled to vacatur relief. Further, Plaintiffs do not dispute that once the D.C. Circuit decides an issue, its holding can be invoked by all non-parties as controlling precedent; until then individual non-parties may file their own suits in the D.C. District Court. In these circumstances, universal relief is not warranted.

## CONCLUSION

The Court should deny Plaintiffs' motion for summary judgment, grant Defendants cross-motion for summary judgment, and dismiss the amended complaint for lack of standing.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*
DREW C. ENSIGN
Deputy Assistant Attorney General
TYLER BECKER

---

[17] On the question of whether 8 U.S.C. §1252(f)(1) precludes §706 vacatur under the APA, Defendants acknowledge that the Court is bound by the D.C. Circuit's recent holding in *MRNY II*, 2026 WL1792978, at *10-12. Defendants preserve for appeal their position that §1252(f)(1) bars both vacatur and declaratory relief in this case. *See* Dkt. 69 at 50-53.

*Counsel to the Assistant Attorney General*
U.S. Department of Justice, Civil Division
950 Pennsylvania Avenue, NW
Washington, DC 20530

<u>s/ *Papu Sandhu*</u>
PAPU SANDHU
*Assistant Director*
ARIC A. ANDERSON
*Trial Attorney*
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
P.O. Box 868 Ben Franklin Station
Washington, DC 20044
(202) 616-9357

Counsel for Defendants

Dated: June 25, 2026

**CERTIFICATE OF SERVICE**

I hereby certify that on June 25, 2026, I electronically filed the foregoing with the Clerk of the District Court for the District of Columbia by using the CM/ECF system. Counsel in the case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

*/s/ Papu Sandhu*
PAPU SANDHU
Assistant Director
U.S. Department of Justice